```
 1                  UNITED STATES DISTRICT COURT
                         DISTRICT OF NEVADA
 2      BEFORE THE HONORABLE LARRY R. HICKS, SENIOR DISTRICT JUDGE
                            ---o0o---
 3

 4     ORACLE USA, INC., et al,       :
                                      :
 5                  Plaintiffs,       :  No. 2:10-cv-0106-LRH-VCF
                                      :
 6          -vs-                      :  September 22, 2021
                                      :
 7     RIMINI STREET, INC., et al,    :  Reno, Nevada
                                      :
 8                  Defendants.       :  Volume 3
                                      :
 9     _____:

10

11                 TRANSCRIPT OF EVIDENTIARY HEARING

12

13     APPEARANCES:

14     FOR THE PLAINTIFF:        Richard J. Pocker
                                 Benjamin P. Smith
15                               William A. Isaacson
                                 Jessica Phillips
16                               Sharon R. Smith
                                 Corey Houmand
17                               Zachary Hill
                                 Attorneys at Law
18

19     FOR THE DEFENDANTS:       W. West Allen
                                 Eric Vandevelde
20                               Samuel G. Liversidge
                                 Ilissa Samplin
21                               Casey J. McCracken
                                 Attorneys at Law
22

23     Reported by:             Margaret E. Griener, CCR #3, FCRR
                                 Official Reporter
24                               400 South Virginia Street
                                 Reno, Nevada 89501 RENO, NEVADA
25
```

```
 1              RENO, NEVADA, WEDNESDAY, SEPTEMBER 22, 2021, 9:00 A.M.

 2                             ---oOo---

 3

 4                   THE COURT:  Good morning.  Have a seat, please.

 5                   All right.  The record will show that we are

 6       reconvened on Wednesday morning, September 22nd, and prepared

 7       for the continued cross-examination of Ms. Frederiksen-Cross.

 8                   Mr. Vandevelde?

 9                   MR. VANDEVELDE:  Yes, your Honor.  If we could

10       have the witness approach, please.

11                   Good morning, Ms. Frederiksen-Cross.

12                   THE WITNESS:  Good morning.

13                      BARBARA FREDERIKSEN-CROSS,
             recalled as a witness on behalf of the Plaintiff,
14             previously sworn, testified further as follows:

15                        CROSS-EXAMINATION RESUMED

16       BY MR. VANDEVELDE:

17        Q   And just a quick housekeeping matter, we replaced one of

18       the binders you had yesterday.  There's new three volumes for

19       you.  One is on your desk in front of as you, and two are

20       below you.  So if I refer to tab numbers, that's where they

21       are.

22                   And let's dive right in.  Yesterday, when we

23       concluded, we were talking about Issue 3 involving an update

24       to a W2 form relating to Johnson Controls.

25                   Do you remember that?
```

1   A    I do, yes.

2   Q    And it was your opinion that it was cross-use because

3   City of Eugene's software was used, and your opinion was that

4   it was used in the provision of the update to Johnson

5   Controls?

6   A    Yes, specifically the configuration update.

7   Q    Understood.  So are you withdrawing your opinion from

8   yesterday that the sending of the Adobe .pdf file was

9   cross-use?

10  A    I think we talked about that, and I think that would

11  depend whether that Adobe file had been edited using the

12  native Adobe environment, or whether it was edited using the

13  business intelligence, the Oracle component that can be used

14  to create pdfs.  So, I'm not certain how that .pdf was

15  created.

16          And I think where we left it is it could be, but it

17  depended on the specifics of what went on, and I wasn't able

18  to discern that from the communications.

19  Q    So you're not offering an opinion that that was cross-use

20  then?

21  A    The .pdf itself?

22  Q    Yeah.

23  A    I can't be certain that it was.

24  Q    You're also not offering an opinion on whether City of

25  Eugene was affected by this W2 issue, are you?

1    A    That is correct.

2    Q    And City of Eugene is in Oregon, obviously, correct?

3    A    Yes.

4    Q    Your home state, which is in the U.S., correct?

5    A    Correct.

6    Q    And this is a W2 federal IRS form, correct?

7    A    Correct.

8    Q    So you would expect City of Eugene to have U.S.

9    employees, correct?

10   A    Oh, certainly.

11   Q    And so then therefore City of Eugene would have to issue

12   W2 forms to its employees every year?

13   A    Not disputed; I hope they do.

14   Q    And you don't offer any opinion that City of Eugene ever

15   said it didn't need or want the update, correct?

16   A    No.  The issue is whether they would actually need the

17   update, and that would depend on how they define some of the

18   descriptions that they were using, but, I'm sure that they

19   would want the 1099 form with the current year on it.

20   Q    And you're not offering an opinion on whether they needed

21   or wanted the update, correct?

22   A    That's correct.

23   Q    If City of Eugene and Johnson Controls are both affected

24   by the W2 issue, the misalignment we saw, do you have an

25   opinion on which client Rimini is required to start its work

1  in?

2  A    No.

3  Q    They can start in either one, right?

4  A    Presumably, yes.

5  Q    And if they have 20 clients who are affected by the same

6  W2 issue we see in Issue 3, Rimini could start in any one of

7  those 20 clients' environments, correct?

8  A    Seems reasonable.

9  Q    And so it doesn't matter whether, of those 20 clients,

10  one of them may reach out to Rimini and say we need this W2

11  update first?

12  A    Yeah.  The issue here was specifically the way that

13  certain fields were being printed for some clients in the W2.

14       But I would assume that if multiple of those clients

15  reached out, there would be no constraint on which one they

16  started the work for.

17  Q    Yeah.  And if Rimini knew that a client would be affected

18  because they're in the United States and they issue W2s, even

19  if that client didn't reach out to Rimini to say, hey, we need

20  the new update form -- the new W2 update, Rimini, based on its

21  prior experience, could know that that client would be

22  affected by it, right?

23  A    I want to make a clarification on the specific change

24  we're talking about here because they had already shipped --

25  you know, the correspondence shows they had already shipped

1  the updated -- that year's W2 to clients, and that some

2  clients, specifically Johnson in this case, had stepped up and

3  said, hey, we're having a problem printing.

4         And then the rest of the correspondence seem to

5  indicate that that had to do with the way that they were

6  providing some of the descriptions that were related to that

7  field and the way their system was specifically configured.

8         So you seem to be implying that all clients would

9  necessarily need the update because they had to have the 2018

10  form, and that's not my understanding of this problem at all,

11  it was those clients who were specifically affected by the

12  alignment issue because of the configuration of their systems

13  or the way that they chose to describe certain things that

14  went into box 14.

15  Q   You would agree that Rimini works in its clients'

16  environments, right, and gains experience doing so?

17  A   I don't know if they gained the kind of experience about

18  the way clients describe the things that they're putting on

19  their W2s, but I'm sure they gain some experience of their

20  clients.

21  Q   So you would agree that a Rimini engineer, based on their

22  prior experience, may know that another client will be

23  affected by this W2 issue, correct?

24  A   Conceivably that could be true.

25  Q   Okay.  So if the Rimini engineer knows another client

1    like Johnson Controls will be affected by the W2 issue, are

2    you saying that the Rimini engineer can't proactively fix the

3    issue that he or she knows the client will be affected by?

4    A    That's not the position I'm taking, counsel.

5    Q    Okay.  So let me unpack it.

6             Can the Rimini engineer, if they know the client

7    will be affected by the issue, proactively solve the problem

8    for that client?

9    A    Well, in the case we have here there's no evidence

10   that City of Eugene was experiencing the problem, but

11   their environment was used to confirm a solution for the

12   configuration that was used subsequently and provided to

13   Johnson Controls.

14            And so I don't think that the facts in this

15   situation are fitting the hypothetical you're posing to me.

16   Q    You previously testified, just this morning, that you

17   were not offering an opinion on whether City of Eugene needed

18   or was affected by an environment, correct?

19   A    Yes, but I'm offering the observation that I see no

20   evidence that they were.

21   Q    Okay.  But they're in the United States, right?

22   A    Sure.

23   Q    Right.  And they have Oregon employees, right?

24   A    Yeah, they do.

25   Q    Okay.  I'd like to publish a demonstrative to use with

438

1  this witness that will help in communicating my questions on

2  issue number 3.

3          John, can you, please, unless there's an objection,

4  I would like to publish tab 20 of the cross-examination

5  binder.  It's purely going to be used as a demonstrative.

6          THE COURT:  You may do so.

7  BY MR. VANDEVELDE:

8  Q   Ms. Frederiksen-Cross, do you see the demonstrative in

9  front of you?

10 A   I do.

11 Q   And there are three kind of larger gray boxes.  One

12 represents the City of Eugene environment.  Do you see that?

13 A   I see that.

14 Q   And one represents Johnson Controls.

15 A   I see that.

16 Q   And one represents Rimini.

17 A   I see that.

18 Q   And there are some red -- some files with some red lines

19 in them, and that's just designed to represent that City of

20 Eugene and Johnson Controls both have Oracle PeopleSoft files.

21 Do you see that?

22 A   I see that.

23 Q   So you understand what that means.  It just represents

24 that they have PeopleSoft environments on their systems,

25 correct?

-439-

1    A    Okay.  I'll accept your representation of that.

2    Q    Okay.  Do you not think they have PeopleSoft environments

3    on their systems?

4    A    No, I'm just saying that's what you're explaining the red

5    boxes to mean, so thank you for that explanation.

6    Q    Sure.  And there's no PeopleSoft environment on Rimini's

7    systems.  We established that yesterday, correct?

8    A    That's correct.

9    Q    And then there's a representation in the Rimini box and

10   the City of Eugene box that represents just the IRS W2 form.

11   Do you see that?

12   A    I see that.

13   Q    Okay.  And that is going to represent the .pdf we were

14   talking about yesterday and then this morning, do you

15   understand that?

16   A    The one that they were editing in the course of that

17   e-mail.

18   Q    Correct.

19   A    Yes.

20   Q    Correct.

21        Now, as to the .pdf form, you're not offering any

22   opinions on the contents of that file, correct?

23   A    That the .pdf itself specifically was at issue, no, I'm

24   not offering that opinion.

25   Q    And no opinion, then, that it contains any protectible or

-440-

1    nonprotectible Oracle expression then, correct?

2    A    That's correct, that the .pdf itself does not.

3    Q    Now, assume City of Eugene is affected by this W2 problem

4    and needs this update, and assume that Rimini modified the W2

5    .pdf on its own computers to shrink the font size in the .pdf,

6    and then sent the file to the City of Eugene.

7            Do you understand?

8    A    So you're talking about the initial problem, the box 14

9    problem.

10   Q    Yes.

11   A    Okay.  For the box 14 problem, I understand that that's

12   where you're at.

13   Q    Okay.  And then assume Rimini sends the W2 .pdf form to

14   City of Eugene.  Are you with me?

15   A    I'm with you so far.

16   Q    Okay.  And then assume Rimini tests in City of Eugene's

17   environment.  Are you with me?

18   A    The font size problem for box 14, yes.

19   Q    Okay.  And assume Rimini determines it's a success, it

20   works.

21   A    Okay.

22   Q    That reducing the font size in that .pdf for box 14

23   solved the issue, at least for that box.  Are you with me?

24   A    I'm with you so far.

25   Q    Okay.  Is sending that file to City of Eugene cross-use

1    in your opinion?

2    A    Sending the file to -- from Rimini to City of Eugene?

3    Q    Yeah.

4    A    For the .pdf file?  I don't think so, no.  I mean, in the

5    facts that you've posed -- or proposed.

6    Q    Okay.  Now assume that based on its experience and

7    knowledge of that successful test for City of Eugene, Rimini

8    sends this W2 form to Johnson Controls.  Are you with me?

9    A    So far.

10   Q    Are you offering an opinion that Rimini sending that W2

11   form to Johnson Controls is cross-use?

12   A    I don't think that it would be necessarily.  I mean, they

13   are using some of the knowledge they gained in City of Eugene.

14            The act of sending the file, of the .pdf file, I

15   would not expect to be cross-use, or, to the extent that it

16   was, it would likely be an allowable form of cross-use.

17   Q    So there are allowable forms of cross-use?

18   A    I don't dispute that there could be.  I think that's up

19   to the judge to decide.

20   Q    So we're here in a contempt proceeding about what

21   cross-use means, and you say there are allowable forms of

22   cross-use and nonallowable forms of cross-use?  Where's the

23   line?

24   A    Okay.  I would characterize this as cross-use in the

25   sense they are using -- it's not the act of sending the .pdf

1   but the act of reusing the knowledge of the solution, and

2   assuming that they could send that without further work to

3   other clients.

4          But whether that was allowable or not I think is not

5   my decision to make.

6   Q   I know it's not your decision, but I'm asking for your

7   opinion.  Do you think Rimini sending this W2 form to Johnson

8   Controls -- yes, using the knowledge that it worked for City

9   of Eugene -- that that's cross-use?

10   A   They have cross-used the testing that they did in the

11   City of Eugene in their assumption that this is a fix for all

12   clients.  But the provision of the form specifically I don't

13   see as cross-use.

14          So there's two separate issues in my mind, the

15   provision of the form, and then the knowledge that underlies

16   the need to provide that form for the --

17   Q   So, you just --

18   A   -- desirability of providing that form to other clients.

19   Q   So this is knowledge cross-use, then.

20   A   In this specific instance, it's the reuse of the results

21   of testing a solution in one client's environment for the

22   benefit of other clients, but the .pdf itself I think is not

23   the issue.

24   Q   We'll get to print parameters in a second.

25          There was no file sent between City of Eugene or

1    Johnson Controls, right?

2    A    Not that I'm aware of here.

3    Q    And when you said test results, there was no test results

4    in the form of documents sent that you saw, right?

5    A    No.  It was the reuse of the environment to diagnose the

6    problem and to develop a solution for the problem.

7    Q    And then reusing that knowledge that it worked for

8    Johnson Controls, that's your opinion.

9    A    Reusing the specific -- the specific knowledge of the

10   specific solution of what, for instance, the settings within

11   the recipient environment should be to be able to print

12   properly within that form --

13   Q    We'll get to the print parameters --

14   A    -- the reuse --

15   Q    We'll get to the print parameters.  I'm just talking

16   about the IRS W2 form for now.

17            Are you saying that Rimini's knowledge that the W2

18   form worked in City of Eugene, that Rimini cannot use that

19   knowledge for Johnson Controls?

20   A    I think in the first case where we're confined just to

21   the knowledge that's related to box 14, that is to say, the

22   changing of the font size of the W2 itself and making that

23   change in the W2, would not be.

24   Q    Okay.  So now you're saying it's not cross-use, there's

25   no knowledge cross-use.  Is that what you're saying?

444

1    A    Well, they are certainly reusing their knowledge of the

2    testing.

3    Q    So is that cross-use?  That's what I'm trying to get at.

4         Is it cross-use or not to use the knowledge from the

5    successful test?

6    A    This particular instance is a bit of a corner case

7    because the knowledge that they are reusing is not specific

8    knowledge related necessarily to the PeopleSoft environment

9    and a specific PeopleSoft issue but, rather, a more general

10   printing issue.

11        And so it's a bit of an on-the-bump case for me

12   because it's something that's -- you know, we're not accusing

13   specifically the shipping of the -- or my understanding is

14   that it's not Oracle's position that the shipping of the .pdf

15   in and of itself constitutes cross-use.

16        Now, you've shifted that to the testing in the

17   environment at the City of Eugene, and there it's my

18   understanding that the Court has identified testing in one

19   customer's environment that is then used to the benefit of

20   other customers as something that is inappropriate.

21   Q    You believe the Court has said that using knowledge of

22   testing results is inappropriate for other clients?  Is that

23   your testimony?

24   A    No, no.  The use of the customer's environment to conduct

25   development and testing that then is used -- and probable

445

1   diagnosis -- that is then used on behalf of another customer.

2   Q   Well --

3   A   And as I mentioned in this case, in the actual facts of

4   the evidence of this case, there is nothing I have seen that

5   indicates City of Eugene had that problem.

6            You know, if City of Eugene had had the problem and

7   it was developed there, that would be a different scenario

8   than a situation where another customer like Johnson has a

9   problem, and that they are then using City of Eugene's

10  environment where there's no evidence the problem exists to

11  bring up information to help that other customer try to

12  circumvent the problem.

13  Q   But, again, you're not offering an opinion on whether

14  City of Eugene had the problem or was affected by the problem,

15  correct?

16  A   I have seen no evidence that they did, but I don't have

17  specific knowledge one way or the other, counsel.

18  Q   Okay.  Now, you said -- I think you said corner case or a

19  bubble case.  The Court set this issue for this hearing,

20  correct?

21  A   My understanding was that it was setting the issue with

22  respect to the use of the Eugene environment, not in the

23  context specifically of this .pdf, but in the context of the

24  other fix that was provided to Johnson based on the use of the

25  City of Eugene's environment.

—446—

Q   And we'll get to the print parameters, I promise, but I'm just asking as to the provision of this, I'm trying to get a clear answer, is it cross-use for Rimini to use its knowledge -- yes, by using City of Eugene's environment, it used City of Eugene's environment to determine that this W2 form modified worked, and then it uses that knowledge that it worked and said, hey, I'm going to give this same IRS form to Johnson Controls.

          Is the reuse of that knowledge, yes, by using City of Eugene's environment, is that unlawful cross-use in your opinion?

A   Because I lack the knowledge of the specific way in which Rimini modified that form, whether or not they used the PeopleSoft environment to create the modification for that form, and exactly how this particular form fix came into being, I am not offering that opinion because I don't have sufficient information to know for certain --

Q   So you're --

A   -- with respect to the actual facts of what happened with that W2 form.

          Now, you've posed a hypothetical here, and it's a hypothetical that, in my consideration of whether or not providing a form was an act of cross-use, I rejected because I have insufficient information in the actual instance to evaluate that case.

1           And so I'm not going to offer an opinion that it is

2    or isn't because there are factors that I would want to

3    consider that are not available in this specific set of facts

4    to me.

5    Q    So did I hear you correctly that whether or not that

6    knowledge cross-use is unlawful depends on what application

7    was used to modify the IRS form?  Is that your testimony?

8    A    Well, my understanding is that there are specific

9    prohibitions or guidance that's been given to the Court about

10   using the PeopleTools environment to develop a fix, and using

11   the PeopleTools to create a fix for one customer and then

12   providing that fix to another, for instance, in the ACA

13   update, where the Court has, as I understand it, given that

14   guidance that that was an inappropriate act.

15           Here, I am lacking an essential fact to be able to

16   evaluate exactly what happened with that .pdf.

17   Q    So if -- so does PeopleTools have a text editor or a file

18   editor?

19   A    PeopleTools provides to BI the ability to edit W2 -- or

20   to any kind of form, really, in a .pdf format.  So, you can

21   create an output .pdf form using the PeopleTools environment.

22           You can create the mappings between PeopleTools data

23   extraction in the population of that form, and so you can

24   create the -- via the vehicle of the xmlp -- or xmlp function

25   that's discussed in this e-mail, that that form could have

1    been created within the tools provided by the PeopleSoft

2    environment.

3            But it could also have been created by other means

4    outside that PeopleSoft environment, and that is the essential

5    information that I'm lacking to be able to sort of fill in the

6    blanks in your hypothetical.

7    Q    So in City of Eugene's environment, they have a .pdf

8    editor -- let's say it's made by Adobe, right, who makes

9    pdfs -- and then there's also the PeopleSoft tool that can

10   also edit the .pdf form.

11           It's your testimony that which application the

12   Rimini engineer may use determines whether -- in City of

13   Eugene's environment whether that's cross-use?

14   A    I think that that's a very important factor, yes, because

15   my understanding of this is that if you were using the

16   PeopleSoft tools and the PeopleSoft environment in City of

17   Eugene in order to create an update that is then used for

18   other customers, that would be cross-use.

19           If you were using an Adobe editor to create a .pdf

20   and sending it elsewhere, I don't think that that would fall

21   within the injunction because it's not using the PeopleSoft

22   environment, it's not modifying the PeopleSoft code.

23   Q    Now, let's turn to print parameters.  I know you wanted

24   to get there.

25           So in addition to modifying the form, the .pdf form

1   we've been talking about, you're aware that this update

2   involved changing a print format field setting in City of

3   Eugene's environment, correct?

4   A    I think that mischaracterizes the evidence, counsel.  The

5   City of Eugene's environment was referenced to see what the

6   PeopleSoft default configuration that had been associated with

7   that particular field was in order to compare and contrast

8   that information to the information for Johnson Controls'

9   default setting for that field.

10           The way that a field is mapped into a form can be

11  defined either in the SQR or -- in the actual source code of

12  the program, or it can be defined as a part of a modification

13  of the PeopleSoft configuration parameters associated with

14  that report.

15  Q    This configuration parameter that we're talking about

16  relates to box 17 of the W2 form, correct?

17  A    That is correct, yes.

18  Q    Okay.  And the parameter merely dictates how many

19  characters you can squeeze into the box, correct?

20  A    It's not quite that simple, but that's essentially it,

21  that it's dictating how many characters long it will be, and

22  it provides a little bit of additional information like that

23  it's a numeric field and meaning zeroes are suppressed by

24  blanks, but the point that will fix the problem was how many

25  characters long it could be.

1    Q    Now, I believe you testified yesterday that -- something

2    to the effect of -- I don't have the transcript, but something

3    to the effect of the Rimini engineer entered into the

4    PeopleSoft environment of a client and uses the tool in that

5    environment, the GUI of it, to make the change.  Is that

6    accurate?  Or you can correct me.

7    A    Yeah.  I mean, there were two parts to this.

8         They went -- after they determined that that format

9    was not being provided by the Rimini SQR, so -- that's why it

10   was blank, it wasn't yet provided, then an engineer went into

11   City of Eugene to see what the values were in City of Eugene

12   that was apparently also using the rsi960.sqr.

13        And there they were able to determine -- well, I'm

14   assuming it was City of Eugene only because of the person who

15   sent the notification.

16        They went into a client's environment that was not

17   having the problem.  They looked at what the system

18   configuration settings were.  They provided an excerpt of

19   those system configuration settings in the e-mail.

20        And, you're right, I don't have definitive proof

21   that that was necessarily City of Eugene's environment, it was

22   from some operational customer.

23        But then later in the e-mail it says that it was

24   tested in City of Eugene, so I'm presuming that that means

25   that that screen excerpt was also from City of Eugene.

1   Q   And something just caught my ear.  You said Form 960.

There's no Form 960 involved in this issue?

3   A   No, I meant that the underlying program that was printing

to this is one of the 960 programs if I'm remembering the

rsi960 -- I don't remember the last two letters.  I'm sorry,

it's in the e-mail.

7   Q   Are you aware that Rimini did remotely connect to City of

Eugene's environment and make the change to that print format

setting?

10  A   I'm aware that that print format setting was changed in

City of Eugene at some point in time because City of Eugene

was not having the problem and they were able to test

successfully there.

14          Whether that had been done years in advance, when

they first started using the Rimini version of the program, or

whether it was done in the instance of this test, I can't

tell.

18          All I know is that they had the setting, and they

ran the test successfully because they said they tested it in

COE, City of Eugene.

21  Q   And you don't know whether the City of Eugene's print

parameter was changed in City of Eugene or already there

before that e-mail, correct?

24  A   I cannot discern that from the e-mail, that's correct.

25  Q   But it was the case that Rimini had remotely connected to

1   City of Eugene and made a change at some point to the print

2   parameter that simply controlled how many characters fit into

3   a text box on the IRS form.

4   A    Either Rimini or potentially even a City of Eugene

5   employee who was familiar with the system could have done

6   that.  I don't know who made that specific change.

7            I know that it was tested in City of Eugene because

8   the e-mail says that.  But the e-mail doesn't say when it got

9   put into their system or by whom.

10  Q    And we'll get to testing in a second.

11           Are you offering the opinion that the injunction

12  would now prohibit Rimini from connecting to Johnson Controls

13  and making the same change to Johnson Controls' environment to

14  the print parameter setting?

15  A    What I understand to be enjoined here was going to

16  another customer's environment and identifying the specific

17  information that needed to be changed and then testing in that

18  environment.

19           This is a small change, comparatively small change,

20  so it's not the issue in my mind of the change itself, but the

21  issue of another customer's environment to do the

22  troubleshooting, to verify what the fix was, and then to

23  perform the testing necessary to confirm that that fix would

24  work in the Johnson Controls environment, or what we believe

25  to work in the Johnson Controls environment, rather than

1    testing it in Johnson Controls.

2    Q    We'll get to testing in a second.

3         You're not contending that any file -- as to the

4    print parameters, there's no files sent back and forth between

5    Rimini and City of Eugene, correct?

6    A    Well, they had sent these W2s, but setting that aside --

7    Q    Yeah.

8    A    -- the change that was made was a configuration change

9    that was made in the Johnson Controls environment to match a

10   configuration that was found in another customer's

11   environment.

12   Q    Okay.  So there was no -- as to the configuration change,

13   just for that print parameter, there was no file sent between

14   Rimini and City of Eugene, or between Rimini and Johnson

15   Controls, or between City of Eugene and Johnson Controls,

16   correct?

17   A    The e-mail that was exchanged showed what the parameter

18   needed to be set to.  Whether there was any other file that

19   was exchanged that communicated that to Johnson Controls, I

20   don't have specific knowledge.

21        It certainly could have been done without the

22   transference of a file because it was, you know, knowledge of

23   what a configuration setting should be changed to in Johnson

24   Controls' environment in order for it to match the environment

25   of a customer that was not having the problem.

1   Q    And you're not offering any opinion that any City of

2   Eugene PeopleSoft files were ever intermingled with any

3   Johnson Controls PeopleSoft files, correct?

4   A    In terms of this specific change, that is correct.

5   Q    You're aware, correct, that the Court has ruled that a

6   Rimini engineer can, quote.

7                "...use the knowledge he or she gained when

8          developing the same or similar update for client B,"

9          correct?

10  A    I'm aware of that, yes.

11  Q    And you're aware, correct, that the Court has ruled that

12  it is not cross-use for a Rimini engineer to memorize work

13  done for one client and replicate the work done for other

14  clients, correct?

15  A    I believe I recall that passage, yes.

16  Q    You testified yesterday that you thought this conduct was

17  a violation of the injunction because Don Sheffield used --

18  and I think you used the phrase very specific information

19  about City of Eugene's environment to benefit Johnson

20  Controls, and you said that took it beyond general know-how.

21                What line are you drawing between specific knowledge

22  and general knowledge?

23  A    Well, for instance here, general knowledge might be that

24  we should look at the way in which -- we should go into

25  Johnson Controls' environment, we should look at the way in

1    which this field format is being configured, and we should

2    figure out what works for Johnson Controls.

3          Here, instead of doing that, they go to another

4    client's environment, they say, "Well, this is the exact

5    format that's working in this environment, let's test it with

6    Johnson Controls' data," or presumably with data that was

7    similar to Johnson Controls, "so that we could know if this

8    fixes the Johnson Controls problem, and then we can use that

9    exact same format in Johnson Controls."

10         So it's not determining what format Johnson Controls

11   needs, it's just saying somebody else has this format, and

12   we're going to put that format in Johnson Controls because we

13   think it's going to work based on our testing.

14   Q    So that's knowledge.

15   A    That is specific knowledge, using the specific knowledge

16   of what was in one client's environment to go into another

17   client and just put that -- that same fix there without any

18   determination of whether that is actually the optimum or the

19   best or even satisfactory fix for that client.

20   Q    The Court didn't refer to a line between general and

21   specific knowledge in any of his Honor's orders, correct?

22   A    I do not recall those specific terms being used.

23   Q    And general and specific knowledge are not in the

24   injunction anywhere, correct?

25   A    That is correct.

1   Q   If Don Sheffield had figured out the solution for City of

2   Eugene to fix the print parameter, and then his colleague is

3   working in Johnson Controls -- is working on Johnson Controls

4   and the colleague says to Mr. Sheffield, "Hey, have you ever

5   dealt with a situation like this," and he says, "Yes,

6   actually, I have, for City of Eugene.  I've changed this print

7   parameter, go to this field in Johnson Controls and change it

8   to this, I think it should work."

9           That would be cross-use, right?

10   A   If he gave him the very specific details of exactly what

11   he changed it to, yes.  If he said just go and check the print

12   parameter and try some different sizes, then I think that

13   would be general know-how.

14   Q   Where did you get this understanding between general and

15   specific knowledge?  Is that something that you came up with

16   or that counsel provided you?

17   A   It's -- certainly I've had discussions with counsel about

18   this in both this case and other cases, some of which involved

19   trade secret or copyright issues.

20           And the distinction -- you know, I'm well aware that

21   you can't use brain bleach and take a person's know-how out of

22   them, but I think the issue here is whether the specific

23   changes and testing and use of an environment is something

24   that's done on behalf of the diagnosis and troubleshooting of

25   a Johnson Controls' problem, or whether it's more generally

1   that someone just has that know-how.

2          And what we see here is that the Rimini engineer

3   reached out for specific knowledge and used that knowledge

4   from City of Eugene to troubleshoot the problem that was at

5   Johnson Controls, and my understanding of the injunction is

6   that that kind of troubleshooting is prohibited under the

7   injunction.

8   Q    This is a copyright case, right?

9   A    Yes, it is.

10  Q    And the injunction was issued pursuant to findings

11  relating to the Copyright Act, correct?

12  A    That is correct, yes.

13  Q    Isn't the line here -- shouldn't it be whether the Rimini

14  work product contains protectible Oracle expression, shouldn't

15  that be the line instead of this specific versus general

16  knowledge when the Court has said that you can reuse

17  knowledge?

18  A    With all due respect, counsel, the specific behavior the

19  Court has enjoined included troubleshooting.  I view this as

20  an instance of troubleshooting.

21         If the Court chose to put troubleshooting in the

22  injunction, I do not feel that it's my place to challenge

23  that.

24  Q    Troubleshooting is not in the injunction, correct?

25  A    Yeah, it's on behalf of troubleshooting for another

1 customer, using one customer's environment for development or

2 troubleshooting on behalf of another -- I mean, I may be

3 mischaracterizing the exact word, but it is that problem

4 diagnosis troubleshooting type thing that I recall being in

5 the injunction.

6 Q What if it's just Don Sheffield, and he had done the work

7 for City of Eugene, and figured out that the print parameter

8 needed to be changed, and he knew what it needed to be changed

9 to, and he's also responsible for Johnson Controls, is he now

10 prohibited from using that specific knowledge in his brain to

11 do the same update for Johnson Controls?

12 A Well, you're supplying a new set of facts, you know, the

13 facts that were the facts here.

14   But to the extent -- I mean, just looking at the --

15 at the Court's injunction that says that, you know,

16   "Rimini shall not reproduce, produce

17  derivative works from, or use PeopleSoft software or

18  documentation --"

19   COURT REPORTER:  I'm sorry, ma'am, slow down.

20   THE WITNESS:  Oh, sorry, sorry.

21   "Rimini shall not reproduce, prepare

22  derivative works from, or use PeopleSoft software or

23  documentation on one licensee's computer system to

24  support, troubleshoot, or perform development or

25  testing for any other licensee, including,

1          specifically, that Rimini shall not use a specific

2          licensee's PeopleSoft environment to develop or test

3          software updates or modifications for the benefit of

4          any other licensee."

5               If Mr. Sheffield knew from his experience with

6     some client that going in and changing the print format would

7     be an appropriate way to address some problem, and if he was

8     just relying on that general know-how that, you know, if

9     you're having a print format issue, go look at the print

10    format configuration in the program, and, if it's not there,

11    go look at the print format default supplied for

12    configuration, you know, if that was the knowledge that he was

13    using, and he wasn't going back to that other environment to

14    see what it should be, and he wasn't testing there to see if

15    that was going to fix it, then I'm thinking that that might be

16    permitted.

17               But, here, we have one Rimini engineer reaching

18    out to another engineer, getting information about a second

19    client's environment, working through this whole process,

20    getting very specific guidance as to what needed to be

21    changed, and then applying that in another customer's

22    environment to resolve a problem.

23               So both doing the troubleshooting and the

24    testing in a second customer's environment on behalf of the

25    first customer who is having the problem, I believe, with my

1  understanding of the injunction, that's enjoined behavior.

2  BY MR. VANDEVELDE:

3  Q    So assume that Don Sheffield has the most specific --

4  highly specific knowledge that you can imagine that the

5  solution worked, That this print parameter, down to the field,

6  down to the exact format that needs to be what he needs to put

7  into the field, what the config -- it's highly specific

8  knowledge, it's in his brain.

9  A    Uh-huh.

10  Q    Is it your opinion that Don Sheffield can't use that

11  knowledge, highly specific knowledge in his brain, to make the

12  same print parameter configuration change in Johnson Controls'

13  environment?

14  A    Well, that's a different set of facts --

15  Q    I'm asking you --

16  A    -- than here.

17       And I'm saying if he just had that knowledge in his

18  brain and used his knowledge, you know, that this -- this was

19  a fix, I don't think that would be prohibited.

20       But what happened here is different.  They used the

21  other environment to troubleshoot the problem and to verify

22  the fix, and that's the issue that I -- is, according to my

23  understanding, that it's a violation.

24  Q    So when you're talking about one employee, this line

25  between general and specific knowledge that you got from

—461—

```
1    Oracle's counsel, that evaporates.  You can use even the most

2    highly specific, highly detailed knowledge with Johnson

3    Controls.

4     A    He's not making reference to another customer's

5    environment for the purpose of troubleshooting and testing.

6              If it's in his head -- I mean, I don't think the

7    poor man has to get a lobotomy to continue to work, but the --

8    there would be other factors I would want to evaluate.  In

9    this specific hypothetical that you've posed here, I think

10   that would be fine.

11             Now, if he had memorized somehow ten pages of Oracle

12   code that had been modified, and had typed those ten pages in

13   verbatim, I would want to look at that as a different kind of

14   case.

15             So I want to be clear here in my answer that with

16   your hypothetical he's gotten one little piece of knowledge in

17   his brain that's an experience that he's had, and maybe even

18   repeated multiple times over the course of his career in

19   fixing similar problems, that -- no.

20             I think in that case, where he's not going back to

21   somebody's environment and looking up what it should be, and

22   testing there, that he's probably entitled to use that

23   knowledge.

24    Q    No matter how highly specific.

25    A    Again, I've made the clarification that I don't agree
```

1    with that last part.  I think that there will be some -- some

2    point where you cross that line.

3           You know, there's some point -- if you've memorized

4    ten pages of code and taken that elsewhere, I'm not sure that

5    that would be allowed.

6    Q    Agreed.  Right?  He can't memorize the code from City of

7    Eugene, ten pages of Oracle code, and then go retype it in

8    Johnson Controls.  Isn't that the line?  The line -- isn't it

9    whether or not protected Oracle expression is involved?

10   A    No, the line -- because, again, my understanding is that

11   even Rimini's own software that has been developed

12   specifically as an extension, modification, and transformation

13   of the PeopleSoft environment, it's my understanding that that

14   is deemed to be a work that is a derivative work, and so it

15   falls within the provision of derivative work.

16          I mean, we're talking about a different provision

17   here, the troubleshooting and the use of an environment for

18   testing on behalf of one customer to the other.

19          But, you know, in each instance I would want to

20   fully evaluate your hypothetical in the context of the actual

21   injunction as I understand it to be.

22   Q    Yeah, and on this issue there's no -- you don't have an

23   allegation that there's a derivative work, right?  We're not

24   talking about a derivative work here, correct?

25   A    No, we're talking about the use of one customer's

463

1   environment for troubleshooting and testing on behalf of

2   another customer.

3   Q    What if Rimini has 50 clients with this same issue?

4   You've opined, haven't you, that Rimini cannot reuse its

5   solution with the 49 other clients, correct?

6   A    Again, you're -- in this specific instance where the

7   knowledge of the solution is not making reference to another

8   client's environment for testing and troubleshooting, and it's

9   a small enough matter like this where someone might arguably

10  have it in their head that "this fix worked for me before,

11  I'll try it here," if they go into that customer's

12  environment, into Customer B or Z or X's environment, and they

13  try to fix -- you know, they develop the fix in that

14  environment, they test the fix in that environment, I don't

15  think that that's problematical.

16                  MR. VANDEVELDE:  Can we pull up

17  Ms. Frederiksen-Cross's deposition, page 154, line 14, to 155,

18  line 15.

19  BY MR. VANDEVELDE:

20  Q    Now, you were asked the question,

21              "Now, imagine 49 other clients with the same

22      version of PeopleSoft had the same file with the same

23      erroneous transposition of those two digits of the

24      year.  Can that engineer go into each of those 49

25      environments, those client environments, separately

1          and implement the same fix correcting that erroneous

2          transposition without violating the injunction?"

3                    And if you could scroll down.

4                    And you answer --

5                    MR. SMITH:  Your Honor, if this is impeachment,

6      I would like to have the entire question read.

7                    MR. VANDEVELDE:  I can read more it if you would

8      like.  There is a prefatory part to it.  Would you like me to

9      read the prefatory part?

10                   MR. SMITH:  Yeah, the entire question and

11     answer.

12                   MR. VANDEVELDE:  Okay.

13                   THE WITNESS:  I think it would be helpful --

14                   MR. VANDEVELDE:  Sure.

15                   THE WITNESS:  -- to read the entire hypothetical

16     so that it has proper context, not just this one question out

17     of context.

18                   MR. VANDEVELDE:  Can you -- yeah, I'll read it.

19     So I say,

20              "Okay.  And he fixes that transposition.  He

21          saves that file, he tests the file, he runs a series

22          of tests to make sure that the behavior of the

23          software works as anticipated, that takes more time,

24          and he solves the problem for client A.

25                   "Now imagine 49 other clients with the same

1       version of PeopleSoft, have the same file with the

2       same erroneous transposition of those two digits of

3       the year, can that engineer go into each of those 49

4       environments, those client environments, separately

5       and implement the same fix, correcting that erroneous

6       transposition without violating the injunction?"

7               And if you could turn to the answer, please.

8               And you testified, "If you're asking can he

9       implement the exact same fix relying his knowledge

10      gained in the first environment and the testing that

11      he did there to note that that was the right test,

12      again, I think that falls afoul of the sixth bullet

13      item in the injunction.

14              "Now, is there a way he can make that fix

15      for other customers?  There doubtless is because code

16      can be changed in many different ways, and there's

17      many ways to fix the same problem.  But it's not at

18      all clear to me from the injunction that he would be

19      free to reuse that same fix.  I think he'd be

20      prohibited from relying on that detailed knowledge of

21      the defect in the fix that he got in the first

22      environment."

23  BY MR. VANDEVELDE:

24  Q   That was your testimony, correct?

25  A   That was may testimony at the time, yes.

1    Q    You offered testimony yesterday about the ease of access

2    to City of Eugene's environment during your direct

3    examination.  Do you remember that?

4    A    That is correct, yes.

5    Q    Is it your opinion that when multiple clients are

6    affected by the same issue, like this W2 issue we're taking

7    about here, that the injunction prohibits Rimini from starting

8    in a client environment that's easy to access?

9    A    Not specifically, no.

10   Q    Are you contending that the injunction requires Rimini to

11   develop solutions for those clients that have the same issue

12   in a particular order?

13   A    I'm not aware of any requirements relating to order.

14                   MR. VANDEVELDE:  John, if you can bring up tab

15   5, please, which, Ms. Frederiksen-Cross, it's your opening

16   report, paragraph 16, and can you put the continuation of 16

17   up there as well.

18   BY MR. VANDEVELDE:

19   Q    You wrote in your report in paragraph 16 that you

20   understand that,

21              "Any development or testing of an update to

22         Oracle's software, with one customer's licensed

23         Oracle software, constitutes cross-use if the update

24         is provided to another customer and that such

25         cross-use violates all relevant licenses."

1              That is what you wrote, correct?

2   A    That is correct.

3   Q    And that is regardless of the content of the update,

4   correct?

5   A    That was correct at the time I wrote it.  I understand

6   that the judge, in his orders, related to the -- what has

7   transpired since between the parties, has offered opinions

8   that have caused me to reshape this opinion slightly based on

9   my understanding of the Court's intent.

10  Q    But this opinion, that "any development or testing of an

11  update to Oracle software with one customer's licensed Oracle

12  software constitutes cross-use if it is provided to another,"

13  that's regardless of whether of any of the components of that

14  update contain protectible work or expression, correct?

15  A    That is my understanding, yes.  So as long as the update

16  is an extension, a modification, transformation, recasting of

17  the PeopleSoft environment.

18           So, if the update were completely just jumped from

19  the PeopleSoft environment but merely happened in the

20  environment, then I would want to evaluate the specific

21  instance to understand how it falls within the scope or

22  outside the scope cross-use.

23  Q    So you don't know in that case.

24  A    In the event that the update was developed without use of

25  the PeopleSoft environment, but maybe had some adjunct

1    functionality in the client's environment, I would want to

2    look at the specific instances to understand the tools that

3    were used and whether or not the Oracle environment was used

4    in the testing and development.

5              But if -- if it was a change to the Oracle

6    PeopleSoft code and, as we've just established something that

7    is outside general know-how because the Court has specifically

8    said that they are not going to restrict Rimini's know-how

9    provisions.

10             But if it was a specific change to the PeopleSoft

11   environment, to the PeopleSoft code, as I'm opining here, then

12   I would understand it to be cross-use outside that category of

13   just general know-how.

14   Q   Okay.  So just to make sure I got it, it is the case that

15   you are sticking with this opinion regardless of whether any

16   components of the update contain any Oracle protectible

17   expression.

18   A   So long as the update itself is an extension,

19   transformation, modification, recasting of the PeopleSoft

20   environment, that is my current understanding, counsel, that

21   it would still be cross-use that violates.

22   Q   And regardless of whether additional testing or

23   development occurred in client B, correct?

24   A   I think the answer to that would depend on when that

25   testing occurred.

```
1    Q    It depends on when the testing occurred?

2    A    Well, if you provide a fix, "Here's your fix, Customer

3    B," and that fix was developed in Customer A's environment

4    using Customer's A license and tested in Customer's A

5    environment using Customer's A license, and then you provide

6    that fix to Customer B, it's my understanding that that would

7    be a violation regardless of whether Customer B subsequently

8    performed additional testing, because that fix was not

9    developed in Customer's B environment, was not developed using

10   Customer's B PeopleSoft tools, or PeopleSoft environment for

11   its development and testing.

12            And so if they come along and test later, I don't

13   think that that erases the fact that they have been the

14   recipient of the work that was done in another customer's

15   environment under another customer's license.

16   Q    So cross-use.

17   A    Cross-use.

18            MR. VANDEVELDE:  Can you please bring up

19   paragraph 17, and, yeah, call it out.  Thank you.

20   BY MR. VANDEVELDE:

21   Q    You wrote in paragraph 17 that you understand that,

22            "Any reproduction of, distribution of, or

23        creation of a derivative works with one client's

24        licensed Oracle software constitutes cross-use if

25        that reproduction, distribution, or creation of
```

1     derivative works benefits another customer."

2              And I wanted to focus on that word "benefits."

3  You don't limit that word "benefits" -- there's no limitation

4  on that, correct?

5  A    Actually, just to be clear, it would probably be more

6  clear to say if it's used for the benefit of another customer,

7  because if it has just a hypothetical benefit, but it's never

8  applied to the customer's environment, obviously that's a

9  different case than if it's actually provided to a customer

10 and used for the benefit of that customer.

11 Q    Okay.  But you do not place any restriction or limitation

12 on the types of benefits, correct?

13 A    My understanding is that the injunction doesn't place

14 such limit and so I have not placed such limit.

15              MR. VANDEVELDE:  You can take that down, John,

16 please.

17 BY MR. VANDEVELDE:

18 Q    Let's switch to the next issue, issue number 4, and

19 that's regarding the rsi940a.sqr update relating to Spherion

20 and Smead.  Do you remember that?

21 A    Yes, I do.

22 Q    And this IRS form at issue was a Schedule A to form 940;

23 is that right?

24 A    That is my recollection, yes.

25 Q    Do you know what that form is?

1  A   Oh, I have to think for a minute.  I would want to take a

2  look at the form probably to -- there's so many IRS forms.

3  Q   I understand.  I feel the same way.  But it's a federal

4  form, correct?

5  A   I do understand it to be a federal form, yes.

6  Q   The IRS puts it out?

7  A   Yes, they dictate what needs to be in that form to be

8  reported.

9  Q   And the problem here was that Xs put on the form, there's

10 a misalignment issue?  Do you recall that?

11 A   I do recall that it was some kind of misalignment issue,

12 yeah.

13 Q   And you've offered the opinion that Rimini's update for

14 Smead and Spherion was cross-use of a fix previously

15 implemented for City of Eugene?

16 A   That's correct, yes.

17 Q   And in support of your opinion that this testing

18 cross-use occurred in this instance, you cited an e-mail

19 thread between Rimini engineers, including Jim Benge, Tim

20 Pringle, and Don Sheffield; is that right?

21 A   I remember those individuals being involved in the e-mail

22 exchange.  There may have been others, but I remember those

23 individuals.

24 Q   And you noted in your report that Don Sheffield says in

25 an e-mail that he, quote, "completed testing in City of

1  Eugene," correct?

2  A    Correct.

3  Q    And you were suggesting that there was no testing

4  performed in Smead or Spherion; is that right?

5  A    There was -- it was my understanding, and is my

6  understanding, that there was no testing of that specific fix

7  performed in Smead and Spherion prior to the provision of that

8  fix, that it was provided to them based on the testing in City

9  of Eugene.

10  Q    You don't know whether testing was performed, right?

11  A    I saw no evidence of it in the record.

12  Q    So you're not offering an opinion on whether there was

13  testing or not?

14  A    My opinion is that there is no evidence that there was

15  testing.

16  Q    And, again, just because someone doesn't describe an

17  event in an e-mail doesn't mean that event didn't happen,

18  correct?

19  A    Rimini uses a system to specifically track its testing,

20  and so that's a little bit different than your analogy

21  yesterday about I e-mailed you, and I didn't tell you I had

22  lunch and did I have lunch.

23        You know, they have a specific mechanism in place to

24  test -- or to track -- well, actually to track test cases and

25  where those cases are performed.  That's their Spira system.

                                                                    473

1    Q    Yet that's not what you relied though, right?   You only

2    relied on the e-mail from Don Sheffield, correct?

3    A    I relied on the evidence that was made available to me

4    more broadly, and I see nothing that indicates that that

5    testing occurred as a part of the development of that fix in

6    the Spherion or Smead environments.

7    Q    But your opinion is based solely on that e-mail, correct,

8    in your report?

9    A    I don't recall if I mentioned any other material in the

10   report or not.   I would have to look at that paragraph.

11              MR. VANDEVELDE:   If we could bring up tab 5,

12   paragraph 275, please.

13   BY MR. VANDEVELDE:

14   Q    All right.   This is the paragraph in your report about

15   this issue, correct?

16   A    It is at least a paragraph in my report about that issue.

17   Q    And you reference a 940A GIF file, correct, in the second

18   line?

19   A    Yeah.   Let me read the paragraph, if you don't mind,

20   counsel.

21   Q    Of course.

22   A    Okay.

23   Q    There's a reference to a GIF file, correct?

24   A    Right.

25   Q    That's a Graphic Image File?

1    A    Yeah, that's another way of doing a form other than a

2    .pdf that the system can use as an underlying template for the

3    form that's being printed.

4    Q    So it's just an image of the IRS form, right?

5    A    Yeah, basically.

6    Q    And you're not offering any opinion that there's any

7    cross-use violation with respect to this 940 GIF file,

8    correct?

9    A    No, the cross-use was with respect to the change to the

10   rsi940.sqr program.

11   Q    Okay.  And that's the one I want to talk about next.

12         You have not disclosed any opinions in any of your

13   expert reports or declarations about whether or not rsi940.sqr

14   is substantially similar to any Oracle code, correct?

15   A    As I sit here, I do not recall having given any

16   substantial similarity opinion.

17   Q    You are not offering an opinion on whether City of Eugene

18   was affected by this 940 -- this Form 940 issue, correct?

19   A    I am not offering the opinion that there was any known

20   problem prior to this development that took place to provide

21   the fix to Spherion and Smead.

22   Q    And City of Eugene is in the United States?

23   A    Yes.

24   Q    And you didn't cite any evidence that City of Eugene ever

25   told Rimini it didn't need or want the update, correct?

1   A    I don't believe I have offered any opinion to that

2   effect, counsel.

3                MR. VANDEVELDE:  If we could pull up tab 27,

4   please, which is another demonstrative relating to this issue

5   number 4.

6   BY MR. VANDEVELDE:

7   Q    So we're looking at another demonstrative.  There are

8   four gray boxes in this one instead three.  There's a City of

9   Eugene box, do you see that?

10  A    I see that.

11  Q    And it represents City of Eugene's systems.

12               And then there's a Spherion and Smead box for each

13  that represents their PeopleSoft environments?  Do you see

14  that?

15  A    I see that.

16  Q    And then there's a Rimini box at the bottom that

17  represents Rimini's systems.  Do you see that?

18  A    I see that.

19  Q    You understand the general concept behind this is to show

20  the different -- the four different systems and environments

21  that we're looking at?

22  A    I see that, yes.

23  Q    Okay.  And, again, in City of Eugene we have put four

24  files with some red lines to represent City of Eugene's

25  PeopleSoft environment, do you see that?

-476-

```
 1   A    I see that, though I'm curious why rsi940A, which is an
 2   extension of that environment, is in a different color.
 3              Is that just to highlight that that's the file we're
 4   talking about?
 5   Q    We'll get to that in a second.
 6   A    Okay.
 7   Q    But, yeah, just the four files with the red lines, it
 8   just conceptually represents the City of Eugene's PeopleSoft
 9   environment.
10   A    Okay.
11   Q    And then we have the same for Spherion and Smead.  They
12   each have their own PeopleSoft environments on their own
13   systems?
14   A    I see that.
15   Q    Okay.  And there's no red files on Rimini's because, as
16   we established yesterday, there's no PeopleSoft environment on
17   the Rimini's systems, correct?
18   A    No environment, yes, that's correct.
19   Q    Okay.  Okay.  Now, we talked about the GIF file which is
20   represented by that IRS form, do you see that, in both the
21   Rimini box and on the City of Eugene box?
22   A    I see that.
23   Q    So that's the GIF file, that's what that represents.
24   A    That's the image file.
25   Q    Image file.
```

—477—

1          And then there's a file labeled rsi940a.sqr that's

2     in blue.  Do you see that?

3     A    I see that.

4     Q    And it's on Rimini's systems and it's on City of Eugene's

5     systems.  Do you see that?

6     A    I see that.

7     Q    And, again, you didn't offer any opinions on whether the

8     contents of the rsi940a.sqr are substantially similar to any

9     Oracle code, correct?

10    A    Again, I do not, as I sit here, recall offering that.

11    There's been a lot of reports, but I don't recall that

12    specific file being the focus of that particular analysis.

13    Q    Okay.  So assume, then, that that rsi940a.sqr file is not

14    substantially similar to any Oracle code in the universe.  Do

15    you understand that?

16    A    Okay.  I'll take that as your hypothetical.

17    Q    Well, you have no opinion otherwise, right?

18    A    Yeah, but I'm just stating that, you know, we're talking

19    about this in a hypothetical.  That's something I would --

20    Q    Well --

21    A    -- check if it were called out but --

22    Q    I know you're saying it's a hypothetical, but you're not

23    offering an opinion on the contents of that file either way,

24    correct?

25    A    With respect to whether or not it's substantially similar

1    to Oracle, that is correct.

2    Q    Okay.  Now, assume City of Eugene is affected by the

3    issue, which you don't have an opinion on you said earlier,

4    and assume Rimini has the rsi940a file on its systems, and

5    Rimini makes modifications to the files to address the issue

6    with this IRS form and sends the file to City of Eugene which

7    is why then we see it on City of Eugene's environment.  Do you

8    understand?

9    A    So far I'm with you.

10   Q    And Rimini tests this update.  So it does whatever it

11   does to apply the update to the City of Eugene environment, it

12   runs it, it tests it, and it's successful.  Do you understand?

13   A    Okay.  So it's modified the City of Eugene's PeopleSoft

14   environment to incorporate this change to the program.  It

15   runs it and tests it in City of Eugene's PeopleSoft

16   environment --

17   Q    Yeah.

18   A    -- and presumably it fixes the problem.  I mean, that's

19   where we're at right now, right?

20   Q    Yeah.  Correct.

21   A    Okay.

22   Q    So when that Rimini file is sent to City of Eugene and

23   it's applied to the Oracle environment, that is a changed

24   Oracle environment as a whole.  That environment is now a

25   derivative work, correct?

1    A    Uh-huh, yes.

2    Q    Because it has Oracle code in it, a substantial amount,

3    correct?

4    A    Certainly.

5    Q    Okay.  Are you offering the opinion that the injunction

6    prohibits Rimini from sending that rsi file and that rsi form

7    -- sorry, that IRS form to Spherion or Smead from Rimini's

8    systems?

9    A    Yes, because it is my understanding, based on the

10   guidance I have been given by counsel, that that Rimini code

11   file is, in fact, a derivative work insofar as it is a file

12   that depends totally for its operation on the Oracle

13   PeopleSoft environment that is an extension and modification

14   to the PeopleSoft environment, and that is it's underlying

15   dependence.

16            Further, I have looked at this code file and I know

17   that it includes -- and we discussed this on my testimony --

18   Q    Wait a second.

19   A    -- yesterday or the day before --

20   Q    I want to object, because you testified earlier you are

21   not offering the opinion on the contents of any of that file,

22   you've never disclosed any analysis regarding the contents of

23   that file, and what your testimony sounds like it was about to

24   be was not disclosed in any report you have ever written,

25   correct?

1    A    With all respect, counsel, I have mentioned, I am sure,

2    the fact that this file includes SQCs that are Oracle SQCs,

3    and we talked about those in my testimony the other day.

4           So the file itself, the individual lines of code in

5    the file may be entirely Rimini authored, but the file when

6    run includes Oracle code because it brings that code into the

7    file, and that's how we know it's dependent on that Oracle

8    environment.

9    Q    And I want to talk about that for second because you

10   testified yesterday about #includes.

11          That merging, right, and the importation of those

12   #include files of Oracle code, that only happens in City of

13   Eugene's environment.  That is not happening on Rimini's

14   environment, correct?

15   A    Not unless Rimini is running a bootleg copy of Oracle

16   which we haven't seen any evidence of.

17          So as far as I know, they are not able to run that

18   file or test it on their systems, and the representation is

19   that the text was typed in on their system.

20   Q    So let me ask again.  That #include process where there's

21   a merging of an Oracle file in the Rimini written code, that

22   is only happening in City of Eugene's environment, correct?

23   A    Or any other environment where that software was

24   installed and run.

25   Q    Okay.  But we're talking about City of Eugene.  So when

1    you said #include and set environment dot SQC, and the merging

2    of the -- that is only in City of Eugene's environment, right,

3    in this issue, and when you talked about that.

4    A    At this point in time in your hypothetical where this

5    file is only on City of Eugene's system, that's correct.

6         My point was just that that is part of the evidence

7    that this is a derivative work of the PeopleSoft environment.

8    Q    But you testified you were not offering an opinion on

9    whether the file substantially incorporates Oracle expression,

10   correct, the rsi940a file?

11   A    But I have offered the opinion that it depends solely for

12   its operation on the PeopleSoft environment and it is an

13   extension and modification of that environment.

14   Q    You're not opining that the rsi940a file that Rimini

15   created was ever sent directly between clients, correct?

16   A    I don't recall offering any such opinion, counsel.

17   Q    And you're not offering any opinion that any of the

18   Oracle PeopleSoft files in any of these three clients'

19   separate environments was ever intermingled, correct?

20   A    In the context of this litigation, that is correct, or

21   the matter before the Court here today.

22   Q    And when testing occurs in City of Eugene's environment,

23   I think you testified in your direct that copies are made,

24   correct, RAM copies?

25   A    That is correct.

1    Q    Okay.  Those RAM copies, though, they never leave City of

2    Eugene's environment, they're always in City of Eugene's

3    environment, correct?

4    A    As far as I know, that is correct.  I mean, I'm not aware

5    of any instance where anyone has taken a memory snapshot and

6    sent it anywhere.  So as far as I know, that is correct.

7    Q    Okay.  So no RAM copies in City of Eugene's environment

8    have ever been shared with any other client, correct?

9    A    As far as I know, that is correct, counsel.

10   Q    What if, instead of sending another copy of the Rimini

11   code, rsi940a, instead of sending it to Spherion, Rimini

12   created a blank file in Spherion and just retyped its own

13   expression again, is that unlawful cross-use?

14   A    If they are reusing the file, which I understand to be a

15   derivative work in this instance that was developed in City of

16   Eugene's environment, I see no distinction with respect to how

17   it gets to the new environment.

18              So if they -- if they typed it in, if they printed

19   it on a piece of paper, went and sat in the new environment

20   and typed it in, they are still reusing the product that they

21   developed on another client's system.

22   Q    Even if they memorized it?

23   A    Well, it's a fairly long file.  I think that would be

24   unlikely.  But maybe you've got somebody with a perfect

25   memory, a photographic memory guys.

1            Again, still, I think, that in the scenario you're

2   talking about where one client's environment has been used for

3   the development and testing, and that development is not

4   repeated in another client's environment, I think you're

5   violating the injunction with respect to the reuse of a

6   derivative work in another environment.

7            I mean, that's my understanding of the injunction

8   and of the derivative work, as I understand it.

9   Q    And you got your understanding of a derivative work from

10  Oracle's counsel?

11  A    In part from Oracle's counsel, though this issue has come

12  up in other contexts that I have worked on as well.

13  Q    Okay.  So even if that Rimini expression, if the engineer

14  just remembers it, he can't even retype it for Spherion and

15  Smead.  That's your opinion.

16  A    My understanding is that it needs to be developed in each

17  client's environment, and merely doing a rote recreation,

18  whether it's by copy and paste, by manually typing in from a

19  printout, or in your hypothetical, from having memorized this

20  big file and then typing it in afresh, it is a recreation in

21  the new customer's environment for the benefit of that

22  customer of work that was done and developed in another

23  customer's environment, and, as I understand the injunction as

24  it's written, that would be prohibited.

25  Q    Let's turn to issue number 10, which is the update

1    HCM200105 involving Rockefeller and Home Shopping Network, and

2    the Court --

3                    THE COURT:  Excuse me.

4                    MR. VANDEVELDE:  Oh, sorry.

5                    THE COURT:  I'm thinking this is a new subject

6    which will probably take some time so let's --

7                    MR. VANDEVELDE:  Oh, perfect.

8                    THE COURT:  Why don't we go ahead and take our

9    morning break at this time and resume with that at the

10   conclusion of the break.

11                   MR. VANDEVELDE:  Sounds good.

12                   THE COURT:  We'll take a break until between

13   10:35 and 10:40, depending on when everyone is ready.

14                   MR. VANDEVELDE:  Thanks, your Honor.

15                        (A recess was taken.)

16                   THE COURT:  Have a seat, please.

17                   The record will show we're reconvened after the

18   morning break.

19                   Mr. Vandevelde, go ahead, please.

20                   MR. VANDEVELDE:  Thank you, your Honor.

21   BY MR. VANDEVELDE:

22   Q    Before the break we were about to turn to issue number 10

23   which relates to HCM200105 relating to two Rimini clients,

24   Rockefeller and Home Shopping Network.  Do you remember that?

25   A    Yes.

1    Q    And the Court, in its order to show cause, wrote that it

2    was not clear whether the update was sent directly to those

3    clients, or developed and tested in their own environments.

4    Do you remember that?

5    A    Yes.

6              MR. VANDEVELDE:   And if we could put up another

7    demonstrative, which is tab 41, with respect to this issue

8    number 10.   Thank you.

9    BY MR. VANDEVELDE:

10   Q    Do you see that in front of you?

11   A    I do, yes.

12   Q    Okay.  This one also has four large gray boxes.  One is

13   labeled "First Client," and what that indicates is the client

14   in which Rimini first developed the solution for this issue.

15   Do you understand that?

16   A    I do.

17   Q    Do you know the identity of that first client?

18   A    With respect to this change, I don't believe I do.  I

19   would want to check back in my report, but my recollection is

20   we know where it was tested, but not where it was necessarily

21   first developed.

22   Q    Okay.  And then there's a large gray box labeled

23   "Rockefeller Group," and another large gray box labeled "Home

24   Shopping Network," and then finally, as in all these slides,

25   at the bottom is a box labeled "Rimini."  Do you see those?

1    A    I see those, yes.

2    Q    And, again, in each of the three client environments, the

3    first client Rockefeller and Home Shopping Network, there are

4    four files that are just a conceptual representation that they

5    each have their own separate PeopleSoft environment.  Do you

6    see that?

7    A    Okay.

8    Q    And then in the Rimini box you see a file with blue

9    lines, and it's labeled rsiqtrtax.sqr, I'll refer to it as rsi

10   quarter tax.  Do you see that?

11   A    Yeah.

12   Q    And that's on Rimini's systems, and it's also in City --

13   sorry, First Client's environment.  Do you see that?

14   A    I see that.

15   Q    Now, you didn't offer or disclose in any of your reports

16   any opinions that the contents of rsi quarter tax are

17   substantially similar to any Oracle code, correct?

18   A    Of the file itself does, correct, yes.

19   Q    And assume that First Client, we're calling it, is

20   affected by this issue.  Do you understand that?

21   A    The issue with rsi quarter tax, that was one of Rimini's

22   one size fits all files that it was developing in order to

23   consolidate the various different varieties that customers had

24   on their machines.

25            So when you say "it was affected by this issue," are

-487-

1    you presuming there was some problem with it or something that

2    they were fixing or what -- what is the hypothetical there?

3    Q    Well, the problem in this particular issue, issue 10, was

4    relating to an Oregon quarterly tax reporting issue.  Do you

5    recall that?

6    A    Yeah, I think it was an update when they added the

7    transportation tax for Oregon, if I recall correctly.

8    Q    Okay.  So it was some issue relating to an Oregon tax

9    issue, correct?

10   A    That's my recollection of this specific problem that

11   HCM200105 represents.

12   Q    Okay.  So back to my earlier question.  Will you assume

13   that the first client was actually affected by that Oregon tax

14   reporting issue?

15   A    Okay.  I will make that assumption for you.

16   Q    And assume that Rimini has the rsi quarter tax on its

17   systems -- in fact, it did, correct?

18   A    Yeah, because it distributed it from its systems.

19   Q    And assume Rimini makes modifications to the file to

20   address this Oregon tax issue and sends the file to the first

21   client, which is why we see it here in the first client's

22   environment.  Do you understand that?

23   A    I'm with you so far.

24   Q    Okay.  And then Rimini remotely connects to the first

25   client's environment and tests the update, that file within

1    the client's environment, and I would assume that you would

2    say that RAM copies during that testing would be created?

3    A    They would necessarily during testing, yes.

4    Q    Okay.  And those RAM copies though, those are only in the

5    first client's environment when that testing is happening,

6    correct?

7    A    Right.  And just to be clear, they're the compiled RAM

8    copies during the test.  But, yes, they would just be in that

9    client's environment.

10   Q    Okay.  And you're not offering any opinion that any

11   Oracle files between the three separate siloed client's

12   environments was ever intermingled in any way, correct?

13   A    With respect to this specific update, that is correct.

14   Q    Okay.  And so when that testing occurs in the first

15   client's environment, and those RAM copies are made, you're

16   not opining that somehow those RAM copies were ever -- ended

17   up in Rockefeller or Home Shopping Network or any other

18   client, correct?

19   A    That's correct.

20              MR. VANDEVELDE:  If we could just switch briefly

21   to another exhibit -- tab 5 of your opening report, and we'll

22   come back to this demonstrative.  It's tab 5 of paragraph 348.

23   BY MR. VANDEVELDE:

24   Q    And you reference -- you can see it on your screen, too,

25   whichever is easier.

-489-

 1   A    Yeah.  I just like to sometimes be able to look and see

 2   what context if you're just taking one paragraph out of

 3   context, or any context as the case may be.

 4   Q    Sure.

 5   A    Okay.

 6   Q    So in that paragraph, 348, on the third line you

 7   reference a test case 8484.  Do you see that?

 8   A    I see that, yes.

 9   Q    And you state that it was created on October 7th, 2018,

10   and executed 94 times between October and December, roughly,

11   2018.  Do you see that?

12   A    I see that, yes.

13   Q    Okay.  You're aware that Rockefeller was not a client at

14   that time of those tests, correct?

15   A    I am aware of that, yes.

16   Q    Okay.  And you're aware that Home Shopping Network was

17   not a client of Rimini's at the time of those tests, correct?

18   A    I'm aware of that as well, yes.

19   Q    So any RAM copy that was created in that first client's

20   environment for the testing in that first client's

21   environment, it couldn't possibly have been for the benefit of

22   Rockefeller, correct?

23   A    You're saying when a RAM client was run -- when a RAM

24   copy was created when a test was performed on some other

25   user's system, that that test was not for Rockefeller's

1   benefit.

2   Q    Well, Rockefeller is not a client yet, right?  So the RAM

3   copy in the first client's environment could not possibly have

4   been for the benefit of Rockefeller, they're not even a Rimini

5   client.

6   A    I'm not sure that I agree entirely, counsel, to the

7   extent that Rimini used the initial -- let's take the initial

8   client environment, for example.

9           To the extent that Rimini developed this rsitaxqtr

10  in order to consolidate -- or to create a one size fits all

11  tax reporting file that was going to be ultimately provided to

12  all of its clients, or as many as it could, I think that that

13  contemplates the benefit of future clients as well because

14  their specific purpose in doing so was we're going to develop

15  this one size fits all, and, of course, the first client isn't

16  all, it's the first client.

17          But the development, the intent of the development

18  for this fix is to create a fix that will ultimately be

19  deployed across multiple clients for the benefit those

20  multiple clients.  I mean, hopefully, it's not for their

21  detriment.

22          And so if you're doing that, that initial

23  development in the first client's machine, while I don't

24  dispute that it may benefit that first client, you can't

25  exclude that that development or that testing that happened in

1    the first client's machine is for the benefit of the

2    subsequent clients.

3            And similarly, if along the way in those intervening

4    periods some defect was found in the program and corrected in

5    some environment, again, that is going to benefit all of the

6    ultimate recipients.

7    Q    You said "contemplate," and I think you may have said the

8    word "intent," although I'm not sure if I caught it.  Are you

9    saying that there's an intent requirement with respect to

10   cross-use?

11   A    No, no, I'm not saying that.  I'm saying that in this

12   particular instance, because I'm familiar with this particular

13   program, this was one of the files that was initially, at

14   least, intended to be rolled out to -- across many clients.

15           I was just making that observation.  I wasn't saying

16   that the intent is related to the cross-use issue at all.

17   Q    Okay.  So --

18   A    Or that an intent in advance.

19           What I am saying is that this development was

20   intended to be on behalf of many clients, and, in fact, was on

21   behalf of many clients as we see from the testing log.

22   Q    So what's the relevance of intent if you keep testifying

23   that it's "intended for other clients"?  Is that part of your

24   definition of cross-use or not?

25   A    No, but the cross-use is the fact that a -- the

492

1   development done in one customer's -- development and testing

2   done in one customer's environment to this file, which is an

3   extension of the PeopleSoft environment, or a modification of

4   the PeopleSoft environment, is then used for the benefit of

5   customers in other environments.

6   Q    Even customers that don't even exist yet.

7   A    Sure, because it's used for them once they exist.

8   Q    So if Rimini has just one client and they're -- we hope

9   we get more clients, we're not sure, if they end up do getting

10  clients, then it somehow makes the prior use of that first

11  client's environment cross-use?

12  A    That is my understanding just under the way the language

13  of the injunction is framed.

14            MR. VANDEVELDE:  John, if you could bring back

15  the demonstrative, please.

16  BY MR. VANDEVELDE:

17  Q    So it's your opinion that when Rockefeller and Home

18  Shopping Network hire Rimini the next year, that the RAM

19  copies that don't exist anymore but that did exist in the

20  previous year, those are now retroactively used for the

21  benefit of Rockefeller and Home Shopping Network.

22  A    To the extent that those RAM copies are the artifact of

23  development and testing in one customer's environment -- the

24  RAM copies themselves are not used, but the benefit of having

25  made those RAM copies, the benefit of having used a customer's

—493—

1    environment to create a fix or an update or a program

2    that is then subsequently provided to other customers

3    where that fix -- in this case it is a PeopleSoft -- an

4    extension or modification to the PeopleSoft environment, it is

5    my understanding that that use of the first customer's

6    environment still benefits the subsequent customers.

7           The RAM copy -- the RAM copy exists in the first

8    customer's environment, the RAM copy doesn't go anywhere, but

9    the fruits of having created that RAM copy to do development,

10   to do testing, to do the iterative process as necessary to

11   make sure that this program, which is an extension of the

12   PeopleSoft environment, performs its intended function in the

13   PeopleSoft environment, is still for the benefit of any

14   subsequent customer that receives it.

15   Q    Okay.  Just focusing on the first client for a second.

16   Those RAM -- so Rockefeller and Home Shopping Network are not

17   even clients yet.

18          The first client, Rimini is doing its work and

19   creates its own expression, rsi quarter tax.  You have no

20   opinion on whether it's substantially similar to any Oracle

21   code in the universe, and Rimini tests it there, those RAM

22   copies, those don't violate the injunction at that time,

23   right?

24   A    On the initial client where the software is developed and

25   tested, there's -- unless there was some other prohibition in

−494−

1    place in the license or something, that those would not

2    violate.

3    Q    And when testing is over the RAM copies go away, right?

4    A    That is correct.

5    Q    So they no longer exist.

6    A    The RAM copies no longer exist, that's true.

7    Q    Okay.  And then a year later Rockefeller and Home

8    Shopping Network hire Rimini, they have the same issue and

9    need the update, and Rimini wants to send its rsi quarter tax

10   file to those.

11            At that moment -- we're now a year later, those RAM

12   copies don't even exist, but the fruits of it kind of exist

13   forever, and so now that's impermissible to use?

14   A    The first customer's environment was used to develop that

15   fix under the color of that first customer's license.

16            Sending that fix to another customer, and applying

17   it in their environment, when I understand that fix to be a

18   derivative work of the PeopleSoft environment, I understand to

19   be prohibited under the injunction.

20   Q    At the time Rimini sends that rsi quarter tax file to

21   Rockefeller, what copy is being cross-used?

22   A    The copy of rsi quarter tax is being cross-used.

23   Q    But what client's Oracle software is being cross-used at

24   that moment the next year?

25   A    The Oracle software on the environment where that fix was

1    developed and tested.

2    Q    But that RAM copy doesn't exist anymore.

3    A    I'm not talking about the RAM copy.  You keep bringing up

4    the RAM copy.

5             But I am talking about the injunction specifically

6    says that you won't use one customer's environment for

7    development and testing of a fix that benefits -- that's used

8    for the benefit of another client, or that is my understanding

9    of what the Court's prohibition here was, in other words, each

10   client's fixes need to be developed in that client's

11   environment.

12   Q    And is your environment based on the rsi quarter tax

13   somehow being a derivative work?

14   A    Well, I think they're somewhat separate issues but

15   related.

16             Rsi quarter tax is, as I understand it, a derivative

17   work of the PeopleSoft environment, but the prohibition

18   doesn't -- for instance, paragraph 6 of the injunction says,

19             "Rimini Street shall not reproduce, prepare

20        derivative works from, or use PeopleSoft software or

21        documentation on one licensee's computer system to

22        support, troubleshoot, or perform development or

23        testing for any other licensee including,

24        specifically, that they shall not use a specific

25        licensee's PeopleSoft environment to development or

1      test updates or modifications for the benefit of any

2      other licensee."

3           Now, here presumably Rimini is sending that fix

4  to Rockefeller and Home Shopping Network for their benefit.

5  They need the fix, you said.

6           And so in this instance, even though it's a year

7  later, that development was done on the first client's

8  machine.  The testing was done on the first client's machine.

9           And I don't dispute that the first client may

10  also have received a benefit from that, but as I understand

11  the injunction, this would still be prohibited.

12  Q   So, let me ask that question again.

13           Does your opinion depend on the file, rsi quarter

14  tax, being a derivative work in your view?

15  A   It doesn't depend solely on that, no.  Because, again,

16  the first client's environment, it's licensed to PeopleSoft

17  software.  PeopleSoft software is being used in support of

18  other clients when that Rimini code is propagated to their

19  environments.

20  Q   Let me ask, though, at the moment Rimini is sending that

21  rsi quarter tax file, which you said you have no opinions on

22  whether it is substantially similar to any Oracle code, at

23  that moment Rimini sends it to Rockefeller, first client's

24  environment isn't even being used, right?

25  A   It has already been used.

1    Q    And that carries forward.

2    A    And I don't know if they're using it at all.  I mean, if

3    you tell me that they're shutdown that day, they're on a

4    holiday, it doesn't change my opinion because that first

5    environment was used to develop the software that is then

6    being provided to other clients for their benefit.

7    Q    And in your view that prohibition would carry forward

8    forever.  Any other future client that hires Rimini, Rimini

9    can never use that work product again.

10   A    My understanding is that they need to develop it in the

11   environment of the client where it's being used, not in some

12   other client's environment.

13   Q    Let's turn to issue number 6 which concerns Rimini's 1099

14   update that Rimini e-mailed to Easter Seals on January 3rd,

15   2019, and whether it's a derivative work.  Do you recall that

16   issue?

17   A    Yes.  It would be helpful if you could remind me what the

18   names of the specific files were.

19   Q    Sure, be happy to.  It is ris1099M.sqr and rsi1099I.sqr.

20   A    Thank you, counsel.

21   Q    And this relates to PeopleSoft, right?

22   A    That's correct, yes.

23            MR. VANDEVELDE:  If we can bring up tab 5, which

24   is her opening report, paragraph 84, please.

25

1   BY MR. VANDEVELDE:

2   Q    You wrote about six lines down,

3            "A derivative work results when Rimini

4        modifies or extends PeopleSoft environments through

5        new updates extending the features and functionality

6        of the existing PeopleSoft software while relying on

7        the underlying PeopleSoft architectural framework

8        instead of operating independently from the

9        PeopleSoft components on which they rely."

10           Do you see that?

11  A    I do see that, yes.

12  Q    And that understanding or that definition, that was given

13  by Oracle's counsel?

14  A    They gave me guidance in that, yes.

15  Q    And their guidance was that -- what we see here in

16  paragraph 84?

17  A    Yes, that there has been cases where this type of

18  extension has been adjudicated before and found to be a

19  derivative work.

20  Q    And you applied this definition in your work in this case

21  and in Rimini II, frankly, correct?

22  A    That is correct.

23  Q    Now, you said yesterday that whether a program operates

24  with one platform or multiple platforms makes a difference

25  about whether something is a derivative work.  Do you remember

1    that?

2    A    I think you're mischaracterizing my testimony slightly.

3    Q    Oh.  Okay.  Sure.

4    A    I said that that was an example with respect of one of

5    the ways one can distinguish, you know, whether a particular

6    piece of software is a derivative work.

7            I don't think I said that that's the only way, or

8    that that's the only test that could be applied.

9    Q    Oh, yeah.  I didn't mean to suggest that you said it was

10   the only test.

11   A    Okay.

12   Q    But why is that even a factor?

13   A    I'm not sure what you're asking me.

14   Q    Why do you contend that whether a piece of software can

15   run on one platform or many platforms informs whether or not

16   that piece of software is a derivative work?

17   A    Well, in the example we were discussing with PeopleSoft,

18   the PeopleSoft environment is portable across multiple

19   platforms.

20           I think you were asking questions that were

21   implying, or at least I understood you to be implying that one

22   should construe the PeopleSoft environment to be an extension

23   of the operating system because the PeopleSoft environment

24   used the functionalities of the operating system and needed to

25   have an operating -- some operating system that it ran on.

1           And I was saying, no, I don't agree with that

2     premise.  You know, my understanding of the PeopleSoft

3     environment, one of the things that I used as a distinguishing

4     characteristic is that it's not timed to that operating -- to

5     a particular operating system.  So you could run on a UNIX

6     operating system or a Windows operating system for instance.

7     Q   So when you say -- well, let me back up.

8           I'm still trying to get at why whether a software

9     program runs on -- can run on one platform or multiple

10    platforms, whether you're contending that that's part of your

11    definition of a derivative work.  Is it?

12    A   No.

13    Q   Okay.

14    A   It was an example that I gave, but it was not a part of

15    my definition of derivative work.

16    Q   Okay.  And you reference in your definition in paragraph

17    84 extending the features and functionality, and yesterday,

18    you testified about whether a program replaces functionality

19    of another program.  Do you remember that?

20    A   Yes, within that infrastructure.

21    Q   Is that a factor -- is that part of your understanding of

22    a derivative work?

23    A   When that work also relies upon and cannot run without

24    the original infrastructure, in this case the PeopleSoft

25    environment.

1              If you were to take one 1099 program and replace it

2    with another 1099 program, you are modifying the environment

3    that produces those 1099s, but you're modifying this part of

4    it.  You're not creating the work that is independent from

5    that original work but, rather, it's a modification or

6    extension of that work depending on if it's a new report or an

7    existing report.

8    Q    Regardless of whether it substantially incorporates

9    protected expression of the original work, correct?

10   A    My understanding is that to be true, yes, given the

11   interdependencies of the underlying framework in our

12   hypothetical program.

13   Q    And that's the definition you applied in this case.

14   A    I think I cite the exact definition earlier in my report,

15   counsel, but that is conceptually a part of that definition,

16   yes.

17   Q    Let me ask you if -- you're very familiar with operating

18   systems, correct?

19   A    I am, yes.

20   Q    And operating systems have file systems as a component of

21   them, correct?

22   A    Yeah, typically, they do.

23   Q    And a file system is responsible for storing and

24   organizing and saving files on everyone's computers, correct?

25   A    A printer operating with the hardware, there may be

1    layers on top of that, but they interoperate with the

2    underlying hardware to effect storage.

3    Q    And you're aware that there are replacement file systems

4    out there, right, for the default file system that might come

5    with an operating system, correct?

6    A    Sure.

7    Q    Okay.  So is it your opinion that no matter how novel, no

8    matter how creative, regardless of whether that replacement

9    file system incorporates any expression whatsoever of the

10   underlying operating system, that because it replaces the

11   functionality of the original operating system's file system,

12   that that is an unlawful derivative work?

13   A    You packed a lot into that hypothetical, so let me try to

14   unpack it a little bit.

15           First of all, as an absolute, I would not make that

16   statement without looking at the specific facts.

17           Looking at the specific facts of a particular

18   hypothetical replacement, I could conceive that it may be

19   deemed to be an extension or a derivative work of the

20   operating system, and there are other facts where I might find

21   that there was not.  I mean, it's too detailed an analysis to

22   do in the abstract.

23   Q    But there are replacement functionality, you could write

24   new code that is a replacement functionality that is at least

25   possible, in your view, would not be derivative work?

503

1   A    Without having evaluated it, I would not want to rule out

2   the possibility that I might so find.  Just as I sit here in

3   the abstract, that's not a problem that I have either

4   considered or that I really can address fully as I sit here on

5   the stand.

6           I think it would be depending on the specific facts,

7   and to give a blanket opinion while I sit here would just be

8   silly.

9   Q    Can you return to paragraph 327 of your report, and

10  towards the bottom, the last sentence of that paragraph, you

11  wrote,

12          "Because this update was specifically

13      tailored to operate only with and modify Oracle's

14      PeopleSoft software, replacing one function within

15      the environment such that the modified system is

16      substantially similar to the Oracle PeopleSoft work

17      but for the modified reporting function, it is my

18      opinion that this update comprises a derivative

19      work."

20          I want be crystal clear.  When you say "as

21  applied" there, right, that is the client's environment as

22  modified by Rimini's update, correct?  That's what you're

23  saying is a derivative work.

24  A    Well, in this particular statement that is what I am

25  saying.  I think I've been clear in my report as a whole that

1    my understanding is that the individual file updates may also

2    be derivative works of the PeopleSoft environment as a

3    stand-alone file because of their dependence on that

4    environment for any practical purpose, for any practical use,

5    they can't be used without it, they're just an extension of

6    the environment.  But, certainly, once applied to the

7    environment, the environment as a whole is also a derivative

8    work.

9    Q    Okay.  But the file by itself could also be a derivative

10   work even if it contains no literal or nonliteral Oracle

11   expression whatsoever in your view.

12   A    That is my understanding, counsel, based on the guidance

13   that I have been given, and that, as I understand, is based on

14   prior case law that evaluated similar fact patterns.

15   Q    You're not a lawyer, right?

16   A    That is true.

17   Q    So is there any way to write code that is specifically

18   tailored to operate only with and modify Oracle's PeopleSoft

19   software replacing one function within the environment, and it

20   goes on, without it being a derivative work?

21   A    Let me make sure I understand you properly.

22         You're asking is there any way to write code that is

23   specifically an extension or modification of the PeopleSoft

24   environment that is not a derivative work of that environment.

25   Q    Correct.

505

1    A    My understanding as I sit here is that there is not, that

2    that would be deemed under prior case law to be a derivative

3    work.  Again, that's my understanding as a layperson.

4    Q    What case law are you referring to?

5    A    There were a couple of cases.  The one that comes to mind

6    is Newton Newcomb.

7    Q    Okay.  And did Oracle counsel provide you with that case

8    law?

9    A    They provided me background on what the issues of that

10   case were.

11   Q    If we could turn to tab 31, which is a demonstrative

12   relating to issue number 6 with these 1099 files to Easter

13   Seals.  Do you see it before you?

14   A    I do.

15   Q    Okay.  In the slide there are three boxes.  One is --

16   gray boxes.  One is labeled "Easter Seals," one is labeled

17   "Other Clients," and that represents some unknown number of

18   other clients.  Do you understand that?

19   A    I understand that.

20   Q    And then there's a box, as with all these at the bottom,

21   that is labeled "Rimini."  Do you see that?

22   A    I see that.

23   Q    And, again, there are some files with red lines in the

24   Easter Seals box, and that represents conceptually Easter

25   Seals' PeopleSoft environment.  Do you understand that?

1    A    I do.

2    Q    And then in the "Other Clients" box, the big gray box

3    representing some unknown number of other clients, there is

4    also a set of files with red lines indicating each of those

5    other clients separate, siloed, PeopleSoft environments.  Do

6    you understand that?

7    A    Okay.

8    Q    And then there are two files, you see them in the Rimini

9    box.  They have blue lines of code.  One is labeled 1099I.sqr,

10   and one is labeled 1099M.sqr.

11           And, actually, as I look at them, those are both --

12   they should have an rsi in front of each of those file names.

13   Do you see those?

14   A    Okay.  Sure.

15   Q    Okay.  And those files, we also see them in the Easter

16   Seals box as well.  Do you see that?

17   A    I see that, yes.

18   Q    Now, you did not offer an opinion in any of your reports

19   or declarations that the ris1099-I and 1099-M files are

20   substantially similar to any Oracle code in the universe,

21   correct?

22   A    As I sit here, I do not recall having done so, so if

23   that's your representation, I'll take it as accurate.

24   Q    Well, I'm asking.

25   A    I just don't remember.  There have been six reports over

-507-

1   several years.  I don't remember ever having done that

2   comparison.

3   Q   Okay.  If you did it, it would be in your report,

4   correct?

5   A   Yes, if I did it, it would be in my report.

6   Q   And not that this is an element that will make something

7   a derivative work, but you don't offer any opinion that either

8   of these files was created with PeopleTools or PeopleSoft

9   tools, correct?

10  A   I can offer the opinion that they incorporate the

11  functions of PeopleSoftTools because of the SQC inclusions

12  that they contain because I'm familiar with this file.

13          Whether they were created within PeopleTools

14  environment or outside that environment in a text editor, I

15  know it's been Rimini's representation that they were created

16  on Rimini's systems so, if that is in fact true, then they

17  wouldn't have been used -- or wouldn't have been typed in

18  through the PeopleSoft tools.

19  Q   Okay.  And as you reference #includes again.  If that

20  happened, that would all be on the Easter Seals environment,

21  correct?

22  A   Well, the inclusion of the #includes in the code would

23  have been done at the time the code was written, wherever it

24  was written, but the actual use of that code would have

25  happened on that PeopleSoft environment or whatever

508

1    environment the software was being run on.

2    Q    You didn't offer or disclose any opinions on whether the

3    update for Easter Seals was developed in Easter Seals'

4    environments, did you?

5    A    I don't believe so, No.

6    Q    And you didn't offer any opinions on whether the

7    update -- the 1099 update for Easter Seals was tested in

8    Easter Seals' environment, did you?

9    A    Again, I don't recall that specific opinion being

10   offered.

11   Q    And you didn't offer any opinion on when the development

12   occurred, correct?

13   A    For this specific update that was shipped to Easter Seals

14   or the program as a whole?

15   Q    The update for Easter Seals.

16   A    No, I don't recall doing so.  As you know, this was an

17   older program that had been around for awhile, so --

18   Q    Are you aware that the update for Easter Seals was

19   developed before the injunction took effect?

20   A    I would want to look at the date.  I don't recall the

21   specific date, counsel, I'm sorry.

22   Q    If we could pull up --

23   A    It should be in the program header probably.

24             MR. VANDEVELDE:  Okay.  Let's pull up tab 32,

25   briefly, the first page, pre-admitted.

509

1    BY MR. VANDEVELDE:

2    Q    And do you see there about 40 percent of the way down,

3    February 28th, 2018, is the last modification in this

4    modification log?  Do you see that?

5    A    I see that.

6    Q    Okay.  So that is, what, eight to nine months before the

7    injunction took effect?

8    A    Seven or eight months, I think, yeah.

9    Q    Okay.  Seven or eight months.  Okay.

10          If we could turn to tab 33 briefly which has also

11   been pre-admitted -- sorry, it's Oracle Exhibit 41, and for

12   the record, the previous one we looked at was Oracle

13   Exhibit 40.

14          So we're now looking at Oracle Exhibit 41 that's

15   been pre-admitted.  This is the 1099 file for Easter Seals --

16   or that Easter Seals received.

17          Do you see at the last entry of the modification log

18   it's dated March 22nd, 2018?

19   A    I see that, yes.

20   Q    And that's a number of months before the injunction took

21   effect, correct?

22   A    Before that November date, yes.

23   Q    Okay.  If we could -- hold on one second.

24          No, we can do it with this one.

25          Okay.  So below the highlighted text here, you see

1    that #include?

2    A    I see that, yes.

3    Q    And it says, "#include seten" -- that's set environment,

4    right?

5    A    Yeah.  That's set environmental -- or allows you to set

6    some of the environmental parameters.

7    Q    Okay.  Are you contending that it's unlawful for Rimini

8    to #include the seten.sqc under the injunction?

9    A    I would not take that position.  I mean, this is evidence

10   that it's used in the PeopleSoft environment.  But if it was

11   done under color of one client's license for that client, I

12   would see nothing inappropriate in it.

13   Q    Okay.  So I'm just -- yeah.  If Rimini writes a file and

14   includes a line that is #include for setenv.sqc, you would not

15   contend that violates the injunction, correct?

16   A    Again, so long as all of the other requirements of the

17   injunction were upheld, then, yeah.

18   Q    If we could turn to your demonstrative slide 35, please.

19         Now, I know you talked about this in connection with

20   JDE, I believe; is that right?

21   A    I think that we used this example in my JDE discussion,

22   yes.

23   Q    Okay.  I think it's useful, but we'll see, to talk about

24   here with respect to #include.  So when the #include -- so let

25   me back up.

1              When that file, that Rimini written ris1099 file is

2    sent to Easter Seals and it's tested, the #include

3    incorporates the Rimini -- the Oracle file referencing that

4    #include file into, and then compiles it, right?

5              And does this diagram kind of demonstrate the

6    process for #include that you talked about yesterday?

7    A    Yes, it would be #include, or the copies we talked about

8    yesterday.  It's pretty much the same process.

9    Q    Okay.  And then this is where I wanted to get to.  All of

10   this on this slide, the source code, the including, the

11   pre-compiling, the expanding, all of this, this is all

12   happening in the client's separate environment, correct?

13   A    For these specific steps, that would be correct, yes.

14   Q    And there's no evidence and -- that any of the pound

15   including or copying or merging or pre-compiling or expanding

16   code, all the things we see here on this slide, none of that

17   was on Rimini's systems, correct?

18   A    With the exception of the one example we discussed

19   yesterday, the dot.lis file where the -- on one of the

20   pre-compiler optional outputs is that listing, and that

21   listing was sent back to Rimini.

22              But in the case of this specific update, these

23   activities would have taken place on a particular client's

24   environment wherever the program was being compiled at that

25   time.

-512-

1    Q   And when you testified about the #include and the merging

2   of the Oracle code with the Rimini code and the

3   pre-compilation expanding, you didn't tell the judge that that

4   was all happening in the client's system, did you?

5   A   I don't recall if I said anything about that or not

6   yesterday.

7    Q   You didn't tell the judge that all of those steps are

8   only within the client's systems, not Rimini's.

9   A   Well, they have it wherever it's being compiled, but,

10   yes, because Rimini doesn't have a PeopleSoft environment, it

11   would not be happening on Rimini's system.  I'll be very clear

12   with that.

13   Q   But you did testify that the updates that result from

14   these files substantially incorporate Oracle expression.  But,

15   again, that just means the modified client environment,

16   correct?

17   A   Well, the object code itself, even for this single file,

18   now contains -- after the compilation now contains substantial

19   portions of Oracle expression, and once that modified file is

20   placed in the operating environment of a particular client,

21   that client's environment has now been amended to include that

22   change as well.

23   Q   But that all happens, even the object code, it's all in

24   the client environment, correct?

25   A   For each client, yes.

1          MR. VANDEVELDE:  Okay.  Thank you.

2          You can take this demonstrative down, please.

3     BY MR. VANDEVELDE:

4     Q    Let's go to Issue Number 5 which concerns Rimini's

5     rspcmpay.cbl file.  Do you recall that issue?

6     A    Yes.

7     Q    And I may refer to it as rsp com pay.

8     A    That's fine.

9     Q    Does that make it easier to say?

10    A    It is a little easier to say that way.

11    Q    And .cbl is a Cobol file, right?

12    A    Correct.

13    Q    You opined in paragraph 189 of your opening report that

14    Rimini copied substantial portions of the PeopleSoft file,

15    psptarry.cbl, or dot cbl, into the Rimini file, correct?

16    A    Correct.

17    Q    And in comparing those files, you used a comparison tool

18    called ARAXIS MERGE, I believe?

19    A    That is one of the comparisons I performed, yes, and it's

20    how I did the side-by-side display.

21    Q    Okay.  And you have done file comparisons using the same

22    tool in other cases, correct?

23    A    For probably the last 10 or 15 years, yeah.

24    Q    And a court in a recent copy infringement action actually

25    said they were unreliable, correct?

A    I think you're relating -- you're referring to the *Drop Zone* matter.

Q    I'm just asking you if a court has previously found that the output of these tools he did not find reliable.

A    I don't remember the Court's exact ruling in that.  It was in the context of some exhibits that I had prepared before the attorney I was working with fell ill.

And, subsequently, those were submitted by the new attorneys, but after the cutoff date for the submission, and I don't remember the exact wording of the Court's order with respect to that.

Q    Okay.  You testified that the two files I'm going to -- the rsp com pay and psptarray file, that you compared them. And I think you said they were a one-third matched?

A    Roughly 30 percent of the lines is what my recollection is.

Q    Okay.  And was that based on your unique, normalized line set analysis?

A    Yes, that was before any filtering to apply any constraints or anything.  So that was just a gross number of the number of lines from the Rimini file that were found to be present in the Oracle file, or the percentage of lines in the Rimini file that were found to be present in the Oracle file.

Q    Would you agree that in assessing substantial similarity the relevant question is whether a substantial portion of the

1   protectible material in Oracle's work was appropriated, not

2   whether a substantial portion of Rimini's work was derived

3   from plaintiff's work?

4   A    That is not my understanding, counsel.

5           My understanding was is that if I copy one chapter

6   out of your 20 chapter book, that that is still a substantial

7   similarity even if my book is shorter than yours.

8   Q    So you calculated a percentage for how much Rimini's file

9   allegedly matched Oracle's?

10  A    Correct.

11  Q    And you used what you referred to as unique normalized

12  lines to calculate that?

13  A    That is my recollection.  It would state in my report, I

14  think, exactly how that number was derived.

15  Q    And that involves creating two sets, correct?

16  A    Two sets of lines and performing line matching between

17  them.

18  Q    And unique lines, correct?

19  A    There's several different ways to do that normalized line

20  matching, unique or not unique.

21          In that specific instance, I would want to

22  double-check what I said in my report was the process because

23  I just don't recall.  That was some time ago.

24  Q    So in footnote 187 of your report, you wrote,

25          "All line matching comparison percentages

1       herein are based on unique normalized lines."

2             Does that refresh your recollection?

3   A   Okay.  Yes, it does, thank you.

4   Q   So it's based on unique normalized lines.

5         So you created a set of all unique lines in the

6   Rimini file, correct?

7   A   Correct.

8   Q   And so if the Rimini file had five lines that were the

9   same, there would only be one in the set, correct?

10  A   Correct.

11  Q   And that's the normalized part of your analysis, right?

12  A   Well, the normalized also includes, as I mentioned

13  yesterday, excluding white space differences and case

14  differences, upper case, lower case, so that the comparison is

15  just the textural elements of the code.

16  Q   And there's no concept of ordering or sequence in this

17  set of lines from the Rimini file, correct?

18  A   Not in that initial normalized line match, that's

19  correct.  Later when I use ARAXIS --

20  Q   We're only talking about the normalized line sets right

21  now.

22        And then you created a similar set of the unique

23  lines from the Oracle file, correct?

24  A   Correct.

25  Q   So if the Oracle file had five lines that were same,

1     there would only be one in that set.

2     A    Correct.

3     Q    And then you essentially eliminated all structure and

4     sequence and organization because a set doesn't have those

5     things, correct?

6     A    Right.  The normalized line match is a first step to help

7     you identify pairs of files that you may want to scrutinize

8     farther.

9     Q    And you didn't filter out any lines from the Oracle

10    normalized line set that were non-expressive, did you?

11    A    In that first step, no.

12    Q    So a blank line would have been in there?

13    A    There would be one blank line in there and one of those

14    flower box lines, assuming all the flower boxes are the same

15    length, et cetera.

16    Q    A filler line?

17    A    Sure.

18    Q    A main exit line?

19    A    If that was one of the lines, yeah.

20    Q    And then you compared the two sets and determined how

21    much they overlap regardless of structure, sequence,

22    organization, correct?

23    A    In that initial step, that's correct, yes.

24    Q    Okay.  And that matching statistics -- statistic, that

25    roughly -- I think you said roughly 32 percent in your report,

1    that's how much of the normalized lines in the Rimini file

2    match the Oracle file, correct?

3    A    Correct.

4    Q    It's not the reverse, what percentage of the Oracle file

5    was supposedly matching normalized lines in the Rimini file,

6    right?

7    A    That is correct, counsel.

8    Q    And you don't know what that second percentage is, right?

9    A    I don't know as I sit here.  It's easily derived, but I

10   don't know as I sit here.

11   Q    Okay.  Let's turn to Issue Number 7 which is regarding

12   JDE software source code.

13   A    I thought you said tab 7, sorry.

14   Q    Oh, sorry.  Issue 7 which is regarding paragraph 8 of the

15   injunction and the phrase "J.D. Edwards software source code."

16   Do you recall that issue?

17   A    Yes.

18   Q    You testified that, you know, in all your experience you

19   hadn't heard the term open and closed code.  Do you remember

20   that?

21   A    Outside this litigation.

22   Q    Yeah, outside this case.

23   A    Yeah, correct.

24   Q    So putting aside the label, you have obviously heard of

25   accessible human-readable text files that have code in them,

-519-

1  right?

2  A    Yes.

3  Q    Of course, right?

4  A    Of course, yes.

5  Q    Okay.  And you are also aware and are familiar with files

6  that are a form of code that are compiled, or object, or

7  obfuscated code, correct?

8  A    Yeah.  Obfuscated is different than compiled or object

9  code, but I'm familiar with all of those tools and have

10  actually written about them somewhat -- or all of those

11  concepts rather.

12  Q    Okay.  So regardless of whether the labels open code and

13  closed code, you are familiar with the underlying concepts,

14  right?

15  A    That computer software exists in two dual forms as source

16  code and as the binary code, and possibly a third, an

17  obfuscated form of either of those.

18  Q    Have you ever personally licensed JDE?

19  A    I have not.

20  Q    Have you ever personally installed it?

21  A    I don't believe so.

22  Q    You don't offer any opinions in any of your reports or

23  declarations regarding how, upon installation, the files and

24  data comprising the JDE environment are structured, do you?

25  A    I think I talk about that briefly in one of my reports

1    where I'm describing the operating environment that's used

2    with EnterpriseOne, and contrasting it to the operating

3    environment for JDE Enterprise World, because I talk about the

4    platforms they're on, and whether the code is accessed in

5    those platforms.

6             But, I'm not sure if your question falls within the

7    scope of that or not.  But I did talk about the way in which

8    the code is stored differently on the two versions.

9    Q    Okay.  Well, maybe I asked a bad question.  I'll ask it

10   differently.

11            Are you aware that Oracle provides its JDE licensees

12   with certain code that, when the licensee gets it, is in

13   accessible human-readable format?

14   A    Did you say inaccessible or accessible, just to be clear

15   for the record.

16   Q    Yes.  Accessible human-readable.

17   A    Yes.  I am aware that they provide source code to their

18   clients as a part of the delivery as well as other components

19   which are object code only.

20   Q    So it's text, those components, correct?

21   A    The source code components are text-based, I mean, in a

22   computer language, yes.

23   Q    And they can be viewed in a text editor, some kind of

24   text editor, correct?

25   A    Certainly they could be viewed with at least some text

1    editors.

2    Q    And they can be modified?

3    A    In the J.D. World environment, they can be viewed and

4    modified in a text editor.

5          Because of the way they're stored in the JDE

6    Enterprise environment, you would have to first use OMW to

7    extract them amount, and then once extracted, you could view

8    them in a text editor.

9    Q    All right.

10   A    Just to be clear.

11   Q    But they could be modified.

12   A    They can be modified, yes.

13   Q    And they can then be compiled, correct?

14   A    Yes.

15   Q    And then are you also aware that Oracle -- when someone

16   pays Oracle for a J.D. license and they get the JDE software,

17   that some of the components of that software are not easily

18   accessible and not in a human-readable form?

19   A    I'm sorry.  I was stifling a sneeze.  Would you just

20   repeat that question.

21   Q    Sure, sure.

22          So you're also aware that when a JDE licensee

23   obtains the software they've purchased from Oracle, that some

24   of the components of that software of JDE is not easily

25   accessible and not human readable.

1   A    Right.  There are components of J.D. Edwards, whether

2   it's World or Enterprise, that are shipped only as object

3   code, and other components that are shipped, the application

4   parts that are shipped, is source code.

5   Q    So it could be compiled or executable code?

6   A    The source code could be, and the executable code, of

7   course, can't be compiled because it's already compiled,

8   but --

9   Q    No, I'm saying those not easily accessible, not

10  human-readable components, could be the compiles code or the

11  executable code, correct?

12  A    Sure.

13  Q    Okay.  You testified yesterday that Rimini's reading of

14  paragraph 8 of the injunction would not make sense because

15  closed code isn't provided to licensees.  Do you remember

16  that?

17  A    Well, yeah, the reading as that closed code being a form

18  of source code, specifically, doesn't make sense because there

19  is no source code provided for that closed portion of the

20  code.

21  Q    But they're provided with that source code, just in a

22  compiled form, correct?

23  A    Once it's compiled it's no longer a source code in the

24  languages involved here.  Do you understand the distinction?

25  Q    No, I understand the difference.

1    A    Okay.

2    Q    But what they're provided with is source code that has --

3    they're provided with the underlying -- the compiled version

4    of the underlying source code, correct?

5    A    They are provided with the compiled object code for some

6    portions of the system, and no source code is provided for

7    those portions.

8         And then they are also provided other portions of

9    the system, which are the application, which are provided in

10   source code format for their customers.

11        So when you say they're provided with the compiled

12   source code, while it's true there must have been source code

13   somewhere that somebody had for the object code only

14   components, there was no provision of source code for those

15   object code only components.

16   Q    Because it's in compiled form.

17   A    Correct.

18   Q    You're aware that the Oracle license and service

19   agreement has a restriction against decompiling and reverse

20   engineering?

21   A    Yes.   That's pretty standard in software that's

22   distributed, object code only.

23   Q    And you're aware that JDE Legacy licenses have the same?

24   A    The ones I have examined have all had that provision.

25   Q    Before this case, isn't it true that your only experience

1   with JDE was in the context of work that you did for one

2   client when you were doing custom software development?

3   A    There is one client over the years that I can recall that

4   I did some software custom development and some systems

5   modifications, you know, of just the configuration of the

6   system as well.

7         And I may have worked on others, but it would have

8   been so long ago that I just really don't recall if there were

9   others or not.  I remember one specific instance because it

10  was a rather large engagement.

11  Q    And it was when you were doing custom software

12  development?

13  A    I was doing both software development and system

14  integration tasks for that client, as well as performing

15  operating system maintenance for that client.

16        I was sort of assistive generally, if you will, so

17  installing software and also doing some custom development.

18  Q    And this was in the 1990s?

19  A    Late 1990s, I think, yeah.

20  Q    So more than 20 years ago.

21  A    It was a significantly long time ago, yeah.

22  Q    Okay.  And then between then and this case, you didn't

23  have any other experience with JDE, correct?

24  A    That is correct, yes.

25  Q    Who was the client?

1    A    That was while I was working for an engagement for

2    Tektronix in Beaverton, Oregon, and it was in relation to a

3    company that they had purchased, and I was doing mostly

4    software development and data extractions so that they could

5    do some extrapolations on personnel changes as they merged

6    their division with the company they had purchased.

7    Q    Yeah, I was just asking for the name.

8         Okay.  So Tektronix, I think you said?

9    A    Yeah, T-e-k-t-r-o-n-i-x.

10   Q    Do you know when JDE EnterpriseOne was released?

11   A    I want to think that the original JDE product was

12   released a couple of decades before that, or a decade and a

13   half before that.  I don't remember specifically JDE

14   EnterpriseOne, when they were released.

15   Q    Are you aware that it was released in approximately the

16   year 2000?

17   A    That wouldn't surprise me because I know it came much

18   later.

19   Q    Okay.  So if it did, then you have no experience prior to

20   this case with JDE EnterpriseOne, correct?

21   A    I do not recall any experience with EnterpriseOne.  It

22   was on AS-400 platform that I was doing the JDE work, and so I

23   believe it would have been World.

24        I mean, it's been long ago.  I don't specifically

25   remember even the version.

1    Q    And there's been lots of versions of JD EnterpriseOne,

2    the 8 series, the 9 series, and you have no experience with

3    any of those versions of J.D. EnterpriseOne, correct?

4    A    Beyond the Oracle trainings that I have done on their

5    system, no, no direct experience working with those products.

6    Q    And you're aware that Object Management Workbench, the

7    tool, was released as part of EnterpriseOne, correct?

8    A    I'm aware that, Yes.

9    Q    So you had no experience, prior to this case, with any

10   Object Management Workbench tool, correct?

11   A    As far as I can recall, I believe that to be true.

12   Q    And so what was the name, do you think, of the J.D.

13   Edwards software that you used in the late '90s?

14   A    Well, I believe that it would have been JDE World because

15   it was on an AS-400, and I do not recall any interaction with

16   OMW.

17          And Tektronix was my client on and off over a period

18   of almost three decades, but as best I can recollect when that

19   work took place, it was in the late '90s.

20   Q    And you performed maintenance in the context of work for

21   one of your consulting clients when you were doing custom

22   software development, correct?

23   A    That is true.

24   Q    Okay.  And you were working -- is that client,

25   Tektronix -- am I saying that right?

527

1    A    Uh-huh.

2    Q    You were Tektronix's consultant, correct?

3    A    That is true.

4    Q    So you were essentially a third-party support provider to

5    Tektronix, right?

6    A    I believe in that particular engagement I was.  I mean, I

7    was an employee of Tektronix twice over the years and a

8    consultant probably two-dozen times beyond that, and as best I

9    recall this particular time frame, it was during when I was a

10   consultant to them as opposed to am employee.

11   Q    Did you install their JDE software?

12   A    I may have installed a patch for it, but I don't -- my

13   principal work was with respect to actually working with some

14   configuration changes, some data extracts, and developing some

15   customized reports.

16   Q    Did you look at any human-readable code portions of

17   Tektronix's JDE software?

18   A    I'm sure that I must have during that timeframe, yes.

19   Q    And looking at that code would make copies, correct?

20   A    In memory, and to the extent that I checked them out to

21   make any changes, I would have made changes, yeah.

22   Q    You'd agree that modifying or making changes to a code

23   file of JDE necessarily entails copying the file in some form,

24   correct?

25   A    Yes.

1  Q   Are you aware that in 2011 Oracle conducted an audit of a

2  third-party support provider named Spinnaker?

3  A   I have heard that company mentioned in the context of the

4  litigation.  I think you asked me about it at one of my

5  depositions.

6        But I really don't know anything substantive about

7  what was audited or how the audit was conducted or what the

8  relationship between the parties was.

9  Q   And it's not on your materials considered list, right,

10  anything relating to Spinnaker?

11  A   I don't believe so.

12  Q   Okay.  So Oracle's counsel didn't provide you any

13  information about Spinnaker, did it?

14  A   Only just the reference that they existed when I asked

15  about it, when I saw it in one of the briefs, but I didn't

16  review any -- independently review any Spinnaker-related

17  materials.

18  Q   So they didn't provide you the declaration of Spinnaker's

19  CEO describing its processes?

20  A   I don't recall having seen that, no.

21  Q   And they didn't provide you the deposition testimony of

22  Oracle's 30(b)(6) witness in Rimini II regarding Spinnaker?

23  A   I do not recall seeing -- what was the deponent's name?

24  Q   Buffy Ransom.

25  A   Not ringing any bell.

1   Q   And Oracle's counsel didn't provide you the letter that

2   Oracle's assistant general counsel wrote to Spinnaker about

3   Spinnaker's processes, did they?

4   A   I don't believe I've seen that either.

5   Q   So you didn't consider any of those things relating to

6   Spinnaker in forming your opinions in this case.

7   A   No.

8   Q   Are you aware that the audit included Oracle reviewing

9   Spinnaker's support processes?

10   A   I have seen that in the briefs for this case.

11   Q   Are you aware that Oracle's associate general counsel was

12   involved in that audit?

13   A   I don't remember specifically who the players were, I'm

14   sorry.

15   Q   Are you aware that Oracle brought in outside counsel for

16   the audit?

17   A   Again, it hasn't been a focus of anything for me in this

18   case, and so I have only the sketchiest details.

19   Q   And so you're not aware that the audit was actually an

20   onsite visit to Spinnaker.

21   A   I don't recall that, No.

22   Q   And so you're not aware that as a result of that audit

23   Oracle's general counsel confirmed in a letter that

24   Spinnaker's processes do not violate Oracle license

25   agreements?

1    A    Again, I saw that when I read the briefs that were

2    associated with this case, but I -- in one of the briefs, I

3    think.  I'm sure it was from Rimini.

4              But I don't have the background materials, and have

5    not reviewed the background materials, so I really can't

6    address anything about the scope of that audit.

7    Q    So Oracle's counsel chose to not provide you those

8    materials.

9    A    I don't think they were relevant to my analysis of the

10   injunction matters here because what the judge enjoined is

11   what the judge enjoined here, and what happened in some other

12   past thing, I -- I don't think would be relevant for me to

13   consider, so it doesn't surprise me that they didn't provide

14   me those materials.

15   Q    And you didn't ask for them?

16   A    I did not.  Again, my focus here was on Rimini's conduct

17   and what the evidence shows with respect to this specific

18   injunction.

19   Q    You're aware that the Court has held that the injunction

20   only covers unlawful conduct, right?

21   A    That is my understanding, yes.

22   Q    So you're not aware of Ms. Ransom's testimony as Oracle's

23   corporate representative on behalf of Oracle International

24   Corporation and Oracle America, correct?  You've never seen

25   her deposition transcript?

1    A    I don't believe I have seen her deposition transcript.

2            I mean, my awareness of this is largely from the OSC

3    briefs that were filed here and just -- when I was asked about

4    it at my deposition in the other Rimini matter I believe it

5    was, I asked counsel what that was all about, and they said it

6    was -- it had to do with Oracle and another party and wasn't a

7    part of this litigation.

8    Q    You're aware Spinnaker is a third-party support provider

9    that provides JDE support, right?

10   A    I am aware that they support one of the products.  I

11   don't remember, as I sit here, which one specifically it was.

12   Q    Okay.  Are you aware that Ms. Random testified about

13   Oracle's audit of Spinnaker processes?

14   A    Only to the extent that I have seen reference to it in

15   the briefs.

16   Q    And are you aware that she testified under oath on behalf

17   of Oracle that Spinnaker provides JDE updates?

18   A    Again, as I sit here, I don't recall specifically which

19   product.  I remember that she testified that Spinnaker

20   provided updates for one of Oracle's products.

21   Q    Okay.  And are you aware that she testified that

22   Spinnaker provides JDE, quote, "tax and regulatory updates"?

23   A    I do remember that whichever product she was talking

24   about did involve tax and regulatory updates.

25   Q    And that Spinnaker also provides JDE custom code

1    solutions.

2    A    I am drawing a blank on whether I saw -- or whether I

3    recollect -- I mean, I don't recollect that specific statement

4    as I sit here, but I have no reason question it if that's your

5    representation, counsel.

6    Q    Are you aware that Ms. Ransom testified under oath on

7    behalf of Oracle that Spinnaker's JDE custom code solutions

8    may take the form of source code changes?

9    A    Again, I remember that with respect to whatever product

10   she was talking about, there was mention that they could

11   include source code changes.

12   Q    And are you aware that Ms. Ransom, on behalf as Oracle,

13   as Oracle's corporate representative, stated under oath that,

14   quote,

15             "Oracle viewed Spinnaker's support policies

16        as respectful of and noninfringing of Oracle's

17        nonintellectual property"?

18   A    I remember the "respectful of" phrase because I thought

19   that was an interesting turn of words.

20             Again, which product, I don't specifically recall,

21   but I remember that -- from reading these briefs that her

22   testimony included some statement of respectful and --

23   Q    And noninfringing, too, right?

24   A    I don't remember the exact wording, I didn't memorize it,

25   counsel, but noninfringing, or acceptable, or whatever term

1    was.

2    Q    Are you aware that Ms. Ransom on behalf of Oracle, as

3    Oracle's corporate representative, stated under oath that

4    Spinnaker's JDE support processes, including its, quote,

5    "custom code solutions and," quote, "source code changes do

6    not violate Oracle license agreements"?

7    A    I think I recall seeing that in the briefs, counsel.

8    Q    But don't you think --

9    A    I didn't read her deposition nor her -- I've only seen

10   the materials that I've seen in this brief so forgive me if I

11   can't answer some of these questions, but --

12   Q    Wouldn't you think it's relevant what Oracle's own

13   corporate representative and Oracle's associate general

14   counsel thinks about the JDE support processes of a

15   third-party like Spinnaker?

16   A    Not having any understanding about the relationship of

17   Spinnaker to Oracle, and whether they were a business partner

18   or a preferred provider, or anything else, and not having any

19   understanding about what Spinnaker's specific practice was, do

20   they do one change that they sent to many customers, or did

21   they just go into one customer site and do it for that

22   customer, and go to another customer's site and do work for

23   that customer, you know, not being -- not having any

24   understanding of that, I don't see how it could possibly be

25   relevant here.

1    Q    And we're not talking about cross-use, we're just talking

2    about J.D. Edwards software source code.

3            You don't think that it's relevant that when

4    Oracle's corporate representative testifies under oath that

5    Spinnaker can do custom code solutions and source code changes

6    and it does not violate Oracle's license agreements, you don't

7    think Oracle's own lawyer's comment and own corporate

8    representative's representation is relevant to your analysis

9    of whether -- what the Court intended by the phrase source

10   code changes -- or, sorry, J.D. Edwards software source code?

11   A    I really don't, counsel, because that's a different set

12   of facts.

13           And, you know, we are here in this courtroom after

14   many years of litigation and after a judge has issued a ruling

15   for an injunction, and I would not presume to say that the

16   judge's injunction, on its face, would be diluted by a set of

17   facts that happened at another point in time between different

18   parties and another set of facts.  I mean, I think that would

19   be really presumptuous of me, counsel.

20   Q    You're aware, again, that the judge has held explicitly

21   that the injunction only reaches unlawful adjudicated conduct,

22   correct?

23   A    That is my understanding.

24   Q    Okay.  So if something is unlawful, it's not just

25   unlawful for one person, it's unlawful for other people, too,

1  correct?

2  A    I think that depends on the contractual relationship.

3           If it's -- for instance, if I violate a license,

4  it's unlawful for me, but you might have a different license,

5  and if I don't know what that license is, I can't say that

6  your behavior and mine should be judged the same.

7  Q    Okay.  Let's put aside the license issue.  Spinnaker is a

8  third-party support provider for JDE.  Do you understand that?

9  A    Well, we've been talking about it for a bit here now, so,

10  yes.

11  Q    Okay.  So if the injunction only covers unlawful conduct

12  as to Rimini, a third-party support provider, then it would be

13  unlawful for any third-party support provider, correct?

14  A    Again, I'm assuming that some of the judgment -- and

15  remember, I'm not a lawyer here, but I'm assuming that what is

16  lawful under one license to one licensee and isn't under

17  another, would color my answer to that.

18  Q    Well, that's --

19  A    If I'm allowed to -- if I'm a licensee of your creative

20  song and I'm allowed to perform it, that doesn't mean somebody

21  else can perform that song, too.

22           And so I don't know enough about the relationship of

23  these parties to know if it's relevant or not, counsel, and I

24  don't know what "legal" would be in the context of these

25  disparate matters because they're -- I don't know what the

536

1    fact pattern was in Spinnaker.

2    Q   And so you don't know whether they had a license, right?

3    A   I don't know whether they had a license.  I don't know

4    whether they had permission.  I don't know -- you know,

5    obviously, Oracle did an audit.

6            I mean, from what I have seen in the briefs, at

7    least, the results of that audit was that Oracle said what

8    they were doing was okay, but I knew nothing else about the

9    fact pattern here, about what exactly they were doing, or what

10   the relationship between the parties were.

11   Q   Okay.  So if Spinnaker's support for its clients is

12   pursuant to the same JDE licenses those clients have that

13   Rimini does for its own JDE clients, then you would agree,

14   then, the ramifications of your testimony is that Spinnaker

15   would be acting illegally, too, correct?

16   A   Again, absent some other agreement between the parties or

17   some other relationship, some other contract that I know

18   nothing about, that might be true.  I mean, I just don't have

19   enough facts to offer an opinion on that, counsel.

20   Q   So if there are many third-party support providers that

21   are all performing JDE support pursuant to the same -- for the

22   their clients who have the same JDE licenses that Rimini's

23   clients do, that entire industry of third-party support would

24   be now acting illegally.

25   A   I wouldn't necessarily make that extrapolation since I am

537

```
1    aware that there are many forms of JDE support that do not

2    involve the modification of source code.

3    Q    And I'm saying that do the same things that Spinnaker

4    did, which is make custom code solutions and source code

5    changes and that you contend Rimini does.  They would now all

6    be acting illegally.

7    A    I think that's for the courts to decide, counsel.

8    Q    Now, you testified about Object Management Workbench a

9    bit during your direct testimony.  Do you remember that?

10   A    Yes.

11   Q    Okay.  If we could put up slide 37 of your demonstrative,

12   I guess it was.  Do you remember this slide?

13   A    I remember this slide, yes.

14   Q    And I just want to be crystal clear here.  All of the

15   things we're looking at, this is in the client's system,

16   right?

17   A    It could be.  I should have noted with the other one we

18   looked at as well, if you were doing the checkout remotely,

19   you might be drawing that back to a remote location.

20            So, in theory, though, this would be -- the

21   development client would be hooked to the development server,

22   and in a normal instance that might be, you know, somebody in

23   the same building or in the same facility or in the same

24   company.

25            But, I should have pointed out when we were talking
```

538

1    before that to the extent that a development client was

2    checking out remotely, that development client could be

3    somewhere else.

4    Q    But you didn't -- you didn't offer any opinion about

5    that, right, about where the development happened?

6    A    With respect to the instances that we have discussed in

7    this matter, that's true, counsel.

8    Q    And I know it's probably not actually JDE code, but that

9    file in the middle, under the label Check Out, that is your

10   representation of what you contend is JDE source code,

11   correct?

12   A    Yeah, it just means this is a source code file being

13   checked out to some development client.

14   Q    Okay.  So presumably there is a copy of what you contend

15   is source code on the development server, and then there's a

16   copy sent to the development client, correct?  And that's the

17   checkout process?

18   A    Correct.  And this is in J.D. Edwards EnterpriseOne, so

19   you would check it out from the repository to where you would

20   be working on it.  It could physically be the same computer or

21   a different computer.

22   Q    Okay.  And if we go to the next slide, slide 38, similar

23   slide, this one is about the display of what you contend is

24   JDE software source code, right?

25   A    When a source code is displayed, yes, it's displayed on

1    the user's computer for the user to view.

2    Q    So what you're saying here is that the mere display of

3    that file causes a copy of what you contend is JDE source

4    code, that creates a copy, right?

5    A    In order for the code to be displayed on the user's

6    computer, there would have to be a portion of at least the

7    code that is displayed in memory on the computer and

8    typically, also, a separate copy in their video processing

9    component.

10   Q    And so it would be your opinion that a Rimini engineer

11   can't even look at what you contend is JDE source code,

12   correct?

13   A    Under the explicit wording of the Court's injunction that

14   involves not creating copies -- you know, shall not copy J.D.

15   Edwards source code to carry out development and testing --

16   under those words I would, as a technical person, understand

17   that to be true, that I was not permitted to view the code

18   because to do so would necessarily create a copy of it.

19   Q    So you can't look at it.

20   A    That would be, again, my understanding as a person

21   evaluating the Court's injunction from the perspective of a

22   technical background.

23   Q    And the previous slide -- I didn't ask, but I will now --

24   a Rimini engineer could not never check out what you contend

25   is JDE source code, correct?

1    A    Again, that's my understanding.

2           Just to be clear, I'm not saying that no one could

3    check it's out, and, similarly, I'm not saying that no one

4    could display it.

5           So it would appear to me that this injunction

6    prohibits J.D. Edwards from performing the checkout or from

7    having a copy on their machine where they are displaying it.

8    I don't think it necessarily prevents a J.D. Edwards person

9    from standing at the shoulder of a --

10   Q    Well, you're saying --

11   A    -- corporate employee.

12   Q    -- J.D. Edwards.  Are you trying to say Rimini?

13   A    I'm sorry.  A Rimini, yeah, engineer from standing at the

14   shoulder of an employee, for instance, and assisting them in

15   making some change to the code.  It just appears to me that

16   they are not allowed, themselves, to make those copies.

17   Q    Okay.  So it's your opinion that the Rimini engineer

18   can -- let's just say physically, physically look at the -- at

19   what you contend is JDE source code?

20   A    In the -- the Court struck the "shall not access J.D.

21   Edwards source code" in an amendment to the version of the

22   document I'm looking at.

23          So I think from the standpoint, as best I understand

24   it, of standing beside an employee of the company who is the

25   licensee and giving them guidance, I don't see anything here

1    that would prevent that.

2    Q    If we could go the next slide, please, and this slide is

3    slide 39 of your demonstrative that you used with your direct

4    testimony, and instead of being about checking out and

5    displaying, this is about the check-in process of the OMW

6    Tools for EnterpriseOne, correct?

7    A    Correct.

8    Q    And it depicts a -- what you contend is JDE source code

9    in the middle being checked in, and it goes to the development

10   server, correct?

11   A    Correct.  Once it's checked back in, a copy of the new

12   code is placed on the development server.

13   Q    And, again, this is all happening in the client's JDE

14   environment, correct?

15   A    Yes.

16             MR. VANDEVELDE:  And if we could go to slide 40,

17   please.

18             THE WITNESS:  Well, again, with the provision on

19   that last slide, assuming that the machine it was checked out

20   to as a development environment was on the client's

21   environment.

22             So if it was somewhere else, you know, if that

23   copy had been checked out to a remote location or something,

24   then it may not be in the client's environment.

25   BY MR. VANDEVELDE:

1    Q    Yeah.  You're not offering any evidence that any file was

2    checked out to a remote location other than a client's system,

3    correct?

4    A    Not in the matter before the Court here.

5    Q    Okay.  So slide 40 of your demonstrative depicts three

6    development environments.  One's called development environ --

7    sorry, three environments, one called Development Environment,

8    one called Test Environment, and one called Production

9    Environment.

10              And this slide relates to the promotion process of

11   JDE -- what you contend is JDE source code, correct?

12   A    Of the promotion between environments, correct.

13   Q    And all of these environments are on the client's

14   systems, correct?

15   A    That would be the normal case, yes.

16   Q    So if there's any copies being made, it's being made on

17   the client's systems, correct?

18   A    During this promotion, yes, the copies would be from one

19   client environment to another client environment.

20   Q    And it's your opinion that Rimini can't promote what you

21   contend is JDE source code, correct?

22   A    That is my understanding, and my understanding of the

23   injunction ruling, yes, that they're not permitted,

24   themselves, to make that copy.

25   Q    So putting these slides together, these four slides we've

543

1    just gone through, 37, 38, 39, and 40, which concern checking

2    out, displaying, checking in, and promotion, all of those

3    involve copying of what you contend is JDE source code in the

4    client's environment, correct?

5    A    In this scenario here, where we have no other

6    environments, it would be in the client's environment, yes.

7    Q    And all of those steps are necessary in the course of

8    developing JDE updates involving what you contend is JDE

9    source code, correct?

10    A    For those updates specifically that involve source code,

11    that would true.    For other types of updates that are

12    configuration or data changes, the path is a little bit

13    different.

14    Q    So for those types of changes, meaning ones that involve

15    looking at, even, what you contend is JDE source code, that is

16    illegal.

17    A    I'm not rendering an opinion on legality.    I'm rendering

18    the opinion that it appears to be prohibited under the Court's

19    injunction.

20    Q    And the injunction says that it only reaches unlawful

21    conduct again, correct?

22    A    It does say that, yes.

23    Q    OMW is the tool that Oracle itself created and gives to

24    licensees to do all these things, correct?

25    A    Yes.    Specifically, it is the tool for EnterpriseOne to

1    do these things.

2    Q    Can you use Oracle's own tool that it provides to its

3    customers without what you contend is JDE source code being

4    copied?

5    A    I'm sorry, ask that again?

6    Q    Is it possible to use the OMW tool that Oracle itself

7    creates and gives to its customers, can you use the tool

8    without copies of what you contend is JDE source code being

9    copied?

10   A    My recollection of that tool is that it provides, also,

11   the facility to interact with the JDE configuration management

12   and other things that are not so source code related, so my

13   answer to that would be yes, you can use OMW without touching

14   source code, if you're not modifying source code or checking

15   out or checking in or viewing.

16   Q    But for any work that requires even looking at what you

17   contend is JDE source code, you cannot use the tool without

18   making copies of that, correct?

19   A    Without making at least in memory copies, that would be

20   correct.

21   Q    Can -- just going back -- and I'm almost done.  We can

22   wrap up for what I'm assuming most people are looking forward

23   to which is a lunch break.

24              I wanted to touch up on one issue which is you

25   mentioned this concept of a Rimini engineer standing next to

545

1    someone who is allowed to look at the code, and I think you

2    said that's okay.  Can a Rimini engineer do the same thing

3    remotely?

4     A    I think that's a slipperier slope because, if they're

5    doing it remotely, at least a video portion of the code that

6    they are looking at is on their remote machine at the time

7    that they viewing it, and so there is a copy of the code in a

8    form remotely on their machine.

9     Q    So they can't.

10    A    I would think that would be prohibited.

11                MR. VANDEVELDE:  Your Honor, I think this would

12    be a decent stopping point if you agree.

13                THE COURT:  Noting that it's after noon, I do

14    agree.

15                We'll take our noon recess at this time.  Let's

16    reconvene at -- I'd like to see it move along.  Let's

17    reconvene at 1:20.

18                MR. VANDEVELDE:  Thank you, your Honor.

19                THE COURT:  Court will be in recess until 1:20.

20                    (The noon recess was taken.)

21                        --o0o--

22

23

24

25

```
 1         RENO, NEVADA, WEDNESDAY, SEPTEMBER 22, 2021, 1:25 P.M.

 2                        ---o0o---

 3

 4              THE COURT:  Have a seat, please.

 5              The record will show we are reconvened following

 6    the lunch hour.

 7              And, Mr. Vandevelde, you're welcome to go

 8    forward.

 9              MR. VANDEVELDE:  Thank you, your Honor.

10              If we could display the transcript from

11    yesterday, at page 325, starting at line 17, please.

12    BY MR. VANDEVELDE:

13    Q    Ms. Frederiksen-Cross, yesterday you were asked by Oracle

14    counsel,

15              "And in connection with your review of the

16         materials in this case and Rimini II, did you come

17         across instances where Rimini support practices for

18         J.D. Edwards only involved data changes or

19         configuration changes?"

20              Do you remember that question?

21    A    Yes.

22    Q    And you answered,

23              "Yes, those were some of the things that I

24         saw principally -- principally in the Rimini II case

25         but some here as well."
```

1          What were the things you saw?

2    A    My recollection was communications where the change

3    involved changing something like just providing a fresh copy

4    of a form, or just those kinds of changes that didn't involve

5    code changes.

6    Q    And then you testified -- you were asked the question --

7    and this is on page 325,

8              "And do you have a percentage or an estimate

9         as to the amount of work that Rimini does to support

10        JDE that involves source code versus compilation

11        changes versus data changes?"

12             And you answered, "Only as derived from some

13        of Rimini's e-mails that communicated counts of

14        overall changes and how many related to source code

15        of that specific count.  If that's representative of

16        their practice as a whole, it's roughly two percent

17        require source code changes."

18             If you could please turn to the binder that

19   contains turn tab 47, please, and take a look at it.

20   A    Okay.  I'm there on tab 47.

21   Q    And can you also look at tab 48, please.

22   A    Sure.  Do you want me to take a moment and review these?

23   Q    Sure.

24   A    Okay, counsel.

25   Q    And these documents, those are the basis for your

1    testimony regarding two percent, correct?

2     A    There's another -- yeah.  So out of 155 cases, only three

3    required source code changes was the number that fixed in my

4    mind when I answered the 20 -- or the two percent.

5              MR. VANDEVELDE:  Your Honor, it's come to our

6    attention, and this is extremely serious and it's very

7    troubling, counsel for Oracle asked the witness to testify

8    about this.  I've just confirmed the basis for her statement

9    about two percent were these exhibits.

10             Those exhibits were struck by your Honor in

11   granting our emergency motion to strike.  They were included

12   in the list of 250 documents that were attached to Appendix A.

13   Oracle's counsel didn't identify them in his question.  She

14   didn't identify them in her answer.

15             I had no basis to object because I didn't know

16   what documents she was talking about, and now, through the

17   back door, they are trying to create new opinions based on

18   documents that your Honor said that she could not use.

19             I would move to strike her testimony.  I have

20   the portions of it.  It would be 324, 18, through 326, line 5.

21   I have a copy for your Honor.

22             But the fact that they are not identifying

23   documents, and then using unidentified documents as the basis

24   to get in opinions based on things that your Honor has struck,

25   I find very troubling.  And so I'd ask that you strike that

1    testimony from yesterday.

2                  THE COURT:  All right.  Mr. Smith?

3                  MR. SMITH:  Yes, your Honor.  I think that

4    Ms. Frederiksen-Cross also testified to her basis for this

5    understanding being part of her work involves Rimini II and,

6    in this case, an analysis of the types of changes that Rimini

7    engineers make to customers.  So there was more basis to it

8    than these e-mails.

9                  MR. VANDEVELDE:  Your Honor, I just asked her

10   what was the basis of two percent, she said three out of 155,

11   that works out to 1.935 percent.  I did the math.

12                 There's no other basis she has for that number.

13   She's attempting to use documents that your Honor excluded,

14   through back door by not identifying, and we'd move to strike

15   that narrow portion of her the testimony.

16                 THE COURT:  That motion will be denied.

17                 I did not view her testimony as attempting to

18   incorporate documents that had been stricken.  I considered

19   her testimony as what appeared to be to the Court a

20   straightforward answer to a question.

21                 There was no objection posed at the time on

22   behalf of Rimini or by anyone, frankly, it was just the

23   witness's testimony, which, when a question is asked, if

24   there's no objection made to the question, I assume the

25   witness is going to answer.  That's exactly what happened.

1            There wasn't any reference to the documents or

2     anything to indicate it was some kind of a charade to admit

3     something that was otherwise stricken by the Court.  I haven't

4     seen any sign of any type of that kind of deceit being

5     practiced in front of the Court, and I therefore deny the

6     motion.

7            MR. VANDEVELDE:  If you could put up tab 48,

8     please, which is OREX Exhibit 69.

9            And I apologize, John.  Could you please put up

10    her answer again on page -- the question and answer at the end

11    of 325 and the beginning of 326.

12            And actually -- yeah.

13    BY MR. VANDEVELDE:

14    Q    And you were asked,

15            "And do you have a percentage or an estimate

16        as the amount of work that Rimini does to support JDE

17        that involves source code versus compilation changes

18        versus data changes?"

19            And your answer was, "Only as derived from

20        some of Rimini's e-mails."

21            So documents are referenced.  Those are the

22        e-mails which you saw which is OREX Exhibits 68 and

23        69, correct?

24    A    I don't know if it was this very specific e-mail.  It

25    was -- the last paragraph of this is the one I was recalling

1    when I tried to calculate a percentage when I was asked that

2    question.

3    Q    So you did --

4    A    So it may have been this document or a document that

5    incorporated a part of this same e-mail.  I'm not sure which,

6    counsel.

7    Q    So as you reference an e-mail, correct, in your answer?

8    A    Correct.

9    Q    And you didn't identify it, correct?

10   A    I wasn't asked to identify it, that is correct.

11   Q    And it was on the Appendix A to your supplemental report?

12   A    Honestly, counsel, I did not realize this e-mail was in

13   that appendix.  I just -- when I was asked the question and

14   tried to do a calculation, these were the numbers that came to

15   my mind.

16   Q    Okay.  And you have no other basis for that two percent

17   figure other than this e-mail, correct?

18   A    I can't think of anything else that I had counted or that

19   has quantities that I could derive that from, that's correct.

20   Q    And before yesterday, never in a report, never in a

21   declaration, never in a deposition, you have never given a

22   percentage with respect to the amount of work that Rimini does

23   that requires touching, in your view, JDE source code,

24   correct?

25   A    I don't recall having done so, counsel.

1   Q    So the only basis was Oracle -- those Oracle Exhibits 68

2   and 69, correct?

3   A    Again, specifically, this one, OREX_69, is where I

4   remembered the numbers from that was a count of the 2016 code

5   changes and the comment that out of 155, three were source

6   code changes.

7   Q    And both OREX Exhibits 68 and 69 were on your Appendix A,

8   correct?

9   A    Honestly, counsel, I did not memorize the list on

10  Appendix A, and as I recited that number, all I remembered is

11  having seen this e-mail.

12          So I would have to check, even now, the list on

13  Exhibit A to answer that question.  If that's your

14  representation, I'm happy to take it as fact.

15               MR. VANDEVELDE:  Okay.  If you could please

16  display Oracle Exhibit 69, please, and if you could blow up

17  the bottom e-mail, please.

18  BY MR. VANDEVELDE:

19  Q    And you've already read this to yourself?

20  A    Yes, I did.

21  Q    Okay.  And it just -- it's from Gerard Roy.  It's to Ray

22  Grigsby at Rimini Street.  And the subject is Libbey Discuss

23  Procedures.  Do you see that?

24  A    Uh-huh.

25  Q    And it's dated November 30th, 2016?

```
1   A    I see that.

2   Q    And it says,

3              "I just finished analyzing all of Libbey's

4        cases for 2016 on a case-by-case basis.  There are

5        155 cases opened in 2016."

6              So I just want to pause there.

7              This e-mail is only about Libbey, correct?

8   A    That is my understanding as I look at it, yes.

9   Q    A single client of Rimini, correct?

10  A    One of the Rimini's clients, yes.

11  Q    And it's only about 2016, correct?

12  A    That appears to be the basis, yes.

13  Q    And only a portion of 2016, correct?

14  A    Yeah.  They don't say the specific dates, but I'm

15  assuming it's up until the point of the e-mail, roughly.

16  Q    And it references 155 cases open.  Do you see that?

17  A    Yes.

18  Q    Okay.  Do you know whether those are break fix cases or

19  support cases -- or, sorry, cases involving tax, legal, and

20  regulatory updates?

21  A    I don't specifically know, counsel.

22  Q    Okay.  So you didn't take that into account.

23  A    I didn't, no.

24  Q    Okay.  And you didn't tell the Court, when you said it

25  was two percent, that it was just about Libbey, correct?
```

1    A    No.  All I remembered is seeing the number that I counted

2    stuff from 2016, out 155 cases, three required source code

3    changes.

4    Q    And you didn't tell the Court that it was only for a

5    portion of 2016, correct?

6    A    Up until November, correct.

7    Q    And you didn't tell the Court that it was only about

8    break fix cases and didn't include tax, legal, and regulatory

9    updates.

10   A    I don't know that that's true even now.  Looking at this,

11   you know, this doesn't say what kind of cases they counted,

12   they just said they counted Libbey cases.

13   Q    But if you included tax, legal, and regulatory updates,

14   which require changes to what you contend are source code,

15   then number would be higher, correct?

16   A    It might be if they weren't already counted in this

17   number of cases, counsel.

18   Q    And it's only ones at the very end, that last sentence,

19   that "required source code changes," correct?

20   A    That's what it says here.

21   Q    Okay.  Lots of actions would trigger, in your view, what

22   you consider JDE source code to be copied, right?  Like,

23   displaying the file?

24   A    I'm not sure what you're asking, counsel.

25            I mean, anytime that you display the file a copy

1    would be created.

2    Q    Okay.

3    A    If you're asking what specific instances would trigger

4    that, of these 155 cases, I have no basis to tell you that

5    because there's no information on that in this document.

6    Q    Well, you based your opinion on this document, right?

7    A    The question I was asked, as best I recall it -- and you

8    have a transcript at the moment -- is what percentage required

9    code changes, and this was the number that came to mind as I

10   tried to reach for something that would allow me to answer

11   counsel's question.

12   Q    And you didn't say it was about one client or that it was

13   about a portion of a year, or that it may only include certain

14   types of, you know, provision of support, correct?

15   A    I didn't elaborate on that.  I didn't have the document

16   in front of me to refresh my recollection, counsel.

17           All I remembered is somebody had counted 2016 cases,

18   come up with a total, and then I remembered I had done in my

19   brain the math to say, "Oh, that's a couple of percent."

20   Q    And you didn't recall the document and you didn't

21   identify this e-mail, correct, on the record?

22   A    No.  I mean, I didn't have the document in front of me,

23   how could I?

24   Q    And when it says, "Only three required source code

25   changes," let me ask again, there are lots of actions that can

556

1    be taken with respect to what you contend is JDE source code

2    that don't require a change, correct?

3              So, for example, looking at a file, even without

4    changing the file, that in your view would create a copy of

5    what you contend is JDE software source code, right?

6    A    It would at least create an in memory copy if you did

7    that, counsel, this is correct.  It would create - - I'll move

8    closer to the mic.  It would create a copy of that file in

9    memory, at least, yes.

10   Q    And you don't know whether those are included in these

11   numbers, correct, even looking at JDE source code, in your

12   view?

13   A    Yeah.  This doesn't count the number of times someone may

14   have looked at source code.  It doesn't give any data about

15   that.

16   Q    So you don't have an opinion, then, about the number of

17   cases that involve copying what you contend is JDE software

18   source code, correct?

19   A    With respect to things that didn't require source code

20   changes to fix, that would be true.

21   Q    And, again, before yesterday you had never disclosed an

22   opinion attempting to calculate the number of cases that

23   require copying of what you contend is JDE source code,

24   correct?

25   A    I don't recall that I had ever been asked to try to

1   calculate that before yesterday.

2   Q    So that was an undisclosed opinion before yesterday.

3   A    That's the first time I recall being asked for that -- to

4   figure that out, yeah.

5   Q    Let's turn to a new issue, issue number 9 which involves

6   a specific Rimini technical specification.  It's Rimini's JDE

7   105328.

8            Do you remember that issue?

9   A    I believe so, yes.

10  Q    Okay.  And the technical specification was a document

11  titled JDE Tech Doc US EF W-2c, 2018.docx.

12           Do you remember that title?

13  A    I didn't memorize it letter for letter, but I remember

14  something with a title like that, yeah.

15  Q    All right.  And you opine that the technical

16  specification contains and refers to copies of source code

17  from Oracle source member P06767, as well as from the Oracle

18  source file R89078652.  Do you remember that?

19  A    That sounds correct, yes.

20  Q    You didn't offer an opinion on whether those two Oracle

21  files are provided to licensees in an accessible

22  human-readable format, did you?

23  A    I don't recall being asked that question, no.

24  Q    They were, weren't they?

25  A    Yes, they would have been.

-558-

1    Q    Okay.  So if the phrase in the injunction, "JDE Edwards

2    software source code" is interpreted not to include accessible

3    human-readable code provided to licensees, then paragraph 8 of

4    the injunction wouldn't apply, correct?

5    A    Let me restate your question so I make sure I understand

6    it.

7          You're saying if that paragraph in the injunction

8    does not apply to the source code that Oracle ships to its JDE

9    customers, then my opinion that that code was copied

10   inappropriately would not apply.

11         Is that correct, or a fair Restatement?

12   Q    I think so.

13   A    I think that would be true.

14   Q    Okay.

15   A    Absent, obviously, evaluation against the other criteria

16   of the injunction.  But taken in isolation, if that was not

17   the code that the Court was talking about, then I would want

18   to at least reevaluate what code the Court was talking about

19   when it got that instruction.

20   Q    Just checking if it was admitted.

21         If we could display, it's OREX Exhibit 212.  I

22   believe it was previously admitted.

23         Do you see it on the screen?

24   A    Yep.

25   Q    This is the first page of OREX's Exhibit 212?

559

1    A    It says page 2 of 16 at the bottom.   Is there a cover

2    page on it?

3    Q    At the bottom, next to page 2 of 16, it says OREX 212?

4    A    Yes.   It does say OREX 212.

5    Q    And your testimony yesterday was that the technical

6    specification at issue, which is on the left-hand side of

7    this, correct?

8    A    That is correct, yes.

9    Q    The purpose of it was to guide development for Rimini's

10   clients, where the Rimini engineer would add the Rimini

11   written code in the add boxes that we see on the left, after

12   or around the markers indicated in the red box.

13          Do you see those?

14   A    Yes.   As indicated, after or before -- but just to

15   clarify, this wasn't to guide development.   It was to guide

16   applying the fix in an environment -- as obviously, the change

17   code had already been developed.

18   Q    And you called these markers, I believe, yesterday?

19   A    I may have used that term for lack of anything better.

20   Yes.

21   Q    Is there another term that you would prefer?

22   A    Lines of source code or indicators for the code -- again,

23   I don't think it matters what we call them.   They are what

24   they are.

25   Q    They're used to indicate where to insert the Rimini

560

1    written code, correct?

2    A    That appears to be their purpose in this document, yes.

3    Q    These markers, they can't be run, right?

4    A    They cannot independently be executed.  They have

5    ellipses in part of their line.  And they also are not the

6    complete program, which is obvious from the comparisons on the

7    other side.

8    Q    So they're snippets of lines, correct?

9    A    That's a fair characterization, yeah, or segments --

10   segments of lines.  They may be a little bit bigger than a

11   snippet, but they're not the complete line.

12   Q    In the full line that they represent, that would -- that

13   full line would already be in the client's environment,

14   correct?

15   A    It should be for this document to be used, yes.  I mean,

16   if they were missing, then someone would be very confused when

17   they tried to use this document.

18   Q    So there would be no need to copy anything in these

19   markers when applying this Rimini written code to the client's

20   environment, correct, because those full lines, which are the

21   markers, they're already in the client's environment, correct?

22   A    I think what you're saying is you wouldn't cut and paste

23   these marker lines into the code because it was already there;

24   and that is correct.

25   Q    Do you know how many lines, with the two files that you

561

1    referenced with respect to this technical specification, the

2    two Oracle files, how many lines they contained?

3    A    I know that one of them was at least several thousand

4    lines long, and the other one was a little shorter.  I don't

5    recall, as I sit here, the total number of lines that they

6    contained.

7    Q    Are you aware that those two files, combined, are roughly

8    13,000 lines?

9    A    I remember one of them was quite large, so that would not

10   totally surprise me.

11   Q    And you didn't attempt to assess the quantity of snippets

12   of code in the markers with respect to the total number of

13   lines in the two Oracle files, correct?

14   A    That is correct.

15   Q    You didn't disclose or offer any opinions about the tech

16   spec as a whole, and whether it's substantially similar to

17   either of the two source -- the Oracle source member files,

18   correct?

19   A    The tech spec is designed to cause you to modify each of

20   those source code members, but I did not attempt to assess

21   whether or not it was, in and of itself, the same as those two

22   because, again, as you've just pointed out, there was a vast

23   disparity in size so, obviously, it wasn't going to match

24   everything.

25   Q    And not just you didn't see whether they were the same,

1     you didn't offer any opinions on whether the JDE tech spec is

2     substantially similar to either of the two Oracle files,

3     correct?

4     A    No.  My analysis was concerning the lines that it

5     contained, not the spec as a whole.

6     Q    So the answer is no?

7     A    That is correct.

8     Q    And you didn't disclose any opinions regarding whether

9     there's -- or distinguishing between any protectible and

10    unprotectible expression in either of the two Oracle files,

11    correct?

12    A    If my recollection is correct, counsel, I was asked

13    whether I thought these lines would be protectible expression

14    yesterday, and I opined that they would be.  So, I believe I

15    did express an opinion about the individual lines when I was

16    asked about them.

17    Q    So, but within those lines, you didn't distinguish

18    between any protectible and unprotectible expression, did you?

19    A    I believe that I said I thought that the portions in the

20    lines that were displayed in the Rimini tech spec were

21    protectible expression because they were sufficient to

22    dispositively identify the corresponding underlying Oracle

23    lines.  That's my recollection of my testimony.

24    Q    As markers?

25    A    Huh.

1    Q    As markers.

2    A    Well, they're being used as markers but their content is

3    what is dispositive.  They have to have sufficient content to

4    allow the programmer who is going to be applying this change

5    to identify with great particularity where within the program

6    the change is going to be applied, otherwise the tech spec

7    wouldn't work.

8    Q    You didn't filter out any unprotectible expression from

9    any of these markers, did you, in your analysis?

10   A    I don't recall specific instance of having done so.  I

11   just looked at the lines.  I looked at whether they contained.

12   They appear to contain almost entirely protectible content to

13   me, and I didn't go beyond that.

14   Q    But you offered no analysis whatsoever regarding

15   substantial similarity of any kind with respect to the tech

16   spec and the two Oracle files, correct?

17   A    I did not compare -- I think we just covered that -- the

18   tech spec individually to either of the Oracle files as a

19   whole.

20   Q    Let's turn to Issue 2, please, which relates to Matheson

21   Trucking, and the file rsi940a.sqr.  Do you remember that

22   file?

23   A    I believe I remember that file.

24   Q    And this relates to Matheson Trucking.

25            If we could pull up tab 5, which is your opening

1   report, at paragraph 343.

2   A    Tab 5.  You switched books on me.  Okay.

3   Q    You see here you note an e-mail from Jim Benge where he

4   says,

5              "There is absolutely no indication that

6        HCM200049 was developed or tested yet for MAT...",

7        which is a reference to Matheson Trucking, correct?

8   A    Correct.

9   Q    Okay.  But then you note that Don Sheffield confirms that

10  development is finished.  Do you see that?

11  A    I see that.

12  Q    Okay.  So you agree that development is finished based on

13  this e-mail?

14  A    It was finished somewhere, yeah.

15  Q    Okay.  It follows a sentence about Matheson, though,

16  right?  Are you suggesting that that development is not in

17  reference to Matheson?

18  A    I am suggesting that it's indeterminate what it's in

19  reference to from the summary I have here.  If I look back at

20  the original document, I might be able to tell you more.

21             But my recollection is that Mr. Sheffield confirmed

22  that development was finished, but he didn't say where.  He

23  just said development is finished.

24  Q    Well, you've looked at other e-mails and have relied on

25  them to draw, in your opinion, inferences about what happened

1    or not happened, right?

2            And so then Benge says, "Absolutely no indication

3    that this update was developed or tested yet for MAT," and

4    then it says, Don Sheffield" -- I guess sic --

5    A   Typo there, sorry.  Yes.

6    Q   -- "confirms that development is finished."

7            Do you see that?

8    A   Yes.  That was what he confirmed is the development was

9    finished.

10   Q   You're not offering an opinion that development didn't

11   happen for Matheson, are you?

12   A   No, just that it was finished somewhere.  I mean, I don't

13   know if it was in MAT or if it was in COE, or if it was

14   somewhere else.

15   Q   You have no opinion one way or the other whether

16   development was performed for Matheson Trucking, correct?

17   A   Actually, as I think about this particular update, I

18   think this was one that may have been already rolled out,

19   200049, to two other clients which would suggest that this

20   development probably happened somewhere else.

21   Q   But you don't know for sure.

22   A   As I sit here, I'm pretty certain that HCM200049 was

23   rolled out two or three days before to two other clients.

24   Q   But you noted that on -- after the e-mail from Jim, he

25   confirms that development is finished.

566

1    A    Yes, that at least the development was finished.

2    Q    All right.  Let's turn to, I believe, one of the last

3    issues which is regarding -- it's issue number 8 regarding the

4    file prvtsidx.plb.  Do you remember that file?

5    A    Yes.

6    Q    And client Australian Bureau -- Rimini client Australian

7    Bureau of Statistics uploaded the file to Rimini SalesForce

8    ticketing system, correct?

9    A    That is correct, yes.

10   Q    And you didn't offer any opinions that it was ever saved

11   to any further Rimini's systems, correct?

12   A    I believe that's correct, yes.

13   Q    Okay.  And you offered no opinions that it was modified

14   or used with any other client, correct?

15   A    I believe that to be correct as well.

16                 MR. VANDEVELDE:  If you could please display

17   OREX_226 which is previously admitted.

18   BY MR. VANDEVELDE:

19   Q    This is that plb file, correct?

20   A    This is the plb file.  I couldn't tell you looking at

21   this without the Bates number if this was the Oracle one or

22   the Rimini I.

23   Q    Well, this is admitted as Oracle Exhibit 226?

24   A    Yes.

25   Q    It's one you discussed yesterday.

1    A    The one I discussed yesterday had Bates numbers on the

2    bottom of the pages so I could tell them apart --

3    Q    Okay.

4    A    -- in my binder.

5                    MR. VANDEVELDE:  And if you could please display

6    Oracle Exhibit 174 which was a demonstrative that Oracle's

7    counsel used.

8    BY MR. VANDEVELDE:

9    Q    And you did a comparison, correct?

10   A    That is correct, yes.

11                   MR. VANDEVELDE:  And if you can just scroll

12   through a couple of pages, John.

13   BY MR. VANDEVELDE:

14   Q    Now, you offered the opinion and you showed this

15   comparison to suggest that it highly matched, right, the --

16   I'm going to call it the private side, the private side file

17   in the Australian Bureau of Statistics, what they sent, versus

18   the Oracle file?

19   A    Yes, the two versions were a close match.

20   Q    Okay.  And it's obvious, right, because it came from

21   Australian Bureau of Statistics' environment, correct?

22   A    Yeah, I mean, they provided from it the PeopleSoft --

23   from their JDE environment, and the other version was provided

24   by Oracle so I would expect that there would be a significant

25   amount of overlap.

1    Q    Okay.  Because the file that Australian Bureau of

2    Statistics sent came from its database on its systems uploaded

3    to SalesForce, and then you just compared it to an Oracle file

4    and said they match which is expected, correct?

5    A    It was not unexpected that they would match.  The degree

6    to which they would match was what I was really looking for

7    when I prepared this comparison.

8    Q    You testified yesterday that there's no local hosting

9    provision in the injunction as to Oracle database, correct?

10   A    I'm sorry, unpack that for me, that there is no --

11   Q    Local hosting provision or prohibition as to Oracle

12   database in the injunction in your view, correct?

13   A    I think what I testified to is that I had not seen a

14   license where there was one, so as far as I knew there was not

15   one.  I don't know dispositively.

16   Q    I'm sorry if there's confusion.  I'm not talking about

17   the license at this point, I'm talking about the injunction.

18          I had asked you to identify any other local hosting

19   prohibition in the injunction other than the one relating to

20   PeopleSoft, and you spent some time looking at the injunction

21   and you couldn't filmed one other than the one that was

22   stricken by the Ninth Circuit, correct?

23   A    That conforms to my recollection, yes.

24   Q    Okay.  What is your theory as to why the private side

25   file violates the injunction?

569

1   A    Well, my understanding is that the parties have now

2   confirmed that despite its original production in the context

3   of JDE materials that this is, in fact, an Oracle database

4   file, and the Oracle database prohibition in the injunction

5   says Rimini shall not reproduce, prepare derivative works

6   from, or distribute Oracle database software.

7            So if this is -- if this file is a part of the

8   Oracle database software, it would appear to me that Rimini

9   has a reproduction on its system by way of this uploading from

10  the client.

11  Q    What does it have to -- why does it matter whether it's

12  on Rimini's system?

13           You just said there's -- you acknowledge that

14  there's no local hosting prohibition in paragraph 15 in the

15  injunction relating to the database.  Why did you mention that

16  it's on Rimini's systems?

17  A    Because that's where the system was -- the copy of this

18  file was found.

19  Q    Does it make a difference in terms of whether you think

20  it violates paragraph 15 of the injunction?

21  A    Assuming for a moment that they made any modification and

22  sent it back, it would.

23  Q    There's no evidence of that.

24  A    The presence there -- let me ponder that just for a

25  moment.

570

1          This is another one of those tough cases because a

2    customer caused the copy to be placed there but the copy is on

3    Rimini's system.

4    Q    I'm asking you whether it's important to whatever theory

5    you have about a violation of paragraph 15 of the injunction

6    that the file was found on Rimini's systems because its client

7    sent to it Rimini.

8    A    Are you asking if it's important that it's on Rimini's

9    system or if it's important that the client sent it?

10   Q    I'm just -- I'm trying to get at your -- let me ask you

11   this.

12          Before, just now, a few minutes ago, when I turned

13   to this issue, you have never disclosed any opinion in any of

14   your reports about this file as it relates specifically to

15   paragraph 15 of the injunction, have you?

16   A    That's correct.  Prior to just very, very recently I was

17   not aware that the parties had come to the agreement that this

18   was an Oracle file so because it had been provided to me as a

19   part of the JDE distribution, both in terms of where it was

20   found on Rimini's system and in terms of the Oracle code I was

21   provided to compare it to, I had considered this to be a JDE

22   file.

23   Q    Okay.  So before today, before me asking you these

24   questions today, I have never heard your theory as to why this

25   violates paragraph 15 of the junction.

1           So I'm literally just asking an open question.

2   What's your theory as to why this file violates paragraph 15

3   of the injunction?

4   A   Because it's a copy of the file that is present on

5   Rimini's system, it's a reproduction, a copy of that file and

6   present on Rimini's system.

7   Q   Okay.  Is present on Rimini's system a necessary element

8   of why you think it's a violation of paragraph 15?

9   A   If it had been present on the client's system, it would

10  not be unless Rimini had caused that copy to come into being.

11          But because this copy is on Rimini's system and

12  Rimini is now the custodian of this copy and did not prevent

13  it from being uploaded to their system and did not take any

14  apparent action to prevent from the client uploading further

15  materials, I consider it likely a violation of that provision.

16  Q   Okay.  So you are implying a local hosting prohibition

17  that doesn't exist in paragraph 15 of the injunction.

18  A   No, I'm implying that Rimini prevented that copy from

19  coming into being on its system.

20  Q   So you interpret paragraph 15 in the injunction as

21  imposing an obligation to that prevent its clients from

22  communicating with Rimini and attaching files that may contain

23  Oracle code.

24  A   That's not my position entirely, counsel.  I'm observing

25  that their failure to do so is what resulted in the presence

1    of this copy.

2    Q    What are the necessary elements for why you contend this

3    violates paragraph 15 of the injunction, if you could list

4    them out to me.  What are the essential elements?

5    A    In it's most basic form, this is a copy of an Oracle file

6    which is present on -- in Rimini's custody.

7    Q    So being in Rimini custody you contend is an element of

8    paragraph 15.  Sorry -- yeah, paragraph 15 in the injunction.

9    A    Yeah, I was following you.

10           In this instance, I believe it is, counsel, because

11   there was no action taken to prevent the occurrence of this

12   copy or to prevent further materials from being copied.

13   Q    So is --

14              MR. VANDEVELDE:  Can you display paragraph 15 of

15   the injunction.  I think it's Tab 1.

16   BY MR. VANDEVELDE

17   Q    There's no reference in paragraph 15 in the injunction to

18   anyone's systems, correct?

19   A    That's correct.

20   Q    So you're implying some type of element about being in

21   the custody of Rimini, correct?

22   A    Rimini has the copy, and that reproduction of that file

23   is present on Rimini's system, so I will certainly give you

24   that they were not the only culpable party in that copy coming

25   in -- being created or being present on their system, but they

1    were the party who could have prevented that.

2    Q    Are you implying a custody provision or local hosting

3    provision in paragraph 15 even though it doesn't have one?

4    A    I'm not trying to do that, counsel.  I'm trying to give

5    you my best understanding of why I find this file's presence

6    on Rimini's system to be a violation.

7              Because Rimini now possesses a copy of this file,

8    there was nothing to show that it had been quarantined or

9    sequestered in any way, there was nothing to show that Rimini

10   didn't want the information that was in this file.

11             If my memory serves me correctly, this is the e-mail

12   where Rimini asked the client to get the SQL out of this file

13   for them, so at the very least a derivative work of the file.

14   Q    But you're reading a possession element in there now?

15   A    Rimini asked the client to get the SQL out of this file.

16   The client responded by sending the entire file --

17   Q    And you remember from yesterday the warnings to clients

18   when they used SalesForce to not upload Oracle IP or other

19   third-party IP to SalesForce, correct?

20   A    Unless Rimini -- unless they had reason to believe that

21   Rimini was authorized to have that, yes.

22   Q    And at the end of that warning it says all of our access

23   will be remote access, correct?

24   A    But Rimini hadn't asked the individual to get the SQL out

25   of this file and put it somewhere remotely, they just said get

1    me the SQL out of the file.

2    Q    And so if the client had followed the warning that Rimini

3    has, it would have put the file on its own systems.  They

4    could have done that, and Rimini could have accessed it

5    remotely, correct?

6    A    I don't dispute that.

7    Q    Okay.  Paragraph 15 reads,

8              "Rimini Street shall not reproduce, prepare

9         derivative works from, or distribute Oracle database

10        software."

11             I want to just focus on the reproduce part.  So

12   if you take out the "prepare derivative works" or

13   "distribute," it says, "Rimini Street shall not reproduce

14   Oracle database software."

15             What's your understanding of that?

16   A    That they should not copy.

17   Q    Ever?

18   A    Oracle database software.  That would be my reading of

19   it, yes.

20   Q    Are you aware that the Court held, quote,

21             "Given the extensive record in this case and

22        the Court's previous orders, it is clear that this

23        provision," paragraph 15, "does not prohibit all

24        copying of Oracle database"?

25   A    I did not recall that specific provision, counsel.

1    Q    So you didn't take into account the Court's order on this

2    paragraph in forming your opinions on this issue.

3    A    I did not recall that in forming my opinions on this,

4    counsel.

5    Q    You have not offered any opinions in any report or

6    declaration or deposition that Rimini has ever locally hosted

7    a database environment, correct?

8    A    I think that is incorrect with respect to the Rimini

9    II --

10   Q    I'm focusing on -- thank you for the correction.

11          In this proceeding, during the relevant time period

12   for this proceeding.   Correct?

13   A    I believe that to be correct, yes.

14   Q    Okay.   And you have not offered any opinion that Rimini

15   has ever used Oracle database environment on its systems

16   during the relevant time period, correct?

17   A    For this litigation, correct.

18   Q    And you're not offering any opinion in this proceeding in

19   the relevant time period that Rimini has ever downloaded

20   Oracle database from Oracle's technology network, correct?

21   A    Again, during the time period at issue for this

22   litigation in this postinjunction hearing, correct.

23   Q    Okay.   Are you offering an opinion that when Rimini

24   remotely connects to its client's environment and uses that

25   client's -- and supports that client's licensed database

1    software environment in that client's environment, that Rimini

2    would violate paragraph 15 of the injunction?

3    A    If their activity was solely on the client's environment,

4    given the paragraph that you discussed a moment ago that I had

5    failed to consider, I think that that would be permissible

6    under the injunction, or at least it would have to be

7    evaluated on a case-by-case basis depending on what else was

8    going on.

9    Q    You had access to Rimini's DevTrack system during this

10   proceeding, discovery period?

11   A    Through counsel, yes.

12   Q    Okay.  And that was 24/7 access, correct?

13   A    I am not aware of the restrictions that were placed on

14   their access of DevTrack, whether it was 24 by 7 or some

15   shorter period.  I just know that I had access to those

16   materials when I was in San Francisco at counsel's office.

17   Q    And DevTrack is the system that Rimini engineers use for

18   tracking its development efforts, correct?

19   A    Some of them, yes.

20   Q    And then Rimini switched to a system called Jira, and you

21   had access to Rimini's Jira system on a 24/7 basis, correct?

22   A    Again, I did not personally have that access, but I had

23   access to the system through counsel's offices in

24   San Francisco when I was there.

25   Q    And you understand that counsel had live 24/7 access to

1  those systems?

2  A   Again, I don't specifically understand that they had 24

3  by 7.  I don't know what restrictions may have been placed on

4  their access.  They had access while I was there in their

5  offices so I could request queries or run queries.

6  Q   Okay.  And in addition to DevTrack and Spira which relate

7  to development work, you also had access to Spira or Spira,

8  which is the system that Rimini engineers with respect to

9  testing efforts, correct?

10  A   Again, through counsel when I was in San Francisco, and,

11  again, I don't know specifically what restrictions may have

12  been placed on their access.

13  Q   Okay.  But Oracle's counsel had access to Rimini's

14  DevTrack, Jira, and Spira systems is you understanding, right?

15  A   I believe that is correct, yes.

16            MR. VANDEVELDE:  Okay.  I think I have no

17  further questions, your Honor.

18            THE COURT:  Thank you.

19            Redirect examination, Mr. Smith?

20            MR. SMITH:  Yes, your Honor.

21            Matt, can we display Exhibit 1342, please.

22                 REDIRECT EXAMINATION

23  BY MR. SMITH:

24  Q   Ms. Frederiksen-Cross, I wanted to return to the

25  questions that were just asked of you about Oracle database

1    and the uploading of the file by the Australian Bureau of

2    Statistics to Rimini Street, and directing your attention to

3    page 8 of this exhibit.

4            Do you recall yesterday testifying that Rimini

5    likely opened the prvtsidx.plb file while trying to solve this

6    case for the Australian Bureau of Statistics?

7    A    Yes, I do.

8    Q    And would Rimini's opening of that prvtsidx.plb file

9    reproduce database, Oracle database?

10   A    It would reproduce that database file in their

11   environment during the time it was open, yes.

12   Q    Okay.  Let's go back to yesterday.

13           I think -- you recall Mr. Vandevelde's questions of

14   you yesterday regarding your creation of SalesForce summaries

15   of voluminous evidence?

16   A    Yes, I do.

17   Q    And can you remind us why you were required to produce

18   summaries of voluminous evidence to take a look at SalesForce

19   records?

20   A    We were not provided with access directly to the

21   SalesForce system using the SalesForce interface so we had no

22   access to Rimini's SalesForce system.

23           And we were not provided that extract as a .pdf or

24   any of the other more friendly extract formats that the system

25   is capable of producing.  Instead, we got those -- a series of

1    rather messy and large tables that we had to reconstruct in

2    order to pull out the communications that related to certain

3    files that we had found on the system.

4    Q    And based upon your knowledge of the SalesForce system,

5    could Rimini have printed out its SalesForce records in a way

6    that could be read without the creation of software?

7    A    Yes.

8    Q    I'd like to go back to Defense Exhibit 41 which I think

9    was shown to you in a native version yesterday.  Do you

10   recognize what's being shown on the screen here?

11   A    Yes.  This is a part of one of the tables -- I think this

12   is the case table -- as it would look if the comma-separated

13   value file that we received was open in Microsoft Excel.

14   Q    And how many such files as the one we're looking at right

15   now, Exhibit 41, did you receive?

16   A    Six or seven I think.

17   Q    And these six -- did you have to assimilate the six or

18   seven different files?

19   A    Yes.  There are fields within these that allow

20   information from the files to be combined and brought

21   together.

22            So just as a simple example, the existence of an

23   attachment, obviously the attachment is not in this file, but

24   by using the Bates reference information, one can get to the

25   attachment as it was produced in the litigation because the

```
 1    file names were changed from the original file name to the

 2    Bates number name for production.

 3              So that would be an example of that kind of tying

 4    that you would have.

 5    Q   So if Matt could scroll through this Defense Exhibit 41,

 6    it starts with a column A, right?  And then as you go

 7    through -- I guess it ends at MN.

 8              Since you know math a lot better than I do,

 9    approximately how many columns are encompassed between A and

10    MN?

11    A   I was afraid you were going to ask me that.  I think it's

12    about 350.  It would be 26 times 13 plus 13.

13    Q   Okay.

14    A   You're 13 times through the whole alphabet and then the

15    extra 13.

16    Q   Okay.  And would you have needed to select from those 300

17    plus columns of information had Rimini supplied SalesForce

18    records to you in a readable format?

19    A   No, I would have used what they supplied.

20    Q   Do you recall Mr. Vandevelde asking you questions about

21    column GC?  And I'd like to show a demonstrative --

22    A   Yeah, I think that's where the kind of generic warning

23    about don't put things on our system is.

24    Q   Yeah.  So let's take a look at defense demonstrative DTX

25    41A.  Do you remember Mr. Vandevelde asking you questions
```

1    about this yesterday?

2    A    Yes, I do.  That was an extract from a small part of that

3    spreadsheet for this column.

4    Q    And do you know when this message is provided to Rimini

5    customers?

6    A    I believe that they see it on the splash screen.

7         I did some research on that last night, and as near

8    as I can tell, it appears on the splash screen when they're

9    logging into the Rimini SalesForce system.

10   Q    And you indicated a moment ago that this is a generic

11   message.  What did you mean by that?

12   A    Well, it appears to be the same message that appears in

13   their -- some of their general documents.

14        I think counsel showed an example of this same

15   language, or something very similar, that he said was from the

16   Web page.  I believe that's how you characterized it, and

17   forgive me if I'm wrong how you characterized that, counsel.

18        And, you know, what it says here is don't send this

19   information unless Rimini Street has demonstrated

20   authorization for Rimini Street to possess a copy of such

21   material, so don't give us any third-party content, code,

22   documentation, trace files, screen shots, or anything else,

23   unless Rimini has demonstrated authorization for Rimini to

24   possess a copy of such material.

25        So it's kind of a blanket warning of something not

1    to do.  It's not a retroactive, oh, you shouldn't have done

2    that, please don't ever do that again, or anything that is

3    responsive to a specific incident.

4    Q    And with respect to the second and third lines of that

5    message, does, in your opinion, Rimini Street demonstrate

6    authorization for Rimini Street to possess a copy of

7    copyrighted materials when they ask a customer for it?

8    A    Well, as I said yesterday, I think that would be very

9    confusing to a customer, and I'm not sure how a customer would

10   resolve that because I don't know what demonstrating

11   authorization constitutes.

12   Q    Do you believe that this message is effective in

13   preventing Rimini's customers from uploading Oracle

14   copyrighted material to Rimini's systems?

15   A    Based on what I have seen, it appears demonstrably to be

16   ineffective because we see and have discussed over the last

17   couple of days incidents where Rimini's customers did exactly

18   that.

19           So, you know, if it prevented some uploads, I can't

20   dispute that that could have happened, but it certainly didn't

21   prevent the uploads we've been looking at.

22   Q    Are you aware of more effective means by which companies

23   can prevent the uploading of materials to their systems?

24   A    There are a variety --

25                MR. VANDEVELDE:  Objection, your Honor, there's

1    been no disclosure whatsoever again about opinions regarding

2    this.   Again, it hasn't been in reports, declarations,

3    depositions.

4              It's another example of undisclosed opinions

5    that are done on the fly in this hearing, it's a Rule 26, and

6    we request that she not be permitted to testify to new

7    opinions that never before have been made.

8              THE COURT:   I think the door was opened by her

9    cross-examination.   I'll allow the question.

10             THE WITNESS:   I am aware that there are software

11   products that are used both to prevent leakage, if you will,

12   of sensitive documents from a company, and to block entry into

13   a company's firewall or into various systems of unwanted

14   documents.

15             You know, a common example of that would be

16   anti-virus software that repels the offensive content of the

17   firewall, if you will.

18             I am aware that SalesForce has plug-ins that

19   help control -- or that can be deployed to help control both

20   leakage of sensitive documents and control what can be

21   uploaded.   So I can see a number of ways that this kind of

22   behavior could be prevented.

23   BY MR. SMITH:

24   Q   You were also asked some questions yesterday about

25   whether the Oracle copyrighted materials that you found on

1    Rimini's systems were quarantined.  Do you recall that?

2    A    I recall that.

3    Q    Even assuming Rimini did quarantine these materials in

4    some way, does that change your opinions in any way regarding

5    Rimini's compliance with the injunction?

6    A    No.

7    Q    Mr. Vandevelde asked you a number of hypotheticals

8    yesterday and today.  Ms. Frederiksen-Cross, are any of the

9    claimed violations of the injunction at issue in this

10   proceeding hypothetical?

11   A    No, they are based on the facts of the evidence I have

12   reviewed.

13   Q    You were asked a series of hypothetical questions about

14   whether Rimini's reuse of knowledge is consistent with the

15   injunction.  Do you recall that?

16   A    I recall that.

17   Q    Are any of your cross-use opinions based on Rimini's

18   reuse of knowledge?

19   A    No, I don't believe so.

20   Q    What are your cross-use opinions based upon?

21   A    My cross-use opinions are based on the evidence I have

22   observed that Rimini has made use of one customer's

23   environment to perform development, modification,

24   troubleshooting, and testing -- and/or testing, I should say,

25   on behalf or for the benefit of another customer.

1    Q    Do you recall Mr. Vandevelde asking you questions this

2    morning about your ARAXIS comparison for the pstarry file?

3    A    I do.

4    Q    And just so the record is clear, is the ARAXIS comparison

5    the only thing you relied upon in determining that Rimini's

6    rsc -- rspcmpay.cbl file contained protected expression from

7    Oracle's pstarry file?

8    A    No.  Obviously, once I had identified those similarities,

9    I had to evaluate their significance.  We talked about some of

10   those I found significant during my testimony.

11   Q    Okay.  And then you were asked some questions this

12   morning about your work at a company called Tektronix?  Do you

13   recall that?

14   A    Yes.

15   Q    And you were asked some questions about your work at

16   Tektronix involving J.D. Edwards World software; is that

17   right?

18   A    Yes.

19   Q    Do you know the contents of the license agreement between

20   Tektronix and Oracle and/or JD Edwards, whichever entity it

21   was at the time?

22   A    No.  These days I'm much more sensitive to legal issues

23   that I might have inquired, but back in those days I was just

24   performing a service to a client who had hired me to perform a

25   service.

1    Q    Do you even know whether the license with Tektronix was

2    between Oracle or with J.D. Edwards?

3    A    I don't, and I'm not even certain, because it was in the

4    context of an acquisition, that it was necessarily even

5    licensed directly to Tektronix except indirectly through that

6    acquisition.

7    Q    Do you recall being asked questions about the JDE

8    technical specification which is Exhibit 80?  Maybe we can

9    display that.

10   A    I'm sorry, what was your question again, counsel?

11   Q    Do you recall being asked questions about this document

12   by Mr. Vandevelde?

13   A    Yes, I do.

14   Q    And the document version control near the bottom

15   indicates that the revision date -- the last revision date was

16   August 10th of 2018.  Do you see that?

17   A    In the revision control section, yes.

18   Q    And do you recall your review of the metadata regarding

19   this document?

20   A    Somewhat dimly, but I recall reviewing the metadata, yes.

21   Q    Do you recall the metadata showing that this technical

22   specification was modified after the effective date of the

23   injunction?

24   A    Yes, I do.

25                    MR. SMITH:  I have no further questions, your

1   Honor.

2                    THE COURT:  All right.  Any further

3   cross-examination?

4                    MR. VANDEVELDE:  No, your Honor, we're good.

5                    THE COURT:  All right.  Ms. Frederiksen-Cross,

6   that will complete your testimony at this time.  You may step

7   down.  Thank you.

8                    THE WITNESS:  Thank you, your Honor.

9                    THE COURT:  Mr. Smith?

10                   MR. SMITH:  Yes.  Now, your Honor, if we could

11  do one of two things.

12                   I would first like to move some discovery

13  responses into evidence, and then we have some deposition

14  designations to play for your Honor.

15                   THE COURT:  Okay.  Go ahead with -- is there any

16  objection to that approach?

17                   MR. VANDEVELDE:  No objection from me.  I would

18  like to know what exhibits he's talking about.

19                   MR. SMITH:  Your Honor, we would like to move

20  into evidence Oracle Exhibits 243, 259, 269, 295, and redacted

21  copies of Oracle Exhibits 246, 274, and 260.

22                   MR. VANDEVELDE:  And, your Honor, if you could

23  indulge me, we just got this list.  Some of them are

24  voluminous.  Maybe we can reverse the order, and we'll do it

25  in the meantime, and we'll give whether we object or not, if

1    that works for your Honor.

2                   THE COURT:  That's acceptable to me.  You need

3    an opportunity to review those.

4                   MR. SMITH:  And then now, your Honor, I would

5    yield the desk to Mr. Hill to discuss some deposition

6    designations that we will be playing.

7                   THE COURT:  All right.

8                   MR. HILL:  Your Honor, Oracle has nine video

9    clips that we would like to play, and we have a binder here

10   that we can offer you while you're viewing these videos.

11                  THE COURT:  All right.

12                  MR. HILL:  If I said nine, your Honor, I meant

13   seven.

14                  Your Honor, the first video is of the Sebastian

15   Grady, deposition dated January 11th, 2018.  It's about ten

16   minutes long, and Sebastian Grady is the president of Rimini

17   Street.

18                        (Portions of the video deposition
                            testimony of Sebastian Grady played.)
19                  MR. HILL:  And, your Honor, Oracle moves to

20   admit OREX_347, OREX_349, and OREX_350 which were the exhibits

21   discussed in that video clip.

22                  MR. VANDEVELDE:  Could you please restate those?

23                  MR. HILL:  OREX_347, OREX_349, and OREX_350.

24                  MR. VANDEVELDE:  No objection, your Honor.

25                  THE COURT:  They are admitted.

```
 1                        (Plaintiff's Document Exhibits 347, 349
                          and 350 received in evidence.)
 2                   MR. HILL:  Your Honor, the next clip we would

 3   like to play is from the February 15th, 2018 deposition of

 4   Mr. Seth Ravin who is the CEO and chairman of Rimini Street.

 5                        (Portions of the Video deposition
                          testimony of Seth Ravin played.)
 6                   MR. HILL:  Your Honor, Oracle moves to admit

 7   Oracle's 365, which is the deposition exhibit 1834 discussed

 8   in that video clip.

 9                   MR. VANDEVELDE:  No objection, your Honor.

10                   THE COURT:  It's admitted.

11                        (Plaintiff's Document Exhibit 365
                          received in evidence.)
12                   MR. HILL:  And in the interest of not hiding the

13   ball, Rimini may wish to admit Exhibit 364 which is from your

14   counters.

15                   MR. VANDEVELDE:  Okay.  Thank you.  So we'll

16   move to admit Oracle Exhibit 364.

17                   MR. HILL:  No objection, your Honor.

18                   THE COURT:  All right.  It is admitted.

19                        (Plaintiff's Document Exhibit 364
                          received in evidence.)
20                   MR. HILL:  Your Honor, the next clip we would

21   like to play is from the December 1st, 2017 deposition of

22   Mr. Brian James Slepko who is the Executive Vice-President of

23   Global Service Delivery at Rimini Street, and that is

24   approximately 4 minutes long.

25                   THE COURT:  All right.  Go ahead, please.
```

```
 1                    (Portions of the Video deposition
                       testimony of Brian James Slepko played.)
 2              MR. HILL:  Your Honor, Oracle moves to admit

 3   Oracle's Exhibit 341 which was Deposition Exhibit 1368

 4   discussed in that clip.

 5              MR. VANDEVELDE:  No objection, your Honor.

 6              THE COURT:  It is admitted.

 7                    (Plaintiff's Document Exhibit 341
                       received in evidence.)
 8              MR. HILL:  Your Honor, the next clip is from the

 9   December 1st, 2017 deposition of Mr. Michael Jacob.  He is a

10   business analyst at Rimini Street.  This is approximately

11   12 minutes.

12              THE COURT:  All right.  Any objection?

13              MR. VANDEVELDE:  No objection, your Honor.

14              THE COURT:  All right.  Go ahead, please.

15                    (Portions of the video deposition
                       testimony of Michael Jacob was played.)
16              MR. HILL:  Your Honor, the fifth clip we would

17   like to play is from the February 22nd, 2018 deposition of

18   Harika Mandla, who is a Senior PeopleSoft Developer at Rimini

19   Street, and this clip is approximately five minutes long.

20              THE COURT:  Is there any objection to that on

21   behalf of Rimini?

22              MR. VANDEVELDE:  No, your Honor.

23              THE COURT:  I will allow it, but I think this is

24   an appropriate time to take our afternoon recess.  We will

25   reconvene at 3:30.
```

591

```
 1                    MR. HILL:  And, your Honor, so you can time

 2      things, we have about 25 minutes left after that.

 3                    THE COURT:  All right.  Thank you.  I appreciate

 4      that.

 5                         (A recess was taken.)

 6                    THE COURT:  Have a seat, please.  The record

 7      will show we are reconvened after the afternoon break, and,

 8      let's see, what's the next deposition?

 9                    MR. HILL:  Your Honor, the next deposition is

10      the February 22nd, 2018 deposition of Harika Mandla who is a

11      Senior PeopleSoft Developer at Rimini Street, and this clip is

12      about five minutes long.

13                              (Portions of the video deposition
                                 testimony of Harika Mandla was played.)
14                    MR. HILL:  Your Honor, the next clip we would

15      like to play is from the February 20, 2018 deposition of

16      Mr. Richard Frank who is the principal software developer at

17      Rimini Street, and this clip is approximately 14 minutes long.

18                    THE COURT:  All right.  Any objection?

19                    MR. VANDEVELDE:  No objection, your Honor.

20                    THE COURT:  Go ahead, please.

21                              (Portions of the video deposition
                                 testimony of Richard Gary Frank was
22                               played.)

23                    MR. HILL:  Your Honor, the final deposition that

24      Oracle would like to play is the November 18th, 2016

25      deposition Ms. Susan Tahtaras, and she is a Senior Director
```

1    for PeopleSoft development at Rimini Street, and this clip is

2    about eight minutes long.

3              THE COURT:  All right.  Any objection?

4              MR. VANDEVELDE:  No objection.

5              THE COURT:  Go ahead, please.

6                   (Portions of the video deposition
                      testimony of Susan Tahtaras was played.)

7              MR. HILL:  Your Honor, Oracle Exhibit 1341,

8    which is deposition Exhibit 80, was pre-admitted, but Oracle

9    moves to admit OREX_309 which is deposition Exhibit 89

10   discussed in that clip.

11             MR. VANDEVELDE:  No objection, your Honor.

12             THE COURT:  All right.  Go ahead, please.

13                  (Plaintiff's Document Exhibit 309
                      received in evidence.)

14             MR. HILL:  And, your Honor, that was the last

15   clip.

16             Oracle would like to reiterate its request to

17   move into evidence the discovery responses mentioned before

18   that Rimini was considering.

19             MR. VANDEVELDE:  And we have no objection to

20   those, your Honor.

21             THE COURT:  All right, let's go with the

22   discovery responses.

23             MR. HILL:  And I'll just read those into the

24   record again, your Honor, so it's clear if that's okay.

25             THE COURT:  Yes.

 1               MR. HILL:  The discovery responses Oracle is

 2    moving into evidence OREX_243, OREX_246, OREX_259, OREX_260,

 3    OREX_269, OREX_274, and OREX_295.

 4               THE COURT:  All right, those are admitted.

 5                    (Plaintiff's Document Exhibits 243, 246,
                       259, 260, 269, 274 and 295 received in
 6                     evidence.)

 7               THE COURT:  All right.  Anything further?

 8               MR. ISAACSON:  Nothing further from Oracle, your

 9    Honor.

10               THE COURT:  All right, and so we switch to

11    Rimini.

12               MR. McCRACKEN:  Your Honor, this is Casey

13    McCracken.  We're ready to call our first witness who will be

14    James Benge.

15               THE COURT:  All right.

16                    JAMES MASON BENGE,
            called as a witness on behalf of the Defendant,
17                was sworn and testified as follows:

18               THE CLERK:  Please state your name for the

19    record.

20               THE WITNESS:  James Mason Benge.

21               THE CLERK:  Please spell your first and last

22    names.

23               THE WITNESS:  J-a-m-e-s, last name B-e-n-g-e.

24               THE CLERK:  Thank you, sir.

25               MR. McCRACKEN:  May I proceed, your Honor?

594

1              THE COURT:  You may.  Go ahead, please.

2              MR. McCRACKEN:  Good afternoon, Mr. Benge.

3              THE WITNESS:  Good afternoon.

4                     DIRECT EXAMINATION

5    BY MR. McCRACKEN:

6    Q    Could you please introduce yourself to the Court.

7    A    Yes.  My name is James Benge, I go by Jim.

8              I'm married.  My wife and I have raised three sons

9    and a daughter in the Bay Area of Northern California.  We

10   just recently moved to Utah, and we're enjoying time with our

11   new granddaughter that was born just a couple of weeks ago.

12   Q    Congratulations.

13   A    Thanks.

14   Q    Where do you work, Mr. Benge?

15   A    I work at Rimini Street.

16   Q    And what is your current position at Rimini Street?

17   A    I am Group Vice-President Global Product Delivery Product

18   and Tools.

19   Q    When did you take on that role?

20   A    That was in April of this year.

21   Q    And this hearing involves events from late 2018 through

22   the end of 2019.  What was your role at Rimini Street at that

23   time?

24   A    I was Vice-President of PeopleSoft Development.

25   Q    What was your role as Vice-President of PeopleSoft

1    Development?

2    A    Managing the development of our product updates that we

3    deliver to our clients.

4    Q    How long have you been with Rimini Street?

5    A    Since 2008, 13 years.

6    Q    Can you tell us a little bit about Rimini's business.

7    A    Yes.  We provide enterprise resourced planning support

8    and services to clients around the world, many Fortune 500

9    companies, hospitals, schools, local governments, and so

10   forth.

11   Q    What kind of support does Rimini provide?

12   A    We, number one, provide support for break fixes if a

13   client encounters any sort of bugs in the software.

14          We also provide tax, legal, and regulatory updates

15   to keep our clients in compliance with tax changes, and we

16   also just provide general support if they have any sort of

17   issues, needs, questions relating to the installation of their

18   software.

19   Q    Is Rimini a service business?

20   A    Yes, we are.  In fact, we don't have customers per se.

21   We have clients that we really partner with and work closely

22   with them to help them get the most value out of the software

23   that they've licensed and help them extend the life of it.

24   Q    How many employees did Rimini have back when you started

25   13 years ago?

596

1   A    We were really small.  We fit on one corner of one floor

2   of an office building, a small office building; less than 50

3   people probably.

4   Q    And I guess 13 years ago, that would be 2008 or so?

5   A    Yes.

6   Q    How many employees does Rimini have today?

7   A    Between 1400 and 1500.

8   Q    Is Rimini now publicly traded?

9   A    Yes, we are, we've been listed on the NASDAQ for a few

10  years now.

11  Q    Mr. Benge, I know you're the VP of software development

12  and PeopleSoft.  Do you have a software background?

13  A    Yes, I have been working with software for 35 years now.

14  Q    Can you tell us a little bit about your work experience

15  with software.

16  A    Sure.  You know, I've worked in a number of different

17  sectors, banking software, lots of experience with enterprise

18  resource planning software.  I got a bachelor's degree in

19  information systems, so I've pretty much spent my whole career

20  working with software.

21  Q    How did you first become interested in software?

22  A    It was actually in high school, first computer

23  programming class I took, tenth grade, and I loved it.

24  Q    Did you study computer programming in college?

25  A    Yes, I did.

1    Q    Did you get any degrees?

2    A    Two, one, an associate's degree in computer science, and

3    then a four-year degree in information systems.

4    Q    So turning to your role during the period at issue in

5    this case when you were -- remind me of your title?

6    A    Vice-president -- well, at the time of this,

7    vice-president PeopleSoft development.

8    Q    How many people were on your team at that time?

9    A    Approximately 30.

10   Q    That's the team that you supervised?

11   A    Yes.

12   Q    And during the period at issue in this hearing, did you

13   work on any product lines other than PeopleSoft?

14   A    No, only PeopleSoft.

15   Q    How many PeopleSoft clients did Rimini have during this

16   period, you know, end of 2018 to the end of 2019?

17   A    Roughly 250.

18   Q    You mentioned earlier when you were talking about the

19   support you provide, you mentioned something called break fix,

20   and I think you said updates; is that right?  Did I get that

21   right?

22   A    Tax, legal, and regulatory updates.

23   Q    Can you just explain what's break fix.

24   A    Break fix is a situation where the client might find a

25   bug in the existing software, pre-existing, that they need

1    resolved, or it could have been something that was broken as a

2    result of a recent product delivery from us.

3    Q    So is that something where the client has to report an

4    issue to you and then it gets fixed?

5    A    Yes.

6    Q    Then tell us about -- well, you said the tax, legal, and

7    regulatory updates.

8    A    This is where we're providing proactive updates to keep a

9    client in compliance with tax, legal, and regulatory changes

10   that have been legislated by various tax jurisdictions.

11           Whereas the break fix support is more reactive,

12   that's the client coming to us, you know, with a problem, and

13   we're reacting to that problem, helping, tax, legal, and

14   regulatory updates are proactive updates to keep them in

15   compliance.

16   Q    Your team, or the team that you had during the period at

17   issue in this case, were they responsible for break fix or the

18   TLR updates or both?

19   A    Primarily the TLR updates; break fix support only to the

20   extent that it was related to a TLR update that we had

21   released.  Other types of break fix support is typically

22   handled by the support services organization.

23   Q    And you touched on this a little bit, but why do clients

24   need tax, legal, and regulatory updates?

25   A    Well, it's important that they have the latest product

1      updates so that they're withholding the correct amounts from

2      their employees' paychecks.  They want to make sure that they

3      collect the right amount and remit the right amount.

4              Keeping them in compliance is important because in

5      certain instances there's actually fines and penalties if they

6      don't keep their product in compliance.

7      Q    Does PeopleSoft have the capability to be updated in that

8      way?

9      A    Indeed, because it's actually designed for that.  The

10     PeopleSoft software is actually delivered with tools to help a

11     client customize the software, to be able to tailor it to meet

12     their needs.  The source code is delivered to many parts of

13     the application allowing it to be customized.

14     Q    Instead of saying tax, legal, and regulatory updates, are

15     you okay if I just say updates?

16     A    Yes.

17     Q    How many updates have you been involved in in your 13

18     years at Rimini?

19     A    Many tens of thousands, considering the number of years

20     I've been here, the number of clients, and the number of

21     individual updates.

22     Q    And what is your personal role in developing updates?

23     A    Primarily in a supervisory capacity, but in my early

24     years with the company I was a little bit more hands-on and

25     involved in some of the development.

1    Q    Do you personally implement updates?

2    A    I have.  I have that skill set.  I am a manager that can

3    work with technical people, you know, I understand what

4    they're doing.

5    Q    And I guess in your early years have you personally

6    developed updates?

7    A    Yes, I have.

8    Q    How many?

9    A    Dozens.  You know, I definitely have been involved -- and

10   certainly over the years working with the development team,

11   many more updates as I -- you know, manager on those.

12   Q    What is the average level of experience of a developer on

13   your team?

14   A    They're very experienced individuals, I would say average

15   15 years experience.  Most of them have worked with PeopleSoft

16   or with some other ERP application in their prior employment.

17   Q    Does it take any special expertise to develop PeopleSoft

18   updates?

19   A    Yes.

20   Q    How hard is it to develop PeopleSoft updates?

21   A    It can be quite difficult at times, especially when

22   there's completely new requirements, new legislation.

23             We're building new solutions for clients, and

24   sometimes if we're just modifying something, it can be very

25   difficult to find exactly where we need to make that

1    modification, and it's, you know, thousands of lines of code

2    in the existing system.

3    Q    How many PeopleSoft updates does Rimini typically release

4    in a year?

5    A    In a year, individual updates, across all clients,

6    between 10 and 15,000.

7    Q    And when you're giving that number, are you counting, you

8    know, multiple clients need something similar, or how are you

9    counting that number?

10   A    That update as it's released to each client, so number of

11   updates times number of clients because they tend to be

12   unique.

13   Q    And how often does Rimini release updates to clients?  I

14   mean, is there a schedule?

15   A    Yes, we release the updates in waves that we call bundles

16   or releases, and that's usually five to seven times per year.

17   Q    Do clients request updates from Rimini?

18   A    Not typically.  Occasionally we might get a support call

19   for something that they're looking for that they haven't

20   received yet.  That's reactive.

21            We don't like that, we try to avoid that.  Our goal

22   is to be proactive in delivering the updates in advance of the

23   effective date before they need them.

24   Q    So how does Rimini, in your words, proactively determine

25   what updates to deliver to clients?

1    A    We have a completely separate group of business analysts

2    that are focused on collecting those changes, understanding

3    what's changing and keeping track of all of that, and then

4    further determining is it applicable to the various product

5    lines that we support.

6         That information is leveraged across more than just

7    PeopleSoft, so if we find that there's a California tax

8    change, it may be applicable to more than just PeopleSoft.

9    Q    I think you said your business analyst team are

10   determining what's changing.  Are you talking about changing

11   laws and regulations?

12   A    Yes.

13   Q    And then building on that, how does Rimini go from

14   whatever the business analyst team does to determining exactly

15   which updates are going to go to which clients?

16   A    So there's some analysis that goes on there, number one,

17   in determining is it applicable to PeopleSoft.

18        Beyond that, what is the tax jurisdiction of the

19   legislative change, you know, let's say that it's a California

20   minimum wage increase.

21        Then they also have to look at what has the client

22   contracted with us to cover.  You know, we have some clients

23   that want US federal updates plus updates for all 50 states.

24   We have others that want the federal updates and maybe only

25   the one or two states that they operate in.  So it's really

603

1   the intersection of that information to determine which

2   clients get which updates.

3   Q    Is the contract an important piece of that?

4   A    Yes, it is.

5   Q    Do all clients receive the same updates when Rimini

6   releases updates?

7   A    No.   There's a number of different factors that go into

8   that.

9   Q    What are those?

10   A    So, as I mentioned, you know, what are the tax

11   jurisdiction that they want updates for.   But when we have an

12   update, we also have to take into consideration what

13   application release the client's on.

14           So even though an update is the same update ID, it

15   may be different per client because of customizations they

16   have or because of where they left off with Oracle support,

17   they may have different code or different releases or

18   different last tax updates.

19   Q    Does that just depend on the situation?

20   A    Yes, it does.

21   Q    Are you familiar with the term software environment?

22   A    Yes.

23   Q    Can you just tell us what's a software environment.

24   A    I think of it as installation of the software and all of

25   the other components that are necessary to have a functioning

1   system.

2            So, for example, with PeopleSoft, yes, you have to

3   install the PeopleSoft software, but you'd also have to

4   install database software, for example, which might be from

5   another vendor.  It's everything together so that you can have

6   a functioning PeopleSoft environment.

7   Q    Do your clients have PeopleSoft environments?

8   A    Yes, they do.

9   Q    What kind of PeopleSoft environments do they have?

10  A    Typical that they would always have a production

11  environment, and they would have development and testing

12  environments as well, usually even more than that, but those

13  are the basic ones.

14  Q    Can you just explain what those are.  You said

15  production, development --

16  A    Sure.

17  Q    -- testing, can you just go through that.

18  A    So production is their live system where they actually

19  conduct their day-to-day business.  That's where their real

20  data is.

21           And the development system would be where they or we

22  can make modifications and unit test them and try them out

23  without having any impact on their production systems.

24           And then the testing environment would be a place

25  where you could take changes from development, apply them, and

1   test them independent of production and not being affected by

2   ongoing development.

3   Q    And which of those three environments you listed, the

4   production, development, testing, does Rimini access

5   typically?

6   A    We are typically just accessing development and testing

7   for product delivery.

8   Q    How many files are in a PeopleSoft environment

9   approximately, if you know?

10  A    Again, many tens of thousands.  I would say roughly

11  50,000.

12  Q    Does Rimini have any of its own PeopleSoft environments?

13  A    No.

14  Q    All right.  I mean, you mentioned you began working for

15  Rimini in 2008.  Are you familiar with Rimini's processes as

16  they have evolved from 2008 to now?

17  A    Yes.

18  Q    Did Rimini change its processes in or around July 2014?

19  A    Yes, we did.

20  Q    What were the processes prior to July 2014?

21  A    At that time we did have remote clients at that time as

22  well, but we had some -- the majority of the clients hosted on

23  in-house systems.  So on Rimini's servers we had client

24  software installed, and we also had certain environments that

25  were generic environments where -- for a particular

1    application release, for example, we would prepare updates.

2    Q    Is there a name for those pre July 2014 processes?

3    A    Process 1.0.

4    Q    You mentioned the servers on your system, or environments

5    on your own system, and you said something about generic

6    environments.  Can you just explain what those are.

7    A    Yeah, it was a location where, for example, if we were

8    doing tax table updates, and we had a group of clients that

9    were all receiving the same tax update, they were on the same

10   release, we could use that environment to prepare that update

11   and package it and deliver it to a client.

12   Q    In process 1.0 would you send Oracle software of one

13   client to other clients?

14   A    I think one of the issues was the use of these generic

15   environments and the fact that things weren't siloed, that

16   even though we weren't giving clients files they weren't

17   entitled to in the sense that, you know, we're not giving them

18   any Oracle update they hadn't received from Oracle, there was

19   commingling.

20   Q    What do you mean, Mr. Benge, when you said that the

21   clients weren't getting any updates they -- I think you said

22   hadn't been entitled to?

23   A    So, for example, if we had a client that came to us in

24   January, okay, on a release 8 -- .8, let's just say, and then

25   another client that came six months later who had received

1    additional updates from Oracle, we would have to ensure that

2    those clients that came earlier did not receive updates or

3    changes that were in the code from the client that came to us

4    later because the first client did not get those from Oracle

5    when they were under Oracle support.

6    Q    Are Rimini's clients, Rimini's PeopleSoft clients, are

7    they licensed to PeopleSoft?

8    A    Yes, they are.

9    Q    So how do those processes you just described, the process

10   1.0 processes, how did those change after July 2014?

11   A    They changed significantly.  We moved to a model where

12   our clients host their environments that we remotely access

13   over the Internet so each client has remote connectivity set

14   up so we can get into their environments to do the development

15   and testing.

16             Think of each client as being completely siloed in

17   their own bubble, there's no cross -- no transfer of files

18   between clients.  Each client has their own environments.  We

19   don't bring any Oracle software back to Rimini's systems, and

20   we don't have environments on Rimini's systems.

21   Q    Why did Rimini change from process 1.0 to process 2.0?

22   A    It's my understanding that that was primarily driven by

23   decisions from the Court.

24   Q    And what were the problems with process 1.0 that process

25   2.0 was designed to fix?

608

1    A    Number one was us having the software installed on

2    Rimini's systems, and we addressed that issue by ensuring that

3    the client has the software installed on their computing

4    equipment and we were remotely accessing it.

5         And the other issue was the use of the generic

6    environments and any mingling of client code, and that was

7    resolved by having distinct separate client environments that

8    we remotely access.  They're each in their own bubble, their

9    own silo.

10   Q    Have there been any active PeopleSoft environments on

11   Rimini's systems since moving to process 2.0?

12   A    No, not since end of July 2014.

13   Q    If there's no environments on your systems, how does

14   Rimini access its client's environments?

15   A    Everything now is remote access over the Internet using a

16   variety of remote access methods, site-to-site tunnels,

17   virtual private networks.

18   Q    After moving to process 2.0, do clients ever share the

19   same environment?

20   A    Never.

21   Q    How much effort did it take for Rimini to transition from

22   process 1.0 to 2.0?

23   A    That was a big project.  There were a lot of different

24   teams involved from environments and IT and onboarding and,

25   you know, development as well.

1             We had to keep, you know, our processes going during

2    this transition so it was a difficult time.  There was a lot

3    of time and effort and a lot of late nights and blood, sweat,

4    and tears that went into that.  It was a lot of work.

5    Q    How long did it take?

6    A    Several months.

7    Q    And has the remote model made your support work more

8    difficult or easier?

9    A    It's a little bit more challenging but definitely doable.

10   We have definitely adapted and learned how to work efficiently

11   and effectively in that setup.

12   Q    After process 2.0, or after transitioning, did Rimini

13   enact any policies with respect to having Oracle software and

14   documentation on its systems?

15   A    Yes, we did.

16   Q    What is that policy?

17   A    Our Acceptable Use Policy, and that outlines that we

18   can't have Oracle's software, files, code, anything of that

19   nature, on Rimini's systems, that all of that type of

20   information needs to remain within the customer's

21   client-hosted systems.

22   Q    We've been calling the authorized use policy the AUP.

23   Are you familiar with that acronym?

24   A    Yes.

25   Q    When was the last time you read the AUP?

1    A    Last month.  It was just -- the training for it was just

2    recently updated.

3    Q    You mentioned training.  Does Rimini do trainings on the

4    AUP?

5    A    Yes, we now have -- for the last few years we've had

6    video-based training that has continued to be refined and

7    updated, and it's quite good now.

8    Q    How often does that training occur?

9    A    At least annually.

10   Q    Who receives the training?

11   A    Everybody in the company.

12   Q    Do employees have to certify that they have accomplished

13   the training?

14   A    Yeah.  After you watch the video-based training course,

15   you're presented with Acceptable Use Policy, and then you have

16   to sign it, e-sign it.

17   Q    Do you have to do that every year?

18   A    Yes.

19   Q    Are you aware of the injunction that went into effect

20   against Rimini in late 2018?

21   A    I am.

22   Q    Have you reviewed it?

23   A    I have.

24   Q    How did Rimini make its employees you aware of the

25   injunction?

1    A    There was an e-mail to the entire company from our chief

2    legal counsel with the injunction attached.

3    Q    And did you receive any guidance on how to comply with

4    the injunction at that time?

5    A    Yes, in meetings with management and with our legal

6    department.

7    Q    And what was the company's decision regarding what

8    processes, if any, had to change to comply with the

9    injunction?

10   A    We largely believed that the significant effort that had

11   taken place with the move to environments 2.0 put us in

12   compliance.

13          But out of an abundance of caution there were a

14   couple of tools that we decided to disable just out of an

15   abundance of caution because we did not want to end up on the

16   wrong side of the injunction.

17   Q    And what were those tools?

18   A    One was the Code Analyzer which is part of the automation

19   framework, and the other was the DevReview tool.

20   Q    Are those Rimini-created tools?

21   A    Yes, they are.

22   Q    And what's your understanding of why Rimini did not make

23   more changes in November of 2018?

24   A    Again, we felt that the issues had been addressed by

25   virtue of the significant changes that we undertook in

1    conjunction with moving to environments 2.0, making all of the

2    access to environments, you know, remote over the Internet and

3    siloing each of those client environments.

4    Q    And how did you make your specific PeopleSoft team aware

5    of the new policies surrounding the injunction?

6    A    I sent an e-mail to the PeopleSoft Dev and QA team

7    outlining that we were going to be disabling these tools, not

8    because we felt that they were infringing but out of an

9    abundance of caution we were going to disable them, explained

10   that to the team.

11          And then we also had a follow-up meeting giving them

12   an opportunity to ask questions and we invited representatives

13   from our legal team to join us.

14   Q    All right.  I want to pull up an exhibit, Oracle Exhibit

15   14.  This is already in evidence.

16          And, Mr. Benge, can you identify for us what this

17   document is, Oracle Exhibit 14.

18   A    Yes, this is an e-mail that I sent to the team regarding

19   the PeopleSoft injunction compliance.  It was sent the 13th of

20   November, 2018.

21   Q    And what did you advise the PeopleSoft team in this

22   e-mail?

23   A    Just, first off, kind of explaining to people, hey, the

24   injunction has been on again off again a little bit, you know,

25   so wanted to make sure that they understood very clearly that

1    the injunction was on and that, again, out of an abundance of

2    caution, there were these two tools that were going to be

3    disabled and that they were not to use them.

4    Q    And you keep saying out of an abundance of caution.  What

5    do you mean by that?

6    A    Just because, again, we -- we did not feel that there was

7    anything at issue there, but we felt that it was something

8    that could be potentially at issue, you know, could be a

9    sensitive area that we just wanted to avoid any conflict, and

10   we wanted to make sure that we ended up on the correct side of

11   the injunction and that we were in compliance.

12   Q    Did you do any follow-up with your team to make sure they

13   understood the new policies in the injunction?

14   A    Yes, that was that meeting.  That was the whole purpose

15   of that to make sure that everyone understood clearly.

16               MR. McCRACKEN:  Your Honor, I'm going to switch

17   to a larger topic.  Do you want to keep going, or is this a

18   good place to break?

19               THE COURT:  Well, I think we're moving along

20   fairly well.  Is there any objection to taking a break at this

21   time by anyone?

22               MR. ISAACSON:  No objection, your Honor.

23               THE COURT:  All right.  We'll go ahead and take

24   our evening break at this time, and we will resume tomorrow

25   morning at 9:00 a.m.

1        MR. McCRACKEN:  Thank you, your Honor.

2        MR. ISAACSON:  Thank you, your Honor.

3             (The evening recess was taken.)

4                      -o0o-

5

6     I certify that the foregoing is a correct
      transcript from the record of proceedings
7     in the above-entitled matter.

8     \s\ Margaret Griener            September 22, 2021

9     ───────────────────────────    ──────────────

      MARGARET GRIENER, FCRR, CRR            DATE
10    Official Reporter

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          I N D E X

2

3   PLAINTIFF'S WITNESSES:                                PAGE:

4     FREDERIKSEN-CROSS, Barbara
        Cross-examination Resumed by Mr. Vandevelde        432
5       Redirect Examination by Mr. Smith                  577

6   WITNESSES APPEARING BY DEPOSITION

7     SEBASTIAN GRADY                                       588

8     SETH RAVIN                                            589

9     BRIAN JAMES SLEPKO                                    590

10    MICHAEL JACOB                                         590

11    HARIKA MANDLA                                         591

12    RICHARD GARY FRANK                                    591

13    SUSAN TAHTARAS                                        592

14  DEFENDANT'S WITNESSES:

15    BENGE, James
        Direct Examination by Mr. McCracken                594
16

17  PLAINTIFFS' EXHIBITS:                   ID      EVIDENCE

18   243 -                                           593
     246 -                                           593
19   259 -                                           593
     260 -                                           593
20   269 -                                           593
     274 -                                           593
21   295 -                                           593
     309 -                                           592
22   341 -                                           590
     347 -                                           589
23   349 -                                           589
     350 -                                           589
24   364 -                                           589
     365 -                                           589
25

1

# #

**#include** [1] - 510:3

# '

**'90s** [2] - 526:13, 526:19

# 0

**0MW** [1] - 526:16

# 1

**1** [1] - 572:15
**1.0** [6] - 606:3, 606:12, 607:10, 607:21, 607:24, 608:22
**1.935** [1] - 549:11
**10** [6] - 483:25, 484:22, 485:8, 487:3, 513:23, 601:6
**105328** [1] - 557:7
**1099** [7] - 434:19, 497:13, 501:1, 501:2, 505:12, 508:7, 509:15
**1099-M** [1] - 506:19
**1099l.sqr** [1] - 506:9
**1099M.sqr** [1] - 506:10
**1099s** [1] - 501:3
**10:35** [1] - 484:13
**10:40** [1] - 484:13
**10th** [1] - 586:16
**11th** [1] - 588:15
**12** [1] - 590:11
**13** [8] - 580:22, 580:14, 580:15, 595:5, 595:25, 596:4, 599:17
**13,000** [1] - 561:8
**1341** [1] - 592:7
**1342** [1] - 577:21
**1368** [1] - 590:3
**13th** [1] - 612:19
**14** [10] - 436:14, 440:8, 440:11, 440:18, 440:22, 443:21, 463:17, 591:17, 612:15, 612:17
**1400** [1] - 596:7
**15** [21] - 463:18, 513:23, 569:14, 569:20, 570:5, 570:15, 570:25, 571:2, 571:8, 571:17, 571:20, 572:3, 572:8, 572:14, 572:17,

573:3, 574:7, 574:23, 576:2, 600:15
**15,000** [1] - 601:6
**1500** [1] - 596:7
**154** [1] - 463:17
**155** [8] - 463:17, 548:2, 549:10, 552:5, 553:5, 553:16, 554:2, 555:4
**15th** [1] - 589:3
**16** [5] - 466:16, 466:19, 559:1, 559:3
**17** [4] - 449:16, 469:19, 469:21, 546:11
**174** [1] - 567:6
**18** [1] - 548:20
**1834** [1] - 589:7
**187** [1] - 515:24
**189** [1] - 513:13
**18th** [1] - 591:24
**1990s** [2] - 524:18, 524:19
**1:20** [2] - 545:17, 545:19
**1:25** [1] - 546:1
**1st** [2] - 589:21, 590:9

# 2

**2** [3] - 559:1, 559:3, 563:20
**2.0** [8] - 607:21, 607:25, 608:11, 608:18, 608:22, 609:12, 611:11, 612:1
**20** [8] - 435:5, 435:7, 435:9, 438:4, 515:6, 524:20, 548:4, 591:15
**2000** [1] - 525:16
**200049** [1] - 565:19
**2008** [4] - 595:5, 596:4, 605:15, 605:16
**2011** [1] - 528:1
**2014** [5] - 605:18, 605:20, 606:2, 607:10, 608:12
**2016** [10] - 552:4, 552:25, 553:4, 553:5, 553:11, 553:13, 554:2, 554:5, 555:17, 591:24
**2017** [2] - 589:21, 590:9
**2018** [16] - 436:9,

489:9, 489:11, 509:3, 509:18, 586:16, 588:15, 589:3, 590:17, 591:10, 591:15, 594:21, 597:16, 610:20, 611:23, 612:20
**2018.docx** [1] - 557:11
**2019** [3] - 497:15, 594:22, 597:16
**2021** [4] - 432:6, 432:1, 546:1, 614:8
**212** [4] - 558:21, 558:25, 559:3, 559:4
**22** [4] - 432:6, 432:1, 546:1, 614:8
**226** [1] - 566:23
**22nd** [4] - 432:6, 509:18, 590:17, 591:10
**24** [2] - 576:14, 577:2
**24/7** [3] - 576:12, 576:21, 576:25
**243** [3] - 587:20, 593:5, 615:18
**246** [3] - 587:21, 593:5, 615:18
**25** [1] - 591:2
**250** [2] - 548:12, 597:17
**259** [3] - 587:20, 593:5, 615:19
**26** [2] - 580:12, 583:5
**260** [3] - 587:21, 593:5, 615:19
**269** [3] - 587:20, 593:5, 615:20
**27** [1] - 475:3
**274** [3] - 587:21, 593:5, 615:20
**275** [1] - 473:12
**28th** [1] - 509:3
**295** [3] - 587:20, 593:5, 615:21
**2:10-cv-0106-LRH-VCF** [1] - 432:5

# 3

**3** [5] - 432:8, 432:23, 432:23, 435:6, 438:2
**30** [2] - 514:15, 597:9
**30(b)(6** [1] - 528:22
**300** [1] - 580:16
**309** [2] - 592:13, 615:21
**30th** [1] - 552:25
**31** [1] - 505:11
**32** [2] - 508:24, 517:25

**324** [1] - 548:20
**325** [3] - 546:11, 547:7, 550:11
**326** [2] - 548:20, 550:11
**327** [1] - 503:9
**33** [1] - 509:10
**341** [3] - 590:3, 590:7, 615:22
**343** [1] - 564:1
**347** [2] - 589:1, 615:22
**348** [2] - 488:22, 489:6
**349** [2] - 589:1, 615:23
**35** [2] - 510:18, 596:13
**350** [3] - 580:12, 589:1, 615:23
**364** [4] - 589:13, 589:16, 589:19, 615:24
**365** [3] - 589:7, 589:11, 615:24
**37** [2] - 537:11, 543:1
**38** [2] - 538:22, 543:1
**39** [2] - 541:3, 543:1
**3:30** [1] - 590:25
**3rd** [1] - 497:14

# 4

**4** [3] - 470:18, 475:5, 589:24
**40** [5] - 509:2, 509:13, 541:16, 542:5, 543:1
**400** [1] - 432:24
**41** [6] - 485:7, 509:11, 509:14, 579:8, 579:15, 580:5
**41A** [1] - 580:25
**432** [1] - 615:4
**47** [2] - 547:19, 547:20
**48** [2] - 547:21, 550:7
**49** [5] - 463:5, 463:21, 463:24, 464:25, 465:3

# 5

**5** [9] - 466:15, 473:11, 488:21, 488:22, 497:23, 513:4, 548:20, 563:25, 564:2
**50** [3] - 463:3, 596:2, 602:23
**50,000** [1] - 605:11
**500** [1] - 595:8
**577** [1] - 615:5
**588** [1] - 615:7
**589** [6] - 615:8, 615:22, 615:23,

615:23, 615:24, 615:24
**590** [3] - 615:9, 615:10, 615:22
**591** [2] - 615:11, 615:12
**592** [2] - 615:13, 615:21
**593** [7] - 615:18, 615:18, 615:19, 615:19, 615:20, 615:20, 615:21
**594** [1] - 615:15

# 6

**6** [3] - 495:18, 497:13, 505:12
**68** [3] - 550:22, 552:1, 552:7
**69** [5] - 550:8, 550:23, 552:2, 552:7, 552:16

# 7

**7** [5] - 518:11, 518:13, 518:14, 576:14, 577:3
**7th** [1] - 489:9

# 8

**8** [8] - 518:14, 522:14, 526:2, 558:3, 566:3, 578:3, 606:24
**80** [2] - 586:8, 592:8
**84** [3] - 497:24, 498:16, 500:17
**8484** [1] - 489:7
**89** [1] - 592:9
**89501** [1] - 432:24

# 9

**9** [2] - 526:2, 557:5
**94** [1] - 489:10
**940** [4] - 470:22, 474:7, 474:18
**940A** [1] - 473:17
**960** [3] - 451:1, 451:2, 451:4
**9:00** [2] - 432:1, 613:25

# A

**A's** [1] - 469:3
**a.m** [1] - 613:25
**A.M** [1] - 432:1
**ability** [1] - 447:19

2

**able** [10] - 433:17, 443:11, 447:15, 448:5, 450:13, 451:12, 480:17, 489:1, 564:20, 599:11
**above-entitled** [1] - 614:7
**absent** [2] - 536:16, 558:15
**absolute** [1] - 502:15
**absolutely** [1] - 564:5
**Absolutely** [1] - 565:2
**abstract** [2] - 502:22, 503:3
**abundance** [5] - 611:13, 611:15, 612:9, 613:1, 613:4
**ACA** [1] - 447:12
**accept** [1] - 439:1
**acceptable** [2] - 532:25, 588:2
**Acceptable** [2] - 609:17, 610:15
**access** [27] - 466:1, 466:8, 540:20, 573:22, 573:23, 576:9, 576:12, 576:14, 576:15, 576:21, 576:22, 576:23, 576:25, 577:4, 577:7, 577:12, 577:13, 578:20, 578:22, 605:4, 607:12, 608:8, 608:14, 608:15, 608:16, 612:2
**accessed** [2] - 520:4, 574:4
**accessible** [9] - 518:25, 520:13, 520:14, 520:16, 521:18, 521:25, 522:9, 557:21, 558:2
**accessing** [2] - 605:6, 608:4
**accomplished** [1] - 610:12
**according** [1] - 460:22
**account** [2] - 553:22, 575:1
**accurate** [2] - 450:6, 506:23
**accusing** [1] - 444:12
**acknowledge** [1] - 569:13
**acquisition** [2] - 586:4, 586:6
**acronym** [1] - 609:23

**Act** [1] - 457:11
**act** [5] - 441:14, 441:25, 442:1, 446:23, 447:14
**acting** [3] - 536:15, 536:24, 537:6
**action** [3] - 513:24, 571:14, 572:11
**actions** [2] - 554:21, 555:25
**active** [1] - 608:10
**activities** [1] - 511:23
**activity** [1] - 576:3
**actual** [6] - 445:3, 446:19, 446:24, 449:11, 462:20, 507:24
**adapted** [1] - 609:10
**add** [2] - 559:10, 559:11
**added** [1] - 487:6
**addition** [2] - 448:25, 577:6
**additional** [4] - 449:22, 468:22, 469:8, 607:1
**address** [5] - 459:7, 478:5, 487:20, 503:4, 530:6
**addressed** [2] - 608:2, 611:24
**adjudicated** [2] - 498:18, 534:21
**adjunct** [1] - 467:25
**admit** [7] - 550:2, 588:20, 589:6, 589:13, 589:16, 590:2, 592:9
**admitted** [13] - 508:25, 509:11, 509:15, 558:20, 558:22, 566:17, 566:23, 588:25, 589:10, 589:18, 590:6, 592:8, 593:4
**Adobe** [5] - 433:8, 433:11, 433:12, 448:8, 448:19
**advance** [3] - 451:14, 491:18, 601:22
**advise** [1] - 612:21
**affected** [20] - 433:25, 434:23, 435:5, 435:17, 435:22, 436:11, 436:23, 437:1, 437:3, 437:7, 437:18, 440:3, 445:14, 466:6, 474:18, 478:2, 486:20, 486:25,

487:13, 605:1
**afoul** [1] - 465:12
**afraid** [1] - 580:11
**afresh** [1] - 483:20
**afternoon** [4] - 590:24, 591:7, 594:2, 594:3
**ago** [11] - 515:23, 524:8, 524:20, 524:21, 525:24, 570:12, 576:4, 581:10, 594:11, 595:25, 596:4
**agree** [11] - 436:15, 436:21, 461:25, 490:6, 500:1, 514:24, 527:22, 536:13, 545:12, 545:14, 564:12
**agreed** [1] - 462:6
**agreement** [4] - 523:19, 536:16, 570:17, 585:19
**agreements** [3] - 529:25, 533:6, 534:6
**ahead** [8] - 484:8, 484:19, 587:15, 589:25, 590:14, 591:20, 592:5, 592:12, 594:1, 613:23
**al** [2] - 432:4, 432:7
**alignment** [1] - 436:12
**allegation** [1] - 462:23
**allegedly** [1] - 515:9
**Allen** [1] - 432:19
**allow** [5] - 555:10, 563:4, 579:19, 583:9, 590:23
**allowable** [4] - 441:16, 441:17, 441:21, 442:4
**allowed** [5] - 462:5, 535:19, 535:20, 540:16, 545:1
**allowing** [1] - 599:13
**allows** [1] - 510:5
**almost** [3] - 526:18, 544:21, 563:12
**alone** [1] - 504:3
**alphabet** [1] - 580:14
**amended** [1] - 512:21
**amendment** [1] - 540:21
**America** [1] - 530:24
**amount** [8] - 479:2, 521:7, 547:9, 550:16, 551:22, 567:25, 599:3
**amounts** [1] - 599:1

**analogy** [1] - 472:20
**analysis** [12] - 477:12, 479:22, 502:21, 514:18, 516:11, 530:9, 534:8, 549:6, 562:4, 563:9, 563:14, 602:16
**analyst** [3] - 590:10, 602:9, 602:14
**analysts** [1] - 602:1
**Analyzer** [1] - 611:18
**analyzing** [1] - 553:3
**annually** [1] - 610:9
**answer** [19] - 446:3, 461:15, 464:4, 464:11, 465:7, 468:24, 533:11, 535:17, 544:13, 548:14, 549:20, 549:25, 550:10, 550:19, 551:7, 552:13, 555:10, 562:6
**answered** [3] - 546:22, 547:12, 548:4
**anti** [1] - 583:16
**anti-virus** [1] - 583:16
**anticipated** [1] - 464:23
**anytime** [1] - 554:25
**apart** [1] - 567:2
**apologize** [1] - 550:9
**apparent** [1] - 571:14
**appear** [3] - 540:5, 563:12, 569:8
**APPEARANCES** [1] - 432:13
**appeared** [1] - 549:19
**APPEARING** [1] - 615:6
**Appendix** [4] - 548:12, 551:11, 552:7, 552:10
**appendix** [1] - 551:13
**applicable** [3] - 602:4, 602:8, 602:17
**application** [8] - 447:6, 448:11, 522:3, 523:9, 599:13, 600:16, 603:13, 606:1
**applied** [8] - 470:8, 478:23, 498:20, 499:8, 501:13, 503:21, 504:6, 563:6
**apply** [6] - 478:11, 514:19, 558:4, 558:8, 558:10, 604:25

**applying** [5] - 459:21, 494:16, 559:16, 560:19, 563:4
**appreciate** [1] - 591:3
**approach** [2] - 432:10, 587:16
**appropriate** [2] - 459:7, 590:24
**appropriated** [1] - 515:1
**April** [1] - 594:20
**ARAXIS** [4] - 513:18, 516:19, 585:2, 585:4
**architectural** [1] - 498:7
**area** [1] - 613:9
**Area** [1] - 594:9
**arguably** [1] - 463:9
**artifact** [1] - 492:22
**AS-400** [2] - 525:22, 526:15
**aside** [3] - 453:6, 518:24, 535:7
**assess** [2] - 561:11, 561:20
**assessing** [1] - 514:24
**assimilate** [1] - 579:17
**assistant** [1] - 529:2
**assisting** [1] - 540:14
**assistive** [1] - 524:16
**associate** [2] - 529:11, 533:13
**associate's** [1] - 597:2
**associated** [3] - 449:6, 449:13, 530:2
**assume** [17] - 435:14, 440:3, 440:4, 440:13, 440:16, 440:19, 441:6, 460:3, 477:13, 478:2, 478:4, 486:19, 487:12, 487:16, 487:19, 488:1, 549:24
**assuming** [10] - 442:2, 450:14, 517:14, 535:14, 535:15, 541:19, 544:22, 553:15, 569:21, 584:3
**assumption** [2] - 442:11, 487:15
**attached** [2] - 548:12, 611:2
**attaching** [1] - 571:22
**attachment** [3] - 579:23, 579:25
**attempt** [2] - 561:11, 561:20
**attempting** [3] -

3

549:13, 549:17, 556:22
**attention** [2] - 548:6, 578:2
**attorney** [1] - 514:7
**Attorneys** [2] - 432:17, 432:21
**attorneys** [1] - 514:9
**audit** [11] - 528:1, 528:7, 529:8, 529:12, 529:16, 529:19, 529:22, 530:6, 531:13, 536:5, 536:7
**audited** [1] - 528:7
**August** [1] - 586:16
**AUP** [3] - 609:22, 609:25, 610:4
**Australian** [7] - 566:6, 567:17, 567:21, 568:1, 578:1, 578:6
**authored** [1] - 480:5
**authorization** [4] - 581:20, 581:23, 582:6, 582:11
**authorized** [2] - 573:21, 609:22
**automation** [1] - 611:18
**available** [2] - 447:3, 473:3
**average** [2] - 600:12, 600:14
**avoid** [2] - 601:21, 613:9
**aware** [54] - 443:2, 449:1, 451:7, 451:10, 454:5, 454:10, 454:11, 456:20, 466:13, 482:4, 489:13, 489:15, 489:16, 489:18, 502:3, 508:18, 519:5, 520:11, 520:17, 521:15, 521:22, 523:18, 523:23, 525:15, 526:6, 526:8, 528:1, 529:8, 529:11, 529:15, 529:19, 529:22, 530:19, 530:22, 531:8, 531:10, 531:12, 531:16, 531:21, 532:6, 532:12, 533:2, 534:20, 537:1, 561:7, 570:17, 574:20, 576:13, 582:22, 583:10,

583:18, 610:19, 610:24, 612:4
**awareness** [1] - 531:2
**awhile** [1] - 508:17

**B**

**B-e-n-g-e** [1] - 593:23
**bachelor's** [1] - 596:18
**background** [5] - 505:9, 530:4, 530:5, 539:22, 596:12
**bad** [1] - 520:9
**ball** [1] - 589:13
**banking** [1] - 596:17
**Barbara** [1] - 615:4
**BARBARA** [1] - 432:13
**based** [28] - 435:20, 436:21, 441:6, 445:24, 445:13, 467:8, 472:8, 473:7, 479:9, 495:12, 504:12, 504:13, 514:17, 516:1, 516:4, 520:21, 548:17, 548:24, 555:6, 564:12, 579:4, 582:15, 584:11, 584:17, 584:20, 584:21, 610:6, 610:14
**basic** [2] - 572:5, 604:13
**basis** [15] - 547:25, 548:8, 548:15, 548:23, 549:4, 549:7, 549:10, 549:12, 551:16, 552:1, 553:4, 553:12, 555:4, 576:7, 576:21
**Bates** [4] - 566:21, 567:1, 579:24, 580:2
**Bay** [1] - 594:9
**Beaverton** [1] - 525:2
**become** [1] - 596:21
**BEFORE** [1] - 432:2
**began** [1] - 605:14
**beginning** [1] - 550:11
**behalf** [19] - 432:13, 445:1, 456:24, 457:25, 458:2, 459:24, 462:18, 463:1, 491:20, 491:21, 530:23, 531:16, 532:7, 532:12, 533:2, 549:22, 584:25,

590:21, 593:16
**behavior** [5] - 457:18, 460:1, 464:22, 535:6, 583:22
**behind** [1] - 475:19
**bell** [1] - 528:25
**below** [2] - 432:20, 509:25
**benefit** [27] - 442:22, 444:19, 454:19, 459:3, 470:6, 470:7, 470:10, 483:21, 489:21, 490:1, 490:4, 490:13, 490:19, 490:24, 491:1, 491:5, 492:4, 492:21, 492:24, 492:25, 493:13, 495:8, 496:1, 496:4, 496:10, 497:6, 584:25
**benefits** [6] - 470:1, 470:2, 470:3, 470:12, 493:6, 495:7
**BENGE** [2] - 593:16, 615:15
**Benge** [11] - 471:19, 564:3, 565:2, 593:14, 593:20, 594:2, 594:7, 594:14, 596:11, 606:20, 612:16
**Benjamin** [1] - 432:14
**beside** [1] - 540:24
**best** [6] - 455:19, 526:18, 527:8, 540:23, 555:7, 573:5
**better** [2] - 559:19, 580:8
**between** [31] - 442:25, 447:22, 453:4, 453:13, 453:14, 453:15, 454:21, 455:20, 456:14, 460:25, 467:7, 471:19, 481:15, 484:12, 488:11, 489:10, 515:16, 524:22, 528:8, 534:17, 536:10, 536:16, 542:12, 562:9, 562:18, 580:9, 585:19, 586:2, 596:7, 601:6, 607:18
**beyond** [5] - 454:20, 526:4, 527:8, 563:13, 602:18
**BI** [1] - 447:19
**big** [3] - 483:20, 506:2,

608:23
**bigger** [1] - 560:10
**binary** [1] - 519:16
**binder** [4] - 438:5, 547:18, 567:4, 588:9
**binders** [1] - 432:18
**bit** [15] - 444:6, 444:11, 449:22, 472:20, 502:14, 535:9, 537:9, 543:12, 560:10, 595:6, 596:14, 598:23, 599:24, 609:9, 612:24
**blank** [5] - 450:10, 482:12, 517:12, 517:13, 532:2
**blanket** [2] - 503:7, 581:25
**blanks** [2] - 448:6, 449:24
**bleach** [1] - 456:21
**block** [1] - 583:12
**blood** [1] - 609:3
**blow** [1] - 552:16
**blue** [3] - 477:2, 486:8, 506:9
**book** [2] - 515:6, 515:7
**books** [1] - 564:2
**bootleg** [1] - 480:15
**born** [1] - 594:11
**bottom** [9] - 475:16, 485:25, 503:10, 505:20, 552:17, 559:1, 559:3, 567:2, 586:14
**box** [29] - 436:14, 439:9, 439:10, 440:8, 440:11, 440:18, 440:22, 440:23, 443:21, 449:16, 449:19, 452:3, 475:9, 475:12, 475:16, 476:21, 485:22, 485:23, 485:25, 486:8, 505:20, 505:4, 506:2, 506:9, 506:16, 517:14, 559:12
**boxes** [8] - 438:11, 439:5, 475:8, 485:12, 505:15, 505:16, 517:14, 559:11
**brain** [7] - 456:21, 458:10, 460:8, 460:11, 460:18, 461:17, 555:19

**break** [20] - 484:9, 484:10, 484:12, 484:18, 484:22, 544:23, 553:18, 554:8, 591:7, 595:12, 597:19, 597:23, 597:24, 598:11, 598:17, 598:19, 598:21, 613:18, 613:20, 613:24
**BRIAN** [1] - 615:9
**Brian** [2] - 589:22, 590:1
**brief** [1] - 533:10
**briefly** [4] - 488:20, 508:25, 509:10, 519:25
**briefs** [9] - 528:15, 529:10, 530:1, 530:2, 531:3, 531:15, 532:21, 533:7, 536:6
**bring** [7] - 445:11, 466:14, 469:18, 473:11, 492:14, 497:23, 607:19
**bringing** [1] - 495:3
**brings** [1] - 480:6
**broadly** [1] - 473:4
**broken** [1] - 598:1
**brought** [2] - 529:15, 579:20
**bubble** [3] - 445:19, 607:17, 608:8
**Buffy** [1] - 528:24
**bug** [1] - 597:25
**bugs** [1] - 595:13
**building** [5] - 537:23, 596:2, 600:23, 602:13
**bullet** [1] - 465:12
**bump** [1] - 444:11
**bundles** [1] - 601:15
**Bureau** [7] - 566:6, 566:7, 567:17, 567:21, 568:1, 578:1, 578:6
**business** [9] - 433:13, 533:17, 590:10, 595:6, 595:19, 602:1, 602:9, 602:14, 604:19
**BY** [29] - 432:16, 438:7, 460:2, 463:19, 465:23, 466:18, 469:20, 470:17, 473:13, 475:6, 484:21, 485:9, 488:23,

4

492:16, 498:1,
509:1, 513:3,
541:25, 546:12,
550:13, 552:18,
566:18, 567:8,
567:13, 572:16,
577:23, 583:23,
594:5, 615:6

## C

**calculate** [4] - 515:12,
551:1, 556:22, 557:1
**calculated** [1] - 515:8
**calculation** [1] -
551:14
**California** [3] - 594:9,
602:7, 602:19
**cannot** [6] - 443:18,
451:24, 463:4,
500:23, 544:17,
560:4
**capability** [1] - 599:7
**capable** [1] - 578:25
**capacity** [1] - 599:23
**career** [2] - 461:18,
596:19
**carries** [1] - 497:1
**carry** [2] - 497:7,
539:15
**case** [55] - 436:2,
437:9, 443:20,
444:6, 444:11,
445:3, 445:4,
445:18, 445:19,
446:25, 451:25,
456:18, 457:8,
461:14, 461:20,
467:23, 468:14,
470:9, 489:3, 489:7,
493:3, 498:20,
500:24, 501:13,
504:14, 505:2,
505:4, 505:7,
505:10, 511:22,
516:13, 516:14,
518:22, 523:25,
524:22, 525:20,
526:9, 529:6,
529:10, 529:18,
530:2, 542:15,
546:16, 546:24,
549:6, 553:4,
574:21, 576:7,
578:6, 579:12,
597:5, 598:17
**case-by-case** [2] -
553:4, 576:7
**cases** [23] - 456:18,
472:24, 472:25,

498:17, 505:5,
513:22, 548:2,
553:4, 553:5,
553:16, 553:18,
553:19, 554:2,
554:8, 554:11,
554:12, 554:17,
555:4, 555:17,
556:17, 556:22,
570:1
**Casey** [2] - 432:21,
593:12
**category** [1] - 468:12
**caught** [2] - 451:1,
491:8
**caused** [3] - 467:8,
570:2, 571:10
**causes** [1] - 539:3
**caution** [5] - 611:13,
611:15, 612:9,
613:2, 613:4
**cbl** [2] - 513:11,
513:15
**CCR** [1] - 432:23
**CEO** [2] - 528:19,
589:4
**certain** [12] - 433:14,
433:23, 435:13,
436:13, 446:17,
520:12, 555:13,
565:22, 579:2,
586:3, 599:5, 605:24
**certainly** [10] - 434:10,
444:1, 453:21,
456:17, 479:4,
504:6, 520:25,
572:23, 582:20,
600:10
**certify** [2] - 610:12,
614:6
**cetera** [1] - 517:15
**chairman** [1] - 589:4
**challenge** [1] - 457:22
**challenging** [1] -
609:9
**change** [37] - 435:23,
443:23, 450:5,
451:8, 452:1, 452:6,
452:13, 452:19,
452:20, 453:8,
453:12, 454:4,
456:7, 460:12,
468:5, 468:10,
474:9, 478:14,
485:18, 497:4,
512:22, 533:20,
540:15, 547:2,
556:2, 559:16,
563:4, 563:6, 584:4,
602:8, 602:19,

605:18, 607:10,
607:21, 611:8
**changed** [13] - 451:10,
451:22, 452:17,
453:23, 456:6,
456:11, 458:8,
459:21, 465:16,
478:23, 580:1,
607:11
**changes** [41] - 456:23,
525:5, 527:14,
527:21, 527:22,
532:8, 532:11,
533:5, 534:5,
534:10, 537:5,
543:12, 543:14,
546:18, 546:19,
547:4, 547:5,
547:11, 547:14,
547:17, 548:3,
549:6, 550:17,
550:18, 552:5,
552:6, 554:3,
554:14, 554:19,
555:9, 555:25,
556:20, 595:15,
598:9, 602:2,
604:25, 607:3,
611:23, 611:25
**changing** [8] - 443:22,
449:2, 459:6, 547:3,
556:4, 602:3, 602:10
**chapter** [2] - 515:5,
515:6
**characteristic** [1] -
500:4
**characterization** [1] -
560:9
**characterize** [1] -
441:24
**characterized** [2] -
581:16, 581:17
**characters** [4] -
449:19, 449:21,
449:25, 452:2
**charade** [1] - 550:2
**Check** [1] - 538:9
**check** [9] - 456:11,
477:21, 485:19,
515:22, 538:19,
539:24, 540:3,
541:5, 552:12
**check-in** [1] - 541:5
**checked** [7] - 527:20,
538:13, 541:9,
541:11, 541:19,
541:23, 542:2
**checking** [7] - 538:2,
541:4, 543:1, 543:2,
544:14, 544:15,

558:20
**checkout** [3] - 537:18,
538:17, 540:6
**chief** [1] - 611:1
**chose** [3] - 436:13,
457:21, 530:7
**Circuit** [1] - 568:22
**circumvent** [1] -
445:12
**cite** [2] - 474:24,
501:14
**cited** [1] - 471:18
**City** [95] - 433:3,
433:24, 434:2,
434:8, 434:11,
434:14, 434:23,
437:10, 437:17,
438:12, 438:19,
439:10, 440:3,
440:6, 440:14,
440:16, 440:25,
441:2, 441:7,
441:13, 442:8,
442:11, 442:25,
443:18, 444:17,
445:5, 445:6, 445:9,
445:14, 445:25,
446:4, 446:5, 446:9,
448:7, 448:12,
448:16, 449:2,
449:5, 450:11,
450:14, 450:21,
450:24, 450:25,
451:7, 451:11,
451:20, 451:21,
451:22, 452:1,
452:4, 452:7, 453:5,
453:14, 453:15,
454:1, 454:19,
456:1, 456:6, 457:4,
458:7, 462:6, 466:2,
471:15, 471:25,
472:8, 474:17,
474:22, 474:24,
475:8, 475:11,
475:23, 475:24,
476:8, 476:21,
477:4, 478:2, 478:6,
478:7, 478:11,
478:13, 478:15,
478:22, 480:12,
480:22, 480:25,
481:2, 481:5,
481:22, 482:1,
482:2, 482:7,
482:15, 486:12
**claimed** [1] - 584:9
**clarification** [2] -
435:23, 461:25
**clarify** [1] - 559:15

**class** [1] - 596:23
**clear** [17] - 446:3,
461:15, 465:18,
470:5, 470:6, 485:2,
488:7, 503:20,
503:25, 512:11,
520:14, 521:10,
537:14, 540:2,
574:22, 585:4,
592:24
**clearly** [2] - 612:25,
613:15
**CLERK** [3] - 593:18,
593:21, 593:24
**client** [102] - 434:25,
435:17, 435:19,
435:21, 436:22,
436:25, 437:3,
437:6, 437:8, 450:4,
454:8, 454:13,
455:17, 455:19,
459:6, 463:25,
464:24, 465:4,
466:8, 468:23,
482:8, 485:13,
485:17, 486:2,
486:3, 487:13,
487:21, 488:18,
489:13, 489:17,
489:23, 490:2,
490:5, 490:8,
490:15, 490:16,
490:24, 492:8,
493:15, 493:18,
493:24, 495:8,
496:9, 497:8,
497:11, 510:11,
512:15, 512:20,
512:24, 512:25,
524:2, 524:3,
524:14, 524:15,
524:25, 526:17,
526:24, 527:21,
538:1, 538:2,
538:13, 538:16,
542:19, 553:9,
555:12, 566:6,
566:14, 569:10,
570:6, 570:9,
571:14, 573:12,
573:15, 573:16,
574:2, 585:24,
595:13, 597:24,
598:3, 598:9,
598:12, 599:11,
601:10, 602:21,
603:15, 605:23,
606:11, 606:13,
606:23, 606:25,
607:3, 607:4,

5

607:13, 607:16,
607:18, 608:3,
608:6, 608:7,
609:21, 612:3
**Client** [2] - 485:13,
486:19
**client's** [60] - 442:21,
450:16, 455:4,
455:16, 459:19,
463:8, 468:1,
469:23, 482:21,
483:2, 483:4,
483:17, 487:21,
487:25, 488:1,
488:5, 488:9,
488:11, 488:15,
489:19, 489:20,
490:3, 490:23,
491:1, 492:11,
494:23, 495:10,
496:7, 496:8,
496:16, 496:23,
497:12, 503:21,
510:11, 511:12,
511:23, 512:4,
512:8, 512:21,
537:15, 541:13,
541:20, 541:24,
542:2, 542:13,
542:17, 543:4,
543:6, 560:13,
560:19, 560:21,
571:9, 575:24,
575:25, 576:1,
576:3, 603:13,
608:14
**Client's** [1] - 486:13
**client-hosted** [1] -
609:21
**Clients** [2] - 505:17,
506:2
**clients** [86] - 435:5,
435:9, 435:13,
435:14, 436:1,
436:2, 436:8,
436:11, 436:18,
436:20, 442:3,
442:12, 442:18,
442:22, 444:22,
454:14, 463:3,
463:5, 463:21,
464:25, 466:5,
466:11, 481:15,
484:23, 485:3,
490:12, 490:13,
490:19, 490:20,
491:2, 491:14,
491:20, 491:21,
491:23, 492:9,
492:10, 493:17,

496:18, 497:6,
505:18, 506:3,
506:5, 520:18,
526:21, 536:11,
536:12, 536:13,
536:22, 536:23,
553:10, 559:10,
565:19, 565:23,
571:21, 573:17,
595:3, 595:8,
595:15, 595:21,
597:15, 598:23,
599:20, 600:23,
601:5, 601:8,
601:11, 601:13,
601:17, 601:25,
602:15, 602:22,
603:2, 603:5, 604:7,
605:21, 605:22,
606:8, 606:13,
606:16, 606:21,
607:2, 607:6,
607:12, 607:18,
608:18
**clients'** [3] - 435:7,
436:15, 481:18
**clip** [14] - 588:21,
589:2, 589:8,
589:20, 590:4,
590:8, 590:16,
590:19, 591:11,
591:14, 591:17,
592:1, 592:10,
592:15
**clips** [1] - 588:9
**close** [1] - 567:19
**closed** [5] - 518:19,
519:13, 522:15,
522:17, 522:19
**closely** [1] - 595:21
**closer** [1] - 556:8
**Cobol** [1] - 513:11
**Code** [1] - 611:18
**code** [179] - 448:22,
449:11, 461:12,
462:4, 462:6, 462:7,
465:15, 468:6,
468:11, 474:14,
477:9, 477:14,
479:2, 479:10,
479:16, 480:4,
480:6, 480:12,
480:21, 482:11,
486:17, 493:21,
496:18, 496:22,
502:24, 504:17,
504:22, 506:9,
506:20, 507:22,
507:23, 507:24,
511:10, 511:16,

512:2, 512:17,
512:23, 516:15,
518:12, 518:15,
518:19, 518:25,
519:6, 519:7, 519:9,
519:12, 519:13,
519:16, 520:4,
520:8, 520:12,
520:17, 520:19,
520:21, 522:3,
522:4, 522:5, 522:6,
522:10, 522:11,
522:15, 522:17,
522:18, 522:19,
522:20, 522:21,
522:23, 523:2,
523:4, 523:5, 523:6,
523:10, 523:12,
523:13, 523:14,
523:15, 523:22,
527:16, 527:19,
527:22, 531:25,
532:7, 532:8,
532:11, 533:5,
534:2, 534:5,
534:10, 537:2,
537:4, 538:8,
538:10, 538:12,
538:15, 538:24,
538:25, 539:4,
539:5, 539:7,
539:11, 539:15,
539:17, 539:25,
540:15, 540:19,
540:21, 541:8,
541:12, 542:11,
542:21, 543:3,
543:9, 543:10,
543:15, 544:3,
544:8, 544:12,
544:14, 544:17,
545:1, 545:5, 545:7,
547:5, 547:10,
547:14, 547:17,
548:3, 550:17,
551:23, 552:4,
552:6, 554:2,
554:14, 554:19,
554:22, 555:9,
555:24, 556:1,
556:5, 556:11,
556:14, 556:18,
556:19, 556:23,
557:16, 558:2,
558:3, 558:8, 558:9,
558:17, 558:18,
559:11, 559:17,
559:22, 560:1,
560:19, 560:23,
561:12, 561:20,
570:20, 571:23,

581:21, 599:12,
601:1, 603:17,
607:3, 608:6, 609:18
**COE** [2] - 451:20,
565:13
**colleague** [2] - 456:2,
456:4
**collect** [1] - 599:3
**collecting** [1] - 602:2
**college** [1] - 596:24
**color** [4] - 476:2,
494:15, 510:11,
535:17
**column** [3] - 580:6,
580:21, 581:3
**columns** [2] - 580:9,
580:17
**com** [2] - 513:7,
514:13
**combined** [2] - 561:7,
579:20
**coming** [3] - 571:19,
572:24, 598:12
**comma** [1] - 579:12
**comma-separated** [1]
- 579:12
**comment** [2] - 534:7,
552:5
**commingling** [1] -
606:19
**common** [1] - 583:15
**communicated** [2] -
453:19, 547:13
**communicating** [2] -
438:1, 571:22
**communications** [3] -
433:18, 547:2, 579:2
**companies** [2] -
582:22, 595:9
**company** [10] - 525:3,
525:6, 528:3,
537:24, 540:24,
583:12, 585:12,
599:24, 610:11,
611:1
**company's** [2] -
583:13, 611:7
**comparatively** [1] -
452:19
**compare** [3] - 449:7,
563:17, 570:21
**compared** [3] -
514:13, 517:20,
568:3
**comparing** [1] -
513:17
**comparison** [9] -
507:2, 513:17,
515:25, 516:14,
567:9, 567:15,

568:7, 585:2, 585:4
**comparisons** [3] -
513:19, 513:21,
560:6
**compilation** [4] -
512:3, 512:18,
547:10, 550:17
**compiled** [15] - 488:7,
511:24, 512:9,
519:6, 519:8,
521:13, 522:5,
522:7, 522:22,
522:23, 523:3,
523:5, 523:11,
523:16
**compiler** [1] - 511:20
**compiles** [2] - 511:4,
522:10
**compiling** [2] -
511:11, 511:15
**complete** [3] - 560:6,
560:11, 587:6
**completed** [1] -
471:25
**completely** [4] -
467:18, 600:22,
602:1, 607:16
**compliance** [9] -
584:5, 595:15,
598:9, 598:15,
599:4, 599:6,
611:12, 612:19,
613:11
**comply** [2] - 611:3,
611:8
**component** [3] -
433:13, 501:20,
539:9
**components** [14] -
467:1, 468:16,
498:9, 520:18,
520:20, 520:21,
521:17, 521:24,
522:1, 522:3,
522:10, 523:14,
523:15, 603:25
**comprises** [1] -
503:18
**comprising** [1] -
519:24
**computer** [12] -
458:23, 495:21,
519:15, 520:22,
538:20, 538:21,
539:1, 539:6, 539:7,
596:22, 596:24,
597:2
**computers** [2] - 440:5,
501:24
**computing** [1] - 608:3

MARGARET E. GRIENER, RDR, CCR NO. 3, OFFICIAL REPORTER
(775) 329-9980

**conceivably** [1] - 436:24
**conceive** [1] - 502:18
**concept** [3] - 475:19, 516:16, 544:25
**concepts** [2] - 519:11, 519:13
**conceptual** [1] - 486:4
**conceptually** [3] - 476:8, 501:15, 505:24
**concern** [1] - 543:1
**concerning** [1] - 562:4
**concerns** [2] - 497:13, 513:4
**concluded** [1] - 432:23
**conclusion** [1] - 484:10
**conduct** [8] - 444:24, 454:16, 530:16, 530:20, 534:21, 535:11, 543:21, 604:19
**conducted** [2] - 528:1, 528:7
**config** [1] - 460:7
**configuration** [20] - 433:6, 436:12, 437:12, 449:6, 449:13, 449:15, 450:18, 450:19, 453:8, 453:10, 453:12, 453:23, 459:10, 459:12, 460:12, 524:5, 527:14, 543:12, 544:11, 546:19
**configured** [2] - 436:7, 455:1
**confined** [1] - 443:20
**confirm** [2] - 437:11, 452:23
**confirmed** [5] - 529:23, 548:8, 564:21, 565:8, 569:2
**confirms** [3] - 564:9, 565:6, 565:25
**conflict** [1] - 613:9
**conforms** [1] - 568:23
**confused** [1] - 560:16
**confusing** [1] - 582:9
**confusion** [1] - 568:16
**congratulations** [1] - 594:12
**conjunction** [1] - 612:1
**connect** [1] - 451:7
**connected** [1] - 451:25

**connecting** [1] - 452:12
**connection** [2] - 510:19, 546:15
**connectivity** [1] - 607:13
**connects** [2] - 487:24, 575:24
**consider** [6] - 447:3, 529:5, 530:13, 554:22, 571:15, 576:5
**consideration** [2] - 446:22, 603:12
**considered** [4] - 503:4, 528:9, 549:18, 570:21
**considering** [2] - 592:18, 599:19
**consistent** [1] - 584:14
**consolidate** [2] - 486:23, 490:10
**constitutes** [5] - 444:15, 466:23, 467:12, 469:24, 582:11
**constraint** [1] - 435:15
**constraints** [1] - 514:20
**construe** [1] - 499:22
**consultant** [3] - 527:2, 527:8, 527:10
**consulting** [1] - 526:21
**contain** [5] - 467:14, 468:16, 507:12, 563:12, 571:22
**contained** [5] - 561:2, 561:6, 562:5, 563:11, 585:6
**contains** [7] - 439:25, 457:14, 504:10, 512:18, 547:19, 557:16
**contemplate** [1] - 491:7
**contemplates** [1] - 490:13
**contempt** [1] - 441:20
**contend** [26] - 499:14, 510:15, 537:5, 538:10, 538:14, 538:23, 539:3, 539:11, 539:24, 540:19, 541:8, 542:11, 542:21, 543:3, 543:8, 543:15, 544:3, 544:8, 544:17,

554:14, 556:1, 556:5, 556:17, 556:23, 572:2, 572:7
**contending** [4] - 453:3, 466:10, 500:10, 510:7
**content** [6] - 467:3, 563:2, 563:3, 563:12, 581:21, 583:16
**contents** [7] - 439:22, 477:8, 477:23, 479:21, 479:22, 486:16, 585:19
**context** [16] - 445:23, 462:20, 464:16, 464:17, 481:20, 489:2, 489:3, 514:6, 524:1, 526:20, 528:3, 535:24, 569:2, 586:4
**contexts** [1] - 483:12
**continuation** [1] - 466:16
**continue** [1] - 461:7
**continued** [2] - 432:7, 610:6
**contract** [2] - 536:17, 603:3
**contracted** [1] - 602:22
**contractual** [1] - 535:2
**contrast** [1] - 449:7
**contrasting** [1] - 520:2
**control** [5] - 583:19, 583:20, 586:14, 586:17
**controlled** [1] - 452:2
**Controls** [38] - 432:24, 433:5, 434:23, 437:1, 437:13, 438:14, 438:20, 441:8, 441:11, 442:8, 443:1, 443:8, 443:19, 446:8, 452:12, 452:24, 452:25, 453:1, 453:9, 453:15, 453:19, 454:3, 454:20, 455:2, 455:7, 455:8, 455:9, 455:10, 455:12, 456:3, 456:7, 457:5, 458:9, 458:11, 461:3, 462:8
**Controls'** [7] - 449:8, 452:13, 453:24, 454:25, 455:6, 456:25, 460:12

**copied** [6] - 513:14, 544:4, 544:9, 554:22, 558:9, 572:12
**copies** [28] - 481:23, 481:24, 482:1, 482:7, 488:2, 488:4, 488:8, 488:15, 488:16, 492:19, 492:22, 492:24, 492:25, 493:22, 494:3, 494:6, 494:12, 511:7, 527:19, 539:14, 540:16, 542:16, 542:18, 544:8, 544:18, 544:19, 557:16, 587:21
**copy** [55] - 480:15, 482:10, 483:18, 489:19, 489:24, 490:3, 493:7, 493:8, 493:9, 494:21, 494:22, 495:2, 495:3, 495:4, 513:24, 515:5, 538:14, 538:16, 539:3, 539:4, 539:8, 539:14, 539:18, 540:7, 541:11, 541:23, 542:24, 545:7, 547:3, 548:21, 554:25, 556:4, 556:6, 556:8, 560:18, 569:17, 570:2, 571:4, 571:5, 571:10, 571:11, 571:12, 571:18, 572:1, 572:5, 572:12, 572:22, 572:24, 573:7, 574:16, 581:20, 581:24, 582:6
**copying** [6] - 511:15, 527:23, 543:3, 556:17, 556:23, 574:24
**copyright** [2] - 456:19, 457:8
**Copyright** [1] - 457:11
**copyrighted** [3] - 582:7, 582:14, 583:25
**Corey** [1] - 432:16
**corner** [3] - 444:6, 445:18, 596:1
**corporate** [7] - 530:23, 532:13, 533:3, 533:13, 534:4, 534:7, 540:11

**Corporation** [1] - 530:24
**correct** [282] - 434:1, 434:2, 434:4, 434:5, 434:6, 434:7, 434:9, 434:15, 434:21, 434:22, 435:7, 436:23, 437:18, 438:25, 439:7, 439:8, 439:18, 439:20, 439:22, 440:1, 440:2, 445:15, 445:20, 449:3, 449:16, 449:17, 449:19, 450:6, 451:23, 451:24, 453:5, 453:16, 454:3, 454:4, 454:5, 454:9, 454:11, 454:14, 455:21, 455:24, 455:25, 457:11, 457:12, 457:24, 462:24, 463:5, 465:24, 466:4, 467:1, 467:2, 467:4, 467:5, 467:14, 468:23, 470:4, 470:12, 471:4, 471:16, 472:1, 472:2, 472:18, 473:2, 473:7, 473:15, 473:17, 473:23, 474:8, 474:14, 474:18, 474:25, 476:17, 476:18, 477:9, 477:24, 478:1, 478:20, 478:25, 479:3, 479:25, 480:14, 480:22, 481:5, 481:10, 481:15, 481:19, 481:20, 481:24, 481:25, 482:3, 482:4, 482:6, 482:8, 482:9, 486:17, 486:18, 487:9, 487:17, 488:6, 488:12, 488:13, 488:18, 488:19, 489:14, 489:17, 489:22, 494:4, 497:22, 498:21, 498:22, 501:9, 501:18, 501:21, 501:24, 502:5, 503:22, 504:25, 506:21, 507:4, 507:9, 507:21, 508:12, 509:21,

7

510:15, 511:12,
511:13, 511:17,
512:16, 512:24,
513:12, 513:15,
513:16, 513:22,
513:25, 515:10,
515:15, 515:18,
516:6, 516:7, 516:9,
516:10, 516:17,
516:19, 516:23,
516:24, 517:2,
517:5, 517:22,
517:23, 518:2,
518:3, 518:7,
518:23, 519:7,
520:20, 520:24,
521:13, 522:11,
522:22, 523:4,
523:17, 524:23,
524:24, 525:20,
526:3, 526:7,
526:10, 526:22,
527:2, 527:19,
527:24, 530:24,
534:22, 535:1,
535:13, 536:15,
538:11, 538:16,
538:18, 539:12,
539:25, 541:6,
541:7, 541:10,
541:11, 541:14,
542:3, 542:11,
542:12, 542:14,
542:17, 542:21,
543:4, 543:9,
543:21, 543:24,
544:18, 544:20,
548:1, 550:23,
551:7, 551:8, 551:9,
551:10, 551:17,
551:19, 551:24,
552:2, 552:8, 553:7,
553:9, 553:11,
553:13, 553:25,
554:5, 554:6,
554:15, 554:19,
555:14, 555:21,
556:2, 556:7,
556:11, 556:18,
556:24, 557:19,
558:4, 558:11,
559:7, 559:8, 560:1,
560:8, 560:14,
560:20, 560:21,
560:24, 561:13,
561:14, 561:18,
562:3, 562:7,
562:11, 562:12,
563:16, 564:7,
564:8, 565:16,
566:8, 566:9,

566:11, 566:12,
566:14, 566:15,
566:19, 567:9,
567:10, 567:21,
568:4, 568:9,
568:12, 568:22,
570:16, 572:18,
572:19, 572:21,
573:19, 573:23,
574:5, 575:7,
575:12, 575:13,
575:16, 575:17,
575:20, 575:22,
576:12, 576:18,
576:21, 577:9,
577:15, 599:1,
613:10, 614:6
**corrected** [1] - 491:4
**correcting** [2] - 464:1,
465:5
**correction** [1] - 575:10
**correctly** [3] - 447:5,
487:7, 573:11
**correspondence** [2] -
435:25, 436:4
**corresponding** [1] -
562:22
**counsel** [71] - 437:4,
445:17, 449:4,
456:16, 456:17,
457:18, 461:1,
468:20, 473:20,
475:2, 479:10,
480:1, 481:16,
482:9, 483:10,
483:11, 490:6,
497:20, 498:13,
501:15, 504:12,
505:7, 508:21,
515:4, 518:7,
528:12, 529:1,
529:2, 529:11,
529:15, 529:23,
530:7, 531:5, 532:5,
532:25, 533:7,
533:14, 534:11,
534:19, 535:23,
536:19, 537:7,
538:7, 546:14,
547:24, 548:7,
548:13, 551:6,
551:12, 551:25,
552:9, 553:21,
554:17, 554:24,
555:16, 556:7,
562:12, 567:7,
571:24, 572:10,
573:4, 574:25,
575:4, 576:11,
576:25, 577:10,

577:13, 581:14,
581:17, 586:10,
611:2
**counsel's** [3] - 555:11,
576:16, 576:23
**count** [3] - 547:15,
552:4, 556:13
**counted** [6] - 551:18,
554:1, 554:11,
554:12, 554:16,
555:17
**counters** [1] - 589:14
**counting** [2] - 601:7,
601:9
**counts** [1] - 547:13
**couple** [7] - 505:5,
525:12, 555:19,
567:12, 582:17,
594:11, 611:14
**course** [9] - 439:16,
461:18, 473:21,
490:15, 519:3,
519:4, 522:7, 543:7,
610:14
**court** [2] - 513:24,
514:3
**Court** [31] - 444:18,
444:21, 445:19,
447:9, 447:13,
454:5, 454:11,
455:20, 457:16,
457:19, 457:21,
468:7, 481:21,
484:2, 485:1,
530:19, 534:9,
540:20, 542:4,
545:19, 549:19,
550:3, 550:5,
553:24, 554:4,
554:7, 558:17,
558:18, 574:20,
594:6, 607:23
**COURT** [48] - 432:1,
432:4, 438:6,
458:19, 484:3,
484:5, 484:8,
484:12, 484:16,
545:13, 545:19,
546:4, 549:2,
549:16, 577:18,
583:8, 587:2, 587:5,
587:9, 587:15,
588:2, 588:7,
588:11, 588:25,
589:10, 589:18,
589:25, 590:6,
590:12, 590:14,
590:20, 590:23,
591:3, 591:6,
591:18, 591:20,

592:3, 592:5,
592:12, 592:21,
592:25, 593:4,
593:7, 593:10,
593:15, 594:1,
613:19, 613:23
**Court's** [10] - 458:15,
467:9, 495:9, 514:5,
514:10, 539:13,
539:21, 543:18,
574:22, 575:1
**courtroom** [1] -
534:13
**courts** [1] - 537:7
**cover** [2] - 559:1,
602:22
**covered** [1] - 563:17
**covers** [2] - 530:20,
535:11
**create** [17] - 433:14,
446:14, 447:11,
447:21, 447:22,
447:24, 448:17,
448:19, 490:10,
490:18, 493:1,
539:18, 548:17,
556:4, 556:6, 556:7,
556:8
**created** [19] - 433:15,
448:1, 448:3,
481:15, 482:12,
488:2, 489:9,
489:19, 489:24,
493:9, 507:8,
507:13, 507:15,
516:5, 516:22,
543:23, 555:1,
572:25, 611:20
**creates** [3] - 493:19,
539:4, 544:7
**creating** [3] - 501:4,
515:15, 539:14
**creation** [4] - 469:23,
469:25, 578:14,
579:6
**creative** [2] - 502:8,
535:19
**criteria** [1] - 558:15
**cross** [61] - 432:7,
433:2, 433:9,
433:19, 438:4,
440:25, 441:11,
441:15, 441:16,
441:17, 441:21,
441:22, 441:24,
442:9, 442:10,
442:13, 442:19,
443:24, 443:25,
444:3, 444:4,
444:15, 446:3,

446:10, 446:23,
447:6, 448:13,
448:18, 454:12,
456:9, 462:2,
466:23, 466:25,
467:12, 467:22,
468:12, 468:21,
469:16, 469:17,
469:24, 471:14,
471:18, 474:7,
474:9, 482:13,
491:10, 491:16,
491:24, 491:25,
492:11, 494:21,
494:22, 494:23,
534:1, 583:9,
584:17, 584:20,
584:21, 587:3,
607:17
**Cross** [10] - 432:7,
432:11, 438:8,
466:15, 546:13,
549:4, 577:24,
584:8, 587:5, 615:4
**CROSS** [3] - 432:13,
432:15, 615:4
**Cross's** [1] - 463:17
**Cross-examination**
[1] - 615:4
**cross-examination** [4]
- 432:7, 438:4,
583:9, 587:3
**CROSS-**
**EXAMINATION** [1] -
432:15
**cross-use** [51] - 433:2,
433:9, 433:19,
440:25, 441:11,
441:15, 441:16,
441:17, 441:21,
441:22, 441:24,
442:9, 442:13,
442:19, 443:24,
443:25, 444:3,
444:4, 444:15,
446:3, 446:10,
446:23, 447:6,
448:13, 448:18,
454:12, 456:9,
466:23, 466:25,
467:12, 467:22,
468:12, 468:21,
469:16, 469:17,
469:24, 471:14,
471:18, 474:7,
474:9, 482:13,
491:10, 491:16,
491:24, 491:25,
492:11, 534:1,
584:17, 584:20,

8

584:21
**cross-used** [4] - 442:10, 494:21, 494:22, 494:23
**CRR** [1] - 614:9
**crystal** [2] - 503:20, 537:14
**culpable** [1] - 572:24
**curious** [1] - 476:1
**current** [3] - 434:19, 468:20, 594:16
**custodian** [1] - 571:12
**custody** [4] - 572:6, 572:7, 572:21, 573:2
**custom** [10] - 524:2, 524:4, 524:11, 524:17, 526:21, 531:25, 532:7, 533:5, 534:5, 537:4
**customer** [26] - 445:1, 445:8, 445:11, 447:11, 450:22, 453:25, 458:1, 459:25, 462:18, 463:2, 466:24, 470:1, 470:6, 470:9, 470:10, 483:22, 493:14, 494:16, 533:21, 533:22, 533:23, 570:2, 582:7, 582:9, 584:25
**Customer** [5] - 463:12, 469:2, 469:3, 469:6, 469:7
**Customer's** [5] - 469:4, 469:5, 469:9, 469:10
**customer's** [30] - 444:19, 444:24, 452:16, 452:21, 453:10, 458:1, 459:21, 459:24, 461:4, 462:25, 463:11, 466:22, 467:11, 469:14, 469:15, 470:8, 483:21, 483:23, 492:1, 492:2, 492:23, 492:25, 493:5, 493:8, 494:14, 494:15, 495:6, 533:22, 584:22, 609:20
**customers** [18] - 444:20, 448:18, 465:15, 486:23, 492:5, 492:6, 493:2, 493:6, 523:10, 533:20, 544:3, 544:7, 549:7, 558:9,

581:5, 582:13, 582:17, 595:20
**customizations** [1] - 603:15
**customize** [1] - 599:11
**customized** [2] - 527:15, 599:13
**cut** [1] - 560:22
**cutoff** [1] - 514:9

# D

**data** [12] - 447:22, 455:6, 519:24, 525:4, 527:14, 543:12, 546:18, 547:11, 550:18, 556:14, 604:20
**database** [21] - 568:2, 568:9, 568:12, 569:3, 569:4, 569:6, 569:8, 569:15, 574:9, 574:14, 574:18, 574:24, 575:7, 575:15, 575:20, 575:25, 577:25, 578:9, 578:10, 604:4
**DATE** [1] - 614:9
**date** [8] - 508:20, 508:21, 509:22, 514:9, 586:15, 586:22, 601:23
**dated** [3] - 509:18, 552:25, 588:15
**dates** [1] - 553:14
**daughter** [1] - 594:9
**day-to-day** [1] - 604:19
**days** [4] - 565:23, 582:17, 585:22, 585:23
**dealt** [1] - 456:5
**decade** [1] - 525:12
**decades** [2] - 525:12, 526:18
**deceit** [1] - 550:4
**December** [3] - 489:10, 589:21, 590:9
**decent** [1] - 545:12
**decide** [2] - 441:19, 537:7
**decided** [1] - 611:14
**decision** [3] - 442:5, 442:6, 611:7
**decisions** [1] - 607:23
**declaration** [3] - 528:18, 551:21,

575:6
**declarations** [4] - 474:13, 506:19, 519:23, 583:2
**decompiling** [1] - 523:19
**deemed** [3] - 462:14, 502:19, 505:2
**default** [4] - 449:6, 449:9, 459:11, 502:4
**defect** [2] - 465:21, 491:4
**Defendant** [1] - 593:16
**DEFENDANT'S** [1] - 615:14
**Defendants** [1] - 432:8
**DEFENDANTS** [1] - 432:19
**defense** [1] - 580:24
**Defense** [2] - 579:8, 580:5
**define** [1] - 434:17
**defined** [2] - 449:11, 449:12
**definitely** [3] - 600:9, 609:9, 609:10
**definition** [9] - 491:24, 498:12, 498:20, 500:11, 500:15, 500:16, 501:13, 501:14, 501:15
**definitive** [1] - 450:20
**degree** [4] - 568:5, 596:18, 597:2, 597:3
**degrees** [1] - 597:1
**deliver** [3] - 595:3, 601:25, 606:11
**delivered** [2] - 599:10, 599:12
**delivering** [1] - 601:22
**delivery** [3] - 520:18, 598:2, 605:7
**Delivery** [2] - 589:23, 594:17
**demonstrably** [1] - 582:15
**demonstrate** [2] - 511:5, 582:5
**demonstrated** [2] - 581:19, 581:23
**demonstrating** [1] - 582:10
**demonstrative** [17] - 437:25, 438:5, 438:8, 475:4, 475:7, 485:7, 488:22, 492:15, 505:11, 510:18, 513:2,

537:11, 541:3, 542:5, 567:6, 580:21, 580:24
**denied** [1] - 549:16
**deny** [1] - 550:5
**department** [1] - 611:6
**depended** [1] - 433:17
**dependence** [2] - 479:15, 504:3
**dependent** [1] - 480:7
**depicts** [2] - 541:8, 542:5
**deployed** [2] - 490:19, 583:19
**deponent's** [1] - 528:23
**Deposition** [1] - 590:3
**deposition** [31] - 463:17, 528:21, 530:25, 531:1, 531:4, 533:9, 551:21, 575:6, 587:13, 588:5, 588:15, 588:18, 589:3, 589:5, 589:7, 589:21, 590:1, 590:9, 590:15, 590:17, 591:8, 591:9, 591:10, 591:13, 591:15, 591:21, 591:23, 591:25, 592:6, 592:8, 592:9
**DEPOSITION** [1] - 615:6
**depositions** [2] - 528:5, 583:3
**derivative** [45] - 458:17, 458:22, 462:14, 462:15, 462:23, 462:24, 469:23, 470:1, 478:25, 479:11, 481:7, 482:15, 483:6, 483:8, 483:9, 494:18, 495:13, 495:16, 495:20, 496:14, 497:15, 498:3, 498:19, 498:25, 499:6, 499:16, 500:11, 500:15, 500:22, 502:12, 502:19, 502:25, 503:18, 503:23, 504:2, 504:7, 504:9, 504:20, 504:24, 505:2, 507:7, 569:5, 573:13, 574:9, 574:12

**derive** [1] - 551:19
**derived** [5] - 515:2, 515:14, 518:9, 547:12, 550:19
**describe** [3] - 436:13, 436:18, 472:16
**described** [1] - 607:9
**describing** [2] - 520:1, 528:19
**descriptions** [2] - 434:18, 436:6
**designations** [2] - 587:14, 588:6
**designed** [4] - 438:19, 561:19, 599:9, 607:25
**desirability** [1] - 442:18
**desk** [2] - 432:19, 588:5
**despite** [1] - 569:2
**detailed** [3] - 461:2, 465:20, 502:21
**details** [2] - 456:10, 529:18
**determination** [1] - 455:18
**determine** [4] - 446:5, 450:13, 601:24, 603:1
**determined** [2] - 450:8, 517:20
**determines** [2] - 440:19, 448:12
**determining** [6] - 455:10, 585:5, 602:4, 602:10, 602:14, 602:17
**detriment** [1] - 490:21
**Dev** [1] - 612:6
**develop** [11] - 443:6, 447:10, 459:2, 463:13, 466:11, 490:14, 494:14, 497:5, 497:10, 600:17, 600:20
**developed** [23] - 445:7, 462:11, 467:24, 469:3, 469:9, 482:15, 482:21, 483:16, 483:22, 485:3, 485:14, 485:21, 490:9, 493:24, 495:1, 495:10, 508:3, 508:19, 559:17, 564:6, 565:3, 600:6
**Developer** [2] - 590:18, 591:11

9

**developer** [2] - 591:16, 600:12
**developing** [5] - 454:8, 486:22, 527:14, 543:8, 599:22
**Development** [3] - 542:7, 594:24, 595:1
**development** [79] - 444:25, 458:1, 458:24, 466:21, 467:10, 468:4, 468:23, 469:11, 473:5, 474:20, 483:3, 490:17, 490:23, 490:25, 491:19, 492:1, 492:23, 493:9, 495:7, 495:22, 495:25, 496:7, 508:11, 524:2, 524:4, 524:12, 524:13, 524:17, 525:4, 526:22, 537:21, 538:1, 538:2, 538:5, 538:13, 538:15, 538:16, 539:15, 541:9, 541:12, 541:20, 542:6, 559:9, 559:15, 564:10, 564:12, 564:16, 564:22, 564:23, 565:6, 565:8, 565:10, 565:16, 565:20, 565:25, 566:1, 576:18, 577:7, 584:23, 592:1, 595:2, 596:11, 597:7, 599:25, 600:10, 604:11, 604:15, 604:21, 604:25, 605:2, 605:4, 605:6, 607:14, 608:25
**DevReview** [1] - 611:19
**DevTrack** [5] - 576:9, 576:14, 576:17, 577:6, 577:14
**diagnose** [1] - 443:5
**diagnosis** [3] - 445:1, 456:24, 458:4
**diagram** [1] - 511:5
**dictate** [1] - 471:7
**dictates** [1] - 449:18
**dictating** [1] - 449:21
**difference** [3] - 498:24, 522:25,

569:19
**differences** [2] - 516:13, 516:14
**different** [28] - 445:7, 456:12, 460:14, 460:20, 461:13, 462:16, 465:16, 470:9, 472:20, 475:20, 476:2, 486:23, 515:19, 519:8, 534:11, 534:17, 535:4, 538:21, 543:13, 579:18, 596:16, 603:7, 603:15, 603:17, 603:18, 608:23
**differently** [2] - 520:8, 520:10
**difficult** [4] - 600:21, 600:25, 609:2, 609:8
**digits** [2] - 463:23, 465:2
**diluted** [1] - 534:16
**dimly** [1] - 586:20
**Direct** [1] - 615:15
**direct** [5] - 466:2, 481:23, 526:5, 537:9, 541:3
**DIRECT** [1] - 594:4
**directing** [1] - 578:2
**directly** [4] - 481:15, 485:2, 578:20, 586:5
**Director** [1] - 591:25
**disable** [2] - 611:14, 612:9
**disabled** [1] - 613:3
**disabling** [1] - 612:7
**discern** [2] - 433:18, 451:24
**disclose** [4] - 486:15, 508:2, 561:15, 562:8
**disclosed** [5] - 474:12, 479:22, 479:24, 556:21, 570:13
**disclosure** [1] - 583:1
**discovery** [5] - 576:10, 587:12, 592:17, 592:22, 593:1
**discuss** [1] - 588:5
**Discuss** [1] - 522:22
**discussed** [12] - 447:25, 479:17, 511:18, 538:6, 566:25, 567:1, 576:4, 582:16, 588:21, 589:7, 590:4, 592:10

**discussing** [1] - 499:17
**discussion** [1] - 510:21
**discussions** [1] - 456:17
**disparate** [1] - 535:25
**disparity** [1] - 561:23
**display** [13] - 513:20, 538:23, 539:2, 540:4, 546:10, 552:16, 554:25, 558:21, 566:16, 567:5, 572:14, 577:21, 586:9
**displayed** [5] - 538:25, 539:5, 539:7, 562:20
**displaying** [4] - 540:7, 541:5, 543:2, 554:23
**dispositive** [1] - 563:3
**dispositively** [2] - 562:22, 568:15
**dispute** [5] - 441:18, 490:24, 496:9, 574:6, 582:20
**disputed** [1] - 434:13
**distinct** [1] - 608:7
**distinction** [3] - 456:20, 482:16, 522:24
**distinguish** [2] - 499:5, 562:17
**distinguishing** [2] - 500:3, 562:9
**distribute** [3] - 569:6, 574:9, 574:13
**distributed** [2] - 487:18, 523:22
**distribution** [3] - 469:22, 469:25, 570:19
**DISTRICT** [3] - 432:1, 432:1, 432:2
**dive** [1] - 432:22
**division** [1] - 525:6
**doable** [1] - 609:9
**Doc** [1] - 557:11
**Document** [6] - 589:1, 589:11, 589:19, 590:7, 592:13, 593:5
**document** [17] - 540:22, 551:4, 555:5, 555:6, 555:15, 555:20, 555:22, 557:10, 560:2, 560:15, 560:17, 564:20, 586:11, 586:14, 586:19, 612:17
**documentation** [5] -

458:18, 458:23, 495:21, 581:22, 609:14
**documents** [15] - 443:4, 547:25, 548:12, 548:16, 548:18, 548:23, 549:13, 549:18, 550:1, 550:21, 581:13, 583:12, 583:14, 583:20
**Don** [10] - 454:17, 456:1, 458:6, 460:3, 460:10, 471:20, 471:24, 473:2, 564:9, 565:4
**done** [27] - 451:14, 451:16, 452:5, 453:21, 454:13, 456:24, 458:6, 469:14, 483:22, 492:1, 492:2, 496:7, 496:8, 506:22, 507:1, 507:23, 510:11, 513:21, 526:4, 544:21, 551:25, 555:18, 563:10, 574:4, 582:1, 583:5
**door** [3] - 548:17, 549:14, 583:8
**dot** [2] - 481:1, 513:15
**dot.lis** [1] - 511:19
**double** [1] - 515:22
**double-check** [1] - 515:22
**doubtless** [1] - 465:15
**down** [9] - 458:19, 460:5, 460:6, 464:3, 470:15, 498:2, 509:2, 513:2, 587:7
**downloaded** [1] - 575:19
**dozen** [1] - 527:8
**dozens** [1] - 600:9
**draw** [1] - 564:25
**drawing** [3] - 454:21, 532:2, 537:19
**driven** [1] - 607:22
**Drop** [1] - 514:1
**DTX** [1] - 580:24
**dual** [1] - 519:15
**due** [1] - 457:18
**during** [19] - 466:2, 488:2, 488:3, 488:8, 527:9, 527:18, 537:9, 542:18, 575:11, 575:16, 575:21, 576:9, 578:11, 585:10,

597:4, 597:12, 597:15, 598:16, 609:1

**E**

**e-mail** [34] - 439:17, 447:25, 450:19, 450:23, 451:6, 451:23, 451:24, 452:8, 453:17, 471:18, 471:21, 471:25, 472:17, 473:2, 473:7, 550:24, 551:5, 551:7, 551:12, 551:17, 552:11, 552:17, 553:7, 553:15, 555:21, 564:3, 564:13, 565:24, 573:11, 611:1, 612:6, 612:18, 612:22
**e-mailed** [2] - 472:21, 497:14
**e-mails** [5] - 547:13, 549:8, 550:20, 550:22, 564:24
**e-sign** [1] - 610:16
**ear** [1] - 451:1
**early** [2] - 599:23, 600:5
**ease** [1] - 466:1
**easier** [4] - 488:25, 513:9, 513:10, 609:8
**easily** [4] - 518:9, 521:17, 521:24, 522:9
**Easter** [17] - 497:14, 505:12, 505:16, 505:24, 506:15, 507:20, 508:3, 508:7, 508:8, 508:13, 508:15, 508:18, 509:15, 509:16, 511:2
**easy** [1] - 466:8
**edit** [2] - 447:19, 448:10
**edited** [2] - 433:11, 433:12
**editing** [1] - 439:16
**editor** [9] - 447:17, 447:18, 448:8, 448:19, 507:14, 520:23, 520:24, 521:4, 521:8
**editors** [1] - 521:1
**Edwards** [16] - 518:15, 522:1, 526:13,

10

534:2, 534:10,
538:18, 539:15,
540:6, 540:8,
540:12, 540:21,
546:18, 558:1,
585:16, 585:20,
586:2
**EF** [1] - 557:11
**effect** [8] - 450:2,
450:3, 475:2, 502:2,
508:19, 509:7,
509:21, 610:19
**effective** [4] - 582:12,
582:22, 586:22,
601:23
**effectively** [1] - 609:11
**efficiently** [1] - 609:10
**effort** [3] - 608:21,
609:3, 611:10
**efforts** [2] - 576:18,
577:9
**eight** [4] - 509:6,
509:8, 509:9, 592:2
**either** [12] - 435:3,
449:11, 452:4,
477:23, 503:3,
507:7, 519:17,
529:4, 561:17,
562:2, 562:10,
563:18
**elaborate** [1] - 555:15
**element** [5] - 507:6,
571:7, 572:7,
572:20, 573:14
**elements** [3] - 516:15,
572:2, 572:4
**eliminated** [1] - 517:3
**ellipses** [1] - 560:5
**elsewhere** [2] -
448:20, 462:4
**emergency** [1] -
548:11
**employee** [7] - 452:5,
460:24, 527:7,
527:10, 540:11,
540:14, 540:24
**employees** [7] - 434:9,
434:12, 437:23,
595:24, 596:6,
610:12, 610:24
**employees'** [1] - 599:2
**employment** [1] -
600:16
**enact** [1] - 609:13
**encompassed** [1] -
580:9
**encounters** [1] -
595:13
**end** [9] - 492:9,
550:10, 554:18,

573:22, 594:22,
597:16, 608:12,
611:15
**ended** [2] - 488:16,
613:10
**ends** [1] - 580:7
**engagement** [3] -
524:10, 525:1, 527:6
**engineer** [22] - 436:21,
436:25, 437:2,
437:6, 448:12,
450:3, 450:10,
454:6, 454:12,
457:2, 459:17,
459:18, 463:24,
465:3, 483:13,
539:10, 539:24,
540:13, 540:17,
544:25, 545:2,
559:10
**engineering** [1] -
523:20
**engineers** [4] -
471:19, 549:7,
576:17, 577:8
**enjoined** [5] - 452:15,
457:19, 460:1,
530:10, 530:11
**enjoying** [1] - 594:10
**ensure** [1] - 607:1
**ensuring** [1] - 608:2
**entails** [1] - 527:23
**entered** [1] - 450:3
**Enterprise** [3] - 520:3,
521:6, 522:2
**enterprise** [2] - 595:7,
596:17
**EnterpriseOne** [11] -
520:2, 525:10,
525:14, 525:20,
525:21, 526:1,
526:3, 526:7,
538:18, 541:6,
543:25
**entire** [6] - 464:6,
464:10, 464:15,
536:23, 573:16,
611:1
**entirely** [4] - 480:5,
490:6, 563:12,
571:24
**entitled** [4] - 461:22,
606:17, 606:22,
614:7
**entity** [1] - 585:20
**entry** [2] - 509:17,
583:12
**environ** [1] - 542:6
**environment** [229] -
433:12, 437:11,

437:18, 438:12,
439:6, 440:17,
442:21, 443:5,
443:11, 444:8,
444:17, 444:19,
444:24, 445:10,
445:22, 445:25,
446:4, 446:5,
446:10, 446:14,
447:10, 447:21,
448:2, 448:4, 448:7,
448:13, 448:16,
448:22, 449:3,
449:5, 450:4, 450:5,
450:16, 450:21,
451:8, 452:13,
452:16, 452:18,
452:21, 452:24,
452:25, 453:9,
453:11, 453:24,
454:19, 454:25,
455:4, 455:5,
455:16, 456:23,
458:1, 459:2,
459:13, 459:19,
459:22, 459:24,
460:13, 460:21,
461:5, 461:21,
462:13, 462:17,
463:1, 463:8,
463:12, 463:14,
465:10, 465:22,
466:2, 466:8,
467:17, 467:19,
467:20, 467:25,
468:1, 468:3,
468:11, 468:20,
469:3, 469:5, 469:9,
469:10, 469:15,
470:8, 475:25,
476:2, 476:9,
476:16, 476:18,
478:7, 478:11,
478:14, 478:16,
478:23, 478:24,
479:13, 479:14,
480:8, 480:13,
480:14, 480:22,
480:23, 481:1,
481:2, 481:7,
481:12, 481:13,
481:22, 482:2,
482:3, 482:7,
482:16, 482:17,
482:19, 483:2,
483:4, 483:6,
483:17, 483:21,
483:23, 486:5,
486:13, 487:22,
487:25, 488:1,
488:5, 488:9,

488:15, 489:20,
489:21, 490:3,
490:8, 491:5, 492:2,
492:3, 492:4,
492:11, 492:23,
493:1, 493:4, 493:6,
493:8, 493:12,
493:13, 494:14,
494:17, 494:18,
494:25, 495:6,
495:11, 495:12,
495:17, 495:25,
496:16, 496:24,
497:5, 497:11,
497:12, 499:18,
499:22, 499:23,
500:3, 500:25,
501:2, 503:15,
503:21, 504:2,
504:4, 504:6, 504:7,
504:19, 504:24,
505:25, 507:14,
507:20, 507:25,
508:1, 508:8, 510:3,
510:10, 511:12,
511:24, 512:10,
512:15, 512:20,
512:21, 512:24,
519:24, 520:1,
520:3, 521:3, 521:6,
541:14, 541:20,
541:21, 541:24,
542:19, 543:4,
543:6, 559:16,
560:13, 560:20,
560:21, 567:21,
567:23, 575:7,
575:15, 575:24,
576:1, 576:3,
578:11, 584:23,
603:21, 603:23,
604:6, 604:11,
604:24, 605:8,
606:10, 608:19
**Environment** [3] -
542:7, 542:8, 542:9
**environmental** [2] -
510:5, 510:6
**environments** [50] -
435:7, 436:16,
438:24, 439:2,
463:25, 465:4,
473:6, 475:13,
475:20, 476:12,
481:19, 485:3,
486:2, 488:12,
492:5, 496:19,
498:4, 506:5, 508:4,
542:6, 542:7,
542:12, 542:13,
543:6, 604:7, 604:9,

604:12, 605:3,
605:12, 605:24,
605:25, 606:4,
606:6, 606:15,
607:12, 607:14,
607:18, 607:20,
608:6, 608:7,
608:10, 608:13,
608:14, 608:24,
611:11, 612:1,
612:2, 612:3
**equipment** [1] - 608:4
**erases** [1] - 469:13
**Eric** [1] - 432:19
**ERP** [1] - 600:16
**erroneous** [4] -
463:23, 464:1,
465:2, 465:5
**especially** [1] - 600:21
**essential** [3] - 447:15,
448:4, 572:4
**essentially** [3] -
449:20, 517:3, 527:4
**established** [3] -
439:7, 468:6, 476:16
**estimate** [2] - 547:8,
550:15
**et** [3] - 432:4, 432:7,
517:15
**Eugene** [63] - 433:25,
434:2, 434:8,
434:11, 434:14,
434:23, 437:10,
437:17, 438:12,
438:20, 439:10,
440:3, 440:6,
440:14, 440:25,
441:2, 441:7,
441:13, 442:9,
442:11, 442:25,
443:18, 444:17,
445:5, 445:6,
445:14, 445:22,
448:17, 450:11,
450:14, 450:24,
450:25, 451:11,
451:20, 451:22,
452:1, 452:4, 452:7,
453:5, 453:14,
453:15, 454:2,
456:2, 456:6, 457:4,
458:7, 462:7,
471:15, 472:1,
472:9, 474:17,
474:22, 474:24,
475:9, 475:23,
476:21, 478:2,
478:6, 478:11,
478:22, 480:25
**Eugene's** [32] - 433:3,

440:16, 445:9, 445:25, 446:4, 446:5, 446:10, 448:7, 448:13, 449:3, 449:5, 450:21, 451:8, 451:21, 454:19, 466:2, 475:11, 475:24, 476:8, 477:4, 478:7, 478:13, 478:15, 480:13, 480:22, 481:2, 481:5, 481:22, 482:2, 482:7, 482:16

**evaluate** [6] - 446:25, 447:16, 461:8, 462:20, 467:20, 585:9

**evaluated** [3] - 503:1, 504:14, 576:7

**evaluating** [1] - 539:21

**evaluation** [1] - 558:15

**evaporates** [1] - 461:1

**evening** [2] - 613:24, 614:3

**event** [3] - 467:24, 472:17

**events** [1] - 594:21

**EVIDENCE** [1] - 615:17

**evidence** [32] - 437:9, 437:20, 445:4, 445:10, 445:16, 449:4, 472:11, 472:14, 473:3, 474:24, 480:16, 481:6, 510:9, 511:14, 530:17, 542:1, 569:23, 578:15, 578:18, 584:11, 584:21, 587:13, 587:20, 589:1, 589:11, 589:19, 590:7, 592:13, 592:17, 593:2, 593:6, 612:15

**EVIDENTIARY** [1] - 432:11

**evolved** [1] - 605:16

**exact** [9] - 455:4, 455:9, 458:3, 460:6, 465:9, 501:14, 514:5, 514:10, 532:24

**exactly** [9] - 446:15, 447:16, 456:10, 515:14, 536:9,

549:25, 582:17, 600:25, 602:14

**examination** [7] - 432:7, 438:4, 466:3, 577:19, 583:9, 587:3, 615:4

**Examination** [2] - 615:5, 615:15

**EXAMINATION** [3] - 432:15, 577:22, 594:4

**examined** [1] - 523:24

**example** [17] - 490:8, 499:4, 499:17, 500:14, 510:21, 511:18, 556:3, 579:22, 580:3, 581:14, 583:4, 583:15, 604:2, 604:4, 606:1, 606:7, 606:23

**Excel** [1] - 579:13

**except** [1] - 586:5

**exception** [1] - 511:18

**excerpt** [2] - 450:18, 450:25

**exchange** [1] - 471:22

**exchanged** [2] - 453:17, 453:19

**exclude** [1] - 490:25

**excluded** [1] - 549:13

**excluding** [1] - 516:13

**excuse** [1] - 484:3

**executable** [3] - 522:5, 522:6, 522:11

**executed** [2] - 489:10, 560:4

**Executive** [1] - 589:22

**exhibit** [4] - 488:21, 578:3, 589:7, 612:14

**Exhibit** [28] - 509:11, 509:13, 509:14, 550:8, 552:13, 552:16, 558:21, 558:25, 566:23, 567:6, 577:21, 579:8, 579:15, 580:5, 586:8, 589:11, 589:13, 589:16, 589:19, 590:3, 590:7, 592:7, 592:8, 592:9, 592:13, 612:14, 612:17

**EXHIBITS** [1] - 615:17

**Exhibits** [7] - 550:22, 552:1, 552:7, 587:20, 587:21, 589:1, 593:5

**exhibits** [5] - 514:6,

548:9, 548:10, 587:18, 588:20

**exist** [10] - 492:6, 492:7, 492:19, 494:5, 494:6, 494:12, 495:2, 571:17

**existed** [1] - 528:14

**existence** [1] - 579:22

**existing** [5] - 498:6, 501:7, 597:25, 601:2

**exists** [3] - 445:10, 493:7, 519:15

**exit** [1] - 517:18

**expanding** [3] - 511:11, 511:15, 512:3

**expect** [3] - 434:8, 441:15, 567:24

**expected** [1] - 568:4

**experience** [20] - 435:21, 436:16, 436:17, 436:19, 436:22, 441:6, 459:5, 461:17, 518:18, 523:25, 524:23, 525:19, 525:21, 526:2, 526:5, 526:9, 596:14, 596:17, 600:12, 600:15

**experienced** [1] - 600:14

**experiencing** [1] - 437:10

**expert** [1] - 474:13

**expertise** [1] - 600:17

**explain** [3] - 597:23, 604:14, 606:6

**explained** [1] - 612:9

**explaining** [2] - 439:4, 612:23

**explanation** [1] - 439:5

**explicit** [1] - 539:13

**explicitly** [1] - 534:20

**express** [1] - 562:15

**expression** [20] - 440:1, 457:14, 462:9, 467:14, 468:17, 481:9, 482:13, 483:13, 493:19, 501:9, 502:9, 504:11, 512:14, 512:19, 562:10, 562:13, 562:18, 562:21, 563:8, 585:6

**expressive** [1] - 517:10

**extend** [1] - 595:23

**extending** [2] - 498:5, 500:17

**extends** [1] - 498:4

**extension** [15] - 462:12, 467:16, 468:18, 476:2, 479:13, 481:13, 492:3, 493:4, 493:11, 498:18, 499:22, 501:6, 502:19, 504:5, 504:23

**extensive** [1] - 574:21

**extent** [9] - 441:15, 458:14, 490:7, 490:9, 492:22, 527:20, 531:14, 538:1, 598:20

**extra** [1] - 580:15

**extract** [4] - 521:7, 578:23, 578:24, 581:2

**extracted** [1] - 521:7

**extraction** [1] - 447:23

**extractions** [1] - 525:4

**extracts** [1] - 527:14

**extrapolation** [1] - 536:25

**extrapolations** [1] - 525:5

**extremely** [1] - 548:6

---

**F**

**face** [1] - 534:16

**facility** [2] - 537:23, 544:11

**fact** [16] - 447:15, 469:13, 479:11, 480:2, 487:17, 491:20, 491:25, 504:14, 507:16, 536:1, 536:9, 548:22, 552:14, 569:3, 595:20, 606:15

**factor** [3] - 448:14, 499:12, 500:21

**factors** [3] - 447:2, 461:8, 603:7

**facts** [18] - 437:14, 441:5, 445:3, 446:19, 447:3, 458:12, 458:13, 460:14, 502:16, 502:17, 502:20, 503:6, 534:12, 534:17, 534:18, 536:19, 584:11

**failed** [1] - 576:5

**failure** [1] - 571:25

**fair** [2] - 558:11, 560:9

**fairly** [2] - 482:23, 613:20

**fall** [1] - 448:20

**falls** [4] - 462:15, 465:12, 467:21, 520:6

**familiar** [10] - 452:5, 491:12, 501:17, 507:12, 519:5, 519:9, 519:13, 603:21, 605:15, 609:23

**far** [11] - 440:15, 440:24, 441:9, 478:9, 480:17, 482:4, 482:6, 482:9, 487:23, 526:11, 568:14

**FCRR** [1] - 432:23, 614:9

**features** [2] - 498:5, 500:17

**February** [5] - 509:3, 589:3, 590:17, 591:10, 591:15

**federal** [5] - 434:6, 471:3, 471:5, 602:23, 602:24

**fell** [1] - 514:7

**felt** [3] - 611:24, 612:8, 613:7

**few** [3] - 570:12, 596:9, 610:5

**field** [10] - 436:7, 449:2, 449:7, 449:9, 449:10, 449:23, 455:1, 456:7, 460:5, 460:7

**fields** [2] - 435:13, 579:19

**fifth** [1] - 590:16

**figure** [3] - 455:2, 551:17, 557:4

**figured** [2] - 456:1, 458:7

**file** [163] - 433:8, 433:11, 439:22, 440:6, 440:25, 441:2, 441:4, 441:14, 442:25, 447:17, 453:3, 453:13, 453:18, 453:22, 463:22, 464:21, 465:1, 473:17, 473:23, 474:7, 476:3, 476:19, 476:23,

476:24, 476:25,
477:1, 477:12,
477:13, 477:23,
478:4, 478:6,
478:22, 479:6,
479:11, 479:16,
479:21, 479:23,
480:2, 480:4, 480:5,
480:7, 480:18,
480:21, 481:5,
481:9, 481:10,
481:14, 482:12,
482:14, 482:23,
483:20, 486:8,
486:18, 487:19,
487:20, 487:25,
490:11, 492:2,
494:10, 494:20,
496:13, 496:21,
501:20, 501:23,
502:3, 502:4, 502:9,
502:11, 504:1,
504:3, 504:9,
506:12, 507:12,
509:15, 510:13,
511:1, 511:3, 511:4,
511:19, 512:17,
512:19, 513:5,
513:11, 513:14,
513:15, 513:21,
514:13, 514:21,
514:22, 514:23,
515:8, 516:6, 516:8,
516:17, 516:23,
516:25, 518:1,
518:2, 518:4, 518:5,
527:23, 538:9,
538:12, 539:3,
542:1, 554:23,
554:25, 556:3,
556:4, 556:8,
557:18, 563:21,
563:22, 563:23,
566:4, 566:7,
566:19, 566:20,
567:16, 567:18,
568:1, 568:3,
568:25, 569:4,
569:7, 569:18,
570:6, 570:14,
570:18, 570:22,
571:2, 571:4, 571:5,
572:5, 572:22,
573:7, 573:10,
573:12, 573:13,
573:15, 573:16,
573:25, 574:1,
574:3, 578:1, 578:5,
578:8, 578:10,
579:13, 579:23,
580:1, 585:2, 585:6,

585:7
**File** [1] - 473:25
**file's** [1] - 573:5
**filed** [1] - 531:3
**files** [51] - 438:18,
438:20, 453:4,
454:2, 454:3,
475:24, 476:7,
476:15, 478:5,
480:12, 481:18,
486:4, 486:22,
488:11, 491:13,
497:18, 501:24,
505:12, 505:23,
506:4, 506:8,
506:15, 506:19,
507:8, 512:14,
513:17, 514:12,
517:7, 518:25,
519:5, 519:23,
557:21, 560:25,
561:2, 561:7,
561:13, 561:17,
562:2, 562:10,
563:16, 563:18,
571:22, 579:3,
579:14, 579:18,
579:20, 581:22,
605:8, 606:16,
607:17, 609:18
**fill** [1] - 448:5
**filler** [1] - 517:16
**filmed** [1] - 568:21
**filter** [2] - 517:9, 563:8
**filtering** [1] - 514:19
**final** [1] - 591:23
**finally** [1] - 485:24
**findings** [1] - 457:10
**fine** [2] - 461:10, 513:8
**fines** [1] - 599:5
**finished** [11] - 553:3,
564:10, 564:12,
564:14, 564:22,
564:23, 565:6,
565:9, 565:12,
565:25, 566:1
**firewall** [2] - 583:13,
583:17
**first** [52] - 435:11,
443:20, 451:15,
459:25, 465:10,
465:21, 485:14,
485:17, 485:21,
486:3, 487:13,
487:20, 487:21,
487:24, 488:5,
488:14, 489:19,
489:20, 490:3,
490:15, 490:16,
490:23, 490:24,

491:1, 492:10,
493:5, 493:7,
493:15, 493:18,
494:14, 494:15,
496:7, 496:8, 496:9,
496:16, 496:23,
497:4, 502:15,
508:25, 517:6,
517:11, 521:6,
557:3, 558:25,
587:12, 588:14,
593:13, 593:21,
596:21, 596:22,
607:4, 612:23
**First** [3] - 485:13,
486:13, 486:19
**fit** [2] - 452:2, 596:1
**fits** [3] - 486:22,
490:10, 490:15
**fitting** [1] - 437:15
**five** [5] - 516:8,
516:25, 590:19,
591:12, 601:16
**fix** [60] - 437:2,
442:11, 445:24,
446:15, 447:10,
447:11, 447:12,
449:24, 452:22,
452:23, 455:17,
455:19, 456:2,
459:15, 460:19,
460:22, 463:10,
463:13, 463:14,
464:1, 465:5, 465:9,
465:14, 465:17,
465:19, 465:21,
469:2, 469:3, 469:6,
469:8, 471:14,
472:6, 472:8, 473:5,
474:21, 490:18,
493:1, 493:3,
494:15, 494:16,
494:17, 494:25,
495:7, 496:3, 496:5,
553:18, 554:8,
556:20, 559:16,
597:19, 597:23,
597:24, 598:11,
598:17, 598:19,
598:21, 607:25
**fixed** [2] - 548:3, 598:4
**fixes** [5] - 455:8,
464:20, 478:18,
495:10, 595:12
**fixing** [2] - 461:19,
487:2
**floor** [1] - 596:1
**flower** [2] - 517:14
**fly** [1] - 583:5
**focus** [5] - 470:2,

477:12, 529:17,
530:16, 574:11
**focused** [1] - 602:2
**focusing** [2] - 493:15,
575:10
**follow** [2] - 612:11,
613:12
**follow-up** [2] - 612:11,
613:12
**followed** [1] - 574:2
**following** [2] - 546:5,
572:9
**follows** [3] - 432:14,
564:15, 593:17
**font** [4] - 440:5,
440:18, 440:22,
443:22
**footnote** [1] - 515:24
**FOR** [2] - 432:14,
432:19
**foregoing** [1] - 614:6
**forever** [2] - 494:13,
497:8
**forgive** [2] - 533:10,
581:17
**Form** [3] - 451:1,
451:2, 474:18
**form** [64] - 432:24,
434:6, 434:19,
435:20, 436:10,
439:10, 439:21,
440:13, 441:8,
441:11, 441:16,
442:7, 442:12,
442:15, 442:16,
442:18, 443:4,
443:12, 443:16,
443:18, 446:6,
446:7, 446:13,
446:15, 446:20,
446:23, 447:7,
447:20, 447:21,
447:23, 447:25,
448:10, 448:25,
449:10, 449:16,
452:3, 470:22,
470:25, 471:2,
471:4, 471:5, 471:7,
471:9, 474:1, 474:3,
474:4, 476:20,
478:6, 479:6, 479:7,
519:6, 519:17,
521:18, 522:17,
522:22, 523:16,
527:23, 532:8,
545:8, 547:4, 572:5
**format** [20] - 447:20,
449:2, 450:8, 451:8,
451:10, 455:1,
455:5, 455:9,

455:10, 455:11,
455:12, 459:6,
459:9, 459:10,
459:11, 460:6,
520:13, 523:10,
557:22, 580:18
**formats** [1] - 578:24
**forming** [3] - 529:6,
575:2, 575:3
**forms** [7] - 434:12,
441:17, 441:21,
441:22, 471:2,
519:15, 537:1
**forth** [2] - 453:4,
595:10
**Fortune** [1] - 595:8
**forward** [4] - 497:1,
497:7, 544:22, 546:8
**four** [8] - 475:8,
475:20, 475:23,
476:7, 485:12,
486:4, 542:25, 597:3
**four-year** [1] - 597:3
**frame** [1] - 527:9
**framed** [1] - 492:13
**framework** [3] - 498:7,
501:11, 611:19
**Francisco** [3] -
576:16, 576:24,
577:10
**FRANK** [1] - 615:12
**Frank** [2] - 591:16,
591:21
**frankly** [2] - 498:21,
549:22
**Frederiksen** [10] -
432:7, 432:11,
438:8, 463:17,
466:15, 546:13,
549:4, 577:24,
584:8, 587:5
**FREDERIKSEN** [2] -
432:13, 615:4
**Frederiksen-Cross** [9]
- 432:7, 432:11,
438:8, 466:15,
546:13, 549:4,
577:24, 584:8, 587:5
**FREDERIKSEN-
CROSS** [2] - 432:13,
615:4
**Frederiksen-Cross's**
[1] - 463:17
**free** [1] - 465:19
**fresh** [1] - 547:3
**friendly** [1] - 578:24
**front** [7] - 432:19,
438:9, 485:10,
506:12, 550:5,
555:16, 555:22

13

**fruits** [2] - 493:9, 494:12
**full** [3] - 560:12, 560:13, 560:20
**fully** [2] - 462:20, 503:4
**function** [5] - 447:24, 493:12, 503:14, 503:17, 504:19
**functionalities** [1] - 499:24
**functionality** [7] - 468:1, 498:5, 500:17, 500:18, 502:11, 502:23, 502:24
**functioning** [2] - 603:25, 604:6
**functions** [1] - 507:11
**future** [2] - 490:13, 497:8

**G**

**gain** [1] - 436:19
**gained** [4] - 436:17, 441:13, 454:7, 465:10
**gains** [1] - 436:16
**GARY** [1] - 615:12
**Gary** [1] - 591:21
**GC** [1] - 580:21
**general** [20] - 444:9, 454:20, 454:22, 454:23, 455:20, 455:23, 456:13, 456:14, 457:15, 459:8, 460:25, 468:7, 468:13, 475:19, 529:11, 529:23, 533:13, 581:13, 595:16
**generally** [2] - 456:25, 524:16
**generic** [6] - 580:22, 581:10, 605:25, 606:5, 606:14, 608:5
**Gerard** [1] - 552:21
**GIF** [5] - 473:17, 473:23, 474:7, 476:19, 476:23
**given** [10] - 447:9, 447:13, 474:15, 479:10, 498:12, 501:10, 504:13, 551:21, 574:21, 576:4
**Global** [2] - 589:23, 594:17

**goal** [1] - 601:21
**governments** [1] - 595:9
**grade** [1] - 596:23
**GRADY** [1] - 615:7
**Grady** [3] - 588:15, 588:16, 588:18
**granddaughter** [1] - 594:11
**granting** [1] - 548:11
**Graphic** [1] - 473:25
**gray** [7] - 438:11, 475:8, 485:12, 485:22, 485:23, 505:16, 506:2
**great** [1] - 563:5
**GRIENER** [1] - 614:9
**Griener** [2] - 432:23, 614:8
**Grigsby** [1] - 552:22
**gross** [1] - 514:20
**group** [2] - 602:1, 606:8
**Group** [2] - 485:23, 594:17
**guess** [5] - 537:12, 565:4, 580:7, 596:4, 600:5
**GUI** [1] - 450:5
**guidance** [9] - 447:9, 447:14, 459:20, 479:10, 498:14, 498:15, 504:12, 540:25, 611:3
**guide** [3] - 559:9, 559:15
**guys** [1] - 482:25

**H**

**half** [1] - 525:13
**hand** [1] - 559:6
**handled** [1] - 598:22
**hands** [1] - 599:24
**hands-on** [1] - 599:24
**happy** [2] - 497:19, 552:14
**hard** [1] - 600:20
**hardware** [2] - 501:25, 502:2
**Harika** [3] - 590:18, 591:10, 591:13
**HARIKA** [1] - 615:11
**HCM200049** [2] - 564:6, 565:22
**HCM200105** [3] - 484:1, 484:23, 487:11
**head** [2] - 461:6, 463:10

**header** [1] - 508:23
**hear** [1] - 447:5
**heard** [4] - 518:19, 518:24, 528:3, 570:24
**hearing** [5] - 445:19, 575:22, 583:5, 594:21, 597:12
**HEARING** [1] - 432:11
**held** [3] - 530:19, 534:20, 574:20
**help** [8] - 438:1, 445:11, 517:6, 583:19, 595:22, 595:23, 599:10
**helpful** [2] - 464:13, 497:17
**helping** [1] - 598:13
**herein** [1] - 516:1
**HICKS** [1] - 432:2
**hiding** [1] - 592:12
**high** [1] - 596:22
**higher** [1] - 554:15
**highlight** [1] - 476:3
**highlighted** [1] - 509:25
**highly** [7] - 460:4, 460:7, 460:11, 461:2, 461:24, 567:15
**Hill** [2] - 432:17, 588:5
**HILL** [20] - 588:8, 588:12, 588:19, 588:23, 589:2, 589:6, 589:12, 589:17, 589:20, 590:2, 590:8, 590:16, 591:9, 591:14, 591:23, 592:7, 592:14, 592:23, 593:1
**hire** [2] - 492:18, 494:8
**hired** [1] - 585:24
**hires** [1] - 497:8
**hold** [1] - 509:23
**holiday** [1] - 497:4
**home** [1] - 434:4
**Home** [11] - 484:1, 484:24, 485:23, 486:3, 488:17, 489:16, 492:17, 492:21, 493:16, 494:7, 496:4
**honestly** [2] - 551:12, 552:9
**Honor** [20] - 432:9, 464:5, 484:14, 484:20, 545:11,

545:18, 546:9, 548:5, 548:10, 548:18, 548:21, 548:24, 549:3, 549:9, 549:13, 577:17, 577:20, 582:25, 587:1, 587:4, 587:8, 587:10, 587:14, 587:19, 587:22, 588:1, 588:4, 588:8, 588:12, 588:14, 588:19, 588:24, 589:2, 589:6, 589:9, 589:17, 589:20, 590:2, 590:5, 590:8, 590:13, 590:16, 590:22, 591:1, 591:9, 591:14, 591:19, 591:23, 592:7, 592:11, 592:14, 592:20, 592:24, 593:9, 593:12, 593:25, 613:16, 613:22, 614:1, 614:2
**Honor's** [1] - 455:21
**HONORABLE** [1] - 432:2
**hooked** [1] - 537:21
**hope** [2] - 434:13, 492:8
**hopefully** [1] - 490:20
**hospitals** [1] - 595:9
**host** [1] - 607:12
**hosted** [3] - 575:6, 605:22, 609:21
**hosting** [6] - 568:8, 568:11, 568:18, 569:14, 571:16, 573:2
**Houmand** [1] - 432:16
**hour** [1] - 546:6
**house** [1] - 605:23
**housekeeping** [1] - 432:17
**human** [9] - 518:25, 520:13, 520:16, 521:18, 521:25, 522:10, 527:16, 557:22, 558:3
**human-readable** [8] - 518:25, 520:13, 520:16, 521:18, 522:10, 527:16, 557:22, 558:3
**hypothetical** [20] - 437:15, 446:21, 446:22, 448:6, 461:9, 461:16,

462:20, 464:15, 470:7, 477:16, 477:19, 477:22, 481:4, 483:19, 487:2, 501:12, 502:13, 502:18, 584:10, 584:13
**hypotheticals** [1] - 584:7

**I**

**ID** [2] - 603:14, 615:17
**identified** [2] - 444:18, 585:8
**identify** [10] - 517:7, 548:13, 548:14, 551:9, 551:10, 555:21, 562:22, 563:5, 568:18, 612:16
**identifying** [3] - 452:16, 548:22, 549:14
**identity** [1] - 485:17
**identity** [2] - 498:21, 528:22, 546:16, 546:24, 549:5, 575:9
**Ilissa** [1] - 432:20
**ill** [1] - 514:7
**illegal** [1] - 543:16
**illegally** [3] - 536:15, 536:24, 537:6
**Image** [1] - 473:25
**image** [3] - 474:4, 476:24, 476:25
**imagine** [3] - 460:4, 463:21, 464:25
**impact** [1] - 604:23
**impeachment** [1] - 464:5
**impermissible** [1] - 494:13
**implement** [4] - 464:1, 465:5, 465:9, 600:1
**implemented** [1] - 471:15
**implying** [7] - 436:8, 499:21, 571:16, 571:18, 572:20, 573:2
**important** [7] - 448:14, 570:4, 570:8, 570:9, 598:25, 599:4, 603:3
**importation** [1] - 480:11
**imposing** [1] - 571:21
**in-house** [1] - 605:23
**inaccessible** [1] -

14

520:14
**inappropriate** [4] -
444:20, 444:22,
447:14, 510:12
**inappropriately** [1] -
558:10
**INC** [2] - 432:4, 432:7
**incident** [1] - 582:3
**incidents** [1] - 582:17
**include** [18] - 480:12,
480:20, 481:1,
510:1, 510:8,
510:14, 510:24,
511:2, 511:4, 511:6,
511:7, 512:1,
512:21, 532:11,
554:8, 555:13, 558:2
**included** [6] - 457:19,
529:8, 532:22,
548:11, 554:13,
556:10
**includes** [8] - 479:17,
480:2, 480:6,
480:10, 507:19,
507:22, 510:14,
516:12
**including** [6] - 458:25,
471:19, 495:23,
511:10, 511:15,
533:4
**inclusion** [1] - 507:22
**inclusions** [1] -
507:11
**incorporate** [4] -
478:14, 507:10,
512:14, 549:18
**incorporated** [1] -
551:5
**incorporates** [4] -
481:9, 501:8, 502:9,
511:3
**incorrect** [1] - 575:8
**increase** [1] - 602:20
**indeed** [1] - 599:9
**independent** [2] -
501:4, 605:1
**independently** [3] -
498:8, 528:16, 560:4
**indeterminate** [1] -
564:18
**indicate** [3] - 436:5,
550:2, 559:25
**indicated** [3] - 559:12,
559:14, 581:10
**indicates** [4] - 445:5,
473:4, 485:13,
586:15
**indicating** [1] - 506:4
**indication** [2] - 564:5,
565:2

**indicators** [1] - 559:22
**indirectly** [1] - 586:5
**individual** [6] - 480:4,
504:1, 562:15,
573:24, 599:21,
601:5
**individually** [1] -
563:18
**individuals** [3] -
471:21, 471:23,
600:14
**indulge** [1] - 587:23
**industry** [1] - 536:23
**ineffective** [1] -
582:16
**inferences** [1] -
564:25
**information** [22] -
445:11, 446:17,
446:24, 448:5,
449:8, 449:22,
452:17, 454:18,
459:18, 528:13,
555:5, 573:10,
579:20, 579:24,
580:17, 581:19,
596:19, 597:3,
602:6, 603:1, 609:20
**informs** [1] - 499:15
**infrastructure** [2] -
500:20, 500:24
**infringement** [1] -
513:24
**infringing** [1] - 612:8
**initial** [7] - 440:8,
490:7, 490:22,
493:24, 516:18,
517:23
**injunction** [91] -
448:21, 452:11,
454:17, 455:24,
457:5, 457:7,
457:10, 457:22,
457:24, 458:5,
458:15, 460:1,
462:21, 464:2,
465:6, 465:13,
465:18, 466:7,
466:10, 470:13,
479:5, 483:5, 483:7,
483:23, 492:13,
493:22, 494:19,
495:5, 495:18,
496:11, 508:19,
509:7, 509:20,
510:8, 510:15,
510:17, 518:15,
522:14, 530:10,
530:18, 530:19,
534:15, 534:16,

534:21, 535:11,
539:13, 539:21,
540:5, 542:23,
543:19, 543:20,
558:1, 558:4, 558:7,
558:16, 568:9,
568:12, 568:17,
568:19, 568:20,
568:25, 569:4,
569:15, 569:20,
570:5, 570:15,
571:3, 571:17,
571:20, 572:3,
572:8, 572:15,
572:17, 576:2,
576:6, 584:5, 584:9,
584:15, 586:23,
610:19, 610:25,
611:2, 611:4, 611:9,
611:16, 612:5,
612:19, 612:24,
613:1, 613:11,
613:13
**inquired** [1] - 585:23
**insert** [1] - 559:25
**insofar** [1] - 479:11
**install** [3] - 527:11,
604:3, 604:4
**installation** [3] -
519:23, 595:17,
603:24
**installed** [6] - 480:24,
519:20, 527:12,
605:24, 608:1, 608:3
**installing** [1] - 524:17
**instance** [25] - 442:20,
443:10, 444:6,
446:24, 447:12,
451:16, 454:23,
457:20, 462:19,
463:6, 467:21,
471:18, 482:5,
482:15, 491:12,
495:18, 496:6,
500:6, 515:21,
524:9, 535:3,
537:22, 540:14,
563:10, 572:10
**instances** [5] - 468:2,
538:6, 546:17,
555:3, 599:5
**instead** [9] - 455:3,
457:15, 475:8,
482:10, 482:11,
498:8, 541:4,
578:25, 599:14
**instruction** [1] -
558:19
**insufficient** [1] -
446:24

**integration** [1] -
524:14
**intelligence** [1] -
433:13
**intended** [5] - 491:14,
491:20, 491:23,
493:12, 534:9
**intent** [7] - 467:9,
490:17, 491:8,
491:9, 491:16,
491:18, 491:22
**interact** [1] - 544:11
**interaction** [1] -
526:15
**interdependencies**
[1] - 501:11
**interest** [1] - 589:12
**interested** [1] - 596:21
**interesting** [1] -
532:19
**interface** [1] - 578:21
**intermingled** [3] -
454:2, 481:19,
488:12
**International** [1] -
530:23
**Internet** [3] - 607:13,
608:15, 612:2
**interoperate** [1] -
502:1
**interpret** [1] - 571:20
**interpreted** [1] - 558:2
**intersection** [1] -
603:1
**intervening** [1] - 491:3
**introduce** [1] - 594:6
**invited** [1] - 612:12
**involve** [7] - 531:24,
537:2, 543:3,
543:10, 543:14,
547:4, 556:17
**involved** [13] - 449:2,
451:2, 456:18,
462:9, 471:21,
522:24, 529:12,
546:18, 547:3,
599:17, 599:25,
600:9, 608:24
**involves** [7] - 515:15,
539:14, 547:10,
549:5, 550:17,
557:5, 594:21
**involving** [5] - 432:23,
484:1, 543:8,
553:19, 585:16
**IP** [2] - 573:18, 573:19
**IRS** [13] - 434:6,
439:10, 443:16,
446:7, 447:7, 452:3,
470:22, 471:2,

471:6, 474:4,
476:20, 478:6, 479:7
**ISAACSON** [3] -
593:8, 613:22, 614:2
**Isaacson** [1] - 432:15
**isolation** [1] - 558:16
**Issue** [6] - 432:23,
435:6, 513:4,
518:11, 518:14,
563:20
**issue** [84] - 433:25,
434:11, 434:16,
434:24, 435:6,
435:12, 435:18,
436:12, 436:23,
437:1, 437:3, 437:7,
438:2, 439:23,
440:23, 442:23,
444:9, 444:10,
445:19, 445:21,
451:2, 452:20,
452:21, 456:22,
459:9, 460:22,
462:22, 463:3,
466:6, 466:11,
470:18, 470:22,
471:10, 471:11,
473:15, 473:16,
474:18, 475:4,
478:3, 478:5, 481:3,
483:11, 483:25,
484:22, 485:7,
485:14, 486:20,
486:21, 486:25,
487:3, 487:4, 487:8,
487:9, 487:14,
487:20, 491:16,
494:8, 497:13,
497:16, 505:12,
513:5, 518:16,
535:7, 544:24,
557:5, 557:8, 559:6,
566:3, 570:13,
575:2, 575:21,
584:9, 597:4,
597:12, 598:4,
598:17, 608:2,
608:5, 613:7, 613:8
**issued** [2] - 457:10,
534:14
**issues** [9] - 442:14,
456:19, 495:14,
505:9, 566:3,
585:22, 595:17,
606:14, 611:24
**IT** [1] - 608:24
**item** [1] - 465:13
**iterative** [1] - 493:10
**itself** [15] - 433:21,
439:23, 440:2,

442:22, 443:22,
444:15, 452:20,
468:18, 480:4,
486:18, 504:9,
512:17, 543:23,
544:6, 561:21

**J**

**J.D** [17] - 518:15,
521:3, 521:16,
522:1, 526:3,
526:12, 534:2,
534:10, 538:18,
539:14, 540:6,
540:8, 540:12,
540:20, 546:18,
585:16, 586:2
**JACOB** [1] - 615:10
**Jacob** [2] - 590:9,
590:15
**James** [6] - 589:22,
590:1, 593:14,
593:20, 594:7,
615:15
**JAMES** [3] - 593:16,
593:23, 615:9
**January** [3] - 497:14,
588:15, 606:24
**JD** [2] - 526:1, 585:20
**JDE** [75] - 510:20,
510:21, 518:12,
519:18, 519:24,
520:3, 520:11,
521:5, 521:16,
521:22, 521:24,
523:23, 524:1,
524:23, 525:10,
525:11, 525:13,
525:20, 525:22,
526:14, 527:11,
527:17, 527:23,
531:9, 531:17,
531:22, 531:25,
532:7, 533:4,
533:14, 535:8,
536:12, 536:13,
536:21, 536:22,
537:1, 538:8,
538:10, 538:24,
539:3, 539:11,
539:25, 540:19,
541:8, 541:13,
542:11, 542:21,
543:3, 543:8,
543:15, 544:3,
544:8, 544:11,
544:17, 547:10,
550:16, 551:23,
554:22, 556:1,
556:5, 556:11,

556:17, 556:23,
557:6, 557:11,
558:1, 558:8, 562:1,
567:23, 569:3,
570:19, 570:21,
586:7
**Jessica** [1] - 432:15
**Jim** [4] - 471:19,
564:3, 565:24, 594:7
**Jira** [3] - 576:20,
576:21, 577:14
**John** [6] - 438:3,
466:14, 470:15,
492:14, 550:9,
567:12
**Johnson** [48] - 432:24,
433:4, 434:23,
436:2, 437:1,
437:13, 438:14,
438:20, 441:8,
441:11, 442:7,
443:1, 443:8,
443:19, 445:8,
445:24, 446:8,
449:8, 452:12,
452:13, 452:24,
452:25, 453:1,
453:9, 453:14,
453:15, 453:19,
453:23, 454:3,
454:19, 454:25,
455:2, 455:6, 455:7,
455:8, 455:9,
455:10, 455:12,
456:3, 456:7,
456:25, 457:5,
458:9, 458:11,
460:12, 461:2, 462:8
**join** [1] - 612:13
**judge** [8] - 441:19,
467:6, 512:3, 512:7,
530:10, 530:11,
534:14, 534:20
**JUDGE** [1] - 432:2
**judge's** [1] - 534:16
**judged** [1] - 535:6
**judgment** [1] - 535:14
**July** [5] - 605:18,
605:20, 606:2,
607:10, 608:12
**jumped** [1] - 467:18
**junction** [1] - 570:25
**jurisdiction** [2] -
602:18, 603:11
**jurisdictions** [1] -
598:10

**K**

**keep** [9] - 491:22,

495:3, 595:15,
598:8, 598:14,
599:6, 609:1, 613:4,
613:17
**keeping** [2] - 599:4,
602:3
**kind** [20] - 436:17,
438:11, 447:20,
457:6, 461:13,
471:11, 494:12,
511:5, 520:23,
550:2, 550:4,
554:11, 563:15,
580:3, 580:22,
581:25, 583:21,
595:11, 604:9,
612:23
**kinds** [1] - 547:4
**know-how** [8] -
454:20, 456:13,
456:21, 457:1,
459:8, 468:7, 468:8,
468:13
**knowledge** [57] -
441:7, 441:13,
442:1, 442:8,
442:15, 442:19,
443:7, 443:9,
443:17, 443:19,
443:21, 443:25,
444:1, 444:4, 444:7,
444:8, 444:21,
445:17, 446:4,
446:6, 446:9,
446:12, 447:6,
453:20, 453:22,
454:7, 454:21,
454:22, 454:23,
455:14, 455:15,
455:21, 455:23,
456:15, 457:3,
457:16, 457:17,
458:10, 459:12,
460:4, 460:8,
460:11, 460:17,
460:18, 460:25,
461:2, 461:16,
461:23, 463:7,
465:9, 465:20,
579:4, 584:14,
584:18
**known** [1] - 474:19
**knows** [2] - 436:25,
437:3

**L**

**label** [2] - 518:24,
538:9
**labeled** [11] - 477:1,

495:3, 595:15,
... 485:13, 485:22,
485:23, 485:25,
486:9, 505:16,
505:21, 506:9,
506:10
**labels** [1] - 519:12
**lack** [2] - 446:12,
559:19
**lacking** [1] - 447:15,
448:5
**language** [3] - 492:12,
520:22, 581:15
**languages** [1] -
522:24
**large** [6] - 485:12,
485:22, 485:23,
524:10, 561:9, 579:1
**largely** [2] - 531:2,
611:10
**larger** [2] - 438:11,
613:17
**LARRY** [1] - 432:2
**last** [20] - 451:5,
462:1, 503:10,
509:3, 509:17,
513:23, 541:19,
550:25, 554:18,
566:2, 581:7,
582:16, 586:15,
592:14, 593:21,
593:23, 603:18,
609:25, 610:1, 610:5
**late** [6] - 524:19,
526:13, 526:19,
594:21, 609:3,
610:20
**latest** [1] - 598:25
**law** [4] - 504:14,
505:2, 505:4, 505:8
**Law** [2] - 432:17,
432:21
**lawful** [1] - 535:16
**laws** [1] - 602:11
**lawyer** [2] - 504:15,
535:15
**lawyer's** [1] - 534:7
**layers** [1] - 502:1
**layperson** [1] - 505:3
**leakage** [2] - 583:11,
583:20
**learned** [1] - 609:10
**least** [18] - 440:23,
473:16, 491:14,
499:21, 502:24,
520:25, 536:7,
539:6, 544:19,
545:5, 556:6, 556:9,
558:18, 561:3,
566:1, 573:13,
576:6, 610:9

**leave** [1] - 482:1
**left** [5] - 433:16, 559:6,
559:11, 591:2,
603:16
**left-hand** [1] - 559:6
**Legacy** [1] - 523:23
**legal** [15] - 535:24,
553:19, 554:8,
554:13, 585:22,
595:14, 597:22,
598:6, 598:9,
598:13, 598:24,
599:14, 611:2,
611:5, 612:13
**legality** [1] - 543:17
**legislated** [1] - 598:10
**legislation** [1] -
600:22
**legislative** [1] - 602:19
**length** [1] - 517:15
**less** [1] - 596:2
**letter** [4] - 529:1,
529:23, 557:13
**letters** [1] - 451:5
**level** [1] - 600:12
**leveraged** [1] - 602:6
**Libbey** [4] - 552:22,
553:7, 553:25,
554:12
**Libbey's** [1] - 553:3
**license** [22] - 469:4,
469:5, 469:15,
494:1, 494:15,
510:11, 521:16,
523:18, 529:24,
533:6, 534:6, 535:3,
535:4, 535:5, 535:7,
535:16, 536:2,
536:3, 568:14,
568:17, 585:19,
586:1
**licensed** [9] - 466:22,
467:11, 469:24,
496:16, 519:18,
575:25, 586:5,
595:23, 607:7
**licensee** [9] - 458:25,
459:4, 495:23,
496:2, 520:12,
521:22, 535:16,
535:19, 540:25
**licensee's** [4] -
458:23, 459:2,
495:21, 495:25
**licensees** [5] - 520:11,
522:15, 543:24,
557:21, 558:3
**licenses** [4] - 466:25,
523:23, 536:12,
536:22

**life** [1] - 595:23
**likely** [3] - 441:16, 571:15, 578:5
**limit** [3] - 470:3, 470:14
**limitation** [2] - 470:3, 470:11
**line** [33] - 441:23, 454:21, 455:20, 457:13, 457:15, 460:24, 462:2, 462:8, 462:10, 463:17, 463:18, 473:18, 489:6, 510:14, 514:17, 515:16, 515:19, 515:25, 516:18, 516:20, 517:6, 517:10, 517:12, 517:13, 517:16, 517:18, 546:11, 548:20, 560:5, 560:11, 560:12, 560:13
**lines** [49] - 438:18, 475:24, 476:7, 480:4, 486:9, 498:2, 505:23, 506:4, 506:9, 514:15, 514:21, 514:22, 515:12, 515:16, 515:18, 516:1, 516:4, 516:5, 516:8, 516:17, 516:23, 516:25, 517:9, 517:14, 517:19, 518:1, 518:5, 559:22, 560:8, 560:10, 560:20, 560:23, 560:25, 561:2, 561:4, 561:5, 561:8, 561:13, 562:4, 562:13, 562:15, 562:17, 562:20, 562:23, 563:11, 582:4, 597:13, 601:1, 602:5
**list** [6] - 528:9, 548:12, 552:9, 552:12, 572:3, 587:23
**listed** [2] - 596:9, 605:3
**listing** [2] - 511:20, 511:21
**literal** [1] - 504:10
**literally** [1] - 571:1
**litigation** [8] - 481:20, 518:21, 528:4, 531:7, 534:14, 575:17, 575:22,

579:25
**live** [2] - 576:25, 604:18
**Liversidge** [1] - 432:20
**lobotomy** [1] - 461:7
**local** [7] - 568:8, 568:11, 568:18, 569:14, 571:16, 573:2, 595:9
**locally** [1] - 575:6
**location** [4] - 537:19, 541:23, 542:2, 606:7
**log** [3] - 491:21, 509:4, 509:17
**logging** [1] - 581:9
**look** [24] - 454:24, 454:25, 459:9, 459:11, 461:13, 468:2, 471:2, 473:10, 489:1, 506:11, 508:20, 527:16, 539:11, 539:19, 540:18, 545:1, 547:19, 547:21, 553:8, 564:19, 578:18, 579:12, 580:24, 602:21
**looked** [8] - 450:17, 479:16, 509:12, 537:18, 556:14, 563:11, 564:24
**looking** [23] - 458:14, 461:21, 475:7, 475:21, 502:16, 502:17, 509:14, 527:19, 537:15, 540:22, 543:15, 544:16, 544:22, 545:6, 554:10, 556:3, 556:11, 566:20, 568:6, 568:20, 579:14, 582:21, 601:19
**loved** [1] - 596:23
**lower** [1] - 516:14
**lunch** [4] - 472:22, 544:23, 546:6

---

## M

**ma'am** [1] - 458:19
**machine** [8] - 490:23, 491:1, 496:8, 540:7, 541:19, 545:6, 545:8
**machines** [1] - 486:24
**mail** [4] - 439:17, 447:25, 450:19, 450:23, 451:6,

451:23, 451:24, 452:8, 453:17, 471:18, 471:21, 471:25, 472:17, 473:2, 473:7, 550:24, 551:5, 551:7, 551:12, 551:17, 552:11, 552:17, 553:7, 553:15, 555:21, 564:3, 564:13, 565:24, 573:11, 611:1, 612:6, 612:18, 612:22
**mailed** [2] - 472:21, 497:14
**mails** [5] - 547:13, 549:8, 550:20, 550:22, 564:24
**main** [1] - 517:18
**maintenance** [2] - 524:15, 526:20
**majority** [1] - 605:22
**man** [1] - 461:7
**Management** [3] - 526:6, 526:10, 537:8
**management** [2] - 544:11, 611:5
**manager** [2] - 600:2, 600:11
**managing** [1] - 595:2
**Mandla** [3] - 590:18, 591:10, 591:13
**MANDLA** [1] - 615:11
**manually** [1] - 483:18
**mapped** [1] - 449:10
**mappings** [1] - 447:22
**March** [1] - 509:18
**Margaret** [2] - 432:23, 614:8
**MARGARET** [1] - 614:9
**marker** [1] - 560:23
**markers** [10] - 559:12, 559:18, 560:3, 560:19, 560:21, 561:12, 562:24, 563:1, 563:2, 563:9
**married** [1] - 594:8
**MASON** [1] - 593:16
**Mason** [1] - 593:20
**MAT** [2] - 565:3, 565:13
**MAT..** [1] - 564:6
**match** [10] - 453:9, 453:24, 516:18, 517:6, 518:2, 561:23, 567:19, 568:4, 568:5, 568:6
**matched** [3] - 514:14,

515:9, 567:15
**matching** [5] - 515:16, 515:20, 515:25, 517:24, 518:5
**material** [5] - 473:9, 515:1, 581:21, 581:24, 582:14
**materials** [16] - 528:9, 528:17, 530:4, 530:5, 530:8, 530:14, 533:10, 546:16, 569:3, 571:15, 572:12, 576:16, 582:7, 582:23, 583:25, 584:3
**math** [3] - 549:11, 555:19, 580:8
**Matheson** [7] - 563:20, 563:24, 564:7, 564:15, 564:17, 565:11, 565:16
**Matt** [2] - 577:21, 580:5
**matter** [13] - 432:17, 435:9, 461:24, 463:9, 481:21, 502:7, 502:8, 514:2, 531:4, 538:7, 542:4, 569:11, 614:7
**matters** [3] - 530:10, 535:25, 559:23
**McCracken** [9] - 432:21, 593:12, 593:13, 593:25, 594:2, 594:5, 613:16, 614:1, 615:15
**mean** [36] - 439:5, 441:4, 441:12, 450:7, 458:2, 458:14, 461:6, 462:16, 472:17, 478:18, 482:4, 483:7, 490:20, 497:2, 499:9, 502:21, 510:9, 520:21, 525:24, 527:6, 531:2, 532:3, 534:18, 535:20, 536:6, 536:18, 554:25, 555:22, 560:15, 565:12, 567:22, 581:11, 601:14, 605:14, 606:20, 613:5
**meaning** [2] - 449:23, 543:14
**means** [7] - 438:23,

441:21, 448:3, 450:24, 512:15, 538:12, 582:22
**meant** [2] - 451:3, 588:12
**meantime** [1] - 587:25
**mechanism** [1] - 472:23
**meet** [1] - 599:11
**meeting** [2] - 612:11, 613:14
**meetings** [1] - 611:5
**member** [2] - 557:17, 561:17
**members** [1] - 561:20
**memorize** [5] - 454:12, 462:6, 532:24, 552:9, 557:13
**memorized** [4] - 461:11, 462:3, 482:22, 483:19
**memory** [9] - 482:5, 482:25, 527:20, 539:7, 544:19, 556:6, 556:9, 573:11
**mention** [2] - 532:10, 569:15
**mentioned** [13] - 445:3, 473:9, 480:1, 516:12, 528:3, 544:25, 592:17, 597:18, 597:19, 603:10, 605:14, 606:4, 610:3
**mere** [1] - 539:2
**merely** [3] - 449:18, 467:19, 483:17
**MERGE** [1] - 513:18
**merged** [1] - 525:5
**merging** [5] - 480:11, 480:21, 481:1, 511:15, 512:1
**message** [5] - 581:4, 581:11, 581:12, 582:5, 582:12
**messy** [1] - 579:1
**metadata** [3] - 586:18, 586:20, 586:21
**methods** [1] - 608:16
**mic** [1] - 556:8
**Michael** [2] - 590:9, 590:15
**MICHAEL** [1] - 615:10
**Microsoft** [1] - 579:13
**middle** [2] - 538:9, 541:9
**might** [16] - 454:23, 459:15, 463:9, 502:4, 502:20,

503:2, 535:4,
536:18, 537:19,
537:22, 554:16,
564:20, 585:23,
597:24, 601:18,
604:4
mind [7] - 442:14,
452:20, 473:19,
505:5, 548:4,
551:15, 555:9
mine [1] - 535:6
mingling [1] - 608:6
minimum [1] - 602:20
minute [1] - 471:1
minutes [9] - 570:12,
588:16, 589:24,
590:11, 590:19,
591:2, 591:12,
591:17, 592:2
misalignment [3] -
434:24, 471:10,
471:11
mischaracterizes [1] -
449:4
mischaracterizing [2]
- 458:3, 499:2
missing [1] - 560:16
MN [2] - 580:7, 580:10
model [2] - 607:11,
609:7
modification [18] -
446:14, 449:12,
462:12, 467:16,
468:19, 479:13,
481:13, 492:3,
493:4, 501:5,
504:23, 509:3,
509:4, 509:17,
537:2, 569:21,
584:23, 601:1
modifications [6] -
459:3, 478:5,
487:19, 496:1,
524:5, 604:22
modified [16] - 440:4,
446:6, 446:13,
461:12, 478:13,
503:15, 503:17,
503:22, 512:15,
512:19, 521:2,
521:4, 521:11,
521:12, 566:13,
586:22
modifies [1] - 498:4
modify [4] - 447:7,
503:13, 504:18,
561:19
modifying [7] -
448:22, 448:25,
501:2, 501:3,

527:22, 544:14,
600:24
moment [10] - 494:11,
494:24, 496:20,
496:23, 547:22,
555:8, 569:21,
569:25, 576:4,
581:10
month [1] - 610:1
months [6] - 509:6,
509:8, 509:9,
509:20, 606:25,
609:6
morning [11] - 432:4,
432:6, 432:11,
432:12, 437:16,
439:14, 484:9,
484:18, 585:2,
585:12, 613:25
most [6] - 460:3,
461:1, 544:22,
572:5, 595:22,
600:15
mostly [1] - 525:3
motion [3] - 548:11,
549:16, 550:6
move [10] - 545:16,
548:19, 549:14,
556:7, 587:12,
587:19, 589:16,
592:17, 611:11
moved [2] - 594:10,
607:11
moves [4] - 588:19,
589:6, 590:2, 592:9
moving [5] - 593:2,
608:11, 608:18,
612:1, 613:19
MR [114] - 432:9,
432:16, 438:7,
460:2, 463:16,
463:19, 464:5,
464:7, 464:10,
464:12, 464:14,
464:18, 465:23,
466:14, 466:18,
469:18, 469:20,
470:15, 470:17,
473:11, 473:13,
475:3, 475:6, 484:4,
484:7, 484:11,
484:14, 484:20,
484:21, 485:6,
485:9, 488:20,
488:23, 492:14,
492:16, 497:23,
498:1, 508:24,
509:1, 513:1, 513:3,
541:16, 541:25,
545:11, 545:18,

546:9, 546:12,
548:5, 549:3, 549:9,
550:7, 550:13,
552:15, 552:18,
566:16, 566:18,
567:5, 567:8,
567:11, 567:13,
572:14, 572:16,
577:16, 577:20,
577:23, 582:25,
583:23, 586:25,
587:4, 587:10,
587:17, 587:19,
587:22, 588:4,
588:8, 588:12,
588:19, 588:22,
588:23, 588:24,
589:2, 589:6, 589:9,
589:12, 589:15,
589:17, 589:20,
590:2, 590:5, 590:8,
590:13, 590:16,
590:22, 591:1,
591:9, 591:14,
591:19, 591:23,
592:4, 592:7,
592:11, 592:14,
592:19, 592:23,
593:1, 593:8,
593:12, 593:25,
594:2, 594:5,
613:16, 613:22,
614:1, 614:2
multiple [9] - 435:14,
461:18, 466:5,
490:19, 490:20,
498:24, 499:18,
500:9, 601:8
must [2] - 523:12,
527:18

N

name [9] - 525:7,
526:12, 528:23,
580:1, 580:2,
593:18, 593:23,
594:7, 606:2
named [1] - 528:2
names [4] - 497:18,
506:12, 580:1,
593:22
narrow [1] - 549:15
NASDAQ [1] - 596:9
native [2] - 433:12,
579:9
nature [1] - 609:19
near [2] - 581:7,
586:14
necessarily [11] -

436:9, 441:12,
444:8, 450:21,
485:20, 488:3,
527:23, 536:25,
539:18, 540:8, 586:4
necessary [6] -
452:23, 493:10,
543:7, 571:7, 572:2,
603:25
need [18] - 434:15,
434:16, 435:10,
435:19, 436:9,
442:16, 474:25,
494:9, 495:10,
496:5, 497:10,
560:18, 588:2,
597:25, 598:24,
600:25, 601:8,
601:23
needed [9] - 434:20,
437:17, 452:17,
453:18, 458:8,
459:20, 499:24,
580:16
needs [9] - 440:4,
455:11, 460:6,
471:7, 483:16,
595:17, 599:12,
609:20
Network [11] - 484:1,
484:24, 485:24,
486:3, 488:17,
489:16, 492:18,
492:21, 493:16,
494:8, 496:4
network [1] - 575:20
networks [1] - 608:17
NEVADA [4] - 432:1,
432:24, 432:1, 546:1
Nevada [2] - 432:7,
432:24
never [15] - 470:7,
479:22, 482:1,
497:9, 530:24,
539:24, 551:20,
551:21, 556:21,
570:13, 570:24,
583:7, 608:20
new [22] - 432:18,
435:20, 458:12,
482:17, 482:19,
483:21, 484:5,
498:5, 501:6,
502:24, 514:8,
541:11, 548:17,
557:5, 583:6,
594:11, 600:22,
600:23, 612:5,
613:13
Newcomb [1] - 505:6

Newton [1] - 505:6
next [14] - 470:18,
474:11, 492:18,
494:24, 538:22,
541:2, 544:25,
559:3, 589:2,
589:20, 590:8,
591:8, 591:9, 591:14
night [1] - 581:7
nights [1] - 609:3
nine [3] - 509:6, 588:8,
588:12
Ninth [1] - 568:22
non [1] - 517:10
non-expressive [1] -
517:10
nonallowable [1] -
441:22
none [2] - 511:16
noninfringing [3] -
532:16, 532:23,
532:25
nonintellectual [1] -
532:17
nonliteral [1] - 504:10
nonprotectible [1] -
440:1
noon [3] - 545:13,
545:15, 545:20
normal [2] - 537:22,
542:15
normalized [13] -
514:17, 515:11,
515:19, 516:1,
516:4, 516:11,
516:12, 516:18,
516:20, 517:6,
517:10, 518:1, 518:5
Northern [1] - 594:9
note [3] - 465:11,
564:3, 564:9
noted [3] - 471:24,
537:17, 565:24
nothing [8] - 445:4,
473:4, 510:12,
536:8, 536:18,
573:8, 573:9, 593:8
notification [1] -
450:15
noting [1] - 545:13
novel [1] - 502:7
November [6] -
509:22, 552:25,
554:6, 591:24,
611:23, 612:20
Number [2] - 513:4,
518:11
number [44] - 438:2,
470:18, 475:5,
483:25, 484:22,

485:8, 497:13, 505:12, 505:17, 506:3, 509:20, 514:20, 514:21, 515:14, 548:3, 549:12, 552:10, 554:1, 554:15, 554:17, 555:9, 556:13, 556:16, 556:22, 557:5, 561:5, 561:12, 566:3, 566:21, 580:2, 583:21, 584:7, 595:12, 596:16, 599:19, 599:20, 601:7, 601:9, 601:10, 601:11, 602:16, 603:7, 608:1

**numbers** [5] - 432:20, 551:14, 552:4, 556:11, 567:1

**numeric** [1] - 449:23

## O

**O0O** [1] - 432:2
**oath** [5] - 531:16, 532:6, 532:13, 533:3, 534:4
**obfuscated** [3] - 519:7, 519:8, 519:17
**Object** [3] - 526:6, 526:10, 537:8
**object** [13] - 479:20, 512:17, 512:23, 519:6, 519:8, 520:19, 522:2, 523:5, 523:13, 523:15, 523:22, 548:15, 587:25
**objection** [21] - 438:3, 549:21, 549:24, 582:25, 587:16, 587:17, 588:24, 589:9, 589:17, 590:5, 590:12, 590:13, 590:20, 591:18, 591:19, 592:3, 592:4, 592:11, 592:19, 613:20, 613:22
**obligation** [1] - 571:21
**observation** [2] - 437:19, 491:15
**observed** [1] - 584:22
**observing** [1] - 571:24
**obtains** [1] - 521:23
**obvious** [2] - 560:6, 567:20

**obviously** [9] - 434:2, 470:8, 518:24, 536:5, 558:15, 559:16, 561:23, 579:23, 585:8
**occasionally** [1] - 601:18
**occur** [1] - 610:8
**occurred** [6] - 468:23, 468:25, 469:1, 471:18, 473:5, 508:12
**occurrence** [1] - 572:11
**occurs** [2] - 481:22, 488:14
**October** [2] - 489:9, 489:10
**OF** [2] - 432:1, 432:11
**offensive** [1] - 583:16
**offer** [18] - 434:14, 447:1, 477:7, 486:15, 506:18, 507:7, 507:10, 508:2, 508:6, 508:11, 519:22, 536:19, 538:4, 557:20, 561:15, 562:1, 566:10, 588:10
**offered** [11] - 466:1, 467:7, 471:13, 475:1, 481:11, 508:10, 563:14, 566:13, 567:14, 575:5, 575:14
**offering** [28] - 433:19, 433:24, 434:20, 437:17, 437:19, 439:21, 439:24, 441:10, 445:13, 446:16, 452:11, 454:1, 472:12, 474:6, 474:17, 474:19, 477:10, 477:23, 479:5, 479:21, 481:8, 481:16, 481:17, 488:10, 542:1, 565:10, 575:18, 575:23
**office** [3] - 576:16, 596:2
**offices** [2] - 576:23, 577:5
**Official** [2] - 432:23, 614:10
**often** [2] - 601:13, 610:8
**older** [1] - 508:17

**OMW** [5] - 521:6, 541:5, 543:23, 544:6, 544:13
**on-the-bump** [1] - 444:11
**onboarding** [1] - 608:24
**once** [7] - 492:7, 504:6, 512:19, 521:7, 522:23, 541:11, 585:8
**One** [1] - 506:9
**one** [134] - 432:17, 432:19, 435:3, 435:6, 435:10, 435:15, 438:11, 438:14, 438:16, 439:16, 442:21, 444:18, 445:17, 447:11, 451:4, 454:13, 455:16, 458:1, 458:23, 459:17, 460:24, 461:16, 462:18, 462:25, 464:16, 466:22, 467:11, 469:23, 474:11, 475:8, 483:2, 485:12, 486:21, 486:22, 489:2, 490:10, 490:15, 491:13, 492:1, 492:2, 492:8, 492:23, 495:6, 495:21, 498:24, 499:4, 499:5, 499:15, 499:21, 500:3, 500:9, 501:1, 503:14, 504:19, 505:5, 505:15, 505:16, 506:10, 509:12, 509:23, 509:24, 510:11, 511:18, 511:19, 513:19, 514:14, 515:5, 516:9, 517:1, 517:13, 517:19, 519:25, 524:1, 524:3, 524:9, 526:21, 528:4, 528:15, 530:2, 531:10, 531:11, 531:20, 533:20, 533:21, 534:25, 535:16, 537:17, 538:23, 540:2, 540:3, 542:7, 542:8, 542:18, 544:24, 550:25, 552:3, 553:10, 555:12,

561:3, 561:4, 561:9, 565:15, 565:18, 566:2, 566:21, 566:25, 567:1, 568:14, 568:15, 568:19, 568:21, 570:1, 573:3, 579:11, 579:14, 579:24, 584:22, 587:11, 595:12, 596:1, 597:2, 602:16, 602:25, 606:12, 606:14, 608:1, 611:18
**one's** [1] - 542:6
**one-third** [1] - 514:14
**ones** [4] - 523:24, 543:14, 554:18, 604:13
**ongoing** [1] - 605:2
**onsite** [1] - 529:20
**open** [6] - 518:19, 519:12, 553:16, 571:1, 578:11, 579:13
**opened** [2] - 553:5, 578:5, 583:8
**opening** [6] - 466:15, 488:21, 497:24, 513:13, 563:25, 578:8
**operate** [3] - 503:13, 504:18, 602:25
**operates** [1] - 498:23
**operating** [20] - 498:8, 499:23, 499:24, 499:25, 500:4, 500:5, 500:6, 501:17, 501:20, 501:25, 502:5, 502:10, 502:11, 502:20, 512:20, 520:1, 520:2, 524:15
**operation** [2] - 479:12, 481:12
**operational** [1] - 450:22
**opine** [1] - 557:15
**opined** [3] - 463:4, 513:13, 562:14
**opining** [3] - 468:11, 481:14, 488:16
**opinion** [82] - 433:2, 433:3, 433:7, 433:19, 433:24, 434:14, 434:20, 434:25, 437:17, 439:24, 439:25, 441:1, 441:10, 442:7, 443:8,

445:13, 446:11, 446:16, 447:1, 452:11, 454:1, 460:10, 466:5, 467:8, 467:10, 468:15, 471:13, 471:17, 472:12, 472:14, 473:7, 474:6, 474:16, 474:17, 474:19, 475:1, 477:17, 477:23, 478:3, 479:5, 479:21, 481:8, 481:11, 481:16, 481:17, 483:15, 488:10, 492:17, 493:20, 496:13, 497:4, 502:7, 503:7, 503:18, 506:18, 507:7, 507:10, 508:9, 508:11, 536:19, 538:4, 539:10, 540:17, 542:20, 543:17, 543:18, 555:6, 556:16, 556:22, 557:2, 557:20, 558:9, 562:15, 564:25, 565:10, 565:15, 567:14, 570:13, 575:14, 575:18, 575:23, 582:5
**opinions** [27] - 439:22, 467:7, 474:12, 477:7, 486:16, 496:21, 508:2, 508:6, 519:22, 529:6, 548:17, 548:24, 561:15, 562:1, 562:8, 566:10, 566:13, 575:2, 575:3, 575:5, 583:1, 583:4, 583:7, 584:4, 584:17, 584:20, 584:21
**opportunity** [2] - 588:3, 612:12
**opposed** [1] - 527:10
**optimum** [1] - 455:18
**optional** [1] - 511:20
**ORACLE** [1] - 432:4
**Oracle** [148] - 433:13, 438:20, 440:1, 457:14, 461:11, 462:7, 462:9, 466:23, 467:11, 468:3, 468:5,

468:16, 469:24,
474:14, 477:9,
477:14, 478:1,
478:23, 478:24,
479:2, 479:12,
480:2, 480:6, 480:7,
480:12, 480:15,
480:21, 481:9,
481:18, 486:17,
488:11, 493:20,
494:23, 494:25,
496:22, 503:16,
504:10, 505:7,
506:20, 509:11,
509:12, 509:14,
511:3, 512:2,
512:14, 512:19,
514:22, 514:23,
516:23, 516:25,
517:9, 518:2, 518:4,
520:11, 521:15,
521:16, 521:23,
523:18, 526:4,
528:1, 529:8,
529:15, 529:24,
530:23, 530:24,
531:6, 531:17,
532:7, 532:12,
532:15, 533:2,
533:6, 533:17,
536:5, 536:7,
543:23, 544:6,
546:13, 548:7,
552:1, 552:16,
557:17, 557:20,
558:8, 561:2,
561:13, 561:17,
562:2, 562:10,
562:22, 563:16,
563:18, 566:21,
566:23, 567:6,
567:18, 567:24,
568:3, 568:9,
568:11, 569:3,
569:4, 569:6, 569:8,
570:18, 570:20,
571:23, 572:5,
573:18, 574:9,
574:14, 574:18,
574:24, 575:15,
575:20, 577:25,
578:9, 582:13,
583:25, 585:20,
586:2, 587:20,
587:21, 588:8,
588:19, 589:6,
589:16, 590:2,
591:24, 592:7,
592:8, 592:16,
593:1, 593:8,
603:16, 606:12,

606:18, 607:1,
607:4, 607:5,
607:19, 609:13,
612:14, 612:17
**Oracle's** [37] - 444:14,
461:1, 466:22,
483:10, 483:11,
498:13, 503:13,
504:18, 515:1,
515:9, 528:12,
528:22, 529:1,
529:2, 529:11,
529:23, 530:7,
530:22, 531:13,
531:20, 532:13,
532:16, 533:3,
533:12, 533:13,
534:4, 534:6, 534:7,
544:2, 548:13,
567:6, 575:20,
577:13, 585:7,
589:7, 590:3, 609:18
**order** [13] - 448:17,
449:7, 453:24,
466:12, 466:13,
485:1, 486:22,
490:10, 514:10,
539:5, 575:1, 579:2,
587:24
**ordering** [1] - 516:16
**orders** [3] - 455:21,
467:6, 574:22
**Oregon** [8] - 434:2,
437:23, 487:4,
487:7, 487:8,
487:13, 487:20,
525:2
**OREX** [6] - 550:8,
550:22, 552:7,
558:21, 559:3, 569:4
**OREX's** [1] - 558:25
**OREX_226** [1] -
566:17
**OREX_243** [1] - 593:2
**OREX_246** [1] - 593:2
**OREX_259** [1] - 593:2
**OREX_260** [1] - 593:2
**OREX_269** [1] - 593:3
**OREX_274** [1] - 593:3
**OREX_295** [1] - 593:3
**OREX_309** [1] - 592:9
**OREX_347** [2] -
588:20, 588:23
**OREX_349** [2] -
588:20, 588:23
**OREX_350** [2] -
588:20, 588:23
**OREX_69** [1] - 552:3
**organization** [3] -
517:4, 517:22,

598:22
**organizing** [1] -
501:24
**original** [8] - 500:24,
501:5, 501:9,
502:11, 525:11,
564:20, 569:2, 580:1
**OSC** [1] - 531:2
**otherwise** [3] -
477:17, 550:3, 563:6
**outlines** [1] - 609:17
**outlining** [1] - 612:7
**output** [4] - 447:21,
514:4
**outputs** [1] - 511:20
**outside** [8] - 448:4,
467:22, 468:7,
468:12, 507:14,
518:21, 518:22,
529:15
**overall** [1] - 547:14
**overlap** [2] - 517:21,
567:25
**own** [20] - 440:5,
462:11, 476:12,
482:12, 485:3,
486:5, 493:19,
533:12, 534:7,
536:13, 544:2,
574:3, 605:12,
606:5, 607:17,
607:18, 608:8, 608:9

**P**

**P.M** [1] - 546:1
**P06767** [1] - 557:17
**package** [1] - 606:11
**packed** [1] - 502:13
**page** [11] - 463:17,
508:25, 546:11,
547:7, 550:10,
558:25, 559:1,
559:2, 559:3, 578:3,
581:16
**PAGE** [1] - 615:3
**pages** [6] - 461:11,
461:12, 462:4,
462:7, 567:2, 567:12
**pairs** [1] - 517:7
**paper** [1] - 482:19
**paragraph** [45] -
466:16, 466:19,
469:19, 469:21,
473:10, 473:12,
473:14, 473:16,
473:19, 488:22,
489:2, 489:6,
495:18, 497:24,
498:16, 500:16,

503:9, 503:10,
513:13, 518:14,
522:14, 550:25,
558:3, 558:7, 564:1,
569:14, 569:20,
570:5, 570:15,
570:25, 571:2,
571:8, 571:17,
571:20, 572:3,
572:8, 572:14,
572:17, 573:3,
574:7, 574:23,
575:2, 576:2, 576:4
**parameter** [13] -
449:15, 449:18,
451:22, 452:2,
452:14, 453:13,
453:17, 456:2,
456:7, 456:12,
458:7, 460:5, 460:12
**parameters** [8] -
442:24, 443:13,
443:15, 446:1,
448:23, 449:13,
453:4, 510:6
**part** [26] - 449:12,
462:1, 464:8, 464:9,
473:5, 481:6,
483:11, 491:23,
500:10, 500:14,
500:21, 501:3,
501:15, 516:11,
520:18, 526:7,
531:7, 549:5, 551:5,
560:5, 569:7,
570:19, 574:11,
579:11, 581:2,
611:18
**particular** [18] - 444:6,
446:15, 449:7,
466:12, 477:12,
487:3, 491:12,
499:5, 500:5,
502:17, 503:24,
511:23, 512:20,
527:6, 527:9,
565:17, 605:25
**particularity** [1] -
563:5
**parties** [8] - 467:7,
528:8, 534:18,
535:23, 536:10,
536:16, 569:1,
570:17
**partner** [2] - 533:17,
595:21
**parts** [3] - 450:7,
522:4, 599:12
**party** [14] - 527:4,
528:2, 531:6, 531:8,

533:15, 535:8,
535:12, 535:13,
536:20, 536:23,
572:24, 573:1,
573:19, 581:21
**passage** [1] - 454:15
**past** [1] - 530:12
**paste** [2] - 483:18,
560:22
**patch** [1] - 527:12
**path** [1] - 543:12
**pattern** [2] - 536:1,
536:9
**patterns** [1] - 504:14
**pause** [1] - 553:6
**pay** [2] - 513:7, 514:13
**paychecks** [1] - 599:2
**pays** [1] - 521:16
**pdf** [26] - 433:8,
433:14, 433:21,
439:13, 439:21,
439:23, 440:2,
440:5, 440:13,
440:22, 441:4,
441:14, 441:25,
442:22, 444:14,
445:23, 447:16,
447:20, 447:21,
448:7, 448:10,
448:19, 448:25,
474:2, 578:23
**pdfs** [2] - 433:14,
448:9
**penalties** [1] - 599:5
**people** [6] - 534:25,
544:22, 596:3,
597:8, 600:3, 612:23
**PeopleSoft** [118] -
438:20, 438:24,
439:2, 439:6, 444:8,
444:9, 446:14,
448:1, 448:4, 448:9,
448:16, 448:21,
448:22, 449:6,
449:13, 450:4,
454:2, 454:3,
458:17, 458:22,
459:2, 462:13,
463:22, 465:1,
467:17, 467:19,
467:25, 468:6,
468:10, 468:11,
468:19, 469:10,
475:13, 475:25,
476:8, 476:12,
476:16, 478:13,
478:15, 479:13,
479:14, 481:7,
481:12, 481:18,
486:5, 492:3, 492:4,

20

493:3, 493:4, 493:12, 493:13, 494:18, 495:17, 495:20, 495:25, 496:16, 496:17, 497:21, 498:4, 498:6, 498:7, 498:9, 499:17, 499:18, 499:22, 499:23, 500:2, 500:24, 503:14, 503:16, 504:2, 504:18, 504:23, 505:25, 506:5, 507:8, 507:18, 507:25, 510:10, 512:10, 513:14, 567:22, 568:20, 590:18, 591:11, 592:1, 594:24, 594:25, 596:12, 597:7, 597:13, 597:14, 597:15, 599:7, 599:10, 600:15, 600:17, 600:20, 601:3, 602:7, 602:8, 602:17, 604:2, 604:3, 604:6, 604:7, 604:9, 605:8, 605:12, 607:6, 607:7, 608:10, 612:4, 612:6, 612:19, 612:21

**PeopleSoftTools** [1] - 507:11

**PeopleTools** [8] - 447:10, 447:11, 447:17, 447:19, 447:21, 447:22, 507:8, 507:13

**per** [3] - 595:20, 601:16, 603:15

**percent** [12] - 509:2, 514:15, 517:25, 547:16, 548:1, 548:4, 548:9, 549:10, 549:11, 551:16, 553:25, 555:19

**percentage** [9] - 514:22, 515:8, 518:4, 518:8, 547:8, 550:15, 551:1, 551:22, 555:8

**percentages** [1] - 515:25

**perfect** [2] - 482:24, 484:7

**perform** [7] - 452:23, 458:24, 495:22,

535:20, 535:21, 584:23, 585:24

**performed** [9] - 469:8, 472:4, 472:7, 472:10, 472:25, 489:24, 513:19, 526:20, 565:16

**performing** [5] - 515:16, 524:14, 536:21, 540:6, 585:24

**performs** [1] - 493:12

**period** [11] - 526:17, 575:11, 575:16, 575:19, 575:21, 576:10, 576:15, 597:4, 597:12, 597:16, 598:16

**periods** [1] - 491:4

**permissible** [1] - 576:5

**permission** [1] - 536:4

**permitted** [4] - 459:16, 539:17, 542:23, 583:6

**person** [5] - 450:14, 534:25, 539:16, 539:20, 540:8

**person's** [1] - 456:21

**personal** [1] - 599:22

**personally** [5] - 519:18, 519:20, 576:22, 600:1, 600:5

**personnel** [1] - 525:5

**perspective** [1] - 539:21

**Phillips** [1] - 432:15

**photographic** [1] - 482:25

**phrase** [5] - 454:18, 518:15, 532:18, 534:9, 558:1

**physically** [3] - 538:20, 540:18

**piece** [6] - 461:16, 482:19, 499:6, 499:14, 499:16, 603:3

**place** [11] - 457:22, 470:11, 470:13, 472:23, 474:20, 494:1, 511:23, 526:19, 604:24, 611:11, 613:18

**placed** [7] - 470:14, 512:20, 541:12, 570:2, 576:13, 577:3, 577:12

**PLAINTIFF** [1] - 432:14

**Plaintiff** [1] - 432:13

**plaintiff's** [1] - 515:3

**PLAINTIFF'S** [1] - 615:3

**Plaintiff's** [6] - 589:1, 589:11, 589:19, 590:7, 592:13, 593:5

**plaintiffs** [1] - 432:5

**PLAINTIFFS'** [1] - 615:17

**planning** [2] - 595:7, 596:18

**platform** [4] - 498:24, 499:15, 500:9, 525:22

**platforms** [6] - 498:24, 499:15, 499:19, 500:10, 520:4, 520:5

**play** [7] - 587:14, 588:9, 589:3, 589:21, 590:17, 591:15, 591:24

**played** [7] - 588:18, 589:5, 590:1, 590:15, 591:13, 591:22, 592:6

**players** [1] - 529:13

**playing** [1] - 588:6

**plb** [2] - 566:19, 566:20

**plug** [1] - 583:18

**plug-ins** [1] - 583:18

**plus** [3] - 580:12, 580:17, 602:23

**Pocker** [1] - 432:14

**point** [11] - 449:24, 451:11, 452:1, 462:2, 462:3, 481:4, 481:6, 534:17, 545:12, 553:15, 568:17

**pointed** [2] - 537:25, 561:22

**policies** [4] - 532:15, 609:13, 612:5, 613:13

**policy** [2] - 609:16, 609:22

**Policy** [2] - 609:17, 610:15

**ponder** [1] - 569:24

**poor** [1] - 461:7

**population** [1] - 447:23

**portable** [1] - 499:18

**portion** [9] - 514:25, 515:2, 522:19, 539:6, 545:5, 549:15, 553:13, 554:5, 555:13

**Portions** [7] - 588:18, 589:5, 590:1, 590:15, 591:13, 591:21, 592:6

**portions** [8] - 512:19, 513:14, 523:6, 523:7, 523:8, 527:16, 548:20, 562:19

**posed** [4] - 441:5, 446:21, 461:9, 549:21

**posing** [1] - 437:15

**position** [5] - 437:4, 444:14, 510:9, 571:24, 594:16

**possess** [3] - 581:20, 581:24, 582:6

**possesses** [1] - 573:7

**possession** [1] - 573:14

**possibility** [1] - 503:2

**possible** [2] - 502:25, 544:6

**possibly** [4] - 489:21, 490:3, 519:16, 533:24

**postinjunction** [1] - 575:22

**potentially** [2] - 452:4, 613:8

**pound** [1] - 511:14

**practical** [2] - 504:4

**practice** [2] - 533:19, 547:16

**practiced** [1] - 550:5

**practices** [1] - 546:17

**pre** [10] - 508:25, 509:11, 509:15, 511:11, 511:15, 511:20, 512:3, 592:8, 597:25, 606:2

**pre-admitted** [4] - 508:25, 509:11, 509:15, 592:8

**pre-compilation** [1] - 512:3

**pre-compiler** [1] - 511:20

**pre-compiling** [2] - 511:11, 511:15

**pre-existing** [1] - 597:25

574:8, 574:12, 606:1, 606:10

**prepared** [3] - 432:6, 514:6, 568:7

**presence** [3] - 569:24, 571:25, 573:5

**present** [9] - 514:22, 514:23, 571:4, 571:6, 571:7, 571:9, 572:6, 572:23, 572:25

**presented** [1] - 610:15

**president** [3] - 588:16, 597:6, 597:7

**President** [5] - 589:22, 594:17, 594:24, 594:25

**presumably** [5] - 435:4, 455:6, 478:18, 496:3, 538:14

**presume** [1] - 534:15

**presuming** [2] - 450:24, 487:1

**presumptuous** [1] - 534:19

**pretty** [4] - 511:8, 523:21, 565:22, 596:19

**prevent** [9] - 541:1, 571:12, 571:14, 571:21, 572:11, 572:12, 582:21, 582:23, 583:11

**prevented** [4] - 571:18, 573:1, 582:19, 583:22

**preventing** [1] - 582:13

**prevents** [1] - 540:8

**previous** [4] - 492:20, 509:12, 539:23, 574:22

**previously** [6] - 432:14, 437:16, 471:14, 514:3, 558:22, 566:17

**primarily** [3] - 598:19, 599:23, 607:22

**principal** [2] - 527:13, 591:16

**principally** [2] - 546:24

**Pringle** [1] - 471:20

**print** [24] - 442:24, 443:11, 443:13, 443:15, 446:1, 448:23, 449:2, 451:8, 451:10, 451:21, 452:1,

**prefatory** [2] - 464:8, 464:9

**prefer** [1] - 559:21

**preferred** [1] - 533:18

**premise** [1] - 500:2

**prepare** [7] - 458:21, 495:19, 569:5,

21

452:14, 453:4,
453:13, 456:2,
456:6, 456:11,
458:7, 459:6, 459:9,
459:11, 460:5,
460:12
**printed** [4] - 435:13,
474:3, 482:18, 579:5
**printer** [1] - 501:25
**printing** [3] - 436:3,
444:10, 451:3
**printout** [1] - 483:19
**private** - 567:16,
568:24, 608:17
**proactive** [3] - 598:8,
598:14, 601:22
**proactively** [3] -
437:2, 437:7, 601:24
**probable** [1] - 444:25
**problem** [41] - 436:3,
436:10, 437:7,
437:10, 440:3,
440:8, 440:9,
440:11, 440:18,
443:6, 445:5, 445:6,
445:9, 445:10,
445:12, 445:14,
449:24, 450:17,
451:12, 453:25,
455:8, 456:25,
457:4, 458:3, 459:7,
459:22, 459:25,
460:21, 464:24,
465:17, 471:9,
474:20, 478:18,
487:1, 487:3,
487:10, 503:3,
598:12, 598:13
**problematical** [1] -
463:15
**problems** [2] - 461:19,
607:24
**Procedures** [1] -
552:23
**proceed** [1] - 593:25
**proceeding** [6] -
441:20, 575:11,
575:12, 575:18,
576:10, 584:10
**proceedings** [1] -
614:6
**process** [20] - 459:19,
480:20, 493:10,
511:6, 511:8,
515:22, 538:17,
541:5, 542:10,
606:3, 606:12,
607:9, 607:21,
607:24, 608:11,
608:18, 608:22,

609:12
**processes** [15] -
528:19, 529:3,
529:9, 529:24,
531:13, 533:4,
533:14, 605:15,
605:18, 605:20,
606:2, 607:9,
607:10, 609:1, 611:8
**processing** [1] - 539:8
**produce** [2] - 458:16,
578:17
**produced** [1] - 579:25
**produces** [1] - 501:3
**producing** [1] -
578:25
**Product** [2] - 594:17
**product** [15] - 457:14,
482:20, 497:9,
525:11, 531:19,
531:23, 532:9,
532:20, 595:2,
597:13, 598:2,
598:25, 599:6,
602:4, 605:7
**production** [8] -
569:2, 580:2,
604:10, 604:15,
604:18, 604:23,
605:1, 605:4
**Production** [1] - 542:8
**products** [4] - 526:5,
531:10, 531:20,
583:11
**program** [23] - 449:12,
451:3, 451:15,
459:10, 474:10,
478:14, 491:4,
491:13, 493:1,
493:11, 498:23,
500:9, 500:18,
500:19, 501:1,
501:2, 501:12,
508:14, 508:17,
508:23, 511:24,
560:6, 563:5
**programmer** [1] -
563:4
**programming** [2] -
596:23, 596:24
**programs** [1] - 451:4
**prohibit** [2] - 452:12,
574:23
**prohibited** [9] - 457:6,
458:10, 460:19,
465:20, 483:24,
494:19, 496:11,
543:18, 545:10
**prohibition** [9] -
493:25, 495:9,

495:17, 497:7,
568:11, 568:19,
569:4, 569:14,
571:16
**prohibitions** [1] -
447:9
**prohibits** [3] - 466:7,
479:6, 540:6
**project** [1] - 608:23
**promise** [1] - 446:1
**promote** [1] - 542:20
**promotion** [4] -
542:10, 542:12,
542:18, 543:2
**proof** [1] - 450:20
**propagated** [1] -
496:18
**proper** [1] - 464:16
**properly** [2] - 443:12,
504:21
**property** [1] - 532:17
**proposed** [1] - 441:5
**protected** [3] - 462:9,
501:9, 585:6
**protectible** [10] -
439:25, 457:14,
467:14, 468:16,
515:1, 562:9,
562:13, 562:18,
562:21, 563:12
**provide** [18] - 442:16,
469:2, 469:5,
474:20, 505:7,
520:17, 528:12,
528:18, 528:21,
529:1, 530:7,
530:13, 595:7,
595:11, 595:12,
595:14, 595:16,
597:19
**provided** [35] -
437:12, 445:24,
448:1, 450:9,
450:10, 450:18,
456:16, 466:24,
467:12, 470:9,
472:8, 490:11,
493:2, 497:6, 505:9,
522:15, 522:19,
522:21, 523:2,
523:3, 523:5, 523:6,
523:8, 523:9,
523:11, 531:20,
557:21, 558:3,
567:22, 567:23,
570:18, 570:21,
578:20, 578:23,
581:4
**provider** [7] - 527:4,
528:2, 531:8,

533:18, 535:8,
535:12, 535:13
**providers** [1] - 536:20
**provides** [9] - 447:19,
449:22, 520:11,
531:9, 531:17,
531:22, 531:25,
544:2, 544:10
**providing** [6] - 436:6,
442:18, 446:23,
447:12, 547:3, 598:8
**provision** [18] - 433:4,
442:12, 442:15,
446:2, 462:15,
462:16, 472:7,
523:14, 523:24,
541:18, 555:14,
568:9, 568:11,
571:15, 573:2,
573:3, 574:23,
574:25
**provisions** [1] - 468:9
**prvtsidx.plb** [3] -
566:4, 578:5, 578:8
**psptarray** [1] - 514:13
**psptarry.cbl** [1] -
513:15
**pstarry** [2] - 585:2,
585:7
**publicly** [1] - 596:8
**publish** [2] - 437:25,
438:4
**pull** [7] - 463:16,
475:3, 508:22,
508:24, 563:25,
579:2, 612:14
**purchased** [3] -
521:23, 525:3, 525:6
**purely** [1] - 438:5
**purpose** [6] - 461:5,
490:14, 504:4,
559:9, 560:2, 613:14
**pursuant** [3] - 457:10,
536:12, 536:21
**put** [17] - 452:9,
455:12, 455:17,
457:21, 460:6,
466:16, 471:9,
475:23, 485:6,
535:7, 537:11,
550:7, 550:9,
573:25, 574:3,
580:23, 611:11
**puts** [1] - 471:6
**putting** [3] - 436:18,
518:24, 542:25

**quantities** [1] - 551:19
**quantity** [1] - 561:11
**quarantine** [1] - 584:3
**quarantined** [2] -
573:8, 584:1
**quarter** [12] - 486:10,
486:16, 486:21,
487:16, 493:19,
494:9, 494:20,
494:22, 495:12,
495:16, 496:13,
496:21
**quarterly** [1] - 487:4
**queries** [2] - 577:5
**questions** [19] - 438:1,
499:20, 533:11,
570:24, 577:17,
577:25, 578:13,
580:20, 580:25,
583:24, 584:13,
585:1, 585:11,
585:15, 586:7,
586:11, 586:25,
595:17, 612:12
**quick** [1] - 432:17
**quite** [4] - 449:20,
561:9, 600:21, 610:7
**quote** [7] - 454:6,
471:25, 531:22,
532:14, 533:4,
533:5, 574:20

## R

**R89078652** [1] -
557:18
**raised** [1] - 594:8
**RAM** [28] - 481:24,
482:1, 482:7, 488:2,
488:4, 488:7,
488:15, 488:16,
489:19, 489:23,
490:2, 492:18,
492:22, 492:24,
492:25, 493:7,
493:8, 493:9,
493:16, 493:21,
494:3, 494:6,
494:11, 495:2,
495:3, 495:4
**ramifications** [1] -
536:14
**ran** [2] - 451:19,
499:25
**random** [1] - 531:12
**Ransom** [4] - 528:24,
532:6, 532:12, 533:2
**ransom's** [1] - 530:22
**rather** [6] - 444:9,
452:25, 501:5,

519:11, 524:10, 579:1
**RAVIN** [1] - 615:8
**Ravin** [2] - 589:4, 589:5
**Ray** [1] - 552:21
**reach** [3] - 435:10, 435:19, 555:10
**reached** [2] - 435:15, 457:3
**reaches** [2] - 534:21, 543:20
**reaching** [1] - 459:17
**reacting** [1] - 598:13
**reactive** [2] - 598:11, 601:20
**read** [12] - 464:6, 464:7, 464:9, 464:15, 464:18, 473:19, 530:1, 533:9, 552:19, 579:6, 592:23, 609:25
**readable** [10] - 518:25, 520:13, 520:16, 521:18, 521:25, 522:10, 527:16, 557:22, 558:3, 580:18
**reading** [5] - 522:13, 522:17, 532:21, 573:14, 574:18
**reads** [1] - 574:7
**ready** [2] - 484:13, 593:13
**real** [1] - 604:19
**realize** [1] - 551:12
**really** [11] - 447:20, 503:4, 524:8, 528:6, 530:5, 534:11, 534:19, 568:6, 595:21, 596:1, 602:25
**reason** [2] - 532:4, 573:20
**reasonable** [1] - 435:8
**recalled** [1] - 432:13
**recalling** [1] - 550:25
**recasting** [2] - 467:16, 468:19
**receive** [4] - 579:15, 603:5, 607:2, 611:3
**received** [12] - 496:10, 509:16, 579:13, 589:1, 589:11, 589:19, 590:7, 592:13, 593:5, 601:20, 606:18, 606:25
**receives** [2] - 493:14,

610:10
**receiving** [1] - 606:9
**recent** [2] - 513:24, 598:2
**recently** [3] - 570:16, 594:10, 610:2
**recess** [7] - 484:15, 545:15, 545:19, 545:20, 590:24, 591:5, 614:3
**recipient** [2] - 443:11, 469:14
**recipients** [1] - 491:6
**recited** [1] - 552:10
**recognize** [1] - 579:10
**recollect** [3] - 526:18, 532:3
**recollection** [13] - 470:24, 485:19, 487:10, 514:15, 515:13, 516:2, 544:10, 547:2, 555:16, 562:12, 562:23, 564:21, 568:23
**reconstruct** [1] - 579:1
**reconvene** [3] - 545:16, 545:17, 590:25
**reconvened** [4] - 432:6, 484:17, 546:5, 591:7
**record** [13] - 432:5, 472:11, 484:17, 509:12, 520:15, 546:5, 555:21, 574:21, 585:4, 591:6, 592:24, 593:19, 614:6
**records** [3] - 578:19, 579:5, 580:18
**recreation** [2] - 483:17, 483:20
**red** [9] - 438:18, 439:4, 475:24, 476:7, 476:15, 505:23, 506:4, 559:12
**redacted** [1] - 587:20
**redirect** [1] - 577:19
**Redirect** [1] - 615:5
**REDIRECT** [1] - 577:22
**reducing** [1] - 440:22
**reevaluate** [1] - 558:18
**refer** [4] - 432:20, 455:20, 486:9, 513:7
**reference** [17] - 461:4,

463:7, 473:17, 473:23, 488:24, 489:7, 500:16, 507:19, 528:14, 531:14, 550:1, 551:7, 564:7, 564:17, 564:19, 572:17, 579:24
**referenced** [3] - 449:5, 550:21, 561:1
**references** [1] - 553:16
**referencing** [1] - 511:3
**referred** [1] - 515:11
**referring** [2] - 505:4, 514:1
**refers** [1] - 557:16
**refined** [1] - 610:6
**refresh** [2] - 516:2, 555:16
**regarding** [17] - 470:19, 479:22, 518:11, 518:14, 519:23, 528:22, 548:1, 562:8, 563:14, 566:3, 578:14, 583:1, 584:4, 586:18, 611:7, 612:18
**regardless** [9] - 467:3, 467:13, 468:15, 468:22, 469:7, 501:8, 502:8, 517:21, 519:12
**regulations** [1] - 602:11
**regulatory** [12] - 531:22, 531:24, 553:20, 554:8, 554:13, 595:14, 597:22, 598:7, 598:9, 598:14, 598:24, 599:14
**reiterate** [1] - 592:16
**rejected** [1] - 446:23
**relate** [1] - 577:6
**related** [11] - 436:6, 443:21, 444:8, 467:6, 491:16, 495:15, 528:16, 544:12, 547:14, 579:2, 598:20
**relates** [7] - 449:16, 484:23, 497:21, 542:10, 563:20, 563:24, 570:14
**relating** [15] - 432:24, 457:11, 466:13, 470:19, 475:4, 484:23, 487:4,

487:8, 505:12, 514:1, 528:10, 529:5, 568:19, 569:15, 595:17
**relation** [1] - 525:2
**relationship** [6] - 528:8, 533:16, 535:2, 535:22, 536:10, 536:17
**release** [7] - 601:3, 601:13, 601:15, 603:13, 606:1, 606:10, 606:24
**released** [7] - 525:10, 525:12, 525:14, 525:15, 526:7, 598:21, 601:10
**releases** [3] - 601:16, 603:6, 603:17
**relevance** [1] - 491:22
**relevant** [7] - 466:25, 514:25, 530:9, 530:12, 533:12, 533:25, 534:3, 534:8, 535:23, 575:11, 575:16, 575:19
**reliable** [1] - 514:4
**relied** [5] - 473:1, 473:2, 473:3, 564:24, 585:5
**relies** [1] - 500:23
**rely** [1] - 498:9
**relying** [4] - 459:8, 465:9, 465:20, 498:6
**remain** [1] - 609:20
**remember** [42] - 432:25, 451:5, 466:3, 470:20, 471:21, 471:22, 484:24, 485:4, 498:25, 500:19, 506:25, 507:1, 514:5, 514:10, 518:19, 522:15, 524:9, 525:13, 525:25, 529:13, 531:11, 531:19, 531:23, 532:9, 532:18, 532:21, 532:24, 535:15, 537:9, 537:12, 537:13, 546:20, 557:8, 557:12, 557:13, 557:18, 561:9, 563:21, 563:23, 566:4, 573:17, 580:25
**remembered** [5] - 552:4, 552:10,

554:1, 555:17, 555:18
**remembering** [1] - 451:4
**remembers** [1] - 483:14
**remind** [3] - 497:17, 578:17, 597:5
**remit** [1] - 599:3
**remote** [11] - 537:19, 541:23, 542:2, 545:6, 573:23, 605:21, 607:13, 608:15, 608:16, 609:7, 612:2
**remotely** [14] - 451:7, 451:25, 487:24, 537:18, 538:2, 545:3, 545:5, 545:8, 573:25, 574:5, 575:24, 607:12, 608:4, 608:8
**rendering** [2] - 543:17
**RENO** [3] - 432:24, 432:1, 546:1
**Reno** [2] - 432:7, 432:24
**repeat** [1] - 521:20
**repeated** [2] - 461:18, 483:4
**repels** [1] - 583:16
**replace** [1] - 501:1
**replaced** [1] - 432:17
**replacement** [5] - 502:3, 502:8, 502:18, 502:23, 502:24
**replaces** [2] - 500:18, 502:10
**replacing** [2] - 503:14, 504:19
**replicate** [1] - 454:13
**report** [29] - 449:14, 466:16, 466:19, 471:24, 473:8, 473:10, 473:14, 473:16, 479:24, 485:19, 488:21, 497:24, 501:6, 501:7, 501:14, 503:9, 503:25, 507:3, 507:5, 513:13, 515:13, 515:22, 515:24, 517:25, 551:11, 551:20, 564:1, 575:5, 598:3
**Reported** [1] - 432:23
**reported** [1] - 471:8
**Reporter** [2] - 432:23,

614:10
**REPORTER** [1] - 458:19
**reporting** [4] - 487:4, 487:14, 490:11, 503:17
**reports** [10] - 474:13, 477:11, 486:15, 506:18, 506:25, 519:22, 519:25, 527:15, 570:14, 583:2
**repository** [1] - 538:19
**represent** [4] - 438:19, 439:13, 475:24, 560:12
**representation** [10] - 439:1, 439:9, 480:18, 486:4, 506:23, 507:15, 532:5, 534:8, 538:10, 552:14
**representative** [6] - 530:23, 532:13, 533:3, 533:13, 534:4, 547:15
**representative's** [1] - 534:8
**representatives** [1] - 612:12
**represented** [1] - 476:20
**representing** [1] - 506:3
**represents** [13] - 438:12, 438:14, 438:16, 438:23, 439:10, 475:11, 475:13, 475:17, 476:8, 476:23, 487:11, 505:17, 505:24
**reproduce** [9] - 458:16, 458:21, 495:19, 569:5, 574:8, 574:11, 574:13, 578:9, 578:10
**reproduction** [5] - 469:22, 469:25, 569:9, 571:5, 572:22
**request** [4] - 577:5, 583:6, 592:16, 601:17
**require** [5] - 547:17, 554:14, 556:2, 556:19, 556:23
**required** [7] - 434:25, 548:3, 554:2, 554:19, 555:8,

555:24, 578:17
**requirement** [1] - 491:9
**requirements** [3] - 466:13, 510:16, 600:22
**requires** [3] - 466:10, 544:16, 551:23
**research** [1] - 581:7
**reshape** [1] - 467:8
**resolve** [2] - 459:22, 582:10
**resolved** [2] - 598:1, 608:7
**resource** [1] - 596:18
**resourced** [1] - 595:7
**respect** [30] - 445:22, 446:19, 457:18, 474:7, 474:9, 477:25, 480:1, 482:16, 483:5, 485:7, 485:18, 488:13, 491:9, 499:4, 510:24, 514:11, 527:13, 530:17, 532:9, 538:6, 551:22, 556:1, 556:19, 561:1, 561:12, 563:15, 575:8, 577:8, 582:4, 609:13
**respectful** [3] - 532:16, 532:18, 532:22
**responded** [1] - 573:16
**responses** [4] - 587:13, 592:17, 592:22, 593:1
**responsible** [3] - 458:9, 501:23, 598:17
**responsive** [1] - 582:3
**rest** [1] - 436:4
**restate** [2] - 558:5, 588:22
**Restatement** [1] - 558:11
**restrict** [1] - 468:8
**restriction** [2] - 470:11, 523:19
**restrictions** [3] - 576:13, 577:3, 577:11
**result** [3] - 512:13, 529:22, 598:2
**resulted** [1] - 571:25
**results** [6] - 442:20, 443:3, 444:22, 498:3, 536:7

**resume** [2] - 484:9, 613:24
**Resumed** [1] - 615:4
**RESUMED** [1] - 432:15
**retroactive** [1] - 582:1
**retroactively** [1] - 492:20
**return** [2] - 503:9, 577:24
**retype** [2] - 462:7, 483:14
**retyped** [1] - 482:12
**reuse** [10] - 442:20, 443:5, 443:14, 446:9, 457:16, 463:4, 465:19, 483:5, 584:14, 584:18
**reusing** [7] - 442:1, 443:7, 443:9, 444:1, 444:7, 482:14, 482:20
**reverse** [3] - 518:4, 523:19, 587:24
**review** [6] - 528:16, 546:15, 547:22, 586:18, 588:3
**reviewed** [3] - 530:5, 584:12, 610:22
**reviewing** [2] - 529:8, 586:20
**revision** [3] - 586:15, 586:17
**RICHARD** [1] - 615:12
**Richard** [3] - 432:14, 591:16, 591:21
**Rimini** [229] - 434:25, 435:6, 435:10, 435:17, 435:19, 435:20, 436:15, 436:21, 436:25, 437:2, 437:6, 438:16, 439:9, 440:4, 440:13, 440:16, 440:19, 441:2, 441:7, 441:10, 442:7, 443:18, 446:3, 446:13, 448:12, 450:3, 450:9, 451:7, 451:15, 451:25, 452:4, 452:12, 453:5, 453:14, 454:6, 454:12, 457:2, 457:13, 458:16, 459:1, 459:17, 463:3, 463:4, 466:7, 466:10, 471:19,

472:19, 474:25, 475:16, 476:21, 478:4, 478:5, 478:10, 478:22, 479:6, 479:10, 480:5, 480:15, 480:21, 481:14, 482:10, 482:11, 483:13, 484:23, 485:14, 485:25, 486:8, 487:16, 487:19, 487:24, 490:4, 490:7, 490:9, 492:8, 492:18, 493:18, 493:21, 494:8, 494:9, 494:20, 495:19, 496:3, 496:18, 496:20, 496:23, 497:8, 497:14, 498:3, 498:21, 505:21, 506:8, 510:7, 510:13, 511:1, 511:3, 511:21, 512:2, 512:10, 513:14, 513:15, 514:21, 514:23, 516:6, 516:8, 516:17, 518:1, 518:5, 528:22, 530:3, 531:4, 535:12, 536:13, 537:5, 539:10, 539:24, 540:12, 540:13, 540:17, 542:20, 544:25, 545:2, 546:16, 546:17, 546:24, 547:9, 549:5, 549:6, 549:22, 550:16, 551:22, 552:22, 553:9, 557:6, 559:10, 559:25, 560:19, 562:20, 566:6, 566:7, 566:22, 569:5, 569:8, 570:7, 571:10, 571:12, 571:18, 571:22, 572:7, 572:21, 572:22, 573:7, 573:9, 573:12, 573:15, 573:20, 573:21, 573:24, 574:2, 574:4, 574:8, 574:13, 575:6, 575:8, 575:14, 575:19, 575:23, 576:1, 576:17, 576:20, 577:8,

578:2, 578:4, 579:5, 580:17, 581:4, 581:9, 581:19, 581:20, 581:23, 582:5, 582:6, 584:3, 584:22, 588:16, 589:4, 589:13, 589:23, 590:10, 590:18, 590:21, 591:11, 591:17, 592:1, 592:18, 593:11, 594:15, 594:16, 594:22, 595:4, 595:11, 595:19, 595:24, 596:6, 596:8, 597:15, 599:18, 601:3, 601:13, 601:17, 601:24, 602:13, 603:5, 605:4, 605:12, 605:15, 605:18, 607:21, 608:14, 608:21, 609:12, 610:3, 610:20, 610:24, 611:20, 611:22
**rimini** [1] - 458:21
**RIMINI** [1] - 432:7
**Rimini's** [69] - 439:6, 443:17, 462:11, 468:8, 471:13, 475:17, 476:15, 476:17, 477:4, 479:7, 480:13, 486:12, 486:21, 489:17, 497:13, 503:22, 507:15, 507:16, 511:17, 512:8, 512:11, 513:4, 515:2, 515:8, 522:13, 530:16, 536:22, 547:13, 550:20, 553:10, 557:6, 559:9, 566:11, 569:12, 569:16, 570:3, 570:6, 570:8, 570:20, 571:5, 571:6, 571:7, 571:11, 572:6, 572:23, 573:6, 576:9, 576:21, 577:13, 578:8, 578:22, 582:13, 582:14, 582:17, 584:1, 584:5, 584:14, 584:17, 585:5, 595:6, 605:15, 605:23, 607:6, 607:19,

607:20, 608:2, 608:11, 609:19
**Rimini-created** [1] - 611:20
**ringing** [1] - 528:25
**ris1099** [1] - 511:1
**ris1099-I** [1] - 506:19
**ris1099M.sqr** [1] - 497:19
**Rockefeller** [16] - 484:1, 484:24, 485:23, 486:3, 488:17, 489:13, 489:22, 490:2, 490:4, 492:17, 492:21, 493:16, 494:7, 494:21, 496:4, 496:23
**Rockefeller's** [1] - 489:25
**role** [5] - 594:19, 594:22, 594:25, 597:4, 599:22
**rolled** [3] - 491:14, 565:18, 565:23
**rote** [1] - 483:17
**roughly** [9] - 489:10, 514:15, 517:25, 547:16, 553:15, 561:7, 597:17, 605:10
**Roy** [1] - 552:21
**rsc** [1] - 585:6
**rsi** [15] - 479:6, 486:9, 486:16, 486:21, 487:16, 493:19, 494:9, 494:20, 494:22, 495:12, 495:16, 496:13, 496:21, 506:12
**rsi1099I.sqr** [1] - 497:19
**rsi940.sqr** [2] - 474:10, 474:13
**rsi940a** [5] - 476:1, 478:4, 481:10, 481:14, 482:11
**rsi940a.sqr** [5] - 470:19, 477:1, 477:8, 477:13, 563:21
**rsi960** [1] - 451:5
**rsi960.sqr** [1] - 450:12
**rsiqtrtax.sqr** [1] - 486:9
**rsitaxqtr** [1] - 490:9
**rsp** [2] - 513:7, 514:13
**rspcmpay.cbl** [2] - 513:5, 585:6
**rule** [1] - 503:1

**Rule** [1] - 583:5
**ruled** [2] - 454:5, 454:11
**ruling** [3] - 514:5, 534:14, 542:23
**run** [11] - 480:6, 480:17, 480:24, 489:23, 499:15, 500:5, 500:9, 500:23, 508:1, 560:3, 577:5
**running** [1] - 480:15
**runs** [4] - 464:21, 478:12, 478:15, 500:9

## S

**SalesForce** [14] - 566:7, 568:3, 573:18, 573:19, 578:14, 578:18, 578:21, 578:22, 579:4, 579:5, 580:17, 581:9, 583:18
**Samplin** [1] - 432:20
**Samuel** [1] - 432:20
**San** [3] - 576:16, 576:24, 577:10
**sat** [1] - 482:19
**satisfactory** [1] - 455:19
**saved** [1] - 566:10
**saves** [1] - 464:21
**saving** [1] - 501:24
**saw** [9] - 434:24, 443:4, 472:11, 528:15, 530:1, 532:2, 546:24, 547:1, 550:22
**scenario** [3] - 445:7, 483:1, 543:5
**Schedule** [1] - 470:22
**schedule** [1] - 601:14
**school** [1] - 596:22
**schools** [1] - 595:9
**science** [1] - 597:2
**scope** [4] - 467:21, 467:22, 520:7, 530:6
**screen** [7] - 450:25, 488:24, 558:23, 579:10, 581:6, 581:8, 581:22
**scroll** [4] - 464:3, 567:11, 580:5
**scrutinize** [1] - 517:7
**se** [1] - 595:20
**Seals** [14] - 497:14, 505:13, 505:16,

505:24, 506:16, 507:20, 508:3, 508:7, 508:13, 508:15, 508:18, 509:15, 509:16, 511:2
**Seals'** [3] - 505:25, 508:3, 508:8
**seat** [4] - 432:4, 484:16, 546:4, 591:6
**SEBASTIAN** [1] - 615:7
**Sebastian** [3] - 588:14, 588:16, 588:18
**second** [13] - 442:24, 452:10, 453:2, 459:18, 459:24, 473:17, 476:5, 479:18, 480:9, 493:15, 509:23, 518:8, 582:4
**secret** [1] - 456:19
**section** [1] - 586:17
**sectors** [1] - 596:17
**see** [92] - 435:6, 437:19, 438:8, 438:12, 438:13, 438:15, 438:17, 438:21, 438:22, 439:11, 439:12, 442:13, 449:5, 450:11, 457:2, 459:14, 473:4, 475:9, 475:10, 475:13, 475:15, 475:17, 475:18, 475:22, 475:25, 476:1, 476:14, 476:20, 476:22, 477:2, 477:3, 477:5, 477:6, 478:7, 482:16, 485:10, 485:25, 486:1, 486:6, 486:8, 486:10, 486:13, 486:14, 487:21, 488:24, 489:1, 489:7, 489:8, 489:11, 489:12, 491:21, 498:10, 498:11, 498:15, 505:13, 505:21, 505:22, 506:8, 506:13, 506:15, 506:16, 506:17, 509:2, 509:4, 509:5, 509:17, 509:19, 509:25, 510:2, 510:12, 510:23,

511:16, 533:24, 540:25, 545:16, 552:23, 553:1, 553:16, 558:23, 559:11, 559:13, 561:25, 564:3, 564:10, 564:11, 565:7, 581:6, 582:16, 583:21, 586:16, 591:8
**seeing** [3] - 528:23, 533:7, 554:1
**seem** [2] - 436:4, 436:8
**segments** [2] - 560:9, 560:10
**select** [1] - 580:16
**send** [4] - 442:2, 494:9, 581:18, 606:12
**sending** [15] - 433:8, 440:25, 441:2, 441:10, 441:14, 441:25, 442:7, 448:20, 479:6, 482:10, 482:11, 494:16, 496:3, 496:20, 573:16
**sends** [6] - 440:13, 441:8, 478:6, 487:20, 494:20, 496:23
**SENIOR** [1] - 432:2
**Senior** [3] - 590:18, 591:11, 591:25
**sense** [4] - 441:25, 522:14, 522:18, 606:17
**sensitive** [4] - 583:12, 583:20, 585:22, 613:9
**sent** [23] - 440:6, 442:25, 443:4, 450:15, 453:4, 453:6, 453:13, 478:22, 481:15, 482:6, 485:2, 511:2, 511:21, 533:20, 538:16, 567:17, 568:2, 569:22, 570:7, 570:9, 612:6, 612:18, 612:19
**sentence** [3] - 503:10, 554:18, 564:15
**separate** [10] - 442:14, 481:19, 486:5, 488:11, 495:14, 506:5, 511:12, 539:8, 602:1, 608:7
**separated** [1] - 579:12

**separately** [2] - 463:25, 465:4
**September** [3] - 432:6, 432:6, 614:8
**SEPTEMBER** [2] - 432:1, 546:1
**sequence** [3] - 516:16, 517:4, 517:21
**sequestered** [1] - 573:9
**series** [5] - 464:21, 526:2, 578:25, 584:13
**serious** [1] - 548:6
**server** [4] - 537:21, 538:15, 541:10, 541:12
**servers** [2] - 605:23, 606:4
**serves** [1] - 573:11
**Service** [1] - 589:23
**service** [4] - 523:18, 585:24, 585:25, 595:19
**services** [2] - 595:8, 598:22
**set** [23] - 445:19, 447:3, 453:18, 458:12, 460:14, 481:1, 506:4, 510:3, 510:5, 514:18, 516:5, 516:9, 516:17, 516:22, 517:1, 517:4, 517:10, 534:11, 534:16, 534:18, 600:2, 607:13
**seten** [1] - 510:3
**seten.sqc** [1] - 510:8
**setenv.sqc** [1] - 510:14
**Seth** [2] - 589:4, 589:5
**SETH** [1] - 615:8
**sets** [4] - 515:15, 515:16, 516:20, 517:20
**setting** [9] - 445:21, 449:2, 449:9, 451:9, 451:10, 451:18, 452:14, 453:6, 453:23
**settings** [3] - 443:10, 450:18, 450:19
**setup** [1] - 609:11
**seven** [6] - 509:8, 509:9, 579:16, 579:18, 588:13, 601:16
**several** [4] - 507:1,

515:19, 561:3, 609:6
**shall** [10] - 458:16, 458:21, 459:1, 495:19, 495:24, 539:14, 540:20, 569:5, 574:8, 574:13
**share** [1] - 608:18
**shared** [1] - 482:8
**Sharon** [1] - 432:16
**Sheffield** [13] - 454:17, 456:1, 456:4, 458:6, 459:5, 460:3, 460:10, 471:20, 471:24, 473:2, 564:9, 564:21, 565:4
**shifted** [1] - 444:16
**shipped** [6] - 435:24, 435:25, 508:13, 522:2, 522:3, 522:4
**shipping** [2] - 444:13, 444:14
**ships** [1] - 558:8
**Shopping** [11] - 484:1, 484:24, 485:24, 486:3, 488:17, 489:16, 492:18, 492:21, 493:16, 494:8, 496:4
**shorter** [3] - 515:7, 561:4, 576:15
**shots** [1] - 581:22
**shoulder** [2] - 540:9, 540:14
**show** [9] - 432:5, 475:19, 484:17, 485:1, 546:5, 573:8, 573:9, 580:21, 591:7
**showed** [3] - 453:17, 567:14, 581:14
**showing** [1] - 586:21
**shown** [2] - 579:9, 579:10
**shows** [2] - 435:25, 530:17
**shrink** [1] - 440:5
**shutdown** [1] - 497:3
**sic** [1] - 565:4
**side** [9] - 513:20, 559:6, 560:7, 567:16, 568:24, 611:16, 613:10
**side-by-side** [1] - 513:20
**sign** [3] - 550:4, 610:16
**significance** [1] - 585:9
**significant** [4] - 567:24, 585:10,

611:10, 611:25
**significantly** [2] - 524:21, 607:11
**silly** [1] - 503:8
**silo** [1] - 608:9
**siloed** [4] - 488:11, 506:5, 606:15, 607:16
**siloing** [1] - 612:3
**similar** [19] - 454:8, 455:7, 461:19, 474:14, 477:8, 477:14, 477:25, 486:17, 493:20, 496:22, 503:16, 504:14, 506:20, 516:22, 538:22, 561:16, 562:2, 581:15, 601:8
**similarities** [1] - 585:8
**similarity** [4] - 474:16, 514:24, 515:7, 563:15
**similarly** [2] - 491:3, 540:3
**simple** [2] - 449:20, 579:22
**simply** [1] - 452:2
**single** [2] - 512:17, 553:9
**sit** [14] - 474:15, 477:10, 503:2, 503:4, 503:7, 505:1, 506:22, 518:9, 518:10, 531:11, 531:18, 532:4, 561:5, 565:22
**site** [4] - 533:21, 533:22, 608:16
**site-to-site** [1] - 608:16
**situation** [5] - 437:15, 445:8, 456:5, 597:24, 603:19
**six** [6] - 498:2, 506:25, 579:16, 579:17, 606:25
**sixth** [1] - 465:12
**size** [8] - 440:5, 440:18, 440:22, 443:22, 486:22, 490:10, 490:15, 561:23
**sizes** [1] - 456:12
**sketchiest** [1] - 529:18
**skill** [1] - 600:2
**Slepko** [2] - 589:22, 590:1
**SLEPKO** [1] - 615:9
**slide** [18] - 505:15,

510:18, 511:10, 511:16, 537:11, 537:12, 537:13, 538:22, 538:23, 539:23, 541:2, 541:3, 541:16, 541:19, 542:5, 542:10
**slides** [3] - 485:24, 542:25
**slightly** [2] - 467:8, 499:2
**slipperier** [1] - 545:4
**slope** [1] - 545:4
**slow** [1] - 458:19
**small** [6] - 452:19, 463:9, 581:2, 596:1, 596:2
**Smead** [10] - 470:20, 471:14, 472:4, 472:7, 473:6, 474:21, 475:12, 476:11, 479:7, 483:15
**SMITH** [10] - 464:5, 464:10, 549:3, 577:20, 577:23, 583:23, 586:25, 587:10, 587:19, 588:4
**Smith** [6] - 432:14, 432:16, 549:2, 577:19, 587:9, 615:5
**snapshot** [1] - 482:5
**sneeze** [1] - 521:19
**snippet** [1] - 560:11
**snippets** [2] - 560:8, 561:11
**software** [88] - 433:3, 458:17, 458:22, 459:3, 462:11, 464:23, 466:22, 466:23, 467:11, 467:12, 469:24, 480:23, 493:24, 494:23, 494:25, 495:20, 496:17, 497:5, 498:6, 499:6, 499:14, 499:16, 500:8, 503:14, 504:19, 508:1, 518:12, 518:15, 519:15, 521:16, 521:17, 521:23, 521:24, 523:21, 524:2, 524:4, 524:11, 524:13, 524:17, 525:4, 526:13, 526:22, 527:11, 527:17,

534:2, 534:10, 538:24, 556:5, 556:17, 558:2, 569:6, 569:8, 574:10, 574:14, 574:18, 576:1, 579:6, 583:10, 583:16, 585:16, 591:16, 595:13, 595:18, 595:22, 596:11, 596:12, 596:13, 596:15, 596:17, 596:18, 596:20, 596:21, 597:25, 599:10, 599:11, 603:21, 603:23, 603:24, 604:3, 604:4, 605:24, 606:12, 607:19, 608:1, 608:3, 609:13, 609:18
**solely** [4] - 473:7, 481:11, 496:15, 576:3
**solution** [10] - 437:11, 442:1, 442:21, 443:6, 443:10, 456:1, 460:5, 463:5, 463:7, 485:14
**solutions** [7] - 466:11, 532:1, 532:7, 533:5, 534:5, 537:4, 600:23
**solve** [2] - 437:7, 578:5
**solved** [1] - 440:23
**solves** [1] - 464:24
**someone** [7] - 457:1, 463:9, 472:16, 521:15, 545:1, 556:13, 560:16
**sometimes** [2] - 489:1, 600:24
**somewhat** [3] - 495:14, 519:10, 586:20
**somewhere** [8] - 523:13, 538:3, 541:22, 564:14, 565:12, 565:14, 565:20, 573:25
**song** [2] - 535:20, 535:21
**sons** [1] - 594:8
**sorry** [23] - 451:5, 458:19, 458:20, 479:7, 484:4, 486:13, 508:21, 509:11, 518:13, 518:14, 521:19,

529:14, 534:10, 540:13, 542:7, 544:5, 553:19, 565:5, 568:10, 568:16, 572:8, 586:10
**sort** [4] - 448:5, 524:16, 595:13, 595:16
**sounds** [3] - 479:23, 484:11, 557:19
**source** [82] - 449:11, 511:10, 518:12, 518:15, 519:15, 520:17, 520:21, 522:4, 522:6, 522:18, 522:19, 522:21, 522:23, 523:2, 523:4, 523:6, 523:10, 523:12, 523:14, 532:8, 532:11, 533:5, 534:2, 534:5, 534:9, 534:10, 537:2, 537:4, 538:10, 538:12, 538:15, 538:24, 538:25, 539:3, 539:11, 539:15, 539:25, 540:19, 540:21, 541:8, 542:11, 542:21, 543:3, 543:9, 543:10, 543:15, 544:3, 544:8, 544:12, 544:14, 544:17, 547:10, 547:14, 547:17, 548:3, 550:17, 551:23, 552:5, 554:2, 554:14, 554:19, 554:22, 555:24, 556:1, 556:5, 556:11, 556:14, 556:18, 556:19, 556:23, 557:16, 557:17, 557:18, 558:2, 558:8, 559:22, 561:17, 561:20, 599:12
**South** [1] - 432:24
**space** [1] - 516:13
**spec** [8] - 561:16, 561:19, 562:1, 562:5, 562:20, 563:6, 563:16, 563:18
**special** [1] - 600:17
**specific** [73] - 435:23, 442:20, 443:9,

443:10, 444:7,
444:9, 445:17,
446:12, 447:3,
447:8, 452:6,
452:16, 453:20,
454:4, 454:18,
454:21, 455:15,
455:21, 455:22,
455:23, 456:10,
456:15, 456:22,
457:3, 457:15,
457:18, 458:10,
459:1, 459:20,
460:3, 460:4, 460:7,
460:11, 460:25,
461:2, 461:9,
461:24, 463:6,
467:20, 468:2,
468:10, 472:6,
472:23, 477:12,
487:10, 488:13,
490:14, 495:24,
497:18, 502:16,
502:17, 503:6,
508:9, 508:13,
508:21, 511:13,
511:22, 515:21,
524:9, 530:17,
532:3, 533:19,
547:15, 550:24,
553:14, 555:3,
557:6, 563:10,
574:25, 582:3, 612:4
**specifically** [33] -
433:6, 435:12,
436:2, 436:7,
436:11, 439:23,
442:12, 444:13,
445:23, 459:1,
462:12, 466:9,
468:7, 472:19,
495:5, 495:24,
503:12, 504:17,
504:23, 522:18,
525:13, 525:24,
529:13, 531:11,
531:18, 532:20,
543:10, 543:25,
552:3, 553:21,
570:14, 577:2,
577:11
**specification** [7] -
557:6, 557:10,
557:16, 559:6,
561:1, 586:8, 586:22
**specifics** [1] - 433:17
**spell** [1] - 593:21
**spent** [2] - 568:20,
596:19
**Spherion** [12] -

470:19, 471:14,
472:4, 472:7, 473:6,
474:21, 475:12,
476:11, 479:7,
482:11, 482:12,
483:14
**Spinnaker** [21] -
528:2, 528:10,
528:13, 528:16,
528:22, 529:2,
529:6, 529:20,
531:8, 531:13,
531:17, 531:19,
531:22, 531:25,
533:15, 533:17,
534:5, 535:7, 536:1,
536:14, 537:3
**Spinnaker's** [9] -
528:18, 529:3,
529:9, 529:24,
532:7, 532:15,
533:4, 533:19,
536:11
**Spinnaker-related** [1]
- 528:16
**Spira** [5] - 472:25,
577:6, 577:7, 577:14
**splash** [2] - 581:6,
581:8
**spreadsheet** [1] -
581:3
**SQC** [2] - 481:1,
507:11
**SQCs** [2] - 480:2
**SQL** [4] - 573:12,
573:15, 573:24,
574:1
**SQR** [2] - 449:11,
450:9
**squeeze** [1] - 449:19
**stand** [2] - 503:5,
504:3
**stand-alone** [1] -
504:3
**standard** [1] - 523:21
**standing** [4] - 540:9,
540:13, 540:24,
544:25
**standpoint** [1] -
540:23
**start** [3] - 434:25,
435:3, 435:6
**started** [3] - 435:16,
451:15, 595:24
**starting** [2] - 466:7,
546:11
**starts** [1] - 580:6
**state** [4] - 434:4,
489:9, 515:13,
593:18

**statement** [5] -
502:16, 503:24,
532:3, 532:22, 548:8
**States** [3] - 435:18,
437:21, 474:22
**states** [2] - 602:23,
602:25
**STATES** [1] - 432:1
**stating** [1] - 477:18
**statistic** [1] - 517:24
**Statistics** [5] - 566:7,
567:17, 568:2,
578:2, 578:6
**statistics** [1] - 517:24
**Statistics'** [1] - 567:21
**step** [4] - 517:6,
517:11, 517:23,
587:6
**stepped** [1] - 436:2
**steps** [3] - 511:13,
512:7, 543:7
**sticking** [1] - 468:15
**stifling** [1] - 521:19
**still** [8] - 468:21,
482:20, 483:1,
493:6, 493:13,
496:11, 500:8, 515:6
**stopping** [1] - 545:12
**storage** [1] - 502:2
**stored** [2] - 520:8,
521:5
**storing** [1] - 501:23
**straightforward** [1] -
549:20
**Street** [22] - 432:24,
495:19, 552:22,
574:8, 574:13,
578:2, 581:9,
581:20, 582:5,
582:6, 588:17,
589:4, 589:23,
590:10, 590:19,
591:11, 591:17,
592:1, 594:15,
594:16, 594:22,
595:4
**STREET** [1] - 432:7
**stricken** [3] - 549:18,
550:3, 568:22
**strike** [4] - 548:11,
548:19, 548:25,
549:14
**struck** [3] - 540:20,
548:10, 548:24
**structure** [2] - 517:3,
517:21
**structured** [1] -
519:24
**study** [1] - 596:24
**stuff** [1] - 554:2

**subject** [2] - 484:5,
552:22
**submission** [1] -
514:9
**submitted** [1] - 514:8
**subsequent** [3] -
491:2, 493:6, 493:14
**subsequently** [4] -
437:12, 469:7,
493:2, 514:8
**substantial** [9] -
474:16, 479:2,
512:18, 513:14,
514:24, 514:25,
515:2, 515:6, 563:15
**substantially** [14] -
474:14, 477:8,
477:14, 477:25,
481:9, 486:17,
493:20, 496:22,
501:8, 503:16,
506:20, 512:14,
561:16, 562:2
**substantive** [1] -
528:6
**success** [1] - 440:19
**successful** [3] -
441:7, 444:5, 478:12
**successfully** [2] -
451:13, 451:19
**sufficient** [3] - 446:17,
562:21, 563:3
**suggest** [3] - 499:9,
565:19, 567:15
**suggesting** [3] -
472:3, 564:16,
564:18
**summaries** [2] -
578:14, 578:18
**summary** [1] - 564:19
**supervised** [1] -
597:10
**supervisory** [1] -
599:23
**supplemental** [1] -
551:11
**supplied** [3] - 459:11,
580:17, 580:19
**supplying** [1] - 458:12
**support** [40] - 458:24,
471:17, 495:22,
496:17, 527:4,
528:2, 529:9, 531:8,
531:9, 531:10,
532:15, 533:4,
533:14, 535:8,
535:12, 535:13,
536:11, 536:20,
536:21, 536:23,
537:1, 546:17,

547:9, 550:16,
553:19, 555:14,
595:7, 595:11,
595:12, 595:16,
597:19, 598:11,
598:19, 598:21,
598:22, 601:18,
602:5, 603:16,
607:5, 609:7
**supports** [1] - 575:25
**supposedly** [1] -
518:5
**suppressed** [1] -
449:23
**surprise** [3] - 525:17,
530:13, 561:10
**surrounding** [1] -
612:5
**Susan** [1] - 591:25,
592:6
**SUSAN** [1] - 615:13
**sweat** [1] - 609:3
**switch** [4] - 470:18,
488:20, 593:10,
613:16
**switched** [2] - 564:2,
576:20
**sworn** [2] - 432:14,
593:17
**system** [74] - 436:7,
450:17, 450:19,
452:5, 452:9,
458:23, 472:19,
472:25, 474:2,
480:19, 481:5,
482:21, 489:25,
495:21, 499:23,
499:24, 499:25,
500:5, 500:6,
501:23, 502:4,
502:5, 502:9,
502:10, 502:11,
502:20, 503:15,
512:4, 512:11,
523:6, 523:9, 524:6,
524:13, 524:15,
526:5, 537:15,
542:2, 566:8, 569:9,
569:12, 569:17,
570:3, 570:9,
570:20, 571:5,
571:6, 571:7, 571:9,
571:11, 571:13,
571:19, 572:23,
572:25, 573:6,
576:9, 576:17,
576:20, 576:21,
576:23, 577:8,
578:21, 578:22,
578:24, 579:3,

579:4, 580:23,
581:9, 601:2, 604:1,
604:18, 604:21,
606:4, 606:5
**system's** [1] - 502:11
**systems** [52] - 436:12,
438:24, 439:3,
439:7, 475:11,
475:17, 475:20,
476:13, 476:17,
477:4, 477:5, 478:4,
479:8, 480:18,
486:12, 487:17,
487:18, 501:18,
501:20, 502:3,
507:16, 511:17,
512:8, 524:4,
542:14, 542:17,
566:11, 568:2,
569:16, 570:6,
572:18, 574:3,
575:15, 577:1,
577:14, 582:14,
582:23, 583:13,
584:1, 596:19,
597:3, 604:23,
605:23, 607:19,
607:20, 608:2,
608:11, 608:13,
609:14, 609:19,
609:21

**T**

**T-e-k-t-r-o-n-i-x** [1] -
525:9
**tab** [19] - 432:20,
438:4, 466:14,
473:11, 475:3,
485:7, 488:21,
488:22, 497:23,
505:11, 508:24,
509:10, 518:13,
547:19, 547:20,
547:21, 550:7,
563:25, 564:2
**Tab** [1] - 572:15
**table** [2] - 579:12,
606:8
**tables** [2] - 579:1,
579:11
**Tahtaras** [2] - 591:25,
592:6
**TAHTARAS** [1] -
615:13
**tailor** [1] - 599:11
**tailored** [2] - 503:13,
504:18
**tasks** [1] - 524:14
**tax** [38] - 486:10,

486:16, 486:21,
487:4, 487:7, 487:8,
487:13, 487:16,
487:20, 490:11,
493:19, 494:9,
494:20, 494:22,
495:12, 495:16,
496:14, 496:21,
531:22, 531:24,
553:19, 554:8,
554:13, 595:14,
595:15, 597:22,
598:6, 598:9,
598:10, 598:13,
598:24, 599:14,
602:7, 602:18,
603:10, 603:18,
606:8, 606:9
**team** [15] - 597:8,
597:10, 598:16,
600:10, 600:13,
602:9, 602:14,
612:4, 612:6,
612:10, 612:13,
612:18, 612:21,
613:12
**teams** [1] - 608:24
**tears** [1] - 609:4
**Tech** [7] - 557:11
**tech** [7] - 561:15,
561:19, 562:1,
562:20, 563:6,
563:15, 563:18
**technical** [10] -
539:16, 539:22,
557:6, 557:10,
557:15, 559:5,
561:1, 586:8,
586:21, 600:3
**technology** [1] -
575:20
**Tektronix** [11] - 525:2,
525:8, 526:17,
526:25, 527:5,
527:7, 585:12,
585:16, 585:20,
586:1, 586:5
**Tektronix's** [2] -
527:2, 527:17
**template** [1] - 474:2
**ten** [5] - 461:11,
461:12, 462:4,
462:7, 588:15
**tend** [1] - 601:11
**tens** [2] - 599:19,
605:14
**tenth** [1] - 596:23
**term** [5] - 518:19,
532:25, 559:19,
559:21, 603:21

**terms** [5] - 454:4,
455:22, 569:19,
570:19, 570:20
**Test** [1] - 542:8
**test** [24] - 441:7,
443:3, 444:5,
451:12, 451:16,
451:19, 455:5,
459:2, 463:14,
465:11, 469:12,
472:24, 480:18,
488:8, 489:7,
489:24, 489:25,
496:1, 499:8,
499:10, 604:22,
605:1
**tested** [12] - 450:24,
451:19, 452:7,
469:4, 485:3,
485:20, 493:25,
495:1, 508:7, 511:2,
564:6, 565:3
**testified** [25] - 432:14,
437:16, 450:1,
454:16, 465:8,
479:20, 480:10,
481:8, 481:23,
500:18, 512:1,
514:12, 518:18,
522:13, 531:12,
531:16, 531:19,
531:21, 532:6,
537:8, 547:6, 549:4,
568:8, 568:13,
593:17
**testifies** [1] - 534:4
**testify** [3] - 512:13,
548:7, 583:6
**testifying** [2] - 491:22,
578:4
**testimony** [34] -
444:23, 447:7,
448:11, 465:24,
465:25, 466:1,
479:17, 479:23,
480:3, 499:2,
528:21, 530:22,
532:22, 536:14,
537:9, 541:4, 548:1,
548:19, 549:1,
549:15, 549:17,
549:19, 549:23,
559:5, 562:23,
585:10, 587:6,
588:18, 589:5,
590:1, 590:15,
591:13, 591:21,
592:6
**testing** [67] - 442:10,
442:21, 444:2,

444:16, 444:18,
444:22, 444:25,
452:10, 452:17,
452:23, 453:1,
453:2, 455:13,
456:23, 458:25,
459:14, 459:24,
461:5, 461:22,
462:18, 463:1,
463:8, 465:10,
466:21, 467:10,
468:4, 468:22,
468:25, 469:1,
469:8, 469:11,
471:17, 471:25,
472:3, 472:6, 472:8,
472:10, 472:13,
472:15, 472:19,
473:5, 481:22,
483:3, 488:2, 488:3,
488:5, 488:14,
489:20, 490:25,
491:21, 492:1,
492:23, 493:10,
494:3, 495:7,
495:23, 496:8,
539:15, 577:9,
584:24, 604:11,
604:17, 604:24,
605:4, 605:6, 607:15
**tests** [10] - 440:16,
464:21, 464:22,
478:10, 478:12,
478:15, 487:25,
489:14, 489:17,
493:21
**text** [13] - 447:17,
452:3, 480:19,
507:14, 509:25,
518:25, 520:20,
520:21, 520:23,
520:24, 520:25,
521:4, 521:8
**text-based** [1] -
520:21
**textural** [1] - 516:15
**THE** [62] - 432:2,
432:14, 432:19,
432:4, 432:12,
438:6, 458:20,
464:13, 464:15,
484:3, 484:5, 484:8,
484:12, 484:16,
541:18, 545:13,
545:19, 546:4,
549:2, 549:16,
577:18, 583:8,
583:10, 587:2,
587:5, 587:8, 587:9,
587:15, 588:2,

588:7, 588:11,
588:25, 589:10,
589:18, 589:25,
590:6, 590:12,
590:14, 590:20,
590:23, 591:3,
591:6, 591:18,
591:20, 592:3,
592:5, 592:12,
592:21, 592:25,
593:4, 593:7,
593:10, 593:15,
593:18, 593:20,
593:21, 593:23,
593:24, 594:1,
594:3, 613:19,
613:23
**themselves** [3] -
492:24, 540:16,
542:24
**theory** [5] - 537:20,
568:24, 570:4,
570:24, 571:2
**therefore** [2] - 434:11,
550:5
**they've** [2] - 521:23,
595:23
**thinking** [2] - 459:15,
484:5
**thinks** [1] - 533:14
**third** [15] - 489:6,
514:14, 519:16,
527:4, 528:2, 531:8,
533:15, 535:8,
535:12, 535:13,
536:20, 536:23,
573:19, 581:21,
582:4
**third-party** [11] -
527:4, 528:2, 531:8,
533:15, 535:8,
535:12, 535:13,
536:20, 536:23,
573:19, 581:21
**thousand** [1] - 561:3
**thousands** [3] -
599:19, 601:1,
605:10
**thread** [1] - 471:19
**three** [18] - 432:18,
438:11, 475:8,
481:18, 486:2,
488:11, 505:15,
526:18, 542:5,
542:7, 548:2,
549:10, 552:5,
554:2, 555:24,
565:23, 594:8, 605:3
**ticketing** [1] - 566:8
**Tim** [1] - 471:19

**timed** [1] - 500:4
**timeframe** [1] - 527:18
**title** [3] - 557:12, 557:14, 597:5
**titled** [1] - 557:11
**TLR** [3] - 598:18, 598:19, 598:20
**today** [5] - 481:21, 570:23, 570:24, 584:8, 596:6
**together** [3] - 542:25, 579:21, 604:5
**tomorrow** [1] - 613:24
**took** [7] - 454:20, 474:20, 508:19, 509:7, 509:20, 526:19, 596:23
**tool** [14] - 448:9, 450:4, 513:17, 513:22, 526:7, 526:10, 543:23, 543:25, 544:2, 544:6, 544:7, 544:10, 544:17, 611:19
**Tools** [2] - 541:6, 594:18
**tools** [14] - 448:1, 448:16, 468:2, 469:10, 507:9, 507:18, 514:4, 519:9, 599:10, 611:14, 611:17, 611:20, 612:7, 613:2
**top** [1] - 502:1
**topic** [1] - 613:17
**total** [3] - 555:18, 561:5, 561:12
**totally** [2] - 479:12, 561:10
**touch** [1] - 544:24
**touched** [1] - 598:23
**touching** [2] - 544:13, 551:23
**tough** [1] - 570:1
**towards** [1] - 503:10
**trace** [1] - 581:22
**track** [4] - 472:19, 472:24, 602:3
**tracking** [1] - 576:18
**trade** [1] - 456:19
**traded** [1] - 596:8
**training** [7] - 610:1, 610:3, 610:6, 610:8, 610:10, 610:13, 610:14
**trainings** [2] - 526:4, 610:3
**TRANSCRIPT** [1] - 432:11

**transcript** [6] - 450:2, 530:25, 531:1, 546:10, 555:8, 614:6
**transfer** [1] - 607:17
**transference** [1] - 453:22
**transformation** [3] - 462:12, 467:16, 468:19
**transition** [2] - 608:21, 609:2
**transitioning** [1] - 609:12
**transpired** [1] - 467:7
**transportation** [1] - 487:7
**transposition** [5] - 463:23, 464:2, 464:20, 465:2, 465:6
**tried** [4] - 551:1, 551:14, 555:10, 560:17
**trigger** [2] - 554:21, 555:3
**troubleshoot** [4] - 457:4, 458:24, 460:21, 495:22
**troubleshooting** [16] - 452:22, 456:24, 457:6, 457:19, 457:20, 457:21, 457:24, 457:25, 458:2, 458:4, 459:23, 461:5, 462:17, 463:1, 463:8, 584:24
**troubling** [2] - 548:7, 548:25
**Trucking** [4] - 563:21, 563:24, 564:7, 565:16
**true** [17] - 436:24, 494:6, 501:10, 504:16, 507:16, 523:12, 523:25, 526:11, 526:23, 527:3, 536:18, 538:7, 539:17, 543:11, 554:10, 556:20, 558:13
**try** [8] - 445:11, 456:12, 463:11, 463:13, 502:13, 556:25, 601:21, 604:22
**trying** [9] - 444:3, 446:2, 500:8, 540:12, 548:17, 570:10, 573:4, 578:5
**tunnels** [1] - 608:16

**turn** [15] - 448:23, 465:7, 483:25, 484:22, 497:13, 505:11, 509:10, 510:18, 518:11, 532:19, 547:18, 547:19, 557:5, 563:20, 566:2
**turned** [1] - 570:12
**turning** [1] - 597:4
**twice** [1] - 527:7
**two** [40] - 432:19, 442:14, 450:7, 451:5, 463:23, 465:2, 484:23, 506:8, 514:12, 515:15, 515:16, 517:20, 519:15, 520:8, 527:8, 547:16, 548:1, 548:4, 548:9, 549:10, 551:16, 553:25, 557:20, 560:25, 561:2, 561:7, 561:13, 561:17, 561:21, 562:2, 562:10, 563:16, 565:19, 565:23, 567:19, 587:11, 597:2, 602:25, 613:2
**two-dozen** [1] - 527:8
**tying** [1] - 580:3
**type** [5] - 458:4, 498:17, 550:4, 572:20, 609:19
**typed** [5] - 461:12, 480:19, 482:18, 482:20, 507:17
**types** [6] - 470:12, 543:11, 543:14, 549:6, 555:14, 598:21
**typical** [1] - 604:10
**typically** [7] - 501:22, 539:8, 598:21, 601:3, 601:18, 605:5, 605:6
**typing** [2] - 483:18, 483:20
**typo** [1] - 565:5

# U

**U.S** [2] - 434:4, 434:8
**ultimate** [1] - 491:6
**ultimately** [2] - 490:11, 490:18
**under** [21] - 457:6, 469:15, 492:12,

494:15, 494:19, 505:2, 510:8, 510:11, 531:16, 532:6, 532:13, 533:3, 534:4, 535:16, 538:9, 539:13, 539:16, 543:18, 576:6, 607:5
**underlies** [1] - 442:15
**underlying** [11] - 451:3, 474:2, 479:14, 498:7, 501:11, 502:2, 502:10, 519:13, 523:3, 523:4, 562:22
**understood** [5] - 433:7, 499:21, 612:25, 613:13, 613:15
**undertook** [1] - 611:25
**undisclosed** [2] - 557:2, 583:4
**unexpected** [1] - 568:5
**unidentified** [1] - 548:23
**unique** [10] - 514:17, 515:11, 515:18, 515:20, 516:1, 516:4, 516:5, 516:22, 601:12
**unit** [1] - 604:22
**United** [3] - 435:18, 437:21, 474:22
**UNITED** [1] - 432:1
**universe** [3] - 477:14, 493:21, 506:20
**UNIX** [1] - 500:5
**unknown** [2] - 505:17, 506:3
**unlawful** [14] - 446:10, 447:6, 482:13, 502:12, 510:7, 530:20, 534:21, 534:24, 534:25, 535:4, 535:11, 535:13, 543:20
**unless** [8] - 438:3, 480:15, 493:25, 571:10, 573:20, 581:19, 581:23
**unlikely** [1] - 482:24
**unpack** [3] - 437:5, 502:14, 568:10
**unprotectible** [3] - 562:10, 562:18, 563:8
**unreliable** [1] - 513:25
**unwanted** [1] - 583:13

**up** [37] - 436:2, 441:18, 445:11, 456:15, 461:21, 463:16, 466:14, 466:17, 469:18, 473:11, 475:3, 483:12, 485:6, 488:17, 492:9, 495:3, 497:23, 500:7, 508:22, 508:24, 510:25, 537:11, 544:22, 544:24, 550:7, 550:9, 552:16, 553:15, 554:6, 555:18, 563:25, 607:14, 611:15, 612:11, 612:14, 613:10, 613:12
**update** [59] - 432:23, 433:4, 433:6, 434:15, 434:17, 434:21, 435:11, 435:20, 436:9, 440:4, 447:13, 448:17, 449:1, 454:8, 458:11, 466:21, 466:23, 467:3, 467:11, 467:14, 467:15, 467:18, 467:24, 468:16, 468:18, 470:19, 471:13, 474:25, 478:10, 478:11, 483:25, 485:2, 487:6, 487:25, 488:13, 493:1, 494:9, 497:14, 503:12, 503:18, 503:22, 508:3, 508:7, 508:13, 508:15, 508:18, 511:22, 565:3, 565:17, 598:20, 601:10, 603:12, 603:14, 606:9, 606:10, 606:18
**updated** [4] - 436:1, 599:7, 610:2, 610:7
**updates** [59] - 459:3, 496:1, 498:5, 504:1, 512:13, 531:17, 531:20, 531:22, 531:24, 543:8, 543:10, 543:11, 553:20, 554:9, 554:13, 595:2, 595:14, 597:20, 597:22, 598:7, 598:8, 598:14,

598:18, 598:19, 598:24, 599:1, 599:14, 599:15, 599:17, 599:21, 599:22, 600:1, 600:6, 600:11, 600:18, 600:20, 601:3, 601:5, 601:11, 601:13, 601:15, 601:17, 601:22, 601:25, 602:15, 602:23, 602:24, 603:2, 603:5, 603:6, 603:11, 603:18, 606:1, 606:8, 606:21, 607:1, 607:2
**upheld** [1] - 510:17
**upload** [1] - 573:18
**uploaded** [4] - 566:7, 568:2, 571:13, 583:21
**uploading** [5] - 569:9, 571:14, 578:1, 582:13, 582:23
**uploads** [2] - 582:19, 582:21
**upper** [1] - 516:14
**US** [2] - 557:11, 602:23
**USA** [1] - 432:4
**useful** [1] - 510:23
**user** [1] - 539:1
**user's** [3] - 489:25, 539:1, 539:5
**uses** [4] - 446:6, 450:4, 472:19, 575:24
**Utah** [1] - 594:10

## V

**value** [2] - 579:13, 595:22
**values** [1] - 450:11
**Vandevelde** [10] - 432:19, 432:8, 484:19, 546:7, 580:20, 580:25, 584:7, 585:1, 586:12, 615:4
**VANDEVELDE** [75] - 432:9, 432:16, 438:7, 460:2, 463:16, 463:19, 464:7, 464:12, 464:14, 464:18, 465:23, 466:14, 466:18, 469:18, 469:20, 470:15,

470:17, 473:11, 473:13, 475:3, 475:6, 484:4, 484:7, 484:11, 484:14, 484:20, 484:21, 485:6, 485:9, 488:20, 488:23, 492:14, 492:16, 497:23, 498:1, 508:24, 509:1, 513:1, 513:3, 541:16, 541:25, 545:11, 545:18, 546:9, 546:12, 548:5, 549:9, 550:7, 550:13, 552:15, 552:18, 566:16, 566:18, 567:5, 567:8, 567:11, 567:13, 572:14, 572:16, 577:16, 582:25, 587:4, 587:17, 587:22, 588:22, 588:24, 589:9, 589:15, 590:5, 590:13, 590:22, 591:19, 592:4, 592:11, 592:19
**Vandevelde's** [1] - 578:13
**varieties** [1] - 486:23
**variety** [2] - 582:24, 608:16
**various** [4] - 486:23, 583:13, 598:10, 602:4
**vast** [1] - 561:22
**vehicle** [1] - 447:24
**vendor** [1] - 604:5
**verbatim** [1] - 461:13
**verify** [2] - 452:22, 460:21
**version** [9] - 451:15, 463:22, 465:1, 523:3, 525:25, 540:21, 567:23, 579:9, 586:14
**versions** [4] - 520:8, 526:1, 526:3, 567:19
**versus** [4] - 457:15, 547:10, 547:11, 550:17, 550:18, 567:17
**via** [1] - 447:24
**Vice** [5] - 589:22, 594:17, 594:24, 594:25, 597:6
**vice** [1] - 597:7
**Vice-president** [5] -

589:22, 594:17, 594:24, 594:25, 597:6
**vice-president** [1] - 597:7
**video** [13] - 539:8, 545:5, 588:8, 588:14, 588:18, 588:21, 589:8, 590:15, 591:13, 591:21, 592:6, 610:6, 610:14
**Video** [2] - 589:5, 590:1
**video-based** [2] - 610:6, 610:14
**videos** [1] - 588:10
**view** [14] - 457:19, 496:14, 497:7, 502:25, 504:11, 521:7, 539:1, 539:17, 549:17, 551:23, 554:21, 556:4, 556:12, 568:12
**viewed** [4] - 520:23, 520:25, 521:3, 532:15
**viewing** [3] - 544:15, 545:7, 588:10
**violate** [7] - 493:22, 494:2, 529:24, 533:6, 534:6, 535:3, 576:2
**violates** [8] - 466:25, 468:21, 510:15, 568:25, 569:20, 570:25, 571:2, 572:3
**violating** [3] - 464:2, 465:6, 483:5
**violation** [8] - 454:17, 460:23, 469:7, 474:7, 570:5, 571:8, 571:15, 573:6
**violations** [1] - 584:9
**Virginia** [1] - 432:24
**virtual** [1] - 608:17
**virtue** [1] - 611:25
**virus** [1] - 583:16
**visit** [1] - 529:20
**Volume** [1] - 432:8
**volumes** [1] - 432:18
**voluminous** [3] - 578:15, 578:18, 587:24
**VP** [1] - 596:11
**vs** [1] - 432:6

## W

**W-2c** [1] - 557:11
**W2** [28] - 432:24, 433:25, 434:6, 434:12, 434:24, 435:6, 435:10, 435:13, 435:20, 436:1, 436:23, 437:1, 439:10, 440:3, 440:4, 440:13, 441:8, 441:10, 442:7, 443:16, 443:17, 443:22, 443:23, 446:5, 446:20, 447:19, 449:16, 466:6
**W2s** [3] - 435:18, 436:19, 453:6
**wage** [1] - 602:20
**wait** [1] - 479:18
**wants** [1] - 494:9
**warning** [4] - 573:22, 574:2, 580:22, 581:25
**warnings** [1] - 573:17
**watch** [1] - 610:14
**waves** [1] - 601:15
**ways** [5] - 465:16, 465:17, 499:5, 515:19, 583:21
**Web** [1] - 581:16
**WEDNESDAY** [2] - 432:1, 546:1
**Wednesday** [1] - 432:6
**weeks** [1] - 594:11
**welcome** [1] - 546:7
**West** [1] - 432:19
**whatsoever** [4] - 502:9, 504:11, 563:14, 583:1
**whereas** [1] - 598:11
**whichever** [3] - 488:25, 531:23, 585:20
**white** [1] - 516:13
**whole** [12] - 459:19, 478:24, 503:25, 504:7, 508:14, 547:16, 561:16, 562:5, 563:19, 580:14, 596:19, 613:14
**wife** [1] - 594:8
**William** [1] - 432:15
**Windows** [1] - 500:6
**wish** [1] - 589:13
**withdrawing** [1] -

433:7
**withholding** [1] - 599:1
**witness** [8] - 432:10, 432:13, 438:1, 528:22, 548:7, 549:25, 593:13, 593:16
**WITNESS** [10] - 432:12, 458:20, 464:13, 464:15, 541:18, 583:10, 587:8, 593:20, 593:23, 594:3
**witness's** [1] - 549:23
**WITNESSES** [2] - 615:3, 615:6, 615:14
**word** [4] - 458:3, 470:2, 470:3, 491:8
**wording** [3] - 514:10, 532:24, 539:13
**words** [4] - 495:9, 532:19, 539:16, 601:24
**Workbench** [3] - 526:6, 526:10, 537:8
**works** [15] - 436:15, 440:20, 455:2, 458:17, 458:22, 464:23, 469:23, 470:1, 495:20, 504:2, 549:11, 569:5, 574:9, 574:12, 588:1
**World** [6] - 520:3, 521:3, 522:2, 525:23, 526:14, 585:16
**world** [1] - 595:8
**wrap** [1] - 544:22
**write** [3] - 502:23, 504:17, 504:22
**writes** [1] - 510:13
**written** [10] - 479:24, 480:21, 483:24, 507:23, 507:24, 511:1, 519:10, 559:11, 560:1, 560:19
**wrote** [9] - 466:19, 467:1, 467:5, 469:21, 485:1, 498:2, 503:11, 515:24, 529:2

## X

**X's** [1] - 463:12
**xmlp** [2] - 447:24
**Xs** [1] - 471:9

## Y

**year** [18] - 434:12, 434:19, 463:24, 465:3, 492:18, 492:20, 494:7, 494:11, 494:24, 496:6, 525:16, 555:13, 594:20, 597:3, 601:4, 601:5, 601:16, 610:17
**year's** [1] - 436:1
**years** [19] - 451:14, 507:1, 513:23, 524:3, 524:20, 527:7, 534:14, 595:5, 595:25, 596:4, 596:10, 596:13, 599:18, 599:19, 599:24, 600:5, 600:10, 600:15, 610:5
**yesterday** [42] - 432:18, 432:22, 433:8, 439:7, 439:14, 450:1, 454:16, 466:1, 472:21, 476:16, 479:19, 480:10, 498:23, 500:17, 511:6, 511:8, 511:19, 512:6, 516:13, 522:13, 546:11, 546:13, 549:1, 551:20, 556:21, 557:1, 557:2, 559:5, 559:18, 562:14, 566:25, 567:1, 568:8, 573:17, 578:4, 578:12, 578:14, 579:9, 581:1, 582:8, 583:24, 584:8
**yield** [1] - 588:5
**yourself** [2] - 552:19, 594:6

## Z

**Zachary** [1] - 432:17
**zeroes** [1] - 449:23
**Zone** [1] - 514:2