1                    UNITED STATES DISTRICT COURT
                          DISTRICT OF NEVADA
2        BEFORE THE HONORABLE LARRY R. HICKS, SENIOR DISTRICT JUDGE
                             ---o0o---
3

4      ORACLE USA, INC., et al,      :
                                     :
5                  Plaintiffs,       :  No. 2:10-cv-0106-LRH-VCF
                                     :
6           -vs-                     :  September 27, 2021
                                     :
7      RIMINI STREET, INC., et al,   :  Reno, Nevada
                                     :
8                  Defendants.       :  Volume 6
                                     :
9      _____:

10

11                   TRANSCRIPT OF EVIDENTIARY HEARING

12

13     APPEARANCES:

14     FOR THE PLAINTIFF:        Richard J. Pocker
                                 Benjamin P. Smith
15                               William A. Isaacson
                                 Jessica Phillips
16                               Sharon R. Smith
                                 Corey Houmand
17                               Zachary Hill
                                 Attorneys at Law
18

19     FOR THE DEFENDANTS:       W. West Allen
                                 Eric Vandevelde
20                               Samuel G. Liversidge
                                 Ilissa Samplin
21                               Casey J. McCracken
                                 Attorneys at Law
22

23     Reported by:             Margaret E. Griener, CCR #3, FCRR
                                 Official Reporter
24                               400 South Virginia Street
                                 Reno, Nevada 89501
25

1    RENO, NEVADA, MONDAY, SEPTEMBER 27, 2021, 9:05 A.M.

2                          ---o0o---

3

4            THE COURT:  Good morning.  Have a seat, please.

5            The record will show we're reconvened this

6   Monday morning following a weekend.  I hope everyone had a

7   chance to rest and recover a little bit from a week-long

8   trial.

9            Let's see, Mr. Isaacson, we're on your continued

10  cross-examination of Professor Astrachan.  You're welcome to

11  go forward, please.

12           MR. ISAACSON:  Thank you.  And good morning,

13  your Honor.

14           Good morning, Professor.

15           THE WITNESS:  Good morning.

16                      OWEN ASTRACHAN,
          recalled as a witness on behalf of the Defendant,
17         previously sworn, testified further as follows:

18                  CROSS-EXAMINATION RESUMED

19  BY MR. ISAACSON:

20  Q    Professor, one of the violations in this case is called

21  violence number 5.

22           You understand that Oracle alleges that Rimini

23  violated the injunction by copying code from Oracle's code

24  psptarry -- with two Rs -- dot cbl source code file to the

25  file rspcmpay.cbl.  You know about that, right?

1   A   Yes.

2   Q   And you don't dispute that the rspcmpay file was saved to

3   Rimini's systems; is that correct?

4   A   That's correct.

5   Q   And you don't dispute that the file was distributed at

6   least 14 times to seven clients?

7   A   I don't know the number off the top of my head, but it

8   was certainly used more than once.

9   Q   The Rimini file -- this Rimini file was designed to

10  augment the functionality of an Oracle file by loading

11  additional, more-detailed data.  Is that your understanding?

12  A   It did additional functions.  I talked about that in my

13  direct testimony, so the word in that file header was augment,

14  but it also performed additional functionality.

15  Q   But it did augment the functionality of an Oracle file,

16  correct?

17  A   I believe that's the words in the header, yes.

18  Q   Now, you testified yesterday on your direct testimony

19  about a number of factors that you indicated that, in your

20  opinion, were not indicative of copying.  Do you remember

21  that?

22  A   In general, yes.

23  Q   All right.  So, for example, it's on your slides,

24  DDX-536, you talk about spacing does not indicate copying, and

25  you say that several times.

1         Going on to the next slide, you say it there.

2         Next slide, you say it there.

3         And, in general, when you're talking about the

4  analysis that you were doing, you were talking about factors

5  that gave you the opinion that there were elements of these

6  files that were not indicative of copying; is that correct?

7  A  I was using the elements as part of my analytic

8  dissection, which, as I understand it, is the proper way to

9  determine if there's substantial similarity between two files.

10  Q  Right.  And you said that the elements of analytic

11  dissection caused you to reach the opinion that many of these

12  elements were not indicative of copying, correct?

13  A  I don't believe I used the phrase "not indicative of

14  copying."  I believe I used the phrase that they would -- the

15  files were not substantially similar.  I'm just being careful

16  with my wording.

17  Q  Well, this spacing is part of your analytical dissection,

18  right?  The one that's on the slide in front of you, DDX-539,

19  right?

20  A  No, That's not part of my analytic dissection.

21  Q  All right.  Well, let me ask you about the trial

22  transcript at 949, lines 1 through 13.  This is the discussion

23  of the flower box.  Is this part of your analytic dissection?

24  A  Not per se, no.  It's part of my discussion about

25  asterisks and comments not being indicative of copying, but

1    it's not, per se, part of my analytic dissection.

2    Q    All right.  So some of the analysis that you were doing

3    yesterday was about whether there were indications of copying

4    that may or may not have been analytic dissection.  Do I have

5    that right?

6    A    In response to what Ms. Frederiksen-Cross said, I was

7    opining that it was not an indication of copying, that's

8    correct.

9    Q    In fact you also said if it's not creative, it's not an

10    indication of copying," correct?

11    A    No, sir.  I did not talk about creativity as part of

12    copying.  I talked about that as part of substantial

13    similarity and analytic dissection.

14    Q    Well, maybe you can look at the end of your testimony on

15    the screen there:

16              "So this is a common convention for comments

17         in Cobol and in fact in other languages.  It's not

18         creative.  It's not an indication of copying."

19    A    Correct.

20    Q    Right?  You did talk about things that you thought were

21    both -- that were not creative, and said therefore they were

22    not indications of copying.

23    A    That's what I said.

24    Q    All right.  Now -- so in terms of your testimony about

25    what's an indication of copying and whatnot, you personally

1    did not do anything to confirm that no Rimini developer

2    directly copied Oracle code into the rspcmpay file, correct?

3    A    I did not speak with any Rimini engineers.

4    Q    You did not investigate how the file originated.

5    A    The file has comments at the top that discusses its

6    origination, but I did not do anything other than look at the

7    file.

8    Q    Right.  And it wasn't just that you didn't speak to

9    Rimini engineers about this, you did not ask to speak with any

10   Rimini engineers about whether this file was copied, correct?

11   A    That's correct.

12   Q    Okay.  So why do all this analysis of comparing code to

13   see whether there's indications of copying?  Why didn't you

14   just ask?  Why didn't you just ask the company did you copy

15   the file?

16   A    My understanding of determining substantial similarity

17   between two files, which, again, as I understand it, is the

18   proper way of determining whether there has been a copyright

19   violation, is to perform analytic dissection.  That is why I

20   performed analytic dissection.

21   Q    But you went farther than that, you talked repeatedly

22   about what was an indication of copying.  I can show you more

23   of that testimony if you want.

24            And before you gave testimony about what was an

25   indication of copying, why do that analysis?  You're working

1    for Rimini, you have access to them, why didn't you just ask

2    them did you copy this file, who did that?

3    A    In my work I was responding to Ms. Frederiksen-Cross in

4    discussing that spacing and comments were not an indication of

5    copying.   That is why I wrote that.

6    Q    So all you did was look at those files and respond to

7    Ms. Frederiksen-Cross, talk about what was an indication of

8    copying and what wasn't, but it never occurred to you to just

9    ask Rimini did you copy this.   Is that what happened?

10   A    My analysis was to respond to Ms. Frederiksen-Cross and

11   to conduct the analytic dissection which, as I understand it,

12   is the proper way of determining whether two files are

13   substantially similar.   I was able to do that without speaking

14   to any Rimini engineers so that's what I did.

15   Q    All right.   And when you say you understood it was the

16   proper analysis, did it ever occur to you it might be the

17   proper analysis of whether Rimini actually copied this file to

18   ask them?   That that might be a proper method of analysis?

19   Did that occur to you?

20   A    No.

21   Q    All right.   You did talk about matching code in the

22   Rimini file that's not dictated by external constraints.   Do

23   you remember that?

24   A    Yes.

25   Q    And am I correct that some of the matching code in the

1  Rimini file is not dictated by external constraints.

2  A    I'd have to look at the files, but in general that's

3  going to be true.  But I would have to look specifically at

4  the files to make a determination in general.

5  Q    So you did not look at the files in order to reach a

6  conclusion as to how much of the matching code was dictated by

7  external constraints or not dictated by external constraints;

8  is that correct?

9  A    No, that's not correct.

10         As I discussed in my direct testimony and in my

11  reports, I conducted analytic dissection on the files to

12  determine that they were not substantially similar.

13  Q    All right.  Am I right that comment blocks in software

14  code are not dictated by external constraints?

15  A    I don't think that's in general correct.  I think there

16  are external conventions that dictate how common blocks work.

17  Q    All right.  So is there a difference between external

18  constraints and external conventions in your mind?

19  A    One of the aspects of how I would filter things out is

20  programming conventions, and the asterisks that are part of a

21  flower box, for example, in a COBOL program are conventional

22  and, as I said in my direct testimony that I just outlined for

23  you, not creative.

24         So because of that conventionality and lack of

25  creativity, in my view they should be filtered out as not

1  substantially similar as part of analytic dissection of these

2  two files.

3  Q   All right.  I thought you drew a distinction yesterday,

4  but you tell me if I'm wrong, that there are certain things

5  that are dictated by external constraints, meaning you have to

6  do them, and then there are other things that are dictated by

7  what you were just calling external conventions, it's

8  conventional to do it that way.

9       Is that a proper distinction?

10  A   There are things that are both dictated by requirements

11  such as an API, and, yes, there are also things that are

12  essentially dictated by convention.  Both of those are true.

13  Q   All right.  And in terms of just looking at what's

14  dictated by external constraints as opposed to external

15  convention, okay, making that distinction, did you do an

16  analysis of how much -- what percentage of the matching code

17  is dictated by external constraints alone?

18  A   No.  As part my analytic dissection I used all of the

19  aspects of substantial similarity that I've discussed in my

20  report and direct testimony in terms of what should be

21  filtered out.

22  Q   And are comment blocks and software code dictated by

23  external constraints as opposed to external convention?

24  A   I'd just like to understand what you mean by comment

25  blocks.  If you mean the asterisks -- because the comments

1    themselves would not be something that's necessarily dictated

2    by convention, but the flower boxes would absolutely be

3    dictated by convention.

4    Q    All right.  That's exactly what I'm talking about.  So

5    the comments in the flower box are not dictated by external

6    constraints or external convention.

7    A    Some comments would be.  For example, the markers in a

8    COBOL program that identify what sections of the COBOL program

9    are in that area would be dictated by both requirements and

10   constraints -- requirements and convention.

11            But if, for example, in the rspcmpay file, at the

12   beginning of that file where I discussed earlier, it explains

13   the purpose of that file, that comment would not be dictated

14   by convention or constraint.

15   Q    All right.  For example, if you could look in your

16   binder --

17   A    I do not have a binder, sir.

18   Q    I thought we brought one up to you.  It's right in front

19   of you.

20   A    Okay.  This says Hearing Exhibits.  That's what you're

21   speaking of?

22   Q    Yes, yes.

23   A    Okay, sorry.

24   Q    One seventy-five, OREX_175.

25   A    Okay.

1    Q    And you recognize this as the comparison file you

2    testified about in your direct.

3    A    This is a file from Ms. Frederiksen-Cross' report that I

4    discussed in my direct, yes.

5    Q    Yes.  And just for example, on page 16, at lines 415 --

6    really, 414 to 416, am I right that additional library

7    function p-a-r, that would be a comment?

8    A    That line is cut off.  The word is actually parameters.

9    That's continued on the next line.

10   Q    All right.

11   A    It's not p-a-r.

12   Q    Thank you for that.  I should read to the next line.

13         Additional library functions parameters, that is a

14   comment such as you're been describing.

15   A    That's a comment, yes.

16   Q    Right.  That's not a comment that is dictated by any

17   external constraint.

18   A    Convention but not constraint, yes.

19   Q    And the same comment is then found in both files when you

20   do the comparison.

21   A    Yes, that's true.

22   Q    And the Oracle programmer -- well, the Rimini

23   programmer -- well, actually, I'll move on.

24         Am I right, also, that the number of spaces in

25   software code is generally a matter of choice?

1    A    And convention, but that's true.

2    Q    And the amount of white space and blank lines between

3    functions helps make programs easier for humans to read, but

4    they don't affect how a program works.

5    A    That is generally true, yes.

6    Q    And when we're talking about white space, we're referring

7    to the space, the tab, and the return seven keys; is that

8    right?

9    A    Yes, that's generally considered white space.

10   Q    The Oracle and Rimini files that were compared here also

11   contain variable names; is that right?

12   A    That's correct.

13   Q    And variable names, am I correct, are not necessarily

14   dictated by external constraints?

15   A    In general they might be dictated by convention or by

16   reading an API and using what's obvious, but typically not by

17   a constraint in our terminology that we're using now together.

18   Q    And in a specific program the variable names can change

19   but the purpose of the program doesn't change.

20   A    That's generally true.  However, as I discussed in my

21   direct, programmers don't have essentially unlimited

22   creativity in variable names because of convention, and using

23   variable names are, in general, indicative of their purpose in

24   programs.

25   Q    All right.  And am I also correct that parameter names

1    are not dictated by external constraints as opposed to what --

2    as opposed to convention?

3    A    Again, an API might provide example parameter names, and

4    a programmer might be able to use other parameter names rather

5    than those that are in the API.

6             But in general programmers will choose to follow the

7    API and not use different variable names.  That is common and

8    expected.

9    Q    And when you say -- when you say that the use of white

10   space in software development is a matter of choice, that

11   would include the use of double spacing before and after a

12   word such as "to," right?

13   A    I would just like to make clear that in COBOL programs,

14   because they're column oriented, sometimes spacing is

15   required.

16            And as in my direct testimony when I discussed why

17   there might be two spaces before a comp at the end of a line

18   to line things up, that's a convention that nearly every

19   programmer in COBOL, as I understand it, would follow.

20            So while there is some degree of choice, there is

21   not necessarily complete freedom because of conventions used

22   in the COBOL language.

23   Q    And looking back at 175, if you can look at paragraph --

24   page 56, and down at line 1900, SQL ERROR PROCESSING, do you

25   see that?

1    A    Yes.

2    Q    That would be a comment such as we were discussing

3    before?

4    A    It is a comment, that's correct.

5    Q    All right.  And this comment is obvious based on the

6    section name that's above on the page, correct?

7    A    Essentially, yes.

8    Q    It's redundant.

9    A    It's not necessarily redundant, but it's clear that it's

10   in the error section, yes.

11   Q    And I think you said yesterday and today that it's your

12   testimony that it is your understanding that analytic

13   dissection is required in this case, right?

14   A    It's my understanding that analytic dissection is the

15   proper way of determining whether two programs are

16   substantially similar.

17   Q    And you believe it's required in this case to determine

18   whether there's a violation of the injunction?

19   A    I believe it's required to determine if two programs are

20   substantially similar, and that's part of understanding the

21   injunction.

22   Q    And is it your view that even though -- that analytic

23   dissection is required even if the copying is of literal code

24   rather than nonliteral design elements?

25   A    It's -- in my response to Ms. Frederiksen-Cross, I read

1  nothing about nonliteral design elements.  I read about, in

2  this case, the psptarry and the rspcmpay, that it was a copy

3  of literal code.

4  Q   It is your view that the copying alleged here should be

5  subject to analytic dissection even if it's copying of literal

6  code; is that right?

7  A   It's my understanding that in order to determine if these

8  two files are substantially similar, we must use analytic

9  dissection, yes.

10  Q   All right.  And I 100 percent believe you stand by the

11  results of your analytic dissection here, but you would agree

12  that it's conceivable that someone else doing an analytic

13  dissection here might reach a different conclusion than you.

14  A   Yes.  I address that in my report as well.

15  Q   Now, for your report, when you discussed analytic

16  dissection, you outlined eight types of elements you deemed

17  unprotectible and should be excluded from consideration; is

18  that right?

19  A   I don't remember what's -- the exact part of what's in my

20  report, but, in general, it was similar to what I did in my

21  direct testimony.

22          Whether there were eight or seven, I can't recall.

23  I'm happy to look at it, but that sounds about right.

24  Q   Sure.  Well, the -- if you look at your rebuttal report,

25  which is dated July 17, 2018 -- and we'll pull it up on the

1    screen for you, but it's in that binder, paragraph 205.

2    A    July 17th?

3    Q    July 13th.

4    A    Okay.

5    Q    There you see paragraph 205, and you can see the eight

6    bullets.  It's on your screen, too.

7    A    Yep, I see that.

8    Q    All right.  And -- all right.  So in your original

9    analysis you were using these eight bullets, right?

10   A    That's correct.

11   Q    All right.  And in your report and at your deposition

12   about this report, you provided no citations to support your

13   understanding that those eight elements taken together should

14   be used to determine what was unprotectible in an analytic

15   dissection, correct?

16   A    I will take what you're saying that -- if I provided no

17   reference, then I did not provide a reference.

18   Q    You have not written about analytic dissection, at least

19   by the time of your depositions, correct?

20   A    When I was deposed in this case I had not written about

21   analytic dissection, that's correct.

22   Q    And you hadn't given any speeches on the topic?

23   A    That is correct.

24   Q    And when you came up with those eight elements, you don't

25   remember whether you came up with those from reading about

1    analytic dissection or by talking to counsel, correct?

2    A    It was likely a combination, but I don't recall.

3    Q    All right.  And you up with that list of eight elements

4    for the purposes of your services as an expert in this case,

5    correct?

6    A    At the time of this report, that's correct.

7    Q    Okay.  And this case was the first time you had ever

8    applied those eight elements of analytic dissection; is that

9    correct?

10   A    Yes, that's correct.

11   Q    You didn't, for example, provide those same eight

12   elements in connection with your opinions in the *Oracle versus*

13   *Google* case, correct?

14   A    That's correct, I did not.

15   Q    All right.  And you were not aware whether any articles

16   indicated that these eight elements as a group should be

17   included in analytic dissection, correct?  At least you

18   weren't at the time of your report and your depositions.

19   A    At the time of my report and deposition, that's correct.

20   Q    And at your deposition you didn't even know if you would

21   find any of these elements in the articles, correct?

22   A    I hadn't read articles at that point, that's correct.

23   Q    And you could not recall whether the eight elements -- at

24   the time of your report and deposition, you could not recall

25   whether the eight elements listed in your rebuttal report were

1   provided to you by counsel or whether you came up with some of

2   them.

3   A   That seems correct.

4   Q   Okay.  And now you've listed five elements -- this is

5   DDX-512 from your -- now, are you saying these five are the

6   same as the eight?

7   A   I'd have to look at both of them together, but I think

8   that the five are essentially a subset of the eight.

9   Q   We've put them together on the screen for you in case

10   that helps.

11         Now, being a subset is not the same as being the

12   same.  I think we can agree with that.

13         Are the five elements the same as the eight

14   elements?

15   A   Well, five and eight are not the same, but these are the

16   elements that I used in my direct testimony in my analytic

17   dissection that I've discussed.

18   Q   I'm aware that those five are the elements that you used

19   in your analytic dissection in direct, but they are a lesser

20   number and not the same analysis that you did in your report;

21   is that right?

22   A   That's true, because it was not necessary to filter out

23   elements taken from the public domain.  It was not necessary

24   to talk about elements constrained by hardware or software

25   interoperability, and it was not necessary to filter out

1    elements that constitute only abstract ideas.

2    Q    All right.  And the slide from your direct, this slide,

3    like the other slide that you talked about yesterday, was part

4    of your collaborative process with counsel, correct?

5    A    Since my report I've also been deposed in another case

6    that used analytic dissection, and these are consistent with

7    the work I did in that case as well.

8    Q    Are you referring to a case having nothing to do with

9    these parties?

10   A    Yes, that's correct.

11   Q    I'm not sure why that answered my question.

12           My question was, was this slide, DDX-512, that you

13   used in your direct testimony also part of that collaborative

14   process you described yesterday of generating slides for your

15   presentation?

16   A    Yes.

17   Q    Now, am I correct that for this case you would perform

18   analytic dissection even if 99 percent of the code in the

19   Rimini file were exactly the same as the code in the Oracle

20   file.

21   A    In order to determine if two programs were substantially

22   similar, yes, I would conduct analytic dissection, that's

23   correct.

24   Q    And you would perform analytic dissection even if you

25   were told, and it was 100 percent true, that Rimini had copied

1    99 percent of the code in a Rimini file from the Oracle file?

2    A    Yes, that's correct.

3    Q    And you would have the same answer if we went from

4    99 percent to a 100 percent.

5    A    It's my understanding that in order to determine if two

6    files are substantially similar, that's what I would do.

7    That's my legal understanding as a technical expert.

8    Q    Even if it's 100 percent copied and you know it happened.

9    A    I'm not sure how I would know that happened.   If somebody

10   said to me, yes, I copied the Oracle file --

11   Q    Yeah.

12   A    -- and then I saw it, then I think in that instance it

13   might not be necessary to conduct analytic dissection.

14          But, I might still do that if that was part of the

15   legal understanding.   I'm not sure how the legality aspects

16   work.

17   Q    It's your testimony that even if a few isolated portions

18   of the rspcmpay file were substantially similar to the code in

19   the psptarry file, those portions are *de minimis* because they

20   represent a small fraction of Oracle's copyrighted work; is

21   that correct?

22   A    In my testimony I discussed how many lines that would be.

23   When you say a small portion, I would need know what the small

24   portion was.

25          I did not say in my testimony that there were

1    substantial similarities between the files.  I said in fact

2    that there was no substantial similarity.

3              So if you're now giving me a hypothetical that there

4    are some sections that are substantially similar, then I need

5    to look to see how much of that there was.

6    Q   All right.  Well, let me ask you about paragraph 200 of

7    your rebuttal report after the injunction, which is

8    March 13th -- we'll pull it up on the screen for you --

9    paragraph 200.  It's also in your binder.

10             Oh, I'm told it's 202.

11             Ah, yes, I see.

12   A   March 13th?

13   Q   Yes.

14   A   Okay.  I see that paragraph.

15   Q   All right.  And you see in the middle you say,

16             "Moreover, even if a few isolated portions of

17        this file" -- and I won't repeat all the acronym, but

18        of the Rimini file -- "were substantially similar to

19        code in the Oracle file, those portions are

20        *de minimis* because they represent a small fraction of

21        Oracle's copyrighted work."

22             That was the comparison you did in your report,

23   correct?

24   A   Yes, and that was discussing what the isolated portions

25   were and that I was comparing it to Oracle's copyrighted work.

1   Q    All right.

2   A    That's correct.

3   Q    All right.  And you didn't know how the legal system

4   determines what's *de minimis* when you wrote that, correct?

5   A    I am not a lawyer, so I don't understand how *de minimis*

6   is interpreted in every situation; that's correct.

7   Q    However, the understanding you were given by counsel for

8   Rimini for your report of what *de minimis* means is a small

9   amount in relation to the whole, correct?

10  A    That's what's written here, yes, that's correct.

11  Q    And by whole, you're referring to all of Oracle's

12  PeopleSoft software, correct?

13  A    Yes, that's correct.

14  Q    And so in your report, when you did your analysis of what

15  *de minimis* was, you did a comparison to all of Oracle's

16  PeopleSoft software which was to compare the psptarry file to

17  millions of lines code in Oracle's PeopleSoft software; is

18  that correct?

19  A    I believe you just said the psptarry file, and that's the

20  Oracle file.

21  Q    You're absolutely right; the Rimini file.

22           When you were saying that any copying of the Oracle

23  file was *de minimis*, you were making that claim in reference

24  to the millions of lines of code in the Oracle's PeopleSoft

25  software, correct?

1   A   That's what's written in this paragraph, but I have also

2   written in my reports that I think it would be *de minimus* even

3   if compared to ptparry [sic].

4         But that's not my understanding of how *de minimus*

5   works, that it should be compared to the copyrighted work as a

6   whole.

7   Q   All right.  Now, on the subject of convention and

8   creativity, I think it's your testimony that if your students

9   were creative in naming their variables, they would lose

10  points in your class.

11  A   I think that's a general over characterization.  There is

12  room for creativity, but you must adhere to convention in that

13  creativity.

14  Q   All right.  But when you -- for example, when you were

15  talking about "go get 'em," I think you said if you named your

16  variable something creative like "go get 'em," you would lose

17  points.

18  A   As opposed to FETCH where FETCH is prescribed in the API,

19  that's correct.

20  Q   All right.  And it's your testimony that you would expect

21  developers at a professional software development company to

22  follow conventions when they were writing code.

23  A   In general I think that's correct, yes.

24  Q   Okay.  And under your analytic dissection approach, you

25  would filter out language that's not conventional and not

1    creative -- I'm sorry, I said that wrong.

2              Under your analytic dissection approach, you would

3    filter out any language that is conventional because it's not

4    creative.

5    A    Because it lacks creativity, that's correct.

6    Q    All right.  So under your analytic dissection approach,

7    you expect the software developer to write conventionally and

8    noncreatively, but then you filter out language that's not

9    creative.  Do I have that right?

10   A    There are kind of too many nots in that question for me.

11   Q    Okay.  Under your analytic dissection approach, you

12   expect to see code that is conventional and, when you see that

13   code, you filter it out.

14   A    Under my analytic dissection, I don't expect to see any

15   kind of code.  What I do in looking at code is determine if it

16   should be constrained because of convention or because of

17   minimal creativity, but I don't go in expecting anything.

18   Q    Well, you absolutely expect a professional software

19   developer to follow convention.

20   A    In general, yes, I do.

21   Q    All right.  You expect that, and then in analytical

22   dissection you filter it out, right?

23   A    There are two statements, both of which are true.  I

24   expect programmers to follow convention, and then lines that

25   are constrained by that convention I would filter out.

1    Q    That's what I thought.

2         But you do recognize that programming somehow is a

3    creative process.

4    A    Absolutely.

5    Q    Programming can be a creative process even if you are

6    using standard variable names and following conventions.

7    A    Absolutely, yes.

8    Q    You agree that computer programs execute sequences of

9    statements often producing some form of output, correct?

10   A    Yes, I do.

11   Q    And you agree that determining what statements to include

12   in a program is in part art.

13   A    I'm -- it's likely that I have said that, yes.

14   Q    You agree that it's simpler to use software components

15   supplied by others than to write everything yourself; is that

16   right?

17   A    I have said that.  That is not uniformly true, but it is

18   often true.

19   Q    All right.  I want to talk to you about violation 9,

20   sometimes called tech spec, so I'm shifting topics for you

21   here.

22   A    Okay.

23   Q    The -- I think your binder is missing the tech spec, so

24   if I may approach, your Honor?

25         THE COURT:  You may.

BY MR. ISAACSON:

Q    Now, I believe it's your testimony that -- and which you explained for the Court, was that Rimini's tech spec, which is for JDE105328, and it's OREX 80, contains markers that refer to variable names and function names from an Oracle code file.

A    That's generally correct.

Q    All right.  So, for example on page 17, which is also being put on the screen, you'll see below where it says begin on the page, and then right below that it says, "if VArpt_, and then it goes on for a little while, do you see that?

A    Yes.

Q    All right.  VArpt_mnOrigAlloc, in the screenshot that's a variable name, but it's not the complete variable name, is that right?

A    Well, I'm -- we just moved from one section to another, and now we're looking at the top, is that correct, the thing that's outlined, the section that is outlined on my screen?

        Just -- previously -- I'm just trying to make sure I understand.  Previously, we were looking at something in the add box, and now we're looking at what is a marker?

Q    I was -- maybe --

        MR. McCRACKEN:  The screen changed during your question.

        MR. ISAACSON:  Pardon?

        MR. McCRACKEN:  The screen changed during your

1    question, that's why it's confusing.

2                    MR. ISAACSON:  Oh, I see.  I see.  Thank you.

3    BY MR. ISAACSON:

4    Q    So the screen is now on the proper point of the document

5    that I was referring to.  I apologize for any confusion.

6    A    Okay.

7    Q    And I'm talking about the language under "begin."

8    A    I see that.

9    Q    And the -- and the VArpt language there that I just read

10   into the record once, so I won't read it again, that language

11   is a variable name but it's not the complete variable name.

12        Do I have that right?

13   A    Well, it's certainly part of something.  I can't tell if

14   it's a variable name or something else.  It's likely a

15   variable name, but I'd need to actually look at what it's a

16   marker for to determine that.  But it's certainly just a piece

17   of the code for which it is a marker.

18   Q    Right.  And this document, the so-called tech spec,

19   OREX_80, contains variable and function names from an Oracle

20   source code file, correct?

21   A    It contains part of them.  It may contain complete ones.

22   I don't see any complete ones here in this example.

23   Q    All right.  And variable names and function names are an

24   integral part of C++ software source code.  Do you agree with

25   that?

```
 1    A    I do.  This is not C++, but I do agree with that
 2    statement.
 3    Q    And the -- you do agree -- well, let me ask you --
 4    actually, let me have you explain this for me.
 5                 MR. ISAACSON:  Can we pull up his rebuttal
 6    report, March 13th, at paragraph 298.
 7                 MR. McCRACKEN:  Mr. Isaacson, this is the 2020
 8    rebuttal report?
 9                 MR. ISAACSON:  Yes.  This is the March 13, 2020.
10                 THE WITNESS:  Paragraph 298?
11                 MR. ISAACSON:  Yes, 298, which would be on the
12    screen.  And -- all right.
13    BY MR. ISAACSON:
14    Q    And there you say Ms. Frederiksen-Cross -- I'm sorry,
15    "the creator of this tech spec used a variable name."
16         Do you see that?
17    A    Yes.
18    Q    All right.  And then there's the name of the variable
19    name "If VArpt_mnOrigAlloc."  That variable name was from the
20    JD Edwards source file, correct?
21    A    That's correct.
22    Q    And there were other variable names in the Oracle file
23    that were all -- from the JD Edwards source file that were
24    also in the Rimini file, correct?
25    A    There are variable names that serve as markers that are
```

1    in this tech spec, that's correct.

2    Q    Now, you've never seen the realtime creation of a tech

3    spec, am I right?

4    A    That's correct.

5    Q    And you don't know how Rimini employees put Oracle

6    function names and variable names into tech specs for JD

7    Edwards.

8    A    It's true that I do not know that.

9    Q    And it was a Rimini developer, Michael Jacobs, who last

10   updated this particular tech spec, correct?  I think you can

11   see that.

12   A    I see his name at the very beginning of the tech spec,

13   yes.

14   Q    Yes.  And do you know who wrote OREX_80?

15   A    I can see that there are two names of Rimini employees

16   there, but I don't know who wrote the entire document from the

17   beginning.

18            I can see that it says Revision Date, Original

19   Design, and then Added World Code, so I see those two names.

20   Q    All right.  And the two names, Ashish Karat and Michael

21   Jacob, those would amongst the Rimini engineers who you

22   decided not to ask to interview in this case, correct?

23   A    They're both Rimini engineers, and I did not ask to

24   interview them, that's correct.

25   Q    The -- let's talk about what's been called violation 10.

1            Now, this is about a file HCM200105, and this a

2   PeopleSoft update for the Oregon quarterly tax reporting; is

3   that right?

4    A    I know that there is an RSI quarter tax file, so if

5   that's what this one is, okay.

6    Q    All right.  And Rimini wrote an SQR file on its own

7   systems named rsiq2rtx.sqr [sic], right?

8    A    That's correct, as I understand it; yes.

9    Q    And this update included two SQR files; the rsi1099-I and

10   the RSI 1099-M.

11    A    No.  You've completely confused two issues here, sir.

12    Q    Okay.  That's always possible.

13            So the -- well, it's the update, you're right.

14            So RSI-18F07 is a PeopleSoft update to the 1099 tax

15   form; is that right?

16    A    I mean, are we switching gears here because --

17    Q    Yes, I'm trying to clarify -- let me ask a different

18   question.

19    A    So we're talking about not rsi quarter tax.

20    Q    Correct.  Correct.

21            Then RSI-18F07, which is the updated issue for

22   violation 6, that's a PeopleSoft update to the 1099 tax form,

23   correct?

24    A    I don't have the H -- of those things.  There is a 1099-I

25   and 1099-M update.  So if that's the case we're going to talk

1    about, I am conversant with that.

2    Q    Okay.  Well, the SQR files here are Oracle PeopleSoft

3    source code files; is that right?

4    A    No.  The rsi1099i and rsi1099m are Rimini-authored files

5    that have been changed over the years, as dictated in the

6    comment section at the top, as each time there's a new 1099.

7    Q    And what the rsiq2 -- qtrtx file has --

8    A    Excuse me.  You just started talking about quarter tax

9    again, and that's not what we've been talking about so I'm

10   very confused.

11   Q    Right.  I -- yeah, I see why I'm causing you this

12   confusion.

13        All right.  So let me bring it together with

14   violation 6 which does have to do with the file I was just

15   mentioning.

16        The -- with respect to violation 6, you don't have

17   an opinion as to whether Rimini's conduct with respect to the

18   1099 SQR files and the Data Mover scripts were permitted under

19   Oracle's PeopleSoft licenses; is that correct?

20   A    I just want to make sure I understand where we are.

21   Q    Violation 6.

22   A    I don't have the injunction in front of me, but I do know

23   the issues that deal with 1099-I and 1099-M and the Data Mover

24   scripts, and I understand that that is an update at issue

25   here.

1    Q    Right.  But you're not expressing any opinion as to

2    whether there's been a violation of the injunction with

3    respect to that issue, correct?

4    A    What I've discussed in my testimony is that it is not an

5    example of cross-use.

6    Q    Right.  But you're not -- you say that it is not an

7    example of cross-use, but you're not giving an opinion about

8    whether the injunction has been violated, correct?

9    A    I'm not giving a legal opinion; that's correct.

10   Q    Now, in reaching your opinions, your understanding was

11   that the injunction prohibits copying and update developed in

12   one customer's environment for other customers, correct?

13   A    I don't think that's precisely how I characterized it.

14   Q    Let me be more precise.

15              In reaching your opinions, your understanding was

16   that Rimini's alleged copyright infringement included copying

17   under the license of one customer for work for other existing

18   customers rather than restricting such copying to work for

19   that particular customer.

20   A    Are you reading from something?

21   Q    I'm happy to show it to you, too --

22   A    Sure.

23   Q    -- if that will make it easier for you.

24   A    Yeah.

25   Q    This would be the March 13th report, paragraph 87.

1    And here you're even quoting the Court, so I'm

2  assuming you're operating -- you're using this to inform your

3  understanding of cross-use, correct?

4  A    That's correct.

5  Q    All right.  And it was your understanding that Rimini's

6  alleged copyright infringement included copying under the

7  license of one customer for work for other existing customers

8  rather than restricting such copying to work for that

9  particular customer.

10    Do I have that right?  That was your understanding

11  as you did your -- for your reports and your testimony.

12  A    Yes, I see that.

13  Q    All right.  And it's also saying it's not just for

14  existing customers, it's also true for unknown or future

15  customers.

16    Rimini -- it was your understanding that copying

17  under the license of one customer for work for unknown or

18  future customers rather than restricting such copying to work

19  for that particular customer would be cross-use.

20  A    I don't see the word "cross-use" here, but I do see that

21  copying under that license, and, as I understand it, this

22  copying would be of an Oracle work.

23  Q    Right.  But what I'm -- in terms of just your

24  understanding of what is cross-use and copyright infringement,

25  it was your understanding as you did your reports and your

1   testimony that it would be -- that copyright infringement

2   included copying under the license of one customer for work

3   for unknown or future customers rather than restricting such

4   copying of work for that particular customer.

5   A   You are reading my paragraph correctly.

6          And I just want to be clear that the copying, as I

7   understand it that we're investigating, is copying of Oracle

8   software or a derivative work.

9   Q   All right.  And I appreciate you telling me things that

10  I'm not asking about.

11         But the -- it's not just that I'm reading your

12  paragraph correctly, this was your understanding of what was a

13  copyright violation, what was cross-use, as you gave your

14  testimony and did your reports, correct?

15  A   That's what's written, that's correct.

16  Q   And it was your understanding that the injunction

17  prohibited Rimini from preparing derivative works except for a

18  specific client.

19  A   That's not quite correct.

20         As I understand it, what Rimini must do is, when

21  they're working for a client, that work is for that client.  I

22  don't understand that there is a prohibition against reusing

23  know-how or knowledge for doing an update for another client.

24  Q   It was your understanding that the injunction provides

25  that Rimini shall not prepare derivative works except for a

1    specific client, correct?

2    A    Again, that's not precisely as I understand it.

3            When the work is done for a client, it is for the

4    benefit of that client.

5            And if that -- if it's a Rimini-written piece of

6    code, for example, that's part of an update done for the

7    benefit of a client, then that Rimini update can be reused as

8    part of knowledge and know-how for another client as I

9    discussed in my testimony.

10            MR. ISAACSON:  All right.  I'd like to look at

11   your June 30th deposition, if I may, your Honor, at page 130,

12   line 8, to 131, 14.

13            MR. McCRACKEN:  What line again, Mr. Isaacson?

14            MR. ISAACSON:  One thirty, line 8, continuing on

15   to 131 down to line 14.

16            THE WITNESS:  Page 130?

17            MR. ISAACSON:  Yes, page 130.

18            THE WITNESS:  And what line number?

19            MR. ISAACSON:  Line 8.

20            THE WITNESS:  That's not the line 8 that I have

21   on page 130 in my binder.

22            MR. ISAACSON:  Have you got the June 30th, 2020,

23   on the -- let's see.  All right.  Let's back up here.

24            THE WITNESS:  No, sorry.  I'm in 2018, so I'm in

25   the wrong one.

1                    MR. ISAACSON:  Yes, that would --

2                    THE WITNESS:  That would do it.

3                    MR. McCRACKEN:  Your Honor, I object.  This is

4     not proper impeachment.  I don't think it's related to what

5     the question was and what the answer was.

6                    MR. ISAACSON:  I think if you see what he says

7     at the bottom of 131, lines 12 through 14, I think it's valid,

8     your Honor.

9                    THE WITNESS:  So I'm on 130?

10                   MR. ISAACSON:  Yes.

11                   THE COURT:  I'll allow the question.

12    BY MR. ISAACSON:

13    Q   All right.  So you'll see there on line 8 you were asked

14    the question about,

15                   "Let's assume that the engineer copied the

16            entire 50 lines of modified code from customer A's

17            environment and then gave it to customer B.  Would

18            that be a violation of the injunction?"

19                   But let me read it slowly.  I'll start over.

20                   On line 8 you were asked the question,

21                   "Let's assume that the engineer copied the

22            entire 50 lines of modified code from customer A's

23            environment and then gave it to customer B.  Would

24            that be a violation of the injunction?"

25                   And then there's some discussion, and then

1   there's a further follow-up question at line 24 on the next

2   page.

3                   "Let's assume that what the Rimini engineer

4           created was a derivative work.  Would that be a

5           violation -- would that be a violation of the

6           injunction?"

7                   Are you with me?

8   A   I'm sorry, now I'm on page 131?

9   Q   Yes.  You'll see -- you'll see continuing -- there's a

10  question that goes from 130 to 131 about a deriv -- about

11  "Let's assume that" --

12  A   I see that, yes.

13  Q   Right.  And then you answer, and -- read your answer, but

14  you conclude,

15                  "If that's the case, then the injunction says

16          it shall not prepare derivative works except for a

17          specific client."

18                  So it was your understanding in answering this

19  hypothetical question that the injunction said that Rimini

20  shall not prepare derivative works except for a specific

21  client, correct?

22  A   That's certainly what I said in my deposition.

23                  MR. ISAACSON:  Okay.  The -- if we can look at

24  DDX-568.

25

1  BY MR. ISAACSON:

2  Q   Now, you have there the environment as a whole is a

3  derivative work, right, and you say it's compliant with the

4  injunction.

5           So what you're saying here is you agree that when a

6  Rimini update is applied to a client's Oracle software

7  environment, the modified environment is a derivative work.

8  But you're giving the opinion that it complies -- that

9  derivative work complies with the injunction; is that correct?

10 A   That's correct.

11 Q   So when Rimini applied the 1099 update to Easter Seals

12 development environment, it created a derivative work,

13 correct?

14 A   Yes, that's correct.

15 Q   And when Rimini applies -- uses Apply Update to package

16 and apply this update to the QA environment, it creates a

17 derivative work, correct?

18 A   The QA environment will ultimately result in a derivative

19 work of PeopleSoft when it's running for QA purposes; that's

20 correct.

21 Q   All right.  And while you had given the opinion that this

22 derivative work complies with the injunction with respect to

23 violation 6 having to do with Easter Seals, you don't know

24 whether Easter Seals' license prohibits a third-party service

25 provider such as Rimini from creating a derivative work in a

1  client's environment.  You don't know that, do you?

2  A   It's true that I don't know what the license says, but I

3  do know that Rimini has contracted with Easter Seals and all

4  its clients to support their software.  So I don't know how

5  they would support the software without running it.

6  Q   Right.  But when you are giving the opinion that

7  something is compliant with the injunction, you are saying

8  that it's compliant with the license between the client and

9  Oracle, correct?

10       That's compliant with their PeopleSoft license, or

11  their JDE license, or whichever license is applicable.

12  A   I don't understand that the injunction includes license

13  information.

14  Q   Okay.  Thanks.

15       Now, it's your understanding that when multiple

16  Rimini clients require the same update, Rimini has a practice

17  of writing an update file that it distributes to all clients

18  that need it --

19            THE COURT REPORTER:  I'm sorry, Mr. Isaacson --

20            MR. ISAACSON:  No, I'm sorry.  Let me start

21  over.

22  BY MR. ISAACSON:

23  Q   When multiple Rimini clients require the same update,

24  it's your understanding that Rimini will write an update file

25  and distribute that to all clients that need the update; is

1  that right?

2  A   I think that's an overgeneralization of the update

3  process, that at a very high level it might be taken as how

4  the update process works, but given the situation that we have

5  here in this hearing, I think it's far too general for me to

6  agree with.

7  Q   All right.  Now, am I right that the SQR files that are

8  at issue in violation 6 from the 1099 update have #include

9  statements?

10  A   I believe that's correct.

11  Q   And those #include statements reference Oracle SQC

12  programs.

13  A   When you say reference, it's included in the #include.  I

14  wouldn't term that a reference.  I would term it -- say that

15  it says #include setenv.sqc.

16  Q   Well, the #include statement directs the program to

17  reference code contained in another file.  Do you agree with

18  that?

19  A   The #include statement does something when it is

20  executing in a client's environment.  It does absolutely

21  nothing on the Rimini system.

22  Q   But it does direct the program to reference code

23  contained in another file.

24  A   When it is run, that's correct.

25  Q   So the -- the -- and you have given the opinion that the

1    SQR programs at issue utilizing #include statements do

2    leverage existing Oracle code, correct?

3    A    When they are run in a PeopleSoft environment, they

4    necessarily leverage the PeopleSoft code because they are part

5    PeopleSoft.  Yes, I agree.

6    Q    All right.  And when they are run, they result in the

7    copying of Oracle code into the SQR file, correct?

8    A    No, I would not say that.  That's not how I construe

9    #include to work.

10   Q    Well, does the #include statement cut and paste code into

11   the translation unit that's past the compiler?

12   A    I would not use the phrase cut and paste.  There's no

13   cutting.

14        What the #include does is it directs the precompiler

15   and the compiler together to include the referenced file in

16   the #include as part of the code that will be compiled.

17        So it is reasonable to say that together they result

18   in an executable in which the executable code contains both

19   the Rimini-authored code and the Oracle-referenced file.

20   Q    Right.  If I can ask you now to look at your 2018

21   deposition on August 21st.  This will be at page 200, line 15,

22   continuing to page 201 at line 12.

23             MR. McCRACKEN:  Again, I object.  This is not

24   proper impeachment.

25             MR. ISAACSON:  I think it's proper at lines

1   201 -- page 201, lines 4 through 8, your Honor.

2                   THE COURT:  I'll allow the question.

3                   I would candidly state that I need to review

4   these more in retrospect than -- in reaching a ruling, and I

5   can do that.  But I'm going to allow the question because I

6   want to see the deposition proceed through.

7                   MR. ISAACSON:  All right.

8   BY MR. ISAACSON:

9   Q   And so you see there at line -- page 200, line 15, you're

10  discussing #include statements.

11  A   In the context of a C++ program in my textbook, that's

12  correct.

13  Q   All right.  And is it in that context that you would say

14  that there's literally cutting and pasting, but there's not

15  literally cutting and pasting in this situation?

16  A   Clearly I wrote at that time literally cut and paste.

17  Sitting here today, I would use different terminology.  But,

18  absolutely, I wrote cut and paste rather than copy into the

19  translation unit as you then go on to ask.

20  Q   All right.  So just so I understand it, that at that time

21  you agreed literally with the statement that the #include --

22  the #include command literally cuts and pastes copy code,

23  and -- but now, in discussing that here, you would put it a

24  different way.

25  A   I don't think the two phrases that I have used are

1   inconsistent with each other.  What I have stated is that

2   today I would explain it differently than the metaphor I had

3   used at the time.

4          In either case, the included file will ultimately

5   become part of the code that's executed.  So to the extent

6   that the included file and, in this case, the Rimini file are

7   together in an Oracle environment, that's absolutely true.

8          And, in this case, the metaphor is one that I would

9   rephrase today.

10          THE COURT:  All right.  The Court -- for the

11   benefit of the record, the Court rules that the question was

12   allowable and appropriate.

13          I also appreciate the grounds upon which it was

14   posed, but I'm of the view that it was proper impeachment.

15          MR. ISAACSON:  Okay.  I have no further

16   questions, your Honor.

17          THE COURT:  All right.

18          MR. ISAACSON:  Well, actually -- I sometimes say

19   this and I haven't conferred with my colleagues.  May I take a

20   minute to confer with my colleagues?

21          THE COURT:  Yes.

22             (Discussion held off the record.)

23   BY MR. ISAACSON:

24   Q   Just briefly, to go back to violation 10, SQC files are

25   Oracle PeopleSoft source code files.  Do we agree on that?

1    A    No.

2    Q    Okay.  The rsiqtrtx.sqr file from the HCM200105 update

3    has #include statements that reference Oracle SQC files; is

4    that correct?

5    A    I would have to look at the file, but that sounds

6    generally reasonable, yes.

7                    MR. ISAACSON:  All right.  On a note of general

8    reasonability, I have no further questions.

9                    THE COURT:  Redirect examination, Mr. McCracken?

10                   MR. McCRACKEN:  Thank you, your Honor.

11                   Good morning, Professor Astrachan.

12                   THE WITNESS:  Good morning.

13                        REDIRECT EXAMINATION

14   BY MR. McCRACKEN:

15   Q    You were some questions about -- well, questions that

16   assumed the difference between a convention and a constraint.

17   Do you recall that?

18   A    Yes.

19   Q    Is that a distinction that you draw in your analysis?

20   A    No.  I use convention as one of the things that I

21   would -- that is constrained and should be filtered out.

22   Q    Can you explain that to us.

23   A    As I understand it, there are many things that go into

24   filtering out or -- and by "filtering out," we'd filter out

25   constrained elements, and in my testimony I discussed syntax

1    of the programming language may dictate something that should

2    be filtered out, a required functionality would dictate

3    something that should be filtered out and is thus constrained.

4    So the constrained elements of a program are filtered out as

5    part of analytic dissection.

6              Convention is one of the areas that would lead to

7    constrained code filtered out as part of my analytic

8    dissection.

9              MR. MCCRACKEN:  Mr. Jay, can we pull up Oracle

10   Exhibit 175 and look at page 56, which was a page the

11   professor was asked about on cross-examination.

12   BY MR. MCCRACKEN:

13   Q    And, Professor, I think you were asked some questions

14   about a line 1900 in the Oracle file which says sequel -- I'm

15   sorry, "SQL ERROR PROCESSING."  Do you remember that?

16   A    Yes.

17   Q    Is this section of code performing error processing?

18   A    Yes, it is.

19   Q    In your opinion, is there anything creative about calling

20   the error -- I'm sorry, this section of the code dealing with

21   error processing sequel error processing?

22   A    No, that's not very creative.

23   Q    You were asked some questions about the #include

24   functionality, and just to make it clear on the record, can

25   you explain where the actions of the #include function take

1    place in Rimini's processes.

2    A    Yes.   A Rimini-authored file sitting on a Rimini system

3    cannot execute until it is in a client's environment because

4    it is designed to run in a PeopleSoft environment in the

5    situation we're discussing here.

6            When it is in the client's environment and it is

7    compiled and run, it is, as I just stated, in the client's

8    environment, so any #include is done as part of the client's

9    environment with all the other PeopleSoft code that's there.

10           The #include is just part of the PeopleSoft

11   environment ultimately as it's running.   It all happens in the

12   client environment.

13   Q    When the phrase #include is sitting in the Rimini SQR

14   file on Rimini systems, does it do anything at that point?

15   A    It's simply text.   It does nothing.   It cannot do

16   anything until it is executed in a client's environment.

17   Q    On Rimini's system, does it copy any Oracle code?

18   A    There is no Oracle code to copy.   It does not copy any

19   code.   Only when it's run in a client environment is the code

20   copied into what will be the executing PeopleSoft program.

21   Q    In your opinion, when the SQR file is sitting on Rimini's

22   system and contains the phrase #include, does that make it a

23   derivative work of Oracle software?

24   A    Absolutely not.   As I discussed in my direct testimony,

25   it's -- I can't understand how #include can lead to a

1    derivative work, so it does not.

2    Q    Stepping outside the context of this case into software

3    generally, how common are #include statements in software?

4    A    I mentioned this in my direct testimony that in fact I

5    can't -- I can't imagine a C or C++ program running that would

6    not have a #include statement.  It might be possible, but I

7    don't see it.

8              Every C or C++ program essentially has a #include

9    statement that would result in, when it's compiled and run,

10   doing the same thing that we discussed here.

11   Q    So what would happen if merely referencing a file via

12   #include caused something to be a derivative work?

13   A    As -- in my view, it would make every C or C++, or other

14   languages that use #include, derivative works of the operating

15   system in which they run.

16              MR. McCRACKEN:  Thank you, Professor.  No more

17   questions.

18              THE COURT:  Any further cross-examination?

19              MR. ISAACSON:  No, your Honor.

20              THE COURT:  All right.

21              Professor, that will complete your testimony.

22   Thank you.

23              THE WITNESS:  Thank you.

24              MS. SAMPLIN:  Your Honor, Rimini calls as its

25   next witness Craig MacKereth.

```
1              THE COURT:  All right.

2              MS. SAMPLIN:  But I was wondering if we should

3  take our morning break before we start.

4              THE COURT:  Yeah, let's do.  Obviously his

5  testimony will take some time.

6              So we'll take our morning break at this time.

7  We'll reconvene between 10:30 and 10:35 depending on

8  everyone's availability.

9                    (A recess was taken.)

10             THE COURT:  Have a seat, please.

11             The record will show that we're reconvened

12 following our morning break.

13             You're welcome to go forward on behalf of Rimini

14 with your next witness, please.

15             MS. SAMPLIN:  Thank you, your Honor.  We call

16 Craig MacKereth to the stand, please.

17                    CRAIG MACKERETH,
         called as a witness on behalf of the Defendant,
18             was sworn and testified as follows:

19             THE CLERK:  Please state your name for the

20 record.

21             THE WITNESS:  Craig MacKereth,

22 M-a-c-K-e-r-e-t-h.

23             THE CLERK:  Thank you.

24             MS. SAMPLIN:  Good morning, Mr. MacKereth.

25             THE WITNESS:  Good morning.
```

1                      DIRECT EXAMINATION

2   BY MS. SAMPLIN:

3   Q    Where do you work?

4   A    I work at Rimini Street in Dallas, Texas.

5   Q    How long have you worked at Rimini Street?

6   A    For nine years.

7   Q    Can you please briefly tell the Court about the jobs you

8   had before joining the Rimini Street about nine years ago.

9   A    Immediately prior to joining Rimini Street I was

10  consulting in the San Francisco Bay Area, but prior to that my

11  entire career has been spent in the support of Enterprise

12  applications.

13          I was responsible for corporate systems at Visa.  I

14  deployed to more than 150 countries, and proud of that, in the

15  aerospace and defense sector for BAE systems.  There, I was

16  responsible -- I was working in the UK and Australia, and

17  there I had responsibility for Enterprise applications as

18  well.

19  Q    What roles have you had at Rimini over the course of your

20  nine years with the company?

21  A    When I first joined Rimini Street, I was the

22  Vice-President for Oracle E-Business Suite and Oracle

23  Technology Support, and then after about a year, I then took

24  over responsibility for the SAP support as well.

25          And in the years following that, I've gradually

1  taken over more and more product lines, including JD Edwards,

2  PeopleSoft, Siebold.

3        And we have expanded the company in the time that I

4  have been employed.  We've added more product lines from

5  SalesForce, IBM, Oracle Communications, Oracle Agile, and

6  several others.

7  Q    What is your job title today?

8  A    I'm the Senior Vice-President for Global Support.

9  Q    And generally what are your responsibilities as Senior

10  Vice-President of Global Support?

11  A    I'm accountable for the support services that we provide

12  to all of our clients around the world.  We provide a 24-by-7

13  support service.

14        If clients need help with any of their Enterprise

15  applications, we are their first point of call, and I'm

16  responsible for about 25 different product lines around the

17  world.

18  Q    How many people do you manage?

19  A    Around 800.

20  Q    And about how many employees does Rimini have total?

21  A    Around 1500.

22  Q    In how many countries are Rimini employees providing

23  support?

24  A    Currently I have engineers located in 17 countries around

25  the world.

1    Q    And in how many countries are Rimini clients operating

2    their software?

3    A    Far more than that.  Depends on the day, between 100,

4    maybe 150, a lot of countries.

5    Q    Can you give us a rough sense of how many software

6    updates Rimini delivers to clients per year?

7    A    More than 10,000.

8    Q    In your capacity as Senior Vice-President of Global

9    Support, are you familiar with the services Rimini Street

10   offers for JD Edwards software?

11   A    Yes, I am.

12   Q    Are you familiar with Global Support Services?

13   A    Yes, I am.

14   Q    What is Global Support?

15   A    So Rimini Street customers that are using JD Edwards

16   software need support if they run into an issue with their

17   operation of the system.  That can be something very simple,

18   they're getting an error, or it can be something more

19   complicated.

20           They reach out to the Rimini Street Global Support

21   team.  We provide a very fast response time, a guaranteed

22   ten-minute response for priority line critical issue, for

23   example, and, we connect them directly with an experienced

24   engineer.

25           All of the engineers in my JD Edwards support team

1  have ten or more years of experience, and we then solve

2  whatever issue it is that they have brought to us.

3  Q    Does Rimini also provide updates for JD Edwards?

4  A    Yes, we do.

5  Q    Is that a separate service from Global Support?

6  A    It's a separate service.

7  Q    What kind updates does Rimini provide for JD Edwards

8  software?

9  A    JD Edwards clients need to maintain compliance with the

10  changing rules and regulations in the countries in which they

11  operate.

12       This, for example, could be a changed tax report, it

13  could be changed tax amounts, a VAT value, for example.

14       In order to continue to operate the software, and

15  this is software that was released decades ago, they need to

16  keep up with the latest changes.

17       So Rimini Street reduces update so that those new

18  changes are reflected in the functionality of the software,

19  and that can be something small, like a -- you know, the US

20  federal government changes the 1099 for example.

21       Or it could be major.  Say, for example, the Indian

22  government just we went through and changed their taxation

23  policy.  It was one of the largest changes they've ever made,

24  and we need to provide that functionality to clients.

25  Q    Are these known as tax and regulatory updates?

1    A    They are.

2    Q    And how does Rimini know when a JD Edwards client needs a

3    tax and regulatory update?

4    A    So we monitor the governments that I mentioned before all

5    around the world to see what sort of changes are coming and

6    what changes will be effective.

7           When we're doing that monitoring, it's on a product

8    agnostic basis, meaning that one change that impacts one

9    country could affect our clients running SAP, JD Edwards,

10   Oracle E-Business Suite, and other products.

11          So they monitor those changes and then identify when

12   they would become effective.

13   Q    And then for how many JD Edwards' clients will Rimini

14   perform that update?

15   A    That depends on the country and the nature of the change.

16          So it could be a country where we only have a few

17   clients, in which case a few clients would benefit from that

18   change, or it could be a change, again, for example here in

19   the US where it could be needed by, you know, 50 or more

20   clients.

21   Q    Is there a specific group at Rimini that provides those

22   JD Edwards tax and regulatory updates?

23   A    There is.

24   Q    What is that group?

25   A    The Global Product Delivery Team.

1    Q    Is there a specific unit within the Global Product

2    Delivery Team that's responsible for JD Edwards?

3    A    So they work as a team, so there's country research

4    specialists and business analysts who are not as focused just

5    on the one product.

6            But specifically in the JD Edwards area there is a

7    team that focuses exclusively on JD Edwards updates, yes.

8    Q    How many people are on that team?

9    A    There's only two people on that team.

10   Q    What is that team of two?  What is their process for

11   developing an update at a high level?

12   A    So when the country research specialists identify that a

13   regulatory change is required, they provide their insight in

14   terms of what changes have happened in that country, what's

15   going to be coming through.

16           Business analysts then take that information further

17   and analyze what sort of functionality could be required.

18           With that information, the JD Edwards team that I

19   mentioned take that research, and then they work to create a

20   technical specification, which is the design of how they will

21   solve this problem in JD Edwards.

22           And, again, this would be from something very

23   simple, we change this value to this value, or a lot more

24   complicated with a lot more rich functionality that the system

25   didn't originally have.

1    Q   What is that team's process if multiple clients need the

2    same update?

3    A   If multiple clients require the same update, then they

4    have to develop that update separately because every client

5    has separate -- well, every client can have a separate setup

6    in their system.

7            So they'll connect to the first client, they'll do

8    work in that client's environment just for that one client.

9    They'll develop the solution for that client working on that

10   client's system.

11           When they're finished working on that system, or

12   when the next client becomes available to start work, they

13   start working on -- let's say that first client was client A,

14   then they'll start working on that second client, let's call

15   them client B.

16           They'll start building out the functionality for

17   that client's -- working in that client's specific environment

18   for that particular solution.

19   Q   Now, you mentioned a bit ago a technical specification.

20   Can you tell the Court what a technical specification is.

21   A   So a technical specification is an internal Rimini Street

22   document used by the tax and regulatory team, and it can be

23   interpreted by a skilled JD Edwards expert in the GPD team to

24   show them the design, how we intend to provide certain

25   functionality.

1        It needs to be interpreted by that specialist so

2   that they can then produce a consistent result for the client

3   that is consistent with whatever government changes have come

4   through.

5   Q   What information is in the technical specification?

6   A   So the technical specification contains the design of the

7   solution.  It takes the information from the country research

8   team and then turns it into something that makes sense for JD

9   Edwards that will be used by our clients in the future.

10  Q   Does a technical specification ever contain code?

11  A   A technical specification can contain code, yes.

12  Q   And what kind of code would the technical specification

13  contain?

14  A   The technical specification can contain Rimini Street

15  created code which will, again, be used by those who are

16  creating the solution in the specific client environment to

17  show them what they need to do to achieve that functionality.

18  Q   Under Rimini's policies, is it acceptable for a Rimini

19  engineer to copy blocks of code written by a vendor into a

20  technical specification?

21  A   It is not acceptable for that to happen under Rimini

22  Street policy.

23  Q   Can a technical specification refer to content in an

24  Oracle file?

25  A   Yes, it can.

1    Q    And can you explain to the Court more what you mean about

2    that.

3    A    So when a Rimini Street JD Edwards specialist is

4    modifying a client's environment, sometimes they need to know

5    where in the existing code they should modify.  So they can

6    use a pointer to indicate, you know, when you're adding this

7    functionality start in this section and end in this section.

8            And this is important because it provides

9    consistency.  If the JD Edwards' team member created it

10   completely differently every time, then my support team would

11   have a harder time supporting that code because it would be

12   vastly different each and every time.

13   Q    Can these pointers or snippets, can they be run on their

14   own?

15   A    They cannot be run on their own.  The pointers that I'm

16   referring to are a description, I would describe it as a label

17   so that you know where to look in a file, but on their own

18   they're useless.  They can't be -- they are not code that can

19   be executed.

20   Q    In these situations where Rimini is creating an update

21   for multiple clients, is the update exactly the same for each

22   client?

23   A    When Rimini Street is creating updates for multiple

24   clients, the updates won't necessarily be the same because

25   this is an area of the software that the client themselves may

1    have modified, or the system's integrator who has done the

2    implementation may have modified.

3              It's one of the reasons why the team will use

4    pointers as opposed to line numbers because if a client has

5    modified that file before, then there could be, you know, 10,

6    50, 100 lines before the section in comparisons with some

7    other client.  So, you know, they can vary quite a bit from

8    client to client.

9    Q    Now, does the tax and regulatory team test JD Edwards

10   updates?

11   A    Yes, they do.

12   Q    How does the team test JD Edwards updates?

13   A    So a person who is not the person who did the original

14   development will connect to that environment.  They'll step

15   through a series of steps, we would call that following a test

16   script, to check to see if the results that they're expecting

17   are produced from the software.

18   Q    Does Rimini complete testing for each client who receives

19   a JD Edwards update?

20   A    Rimini Street will complete testing in one particular

21   client's environment for that one particular client.  They

22   will do that for each and every client that has received that

23   particular tax and regulatory update.

24   Q    In the process of providing tax and regulatory updates to

25   clients, does Rimini modify any code in the JD Edwards

1   software?

2   A    Yes.

3   Q    And what code is Rimini modifying in that process?

4   A    So in the architecture of JD Edwards and many other

5   Enterprise systems, there is code, which is open code which is

6   able to be modified, and there is code, which is closed code

7   which is less easy to modify.

8           The open code is the area where the Rimini Street

9   team is providing changes as necessary for the clients.

10  Q    Are tools used to modify that open code?

11  A    For JD Edwards there are tools used to modify that code.

12  Q    Who provides those tools used to modify the open code?

13  A    The tools are provided by Oracle to the licensee of their

14  product.

15  Q    And when does Oracle provide those tools to the licensee?

16  A    At the time that the product is shipped.

17  Q    So the product comes shipped with tools from Oracle; is

18  that right?

19  A    Yes, correct.  The product comes bundled with tools to

20  make the modifications to this open code.

21  Q    So we've talked about tax and regulatory updates.  What

22  about local support, does Rimini provide -- does Rimini modify

23  code in the process of providing global support for JD Edwards

24  software clients?

25  A    From time to time we do modify the code that is shipped

1   with the product to provide support to our clients, yes.

2   Q    And what code would Rimini be providing to provide global

3   support services to its JD Edwards clients?

4   A    So Rimini Street scope is not only the product itself but

5   also the custom code.  So we provide support for all of the

6   open code areas of the architecture.

7           This includes code that Oracle had produced

8   originally, and also we provide support for the customized

9   code.  So if the client has modified that code themselves, or

10  a systems integrator has modified the code either when they're

11  implementing the product or when they were tailoring it for

12  their own business needs, we provide support for that code,

13  and that can sometimes include modifying the code.

14  Q    And what type of code would the system integrators you

15  referred to in your answer just now, what kind of code would

16  they have been modifying?

17  A    Systems integrators would be modifying the open code.

18  Q    And that's the open code for JD Edwards software,

19  correct?

20  A    It's the open code for JD Edwards software.  It can be

21  modified by systems integrators.  That is a common business

22  practice to make such modifications.

23  Q    Do you always need to modify open code in responding to

24  support cases for JD Edwards software?

25  A    We do not always need to modify open code when addressing

1    issues that clients have raised for JD Edwards software.

2              We will often get questions that are functional

3    questions, how do I do this, how could I do this.

4              Sometimes the solutions that we come up with are a

5    parameter change or a configuration or training the clients

6    how to use the software appropriately.

7              But on occasion we will include modification of code

8    as part of the solution.

9    Q    Now, even when you don't modify the code, do you need to

10   look at the open code in order to provide support to these JD

11   Edwards customers?

12   A    So we train all of our engineers to follow an approach

13   called genuine debug.  By that I mean we are looking to find

14   the root cause of the problem.

15             To find the root cause of the problem you often have

16   to look at the entire system to understand what is going on.

17   You need to follow the logic to understand why the system is

18   behaving a certain way.

19             And, as a result, then we will sometimes review the

20   open code, even if when we provide the solution to the client

21   we don't actually have to modify that code and it can stay as

22   it is.  But reviewing that is a common thing that could occur.

23   Q    And would the review of the code create a copy of the

24   open code?

25   A    Because of the way that the JD Edwards system is

1    configured, simply using the tool to view the code can result

2    in a copy of the code.

3    Q    And those tools you mentioned that would be used to view

4    the open code, are those the tools you told us were shipped by

5    Oracle?

6    A    That is correct, they are the tools that are shipped by

7    Oracle.

8    Q    Can you please provide the Court with some examples of

9    why a JD Edwards client might need its open code modified.

10   A    Of course.  JD Edwards is a very popular piece of

11   software and it's been used by many different industries.

12            You can use the same piece of software to

13   manufacture, help you with the manufacturing of aircraft

14   components, or you can use the same piece of software in the

15   manufacture of pharmaceuticals.

16            As a result then the system -- one of the reasons --

17   in my view, one of the reasons that it is so popular is

18   because of its flexibility that I'm describing.

19            You can modify JD Edwards in many areas.  Examples

20   would be sales invoices you could change, or it could be in

21   the workflow of a procurement configuration.

22            There's many areas that a client might choose to

23   tailor and customize to their own business, and when they

24   purchase this software, they do so knowing that they can

25   continue to modify it in the future if and when their business

1    evolves.

2    Q    And you touched on this, but in your view how is

3    this ability of the software to be modified, how has that

4    contributed to the longevity of the JD Edwards product?

5    A    So as I sit here in 2021 testifying about software that's

6    been in successful operation for 20 or 30 years, the success,

7    I think, speaks for itself.

8              It's a fantastic piece of software.  It allows

9    you -- the architecture allows you to evolve this software for

10   your changing business needs.  I believe it's one of the

11   reasons why it has stood the test of time.

12             And this is, again, common if you look at the most

13   popular ERP software packages today.  SAP has the lead.  It is

14   also architected, you know, with a similar structure.

15             Oracle's E-Business Suite is configured with a

16   similar structure where there's open code you can modify and

17   then this closed code which you should not be modifying.

18             So I think that is one of the reasons why it's been

19   so successful.

20   Q    So let's talk more about the closed code component.  What

21   is closed code?

22   A    So when I refer to closed code, I'm talking about code

23   that is also shipped from Oracle to the customer, but that

24   code is compiled or obfuscated in a way that it's not easily

25   able to be reviewed or modified.  So we would refer to that

1  code as closed code.

2  Q    Would it be technically possible for a Rimini engineer to

3  access the closed code?

4  A    Yes.

5  Q    And how would that be done?

6  A    So we have remote connectivity to our client

7  environments.  A Rimini Street engineer could connect to that

8  environment, decompile the -- compile the closed code and

9  therefore reveal the JD Edwards software source code.

10  Q    Do Rimini employees try to access that layer of code, so

11  the close code, in performing their work for JD Edwards

12  clients?

13  A    Rimini Street engineers do not try to access that code.

14  Q    Are Rimini Street employees allowed to access the closed

15  code in performing their work for JD Edwards clients?

16  A    To access or modify the closed code is forbidden by

17  policy.

18  Q    And is there a specific policy document at Rimini that

19  forbids that access or decompiling of the closed code?

20  A    Specifically, this is forbidden in our Acceptable Usage

21  Policy.

22  Q    What is the Acceptable Usage Policy?

23  A    The Acceptable Usage Policy is a document that governs a

24  lot of the ways that we conduct our business at Rimini Street.

25  It is designed to cover a range of different topics.

1    Specifically, it talks about the use of third-party

2    intellectual property and client confidential data and the

3    importance of protecting that information, and that is

4    documented in the Acceptable Usage Policy which is commonly

5    referred to as the AUP.

6    Q    Who has access to the AUP?

7    A    All employees and contractors of Rimini Street have

8    access to the AUP.

9    Q    Let's take a look, please, at Exhibit DTX Exhibit 25,

10   which is preadmitted.

11   A    Okay.

12   Q    Is this the Acceptable Use Policy?

13   A    Yes, it is.

14   Q    And, also, Mr. MacKereth, this is tab 1 in your binder

15   but we'll also be showing it on the screen.

16        You mention decompilation, does the AUP discuss

17   decompilation?

18   A    Yes, the Acceptable Usage Policy does discuss

19   decompilation.

20   Q    Okay.  If we can please take a look at 10.8 in the

21   Acceptable Use Policy.  Can you please read for the Court

22   sentence 10.8?

23   A    I will.

24        Section 10.8 of our Acceptable Usage Policy states,

25           "Decompiling, Disassembling, and Reverse

1    Engineering.  You may not decompile, disassemble, or

2    reverse engineer any software and material without

3    prior permission from the Rimini Street Legal

4    Department.  The terms 'decompile,' 'disassemble,'

5    and 'reverse engineer' are viewed as legal terms, and

6    any interpretation or question about the meaning of

7    these terms in the course of your employment should

8    be discussed with the Rimini Street Legal

9    Department."

10   Q    What is the meaning of that text you just read from the

11   AUP?

12   A    The meaning of this text I feel is very clear, that our

13   Rimini Street engineers shall not reverse engineer or

14   decompile any software or material in the course of their

15   employment.

16   Q    If Rimini could not modify the open code in JD Edwards

17   software, could it provide global support to its JD Edwards

18   clients?

19   A    Could you repeat the question again?  Sorry.

20   Q    Yes.  If Rimini could not modify the open code in JD

21   Edwards, could it provide global support to its JD Edwards

22   clients?

23   A    In my view, Rimini Street could not provide support to

24   our JD Edwards clients if we were unable to modify the open

25   code that I've been describing in my testimony today.

1    Q    And why do you say that?

2    A    It would not be viable to provide support to clients

3    without also being able to provide support and modification of

4    that open code.

5            One of the reasons that Rimini Street clients look

6    for assistance is that they need skills in JD Edwards to be

7    able to provide support, and if Rimini Street was able to have

8    the skill but we couldn't do the work, then Rimini Street

9    clients would not stay with us and new clients would not join

10   us.

11   Q    And what about tax and regulatory updates, if Rimini

12   could not modify the open code in JD Edwards, could it provide

13   tax and regulatory updates to its JD Edwards clients?

14   A    Rimini Street could not provide ongoing tax and

15   regulatory services to our clients without the ability to

16   modify open code, and our clients would be forced to go and

17   work with a systems integrator or local JD Edwards developer

18   to perform that work for them instead.  So it would not be a

19   viable business model to provide this service without the

20   ability to modify open code in my view.

21   Q    Has Rimini ever considered a business model that would

22   not involve modifying the open code?

23   A    Yes, we have.

24   Q    And can you describe that model.

25   A    So for a period of time after the injunction was

1    originally issued, we took a step back and considered a model

2    where engineers would not have their hands on keyboard,

3    wouldn't use remote connectivity anymore to connect to

4    JD Edwards clients, JD Edwards systems, and that was the model

5    that we were considering.

6    Q    What was that model called?

7    A    Sometimes you'll hear it referred to as over-the-shoulder

8    support, or I might simply say not using our remote access.

9    Q    And when, again, did Rimini consider using that

10   over-the-shoulder model?

11   A    So for a period of months after the injunction was first

12   issued this was considered by the -- by my team, the

13   engineering team within the company.

14   Q    When Rimini was considering this over-the-shoulder model,

15   was the idea that engineers would go physically to clients'

16   buildings to stand behind them and instruct them?

17   A    That was never a consideration that we would physically

18   go to a client's building.  I've not heard of that suggestion

19   at that time.

20   Q    If you had known that Oracle's contention was that Rimini

21   had to have its engineers physically present, looking over the

22   shoulder of its clients to provide support, would that have

23   impacted your assessment of the over-the-shoulder model?

24   A    That would have impacted my assessment of the

25   over-the-shoulder model.  Our engineers are geographically

1    distributed, but in order to be physically in whichever

2    country the client's engineers are to provide that service

3    would have meant that our engineers would be constantly

4    traveling.

5           There would be long delays for quite simple issues

6    to be addressed.  I couldn't imagine a scenario where, you

7    know, they would be constantly traveling to provide those

8    services.

9    Q    Why did Rimini consider an over-the-shoulder model at

10   around the time the injunction came out?

11   A    So back in the time when the injunction came out, there

12   was a lot of confusion at that time, you know, a lot of

13   discussions going on, many with counsel so I obviously can't

14   comment on those, but from a business standpoint we took the

15   approach take a step back.

16          We wanted to comply with the injunction, of course.

17   It's very important to comply with the injunction, and we took

18   a step back.  During that time we chose not to put hands on

19   keyboard and to evaluate some -- that model using no remote

20   access.

21   Q    What was your reaction to the concept that the injunction

22   could possibly be read to require Rimini not to modify open

23   code?

24   A    I remember when I first heard that that was the way that

25   some people could be thinking that the language was written,

1    and I was incredulous that that would be a limitation.

2            I -- I've been in this industry for my entire

3    career.  I couldn't imagine a scenario where Rimini Street was

4    limited from making modifications that the entire industry is

5    built on.

6            This capability to modify the open code that I've

7    been describing today is something that every one of my

8    engineers has been operating in that landscape for their

9    entire career as well, and I just -- I was incredulous.

10           I just could not believe that that could be an

11   imposition, so I was certain that that was the wrong way of

12   looking at the language in the injunction.

13   Q   And just to be clear, this over-the-shoulder model that

14   we're talking about, was this one that Rimini considered when

15   the injunction came out in 2016?

16   A   That is correct as for the timeline.  It was in 2016 when

17   the injunction was first issued, we considered

18   over-the-shoulder at that time.

19   Q   Did Rimini implement the over-the-shoulder model in 2016?

20   A   For a period of time we did use a method without remote

21   access, or over the shoulder.  We discussed it with some of

22   our clients.

23           Remember that when the injunction was issued, we had

24   open cases in flight that we were working on.  We had tax and

25   regulatory updates that were due, and so work had to continue.

1          So we took a step back.  We asked some of our

2    engineers to not connect to client environments in that

3    timeframe, and discussed it with some of our clients.

4    Q    And did Rimini ultimately decide to use and implement the

5    over-the-shoulder model?

6    A    We did not choose to implement it, no.

7    Q    Why not?

8    A    We decided that the over-the-shoulder model was not at

9    all something that clients would accept.

10          If you -- you know, we talk about open code and

11    closed code, I feel it's sometimes easier to think of this as

12    an analogy.

13          If you had a classic car, like a JD Edwards piece of

14    classic software, if you had a classic car and you needed to

15    get an oil change on that classic car.  So you went down to

16    the local garage, you looked around, the engineers or

17    mechanics there seem pretty experienced, they seemed to know

18    what they were doing.

19          And you say, "Hey, I just need an oil change in my

20    car, please."  And you sat down, ready to read one of those

21    magazines in the foyer but, instead, they call you up and they

22    say, "You need to come to the back here.  You're going to do

23    this oil change yourself in the car, and you're going to be

24    under the car doing what you do, and if you've got any

25    questions, you just call out to us and we'll help you, but we

1   won't do anything."

2          But that would be what it would be like, and clients

3   just wouldn't accept that as any sort of a reasonable business

4   model.

5          I was convinced after spending a quality time with

6   the injunction that the only possible -- only possible thing

7   this could mean would be that it's saying, "You can continue

8   to operate with modifying the open code, but we're making it

9   very clear that the closed code here is Oracle's material, you

10  cannot modify that, Rimini Street, and do not make

11  modifications to this area of the code."

12         And therefore that's the approach that we chose.

13  Q   Let's take a look, please, at DTX Exhibit 20.  This is

14  tab 2 in your binder.  This is a preadmitted exhibit.  It's a

15  November 10th, 2018 e-mail from Ray Grigsby to various Rimini

16  employees.

17  A   I see that.

18  Q   And are you familiar with this e-mail?

19  A   Yes, I am.

20  Q   How did you become familiar with this e-mail?

21  A   Ray Grigsby, the author of the e-mail, as the

22  Vice-President of Global Support for JD Edwards, reports to

23  me, and I saw the draft of this communication before it went

24  to our team.

25  Q   What was the purpose of this e-mail?

1143

1     A    So when the injunction is issued, we communicate, of

2     course, to all employees, but there were some teams who we

3     would want to give some specific guidance to.

4              This is an example of that sort of specific

5     communication that was directed here to members of the JD

6     Edwards team to show them how the injunction applies to their

7     particular part of Rimini Street's operation.

8     Q    And if you can take a look at the bottom of the e-mail,

9     please, this "as you know" paragraph.  What is the instruction

10    here to the business with respect to open code?

11    A    So this section of the document is the last paragraph on

12    the first page, and it says,

13              "As you know, JDE has multiple layers of open

14        code that are designed and intended to be accessed,

15        customized, and maintained by licensees or their

16        agents for purposes of supporting the software and

17        maintaining its functionality.  JDE also has"

18        functional "code, which is closed.  Consistent with

19        the injunction and existing practices, therefore, no

20        one is permitted to copy or access any closed JDE

21        code for development and testing of software

22        updates."

23    Q    And I think you said "JDE has functional code," but you

24    meant "JDE has foundational code," right?

25    A    Sorry.  Right.  JDE has foundational code is what we

1144

1   would say here.

2   Q    And that is the closed code, correct?

3   A    That is referring to the closed code, yes.

4   Q    Are the portions of this e-mail that you just read aloud

5   consistent with Rimini's practices today?

6   A    Yes, they are.

7   Q    And what is your view of that position?

8   A    In my view, this is the logical position that makes sense

9   for anyone who has been working in the software industry in

10  the Enterprise system space.

11           That code that is shipped with the products, shipped

12  with the tools to modify that code and commonly has been

13  modified over time, can be modified.

14           But that the code which is closed code, which Oracle

15  chooses not to ship in a way that is easily modified, shall

16  remain out of scope for modification for Rimini Street.

17           And I believe the injunction is clarifying that

18  position.  We want to follow the injunction, and we have done

19  so consistent with this communication.

20  Q    And so is it your belief that this position with respect

21  to open and closed code is consistent with the injunction?

22  A    It is my belief that we are consistent with the junction

23  with respect to open and closed code as described here.

24  Q    And how, if at all, does Rimini's position develop in

25  response to the injunction language?  How, if at all, does it

1    differ from how other companies in the market approach JDE's

2    software?

3                   MS. PHILLIPS:  Objection.  Foundation.  His

4    knowledge about other companies.

5                   THE COURT:  Sustained.

6    BY MS. SAMPLIN:

7    Q    In any of your prior roles, have you had a position where

8    your teams needed to modify open code for Oracle?

9    A    Yes, I have.

10   Q    And why would you need to modify open code?

11   A    So I was working in a few different industries, in the

12   aerospace and defense sector and in the financial services

13   industry.  From time to time, we needed to make modifications

14   to open code for additional functionality.

15            We needed, as a business, to interface to different

16   systems, to change the way that the system worked by default

17   so that we can have it working for our particular industry.

18   Q    In your employment at Rimini Street, have any of your

19   teams come across JD Edwards code created by companies other

20   than Oracle?

21   A    Yes.

22   Q    And have these companies other than Oracle, have they

23   modified any of the open code?

24   A    So companies other than Oracle who are supporting our

25   clients, and we would call them AMS providers, have made

1   modifications to the open code that I have described before as

2   were requested by the licensees of the software, yes.

3   Q   So I'll ask again, how, if at all, does the Rimini

4   position with respect to open end code differ from how other

5   companies in the market, based on your experience, have

6   approached JDE software?

7              MS. PHILLIPS:  Objection, your Honor.  It's

8   hearsay.  She's asking him to testify about what other clients

9   have said.

10              THE COURT:  Sustained.

11              MS. SAMPLIN:  Okay.  Your Honor, I was asking

12  about the position that the companies have taken, not what

13  they have said, but what he's seen based on the course of his

14  work for Rimini Street and for Rimini Street, since he just

15  testified that he's seen that other companies are modifying

16  the open code.

17              THE COURT:  Your response?

18              MS. PHILLIPS:  I -- I have another objection

19  which is to foundation because I don't believe this is with

20  regard to JDE in particular.

21              MS. SAMPLIN:  I think my question was in your

22  employment at Rimini Street have any of your teams come across

23  JD Edwards code created by companies other than Oracle.

24              MS. PHILLIPS:  Yeah, your Honor, I renew my

25  objection on the basis of hearsay.

1              THE COURT:  Well, that particular question that

2    was just repeated was not objectionable.  It's the question

3    that followed that I think that we're focused upon.

4              MS. SAMPLIN:  Okay.  I can move on and rephrase.

5              THE COURT:  All right.

6    BY MS. SAMPLIN:

7    Q   Can you give us some examples of companies out in the

8    market who modify JDE software open code?

9              MS. PHILLIPS:  Objection, foundation.

10             THE COURT:  Sustained.

11   BY MS. SAMPLIN:

12   Q   In the course of your work at Rimini Street, I believe

13   you just said you have seen JD Edwards code created by

14   companies other than Oracle; is that correct?

15   A   That is correct.

16             MS. PHILLIPS:  Objection.  Hearsay.

17             THE COURT:  I don't think it's hearsay, but I do

18   think there's a foundation issue here.

19             MS. SAMPLIN:  Okay.  I'm asking though the

20   question to establish foundation, which is if, in his

21   employment at Rimini Street, his -- he and his team have come

22   across any JD Edwards code created by companies other than

23   Oracle.

24             MS. PHILLIPS:  Your Honor, any testimony about

25   what his team has experienced would be hearsay.

1        THE COURT:  Sustained.

2    BY MS. SAMPLIN:

3    Q    Would a support model where Rimini does not modify open

4    code be a viable business model for JDE software?

5    A    It would not be a viable business for supporting JDE

6    software in my view.

7    Q    And why do you say that?

8    A    Modification of the JD Edwards open code is common in the

9    industry.  It's something that the clients themselves modify.

10   It's something that clients engage third parties to provide

11   level two administrative services and they modify.

12            And it's a section that clients would engage systems

13   integrators to modify and adapt the system during an

14   implementation or interface or other project.

15            And for Rimini Street to offer a support model where

16   we could not modify that open code would not be acceptable to

17   clients.  They could simply go to one of the AMS providers or

18   systems integrators and ask them to do that same work so why

19   would they come to Rimini Street if Rimini Street is

20   exclusively prohibited from making modifications which other

21   companies are able to make.

22   Q    Can you give us some examples of the system integrators

23   you're referring to?

24   A    When I refer to systems integrators, I'm talking about

25   companies in the market who offer services to install or

1   modify or customize Oracle Enterprise software, including JD

2   Edwards.

3           Examples here in the US would be Accentia or

4   Deloitte.  In other countries there's been a lot of popular

5   companies in India like Wipro or Infosys or Tech Mahindra.

6   They're all systems integrators that I'm referring to here.

7   Q   So you mentioned -- we talked about whether a support

8   model where Rimini does not modify open code, whether it could

9   be viable.

10          My next question is would a support model where

11  Rimini does not copy open code be a viable business model for

12  JDE software?

13  A   Because of the way that the tools work, unfortunately a

14  copy is created even when you're viewing the code.  A copy's

15  also made when you need to modify the code.

16          So, therefore, for the same reason as I stated

17  earlier, I don't think that a support model where you are

18  prohibited from copying the open code is a viable model or

19  would be acceptable to clients.

20  Q   And those tools you just referred to, are those the

21  Oracle tools shipped with the software that you discussed

22  earlier?

23  A   That is correct.

24  Q   Let's take a look at tab 12 in the binder, which is the

25  injunction that was entered, and I'd specifically like to

1    direct your attention to page 3 which is the section on JD

2    Edwards.

3    A    Yes.

4    Q    Have you seen this document before the injunction?

5    A    Yes, I have.

6    Q    Okay.  Please take a look at paragraph 8 of the

7    injunction which is now on the screen.  It reads:

8              "Rimini Street shall not copy" -- and then

9         "access" was struck -- so "Rimini Street shall not

10        copy JD Edwards software source code to carry out

11        development and testing of software updates."

12             Do you see that language?

13   A    Yes, I do.

14   Q    Could Rimini Street develop and test software updates

15   without copying JD Edwards open code?

16   A    Rimini Street could not provide the updates that we need

17   to provide, not all of them anyway, by modifying -- without

18   modifying the open code that I'm referring to.

19   Q    And could Rimini Street develop and test software updates

20   without copying the JD Edwards open code?

21   A    Rimini Street could not provide all the tax and

22   regulatory updates that we need to provide without copying

23   open code in JD Edwards.

24   Q    And why not?

25   A    Because the modification to extend the functionality the

1    clients must have to comply with the local legislation

2    requires modification of the open code if there's that sort of

3    functionality, and, as a result, we could not offer to our

4    clients that we would develop any functionality they needed to

5    maintain compliance with the local government jurisdiction in

6    which they operate.

7    Q    Is there any code that a Rimini engineer would not need

8    to copy in order to carry out development and testing of

9    software updates for JD Edwards?

10   A    There is.

11   Q    And what is that?

12   A    That is the closed code that I'm referring to.

13   Q    Could we please take a look at Oracle Exhibit 69.  This

14   is tab 3 in the binder, and it was previously admitted.

15            This is a November 30th, 2016 e-mail from Gerard Roy

16   about Libbey Glass, and I'm specifically looking at the bottom

17   e-mail which is a November 30th, 2016 e-mail from Gerard Roy

18   to Ray Grigsby.  Do you see that?

19   A    Yes, I do.

20   Q    Who is Gerard Roy?

21   A    Gerard Roy, or Gerry Roy, is one of the support engineers

22   for JD Edwards.  He's on my team.

23   Q    And who is Ray Grigsby?

24   A    Ray Grigsby is the Vice-President for Global JD Edwards

25   Support, and he is one of my direct reports.

1   Q   In this e-mail Gerry Roy is commenting about Libbey's

2   cases for 2016.  He writes, "There were 155 cases opened in

3   2016."  Do you know what that means?

4   A   Yes.  So Gerry must be referring there to support cases.

5   As Gerry is on the support team, we refer to support requests

6   as cases, and they would be in our ticketing system.

7   Q   And is this correspondence about Libbey Glass' JDE

8   software?

9   A   Yes, it is.

10  Q   How can you tell?

11  A   I've visited Libbey Glass as part of bringing them on as

12  a customer, and at this stage, we're only supporting their JD

13  Edwards environment.

14  Q   If we go to the last line in that e-mail, "So out of 155

15  cases, only three require source code changes," how do you

16  understand Mr. Roy to be using the term source code in this

17  correspondence?

18  A   So Mr. Roy using source code in a more general phrase

19  here.  Source code is a common phrase that is used and

20  somewhat interchangeably.  It's -- I would describe it as a

21  flexible term.  Here he must be referring to open code

22  modifications.

23  Q   And what makes you say that he must be referring to open

24  code modifications?

25  A   There's a couple of reasons, and the first one is, if you

1    look at the second line, he says, "Only four would have

2    required the assistance of a programmer from Libbey."

3             And then, secondly, because he's referring to making

4    modifications to code, and that can only be to open code as

5    per Rimini Street's policy.

6    Q    Does that count of 155 cases include the tax and

7    regulatory updates prepared for Libbey Glass in 2016?

8    A    It doesn't --

9                 MS. PHILLIPS:  Objection, foundation.

10                THE COURT:  Sustained.

11   BY MS. SAMPLIN:

12   Q    Can you tell us, again, what kind of support Gerry Roy

13   provides for clients such as Libbey Glass?

14   A    Gerry Roy is in the Global Support team, and he provides

15   support in reaction to client's opening support tickets for JD

16   Edwards customers.

17   Q    Does Gerry Roy have any involvement in the tax and

18   regulatory updates for JDE clients?

19   A    Gerry Roy would not create a new tax and regulatory

20   update.  If there was an issue with it, he may provide

21   support, and if he were to provide support for tax and regs,

22   that would be in a ticket indicated here as a case in the

23   e-mail you see.

24   Q    And so when Gerry Roy typically discusses Libbey's --

25   when Gerry Roy typically discusses client cases with you and

1     your team, does he refer to tax and regulatory updates?

2      A    He would not refer to tax and regulatory updates in that

3     way.

4              When we discuss a case, it's discussing an incident.

5     It's a sort of request for the support team, in comparison to

6     a tax and regulatory update, they have a separate system, it's

7     not a case.  This wouldn't be included in these 155, for

8     example.

9      Q    Earlier in this hearing, Oracle's expert used this three

10    out of 155 number in a calculation to extrapolate cases across

11    all Rimini JD Edwards clients.  She opined that this document

12    indicates that only two percent of Rimini's work for JDE

13    clients requires source code changes.

14              Do you agree with that?

15     A    I'm confident that would be an error.

16     Q    And why do you say that?

17     A    For many reasons.  Firstly, Libbey is one customer, and

18    no customers are created exactly the same.  Some customers

19    have got more customized systems.  Some customers have less

20    customized systems.

21              When looking at just Libbey's cases, as has been

22    done here, that looks at the time from beginning 2016 through

23    November of 2016, it's not necessarily the same as another

24    customer even in that same time frame.

25              They might have been rolling out to different

1    countries.  They could be building new functionality and

2    require our support in that area.

3         I would also say that the amount of effort involved

4    in cases varies considerably.  One case is not the same as

5    another one.  It could be very simple, another could take

6    weeks and weeks to provide a solution.

7         And although this e-mail states only three required

8    changes to code, it does not state how many cases involved an

9    investigation, and investigation can include opening the code,

10   looking at the logic in the code, and that's certainly not

11   what is stated here.

12        So it would be erroneous, in my view, to extrapolate

13   this to every customer and every situation.

14   Q    And so when you referred to an investigation just now,

15   and opening the code, would that involve creating a copy of

16   the code?

17   A    Under the JD Edwards architecture that we've been

18   discussing, simply using the Oracle tools to review the code

19   includes making a copy of that open code, yes.

20   Q    And so, in your view, those kinds of copies of the code

21   are not included in the three cases here that require source

22   code changes?

23   A    That is my understanding.  You don't need to make a

24   source code change simply to open and review the code, and

25   opening and reviewing code is a consistent approach in the

1    genuine debug of software issues including for the JD Edwards

2    system.

3    Q    And what do you understand Mr. Roy's reference to source

4    code changes here to mean?

5                     MS. PHILLIPS:  Objection, foundation.

6                     THE COURT:  Sustained.

7    BY MS. SAMPLIN:

8    Q    Would you expect that engineers looked at open code

9    to resolve more than three of the 155 referenced cases?

10   A    I would expect that JD Edwards support engineers would

11   look at open code in more than three out of 155 cases on

12   average, yes.

13   Q    And why do you say that?

14   A    In my experience, and I've been responsible for JD

15   Edwards at the company for many years now, the team will look

16   at the full system to establish the best solution for a

17   customer, that looking at the open code, the configuration,

18   the data, to make the best solution for a customer, we want to

19   look at the full system to make the best recommendation, and

20   so, therefore, viewing open code would be much more common

21   than is indicated by this e-mail.

22   Q    Shifting gears a bit, are you familiar with Rimini's

23   efforts to notify its employees about the requirements of the

24   injunction?

25   A    Yes, I am.

1    Q    And how are you familiar with those efforts?

2    A    I've been employed with the company for many years, and

3    so I'm a recipient of some of the modification, and, as a

4    leader in the company, I help to make sure that some of the

5    communication gets distributed and understood by the teams.

6    Q    Can you tell me about those efforts.  How does Rimini go

7    about notifying its employees of the requirements of the

8    injunction?

9    A    When an injunction or other similar important instruction

10   is issued by the court, Rimini Street will notify our team

11   members.  Communications come from Dan Winslow, our chief

12   counsel, or similar executive within the business.

13            We will make sure that we remind people of our

14   Acceptable Usage Policy as part of that communication, and

15   then we also will make sure that we train particular members

16   of the team in the -- any specifics that's relevant to their

17   particular job function to make sure that they are very clear

18   how to comply with the important injunction that's been

19   issued.

20   Q    So you first said that notice of the injunction was

21   provided to Rimini employees.  Let's take a look at DTX

22   Exhibit 17.  This is tab 4 in your binder, and this is

23   preadmitted.  This is an August 23rd, 2018 e-mail from

24   Dan Winslow to all Rimini employees and contractors.

25            Do you see that here?

1    A    Yes, I do.

2    Q    Were you a recipient of this e-mail?

3    A    Yes, I was.

4    Q    What was your understanding of the purpose of this

5    e-mail?

6    A    The purpose of this e-mail is to communicate to all

7    Rimini Street employees and contractors in the company that an

8    injunction is being provided, and to enforce how important it

9    is to comply with the injunction, to share that injunction

10   with our team, and to give an explanation.

11   Q    If we can look, please, to the first paragraph of this

12   e-mail that's now up on the screen.

13            This first paragraph references that,

14               "A separate copy of this notice will be sent

15        to you shortly by Adobe Sign for you to provide

16        written acknowledgment that you have received and

17        reviewed the injunction."

18               Do you know whether that happened?

19   A    Yes, I do.

20   Q    And how do you know?

21   A    I personally received the Adobe Sign document to -- that

22   I could read the injunction and comply and had to acknowledge

23   on there that I did.

24            During the course of my preparation for an earlier

25   deposition in this matter, I had the opportunity to question

1   the team responsible for this Adobe Sign system.  And I

2   specifically asked them if that had been followed through and

3   that it had been distributed and checked --

4             MS. PHILLIPS:  Objection, your Honor.  If he's

5   about to testify as to what his team told him, that's hearsay.

6             THE COURT:  Sustained.

7   BY MS. SAMPLIN:

8   Q   Did you review any records in connection with your

9   deposition preparation related to this notice?

10   A   I did not review records.  I asked the team for

11   confirmation that it had been distributed to them, to the

12   audience here.

13             MS. PHILLIPS:  Objection, again, if he's

14   testifying about what his team told him with regard to --

15             THE COURT:  He can testify to his understanding.

16   He can't testify as to what his team told him.

17   BY MS. SAMPLIN:

18   Q   On the next page of this document at the bottom there's a

19   section "How to Comply With the Injunction."

20        Do you see that?

21   A   Yes, I do.

22   Q   And this section references that "leadership has met or

23   will meet with you to provide general technical guidance on

24   how to comply with the injunction."

25        Do you know whether respective leadership teams met

1    to provide guidance?

2    A    Yes, I do.

3    Q    And how do you know that?

4    A    So the teams that are referred to there, the PeopleSoft,

5    JD Edwards, Siebold, and database teams each have

6    vice-presidents responsible for those teams.  Those

7    vice-presidents work for me.

8            I noted they scheduled those meetings.  I was

9    invited to a number of them, and I attended some of the

10   meetings as well.

11   Q    Now, we talked previously about the Acceptable Use

12   Policy.  How does the Acceptable Use Policy relate to the

13   injunction?

14   A    So the Acceptable Use Policy is a broad document so it

15   contains a lot of detail.

16           Specifically relating to the injunction, it focuses

17   on third-party intellectual property protection, and also the

18   protection of client confidential data.

19   Q    Let's take a look at the AUP again, that's DTX Exhibit

20   25, and if I can direct you to the appendix of that document,

21   please.  Are these some of the instructions you were

22   referring?

23   A    Yes, that is correct.

24   Q    And can you explain to the Court what this section

25   conveys.

1   A    So Section 33 marked as the Appendix in our Acceptable

Use Policy is referred to as "Can't Cope Rules," as you can

see on the document here.

4            This governs how we should treat certain material.

This is material which is software applications produced by an

outside company such as Oracle or SAP, including the code, the

database designs, the custom solutions that is specifically

called out here.

9   Q    And is this section of the AUP limited to PeopleSoft

software?

11  A    This section of the AUP applies to all employees and all

the product lines that we support, not just JD Edwards.

13  Q    Are there instructions in the AUP regarding copying one

client's software for another client?

15  A    There are sections that -- you can see one in this

Section 33, Section 2 there says, "Don't move 'Can't Copy

Content' from one client to another."

18           There are other sections also in the document that

back up that statement.  This is easy to understand, in a very

straightforward language, to reinforce to the team to follow

these important controls.

22  Q    Do you recall which other sections of the AUP address

that issue?

24  A    I do.  One moment.

25           Okay.  So I have turned now to Section 10.1.2.  It's

1  DTX-25.10.  In that section it says, "You may not copy

2  software and material from one client to another.

3  Q   And are there any provisions in Section 9 that relate to

4  this issue?

5  A   Looking at Section 9 -- that's marked DTX-25-008, Section

6  9.1.1.4 states,

7              "You may not share a client's installation

8        media, or other company's software materials with any

9        other clients or use it for another client."

10  Q   Let's take a look at Section 19 of the AUP, please.

11              What instruction is this Section 19 providing?

12  A   So Section 19 is titled, "Rimini Street Custom Content."

13  This section is designed to explain that we can create custom

14  material as part of their normal course of doing business, so

15  if Rimini Street produces, you know, some custom open code,

16  for example, then we can obviously use that for any legitimate

17  business purpose, but that if we incorporate any material from

18  other parties, that we're unable to use that unless we have

19  permission to do so from that other provider of material.

20  Q   Now, I'm going to ask you how Rimini informs its

21  employees about the requirements of the injunction.

22              You also mentioned training?  What does Rimini do to

23  train its employees on the requirements of the injunction?

24  A   So when a new employee joins, they're provided with

25  specific new hire training to explain to them the various

1    processes that they need to follow.

2            This, of course, includes training on the important

3    processes which relate to the injunction.  It includes

4    training on the Acceptable Use Policy.

5            In addition to that, we also train our existing team

6    members on a regular basis.  We have developed -- the

7    compliance team have developed training which specifically

8    focuses on the Acceptable Use Policy and how to practically

9    apply that to their day-to-day work.

10           That is rolled out through a -- we have an in-house

11   tool which is used to administer training, so it's deployed

12   out to existing engineers on a recurring basis.  They need to

13   watch the material, read the documentation, and then certify

14   that both of those things have happened.

15   Q    How often does that occur?

16   A    It depends year to year, but every 6 to 12 months on

17   average.

18   Q    Does Rimini take steps to inform its clients about the

19   requirements of the injunction?

20   A    Yes, we do.

21   Q    Can you tell me about those steps that are taken to

22   inform clients about the requirements of the injunction.

23   A    When clients join Rimini Street, we generally call that

24   period onboarding, and during onboarding we inform clients of

25   the specific controls we have in place to protect that

1   intellectual property and client confidential data.

2           We do that in multiple presentations that we present

3   to clients, and then once they start to use our systems, they

4   get further reminded of those controls through our Street

5   Central Portal.

6           Whenever they're opening up the case, whenever

7   they're contributing to a case, they get reminded of the

8   importance of protecting this material.

9   Q   Let's take a look, please, at DTX Exhibit 40 which is tab

10  5 in the binder.  Are you familiar with this document?

11  A   Yes, I am.  This is a Support Engagement Call

12  presentation.

13  Q   And --

14           MS. PHILLIPS:  Objection, your Honor,

15  foundation, and also hearsay.

16           MS. SAMPLIN:  I'm trying to lay the foundation.

17           THE COURT:  I understand.  You can do that.

18  BY MS. SAMPLIN:

19  Q   How are you familiar with this document?

20  A   A support engagement call is a presentation that we give

21  to all of our clients when they're new to us, when they're

22  going through onboarding.  I have presented this document many

23  times to clients myself.

24           I've also, if there's any modifications needed to

25  this document, then I would be involved in that because it's

1    something that we provide to all of our customers across every

2    product line.  So this is a document that touches every

3    product line.

4             Typically I'll be included in the approval cycle

5    before any changes are made to this document.

6    Q    So have you personally presented this document to clients

7    of Rimini Street?

8    A    I've personally presented support engagement calls to

9    clients at Rimini Street, yes.

10             MS. SAMPLIN:  I would like to move this document

11   into evidence.

12             MS. PHILLIPS:  No objection.

13             THE COURT:  It's admitted.

14                 (Defendant's Document Exhibit 40 received
                   in evidence.)

15   BY MS. SAMPLIN:

16   Q    If we can please turn to the page of this exhibit that

17   ends in 21, DTX 40-21.  Do you see that?

18   A    Yes, I do.

19   Q    Can you please read the text in the left-hand column.

20   A    On the left-hand column of the slide ending in 21 at the

21   bottom of the page, it says,

22             "Important.  Please do not upload any

23        third-party software (for example, code contained in

24        either documentation, trace files or screenshots), or

25        any other third-party intellectual property or

1     confidential data to this client portal, or send such

2     information to Rimini Street via e-mail, unless

3     Rimini Street has demonstrated authorization for

4     Rimini Street to possess a copy of such material."

5  Q   And will you also, please, read the last sentence in the

6  right-hand column.

7  A   The last sentence in the right-hand column says,

8         "All access to your supported products will

9     be via the remote access established during your

10    onboarding process."

11 Q   Is this message given to clients during the support

12 engagement call?

13 A   This message is given to all clients during the support

14 engagement call.  It will be read out by the presenter.  We

15 make a big deal of this particular page whenever we're doing a

16 support engagement call.

17 Q   Are there any other times of which you're aware when

18 clients are given this message during the onboarding process?

19 A   Yes, there are.

20 Q   Can you please tell me about that.

21 A   So during the onboarding process we also step through the

22 remote connectivity that I described earlier now in our

23 conversation today, and that remote access setup is another

24 time when we run through this language with clients to, again,

25 reinforce to them how important it is to follow this approach.

1    Q    Have you been involved in that remote access

2    presentation?

3    A    Yes.  I've been involved in the remote access

4    presentation as an audience member.  I have sat through these

5    presentations as they're being presented to clients.

6    Q    If we can take a look, please, at DTX-31, which, is tab 6

7    in the binder.

8              And how, if at all, does this document relate to

9    that remote access presentation you were just mentioning?

10   A    So this is a remote access presentation that is delivered

11   to clients as they onboard with Rimini Street to explain to

12   them how remote access will work with their environment.

13              MS. SAMPLIN:  I would like to move this document

14   into evidence.

15              MS. PHILLIPS:  No objection.

16              THE COURT:  It is admitted.

17                  (Defendant's Document Exhibit 31 received
                          in evidence.)

18   BY MS. SAMPLIN:

19   Q    And if we can turn, please, to the page ending in 21,

20   DTX-31-21.  And what is this slide?

21   A    The slide ending in 21 is Rimini Street's Acceptable Use

22   Policy.  This is a slide that we show to all new clients to

23   remind them of our Acceptable Use Policy, and to ensure that

24   they understand how important it is to protect third-party's

25   intellectual property when they are uploading material to our

1    support portal or when they're thinking of e-mailing material

2    to Rimini Street.

3    Q    Is this the same language we just saw in the support

4    engagement call presentation?

5    A    This is the same language we saw in the support

6    engagement call presentation, yes.

7    Q    And is this slide shown during the remote access working

8    session during the onboarding of clients?

9    A    That is correct.

10   Q    So we've seen these two presentations in which

11   notifications are made to clients about how to deal with

12   third-party intellectual property.  Are there other ways that

13   clients are informed by Rimini about this instruction?

14   A    There are other methods that we use to inform clients of

15   the controls that we have in place.

16            During onboarding a lot of discussions happen with

17   our clients, and all of our team, as I've explained earlier,

18   are trained in the Acceptable Use Policy so they will remind

19   clients of this issue during the onboarding period.  They'll

20   make it very clear what is expected and what is not.

21            We also, once they start opening cases, which

22   happens during onboarding as well, they're reminded of that

23   with the explanation on the Street Central Portal.

24   Q    What is the Street Central Portal?

25   A    When clients raise tickets with Rimini Street, they can

1   call a hotline telephone number, or most of the time, more

2   than 90 percent of the time, they'll raise the ticket using an

3   online support portal, and we call it Street Central.

4           And it's a web-based system where they can raise a

5   new ticket with us, or they can update any cases that we are

6   working on for them.

7   Q   How does Street Central work relate to Rimini's

8   SalesForce system?

9   A   You can think of Street Central as the front-end client

10  facing system, and the back-end system is SalesForce or, more

11  specifically, service cloud within SalesForce, and that is our

12  system of record.  SalesForce is where all the data is stored

13  for the cases that we're working for clients.

14  Q   And are you familiar with SalesForce?

15  A   Yes, I am.

16  Q   Tell us a little bit about your role in relation to

17  SalesForce.

18  A   Because SalesForce is the system of record for all of our

19  support work, I am the system owner of that system, meaning

20  that if there are changes that happen to the SalesForce

21  system, I would be included in approval before those changes

22  get rolled out.

23          I'm pretty guarded about SalesForce changes because

24  any changes could impact my day-to-day operation, engineers

25  all around the world, so I'm heavily involved in the

1    SalesForce system and controls in that area.

2    Q    And does that include the client facing Street Central

3    Portal, meaning are you involved in decisions made about, you

4    know, the look and information contained on the Street Central

5    Portal?

6    A    It extends to the Street Central as well.  I've been a

7    part of the steering committee for Street Central, I'm

8    involved in changes to Street Central, including approving

9    changes that applied to that system, including recommendations

10   for design of the Street Central user experience for our

11   clients.

12   Q    If we can take a look, please, at DTX Exhibit 8.  This is

13   tab 7 in your binder.  What is this document, Mr. MacKereth?

14   A    The document I'm looking at is a printout from the Street

15   Central systems, so the front-end of the application that I

16   was referring to there.

17         This is a case for one of the Rimini Street clients,

18   the City of Kent, case 159413.  Someone has printed it from

19   the Street Central system itself.

20   Q    And is this typical of printouts that you've seen from

21   the Street Central Portal?

22   A    Yes.  This is typical of the Street Central Portal that

23   I'm familiar with.

24                MS. SAMPLIN:  I'd like to move this document

25   into evidence.

1          MS. PHILLIPS:  No objection.

2          THE COURT:  It's admitted.

3                    (Defendant's Document Exhibit 8 received
                        in evidence.)

4  BY MS. SAMPLIN:

5  Q   Now, if we can turn to page 2 of this document, please.

6  I'm looking at the section in the middle labeled "Important

7  Information."  Do you see that?

8  A   Yes, I do.

9  Q   What is this language?

10  A   The language indicated by Important Information on page 2

11  of this document is the warning to clients to not upload any

12  third-party software or any third-party intellectual property

13  or confidential data to this portal.

14          It's what they see on the screen whenever they're

15  either making changes to the case or when they are first

16  logging a case for our attention.

17  Q   Does the client see this important information section

18  every time it views a Street Central case?

19  A   Clients must see this every time they view or open a

20  Street Central case, and that is by design.  We put this text

21  in a very visible place on that same page so that they can't

22  ignore it.  They must scroll past it to press submit to

23  provide this material to us, and that's the first time and

24  every other time they use this portal.

25  Q   Let's take a look, please, at DTX Exhibit 4, which was

-1172-

```
 1    already admitted.  This is tab 8 in your binder.

 2              And this is -- sorry, DTX Exhibit 41 -- 41A.  Sorry,

 3    my mistake.

 4              I'm showing you an excerpt of a spreadsheet that

 5    Oracle's expert testified about during her examination.

 6              Is this language in column GB the language clients

 7    see in the Street Central Portal?

 8    A    Yes.  I confirm this is the same language that we display

 9    to clients in the Street Central Portal.

10    Q    Let's take a look now, please, at DTX Exhibit 40, and

11    this time I'm looking at page 14 which is a page ending in

12    Bates 53064.

13              And this is, again, the support engagement call

14    presentation that we looked at a bit ago.  And so on this page

15    of the presentation what are we looking at?

16    A    So in this page of the support engagement call, we are

17    showing clients what the Street Central experience will be

18    like when they are raising a ticket with us.  This is an

19    excerpt from that Street Central page.  You can see all the

20    forms there that were consistent with what we saw earlier in

21    the printout.

22              And here you can see what I was describing earlier,

23    so that Important Information section appears below the

24    description of the case but before the submit button.

25              So the clients read this information.  It's visible
```

1    on the page in front them before they press submit.

2           So this is how I know that they've seen this content

3    before they send us a file, or before they send us an update

4    on the support incident we are working on with them.

5    Q   And if a client was sending a file to Rimini through

6    Street Central, would it have to click the submit button that

7    we see on the screen?

8    A   That is correct.  So they would select the file, and then

9    it would not be sent through to us until they press that

10   submit button.

11          And so we designed the look and feel of this so that

12   the information will be present immediately prior to the

13   submit button so that they would always have to see this

14   content.

15   Q   And just to be clear, is this content that we're looking

16   at above the submit button the same language that we just

17   looked at on the Excel spreadsheet I showed you?

18   A   This is the same language that I identified on the Excel

19   spreadsheet from earlier and consistent with the language that

20   we share in the support engagement call and the remote access

21   presentation that we reviewed.

22   Q   Now, once a client has opened a case, if they continue to

23   have discussions with Rimini, is this language still visible

24   to them?

25   A   The language labeled Important Information here relevant

1    to third-party software controls is visible to the client for

2    every update that they make in the Street Central system, not

3    just the first update, but every time they go in to provide us

4    with any comment on the case, or any additional information,

5    it's present and visible to the clients on that screen.

6    Q    Are there any other ways in which Rimini informs clients

7    about the restrictions of the injunction?

8    A    I have a lot of engineers in my team who are well-trained

9    in the Acceptable Use Policy.

10            A lot of our communication is verbal, you know, by

11   e-mail or telephone, so our team can continue to remind

12   clients of the importance of this and direct them how to share

13   information with us in a way that does not violate our

14   Acceptable Use Policy.

15            MS. SAMPLIN:  Your Honor, I can keep going, but

16   I'm at a good stopping point if you wanted to take the lunch

17   break.

18            THE COURT:  Right.  And I've let you go over a

19   little bit because of that.

20            Let's go ahead and take our noon recess at this

21   time.  We'll reconvene between 1:15 and 1:20 depending on your

22   availability.  Thank you.

23                   (The noon recess was taken.)

24                         --o0o--

25

```
 1            RENO, NEVADA, MONDAY, SEPTEMBER 27, 2021, 1:20 P.M.

 2                            ---o0o---

 3

 4                 THE COURT:  Have a seat, please.

 5                 The record will show we're reconvened following

 6    the break over the luncheon hour.

 7                 And, Ms. Phillips, are you ready to proceed with

 8    further examination --

 9                 MS. PHILLIPS:  It was Ms. Samplin.

10                 THE COURT:  I'm sorry, It wasn't Ms. Phillips.

11    I apologize.  Ms. Samplin.

12                 MS. SAMPLIN:  Yes.  Thank you.

13                      DIRECT EXAMINATION RESUMED

14    BY MS. SAMPLIN:

15    Q    Mr. MacKereth, before the lunch break, we were talking

16    about the various ways Rimini informs clients about the

17    restrictions of the injunction.  Do you remember that?

18    A    Yes, I do.

19    Q    Have there been instances in which clients have not

20    followed instructions given to them by Rimini about the

21    restrictions in the injunction?

22    A    Yes, there have.

23    Q    In your view, why might that happen?

24    A    In my view, clients may accidently upload material not

25    thinking about the contents within a given file.
```

1            When we are providing support, it's typically under

2   a time crunch, something is broken, and they're hoping to get

3   it fixed quickly.  Under that pressure, perhaps, they're

4   forgetting the controls that we have put in place.

5   Q    Does Rimini want clients to send them those materials?

6   A    We do not want clients to send us the materials.  We

7   don't require the materials to do our job, and we have told

8   them that we do not want them to send them to us.

9   Q    Are you familiar with a company called SpearMC?

10  A    Yes, I am.

11  Q    What is SpearMC?

12  A    They're a provider.  They provide support to some of our

13  clients, an AMS provider.  I describe them as a level 2

14  support provider that helps some of our PeopleSoft clients.

15  Q    Do you know whether SpearMC is part of the Oracle Partner

16  Network?

17  A    I do know that they are part of the Oracle Partner

18  Network, yes.

19  Q    And what does that mean?

20  A    The Oracle Partner Network is a group of companies that

21  receive an endorsement, it might be a platinum or a gold level

22  from Oracle.  Oracle markets this to the IT market in general,

23  that members of the Partner Network are trusted --

24            COURT REPORTER:  I can't quite hear you, sir.

25  Could you pull your microphone down.

1    THE WITNESS:  Sure.  How's that?

2         So the Oracle Partner Network is a collection of

3    companies that are designated as Oracle partners.  What this

4    means is that they are either assigned a platinum or gold

5    standard by Oracle as a trusted member of the community that

6    serves the ERP industry.

7    BY MS. SAMPLIN:

8    Q    Does Oracle recommend that its licensees use companies in

9    its Oracle Partner Network?

10        MS. PHILLIPS:  Objection, foundation.

11        THE COURT:  Sustained.

12   BY MS. SAMPLIN:

13   Q    Have you seen any guidance or documents from Oracle

14   relating to the Oracle Partner Network?

15   A    In my --

16        MS. PHILLIPS:  Objection, hearsay.

17        THE COURT:  Sustained.

18   BY MS. SAMPLIN:

19   Q    Have you seen documents about the Oracle Partner Network?

20   A    Yes.

21   Q    And what kind of documents are you referring to?

22   A    In my capacity as running the Corporate Systems team at

23   Visa, and in my capacity as running the Business Systems at

24   BAE Systems, we would engage with systems integrators and

25   other providers in this space.

1    And at that time we would look for the partner

2  designation to confirm that this client was -- that this

3  systems integrator was part of that network and therefore was

4  committed to the Oracle Ecosystem and was providing other

5  clients with services related to that area.

6  Q    Can we take a look, please, at Oracle Exhibit 98.  That's

7  tab 11 in your binder, and it's been preadmitted.

8  A    Okay.

9  Q    We'll wait for it to get up on the screen, if you don't

10 mind.  This is OREX_98.  Do you see references to Evergreen in

11 this document?

12 A    Yes, I do.  The e-mail extract that I'm seeing is from

13 Evergreen Support.

14 Q    And what is Evergreen?

15 A    Evergreen is a Rimini Street client.

16 Q    What is the relationship between Evergreen and SpearMC

17 which we see in the e-mail domain?

18 A    So as happened with many of our clients, Evergreen have

19 contracted with SpearMC to provide a level of support and

20 administrative services.

21    So when we are exchanging information about a

22 particular case, then we are working with the SpearMC

23 representatives, so I can see that indicated here, it says,

24 "Evergreen - support at spearmc.com" for the e-mail

25 distribution.

1    Q    And the other names in the "to" and "cc" field, those are
2    Rimini employees, right?
3    A    That's correct.  I see Manjula, Sarah, and Syed as --
4    they're all Rimini Street employees, in the "to" and the "cc"
5    lines.
6    Q    So this e-mail chain is between Rimini and Oracle
7    partners, SpearMC?
8    A    That is correct.
9    Q    Let's turn to page 1142, Bates ending in 1142.
10   A    Okay.
11   Q    I apologize -- oh, yes, okay, 1142.
12            What is Manjula Hosalli telling MC Spear to do in
13   this e-mail dated May 23rd, 2019?
14   A    In the e-mail dated May 23rd, 2019, Manjula is contacting
15   Greg at the SpearMC team.  He is asking Greg to place the
16   psptcalc.lis file somewhere in server, and then he provides an
17   IP address on the client's internal domain and shared the
18   location with us.
19            The developer needs this file to look into the error
20   details, and he's copying one of the developers on the e-mail.
21   Q    And so Manjula told MC Spear, I believe you said, to put
22   this file on the client's server?
23   A    The Rimini Street employee here is asking the SpearMC
24   team to place a particular file somewhere on the client's
25   server in this e-mail.

1  Q    Okay.  And then looking at the rest of the document, can
2  you tell what happened?
3  A    So in reading the rest of the document, I can see that
4  the SpearMC team on Thursday, 23rd of May, 2019, found the
5  file that we had asked for, but instead of placing it on the
6  file server location, he attached it to e-mail.
7  Q    And where do you see that?
8  A    On the first page dated -- 1 of 5 on the RX-98 exhibit
9  here from Evergreen Support at spearmc.com, it says, "Manjula
10 I found it now and have attached it.  Thanks.  Greg."
11 Q    So that file was sent to Rimini by an Oracle partner; is
12 that right?
13 A    That is correct.
14 Q    If a Rimini employee realizes that a client has sent
15 third-party intellectual property to Rimini in violation of
16 Rimini's instructions, what is the Rimini employee supposed to
17 do?
18 A    The Rimini employee is instructed to e-mail
19 security@riministreet.com if they have a situation like that
20 occur.
21 Q    And where is that instruction delivered to clients --
22 sorry, to employees?
23 A    The instruction to e-mail security@riministreet.com
24 is given to our employees in the Acceptable Use Policy that
25 specifically calls out how to deal with the situation where

1    clients or, in this case, an Oracle partner has e-mailed us

2    material that we are concerned may contain third-party

3    intellectual property.

4    Q    Let's take a look, please, back at the AUP which was DTX

5    Exhibit 25, and let's take a look at the Appendix, which we've

6    looked at previously.

7              Does this part of the AUP contain the

8    instruction you were just talking about?

9    A    Yes.  I would refer to this section as the easiest

10   material.  It's referred to elsewhere in the document as well,

11   but this is a great example.

12   Q    Okay.  And you're looking, I assume, at the

13   security@riministreet.com line in this document?

14   A    I think the information is very clear here.  It says,

15             "If you see the...content on Rimini Street

16        computer resources:  Don't copy it.  Don't delete it.

17        Don't forward it."  And "Do promptly report it to

18        security@riministreet.com."

19   Q    Separate and apart from this instruction about e-mailing

20   security@riministreet.com, are there any other ways for Rimini

21   employees to alert the company if they see third-party IP on

22   Rimini's systems?

23   A    There's another way that you may see in our systems.

24             So most often when clients accidently send this

25   material through, they would upload it as an attachment to

1    Street Central.

2            When they upload it through Street Central, and a

3    Rimini Street employee notices that this content is within a

4    file that they have shared, the client has shared with Rimini

5    Street, then they can check a box in the SalesForce system to

6    flag that that material may potentially contain third-party

7    intellectual property.

8            And what will happen then is the file won't

9    available to any of the other engineers that subsequently come

10   to look at the record.  It will be quarantined as

11   automatically communications at security@riministreet.com

12   there.

13           So it satisfies the specifics in our Acceptable

14   Usage Policy, and, as a result, we then, the same team, will

15   investigate to see if, indeed, this has occurred.

16   Q    So just to be clear, if the client uploads third-party IP

17   to Street Central, you're saying there's a box that can be

18   checked on the Rimini side, which is SalesForce?

19   A    That is correct.  It's on the Rimini Street side.  Our

20   engineers are not needing to use Street Central, they're in

21   the SalesForce system, which is our system of record, and they

22   can check an individual file and flag that this has got

23   intellectual property.

24           The benefits there, it rapidly notifies security.

25   It flags the file is unavailable for future use, and it

1    actually does one more thing, if I can explain also, it does

2    this.

3            Anyone else who then views that case then has a

4    warning that at some stage there may have been third-party

5    intellectual property provided as part of this case, and so it

6    just gives visibility to any of us, including myself or any

7    manager who opens that case, just to be aware that that may

8    have occurred.

9    Q    Have there been instances when Rimini employees have

10   reported that third-party IP was uploaded through Street

11   Central?

12   A    Yes, there have.

13   Q    And when Rimini employees report that third-party IP was

14   uploaded through Street Central despite Rimini's warning, does

15   Rimini take steps to quarantine the file?

16   A    Yes.  Rimini Street will then quarantine the file

17   when that has been reported.  As I mentioned before, through

18   the system, if you just check the box, it will be quarantined

19   automatically.

20           But if you have reported to

21   security@riministreet.com, we have a compliance team that

22   monitors any reports like that.  They will then come in and

23   request that IT quarantine a particular file, and, as a

24   result, it's moved.

25           We don't delete anything because we have a legal

1  hold, but the material will be moved to an area that's only

2  available to the compliance team, and none of my team will

3  able to access that file any more because it's quarantined.

4  Q   I'd like do show you a document that was introduced

5  earlier in the case.  This is OREX Exhibit 105.  It's tab 9 in

6  your binder, and it was preadmitted, or it was admitted

7  already.

8         Oracle's expert testified that this is a printout

9  she created from SalesForce data she was provided for

10  University of Oklahoma Health Sciences Center.  Does that look

11  right to you?

12  A   Yes, it does.  This is consistent with the fields from

13  our SalesForce system.

14  Q   And just once again, can you please remind the Court of

15  the relationship between Street Central and SalesForce.

16  A   So while clients interface and interact through the

17  Street Central system as it -- that serves the Web pages, the

18  actual system of record that houses the data is SalesForce

19  and, specifically, the service Cloud environment within

20  SalesForce.  So we're looking at the SalesForce data here in

21  this item.

22  Q   And on what date was this case for the University of

23  Oklahoma Health Sciences Center opened?

24  A   I can see from the data here, this was opened 2019,

25  February 13th.

1   Q    Okay.  And I'd like to direct your attention to page 6 of

2   18, and I'm looking at the middle of the page.  Maybe we can

3   call out the box in the center.

4            Does this record here show the uploading of a file

5   entitled "Tax920us.txt"?

6   A    So to be clear, I'm looking at the box with the heading

7   ending in Bates number 876.  From that box, I can see there is

8   an attachment provided by a Rimini Street client.  The file

9   name is this tax920us.txt.

10  Q    Oracle's expert testified that tax920us.txt is a

11  PeopleSoft code file was that uploaded to Rimini's systems by

12  a client.  Do you agree with that?

13  A    From what I'm seeing of the extract that you're

14  presenting to me here today, I would see where she would reach

15  that conclusion.

16           It says a Rimini Street client provided the file.

17           Anytime Rimini Street clients update our system, it

18  will say "Rimini Street client" in that box, and I see the

19  attachment there so I have no reason to doubt her claims.

20  Q    Can you tell from this record whether the file was later

21  quarantined?

22  A    So I can tell that this file was later quarantined by

23  looking at what you presented to me here on the page.

24  Q    Can you explain that to us.

25  A    So if you look in the bottom section of that box, it says

1    "last modified by," and the name there is Maurya, and Maurya

2    is a member of our SalesForce administration team.  Maurya is

3    not part of the Rimini Street Global Support team, and the IT

4    team should not be modifying any files within the environment,

5    unless under direction.

6           That direction would be to quarantine the file.

7    Q    Can you tell the date on which the file was quarantined?

8    A    From the information here, you can't really tell the

9    date.  You can't confirm that.

10          It says last modified date was August 23rd, 2019,

11   but that doesn't necessarily mean that that was the first

12   quarantine action.  So sometime between February and August it

13   was quarantined, but you can't tell the exact date from what I

14   have here.

15   Q    Could it have been quarantined after August 23rd, 2019?

16   A    It could not have been after August 23rd, but, you know,

17   it could have been a much quicker quarantine potentially.

18   Q    So you just can't tell from this document where, between

19   February 15, 2019, and August 23rd, 2019, the file was

20   quarantined; is that right?

21   A    Yes, that is correct.

22   Q    Let's look back of the same page of this document.  I'm

23   looking at the bottom of that page.  So this is page 6, the

24   bottom record that you'll see Bates number on the top ending

25   in 77, and do you see that that's a similar record but for

1    tax922us.txt?

2    A    Yes, I see that.

3    Q    And what can you tell from this record?

4    A    The few things you can tell from the record, so you can

5    tell that an attachment was provided.  You can tell that the

6    attachment was provided by Rimini Street clients, and that it

7    was provided February 15, 2019, 08:36.

8              You can also, if you continue reviewing this same

9    section, you can see that this object was last modified

10   by Maurya who is a member of our IT administration staff

11   responsible for SalesForce administration, and that

12   modification was at least August 23rd, 2019, indicating that

13   an archive has occurred -- that a quarantine has occurred, I

14   should say.

15   Q    Okay.  Let's take a look at the same document on pages 12

16   and 13 of 18, and we see two boxes here of Bates numbers, if

17   we can call those out, and you see here some additional Bates

18   numbers ending in 43 and 45.  Do you see those?

19   A    Yes, I do.

20   Q    And the attachment names in those records are

21   tax921us.txt, and tax922us.txt.  Do you see that?

22   A    Yes, I do.

23   Q    And what can you conclude from these two records?

24   A    From reviewing these two records, I can see here that a

25   Rimini Street client has uploaded material February 26, 2019,

1    tax921.txt.  That file has been modified by SalesForce

2    administrator, Maurya, and I can see the modification date

3    here indicating that it has been quarantined.

4         I see the same for the next Bates number ending in

5    545, which is tax922us.text -- tax922us.txt has also been

6    uploaded by Rimini Street clients February 26, and, again, you

7    can see there that the quarantine has occurred.  A member of

8    the SalesForce administration team has performed that

9    quarantine.

10   Q    Let's take a look at page 15 of this same document, and

11   I'm looking at -- if we go to page 15.  I'm looking at, in

12   particular, the top record, and we see a note that it was

13   created by Jai Ramachandran, I think.  Do you see this note

14   from Jai?

15   A    Yes, I do.

16   Q    And who is Jai?

17   A    Jai is one of the support engineers in my PeopleSoft

18   support team.

19   Q    And what is Jai saying in this note here?

20   A    So Jai is communicating with the end client.  You can

21   tell that by seeing Sarah Walsham with the HSC, brackets after

22   that, at the University of Oklahoma Health Sciences Center.

23        And he's instructing the client to perform a

24   particular process in their PeopleSoft environment to run a

25   particular process.

1              He explains that he does not have the normal remote

2   access to their server at the moment because his password has

3   expired on that particular client's system, and he's waiting

4   for that to be restored.

5              He goes on to say that he cannot use the attached

6   SQR, and he says here,

7              "I cannot use the attached SQR as I'm not

8         allowed to download the SQR to my PC due to copyright

9         restrictions."

10  Q    Let's take a look at another document that was introduced

11  earlier in this case, OREX Exhibit 13 which is tab 10 in your

12  binder.

13             And Oracle's expert testified that this is a

14  printout she created from SalesForce data she was provided for

15  RR Donnelley & Sons Company.  Does that look right now, to

16  you?

17  A    Yes, I can confirm this is -- looks exactly like our

18  SalesForce system was all the right records, so I believe that

19  to be correct.

20  Q    And on what date was this case opened for RR Donnelley?

21  A    This case was opened January 22nd, 2019.

22  Q    And if I can direct your attention to page 8 of 12, and

23  I'm looking at the record -- I'm sorry, it's 7 of 11, not 8 of

24  12.

25             If we can take out the record at the bottom there

```
 1   that has Bates number ending in 905.  Do you see that?

 2   A    Yes, I do.

 3   Q    And this shows the uploading of a file entitled

 4   psptaxdt.dms.  Do you see that?

 5   A    Yes, I do.

 6   Q    Can you tell from this record whether that file was later

 7   quarantined?

 8   A    So based on the record shown here ending in Bates number

 9   905, I can see that this file has been quarantined because the

10   last modified by date -- last modified by is Maurya from our

11   IT SalesForce administration team, and, again, Maurya has no

12   reason to be modifying these files.  She's not a member of the

13   support team.

14             When information is flagged through one of our

15   processes that it's potentially third-party intellectual

16   property, the IT team will intervene and quarantine these

17   files which has happened here.

18   Q    Does Rimini have any processes in place to scan its

19   systems for third-party intellectual property?

20   A    Yes, we do.

21   Q    Can you please tell the Court, at a high level, how that

22   works.

23   A    So we have a couple of different methods that we're using

24   for scanning, looking for third-party intellectual property.

25             The first one is that we have a compliance team.
```

1   That compliance team executes scans searching through network

2   locations, engineer laptops, anywhere that they can find files

3   are stored, and they will search for particular keywords

4   within the contents of those files, including the contents of

5   zip archive files, for example.

6            When they find potentially -- potential third-party

7   intellectual property, they will then report it, investigate,

8   and seek information about that -- about that material to see

9   whether it was in violation, you know, what the source of that

10  was.  They'll ask the owner of that file to explain what has

11  happened there as part of their investigation.

12  Q   And how, if at all, has that process evolved over time?

13  A   So over time that very manual process has involved.

14           And, as I have testified earlier, one of the ways

15  that clients can share third-party intellectual property is

16  through the Street Central system.

17           We warn clients to not do this, but if, for whatever

18  reason, they were to continue to do so, we have introduced

19  further scanning technology to check the material as it is

20  inbound.  So we can then run checks against the contents of

21  that material to identify whether there's third-party

22  intellectual property within the material that a client has

23  uploaded.

24           This happens very rapidly, so it is beneficial to my

25  team because it's scanning the file so quickly, that

1   oftentimes it will be before an engineer ever gets to read the

2   file, so it shortens the time to identify potential

3   inappropriate material.

4   Q   And what is the name of that new process or material?

5   A   So we've used a commercial product, it's called Kona,

6   K-o-n-a, and that's the tool we use to scan inbound material

7   coming from Street Central.

8   Q   Is that a plug-in for SalesForce?

9   A   That's the technology.  It's a plug-in for the SalesForce

10  system.  So it can scan through the objects once it reaches

11  the SalesForce system.

12  Q   How do you know about the new use -- the more recent use

13  of Kona?

14  A   I'm the system monitor of the SalesForce system, so any

15  introduction of changes like this would have come through me

16  for approval.

17          I was also part of the project team to implement

18  this solution as one of the stakeholders, and so I was aware

19  of it, and it was requested of me whether it would be a --

20  what sort of an impact that would be on my team, and I made

21  sure that I was involved in that project throughout.

22  Q   Were you a supporter of including Kona?

23  A   I'm an advocate of this, absolutely.  I think it's makes

24  a lot sense to scan this material.  We don't need this

25  material on our systems.  We don't need it to do our job.

1    And there's a potential that clients could

2 inadvertently upload third-party intellectual property from

3 SAP or Oracle or any of the vendors that provide the software.

4    So having a rapid system that checks this material

5 on intake made a lot of sense to me, so I was a big fan of it.

6 Q   How long did it take to implement Kona in your SalesForce

7 system?

8 A   It took about six months to implement.  We had to tailor

9 the system to work for the specific use case that we have here

10 including our quarantine process.

11    We also had to thoroughly test this to make sure

12 that it wouldn't impact our operations because we couldn't

13 have it break a system that our clients are reliant upon.

14 Q   Approximately how much money was spent to implement Kona?

15 A   Hundreds of thousands of dollars was spent on this

16 project.

17 Q   Why did you choose to implement this plug-in in

18 SalesForce in particular?

19 A   We chose to implement the plug-in in SalesForce because

20 that's an area where clients can upload material through the

21 Street Central portal.  It's relatively easy for them to do.

22    It's common practice for clients who have been

23 working -- obviously, before they joined Rimini Street, they

24 had been working with somebody else to provide support for

25 their systems so they're used to uploading content, and so we

1    thought this was a good way to scan that to further enforce to

2    prevent material getting into the hands of engineers.  So,

3    again, we're a big fan of it.

4    Q    So how quickly does Kona remove an attachment from

5    SalesForce if it's flagged?

6    A    So the reaction time is very fast, and typically, it

7    would take about 15 minutes maximum time to perform the scan.

8              And then it actually quarantine's that file, so it

9    flags it so that it's not available for any of the team to

10   work on it.  So it's very fast.

11   Q    When was Kona implemented?

12   A    We've been running it for a little more than a year now,

13   I believe.

14   Q    Have you seen reports from these scanning processes?

15   A    There's a dedicated compliance team that takes care of

16   that so I don't see reports out of it.  It's a separate team

17   that does that.

18              There is a separate team that runs and administers

19   that system, so they would see the reports, it's not something

20   that is shared with me.

21   Q    We've talked a lot about the AUP today and its

22   instructions to Rimini employees.  What does Rimini do if it

23   learns that an employee has not followed the AUP?

24   A    If an employee has not followed the Acceptable Usage

25   Policy, an investigation will occur.

1    Depending on the results of that investigation,

2   there will be discipline of the employee which could be up to

3   and including termination of their employment with Rimini

4   Street.

5   Q   What is your personal view of Rimini's efforts to comply

6   with the injunction?

7   A   In my personal view, I believe that Rimini Street has

8   worked extremely hard to comply with the injunction.

9    We have trained hundreds and hundreds of people, and

10  we continue to do so.

11   We take this very seriously, and we now have this in

12  the -- in the general day-to-day business practice of

13  everything that we follow.

14   I feel that this is an appropriate reaction to make

15  sure that we are -- while we continue to provide service to

16  our clients, we are making sure that the third-party

17  intellectual property and client confidential data is

18  protected.

19   We are making sure that we are limiting the

20  modifications to the open code, and, we are following the

21  guidance provided.  We are not modifying the closed code that

22  is shipped through the Oracle product.

23  Q   Is it important to Rimini to comply with the injunction

24  in your view?

25  A   It's very important for Rimini Street to comply with the

1    injunction.  We have invested an enormous amount time to make

2    sure that our team are following the instructions very

3    closely.

4              We are investigating.  We have a dedicated team

5    constantly scanning and searching for material that may have

6    been provided to us that is in violation of the third-party

7    intellectual property controls that we have in place.

8              And I feel that this is -- is the right thing for us

9    to be doing.  So I support it.  And I back it in my day-to-day

10   work as a leader in the support team.

11             MS. SAMPLIN:  Thank you.  Oh, sorry.  One more

12   thing I'm reminded of.

13             Earlier during Mr. MacKereth's direct

14   examination I misspoke and said that OREX_69 was already

15   admitted it, it had not been, so we'd move it into evidence,

16   and I understand there's no objection from Oracle.

17             MS. PHILLIPS:  No objection.

18             THE COURT:  All right, it is admitted.

19             Thank you.

20                  (Plaintiff's Document Exhibit 69 received
                        in evidence.)
21             THE COURT:  Ms. Phillips.

22             MR. HOUMAND:  May I approach, your Honor?

23             THE COURT:  Yes, you may.

24             MR. HOUMAND:  Thank you very much.

25             MS. PHILLIPS:  May I proceed, your Honor?

```
 1                    THE COURT:  You may.

 2                    MS. PHILLIPS:  Thank you very much.

 3                    Good afternoon, Mr. MacKereth.  My name is

 4   Jessica Phillips, and I'll be asking you some questions this

 5   afternoon.

 6                    THE WITNESS:  Okay.  Good afternoon.

 7                         CROSS-EXAMINATION

 8   BY MS. PHILLIPS:

 9   Q    As the Senior Vice-President for Global Support at Rimini

10   Street, you're a member of the management team, correct?

11   A    That is correct.

12   Q    And you're not the person making the decisions about how

13   Rimini would comply with any aspect of the injunction; is that

14   right?

15   A    You know, not from -- in normal course of duties, you

16   know, I'm engaged in decisions around compliance for a range

17   of topics.  So I think I am engaged in those discussions.

18   Q    Okay.  But you're not the person making decisions about

19   how Rimini would comply with any aspect of the injunction,

20   right?

21   A    I'm not sure that I understand your question.

22                    MS. PHILLIPS:  Sure.

23                    Your Honor, if I may read from Mr. MacKereth's

24   postinjunction 30(b)(6) deposition from January 17th of 2020,

25   specifically --
```

1    MS. SAMPLIN:  Sorry.  I'm just going to object.

2  It's not impeachment if he didn't understand the question.

3    THE COURT:  I think that's correct.  I think

4  that he needs to be given an opportunity to respond to your

5  question.

6    MS. PHILLIPS:  Sure.  No problem.  I understand.

7  BY MS. PHILLIPS:

8  Q   So, Mr. MacKereth, are you the person at Rimini Street

9  responsible for making decisions about how Rimini Street

10  complies with the injunction?

11  A   So Rimini Street is a company made up of many employees,

12  and when employees must comply with the guidance that's

13  provided, then sometimes employees will consult with me as

14  their leader, and so, therefore, I will be giving them

15  guidance as to how to comply.

16    I mean, that happens in the day-to-day.  So I'm just

17  not sure that I understood --

18  Q   Understood.  I'll rephrase.

19    Is it fair to say that you personally have been

20  involved in discussions about compliance with the injunction,

21  but you were not the person making the decisions about how

22  Rimini would comply with any aspect of the injunction?

23  A   I'd state that it's fair to say that Rimini Street

24  consults with, you know, a number of members of the management

25  team to eventually reach a conclusion as to how we're going to

1    comply with a certain thing.

2            And so, you know, there's a number of people that

3    contribute.  I'm not solely responsible for choosing the

4    compliance choices for every single decision we make.  That

5    would be fair.

6    Q    Understood.

7            And you testified on direct that you spent some time

8    with the injunction and, after you did, you became convinced

9    that source code, JD Edwards software source code from the

10   injunction, means closed code, correct?

11   A    So my determination around source code, open code, and

12   closed code, to be very clear, is not as a result of this

13   injunction.

14           My position on open code and closed code is

15   something that I have known for many years, including

16   preceding the injunction.  It's not as a result of the

17   injunction that's been provided here.

18   Q    Understood.

19           Not quite what I was asking.  I was asking about

20   your specific testimony on direct where you said that you

21   spent some time with the injunction, and, after you did, you

22   became convinced that source code, JD Edwards software source

23   code, as provided for in the injunction, means closed code,

24   correct?

25   A    So after spending time, stepping back, looking at the

1    situation, I was convinced that the only possible meaning of

2    the JD Edwards software source code could possibly be that

3    it's referring to the closed code.

4    Q    And you're not an attorney, correct?

5    A    That is correct.

6    Q    Mr. MacKereth, Ray Grigsby is Rimini's Vice-President of

7    Global JD Edwards Service Delivery; is that right?

8    A    Yes, that will do.

9    Q    And he oversees the people and practices for JD Edwards

10   support; is that true?

11   A    That is correct.

12   Q    Okay.  And that's not your role at Rimini, correct?

13   A    I supervise Ray, so he's reported directly to me for a

14   number of years.  So I have responsibility, ultimately, for

15   the services.  Ray is one of the leaders in that team.

16   Q    And you were deposed in these postinjunction proceedings

17   as Rimini's corporate representative, do you recall that, from

18   January 2020?

19   A    Yes, I do.

20   Q    Okay.  And when you testified as the corporate

21   representative for Rimini, you spoke to Mr. Grigsby about

22   Rimini's practices and people for JD Edwards support, correct?

23   A    That is correct.

24   Q    Okay.  And you did that because Mr. Grigsby is

25   knowledgeable about Rimini's practices and processes related

1    to JD Edwards software, correct?

2                    COURT REPORTER:  I'm sorry.  You need to slow

3    down a little bit, ma'am.

4                    MS. PHILLIPS:  Will do.  I'll repeat the

5    question.

6    BY MS. PHILLIPS

7    Q    You spoke with him in preparation for your deposition as

8    the corporate witness for Rimini because Mr. Grigsby is

9    knowledgeable about Rimini's practices and processes relating

10   to JD Edwards software, correct?

11   A    I spoke to a number of people in preparation for that

12   deposition, including Ray Grigsby, and I found him to be

13   knowledgeable on JD Edwards.

14   Q    Thank you.  And Mr. Grigsby currently works at Rimini,

15   correct?

16   A    Yes, he does.

17   Q    And he could have come to testify about Rimini's JD

18   Edwards support practices, correct?

19                    MS. SAMPLIN:  Objection, lacks foundation.

20   BY MS. PHILLIPS:

21   Q    I'm asking if you know.  Is he available to come to

22   testify at this hearing?

23                    MS. SAMPLIN:  Objection, lacks foundation.

24                    THE WITNESS:  You know, I don't --

25                    THE COURT:  Wait a minute.

1           The objection is overruled.  I'll allow that

2    question.

3           THE WITNESS:  You know, I can't speak to the

4    travel availability in these COVID times of someone to come to

5    a particular location.

6           I'm not a member of the legal team, so I'm not

7    sure whether was evaluated or not.  I can't really comment.

8    BY MS. PHILLIPS:

9    Q    Understood.  But he does currently work at Rimini Street,

10   correct?

11   A    Yes, that is correct.

12   Q    Okay.  Mr. MacKereth, the injunction in this case was

13   first issued in October of 2016.  Do you recall that?

14   A    I do recall it being initially put into effect, yes.

15   Q    Okay.  And it prohibited Rimini from accessing or copying

16   JD Edwards software source code.  Do you recall that?

17   A    I recall the language in the injunction.

18   Q    Okay.  And at that point in 2016 Rimini determined that

19   because of the injunction it couldn't access or copy any JDE

20   source code, whether you call it open or closed, correct?

21   A    It wasn't an assertation at that time that we could

22   or could not do a particular activity.

23          There was a lot of confusion at the time to

24   determine what the language in the injunction truly meant.

25          I was convinced, as I am today, that the language

1    was specifically referring to the closed code that I described

2    earlier, but, you know, there wasn't -- exactly what that

3    meant was not entirely clear.

4                MS. PHILLIPS:  I'd like to you turn in your

5    binder, to OREX_70.

6                And, Matt, if you can put that up on the screen,

7    please.

8    BY MS. PHILLIPS:

9    Q    This is a Rimini Street JDE World software overview.  Do

10   you see that?

11               MS. SAMPLIN:  And I'm going to object to this

12   exhibit, lacks foundation.

13               THE COURT:  Is it not in evidence?

14               MS. PHILLIPS:  It is not yet admitted in

15   evidence.

16               THE COURT:  All right.  Well, you'll have to lay

17   some foundation for that.

18               MS. PHILLIPS:  Understood.

19   BY MS. PHILLIPS:

20   Q    So, Mr. MacKereth, you've testified that you are the

21   Senior VP for Global Support, including the delivery of

22   support services for JD Edwards software, correct?

23   A    That is correct.

24   Q    Okay.  And this is a JD Edwards World software overview

25   document, correct?

1   A    This is the first time that I'm seeing this document as

far as I'm aware.  It appears to be something about JD Edwards

software.

4   Q    Yes.  And that is the product line that you oversee

directly as you've testified to, correct?

6   A    Well, actually, it doesn't say that it's about the

product line here, it says that it's about JDE World which is

an Oracle application, and it says that it's about an overview

of that software.  It doesn't say that it's anything about the

product line.

11  Q    Okay.  Well, do you recognize this as a Rimini business

document?

13  A    It does have our copyright on it and logo, so it's in our

standard format.  I believe this would be a Rimini Street

presentation.  All employees would use this format if they are

creating a presentation.

17            MS. PHILLIPS:  Okay.  I would move OREX_70 into

evidence, your Honor.

19            MS. SAMPLIN:  And I'm going to renew my

objection as lack of foundation based on the witness saying he

has not seen this document before.

22            MS. PHILLIPS:  Your Honor, he's testified that

he is the Senior Vice-President of Global Support for JD

Edwards World software.  He's also just testified that this is

a business record.

1    MS. SAMPLIN:  He did not testify that he was the

2    owner of JDE World software.

3    THE COURT:  The objection is overruled.  It is

4    admitted.

5    (Plaintiff's Document Exhibit 70 received
        in evidence.)

6    BY MS. PHILLIPS:

7    Q    I will direct your attention, Mr. MacKereth, to slide 5

8    of this document, please.

9    The top of the slide says that the documentation

10   indicates that the source code is "stored within the JDFSRC

11   library in three multi-member source files."

12   Do you see that?

13   A    Yes, I do.

14   Q    And then below it lists three multi-member source files.

15   Do you see that?

16   A    Yes.

17   Q    And just below that, it says,

18        "As these are all source code, none of the

19        members in the JDFSRC library can be 'accessed or

20        copied' while the injunction is in place."

21        Do you see that?

22   A    Yes, I do.

23   Q    Okay.  And those three-multi member source files are all

24   what Rimini now calls open code, correct?

25   A    I believe that to be the case.  I would not like to go

 1    too far down the technical details, but I believe that would

 2    be reasonable.

 3    Q    Okay.  And you see at the very bottom of the documents it

 4    says,

 5                    "You would not be able to debug programs as

 6            this will bring up the source code."

 7                    Do you see that?

 8    A    I do see that line.

 9    Q    And just above that, it says,

10                    "We are unable to do development in JDE World

11            software while the injunction" was "in place."

12                    So do you understand that this was Rimini's

13    determination after the injunction was issued in 2016?

14    A    I do not believe that this is a Rimini Street

15    determination.

16              This document, which I don't know to be draft or a

17    production document -- it's got errors all through it, so it

18    may well be some sort of rough draft.  It's copyright 2016,

19    but there's no date on here to indicate when this was produced

20    or the author.  So it certainly doesn't stand up as something

21    that is Rimini Street's position.

22              If we had Rimini Street's position, it would be

23    communicated by the senior leaders in the company.  It would

24    be backed with evidence, documentation, analysis, and it

25    certainly wouldn't be in this presentation with typos in it

1    and sent out here, so --

2    Q    But you agree that this is a Rimini Street business

3    document, and it says what it says, correct?

4                  MS. SAMPLIN:   Objection, lacks foundation.

5                  THE COURT:   Sustained.

6    BY MS. PHILLIPS:

7    Q    Okay.  And the phrase -- or, excuse me, the sentence

8    directly under,

9                  "We are unable to do development in JDE World

10              software while the injunction is in place," it says,

11              "We are able to work on functional and data related

12              cases while the injunction is in place."

13                  Do you see that?

14   A    Yes, I do.

15   Q    And that's because those cases don't touch source code,

16   correct?

17   A    You know, I can't really comment as to what this author

18   was saying in this potential draft document.

19   Q    Understood.  I'm not asking you to do that.  I'm asking

20   you if you understand that the position here is that we are

21   able to work on functional on data related cases --

22                  THE COURT REPORTER:   Sorry, ma'am, you need to

23   slow down.

24                  MS. PHILLIPS:   Understood.  I apologize.  I'll

25   repeat my question.

BY MS. PHILLIPS:

Q    And my question, Mr. MacKereth, is that this says,

            "We are able to work on functional and

      data related cases while the injunction is in place."

            My question to you is are functional and data

related cases ones that touch source code?

A    So I think, again, that's another reason why this view

expressed in this document is invalid because --

Q    Mr. MacKereth, my question was a yes or no answer.

A    Well, I don't want to mislead the Court here.  So, you

know, reading what you asked me to look at here on the screen

on this slide where it says, "We are able to work on

functional cases," for example, there are functional times

when you need to modify the open code.

            So I'm not sure who wrote this.  There's no detail

there.  I think it's an invalid assumption.  I think that to

solve functional cases for clients, you sometimes do need to

modify the open code.

Q    Okay.  Would you agree with Sebastian Grady, the

President of Rimini Street, that most of Rimini's JDE work

doesn't touch source code?

A    You know, I haven't seen that statement from Mr. Grady

who is head of the sales team.

            MS. PHILLIPS:  All right.  Let's go ahead and

put up OREX_65, please.  And at the top of the e-mail there,

1    Matt, if you can blow that up, please.

2    BY MS. PHILLIPS:

3    Q    This is an e-mail from October 14th, 2016, three days

4    after the injunction was issued, and Mr. Grady notes there,

5                    "The story gets even better - most of our JDE

6         work doesn't even touch source code.  It is

7         configurations and other things."

8                    Do you see that?

9    A    Yes, I do.

10   Q    So do you agree with that statement?

11   A    No, I don't agree with that.  I don't think that

12   Mr. Grady is making a technical evaluation there.  This is an

13   e-mail exchange presented to me between the president of

14   sales, the head of sales North America, and head of our

15   renewal sales.  I don't think they are providing any technical

16   guidance.

17           Earlier in my testimony I did provide the technical

18   view from the support team that, you know, we do need to

19   review and sometimes update the open code as necessary as part

20   of delivering support and, certainly, as part of providing tax

21   and regulatory updates.

22   Q    So Sebastian Grady is wrong when he says this, correct?

23   A    This does not appear to be correct.

24               MS. PHILLIPS:  Okay.  You can take that down

25   now, thanks.

1               Your Honor, I'm reminded that I need to move

2    into evidence OREX_65.

3               MS. SAMPLIN:  No objection.

4               THE COURT:  It's admitted.

5                    (Plaintiff's Document Exhibit 65 received
                         in evidence.)
6               MS. PHILLIPS:  Thank you.

7    BY MS. PHILLIPS:

8    Q    Would you agree that in 2016, after the initial

9    injunction was issued, Rimini positions -- Rimini Street's

10   position with regard to the injunction that it would -- excuse

11   me, let me repeat that.

12              Would you agree that in 2016, after the injunction

13   was issued, Rimini Street's position was that it would limit

14   the process of Rimini's currently authored JD Edwards support

15   services to the extent Rimini would not be able to access

16   source code?

17   A    I would agree that Rimini Street made modifications to

18   our processes for a period of time after that injunction was

19   initially provided in 2016.

20              The adjustments were in an abundance of caution.  We

21   took a step back and voluntarily modified our processes to ask

22   engineers at that time not to do hands on keyboard, not to

23   have any interaction with the JD Edwards environment while we

24   were determining what our approach would be.

25              So that was the approach that we had taken, was it

1    was a, you know, don't use the remote connectivity in which,

2    of course, open code was not able to be accessed, but you

3    couldn't -- they couldn't do anything, you know, through that

4    remote connection, we just asked them not to use it.

5    Q    Understood.  And, again, that based on Rimini's

6    understanding at the time that the injunction would limit

7    those processes, correct?

8    A    So it feels like you're asking me for a legal opinion

9    there.  You know, there was, obviously, legal opinions on what

10   different things meant.

11             What I can answer, and I explained earlier today, is

12   that from a business perspective we chose to limit -- to ask

13   our engineers to not access the JD Edwards environment for a

14   limited period of time while we took a step back and we

15   evaluated, you know, what approach we should take.

16             It was important for us to comply with the

17   injunction, of course, but we had just took a break there for

18   a while where we weren't using remote access.

19   Q    Okay.  I'll ask you to take a look at OREX_66, if you

20   will, please.  This is a Rimini Street investor presentation

21   dated February 7th, 2017, and I will represent to you that I

22   believe this is a draft investor presentation.

23             MS. SAMPLIN:  And I'll object for lack of

24   foundation.

25             MS. PHILLIPS:  Do you --

1            THE COURT:  Well, I don't have a question before

2   me, and I didn't understand it was being offered, but

3   obviously there's an --

4            MS. PHILLIPS:  I'm not offering it yet.  I would

5   like to lay the foundation, please.

6            THE COURT:  All right.  Go ahead.

7   BY MS. PHILLIPS:

8   Q   Mr. MacKereth, you understand that Rimini has, in the

9   past, delivered investor presentations, correct?

10  A   Yes, I do.

11  Q   And do you recognize this document as such an investor

12  presentation?

13  A   I'm not familiar with all the presentations we give to

14  investors, but I will give you that it says Investor

15  Presentation on the cover.

16  Q   Uh-huh.  So do you recognize it as an investor

17  presentation?

18  A   You know, I can't confirm this is definitely something

19  that was shared with anybody, but I can, again, say that on

20  the cover page it says Investor Presentation.

21          I can't -- you know, I'm not involved in presenting

22  these to investors very often.  I've certainly pulled them

23  together so I don't really have any knowledge of it other than

24  that.

25  Q   Okay.  But you have been involved, then, in some investor

1   presentations, correct?

2    A    You know, sometimes I'll be called to present, you know,

3   a slide in an investment presentation, sure.

4    Q    Okay.  So do you recognize this as a Rimini business

5   document, then, sir?

6    A    It's obviously in Rimini Street format.  So, again, I'm

7   not an expert to know whether it truly is ours, but I'll take

8   your word for it.

9                MS. PHILLIPS:  All right.  Your Honor, I'd move

10   into evidence OREX_66.

11                MS. SAMPLIN:  Objection, lacks foundation.

12                THE COURT:  Sustained.  It's not admitted.

13                MS. PHILLIPS:  Okay.

14   BY MS. PHILLIPS:

15    Q    Mr. MacKereth, I believe you were testifying about the --

16   what I believe your counsel called the over-the-shoulder

17   method.  Do you recall that testimony?

18    A    Yes, I do.

19    Q    And, again, in 2016, Rimini determined that it would

20   fulfill its service obligations involving source code

21   modification by looking over the shoulder via remote

22   access, GTM, of client employees access -- as client employees

23   access -- employees access the source code.  Is that your

24   understanding?

25    A    No, that's not my understanding.  I think you might be

 1  misstating some things there.  Could you repeat the question,

 2  please?

 3   Q    Sure, absolutely.

 4          So do you agree that Rimini determined in 2016 that

 5  it would fulfill its service obligations involving source code

 6  modification by looking over the shoulder via remote access of

 7  client employees access the source code?

 8   A    So -- thank you.  Rimini Street had not taken a position

 9  overall as to the best way to provide our services at that

10  point.

11          What I testified to this morning is that for a

12  period of time shortly after the injunction we took a step

13  back, we asked our clients -- we asked our engineers to not

14  use remote access to work on client environments to provide

15  those updates, and we discussed this with some of our clients.

16          It was not a Rimini Street position that we've

17  determined this was appropriate for clients, and so I didn't

18  state that it was, you know, the Rimini Street position.

19          What I said was that we did experiment with this

20  with some of our clients just following the injunction.

21   Q    Are you aware that your CEO, Seth Ravin, in February of

22  2018, testified that, quote,

23          "A second decision that was made was that

24       relating to JDE software, we would implement a

25       go-to-meeting, over-the-shoulder advisement for our

1       customers to touch the code themselves with Rimini

2       Street not touching Oracle code"?

3   A   I'm not familiar with our CEO's testimony in this case.

4   I haven't reviewed that content.

5   Q   Okay.  Well, you were involved, yourself, in the decision

6   to implement the over-the-shoulder approach to providing JDE

7   support, correct?

8   A   I was involved in the discussions around how we

9   would provide support for our JD Edwards customers, of course.

10  Q   Let's take a look at OREX_1340, please.

11          Okay.  This is an e-mail chain dated November 28th

12  and 29th, 2016, that you were on.  Do you see that?

13  A   Yes, I see it.

14  Q   And I will direct your attention to --

15          MS. PHILLIPS:  Well, first, I'll stop and ask to

16  move this into evidence, your Honor, OREX_1340.

17          MS. SAMPLIN:  No objection.

18          THE COURT:  It's admitted.

19              (Plaintiff's Document Exhibit 1340
                  received in evidence.)

20  BY MS. PHILLIPS:

21  Q   Okay.  And at the bottom of the page, on page 1 there,

22  you asked Ray Grigsby and Roger Franklin,

23          "I need you to explain why we could not look

24      over the shoulder and instruct a client how to fix

25      their system.  Let's use this example to help me

```
 1          understand because, before reading these, and I

 2          attended all the same calls with Legal, I would have

 3          thought it's all okay as long as we're not accessing

 4          the system."

 5               Do you see that?

 6   A    I'm just reading the rest of the e-mail thread as I am

 7   refamiliarizing myself with this.  It was back in 2016.

 8   Q    Uh-huh.

 9   A    Okay.  So could you repeat that question again?  I was

10   just kind of multitasking.  I was just reading.

11   Q    No problem at all, I understand.

12          I just read this e-mail from November 29th from you

13   to Ray and Roger, asking you if you saw that, correct?

14   A    Yes.  I've seen this e-mail.  I created this e-mail back

15   in 2016.

16   Q    Okay.  And at the time you thought that over-the-shoulder

17   support was, quote, "all okay as long as we are not accessing

18   the system," correct?

19   A    So it's important to put this into context, which is why

20   I was double checking the rest of the thread here.

21          So this e-mail exchange is between myself and Ray

22   Grigsby, who heads the JDE team, and Roger Franklin, who is

23   also part on my team, part of the support team.

24          And if you'd read the full e-mail, you would see

25   there that he's been requested by the sales team to
```

1    participate in a sales discussion with a client.

2              We don't have remote connectivity to prospective

3    clients.  We haven't gone through and set up that remote

4    connectivity with those clients.

5              So we are, you know, working with him to explain how

6    the system works, and it appears by some of the earlier

7    communication that you didn't read, that the sales team had

8    asked us to remotely participate in an over-the-shoulder or

9    go-to-meeting session and help the client with a particular

10   issue that they had.

11             It further goes on to say that the concern from the

12   team is that it's in Mandarin, the client's engineers

13   understand the Mandarin language, and the system would be in

14   Mandarin, so it would be difficult to provide that over the

15   shoulder.

16             So here we're referring to, "as long as we're not

17   accessing the system," that's in the context of we're not

18   accessing the system because they're not our clients and they

19   haven't given us the ability to modify their system because

20   they provide that typically by being a licensee and then

21   giving us the ability to modify the code.

22             So just to put it into context, it's not the same as

23   you were stating.

24   Q    Understood.  And Mr. Ray [sic] responds to you,

25             "The question was not 'if we can use the

1           proposed procedure,' Roger wanted to ensure that the

2           'over the shoulder technique' allowed" verifying "the

3           BF (C source code) via GTM.  Just a clarification as

4           it is still 'viewing' the source code using the

5           client as the driver."

6                   Do you see is that?

7    A   I do.

8    Q   And the C source code there referred to is code in human

9    readable format, correct?

10   A   I believe that to be the case, yes.

11   Q   Okay.  And that's what you've been referring to in this

12   proceeding as open code, correct?

13   A   That is correct.

14   Q   Okay.  Thank you.

15           Now, you testified that Rimini Street considered the

16   over-the-shoulder approach, but it did more than just consider

17   that approach, correct?  It actually communicated the

18   over-the-shoulder to some of its JDE clients, correct?

19   A   I believe I've stated that already that, we considered

20   using over the shoulder, and we did discuss it with some of

21   our clients because we had in-flight cases and we had tax and

22   regulatory updates that were due.

23   Q   Okay.  Let's take a look at OREX_339, please.  And this

24   is an October 2016 e-mail chain that you are on.  Do you see

25   that?

1    A    Yeah.  I'm just reading this.  This is another e-mail

2    thread here so --

3    Q    Sure.  And you recognize this as an e-mail that you

4    sent -- or, excuse me, that you received?

5    A    I'm copied.  I didn't author any of these, but I'm

6    copied, yes.

7              MS. PHILLIPS:  All right.  Your Honor, I would

8    move OREX_1339 into evidence.

9              MS. SAMPLIN:  No objection.

10             THE COURT:  It's admitted.

11                  (Plaintiff's Document Exhibit 1339
                       received in evidence.)

12   BY MS. PHILLIPS:

13   Q    All right.  And you see there at the top, Sebastian

14   Grady, again, the Rimini President, reports that he just spoke

15   to Brian, and he is fine even if we have to look over their

16   shoulder on the JDE issues that require source code changes.

17        Do you see that?

18   A    I do.

19   Q    And the date of this e-mail is October 21st, 2016;

20   correct?

21   A    That is correct.

22   Q    Okay.  And if you go to the third e-mail -- or, excuse

23   me, the last page of the e-mail, do you recognize Brian here

24   as from Dean Foods?

25   A    Yes.  Brian Murphy is one of the executives that Rimini

```
 1   Street client Dean Foods.

 2                MS. PHILLIPS:  Great.  Thank you.

 3                All right.  You can put that away, Matt, Thank

 4   you.

 5   BY MS. PHILLIPS:

 6   Q   And I'll direct your attention, now, to OREX_68, please.

 7                And this is a December 6th -- excuse me, December

 8   1st, 2016, e-mail.  Do you see that?

 9   A   I'm getting there.

10   Q   Okay.  And I believe you testified on direct about Rimini

11   Street's client, Libbey Glass, correct?

12   A   Yes, that is correct.  I confirm they're a Rimini Street

13   client.

14   Q   And Rimini Street told its client, Libbey Glass, about

15   the required process for over the shoulder, correct?

16   A   It's my understanding that Libbey Glass is one of the

17   clients that we discussed not using our remote access for a

18   period of time with that particular client.

19   Q   Okay.  And if you go down to the subject -- or, excuse

20   me, the contents of that e-mail there, you'll see this says,

21                "Lowering case to GREEN since you all had the

22        great call with Libbey and they understand the

23        required process for 'over the shoulder.'"

24                Do you see that?

25   A   I do.
```

1    Q    And they describe the over-the-shoulder process as

2    required, correct?

3    A    In Ray's e-mail he uses the word required, yes.

4    Q    Right.  And that over-the-shoulder process was required

5    because of the injunction, correct?

6    A    So I explained this earlier that after the injunction

7    came out, when we took a step back and looked at our

8    processes, we discussed with a few of our clients, Libbey

9    Glass was one, not using remote connectivity for a period.

10              So we had had that discussion.  This was not that

11   Rimini Street took an official position as a company, and,

12   indeed, I think that ultimately, when we had taken a position

13   on this when the injunction was reinstated then we were very

14   clear, as I've testified today, what our approach has been.

15   Q    And if you can go, I think.  To page 4, please.

16              These are notes of the call with Libbey Glass.  Do

17   you see that?

18   A    Yes, I do.

19   Q    And do you see where Rimini told Libbey Glass that,

20   quote,

21              "For future accessing of JD Edwards code, we

22         will need to use GTM and have the client drive when

23         accessing the source code."

24              Do you see that?

25   A    Okay.  I see that there, yes.

1    Q   Okay.  So, again, that was what was communicated to

2    Rimini Street's client Libbey Glass, correct?

3                    MS. SAMPLIN:  Objection, lacks foundation.

4                    THE COURT:  Is the exhibit in evidence?

5                    MS. PHILLIPS:  I would move it into evidence if

6    it is not.

7                    MS. SAMPLIN:  I have no objection to the exhibit

8    being moved into evidence, but there's been no foundation for

9    the fact whether Mr. MacKereth knows or does not know what

10   happened on the call.

11                   MS. PHILLIPS:  I wasn't asking whether he knows

12   or not, I'm asking whether or not he sees it in the notes.

13                   THE COURT:  Well, some foundation is necessary

14   here.  I don't recall that being the specific question.

15                   MS. PHILLIPS:  Understood.  I'll rephrase.

16   BY MS. PHILLIPS:

17   Q   So, Mr. MacKereth, you've testified on direct and in

18   cross-examination that you are aware that Rimini Street

19   employees reached out to your client, Libbey Glass, to

20   communicate that to them, the over-the-shoulder method,

21   correct?

22   A   I'm aware that we discussed the remote support model with

23   Libbey Glass, yes.

24   Q   Okay.  And do you understand these are notes of that

25   phone call?

1    A    You know, I've not -- this is not my notes.  I wasn't

2   present in this meeting, and so I'm not aware of whether these

3   are indeed accurate notes reflecting that meeting.  I can't

4   attest to that unfortunately.

5    Q    Okay.  Do you see, though, that Rimini told Libbey Glass

6   that,

7                  "For future accessing of JD Edwards code, we

8           will need to use GTM and have the client drive when

9           accessing the source code"?

10                  MS. SAMPLIN:  Objection, lacks foundation.

11                  THE COURT:  I think you asked -- the question

12   was whether he was aware, isn't it?

13                  MS. SAMPLIN:  The question was do you see that

14   they told Libbey Glass, I believe.

15                  THE COURT:  All right.  You're correct.

16                  Rephrase the question, please.

17                  MS. PHILLIPS:  Sure.  No problem, your Honor.

18   BY MS. PHILLIPS:

19    Q    Were you aware that Rimini told Libbey Glass that,

20                  "For future accessing of JD Edwards code we

21           will need to use GTM and have the client drive when

22           accessing the source code"?

23                  MS. SAMPLIN:  Same objection.

24                  THE COURT:  Overruled.

25                  THE WITNESS:  So I was not aware of the specific

1    messaging that you're using there.

2                    And, again, I think I want to be clear about my

3    testimony.  The testimony is that for a period of time we took

4    a step back, we made an adjustment to our processes, including

5    Libbey Glass, and we did not use remote access at all.

6                    It does not mean that for any future time that

7    we're performing support that we've made this change.  So if

8    that was the suggestion in a meeting between a couple of

9    members of the support team and some of the members of the

10   Libbey Glass team, then, again, noted in these minutes, that

11   does not reflect the Rimini Street position on that matter

12   that going forward we would always be changing our approach to

13   do something.  The company did not take that position.

14   BY MS. PHILLIPS:

15   Q    Okay.  Are you aware that Rimini told Libbey Glass that,

16   quote,

17                    "Any debugging that requires access to JDE

18        source must be done via GTM with Libbey resource

19        while injunction was in place"?

20   A    Are you quoting from these notes here?

21   Q    I am.

22   A    I'm not aware of the exact messaging that was given and

23   relevant to the injunction in this meeting.

24   Q    Do you have any reason to doubt the accuracy of these

25   notes?

1    A   I have lots of reasons to doubt the accuracy.  I don't

2  know what material you've presented here, no way to know

3  whether it's valid or not.

4    Q   Okay.  Let's take a look at OREX_19, which is

5  preadmitted.

6            THE COURT:  For the record, what does GTM stand

7  for?  I assume everyone is in agreement.

8            MS. PHILLIPS:  It's Go to Meeting, correct?

9            THE WITNESS:  Yes.  It's Go to Meeting, your

10  Honor.  It's a conferencing software.

11            THE COURT:  All right.  Thank you.

12            MS. PHILLIPS:  And, I'm sorry.  I just want to

13  make sure that the record is clear that I've moved to admit

14  OREX_68.  I thought I had, but maybe I didn't.

15            MS. SAMPLIN:  We have a foundation objection.  I

16  mean, I'm not going to object that the e-mail is what it is,

17  but I think there's a foundation issue with respect to the

18  attachment that hasn't been overcome.

19            MS. PHILLIPS:  I -- we can check the record.

20  I'm virtually certain that you admitted OREX_68.

21            THE COURT:  Well, if it's admitted, it's not an

22  issue.  I'll allow counsel to bring that to my attention after

23  they've had a more careful chance to review that.  I'll

24  reserve ruling.

25            MS. PHILLIPS:  Thank you.

1  BY MS. PHILLIPS:

2  Q    So let's take a look at OREX_19.

3        So after the injunction was reinstated in November

4  of 2018, so two years after the period we were talking about,

5  Seth Ravin sent an e-mail on November 6, 2018, to all Rimini

6  employees notifying them that the injunction was on -- now on

7  again, correct?

8  A    Yes, I see that.

9  Q    Okay.  And you received this, right?

10  A    That is correct.  I'm a member of the RSI all

11  distribution list.

12  Q    And this is the last time that Rimini made a change to

13  its position about how to comply with the injunction, correct?

14  A    I think that's not an accurate statement.  We continue to

15  evolve that processes to comply with the injunction.  So as

16  much as you said this is the last time we made a change, we

17  continued to make adjustments constantly as we'd come up with

18  new innovations and ideas and ways to comply with the controls

19  that are in place.

20  Q    I would like to read to you from your deposition from

21  January 17th, 2020, page 57, line 24, to page 58, line 15.

22  A    Do I have a copy of that here?

23  Q    You should, actually.  Not in the binder you've been

24  looking in, but in the second binder both of your depositions

25  should be there.

1    And, again, I'll read you the page.  If you look to

2    page 57 of your January 2020 deposition.

3    A   Fifty-seven, you said?

4    Q   Yes.

5            "QUESTION:  As you sit here today, do you

6        know when the last time is that Rimini made a change

7        to its position about how to comply with the

8        injunction in response to relevant decisions from the

9        Court?

10            Your answer, "To my recollection, the most

11        recent made decision was the November decision around

12        the injunction, and that would be the most recent

13        time for this particular document.

14            "QUESTION:  And that would be November of

15        2018?

16            "ANSWER:  Yes.

17            "QUESTION:  On November 5th, 2018, the Ninth

18        Circuit denied a stay, is that to which you were

19        referring?

20            "ANSWER:  That's my recollection.  Yes."

21            MS. SAMPLIN:  I would object to improper

22    impeachment.  This deposition happened on January 17th, 2020,

23    and so I don't think it's impeachment if there were

24    changes made after that point which is what he testified to on

25    direct.

1          THE COURT:  The objection is overruled.

2  BY MS. PHILLIPS:

3  Q   Was this testimony accurate when you gave it?

4  A   Yes.

5  Q   Okay.  And Rimini's position at that time was that it

6  does not believe we need to make any changes to the current

7  support processes for JD Edwards to comply with the

8  injunction, correct?

9  A   I believe I was clear in my testimony that we believed we

10  had the correct processes to support the injunction.  We

11  believed we had the right processes, but that doesn't say that

12  we can't continue to innovate and evolve that processes over

13  time.

14          So, you know, this is a business, and we continue to

15  improve our processes over time within our -- it's certainly

16  possible for a company to do that as we come up with new ways

17  of solving problems.  It doesn't mean that we're frozen in

18  time from ever improving our processes.

19  Q   Let's take at OREX_2, please, and this has been

20  preadmitted.  And I believe you took a look at this e-mail on

21  direct.

22          And do you see the beginning of the second paragraph

23  says,

24          "We do not believe that we need to make any

25      changes to current support processes for JD Edwards,

1      JDE, to comply with the injunction."

2           Do you see that?

3  A    I do.

4  Q    So as of November 10th, 2018, it was Rimini's position

5  that it did not require any changes to the current support

6  processes for JD Edwards, correct?

7  A    So I think that that language is clear.  It's explaining

8  that we are not making changes to the current support

9  processes.

10          Our support processes continue to evolve, and we

11 have protections in place for third-party intellectual

12 property that I have explained before in the Acceptable Use

13 Policy.  So I think that we made that position very clear.

14 Q    Yeah.  So the answer to my question was yes?

15 A    I'm sorry.  You'll have to repeat your question again

16 before --

17 Q    No, I'm not going to repeat it again.

18          In this e-mail about JD Edwards compliance with the

19 injunction, Mr. Grigsby uses the terms closed and open code,

20 correct?

21 A    Yes, he does.

22 Q    And if you look at the paragraph that begins, "As you

23 know, JDE as multiple layers of open code."  Do you see that?

24 A    I do.

25 Q    Okay.  And so Mr. Grigsby told all the JDE team that no

1    one is permitted to copy any closed JDE code for development

2    and testing of software updates, correct?

3    A    Yes, that is correct.

4    Q    Okay.  But he did not prohibit Rimini engineers from

5    copying what you've referred to as open code, JDE open code,

6    for development and testing of software updates, right?

7    A    In this communication he is not so prohibiting that, no.

8    Q    Okay.  So JDE engineers could continue to copy what you

9    call -- what you have called JDE open code after the

10   injunction, correct?

11   A    Rimini Street engineers can continue to modify open code

12   in the JD Edwards environment as is consistent with industry

13   practice, yes.

14   Q    Okay.  And after the injunction Rimini engineers did

15   continue to copy what you referred to as JDE open code to

16   support clients, correct?

17   A    Yes, that is correct.

18   Q    Would you agree that if JDE software source code in

19   paragraph 8 of the injunction means source code including what

20   you have called open code, that Rimini has been violating the

21   injunction since November of 2018?

22   A    So I'm not a lawyer, obviously, here.

23           It's my understanding that we are providing the

24   services in line with all the laws that apply, including this

25   injunction, and that that could not possibly be referring to

1    the open code that I've been describing in my testimony today.

2     Q    I understand that that's your position, and one that is

3    given not as a lawyer.

4              But I'm asking you, if in fact JDE software source

5    code does mean open code, then that means Rimini has been in

6    violation of the injunction since November of 2018, correct?

7              MS. SAMPLIN:  Objection, calls for a legal

8    conclusion.

9              THE COURT:  Sustained.

10             MS. PHILLIPS:  I'll move on.

11   MS. PHILLIPS:

12    Q    I want to keep this e-mail up though.

13             At the end of this e-mail Mr. Grigsby also wrote

14   that -- if you can see, Rimini would continue its practices

15   and "seek further guidance from the District Court, as

16   necessary, at the appropriate time."

17             Do you see that?

18    A    Yes, I do.

19    Q    And that never happened, did it?

20             MS. SAMPLIN:  Objection, lacks foundation.

21   BY MS. PHILLIPS:

22    Q    I'm asking, did it happen?

23    A    You would have to direct these legal questions to our

24   legal team.  I'm not really familiar with exactly all the

25   back-and-forth with different courts.

1    Q    I'm just asking you a yes or no question.  Do you know

2    whether or not Rimini ever sought guidance from the district

3    court about the meaning of JD Edwards source code?

4    A    I'm not aware.

5    Q    Okay.  Would you be part of the decision-making team --

6    strike that.

7              You testified on direct, I believe, that you were

8    incredulous about the idea that the injunction could apply to

9    open code.  Do you remember that?

10   A    That is a true statement.

11   Q    And you just testified, I think, extensively in regard to

12   previous documents that I showed you that there was a lot of

13   confusion about the meaning of the 2016 injunction.  Do you

14   remember that testimony?

15   A    I stated that there was a lot of confusion at the time

16   following the injunction.  It's not necessarily just about the

17   one particular -- about the language, but just confusion in

18   terms of, you know, what steps would be appropriate to take.

19   Q    Okay.  Let's take a look at the Acceptable Use Policy

20   that you went over with your counsel on direct.  This is

21   OREX_17 or DTX-025 depending on the binder, but let's stick

22   with my binder and then it's OREX_17, and it has been

23   preadmitted.

24   A    Okay.  Got it.

25   Q    Okay.  And you were looking, I believe, at the appendix

1    with your counsel so I'll direct you there, it's at the very

2    back page.

3              All right.  And the appendix of the AUP defines

4    can't copy content as, quote,

5                   "Other companies' software and materials that

6         are not licensed to Rimini Street (e.g., Oracle or

7         SAP software documents and code.)"

8                   Am I reading that correctly?

9    A    Are you reading from the footer of the document?

10   Q    I'm reading at the top,

11                  "Can't copy content" means other companies'

12        software and materials that are not licensed to

13        Rimini Street."

14                  Do you see that at the very top?  It's

15   highlighted on your screen if you want to take a look at your

16   screen.

17   A    Yes, I do.

18   Q    Okay, great.

19             And then if we go to the footnote here at the very

20   bottom, the first footnote, not the second, that defines the

21   meaning of, quote, "other companies' software and materials."

22   Do you see that?

23   A    Yes, I do.

24   Q    And that's defined as,

25                  "All the materials that comprise software

1           applications produced by an outside company or per,

2           Oracle, SAP), including the object and source

3           computer code, database designs, software updates,

4           custom solutions, environments, software bug fixes

5           and patches (code error corrections), and related

6           documentation."

7                   Do you see that?

8   A   I do.

9   Q   Okay.  What Rimini calls JDE open code would fall into

10  the category of other companies' software and materials,

11  correct?

12  A   Yes, that is correct.

13  Q   And the terms open code and closed code, they don't

14  appear anywhere in this AUP, correct?

15  A   You know, as I sit here, I couldn't state that that's

16  correct or not.  The AUP is a large document, it may refer to

17  open or closed, but I can't tell you off the top of my head.

18  Q   Okay.  But you're read the AUP, correct?

19  A   Many times, yes.

20  Q   Yes.  And you've had to read it every year, correct?

21  A   Yes, that is correct.

22  Q   Okay.  But you don't know whether or not it makes a

23  distinction between an open code or a closed code?

24  A   You know, just off the top of my head without going

25  through and checking, there may be a section here, and I can

1    search through and find it.  I don't know for sure.

2    Q    Okay.  Under Rimini's standard processes, would you agree

3    that Rimini does not access, copy, modify, or use the nonhuman

4    readable code underlying portions of the JD Edwards software?

5    A    Sorry, just repeat that one more time.

6    Q    Sure, of course.

7              Under Rimini's standard processes, Rimini does not

8    access, copy, modify, or use the nonhuman readable code

9    underlying portions of the JD Edwards software.  Do you agree

10   with that statement?

11   A    Yes, I believe that is true.

12   Q    And this code is what Rimini refers to in this litigation

13   as closed code, correct?

14   A    I've been referring to the nonhuman readable code as

15   closed code, that is correct.

16   Q    Okay.  And Rimini has never provided JDE support by

17   decompiling closed code, correct?  Do you agree with that,

18   Mr. MacKereth?

19   A    You know, our Acceptable Usage Policy is very clear that

20   decompilation of this code is against our policy, and we have

21   had that prohibition in place.

22              As I sit here, could I say that there's never ever

23   been a time when someone has ever decompiled something, you

24   know, I want to be very clear, I'm not privy to every single

25   support action that's ever been taken so perhaps that would be

—1236—

1    possible, but it is against that policy today to decompile,

2    I'll testify to that.

3    Q    I appreciate the caveat.

4         But so you do agree, though, that under your

5    standard processes Rimini would not provide support for JDE

6    clients by decompiling closed code, correct?

7    A    Under the processes that we have in place today, we

8    forbid our team from decompiling JD Edwards closed code that

9    is shipped with their product.

10   Q    Okay.  And same thing for reverse engineering and closed

11   code, correct?  Rimini's standard processes do not allow for

12   providing JDE support by reverse engineering closed code,

13   would you agree with that?

14   A    Our Acceptable Usage Policy prevents a JD Edwards support

15   team from reverse engineering JD Edwards software support

16   code, yes, that is part of our compliance.

17   Q    Okay.  And, again, it's not part of your standard

18   processes to do this.

19   A    Well, it's part of our standard processes to not

20   decompile because it's in the Acceptable Usage Policy, so

21   that's why we put that in place.

22   Q    Okay.  Would you agree that source code is human-readable

23   code?

24   A    You know, source code is a flexible term, and so I think

25   you've got to be careful how you use that.

1    Q    Okay.  Well, let's take a look then at OREX_139.  This is

2    the Compendium of US Copyright Office Practices, and if we

3    take a look at -- I think what you have is just an excerpt of

4    it, and I'm looking at 721.3.

5    A    Okay.

6    Q    The question is What is Source Code.  Do you see that?

7    A    I do.

8    Q    And so the copyright -- the US Copyright Office defines

9    source code as.

10                    "...a set of statements and instructions

11            written by a human being using a particular

12            programming language such as C, C++, FORTRAN, COBOL,

13            PERL, Java, Basic, PASCAL, LISP, LOGO, or other

14            programming languages.  These statements or

15            instructions are comprehensible to a person who is

16            familiar with the relevant programming language, but

17            in most cases a computer or other electronic device

18            cannot execute these statements or instructions

19            unless they have been converted into object code."

20                Do you see that?

21    A    I do.

22    Q    Okay.  And the US Copyright Office does not use the terms

23    open code or closed code, correct, in this definition?

24    A    In the definition that you put in front of me, the US

25    Copyright Office has not used the phrase open code.

1    However, we're talking about this injunction, and

2    we're talking about the Enterprise software support industry,

3    and in the Enterprise software support industry open code and

4    closed code is a terms that are used frequently.

5    It's not something that should be a surprise to

6    anyone in the Enterprise support space, and I'm commonly asked

7    about open code and closed code by our clients.  I talk about

8    this all the time.

9    And so that's -- when the way we refer to open code

10   and closed code, our team understands what that means, and,

11   indeed, people working in this industry know very well what

12   that means.

13   So the fact that there's no definition in this one

14   document, I don't conclude that that means what you're

15   suggesting.

16   Q   Okay.  My question was just does the US Copyright Office

17   use the terms open code or closed code.  Is your answer that's

18   correct?

19                MS. SAMPLIN:  Objection, lacks foundation based

20   the way the question was phrased.

21                MS. PHILLIPS:  I'll rephrase then.

22   BY MS. PHILLIPS:

23   Q   In this definition that you have before you, does the US

24   Copyright Office use the term open code or closed code, yes or

25   no?

1   A   In this one definition you have presented to me, they do

2   not use that phrase.

3   Q   Okay.  But you does define object code, correct?

4   A   Looks like that's 721.4?

5   Q   Correct.  And that's defined as "the representation of a

6   computer program in a machine language."  Do you see that?

7   A   I do.

8   Q   And then one more sentence down it says,

9           "Object code is comprehensible to a computer

10          or other electronic device, but it is not intended to

11          be read by human beings, and as a general rule, it is

12          not directly comprehensible to human beings."

13              Do you see that?

14   A   I do.

15   Q   Okay.  And is object code what you have been referring to

16   as closed code?

17   A   So closed code is also not able to be read by human

18   beings.  It's compiled so it fits into a lot of the

19   definitions that we have here.

20          Again, I'm using a definition which is commonly

21   Enterprise support space, but you've put something in front of

22   me -- I don't doubt the US Copyright Office, but you've put

23   something in front of me here which is a very different scope.

24          I'm talking about Enterprise applications here, and

25   I've been very clear in my testimony about open code and

1    closed code, so I don't want to be misrepresented in what

2    those terms mean.

3    Q    So what was your answer to my question?

4    A    My answer to the question was that while I can see that

5    there's a reference to object code in here, this is -- and I'm

6    not going argue with this source, of course, that we're

7    talking about two different things.

8              You're bringing up a definition in a -- just talking

9    in general about different types of software.

10             I'm talking about Enterprise application software

11   here, and in Enterprise application software we use open code

12   and closed code, not just myself, other organizations use

13   these phrases.  So I feel that I'm being a little bit misled

14   here.

15   Q    Okay.  Let's take a look at OREX_61.

16             This is a Rimini document called JD Edwards Practice

17   PSE, which I believe stands for Primary Support Engineers,

18   Rules and Procedures Pertaining to IP.

19             Do you see that?

20   A    Sorry, I'm just getting there.

21             Yes, I see that document.

22   Q    Okay.  And these are instructions for JDE primary support

23   engineers, yes?

24   A    You know, this document is, once again, a very old

25   document, 2010.

1    Q    Correct.

2    A    Written by an employee that I'm not familiar with so I

3    don't think he's been working with us for the last nine years,

4    and so I couldn't say that this is really instructions for the

5    primary support engineers, certainly not something that our

6    engineers would be following.

7           It doesn't follow any of our normal guidance

8    structure for work instruction.  We have a very formal

9    document control system, it's not following any of those

10   controls.

11          So, no, I don't think so.  This may be -- again,

12   this could be some draft document that you have discovered.

13   Q    Well, I'll direct your attention to page 4 and

14   specifically the instructions under Access to JDE Software.

15   Do you see that under 9a?  And -- let me ask that question.

16   Do you see that, Access to JDE Software?  Are you with me?

17   A    Yes, sorry, I was looking at section 4.

18          Section 9, you said, 9a?

19   Q    Yes.

20   A    Okay.

21   Q    I believe I directed you to page 4.

22   A    Got it.  Yes, I do.

23   Q    Okay.  And it says,

24          "Any Rimini Street PSE or developer will have

25          access to the JDE source code via the customer's

1    machine access."

2              Do you see that?

3  A   I do.

4  Q   Okay.  And my question for you is, I believe you said

5  that you thought this document came from 2010; is that

6  correct?

7  A   Well, I read the document change log in page 2 of this

8  document, and it states that it was 2010.

9  Q   So that was before the injunction, correct?

10 A   And that would date this prior to the injunction,

11 certainly.

12 Q   Okay.  And here's there's a reference,

13           "Any Rimini Street PSE or developer will have

14      access to the JDE source code."

15              Do you see that?

16 A   I see that line, yes.

17 Q   And it doesn't make a distinction between open code or

18 source code, does it?

19 A   So source code again --

20 Q   Sir, my question was yes or no one.

21 A   But it's misleading so I feel I can't give you an answer

22 if you are misleading me.

23 Q   Well, you know what, your counsel will have an

24 opportunity on redirect to ask you what you want to answer.

25           My question was a yes or no question, sir.

1    A    Could you repeat that question?

2    Q    Yes.  The reference here is to JDE source code, correct?

3  And there is no distinction between open code or closed code,

4  yes or no.

5    A    That's what the document says.

6    Q    Great.  You can put this document away.

7            Let's pull up OREX_64, please.

8                MS. SAMPLIN:  I just want to -- can I just be

9  clear that that document is not in evidence and we have a

10  foundation objection to that.

11                MS. PHILLIPS:  Understood.

12                THE WITNESS:  What's the reference to the next

13  document?

14  BY MS. PHILLIPS:

15    Q    Oh, I'm sorry, it's OREX_64, if you can look at that,

16  please.

17            And this is an e-mail from J. Harrison, who I

18  believe is Jill Harrison, to Mr. Grigsby about whom we've

19  spoken, correct?

20    A    Yes.  I'm just reading --

21    Q    And this is an August 27th, 2013 document, correct?

22    A    Yes, the e-mails do cover that time frame.

23    Q    Okay.  And Mr. Grigsby says in that top e-mail -- sorry,

24  in the bottom e-mail, I apologize,

25                "If there are critical Oracle patches, that

1           are necessary for the software, we (our CNC team)

2           will handle them and we can find a work-around and

3           fix the problem in the source code we can access."

4                Do you see that?

5    A   Yes, I do.

6    Q   Okay.  And he's talking about "source code we can

7    access," and that's what you refer to as open code, correct?

8    A   If Ray's referring to providing solutions, then he will

9    be referring to making modifications to the open code most

10   likely, yes, I would agree.

11   Q   Yes.  But he refers to it as source code, correct?  He

12   does not refer to it as open code?  Do you agree?

13   A   I stated earlier my position on that, that source code is

14   a flexible term so he may be using that language here, but,

15   again, my position on that has been clear.

16   Q   Again, my question was does he make a distinction in this

17   e-mail between open code and closed code?  Yes or no.

18   A   Not that I can see.

19   Q   Okay.  Now, JD Edwards software comes with tools.  You've

20   testified about that, correct?

21   A   That is correct.

22   Q   And one of the tools is called Object Management

23   Workbench, correct?

24   A   That is correct.

25   Q   OMW?

1   A    Yes.

2   Q    And that tool allows a licensee to access, read, and

3   modify the JDE software, correct?

4   A    That is what tool allows you to modify the open code,

5   correct.

6   Q    Let's look at OREX_62, please, and this is an e-mail

7   where you were at the cc, do you see that?

8   A    Yes, I do.

9   Q    And it's dated June 15th, 2015.  Do you see that?

10  A    Yes.

11  Q    Okay.  And this is prior to the injunction, correct?

12  A    That is correct.

13  Q    Okay.  And you see the attachment is JDE Dictionary of

14  Common Terms.  So I will direct your attention to that

15  Dictionary of Common JDE Terms, specifically the Object

16  Management Workbench, OMW.

17           It is defined as,

18              "A JDE E1 development tool used to manage

19       source code changes and migration to other

20       environments."

21                Do you see that?

22  A    Yes, I do.

23  Q    And so in this Dictionary of Common JDE Terms, source

24  code means open code, correct?

25  A    In this example document, this one document, there's a

1    reference to source code, and that reference here is to JDE

2    code, and there is -- the team modifies open code as part of

3    the work that they provide.

4    Q    Okay.  Again, my question was, in this Dictionary of

5    Common JDE Terms, source code means open code, correct?

6    A    In the document that you've presented to me, I see the

7    reference to source code.  Again, I think that it's --

8    Q    Well, you just testified, sir, that OMW is used as a tool

9    to manage source code changes, and that would be open code,

10   correct?

11   A    Actually, I don't think I said that in my testimony.

12           So the Object Management Workbench is a tool that's

13   provided from Oracle to modify code within the JDE

14   environment.

15           I think you may have used the phrase source code

16   there.  I don't think I -- I typically will be more clear in

17   my articulation.  Apologies if I was erroneous.

18           I'll make it clear that we're modifying the open

19   code because it can be confusing to use the phrase source

20   code.

21   Q    So, again, though, this definition, when it says "source

22   code changes and migrations," it is referring to what you call

23   open code, correct?  That's what source code means in this

24   definition.

25   A    So, again, I didn't create this document.  I've made it

1    clear our position on open code and closed code.  I feel

2    that's -- you know, again, I didn't create this.

3    Q    I understand that you didn't create it.  I'm asking you,

4    you were on this e-mail, this is JDE common terms that your

5    employees were circulating, you oversee those individuals.

6          This definition of common JDE terms for OMW where

7    source code is referenced, and there is no distinction between

8    open code and closed code, source code in this context means

9    open code, correct?

10   A    This document only states source code, that is correct.

11   Q    Okay.  But when it says source code, what it's referring

12   to is what you have called open code.

13   A    So I have referred to the Object Management Workbench as

14   being a tool that is used -- provided by Oracle to update the

15   open code used throughout industry to do this, and therefore

16   that is the same tool that we're describing.  I think this

17   description is misleading.

18   Q    Can you take a look through the rest of the common JDE

19   terms listed in this document and tell me if you see whether

20   open code is listed among the common JDE terms.

21   A    Sure.

22          MS. PHILLIPS:  And while he's looking, your

23   Honor, I'd like admit OREX_62.

24          MS. SAMPLIN:  No objection.

25          THE COURT:  It is admitted.

1                    (Plaintiff's Document Exhibit 62 received
                     in evidence.)
2                    MS. PHILLIPS:  Thank you.

3    BY MS. PHILLIPS:

4    Q    I can try and make it easier for you, Mr. MacKereth, it

5    does look like the common JDE terms are alphabetized if that's

6    helpful.

7    A    Yeah, I can't see open code used in this particular

8    document.

9    Q    Okay.  And is closed code used among common JDE terms in

10   this document?

11   A    I did not see closed code referred to in this which I

12   will note is a draft document.  It says so in the header

13   there, so perhaps it's been updated with the correct material

14   now.

15   Q    Well, I'll invite your counsel on redirect to show you

16   the final.

17            Let's take a look at OREX_63, and here is an e-mail

18   chain between Jill Harrison who we saw in a previous document,

19   and Frank -- I hope I'm pronouncing his last name right,

20   Reneke?

21   A    Reneke.

22   Q    I did not, sorry.  Dan Ashton, with a cc to John

23   Whitaker.  Do you see that?

24   A    I do, I was reading --

25   Q    And this is from April 8, 2015?  Do you see that?

1    A    Yes, I'm just --

2    Q    And, again, so that's before the injunction, correct?

3    A    Yes, that's also my understanding.

4    Q    Okay.  And at the bottom of this document Jill Harrison

5    asks how Rimini handles tax and regs development for JDE.  Do

6    you see that?

7              And if you go up -- well, let me ask, do you see

8    that?  Are you with me?

9    A    No, I'm still -- sorry, I'm just trying to read.  It's an

10   e-mail thread here so it's --

11   Q    Sure.

12   A    Okay.  Yeah, I see that thread.

13   Q    And if you go up to the top e-mail then -- I'm sorry --

14   yes, sorry.  The middle one, thanks.

15             Frank Reneke says that for JDE World, quote, "Every

16   code fix is done directly in the source code."

17             Do you see that?

18   A    I do.

19   Q    Okay.  And, again, he doesn't distinguish between open

20   code or closed code, correct?

21   A    So, again, this is an e-mail from a salesperson to a

22   couple of other salespeople.  He's not making a technical case

23   here.  You're correct in that he uses the phrase source code

24   which I've said already is a flexible term.

25   Q    Thank you.  And for Enterprise, he says, "Code fixes are

1    is written in C," and, again, we have source code, correct?

2    A    I do see what he has stated there, yes.

3    Q    And code fixes written in C are what you referred to as

4    open code, correct?

5    A    The code which is written in C, and that C is open and

6    shipped with the product is open code and is commonly modified

7    in the industry as per my testimony, yes.

8              THE COURT REPORTER:  I'm sorry, I can't hear

9    you, sir.

10             THE WITNESS:  Sorry.

11             The said that the C code that is shipped by

12   Oracle which is commonly used in industry to modify the JDE

13   application is open code.

14   BY MS. PHILLIPS:

15   Q    Okay.  Just so that I'm clear for the record, the

16   reference here to source code for JDE in this e-mail is what

17   Rimini has been calling open code, what you have referred to

18   as open code, correct?

19   A    The reference to C where the source code is shipped by

20   Oracle with the product, we're referring here as the open

21   code.

22   Q    Okay.  Great.  Thank you.

23             You testified on direct, Mr. MacKereth --

24             MS. PHILLIPS:  You can put down this exhibit,

25   Matt, thank you.

1   BY MS. PHILLIPS:

2   Q    You testified on direct, Mr. MacKereth, about JDE

3   technical specifications.  Do you recall that testimony?

4   A    Yes, I do.

5   Q    Okay.  So do you agree that it's acceptable to use Oracle

6   code in a JDE technical specification as a pointer to know

7   where to look in a file?  Is that your testimony?

8   A    So to be clear here, so what I stated earlier this

9   morning is that it's acceptable for Rimini Street to tell

10  developers where within a particular Oracle file needs to be

11  adjusted, and that sometimes they will use a description of

12  the code to point at where that is, not that it is code that

13  can be -- you can take that code and execute that, it's simply

14  a pointer to say between, you know, section A and section B,

15  make the changes there.

16  Q    Okay.  But you agree that in the technical specifications

17  there's a reference to Oracle code, correct?

18  A    There is a reference to the Oracle system and

19  specifically where in that system that change needs to be

20  made, and it's pointing specifically at where in the open code

21  that modification should go.

22          Because -- if I can just give a little explanation,

23  because it can be modified.  So you cannot say please put this

24  in line 43 because client A might have modified the system to

25  do something, and client B might have modified it to do

1   something else.  So you can't just say put it in this row

2   number, you have to give the developer a little bit more than

3   that so it just says put it in this section.

4   Q   So that's a Rimini business practice, correct, to use JDE

5   technical specifications and refer to Oracle code as pointers?

6   A   It is Rimini Street's business practice to prepare a

7   technical specification.  In that technical specification we

8   will use pointers as I have described.

9   Q   Okay.  Mr. MacKereth, Rimini doesn't use a version

10  control system to control the version of updated or modified

11  objects in a client's environment, does it?

12  A   Rimini Street does not use a version control to control

13  the versions in a client's environment because the client

14  controls the versions at the client side.  We're not using any

15  Rimini Street systems, they're on the client's side, it's a

16  remote connection model.

17  Q   And Rimini doesn't use version controls for updates that

18  it says are written entirely with Rimini code, correct?

19  A   Actually, I couldn't state that completely.  I don't know

20  whether -- there may be some -- there may be some version --

21  version management there.

22          There's certainly in our system -- it's not like

23  a -- like a CVS type system that you check documents in and

24  out of in a similar way.

25  Q   And is Rimini the only company you have worked at that

1    does not use version control software?

2    A    So, again, I want to be clear, there is some use of

3    version control at Rimini Street.  But you were specifically

4    asking about code that we are -- Rimini Street-generated code.

5              So we do have version control, but we, to my

6    knowledge, don't have that necessarily for code.

7    Q    Okay.  I appreciate the clarification.  So let me just

8    ask question to make sure I understand.

9              Your testimony is that Rimini Street does not have

10   version control systems for changes to code, correct?  I got

11   that right?

12   A    We don't have a version control system that's standard

13   for code changes, that is correct.

14   Q    Understood.  But all of your prior employers, at least as

15   of your deposition, had used various version control software,

16   correct?

17   A    Yes, that is correct.

18   Q    Okay.  And you have never suggested to Rimini that it

19   should start using version control systems?

20   A    Well, actually, I have suggested it, and we have

21   implemented version control but not specifically for code.

22             So, again, we do use version control, but it's for

23   documents and files as opposed to for code because, you know,

24   Rimini Street is primarily working remotely with clients where

25   the code exists on their system.  We don't need to bring back

1   the third-party intellectual property to our work do our work

2   so there's no reason to version control that.

3   Q   So let me ask the question again just so that I make sure

4   I understand.

5        You have never suggested to Rimini that it should

6   use version control systems for changes made to EBS and

7   related software; is that correct?

8   A   Yes.  I do not recall ever making a recommendation to use

9   version control for EBS software.

10  Q   And Rimini does not have a centralized system to track

11  and log updates for clients, correct?

12  A   We do have a centralized system to track and log updates,

13  yes.

14  Q   Okay.  What is that system?

15  A   So we've got a couple of tools to do that.  I think

16  the -- I'm blanking now.  It's a tool that we use to track

17  which updates were developed for a particular client.

18  Q   If I said Jira, does that ring a bell?

19  A   Jira -- yes, thank you.  Jira is one of those tools --

20  actually, I was thinking of the one that is used for

21  communications, but, yeah, Jira also has some controls in

22  place so I'll take that, thank you.

23  Q   Okay.  And you testified in your deposition that Jira is

24  not a reliable place to look to see where updates have been

25  completed, correct?

1    A    Yes, I did testify that because the dates that are there

2    don't necessarily reflect the actual date that something

3    occurred.  So I was explaining to the -- to Oracle's counsel

4    that I would not rely on the dates in that system very much at

5    all.

6    Q    You spoke on direct, Mr. MacKereth, about some SalesForce

7    data.  Do you remember that?

8    A    Yes, I do.

9    Q    Okay.  Have you seen -- in other than the SalesForce data

10   that you testified about, have you seen in the exhibits in

11   this case any documentation of a file that was quarantined?

12   A    No, I'm not actually party to all the things that have

13   been submitted for the case so I haven't really been reviewing

14   all the evidence that's before the Court.

15            I can't recall whether there's evidence for that or

16   not in the record.

17   Q    Okay.

18   A    Although, actually, now that you mention it, in that

19   document that I reviewed earlier there was an e-mail from one

20   of my engineers, Jai, and he referred to a document that had

21   been quarantined so I guess that's in the record.

22   Q    That was in a SalesForce document, correct?

23   A    He was referring to an attachment that was not available

24   to him because it had been quarantined so that was in the -- I

25   think -- I think Oracle might have brought that evidence here,

1    and I was asked to read through it in my direct earlier today.

2    Q    Okay.  Let's take a look at OREX_105, please, and this is

3    something that you looked at on direct examination.

4             And I believe that you testified about a few -- a

5    few Oracle documents that were uploaded by clients.  Do you

6    remember that testimony?

7    A    Yeah.  Sorry, I don't think I've got that in this folder

8    so can I just go back to --

9    Q    Absolutely, yes, please do.

10   A    Thank you.

11   Q    When you get there, it's tab 9.

12   A    Oh, it's right here.  Thank you.

13   Q    Of course.  And I'll direct you to page 13 of 18.

14   A    Okay.

15   Q    Okay.  And I'll direct you down on that page 13 of 18 to

16   the third full square, case comment ID -- excuse me, that ends

17   in p93a.  Do you see that?

18   A    Yep, got it.

19   Q    And this is created by Jai, that same individual we were

20   talking about?

21   A    Yes, it does appear that way.

22   Q    He says,

23             "Hi, Sarah, the only place where the

24        flags are closed is when running the TAX920 PRINT

25        program.  The key to that processing is the

1    W2C_REG_REPRINT field in the run control table

2    PS_RC_TAX920."

3              Do you see that?

4    A    I do.

5    Q    Okay.  And do you understand that that means Jai opened

6    this document and accessed it?

7    A    No, I think he's -- I mean, he's an expert PeopleSoft

8    engineer.  He's explaining to this client that if you were to

9    follow the steps here, he's talking about the run control

10   table, then this is the result that you would get.

11           He doesn't have remote connectivity to this client

12   at this time so he's just giving them some guidance while that

13   being established is my understanding.

14   Q    Okay.  And if Mr. Benge testified in his direct -- excuse

15   me, under oath in this proceeding that that was in fact

16   exactly what Jai did, that he opened and used this document,

17   do you have any reason to disagree with Mr. Benge?

18              MS. SAMPLIN:  Objection, lacks foundation.

19              THE COURT:  I'll sustain the objection.

20   BY MS. PHILLIPS:

21   Q    Let's take a look at OREX_98 that you looked at, and let

22   me just take a quick peek at which tab it was.

23   A    This one?

24   Q    I believe it's tab 11, if you can go there, sir.

25   A    Okay.

1258

1    Q    Okay.

2    A    Yep, got it.

3    Q    Okay, great.  And at the top I believe you testified on

4    direct that a client here, Evergreen Support -- that is a

5    Rimini client, correct?

6    A    The client's name is Evergreen, yes.

7    Q    Okay.  And the client there has reference in that top

8    e-mail to attaching a -- attaching an Oracle file, correct?

9    A    Yes, it's actually the client's platinum Oracle partner

10   has attached a file to the e-mail.

11   Q    It was a Rimini client, correct?

12   A    So this is, as you can see from the e-mail domain

13   there --

14   Q    I understand.  I'm asking you if Evergreen is a Rimini

15   client.

16   A    Oh, I'm sorry, I misunderstood your question.

17            Evergreen is a Rimini Street client, yes.

18   Q    Yes.  Okay.  So would you agree that in attaching an

19   Oracle document to this e-mail, the Evergreen Support violated

20   the AUP?

21   A    No.

22   Q    I apologize.  Let me rephrase the question.

23            Would you agree that in receiving the document from

24   Evergreen Support that Rimini Street without -- in not

25   responding to this -- to the receipt of this -- this document

1   and without e-mailing security@riministreet.com, that was a

2   violation of the AUP?

3              MS. SAMPLIN:  Objection, assumes facts not in

4   evidence.

5              THE COURT:  Well, it's a fair question on

6   cross-examination.  I'll allow it.

7              THE WITNESS:  There is nothing here that tells

8   me how the document was treated once it was received by Rimini

9   Street.

10             I would fully expect that members of this team

11  would have e-mailed security@riministreet.com and reported

12  this file.

13             There's nothing here that says anything to the

14  contrary, therefore none of the team have violated the

15  Acceptable Usage Policy by not reporting it.

16  BY MS. PHILLIPS:

17  Q   Okay.  But you don't have any evidence that they did,

18  correct, and if they did not, that would have been a violation

19  of the AUP, correct?

20  A   In the event that a file was transmitted to our team that

21  they recognized that it was third-party intellectual property

22  and they did not report it, then that would be a violation of

23  our Acceptable Usage Policy, and would expect that

24  disciplinary action would take place.

25             MS. PHILLIPS:  Your Honor, I see that it's past

1   3:15, would you like to take our break?

2                    THE COURT:  Yes, if you're about to change to

3   another subject, this is a good time --

4                    MS. PHILLIPS:  Great, thank you.

5                    THE COURT:  -- for the afternoon break, and

6   we'll take it at this time, and we'll reconvene at -- no later

7   than 3:40.

8                        (Recess taken.)

9                    THE COURT:  Have a seat, please.

10                   The record will show that we are reconvened

11  following our afternoon break.

12                   Counsel, I would tell you that we need to stop

13  by no later than five o'clock this afternoon.

14                   MS. PHILLIPS:  I have no more questions.  Thank

15  you, your Honor.

16                   THE COURT:  All right.  Redirect examination,

17  please.

18                      REDIRECT EXAMINATION

19  BY MS. SAMPLIN:

20   Q   Mr. MacKereth, do you recall that on your

21  cross-examination you were asked about your use of the terms

22  open code and closed code in this litigation?

23   A   Yes, I do.

24   Q   When did you start using the terms open code and closed

25  code?

1    A    I've been using the terms open code and closed code

2    throughout my career.   Certainly at the very beginning of my

3    time with Rimini Street I using the phrase open code and

4    closed code.

5    Q    Was that prior to the injunction that came out in 2016?

6    A    That was prior to the injunction in 2016, yes.

7    Q    I'd like to show you a document that you were shown on

8    cross, OREX Exhibit 62, and if you can flip to the next page

9    of this document, please.

10          Do you recall looking at this document called a

11   Dictionary of Common JDE Terms on your cross-examination?

12   A    Yes, I do.

13   Q    Do you recall that you were asked whether open and closed

14   code are terms that appear in this Dictionary of Common JDE

15   Terms?

16   A    I was asked that, yes.

17   Q    Are open and closed code JDE specific terms?

18   A    They're not JD Edwards specific terms.   Open and closed

19   code are not simply JDE terms, they are terms used commonly in

20   the Enterprise resource planning or Enterprise applications in

21   the software industry commonly.

22   Q    If we can turn to the next page of this document, I'm

23   looking specifically -- sorry, one more page.   I'm looking at

24   the Object Management Workbench, OMW definition.   Do you

25   recall being asked about that on your cross-examination?

1    A    I do.

2    Q    Is that one of the tools provided by Oracle?

3    A    Yes, it is.

4    Q    And is that one of the tools that you testified on direct

5    Oracle provides to licensees initially when they get the

6    software?

7    A    That is correct.

8    Q    What is this tool used to do?

9    A    The Object Management Workbench is shipped by Oracle for

10   the purpose of modifying the open code that is included as

11   part of the JD Edwards application.

12   Q    So setting aside whether source code, the term used in

13   this definition, setting aside whether that's the right term,

14   is that a reference to the open code everyone in the industry

15   has to copy to provide updates to the JDE software?

16   A    The reference to source code there must be referring to

17   the Object Management Workbench -- what the Object Management

18   Workbench can modify, and that can modify the open code.

19              MS. SAMPLIN:  Thank you.  No further questions.

20              THE COURT:  All right.

21              MS. PHILLIPS:  Nothing further, thank you.

22              THE COURT:  All right.  That will conclude your

23   testimony, Mr. MacKereth.  You may step down.  Thank you.

24              All right.  Your next witness, please,

25   Mr. Vandevelde.

1    MR. VANDEVELDE:  Yes, your Honor.  Before we

2  call our next and last witness, we thought we would play a

3  video clip of a deposition.  May I proceed?

4    THE COURT:  You may.

5    MR. VANDEVELDE:  The video clip you're about to

6  hear is the Rule 30(b)(6) testimony of Buffy Ransom, Oracle's

7  Senior Vice-President of Global Customer Support, who

8  testified as Oracle's designated corporate representative

9  regarding Oracle's audit of another third-party support

10  provider named Spinnaker and Spinnaker's processes with

11  respect to JDE, including regarding their custom code

12  solutions and source code changes, and the results and

13  conclusions by Oracle of that audit.

14    Your Honor saw some of this testimony in

15  opening, and the clip is approximately 15 minutes in length.

16    THE COURT:  All right.  Go ahead, please.  Thank

17  you.

                        (A video excerpt of the deposition
18                       testimony of Buffy Ransom played.)

19    MR. VANDEVELDE:  Thank you, your Honor.

20    And at this time I'd to move in DTX-716 and

21  DTX-724 which are the two exhibits referenced in the

22  deposition.

23    MR. HILL:  No objection, your Honor.

24    THE COURT:  They are admitted.

25

1      (Defendant's Document Exhibits 716 and
       724 received in evidence.)
2            MR. VANDEVELDE:  Thank you, your Honor.

3            MR. LIVERSIDGE:  Your Honor, we can call our

4   last witness for our case now.  It's up to you whether you

5   want -- I know there's a five o'clock deadline.

6            THE COURT:  No, let's go ahead and start.

7            MR. LIVERSIDGE:  Sounds good.

8                       STEPHEN LANCHAK,
       called as a witness on behalf of the Defendant,
9              was, sworn and testified as follows:

10           THE CLERK:  Can you please state your name for

11  the record.

12           THE WITNESS:  Yes, Steven Lanchak;

13  L-a-n-c-h-a-k.

14           MR. LIVERSIDGE:  May I proceed, your Honor?

15           THE COURT:  Go ahead.  That's fine.

16           MR. LIVERSIDGE:  Thank you.

17           Good afternoon, Mr. Lanchak.

18           THE WITNESS:  Good afternoon.

19                    DIRECT EXAMINATION

20  BY MR. LIVERSIDGE:

21   Q   Could you tell us where you're currently employed.

22   A   I'm currently employed at the Kellogg School of

23  Management at Northwestern University as a career coach in the

24  career management center where I work with executive MBA

25  students on -- helping them navigate their careers.

1  Q   And are you retired or current or semiretired at this

2  point?

3  A   I'm semiretired.

4  Q   Okay.  And prior to the time that you started working at

5  Northwestern University, what were you doing?

6  A   I was a management and technology consultant for over

7  33 years.

8  Q   Okay.  And when you were working in management and

9  technology consulting, what was your area of focus?

10  A   My area of focus was really helping clients evaluate and

11  integrate Enterprise technology into their businesses, and

12  what this really means is understanding how this software

13  would integrate in their day-to-day business activities so

14  that it could drive a meaningful business improvement.  What I

15  mean that by is drive bottom line improvements in terms of

16  reducing costs, improving customer service, and improving

17  efficiencies.

18  Q   And would you say that you were specifically focused on

19  Enterprise software during your 33 years in consulting?

20  A   Most of that 33 years.  There was a period when I was at

21  Anderson Consulting/Accenture where I was doing mergers and

22  acquisitions work, I was doing business process reengineering

23  work and some other things outside of the technologies here,

24  but by and large most of my career has been technology

25  focused.

1   Q    And during your time as a consultant did you work with

2   Oracle Enterprise software products?

3   A    Yes, for over 18 years I worked exclusively with Oracle

4   products, JD Edwards, PeopleSoft, Oracle EBS, Siebel, and I've

5   worked with over 300 Oracle licensees.

6        And I'd characterize probably about 60 of those 300

7   licensees as having a trusted adviser relationship with the C

8   Suite where I would meet regularly with CIOs, CEOs, and CFOs

9   in helping them understand what this technology would mean for

10  their business.

11  Q    And did you specifically work with JDE licensees as well?

12  A    I did.

13  Q    Now, it says here on the slide that you advised over 300

14  Oracle licensees on Oracle ERP strategy.  What does that mean?

15  A    Well, essentially what that means is understanding what

16  all these modules are that you can license from Oracle.

17       You know, to the average CFO that's just a bunch of

18  alphabet soup, so helping them understand conceptually what we

19  were going to do to integrate these applications into their

20  business, and, you know, what may have to change in their

21  business in terms of business processes, that sort of thing.

22       So it's really laying out that big picture for how

23  that would look and work over some period of time.

24  Q    Okay.  And what were some of the companies that you

25  worked with during these decades of working with Oracle

1  products?

2              MR. LIVERSIDGE:  And I think we can go to our --

3  I think we have a slide for that.

4              THE WITNESS:  So I started my career at Arthur

5  Andersen, and, you know, there I got a great deal of

6  technology training.

7              In fact, Arthur Andersen mandated that -- and

8  this was specifically in the management information consulting

9  division.  They mandated that new hires do several years of

10  programming to understand basic fundamentals of systems

11  integration.  So I did that, and that was on a JDE platform

12  where I did design development work for several years.

13              And then my practice focused a lot on, as I

14  said, you know, acquisitions, mergers, technology integration,

15  and then I also did some PeopleSoft implementation and support

16  work as well towards the latter part of my tenure with

17  Andersen.

18              Then I moved on to KPMG after that point and

19  started taking on leadership responsibility for specifically

20  their Midwest PeopleSoft practice at KPMG where I was charged

21  with working with Oracle directly, selling and delivering

22  PeopleSoft engagements and eventually evolved into

23  BearingPoint.

24              Then with MarketSphere, when I joined

25  MarketSphere, I took on an increasing level of responsibility

1    in terms of managing their Midwest practice, Oracle practice.

2    This was a multifaceted role where JD Edwards was a big part

3    of what MarketSphere did, as well as PeopleSoft and EBS.

4                    And my job there was really to expand the market

5    in the Midwest, and that meant going out selling new business

6    at clients, making sure that we were delivering on our

7    commitments around these products, and also working directly

8    with Oracle primarily doing a lot of promotional campaigns

9    with Oracle to sell JD Edwards licenses.

10                   That then led to HCL/Axon where I actually got

11   hired in an as a senior vice-president in charge of building a

12   consulting practice around Oracle's products, and, again,

13   overseeing an existing practice and building a management

14   consulting practice around those products and utilizing HCL

15   technologies, Oracle technology group, which had several

16   thousand people.

17                   And it involved, you know, application, support,

18   and maintenance work of the Oracle products, Oracle

19   E-Business, PeopleSoft, JD Edwards, and also overseeing the

20   growth, as I said, of this consulting practice around that

21   technology kernel that we had with HCL technology.

22                   Now, the way I'd characterize my career, just

23   looking back on retrospect, is that it had three pillars

24   really.

25                   The first pillar was working with my clients,

1    and my clients were everything to me, and my clients made we

2    successful.  So I spent a lot of time in the market

3    understanding what clients needed and making sure that we were

4    developing solutions that addressed those needs.  The client

5    pillar was the first.

6              The second pillar was Oracle Corporation and

7    working with Oracle on a regular basis, weekly basis, in terms

8    of making sure that we were doing joint promotions, we were

9    going out on joint customer calls together whenever we were

10   having, you know, some issues on an engagement, maybe

11   technology related, we would pull Oracle in.

12             We would meet at Oracle Open World on a regular

13   basis with the executives, the senior executives at Oracle,

14   and then we would meet on a regional basis with Oracle

15   executives.  So that second pillar around Oracle, another key

16   pillar.

17             The third pillar was around the practice.  So I

18   was responsible for building and maintaining a profitable

19   practice within all my companies here that I worked at, so

20   making sure that we were pricing work appropriately, making

21   sure that we were implementing it as effectively as we could,

22   and making sure that those engagements were profitable for the

23   firm and we were growing.

24   BY MR. LIVERSIDGE:

25    Q   And during your time working at these companies that

1  you've talked about, what was a typical project for which you

2  would be engaged, if there was a typical project?

3   A    Yeah, well, they really ran the gamut, but, you know, if

4  I had to talk about a typical project, it would be an ERP

5  business transformation project where we were called in to sit

6  down with the client and understand what they were trying to

7  accomplish, and this meant identifying hundreds of business

8  requirements that they needed the software to do.

9         And then what we would do is our teams would look at

10  the software we were implementing, in this case JD Edwards,

11  and we would identify all the features and functions,

12  everything that the software in all its respective modules did

13  from a business standpoint.

14         And we'd do what we called a fit gap analysis.  We

15  would look at what the software did versus what the client

16  required, overlay them, and identify the gaps.

17         And those gaps would mean, okay, well, maybe some of

18  these would require some significant configuration changes,

19  and, of course, we would do the configuration.

20         But really what we were looking for here was gaps

21  that would result in customizations because this would

22  certainly drive, you know, the cost of the project.  So

23  identifying those customizations up front was key.

24         So we would do an inventory of customizations,

25  integrations, new functionality that we needed to build to

1    meet the particular requirement for this business, identify

2    all these gaps, and then build a conceptual design that would

3    illustrate, usually graphically for the client, how this

4    software solution, in this case JD Edwards let's say, would

5    address their business needs.

6            And then from there we would do a detailed design.

7    Now we would be getting into the code of the system, looking

8    at the code, figuring out how these customizations are going

9    to fit into the existing software.

10           And then, of course, we would move into the

11   implementation phase, actually do those coding changes, test

12   them.

13           And, finally, we would go live with the system, and

14   then we would do several months of what we call postconversion

15   support.  This is support work to make sure that the

16   application is stable, the client knows how to use the

17   application productively.

18           And then we would usually move on to what we called

19   an application support and maintenance contract where we would

20   support that engagement for, you know, a contractual period

21   of, you know, five, seven years, something like that, to

22   actually do all the support activities that that particular

23   client would need to keep the software current over time.

24   Q    And to be clear, when you were working your way through

25   these various projects, did you do this specifically for JD

1  Edwards software?

2   A   I did.

3   Q   And as part of your experience working with JD Edwards

4  software, did you work with clients to make modifications to

5  JD Edwards software code?

6   A   I did.  I did.  So obviously I did that earlier in my

7  career as a programmer of JDE and RPG programmer, and then I

8  would also do it when we had an engagement and my team would

9  be charged with making these customizations that I talked

10  about to the JD Edwards software.

11   Q   And did you specifically oversee teams of employees who

12  were making modifications to JD Edwards software code?

13   A   Yes.

14   Q   And when you say software code, are you referring to JD

15  Edwards software open source code?

16   A   Yeah, I'm referring to the code that JD Edwards would

17  make available to the users or to the licensees for the

18  specific purpose of tailoring, modifying that software to

19  do -- to meet those business requirements that I was talking

20  about.

21   Q   And when you were working on these projects were the

22  licensees or customers also making modifications to the JD

23  Edwards software open source code?

24   A   Yeah.  We would form project teams that were mixed.  We

25  would have our consultants, then we would have some

1273

1    third-party contractors, then we would also have a client team

2    that would work with us side-by-side to do all these changes

3    as well.

4    Q    Mr. Lanchak, can you just briefly describe your

5    educational background for us.

6    A    Yeah, I have a bachelor of science from the University of

7    Texas at Austin, and a master's of business and finance from

8    the University of Texas at Austin.

9    Q    Now, Mr. Lanchak, were you retained by counsel for Rimini

10   Street to offer opinions about certain of the issues in this

11   case?

12   A    I was.

13   Q    And as part of your work in the case, have you reviewed

14   materials and other evidence that's been produced in the case

15   in reaching your opinions and conclusions?

16   A    Yes, I have.

17            I had a significant number of materials made

18   available to me, the complete Rimini production, the complete

19   Oracle production, search tools for accessing both.

20            So I've seen a lot of exhibits, depositions,

21   interrogatories, I mean, a lot of things I had never heard of

22   before even.

23   Q    And, Mr. Lanchak, were you specifically asked to perform

24   a forensic analysis of Rimini's systems?

25   A    No, I was not asked to perform a forensic analysis of

1    Rimini's systems.

2    Q    Based on your experience in the industry and review of

3    the materials, do you have a general understanding of the

4    services that Rimini provides?

5    A    I do.

6    Q    Are you being compensated for your time on this matter?

7    A    I am.

8    Q    How much are you being compensated per hour?

9    A    The firm that I'm looking through gets $800 an hour, and

10   I'm paid $600 an hour.

11   Q    All right.  Thank you.

12            Mr. Lanchak, I'd like to now turn to your opinions

13   in the case.  Have you offered an opinion in this case

14   relating to JD Edwards software?

15   A    Yes, I have.

16            MR. LIVERSIDGE:  All right.  And, John, if we

17   could bring up slide 33 from the Fredericksen-Cross slide

18   deck, that would be great.

19   BY MR. LIVERSIDGE:

20   Q    Mr. Lanchak, this slide 33 should be on your screen, and

21   to orient everyone, this pertains to what we've been calling

22   Issue Number 7.

23            And, Mr. Lanchak, are you providing an opinion in

24   this case that responds to the opinion provided by

25   Ms. Frederiksen-Cross on JD Edwards software source code?

1    A    Yes, that is correct.

2    Q    And, generally speaking, what is your understanding of

3    Ms. Frederiksen-Cross's opinion?

4    A    Well, her sweeping definition of source code means that

5    it's unlawful and a violation of the injunction every time

6    Rimini copies and modifies code, code that everyone in the

7    industry has been copying and modifying for decades often at

8    the behest of Oracle, even, to support JD Edwards.

9    Q    And do you agree with her opinion?

10   A    I do not.

11                MR. LIVERSIDGE:  And if we can go back to our

12   slide deck, and if we can display DDX-704.

13   BY MR. LIVERSIDGE:

14   Q    And, Mr. Lanchak, does this slide reflect in general

15   terms the three keys reasons that you disagree with

16   Ms. Frederiksen-Cross's opinion?

17   A    It does; it does.

18   Q    And we're going to delve into these in more detail, but

19   can you describe for us at a high level why you disagree with

20   her.

21   A    Well, yeah.  So initially it includes the code that

22   everyone uses every day to support, maintain, and implement JD

23   Edwards.

24           This is code that you have to -- you have to access

25   it to implement the software and then keep the software up

1276

```
 1    over time as business conditions evolve and change.

 2              And Oracle has even provided tools, I think we've

 3    heard about those tools earlier today, that, you know,

 4    facilitate the licensees and the licensees' agents to modify

 5    and tailor the software.

 6              So -- those are a couple of key points.

 7              And the third point is that, obviously, if it's

 8    unlawful to access any of the code that's provided with JD

 9    Edwards, that's essentially a ban, I would say, over JD

10    Edwards software support.

11    Q    And, Mr. Lanchak, in your reason number two you indicate

12    here Oracle has never before taken this position.  What do you

13    mean there?

14    A    Well, I've worked with Oracle, as I said, exclusively for

15    18 years.  I have never had at any time under any

16    circumstances have had Oracle tell me that it wasn't lawful or

17    it wasn't permitted or it was wrong to access this code for

18    the purposes of implementing, maintaining, and supporting the

19    JD Edwards software.

20              In fact, they would take the opposite perspective,

21    and we would be sitting in client meetings where, you know,

22    together with Oracle and the client and myself and talking

23    about -- and Oracle talking about how we, the consultant,

24    would be engaged to modify this software so that it would meet

25    the client, in the room with us, meet their business
```

1    requirements with the ultimate purpose being to hopefully sell

2    a software license.

3    Q    All right.   Thank you.

4          So before we get into these opinions in more detail,

5    let's talk a little bit more about some background on JD

6    Edwards software, and I think we can go to DDX-705.

7          Mr. Lanchak, at a high level what is JDE software?

8    A    Well, JD Edwards is an Enterprise resource planning

9    application which means it's a fancy word for really back

10   office automation, and what I mean by back office automation

11   is all of the things that a company needs to do around

12   finance, accounting, inventory management, payroll, human

13   resources management, all the sort of unglamorous stuff that

14   kind of happens, you know, in the background that used to be

15   fairly manual, believe it or not, years ago.

16         And, in fact, when JD Edwards was formed by three

17   gentlemen, Jack, Dan, and Edward, they were public accounting,

18   public accountants working for -- I think it was Alexander

19   Grant.

20         But they loved working with technology, and they got

21   together and saw a market opportunity with small and

22   medium-sized businesses that were all manual.  When I say all

23   manual, I mean all manual, paper ledgers because you didn't

24   have Microsoft Excel, you didn't have Visicalc back then.

25         So they saw all these companies with nothing

1    because -- for automation because they couldn't afford the big

2    room-sized mainframe computers of the time and couldn't afford

3    the support that would be necessary to maintain a mainframe

4    computer.

5              So these individuals saw this business opportunity,

6    teamed with IBM who at that same time was launching a midrange

7    platform, they called them minicomputers back then as opposed

8    to main frames, about the size of a washing machine, and these

9    computers -- I think they started with System 34 -- were

10   geared primarily towards these small and medium-sized

11   businesses.

12             So Jack, Dan, and Ed saw this opportunity, formed

13   this company, and started writing code along with IBM's RPG

14   programmers to do finance and accounting basically.

15             And I don't remember who their first client was, but

16   they worked side-by-side with that client, literally, Jack,

17   Dan, and Ed sitting with that client understanding their

18   business requirements for other things besides finance and

19   accounting, and then with the IBM RPG programmers, they just

20   started writing this thing and expanding it.

21             And this turned into JD Edwards World which is still

22   in existence today, which is amazing, it's been over 40 years,

23   because I think this probably launched in the late seventies.

24             So, anyway, it obviously took off.  They were doing

25   really well, and then in the '90s, as new technology, new

1    architectures came into play around the client server

2    technology, they developed what is now known as Enterprise 1

3    to essentially be not dependent on just an IBM platform but to

4    be able to run on a multitude of platforms in this client

5    server architecture.

6            So this was launched in mid to late '90s, Enterprise

7    1, and this was also a period when you had the ERP heyday.

8    People were going crazy licensing ERP because everyone was

9    afraid of Y2K, their systems were going to blow up when the

10   date changed, so they wanted new systems, the latest and

11   greatest.

12           So things were going at a breakneck speed, and a lot

13   of companies licensed the software, implemented it, then Y2K

14   happened, or I should say Y2K nothing happened, and these

15   companies were done.  Well, we have this new software, we

16   don't need any new licenses, and you saw the market just sort

17   of tank after the year 2000.

18           And, naturally, there was consolidation in the

19   market at that point, and PeopleSoft acquired JD Edwards at

20   that point.  I think it was 2003, as we see there.  And then

21   Oracle acquired PeopleSoft a couple of years later, and there

22   were other examples of consolidation as well.

23           And then, you know, Oracle acquired these products

24   and then kept them going, and they're still moving and going

25   to this day.

1  Q   Okay.  Thank you.

2        Now, if we can go back to your opinions and start

3  with your reason number one on your summary of key reasons

4  slide, which I think is DDX-706, now, in your first reason

5  that you disagree with Ms. Frederiksen-Cross, you say,

6        "Included in Oracle's definition of JD

7     Edwards software source code is the code that

8     everyone modifies and copies when using the product."

9        Now, when you say "the code that everyone

10 modifies and copies," at what stage does this software need to

11 be modified and copied?

12 A   Well, really at every stage.  So let's say you get the

13 CDs, and the software was on CDs back then, you have to stand

14 up the software, load the CDs, create the environments, you

15 know, you had to do all the environment, you have to test the

16 environment, you may a QA testing environment, a production

17 environment, so you're creating copies there from the very

18 beginning.

19        And then, as you're going about doing your

20 conceptual design activities that I spoke about, you're going

21 in, looking at the code, which invariably means you're making

22 in-memory copies of the code, and you're just seeing what's

23 going on because now you're thinking about how you're going to

24 be making the customizations you need to make to address the

25 gaps that you've already identified.

1            Then obviously you do detail design, and you're now

2    creating functional and technical specifications for those

3    modifications that you're going to make in detail, exactly

4    where are we going to go in the software.

5            So you look and see where they need to go, then you

6    put those markers into your technical design so that you know

7    where that particular code modification is going to take

8    place.

9            So then, obviously, I mean, you've got maintenance

10   and support, and then you're getting into a significant

11   modification on an ongoing basis as business conditions

12   evolve.

13   Q    Now, you say everyone modifies and copies this code.  Who

14   are you referring?  Who is doing the copying and modifying?

15   A    We have a whole ecosystem that supports these

16   applications.  So you've got third-party support providers

17   like Rimini and Spinnaker and Support Revolution, but then

18   you've got the systems integrators and the application support

19   and maintenance firms.

20           Then you have sort of a second tier firm like we're

21   talking about SpearMC earlier, they fall into that category.

22   ERP Suites is another JD Edwards third-party support firm that

23   does it.

24           And then you have -- oh, my gosh, innumerable LLCs

25   of, you know, four, five, seven people that do this kind of

1    work.

2            And then sort of at the bottom of that ecosystem

3    you've got your individual independent contractor that will

4    work on specific engagements as needed.

5    Q    And in your experience are the licensees themselves

6    modifying and copying the code?

7    A    Absolutely, yeah.  Usually on these teams you would have

8    representatives from the technology group within the client

9    that would be participating as well.

10           MR. LIVERSIDGE:  Now, I'd like talk a little bit

11   more about the type of code that you say everyone is modifying

12   and copying, and we have a slide, if you can bring up DDX-707.

13   BY MR. LIVERSIDGE:

14   Q    Now, Mr. Lanchak, what is reflected on this slide?

15   A    Yes.  Well, you have two layers of code in its simplest

16   form here that you're dealing with.

17           So the open -- what we're calling the accessible

18   code, but I used to call -- when I was consulting we called it

19   the exposed code, is the code that the software developer,

20   Oracle, JD Edwards, intended for you to, you know, modify on

21   an open basis.

22           And I like to think of this as sort of controlling

23   what the system does.  Okay.  So what does it do around HR and

24   payroll.  Well, it needs to pay your employees, right, that's

25   what it needs to do.

1          And it needs to post journal entries to the general

2    ledger, that's what it needs to do from a finance and

3    accounting standpoint.

4          So you have all these activities around the what

5    that need to be molded and shaped because the software -- it's

6    not one size fits all.  You've got a multitude of industries

7    that use JD Edwards, and then within those industries there

8    are a multitude of business strategies there as well.

9          So this open accessible code is what you use to --

10   you know, think of it as a starter kit almost, too.  You take

11   the starter kit and then shape it to fit your specific

12   business requirements.

13   Q    And let me just stop you there quickly.

14   A    Sure.

15   Q    Is it your understanding, Mr. Lanchak, that

16   Ms. Frederiksen-Cross says that with respect to this layer of

17   code that you're calling the open accessible code, that it is

18   unlawful to modify or copy that code?

19   A    Ms. Frederiksen-Cross is saying it's unlawful to copy all

20   of this code.

21   Q    Including the open code.

22   A    Including the open code.

23   Q    All right.  And then you have something called closed or

24   core architectural code.  What are you referring to there?

25   A    Right.  So, you know, I describe the open accessible code

1   as being what the software does.  This closed core

2   architectural code layer is really the how the software does

3   it.

4          You can see where a licensee would be less concerned

5   about how the software posts journal entries to the general

6   ledger, just as long as it gets done.

7          Well, and it's other things, too, like how the

8   software would go out to the database, the relational

9   database, and insert a data element or retrieve a data

10  element, or batch processes that would run behind the scenes

11  invisibly, automatically these batch processes would run.

12  That's a function of this closed code.

13         How error messages may be handled in the software,

14  how performance is managed in the software, so it's all this

15  how stuff that the typical licensee really, you know, isn't

16  that concerned with.

17  Q   And so is the how versus what distinction important in

18  your mind?

19  A   It's absolutely important.

20  Q   Why do you say that?

21  A   Because to make the -- you license the software and you

22  want it to support your business, you have to control what it

23  does.  You have to -- you know, as I said, coming out of the

24  box it really does much of nothing really.

25         I mean, you configure it, you set up a vendor

1    master, you set up a customer master, you set up a chart of

2    accounts, that's great, but it doesn't necessarily do what you

3    need it to do to meet your specific business requirements, and

4    that's the rough, I mean, that's the hard work is

5    understanding what those business requirements are and making

6    it meet those requirements.

7    Q    Mr. Lanchak, do you -- with respect to the closed core

8    architectural code, do you think of that as the core program

9    source code that somebody would have to decompile to get at

10   and copy the underlying source code?

11   A    Yes.  The -- the developer of the software purposely

12   makes that inaccessible to you because they don't want you to

13   get at that.

14            And this was a problem back in the 1990s where there

15   was less of this distinction and companies, licensees, were

16   modifying all the code.

17            They were just jumping into it and creating

18   situations where the developer of the software, JD Edwards,

19   you know, in this case, couldn't upgrade these customers

20   because the automated upgrade scripts that would do the

21   upgrade to the new version couldn't recognize the source

22   system that it was working with, it was unrecognizable.

23            So at that time there was a push to make more of

24   this distinction in the industry and really drive licensees

25   towards this open layer of code versus -- and then making this

1    inaccessible closed layer less accessible for them and then

2    providing tools that would steer them towards this open layer

3    of code as well.

4    Q    Now, did you come up with the terms open and closed code?

5    A    I came up with the terms for the purposes of my report

6    because I think, as I said earlier, I had not -- I had seen

7    those terms in the industry, but I did not personally use

8    them.

9              In my practice we used -- you know, I would be

10   telling my teams, you know, not to alter the core

11   architectural code, and then I would use the term -- I think

12   it was exposed code for the code that we were supposed to

13   modify.

14             But, in writing the report, I wanted something clear

15   and concise.  Open and closed, it's very binary.  It's easy to

16   understand.  Everyone knows what open means, everyone knows

17   what closed means, so that's why I used that in my report.

18             It's really just a label.  I mean, we could call it

19   anything we want.

20   Q    I was going to ask, does it matter what label we put on

21   these different layers of code?

22   A    No.  I mean, I have heard people call the closed code

23   proprietary code, it gets called all different kinds of things

24   really.

25   Q    Have you seen industry publications and other documents

1    that specifically refer to these concepts using the terms open

2    and closed code?

3    A    Yeah, I have.  That would be analysts like IDC and

4    Gartner.  I believe they use these concepts.

5             And then we also see these concepts in general IT

6    spaces where they may be talking about open source and closed

7    source, you know, talking about Linux being an open source

8    operating system which means everybody can have at it, right,

9    and add to the code versus Unix which is a closed source, you

10   can't -- the code is inaccessible on Unix.

11   Q    Could you use the term source code to refer to this layer

12   of code that you are referring to as open and accessible?

13   A    You could, but when you're talking about this code it's

14   really what code specifically are you referencing.  You have

15   to be -- you have to really examine the context that you're

16   using this code in, otherwise the term source code is used so

17   loosely in the industry, it can mean all kinds of different

18   things.

19             MR. LIVERSIDGE:  Your Honor, this would be good

20   time to break if it makes sense to do that.

21             THE COURT:  We can do that.

22             We'll take our evening break at this time.

23   We'll convene in the morning at 9:00 a.m. and pick up from

24   where you left off.

25             MR. LIVERSIDGE:  Thanks very much.

1288

1     THE COURT:  All right.  We'll be adjourned at

2  this time.

3          (Court adjourned.)

4                  -o0o-

5

6      I certify that the foregoing is a correct
       transcript from the record of proceedings
7      in the above-entitled matter.

8      /s/Margaret E. Griener         September 27, 2021
       Margaret E. Griener, CCR #3, FCRR
9      Official Reporter

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                              I N D E X

2

3    DEFENDANT'S  WITNESSES:                              PAGE:

4      ASTRACHAN, Owen
         Cross-Examination Resumed By Mr. Isaacson       1070
5         Redirect Examination By Mr. McCracken          1114

6      MacKERETH, Craig
         Direct Examination by Ms. Samplin               1119
7         Cross-Examination By Ms. Phillips              1197
         Redirect Examination By Ms. Samplin             1260
8

9      RANSOM, Buffy
         Video Deposition Excerpts                       1263
10

11     LANCHAK, Stephen
         Direct Examination By Mr. Liversidge            1264
12

13

14   PLAINTIFF'S EXHIBITS:              MARKED    RECEIVED

15     65 -                                       1201
       69 -                                       1196
16     70 -                                       1205
     1339 -                                       1219
17   1340 -                                       1215

18   DEFENDANT'S EXHIBITS:

19      8 -                                       1171
       31 -                                       1167
20     40 -                                       1165
       62 -                                       1248
21    716 -                                       1264
      724 -                                       1264
22

23

24

25
```

1

## $

**$600** [1] - 1274:10
**$800** [1] - 1274:9

## '

**'90s** [2] - 1278:25, 1279:6
**'accessed** [1] - 1205:19
**'decompile** [1] - 1136:4
**'disassemble** [1] - 1136:4
**'em** [2] - 1093:15, 1093:16
**'if** [1] - 1217:25
**'over** [2] - 1218:2, 1220:23
**'reverse** [1] - 1136:5
**'viewing'** [1] - 1218:4

## /

**/s/Margaret** [1] - 1288:8

## 0

**08:36** [1] - 1187:7

## 1

**1** [6] - 1074:22, 1135:14, 1180:8, 1215:21, 1279:2, 1279:7
**10** [4] - 1099:25, 1113:24, 1128:5, 1189:11
**10,000** [1] - 1121:7
**10.1.2** [1] - 1161:25
**10.8** [3] - 1135:20, 1135:22, 1135:24
**100** [6] - 1085:10, 1089:25, 1090:4, 1090:8, 1121:3, 1128:6
**105** [1] - 1184:5
**1070** [1] - 1289:4
**1099** [7] - 1100:14, 1100:22, 1101:6, 1101:18, 1108:11, 1110:8, 1122:20
**1099-I** [2] - 1100:24, 1101:23
**1099-M** [3] - 1100:10, 1100:25, 1101:23
**10:30** [1] - 1118:7

**10:35** [1] - 1118:7
**10th** [2] - 1142:15, 1229:4
**11** [3] - 1178:7, 1189:23, 1257:24
**1114** [1] - 1289:5
**1119** [1] - 1289:6
**1142** [3] - 1179:9, 1179:11
**1165** [1] - 1289:20
**1167** [1] - 1289:19
**1171** [1] - 1289:19
**1196** [1] - 1289:15
**1197** [1] - 1289:7
**12** [7] - 1106:7, 1111:22, 1149:24, 1163:16, 1187:15, 1189:22, 1189:24
**1201** [1] - 1289:15
**1205** [1] - 1289:16
**1215** [1] - 1289:17
**1219** [1] - 1289:16
**1248** [1] - 1289:20
**1260** [1] - 1289:7
**1263** [1] - 1289:9
**1264** [3] - 1289:11, 1289:21, 1289:21
**13** [6] - 1074:22, 1098:9, 1187:16, 1189:11, 1256:13, 1256:15
**130** [6] - 1105:11, 1105:16, 1105:17, 1105:21, 1106:9, 1107:10
**131** [5] - 1105:12, 1105:15, 1106:7, 1107:8, 1107:10
**1339** [2] - 1219:11, 1289:16
**1340** [2] - 1215:19, 1289:17
**13th** [6] - 1086:3, 1091:8, 1091:12, 1098:6, 1102:25, 1184:25
**14** [5] - 1073:6, 1105:12, 1105:15, 1106:7, 1172:11
**14th** [1] - 1209:3
**15** [9] - 1111:21, 1112:9, 1186:19, 1187:7, 1188:10, 1188:11, 1194:7, 1226:21, 1263:15
**150** [2] - 1119:14, 1121:4
**1500** [1] - 1120:21
**155** [7] - 1152:2, 1152:14, 1153:6,

1154:7, 1154:10, 1156:9, 1156:11
**159413** [1] - 1170:18
**15th** [1] - 1245:9
**16** [1] - 1081:5
**17** [4] - 1085:25, 1096:7, 1120:24, 1157:22
**175** [2] - 1083:23, 1115:10
**17th** [4] - 1086:2, 1197:24, 1226:21, 1227:22
**18** [6] - 1185:2, 1187:16, 1256:13, 1256:15, 1266:3, 1276:15
**19** [3] - 1162:10, 1162:11, 1162:12
**1900** [2] - 1083:24, 1115:14
**1990s** [1] - 1285:14
**1:15** [1] - 1174:21
**1:20** [2] - 1174:21, 1175:1
**1st** [1] - 1220:8

## 2

**2** [6] - 1142:14, 1161:16, 1171:5, 1171:10, 1176:13, 1242:7
**20** [2] - 1133:6, 1142:13
**200** [4] - 1091:6, 1091:9, 1111:21, 1112:9
**2000** [1] - 1279:17
**2003** [1] - 1279:20
**201** [3] - 1111:22, 1112:1
**2010** [3] - 1240:25, 1242:5, 1242:8
**2013** [1] - 1243:21
**2015** [2] - 1245:9, 1248:25
**2016** [29] - 1140:15, 1140:16, 1140:19, 1151:15, 1151:17, 1152:2, 1152:3, 1153:7, 1154:22, 1154:23, 1202:13, 1202:18, 1206:13, 1206:18, 1209:3, 1210:8, 1210:12, 1210:19, 1213:19, 1214:4, 1215:12, 1216:7, 1216:15, 1218:24, 1219:19,

1220:8, 1232:13, 1261:5, 1261:6
**2017** [1] - 1211:21
**2018** [13] - 1085:25, 1105:24, 1111:20, 1142:15, 1157:23, 1214:22, 1226:4, 1226:5, 1227:15, 1227:17, 1229:4, 1230:21, 1231:6
**2019** [12] - 1179:13, 1179:14, 1180:4, 1184:24, 1186:10, 1186:15, 1186:19, 1187:7, 1187:12, 1187:25, 1189:21
**202** [1] - 1091:10
**2020** [8] - 1098:7, 1098:9, 1105:22, 1197:24, 1200:18, 1226:21, 1227:2, 1227:22
**2021** [5] - 1071:6, 1072:1, 1133:5, 1175:1, 1288:8
**205** [2] - 1086:1, 1086:5
**21** [4] - 1165:17, 1165:20, 1167:19, 1167:21
**21st** [2] - 1111:21, 1219:19
**22nd** [1] - 1189:21
**23rd** [9] - 1157:23, 1179:13, 1179:14, 1180:4, 1186:10, 1186:15, 1186:16, 1186:19, 1187:12
**24** [2] - 1107:1, 1226:21
**24-by-7** [1] - 1120:12
**25** [4] - 1120:16, 1135:9, 1160:20, 1181:5
**26** [2] - 1187:25, 1188:6
**27** [4] - 1071:6, 1072:1, 1175:1, 1288:8
**27th** [1] - 1243:21
**28th** [1] - 1215:11
**298** [3] - 1098:6, 1098:10, 1098:11
**29th** [2] - 1215:12, 1216:12
**2:10-cv-0106-LRH-VCF** [1] - 1071:5

## 3

**3** [4] - 1071:23, 1150:1, 1151:14, 1288:8
**30** [1] - 1133:6
**30(b)(6** [2] - 1197:24, 1263:6
**300** [3] - 1266:5, 1266:6, 1266:13
**30th** [4] - 1105:11, 1105:22, 1151:15, 1151:17
**31** [2] - 1167:17, 1289:19
**33** [7] - 1161:1, 1161:16, 1265:7, 1265:19, 1265:20, 1274:17, 1274:20
**34** [1] - 1278:9
**3:15** [1] - 1260:1
**3:40** [1] - 1260:7

## 4

**4** [7] - 1112:1, 1157:22, 1171:25, 1221:15, 1241:13, 1241:17, 1241:21
**40** [5] - 1164:9, 1165:14, 1172:10, 1278:22, 1289:20
**40-21** [1] - 1165:17
**400** [1] - 1071:24
**41** [1] - 1172:2
**414** [1] - 1081:6
**415** [1] - 1081:5
**416** [1] - 1081:4
**41A** [1] - 1172:2
**43** [2] - 1187:18, 1251:24
**45** [1] - 1187:18

## 5

**5** [4] - 1072:21, 1164:10, 1180:8, 1205:7
**50** [4] - 1106:16, 1106:22, 1123:19, 1128:6
**53064** [1] - 1172:12
**545** [1] - 1188:5
**56** [2] - 1083:24, 1115:10
**57** [2] - 1226:21, 1227:2
**58** [1] - 1226:21
**5th** [1] - 1227:17

2

**6**

**6** [12] - 1071:8,
1100:22, 1101:14,
1101:16, 1101:21,
1108:23, 1110:8,
1163:16, 1167:6,
1185:1, 1186:23,
1226:5
**60** [1] - 1266:6
**62** [3] - 1248:1,
1261:8, 1289:20
**65** [2] - 1210:5,
1289:15
**69** [1] - 1151:13,
1196:20, 1289:15
**6th** [1] - 1220:7

**7**

**7** [3] - 1170:13,
1189:23, 1274:22
**70** [2] - 1205:5,
1289:16
**716** [2] - 1264:1,
1289:21
**721.3** [1] - 1237:4
**721.4** [1] - 1239:4
**724** [2] - 1264:1,
1289:21
**77** [1] - 1186:25
**7th** [1] - 1211:21

**8**

**8** [16] - 1105:12,
1105:14, 1105:19,
1105:20, 1106:13,
1106:20, 1112:1,
1150:6, 1170:12,
1171:3, 1172:1,
1189:22, 1189:23,
1230:19, 1248:25,
1289:19
**80** [1] - 1096:4
**800** [1] - 1120:19
**87** [1] - 1102:25
**876** [1] - 1185:7
**89501** [1] - 1071:24

**9**

**9** [6] - 1095:19,
1162:3, 1162:5,
1184:5, 1241:18,
1256:11
**9.1.1.4** [1] - 1162:6
**90** [1] - 1169:2
**905** [2] - 1190:1,
1190:9

**949** [1] - 1074:22
**98** [1] - 1178:6
**99** [3] - 1089:18,
1090:1, 1090:4
**9:00** [1] - 1287:23
**9:05** [1] - 1072:1
**9a** [2] - 1241:15,
1241:18

**A**

**A's** [2] - 1106:16,
1106:22
**a.m** [1] - 1287:23
**A.M** [1] - 1072:1
**ability** [5] - 1133:3,
1137:15, 1137:20,
1217:19, 1217:21
**able** [18] - 1077:13,
1083:4, 1129:6,
1133:25, 1137:3,
1137:7, 1148:21,
1184:3, 1206:5,
1207:11, 1207:21,
1208:3, 1208:12,
1210:15, 1211:2,
1239:17, 1279:4
**above-entitled** [1] -
1288:7
**absolutely** [14] -
1080:2, 1092:21,
1094:18, 1095:4,
1095:7, 1110:20,
1112:18, 1113:7,
1116:24, 1192:23,
1214:3, 1256:9,
1282:7, 1284:19
**abstract** [1] - 1089:1
**abundance** [1] -
1210:20
**Accentia** [1] - 1149:3
**accept** [2] - 1141:9,
1142:3
**acceptable** [6] -
1126:18, 1126:21,
1148:16, 1149:19,
1251:5, 1251:9
**Acceptable** [1] -
1134:20, 1134:22,
1134:23, 1135:4,
1135:12, 1135:18,
1135:21, 1135:24,
1157:14, 1160:11,
1160:12, 1160:14,
1161:1, 1163:4,
1163:8, 1167:21,
1167:23, 1168:18,
1174:9, 1174:14,
1180:24, 1182:13,
1194:24, 1229:12,

1232:19, 1235:19,
1236:14, 1236:20,
1259:15, 1259:23
**access** [51] - 1077:1,
1134:3, 1134:10,
1134:13, 1134:14,
1134:16, 1134:19,
1135:6, 1135:8,
1138:8, 1139:20,
1140:21, 1143:20,
1150:9, 1166:8,
1166:9, 1166:23,
1167:1, 1167:3,
1167:9, 1167:10,
1167:12, 1168:7,
1173:20, 1184:3,
1189:2, 1202:19,
1210:15, 1211:3,
1211:18, 1213:22,
1213:23, 1214:6,
1214:7, 1214:14,
1220:17, 1224:5,
1224:17, 1235:3,
1235:8, 1241:25,
1242:1, 1242:14,
1244:3, 1244:7,
1245:2, 1275:24,
1276:8, 1276:17
**Access** [2] - 1241:14,
1241:16
**accessed** [3] -
1143:14, 1211:2,
1257:6
**accessible** [6] -
1282:17, 1283:9,
1283:17, 1283:25,
1286:1, 1287:12
**accessing** [12] -
1202:15, 1216:3,
1216:17, 1217:17,
1217:18, 1221:21,
1221:23, 1223:7,
1223:9, 1223:20,
1223:22, 1273:19
**accidently** [2] -
1175:24, 1181:24
**accomplish** [1] -
1270:7
**accountable** [1] -
1120:11
**accountants** [1] -
1277:18
**accounting** [5] -
1277:12, 1277:17,
1278:14, 1278:19,
1283:3
**accounts** [1] - 1285:2
**accuracy** [1] -
1224:24, 1225:1
**accurate** [3] - 1223:3,

1226:14, 1228:3
**achieve** [1] - 1126:17
**acknowledge** [1] -
1158:22
**acknowledgment** [1] -
1158:16
**acquired** [3] -
1279:19, 1279:21,
1279:23
**acquisitions** [2] -
1265:22, 1267:14
**acronym** [1] - 1091:17
**action** [3] - 1186:12,
1235:25, 1259:24
**actions** [1] - 1115:25
**activities** [4] -
1265:13, 1271:22,
1280:20, 1283:4
**activity** [1] - 1202:22
**actual** [2] - 1184:18,
1255:2
**adapt** [1] - 1148:13
**add** [2] - 1096:20,
1287:9
**added** [1] - 1120:4
**Added** [1] - 1099:19
**adding** [1] - 1127:6
**addition** [1] - 1163:5
**additional** [8] -
1073:11, 1073:12,
1073:14, 1081:6,
1081:13, 1145:14,
1174:4, 1187:17
**address** [6] - 1085:14,
1161:22, 1179:17,
1271:5, 1280:24
**addressed** [2] -
1139:6, 1269:4
**addressing** [1] -
1130:25
**adhere** [1] - 1093:12
**adjourned** [2] -
1288:1, 1288:3
**adjusted** [1] - 1251:11
**adjustment** [1] -
1224:4
**adjustments** [2] -
1210:20, 1226:17
**administer** [1] -
1163:11
**administers** [1] -
1194:18
**administration** [5] -
1186:2, 1187:10,
1187:11, 1188:8,
1190:11
**administrative** [2] -
1148:11, 1178:20
**administrator** [1] -
1188:2

**admit** [2] - 1225:13,
1247:23
**admitted** [18] -
1151:14, 1165:13,
1167:16, 1171:2,
1172:1, 1184:6,
1196:15, 1196:18,
1203:14, 1205:4,
1210:4, 1213:12,
1215:18, 1219:10,
1225:20, 1225:21,
1247:25, 1263:24
**Adobe** [3] - 1158:15,
1158:21, 1159:1
**advised** [1] - 1266:13
**advisement** [1] -
1214:25
**adviser** [1] - 1266:7
**advocate** [1] - 1192:23
**aerospace** [2] -
1119:15, 1145:12
**affect** [2] - 1082:4,
1123:9
**afford** [1] - 1278:1,
1278:2
**afraid** [1] - 1279:9
**afternoon** [8] -
1197:3, 1197:5,
1197:6, 1260:5,
1260:11, 1260:13,
1264:17, 1264:18
**agents** [2] - 1143:16,
1276:4
**Agile** [1] - 1120:5
**agnostic** [1] - 1123:8
**ago** [5] - 1119:8,
1122:15, 1125:19,
1172:14, 1277:15
**agree** [37] - 1085:11,
1088:12, 1095:8,
1095:11, 1095:14,
1097:24, 1098:1,
1098:3, 1108:5,
1110:6, 1110:17,
1111:5, 1113:25,
1154:14, 1185:12,
1207:2, 1208:19,
1209:10, 1209:11,
1210:8, 1210:12,
1210:17, 1214:4,
1230:18, 1235:2,
1235:9, 1235:17,
1236:4, 1236:13,
1236:22, 1244:10,
1244:12, 1251:5,
1251:16, 1258:18,
1258:23, 1275:9
**agreed** [1] - 1112:21
**agreement** [1] -
1225:7

3

**ahead** [6] - 1174:20, 1208:24, 1212:6, 1263:16, 1264:6, 1264:15
**aircraft** [1] - 1132:13
**al** [2] - 1071:4, 1071:7
**alert** [1] - 1181:21
**Alexander** [1] - 1277:18
**alleged** [3] - 1085:4, 1102:16, 1103:6
**alleges** [1] - 1072:22
**Allen** [1] - 1071:19
**allow** [7] - 1106:11, 1112:2, 1112:5, 1202:1, 1225:22, 1236:11, 1259:6
**allowable** [1] - 1113:12
**allowed** [3] - 1134:14, 1189:8, 1218:2
**allows** [4] - 1133:8, 1133:9, 1245:2, 1245:4
**almost** [1] - 1283:10
**alone** [1] - 1079:17
**aloud** [1] - 1144:4
**alphabet** [1] - 1266:18
**alphabetized** [1] - 1248:5
**alter** [1] - 1286:10
**amazing** [1] - 1278:22
**America** [1] - 1209:14
**amount** [4] - 1082:2, 1092:9, 1155:3, 1196:1
**amounts** [1] - 1122:13
**AMS** [3] - 1145:25, 1148:17, 1176:13
**analogy** [1] - 1141:12
**analysis** [17] - 1074:4, 1075:2, 1076:12, 1076:25, 1077:10, 1077:16, 1077:17, 1077:18, 1079:16, 1086:9, 1088:20, 1092:14, 1114:19, 1206:24, 1270:14, 1273:24, 1273:25
**analysts** [3] - 1124:4, 1124:16, 1287:3
**analytic** [41] - 1074:7, 1074:10, 1074:20, 1074:23, 1075:1, 1075:4, 1075:13, 1076:19, 1076:20, 1077:11, 1078:11, 1079:1, 1079:18, 1084:12, 1084:14, 1084:22, 1085:5,

1085:8, 1085:11, 1085:12, 1085:15, 1086:14, 1086:18, 1086:21, 1087:1, 1087:8, 1087:17, 1088:16, 1088:19, 1089:6, 1089:18, 1089:22, 1089:24, 1090:13, 1093:24, 1094:2, 1094:6, 1094:11, 1094:14, 1115:5, 1115:7
**analytical** [2] - 1074:17, 1094:21
**analyze** [1] - 1124:17
**Andersen** [3] - 1267:5, 1267:7, 1267:17
**Anderson** [1] - 1265:21
**answer** [14] - 1090:3, 1106:5, 1107:13, 1130:15, 1208:9, 1211:11, 1227:10, 1229:14, 1238:17, 1240:3, 1240:4, 1242:21, 1242:24
**ANSWER** [2] - 1227:16, 1227:20
**answered** [1] - 1089:11
**answering** [1] - 1107:18
**anytime** [1] - 1185:17
**anyway** [2] - 1150:17, 1278:24
**apart** [1] - 1181:19
**API** [6] - 1079:11, 1082:16, 1083:3, 1083:5, 1083:7, 1093:18
**apologies** [1] - 1246:17
**apologize** [6] - 1097:5, 1175:11, 1179:11, 1207:24, 1243:24, 1258:22
**appear** [4] - 1209:23, 1234:14, 1256:21, 1261:14
**APPEARANCES** [1] - 1071:13
**appendix** [3] - 1160:20, 1232:25, 1233:3
**Appendix** [2] - 1161:1, 1181:5
**applicable** [1] - 1109:11
**application** [12] - 1170:15, 1204:8,

1240:10, 1240:11, 1250:13, 1262:11, 1268:17, 1271:16, 1271:17, 1271:19, 1277:9, 1281:18
**applications** [9] - 1119:12, 1119:17, 1120:15, 1161:5, 1234:1, 1239:24, 1261:20, 1266:19, 1281:16
**applied** [4] - 1087:8, 1108:6, 1108:11, 1170:9
**applies** [3] - 1108:15, 1143:6, 1161:11
**Apply** [1] - 1108:15
**apply** [4] - 1108:16, 1163:9, 1230:24, 1232:8
**appreciate** [4] - 1104:9, 1113:13, 1236:3, 1253:7
**approach** [20] - 1093:24, 1094:2, 1094:6, 1094:11, 1095:24, 1131:12, 1139:15, 1142:12, 1145:1, 1155:25, 1166:25, 1196:22, 1210:24, 1210:25, 1211:15, 1215:6, 1218:16, 1218:17, 1221:14, 1224:12
**approached** [1] - 1146:6
**appropriate** [5] - 1113:12, 1195:14, 1214:17, 1231:16, 1232:18
**appropriately** [2] - 1131:6, 1269:20
**approval** [3] - 1165:4, 1169:21, 1192:16
**approving** [1] - 1170:8
**April** [1] - 1248:25
**architected** [1] - 1133:14
**architectural** [4] - 1283:24, 1284:2, 1285:8, 1286:11
**architecture** [5] - 1129:4, 1130:6, 1133:9, 1155:17, 1279:5
**architectures** [1] - 1279:1
**archive** [2] - 1187:13, 1191:5
**Area** [1] - 1119:10

**area** [12] - 1080:9, 1124:6, 1127:25, 1129:8, 1142:11, 1155:2, 1170:1, 1178:5, 1184:1, 1193:20, 1265:9, 1265:10
**areas** [4] - 1115:6, 1130:6, 1132:19, 1132:22
**argue** [1] - 1240:6
**art** [1] - 1095:12
**Arthur** [2] - 1267:4, 1267:7
**articles** [3] - 1087:15, 1087:21, 1087:22
**articulation** [1] - 1246:17
**Ashish** [1] - 1099:20
**Ashton** [1] - 1248:22
**aside** [2] - 1262:12, 1262:13
**aspect** [3] - 1197:13, 1197:19, 1198:22
**aspects** [3] - 1078:17, 1079:19, 1090:15
**assertion** [1] - 1202:21
**assessment** [2] - 1138:23, 1138:24
**assigned** [1] - 1177:4
**assistance** [2] - 1137:6, 1153:2
**assume** [6] - 1106:15, 1106:21, 1107:3, 1107:11, 1181:12, 1225:7
**assumed** [1] - 1114:16
**assumes** [1] - 1259:3
**assuming** [1] - 1103:2
**assumption** [1] - 1208:16
**asterisks** [3] - 1074:25, 1078:20, 1079:25
**Astrachan** [2] - 1072:10, 1114:11
**ASTRACHAN** [2] - 1072:16, 1289:4
**attached** [5] - 1180:6, 1180:10, 1189:5, 1189:7, 1258:10
**attaching** [3] - 1258:8, 1258:18
**attachment** [10] - 1181:25, 1185:8, 1185:19, 1187:5, 1187:6, 1187:20, 1194:4, 1225:18, 1245:13, 1255:23

**attended** [2] - 1160:9, 1216:2
**attention** [10] - 1150:1, 1171:16, 1185:1, 1189:22, 1205:7, 1215:14, 1220:6, 1225:22, 1241:13, 1245:14
**attest** [1] - 1223:4
**attorney** [1] - 1200:4
**Attorneys** [2] - 1071:17, 1071:21
**audience** [2] - 1159:12, 1167:4
**audit** [2] - 1263:9, 1263:13
**augment** [3] - 1073:10, 1073:13, 1073:15
**August** [9] - 1111:21, 1157:23, 1186:10, 1186:12, 1186:15, 1186:16, 1186:19, 1187:12, 1243:21
**AUP** [22] - 1135:5, 1135:6, 1135:8, 1135:16, 1136:11, 1160:19, 1161:9, 1161:11, 1161:13, 1161:22, 1162:10, 1181:4, 1181:7, 1194:21, 1194:23, 1233:3, 1234:14, 1234:16, 1234:18, 1258:20, 1259:2, 1259:19
**Austin** [1] - 1273:7, 1273:8
**Australia** [1] - 1119:16
**author** [4] - 1142:21, 1206:20, 1207:17, 1219:5
**authored** [4] - 1101:4, 1111:19, 1116:2, 1210:14
**authorization** [1] - 1166:3
**automated** [1] - 1285:20
**automatically** [3] - 1182:11, 1183:19, 1284:11
**automation** [3] - 1277:10, 1278:1
**availability** [3] - 1118:8, 1174:22, 1202:4
**available** [8] - 1125:12, 1182:9, 1184:2, 1194:9,

4

1201:21, 1255:23,
1272:17, 1273:18
**average** [3] - 1156:12,
1163:17, 1266:17
**aware** [16] - 1087:15,
1088:18, 1166:17,
1183:7, 1192:18,
1204:2, 1214:21,
1222:18, 1222:22,
1223:2, 1223:12,
1223:19, 1223:25,
1224:15, 1224:22,
1232:4

## B

**bachelor** [1] - 1273:6
**back-and-forth** [1] -
1231:25
**back-end** [1] -
1169:10
**backed** [1] - 1206:24
**background** [3] -
1273:5, 1277:5,
1277:14
**BAE** [2] - 1119:15,
1177:24
**ban** [1] - 1276:9
**based** [9] - 1084:5,
1146:5, 1146:13,
1169:4, 1190:8,
1204:20, 1211:5,
1238:19, 1274:2
**Basic** [1] - 1237:13
**basic** [1] - 1267:10
**basis** [10] - 1123:8,
1146:25, 1163:6,
1163:12, 1269:7,
1269:13, 1269:14,
1281:11, 1282:21
**batch** [1] - 1284:10,
1284:11
**Bates** [9] - 1172:12,
1179:9, 1185:7,
1186:24, 1187:16,
1187:17, 1188:4,
1190:1, 1190:8
**Bay** [1] - 1119:10
**BearingPoint** [1] -
1267:23
**became** [2] - 1199:8,
1199:22
**become** [3] - 1113:5,
1123:12, 1142:20
**becomes** [1] - 1125:12
**BEFORE** [1] - 1071:2
**begin** [2] - 1096:8,
1097:7
**beginning** [7] -
1080:12, 1099:12,

1099:17, 1154:22,
1228:22, 1261:2,
1280:18
**begins** [1] - 1229:22
**behalf** [4] - 1072:16,
1118:13, 1118:17,
1264:8
**behaving** [1] -
1131:18
**behest** [1] - 1275:8
**behind** [2] - 1138:16,
1284:10
**beings** [3] - 1239:11,
1239:12, 1239:18
**belief** [2] - 1144:20,
1144:22
**bell** [1] - 1254:18
**below** [5] - 1096:8,
1096:9, 1172:23,
1205:14, 1205:17
**beneficial** [1] -
1191:24
**benefit** [4] - 1105:4,
1105:7, 1113:11,
1123:17
**benefits** [1] - 1182:24
**Benge** [2] - 1257:14,
1257:17
**Benjamin** [1] -
1071:14
**best** [4] - 1156:16,
1156:18, 1156:19,
1214:9
**better** [1] - 1209:5
**between** [26] - 1074:9,
1076:17, 1078:17,
1082:2, 1091:1,
1109:8, 1114:16,
1118:7, 1121:3,
1174:21, 1178:16,
1179:6, 1184:15,
1186:12, 1186:18,
1209:13, 1216:21,
1224:8, 1234:23,
1242:17, 1243:3,
1244:17, 1247:7,
1248:18, 1249:19,
1251:14
**BF** [1] - 1218:3
**big** [6] - 1166:15,
1193:5, 1194:3,
1266:22, 1268:2,
1278:1
**binary** [1] - 1286:15
**binder** [23] - 1080:16,
1080:17, 1086:1,
1091:9, 1095:23,
1105:21, 1135:14,
1142:14, 1149:24,
1151:14, 1157:22,

1164:10, 1167:7,
1170:13, 1172:1,
1178:7, 1184:6,
1189:12, 1203:5,
1226:23, 1226:24,
1232:21, 1232:22
**bit** [12] - 1072:7,
1125:19, 1128:7,
1156:22, 1169:16,
1172:14, 1174:19,
1201:3, 1240:13,
1252:2, 1277:5,
1282:10
**blank** [1] - 1082:2
**blanking** [1] - 1254:16
**blocks** [5] - 1078:13,
1078:16, 1079:22,
1079:25, 1126:19
**blow** [2] - 1209:1,
1279:9
**bottom** [16] - 1106:7,
1143:8, 1151:16,
1159:18, 1165:21,
1185:25, 1186:23,
1186:24, 1189:25,
1206:3, 1215:21,
1233:20, 1243:24,
1249:4, 1265:15,
1282:2
**box** [13] - 1074:23,
1078:21, 1080:5,
1096:20, 1182:5,
1182:17, 1183:18,
1185:3, 1185:6,
1185:7, 1185:18,
1185:25, 1284:24
**boxes** [2] - 1080:2,
1187:16
**brackets** [1] - 1188:21
**break** [13] - 1118:3,
1118:6, 1118:12,
1174:17, 1175:6,
1175:15, 1193:13,
1211:17, 1260:1,
1260:5, 1260:11,
1287:20, 1287:22
**breakneck** [1] -
1279:12
**Brian** [3] - 1219:15,
1219:23, 1219:25
**briefly** [3] - 1113:24,
1119:7, 1273:4
**bring** [6] - 1101:13,
1206:6, 1225:22,
1253:25, 1274:17,
1282:12
**bringing** [2] - 1152:11,
1240:8
**broad** [1] - 1160:14
**broken** [1] - 1176:2

**brought** [3] - 1080:18,
1122:2, 1255:25
**Buffy** [3] - 1263:6,
1263:18, 1289:9
**bug** [1] - 1234:4
**build** [2] - 1270:25,
1271:2
**building** [6] - 1125:16,
1138:18, 1155:1,
1268:11, 1268:13,
1269:18
**buildings** [1] -
1138:16
**built** [1] - 1140:5
**bullets** [2] - 1086:6,
1086:9
**bunch** [1] - 1266:17
**bundled** [1] - 1129:19
**Business** [5] -
1119:22, 1123:10,
1133:15, 1177:23,
1268:19
**business** [54] -
1124:4, 1124:16,
1130:12, 1130:21,
1132:23, 1132:25,
1133:10, 1134:24,
1137:19, 1137:21,
1139:14, 1142:3,
1143:10, 1145:15,
1148:4, 1148:5,
1149:11, 1157:12,
1162:14, 1162:17,
1195:12, 1204:11,
1204:25, 1207:2,
1211:12, 1213:4,
1228:14, 1252:4,
1252:6, 1265:13,
1265:14, 1265:22,
1266:10, 1266:20,
1266:21, 1268:5,
1270:5, 1270:7,
1270:13, 1271:1,
1271:5, 1272:19,
1273:7, 1276:1,
1276:25, 1278:5,
1278:18, 1281:11,
1283:8, 1283:12,
1284:22, 1285:3,
1285:5
**businesses** [3] -
1265:11, 1277:22,
1278:11
**button** [5] - 1172:24,
1173:6, 1173:10,
1173:13, 1173:16
**BY** [64] - 1072:19,
1096:1, 1097:3,
1098:13, 1106:12,
1108:1, 1109:22,

1112:8, 1113:23,
1114:14, 1115:12,
1119:2, 1145:6,
1147:6, 1147:11,
1148:2, 1153:11,
1156:7, 1159:7,
1159:17, 1164:18,
1165:15, 1167:18,
1171:4, 1175:14,
1177:7, 1177:12,
1177:18, 1197:8,
1198:7, 1201:6,
1201:20, 1202:8,
1203:8, 1203:19,
1205:6, 1207:6,
1208:1, 1209:2,
1210:7, 1212:7,
1213:14, 1215:20,
1219:12, 1220:5,
1222:16, 1223:18,
1224:14, 1226:1,
1228:2, 1231:21,
1238:22, 1243:14,
1248:3, 1250:14,
1251:1, 1257:20,
1259:16, 1260:19,
1264:20, 1269:24,
1274:19, 1275:13,
1282:13

## C

**calculation** [1] -
1154:10
**campaigns** [1] -
1268:8
**candidly** [1] - 1112:3
**cannot** [8] - 1116:3,
1116:15, 1127:15,
1142:10, 1189:5,
1189:7, 1237:18,
1251:23
**capability** [1] - 1140:6
**capacity** [3] - 1121:8,
1177:22, 1177:23
**car** [6] - 1141:13,
1141:14, 1141:15,
1141:20, 1141:23,
1141:24
**care** [1] - 1194:15
**career** [10] - 1119:11,
1140:3, 1140:9,
1261:2, 1264:23,
1264:24, 1265:24,
1267:4, 1268:22,
1272:7
**careers** [1] - 1264:25
**careful** [3] - 1074:15,
1225:23, 1236:25
**carry** [2] - 1150:10,

1151:8
case [66] - 1072:20,
1084:13, 1084:17,
1085:2, 1086:20,
1087:4, 1087:7,
1087:13, 1088:9,
1089:5, 1089:7,
1089:8, 1089:17,
1099:22, 1100:25,
1107:15, 1113:4,
1113:6, 1113:8,
1117:2, 1123:17,
1153:22, 1154:4,
1154:7, 1155:4,
1164:6, 1164:7,
1170:17, 1170:18,
1171:15, 1171:16,
1171:18, 1171:20,
1172:24, 1173:22,
1174:4, 1178:22,
1181:1, 1183:3,
1183:5, 1183:7,
1184:5, 1184:22,
1189:11, 1189:20,
1189:21, 1193:9,
1202:12, 1205:25,
1215:3, 1218:10,
1220:21, 1249:22,
1255:11, 1255:13,
1256:16, 1264:4,
1270:10, 1271:4,
1273:11, 1273:13,
1273:14, 1274:13,
1274:24, 1285:19
cases [28] - 1130:24,
1140:24, 1152:2,
1152:4, 1152:6,
1152:15, 1153:6,
1153:25, 1154:10,
1154:21, 1155:4,
1155:8, 1155:21,
1156:9, 1156:11,
1168:21, 1169:5,
1169:13, 1207:12,
1207:15, 1207:21,
1208:4, 1208:6,
1208:13, 1208:17,
1218:21, 1237:17
Casey [1] - 1071:21
category [2] -
1234:10, 1281:21
caused [2] - 1074:11,
1117:12
causing [1] - 1101:11
caution [1] - 1210:20
caveat [1] - 1236:3
cbl [1] - 1072:24
cc [4] - 1179:1,
1179:4, 1245:7,
1248:22

CCR [2] - 1071:23,
1288:8
CDs [3] - 1280:13,
1280:14
Center [3] - 1184:10,
1184:23, 1188:22
center [2] - 1185:3,
1264:24
Central [35] - 1164:5,
1168:23, 1168:24,
1169:3, 1169:7,
1169:9, 1170:2,
1170:4, 1170:6,
1170:7, 1170:8,
1170:10, 1170:15,
1170:19, 1170:21,
1170:22, 1171:18,
1171:20, 1172:7,
1172:9, 1172:17,
1172:19, 1173:6,
1174:2, 1182:1,
1182:2, 1182:17,
1182:20, 1183:11,
1183:14, 1184:15,
1184:17, 1191:16,
1192:7, 1193:21
centralized [2] -
1254:10, 1254:12
CEO [1] - 1214:21
CEO's [1] - 1215:3
CEOs [1] - 1266:8
certain [8] - 1079:4,
1125:24, 1131:18,
1140:11, 1161:4,
1199:1, 1225:20,
1273:10
certainly [15] - 1073:8,
1097:13, 1097:16,
1107:22, 1155:10,
1206:20, 1206:25,
1209:20, 1212:22,
1228:15, 1241:5,
1242:11, 1252:22,
1261:2, 1270:22
certify [2] - 1163:13,
1288:6
CFO [1] - 1266:17
CFOs [1] - 1266:8
chain [4] - 1179:6,
1215:11, 1218:24,
1248:18
chance [2] - 1072:7,
1225:23
change [24] - 1082:18,
1082:19, 1123:8,
1123:15, 1123:18,
1124:13, 1124:23,
1131:5, 1132:20,
1141:15, 1141:19,
1141:23, 1145:16,

1155:24, 1224:7,
1226:12, 1226:16,
1227:6, 1242:7,
1251:19, 1260:2,
1266:20, 1276:1
changed [7] -
1096:22, 1096:25,
1101:5, 1122:12,
1122:13, 1122:22,
1279:10
changes [41] -
1122:16, 1122:18,
1122:20, 1122:23,
1123:5, 1123:6,
1123:11, 1124:14,
1126:3, 1129:9,
1152:15, 1154:13,
1155:8, 1155:22,
1156:4, 1165:5,
1169:20, 1169:21,
1169:23, 1169:24,
1170:8, 1170:9,
1171:15, 1192:15,
1219:16, 1227:24,
1228:6, 1228:25,
1229:5, 1229:8,
1245:19, 1246:9,
1246:22, 1251:15,
1253:10, 1253:13,
1254:6, 1263:12,
1270:18, 1271:11,
1273:2
changing [3] -
1122:10, 1133:10,
1224:12
characterization [1] -
1093:11
characterize [2] -
1266:6, 1268:22
characterized [1] -
1102:13
charge [1] - 1268:11
charged [2] - 1267:20,
1272:9
chart [1] - 1285:1
check [7] - 1128:16,
1182:5, 1182:22,
1183:18, 1191:19,
1225:19, 1252:23
checked [2] - 1159:3,
1182:18
checking [2] -
1216:20, 1234:25
checks [2] - 1191:20,
1193:4
chief [1] - 1157:11
choice [3] - 1081:25,
1083:10, 1083:20
choices [1] - 1199:4
choose [4] - 1083:6,

1132:22, 1141:6,
1193:17
chooses [1] - 1144:15
choosing [1] - 1199:3
chose [4] - 1139:18,
1142:12, 1193:19,
1211:12
CIOs [1] - 1266:8
Circuit [1] - 1227:18
circulating [1] -
1247:5
circumstances [1] -
1276:16
citations [1] - 1086:12
City [1] - 1170:18
claim [1] - 1092:23
claims [1] - 1185:19
clarification [2] -
1218:3, 1253:7
clarify [1] - 1100:17
clarifying [1] -
1144:17
class [1] - 1093:10
classic [4] - 1141:3,
1141:14, 1141:15
clear [34] - 1083:13,
1084:9, 1104:6,
1115:24, 1136:12,
1140:13, 1142:9,
1157:17, 1168:20,
1173:15, 1181:14,
1182:16, 1185:6,
1199:12, 1203:3,
1221:14, 1224:2,
1225:13, 1228:9,
1229:7, 1229:13,
1235:19, 1235:24,
1239:25, 1243:9,
1244:15, 1246:16,
1246:18, 1247:1,
1250:15, 1251:8,
1253:2, 1271:24,
1286:14
clearly [1] - 1112:16
CLERK [3] - 1118:19,
1118:23, 1264:10
click [1] - 1173:6
client [118] - 1104:18,
1104:21, 1104:23,
1105:1, 1105:3,
1105:4, 1105:7,
1105:8, 1107:17,
1107:21, 1109:8,
1116:12, 1116:19,
1123:2, 1125:4,
1125:5, 1125:7,
1125:8, 1125:9,
1125:12, 1125:13,
1125:14, 1125:15,
1126:2, 1126:16,

1127:22, 1127:25,
1128:4, 1128:7,
1128:8, 1128:18,
1128:21, 1128:22,
1130:9, 1131:20,
1132:9, 1132:22,
1134:6, 1135:2,
1141:2, 1153:25,
1160:18, 1161:14,
1161:17, 1162:2,
1162:9, 1164:1,
1166:1, 1169:9,
1170:2, 1171:17,
1173:5, 1173:22,
1174:1, 1178:2,
1178:15, 1180:14,
1182:4, 1182:16,
1185:8, 1185:12,
1185:16, 1185:18,
1187:25, 1188:20,
1188:23, 1191:22,
1195:17, 1213:22,
1214:7, 1214:14,
1215:24, 1217:1,
1217:9, 1218:5,
1220:1, 1220:11,
1220:13, 1220:14,
1220:18, 1221:22,
1222:2, 1222:19,
1223:8, 1223:21,
1251:24, 1251:25,
1252:13, 1252:14,
1254:17, 1257:8,
1257:11, 1258:4,
1258:5, 1258:7,
1258:11, 1258:15,
1258:17, 1269:4,
1270:6, 1270:15,
1271:3, 1271:16,
1271:23, 1273:1,
1276:21, 1276:22,
1276:25, 1278:15,
1278:16, 1278:17,
1279:1, 1279:4,
1282:8
client's [29] - 1108:6,
1109:1, 1110:20,
1116:3, 1116:6,
1116:7, 1116:8,
1116:16, 1125:8,
1125:10, 1125:17,
1127:4, 1128:21,
1138:18, 1139:2,
1153:15, 1161:14,
1162:7, 1179:17,
1179:22, 1179:24,
1189:3, 1217:12,
1252:11, 1252:13,
1252:15, 1258:6,
1258:9
clients [144] - 1073:6,

1109:4, 1109:16, 1109:17, 1109:23, 1109:25, 1120:12, 1120:14, 1121:1, 1121:6, 1122:9, 1122:24, 1123:9, 1123:13, 1123:17, 1123:20, 1125:1, 1125:3, 1126:9, 1127:21, 1127:24, 1128:25, 1129:9, 1129:24, 1130:1, 1130:3, 1131:1, 1131:5, 1134:12, 1134:15, 1136:18, 1136:22, 1136:24, 1137:2, 1137:5, 1137:9, 1137:13, 1137:15, 1137:16, 1138:4, 1138:22, 1140:22, 1141:3, 1141:9, 1142:2, 1145:25, 1146:8, 1148:9, 1148:10, 1148:12, 1148:17, 1149:19, 1151:1, 1151:4, 1153:13, 1153:18, 1154:11, 1154:13, 1162:9, 1163:18, 1163:22, 1163:23, 1163:24, 1164:3, 1164:21, 1164:23, 1165:6, 1165:9, 1166:11, 1166:13, 1166:18, 1166:24, 1167:5, 1167:11, 1167:22, 1168:8, 1168:11, 1168:13, 1168:14, 1168:17, 1168:19, 1168:25, 1169:13, 1170:11, 1170:17, 1171:11, 1171:19, 1172:6, 1172:9, 1172:17, 1172:25, 1174:5, 1174:6, 1174:12, 1175:16, 1175:19, 1175:24, 1176:5, 1176:6, 1176:13, 1176:14, 1178:5, 1178:18, 1180:21, 1181:1, 1181:24, 1184:16, 1185:17, 1187:6, 1188:6, 1191:15, 1191:17, 1193:1, 1193:13, 1193:20, 1193:22, 1195:16, 1208:17, 1214:13, 1214:15, 1214:17, 1214:20, 1217:3,

1217:4, 1217:18, 1218:18, 1218:21, 1220:17, 1221:8, 1230:16, 1236:6, 1238:7, 1253:24, 1254:11, 1256:5, 1265:10, 1268:6, 1268:25, 1269:1, 1269:3, 1272:4

**clients'** [1] - 1138:15

**clip** [3] - 1263:3, 1263:5, 1263:15

**close** [1] - 1134:11

**closed** [78] - 1129:6, 1133:17, 1133:20, 1133:21, 1133:22, 1134:1, 1134:3, 1134:8, 1134:14, 1134:16, 1134:19, 1141:11, 1142:9, 1143:18, 1143:20, 1144:2, 1144:3, 1144:14, 1144:21, 1144:23, 1151:12, 1195:21, 1199:10, 1199:12, 1199:14, 1199:23, 1200:3, 1202:20, 1203:1, 1229:19, 1230:1, 1234:13, 1234:17, 1234:23, 1235:13, 1235:15, 1235:17, 1236:6, 1236:8, 1236:10, 1236:12, 1237:23, 1238:4, 1238:7, 1238:10, 1238:17, 1238:24, 1239:16, 1239:17, 1240:1, 1240:12, 1243:3, 1244:17, 1247:1, 1247:8, 1248:9, 1248:11, 1249:20, 1256:24, 1260:22, 1260:24, 1261:1, 1261:4, 1261:13, 1261:17, 1261:18, 1283:23, 1284:1, 1284:12, 1285:7, 1286:1, 1286:4, 1286:15, 1286:17, 1286:22, 1287:2, 1287:6, 1287:9

**closely** [1] - 1196:3

**cloud** [1] - 1169:11

**Cloud** [1] - 1184:19

**CNC** [1] - 1244:1

**coach** [1] - 1264:23

**Cobol** [1] - 1075:17

**COBOL** [7] - 1078:21,

1080:8, 1083:13, 1083:19, 1083:22, 1237:12

**code** [489] - 1072:23, 1072:24, 1076:2, 1076:12, 1077:21, 1077:25, 1078:6, 1078:14, 1079:16, 1079:22, 1081:25, 1084:23, 1085:3, 1085:6, 1089:18, 1089:19, 1090:1, 1090:18, 1091:19, 1092:17, 1092:24, 1093:22, 1094:12, 1094:13, 1094:15, 1096:5, 1097:17, 1097:20, 1097:24, 1101:3, 1105:6, 1106:16, 1106:22, 1110:17, 1110:22, 1111:2, 1111:4, 1111:7, 1111:10, 1111:16, 1111:18, 1111:19, 1112:22, 1113:5, 1113:25, 1115:7, 1115:17, 1115:20, 1116:9, 1116:17, 1116:18, 1116:19, 1126:10, 1126:11, 1126:12, 1126:15, 1126:19, 1127:5, 1127:11, 1127:18, 1128:25, 1129:3, 1129:5, 1129:6, 1129:8, 1129:10, 1129:11, 1129:12, 1129:20, 1129:23, 1129:25, 1130:2, 1130:5, 1130:6, 1130:7, 1130:9, 1130:10, 1130:12, 1130:13, 1130:14, 1130:15, 1130:17, 1130:18, 1130:20, 1130:23, 1130:25, 1131:7, 1131:9, 1131:10, 1131:20, 1131:21, 1131:23, 1131:24, 1132:1, 1132:2, 1132:4, 1132:9, 1133:16, 1133:17, 1133:20, 1133:21, 1133:22, 1134:3, 1134:1, 1134:3, 1134:8, 1134:14, 1134:10, 1134:11, 1134:13, 1134:15, 1134:16, 1134:19, 1136:16, 1136:20,

1136:25, 1137:4, 1137:12, 1137:16, 1137:20, 1137:22, 1139:23, 1140:6, 1141:10, 1141:11, 1142:8, 1142:9, 1142:11, 1143:10, 1143:14, 1143:18, 1143:21, 1143:23, 1143:24, 1143:25, 1144:2, 1144:3, 1144:11, 1144:12, 1144:14, 1144:21, 1144:23, 1145:8, 1145:10, 1145:14, 1145:19, 1145:23, 1146:1, 1146:4, 1146:16, 1146:23, 1147:8, 1147:13, 1147:22, 1148:4, 1148:8, 1148:16, 1149:8, 1149:11, 1149:14, 1149:15, 1149:18, 1150:10, 1150:15, 1150:18, 1150:20, 1150:23, 1151:2, 1151:7, 1151:12, 1152:15, 1152:16, 1152:18, 1152:19, 1152:21, 1152:24, 1153:4, 1154:13, 1155:8, 1155:9, 1155:10, 1155:15, 1155:16, 1155:18, 1155:19, 1155:20, 1155:22, 1155:24, 1155:25, 1156:4, 1156:8, 1156:11, 1156:17, 1156:20, 1161:6, 1162:15, 1165:23, 1185:11, 1195:20, 1195:21, 1199:9, 1199:10, 1199:11, 1199:12, 1199:14, 1199:22, 1199:23, 1200:2, 1200:3, 1202:16, 1202:20, 1203:1, 1205:10, 1205:18, 1205:24, 1206:6, 1207:15, 1208:6, 1208:14, 1208:18, 1208:21, 1209:6, 1209:19, 1210:16, 1211:2, 1213:20, 1213:23, 1214:5, 1214:7, 1215:1, 1215:2, 1217:21, 1218:3, 1218:4, 1218:8, 1218:12, 1219:16,

1221:21, 1221:23, 1223:7, 1223:9, 1223:20, 1223:22, 1229:19, 1229:23, 1230:1, 1230:5, 1230:9, 1230:11, 1230:15, 1230:18, 1230:19, 1230:20, 1231:1, 1231:5, 1232:3, 1232:9, 1233:7, 1234:3, 1234:5, 1234:9, 1234:13, 1234:23, 1235:4, 1235:8, 1235:12, 1235:13, 1235:14, 1235:15, 1235:17, 1235:20, 1236:6, 1236:8, 1236:11, 1236:12, 1236:16, 1236:22, 1236:23, 1236:24, 1237:9, 1237:19, 1237:23, 1237:25, 1238:3, 1238:4, 1238:7, 1238:9, 1238:10, 1238:17, 1238:24, 1239:3, 1239:9, 1239:15, 1239:16, 1239:17, 1239:25, 1240:1, 1240:5, 1240:11, 1240:12, 1241:25, 1242:14, 1242:17, 1242:18, 1242:19, 1243:2, 1243:3, 1244:3, 1244:6, 1244:7, 1244:9, 1244:11, 1244:12, 1244:13, 1244:17, 1245:4, 1245:19, 1245:24, 1246:1, 1246:2, 1246:5, 1246:7, 1246:9, 1246:13, 1246:15, 1246:19, 1246:20, 1246:22, 1246:23, 1247:1, 1247:7, 1247:8, 1247:9, 1247:10, 1247:11, 1247:12, 1247:15, 1247:20, 1248:7, 1248:9, 1248:11, 1249:16, 1249:20, 1249:23, 1250:1, 1250:3, 1250:4, 1250:5, 1250:6, 1250:11, 1250:13, 1250:16, 1250:17, 1250:18, 1250:19, 1250:21, 1251:6, 1251:12, 1251:13,

7

1251:17, 1251:20,
1252:5, 1252:18,
1253:4, 1253:6,
1253:10, 1253:13,
1253:21, 1253:23,
1253:25, 1260:22,
1260:24, 1260:25,
1261:1, 1261:3,
1261:4, 1261:14,
1261:17, 1261:19,
1262:10, 1262:12,
1262:14, 1262:16,
1262:18, 1263:11,
1263:12, 1271:7,
1271:8, 1272:5,
1272:12, 1272:14,
1272:15, 1272:16,
1272:23, 1274:25,
1275:4, 1275:6,
1275:21, 1275:24,
1276:8, 1276:17,
1278:13, 1280:7,
1280:9, 1280:21,
1280:22, 1281:7,
1281:13, 1282:6,
1282:11, 1282:15,
1282:18, 1282:19,
1283:9, 1283:17,
1283:18, 1283:20,
1283:21, 1283:22,
1283:24, 1283:25,
1284:2, 1284:12,
1285:8, 1285:9,
1285:10, 1285:16,
1285:25, 1286:3,
1286:4, 1286:11,
1286:12, 1286:21,
1286:22, 1286:23,
1287:2, 1287:9,
1287:10, 1287:11,
1287:12, 1287:13,
1287:14, 1287:16
**Code** [3] - 1099:19,
1237:6, 1249:25
**coding** [1] - 1271:11
**collaborative** [2] -
1089:4, 1089:13
**colleagues** [2] -
1113:19, 1113:20
**collection** [1] - 1177:2
**column** [6] - 1083:14,
1165:19, 1165:20,
1166:6, 1166:7,
1172:6
**combination** [1] -
1087:2
**coming** [4] - 1123:5,
1124:15, 1192:7,
1284:23
**command** [1] -

1112:22
**comment** [18] -
1078:13, 1079:22,
1079:24, 1080:13,
1081:7, 1081:14,
1081:15, 1081:16,
1081:19, 1084:2,
1084:4, 1084:5,
1101:6, 1139:14,
1174:4, 1202:7,
1207:17, 1256:16
**commenting** [1] -
1152:1
**comments** [7] -
1074:25, 1075:16,
1076:5, 1077:4,
1079:25, 1080:5,
1080:7
**commercial** [1] -
1192:5
**commitments** [1] -
1268:7
**committed** [1] -
1178:4
**committee** [1] -
1170:7
**common** [17] -
1075:16, 1078:16,
1083:7, 1117:3,
1130:21, 1131:22,
1133:12, 1148:8,
1152:19, 1156:20,
1193:22, 1247:4,
1247:6, 1247:18,
1247:20, 1248:5,
1248:9
**Common** [6] -
1245:14, 1245:15,
1245:23, 1246:5,
1261:11, 1261:14
**commonly** [8] -
1135:4, 1144:12,
1238:6, 1239:20,
1250:6, 1250:12,
1261:19, 1261:21
**communicate** [3] -
1143:1, 1158:6,
1222:20
**communicated** [3] -
1206:23, 1218:17,
1222:1
**communicating** [1] -
1188:20
**communication** [8] -
1142:23, 1143:5,
1144:19, 1157:5,
1157:14, 1174:10,
1217:7, 1230:7
**communications** [3] -
1157:11, 1182:11,

1254:21
**Communications** [1] -
1120:5
**community** [1] -
1177:5
**comp** [1] - 1083:17
**companies** [25] -
1145:1, 1145:4,
1145:19, 1145:22,
1145:24, 1146:5,
1146:12, 1146:15,
1146:23, 1147:7,
1147:14, 1147:22,
1148:21, 1148:25,
1149:5, 1176:20,
1177:3, 1177:8,
1266:24, 1269:19,
1269:25, 1277:25,
1279:13, 1279:15,
1285:15
**companies'** [4] -
1233:5, 1233:11,
1233:21, 1234:10
**company** [21] -
1076:14, 1093:21,
1119:20, 1120:3,
1138:13, 1156:15,
1157:2, 1157:4,
1158:7, 1161:6,
1176:9, 1181:21,
1198:11, 1206:23,
1221:11, 1224:13,
1228:16, 1234:1,
1252:25, 1277:11,
1278:13
**Company** [1] -
1189:15
**company's** [1] -
1162:8
**compare** [1] - 1092:16
**compared** [3] -
1082:10, 1093:3,
1093:5
**comparing** [2] -
1076:12, 1091:25
**comparison** [5] -
1081:1, 1081:20,
1091:22, 1092:15,
1154:5
**comparisons** [1] -
1128:6
**Compendium** [1] -
1237:2
**compensated** [2] -
1274:6, 1274:8
**compile** [1] - 1134:8
**compiled** [5] -
1111:16, 1116:7,
1117:9, 1133:24,
1239:18

**compiler** [2] -
1111:11, 1111:15
**complete** [10] -
1083:21, 1096:13,
1097:11, 1097:21,
1097:22, 1117:21,
1128:18, 1128:20,
1273:18
**completed** [1] -
1254:25
**completely** [3] -
1100:11, 1127:10,
1252:19
**compliance** [13] -
1122:9, 1151:5,
1163:7, 1183:21,
1184:2, 1190:25,
1191:1, 1194:15,
1197:16, 1198:20,
1199:4, 1229:18,
1236:16
**compliant** [4] -
1108:3, 1109:7,
1109:8, 1109:10
**complicated** [2] -
1121:19, 1124:24
**complies** [4] - 1108:8,
1108:9, 1108:22,
1198:10
**Comply** [1] - 1159:19
**comply** [24] - 1139:16,
1139:17, 1151:1,
1157:18, 1158:9,
1158:22, 1159:24,
1195:5, 1195:8,
1195:23, 1195:25,
1197:13, 1197:19,
1198:12, 1198:15,
1198:22, 1199:1,
1211:16, 1226:13,
1226:15, 1226:18,
1227:7, 1228:7,
1229:1
**component** [1] -
1133:20
**components** [2] -
1095:14, 1132:14
**comprehensible** [3] -
1237:15, 1239:9,
1239:12
**comprise** [1] -
1233:25
**computer** [7] - 1095:8,
1181:16, 1234:3,
1237:17, 1239:6,
1239:9, 1278:4
**computers** [2] -
1278:2, 1278:9
**conceivable** [1] -
1085:12

**concept** [1] - 1139:21
**concepts** [3] - 1287:1,
1287:4, 1287:5
**conceptual** [2] -
1271:2, 1280:20
**conceptually** [1] -
1266:18
**concern** [1] - 1217:11
**concerned** [3] -
1181:2, 1284:4,
1284:16
**concise** [1] - 1286:15
**conclude** [4] -
1107:14, 1187:23,
1238:14, 1262:22
**conclusion** [5] -
1078:6, 1085:13,
1185:15, 1198:25,
1231:8
**conclusions** [2] -
1263:13, 1273:15
**conditions** [2] -
1276:1, 1281:11
**conduct** [5] - 1077:11,
1089:22, 1090:13,
1101:17, 1134:24
**conducted** [1] -
1078:11
**confer** [1] - 1113:20
**conferencing** [1] -
1225:10
**conferred** [1] -
1113:19
**confident** [1] -
1154:15
**confidential** [6] -
1135:2, 1160:18,
1164:1, 1166:1,
1171:13, 1195:17
**configuration** [5] -
1131:5, 1132:21,
1156:17, 1270:18,
1270:19
**configurations** [1] -
1209:7
**configure** [1] -
1284:25
**configured** [2] -
1132:1, 1133:15
**confirm** [7] - 1076:1,
1172:8, 1178:2,
1186:9, 1189:17,
1212:18, 1220:12
**confirmation** [1] -
1159:11
**confused** [2] -
1100:11, 1101:10
**confusing** [2] -
1097:1, 1246:19
**confusion** [7] -

1097:5, 1101:12, 1139:12, 1202:23, 1232:13, 1232:15, 1232:17

**connect** [6] - 1121:23, 1125:7, 1128:14, 1134:7, 1138:3, 1141:2

**connection** [4] - 1087:12, 1159:8, 1211:4, 1252:16

**connectivity** [8] - 1134:6, 1138:3, 1166:22, 1211:1, 1217:2, 1217:4, 1221:9, 1257:11

**consider** [3] - 1138:9, 1139:9, 1218:16

**considerably** [1] - 1155:4

**consideration** [2] - 1085:17, 1138:17

**considered** [8] - 1082:9, 1137:21, 1138:1, 1138:12, 1140:14, 1140:17, 1218:15, 1218:19

**considering** [2] - 1138:5, 1138:14

**consistency** [1] - 1127:9

**consistent** [13] - 1089:6, 1126:2, 1126:3, 1143:18, 1144:5, 1144:19, 1144:21, 1144:22, 1155:25, 1172:20, 1173:19, 1184:12, 1230:12

**consolidation** [2] - 1279:18, 1279:22

**constantly** [4] - 1139:3, 1139:7, 1196:5, 1226:17

**constitute** [1] - 1089:1

**constrained** [8] - 1088:24, 1094:16, 1094:25, 1114:21, 1114:25, 1115:3, 1115:4, 1115:7

**constraint** [5] - 1080:14, 1081:17, 1081:18, 1082:17, 1114:16

**constraints** [14] - 1077:22, 1078:1, 1078:7, 1078:14, 1078:18, 1079:5, 1079:14, 1079:17, 1079:23, 1080:6,

1080:10, 1082:14, 1083:1

**construe** [1] - 1111:8

**consult** [1] - 1198:13

**consultant** [3] - 1265:6, 1266:1, 1276:23

**consultants** [1] - 1272:25

**consulting** [8] - 1119:10, 1265:9, 1265:19, 1267:8, 1268:12, 1268:14, 1268:20, 1282:18

**Consulting/ Accenture** [1] - 1265:21

**consults** [1] - 1198:24

**contacting** [1] - 1179:14

**contain** [9] - 1082:11, 1097:21, 1126:10, 1126:11, 1126:13, 1126:14, 1181:2, 1181:7, 1182:6

**contained** [4] - 1110:17, 1110:23, 1165:23, 1170:4

**contains** [7] - 1096:4, 1097:19, 1097:21, 1111:18, 1116:22, 1126:6, 1160:15

**content** [9] - 1126:23, 1173:2, 1173:14, 1173:15, 1182:3, 1193:25, 1215:4, 1233:4, 1233:11

**Content** [1] - 1162:12

**Content'** [1] - 1161:17

**contention** [1] - 1138:20

**contents** [5] - 1175:25, 1191:4, 1191:20, 1220:20

**context** [8] - 1112:11, 1112:13, 1117:2, 1216:19, 1217:17, 1217:22, 1247:8, 1287:15

**continue** [18] - 1122:14, 1132:25, 1140:25, 1142:7, 1173:22, 1174:11, 1187:8, 1191:18, 1195:10, 1195:15, 1226:14, 1228:12, 1228:14, 1229:10, 1230:8, 1230:11, 1230:15, 1231:14

**continued** [3] -

1072:9, 1081:9, 1226:17

**continuing** [3] - 1105:14, 1107:9, 1111:22

**contract** [1] - 1271:19

**contracted** [2] - 1109:3, 1178:19

**contractor** [1] - 1282:3

**contractors** [4] - 1135:7, 1157:24, 1158:7, 1273:1

**contractual** [1] - 1271:20

**contrary** [1] - 1259:14

**contribute** [1] - 1199:3

**contributed** [1] - 1133:4

**contributing** [1] - 1164:7

**control** [20] - 1241:9, 1252:10, 1252:12, 1253:1, 1253:3, 1253:5, 1253:10, 1253:12, 1253:15, 1253:19, 1253:21, 1253:22, 1254:2, 1254:6, 1254:9, 1257:1, 1257:9, 1284:22

**controlling** [1] - 1282:22

**controls** [13] - 1161:21, 1163:25, 1164:4, 1168:15, 1170:1, 1174:1, 1176:4, 1196:7, 1226:18, 1241:10, 1252:14, 1252:17, 1254:21

**convene** [1] - 1287:23

**convention** [24] - 1075:16, 1079:12, 1079:15, 1079:23, 1080:2, 1080:3, 1080:6, 1080:10, 1080:14, 1081:18, 1082:1, 1082:15, 1082:22, 1083:2, 1083:18, 1093:7, 1093:12, 1094:16, 1094:19, 1094:24, 1094:25, 1114:16, 1114:20, 1115:6

**conventional** [5] - 1078:21, 1079:8, 1093:25, 1094:3, 1094:12

**conventionality** [1] - 1078:24

**conventionally** [1] - 1094:7

**conventions** [7] - 1078:16, 1078:18, 1078:20, 1079:7, 1083:21, 1093:22, 1095:6

**conversant** [1] - 1101:1

**conversation** [1] - 1166:23

**converted** [1] - 1237:19

**conveys** [1] - 1160:25

**convinced** [5] - 1142:5, 1199:8, 1199:22, 1200:1, 1202:25

**Cope** [1] - 1161:2

**copied** [12] - 1076:2, 1076:10, 1077:17, 1089:25, 1090:8, 1090:10, 1106:15, 1106:21, 1116:20, 1219:5, 1219:6, 1280:11

**copied'** [1] - 1205:20

**copies** [7] - 1155:20, 1275:6, 1280:8, 1280:10, 1280:17, 1280:22, 1281:13

**copy** [37] - 1076:14, 1077:2, 1077:9, 1085:2, 1112:18, 1112:22, 1116:17, 1116:18, 1126:19, 1131:23, 1132:2, 1143:20, 1149:11, 1149:14, 1150:8, 1150:10, 1151:8, 1155:15, 1155:19, 1158:14, 1162:1, 1166:4, 1181:16, 1202:19, 1226:22, 1230:1, 1230:8, 1230:15, 1233:4, 1233:11, 1235:3, 1235:8, 1262:15, 1283:18, 1283:19, 1285:10

**Copy** [1] - 1161:16

**copy's** [1] - 1149:14

**copying** [49] - 1072:23, 1073:20, 1073:24, 1074:6, 1074:12, 1074:14, 1074:25, 1075:3, 1075:7, 1075:10,

**conventionality** [1] - 1078:24

1075:12, 1075:18, 1075:22, 1075:25, 1076:13, 1076:22, 1076:25, 1077:5, 1077:8, 1084:23, 1085:4, 1085:5, 1092:22, 1102:11, 1102:16, 1102:18, 1103:6, 1103:8, 1103:16, 1103:18, 1103:21, 1103:22, 1104:2, 1104:4, 1104:6, 1104:7, 1111:7, 1149:18, 1150:15, 1150:20, 1150:22, 1161:13, 1179:20, 1202:15, 1230:5, 1275:7, 1281:14, 1282:6, 1282:12

**Copyright** [7] - 1237:2, 1237:8, 1237:22, 1237:25, 1238:16, 1238:24, 1239:22

**copyright** [10] - 1076:18, 1102:16, 1103:6, 1103:24, 1104:1, 1104:13, 1189:8, 1204:13, 1206:18, 1237:8

**copyrighted** [4] - 1090:20, 1091:21, 1091:25, 1093:5

**core** [5] - 1283:24, 1284:1, 1285:7, 1285:8, 1286:10

**Corey** [1] - 1071:16

**corporate** [5] - 1119:13, 1200:17, 1200:20, 1201:8, 1263:8

**Corporate** [1] - 1177:22

**Corporation** [1] - 1269:6

**correct** [240] - 1073:3, 1073:4, 1073:16, 1074:6, 1074:12, 1075:8, 1075:10, 1075:19, 1076:2, 1076:10, 1076:11, 1077:25, 1078:8, 1078:9, 1078:15, 1082:12, 1082:13, 1082:25, 1084:4, 1084:6, 1086:10, 1086:15, 1086:19, 1086:21, 1086:23, 1087:1, 1087:5,

1087:6, 1087:9, 1087:10, 1087:13, 1087:14, 1087:17, 1087:19, 1087:21, 1087:22, 1088:3, 1089:4, 1089:10, 1089:17, 1089:23, 1090:2, 1090:21, 1091:23, 1092:2, 1092:4, 1092:6, 1092:9, 1092:10, 1092:12, 1092:13, 1092:18, 1092:25, 1093:19, 1093:23, 1094:5, 1095:9, 1096:6, 1096:16, 1097:20, 1098:20, 1098:21, 1098:24, 1099:1, 1099:4, 1099:10, 1099:22, 1099:24, 1100:8, 1100:20, 1100:23, 1101:19, 1102:3, 1102:8, 1102:9, 1102:12, 1103:3, 1103:4, 1104:14, 1104:15, 1104:19, 1105:1, 1107:21, 1108:9, 1108:10, 1108:13, 1108:14, 1108:17, 1108:20, 1109:9, 1110:10, 1110:24, 1111:2, 1111:7, 1112:12, 1114:4, 1129:19, 1130:19, 1132:6, 1140:16, 1144:2, 1147:14, 1147:15, 1149:23, 1160:23, 1168:9, 1173:8, 1179:3, 1179:8, 1180:13, 1182:19, 1186:21, 1189:19, 1197:10, 1197:11, 1198:3, 1199:10, 1199:24, 1200:4, 1200:5, 1200:11, 1200:12, 1200:22, 1200:23, 1201:1, 1201:10, 1201:15, 1201:18, 1202:10, 1202:11, 1202:20, 1203:22, 1203:23, 1203:25, 1204:5, 1205:24, 1207:3, 1207:16, 1209:22, 1209:23, 1211:7, 1212:9, 1213:1, 1215:7, 1216:13, 1216:18, 1218:9, 1218:12, 1218:13,

1218:17, 1218:18, 1219:20, 1219:21, 1220:11, 1220:12, 1220:15, 1221:2, 1221:5, 1222:2, 1222:21, 1223:15, 1225:8, 1226:7, 1226:10, 1226:13, 1228:8, 1228:10, 1229:6, 1229:20, 1230:2, 1230:3, 1230:10, 1230:16, 1230:17, 1231:6, 1234:11, 1234:12, 1234:14, 1234:16, 1234:18, 1234:20, 1234:21, 1235:13, 1235:15, 1235:17, 1236:6, 1236:11, 1237:23, 1238:18, 1239:3, 1239:5, 1241:1, 1242:6, 1242:9, 1243:2, 1243:19, 1243:21, 1244:7, 1244:11, 1244:20, 1244:21, 1244:23, 1244:24, 1245:3, 1245:5, 1245:11, 1245:12, 1245:24, 1246:5, 1246:10, 1246:23, 1247:9, 1247:10, 1248:13, 1249:2, 1249:20, 1249:23, 1250:1, 1250:4, 1250:18, 1251:17, 1252:4, 1252:18, 1253:10, 1253:13, 1253:16, 1253:17, 1254:7, 1254:11, 1254:25, 1255:22, 1258:5, 1258:8, 1258:11, 1259:18, 1259:19, 1262:7, 1275:1, 1288:6
**corrections** [1] - 1234:5
**correctly** [3] - 1104:5, 1104:12, 1233:8
**correspondence** [2] - 1152:7, 1152:17
**cost** [1] - 1270:22
**costs** [1] - 1265:16
**counsel** [15] - 1087:1, 1088:1, 1089:4, 1092:7, 1139:13, 1157:12, 1213:16, 1225:22, 1232:20, 1233:1, 1242:23, 1248:15, 1255:3,

1260:12, 1273:9
**count** [1] - 1153:6
**countries** [8] - 1119:14, 1120:22, 1120:24, 1121:1, 1121:4, 1122:10, 1149:4, 1155:1
**country** [8] - 1123:9, 1123:15, 1123:16, 1124:3, 1124:12, 1124:14, 1126:7, 1139:2
**couple** [7] - 1152:25, 1190:23, 1224:8, 1249:22, 1254:15, 1276:6, 1279:21
**course** [20] - 1119:19, 1132:10, 1136:7, 1136:14, 1139:16, 1143:2, 1146:13, 1147:12, 1158:24, 1162:14, 1163:2, 1197:15, 1211:2, 1211:17, 1215:9, 1235:6, 1240:6, 1256:13, 1270:19, 1271:10
**Court** [17] - 1096:3, 1103:1, 1113:10, 1113:11, 1119:7, 1125:20, 1127:1, 1132:8, 1135:21, 1160:24, 1184:14, 1190:21, 1208:10, 1227:9, 1231:15, 1255:14, 1288:3
**COURT** [82] - 1071:1, 1072:4, 1095:25, 1106:11, 1109:19, 1112:2, 1113:10, 1113:17, 1113:21, 1114:9, 1117:18, 1117:20, 1118:1, 1118:4, 1118:10, 1145:5, 1146:10, 1146:17, 1147:1, 1147:5, 1147:10, 1147:17, 1148:1, 1153:10, 1156:6, 1159:6, 1159:15, 1164:17, 1165:13, 1167:16, 1171:2, 1174:18, 1175:4, 1175:10, 1176:24, 1177:11, 1177:17, 1196:18, 1196:21, 1196:23, 1197:1, 1198:3, 1201:2, 1201:25, 1203:13, 1203:16, 1205:3,

1207:5, 1207:22, 1210:4, 1212:1, 1212:6, 1213:12, 1215:18, 1219:10, 1222:4, 1222:13, 1223:11, 1223:15, 1223:24, 1225:6, 1225:11, 1225:21, 1228:1, 1231:9, 1247:25, 1250:8, 1257:19, 1259:5, 1260:2, 1260:5, 1260:9, 1260:16, 1262:20, 1262:22, 1263:4, 1263:16, 1263:24, 1264:6, 1264:15, 1287:21, 1288:1
**court** [2] - 1157:10, 1232:3
**courts** [1] - 1231:25
**cover** [4] - 1134:25, 1212:15, 1212:20, 1243:22
**COVID** [1] - 1202:4
**Craig** [4] - 1117:25, 1118:16, 1118:21, 1289:6
**CRAIG** [1] - 1118:17
**crazy** [1] - 1279:8
**create** [8] - 1124:19, 1131:23, 1153:19, 1162:13, 1246:25, 1247:2, 1247:3, 1280:14
**created** [15] - 1107:4, 1108:12, 1126:15, 1127:9, 1145:19, 1146:23, 1147:13, 1147:22, 1149:14, 1154:18, 1184:9, 1188:13, 1189:14, 1216:14, 1256:19
**creates** [1] - 1108:16
**creating** [9] - 1108:25, 1126:16, 1127:20, 1127:23, 1155:15, 1204:16, 1280:17, 1281:2, 1285:17
**creation** [1] - 1099:2
**creative** [13] - 1075:9, 1075:18, 1075:21, 1078:23, 1093:9, 1093:16, 1094:1, 1094:4, 1094:9, 1095:3, 1095:5, 1115:19, 1115:22
**creativity** [1] - 1075:11, 1078:25, 1082:22, 1093:8,

1093:12, 1093:13, 1094:5, 1094:17
**creator** [1] - 1098:15
**critical** [2] - 1121:22, 1243:25
**cross** [17] - 1072:10, 1102:5, 1102:7, 1103:3, 1103:19, 1103:20, 1103:24, 1104:13, 1115:11, 1117:18, 1222:18, 1259:6, 1260:21, 1261:8, 1261:11, 1261:25, 1289:7
**Cross** [12] - 1075:6, 1077:3, 1077:7, 1077:10, 1084:25, 1098:14, 1274:17, 1274:25, 1280:5, 1283:16, 1283:19, 1289:4
**CROSS** [2] - 1072:18, 1197:7
**Cross'** [1] - 1081:3
**Cross's** [2] - 1275:3, 1275:16
**Cross-Examination** [1] - 1289:4
**cross-examination** [9] - 1072:10, 1115:11, 1117:18, 1222:18, 1259:6, 1260:21, 1261:11, 1261:25, 1289:7
**CROSS-EXAMINATION** [2] - 1072:18, 1197:7
**cross-use** [7] - 1102:5, 1102:7, 1103:3, 1103:19, 1103:20, 1103:24, 1104:13
**crunch** [1] - 1176:2
**current** [6] - 1228:6, 1228:25, 1229:5, 1229:8, 1265:1, 1271:23
**custom** [6] - 1130:5, 1161:7, 1162:13, 1215:15, 1234:4, 1263:11
**Custom** [1] - 1162:12
**Customer** [1] - 1263:7
**customer** [22] - 1102:17, 1102:19, 1103:7, 1103:9, 1103:17, 1103:19, 1104:2, 1104:4, 1106:16, 1106:17, 1106:22, 1106:23,

1133:23, 1152:12,
1154:17, 1154:24,
1155:13, 1156:17,
1156:18, 1265:16,
1269:9, 1285:1
**customer's** [2] -
1102:12, 1241:25
**customers** [18] -
1102:12, 1102:18,
1103:7, 1103:14,
1103:15, 1103:18,
1104:3, 1121:15,
1131:11, 1153:16,
1154:18, 1154:19,
1165:1, 1215:1,
1215:9, 1272:22,
1285:19
**customizations** [6] -
1270:21, 1270:23,
1270:24, 1271:8,
1272:9, 1280:24
**customize** [2] -
1132:23, 1149:1
**customized** [4] -
1130:8, 1143:15,
1154:19, 1154:20
**cut** [5] - 1081:8,
1111:10, 1111:12,
1112:16, 1112:18
**cuts** [1] - 1112:22
**cutting** [3] - 1111:13,
1112:14, 1112:15
**CVS** [1] - 1252:23
**cycle** [1] - 1165:4

# D

**Dallas** [1] - 1119:4
**Dan** [6] - 1157:11,
1157:24, 1248:22,
1277:17, 1278:12,
1278:17
**Data** [2] - 1101:18,
1101:23
**data** [22] - 1073:11,
1135:2, 1156:18,
1160:18, 1164:1,
1166:1, 1169:12,
1171:13, 1184:9,
1184:18, 1184:20,
1184:24, 1189:14,
1195:17, 1207:11,
1207:21, 1208:4,
1208:5, 1255:7,
1255:9, 1284:9
**database** [5] - 1160:5,
1161:7, 1234:3,
1284:8, 1284:9
**date** [13] - 1184:22,
1186:7, 1186:9,

1186:10, 1186:13,
1188:2, 1189:20,
1190:10, 1206:19,
1219:19, 1242:10,
1255:2, 1279:10
**Date** [1] - 1099:18
**dated** [7] - 1085:25,
1179:13, 1179:14,
1180:8, 1211:21,
1215:11, 1245:9
**dates** [2] - 1255:1,
1255:4
**day-to-day** [6] -
1163:9, 1169:24,
1195:12, 1196:9,
1198:16, 1265:13
**days** [1] - 1209:3
**DDX-512** [2] - 1088:5,
1089:12
**DDX-536** [1] - 1073:24
**DDX-539** [1] - 1074:18
**DDX-568** [1] - 1107:24
**DDX-704** [1] - 1275:12
**DDX-705** [1] - 1277:6
**DDX-706** [1] - 1280:4
**DDX-707** [1] - 1282:12
**de** [9] - 1090:19,
1091:20, 1092:4,
1092:5, 1092:8,
1092:15, 1092:23,
1093:2, 1093:4
**deadline** [1] - 1264:5
**deal** [5] - 1101:23,
1166:15, 1168:11,
1180:25, 1267:5
**dealing** [2] - 1115:20,
1282:16
**Dean** [2] - 1219:24,
1220:1
**debug** [3] - 1131:13,
1156:1, 1206:5
**debugging** [1] -
1224:17
**decades** [3] - 1122:15,
1266:25, 1275:7
**December** [2] - 1220:7
**decide** [1] - 1141:4
**decided** [2] - 1099:22,
1141:8
**decision** [6] - 1199:4,
1214:23, 1215:5,
1227:11, 1232:5
**decision-making** [1] -
1232:5
**decisions** [7] -
1170:3, 1197:12,
1197:16, 1197:18,
1198:9, 1198:21,
1227:8
**deck** [2] - 1274:18,

1275:12
**decompilation** [4] -
1135:16, 1135:17,
1135:19, 1235:20
**decompile** [6] -
1134:8, 1136:1,
1136:14, 1236:1,
1236:20, 1285:9
**decompiled** [1] -
1235:23
**decompiling** [5] -
1134:19, 1135:25,
1235:17, 1236:6,
1236:8
**dedicated** [2] -
1194:15, 1196:4
**deemed** [1] - 1085:16
**default** [1] - 1145:16
**Defendant** [3] -
1072:16, 1118:17,
1264:8
**DEFENDANT'S** [2] -
1289:3, 1289:18
**Defendant's** [4] -
1165:14, 1167:17,
1171:3, 1264:1
**Defendants** [1] -
1071:8
**DEFENDANTS** [1] -
1071:19
**defense** [2] - 1119:15,
1145:12
**define** [1] - 1239:3
**defined** [3] - 1233:24,
1239:5, 1245:17
**defines** [3] - 1233:3,
1233:20, 1237:8
**definitely** [1] -
1212:18
**definition** [14] -
1237:23, 1237:24,
1238:13, 1238:23,
1239:1, 1239:20,
1240:8, 1246:21,
1246:24, 1247:6,
1261:24, 1262:13,
1275:4, 1280:6
**definitions** [1] -
1239:19
**degree** [1] - 1083:20
**delays** [1] - 1139:5
**delete** [2] - 1181:16,
1183:25
**delivered** [3] -
1167:10, 1180:21,
1212:9
**delivering** [3] -
1209:20, 1267:21,
1268:6
**delivers** [1] - 1121:6

**Delivery** [3] - 1123:25,
1124:2, 1200:7
**delivery** [1] - 1203:21
**Deloitte** [1] - 1149:4
**delve** [1] - 1275:18
**demonstrated** [1] -
1166:3
**denied** [1] - 1227:18
**Department** [2] -
1136:4, 1136:9
**dependent** [1] -
1279:3
**deployed** [2] -
1119:14, 1163:11
**deposed** [3] -
1086:20, 1089:5,
1200:16
**Deposition** [1] -
1289:9
**deposition** [21] -
1086:11, 1087:19,
1087:20, 1087:24,
1105:11, 1107:22,
1111:21, 1112:6,
1158:25, 1159:9,
1197:24, 1201:7,
1201:12, 1226:20,
1227:2, 1227:22,
1253:15, 1254:23,
1263:3, 1263:17,
1263:22
**depositions** [4] -
1086:19, 1087:18,
1226:24, 1273:20
**deriv** [1] - 1107:10
**derivative** [18] -
1104:8, 1104:17,
1104:25, 1107:4,
1107:16, 1107:20,
1108:3, 1108:7,
1108:9, 1108:12,
1108:17, 1108:18,
1108:22, 1108:25,
1116:23, 1117:1,
1117:12, 1117:14
**describe** [8] -
1127:16, 1137:24,
1152:20, 1176:13,
1221:1, 1273:4,
1275:19, 1283:25
**described** [6] -
1089:14, 1144:23,
1146:1, 1166:22,
1203:1, 1252:8
**describing** [7] -
1081:14, 1132:18,
1136:25, 1140:7,
1172:22, 1231:1,
1247:16
**description** [4] -

1127:16, 1172:24,
1247:17, 1251:11
**Design** [1] - 1099:19
**design** [13] - 1084:24,
1085:1, 1124:20,
1125:24, 1126:6,
1170:10, 1171:20,
1267:12, 1271:2,
1271:6, 1280:20,
1281:1, 1281:6
**designated** [2] -
1177:3, 1263:8
**designation** [1] -
1178:2
**designed** [6] - 1073:9,
1116:4, 1134:25,
1143:14, 1162:13,
1173:11
**designs** [2] - 1161:7,
1234:3
**despite** [1] - 1183:14
**detail** [6] - 1160:15,
1208:15, 1275:18,
1277:4, 1281:1,
1281:3
**detailed** [2] - 1073:11,
1271:6
**details** [2] - 1179:20,
1206:1
**determination** [4] -
1078:4, 1199:11,
1206:13, 1206:15
**determine** [11] -
1074:9, 1078:12,
1084:17, 1084:19,
1085:7, 1086:14,
1089:21, 1090:5,
1094:15, 1097:16,
1202:24
**determined** [4] -
1202:18, 1213:19,
1214:4, 1214:17
**determines** [1] -
1092:4
**determining** [6] -
1076:16, 1076:18,
1077:12, 1084:15,
1095:11, 1210:24
**develop** [6] - 1125:4,
1125:9, 1144:24,
1150:14, 1150:19,
1151:4
**developed** [5] -
1102:11, 1163:6,
1163:7, 1254:17,
1279:2
**developer** [12] -
1076:1, 1094:7,
1094:19, 1099:9,
1137:17, 1179:19,

11

1241:24, 1242:13,
1252:2, 1282:19,
1285:11, 1285:18
**developers** [3] -
1093:21, 1179:20,
1251:10
**developing** [2] -
1124:11, 1269:4
**development** [14] -
1083:10, 1093:21,
1108:12, 1128:14,
1143:21, 1150:11,
1151:8, 1206:10,
1207:9, 1230:1,
1230:6, 1245:18,
1249:5, 1267:12
**device** [2] - 1237:17,
1239:10
**dictate** [3] - 1078:16,
1115:1, 1115:2
**dictated** [22] -
1077:22, 1078:1,
1078:6, 1078:7,
1078:14, 1079:5,
1079:6, 1079:10,
1079:12, 1079:14,
1079:17, 1079:22,
1080:1, 1080:3,
1080:5, 1080:9,
1080:13, 1081:16,
1082:14, 1082:15,
1083:1, 1101:5
**Dictionary** [6] -
1245:13, 1245:15,
1245:23, 1246:4,
1261:11, 1261:14
**differ** [2] - 1145:1,
1146:4
**difference** [2] -
1078:17, 1114:16
**different** [21] - 1083:7,
1085:13, 1100:17,
1112:17, 1112:24,
1120:16, 1127:12,
1132:11, 1134:25,
1145:11, 1145:15,
1154:25, 1190:23,
1211:10, 1231:25,
1239:23, 1240:7,
1240:9, 1286:21,
1286:23, 1287:17
**differently** [2] -
1113:2, 1127:10
**difficult** [1] - 1217:14
**Direct** [1] - 1289:11
**direct** [50] - 1073:13,
1073:18, 1078:10,
1078:22, 1079:20,
1081:2, 1081:4,
1082:21, 1083:16,

1085:21, 1088:16,
1088:19, 1089:2,
1089:13, 1110:22,
1116:24, 1117:4,
1150:1, 1151:25,
1160:20, 1174:12,
1185:1, 1189:22,
1196:13, 1199:7,
1199:20, 1205:7,
1215:14, 1220:6,
1220:10, 1222:17,
1227:25, 1228:21,
1231:23, 1232:7,
1232:20, 1233:1,
1241:13, 1245:14,
1250:23, 1251:2,
1255:6, 1256:1,
1256:3, 1256:13,
1256:15, 1257:14,
1258:4, 1262:4,
1289:6
**DIRECT** [3] - 1119:1,
1175:13, 1264:19
**directed** [2] - 1143:5,
1241:21
**direction** [2] - 1186:5,
1186:6
**directly** [9] - 1076:2,
1121:23, 1200:13,
1204:5, 1207:8,
1239:12, 1249:16,
1267:21, 1268:7
**directs** [2] - 1110:16,
1111:14
**disagree** [4] -
1257:17, 1275:15,
1275:19, 1280:5
**disassemble** [1] -
1136:1
**Disassembling** [1] -
1135:25
**disciplinary** [1] -
1259:24
**discipline** [1] - 1195:2
**discovered** [1] -
1241:12
**discuss** [4] - 1135:16,
1135:18, 1154:4,
1218:20
**discussed** [22] -
1078:10, 1079:19,
1080:12, 1081:4,
1082:20, 1083:16,
1085:15, 1088:17,
1090:22, 1102:4,
1105:9, 1114:25,
1116:24, 1117:10,
1136:8, 1140:21,
1141:3, 1149:21,
1214:15, 1220:17,

1221:8, 1222:22
**discusses** [3] -
1076:5, 1153:24,
1153:25
**discussing** [8] -
1077:4, 1084:2,
1091:24, 1112:10,
1112:23, 1116:5,
1154:4, 1155:18
**Discussion** [1] -
1113:22
**discussion** [5] -
1074:22, 1074:24,
1106:25, 1217:1,
1221:10
**discussions** [6] -
1139:13, 1168:16,
1173:23, 1197:17,
1198:20, 1215:8
**display** [2] - 1172:8,
1275:12
**dispute** [2] - 1073:2,
1073:5
**dissection** [43] -
1074:8, 1074:11,
1074:17, 1074:20,
1074:23, 1075:1,
1075:4, 1075:13,
1076:19, 1076:20,
1077:11, 1078:11,
1079:1, 1079:18,
1084:13, 1084:14,
1084:23, 1085:5,
1085:9, 1085:11,
1085:13, 1085:16,
1086:15, 1086:18,
1086:21, 1087:1,
1087:8, 1087:17,
1088:17, 1088:19,
1089:6, 1089:18,
1089:22, 1089:24,
1090:13, 1093:24,
1094:2, 1094:6,
1094:11, 1094:14,
1094:22, 1115:5,
1115:8
**distinction** [12] -
1079:3, 1079:9,
1079:15, 1114:19,
1234:23, 1242:17,
1243:3, 1244:16,
1247:7, 1284:17,
1285:15, 1285:24
**distinguish** [1] -
1249:19
**distribute** [1] -
1109:25
**distributed** [5] -
1073:5, 1139:1,
1157:5, 1159:3,

1159:11
**distributes** [1] -
1109:17
**distribution** [2] -
1178:25, 1226:11
**District** [1] - 1231:15
**DISTRICT** [3] - 1071:1,
1071:1, 1071:2
**district** [1] - 1232:2
**division** [1] - 1267:9
**Document** [10] -
1165:14, 1167:17,
1171:3, 1196:20,
1205:5, 1210:5,
1215:19, 1219:11,
1248:1, 1264:1
**document** [95] -
1097:4, 1097:18,
1099:16, 1125:22,
1134:18, 1134:23,
1143:11, 1150:4,
1154:11, 1158:21,
1159:18, 1160:14,
1160:20, 1161:3,
1161:18, 1164:10,
1164:19, 1164:22,
1164:25, 1165:2,
1165:5, 1165:6,
1165:10, 1167:8,
1167:13, 1170:13,
1170:14, 1170:24,
1171:5, 1171:11,
1178:11, 1180:1,
1180:3, 1181:10,
1181:13, 1184:4,
1186:18, 1186:22,
1187:15, 1188:10,
1189:10, 1203:25,
1204:1, 1204:12,
1204:21, 1205:8,
1206:16, 1206:17,
1207:3, 1207:18,
1208:8, 1212:11,
1213:5, 1227:13,
1233:9, 1234:16,
1238:14, 1240:16,
1240:21, 1240:24,
1240:25, 1241:9,
1241:12, 1242:5,
1242:7, 1242:8,
1243:5, 1243:6,
1243:9, 1243:13,
1243:21, 1245:25,
1246:6, 1246:25,
1247:10, 1247:19,
1248:8, 1248:10,
1248:12, 1248:18,
1249:4, 1255:19,
1255:20, 1255:22,
1257:6, 1257:16,

1258:19, 1258:23,
1258:25, 1259:8,
1261:7, 1261:9,
1261:10, 1261:22
**documentation** [6] -
1163:13, 1165:24,
1205:9, 1206:24,
1234:6, 1255:11
**documented** [1] -
1135:4
**documents** [10] -
1177:13, 1177:19,
1177:21, 1206:3,
1232:12, 1233:7,
1252:23, 1253:23,
1256:5, 1286:25
**dollars** [1] - 1193:15
**domain** [4] - 1088:23,
1178:17, 1179:17,
1258:12
**done** [11] - 1105:3,
1105:6, 1116:8,
1128:1, 1134:5,
1144:18, 1154:22,
1224:18, 1249:16,
1279:15, 1284:6
**Donnelley** [2] -
1189:15, 1189:20
**dot** [1] - 1072:24
**double** [2] - 1083:11,
1216:20
**doubt** [4] - 1185:19,
1224:24, 1225:1,
1239:22
**down** [15] - 1083:24,
1105:15, 1141:15,
1141:20, 1176:25,
1201:3, 1206:1,
1207:23, 1209:24,
1220:19, 1239:8,
1250:24, 1256:15,
1262:23, 1270:6
**download** [1] - 1189:8
**draft** [7] - 1142:23,
1206:16, 1206:18,
1207:18, 1211:22,
1241:12, 1248:12
**draw** [1] - 1114:19
**drew** [1] - 1079:3
**drive** [7] - 1221:22,
1223:8, 1223:21,
1265:14, 1265:15,
1270:22, 1285:24
**driver** [1] - 1218:5
**DTX** [11] - 1135:9,
1142:13, 1157:21,
1160:19, 1164:9,
1165:17, 1170:12,
1171:25, 1172:2,
1172:10, 1181:4

**DTX-025** [1] - 1232:21
**DTX-25-008** [1] - 1162:5
**DTX-25.10** [1] - 1162:1
**DTX-31** [1] - 1167:6
**DTX-31-21** [1] - 1167:20
**DTX-716** [1] - 1263:20
**DTX-724** [1] - 1263:21
**due** [3] - 1140:25, 1189:8, 1218:22
**during** [22] - 1096:22, 1096:25, 1139:18, 1148:13, 1158:24, 1163:24, 1166:9, 1166:11, 1166:13, 1166:18, 1166:21, 1168:7, 1168:8, 1168:16, 1168:19, 1168:22, 1172:5, 1196:13, 1265:19, 1266:1, 1266:25, 1269:25
**duties** [1] - 1197:24

# E

**E-Business** [4] - 1119:22, 1123:10, 1133:15, 1268:19
**e-mail** [74] - 1142:15, 1142:18, 1142:20, 1142:21, 1142:25, 1143:8, 1144:4, 1151:15, 1151:17, 1152:1, 1152:14, 1153:23, 1155:7, 1156:21, 1157:23, 1158:2, 1158:5, 1158:6, 1158:12, 1166:2, 1174:11, 1178:12, 1178:17, 1178:24, 1179:6, 1179:13, 1179:14, 1179:20, 1179:25, 1180:6, 1180:18, 1180:23, 1208:25, 1209:3, 1209:13, 1215:11, 1216:6, 1216:12, 1216:14, 1216:21, 1216:24, 1218:24, 1219:1, 1219:3, 1219:19, 1219:22, 1219:23, 1220:8, 1220:20, 1221:3, 1225:16, 1226:5, 1228:20, 1229:18, 1231:12, 1231:13, 1243:17, 1243:23, 1243:24,

1244:17, 1245:6, 1247:4, 1248:17, 1249:10, 1249:13, 1249:21, 1250:16, 1255:19, 1258:8, 1258:10, 1258:12, 1258:19
**e-mailed** [2] - 1181:1, 1259:11
**e-mailing** [3] - 1168:1, 1181:19, 1259:1
**e-mails** [1] - 1243:22
**e.g** [1] - 1233:6
**E1** [1] - 1245:18
**easier** [4] - 1082:3, 1102:23, 1141:11, 1248:4
**easiest** [1] - 1181:9
**easily** [2] - 1133:24, 1144:15
**Easter** [4] - 1108:11, 1108:23, 1108:24, 1109:3
**easy** [4] - 1129:7, 1161:19, 1193:21, 1286:15
**EBS** [1] - 1254:6, 1254:9, 1266:4, 1268:3
**ecosystem** [2] - 1281:15, 1282:2
**Ecosystem** [1] - 1178:4
**Ed** [2] - 1278:12, 1278:17
**educational** [1] - 1273:5
**Edward** [1] - 1277:17
**Edwards** [147] - 1098:20, 1098:23, 1099:7, 1120:1, 1121:10, 1121:15, 1121:25, 1122:3, 1122:7, 1122:9, 1123:2, 1123:9, 1123:22, 1124:2, 1124:6, 1124:7, 1124:18, 1124:21, 1125:23, 1126:9, 1127:3, 1128:9, 1128:12, 1128:19, 1128:25, 1129:4, 1129:11, 1129:23, 1130:3, 1130:18, 1130:20, 1130:24, 1131:1, 1131:11, 1131:25, 1132:9, 1132:10, 1132:19, 1133:4, 1134:9, 1134:11, 1134:15,

1136:16, 1136:17, 1136:21, 1136:24, 1137:6, 1137:12, 1137:13, 1137:17, 1138:4, 1141:13, 1142:22, 1143:6, 1145:19, 1146:23, 1147:13, 1147:22, 1148:8, 1149:2, 1150:2, 1150:10, 1150:15, 1150:20, 1150:23, 1151:9, 1151:22, 1151:24, 1152:13, 1153:16, 1154:11, 1155:17, 1156:1, 1156:10, 1156:15, 1160:5, 1161:12, 1199:9, 1199:22, 1200:2, 1200:7, 1200:9, 1200:22, 1201:1, 1201:10, 1201:13, 1201:18, 1202:16, 1203:22, 1203:24, 1204:2, 1204:24, 1210:14, 1210:23, 1211:13, 1215:9, 1221:21, 1223:7, 1223:20, 1228:7, 1228:25, 1229:6, 1229:18, 1230:12, 1232:3, 1235:4, 1235:9, 1236:8, 1236:14, 1236:15, 1240:16, 1244:19, 1261:18, 1262:11, 1266:4, 1268:2, 1268:9, 1268:19, 1270:10, 1271:4, 1272:1, 1272:3, 1272:5, 1272:10, 1272:12, 1272:15, 1272:16, 1272:23, 1274:14, 1274:25, 1275:8, 1275:23, 1276:9, 1276:10, 1276:19, 1277:6, 1277:8, 1277:16, 1278:21, 1279:19, 1280:7, 1281:22, 1282:20, 1283:7, 1285:18
**Edwards'** [2] - 1123:13, 1127:9
**effect** [1] - 1202:14
**effective** [2] - 1123:6, 1123:12
**effectively** [1] - 1269:21
**efficiencies** [1] -

1265:17
**effort** [1] - 1155:3
**efforts** [4] - 1156:23, 1157:1, 1157:6, 1195:5
**eight** [16] - 1085:16, 1085:22, 1086:5, 1086:9, 1086:13, 1086:24, 1087:3, 1087:8, 1087:11, 1087:16, 1087:23, 1087:25, 1088:6, 1088:8, 1088:13, 1088:15
**either** [5] - 1113:4, 1130:10, 1165:24, 1171:15, 1177:4
**electronic** [2] - 1237:17, 1239:10
**element** [2] - 1284:9, 1284:10
**elements** [26] - 1074:5, 1074:7, 1074:10, 1074:12, 1084:24, 1085:1, 1085:16, 1086:13, 1086:24, 1087:3, 1087:8, 1087:12, 1087:16, 1087:21, 1087:23, 1087:25, 1088:4, 1088:13, 1088:14, 1088:16, 1088:18, 1088:23, 1088:24, 1089:1, 1114:25, 1115:4
**elsewhere** [1] - 1181:10
**employed** [4] - 1120:4, 1157:2, 1264:21, 1264:22
**employee** [10] - 1162:24, 1179:23, 1180:14, 1180:16, 1180:18, 1182:3, 1194:23, 1194:24, 1195:2, 1241:2
**employees** [38] - 1099:5, 1099:15, 1120:20, 1120:22, 1134:10, 1134:14, 1135:7, 1142:16, 1143:2, 1156:23, 1157:7, 1157:21, 1157:24, 1158:7, 1161:11, 1162:21, 1162:23, 1179:2, 1179:4, 1180:22, 1180:24, 1181:21, 1183:9, 1183:13, 1194:22, 1198:11,

1198:12, 1198:13, 1204:15, 1213:22, 1213:23, 1214:7, 1222:19, 1226:6, 1247:5, 1272:11, 1282:24
**employers** [1] - 1253:14
**employment** [6] - 1136:7, 1136:15, 1145:18, 1146:22, 1147:21, 1195:3
**end** [9] - 1075:14, 1083:17, 1127:7, 1146:4, 1169:9, 1169:10, 1170:15, 1188:20, 1231:13
**ending** [11] - 1165:20, 1167:19, 1167:21, 1172:11, 1179:9, 1185:7, 1186:24, 1187:18, 1188:4, 1190:1, 1190:8
**endorsement** [1] - 1176:21
**ends** [2] - 1165:17, 1256:16
**enforce** [2] - 1158:8, 1194:1
**engage** [3] - 1148:10, 1148:12, 1177:24
**engaged** [4] - 1197:16, 1197:17, 1270:2, 1276:24
**Engagement** [1] - 1164:11
**engagement** [13] - 1164:20, 1165:8, 1166:12, 1166:14, 1166:16, 1168:4, 1168:6, 1172:13, 1172:16, 1173:20, 1269:10, 1271:20, 1272:8
**engagements** [3] - 1267:22, 1269:22, 1282:4
**engineer** [13] - 1106:15, 1106:21, 1107:3, 1121:24, 1126:19, 1134:2, 1134:7, 1136:2, 1136:13, 1151:7, 1191:2, 1192:1, 1257:8
**engineer'** [1] - 1136:5
**Engineering** [1] - 1136:1
**engineering** [4] - 1138:13, 1236:10,

1236:12, 1236:15
**Engineers** [1] -
1240:17
**engineers** [42] -
1076:3, 1076:9,
1076:10, 1077:14,
1099:21, 1099:23,
1120:24, 1121:205,
1131:12, 1134:13,
1136:13, 1138:2,
1138:15, 1138:21,
1138:25, 1139:2,
1139:3, 1140:8,
1141:2, 1141:16,
1151:21, 1156:8,
1156:10, 1163:12,
1169:24, 1174:8,
1182:9, 1182:20,
1188:17, 1194:2,
1210:22, 1211:13,
1214:13, 1217:12,
1230:4, 1230:8,
1230:11, 1230:14,
1240:23, 1241:5,
1241:6, 1255:20
**enormous** [1] - 1196:1
**ensure** [2] - 1167:23,
1218:1
**entered** [1] - 1149:25
**Enterprise** [22] -
1119:11, 1119:17,
1120:14, 1129:5,
1144:10, 1149:1,
1238:2, 1238:3,
1238:6, 1239:21,
1239:24, 1240:10,
1240:11, 1249:25,
1261:20, 1265:11,
1265:19, 1266:2,
1277:8, 1279:2,
1279:6
**entire** [8] - 1099:16,
1106:16, 1106:22,
1119:11, 1131:16,
1140:2, 1140:4,
1140:9
**entirely** [2] - 1203:3,
1252:18
**entitled** [3] - 1185:5,
1190:3, 1288:7
**entries** [2] - 1283:1,
1284:5
**environment** [44] -
1102:12, 1106:17,
1106:23, 1108:2,
1108:7, 1108:12,
1108:16, 1108:18,
1109:1, 1110:20,
1111:3, 1113:7,
1116:3, 1116:4,

1116:6, 1116:8,
1116:9, 1116:11,
1116:12, 1116:16,
1116:19, 1125:8,
1125:17, 1126:16,
1127:4, 1128:14,
1128:21, 1134:8,
1152:13, 1167:12,
1184:19, 1186:4,
1188:24, 1210:23,
1211:13, 1230:12,
1246:14, 1252:11,
1252:13, 1280:15,
1280:16, 1280:17
**environments** [6] -
1134:7, 1141:2,
1214:14, 1234:4,
1245:20, 1280:14
**Eric** [1] - 1071:19
**ERP** [7] - 1133:13,
1177:6, 1266:14,
1270:4, 1279:7,
1279:8, 1281:22
**erroneous** [2] -
1155:12, 1246:17
**ERROR** [2] - 1083:24,
1115:15
**error** [10] - 1084:10,
1115:17, 1115:20,
1115:21, 1121:18,
1154:15, 1179:19,
1234:5, 1284:13
**errors** [1] - 1206:17
**essentially** [8] -
1079:12, 1082:21,
1084:7, 1088:8,
1117:8, 1266:15,
1276:9, 1279:3
**establish** [2] -
1147:20, 1156:16
**established** [2] -
1166:9, 1257:13
**et** [2] - 1071:4, 1071:7
**evaluate** [2] - 1139:19,
1265:10
**evaluated** [2] - 1202:7,
1211:15
**evaluation** [1] -
1209:12
**evening** [1] - 1287:22
**event** [1] - 1259:20
**eventually** [2] -
1198:25, 1267:22
**Evergreen** [14] -
1178:10, 1178:13,
1178:14, 1178:15,
1178:16, 1178:18,
1178:24, 1189:9,
1258:4, 1258:6,
1258:14, 1258:17,

1258:19, 1258:24
**evidence** [32] -
1165:11, 1165:14,
1167:14, 1167:17,
1170:25, 1171:3,
1196:15, 1196:20,
1203:13, 1203:15,
1204:18, 1205:5,
1206:24, 1210:2,
1210:5, 1213:10,
1215:16, 1215:19,
1219:8, 1219:11,
1222:4, 1222:5,
1222:8, 1243:9,
1248:1, 1255:14,
1255:15, 1255:25,
1259:4, 1259:17,
1264:1, 1273:14
**EVIDENTIARY** [1] -
1071:11
**evolve** [6] - 1133:9,
1226:15, 1228:12,
1229:10, 1276:1,
1281:12
**evolved** [2] - 1191:12,
1267:22
**evolves** [1] - 1133:1
**exact** [3] - 1085:19,
1186:13, 1224:22
**exactly** [9] - 1080:4,
1089:19, 1127:21,
1154:18, 1189:17,
1203:2, 1231:24,
1257:16, 1281:3
**examination** [14] -
1072:10, 1114:9,
1115:11, 1117:18,
1172:5, 1175:8,
1196:14, 1222:18,
1256:3, 1259:6,
1260:16, 1260:21,
1261:11, 1261:25
**Examination** [6] -
1289:4, 1289:5,
1289:6, 1289:7,
1289:7, 1289:11
**EXAMINATION** [7] -
1072:18, 1114:13,
1119:1, 1175:13,
1197:7, 1260:18,
1264:19
**examine** [1] - 1287:15
**example** [29] -
1073:23, 1078:21,
1080:7, 1080:11,
1080:15, 1081:5,
1083:3, 1087:11,
1093:14, 1096:7,
1097:22, 1102:5,
1102:7, 1105:6,

1121:23, 1122:12,
1122:13, 1122:20,
1122:21, 1123:18,
1143:4, 1154:8,
1162:16, 1165:23,
1181:11, 1191:5,
1208:13, 1215:25,
1245:25
**examples** [6] - 1132:8,
1132:19, 1147:7,
1148:22, 1149:3,
1279:22
**Excel** [3] - 1173:17,
1173:18, 1277:24
**except** [4] - 1104:17,
1104:25, 1107:16,
1107:20
**excerpt** [4] - 1172:4,
1172:19, 1237:3,
1263:17
**Excerpts** [1] - 1289:9
**exchange** [2] -
1209:13, 1216:21
**exchanging** [1] -
1178:21
**excluded** [1] -
1085:17
**exclusively** [4] -
1124:7, 1148:20,
1266:3, 1276:14
**excuse** [9] - 1101:8,
1207:7, 1210:10,
1219:4, 1219:22,
1220:7, 1220:19,
1256:16, 1257:14
**executable** [2] -
1111:18
**execute** [4] - 1095:8,
1116:3, 1237:18,
1251:13
**executed** [3] - 1113:5,
1116:16, 1127:19
**executes** [1] - 1191:1
**executing** [2] -
1110:20, 1116:20
**executive** [2] -
1157:12, 1264:24
**executives** [4] -
1219:25, 1269:13,
1269:15
**exhibit** [7] - 1142:14,
1165:16, 1180:8,
1203:12, 1222:4,
1222:7, 1250:24
**Exhibit** [26] - 1115:10,
1135:9, 1142:13,
1151:13, 1157:22,
1160:19, 1164:9,
1165:14, 1167:17,
1170:12, 1171:3,

1171:25, 1172:2,
1172:10, 1178:6,
1181:5, 1184:5,
1189:11, 1196:20,
1205:5, 1210:5,
1215:19, 1219:11,
1248:1, 1261:8
**EXHIBITS** [2] -
1289:14, 1289:18
**Exhibits** [2] - 1080:20,
1264:1
**exhibits** [3] - 1255:10,
1263:21, 1273:20
**existence** [1] -
1278:22
**existing** [10] -
1102:17, 1103:7,
1103:14, 1111:2,
1127:5, 1143:19,
1163:5, 1163:12,
1268:13, 1271:9
**exists** [1] - 1253:25
**expand** [1] - 1268:4
**expanded** [1] - 1120:3
**expanding** [1] -
1278:20
**expect** [11] - 1093:20,
1094:7, 1094:12,
1094:14, 1094:18,
1094:21, 1094:24,
1156:8, 1156:10,
1259:10, 1259:23
**expected** [2] - 1083:8,
1168:20
**expecting** [2] -
1094:17, 1128:16
**experience** [8] -
1122:1, 1146:5,
1156:14, 1170:10,
1172:17, 1272:3,
1274:2, 1282:5
**experienced** [3] -
1121:23, 1141:17,
1147:25
**experiment** [1] -
1214:19
**expert** [10] - 1087:4,
1090:7, 1125:23,
1154:9, 1172:5,
1184:8, 1185:10,
1189:13, 1213:7,
1257:7
**expired** [1] - 1189:3
**explain** [14] - 1098:4,
1113:2, 1114:22,
1115:25, 1127:1,
1160:24, 1162:13,
1162:25, 1167:11,
1183:1, 1185:24,
1191:10, 1215:23,

1217:5
**explained** [5] - 1096:3, 1168:17, 1211:11, 1221:6, 1229:12
**explaining** [3] - 1229:7, 1255:3, 1257:8
**explains** [2] - 1080:12, 1189:1
**explanation** [3] - 1158:10, 1168:23, 1251:22
**exposed** [2] - 1282:19, 1286:12
**expressed** [1] - 1208:8
**expressing** [1] - 1102:1
**extend** [1] - 1150:25
**extends** [1] - 1170:6
**extensively** [1] - 1232:11
**extent** [2] - 1113:5, 1210:15
**external** [20] - 1077:22, 1078:1, 1078:7, 1078:14, 1078:16, 1078:17, 1078:18, 1079:5, 1079:7, 1079:14, 1079:17, 1079:23, 1080:5, 1080:6, 1081:17, 1082:14, 1083:1
**extract** [2] - 1178:12, 1185:13
**extrapolate** [2] - 1154:10, 1155:12
**extremely** [1] - 1195:8

## F

**facilitate** [1] - 1276:4
**facing** [2] - 1169:10, 1170:2
**fact** [11] - 1075:9, 1075:17, 1091:1, 1117:4, 1222:9, 1231:4, 1238:13, 1257:15, 1267:7, 1276:20, 1277:16
**factors** [2] - 1073:19, 1074:4
**facts** [1] - 1259:3
**fair** [4] - 1198:19, 1198:23, 1199:5, 1259:5
**fairly** [1] - 1277:15
**fall** [2] - 1234:9,

1281:21
**familiar** [16] - 1121:9, 1121:12, 1142:18, 1142:20, 1156:22, 1157:1, 1164:10, 1164:19, 1169:14, 1170:23, 1176:9, 1212:13, 1215:3, 1231:24, 1237:16, 1241:2
**fan** [2] - 1193:5, 1194:3
**fancy** [1] - 1277:9
**fantastic** [1] - 1133:8
**far** [4] - 1110:5, 1121:3, 1204:2, 1206:1
**fast** [3] - 1121:21, 1194:6, 1194:10
**FCRR** [2] - 1071:23, 1288:8
**features** [1] - 1270:11
**February** [8] - 1184:25, 1186:12, 1186:19, 1187:7, 1187:25, 1188:6, 1211:21, 1214:21
**federal** [1] - 1122:20
**FETCH** [2] - 1093:18
**few** [9] - 1090:17, 1091:16, 1123:16, 1123:17, 1145:11, 1187:4, 1221:8, 1256:4, 1256:5
**field** [2] - 1179:1, 1257:1
**fields** [1] - 1184:12
**fifty** [1] - 1227:3
**fifty-seven** [1] - 1227:3
**figuring** [1] - 1271:8
**file** [113] - 1072:24, 1072:25, 1073:2, 1073:5, 1073:9, 1073:10, 1073:13, 1073:15, 1076:2, 1076:4, 1076:5, 1076:7, 1076:10, 1076:15, 1077:2, 1077:17, 1077:22, 1078:1, 1080:11, 1080:12, 1080:13, 1081:1, 1081:3, 1089:19, 1089:20, 1090:1, 1090:10, 1090:18, 1090:19, 1091:17, 1091:18, 1091:19, 1092:16, 1092:19, 1092:20, 1092:21, 1092:23,

1096:5, 1097:20, 1098:20, 1098:22, 1098:23, 1098:24, 1100:1, 1100:4, 1100:6, 1101:7, 1101:14, 1109:17, 1109:24, 1110:17, 1110:23, 1111:7, 1111:15, 1111:19, 1113:4, 1113:6, 1114:2, 1114:5, 1115:14, 1116:2, 1116:14, 1116:21, 1117:11, 1126:24, 1127:17, 1128:5, 1173:3, 1173:5, 1173:8, 1175:25, 1179:16, 1179:19, 1179:22, 1179:24, 1180:5, 1180:6, 1180:11, 1182:4, 1182:8, 1182:22, 1182:25, 1183:15, 1183:16, 1183:23, 1184:3, 1185:4, 1185:8, 1185:11, 1185:16, 1185:20, 1185:22, 1186:6, 1186:7, 1186:19, 1188:1, 1190:3, 1190:6, 1190:9, 1191:10, 1191:25, 1192:2, 1194:8, 1251:7, 1251:10, 1255:11, 1258:8, 1258:10, 1259:12, 1259:20
**files** [36] - 1074:6, 1074:9, 1074:15, 1076:17, 1077:6, 1077:12, 1078:2, 1078:4, 1078:5, 1078:11, 1079:2, 1081:19, 1082:10, 1085:8, 1090:6, 1091:1, 1100:9, 1101:2, 1101:3, 1101:4, 1101:18, 1110:7, 1113:24, 1113:25, 1114:3, 1165:24, 1186:4, 1190:12, 1190:17, 1191:2, 1191:4, 1191:5, 1205:11, 1205:14, 1205:23, 1253:23
**filter** [10] - 1078:19, 1088:22, 1088:25, 1093:25, 1094:3, 1094:8, 1094:13, 1094:22, 1094:25,

1114:24
**filtered** [7] - 1078:25, 1079:21, 1114:21, 1115:2, 1115:3, 1115:4, 1115:7
**filtering** [2] - 1114:24
**final** [1] - 1248:16
**finally** [1] - 1271:13
**finance** [5] - 1273:7, 1277:12, 1278:14, 1278:18, 1283:2
**financial** [1] - 1145:12
**fine** [2] - 1219:15, 1264:15
**finished** [1] - 1125:11
**firm** [4] - 1269:23, 1274:9, 1281:20, 1281:22
**firms** [1] - 1281:19
**first** [27] - 1087:7, 1119:21, 1120:15, 1125:7, 1125:13, 1138:11, 1139:24, 1140:17, 1143:12, 1152:25, 1157:20, 1158:11, 1158:13, 1171:15, 1171:23, 1174:3, 1180:8, 1186:11, 1190:25, 1202:13, 1204:1, 1215:15, 1233:20, 1268:25, 1269:5, 1278:15, 1280:4
**firstly** [1] - 1154:17
**fit** [3] - 1270:14, 1271:9, 1283:11
**fits** [2] - 1239:18, 1283:6
**five** [11] - 1080:24, 1088:4, 1088:5, 1088:8, 1088:13, 1088:15, 1088:18, 1260:13, 1264:5, 1271:21, 1281:25
**fix** [3] - 1215:24, 1244:3, 1249:16
**fixed** [1] - 1176:3
**fixes** [3] - 1234:4, 1249:25, 1250:3
**flag** [2] - 1182:6, 1182:22
**flagged** [2] - 1190:14, 1194:5
**flags** [3] - 1182:25, 1194:9, 1256:24
**flexibility** [1] - 1132:18
**flexible** [4] - 1152:21, 1236:24, 1244:14, 1249:24
**flight** [2] - 1140:24,

1218:21
**flip** [1] - 1261:8
**flower** [4] - 1074:23, 1078:21, 1080:2, 1080:5
**focus** [2] - 1265:9, 1265:10
**focused** [5] - 1124:4, 1147:3, 1265:18, 1265:25, 1267:13
**focuses** [3] - 1124:7, 1160:16, 1163:8
**folder** [1] - 1256:7
**follow** [15] - 1083:6, 1083:19, 1093:22, 1094:19, 1094:24, 1107:1, 1131:12, 1131:17, 1144:18, 1161:20, 1163:1, 1166:25, 1195:13, 1241:7, 1257:9
**follow-up** [1] - 1107:1
**followed** [5] - 1147:3, 1159:2, 1175:20, 1194:23, 1194:24
**following** [13] - 1072:6, 1095:6, 1118:12, 1119:25, 1128:15, 1175:5, 1195:20, 1196:2, 1214:20, 1232:16, 1241:6, 1241:9, 1260:11
**follows** [3] - 1072:17, 1118:18, 1264:9
**Foods** [2] - 1219:24, 1220:1
**footer** [1] - 1233:9
**footnote** [2] - 1233:19, 1233:20
**FOR** [2] - 1071:14, 1071:19
**forbid** [1] - 1236:8
**forbidden** [2] - 1134:16, 1134:20
**forbids** [1] - 1134:19
**forced** [1] - 1137:16
**foregoing** [1] - 1288:6
**forensic** [2] - 1273:24, 1273:25
**forgetting** [1] - 1176:4
**form** [5] - 1095:9, 1100:15, 1100:22, 1272:24, 1282:16
**formal** [1] - 1241:8
**format** [4] - 1204:14, 1204:15, 1213:6, 1218:9
**formed** [2] - 1277:16, 1278:12

forms [1] - 1172:20
forth [1] - 1231:25
FORTRAN [1] -
1237:12
forward [4] - 1072:11,
1118:13, 1181:17,
1224:12
foundation [29] -
1145:3, 1146:19,
1147:9, 1147:18,
1147:20, 1153:9,
1156:5, 1164:15,
1164:16, 1177:10,
1201:19, 1201:23,
1203:12, 1203:17,
1204:20, 1207:4,
1211:24, 1212:5,
1213:11, 1222:3,
1222:8, 1222:13,
1223:10, 1225:15,
1225:17, 1231:20,
1238:19, 1243:10,
1257:18
foundational [2] -
1143:24, 1143:25
four [2] - 1153:1,
1281:25
foyer [1] - 1141:21
fraction [2] - 1090:20,
1091:20
frame [2] - 1154:24,
1243:22
frames [1] - 1278:8
Francisco [1] -
1119:10
Frank [1] - 1248:19
frank [1] - 1249:15
Franklin [2] - 1215:22,
1216:22
Fredericksen [1] -
1274:17
Fredericksen-Cross
[1] - 1274:17
Frederiksen [13] -
1075:6, 1077:3,
1077:7, 1077:10,
1081:3, 1084:25,
1098:14, 1274:25,
1275:3, 1275:16,
1280:5, 1283:16,
1283:19
Frederiksen-Cross
[10] - 1075:6, 1077:3,
1077:7, 1077:10,
1084:25, 1098:14,
1274:25, 1280:5,
1283:16, 1283:19
Frederiksen-Cross'
[1] - 1081:3
Frederiksen-Cross's

[2] - 1275:3, 1275:16
freedom [1] - 1083:21
frequently [1] - 1238:4
front [10] - 1074:18,
1080:18, 1101:22,
1169:9, 1170:15,
1173:1, 1237:24,
1239:21, 1239:23,
1270:23
front-end [2] - 1169:9,
1170:15
frozen [1] - 1228:17
fulfill [2] - 1213:20,
1214:5
full [4] - 1156:16,
1156:19, 1216:24,
1256:16
fully [1] - 1259:10
function [8] - 1081:7,
1096:5, 1097:19,
1097:23, 1099:6,
1115:25, 1157:17,
1284:12
functional [11] -
1131:2, 1143:18,
1143:23, 1207:11,
1207:21, 1208:3,
1208:5, 1208:13,
1208:17, 1281:2
functionality [20] -
1073:10, 1073:14,
1073:15, 1115:2,
1115:24, 1122:18,
1122:24, 1124:17,
1124:24, 1125:16,
1125:25, 1126:17,
1127:7, 1143:17,
1145:14, 1150:25,
1151:3, 1151:4,
1155:1, 1270:25
functions [4] -
1073:12, 1081:13,
1082:3, 1270:11
fundamentals [1] -
1267:10
future [10] - 1103:14,
1103:18, 1104:3,
1126:9, 1132:25,
1182:25, 1221:21,
1223:7, 1223:20,
1224:6

G

gamut [1] - 1270:3
gap [1] - 1270:14
gaps [5] - 1270:16,
1270:17, 1270:20,
1271:2, 1280:25
garage [1] - 1141:16

Gartner [1] - 1287:4
GB [1] - 1172:6
geared [1] - 1278:10
gears [2] - 1100:16,
1156:22
general [25] - 1073:22,
1074:3, 1078:2,
1078:4, 1078:15,
1082:15, 1082:23,
1083:6, 1085:20,
1093:11, 1093:23,
1094:20, 1110:5,
1114:7, 1152:18,
1159:23, 1176:22,
1195:12, 1239:11,
1240:9, 1274:3,
1275:14, 1283:1,
1284:5, 1287:5
generally [10] -
1081:25, 1082:5,
1082:9, 1082:20,
1096:6, 1114:6,
1117:3, 1120:9,
1163:23, 1275:2
generated [1] - 1253:4
generating [1] -
1089:14
gentlemen [1] -
1277:17
genuine [2] - 1131:13,
1156:1
geographically [1] -
1138:25
Gerard [4] - 1151:15,
1151:17, 1151:20,
1151:21
Gerry [10] - 1151:21,
1152:1, 1152:4,
1152:5, 1153:12,
1153:14, 1153:17,
1153:19, 1153:24,
1153:25
given [15] - 1086:22,
1092:7, 1108:21,
1110:4, 1110:25,
1166:11, 1166:13,
1166:18, 1175:20,
1175:25, 1180:24,
1198:4, 1217:19,
1224:22, 1231:3
Glass [19] - 1151:16,
1152:11, 1153:7,
1153:13, 1220:11,
1220:14, 1220:16,
1221:9, 1221:16,
1221:19, 1222:2,
1222:19, 1222:23,
1223:5, 1223:14,
1223:19, 1224:5,
1224:10, 1224:15

Glass' [1] - 1152:7
global [4] - 1129:23,
1130:2, 1136:17,
1136:21
Global [18] - 1120:8,
1120:10, 1121:8,
1121:12, 1121:14,
1121:20, 1122:5,
1123:25, 1124:1,
1142:22, 1151:24,
1153:14, 1186:3,
1197:9, 1200:7,
1203:21, 1204:23,
1263:7
go-to-meeting [2] -
1214:25, 1217:9
gold [2] - 1176:21,
1177:4
Google [1] - 1087:13
gosh [1] - 1281:24
government [4] -
1122:20, 1122:22,
1126:3, 1151:5
governments [1] -
1123:4
governs [2] - 1134:23,
1161:4
GPD [1] - 1125:23
gradually [1] -
1119:25
Grady [6] - 1208:19,
1208:22, 1209:4,
1209:12, 1209:22,
1219:14
Grant [1] - 1277:19
graphically [1] -
1271:3
great [11] - 1181:11,
1220:2, 1220:22,
1233:18, 1243:6,
1250:22, 1258:3,
1260:4, 1267:5,
1274:18, 1285:2
greatest [1] - 1279:11
GREEN [1] - 1220:21
Greg [3] - 1179:15,
1180:10
Griener [3] - 1071:23,
1288:8, 1288:8
Grigsby [13] -
1142:15, 1142:21,
1151:18, 1151:23,
1151:24, 1200:6,
1200:21, 1200:24,
1201:8, 1201:12,
1201:14, 1215:22,
1216:22
grigsby [5] - 1229:19,
1229:25, 1231:13,
1243:18, 1243:23

grounds [1] - 1113:13
group [6] - 1087:16,
1123:21, 1123:24,
1176:20, 1268:15,
1282:8
growing [1] - 1269:23
growth [1] - 1268:20
GTM [7] - 1213:22,
1218:3, 1221:22,
1223:8, 1223:21,
1224:18, 1225:6
guaranteed [1] -
1121:21
guarded [1] - 1169:23
guess [1] - 1255:21
guidance [12] -
1143:3, 1159:23,
1160:1, 1177:13,
1195:21, 1198:12,
1198:15, 1209:16,
1231:15, 1232:2,
1241:7, 1257:12

H

hand [4] - 1165:19,
1165:20, 1166:6,
1166:7
handle [1] - 1244:2
handled [1] - 1284:13
handles [1] - 1249:5
hands [4] - 1138:2,
1139:18, 1194:2,
1210:22
happy [2] - 1085:23,
1102:21
hard [2] - 1195:8,
1285:4
harder [1] - 1127:11
hardware [1] -
1088:24
Harrison [4] -
1243:17, 1243:18,
1248:18, 1249:4
HCL [2] - 1268:14,
1268:21
HCL/Axon [1] -
1268:10
HCM200105 [2] -
1100:1, 1114:2
head [6] - 1073:7,
1208:23, 1209:14,
1234:17, 1234:24
header [3] - 1073:13,
1073:17, 1248:12
heading [1] - 1185:6
heads [1] - 1216:22
Health [3] - 1184:10,
1184:23, 1188:22
hear [4] - 1138:7,

1176:24, 1250:8,
1263:6
**heard** [5] - 1138:18,
1139:24, 1273:21,
1276:3, 1286:22
**hearing** [3] - 1110:5,
1154:9, 1201:22
**Hearing** [1] - 1080:20
**HEARING** [1] -
1071:11
**hearsay** [8] - 1146:8,
1146:25, 1147:16,
1147:17, 1147:25,
1159:5, 1164:15,
1177:16
**heavily** [1] - 1169:25
**held** [1] - 1113:22
**help** [6] - 1120:14,
1132:13, 1141:25,
1157:4, 1215:25,
1217:9
**helpful** [1] - 1248:6
**helping** [4] - 1264:25,
1265:10, 1266:9,
1266:18
**helps** [3] - 1082:3,
1088:10, 1176:14
**heyday** [1] - 1279:7
**Hi** [1] - 1256:23
**HICKS** [1] - 1071:2
**high** [5] - 1110:3,
1124:11, 1190:21,
1275:19, 1277:7
**highlighted** [1] -
1233:15
**Hill** [1] - 1071:17
**HILL** [1] - 1263:23
**hire** [1] - 1162:25
**hired** [1] - 1268:11
**hires** [1] - 1267:9
**hold** [1] - 1184:1
**Honor** [40] - 1072:13,
1095:24, 1105:11,
1106:3, 1106:8,
1112:1, 1113:16,
1114:10, 1117:19,
1117:24, 1118:15,
1146:7, 1146:11,
1146:24, 1147:24,
1159:4, 1164:14,
1174:15, 1196:22,
1196:25, 1197:23,
1204:18, 1204:22,
1210:1, 1213:9,
1215:16, 1219:7,
1223:17, 1225:10,
1247:23, 1259:25,
1260:15, 1263:1,
1263:14, 1263:19,
1263:23, 1264:2,

1264:3, 1264:14,
1287:19
**HONORABLE** [1] -
1071:2
**hope** [2] - 1072:6,
1248:19
**hopefully** [1] - 1277:1
**hoping** [1] - 1176:2
**Hosalli** [1] - 1179:12
**hotline** [1] - 1169:1
**HOUMAND** [2] -
1196:22, 1196:24
**Houmand** [1] -
1071:16
**hour** [4] - 1175:6,
1274:8, 1274:9,
1274:10
**house** [1] - 1163:10
**houses** [1] - 1184:18
**HR** [1] - 1282:23
**HSC** [1] - 1188:21
**human** [7] - 1218:8,
1236:22, 1237:11,
1239:11, 1239:12,
1239:17, 1277:12
**human-readable** [1] -
1236:22
**humans** [1] - 1082:3
**hundreds** [4] -
1193:15, 1195:9,
1270:7
**hypothetical** [2] -
1091:3, 1107:19

## I

**IBM** [4] - 1120:5,
1278:6, 1278:19,
1279:3
**IBM's** [1] - 1278:13
**ID** [1] - 1256:16
**IDC** [1] - 1287:3
**idea** [2] - 1138:15,
1232:8
**ideas** [2] - 1089:1,
1226:18
**identified** [2] -
1173:18, 1280:25
**identify** [8] - 1080:8,
1123:11, 1124:12,
1191:21, 1192:2,
1270:11, 1270:16,
1271:1
**identifying** [2] -
1270:7, 1270:23
**ignore** [1] - 1171:22
**Ilissa** [1] - 1071:20
**illustrate** [1] - 1271:3
**imagine** [3] - 1117:5,
1139:6, 1140:3

**immediately** [2] -
1119:9, 1173:12
**impact** [3] - 1169:24,
1192:20, 1193:12
**impacted** [2] -
1138:23, 1138:24
**impacts** [1] - 1123:8
**impeachment** [6] -
1106:4, 1111:24,
1113:14, 1198:2,
1227:22, 1227:23
**implement** [13] -
1140:19, 1141:4,
1141:6, 1192:17,
1193:6, 1193:8,
1193:14, 1193:17,
1193:19, 1214:24,
1215:6, 1275:22,
1275:25
**implementation** [4] -
1128:2, 1148:14,
1267:15, 1271:11
**implemented** [5] -
1194:11, 1253:21,
1279:13
**implementing** [4] -
1130:11, 1269:21,
1270:10, 1276:18
**importance** [3] -
1135:3, 1164:8,
1174:12
**Important** [5] -
1165:22, 1171:6,
1171:10, 1172:23,
1173:25
**important** [16] -
1127:8, 1139:17,
1157:9, 1157:18,
1158:8, 1161:21,
1163:2, 1166:25,
1167:24, 1171:17,
1195:23, 1195:25,
1211:16, 1216:19,
1284:17, 1284:19
**imposition** [1] -
1140:11
**improper** [1] - 1227:21
**improve** [1] - 1228:15
**improvement** [1] -
1265:14
**improvements** [1] -
1265:15
**improving** [3] -
1228:18, 1265:16
**in-flight** [1] - 1218:21
**in-house** [1] - 1163:10
**in-memory** [1] -
1280:22
**inaccessible** [3] -
1285:12, 1286:1,

1287:10
**inadvertently** [1] -
1193:2
**inappropriate** [1] -
1192:3
**inbound** [2] - 1191:20,
1192:6
**INC** [2] - 1071:4,
1071:7
**incident** [2] - 1154:4,
1173:4
**include** [35] - 1083:11,
1095:11, 1110:8,
1110:11, 1110:13,
1110:15, 1110:16,
1110:19, 1111:1,
1111:9, 1111:10,
1111:14, 1111:15,
1111:16, 1112:10,
1112:21, 1112:22,
1114:3, 1115:23,
1115:25, 1116:8,
1116:10, 1116:13,
1116:22, 1116:25,
1117:3, 1117:6,
1117:8, 1117:12,
1117:14, 1130:13,
1131:7, 1153:6,
1155:9, 1170:2
**Included** [1] - 1280:6
**included** [13] -
1087:17, 1100:9,
1102:16, 1103:6,
1104:2, 1110:13,
1113:4, 1113:6,
1154:7, 1155:21,
1165:4, 1169:21,
1262:10
**includes** [6] -
1109:12, 1130:7,
1155:19, 1163:2,
1163:3, 1275:21
**including** [21] -
1120:1, 1149:1,
1156:1, 1161:6,
1170:8, 1170:9,
1183:6, 1191:4,
1192:22, 1193:10,
1195:3, 1199:15,
1201:12, 1203:21,
1224:4, 1230:19,
1230:24, 1234:2,
1263:11, 1283:21,
1283:22
**inconsistent** [1] -
1113:1
**incorporate** [1] -
1162:17
**increasing** [1] -
1267:25

**incredulous** [3] -
1140:1, 1140:9,
1232:8
**indeed** [4] - 1182:15,
1221:12, 1223:3,
1238:11
**independent** [1] -
1282:3
**India** [1] - 1149:5
**Indian** [1] - 1122:21
**indicate** [4] - 1073:24,
1127:6, 1206:19,
1276:11
**indicated** [6] -
1073:19, 1087:16,
1153:22, 1156:21,
1171:10, 1178:23
**indicates** [2] -
1154:12, 1205:10
**indicating** [2] -
1187:12, 1188:3
**indication** [8] -
1075:7, 1075:10,
1075:18, 1075:25,
1076:22, 1076:25,
1077:4, 1077:7
**indications** [3] -
1075:3, 1075:22,
1076:13
**indicative** [6] -
1073:20, 1074:6,
1074:12, 1074:13,
1074:25, 1082:23
**individual** [3] -
1182:22, 1256:19,
1282:3
**individuals** [2] -
1247:5, 1278:5
**industries** [4] -
1132:11, 1145:11,
1283:6, 1283:7
**industry** [22] - 1140:2,
1140:4, 1144:9,
1145:13, 1145:17,
1148:9, 1177:6,
1230:12, 1238:2,
1238:3, 1238:11,
1247:15, 1250:7,
1250:12, 1261:21,
1262:14, 1274:2,
1275:7, 1285:24,
1286:7, 1286:25,
1287:17
**inform** [5] - 1103:2,
1163:18, 1163:22,
1163:24, 1168:14
**Information** [4] -
1171:7, 1171:10,
1172:23, 1173:25
**information** [19] -

1109:13, 1124:16, 1124:18, 1126:5, 1126:7, 1135:3, 1166:2, 1170:4, 1171:17, 1172:25, 1173:12, 1174:4, 1174:13, 1178:21, 1181:14, 1186:8, 1190:14, 1191:8, 1267:8

**informed** [1] - 1168:13

**informs** [3] - 1162:20, 1174:6, 1175:16

**Infosys** [1] - 1149:5

**infringement** [4] - 1102:16, 1103:6, 1103:24, 1104:1

**initial** [1] - 1210:8

**injunction** [130] - 1072:23, 1084:18, 1084:21, 1091:7, 1101:22, 1102:2, 1102:8, 1102:11, 1104:16, 1104:24, 1106:18, 1106:24, 1107:6, 1107:15, 1107:19, 1108:4, 1108:9, 1108:22, 1109:7, 1109:12, 1137:25, 1138:11, 1139:10, 1139:11, 1139:16, 1139:17, 1139:21, 1140:12, 1140:15, 1140:17, 1140:23, 1142:6, 1143:1, 1143:6, 1143:19, 1144:17, 1144:18, 1144:21, 1144:25, 1149:25, 1150:4, 1150:7, 1156:24, 1157:8, 1157:9, 1157:18, 1157:20, 1158:8, 1158:9, 1158:17, 1158:22, 1159:24, 1160:13, 1160:16, 1162:21, 1162:23, 1163:3, 1163:19, 1163:22, 1174:7, 1175:17, 1175:21, 1195:6, 1195:8, 1195:23, 1196:1, 1197:13, 1197:19, 1198:10, 1198:20, 1198:22, 1199:8, 1199:10, 1199:13, 1199:16, 1199:17, 1199:21, 1199:23, 1202:12, 1202:17, 1202:19, 1202:24,

1205:20, 1206:11, 1206:13, 1207:10, 1207:12, 1208:4, 1209:4, 1210:9, 1210:10, 1210:12, 1210:18, 1211:6, 1211:17, 1214:12, 1214:20, 1221:5, 1221:6, 1221:13, 1224:19, 1224:23, 1226:3, 1226:6, 1226:13, 1226:15, 1227:8, 1227:12, 1228:8, 1228:10, 1229:1, 1229:19, 1230:10, 1230:14, 1230:19, 1230:21, 1230:25, 1231:6, 1232:8, 1232:13, 1232:16, 1238:1, 1242:9, 1242:10, 1245:11, 1249:2, 1261:5, 1261:6, 1275:5

**Injunction** [1] - 1159:19

**innovate** [1] - 1228:12

**innovations** [1] - 1226:18

**innumerable** [1] - 1281:24

**insert** [1] - 1284:9

**insight** [1] - 1142:13

**install** [1] - 1148:25

**installation** [1] - 1162:7

**instance** [1] - 1090:12

**instances** [2] - 1175:19, 1183:9

**instead** [3] - 1137:18, 1141:21, 1180:5

**instruct** [2] - 1138:16, 1215:24

**instructed** [1] - 1180:18

**instructing** [1] - 1188:23

**instruction** [9] - 1143:9, 1157:9, 1162:11, 1168:13, 1180:21, 1180:23, 1181:8, 1181:19, 1241:8

**instructions** [12] - 1160:21, 1161:13, 1175:20, 1180:16, 1194:22, 1196:2, 1237:10, 1237:15, 1237:18, 1240:22, 1241:4, 1241:14

**intake** [1] - 1193:5

**integral** [1] - 1097:24

**integrate** [3] - 1265:11, 1265:13, 1266:19

**integration** [2] - 1267:11, 1267:14

**integrations** [1] - 1270:25

**integrator** [4] - 1128:1, 1130:10, 1137:17, 1178:3

**integrators** [10] - 1130:14, 1130:17, 1130:21, 1148:13, 1148:18, 1148:22, 1148:24, 1149:6, 1177:24, 1281:18

**intellectual** [24] - 1135:2, 1160:17, 1164:1, 1165:25, 1167:25, 1168:12, 1171:12, 1180:15, 1181:3, 1182:7, 1182:23, 1183:5, 1190:15, 1190:19, 1190:24, 1191:7, 1191:15, 1191:22, 1193:2, 1195:17, 1196:7, 1229:11, 1254:1, 1259:21

**intend** [1] - 1125:24

**intended** [3] - 1143:14, 1239:10, 1282:20

**interact** [1] - 1184:16

**interaction** [1] - 1210:23

**interchangeably** [1] - 1152:20

**interface** [3] - 1145:15, 1148:14, 1184:16

**internal** [2] - 1125:21, 1179:17

**interoperability** [1] - 1088:25

**interpretation** [1] - 1136:6

**interpreted** [3] - 1092:6, 1125:23, 1126:1

**interrogatories** [1] - 1273:21

**intervene** [1] - 1190:16

**interview** [2] - 1099:22, 1099:24

**introduced** [3] - 1184:4, 1189:10,

1191:18

**introduction** [1] - 1192:15

**invalid** [2] - 1208:8, 1208:16

**invariably** [1] - 1280:21

**inventory** [2] - 1270:24, 1277:12

**invested** [1] - 1196:1

**investigate** [3] - 1076:4, 1182:15, 1191:7

**investigating** [2] - 1104:7, 1196:4

**investigation** [6] - 1155:9, 1155:14, 1191:11, 1194:25, 1195:1

**investment** [1] - 1213:3

**investor** [6] - 1211:20, 1211:22, 1212:9, 1212:11, 1212:16, 1212:25

**Investor** [2] - 1212:14, 1212:20

**investors** [2] - 1212:14, 1212:22

**invisibly** [1] - 1284:11

**invite** [1] - 1248:15

**invited** [1] - 1160:9

**invoices** [1] - 1132:20

**involve** [2] - 1137:22, 1155:15

**involved** [16] - 1155:3, 1155:8, 1164:25, 1167:1, 1167:3, 1169:25, 1170:3, 1170:8, 1191:13, 1192:21, 1198:20, 1212:21, 1212:25, 1215:5, 1215:8, 1268:17

**involvement** [1] - 1153:17

**involving** [2] - 1213:20, 1214:5

**IP** [6] - 1179:17, 1181:21, 1182:16, 1183:10, 1183:13, 1240:18

**Isaacson** [6] - 1071:15, 1072:9, 1098:7, 1105:13, 1109:19, 1289:4

**ISAACSON** [31] - 1072:12, 1072:19, 1096:1, 1096:24, 1097:2, 1097:3,

1098:5, 1098:9, 1098:11, 1098:13, 1105:10, 1105:14, 1105:17, 1105:19, 1105:22, 1106:1, 1106:6, 1106:10, 1106:12, 1107:23, 1108:1, 1109:20, 1109:22, 1111:25, 1112:7, 1112:8, 1113:15, 1113:18, 1113:23, 1114:7, 1117:19

**isolated** [3] - 1090:17, 1091:16, 1091:24

**issue** [16] - 1100:21, 1101:24, 1102:3, 1110:8, 1111:1, 1121:16, 1121:22, 1122:2, 1147:18, 1153:20, 1161:23, 1162:4, 1168:19, 1217:10, 1225:17, 1225:22

**Issue** [1] - 1274:22

**issued** [12] - 1138:1, 1138:12, 1140:17, 1140:23, 1143:1, 1157:10, 1157:19, 1202:13, 1206:13, 1209:4, 1210:9, 1210:13

**issues** [8] - 1100:11, 1101:23, 1131:1, 1139:5, 1156:1, 1219:16, 1269:10, 1273:10

**IT** [7] - 1176:22, 1183:23, 1186:3, 1187:10, 1190:11, 1190:16, 1287:5

**item** [1] - 1184:21

**itself** [3] - 1130:4, 1133:7, 1170:19

## J

**Jack** [3] - 1277:17, 1278:12, 1278:16

**Jacob** [1] - 1099:21

**Jacobs** [1] - 1099:9

**Jai** [10] - 1188:13, 1188:14, 1188:16, 1188:17, 1188:19, 1188:20, 1255:20, 1256:19, 1257:5, 1257:16

**January** [6] - 1189:21, 1197:24, 1200:18, 1226:21, 1227:2,

1227:22
**Java** [1] - 1237:13
**Jay** [1] - 1115:9
**JD** [149] - 1098:20, 1098:23, 1099:6, 1120:1, 1121:10, 1121:15, 1121:25, 1122:3, 1122:7, 1122:9, 1123:2, 1123:9, 1123:13, 1123:22, 1124:2, 1124:6, 1124:7, 1124:18, 1124:21, 1125:23, 1126:8, 1127:3, 1127:9, 1128:9, 1128:12, 1128:19, 1128:25, 1129:4, 1129:11, 1129:23, 1130:3, 1130:18, 1130:20, 1130:24, 1131:1, 1131:10, 1131:25, 1132:9, 1132:10, 1132:19, 1133:4, 1134:9, 1134:11, 1134:15, 1136:16, 1136:17, 1136:20, 1136:21, 1136:24, 1137:6, 1137:12, 1137:13, 1137:17, 1138:4, 1141:13, 1142:22, 1143:5, 1145:19, 1146:23, 1147:13, 1147:22, 1148:8, 1149:1, 1150:1, 1150:10, 1150:15, 1150:20, 1150:23, 1151:9, 1151:22, 1151:24, 1152:12, 1153:15, 1154:11, 1155:17, 1156:1, 1156:10, 1156:14, 1160:5, 1161:12, 1199:9, 1199:22, 1200:2, 1200:7, 1200:9, 1200:22, 1201:1, 1201:10, 1201:13, 1201:17, 1202:16, 1203:22, 1203:24, 1204:2, 1204:23, 1210:14, 1210:23, 1211:13, 1215:9, 1221:21, 1223:7, 1223:20, 1228:7, 1228:25, 1229:6, 1229:18, 1230:12, 1232:3, 1235:4, 1235:9, 1236:8, 1236:14, 1236:15, 1240:16, 1244:19,

1261:18, 1262:11, 1266:4, 1268:2, 1268:9, 1268:19, 1270:10, 1271:4, 1271:25, 1272:3, 1272:5, 1272:10, 1272:12, 1272:14, 1272:16, 1272:22, 1274:14, 1274:25, 1275:8, 1275:22, 1276:8, 1276:9, 1276:19, 1277:5, 1277:8, 1277:16, 1278:21, 1279:19, 1280:6, 1281:22, 1282:20, 1283:7, 1285:18
**JDE** [81] - 1109:11, 1143:13, 1143:17, 1143:20, 1143:23, 1143:24, 1143:25, 1146:6, 1146:20, 1147:8, 1148:4, 1148:5, 1149:12, 1152:7, 1153:18, 1154:12, 1202:19, 1203:9, 1204:7, 1205:2, 1206:10, 1207:9, 1208:20, 1209:5, 1214:24, 1215:6, 1216:22, 1218:18, 1219:16, 1224:17, 1229:1, 1229:23, 1229:25, 1230:1, 1230:5, 1230:8, 1230:9, 1230:15, 1230:18, 1231:4, 1234:9, 1235:16, 1236:5, 1236:12, 1240:22, 1241:14, 1241:16, 1241:25, 1242:14, 1243:2, 1245:3, 1245:13, 1245:15, 1245:18, 1245:23, 1246:1, 1246:5, 1246:13, 1247:4, 1247:6, 1247:18, 1247:20, 1248:5, 1248:9, 1249:5, 1249:15, 1250:12, 1250:16, 1251:2, 1251:6, 1252:4, 1261:11, 1261:14, 1261:17, 1261:19, 1262:15, 1263:11, 1266:11, 1267:11, 1272:7, 1277:7
**JDE's** [1] - 1145:1
**JDE105328** [1] - 1096:4

**JDFSRC** [2] - 1205:10, 1205:19
**Jessica** [2] - 1071:15, 1197:4
**Jill** [3] - 1243:18, 1248:18, 1249:4
**Jira** [5] - 1254:18, 1254:19, 1254:21, 1254:23
**job** [5] - 1120:7, 1157:17, 1176:7, 1192:25, 1268:4
**jobs** [1] - 1119:7
**John** [2] - 1248:22, 1274:16
**join** [2] - 1137:9, 1163:23
**joined** [3] - 1119:21, 1193:23, 1267:24
**joining** [2] - 1119:8, 1119:9
**joins** [1] - 1162:24
**joint** [2] - 1269:8, 1269:9
**journal** [2] - 1283:1, 1284:5
**JUDGE** [1] - 1071:2
**July** [3] - 1085:25, 1086:2, 1086:3
**jumping** [1] - 1285:17
**junction** [1] - 1144:22
**June** [3] - 1105:11, 1105:22, 1245:9
**jurisdiction** [1] - 1151:5

## K

**Karat** [1] - 1099:20
**keep** [5] - 1122:16, 1174:15, 1231:12, 1271:23, 1275:25
**Kellogg** [1] - 1264:22
**Kent** [1] - 1170:18
**kept** [1] - 1279:24
**kernel** [1] - 1268:21
**key** [5] - 1256:25, 1269:15, 1270:23, 1276:6, 1280:3
**keyboard** [3] - 1138:2, 1139:19, 1210:22
**keys** [2] - 1082:7, 1256:16
**keywords** [1] - 1191:3
**kind** [10] - 1094:10, 1094:15, 1122:7, 1126:12, 1130:15, 1153:12, 1177:21, 1216:10, 1277:14, 1281:25

**kinds** [3] - 1155:20, 1286:23, 1287:17
**kit** [2] - 1283:10, 1283:11
**know-how** [2] - 1104:23, 1105:8
**knowing** [1] - 1132:24
**knowledge** [5] - 1104:23, 1105:8, 1145:4, 1212:23, 1253:6
**knowledgeable** [3] - 1200:25, 1201:9, 1201:13
**known** [4] - 1122:25, 1138:20, 1199:15, 1279:2
**knows** [5] - 1222:9, 1222:11, 1271:16, 1286:16
**Kona** [7] - 1192:5, 1192:13, 1192:22, 1193:6, 1193:14, 1194:4, 1194:11
**KONA** [1] - 1192:6
**KPMG** [2] - 1267:18, 1267:20

## L

**L-a-n-c-h-a-k** [1] - 1264:13
**label** [3] - 1127:16, 1286:18, 1286:20
**labeled** [2] - 1171:6, 1173:25
**lack** [3] - 1078:24, 1204:20, 1211:23
**lacks** [11] - 1094:5, 1201:19, 1201:23, 1203:12, 1207:4, 1213:11, 1222:3, 1223:10, 1231:20, 1238:19, 1257:18
**LANCHAK** [2] - 1264:8, 1289:11
**Lanchak** [14] - 1264:12, 1264:17, 1273:4, 1273:9, 1273:23, 1274:12, 1274:20, 1274:23, 1275:14, 1276:11, 1277:7, 1282:14, 1283:15, 1285:7
**landscape** [1] - 1140:8
**language** [36] - 1083:22, 1093:25, 1094:3, 1094:8, 1097:7, 1097:9,

1097:10, 1115:1, 1139:25, 1140:12, 1144:25, 1150:12, 1161:20, 1166:24, 1168:3, 1168:5, 1171:9, 1171:10, 1172:6, 1172:8, 1173:16, 1173:18, 1173:19, 1173:23, 1173:25, 1202:17, 1202:24, 1202:25, 1217:13, 1229:7, 1232:17, 1237:12, 1237:16, 1239:6, 1244:14
**languages** [3] - 1075:17, 1117:14, 1237:14
**laptops** [1] - 1191:2
**large** [2] - 1234:16, 1265:24
**largest** [1] - 1122:23
**LARRY** [1] - 1071:2
**last** [18] - 1099:9, 1143:11, 1152:14, 1166:5, 1166:7, 1186:1, 1186:10, 1187:9, 1190:10, 1219:23, 1226:12, 1226:16, 1227:6, 1241:3, 1248:19, 1263:2, 1264:4
**late** [2] - 1278:23, 1279:6
**latest** [2] - 1122:16, 1279:10
**latter** [1] - 1267:16
**launched** [2] - 1278:23, 1279:6
**launching** [1] - 1278:6
**Law** [2] - 1071:17, 1071:21
**lawful** [1] - 1276:16
**laws** [1] - 1230:24
**lawyer** [3] - 1092:5, 1230:22, 1231:3
**lay** [3] - 1164:16, 1203:16, 1212:5
**layer** [7] - 1134:10, 1283:16, 1284:2, 1285:25, 1286:1, 1286:2, 1287:11
**layers** [4] - 1143:13, 1229:23, 1282:15, 1286:21
**laying** [1] - 1266:22
**lead** [3] - 1115:6, 1116:25, 1133:13
**leader** [3] - 1157:4, 1196:10, 1198:14

**leaders** [2] - 1200:15, 1206:23
**leadership** [3] - 1159:22, 1159:25, 1267:19
**learns** [1] - 1194:23
**least** [5] - 1073:6, 1086:18, 1087:17, 1187:12, 1253:14
**led** [1] - 1268:10
**ledger** [2] - 1283:2, 1284:6
**ledgers** [1] - 1277:23
**left** [3] - 1165:19, 1165:20, 1287:24
**left-hand** [2] - 1165:19, 1165:20
**Legal** [3] - 1136:3, 1136:8, 1216:2
**legal** [12] - 1090:7, 1090:15, 1092:3, 1102:9, 1136:5, 1183:25, 1202:6, 1211:8, 1211:9, 1231:7, 1231:23, 1231:24
**legality** [1] - 1090:15
**legislation** [1] - 1151:1
**legitimate** [1] - 1162:16
**length** [1] - 1263:15
**less** [5] - 1129:7, 1154:19, 1284:4, 1285:15, 1286:1
**lesser** [1] - 1088:19
**level** [10] - 1110:3, 1124:11, 1148:11, 1176:13, 1176:21, 1178:19, 1190:21, 1267:25, 1275:19, 1277:7
**leverage** [2] - 1111:2, 1111:4
**Libbey** [24] - 1151:16, 1152:7, 1152:11, 1153:2, 1153:7, 1153:13, 1154:17, 1220:11, 1220:14, 1220:16, 1220:22, 1221:8, 1221:16, 1221:19, 1222:2, 1222:19, 1222:23, 1223:5, 1223:14, 1223:19, 1224:5, 1224:10, 1224:15, 1224:18
**Libbey's** [3] - 1152:1, 1153:24, 1154:21
**library** [4] - 1081:6,

1081:13, 1205:11, 1205:19
**license** [15] - 1102:17, 1103:7, 1103:17, 1103:21, 1104:2, 1108:24, 1109:2, 1109:8, 1109:10, 1109:11, 1109:12, 1266:16, 1277:2, 1284:21
**licensed** [3] - 1233:6, 1233:12, 1279:13
**licensee** [6] - 1129:13, 1129:15, 1217:20, 1245:2, 1284:4, 1284:15
**licensees** [14] - 1143:15, 1146:2, 1177:8, 1262:5, 1266:5, 1266:7, 1266:11, 1266:14, 1272:17, 1272:22, 1276:4, 1282:5, 1285:15, 1285:24
**licensees'** [1] - 1276:4
**licenses** [3] - 1101:19, 1268:9, 1279:16
**licensing** [1] - 1279:8
**likely** [4] - 1087:2, 1095:13, 1097:14, 1244:10
**limit** [3] - 1210:13, 1211:6, 1211:12
**limitation** [1] - 1140:1
**limited** [3] - 1140:4, 1161:9, 1211:14
**limiting** [1] - 1195:19
**line** [38] - 1081:8, 1081:9, 1081:12, 1083:17, 1083:18, 1083:24, 1105:12, 1105:13, 1105:14, 1105:15, 1105:18, 1105:19, 1105:20, 1106:13, 1106:20, 1107:1, 1111:21, 1111:22, 1112:9, 1115:14, 1121:22, 1128:4, 1152:14, 1153:1, 1165:2, 1165:3, 1181:13, 1204:4, 1204:7, 1204:10, 1206:8, 1226:21, 1230:24, 1242:16, 1251:24, 1265:15
**lines** [18] - 1074:22, 1081:5, 1082:2, 1090:22, 1092:17, 1092:24, 1094:24,

1106:7, 1106:16, 1106:22, 1111:25, 1112:1, 1120:1, 1120:4, 1120:16, 1128:6, 1161:12, 1179:5
**Linux** [1] - 1287:7
**LISP** [1] - 1237:13
**list** [2] - 1087:3, 1226:11
**listed** [4] - 1087:25, 1088:4, 1247:19, 1247:20
**lists** [1] - 1205:14
**literal** [3] - 1084:23, 1085:3, 1085:5
**literally** [6] - 1112:14, 1112:15, 1112:16, 1112:21, 1112:22, 1278:16
**litigation** [2] - 1235:12, 1260:22
**live** [1] - 1271:13
**LIVERSIDGE** [15] - 1264:3, 1264:7, 1264:14, 1264:16, 1264:20, 1267:2, 1269:24, 1274:16, 1274:19, 1275:11, 1275:13, 1282:10, 1282:13, 1287:19, 1287:25
**Liversidge** [2] - 1071:20, 1289:11
**LLCs** [1] - 1281:24
**load** [1] - 1280:14
**loading** [1] - 1073:10
**local** [5] - 1129:22, 1137:17, 1141:16, 1151:1, 1151:5
**located** [1] - 1120:24
**location** [3] - 1179:18, 1180:6, 1202:5
**locations** [1] - 1191:2
**log** [3] - 1242:7, 1254:11, 1254:12
**logging** [1] - 1171:16
**logic** [2] - 1131:17, 1155:10
**logical** [1] - 1144:8
**LOGO** [1] - 1237:13
**logo** [1] - 1204:13
**longevity** [1] - 1133:4
**look** [87] - 1075:14, 1076:6, 1077:6, 1078:2, 1078:3, 1078:5, 1080:15, 1083:23, 1085:23, 1085:24, 1088:7, 1091:5, 1097:15,

1105:10, 1107:23, 1111:20, 1114:5, 1115:10, 1127:17, 1131:10, 1131:16, 1133:12, 1135:9, 1135:20, 1137:5, 1142:13, 1143:8, 1149:24, 1150:6, 1151:13, 1153:1, 1156:11, 1156:15, 1156:19, 1157:21, 1158:11, 1160:19, 1162:10, 1164:9, 1167:6, 1170:4, 1170:12, 1171:25, 1172:10, 1173:11, 1178:1, 1178:6, 1179:19, 1181:4, 1181:5, 1182:10, 1184:10, 1185:25, 1186:22, 1187:15, 1188:10, 1189:10, 1189:15, 1208:11, 1211:19, 1215:10, 1215:23, 1218:23, 1219:15, 1225:4, 1226:2, 1227:1, 1228:20, 1229:22, 1232:19, 1233:15, 1237:1, 1237:3, 1240:15, 1243:15, 1245:6, 1247:18, 1248:5, 1248:17, 1251:7, 1254:24, 1256:2, 1257:21, 1266:23, 1270:9, 1270:15, 1281:5
**looked** [8] - 1141:16, 1156:8, 1172:14, 1173:17, 1181:6, 1221:7, 1256:3, 1257:21
**looking** [46] - 1079:13, 1083:23, 1094:15, 1096:16, 1096:19, 1096:20, 1131:13, 1138:21, 1140:12, 1151:16, 1154:21, 1155:10, 1156:17, 1162:5, 1170:14, 1171:6, 1172:11, 1172:15, 1173:15, 1180:1, 1181:12, 1184:20, 1185:2, 1185:6, 1185:23, 1186:23, 1188:11, 1189:23, 1190:24, 1199:25, 1213:21, 1214:6, 1226:24, 1232:25, 1237:4, 1241:17, 1247:22,

1261:10, 1261:23, 1268:23, 1270:20, 1271:7, 1274:9, 1280:21
**looks** [3] - 1154:22, 1189:17, 1239:4
**loosely** [1] - 1287:17
**lose** [2] - 1093:9, 1093:16
**loved** [1] - 1277:20
**Lowering** [1] - 1220:21
**lunch** [2] - 1174:16, 1175:15
**luncheon** [1] - 1175:6

### M

**M-a-c-K-e-r-e-t-h** [1] - 1118:22
**ma'am** [2] - 1201:3, 1207:22
**machine** [3] - 1239:6, 1242:1, 1278:8
**MacKereth** [28] - 1117:25, 1118:16, 1118:21, 1118:24, 1135:14, 1170:13, 1175:15, 1197:3, 1198:8, 1200:6, 1202:12, 1203:20, 1205:7, 1208:2, 1208:9, 1212:8, 1213:15, 1222:9, 1222:17, 1235:18, 1248:4, 1250:23, 1251:2, 1252:9, 1255:6, 1260:20, 1262:23, 1289:6
**MACKERETH** [1] - 1118:17
**MacKereth's** [2] - 1196:13, 1197:23
**magazines** [1] - 1141:21
**Mahindra** [1] - 1149:5
**mail** [74] - 1142:15, 1142:18, 1142:20, 1142:21, 1142:25, 1143:8, 1144:4, 1151:15, 1151:17, 1152:1, 1152:14, 1153:23, 1155:7, 1156:21, 1157:23, 1158:2, 1158:5, 1158:6, 1158:12, 1166:2, 1174:11, 1178:12, 1178:17, 1178:24, 1179:6, 1179:13, 1179:14,

1179:20, 1179:25, 1180:6, 1180:18, 1180:23, 1208:25, 1209:3, 1209:13, 1215:11, 1216:6, 1216:12, 1216:14, 1216:21, 1216:24, 1218:24, 1219:1, 1219:3, 1219:19, 1219:22, 1219:23, 1220:8, 1220:20, 1221:3, 1225:16, 1226:5, 1228:20, 1229:18, 1231:12, 1231:13, 1243:17, 1243:23, 1243:24, 1244:17, 1245:6, 1247:4, 1248:17, 1249:10, 1249:13, 1249:21, 1250:16, 1255:19, 1258:8, 1258:10, 1258:12, 1258:19

**mailed** [2] - 1181:1, 1259:11

**mailing** [3] - 1168:1, 1181:19, 1259:1

**mails** [1] - 1243:22

**main** [1] - 1278:8

**mainframe** [2] - 1278:2, 1278:3

**maintain** [4] - 1122:9, 1151:5, 1275:22, 1278:3

**maintained** [1] - 1143:15

**maintaining** [3] - 1143:17, 1269:18, 1276:18

**maintenance** [4] - 1268:18, 1271:19, 1281:9, 1281:19

**major** [1] - 1122:21

**manage** [3] - 1120:18, 1245:18, 1246:9

**managed** [1] - 1284:14

**Management** [9] - 1244:22, 1245:16, 1246:12, 1247:13, 1261:24, 1262:9, 1262:17, 1264:23

**management** [10] - 1197:10, 1198:24, 1252:21, 1264:24, 1265:6, 1265:8, 1267:8, 1268:13, 1277:12, 1277:13

**manager** [1] - 1183:7

**managing** [1] - 1268:1

**Mandarin** [3] - 1217:12, 1217:13, 1217:14

**mandated** [2] - 1267:7, 1267:9

**Manjula** [5] - 1179:3, 1179:12, 1179:14, 1179:21, 1180:9

**manual** [5] - 1191:13, 1277:15, 1277:22, 1277:23

**manufacture** [2] - 1132:13, 1132:15

**manufacturing** [1] - 1132:13

**March** [5] - 1091:8, 1091:12, 1098:6, 1098:9, 1102:25

**Margaret** [2] - 1071:23, 1288:8

**MARKED** [1] - 1289:14

**marked** [2] - 1161:1, 1162:5

**marker** [3] - 1096:20, 1097:16, 1097:17

**markers** [4] - 1080:7, 1096:4, 1098:25, 1281:6

**market** [10] - 1145:1, 1146:5, 1147:8, 1148:25, 1176:22, 1268:4, 1269:2, 1277:21, 1279:16, 1279:19

**markets** [1] - 1176:22

**MarketSphere** [3] - 1267:24, 1267:25, 1268:3

**master** [2] - 1285:1

**master's** [1] - 1273:7

**matching** [4] - 1077:21, 1077:25, 1078:6, 1079:16

**material** [37] - 1136:2, 1136:14, 1142:9, 1161:4, 1161:5, 1162:2, 1162:14, 1162:17, 1162:19, 1163:13, 1164:8, 1166:4, 1167:25, 1168:1, 1171:23, 1175:24, 1181:2, 1181:10, 1181:25, 1182:6, 1184:1, 1187:25, 1191:8, 1191:19, 1191:21, 1191:22, 1192:3, 1192:4, 1192:6, 1192:24, 1192:25,

1193:4, 1193:20, 1194:2, 1196:5, 1225:2, 1248:13

**materials** [12] - 1162:8, 1176:5, 1176:6, 1176:7, 1233:5, 1233:12, 1233:21, 1233:25, 1234:10, 1273:14, 1273:17, 1274:3

**Matt** [4] - 1203:6, 1209:1, 1220:3, 1250:25

**matter** [7] - 1081:25, 1083:10, 1158:25, 1224:11, 1274:6, 1286:20, 1288:7

**Maurya** [7] - 1186:1, 1186:2, 1187:10, 1188:2, 1190:10, 1190:11

**maximum** [1] - 1194:7

**MBA** [1] - 1264:24

**MC** [2] - 1179:12, 1179:21

**MCCRACKEN** [2] - 1115:9, 1115:12

**McCracken** [12] - 1071:21, 1096:22, 1096:25, 1098:7, 1105:13, 1106:3, 1111:23, 1114:9, 1114:10, 1114:14, 1117:16, 1289:5

**mean** [30] - 1079:24, 1079:25, 1100:16, 1127:1, 1131:13, 1142:7, 1156:4, 1176:19, 1186:11, 1198:16, 1224:6, 1225:16, 1228:17, 1231:5, 1240:2, 1257:7, 1265:15, 1266:9, 1266:14, 1270:17, 1273:21, 1276:13, 1277:10, 1277:23, 1281:9, 1284:25, 1285:4, 1286:18, 1286:22, 1287:17

**meaning** [11] - 1079:5, 1123:8, 1136:6, 1136:10, 1136:12, 1169:19, 1170:3, 1200:1, 1232:3, 1232:13, 1233:21

**meaningful** [1] - 1265:14

**means** [24] - 1092:8, 1152:3, 1177:4,

1199:10, 1199:23, 1230:19, 1231:5, 1233:11, 1238:10, 1238:12, 1238:14, 1245:24, 1246:5, 1246:23, 1247:8, 1257:5, 1265:12, 1266:15, 1275:4, 1277:9, 1280:21, 1286:16, 1286:17, 1287:8

**meant** [7] - 1139:3, 1143:24, 1202:24, 1203:3, 1211:10, 1268:5, 1270:7

**mechanics** [1] - 1141:17

**media** [1] - 1162:8

**medium** [2] - 1277:22, 1278:10

**medium-sized** [2] - 1277:22, 1278:10

**meet** [10] - 1159:23, 1266:8, 1269:12, 1269:14, 1271:1, 1272:19, 1276:24, 1276:25, 1285:3, 1285:6

**Meeting** [2] - 1225:8, 1225:9

**meeting** [6] - 1214:25, 1217:9, 1223:2, 1223:3, 1224:8, 1224:23

**meetings** [3] - 1160:8, 1160:10, 1276:21

**member** [13] - 1127:9, 1167:4, 1177:5, 1186:2, 1187:10, 1188:7, 1190:12, 1197:10, 1202:6, 1205:11, 1205:14, 1205:23, 1226:10

**members** [10] - 1143:5, 1157:11, 1157:15, 1163:6, 1176:23, 1198:24, 1205:19, 1224:9, 1259:10

**memory** [1] - 1280:22

**mention** [2] - 1135:16, 1255:18

**mentioned** [8] - 1117:4, 1123:4, 1124:19, 1125:19, 1132:3, 1149:7, 1162:22, 1183:17

**mentioning** [2] - 1101:15, 1167:9

**merely** [1] - 1117:11

**mergers** [2] - 1265:21, 1267:14

**message** [3] - 1166:11, 1166:13, 1166:18

**messages** [1] - 1284:13

**messaging** [2] - 1224:1, 1224:22

**met** [2] - 1159:22, 1159:25

**metaphor** [2] - 1113:2, 1113:8

**method** [4] - 1077:18, 1140:20, 1213:17, 1222:20

**methods** [2] - 1168:14, 1190:23

**Michael** [2] - 1099:9, 1099:20

**microphone** [1] - 1176:25

**Microsoft** [1] - 1277:24

**mid** [1] - 1279:6

**middle** [4] - 1091:15, 1171:6, 1185:2, 1249:14

**midrange** [1] - 1278:6

**Midwest** [3] - 1267:20, 1268:1, 1268:5

**might** [21] - 1077:16, 1077:18, 1082:15, 1083:3, 1083:4, 1083:17, 1085:13, 1090:13, 1090:14, 1110:3, 1117:6, 1132:9, 1132:22, 1138:8, 1154:25, 1175:23, 1176:21, 1213:25, 1251:24, 1251:25, 1255:25

**migration** [1] - 1245:19

**migrations** [1] - 1246:22

**millions** [2] - 1092:17, 1092:24

**mind** [3] - 1078:18, 1178:10, 1284:18

**minicomputers** [1] - 1278:7

**minimal** [1] - 1094:17

**minimis** [7] - 1090:19, 1091:20, 1092:4, 1092:5, 1092:8, 1092:15, 1092:23

**minimus** [2] - 1093:2, 1093:4

**minute** [3] - 1113:20,

1121:22, 1201:25
**minutes** [3] - 1194:7,
1224:10, 1263:15
**mislead** [1] - 1208:10
**misleading** [3] -
1242:21, 1242:22,
1247:17
**misled** [1] - 1240:13
**misrepresented** [1] -
1240:1
**missing** [1] - 1095:23
**misspoke** [1] -
1196:14
**misstating** [1] -
1214:1
**mistake** [1] - 1172:3
**misunderstood** [1] -
1258:16
**mixed** [1] - 1272:24
**model** [27] - 1137:19,
1137:21, 1137:24,
1138:1, 1138:4,
1138:6, 1138:10,
1138:14, 1138:23,
1138:25, 1139:9,
1139:19, 1140:13,
1140:19, 1141:5,
1141:8, 1142:4,
1148:3, 1148:4,
1148:15, 1149:8,
1149:10, 1149:11,
1149:17, 1149:18,
1222:22, 1252:16
**modification** [14] -
1131:7, 1137:3,
1144:16, 1148:8,
1150:25, 1151:2,
1157:3, 1187:12,
1188:2, 1213:21,
1214:6, 1251:21,
1281:7, 1281:11
**modifications** [18] -
1129:20, 1130:22,
1140:4, 1142:11,
1145:13, 1146:1,
1148:20, 1152:22,
1152:24, 1153:4,
1164:24, 1195:20,
1210:17, 1244:9,
1272:4, 1272:12,
1272:22, 1281:3
**modified** [30] -
1106:16, 1106:22,
1108:7, 1128:1,
1128:2, 1128:5,
1129:6, 1130:9,
1130:10, 1130:21,
1132:9, 1133:3,
1133:25, 1144:13,
1144:15, 1145:23,

1186:1, 1186:10,
1187:9, 1188:1,
1190:10, 1210:21,
1250:6, 1251:23,
1251:24, 1251:25,
1252:10, 1280:11
**modifies** [5] - 1246:2,
1275:6, 1280:8,
1280:10, 1281:13
**modify** [55] - 1127:5,
1128:25, 1129:7,
1129:10, 1129:11,
1129:12, 1129:22,
1129:25, 1130:23,
1130:25, 1131:9,
1131:21, 1132:19,
1132:25, 1133:16,
1134:16, 1136:16,
1136:20, 1136:24,
1137:12, 1137:16,
1137:20, 1139:22,
1140:6, 1142:10,
1144:12, 1145:8,
1145:10, 1147:8,
1148:3, 1148:9,
1148:11, 1148:13,
1148:16, 1149:1,
1149:8, 1149:15,
1208:14, 1208:18,
1217:19, 1217:21,
1230:11, 1235:3,
1235:8, 1245:3,
1245:4, 1246:13,
1250:12, 1262:18,
1276:4, 1276:24,
1282:20, 1283:18,
1286:13
**modifying** [22] -
1127:4, 1129:3,
1130:13, 1130:16,
1130:17, 1133:17,
1137:22, 1142:8,
1146:15, 1150:17,
1150:18, 1186:4,
1190:12, 1195:21,
1246:18, 1262:10,
1272:18, 1275:7,
1281:14, 1282:6,
1282:11, 1285:16
**modules** [2] -
1266:16, 1270:12
**molded** [1] - 1283:5
**moment** [2] - 1161:24,
1189:2
**MONDAY** [2] - 1072:1,
1175:1
**Monday** [1] - 1072:6
**money** [1] - 1193:14
**monitor** [3] - 1123:4,
1123:11, 1192:14

**monitoring** [1] -
1123:7
**monitors** [1] - 1183:22
**months** [4] - 1138:11,
1163:16, 1193:8,
1271:14
**more-detailed** [1] -
1073:11
**Moreover** [1] -
1091:16
**morning** [15] - 1072:4,
1072:6, 1072:12,
1072:14, 1072:15,
1114:11, 1114:12,
1118:3, 1118:6,
1118:12, 1118:24,
1118:25, 1214:11,
1251:9, 1287:23
**most** [11] - 1133:12,
1169:1, 1181:24,
1208:20, 1209:5,
1227:10, 1227:12,
1237:17, 1244:9,
1265:20, 1265:24
**move** [17] - 1081:23,
1147:4, 1161:16,
1165:10, 1167:13,
1170:24, 1196:15,
1204:17, 1210:1,
1213:9, 1215:16,
1219:8, 1222:5,
1231:10, 1263:20,
1271:10, 1271:18
**moved** [6] - 1096:15,
1183:24, 1184:1,
1222:8, 1225:13,
1267:18
**Mover** [2] - 1101:18,
1101:23
**moving** [1] - 1279:24
**MR** [64] - 1072:12,
1072:19, 1096:1,
1096:22, 1096:24,
1096:25, 1097:2,
1097:3, 1098:5,
1098:7, 1098:9,
1098:11, 1098:13,
1105:10, 1105:13,
1105:14, 1105:17,
1105:19, 1105:22,
1106:1, 1106:3,
1106:6, 1106:10,
1106:12, 1107:23,
1108:1, 1109:20,
1109:22, 1111:23,
1111:25, 1112:7,
1112:8, 1113:15,
1113:18, 1113:23,
1114:7, 1114:10,
1114:14, 1115:9,

1115:12, 1117:16,
1117:19, 1196:22,
1196:24, 1263:1,
1263:5, 1263:19,
1263:23, 1264:2,
1264:3, 1264:7,
1264:14, 1264:16,
1264:20, 1267:2,
1269:24, 1274:16,
1274:19, 1275:11,
1275:13, 1282:10,
1282:13, 1287:19,
1287:25
**MS** [149] - 1117:24,
1118:2, 1118:15,
1118:24, 1119:2,
1145:3, 1145:6,
1146:7, 1146:11,
1146:18, 1146:21,
1146:24, 1147:4,
1147:6, 1147:9,
1147:11, 1147:16,
1147:19, 1147:24,
1148:2, 1153:9,
1153:11, 1156:5,
1156:7, 1159:4,
1159:7, 1159:13,
1159:17, 1164:14,
1164:16, 1164:18,
1165:10, 1165:12,
1165:15, 1167:13,
1167:15, 1167:18,
1170:24, 1171:1,
1171:4, 1174:15,
1175:9, 1175:12,
1175:14, 1177:7,
1177:10, 1177:12,
1177:16, 1177:18,
1196:11, 1196:17,
1196:25, 1197:2,
1197:8, 1197:22,
1198:1, 1198:6,
1198:7, 1201:4,
1201:6, 1201:19,
1201:20, 1201:23,
1202:8, 1203:4,
1203:8, 1203:11,
1203:14, 1203:18,
1203:19, 1204:17,
1204:19, 1204:22,
1205:1, 1205:6,
1207:4, 1207:6,
1207:24, 1208:1,
1208:24, 1209:2,
1209:24, 1210:3,
1210:6, 1210:7,
1211:23, 1211:25,
1212:4, 1212:7,
1213:9, 1213:11,
1213:13, 1213:14,
1215:15, 1215:17,

1215:20, 1219:7,
1219:9, 1219:12,
1220:2, 1220:5,
1222:3, 1222:5,
1222:7, 1222:11,
1222:15, 1222:16,
1223:10, 1223:13,
1223:17, 1223:18,
1223:23, 1224:14,
1225:8, 1225:12,
1225:15, 1225:19,
1225:25, 1226:1,
1227:21, 1228:2,
1231:7, 1231:10,
1231:11, 1231:20,
1231:21, 1238:19,
1238:21, 1238:22,
1243:8, 1243:11,
1243:14, 1247:22,
1247:24, 1248:2,
1248:3, 1250:14,
1250:24, 1251:1,
1257:18, 1257:20,
1259:3, 1259:16,
1259:25, 1260:4,
1260:14, 1260:19,
1262:19, 1262:21
**multi** [3] - 1205:11,
1205:14, 1205:23
**multi-member** [2] -
1205:11, 1205:14
**multifaceted** [1] -
1268:2
**multiple** [9] - 1109:15,
1109:23, 1125:1,
1125:3, 1127:21,
1127:23, 1143:13,
1164:2, 1229:23
**multitasking** [1] -
1216:10
**multitude** [3] - 1279:4,
1283:6, 1283:8
**Murphy** [1] - 1219:25
**must** [12] - 1085:8,
1093:12, 1104:20,
1151:1, 1152:4,
1152:21, 1152:23,
1171:19, 1171:22,
1198:12, 1224:18,
1262:16

---

## N

**name** [20] - 1084:6,
1096:13, 1097:11,
1097:14, 1097:15,
1098:15, 1098:18,
1098:19, 1099:12,
1118:19, 1185:9,
1186:1, 1192:4,

1197:3, 1248:19, 1258:6, 1264:10
**named** [3] - 1093:15, 1100:7, 1263:10
**names** [24] - 1082:11, 1082:13, 1082:18, 1082:22, 1082:23, 1082:25, 1083:3, 1083:4, 1083:7, 1095:6, 1096:5, 1097:19, 1097:23, 1098:22, 1098:25, 1099:6, 1099:15, 1099:19, 1099:20, 1179:1, 1187:20
**naming** [1] - 1093:9
**naturally** [1] - 1279:18
**nature** [1] - 1123:15
**navigate** [1] - 1264:25
**nearly** [1] - 1083:18
**necessarily** [12] - 1080:1, 1082:13, 1083:21, 1084:9, 1111:4, 1127:24, 1154:23, 1186:11, 1232:16, 1253:6, 1255:2, 1285:2
**necessary** [10] - 1088:22, 1088:23, 1088:25, 1090:13, 1129:9, 1209:19, 1222:13, 1231:16, 1244:1, 1278:3
**need** [53] - 1090:23, 1091:4, 1097:15, 1109:18, 1109:25, 1112:3, 1120:14, 1121:16, 1122:9, 1122:15, 1122:24, 1125:1, 1126:17, 1127:4, 1130:23, 1130:25, 1131:9, 1131:17, 1132:9, 1137:6, 1141:19, 1141:22, 1145:10, 1149:15, 1150:16, 1150:22, 1151:7, 1155:23, 1163:1, 1163:12, 1192:24, 1192:25, 1201:2, 1207:22, 1208:14, 1208:17, 1209:18, 1210:1, 1215:23, 1221:22, 1223:8, 1223:21, 1228:6, 1228:24, 1253:25, 1260:12, 1273:23, 1279:16, 1280:10, 1280:24, 1281:5, 1283:5, 1285:3

**needed** [11] - 1123:19, 1141:14, 1145:8, 1145:13, 1145:15, 1151:4, 1164:24, 1269:3, 1270:8, 1270:25, 1282:4
**needing** [1] - 1182:20
**needs** [15] - 1123:2, 1126:1, 1130:12, 1133:10, 1179:19, 1198:4, 1251:10, 1251:19, 1269:4, 1271:5, 1277:11, 1282:24, 1282:25, 1283:1, 1283:2
**Network** [8] - 1176:16, 1176:18, 1176:20, 1176:23, 1177:2, 1177:9, 1177:14, 1177:19
**network** [2] - 1178:3, 1191:1
**NEVADA** [3] - 1071:1, 1072:1, 1175:1
**Nevada** [2] - 1071:7, 1071:24
**never** [11] - 1077:8, 1099:2, 1138:17, 1231:19, 1235:16, 1235:22, 1253:18, 1254:5, 1273:21, 1276:12, 1276:15
**new** [23] - 1101:6, 1122:17, 1137:9, 1153:19, 1155:1, 1162:24, 1162:25, 1164:21, 1167:22, 1169:5, 1192:4, 1192:12, 1226:18, 1228:16, 1267:9, 1268:5, 1270:25, 1278:25, 1279:10, 1279:15, 1279:16, 1285:21
**next** [16] - 1074:1, 1074:2, 1081:9, 1081:12, 1107:1, 1117:25, 1118:14, 1125:12, 1149:10, 1159:18, 1188:4, 1243:12, 1261:8, 1261:22, 1262:24, 1263:2
**nine** [4] - 1119:6, 1119:8, 1119:20, 1241:3
**Ninth** [1] - 1227:17
**noncreatively** [1] - 1094:8
**none** [3] - 1184:2,

1205:18, 1259:14
**nonhuman** [3] - 1235:3, 1235:8, 1235:14
**nonliteral** [2] - 1084:24, 1085:1
**noon** [2] - 1174:20, 1174:23
**normal** [4] - 1162:14, 1189:1, 1197:15, 1241:7
**North** [1] - 1209:14
**Northwestern** [2] - 1264:23, 1265:5
**note** [5] - 1114:7, 1188:12, 1188:13, 1188:19, 1248:12
**noted** [2] - 1160:8, 1224:10
**notes** [8] - 1209:4, 1221:16, 1222:12, 1222:24, 1223:1, 1223:3, 1224:20, 1224:25
**nothing** [10] - 1085:1, 1089:8, 1110:21, 1116:15, 1259:7, 1259:13, 1262:21, 1277:25, 1279:14, 1284:24
**notice** [3] - 1157:20, 1158:14, 1159:9
**notices** [1] - 1182:3
**notifications** [1] - 1168:11
**notifies** [1] - 1182:24
**notify** [2] - 1156:23, 1157:10
**notifying** [2] - 1157:7, 1226:6
**nots** [1] - 1094:10
**November** [14] - 1142:15, 1151:15, 1151:17, 1154:23, 1215:11, 1216:12, 1226:3, 1226:5, 1227:11, 1227:14, 1227:17, 1229:4, 1230:21, 1231:6
**Number** [1] - 1274:22
**number** [22] - 1072:21, 1073:7, 1073:19, 1081:24, 1088:20, 1105:18, 1154:10, 1160:9, 1169:1, 1185:7, 1186:24, 1188:4, 1190:1, 1190:8, 1198:24, 1199:2, 1200:14, 1201:11,

1252:2, 1273:17, 1276:11, 1280:3
**numbers** [3] - 1128:4, 1187:16, 1187:18

**O**

**o'clock** [2] - 1260:13, 1264:5
**oath** [1] - 1257:15
**obfuscated** [1] - 1133:24
**Object** [9] - 1239:9, 1244:22, 1245:15, 1246:12, 1247:13, 1261:24, 1262:9, 1262:17
**object** [13] - 1106:3, 1111:23, 1187:9, 1198:1, 1203:11, 1211:23, 1225:16, 1227:21, 1234:2, 1237:19, 1239:3, 1239:15, 1240:5
**objection** [43] - 1145:3, 1146:7, 1146:18, 1146:25, 1147:9, 1147:16, 1153:9, 1156:5, 1159:4, 1159:13, 1164:14, 1165:12, 1167:15, 1171:1, 1177:10, 1177:16, 1196:16, 1196:17, 1201:19, 1201:23, 1202:1, 1204:20, 1205:3, 1207:4, 1210:3, 1213:11, 1215:17, 1219:9, 1222:3, 1222:7, 1223:10, 1223:23, 1225:15, 1228:1, 1231:7, 1231:20, 1238:19, 1243:10, 1247:24, 1257:18, 1257:19, 1259:3, 1263:23
**objectionable** [1] - 1147:2
**objects** [2] - 1192:10, 1252:11
**obligations** [2] - 1213:20, 1214:5
**obvious** [2] - 1082:16, 1084:5
**obviously** [13] - 1118:4, 1139:13, 1162:16, 1193:23, 1211:9, 1212:3, 1213:6, 1230:22,

1272:6, 1276:7, 1278:24, 1281:1, 1281:9
**occasion** [1] - 1131:7
**occur** [6] - 1077:16, 1077:19, 1131:22, 1163:15, 1180:20, 1194:25
**occurred** [7] - 1077:8, 1182:15, 1183:8, 1187:13, 1188:7, 1255:3
**October** [4] - 1202:13, 1209:3, 1218:24, 1219:19
**OF** [2] - 1071:1, 1071:11
**offer** [4] - 1148:15, 1148:25, 1151:3, 1273:10
**offered** [2] - 1212:2, 1274:13
**offering** [1] - 1212:4
**offers** [1] - 1121:10
**Office** [7] - 1237:2, 1237:8, 1237:22, 1237:25, 1238:16, 1238:24, 1239:22
**office** [2] - 1277:10
**Official** [2] - 1071:23, 1288:9
**official** [1] - 1221:11
**often** [8] - 1095:9, 1095:18, 1131:2, 1131:15, 1163:15, 1181:24, 1212:22, 1275:7
**oftentimes** [1] - 1192:1
**oil** [3] - 1141:15, 1141:19, 1141:23
**Oklahoma** [3] - 1184:10, 1184:23, 1188:22
**old** [1] - 1240:24
**OMW** [5] - 1244:25, 1245:16, 1246:8, 1247:6, 1261:24
**onboard** [1] - 1167:11
**onboarding** [10] - 1163:24, 1164:22, 1166:10, 1166:18, 1166:21, 1168:8, 1168:16, 1168:19, 1168:22
**once** [9] - 1073:8, 1097:10, 1164:3, 1168:21, 1173:22, 1184:14, 1192:10, 1240:24, 1259:8

one [78] - 1072:20,
1074:18, 1078:19,
1080:18, 1080:24,
1096:15, 1100:5,
1102:12, 1102:17,
1103:7, 1103:17,
1104:2, 1105:25,
1113:8, 1114:20,
1115:6, 1122:23,
1123:8, 1124:5,
1125:8, 1128:3,
1128:20, 1128:21,
1132:16, 1132:17,
1133:10, 1133:18,
1137:5, 1140:7,
1140:14, 1141:20,
1143:20, 1148:17,
1151:21, 1151:25,
1152:25, 1154:17,
1155:4, 1155:5,
1161:13, 1161:15,
1161:17, 1161:24,
1162:2, 1170:17,
1179:20, 1183:1,
1188:17, 1190:14,
1190:25, 1191:14,
1192:18, 1196:11,
1200:15, 1219:25,
1220:16, 1221:9,
1230:1, 1231:2,
1232:17, 1235:5,
1238:13, 1239:1,
1239:8, 1242:20,
1244:22, 1245:25,
1249:14, 1254:19,
1254:20, 1255:19,
1257:23, 1261:23,
1262:2, 1262:4,
1280:3, 1283:6
One [1] - 1105:14
ones [3] - 1097:21,
1097:22, 1208:6
ongoing [2] - 1137:14,
1281:11
online [1] - 1169:3
Open [1] - 1269:12
open [155] - 1129:5,
1129:8, 1129:10,
1129:12, 1129:20,
1130:6, 1130:17,
1130:18, 1130:20,
1130:23, 1130:25,
1131:10, 1131:20,
1131:24, 1132:4,
1132:9, 1133:16,
1136:16, 1136:20,
1136:24, 1137:4,
1137:12, 1137:16,
1137:20, 1137:22,
1139:22, 1140:6,

1140:24, 1141:10,
1142:8, 1143:10,
1143:13, 1144:21,
1144:23, 1145:8,
1145:10, 1145:14,
1145:23, 1146:1,
1146:4, 1146:16,
1147:8, 1148:3,
1148:8, 1148:16,
1149:8, 1149:11,
1149:18, 1150:15,
1150:18, 1150:20,
1150:23, 1151:2,
1152:21, 1152:23,
1153:4, 1155:19,
1155:24, 1156:8,
1156:11, 1156:17,
1156:20, 1162:15,
1171:19, 1195:20,
1199:11, 1199:14,
1202:20, 1205:24,
1208:14, 1208:18,
1209:19, 1211:2,
1218:12, 1229:19,
1229:23, 1230:5,
1230:9, 1230:11,
1230:15, 1230:20,
1231:1, 1231:5,
1232:9, 1234:9,
1234:13, 1234:17,
1234:23, 1237:23,
1237:25, 1238:3,
1238:7, 1238:9,
1238:17, 1238:24,
1239:25, 1240:11,
1242:17, 1243:3,
1244:7, 1244:9,
1244:12, 1244:17,
1245:4, 1245:24,
1246:2, 1246:5,
1246:9, 1246:18,
1246:23, 1247:1,
1247:8, 1247:9,
1247:12, 1247:15,
1247:20, 1248:7,
1249:19, 1250:4,
1250:5, 1250:6,
1250:13, 1250:17,
1250:18, 1250:20,
1251:20, 1260:22,
1260:24, 1261:1,
1261:3, 1261:13,
1261:17, 1261:18,
1262:10, 1262:14,
1262:18, 1272:15,
1272:23, 1282:17,
1282:21, 1283:9,
1283:17, 1283:21,
1283:22, 1283:25,
1285:25, 1286:2,
1286:4, 1286:15,

1286:16, 1287:1,
1287:6, 1287:7,
1287:12
opened [8] - 1152:2,
1173:22, 1184:23,
1184:24, 1189:20,
1189:21, 1257:5,
1257:16
opening [7] - 1153:15,
1155:9, 1155:15,
1155:25, 1164:6,
1168:21, 1263:15
opens [1] - 1183:7
operate [4] - 1122:11,
1122:14, 1142:8,
1151:6
operating [5] - 1103:2,
1117:14, 1121:1,
1140:8, 1287:8
operation [4] -
1121:17, 1133:6,
1143:7, 1169:24
operations [1] -
1193:12
opined [1] - 1154:11
opining [1] - 1075:7
opinion [20] -
1073:20, 1074:5,
1074:11, 1101:17,
1102:1, 1102:7,
1102:9, 1108:8,
1108:21, 1109:6,
1110:25, 1115:19,
1116:21, 1211:8,
1274:13, 1274:23,
1274:24, 1275:3,
1275:9, 1275:16
opinions [9] -
1087:12, 1102:10,
1102:15, 1211:9,
1273:10, 1273:15,
1274:12, 1277:4,
1280:2
opportunity [6] -
1158:25, 1198:4,
1242:24, 1277:21,
1278:5, 1278:12
opposed [8] -
1079:14, 1079:23,
1083:1, 1083:2,
1093:18, 1128:4,
1253:23, 1278:7
opposite [1] - 1276:20
ORACLE [1] - 1071:4
Oracle [137] - 1072:22,
1073:10, 1073:15,
1076:2, 1081:22,
1082:10, 1087:12,
1089:19, 1090:1,
1090:10, 1091:19,

1092:20, 1092:22,
1096:5, 1097:19,
1098:22, 1099:5,
1101:2, 1103:22,
1104:7, 1108:6,
1109:9, 1110:11,
1111:2, 1111:7,
1111:19, 1113:7,
1113:25, 1114:3,
1115:9, 1115:14,
1116:17, 1116:18,
1116:23, 1119:22,
1120:5, 1123:10,
1126:24, 1129:13,
1129:15, 1129:17,
1130:7, 1132:5,
1132:7, 1133:23,
1144:14, 1145:8,
1145:20, 1145:22,
1145:24, 1146:23,
1147:14, 1147:23,
1149:1, 1149:21,
1151:13, 1155:18,
1161:6, 1176:15,
1176:17, 1176:20,
1176:22, 1177:2,
1177:3, 1177:5,
1177:8, 1177:9,
1177:13, 1177:14,
1177:19, 1178:4,
1178:6, 1179:6,
1180:11, 1181:1,
1193:3, 1195:22,
1196:16, 1204:8,
1215:2, 1233:6,
1234:2, 1243:25,
1246:13, 1247:14,
1250:12, 1250:20,
1251:5, 1251:10,
1251:17, 1251:18,
1252:5, 1255:25,
1256:5, 1258:8,
1258:9, 1258:19,
1262:2, 1262:5,
1262:9, 1263:13,
1266:2, 1266:3,
1266:4, 1266:5,
1266:14, 1266:16,
1266:25, 1267:21,
1268:1, 1268:8,
1268:9, 1268:15,
1268:18, 1269:6,
1269:7, 1269:11,
1269:12, 1269:13,
1269:14, 1269:15,
1273:19, 1275:8,
1276:2, 1276:12,
1276:14, 1276:16,
1276:22, 1276:23,
1279:21, 1279:23,
1282:20

Oracle's [23] -
1072:23, 1090:20,
1091:21, 1091:25,
1092:11, 1092:15,
1092:17, 1092:24,
1101:19, 1133:15,
1138:20, 1142:9,
1154:9, 1172:5,
1184:8, 1185:10,
1189:13, 1255:3,
1263:6, 1263:8,
1263:9, 1268:12,
1280:6
Oracle-referenced [1]
- 1111:19
order [8] - 1078:5,
1085:7, 1089:21,
1090:5, 1122:14,
1131:10, 1139:1,
1151:8
Oregon [1] - 1100:2
OREX [4] - 1096:4,
1184:5, 1189:11,
1261:8
OREX_105 [1] -
1256:2
OREX_1339 [1] -
1219:8
OREX_1340 [2] -
1215:10, 1215:16
OREX_139 [1] -
1237:1
OREX_17 [2] -
1232:21, 1232:22
OREX_175 [1] -
1080:24
OREX_19 [2] - 1225:4,
1226:2
OREX_2 [1] - 1228:19
OREX_339 [1] -
1218:23
OREX_61 [1] -
1240:15
OREX_62 [2] - 1245:6,
1247:23
OREX_63 [1] -
1248:17
OREX_64 [2] - 1243:7,
1243:15
OREX_65 [2] -
1208:25, 1210:2
OREX_66 [2] -
1211:19, 1213:10
OREX_68 [3] - 1220:6,
1225:14, 1225:20
OREX_69 [1] -
1196:14
OREX_70 [2] - 1203:5,
1204:17
OREX_80 [2] -

1097:19, 1099:14
**OREX_98** [2] - 1178:10, 1257:21
**organizations** [1] - 1240:12
**orient** [1] - 1274:21
**oriented** [1] - 1083:14
**Original** [1] - 1099:18
**original** [2] - 1086:8, 1128:13
**originally** [3] - 1124:25, 1130:8, 1138:1
**originated** [1] - 1076:4
**origination** [1] - 1076:6
**otherwise** [1] - 1287:16
**outlined** [4] - 1078:22, 1085:16, 1096:17
**output** [1] - 1095:9
**outside** [4] - 1117:2, 1161:6, 1234:1, 1265:23
**over-the-shoulder** [21] - 1138:7, 1138:10, 1138:14, 1138:23, 1138:25, 1139:9, 1140:13, 1140:18, 1140:19, 1141:5, 1141:8, 1213:16, 1214:25, 1215:6, 1216:16, 1217:8, 1218:16, 1218:18, 1221:1, 1221:4, 1222:20
**overall** [1] - 1214:9
**overcome** [1] - 1225:18
**overgeneralization** [1] - 1110:2
**overlay** [1] - 1270:16
**overruled** [4] - 1202:1, 1205:3, 1223:24, 1228:1
**oversee** [3] - 1204:4, 1247:5, 1272:11
**overseeing** [2] - 1268:13, 1268:19
**oversees** [1] - 1200:9
**overview** [3] - 1203:9, 1203:24, 1204:8
**OWEN** [1] - 1072:16
**Owen** [1] - 1289:4
**own** [6] - 1100:6, 1127:14, 1127:15, 1127:17, 1130:12, 1132:23
**owner** [3] - 1169:19, 1191:10, 1205:2

**P**

**p-a-r** [1] - 1081:11
**P.M** [1] - 1175:1
**p93a** [1] - 1256:17
**package** [1] - 1108:15
**packages** [1] - 1133:13
**PAGE** [1] - 1289:3
**page** [62] - 1081:5, 1083:24, 1084:6, 1096:7, 1096:9, 1105:11, 1105:16, 1105:17, 1105:21, 1107:2, 1107:8, 1111:21, 1111:22, 1112:1, 1112:9, 1115:10, 1143:12, 1150:1, 1159:18, 1165:16, 1165:21, 1166:15, 1167:19, 1171:5, 1171:10, 1171:21, 1172:11, 1172:14, 1172:16, 1172:19, 1173:1, 1179:9, 1180:8, 1185:1, 1185:2, 1185:23, 1186:22, 1186:23, 1188:10, 1188:11, 1189:22, 1212:20, 1215:21, 1219:23, 1221:15, 1226:21, 1227:1, 1227:2, 1233:2, 1241:13, 1241:21, 1242:7, 1256:13, 1256:15, 1261:8, 1261:22, 1261:23
**pages** [2] - 1184:17, 1187:15
**paid** [1] - 1274:10
**paper** [1] - 1277:23
**PAR** [1] - 1081:7
**paragraph** [20] - 1083:23, 1086:1, 1086:5, 1091:6, 1091:9, 1091:14, 1093:1, 1098:6, 1098:10, 1102:25, 1104:5, 1104:12, 1143:9, 1143:11, 1150:6, 1158:11, 1158:13, 1228:22, 1229:22, 1230:19
**parameter** [4] - 1082:25, 1083:3, 1083:4, 1131:5
**parameters** [2] - 1081:8, 1081:13
**pardon** [1] - 1096:24

**part** [57] - 1074:7, 1074:17, 1074:20, 1074:23, 1074:24, 1075:1, 1075:11, 1075:12, 1078:20, 1079:1, 1079:18, 1084:20, 1085:19, 1089:3, 1089:13, 1090:14, 1095:12, 1097:13, 1097:21, 1097:24, 1105:6, 1105:8, 1111:4, 1111:16, 1113:5, 1115:5, 1115:7, 1116:8, 1116:10, 1131:8, 1143:7, 1152:11, 1157:14, 1162:14, 1170:7, 1176:15, 1176:17, 1178:3, 1181:7, 1183:5, 1186:3, 1191:11, 1192:17, 1209:19, 1209:20, 1216:23, 1232:5, 1236:16, 1236:17, 1236:19, 1246:2, 1262:11, 1267:16, 1268:2, 1272:3, 1273:13
**participate** [2] - 1217:1, 1217:8
**participating** [1] - 1282:9
**particular** [38] - 1099:10, 1102:19, 1103:9, 1103:19, 1104:4, 1125:18, 1128:20, 1128:21, 1128:23, 1143:7, 1145:17, 1146:20, 1147:1, 1157:15, 1157:17, 1166:15, 1178:22, 1179:24, 1183:23, 1188:12, 1188:24, 1188:25, 1189:3, 1191:3, 1193:18, 1202:5, 1202:22, 1217:9, 1220:18, 1227:13, 1232:17, 1237:11, 1248:7, 1251:10, 1254:17, 1271:1, 1271:22, 1281:7
**parties** [3] - 1089:9, 1148:10, 1162:18
**Partner** [8] - 1176:15, 1176:17, 1176:20, 1176:23, 1177:2, 1177:9, 1177:14, 1177:19

**partner** [4] - 1178:1, 1180:11, 1181:1, 1258:9
**partners** [2] - 1177:3, 1179:7
**party** [34] - 1108:24, 1135:1, 1160:17, 1165:23, 1165:25, 1168:12, 1171:12, 1174:1, 1180:15, 1181:2, 1181:21, 1182:6, 1182:16, 1183:4, 1183:10, 1183:13, 1190:15, 1190:19, 1190:24, 1191:6, 1191:15, 1191:21, 1193:2, 1195:16, 1196:6, 1229:11, 1254:1, 1255:12, 1259:21, 1263:9, 1273:1, 1281:16, 1281:22
**party's** [1] - 1167:24
**PASCAL** [1] - 1237:13
**password** [1] - 1189:2
**past** [4] - 1111:11, 1171:22, 1212:9, 1259:25
**paste** [4] - 1111:10, 1111:12, 1112:16, 1112:18
**pastes** [1] - 1112:22
**pasting** [2] - 1112:14, 1112:15
**patches** [2] - 1234:5, 1243:25
**pay** [1] - 1282:24
**payroll** [2] - 1277:12, 1282:24
**PC** [1] - 1189:8
**peek** [1] - 1257:22
**people** [15] - 1120:18, 1124:8, 1124:9, 1139:25, 1157:13, 1195:9, 1199:2, 1200:9, 1200:22, 1201:11, 1238:11, 1268:16, 1279:8, 1281:25, 1286:22
**PeopleSoft** [35] - 1092:12, 1092:16, 1092:17, 1092:24, 1100:2, 1100:14, 1100:22, 1101:2, 1101:19, 1108:19, 1109:10, 1111:3, 1111:4, 1111:5, 1113:25, 1116:4, 1116:9, 1116:10, 1116:20, 1120:2,

1160:4, 1161:9, 1176:14, 1185:11, 1188:17, 1188:24, 1257:7, 1266:4, 1267:15, 1267:18, 1267:22, 1268:3, 1268:19, 1279:19, 1279:21
**per** [7] - 1074:24, 1075:1, 1121:6, 1153:5, 1234:1, 1250:7, 1274:8
**percent** [9] - 1085:10, 1089:18, 1089:25, 1090:1, 1090:4, 1090:8, 1154:12, 1169:2
**percentage** [1] - 1079:16
**perform** [9] - 1076:19, 1089:17, 1089:24, 1123:14, 1137:18, 1188:23, 1194:7, 1273:23, 1273:25
**performance** [1] - 1284:14
**performed** [3] - 1073:14, 1076:20, 1188:8
**performing** [4] - 1115:17, 1134:11, 1134:15, 1224:7
**perhaps** [3] - 1176:3, 1235:25, 1248:13
**period** [6] - 1137:25, 1138:11, 1140:20, 1163:24, 1168:19, 1210:18, 1211:14, 1214:12, 1220:18, 1221:9, 1224:3, 1226:4, 1265:20, 1266:23, 1271:20, 1279:7
**PERL** [1] - 1237:13
**permission** [2] - 1136:3, 1162:19
**permitted** [4] - 1101:18, 1143:20, 1230:1, 1276:17
**person** [7] - 1128:13, 1197:12, 1197:18, 1198:8, 1198:21, 1237:15
**personal** [2] - 1195:5, 1195:7
**personally** [6] - 1075:25, 1158:21, 1165:6, 1165:8, 1198:19, 1286:7
**perspective** [2] -

1211:12, 1276:20
**Pertaining** [1] -
1240:18
**pertains** [1] - 1274:21
**pharmaceuticals** [1] -
1132:15
**phase** [1] - 1271:11
**Phillips** [6] - 1071:15,
1175:7, 1175:10,
1196:21, 1197:4,
1289:7
**PHILLIPS** [89] -
1145:3, 1146:7,
1146:18, 1146:24,
1147:9, 1147:16,
1147:24, 1153:9,
1156:5, 1159:4,
1159:13, 1164:14,
1165:12, 1167:15,
1171:1, 1175:9,
1177:10, 1177:16,
1196:17, 1196:25,
1197:2, 1197:8,
1197:22, 1198:6,
1198:7, 1201:4,
1201:6, 1201:20,
1202:8, 1203:4,
1203:8, 1203:14,
1203:18, 1203:19,
1204:17, 1204:22,
1205:6, 1207:6,
1207:24, 1208:1,
1208:24, 1209:2,
1209:24, 1210:6,
1210:7, 1211:25,
1212:4, 1212:7,
1213:9, 1213:13,
1213:14, 1215:15,
1215:20, 1219:7,
1219:12, 1220:2,
1220:5, 1222:5,
1222:11, 1222:15,
1222:16, 1223:17,
1223:18, 1224:14,
1225:8, 1225:12,
1225:19, 1225:25,
1226:1, 1228:2,
1231:10, 1231:11,
1231:21, 1238:21,
1238:22, 1243:11,
1243:14, 1247:22,
1248:2, 1248:3,
1250:14, 1250:24,
1251:1, 1257:20,
1259:16, 1259:25,
1260:4, 1260:14,
1262:21
**phone** [1] - 1222:25
**phrase** [14] - 1074:13,
1074:14, 1111:12,

1116:13, 1116:22,
1152:18, 1152:19,
1207:7, 1237:25,
1239:2, 1246:15,
1246:19, 1249:23,
1261:3
**phrased** [1] - 1238:20
**phrases** [2] - 1112:25,
1240:13
**physically** [4] -
1138:15, 1138:17,
1138:21, 1139:1
**pick** [1] - 1287:23
**picture** [1] - 1266:22
**piece** [7] - 1097:16,
1105:5, 1132:10,
1132:12, 1132:14,
1133:8, 1141:13
**pillar** [6] - 1268:25,
1269:5, 1269:6,
1269:15, 1269:16,
1269:17
**pillars** [1] - 1268:23
**place** [25] - 1116:1,
1163:25, 1168:15,
1171:21, 1176:4,
1179:15, 1179:24,
1190:18, 1196:7,
1205:20, 1206:11,
1207:10, 1207:12,
1208:4, 1224:19,
1226:19, 1229:11,
1235:21, 1236:7,
1236:21, 1254:22,
1254:24, 1256:23,
1259:24, 1281:8
**placing** [1] - 1180:5
**PLAINTIFF** [1] -
1071:14
**PLAINTIFF'S** [1] -
1289:14
**Plaintiff's** [6] -
1196:20, 1205:5,
1210:5, 1215:19,
1219:11, 1248:1
**plaintiffs** [1] - 1071:5
**planning** [2] -
1261:20, 1277:8
**platform** [3] - 1267:11,
1278:7, 1279:3
**platforms** [1] - 1279:4
**platinum** [3] -
1176:21, 1177:4,
1258:9
**play** [2] - 1263:2,
1279:1
**played** [1] - 1263:18
**plug** [4] - 1192:8,
1192:9, 1193:17,
1193:19

**plug-in** [4] - 1192:8,
1192:9, 1193:17,
1193:19
**Pocker** [1] - 1071:14
**point** [14] - 1087:22,
1097:4, 1116:14,
1120:15, 1174:16,
1202:18, 1214:10,
1227:24, 1251:12,
1265:2, 1267:18,
1276:7, 1279:19,
1279:20
**pointer** [3] - 1127:6,
1251:6, 1251:14
**pointers** [5] - 1127:13,
1127:15, 1128:4,
1252:5, 1252:8
**pointing** [1] - 1251:20
**points** [3] - 1093:10,
1093:17, 1276:6
**policies** [1] - 1126:18
**Policy** [30] - 1134:21,
1134:22, 1134:23,
1135:4, 1135:12,
1135:18, 1135:21,
1135:24, 1157:14,
1160:12, 1160:14,
1161:2, 1163:4,
1163:8, 1167:22,
1167:23, 1168:18,
1174:9, 1174:14,
1180:24, 1182:14,
1194:25, 1229:13,
1232:19, 1235:19,
1236:14, 1236:20,
1259:15, 1259:23
**policy** [7] - 1122:23,
1126:22, 1134:17,
1134:18, 1153:5,
1235:20, 1236:1
**popular** [4] - 1132:10,
1132:17, 1133:13,
1149:4
**Portal** [9] - 1164:5,
1168:23, 1168:24,
1170:3, 1170:5,
1170:21, 1170:22,
1172:7, 1172:9
**portal** [6] - 1166:1,
1168:1, 1169:3,
1171:13, 1171:24,
1193:21
**portion** [2] - 1090:23,
1090:24
**portions** [8] - 1090:17,
1090:19, 1091:16,
1091:19, 1091:24,
1144:4, 1235:4,
1235:9
**posed** [1] - 1113:14

**position** [31] - 1144:7,
1144:8, 1144:18,
1144:20, 1144:24,
1145:7, 1146:4,
1146:12, 1199:14,
1206:21, 1206:22,
1207:20, 1210:10,
1210:13, 1214:8,
1214:16, 1214:18,
1221:11, 1221:12,
1224:11, 1224:13,
1226:13, 1227:7,
1228:5, 1229:4,
1229:13, 1231:2,
1244:13, 1244:15,
1247:1, 1276:12
**positions** [1] - 1210:9
**possess** [1] - 1166:4
**possible** [8] -
1100:12, 1117:6,
1134:2, 1142:6,
1200:1, 1228:16,
1236:1
**possibly** [3] - 1139:22,
1200:2, 1230:25
**post** [1] - 1283:1
**postconversion** [1] -
1271:14
**postinjunction** [2] -
1197:24, 1200:16
**posts** [1] - 1284:5
**potential** [4] - 1191:6,
1192:2, 1193:1,
1207:18
**potentially** [4] -
1182:6, 1186:17,
1190:15, 1191:6
**practically** [1] -
1163:8
**practice** [18] -
1109:16, 1130:22,
1193:22, 1195:12,
1230:13, 1252:4,
1252:6, 1267:13,
1267:20, 1268:1,
1268:12, 1268:13,
1268:14, 1268:20,
1269:17, 1269:19,
1286:9
**Practice** [1] - 1240:16
**Practices** [1] - 1237:2
**practices** [8] -
1143:19, 1144:5,
1200:9, 1200:22,
1200:25, 1201:9,
1201:18, 1231:14
**preadmitted** [8] -
1135:10, 1142:14,
1157:23, 1178:7,
1184:6, 1225:5,

1228:20, 1232:23
**preceding** [1] -
1199:16
**precise** [1] - 1102:14
**precisely** [2] -
1102:13, 1105:2
**precompiler** [1] -
1111:14
**preparation** [4] -
1158:24, 1159:9,
1201:7, 1201:11
**prepare** [4] - 1104:25,
1107:16, 1107:20,
1252:6
**prepared** [1] - 1153:7
**preparing** [1] -
1104:17
**prescribed** [1] -
1093:18
**present** [6] - 1138:21,
1164:2, 1173:12,
1174:5, 1213:2,
1223:2
**Presentation** [2] -
1212:15, 1212:20
**presentation** [20] -
1089:15, 1164:12,
1164:20, 1167:2,
1167:4, 1167:9,
1167:10, 1168:4,
1168:6, 1172:14,
1172:15, 1173:21,
1204:15, 1204:16,
1206:25, 1211:20,
1211:22, 1212:12,
1212:17, 1213:3
**presentations** [6] -
1164:2, 1167:5,
1168:10, 1212:9,
1212:13, 1213:1
**presented** [9] -
1164:22, 1165:6,
1165:8, 1167:5,
1185:23, 1209:13,
1225:2, 1239:1,
1246:6
**presenter** [1] -
1166:14
**presenting** [2] -
1185:14, 1212:21
**president** [2] -
1209:13, 1268:11
**President** [12] -
1119:22, 1120:8,
1120:10, 1121:8,
1142:22, 1151:24,
1197:9, 1200:6,
1204:23, 1208:20,
1219:14, 1263:7
**presidents** [2] -

1160:6, 1160:7
**press** [3] - 1171:22, 1173:1, 1173:9
**pressure** [1] - 1176:3
**pretty** [2] - 1141:17, 1169:23
**prevent** [1] - 1194:2
**prevents** [1] - 1236:14
**previous** [2] - 1232:12, 1248:18
**previously** [6] - 1072:17, 1096:18, 1096:19, 1151:14, 1160:11, 1181:6
**pricing** [1] - 1269:20
**primarily** [3] - 1253:24, 1268:8, 1278:10
**Primary** [1] - 1240:17
**primary** [2] - 1240:22, 1241:5
**PRINT** [1] - 1256:24
**printed** [1] - 1170:18
**printout** [4] - 1170:14, 1172:21, 1184:8, 1189:14
**printouts** [1] - 1170:20
**priority** [1] - 1121:22
**privy** [1] - 1235:24
**problem** [8] - 1124:21, 1131:14, 1131:15, 1198:6, 1216:11, 1223:17, 1244:3, 1285:14
**problems** [1] - 1228:17
**procedure** [1] - 1218:1
**Procedures** [1] - 1240:18
**proceed** [5] - 1112:6, 1175:7, 1196:25, 1263:3, 1264:14
**proceeding** [2] - 1218:12, 1257:15
**proceedings** [2] - 1200:16, 1288:6
**process** [6] - 1089:4, 1089:14, 1095:3, 1095:5, 1110:3, 1110:4, 1124:10, 1125:1, 1128:24, 1129:3, 1129:23, 1166:10, 1166:18, 1166:21, 1188:24, 1188:25, 1191:12, 1191:13, 1192:4, 1193:10, 1210:14, 1220:15, 1220:23, 1221:1, 1221:4,

1265:22
**processes** [35] - 1116:1, 1163:1, 1163:3, 1190:15, 1190:18, 1194:14, 1200:25, 1201:9, 1210:18, 1210:21, 1211:7, 1221:8, 1224:4, 1226:15, 1228:7, 1228:10, 1228:11, 1228:12, 1228:15, 1228:18, 1228:25, 1229:6, 1229:9, 1229:10, 1235:2, 1235:7, 1236:5, 1236:7, 1236:11, 1236:18, 1236:19, 1263:10, 1266:21, 1284:10, 1284:11
**PROCESSING** [2] - 1083:24, 1115:15
**processing** [4] - 1115:17, 1115:21, 1256:25
**procurement** [1] - 1132:21
**produce** [1] - 1126:2
**produced** [6] - 1128:17, 1130:7, 1161:5, 1206:19, 1234:1, 1273:14
**produces** [1] - 1162:15
**producing** [1] - 1095:9
**product** [25] - 1120:1, 1120:4, 1120:16, 1123:7, 1124:5, 1129:14, 1129:16, 1129:17, 1129:19, 1130:1, 1130:4, 1130:11, 1133:4, 1161:12, 1165:2, 1165:3, 1192:5, 1195:22, 1204:4, 1204:7, 1204:10, 1236:9, 1250:6, 1250:20, 1280:8
**Product** [2] - 1123:25, 1124:1
**production** [4] - 1206:17, 1273:18, 1273:19, 1280:16
**productively** [1] - 1271:17
**products** [7] - 1123:10, 1144:11, 1166:8, 1266:2, 1266:4, 1267:1,

1268:7, 1268:12, 1268:14, 1268:18, 1279:23
**professional** [2] - 1093:21, 1094:18
**Professor** [7] - 1072:10, 1072:14, 1072:20, 1114:11, 1115:13, 1117:16, 1117:21
**professor** [1] - 1115:11
**profitable** [2] - 1269:18, 1269:22
**program** [17] - 1078:21, 1080:8, 1082:4, 1082:18, 1082:19, 1095:12, 1110:16, 1110:22, 1112:11, 1115:4, 1116:20, 1117:5, 1117:8, 1239:6, 1256:25, 1285:8
**programmer** [7] - 1081:22, 1081:23, 1083:4, 1083:19, 1153:2, 1272:7
**programmers** [5] - 1082:21, 1083:6, 1094:24, 1278:14, 1278:19
**programming** [8] - 1078:20, 1095:2, 1095:5, 1115:1, 1237:12, 1237:14, 1237:16, 1267:10
**programs** [10] - 1082:3, 1082:24, 1083:13, 1084:15, 1084:19, 1089:21, 1095:8, 1110:12, 1111:1, 1206:5
**prohibit** [1] - 1230:4
**prohibited** [4] - 1104:17, 1148:20, 1149:18, 1202:15
**prohibiting** [1] - 1230:7
**prohibition** [2] - 1104:22, 1235:21
**prohibits** [2] - 1102:11, 1108:24
**project** [10] - 1148:14, 1192:17, 1192:21, 1193:16, 1270:11, 1270:2, 1270:4, 1270:5, 1270:22, 1272:24
**projects** [2] - 1271:25, 1272:21

**promotional** [1] - 1268:8
**promotions** [1] - 1269:8
**promptly** [1] - 1181:17
**pronouncing** [1] - 1248:19
**proper** [13] - 1074:8, 1076:18, 1077:12, 1077:16, 1077:17, 1077:18, 1079:9, 1084:15, 1097:4, 1106:4, 1111:24, 1111:25, 1113:14
**property** [24] - 1135:2, 1160:17, 1164:1, 1165:25, 1167:25, 1168:12, 1171:12, 1180:15, 1181:3, 1182:7, 1182:23, 1183:5, 1190:16, 1190:19, 1190:24, 1191:7, 1191:15, 1191:22, 1193:2, 1195:17, 1196:7, 1229:12, 1254:1, 1259:21
**proposed** [1] - 1218:1
**proprietary** [1] - 1286:23
**prospective** [1] - 1217:2
**protect** [2] - 1163:25, 1167:24
**protected** [1] - 1195:18
**protecting** [2] - 1135:3, 1164:8
**protection** [2] - 1160:17, 1160:18
**protections** [1] - 1229:11
**proud** [1] - 1119:14
**provide** [61] - 1083:3, 1086:17, 1087:11, 1120:11, 1120:12, 1121:21, 1122:3, 1122:7, 1122:24, 1124:13, 1125:24, 1129:15, 1129:22, 1130:1, 1130:2, 1130:5, 1130:8, 1130:12, 1131:10, 1131:20, 1132:8, 1136:17, 1136:21, 1136:23, 1137:2, 1137:3, 1137:7, 1137:12, 1137:14, 1137:19, 1138:22, 1139:2, 1139:7,

1148:10, 1150:16, 1150:17, 1150:21, 1150:22, 1153:20, 1153:21, 1155:6, 1158:15, 1159:23, 1160:1, 1165:1, 1171:23, 1174:3, 1176:12, 1178:19, 1193:3, 1193:24, 1195:15, 1209:17, 1214:9, 1214:14, 1215:9, 1217:14, 1217:20, 1236:5, 1246:3, 1262:15
**provided** [28] - 1086:12, 1086:16, 1088:1, 1129:13, 1157:21, 1158:8, 1162:24, 1183:5, 1184:9, 1185:8, 1185:16, 1187:5, 1187:6, 1187:7, 1189:14, 1195:21, 1196:6, 1198:13, 1199:17, 1199:23, 1210:19, 1235:16, 1246:13, 1247:14, 1262:2, 1274:24, 1276:2, 1276:8
**provider** [6] - 1108:25, 1162:19, 1176:12, 1176:13, 1176:14, 1263:10
**providers** [4] - 1145:25, 1148:17, 1177:25, 1281:16
**provides** [9] - 1104:24, 1123:21, 1127:8, 1129:12, 1153:13, 1153:14, 1179:16, 1262:5, 1274:4
**providing** [16] - 1120:22, 1128:24, 1129:9, 1129:23, 1130:2, 1162:11, 1176:1, 1178:4, 1209:15, 1209:20, 1215:6, 1230:23, 1236:12, 1244:8, 1274:23, 1286:2
**provisions** [1] - 1162:3
**PS_RC_TAX920** [1] - 1257:2
**PSE** [3] - 1240:17, 1241:24, 1242:13
**psptarry** [5] - 1072:24, 1085:2, 1090:19, 1092:16, 1092:19

**psptaxdt.dms** [1] - 1190:4
**psptcalc.lis** [1] - 1179:16
**ptparry** [1] - 1093:3
**public** [3] - 1088:23, 1277:17, 1277:18
**publications** [1] - 1286:25
**pull** [7] - 1085:25, 1091:8, 1098:5, 1115:9, 1176:25, 1243:7, 1269:11
**pulled** [1] - 1212:22
**purchase** [1] - 1132:24
**purpose** [10] - 1080:13, 1082:19, 1082:23, 1142:25, 1158:4, 1158:6, 1162:17, 1262:10, 1272:18, 1277:1
**purposely** [1] - 1285:11
**purposes** [5] - 1087:4, 1108:19, 1143:16, 1276:18, 1286:5
**push** [1] - 1285:23
**put** [25] - 1088:9, 1096:8, 1099:5, 1112:23, 1139:18, 1171:20, 1176:4, 1179:21, 1202:14, 1203:6, 1208:25, 1216:19, 1217:22, 1220:3, 1236:21, 1237:24, 1239:21, 1239:22, 1243:6, 1250:24, 1251:23, 1252:1, 1252:3, 1281:6, 1286:20

**Q**

**QA** [4] - 1108:16, 1108:18, 1108:19, 1280:16
**qtrtx** [1] - 1101:7
**quality** [1] - 1142:5
**quarantine** [11] - 1183:15, 1183:16, 1183:23, 1186:6, 1186:12, 1186:17, 1187:13, 1188:7, 1188:9, 1190:16, 1193:10
**quarantine's** [1] - 1194:8
**quarantined** [15] - 1182:10, 1183:18,

1184:3, 1185:21, 1185:22, 1186:7, 1186:13, 1186:15, 1186:20, 1188:3, 1190:7, 1190:9, 1255:11, 1255:21, 1255:24
**quarter** [3] - 1100:4, 1100:19, 1101:8
**quarterly** [1] - 1100:2
**QUESTION** [3] - 1227:5, 1227:14, 1227:17
**questions** [14] - 1113:16, 1114:8, 1114:15, 1115:13, 1115:23, 1117:17, 1131:2, 1131:3, 1141:25, 1197:4, 1231:23, 1260:14, 1262:19
**quick** [1] - 1257:22
**quicker** [1] - 1186:17
**quickly** [4] - 1176:3, 1191:25, 1194:4, 1283:13
**quite** [5] - 1104:19, 1128:7, 1139:5, 1176:24, 1199:19
**quote** [7] - 1214:22, 1216:17, 1221:20, 1224:16, 1233:4, 1233:21, 1249:15
**quoting** [2] - 1103:1, 1224:20

**R**

**raise** [3] - 1168:25, 1169:2, 1169:4
**raised** [1] - 1131:1
**raising** [1] - 1172:18
**Ramachandran** [1] - 1188:13
**ran** [1] - 1270:3
**range** [2] - 1134:25, 1197:16
**RANSOM** [1] - 1289:9
**Ransom** [2] - 1263:6, 1263:18
**rapid** [1] - 1193:4
**rapidly** [2] - 1182:24, 1191:24
**rather** [7] - 1083:4, 1084:24, 1102:18, 1103:8, 1103:18, 1104:3, 1112:18
**Ravin** [2] - 1214:21, 1226:5
**Ray** [13] - 1142:15,

1142:21, 1151:18, 1151:23, 1151:24, 1200:6, 1200:13, 1200:15, 1201:12, 1215:22, 1216:13, 1216:21, 1217:24
**Ray's** [2] - 1221:3, 1244:8
**reach** [6] - 1074:11, 1078:5, 1085:13, 1121:20, 1185:14, 1198:25
**reached** [1] - 1222:19
**reaches** [1] - 1192:10
**reaching** [4] - 1102:10, 1102:15, 1112:4, 1273:15
**reaction** [4] - 1139:21, 1153:15, 1194:6, 1195:14
**read** [35] - 1081:12, 1082:3, 1084:25, 1085:1, 1087:22, 1097:9, 1097:10, 1106:19, 1107:13, 1135:21, 1136:10, 1139:22, 1141:20, 1144:4, 1158:22, 1163:13, 1165:19, 1166:5, 1166:14, 1172:25, 1192:1, 1197:23, 1216:12, 1216:24, 1217:7, 1226:20, 1227:1, 1234:18, 1234:20, 1239:11, 1239:17, 1242:7, 1245:2, 1249:9, 1256:1
**readable** [5] - 1218:9, 1235:4, 1235:8, 1235:14, 1236:22
**reading** [16] - 1082:16, 1086:25, 1102:20, 1104:5, 1104:11, 1180:3, 1208:11, 1216:1, 1216:6, 1216:10, 1219:1, 1233:8, 1233:9, 1233:10, 1243:20, 1248:24
**reads** [1] - 1150:7
**ready** [2] - 1141:20, 1175:7
**realizes** [1] - 1180:14
**really** [27] - 1081:6, 1186:8, 1202:7, 1207:17, 1212:23, 1231:24, 1241:4, 1255:13, 1265:10, 1265:12, 1266:22,

1268:4, 1268:24, 1270:3, 1270:20, 1277:9, 1278:25, 1280:12, 1284:2, 1284:15, 1284:24, 1285:24, 1286:18, 1286:24, 1287:14, 1287:15
**realtime** [1] - 1099:2
**reason** [11] - 1149:16, 1185:19, 1190:12, 1191:18, 1208:7, 1224:24, 1254:2, 1257:17, 1276:11, 1280:3, 1280:4
**reasonability** [1] - 1114:8
**reasonable** [4] - 1111:17, 1114:6, 1142:3, 1206:2
**reasons** [11] - 1128:3, 1132:16, 1132:17, 1133:11, 1133:18, 1137:5, 1152:25, 1154:17, 1225:1, 1275:15, 1280:3
**rebuttal** [5] - 1085:24, 1087:25, 1091:7, 1098:5, 1098:8
**recalled** [1] - 1072:16
**receipt** [1] - 1258:25
**receive** [1] - 1176:21
**received** [16] - 1128:22, 1158:16, 1158:21, 1165:14, 1167:17, 1171:3, 1196:20, 1205:5, 1210:5, 1215:19, 1219:4, 1219:11, 1226:9, 1248:1, 1259:8, 1264:1
**RECEIVED** [1] - 1289:14
**receives** [1] - 1128:18
**receiving** [1] - 1258:23
**recent** [3] - 1192:12, 1227:11, 1227:12
**recess** [3] - 1118:9, 1174:20, 1174:23
**Recess** [1] - 1260:8
**recipient** [2] - 1157:3, 1158:2
**recognize** [9] - 1081:1, 1095:2, 1204:11, 1212:11, 1212:16, 1213:4, 1219:3, 1219:23, 1285:21
**recognized** [1] -

1259:21
**recollection** [2] - 1227:10, 1227:20
**recommend** [1] - 1177:8
**recommendation** [2] - 1156:19, 1254:8
**recommendations** [1] - 1170:9
**reconvene** [3] - 1118:7, 1174:21, 1260:6
**reconvened** [4] - 1072:5, 1118:11, 1175:5, 1260:10
**record** [34] - 1072:5, 1097:10, 1113:11, 1113:22, 1115:24, 1118:11, 1118:20, 1169:12, 1169:18, 1175:5, 1182:10, 1182:21, 1184:18, 1185:4, 1185:20, 1186:24, 1186:25, 1187:3, 1187:4, 1188:12, 1189:23, 1189:25, 1190:6, 1190:8, 1204:25, 1225:6, 1225:13, 1225:19, 1250:15, 1255:16, 1255:21, 1260:10, 1264:11, 1288:6
**records** [6] - 1159:8, 1159:10, 1187:20, 1187:23, 1187:24, 1189:18
**recover** [1] - 1072:7
**recurring** [1] - 1163:12
**redirect** [4] - 1114:9, 1242:24, 1248:15, 1260:16
**Redirect** [2] - 1289:5, 1289:7
**REDIRECT** [2] - 1114:13, 1260:18
**reduces** [1] - 1122:17
**reducing** [1] - 1265:16
**redundant** [2] - 1084:8, 1084:9
**reengineering** [1] - 1265:22
**refamiliarizing** [1] - 1216:7
**refer** [16] - 1096:4, 1126:23, 1133:22, 1133:25, 1148:24, 1152:5, 1154:1, 1154:2, 1181:9,

1234:16, 1238:9, 1244:7, 1244:12, 1252:5, 1287:1, 1287:11

**reference** [24] - 1086:17, 1092:23, 1110:11, 1110:13, 1110:14, 1110:17, 1110:22, 1114:3, 1156:3, 1240:5, 1242:12, 1243:2, 1243:12, 1246:1, 1246:7, 1250:16, 1250:19, 1251:17, 1251:18, 1258:7, 1262:14, 1262:16

**referenced** [5] - 1111:15, 1111:19, 1156:9, 1247:7, 1263:21

**references** [3] - 1158:13, 1159:22, 1178:10

**referencing** [2] - 1117:11, 1287:14

**referred** [16] - 1130:15, 1135:5, 1138:7, 1149:20, 1155:14, 1160:4, 1161:2, 1181:10, 1218:8, 1230:5, 1230:15, 1247:13, 1248:11, 1250:3, 1250:17, 1255:20

**referring** [37] - 1082:6, 1089:8, 1092:11, 1097:5, 1127:16, 1144:3, 1148:23, 1149:6, 1150:18, 1151:12, 1152:4, 1152:21, 1152:23, 1153:3, 1160:22, 1170:16, 1177:21, 1200:3, 1203:1, 1217:16, 1218:11, 1227:19, 1230:25, 1235:14, 1239:15, 1244:8, 1244:9, 1246:22, 1247:11, 1250:20, 1255:23, 1262:16, 1272:14, 1272:16, 1281:14, 1283:24, 1287:12

**refers** [2] - 1235:12, 1244:11

**reflect** [3] - 1224:11, 1255:2, 1275:14

**reflected** [2] - 1122:18, 1282:14

**reflecting** [1] - 1223:3

**regard** [4] - 1146:20, 1159:14, 1210:10, 1232:11

**regarding** [3] - 1161:13, 1263:9, 1263:11

**regional** [1] - 1269:14

**regs** [2] - 1153:21, 1249:5

**regular** [3] - 1163:6, 1269:7, 1269:12

**regularly** [1] - 1266:8

**regulations** [1] - 1122:10

**regulatory** [22] - 1122:25, 1123:3, 1123:22, 1124:13, 1125:22, 1128:9, 1128:23, 1128:24, 1129:21, 1137:11, 1137:13, 1137:15, 1140:25, 1150:22, 1153:7, 1153:18, 1153:19, 1154:1, 1154:2, 1154:6, 1209:21, 1218:22

**reinforce** [2] - 1161:20, 1166:25

**reinstated** [2] - 1221:13, 1226:3

**relate** [5] - 1160:12, 1162:3, 1163:3, 1167:8, 1169:7

**related** [11] - 1106:4, 1159:9, 1178:5, 1200:25, 1207:11, 1207:21, 1208:4, 1208:6, 1234:5, 1254:7, 1269:11

**relating** [5] - 1160:16, 1177:14, 1201:9, 1214:24, 1274:14

**relation** [2] - 1092:9, 1169:16

**relational** [1] - 1284:8

**relationship** [3] - 1178:16, 1184:15, 1266:7

**relatively** [1] - 1193:21

**released** [1] - 1122:15

**relevant** [5] - 1157:16, 1173:25, 1224:23, 1227:8, 1237:16

**reliable** [1] - 1254:24

**reliant** [1] - 1193:13

**rely** [1] - 1255:4

**remain** [1] - 1144:16

**remember** [13] - 1073:20, 1077:23, 1085:19, 1086:25,

1115:15, 1139:24, 1140:23, 1175:17, 1232:9, 1232:14, 1255:7, 1256:6, 1278:15

**remind** [5] - 1157:13, 1167:23, 1168:18, 1174:11, 1184:14

**reminded** [5] - 1164:4, 1164:7, 1168:22, 1196:12, 1210:1

**remote** [30] - 1134:6, 1138:3, 1138:8, 1139:19, 1140:20, 1166:9, 1166:22, 1166:23, 1167:1, 1167:3, 1167:9, 1167:10, 1167:12, 1168:7, 1173:20, 1189:1, 1211:1, 1211:4, 1211:18, 1213:21, 1214:6, 1214:14, 1217:2, 1217:3, 1220:17, 1221:9, 1222:22, 1224:5, 1252:16, 1257:11

**remotely** [2] - 1217:8, 1253:24

**remove** [1] - 1194:4

**Reneke** [2] - 1248:20, 1249:15

**reneke** [1] - 1248:21

**renew** [2] - 1146:24, 1204:19

**renewal** [1] - 1209:15

**Reno** [2] - 1071:7, 1071:24

**RENO** [2] - 1072:1, 1175:1

**repeat** [11] - 1091:17, 1136:19, 1201:4, 1207:25, 1210:11, 1214:1, 1216:9, 1229:15, 1229:17, 1235:5, 1243:1

**repeated** [1] - 1147:2

**repeatedly** [1] - 1076:21

**rephrase** [7] - 1113:9, 1147:4, 1198:18, 1222:15, 1223:16, 1238:21, 1258:22

**report** [30] - 1079:20, 1081:3, 1085:14, 1085:15, 1085:20, 1085:24, 1086:11, 1086:12, 1087:6, 1087:18, 1087:19, 1087:24, 1087:25,

1088:20, 1089:5, 1091:7, 1091:22, 1092:8, 1092:14, 1098:6, 1098:8, 1102:25, 1122:12, 1181:17, 1183:13, 1191:7, 1259:22, 1286:5, 1286:14, 1286:17

**reported** [5] - 1183:10, 1183:17, 1183:20, 1200:13, 1259:11

**Reported** [1] - 1071:23

**Reporter** [2] - 1071:23, 1288:9

**REPORTER** [5] - 1109:19, 1176:24, 1201:2, 1207:22, 1250:8

**reporting** [2] - 1100:2, 1259:15

**reports** [12] - 1078:11, 1093:2, 1103:11, 1103:25, 1104:14, 1142:22, 1151:25, 1183:22, 1194:14, 1194:16, 1194:19, 1219:14

**represent** [3] - 1090:20, 1091:20, 1211:21

**representation** [1] - 1239:5

**representative** [3] - 1200:17, 1200:21, 1263:8

**representatives** [2] - 1178:23, 1282:8

**request** [2] - 1154:5, 1183:23

**requested** [3] - 1146:2, 1192:19, 1216:25

**requests** [1] - 1152:5

**require** [11] - 1109:16, 1109:23, 1125:3, 1139:22, 1152:15, 1155:2, 1155:21, 1176:7, 1219:16, 1229:5, 1270:18

**required** [16] - 1083:15, 1084:13, 1084:17, 1084:19, 1084:23, 1115:2, 1124:13, 1124:17, 1153:2, 1155:7, 1220:15, 1220:23, 1221:2, 1221:3, 1221:4, 1270:16

**requirement** [1] - 1271:1

**requirements** [17] - 1079:10, 1080:9, 1080:10, 1156:23, 1157:7, 1162:21, 1162:23, 1163:19, 1163:22, 1270:8, 1272:19, 1277:1, 1278:18, 1283:12, 1285:3, 1285:5, 1285:6

**requires** [3] - 1151:2, 1154:13, 1224:17

**research** [4] - 1124:3, 1124:12, 1124:19, 1126:7

**reserve** [1] - 1225:24

**resolve** [1] - 1156:9

**resource** [3] - 1224:18, 1261:20, 1277:8

**resources** [2] - 1181:16, 1277:13

**respect** [12] - 1101:16, 1101:17, 1102:3, 1108:22, 1143:10, 1144:20, 1144:23, 1146:4, 1225:17, 1263:11, 1283:16, 1285:7

**respective** [2] - 1159:25, 1270:12

**respond** [3] - 1077:6, 1077:10, 1198:4

**responding** [3] - 1077:3, 1130:23, 1258:25

**responds** [2] - 1217:24, 1274:24

**response** [7] - 1075:6, 1084:25, 1121:21, 1121:22, 1144:25, 1146:17, 1227:8

**responsibilities** [1] - 1120:9

**responsibility** [5] - 1119:17, 1119:24, 1200:14, 1267:19, 1267:25

**responsible** [11] - 1119:13, 1119:16, 1120:16, 1124:2, 1156:14, 1159:1, 1160:6, 1187:11, 1198:9, 1199:3, 1269:18

**rest** [6] - 1072:7, 1180:1, 1180:3, 1216:6, 1216:20,

1247:18
**restored** [1] - 1189:4
**restricting** [4] -
1102:18, 1103:8,
1103:18, 1104:3
**restrictions** [4] -
1174:7, 1175:17,
1175:21, 1189:9
**result** [15] - 1108:18,
1111:6, 1111:17,
1117:9, 1126:2,
1131:19, 1132:1,
1132:16, 1151:3,
1182:14, 1183:24,
1199:12, 1199:16,
1257:10, 1270:21
**results** [4] - 1085:11,
1128:16, 1195:1,
1263:12
**Resumed** [1] - 1289:4
**RESUMED** [2] -
1072:18, 1175:13
**retained** [1] - 1273:9
**retired** [1] - 1265:1
**retrieve** [1] - 1284:9
**retrospect** [2] -
1112:4, 1268:23
**return** [1] - 1082:7
**reused** [1] - 1105:7
**reusing** [1] - 1104:22
**reveal** [1] - 1134:9
**reverse** [5] - 1136:2,
1136:13, 1236:10,
1236:12, 1236:15
**Reverse** [1] - 1135:25
**review** [10] - 1112:3,
1131:19, 1131:23,
1155:18, 1155:24,
1159:8, 1159:10,
1209:19, 1225:23,
1274:2
**reviewed** [6] -
1133:25, 1158:17,
1173:21, 1215:4,
1255:19, 1273:13
**reviewing** [5] -
1131:22, 1155:25,
1187:8, 1187:24,
1255:13
**Revision** [1] - 1099:18
**Revolution** [1] -
1281:17
**rich** [1] - 1124:24
**Richard** [1] - 1071:14
**right-hand** [2] -
1166:6, 1166:7
**Rimini** [313] - 1072:22,
1073:9, 1076:1,
1076:3, 1076:9,
1076:10, 1077:1,

1077:9, 1077:14,
1077:17, 1077:22,
1078:1, 1081:22,
1082:10, 1089:19,
1089:25, 1090:1,
1091:18, 1092:8,
1092:21, 1098:24,
1099:5, 1099:9,
1099:15, 1099:21,
1099:23, 1100:6,
1101:4, 1103:16,
1104:17, 1104:20,
1104:25, 1105:5,
1105:7, 1107:3,
1107:19, 1108:6,
1108:11, 1108:15,
1108:25, 1109:3,
1109:16, 1109:23,
1109:24, 1110:21,
1111:19, 1113:6,
1116:2, 1116:13,
1116:14, 1117:24,
1118:13, 1119:4,
1119:5, 1119:8,
1119:9, 1119:19,
1119:21, 1120:20,
1120:22, 1121:1,
1121:6, 1121:9,
1121:15, 1121:20,
1122:3, 1122:7,
1122:17, 1123:2,
1123:13, 1123:21,
1125:21, 1126:14,
1126:18, 1126:21,
1127:3, 1127:20,
1127:23, 1128:18,
1128:20, 1128:25,
1129:3, 1129:8,
1129:22, 1130:2,
1130:4, 1134:2,
1134:7, 1134:10,
1134:13, 1134:14,
1134:18, 1134:24,
1135:7, 1136:3,
1136:8, 1136:13,
1136:16, 1136:20,
1136:23, 1137:5,
1137:7, 1137:8,
1137:11, 1137:14,
1137:21, 1138:9,
1138:14, 1138:20,
1139:9, 1139:22,
1140:3, 1140:14,
1140:19, 1141:4,
1142:10, 1142:15,
1143:7, 1144:16,
1145:18, 1146:3,
1146:14, 1146:22,
1147:12, 1147:21,
1148:3, 1148:15,
1148:19, 1149:8,

1149:11, 1150:8,
1150:9, 1150:14,
1150:16, 1150:19,
1150:21, 1151:7,
1153:5, 1154:11,
1157:6, 1157:10,
1157:21, 1157:24,
1158:7, 1162:12,
1162:15, 1162:20,
1162:22, 1163:18,
1163:23, 1165:7,
1165:9, 1166:2,
1166:3, 1166:4,
1167:11, 1167:21,
1168:2, 1168:13,
1168:25, 1170:17,
1173:5, 1173:23,
1174:6, 1175:16,
1175:20, 1176:5,
1178:15, 1179:2,
1179:4, 1179:6,
1179:23, 1180:11,
1180:14, 1180:15,
1180:16, 1180:18,
1181:15, 1181:20,
1182:3, 1182:4,
1182:18, 1182:19,
1183:9, 1183:13,
1183:15, 1183:16,
1185:8, 1185:16,
1185:17, 1185:18,
1186:3, 1187:6,
1187:25, 1188:6,
1190:18, 1193:23,
1194:22, 1195:3,
1195:7, 1195:23,
1195:25, 1197:9,
1197:13, 1197:19,
1198:8, 1198:9,
1198:11, 1198:22,
1198:23, 1200:12,
1200:21, 1201:8,
1201:14, 1202:9,
1202:15, 1202:18,
1203:9, 1204:11,
1204:14, 1205:24,
1206:14, 1206:21,
1206:22, 1207:2,
1208:20, 1210:9,
1210:13, 1210:15,
1210:17, 1211:20,
1212:8, 1213:4,
1213:6, 1213:19,
1214:4, 1214:8,
1214:16, 1214:18,
1215:1, 1218:15,
1219:14, 1219:25,
1220:10, 1220:12,
1220:14, 1221:11,
1221:19, 1222:2,
1222:18, 1223:5,

1223:19, 1224:11,
1224:15, 1226:5,
1226:12, 1227:6,
1230:4, 1230:11,
1230:14, 1230:20,
1231:5, 1231:14,
1232:2, 1233:6,
1233:13, 1234:9,
1235:3, 1235:7,
1235:12, 1235:16,
1236:5, 1240:16,
1241:24, 1242:13,
1249:5, 1250:17,
1251:9, 1252:4,
1252:6, 1252:9,
1252:12, 1252:15,
1252:17, 1252:18,
1252:25, 1253:3,
1253:4, 1253:9,
1253:18, 1253:24,
1254:5, 1254:10,
1258:5, 1258:11,
1258:14, 1258:17,
1258:24, 1259:8,
1261:3, 1273:9,
1273:18, 1274:4,
1275:6, 1281:17
**RIMINI** [1] - 1071:7
**Rimini's** [36] - 1073:3,
1096:3, 1101:17,
1102:16, 1103:5,
1116:1, 1116:17,
1116:21, 1126:18,
1144:5, 1144:24,
1154:12, 1156:22,
1169:7, 1180:16,
1181:22, 1183:14,
1185:11, 1195:5,
1200:6, 1200:17,
1200:22, 1200:25,
1201:9, 1201:17,
1206:12, 1208:20,
1210:14, 1211:5,
1228:5, 1229:4,
1235:2, 1235:7,
1236:11, 1273:24,
1274:1
**Rimini-authored** [3] -
1101:4, 1111:19,
1116:2
**Rimini-written** [1] -
1105:5
**ring** [1] - 1254:18
**Roger** [4] - 1215:22,
1216:13, 1216:22,
1218:1
**role** [3] - 1169:16,
1200:12, 1268:2
**roles** [2] - 1119:19,
1145:7

**rolled** [2] - 1163:10,
1169:22
**rolling** [1] - 1154:25
**room** [3] - 1093:12,
1276:25, 1278:2
**room-sized** [1] -
1278:2
**root** [2] - 1131:14,
1131:15
**rough** [3] - 1121:5,
1206:18, 1285:4
**row** [1] - 1252:1
**Roy** [14] - 1151:15,
1151:17, 1151:20,
1151:21, 1152:1,
1152:16, 1152:18,
1153:12, 1153:14,
1153:17, 1153:19,
1153:24, 1153:25
**Roy's** [1] - 1156:3
**RPG** [3] - 1272:7,
1278:13, 1278:19
**RR** [2] - 1189:15,
1189:20
**Rs** [1] - 1072:24
**RSI** [3] - 1100:4,
1100:10, 1226:10
**rsi** [1] - 1100:19
**RSI-18F07** [2] -
1100:14, 1100:21
**rsi1099-I** [1] - 1100:9
**rsi1099i** [1] - 1101:4
**rsi1099m** [1] - 1101:4
**rsiq2** [1] - 1101:7
**rsiq2rtx.sqr** [1] -
1100:7
**rsiqtrtx.sqr** [1] -
1114:2
**rspcmpay** [5] -
1073:2, 1076:2,
1080:11, 1085:2,
1090:18
**rspcmpay.cbl** [1] -
1072:25
**Rule** [1] - 1263:6
**rule** [1] - 1239:11
**Rules** [2] - 1161:2,
1240:18
**rules** [2] - 1113:11,
1122:10
**ruling** [2] - 1112:4,
1225:24
**run** [19] - 1110:24,
1111:3, 1111:6,
1116:4, 1116:7,
1116:19, 1117:9,
1117:15, 1121:16,
1127:13, 1127:15,
1166:24, 1188:24,
1191:20, 1257:1,

1257:9, 1279:4,
1284:10, 1284:11
**running** [9] - 1108:19,
1109:5, 1116:11,
1117:5, 1123:9,
1177:22, 1177:23,
1194:12, 1256:24
**runs** [1] - 1194:18
**RX-98** [1] - 1180:8

## S

**sales** [8] - 1132:20,
1208:23, 1209:14,
1209:15, 1216:25,
1217:1, 1217:7
**SalesForce** [38] -
1120:5, 1169:8,
1169:10, 1169:11,
1169:12, 1169:14,
1169:17, 1169:18,
1169:20, 1169:23,
1170:1, 1182:5,
1182:18, 1182:21,
1184:9, 1184:13,
1184:15, 1184:18,
1184:20, 1186:2,
1187:11, 1188:1,
1188:8, 1189:14,
1189:18, 1190:11,
1192:8, 1192:9,
1192:11, 1192:14,
1193:6, 1193:18,
1193:19, 1194:5,
1255:6, 1255:9,
1255:22
**salespeople** [1] -
1249:22
**salesperson** [1] -
1249:21
**SAMPLIN** [60] -
1117:24, 1118:2,
1118:15, 1118:24,
1119:2, 1145:6,
1146:11, 1146:21,
1147:4, 1147:6,
1147:11, 1147:19,
1148:2, 1153:11,
1156:7, 1159:7,
1159:17, 1164:16,
1164:18, 1165:10,
1165:15, 1167:13,
1167:18, 1170:24,
1171:4, 1174:15,
1175:12, 1175:14,
1177:7, 1177:12,
1177:18, 1196:11,
1198:1, 1201:19,
1201:23, 1203:11,
1204:19, 1205:1,
1207:4, 1210:3,

1211:23, 1213:11,
1215:17, 1219:9,
1222:3, 1222:7,
1223:10, 1223:13,
1223:23, 1225:15,
1227:21, 1231:7,
1231:20, 1238:19,
1243:8, 1247:24,
1257:18, 1259:3,
1260:19, 1262:19
**Samplin** [5] - 1071:20,
1175:9, 1175:11,
1289:6, 1289:7
**Samuel** [1] - 1071:20
**San** [1] - 1119:10
**SAP** [7] - 1119:24,
1123:9, 1133:13,
1161:6, 1193:3,
1233:7, 1234:2
**Sarah** [3] - 1179:3,
1188:21, 1256:23
**sat** [2] - 1141:20,
1167:4
**satisfies** [1] - 1182:13
**saved** [1] - 1073:2
**saw** [13] - 1090:12,
1142:23, 1168:3,
1168:5, 1172:20,
1216:13, 1248:18,
1263:14, 1277:21,
1277:25, 1278:5,
1278:12, 1279:16
**scan** [6] - 1190:18,
1192:6, 1192:10,
1192:24, 1194:1,
1194:7
**scanning** [5] -
1190:24, 1191:19,
1191:25, 1194:14,
1196:5
**scans** [1] - 1191:1
**scenario** [2] - 1139:6,
1140:3
**scenes** [1] - 1284:10
**scheduled** [1] -
1160:8
**School** [1] - 1264:22
**science** [1] - 1273:6
**Sciences** [3] -
1184:10, 1184:23,
1188:22
**scope** [3] - 1130:4,
1144:16, 1239:23
**screen** [23] - 1075:15,
1086:1, 1086:6,
1088:9, 1091:8,
1096:8, 1096:17,
1096:22, 1096:25,
1097:4, 1098:12,
1135:15, 1150:7,

1158:12, 1171:14,
1173:7, 1174:5,
1178:9, 1203:6,
1208:11, 1233:15,
1233:16, 1274:20
**screenshot** [1] -
1096:12
**screenshots** [1] -
1165:24
**script** [1] - 1128:16
**scripts** [3] - 1101:18,
1101:24, 1285:20
**scroll** [1] - 1171:22
**se** [2] - 1074:24,
1075:1
**Seals** [3] - 1108:11,
1108:23, 1109:3
**Seals'** [1] - 1108:24
**search** [3] - 1191:3,
1235:1, 1273:19
**searching** [2] -
1191:1, 1196:5
**seat** [4] - 1072:4,
1118:10, 1175:4,
1260:9
**Sebastian** [3] -
1208:19, 1209:22,
1219:13
**second** [9] - 1125:14,
1153:1, 1214:23,
1226:24, 1228:22,
1233:20, 1269:6,
1269:15, 1281:20
**secondly** [1] - 1153:3
**Section** [11] - 1135:24,
1161:1, 1161:16,
1161:25, 1162:3,
1162:5, 1162:10,
1162:11, 1162:12
**section** [32] - 1084:6,
1084:10, 1096:15,
1096:17, 1101:6,
1115:17, 1115:20,
1127:7, 1128:6,
1143:11, 1148:12,
1150:1, 1159:19,
1159:22, 1160:24,
1161:9, 1161:11,
1162:1, 1162:13,
1171:6, 1171:17,
1172:23, 1181:9,
1185:25, 1187:9,
1234:25, 1241:17,
1241:18, 1251:14,
1252:3
**sections** [5] - 1080:8,
1091:4, 1161:15,
1161:18, 1161:22
**sector** [2] - 1119:15,
1145:12

**security** [1] - 1182:24
**security@**
**riministreet.com** [9]
- 1180:19, 1180:23,
1181:13, 1181:18,
1181:20, 1182:11,
1183:21, 1259:1,
1259:11
**see** [165] - 1072:9,
1076:13, 1083:25,
1086:5, 1086:7,
1091:5, 1091:11,
1091:14, 1091:15,
1094:12, 1094:14,
1096:8, 1096:10,
1097:2, 1097:8,
1097:22, 1098:16,
1099:11, 1099:12,
1099:15, 1099:18,
1099:19, 1101:11,
1103:12, 1103:20,
1105:23, 1106:6,
1106:13, 1107:9,
1107:12, 1112:6,
1112:9, 1117:7,
1123:5, 1128:16,
1142:17, 1150:12,
1151:18, 1153:23,
1157:25, 1159:20,
1161:3, 1161:15,
1165:17, 1171:7,
1171:14, 1171:17,
1171:19, 1172:7,
1172:19, 1172:22,
1173:7, 1173:13,
1178:10, 1178:17,
1178:23, 1179:3,
1180:3, 1180:7,
1181:15, 1181:21,
1181:23, 1182:15,
1184:24, 1185:7,
1185:14, 1185:18,
1186:24, 1186:25,
1187:2, 1187:9,
1187:16, 1187:17,
1187:18, 1187:21,
1187:24, 1188:2,
1188:4, 1188:7,
1188:12, 1188:13,
1190:1, 1190:4,
1190:9, 1191:8,
1194:16, 1194:19,
1203:10, 1205:12,
1205:15, 1205:21,
1206:3, 1206:7,
1206:8, 1207:13,
1209:8, 1215:12,
1215:13, 1216:5,
1216:24, 1218:6,
1218:24, 1219:13,
1219:17, 1220:8,

1220:20, 1220:24,
1221:17, 1221:19,
1221:24, 1221:25,
1223:5, 1223:13,
1226:8, 1228:22,
1229:2, 1229:23,
1231:14, 1231:17,
1233:14, 1233:22,
1234:7, 1237:6,
1237:20, 1239:6,
1239:13, 1240:4,
1240:19, 1240:21,
1241:15, 1241:16,
1242:2, 1242:15,
1242:16, 1244:4,
1244:18, 1245:7,
1245:9, 1245:13,
1245:21, 1246:6,
1247:19, 1248:7,
1248:11, 1248:23,
1248:25, 1249:6,
1249:7, 1249:12,
1249:17, 1250:2,
1254:24, 1256:17,
1257:3, 1258:12,
1259:25, 1279:20,
1281:5, 1284:4,
1287:5
**seeing** [5] - 1178:12,
1185:13, 1188:21,
1204:1, 1280:22
**seek** [2] - 1191:8,
1231:15
**seem** [1] - 1141:17
**sees** [1] - 1222:12
**select** [1] - 1173:8
**sell** [2] - 1268:9,
1277:1
**selling** [2] - 1267:21,
1268:5
**semiretired** [2] -
1265:1, 1265:3
**send** [7] - 1166:1,
1173:3, 1176:5,
1176:6, 1176:8,
1181:24
**sending** [1] - 1173:5
**Senior** [7] - 1120:8,
1120:9, 1121:8,
1197:9, 1203:21,
1204:23, 1263:7
**senior** [3] - 1206:23,
1268:11, 1269:13
**SENIOR** [1] - 1071:2
**sense** [6] - 1121:5,
1126:8, 1144:8,
1192:24, 1193:5,
1287:20
**sent** [7] - 1158:14,
1173:9, 1180:11,

1180:14, 1207:1, 1219:4, 1226:5

**sentence** [5] - 1135:22, 1166:5, 1166:7, 1207:7, 1239:8

**separate** [9] - 1122:5, 1122:6, 1125:5, 1154:6, 1158:14, 1181:19, 1194:16, 1194:18

**separately** [1] - 1125:4

**September** [2] - 1071:6, 1288:8

**SEPTEMBER** [2] - 1072:1, 1175:1

**sequel** [2] - 1115:14, 1115:21

**sequences** [1] - 1095:8

**series** [1] - 1128:15

**seriously** [1] - 1195:11

**serve** [1] - 1098:25

**server** [7] - 1179:16, 1179:22, 1179:25, 1180:6, 1189:2, 1279:1, 1279:5

**serves** [2] - 1177:6, 1184:17

**service** [12] - 1108:24, 1120:13, 1122:5, 1122:6, 1137:19, 1139:2, 1169:11, 1184:19, 1195:15, 1213:20, 1214:5, 1265:16

**Service** [1] - 1200:7

**services** [17] - 1087:4, 1120:11, 1121:9, 1130:3, 1137:15, 1139:8, 1145:12, 1148:11, 1148:25, 1178:5, 1178:20, 1200:15, 1203:22, 1210:15, 1214:9, 1230:24, 1274:4

**Services** [1] - 1121:12

**session** [2] - 1168:8, 1217:9

**set** [5] - 1217:3, 1237:10, 1284:25, 1285:1

**setenv.sqc** [1] - 1110:15

**Seth** [2] - 1214:21, 1226:5

**setting** [2] - 1262:12, 1262:13

**setup** [2] - 1125:5, 1166:23

**seven** [6] - 1073:6, 1082:7, 1085:22, 1227:3, 1271:21, 1281:25

**seventies** [1] - 1278:23

**seventy** [1] - 1080:24

**seventy-five** [1] - 1080:24

**several** [6] - 1073:25, 1120:6, 1267:9, 1267:12, 1268:15, 1271:14

**shall** [7] - 1104:25, 1107:16, 1107:20, 1136:13, 1144:15, 1150:8, 1150:9

**shape** [1] - 1283:11

**shaped** [1] - 1283:5

**share** [5] - 1158:9, 1162:7, 1173:20, 1174:12, 1191:15

**shared** [5] - 1179:17, 1182:4, 1194:20, 1212:19

**Sharon** [1] - 1071:16

**shifting** [2] - 1095:20, 1156:22

**ship** [1] - 1144:15

**shipped** [15] - 1129:16, 1129:17, 1129:25, 1132:4, 1132:6, 1133:23, 1144:11, 1149:21, 1195:22, 1236:9, 1250:6, 1250:11, 1250:19, 1262:9

**shortens** [1] - 1192:2

**shortly** [2] - 1158:15, 1214:12

**shoulder** [32] - 1138:7, 1138:10, 1138:14, 1138:22, 1138:23, 1138:25, 1139:9, 1140:13, 1140:18, 1140:19, 1140:21, 1141:5, 1141:8, 1213:16, 1213:21, 1214:6, 1214:25, 1215:6, 1215:24, 1216:16, 1217:8, 1217:15, 1218:2, 1218:16, 1218:18, 1218:20, 1219:16, 1220:15, 1220:23, 1221:1, 1221:4, 1222:20

**show** [14] - 1072:5,

1076:22, 1102:21, 1118:11, 1125:24, 1126:17, 1143:6, 1167:22, 1175:5, 1184:4, 1185:4, 1248:15, 1260:10, 1261:7

**showed** [2] - 1173:17, 1232:12

**showing** [3] - 1135:15, 1172:4, 1172:17

**shown** [3] - 1168:7, 1190:8, 1261:7

**shows** [1] - 1190:3

**sic** [2] - 1100:7, 1217:24

**sic]** [1] - 1093:3

**side** [8] - 1182:18, 1182:19, 1252:14, 1252:15, 1273:2, 1278:16

**side-by-side** [2] - 1273:2, 1278:16

**Siebel** [1] - 1266:4

**Siebold** [2] - 1120:2, 1160:5

**Sign** [3] - 1158:15, 1158:21, 1159:1

**significant** [3] - 1270:18, 1273:17, 1281:10

**similar** [19] - 1074:15, 1077:13, 1078:12, 1079:1, 1084:16, 1084:20, 1085:8, 1085:20, 1089:22, 1090:6, 1090:18, 1091:4, 1091:18, 1133:14, 1133:16, 1157:9, 1157:12, 1186:25, 1252:24

**similarities** [1] - 1091:1

**similarity** [5] - 1074:9, 1075:13, 1076:16, 1079:19, 1091:2

**simple** [4] - 1121:17, 1124:23, 1139:5, 1155:5

**simpler** [1] - 1095:14

**simplest** [1] - 1282:15

**simply** [8] - 1116:15, 1132:1, 1138:8, 1148:17, 1155:18, 1155:24, 1251:13, 1261:19

**single** [2] - 1199:4, 1235:24

**sit** [5] - 1133:5,

1227:5, 1234:15, 1235:22, 1270:5

**sitting** [6] - 1112:17, 1116:2, 1116:13, 1116:21, 1276:21, 1278:17

**situation** [8] - 1092:6, 1110:4, 1112:15, 1116:5, 1155:13, 1180:19, 1180:25, 1200:1

**situations** [2] - 1127:20, 1285:18

**six** [1] - 1193:8

**size** [2] - 1278:8, 1283:6

**sized** [3] - 1277:22, 1278:2, 1278:10

**skill** [1] - 1137:8

**skilled** [1] - 1125:23

**skills** [1] - 1137:6

**slide** [26] - 1074:1, 1074:2, 1074:18, 1089:2, 1089:3, 1089:12, 1165:20, 1167:20, 1167:21, 1167:22, 1168:7, 1205:7, 1205:9, 1208:12, 1213:3, 1266:13, 1267:3, 1274:17, 1274:20, 1275:12, 1275:14, 1280:4, 1282:12, 1282:14

**slides** [2] - 1073:23, 1089:14

**slow** [2] - 1201:2, 1207:23

**slowly** [1] - 1106:19

**small** [8] - 1090:20, 1090:23, 1091:20, 1092:8, 1122:19, 1277:21, 1278:10

**Smith** [2] - 1071:14, 1071:16

**snippets** [1] - 1127:13

**so-called** [1] - 1097:18

**Software** [2] - 1241:14, 1241:16

**software** [175] - 1078:13, 1079:22, 1081:25, 1083:10, 1088:24, 1092:12, 1092:16, 1092:17, 1092:25, 1093:21, 1094:7, 1094:18, 1095:14, 1097:24, 1104:8, 1108:6, 1109:4, 1109:5,

1116:23, 1117:2, 1117:3, 1121:2, 1121:5, 1121:10, 1121:16, 1122:8, 1122:14, 1122:15, 1127:18, 1127:25, 1128:17, 1129:1, 1129:24, 1130:18, 1130:20, 1130:24, 1131:1, 1131:6, 1132:11, 1132:12, 1132:14, 1132:24, 1133:3, 1133:5, 1133:8, 1133:9, 1133:13, 1134:9, 1136:2, 1136:14, 1136:17, 1141:14, 1143:16, 1143:21, 1144:9, 1145:2, 1146:2, 1146:6, 1147:8, 1148:4, 1148:6, 1149:1, 1149:12, 1149:21, 1150:10, 1150:11, 1150:14, 1150:19, 1151:9, 1152:8, 1156:1, 1161:5, 1161:10, 1161:14, 1162:2, 1162:8, 1165:23, 1171:12, 1174:1, 1193:3, 1199:9, 1199:22, 1200:2, 1201:1, 1201:10, 1202:16, 1203:9, 1203:22, 1203:24, 1204:3, 1204:9, 1204:24, 1205:2, 1206:11, 1207:10, 1214:24, 1225:10, 1230:2, 1230:6, 1230:18, 1231:4, 1233:5, 1233:7, 1233:12, 1233:21, 1233:25, 1234:3, 1234:4, 1234:10, 1235:4, 1235:9, 1236:15, 1238:2, 1238:3, 1240:9, 1240:10, 1240:11, 1244:1, 1244:19, 1245:3, 1253:1, 1253:15, 1254:7, 1254:9, 1261:21, 1262:6, 1262:15, 1265:12, 1265:19, 1266:2, 1270:8, 1270:10, 1270:12, 1270:15, 1271:4, 1271:9, 1271:23, 1272:1, 1272:4, 1272:5,

1272:10, 1272:12, 1272:14, 1272:15, 1272:18, 1272:23, 1274:14, 1274:25, 1275:25, 1276:5, 1276:10, 1276:19, 1276:24, 1277:2, 1277:6, 1277:7, 1279:13, 1279:15, 1280:7, 1280:10, 1280:13, 1280:14, 1281:4, 1282:19, 1283:5, 1284:1, 1284:2, 1284:5, 1284:8, 1284:13, 1284:14, 1284:21, 1285:11, 1285:18

**solely** [1] - 1199:3

**solution** [11] - 1125:9, 1125:18, 1126:7, 1126:16, 1131:8, 1131:20, 1155:6, 1156:16, 1156:18, 1192:18, 1271:4

**solutions** [6] - 1131:4, 1161:7, 1234:4, 1244:8, 1263:12, 1269:4

**solve** [3] - 1122:1, 1124:21, 1208:17

**solving** [1] - 1228:17

**someone** [4] - 1085:12, 1170:18, 1202:4, 1235:23

**sometime** [1] - 1186:12

**sometimes** [14] - 1083:14, 1095:20, 1113:18, 1127:4, 1130:13, 1131:4, 1131:19, 1138:7, 1141:11, 1198:13, 1208:17, 1209:19, 1213:2, 1251:11

**somewhat** [1] - 1152:20

**somewhere** [2] - 1179:16, 1179:24

**Sons** [1] - 1189:15

**Sorry** [2] - 1198:1, 1256:7

**sorry** [34] - 1080:23, 1094:1, 1098:14, 1105:24, 1107:8, 1109:19, 1109:20, 1115:15, 1115:20, 1136:19, 1143:25, 1172:2, 1175:10, 1180:22, 1189:23, 1196:11, 1201:2,

1207:22, 1225:12, 1229:15, 1235:5, 1240:20, 1241:17, 1243:15, 1243:23, 1248:22, 1249:9, 1249:13, 1249:14, 1250:8, 1250:10, 1258:16, 1261:23

**sort** [14] - 1123:5, 1124:17, 1142:3, 1143:4, 1151:2, 1154:5, 1192:20, 1206:18, 1266:21, 1277:13, 1279:16, 1281:20, 1282:2, 1282:22

**sought** [1] - 1232:2

**sounds** [3] - 1085:23, 1114:5, 1264:7

**soup** [1] - 1266:18

**source** [103] - 1072:24, 1097:20, 1097:24, 1098:20, 1098:23, 1101:3, 1113:25, 1134:9, 1150:10, 1152:15, 1152:16, 1152:18, 1152:19, 1154:13, 1155:21, 1155:24, 1156:3, 1191:9, 1199:9, 1199:11, 1199:22, 1200:2, 1202:16, 1202:20, 1205:10, 1205:11, 1205:14, 1205:18, 1205:23, 1206:6, 1207:15, 1208:6, 1208:21, 1209:6, 1210:16, 1213:20, 1213:23, 1214:5, 1214:7, 1218:3, 1218:4, 1218:8, 1219:16, 1221:23, 1223:9, 1223:22, 1224:18, 1230:18, 1230:19, 1231:4, 1232:3, 1234:2, 1236:22, 1236:24, 1237:9, 1240:6, 1241:25, 1242:14, 1242:18, 1242:19, 1243:2, 1244:3, 1244:6, 1244:11, 1244:13, 1245:19, 1245:23, 1246:1, 1246:5, 1246:7, 1246:9, 1246:15, 1246:19, 1246:21, 1246:23, 1247:7, 1247:8, 1247:10,

1247:11, 1249:16, 1249:23, 1250:1, 1250:16, 1250:19, 1262:12, 1262:16, 1263:12, 1272:15, 1272:23, 1274:25, 1275:4, 1280:7, 1285:9, 1285:10, 1285:21, 1287:6, 1287:7, 1287:9, 1287:11, 1287:16

**Source** [1] - 1237:6

**South** [1] - 1071:24

**space** [9] - 1082:2, 1082:6, 1082:7, 1082:9, 1083:10, 1144:10, 1177:25, 1238:6, 1239:21

**spaces** [3] - 1081:24, 1083:17, 1287:6

**spacing** [5] - 1073:24, 1074:17, 1077:4, 1083:11, 1083:14

**speaking** [3] - 1077:13, 1080:21, 1275:2

**speaks** [1] - 1133:7

**Spear** [2] - 1179:12, 1179:21

**SpearMC** [11] - 1176:9, 1176:11, 1176:15, 1178:16, 1178:19, 1178:22, 1179:7, 1179:15, 1179:23, 1180:4, 1281:21

**spearmc.com** [2] - 1178:24, 1180:9

**spec** [9] - 1095:20, 1095:23, 1096:3, 1097:18, 1098:15, 1099:1, 1099:3, 1099:10, 1099:12

**specialist** [2] - 1126:1, 1127:3

**specialists** [2] - 1124:4, 1124:12

**specific** [24] - 1082:18, 1104:18, 1105:1, 1107:17, 1107:20, 1123:21, 1124:1, 1125:17, 1126:16, 1134:18, 1143:3, 1143:4, 1162:25, 1163:25, 1193:9, 1199:20, 1222:14, 1223:25, 1261:17, 1261:18, 1272:18, 1282:4, 1283:11, 1285:3

**specifically** [31] - 1078:3, 1124:6, 1134:20, 1135:1, 1149:25, 1151:16, 1159:2, 1160:16, 1161:7, 1163:7, 1169:11, 1180:25, 1184:19, 1197:25, 1203:1, 1241:14, 1245:15, 1251:19, 1251:20, 1253:3, 1253:21, 1261:23, 1265:18, 1266:11, 1267:8, 1267:19, 1271:25, 1272:11, 1273:23, 1287:1, 1287:14

**specification** [15] - 1124:20, 1125:19, 1125:20, 1125:21, 1126:5, 1126:6, 1126:10, 1126:11, 1126:12, 1126:14, 1126:20, 1126:23, 1251:6, 1252:7

**specifications** [4] - 1251:3, 1251:16, 1252:5, 1281:2

**specifics** [2] - 1157:16, 1182:13

**specs** [1] - 1099:6

**speeches** [1] - 1086:22

**speed** [1] - 1279:12

**spending** [2] - 1142:5, 1199:25

**spent** [6] - 1119:11, 1193:14, 1193:15, 1199:7, 1199:21, 1269:2

**Spinnaker** [2] - 1263:10, 1281:17

**Spinnaker's** [1] - 1263:10

**spoken** [1] - 1243:19

**spreadsheet** [3] - 1172:4, 1173:17, 1173:19

**SQC** [3] - 1110:11, 1113:24, 1114:3

**SQL** [2] - 1083:24, 1115:15

**SQR** [12] - 1100:6, 1100:9, 1101:2, 1101:18, 1110:7, 1111:1, 1111:7, 1116:13, 1116:21, 1189:6, 1189:7, 1189:8

**square** [1] - 1256:16

**stable** [1] - 1271:16

**staff** [1] - 1187:10

**stage** [4] - 1152:12, 1183:4, 1280:10, 1280:12

**stakeholders** [1] - 1192:18

**stand** [6] - 1085:10, 1118:16, 1138:16, 1206:20, 1225:6, 1280:13

**standard** [10] - 1095:6, 1177:5, 1204:14, 1235:2, 1235:7, 1236:5, 1236:11, 1236:17, 1236:19, 1253:12

**standpoint** [3] - 1139:14, 1270:13, 1283:3

**stands** [1] - 1240:17

**start** [14] - 1106:19, 1109:20, 1118:3, 1125:12, 1125:13, 1125:14, 1125:16, 1127:7, 1164:3, 1168:21, 1253:19, 1260:24, 1264:6, 1280:2

**started** [7] - 1101:8, 1265:4, 1267:4, 1267:19, 1278:9, 1278:13, 1278:20

**starter** [2] - 1283:10, 1283:11

**state** [8] - 1112:3, 1118:19, 1155:8, 1198:23, 1214:18, 1234:15, 1252:19, 1264:10

**statement** [13] - 1098:2, 1110:16, 1110:19, 1111:10, 1112:21, 1117:6, 1117:9, 1161:19, 1208:22, 1209:10, 1226:14, 1232:10, 1235:10

**statements** [12] - 1094:23, 1095:9, 1095:11, 1110:9, 1110:11, 1111:1, 1112:10, 1114:3, 1117:3, 1237:10, 1237:14, 1237:18

**states** [5] - 1135:24, 1155:7, 1162:6, 1242:8, 1247:10

**STATES** [1] - 1071:1

**stating** [1] - 1217:23

**stay** [3] - 1131:21, 1137:9, 1227:18
**steer** [1] - 1286:2
**steering** [1] - 1170:7
**step** [12] - 1128:14, 1138:1, 1139:15, 1139:18, 1141:1, 1166:21, 1210:21, 1211:14, 1214:12, 1221:7, 1224:4, 1222:23
**STEPHEN** [1] - 1264:8
**Stephen** [1] - 1289:11
**stepping** [2] - 1117:2, 1199:25
**steps** [6] - 1128:15, 1163:18, 1163:21, 1183:15, 1232:18, 1257:9
**Steven** [1] - 1264:12
**stick** [1] - 1232:21
**still** [6] - 1090:14, 1173:23, 1218:4, 1249:9, 1278:21, 1279:24
**stood** [1] - 1133:11
**stop** [3] - 1215:15, 1260:12, 1283:13
**stopping** [1] - 1174:16
**stored** [3] - 1169:12, 1191:3, 1205:10
**story** [1] - 1209:5
**straightforward** [1] - 1161:20
**strategies** [1] - 1283:8
**strategy** [1] - 1266:14
**Street** [160] - 1071:24, 1119:4, 1119:5, 1119:8, 1119:9, 1119:21, 1121:9, 1121:15, 1121:20, 1122:17, 1125:21, 1126:14, 1126:22, 1127:3, 1127:23, 1128:20, 1129:8, 1130:4, 1134:7, 1134:13, 1134:14, 1134:24, 1135:7, 1136:3, 1136:8, 1136:13, 1136:23, 1137:5, 1137:7, 1137:8, 1137:14, 1140:3, 1142:10, 1144:16, 1145:18, 1146:14, 1146:22, 1147:12, 1147:21, 1148:15, 1148:19, 1150:8, 1150:9, 1150:14, 1150:16, 1150:19, 1150:21,

1157:10, 1158:7, 1162:12, 1162:15, 1163:23, 1164:4, 1165:7, 1165:9, 1166:2, 1166:3, 1166:4, 1167:11, 1168:2, 1168:23, 1168:24, 1168:25, 1169:3, 1169:7, 1169:9, 1170:2, 1170:4, 1170:6, 1170:7, 1170:8, 1170:10, 1170:14, 1170:17, 1170:19, 1170:21, 1170:22, 1171:18, 1171:20, 1172:7, 1172:9, 1172:17, 1172:19, 1173:6, 1174:2, 1178:15, 1179:4, 1179:23, 1181:15, 1182:1, 1182:2, 1182:3, 1182:5, 1182:17, 1182:19, 1182:20, 1183:10, 1183:14, 1183:16, 1184:15, 1184:17, 1185:8, 1185:16, 1185:17, 1185:18, 1186:3, 1187:6, 1187:25, 1188:6, 1191:16, 1192:7, 1193:21, 1193:23, 1195:4, 1195:7, 1195:25, 1197:10, 1198:8, 1198:9, 1198:11, 1198:23, 1202:9, 1203:9, 1204:14, 1206:14, 1207:2, 1208:20, 1210:17, 1211:20, 1213:6, 1214:8, 1214:16, 1214:18, 1215:2, 1218:15, 1220:1, 1220:12, 1220:14, 1221:11, 1222:18, 1224:11, 1230:11, 1233:6, 1233:13, 1241:24, 1242:13, 1251:9, 1252:12, 1252:15, 1253:3, 1253:4, 1253:9, 1253:24, 1258:17, 1258:24, 1259:9, 1261:3, 1273:10
**STREET** [1] - 1071:7
**Street's** [10] - 1143:7, 1153:5, 1167:21, 1206:21, 1206:22, 1210:9, 1210:13,

1220:11, 1222:2, 1252:6
**Street-generated** [1] - 1253:4
**strike** [1] - 1232:6
**struck** [1] - 1150:9
**structure** [3] - 1133:14, 1133:16, 1241:8
**students** [2] - 1093:8, 1264:25
**stuff** [2] - 1277:13, 1284:15
**subject** [4] - 1085:5, 1093:7, 1220:19, 1260:3
**submit** [7] - 1171:22, 1172:24, 1173:1, 1173:6, 1173:10, 1173:13, 1173:16
**submitted** [1] - 1255:13
**subsequently** [1] - 1182:9
**subset** [2] - 1088:8, 1088:11
**substantial** [6] - 1074:9, 1075:12, 1076:16, 1079:19, 1091:1, 1091:2
**substantially** [12] - 1074:15, 1077:13, 1078:12, 1079:1, 1084:16, 1084:20, 1085:8, 1089:21, 1090:6, 1090:18, 1091:4, 1091:18
**success** [1] - 1133:6
**successful** [3] - 1133:6, 1133:19, 1269:2
**suggested** [3] - 1253:18, 1253:20, 1254:5
**suggesting** [1] - 1238:15
**suggestion** [2] - 1138:18, 1224:8
**Suite** [4] - 1119:22, 1123:10, 1133:15, 1266:8
**Suites** [1] - 1281:22
**summary** [1] - 1280:3
**supervise** [1] - 1200:13
**supplied** [1] - 1095:15
**support** [121] - 1086:12, 1109:4, 1109:5, 1119:11, 1119:24, 1120:11,

1120:13, 1120:23, 1121:16, 1121:25, 1127:10, 1129:22, 1129:23, 1130:1, 1130:3, 1130:5, 1130:8, 1130:12, 1130:24, 1131:10, 1136:17, 1136:21, 1136:23, 1137:2, 1137:3, 1137:7, 1138:8, 1138:22, 1148:3, 1148:15, 1149:7, 1149:10, 1149:17, 1151:21, 1152:4, 1152:5, 1153:12, 1153:15, 1153:21, 1154:5, 1155:2, 1156:10, 1161:12, 1164:20, 1165:8, 1166:11, 1166:13, 1166:16, 1168:1, 1168:3, 1168:5, 1169:3, 1169:19, 1172:13, 1172:16, 1173:4, 1173:20, 1176:1, 1176:12, 1176:14, 1178:19, 1178:24, 1188:17, 1188:18, 1190:13, 1193:24, 1196:9, 1196:10, 1200:10, 1200:22, 1201:18, 1203:22, 1209:18, 1209:20, 1210:14, 1215:7, 1215:9, 1216:17, 1216:23, 1222:22, 1224:7, 1224:9, 1228:7, 1228:10, 1228:25, 1229:5, 1229:8, 1229:10, 1230:16, 1235:16, 1235:25, 1236:5, 1236:12, 1236:14, 1236:15, 1238:2, 1238:3, 1238:6, 1239:21, 1240:22, 1241:5, 1263:9, 1267:15, 1268:17, 1271:15, 1271:19, 1271:20, 1271:22, 1275:8, 1275:22, 1276:10, 1278:3, 1281:10, 1281:16, 1281:18, 1281:22, 1284:22
**Support** [24] - 1119:23, 1120:8, 1120:10, 1121:9, 1121:12, 1121:14, 1121:20, 1122:5,

1142:22, 1151:25, 1153:14, 1164:11, 1178:13, 1180:9, 1186:3, 1197:9, 1203:21, 1204:23, 1240:17, 1258:4, 1258:19, 1258:24, 1263:7, 1281:17
**supported** [1] - 1166:8
**supporter** [1] - 1192:22
**supporting** [6] - 1127:11, 1143:16, 1145:24, 1148:5, 1152:12, 1276:18
**supports** [1] - 1281:15
**supposed** [2] - 1180:16, 1286:12
**surprise** [1] - 1238:5
**sustain** [1] - 1257:19
**sustained** [12] - 1145:5, 1146:10, 1147:10, 1148:1, 1153:10, 1156:6, 1159:6, 1177:11, 1177:17, 1207:5, 1213:12, 1231:9
**sweeping** [1] - 1275:4
**switching** [1] - 1100:16
**sworn** [3] - 1072:17, 1118:18, 1264:9
**Syed** [1] - 1179:3
**syntax** [1] - 1114:25
**System** [1] - 1278:9
**system** [85] - 1092:3, 1110:21, 1116:2, 1116:17, 1116:22, 1117:15, 1121:17, 1124:24, 1125:6, 1125:10, 1125:11, 1130:14, 1131:16, 1131:17, 1131:25, 1132:16, 1144:10, 1145:16, 1148:13, 1148:22, 1152:6, 1154:6, 1156:2, 1156:16, 1156:19, 1159:1, 1169:4, 1169:8, 1169:10, 1169:12, 1169:18, 1169:19, 1169:21, 1170:1, 1170:9, 1170:19, 1174:2, 1182:5, 1182:21, 1183:18, 1184:13, 1184:17, 1184:18, 1185:17, 1189:3, 1189:18, 1191:16,

1192:10, 1192:11,
1192:14, 1193:4,
1193:7, 1193:9,
1193:13, 1194:19,
1215:25, 1216:4,
1216:18, 1217:6,
1217:13, 1217:17,
1217:18, 1217:19,
1241:9, 1251:18,
1251:19, 1251:24,
1252:10, 1252:22,
1252:23, 1253:12,
1253:25, 1254:10,
1254:12, 1254:14,
1255:4, 1271:7,
1271:13, 1282:23,
1285:22, 1287:8

**system's** [1] - 1128:1
**Systems** [3] -
   1177:22, 1177:23,
   1177:24
**systems** [38] - 1073:3,
   1100:7, 1116:14,
   1119:13, 1119:15,
   1129:5, 1130:10,
   1130:17, 1130:21,
   1137:17, 1138:4,
   1145:16, 1148:12,
   1148:18, 1148:24,
   1149:6, 1154:19,
   1154:20, 1164:3,
   1170:15, 1177:24,
   1178:3, 1181:22,
   1181:23, 1185:11,
   1190:19, 1192:25,
   1193:25, 1252:15,
   1253:10, 1253:19,
   1254:6, 1267:10,
   1273:24, 1274:1,
   1279:9, 1279:10,
   1281:18

**T**

**tab** [16] - 1082:7,
   1135:14, 1142:14,
   1149:24, 1151:14,
   1157:22, 1164:9,
   1167:6, 1170:13,
   1172:1, 1178:7,
   1184:5, 1189:11,
   1256:11, 1257:22,
   1257:24
**table** [2] - 1257:1,
   1257:10
**tailor** [3] - 1132:23,
   1193:8, 1276:5
**tailoring** [2] - 1130:11,
   1272:18
**talks** [1] - 1135:1

**tank** [1] - 1279:17
**tax** [31] - 1100:2,
   1100:4, 1100:14,
   1100:19, 1100:22,
   1101:8, 1122:12,
   1122:13, 1122:25,
   1123:3, 1123:22,
   1125:22, 1128:9,
   1128:23, 1128:24,
   1129:21, 1137:11,
   1137:13, 1137:14,
   1140:24, 1150:21,
   1153:6, 1153:17,
   1153:19, 1153:21,
   1154:1, 1154:2,
   1154:6, 1209:20,
   1218:21, 1249:5
**TAX920** [1] - 1256:24
**Tax920us.txt** [1] -
   1185:5
**tax920us.txt** [2] -
   1185:9, 1185:10
**tax921.txt** [1] - 1188:1
**tax921us.txt** [1] -
   1187:21
**tax922us.text** [1] -
   1188:5
**tax922us.txt** [3] -
   1187:1, 1187:21,
   1188:5
**taxation** [1] - 1122:22
**team** [98] - 1121:21,
   1121:25, 1124:3,
   1124:7, 1124:8,
   1124:9, 1124:10,
   1124:18, 1125:22,
   1125:23, 1126:8,
   1127:9, 1127:10,
   1128:3, 1128:9,
   1128:12, 1129:9,
   1138:12, 1138:13,
   1142:24, 1143:6,
   1147:21, 1147:25,
   1151:22, 1152:5,
   1153:14, 1154:1,
   1154:5, 1156:15,
   1157:10, 1157:16,
   1158:10, 1159:1,
   1159:5, 1159:10,
   1159:14, 1159:16,
   1161:20, 1163:5,
   1163:7, 1168:17,
   1174:8, 1174:11,
   1177:22, 1179:15,
   1179:24, 1180:4,
   1182:14, 1183:21,
   1184:2, 1186:2,
   1186:3, 1186:4,
   1188:8, 1188:18,
   1190:11, 1190:13,

1190:16, 1190:25,
1191:1, 1191:25,
1192:17, 1192:20,
1194:9, 1194:15,
1194:16, 1194:18,
1196:2, 1196:4,
1196:10, 1197:10,
1198:25, 1200:15,
1202:6, 1208:23,
1209:18, 1216:22,
1216:23, 1216:25,
1217:7, 1217:12,
1224:9, 1224:10,
1229:25, 1231:24,
1232:5, 1236:8,
1236:15, 1238:10,
1244:1, 1246:2,
1259:10, 1259:14,
1259:20, 1272:8,
1273:1
**Team** [2] - 1123:25,
   1124:2
**team's** [1] - 1125:1
**teamed** [1] - 1278:6
**teams** [14] - 1143:2,
   1145:8, 1145:19,
   1146:22, 1157:5,
   1159:25, 1160:4,
   1160:5, 1160:6,
   1270:9, 1272:11,
   1272:24, 1282:7,
   1286:10
**Tech** [1] - 1149:5
**tech** [10] - 1095:20,
   1095:23, 1096:3,
   1097:18, 1098:15,
   1099:1, 1099:2,
   1099:6, 1099:10,
   1099:12
**technical** [27] -
   1090:7, 1124:20,
   1125:19, 1125:20,
   1125:21, 1126:5,
   1126:6, 1126:10,
   1126:11, 1126:12,
   1126:14, 1126:20,
   1126:23, 1159:23,
   1206:1, 1209:12,
   1209:15, 1209:17,
   1249:22, 1251:3,
   1251:6, 1251:16,
   1252:5, 1252:7,
   1281:2, 1281:6
**technically** [1] -
   1134:2
**technique'** [1] -
   1218:2
**technologies** [2] -
   1265:23, 1268:15
**Technology** [1] -

1119:23
**technology** [17] -
   1191:19, 1192:9,
   1265:6, 1265:9,
   1265:11, 1265:24,
   1266:9, 1267:6,
   1267:14, 1268:15,
   1268:21, 1269:11,
   1277:20, 1278:25,
   1279:2, 1282:8
**telephone** [2] -
   1169:1, 1174:11
**ten** [2] - 1121:22,
   1122:1
**ten-minute** [1] -
   1121:22
**tenure** [1] - 1267:16
**term** [13] - 1110:14,
   1152:16, 1152:21,
   1236:24, 1238:24,
   1244:14, 1249:24,
   1262:12, 1262:13,
   1286:11, 1287:11,
   1287:16
**termination** [1] -
   1195:3
**terminology** [2] -
   1082:17, 1112:17
**Terms** [6] - 1245:14,
   1245:15, 1245:23,
   1246:5, 1261:11,
   1261:15
**terms** [38] - 1075:24,
   1079:13, 1079:20,
   1103:23, 1124:14,
   1136:4, 1136:5,
   1136:7, 1229:19,
   1232:18, 1234:13,
   1237:22, 1238:4,
   1238:17, 1240:2,
   1247:4, 1247:6,
   1247:19, 1247:20,
   1248:5, 1248:9,
   1260:21, 1260:24,
   1261:1, 1261:14,
   1261:17, 1261:18,
   1261:19, 1265:15,
   1266:21, 1268:1,
   1269:7, 1275:15,
   1286:4, 1286:5,
   1286:7, 1287:1
**test** [9] - 1128:9,
   1128:12, 1128:15,
   1133:11, 1150:14,
   1150:19, 1193:11,
   1271:11, 1280:15
**testified** [37] -
   1072:17, 1073:18,
   1081:2, 1118:18,
   1146:15, 1172:5,

1184:8, 1185:10,
1189:13, 1191:14,
1199:7, 1200:20,
1203:20, 1204:5,
1204:22, 1204:24,
1214:11, 1214:22,
1218:15, 1220:10,
1221:14, 1222:17,
1227:24, 1232:7,
1232:11, 1244:20,
1246:8, 1250:23,
1251:2, 1254:23,
1255:10, 1256:4,
1257:14, 1258:3,
1262:4, 1263:8,
1264:9
**testify** [9] - 1146:8,
   1159:5, 1159:15,
   1159:16, 1201:17,
   1201:22, 1205:1,
   1236:2, 1255:1
**testifying** [3] - 1133:5,
   1159:14, 1213:15
**testimony** [53] -
   1073:13, 1073:18,
   1075:14, 1075:24,
   1076:23, 1076:24,
   1078:10, 1078:22,
   1079:20, 1083:16,
   1084:12, 1085:21,
   1088:16, 1089:13,
   1090:17, 1090:22,
   1090:25, 1093:8,
   1093:20, 1096:2,
   1102:4, 1103:11,
   1104:1, 1104:14,
   1105:9, 1114:25,
   1116:24, 1117:4,
   1117:21, 1118:5,
   1136:25, 1147:24,
   1199:20, 1209:17,
   1213:17, 1215:3,
   1224:3, 1228:3,
   1228:9, 1231:1,
   1232:14, 1239:25,
   1246:11, 1250:7,
   1251:3, 1251:7,
   1253:9, 1256:6,
   1262:23, 1263:6,
   1263:14, 1263:18
**testing** [8] - 1128:18,
   1128:20, 1143:21,
   1150:11, 1151:8,
   1230:2, 1230:6,
   1280:16
**Texas** [3] - 1119:4,
   1273:7, 1273:8
**text** [5] - 1116:15,
   1136:10, 1136:12,
   1165:19, 1171:20

**textbook** [1] - 1112:11
**THE** [109] - 1071:2,
1071:14, 1071:19,
1072:4, 1072:15,
1095:25, 1098:10,
1105:16, 1105:18,
1105:20, 1105:24,
1106:2, 1106:9,
1106:11, 1109:19,
1112:2, 1113:10,
1113:17, 1113:21,
1114:9, 1114:12,
1117:18, 1117:20,
1117:23, 1118:1,
1118:4, 1118:10,
1118:19, 1118:21,
1118:23, 1118:25,
1145:5, 1146:10,
1146:17, 1147:1,
1147:5, 1147:10,
1147:17, 1148:1,
1153:10, 1156:6,
1159:6, 1159:15,
1164:17, 1165:13,
1167:16, 1171:2,
1174:18, 1175:4,
1175:10, 1177:1,
1177:11, 1177:17,
1196:18, 1196:21,
1196:23, 1197:1,
1197:6, 1198:3,
1201:24, 1201:25,
1202:3, 1203:13,
1203:16, 1205:3,
1207:5, 1207:22,
1210:4, 1212:1,
1212:6, 1213:12,
1215:18, 1219:10,
1222:4, 1222:13,
1223:11, 1223:15,
1223:24, 1223:25,
1225:6, 1225:9,
1225:11, 1225:21,
1228:1, 1231:9,
1243:12, 1247:25,
1250:8, 1250:10,
1257:19, 1259:5,
1259:7, 1260:2,
1260:5, 1260:9,
1260:16, 1262:20,
1262:22, 1263:4,
1263:16, 1263:24,
1264:6, 1264:10,
1264:12, 1264:15,
1264:18, 1267:4,
1287:21, 1288:1
**the...content** [1] -
1181:15
**themselves** [6] -
1080:1, 1127:25,
1130:9, 1148:9,

1215:1, 1282:5
**therefore** [10] -
1075:21, 1134:9,
1142:12, 1143:19,
1149:16, 1156:20,
1178:3, 1198:14,
1247:15, 1259:14
**they've** [3] - 1122:23,
1173:2, 1225:23
**thinking** [5] - 1139:25,
1168:1, 1175:25,
1254:20, 1280:23
**third** [39] - 1108:24,
1135:1, 1148:10,
1160:17, 1165:23,
1165:25, 1167:24,
1168:12, 1171:12,
1174:1, 1180:15,
1181:2, 1181:21,
1182:6, 1182:16,
1183:4, 1183:10,
1183:13, 1190:15,
1190:19, 1190:24,
1191:6, 1191:15,
1191:21, 1193:2,
1195:16, 1196:6,
1219:22, 1229:11,
1254:1, 1256:16,
1259:21, 1263:9,
1269:17, 1273:1,
1276:7, 1281:16,
1281:22
**third-party** [33] -
1108:24, 1135:1,
1160:17, 1165:23,
1165:25, 1168:12,
1171:12, 1174:1,
1180:15, 1181:2,
1181:21, 1182:6,
1182:16, 1183:4,
1183:10, 1183:13,
1190:15, 1190:19,
1190:24, 1191:6,
1191:15, 1191:21,
1193:2, 1195:16,
1196:6, 1229:11,
1254:1, 1259:21,
1263:9, 1273:1,
1281:16, 1281:22
**third-party's** [1] -
1167:24
**thirty** [1] - 1105:14
**thoroughly** [1] -
1193:11
**thousand** [1] -
1268:16
**thousands** [1] -
1193:15
**thread** [5] - 1216:6,
1216:20, 1219:2,

1249:10, 1249:12
**three** [13] - 1152:15,
1154:9, 1155:7,
1155:21, 1156:9,
1156:11, 1205:11,
1205:14, 1205:23,
1209:3, 1268:23,
1275:15, 1277:16
**three-multi** [1] -
1205:23
**throughout** [3] -
1192:21, 1247:15,
1261:2
**Thursday** [1] - 1180:4
**ticket** [4] - 1153:22,
1169:2, 1169:5,
1172:18
**ticketing** [1] - 1152:6
**tickets** [2] - 1153:15,
1168:25
**tier** [1] - 1281:20
**timeframe** [1] - 1141:3
**timeline** [1] - 1140:16
**title** [1] - 1120:7
**titled** [1] - 1162:12
**today** [22] - 1084:11,
1112:17, 1113:2,
1113:9, 1120:7,
1133:13, 1136:25,
1140:7, 1144:5,
1166:23, 1185:14,
1194:21, 1202:25,
1211:11, 1221:14,
1227:5, 1231:1,
1236:1, 1236:7,
1256:1, 1276:3,
1278:22
**together** [12] -
1082:17, 1086:13,
1088:7, 1088:9,
1101:13, 1111:15,
1111:17, 1113:7,
1212:23, 1269:9,
1276:22, 1277:21
**took** [16] - 1119:23,
1138:1, 1139:14,
1139:17, 1141:1,
1193:8, 1210:21,
1211:14, 1211:17,
1214:12, 1217:7,
1221:11, 1224:3,
1228:20, 1267:25,
1278:24
**tool** [12] - 1132:1,
1163:11, 1192:6,
1245:2, 1245:4,
1245:18, 1246:8,
1246:12, 1247:14,
1247:16, 1254:16,
1262:8

**tools** [25] - 1129:10,
1129:11, 1129:12,
1129:13, 1129:15,
1129:17, 1129:19,
1132:3, 1132:4,
1132:6, 1144:12,
1149:13, 1149:20,
1149:21, 1155:18,
1244:19, 1244:22,
1254:15, 1254:19,
1262:2, 1262:4,
1273:19, 1276:2,
1276:3, 1286:2
**top** [17] - 1073:7,
1076:5, 1096:16,
1101:6, 1186:24,
1188:12, 1205:9,
1208:25, 1219:13,
1233:10, 1233:14,
1234:17, 1234:24,
1243:23, 1249:13,
1258:3, 1258:7
**topic** [1] - 1086:22
**topics** [3] - 1095:20,
1134:25, 1197:17
**total** [1] - 1120:20
**touch** [5] - 1207:15,
1208:6, 1208:21,
1209:6, 1215:1
**touched** [1] - 1133:2
**touches** [1] - 1165:2
**touching** [1] - 1215:2
**towards** [4] - 1267:16,
1278:10, 1285:25,
1286:2
**trace** [1] - 1165:24
**track** [3] - 1254:10,
1254:12, 1254:16
**train** [4] - 1131:12,
1157:15, 1162:23,
1163:5
**trained** [3] - 1168:18,
1174:8, 1195:9
**training** [8] - 1131:5,
1162:22, 1162:25,
1163:2, 1163:4,
1163:7, 1163:11,
1267:6
**transcript** [2] -
1074:22, 1288:6
**TRANSCRIPT** [1] -
1071:11
**transformation** [1] -
1270:5
**translation** [2] -
1111:11, 1112:19
**transmitted** [1] -
1259:20
**travel** [1] - 1202:4
**traveling** [2] - 1139:4,

1139:7
**treat** [1] - 1161:4
**treated** [1] - 1259:8
**trial** [2] - 1072:8,
1074:21
**true** [18] - 1078:3,
1079:12, 1081:21,
1082:1, 1082:5,
1082:20, 1088:22,
1089:25, 1094:23,
1095:17, 1095:18,
1099:8, 1103:14,
1109:2, 1113:7,
1200:10, 1232:10,
1235:11
**truly** [2] - 1202:24,
1213:7
**trusted** [3] - 1176:23,
1177:5, 1266:7
**try** [3] - 1134:10,
1134:13, 1248:4
**trying** [5] - 1096:18,
1100:17, 1164:16,
1249:9, 1270:6
**turn** [7] - 1165:16,
1167:19, 1171:5,
1179:9, 1203:4,
1261:22, 1274:12
**turned** [2] - 1161:25,
1278:21
**turns** [1] - 1126:8
**two** [31] - 1072:24,
1074:9, 1076:17,
1077:12, 1079:2,
1083:17, 1084:15,
1084:19, 1085:8,
1089:21, 1090:5,
1094:23, 1099:15,
1099:19, 1099:20,
1100:9, 1100:11,
1112:25, 1124:9,
1124:10, 1148:11,
1154:12, 1168:10,
1187:16, 1187:23,
1187:24, 1226:4,
1240:7, 1263:21,
1276:11, 1282:15
**type** [3] - 1130:14,
1252:23, 1282:11
**types** [2] - 1085:16,
1240:9
**typical** [6] - 1170:20,
1170:22, 1270:1,
1270:2, 1270:4,
1284:15
**typically** [8] - 1082:16,
1153:24, 1153:25,
1165:4, 1176:1,
1194:6, 1217:20,
1246:16

**typos** [1] - 1206:25

# U

**UK** [1] - 1119:16
**ultimate** [1] - 1277:1
**ultimately** [6] -
1108:18, 1113:4,
1116:11, 1141:4,
1200:14, 1221:12
**unable** [4] - 1136:24,
1162:18, 1206:10,
1207:9
**unavailable** [1] -
1182:25
**under** [28] - 1093:24,
1094:2, 1094:6,
1094:11, 1094:14,
1097:7, 1101:18,
1102:17, 1103:6,
1103:17, 1103:21,
1104:2, 1126:18,
1126:21, 1141:24,
1155:17, 1176:1,
1176:3, 1186:5,
1207:8, 1235:2,
1235:7, 1236:4,
1236:7, 1241:14,
1241:15, 1257:15,
1276:15
**underlying** [3] -
1235:4, 1235:9,
1285:10
**Understood** [3] -
1198:18, 1207:19,
1222:15
**understood** [12] -
1077:15, 1157:5,
1198:17, 1199:6,
1199:18, 1202:9,
1203:18, 1207:24,
1211:5, 1217:24,
1243:11, 1253:14
**unfortunately** [2] -
1149:13, 1223:4
**unglamorous** [1] -
1277:13
**uniformly** [1] -
1095:17
**unit** [3] - 1111:11,
1112:19, 1124:1
**UNITED** [1] - 1071:1
**University** [7] -
1184:10, 1184:22,
1188:22, 1264:23,
1265:5, 1273:6,
1273:8
**Unix** [2] - 1287:9,
1287:10
**unknown** [3] -

1103:14, 1103:17,
1104:3
**unlawful** [4] - 1275:5,
1276:8, 1283:18,
1283:19
**unless** [4] - 1162:18,
1166:2, 1186:5,
1237:19
**unlimited** [1] -
1082:21
**unprotectible** [2] -
1085:17, 1086:14
**unrecognizable** [1] -
1285:22
**up** [47] - 1080:18,
1083:18, 1085:25,
1086:24, 1086:25,
1087:3, 1088:1,
1091:8, 1098:5,
1105:23, 1107:1,
1115:9, 1122:16,
1131:4, 1141:21,
1158:12, 1161:19,
1164:6, 1178:9,
1195:2, 1198:11,
1203:6, 1206:6,
1206:20, 1208:25,
1209:1, 1217:3,
1226:17, 1228:16,
1231:12, 1240:8,
1243:7, 1249:7,
1249:13, 1264:4,
1270:23, 1274:17,
1275:25, 1279:9,
1280:14, 1282:12,
1284:25, 1285:1,
1286:4, 1286:5,
1287:23
**Update** [1] - 1108:15
**update** [43] - 1100:2,
1100:9, 1100:13,
1100:14, 1100:22,
1100:25, 1101:24,
1102:11, 1104:23,
1105:6, 1105:7,
1108:6, 1108:11,
1108:16, 1109:16,
1109:17, 1109:23,
1109:24, 1109:25,
1110:2, 1110:4,
1110:8, 1114:2,
1122:17, 1123:3,
1123:14, 1124:11,
1125:2, 1125:3,
1125:4, 1127:20,
1127:21, 1128:19,
1128:23, 1153:20,
1154:6, 1169:5,
1173:3, 1174:2,
1174:3, 1185:17,

1209:19, 1247:14
**updated** [4] - 1099:10,
1100:21, 1248:13,
1252:10
**updates** [38] - 1121:6,
1122:3, 1122:7,
1122:25, 1123:22,
1124:7, 1127:23,
1127:24, 1128:10,
1128:12, 1128:24,
1129:21, 1137:11,
1137:13, 1140:25,
1143:22, 1150:11,
1150:14, 1150:16,
1150:19, 1150:22,
1151:9, 1153:7,
1153:18, 1154:1,
1154:2, 1209:21,
1214:15, 1218:22,
1230:2, 1230:6,
1234:3, 1252:17,
1254:11, 1254:12,
1254:17, 1254:24,
1262:15
**upgrade** [3] - 1285:19,
1285:20, 1285:21
**upload** [7] - 1165:22,
1171:11, 1175:24,
1181:25, 1182:2,
1193:2, 1193:20
**uploaded** [7] -
1183:10, 1183:14,
1185:11, 1187:25,
1188:6, 1191:23,
1256:5
**uploading** [4] -
1167:25, 1185:4,
1190:3, 1193:25
**uploads** [1] - 1182:16
**US** [10] - 1122:19,
1123:19, 1149:3,
1237:2, 1237:8,
1237:22, 1237:24,
1238:16, 1238:23,
1239:22
**USA** [1] - 1071:4
**Usage** [14] - 1134:20,
1134:22, 1134:23,
1135:4, 1135:18,
1135:24, 1157:14,
1182:14, 1194:24,
1235:19, 1236:14,
1236:20, 1259:15,
1259:23
**useless** [1] - 1127:18
**user** [1] - 1170:10
**users** [1] - 1272:17
**uses** [5] - 1108:15,
1221:3, 1229:19,
1249:23, 1275:22

**utilizing** [2] - 1111:1,
1268:14

# V

**valid** [2] - 1106:7,
1225:3
**value** [3] - 1122:13,
1124:23
**Vandevelde** [2] -
1071:19, 1262:25
**VANDEVELDE** [4] -
1263:1, 1263:5,
1263:19, 1264:2
**variable** [23] -
1082:11, 1082:13,
1082:18, 1082:22,
1082:23, 1083:7,
1093:16, 1095:6,
1096:5, 1096:13,
1097:11, 1097:14,
1097:15, 1097:19,
1097:23, 1098:15,
1098:18, 1098:19,
1098:22, 1098:25,
1099:6
**variables** [1] - 1093:9
**varies** [1] - 1155:4
**various** [5] - 1142:15,
1162:25, 1175:16,
1253:15, 1271:25
**VArpt** [2] - 1096:9,
1097:9
**VArpt_mnOrigAlloc**
[2] - 1096:12,
1098:19
**vary** [1] - 1128:7
**vastly** [1] - 1217:12
**VAT** [1] - 1122:13
**vendor** [2] - 1126:19,
1284:25
**vendors** [1] - 1193:3
**verbal** [1] - 1174:10
**verifying** [1] - 1218:2
**version** [19] - 1252:9,
1252:10, 1252:12,
1252:17, 1252:20,
1252:21, 1253:1,
1253:3, 1253:5,
1253:10, 1253:12,
1253:15, 1253:19,
1253:21, 1253:22,
1254:2, 1254:6,
1254:9, 1285:21
**versions** [2] -
1252:13, 1252:14
**versus** [5] - 1087:12,
1270:15, 1284:17,
1285:25, 1287:9
**via** [8] - 1117:11,

1166:2, 1166:9,
1213:21, 1214:6,
1218:3, 1224:18,
1241:25
**viable** [7] - 1137:2,
1137:19, 1148:4,
1148:5, 1149:9,
1149:11, 1149:18
**vice** [3] - 1160:6,
1160:7, 1268:11
**Vice** [10] - 1119:22,
1120:8, 1120:10,
1121:8, 1142:22,
1151:24, 1197:9,
1200:6, 1204:23,
1263:7
**vice-president** [1] -
1268:11
**Vice-President** [10] -
1119:22, 1120:8,
1120:10, 1121:8,
1142:22, 1151:24,
1197:9, 1200:6,
1204:23, 1263:7
**vice-presidents** [2] -
1160:6, 1160:7
**Video** [1] - 1289:9
**video** [3] - 1263:3,
1263:5, 1263:17
**view** [24] - 1078:25,
1084:22, 1085:4,
1113:14, 1117:13,
1132:1, 1132:3,
1132:17, 1133:2,
1136:23, 1137:20,
1144:7, 1144:8,
1148:6, 1155:12,
1155:20, 1171:19,
1175:23, 1175:24,
1195:5, 1195:7,
1195:24, 1208:7,
1209:18
**viewed** [1] - 1136:5
**viewing** [2] - 1149:14,
1156:20
**views** [2] - 1171:18,
1183:3
**violate** [1] - 1174:13
**violated** [4] - 1072:23,
1102:8, 1258:19,
1259:14
**violating** [1] - 1230:20
**violation** [25] -
1076:19, 1084:18,
1095:19, 1099:25,
1100:22, 1101:14,
1101:16, 1101:21,
1102:2, 1104:13,
1106:18, 1106:24,
1107:5, 1108:23,

1110:8, 1113:24, 1180:15, 1191:9, 1196:6, 1231:6, 1259:2, 1259:18, 1259:22, 1275:5

**violations** [1] - 1072:20

**violence** [1] - 1072:21

**Virginia** [1] - 1071:24

**virtually** [1] - 1225:20

**Visa** [2] - 1119:13, 1177:23

**visibility** [1] - 1183:6

**visible** [5] - 1171:21, 1172:25, 1173:23, 1174:1, 1174:5

**Visicalc** [1] - 1277:24

**visited** [1] - 1152:11

**Volume** [1] - 1071:8

**voluntarily** [1] - 1210:21

**VP** [1] - 1203:21

**vs** [1] - 1071:6

## W

**W2C_REG_ REPRINT** [1] - 1257:1

**wait** [2] - 1178:9, 1201:25

**waiting** [1] - 1189:3

**Walsham** [1] - 1188:21

**warn** [1] - 1191:17

**warning** [3] - 1171:11, 1183:4, 1183:14

**washing** [1] - 1278:8

**watch** [1] - 1163:13

**ways** [8] - 1134:24, 1168:12, 1174:6, 1175:16, 1181:20, 1191:14, 1226:18, 1228:16

**Web** [1] - 1184:17

**web** [1] - 1169:4

**web-based** [1] - 1169:4

**week** [1] - 1072:7

**week-long** [1] - 1072:7

**weekend** [1] - 1072:6

**weekly** [1] - 1269:7

**weeks** [2] - 1155:6

**welcome** [2] - 1072:10, 1118:13

**well-trained** [1] - 1174:8

**West** [1] - 1071:19

**whatnot** [1] - 1075:25

**whichever** [2] - 1109:11, 1139:1

**Whitaker** [1] - 1248:23

**white** [4] - 1082:2, 1082:6, 1082:9, 1083:9

**whole** [5] - 1092:9, 1092:11, 1093:6, 1108:2, 1281:15

**William** [1] - 1071:15

**Winslow** [2] - 1157:11, 1157:24

**Wipro** [1] - 1149:5

**WITNESS** [24] - 1072:15, 1098:10, 1105:16, 1105:18, 1105:20, 1105:24, 1106:2, 1106:9, 1114:12, 1117:23, 1118:21, 1118:25, 1177:1, 1197:6, 1201:24, 1202:3, 1223:25, 1225:9, 1243:12, 1250:10, 1259:7, 1264:12, 1264:18, 1267:4

**witness** [10] - 1072:16, 1117:25, 1118:14, 1118:17, 1201:8, 1204:20, 1262:24, 1263:2, 1264:4, 1264:8

**WITNESSES** [1] - 1289:3

**wondering** [1] - 1118:2

**word** [7] - 1073:13, 1081:8, 1083:12, 1103:20, 1213:8, 1221:3, 1277:9

**wording** [1] - 1074:16

**words** [1] - 1073:17

**work-around** [1] - 1244:2

**Workbench** [8] - 1244:23, 1245:16, 1246:12, 1247:13, 1261:24, 1262:9, 1262:17, 1262:18

**workflow** [1] - 1132:21

**works** [11] - 1082:4, 1093:5, 1104:17, 1104:25, 1107:16, 1107:20, 1110:4, 1117:14, 1190:22, 1201:14, 1217:6

**world** [5] - 1120:12, 1120:17, 1120:25, 1123:5, 1169:25

**World** [11] - 1099:19, 1203:9, 1203:24, 1204:7, 1204:24, 1205:2, 1206:10, 1207:9, 1249:15, 1269:12, 1278:21

**write** [3] - 1094:7, 1095:15, 1109:24

**writes** [1] - 1152:2

**writing** [5] - 1093:22, 1109:17, 1278:13, 1278:20, 1286:14

**written** [16] - 1086:18, 1086:20, 1092:10, 1093:1, 1093:2, 1104:15, 1105:5, 1126:19, 1139:25, 1158:16, 1237:11, 1241:2, 1250:1, 1250:3, 1250:5, 1252:18

**wrote** [9] - 1077:5, 1092:4, 1099:14, 1099:16, 1100:6, 1112:16, 1112:18, 1208:15, 1231:13

## Y

**Y2K** [3] - 1279:9, 1279:13, 1279:14

**year** [7] - 1119:23, 1121:6, 1163:16, 1194:12, 1234:20, 1279:17

**years** [24] - 1101:5, 1119:6, 1119:8, 1119:20, 1119:25, 1122:1, 1133:6, 1156:15, 1157:2, 1199:15, 1200:14, 1226:4, 1241:3, 1265:7, 1265:19, 1265:20, 1266:3, 1267:9, 1267:12, 1271:21, 1276:15, 1277:15, 1278:22, 1279:21

**yesterday** [6] - 1073:18, 1075:3, 1079:3, 1084:11, 1089:3, 1089:14

**yourself** [3] - 1095:15, 1141:23, 1215:5

## Z

**Zachary** [1] - 1071:17

**zip** [1] - 1191:5