1            UNITED STATES DISTRICT COURT
                 DISTRICT OF NEVADA
2     BEFORE THE HONORABLE LARRY R. HICKS, SENIOR DISTRICT JUDGE
                    ---o0o---
3

4     ORACLE USA, INC., et al,      :
                                    :
5              Plaintiffs,          :
                                    : No. 2:10-cv-0106-LRH-VCF
6          -vs-                     :
                                    : September 28, 2021
7     RIMINI STREET, INC., et al,   :
                                    : Reno, Nevada
8              Defendants.          :
                                    : Volume 7
9     _____:

10

11              TRANSCRIPT OF EVIDENTIARY HEARING

12

13    APPEARANCES:

14    FOR THE PLAINTIFF:        Richard J. Pocker
                                Benjamin P. Smith
15                              William A. Isaacson
                                Jessica Phillips
16                              Sharon R. Smith
                                Corey Houmand
17                              Zachary Hill
                                Attorneys at Law
18

19    FOR THE DEFENDANTS:       W. West Allen
                                Eric Vandevelde
20                              Samuel G. Liversidge
                                Ilissa Samplin
21                              Casey J. McCracken
                                Attorneys at Law
22

23    Reported by:             Margaret E. Griener, CCR #3, FCRR
                                Official Reporter
24                              400 South Virginia Street
                                Reno, Nevada 89501
25

1        RENO, NEVADA, MONDAY, SEPTEMBER 28, 2021, 9:00 A.M.

2                          ---o0o---

3

4                THE COURT:  Good morning.

5                Have a seat, please.

6                All right.  The record will show that we're

7   reconvened on Tuesday morning, September 28th.

8                This is our seventh day of trial, and I would

9   expect that the evidence would be finished today, but, in any

10  event, we're in the course of the examination this morning of

11  Mr. Lanchak by Mr. Liversidge.

12                You're welcome to go forward.

13                MR. LIVERSIDGE:  Thank you, your Honor.

14  Good morning.

15                Good morning, Mr. Lanchak.

16                THE WITNESS:  Good morning.

17                        STEPHEN LANCHAK,
          recalled as a witness on behalf of the Defendant,
18          previously sworn, testified further as follows:

19                  DIRECT EXAMINATION RESUMED

20  BY MR. LIVERSIDGE:

21  Q   When we finished yesterday we were talking about the use

22  of open code in providing updates for JD Edwards software, and

23  you mentioned that open code is modified at every stage of the

24  software's lifecycle.  I'd like start by focusing on the

25  maintenance and support phase of the product life cycle.

```
 1              MR. LIVERSIDGE:  And if we could go to the next
 2    slide in our slide deck, which is DDX-708.
 3    BY MR. LIVERSIDGE:
 4    Q    Now, Mr. Lanchak, can you walk us through what is
 5    reflected on this slide.
 6    A    Yes.  From a support and maintenance perspective, what we
 7    have here -- and I'll go from left to right -- is -- let's say
 8    in course of normally conducting your business there are tax
 9    law changes, and we've seen some of these already in terms of
10    year-end changes, like 1099 changes, W2 changes.
11              But there are also larger changes that happen, you
12    know, on occasion.  For instance, in the past we've had the
13    Affordable Care Act, and, with what's being discussed in
14    Washington, who knows.  I mean, Washington, D.C., might become
15    the 51st state.  That's an example of some major changes that
16    would need to be made for these applications in the open layer
17    of the code.
18              But then you have other things that may be related
19    to the company's business strategy, for instance, they're
20    expanding globally which means they would need to add to their
21    chart of accounts, add new accounts.
22              Those new accounts might require additional business
23    functions that would need to be coded within the open layer of
24    the code to accommodate this new region that they're operating
25    in.
```

1    And, then, you know, other changes, for example, a

2  new distributor is added, and that new distributor may have

3  new or different processing requirements, functionality

4  requirements, that are necessary, and that would be a change

5  to the open code to add that new distributor and the business

6  functions associated with their work.

7    And then, lastly, I mean, innovation happens all the

8  time, new products are being added.  A new product is added,

9  and there may -- there would likely be new vendors associated

10  with the manufacture of that new product, and there, again,

11  may be additional business functions that need to be coded

12  into the open accessible layer to accommodate, you know, that

13  change.

14    So that's a quick high level summary of the types of

15  maintenance and support events that you may have to contend

16  with.

17  Q   And, Mr. Lanchak, do you have an understanding of whether

18  Rimini assists customers with the types of updates you have

19  just described in this slide?

20  A   Yes, they do --

21    MR. HILL:  Objection, foundation, your Honor.

22    THE COURT:  Sustained.  I think some greater

23  foundation is necessary here.

24  BY MR. LIVERSIDGE:

25  Q   Mr. Lanchak, as part of your work in this case, did you

1    review the materials that the parties produced in deposition

2    testimony and interrogatory responses?

3    A    I reviewed lots of documentation regarding what Rimini

4    does with regard to maintenance and support operations.

5    Q    And have you sat through various parts of the testimony

6    during this proceeding?

7    A    I have.

8    Q    And based on your review of the materials and your

9    understanding of the testimony, do you believe you have a

10   general understanding of the types of support that Rimini

11   provides to its customers?

12   A    Yes, I do have a general understanding of the types of

13   support that Rimini provides to its customer base.

14   Q    Based on that, do you have an understanding of whether

15   Rimini assists customers with the types of updates that you

16   have described in this slide?

17   A    Yes.  As a third-party maintenance and support provider,

18   Rimini would do this kind of work for their clients.

19   Q    And when you were working as a third-party support

20   provider yourself, did you modify and copy the open code in

21   supporting JDE along the lines described in this slide?

22   A    I did.

23   Q    Now, we've talked about it a little bit, but what is the

24   purpose of the tool image in this slide?

25   A    Well, the tools -- I think I may have spoken about this

1   yesterday a little bit, too -- are provided by the software

2   vendor, JD Edwards, Oracle, to facilitate the access and

3   modification and copying of the code in that open layer to

4   bring about these changes that you need to be responsive to

5   your business environment, your regulatory environment,

6   et cetera.

7          And these tools, you know, essentially, support

8   the -- tools like Object Management Workbench in particular

9   support your ability to go in and create new code objects,

10  modify existing code objects, and properly promote those

11  objects through the various environments.

12         There's also another tool, too, that we haven't

13  spoken about yet that is called event rule language, which is

14  a tool that enables the user to actually create code without

15  programming it.  It's called programmerless programming is the

16  slogan that's been used with it.

17         And it essentially is a tool that allows -- through

18  point and click allows the user to create code, and it also

19  uses wizards to aid the user in creating that code.

20         It's great for simple business functions.  For the

21  more complex business functions usually you have to go into

22  the native C and do those C code and do those directly.

23  Q    And are these tools that are provided used to implement

24  tax and regulatory updates into the JDE open code software?

25  A    They are.

1    Q    Mr. Lanchak, do you recall hearing testimony from

2    Ms. Frederiksen-Cross regarding Rimini's use of the JDE tools?

3    A    I do.

4                MR. LIVERSIDGE:  Let's pull up slide 37, if we

5    could, from Ms. Frederiksen-Cross's slide deck.

6    BY MR. LIVERSIDGE:

7    Q    Mr. Lanchak, do you recall seeing this slide?

8    A    I do.

9    Q    And what is your understanding of Ms. Frederiksen-Cross's

10   contention in connection with this slide?

11   A    Well, essentially that it would be unlawful to use Object

12   Management Workbench to work with the JD Edwards code.

13   Q    And what is your reaction to Ms. Frederiksen-Cross's

14   contention that it is illegal to use the tools that Oracle

15   provides to modify the open code?

16   A    It makes absolutely no sense that the software vendor

17   would provide tools for you, encourage your use of those

18   tools, facilitate your ability to use these tools to modify

19   the code, and then say it's illegal to use these tools.  It

20   just flies in the face of common sense.

21   Q    Did you use these tools when you were working with JDE

22   products?

23   A    Yes, we did.

24   Q    And is it your understanding that Rimini uses these

25   tools?

1   A    Yes.  That is my understanding.

2   Q    In your experience, do other companies use these tools?

3   A    Yes, they do.

4   Q    Which types of companies are you referring to?

5   A    Well, you have the direct competitors of Rimini, such as

6   Spinnaker and Support Revolution, but then you also have the

7   whole -- the rest of the ecosystem, including the application

8   support and maintenance providers, the systems integrators,

9   you know, companies that -- like IBM, Accenture, Capgemini,

10  Deloitte, PWC, Tata, Infosys, HCL.  It's quite a long list.

11  Q    And how about smaller firms, like mom-and-pop shops, do

12  they use the tools as well?

13  A    Yes, they do.  So, you know, there was some testimony

14  yesterday about SpearMC.  That's a medium-sized company that

15  uses these tools.  ERP Suites is another example of a smaller

16  JD Edwards integrator and support provider that uses the

17  tools.

18       And then you have, as I mentioned yesterday,

19  innumerable LLCs, you know, with a handful of people, that use

20  these tools in service of their customers.

21       And then, of course, as I said yesterday, too, the

22  independent third-party contractors, individuals, that hire

23  themselves out to work, you know, in a support and maintenance

24  capacity, or to work on a project, utilize these tools.

25  Q    Now, Mr. Lanchak, you've testified that you've worked in

1    the industry for three decades; is that correct?

2    A    That's correct.

3    Q    And you had 18 years of working exclusively with Oracle

4    products; is that right?

5    A    That's correct.

6    Q    And you also testified that you were a trusted adviser

7    for over 60 senior IT executives, including CIOs and CTOs; is

8    that right?

9    A    That is right.

10   Q    And in the course of that work, you had many meetings

11   with Oracle in connection with these engagements; is that

12   correct?

13   A    I did.

14   Q    And based on that experience during your work in the

15   Oracle Enterprise software industry, did you ever have any

16   reason to believe that it would be unlawful to modify and copy

17   JDE open code using these Oracle-provided tools?

18   A    None whatsoever.  In all the meetings that I've had with

19   Oracle, with clients individually, innumerable meetings,

20   countless meetings, this was never even, you know,

21   conceivable.

22   Q    Did anyone ever express to you that it would be unlawful

23   to modify and copy JDE open code using these tools?

24   A    No.

25              MR. HILL:  Objection, hearsay.

1    THE COURT:  I'll allow the answer based on his

2  experience.

3  BY MR. LIVERSIDGE:

4   Q   Have you ever seen any industry documents suggesting that

5  modifying and copying open code is unlawful?

6   A   No, I have not.

7   Q   In your opinion, from an industry perspective, would it

8  be reasonable to conclude that it may be unlawful to work with

9  these Oracle-provided tools?

10   A   No, I wouldn't conclude that it is unlawful to work with

11  these tools.

12   Q   Now, do you recall Ms. Frederiksen-Cross also testifying

13  that displaying this JDE open code was a violation of the

14  injunction?

15   A   Yes, I do remember that.

16    MR. LIVERSIDGE:  And let's pull up slide 38 from

17  Ms. Frederiksen-Cross's slide deck, if we could.

18  BY MR. LIVERSIDGE:

19   Q   Now, Mr. Lanchak, do you recall seeing this slide?

20   A   I do.

21   Q   And what is your understanding of what

22  Ms. Frederiksen-Cross was contending in this slide?

23   A   That it's a violation of the injunction and unlawful

24  whenever the code is displayed on the engineer's -- well, the

25  client or laptop or what have you, wherever they're using it

1    -- creates an in-memory copy, a RAM copy of the software, and,

2    according to Ms. Frederiksen-Cross's opinion, that's a

3    violation of the injunction and is unlawful.

4    Q    And what is your reaction to that?

5    A    Again, it's ludicrous.  I don't understand how one would

6    be able to -- especially in a third-party support capacity --

7    perform the job that you're hired to do, without displaying

8    that code on your own workstation or laptop.  It's -- it makes

9    no sense.

10   Q    And when you were working as a third-party support

11   provider, did you display JDE open code when you worked with

12   the product?

13   A    Yes, all the time.

14   Q    And did you ever see your teams displaying JDE open code

15   when working with the product?

16   A    Yes, all the time.

17   Q    And based on your experience in the industry, during your

18   work in the Oracle Enterprise software industry, did you ever

19   have any reason to believe that it would be unlawful to

20   display JDE open code?

21   A    No.

22   Q    Have you ever seen any industry document suggesting that

23   displaying open code is unlawful?

24   A    I have not.

25   Q    In your opinion, from an industry perspective, would it

1    be reasonable to conclude that it may be unlawful to display

2    this JDE open code?

3    A    No.

4    Q    Now, Mr. Lanchak, do you recall hearing some testimony

5    from Ms. Frederiksen-Cross that she had never, in her history

6    of working in the industry, seen any reference to these open

7    and closed code terms?

8    A    I do recall that.

9                    MR. LIVERSIDGE:  And let's -- John, if we can,

10    let's bring up that testimony from the transcript and just

11    walk through it quickly here.

12    BY MR. LIVERSIDGE:

13    Q    So if we -- and this is at page 300 of the transcript,

14    starting at line 10, the question is,

15                    "In your 45 years of experience, have you

16          ever heard of a distinction between open code and

17          closed code?"

18                    And the answer is, "Not as it's used here,

19          no.

20                    "QUESTION:  Had you ever seen Rimini make

21          this distinction in any of its internal documents

22          prior to the time the injunction was issued?"

23                    And the answer is, "I have not."

24                    Do you recall that testimony?

25    A    I do.

```
 1   Q    I think we have some additional testimony we can go to.
 2             "QUESTION:  Do any of the sources with which
 3        you are familiar draw a distinction between open and
 4        closed source code?
 5             "ANSWER:  I have not seen that distinction
 6        written in that with respect to source code for -- in
 7        its distinction for object code, only modules, ever,
 8        in my entire career."
 9             I think we have one more example:
10             "QUESTION:  You testified that, you know, in
11        all your experience, you hadn't heard the term open
12        and closed code.  Do you remember that?
13             "ANSWER:  Outside this litigation?
14             "QUESTION:  Yeah, outside this case.
15             "ANSWER:  Yeah.  Correct."
16             Mr. Lanchak, do you recall hearing that
17   testimony?
18   A    I do.
19   Q    What is your reaction to that testimony?
20   A    That's hard to believe, frankly.  The terms have been out
21   there.  I believe I mentioned yesterday that analysts,
22   particularly Gartner, has used the terms in specific relation
23   to application maintenance and support, and there's also been
24   internal communications that I believe are entered into the
25   record from Rimini using terms open and closed code.
```

1   Q   And you mentioned Gartner, what is Gartner?

2   A   Gartner is an industry analyst.  Gartner is probably the

3   preeminent source of comparative information in the industry.

4         Everyone subscribes to Gartner, relies on it.  It

5   will rank the various, like, application support and

6   maintenance providers.  It will rank systems integrators.

7         We are always trying to get as high a ranking in

8   Gartner as we could because the industry respects Gartner's

9   opinions.  It carries a lot of weight.

10         And we would also meet with Gartner to talk about

11  what we are doing strategically with our practices, and they

12  would report on that, and then they would also talk to us

13  about their views on where they think the industry is going.

14         So we would have one-on-one meetings with Gartner.

15  They would meet with all kinds of third-parties, and then we'd

16  also, you know, pay a lot of attention to their publications.

17  Q   And when you were working in the industry, did you use

18  and rely upon Gartner?

19  A   I did, extensively.

20         MR. LIVERSIDGE:  If I could, I would like to

21  bring up an industry publication from Gartner that starts with

22  the Bates numbers Oracle, ORCORST-00639707.

23         MR. HILL:  Objection, your Honor.  This document

24  is not in reference to any of Mr. Lanchak's reports and it

25  doesn't have an exhibit -- it's not on Rimini's exhibit list

1   either.

2                    MR. LIVERSIDGE:  Your Honor, this document was

3   produced from Oracle's files.  It's been in production.  It's

4   been in the case for years.

5                    And Oracle has come in here and offered

6   testimony that essentially this distinction between open and

7   closed code is something that was essentially made up for

8   litigation purposes.

9                    Ms. Frederiksen-Cross got on the stand and said

10  she's never heard of these terms, these terms don't exist in

11  the industry, and this was all offered on the fly, and we

12  would like to respond and to present the Court with documents

13  that do make the distinction.

14                   It's true that the document was not on his

15  initial considered list, but he has looked at the materials

16  now based on that testimony.  He was certain that these

17  materials are out there, and we think the Court would benefit

18  from seeing them.

19                   THE COURT:  The objection is sustained.

20                   I struck all of the supplemental information

21  that was proposed for Ms. Frederiksen-Cross on motion of

22  Rimini, and my view is the same treatment should be applied to

23  the sources we're talking about here.

24                   The objection is sustained.

25                   MR. LIVERSIDGE:  Thank you, your Honor.

1    Would it be -- if the document is not put into

2    evidence, is it possible to present it as something that the

3    witness has relied upon in coming up with his opinion?  This

4    has been done with demonstratives and the like.  It is

5    something that he's relied upon.

6    Even if not accepted into evidence, are we able

7    to present it with him?

8    THE COURT:  No.

9    MR. LIVERSIDGE:  Thank you.

10   BY MR. LIVERSIDGE:

11   Q   Mr. Lanchak, during the time you worked in the Oracle

12   Enterprise software industry, was it your understanding that

13   it could be unlawful to modify or copy the closed code that

14   came with JDE?

15   A   Yes, that's correct, and I believe that's spelled out

16   fairly clearly in the licenses that we -- we'd rely on that.

17   Q   And based on your work in the industry, was it your

18   perception that others in the industry had the same view?

19   A   Yes.

20   MR. HILL1:  Objection, foundation.

21   THE COURT:  I'll allow the question and answer.

22   BY MR. LIVERSIDGE:

23   Q   The question, Mr. Lanchak, was it your perception that

24   others in the industry have the same view?

25   A   Yes, it was my perception.

1   Q    And did you instruct your teams, when you were working

2   with JDE software, not to work with this closed code?

3   A    Yes.  We would have these conversations often when we

4   were approaching the design phase, getting into the design

5   phase.

6            And what I would discuss with my teams is I would

7   use the terms, you know, "Let's not," you know, "access and

8   get into the core architectural code.  You guys understand

9   this is not what we're supposed to do.  Let's bolt on our

10  customizations through the accessible code," or exposed code

11  is the term I used to use with my team.

12  Q    Do you recall testimony from Ms. Frederiksen-Cross that

13  closed source code is not made available to JDE licensees?

14  A    I do remember that.

15            MR. LIVERSIDGE:  And, John, maybe we can pull up

16  that testimony.  It's at page 301 of the transcript, lines 15

17  to 25.

18  BY MR. LIVERSIDGE:

19  Q    And the question here is,

20            "So no closed source code is made available

21        to JD Edwards licensees; is that right?

22            "ANSWER:  That is correct."

23            And then it goes on from there.  Do you recall

24  that testimony?

25  A    I do.

1  Q    And do you agree with Ms. Frederiksen-Cross?

2  A    No, I don't.

3        This is rather artfully worded.  Closed code is

4  supplied with every license.  It has to be, that's what really

5  runs the application.  So that closed code is compiled source

6  code, and every licensee needs to have it.

7  Q    And so is it the case that every licensee, in fact, does

8  receive the closed code?

9  A    Yes, absolutely.

10        And, also, let me say one more thing about that, and

11 I think this is an important point to get out there.

12        When we talk about object code and source code,

13 they're not really two different things.  Object code doesn't

14 exist in and of itself.  It has to have a source, and that

15 source is the source code.

16        So it's good to think of it as two sides of the same

17 coin.  Where you have source code, you compile it, it's object

18 code, you have object code, you decompile it, and you have

19 source code.

20 Q    So is the closed code provided in compiled form?

21 A    The closed code is provided in compiled form, and

22 then the license specifically speaks that thou shall not

23 decompile, disassemble, or reverse engineer this closed code.

24 Q    And as part of your work in the case, did you review the

25 OLSAs and Legacy JDE licenses?

1    A    I did.

2    Q    And did you hear Ms. Frederiksen-Cross's testimony that

3    the OLSA and Legacy JDE licenses contain that provision

4    prohibiting decompiling, disassembling, and reverse

5    engineering JDE code?

6    A    Yes, I did.

7              MR. LIVERSIDGE:  And maybe we can bring that up,

8    John.

9    BY MR. LIVERSIDGE:

10   Q    And the question was,

11            "You're aware that the Oracle license and

12        service agreement has a restriction against

13        decompiling and reverse engineering?

14            "ANSWER:  Yes, that's pretty standard in

15        software that's distributing object code only.

16            "And you're aware that JDE Legacy licenses

17        have the same?

18            "ANSWER:  The ones I have examined all have

19        that provision."

20            Do you recall that testimony from

21   Ms. Frederiksen-Cross?

22   A    I do.

23   Q    And do you agree with her?

24   A    Yes, I do agree with her.  That is pretty standard.

25   Q    And I think we have an example of one of the licenses

1    that you reviewed in coming up with your opinions and

2    conclusions, and that is OREX_67 which I believe is

3    preadmitted, if we can bring that up.

4              Mr. Lanchak, do you recall reviewing this particular

5    license which I believe is a JDE Legacy license with Giant

6    Cement?

7    A    Yes, I do.

8    Q    And is this one of the licenses that you reviewed as part

9    of your work in the case?

10   A    It is.

11   Q    And are the terms open and closed code used in this

12   license?

13   A    The terms aren't specifically used in this license, but

14   the concepts are in this license.

15             And, again, it's important to just remember, open

16   and closed -- they're just labels that we're using.  It's the

17   concepts which rely on the context of how the code is used

18   that is most important.

19   Q    And does this license contain a prohibition against

20   decompiling or disassembling JDE code?

21   A    It does.

22             MR. LIVERSIDGE:  All right.  Let's pull up

23   Section 71, if we could, John.

24   BY MR. LIVERSIDGE:

25   Q    And, Mr. Lanchak, is this one of the license provisions

1    you were referring to?

2    A    It is.

3    Q    And this particular provision says,

4              "Customer shall not, or cause anyone else to:

5         Reverse engineer, disassemble, decompile, or

6         otherwise attempt to discover the source code of any

7         part of the software."

8              Do you see that?

9    A    I do.

10   Q    And is that one of the provisions you reviewed in coming

11   up with this case --

12   A    Yes, it is.

13   Q    Your opinions.  I'm sorry.

14   A    Yes, it is.

15   Q    And do you believe this provision supports your opinions

16   in this case?

17   A    I do.  This provision is referring to the closed code,

18   that core architectural code that the software developer is

19   trying to protect.

20            And let's remember, back when these licenses were

21   originally written, usually in the late '90s, it was the wild

22   west in EOP market.  New entrants were coming into the market

23   all the time.

24            Companies realized that they needed to protect their

25   intellectual property which was contained in that closed

1    layer, and these provisions became very, very common, and that

2    was the intent.  We don't want anyone decompiling this code to

3    see how we did what we did, and then copying it in their own

4    software.

5    Q   And is the closed code the code layer that needs to be

6    decompiled in order to access?

7    A   Yes, absolutely.

8    Q   And are there other provisions in this license that you

9    believe support your opinions?

10   A   There are.

11              MR. LIVERSIDGE:  Let's pull up provisions 1-ii,

12   and 7-iii, and 3.

13   BY MR. LIVERSIDGE:

14   Q   And, Mr. Lanchak, just going back to my prior question to

15   clarify, is the closed code the code layer that needs to be

16   decompiled in order to access and copy the source code?

17   A   It is.

18   Q   Thank you.

19          Let's look at these provisions.  Are these other

20   provisions that you reviewed in connection with coming up with

21   your opinions and conclusions?

22   A   Yes, they are.

23          And the first one refers to access to the software

24   being allowed for,

25              "Independent contractors engaged by customer

1      who require access to the software to perform their

2      tasks."

3  Q    And what about paragraph 7?  What is it in that paragraph

4  that you believe supports your opinions?

5  A    Yeah.  And here it says,

6           "Customer shall not, or cause anyone else to

7      copy the documentation or software except to the

8      extent necessary...to support the users."

9           And the users are the ones that obviously are

10  utilizing the functionality of the software.

11           So it is supporting the need to go in and modify

12  and copy that open code portion of the software which is in

13  support of the users of the software.

14  Q    And then if we look at paragraph 3, it says,

15           "For any access to the software other than by

16      an employee of customer, customer shall not provide

17      access to source code and all provided access shall

18      be restricted to screen access for the functions

19      required."

20           Now, is that a provision that you reviewed in

21  coming up with your opinions and conclusions?

22  A    That is a provision I've reviewed, and that is how

23  third-party service providers work.

24           You're granted access, screen access, to the

25  functions that you need to perform.  So that would mean, if

1    you're a contractor working on a support engagement or an

2    implementation engagement for a particular client, they're

3    going to grant you certain permissions, certain access to

4    certain portions of that sytem; i.e., the development

5    environment.  You would not get access to the production

6    environment.

7                Conversely, if you're -- let's say you're

8    outsourcing their accounts payable function, and you're an

9    accounts payable clerk, you'll have screen access to the

10   production version, just the accounts payable function, that

11   you need to perform your job.

12   Q    And, in your experience, do third-party support providers

13   provide JDE support through screen access?

14   A    Yes.

15   Q    And are third-parties able to modify and copy the open

16   code using screen access?

17   A    Yes, they are.

18   Q    And does a third-party have access to Oracle tools

19   through the screen access?

20   A    Yes, they do.

21   Q    And do you have experience, yourself, using screen

22   access?

23   A    Yes, I've used screen access many times in my career.

24   Q    And is that how you and your teams provided support for

25   JDE software when you were working in the industry?

1    A    Yes, it is.

2    Q    All right.  Thank you.

3           Let's go back, now, to your summary of key reasons.

4    Let's go to DDX-709, and we're on key reason number 2, and you

5    indicate,

6             "Oracle has never before taken this position.

7        Oracle says the exact opposite and provides tools for

8        the specific purpose of modifying and copying JD

9        Edwards code."

10            And is that your second key reason, Mr. Lanchak?

11   A    It is, absolutely.

12           In the 18 years I've spent working exclusively with

13   Oracle products and Oracle corporation, they have always

14   promoted the use of the tools.

15           In meetings I've had with them, and the

16   documentation that we would review, you know, on the Web,

17   related to JD Edwards, these tools are there.

18           There are even coding standards provided in the

19   description of these tools.  It tells you, if you're going to

20   go into the native C code and make changes, you know, here are

21   the correct standards to use.

22           So, again, it's presenting that open layer of code

23   on a silver platter for the licensee and the licensee's

24   designates, and to now say it's illegal or unlawful or a

25   violation to use these tools, on the face of it, it makes no

1    sense.

2    Q    Let's go to our next slide, which I think just provides

3    some key points in this area.

4             We've already talked a fair bit about the tools, but

5    what do you have in mind when you say "marketing and promotion

6    and customizations for clients"?

7    A    Yeah.  So regarding marketing and promotion, a big part

8    of my job, especially at MarketSphere, was working with Oracle

9    to come up with promotional campaigns for JD Edwards, and

10   those promotional campaigns often promoted customizations.

11            For instance, I have one in my report, an example,

12   where we had a promotional campaign together with a company

13   called DSI, Data Systems International.  DSI had some

14   independent third-party application that they said if you

15   integrate this with JD Edwards, it's going to, you know, add

16   value, measurable business value to your environment.

17            So we would come up with our JD Edwards clients.

18   We'd invite them to these webinars.  Oracle would reach out to

19   some of their clients, invite them to these webinars, and we

20   would make this pitch to them about, you know, hey, let us,

21   you know, serve you lunch and tell you about how we can add

22   this kind of value to your JD Edwards system through DSI and

23   the custom code changes we would need to make to utilize this

24   new application.

25            So we did that on, you know, many occasions, and,

1    you know, Oracle would be, you know, in the room with us when

2    we were holding these webinars.

3              And then customizations, this was something,

4    you know, we did all the time.  Every time there would be

5    customizations.

6              And, you know, one example that I worked on where I

7    actually did the customizations myself, I designed and

8    developed them in RPG, was when the crude oil windfall profits

9    tax was enacted by Congress, and this is going back a ways,

10   but we were working with oil and gas exploration and drilling

11   firms that were on JD Edwards World at the time.

12             You know, this act comes down from Congress, it has

13   to be responded to, and JD Edwards at the time -- I forget the

14   reason, either they didn't have the bandwidth, or they felt it

15   was too small of a niche for them to respond to this, told

16   us -- and this is when I was with Arthur Andersen -- that we

17   should develop it for the customers.

18             So we developed a whole module to handle the crude

19   oil windfall profits tax, and then we sold that to additional

20   oil drilling and exploration companies mainly in the Texas

21   market.

22             So that's one example.  Another example, more

23   recent, is work we did for the Renewable Energy Group in Ames,

24   Iowa, a bio-diesel producer.  And we assessed their business

25   requirements as I described yesterday, and we selected JD

1    Edwards because we felt it was a good fit, but it still needed

2    a lot of customizations to accommodate the bio-diesel

3    industry.

4            For instance, we had to add field, fields to

5    existing screens, we had to add new screens that we -- and the

6    functionality for those screens, and this was all because they

7    had some fairly unique shipping requirements, multi-modal

8    shipping requirements for bio-diesel that required shipment

9    via rail, truck, both.

10            And then there were different types of requirements

11   for shipping the bio-diesel.  You could do it by least cost,

12   preferred route, or you could allocate various percents to the

13   various carriers.

14            So JD Edwards obviously is not going to accommodate

15   bio-diesel shipping right out of the box.  We had to build

16   that functionality onto -- bolt it onto the software through

17   that open code layer.

18   Q   Okay.  Thank you for that.

19            Shifting gears slightly now, Mr. Lanchak, are you

20   familiar with a third-party support provider named Spinnaker?

21   A   I am.

22   Q   Now, have you undertaken an analysis of Spinnaker's

23   processes as it relates to JDE support?

24   A   No, I have not.

25   Q   Have you reviewed materials in this case about

1    Spinnaker's support processes, including Spinnaker's

2    sworn statements and Oracle's testimony under oath regarding

3    those processes?

4     A    Yes, I have.  I believe there's Mathew Stava's

5    declaration, and also the Buffy Ransom deposition that I

6    reviewed.

7     Q    And did you review those materials in coming up with your

8    opinions and conclusions in this case?

9     A    I did.

10              MR. LIVERSIDGE:  John, if we could pull up

11   DTX-733, which I believe is in evidence at this point, and go

12   to paragraph 14.

13   BY MR. LIVERSIDGE:

14    Q    Mr. Lanchak, you indicated that you reviewed Mr. Stava's

15   declaration.  Is this the declaration you were referring to?

16              MR. LIVERSIDGE:  We want to go to the first

17   page, maybe, of that.

18              THE WITNESS:  Yes.

19              MR. LIVERSIDGE:  All right, and let's go to

20   paragraph 14.

21   BY MR. LIVERSIDGE:

22    Q    And who is Mr. Stava according to your understanding?

23    A    My understanding is that at that time, I don't know if he

24   still is, but he was the CEO of Spinnaker.

25    Q    And if you look at paragraph 14 of Mr. Stava's

-1319-

1    declaration, it says,

2              "Spinnaker Support develops fixes for its JD

3         Edwards customers.  These fixes include product fixes

4         and operational work-arounds; updates, including but

5         not limited to tax and regulatory updates; and custom

6         code solution for its customers.  Fixes, updates and

7         custom code solutions developed by Spinnaker support

8         may take the form of source code changes,

9         configuration changes, and data changes; or, may take

10        the form of a 'paper fix' or other instructional

11        document."

12             Do you recall reading that sworn statement from

13   Mr. Stava?

14   A    I do.

15   Q    And when Mr. Stava says,

16             "The fixes, updates, and custom code

17        solutions developed by Spinnaker Support may take the

18        form of source code changes, configuration changes,

19        and data changes,"

20   what is your understanding of what he means by that?

21   A    Well, he's referring to Spinnaker's use of that open code

22   layer in JD Edwards.  He's clearly not talking about the

23   closed code layer because that's prohibited by the licenses.

24   Q    And did you see any response from Oracle concerning

25   Spinnaker's support processes?

1    A    I did.

2                   MR. LIVERSIDGE:  And let's go to DDX-724, which

3    I believe is also admitted at this point, and we have on the

4    screen a letter from Deborah Miller, Vice-President and

5    Associate General Counsel of Oracle, to Mr. Stava.

6    BY MR. LIVERSIDGE:

7    Q    Mr. Lanchak, did you review this information in coming up

8    with your opinions and conclusions?

9    A    I did.

10   Q    If we can bring up the -- and is it your understanding

11   that Oracle, along with its outside legal counsel, Bingham

12   McCutchen, conducted an audit on premises at Spinnaker of its

13   support processes?

14   A    Yes.

15   Q    If we go down in the letter it says,

16              "Based upon that review and the information

17         provided, we have determined that (a) Spinnaker's

18         current practices and procedures are respectful of

19         and do not infringe upon Oracle's intellectual

20         property rights and (b) do not violate Oracle's

21         license agreements with its clients."

22              And that's information that you reviewed in

23   coming up with your opinions?

24   A    It is.

25   Q    And do you believe that supports your opinions in this

1    case?

2    A    I believe it very much supports my opinions.

3    Q    Why do you say that?

4    A    Because Oracle is essentially saying those things that

5    Spinnaker does to support and maintain JD Edwards, the things

6    that everyone does to support and maintain JD Edwards, that

7    those things that you do are respectful and do not infringe

8    upon Oracle's intellectual property rights.

9    Q    And did you also review testimony from Oracle's corporate

10   representative regarding Spinnaker Support?

11   A    I did.

12              MR. LIVERSIDGE:  Let's bring this up, John, and

13   we'll go through it quickly.  If we go to page 163, 12 to 15.

14   BY MR. LIVERSIDGE:

15   Q    And the question here is,

16              "So does this paragraph contain an accurate

17        description of Spinnaker Support policies as they

18        were presented to Oracle during the 2011 audit?"

19              Mr. Lanchak, is it your understanding that in

20   the deposition Oracle was presented with Mr. Stava's

21   declaration and asked to respond to the paragraphs in that

22   declaration?

23   A    Yes.

24   Q    Let's go to our next testimony, which is 164, 4

25   through 10.

```
1              And Oracle's corporate representative was asked,
2                  "And is it fair to say that Oracle concluded
3          that it was proper for Spinnaker to develop fixes,
4          updates, and custom code solutions for its customers
5          that may take the form of source code changes,
6          configuration changes, and data changes for its
7          clients in the manner described in this paragraph?
8                  "ANSWER:  Yes."
9                  Did you review that information?
10   A    I did.
11   Q    Do you believe it supports your opinions in this case?
12   A    I believe it does.
13   Q    Why do you say that?
14   A    Well, because this particular Oracle executive is saying
15   that the fixes, the updates, the custom code solutions, which
16   is what, you know, I've been talking about since yesterday,
17   that those would take the form of code changes and that that
18   is allowable and permissible.
19   Q    In your view in this testimony, is Oracle essentially
20   saying the same thing you're saying?
21   A    Yes, I think this is exactly what I've been saying.
22   Q    All right.  If we to our next testimony, which is 156, 3
23   through 10, the question is,
24                  "Did Oracle conclude that Spinnaker's
25          processes do not infringe upon Oracle's intellectual
```

1    property rights?

2              "ANSWER:  Yes.

3              "And did Oracle conclude that Spinnaker's

4    processes do not violate Oracle's license agreements

5    with its clients?

6              "ANSWER:  Yes."

7              And this is information you reviewed?

8    A    Yes, it is.

9    Q    And you believe this supports your opinions?

10   A    I believe it does.

11   Q    Let's go back to our summary of key reasons, which is

12   DDX-711.

13             And your final key reason, Mr. Lanchak, that

14   you disagree with Ms. Frederiksen-Cross is that the

15   interpretation, in your opinion, would foreclose third-party

16   support for JD Edwards software; is that correct?

17   A    That is correct.

18   Q    And why do you say that?

19   A    I say that because the definition of source code put

20   forth by Ms. Frederiksen-Cross would essentially result in

21   banning third-party support of JD Edwards software.

22   Q    And, in your opinion, could Rimini support JDE if it did

23   not have the ability to create tax, legal and regulatory

24   updates?

25   A    No, it could not.

1    Q    And to your understanding, is the ability to create tax,

2    legal, and regulatory updates an important part of Rimini

3    Street support offering to clients?

4              MR. HILL:  Objection, foundation.

5              THE COURT:  I'll allow the question.  I think

6    sufficient foundation has been established.

7              THE WITNESS:  Can you repeat the question?

8    BY MR. LIVERSIDGE:

9    Q    Yes, I can.

10             In your opinion, is Rimini Street's offering of tax,

11   legal, and regulatory updates an important part of the

12   offering that Rimini Street provides to its JDE clients?

13   A    Yes.  It's one of the key things that Rimini's clients

14   hire Rimini to do.

15   Q    And could Rimini design, develop, and test tax, legal,

16   and regulatory updates without modifying and copying open code

17   in your view?

18   A    No, they could not.

19   Q    And could Rimini use the tools to develop and test

20   without modifying open code?

21   A    No.

22   Q    Could Rimini do break fix support without the ability to

23   modify and copy open code?

24   A    Absolutely not.

25   Q    What is break fix support?

1    A    Well, break fix is what it sounds like.

2              You know, these software applications contain

3    millions of lines of code and things can go wrong, and when

4    they go wrong, it can be, you know, catastrophic.

5              So let me give you an example.  So let's say you are

6    a staffing firm and you have thousands of third-party support

7    contractors that you need to pay.  Your customers pay you, you

8    need to now pay the contractors that work for you.

9              And let's say it's a Friday, and you're running the

10   application -- the portion of the application that processes

11   payments for these third-party contractors, and all of a

12   sudden, inexplicably, it stops, it ends, it crashes.

13             If you're the CIO, you're immediately on the phone

14   with your support provider saying, "We have a Sev 1 issue,"

15   which means of severity 1 issue, "we need to get this fixed.

16   I have people expecting to get paid today that have bills to

17   pay.  If they don't get paid this Friday, there's going to be

18   hell to pay.  This is going to be bad.  Get it fixed."

19             Well, you know, with break fix, immediately what

20   would happen is a support engineer would get on the system,

21   actually start looking around, exploring the database layer,

22   the application layer, infrastructure layer, and try and find

23   out what's going on here, what's going wrong.

24             And, you know, they're working at the speed of

25   thought basically, hands on the keyboard, doing exploratory

1    surgery on this application, trying to find the cause of this

2    break.  Okay?

3          So if we take a step back and say, okay, based on

4    Ms. Frederiksen-Cross's definition of source code and what it

5    says is unlawful, what this now means is that this support

6    engineer, who would take the phone call and say, "Hmm, I

7    understand what you're saying.  Hold on.  I'm going to get the

8    first flight out.  I'm going to fly to your site, because I

9    can't look at your code remotely, fly to your site," which may

10   be halfway across the country, "check into my hotel, then I'll

11   come over, and I'll look over your shoulder as you start

12   trying to find this issue."

13         Now, I'm going to tell you, that would be completely

14   unacceptable for that customer.

15         There are service levels that are negotiated in

16   these types of third-party support contracts, and a service

17   level means that if there's a break fix incident like this, it

18   has to be resolved in a certain period, short period of time.

19   If it's not, there are penalties.

20         And if these infractions happen too often, or there

21   are too many of them, I believe the client could, you know,

22   walk away from the contract.

23         So you have to be responsive to these types of

24   incidents if you want to stay in the third-party support

25   maintenance business.

-1327-

1    Q    Now, I take it from your explanation you heard testimony

2    during this proceeding that at one point Rimini had considered

3    an over-the-shoulder method?

4    A    Yes, I have seen that.

5    Q    And so, in your opinion, could Rimini have provided

6    meaningful JDE support going forward using an

7    over-the-shoulder method of support?

8    A    No, they cannot.

9    Q    And could Rimini, itself, even provide tax, legal, and

10   regulatory updates directly to customers using this

11   over-the-shoulder method?

12   A    No.

13   Q    Would Rimini have required customers to engage employees

14   or other third-parties to actually do the implementation?

15   A    Well, see, that's the point.  Because, you know, even if

16   it's a more mundane type of change, it's going to be

17   frustrating for that client to have to take someone that they

18   have doing some other job, put them at that computer with the

19   Rimini engineer over their shoulder, you know, telling them

20   what to do.

21          That's going to be frustrating because there's an

22   opportunity cost associated with that individual, the client

23   individual, sitting at that commuter.  They need to be doing

24   their normal day job, not doing Rimini's work.

25          So you could see it's going to be very frustrating,

1   and what would result is that customer would eventually look

2   for a way out of that contract with Rimini, or wait for the

3   expiration of that contract, and then go elsewhere for their

4   services.

5           Furthermore, you wouldn't get any new business --

6   let me repeat that -- no new business with that type of

7   approach.  You would not acquire any more support and

8   maintenance contracts.  No one would buy that service.

9   Q   And during the time that you were working in the

10  industry, were you ever aware of any company that provided

11  ongoing maintenance and support for JDE using this

12  over-the-shoulder method?

13  A   No.

14  Q   Do you recall testimony from Ms. Frederiksen-Cross that

15  it would be prohibited for Rimini to remotely connect to its

16  clients to do the over-the-shoulder support?

17  A   Yes, I do.

18          MR. LIVERSIDGE:  And maybe we can bring that up,

19  John.  I think it's at 543, lines 5 through 18.

20  BY MR. LIVERSIDGE:

21  Q   And I think the question starts about on line 7,

22          "I wanted to touch up on one issue which is

23      you mention this concept of a Rimini engineer

24      standing next to someone who is allowed to look at

25      the code.  And I wanted -- and I think you said

1   that's okay.  Can a Rimini engineer do the same thing

2   remotely?

3           "ANSWER:  I think that's a slipperier slope

4   because, if they're doing it remotely, at least a

5   video portion of the call, the only thing they can

6   have is on their remote machine at the time that they

7   reviewing, and so there is a copy of the code in a

8   form remotely on their machine.

9           "QUESTION:  So they can't?

10          "ANSWER:  I would think that would be

11  prohibited."

12          Do you recall that testimony?

13  A   I do.

14  Q   And so is it your understanding that

15  Ms. Frederiksen-Cross's view is that a Rimini employee

16  must literally be looking over the physical shoulder of its

17  client at the client's building in order to provide support?

18  A   Yes.  And that was what I was describing in my example of

19  break fix support, that a Rimini engineer -- or any

20  third-party support engineer -- needing to get on a plane in

21  the middle of a crisis to fly physically to that site to

22  physically look over the shoulder of the employee as they

23  would access modifying copy of the code, it's ludicrous.

24  Q   And, in your opinion, would it even be feasible to have a

25  remote viewing access model with no ability to remotely access

1 and view the code?

2  A   No, it makes no sense.

3  Q   Do you recall testimony from Ms. Frederiksen-Cross that

4 she did not believe that paragraph 10 of the injunction would

5 be rendered superfluous by her interpretation of paragraph 8?

6  A   I do recall that.

7  Q   And do you agree with her?

8  A   I don't.

9           MR. LIVERSIDGE:  Now, maybe we can bring up -- I

10 think it's, John, page 4 of docket number 1459.

11 BY MR. LIVERSIDGE:

12  Q   And here we have the two paragraphs of the injunction,

13 paragraph 8 and paragraph 10, and, Mr. Lanchak, why do you

14 disagree with Ms. Frederiksen-Cross?

15  A   Well, paragraph 10 is alluding to third-party support

16 going on because it's really what I believe is called a

17 cross-use type of issue.  So it's assuming that there's

18 third-party support.

19       Well, paragraph 8 essentially is banning third-party

20 support by prohibiting and making unlawful the copying of JD

21 Edwards software source code.

22  Q   And when you say paragraph 8 is banning third-party

23 support, are you referring to Ms. Frederiksen-Cross's

24 interpretation?

25  A   I am.  Her interpretation of that is that that would

1    be -- that interpretation includes all code associated with JD

2    Edwards.  And if you're going to say you cannot copy all code

3    associated with JD Edwards software support, you're

4    essentially banning third-party support of that application,

5    and that's not what paragraph 10 seems to indicate.

6    Q    And does paragraph 10 contemplate development and testing

7    of JDE updates by Rimini?

8    A    It does.

9    Q    And would Rimini need to modify and copy open code in

10   order to provide development and testing of JDE updates?

11   A    Absolutely.  So I think -- in my opinion, it renders 10

12   superfluous.  Yes.

13                 MR. LIVERSIDGE:  Thank you, Mr. Lanchak.

14                 No further questions.

15                 THE COURT:  Cross-examination.

16                 MR. HILL:  Your Honor, may I approach with

17   witness binders?

18                 THE COURT:  Yes, sure.

19                 MR. HILL:  Good morning, Mr. Lanchak.

20                 THE WITNESS:  Good morning, Mr. Hill.

21                         CROSS-EXAMINATION

22   BY MR. HILL:

23   Q    Mr. Lanchak, you are not a computer scientist, correct?

24   A    That is correct.

25   Q    And understanding that you're not a computer scientist,

1  do you have an opinion on the definition of the term source

2  code?

3  A    I do.

4  Q    Would you defer to Mr. -- Professor Astrachan on the

5  definition of source code?

6  A    My definition of source code is human-readable code, and

7  I believe, you know, he said something to that same effect.

8  Q    And the closed code that you've talked about that

9  licensees receive when they get the JDE software, that's not

10  human-readable code, is it?

11  A    It's provided in object code form, so --

12  Q    So what the licensees receive is not human-readable code,

13  correct?

14  A    It's not.  It's compiled source code so it can be

15  converted to human-readable code.

16  Q    When you say -- okay.

17        And, Mr. Lanchak, you're not an expert at

18  interpreting Oracle licenses, correct?

19  A    I am not.

20  Q    But you looked at a lot of JD Edwards licenses in

21  preparing your opinions, correct?

22  A    I did.

23  Q    And I think you mentioned this, but the terms closed code

24  and open code, those are not contained in any JD Edwards

25  license that you have seen, correct?

1  A    That's correct.

2  Q    And it's your opinion that it would be effectively

3  impossible to use, maintain, or support JD Edwards software in

4  a meaningful way without copying JDE open code, correct?

5  A    That is correct.

6  Q    And, in fact, it's your opinion that there's no level of

7  support that Rimini could provide to its JDE customers without

8  copying the JDE open code, correct?

9  A    There's no level of meaningful support, I believe is what

10  I said, yes.

11        I mean, that's not to say they can -- they can

12  answer the phone and answer users' questions about how, you

13  know, something works.  They can set up, you know, new user

14  IDs, perhaps.

15        But, I'm talking about meaningful support, those

16  types of serious items and significant items.

17  Q    And as for tax, legal, and regulatory updates, it would

18  be effectively impossible for Rimini to create those without

19  copying JDE open code, correct?

20  A    Yes.

21  Q    And it would be effectively impossible for any

22  support provider to provide break fix support without copying

23  the JD Edwards open code, correct?

24  A    Yes.

25  Q    And it's your opinion that no support provider could

```
1   effectively provide support to JDE customers by remotely

2   viewing the customer's screen and providing that

3   over-the-shoulder support, correct?

4   A    Based on the definition of source code that was put forth

5   by Ms. Frederiksen-Cross, yes.

6   Q    And these opinions that you've just talked about, about

7   the inability to provide effective support, those are not

8   based on your analysis of the details of Rimini's support

9   offerings, correct?

10  A    It's based on the -- my review of the materials in this

11  case and my experience working in the industry over all these

12  years.

13  Q    But I think you testified yesterday that you haven't done

14  that detailed analysis of Rimini's processes --

15  A    I have --

16                      (Simultaneous indecipherable
                          conversation.)
17                  MR. HILL:  I'll ask my question again.

18  BY MR. HILL:

19  Q    You haven't done that detailed analysis of Rimini's

20  processes and procedures to determine if it would be possible,

21  correct?

22  A    That's correct, I haven't done a detailed analysis of

23  Rimini's processes and procedures.  I wasn't asked to do that

24  as part of my task.

25  Q    And you don't have an opinion on exactly what Rimini does
```

1    and doesn't do in terms of its JDE support processes, correct?

2    A    Well, I haven't reviewed, as we just said, their -- I

3    haven't reviewed the specific processes and procedures that

4    Rimini does, but, I have worked in the industry quite a bit,

5    and I understand what Rimini does from the documentation I've

6    seen and from my industry experience.

7    Q    But when you formed your opinions, you didn't even know

8    if Rimini provided break fix support, correct?

9    A    That's not correct.

10                  MR. HILL:  Matt, could you pull up, from

11   Mr. Lanchak's June 2020 deposition page 181, line 16.

12   BY MR. HILL:

13   Q    Mr. Lanchak, I asked you,

14               "Does Rimini provide break fix support to its

15        JD Edwards clients?

16               "ANSWER:  Yeah.  I haven't Rimini's specific

17        services so I'm not going to provide an opinion on

18        exactly what they do and don't do."

19               That's your testimony, correct?

20   A    That is my testimony.

21           And what I'm saying there is that I wasn't going to

22   comment on that because I hadn't done that detailed analysis.

23   Q    Mr. Lanchak, you're not an expert in tax, legal, or

24   regulatory updates for JD Edwards, correct?

25   A    I'm an expert in understanding what tax, legal, and

1    regulatory updates are.  I've been involved in applying those

2    updates, but I'm not an expert in creating those updates or

3    doing the research, the analysis necessary in understanding

4    what updates need to be created.

5    Q    You've never designed and coded a tax, legal, or

6    regulatory update, correct?

7    A    That is correct.

8    Q    You talked about Spinnaker a little bit.  Spinnaker is a

9    Rimini support competitor, correct?

10   A    That is correct.

11   Q    And you haven't done the analysis of Spinnaker support

12   processes, just like with Rimini's, to determine whether they

13   copy JDE open code when they support JDE customers, correct?

14   A    I have not done that analysis of their processes, but I

15   have just relied on the sworn statement by Mathew Stava and

16   some of the other documentation I've seen.

17                   MR. HILL:  Matt, could you pull up DTX-733,

18   paragraph 14, again.

19   BY MR. HILL:

20   Q    And this is the portion that you're referencing where

21   Mr. Stava says, in your opinion, that Spinnaker copies JDE

22   open code?

23   A    Yes.

24   Q    Okay.  Now, in making -- in creating these updates

25   mentioned here, you don't know if Spinnaker actually

1    implemented those directly, or if the customer implemented

2    those with Spinnaker remotely providing support, correct?

3    A    I don't know specifically how those were conducted,

4    that's correct.  But I do -- can infer that Spinnaker, from

5    what I'm reading here, would be executing those changes.

6              I would think -- I'd back up that by saying that I

7    don't think Spinnaker would be as successful as they are today

8    if they were not making those open code changes themselves.

9    Q    Can you identify any Spinnaker customers from 2011?

10   A    Not offhand.

11   Q    And so that means you don't know the terms of the license

12   of any of those Spinnaker customers in 2011, correct?

13   A    Well, I've seen lots of JD Edwards licenses, and I know

14   they're going to be pretty standard from customer to customer.

15   Q    But specifically, in 2011, you can't identify any license

16   for any of the Spinnaker customers, correct?

17   A    If you're asking me specifically can I identify a license

18   between Spinnaker and one of its clients, no, I cannot.

19   Q    Mr. Lanchak, what is an Oracle integration license?

20   A    An Oracle integration license?

21   Q    Yes.

22   A    I'm not familiar with that term.

23   Q    You have never heard that before?

24   A    I don't recall what that would be.

25   Q    All the companies that you work for in the industry, that

1    includes Accenture, KPMG, BearingPoint, HCL, they're all part

2    of the Oracle Partner Network, correct?

3    A    That is correct.

4    Q    ERP Suite, that company is part of the Oracle Partner

5    Network, correct?

6    A    I believe they are.

7    Q    SpearMC?

8    A    I believe they are as well.

9    Q    And if they're part of the Oracle Partner Network, that

10   means they all had a partner agreement in place with Oracle,

11   correct?

12   A    Yes.  I'm very familiar with those Oracle partner

13   agreements.  They were primarily focused around business

14   development, and governed the payment of fees such as co-sale

15   fees and resale fees for the integrator that was facilitating

16   the sale of an Oracle license.

17   Q    But you don't know the terms of any of those Oracle

18   partner agreements, correct?

19   A    I don't recall the specific terms.  We're talking a few

20   years ago.

21   Q    And you don't know the terms of the Oracle partner

22   agreements for any of the companies in the JD Edwards support

23   ecosystem, correct?

24   A    Can you repeat that question, please.

25   Q    You don't know the terms of the Oracle partner agreements

1339

1     for any of the companies in the JDE support ecosystem,

2     correct?

3      A    I haven't seen their specific terms; that's correct.

4      Q    And you mentioned I believe yesterday that many of the

5     big projects you worked for in JDE were integration projects,

6     correct, systems integration projects?

7      A    It included integration and implementation, but there

8     were large elements of support and maintenance in those

9     engagements as well.

10     Q    And you -- because you don't know the terms of the Oracle

11    partner agreements, you don't know if any of the entities that

12    you worked for, as part of their Oracle partner agreements,

13    had a license from Oracle, correct?

14     A    Can you repeat that?

15     Q    You don't know if any of the entities that you worked for

16    in the industry, as part of their Oracle partner agreements,

17    had a license from Oracle, correct?

18     A    As I said before, I don't recall all the specific terms

19    in these agreements, but if we had a license for these

20    applications, I believe it would have been for our use of

21    those applications in the course of operating our business.

22     Q    But, again, you don't know the terms of those partner

23    agreements, correct?

24     A    I don't recall the detailed terms of those

25    partner agreements.  As I said, they're more business

```
 1    development-oriented and governed the payment of resale

 2    or co-sale fees by Oracle to us for helping Oracle sell those

 3    licenses.  That's what I remember about them.

 4                   MR. HILL:  Matt, could you put up tab 1, please.

 5                   This is tab 1 in your binder.  At the very end

 6    there's a series of tabs.  This is the first one.  This is a

 7    document entitled Oracle Partner Network Policies.

 8                   Matt, could you go to page 6 under section C --

 9                   THE WITNESS:  I'm sorry, Mr. Hill, what tab am I

10    looking at here?

11                   MR. HILL:  It's tab 1 in your binder.  It's

12    towards the very end.  It's after the depositions and --

13                   THE WITNESS:  Oh, tab 1.  Okay.  I thought you

14    meant the first tab.

15                   MR. LIVERSIDGE:  I'm sorry to interject.  Your

16    Honor, can we get an exhibit number for this document?

17                   MR. HILL:  Your Honor, this doesn't have an

18    exhibit number.  I'm not offering to admit it at this point,

19    I'm just establishing foundation.

20                   THE COURT:  Well, let's at least mark it for

21    identification in the event it is later referred to.

22                   MR. LIVERSIDGE:  Well, your Honor, they objected

23    to me showing the witness documents not on the trial exhibit

24    list.  I don't believe this document is on their trial exhibit

25    list.
```

1          MR. HILL:  This is cross-examination, your

2    Honor.  This is not on our exhibit list.

3          THE COURT:  I'll allow it for a limited purpose.

4    I'm not going to admit it.

5          MR. HILL:  Understood.

6    BY MR. HILL:

7    Q    Are you with me, Mr. Lanchak, on tab 1?

8    A    Yes, I have it.

9    Q    Could you look at page 6 under section C.

10         And do you see where it says -- this section C is

11   Application Programs, and do you see where it says,

12              "If you join the license and hardware track,

13         you may order an unlimited number of integration

14         licenses for use with your proprietary application

15         program as described in your OPM agreement."

16              Do you see that.

17   A    Yes.  Give me a second to just look at that.

18   Q    Sure.

19         THE COURT:  Mr. Smith [sic], I'm going to cut

20   you off here.  He's previously testified that he's not

21   familiar with the terms, doesn't know the terms of the Oracle

22   partnership agreement.

23         I assume that what you're producing here is, in

24   fact, the current edition of the Oracle partner agreement, but

25   if he doesn't know it, he's not familiar with the terms, the

-1342-

```
 1    document hasn't been produced before, I'm going to cut you
 2    off.
 3                 MR. HILL:  Understood, your Honor.
 4    BY MR. HILL:
 5    Q    Mr. Lanchak, that integration license mentioned in that
 6    document, you're not familiar with that, correct?
 7    A    This specific license, I'm not.  This is dated 2021, so I
 8    wouldn't be familiar with this particular version.
 9    Q    Are you familiar with any version of an integration
10    license?  I think you said before you hadn't --
11    A    Oh, no.  I thought you were talking about the partner
12    agreement.  I'm sorry, the integration license, no, I'm not.
13    Q    Okay.  And you're not familiar with the terms of an
14    integration license, correct?
15    A    As I said, I don't recall the integration license.
16    Q    So you don't know if an integration license gives the
17    licensee the license to access and copy JDE open code,
18    correct?
19    A    Well, what I'd tell you is, you know, there may be terms
20    for some of the larger providers that are in place currently.
21    I don't know if they were in place when I was dealing with
22    these systems.
23                 But you also have a lot of these smaller providers
24    that are doing the exact same work, the LLCs that I talked
25    about, the independent third-party contractors that do not
```

1  have any of these provisions governing their use of the

2  software.

3  Q   Mr. Liversidge asked you about the mom and pop shops.

4  You mentioned SpearMC and ERP Suites, correct?

5  A   Yes.  And then I also talked about the tier in the

6  ecosystem below that which would be these LLCs made up of

7  three, five, seven people that do the same modification work.

8  Q   And ERP Suites and SpearMC, you mentioned they have an

9  Oracle partner agreement, correct?

10  A   They may or may not.  I do not know.

11  Q   I believe --

12  A   Oh, oh, I'm sorry.  I thought (unintelligible) the

13  integration agreement.

14  Q   No, just a partner agreement.

15  A   Just partner -- yeah, I believe ERP Suites and SpearMC

16  does -- they both have a partner agreement.

17  Q   And for those small, five- to seven-person operations,

18  you don't their license arrangements with Oracle or --

19            COURT REPORTER:  I'm sorry, sir.  Would you

20  repeat the question a little slower.

21            MR. HILL:  Sorry.

22  BY MR. HILL:

23  Q   Those smaller shops with the five to seven people you

24  mentioned, you don't have any understanding of their

25  arrangements or agreements, licenses with Oracle, correct?

1    A    I don't specifically, but I have worked quite a bit with

2    them in the 18 years that I've been working with Oracle, and I

3    feel -- my opinion is that they do not, and I saw no

4    indication that they had any kind of agreements with Oracle

5    when I was working with them.

6    Q    Well, you didn't work for them, right?  You worked

7    for these --

8    A    No, but I hired them on my teams, so they would be on my

9    projects.

10   Q    But you wouldn't be privy to their contractual agreements

11   and negotiations with Oracle, correct?

12   A    Well, as I said, specifically, I wouldn't.  But being so

13   familiar with what they did, how they did it, and their

14   involvement on my teams, I feel pretty certain they did not

15   have any kind of documentation -- or agreements with Oracle.

16   Q    But you don't know, right?

17   A    I haven't specifically asked them that question in the

18   past.

19   Q    Mr. Lanchak, it's not your view that Oracle's

20   interpretation of the injunction prevents JDE licensees from

21   copying the open JDE code, correct?

22   A    I'm sorry, can you repeat that.

23   Q    Yeah.  It's not your view that Oracle's interpretation of

24   the injunction prohibits licensees from accessing the JDE open

25   code, correct?

1   A    No, that's incorrect.  It would prohibit them as well.

2   If it's unlawful, it's unlawful.

3                   MR. HILL:  Well -- Matt, could you bring up the

4   injunction, ECF 1166, paragraph 8.

5   BY MR. HILL:

6   Q    As that's written, Mr. Lanchak, that doesn't prohibit a

7   licensee from accessing the JDE open code, correct?

8   A    Well, I believe the injunction's purpose was to prohibit

9   unlawful conduct.

10  Q    Well, let me just read it.

11                  "Rimini Street shall not copy or access JD

12          Edwards software source code to carry out development

13          and testing of software updates."

14                  So that only applies to Rimini Street, correct?

15                  MR. LIVERSIDGE:  Objection, calls for a legal

16  conclusion.

17                  THE COURT:  Sustained.  And I would also state

18  that the words "or access" have been stricken from the

19  injunction.

20                  MR. HILL:  Thank you, your Honor.

21  BY MR. HILL:

22  Q    But as you read this, this doesn't apply to a licensee,

23  correct?  It only applies to Rimini Street.

24  A    I see the words there, but, as I said, I believe the

25  injunction is meant to prohibit unlawful conduct, and unlawful

```
 1   is unlawful.
 2   Q    Okay.  In your interpretation -- well, assuming Oracle's
 3   interpretation, have you seen any JD Edwards license that
 4   prohibits the licensee from accessing the JDE -- from copying
 5   the JDE open code?
 6   A    Repeat it, please.
 7   Q    Yeah.  Under Oracle's interpretation of source code, have
 8   you seen any license that prohibits the licensee from
 9   accessing what you call JDE open code?
10   A    I believe the licenses support the licensees and their
11   affiliates in supporting -- or in accessing and modifying and
12   copying that open layer of code, as I've said.
13                   MR. HILL:  No further questions, your Honor.
14                   THE COURT:  Redirect examination?
15                   MR. LIVERSIDGE:  Just very briefly, your Honor.
16                        REDIRECT EXAMINATION
17   BY MR. LIVERSIDGE:
18   Q    Mr. Lanchak, do you recall that counsel asked you about
19   whether the terms open and closed code were reflected in the
20   licenses?
21   A    Yes, I do.
22   Q    And you indicated that the actual terms open and closed
23   were not used.  Do you recall that?
24   A    I do recall that.
25   Q    But are the concepts around these open and closed layers
```

1  of code reflected in the licenses?

2  A   They are.  And the point I want to make about open and

3  closed, they're mere labels.  We can call opened and closed

4  whatever we want.

5          But the concepts -- which is what -- what is the

6  important point here, are reflected in the licenses as we

7  discussed.

8  Q   And we looked at one of the licenses for JD Edwards, and

9  do the licenses have a prohibition on decompiling, accessing,

10  and ultimately copying the closed layer of code that you've

11  identified?

12  A   That is correct.

13  Q   And is there any prohibition that you've seen in the

14  licenses on copying the open code?

15  A   No.  There is no prohibition against that that I've seen

16  in the licenses.

17          MR. LIVERSIDGE:  Nothing further, your Honor.

18          THE COURT:  Anything further?

19          MR. HILL:  Nothing further, your Honor.

20          THE COURT:  All right.

21          That will conclude the testimony of Mr. Lanchak.

22          Let me inquire, what do you next anticipate on

23  behalf of Rimini?

24          MR. LIVERSIDGE:  Your Honor, my understanding is

25  we have a few housekeeping matters to take up and to clean up

1    before we close, and then we'll be at the end of our case.

2              THE COURT:  All right.  Thank you.

3              And Mr. Smith do you know, at this point in

4    time -- I'm sorry, Mr. Hill, whether any rebuttal is

5    anticipated on behalf of Oracle?

6              MR. HILL:  Yes.  Oracle intends to call back

7    Ms. Frederiksen-Cross.

8              THE COURT:  All right.  Okay.  Thank you.

9              We will take our morning recess at this time.

10   We will reconvene at 10:40 or shortly thereafter.

11                   (A recess was taken.)

12             THE COURT:  Have a seat, please.

13             The record will show we are reconvened after our

14   morning break.

15             And, Mr. McCracken, I see that you're up at bat

16   at this time so go ahead.

17             MR. MCCRACKEN:  Yes, good morning, your Honor.

18   We just have a few evidentiary housekeeping matters before

19   Rimini rests its case.

20             THE COURT:  Okay.

21             MR. McCRACKEN:  The first is that yesterday the

22   Court reserved ruling on Oracle Exhibit 68, but at this time

23   both parties have agreed that that should come into evidence,

24   and so we would offer Oracle Exhibit 68.

25             THE COURT:  All right.  It is admitted.  I

```
 1   appreciate your doing that.
 2                    (Plaintiff's Document Exhibit 68 received
                       in evidence.)
 3             MR. McCRACKEN:  The second issue, your Honor, is
 4   we have DTX-46, which is an excerpt of Ms. Frederiksen-Cross's
 5   deposition testimony that was read into the record on
 6   Wednesday, so we would offer DTX-46.  There's no objection
 7   from Oracle.
 8             THE COURT:  All right.  It's admitted as well.
 9   Thank you.
10                    (Defendant's Exhibit 46 received in
                       evidence.)
11             MR. McCRACKEN:  The third issue is with regard
12   to DTX-733, which is a copy of the Mathew Stava declaration
13   that we've heard testimony about.  Another copy of that is
14   already admitted, which is DTX-716, and so we'd offer DTX-733,
15   and there's no objection to that.
16             THE COURT:  All right.  It is admitted.
17                    (Defendant's Document Exhibit 733
                       received in evidence.)
18             THE COURT:  Is 716 already in evidence?
19             MR. McCRACKEN:  Yes, that's my understanding,
20   your Honor.
21             THE COURT:  Okay.  Go ahead, please.
22             MR. McCRACKEN:  And then, finally, we would
23   offer DTX-740, which is a copy of the transcript of the
24   deposition of Buffy Ransom that was played in court -- was
25   that Friday?  Monday?  In any event, it was played in court,
```

1    and there's no objection to that.

2              THE COURT:  All right.  It's admitted.

3                   (Defendant's Exhibit 740 received in
                    evidence.)

4              MR. McCRACKEN:  And with those resolved, your

5    Honor, Rimini rests subject to Oracle's rebuttal case.

6              THE COURT:  All right.  Thank you very much,

7    Mr. McCracken.

8              MR. McCRACKEN:  Thank you.

9              THE COURT:  Mr. Smith, are you at bat?

10             MR. SMITH:  I'm at bat, your Honor.  We recall

11   Ms. Frederiksen-Cross to the stand.

12             THE COURT:  All right, thank you.

13             MR. SMITH:  Welcome back, Ms. Frederiksen-Cross.

14             THE WITNESS:  Thank you.

15                   BARBARA FREDERIKSEN-CROSS,
         called as a rebuttal witness on behalf of the Plaintiff,
16                previously sworn, testified as follows:

17                   DIRECT EXAMINATION

18   BY MR. SMITH:

19    Q   Let's get to it.  Do you recall Professor Astrachan's

20   testimony that the Oracle copyrighted files and documents

21   found on Rimini's systems were isolated?

22    A   I recall that testimony, yes.

23    Q   And do you recall that he testified that he called these

24   files and documentation isolated either because they were few

25   in number or because they are separated from the PeopleSoft

1   environments?

2   A    I do recall, yes.

3   Q    Do you believe the Oracle files and documentation found

4   on Rimini systems were isolated in number?

5   A    No, I do not.

6   Q    Do you have a demonstrative showing the number of files,

7   Oracle copyrighted files, that you found on Rimini systems?

8   A    Yes, I do.

9           MR. SMITH:  And with your Honor's permission, we

10  would show slide 2 of her demonstratives which I have provided

11  a copy for the Court, too.

12          THE COURT:  All right.  You may do so.

13  BY MR. SMITH:

14  Q    Can you walk us through this slide and your analysis of

15  the copyrighted files.

16  A    Yes, just to refresh the testimony I gave the other day,

17  we initially searched for indicia of documents that contained

18  Oracle copyright.  So this would be Oracle or PeopleSoft,

19  PeopleTools, JDE documents.

20          We did so using a text-based search that just looks

21  for the proximity of copyright with those words.  That

22  research revealed 4,481 documents.

23          And then just to reduce that to a manageable number

24  for a more detailed review, we also filtered to include dot

25  txt files because we had seen evidence, for instance, of files

1352

1   being renamed to txt when they're being transmitted to

2   SalesForce.

3           Similarly, we filtered for files beginning with OOP,

4   because that was used in some of Oracle's filing name

5   conventions, and we -- that yielded -- after that pass of

6   filtering, we had 1139 documents.  This excluded .pdf files

7   and certain other types of files as well.

8   Q    Okay.  So with respect to the 1,139 documents, that

9   excluded .pdf files?

10  A    Yes, unless they met the OOP.

11  Q    And were other types of documents also excluded by that

12  initial filtering process?

13  A    Yes.  This was intended to exclude things like HTML

14  files, for instance, that would have been the results of

15  someone printing a support page, for instance, that was

16  publicly available but had an Oracle copyright.

17          And, similarly, if you had copied from a page like

18  that into a Word document, you know, because we didn't include

19  the Word file types, that would have been excluded as well.

20  Q    And then can you describe the further filtering process

21  that's referenced here.

22  A    Yes.  Then we filtered specifically for the file

23  extensions that would have been related to source code as

24  well.

25  Q    Okay.  And so Professor Astrachan has opined that 844 of

1  the 934 documents that resulted from your filtering process

2  were uploaded to SalesForce by clients.  Do you recall

3  evidence of that?

4  A   I recall his testimony that he was told that and had

5  relied upon that number.

6  Q   And do you know how that number was determined by

7  Professor Astrachan?

8  A   It was through interview with Mr. Butler who I understand

9  to be a Rimini employee.

10  Q   Now, assuming that that figure is accurate, that 844 of

11  the 934 documents were uploaded to SalesForce by clients, how

12  many documents does that leave, based upon your search, that

13  were not uploaded by clients?

14  A   That leaves an additional 90 documents.

15  Q   I would like to show you page 929, line 24, to page 930,

16  line 7, of the transcript from day five, which was Professor

17  Astrachan's testimony.  And he was asked:

18           "Do you consider those 19 files sent to

19       Rimini by clients to be isolated?"

20            His answer was, "Yes.  I call them isolated

21       because they're not part of any environment.  Any

22       environment from which they came were the client's

23       environment.  Rimini has no environments.  So these

24       PeopleSoft files are isolated.  They can't be

25       executed because Rimini has no PeopleSoft

1    environments.  They can't be run.  They can't be used

2    because they are isolated from the environments from

3    which they came."

4              Do you agree with that testimony.

5    A    I think it ignores the fact that there are other forms of

6    use than running the software, for instance, looking at the

7    files in order to diagnosis a problem, or, if it's a

8    description of an Oracle fix, in order to understand, you

9    know, what Oracle was fixing and how it was fixed.

10             So I disagree with the characterization as these

11   being not -- not useable.

12   Q    And do you have a demonstrative highlighting Rimini's use

13   of certain documents and files?

14   A    Yes, I do, with the Court's permission.

15   Q    And we'd like to display slide 3.

16             Can you briefly explain this slide and how the

17   exemplar files that you found on Rimini systems were used.

18   A    These are files that I spoke about in my testimony

19   a few days ago.  Psptaxdt.dms, this file was uploaded to

20   Rimini's system.  It was opened, and the change log was viewed

21   in order to assess the version so that Rimini could help a

22   customer resolve a problem.

23             The PeopleSoft documentation that was sent through

24   SalesForce from -- by Texas General's -- Texas General --

25   Texas Children's Hospital, sorry, was then loaded to a share

1    file.

2          So it was initially sent to Tom Glazer, or provided

3    to Tom Glazer as an attachment, and then later moved to the

4    share file on Rimini's system presumably because someone

5    thought it was useful.

6          With respect to Evergreen Support, the file

7    psptcalc.lis, was a program listing that was provided by a

8    client to Rimini, and the SalesForce document indicates that

9    Rimini was able to identify the problem in one of its files

10   after reviewing this listing from the Oracle file that

11   happened to have an inclusion for that Rimini file.

12          And then, finally, the University of Oklahoma Health

13   Sciences Center tax files, again, the record shows that they

14   were reviewed for the purposes of diagnosing a problem with

15   the calendar year and where it was being picked up from in the

16   database.

17          MR. SMITH:  Okay.  We can take that down.

18   BY MR. SMITH:

19   Q    Do you recall Mr. MacKereth's testimony from yesterday

20   that the SalesForce records you analyzed were flagged for

21   quarantine in some fashion?

22   A    I do recall that testimony, yes.

23   Q    Was yesterday the first time you heard of any such

24   practice by Rimini with regard to the files that you discussed

25   in your prior testimony?

1    A     Well, in Mr. Astrachan's report, he had said he had been

2    provided information by Mr. Butler in a verbal conversation

3    that there had been some kind of quarantine, but yesterday was

4    the first evidence I had ever seen presented that was

5    represented to be associated with that quarantining.

6    Q     And did you review the production history of the

7    SalesForce documents in this case following Mr. MacKereth's

8    testimony from yesterday?

9    A     Yes, I did.

10   Q     And did you reach any conclusions based upon that review?

11   A     Yeah.  It appears that the -- assuming, for a moment,

12   that that date change does, in fact, reflect the date that

13   these documents were quarantined, it appears that they were

14   quarantined at a point in time after Rimini had agreed to

15   produce those documents but a couple of months before they

16   were actually produced.

17   Q     And do you know when Rimini agreed to provide the

18   SalesForce tables that you reviewed in this case?

19   A     My recollection is that that was August 5th or 6th of

20   2019.

21   Q     And do you recall when the SalesForce records that you

22   reviewed in this case were actually produced by Rimini?

23   A     That was later in October.

24   Q     And how many months after the injunction was issued were

25   the SalesForce records offered to be produced by Rimini in

1   this case?

2   A    The original 2016 injunction or the confirmation of that

3   in November?

4   Q    Let's go from the November 2018 date.

5   A    That would be, I think, seven or eight months.

6   Q    And let me move on -- well, let me ask you one final

7   question with respect to the SalesForce records.

8            We saw records yesterday that were indicated to be

9   modified by Ms. Maurya Priyadarshi.  Do you recall that?

10  A    I do.

11  Q    And do you understand the dates reflected in the

12  SalesForce records, which I believe ranged from August 23rd to

13  28 of 2019, to reflect the date when she modified those files

14  in some way?

15  A    That was my understanding from the testimony provided.

16  Q    I'd now like to talk to you about the evidence presented

17  in this case regarding violations 4, 2, 3 and 10, which I

18  think have been loosely grouped together as kind of the

19  cross-use violations.

20           Are there some general rebuttal points that you

21  would like to make regarding each of these violations?

22  A    Yes, there are.

23  Q    And do you have a demonstrative outlining these general

24  rebuttal points?

25  A    Yes, I do.

1    MR. SMITH:  If we could show slide 4.

2  BY MR. SMITH:

3   Q    Are these your general rebuttal points?

4   A    Yes.

5   Q    Can you explain these briefly, and then we'll get into

6  greater detail in a moment.

7   A    Sure.  With respect to the first point, you know, it is

8  my understanding that even if a particular client were in

9  scope, that the injunction prohibits the reuse of work done in

10  that client's environment to support some other licensee, that

11  the injunction really makes clear that it's solely in support

12  of a particular client's use that their environment can be

13  used.

14   Q    And then how about number 2.

15   A    There was some rather muddy testimony, I felt, yesterday

16  that seemed to conflate the delivery of software -- or of an

17  update to a client with development in that client's

18  environment, and this specifically focused on some of the logs

19  that were discussed where the file transfer and -- and the

20  creation of the upload folders, and so I'd like the

21  opportunity to clear that up.

22   Q    Okay.  So let's talk about your first general rebuttal

23  opinion regarding cross-use.

24        Do violations number 4 and 2 regarding Spherion,

25  Smead and Matheson Trucking illustrate this point?

1    A    Yes, they do.

2    Q    And do you recall that violations 2 and 4 concern the

3    form 940A, which involved credit reductions for businesses

4    with employees in the US Virgin Islands?

5    A    I do, yes.

6    Q    Do you recall testimony to the effect that because the

7    HCM200049 update for this credit reduction issue involved a

8    federal tax form, all states and clients were in scope to

9    receive the update?

10   A    I recall that testimony.

11   Q    And do you recall Mr. Benge's testimony that because the

12   City of Eugene was part of a group of clients that were in

13   scope to receive the update, the update was first developed in

14   City of Eugene?

15   A    I recall that testimony, yes.

16   Q    Do you agree that the City of Eugene was in scope to

17   receive the HCM200049 update at the time Mr. Don Sheffield

18   first went into the environment associated with the City of

19   Eugene, and performed testing of that update?

20   A    Not with respect to the specific problem that was being

21   worked on at that point in time.

22   Q    And do you recall Professor Astrachan's demonstrative

23   regarding this timeline?

24   A    Yes, I do.

25              MR. SMITH:  And if we could show slide 5.

```
 1   BY MR. SMITH:

 2   Q    And this is DDX-559.  Do you recognize this as the

 3   demonstrative from Professor Astrachan's direct testimony?

 4   A    I do, yes.

 5   Q    Was this timeline accurate in your opinion?

 6   A    In my opinion, it's both incomplete and inaccurate.

 7   Q    Have you created your own rebuttal timeline?

 8   A    Yes, I have.

 9              MR. SMITH:  And if we could show slide 6.

10   BY MR. SMITH:

11   Q    Can you please explain your timeline with respect to this

12   violation, Ms. Frederiksen-Cross.

13   A    Yes.  What I think is significant that was omitted was

14   that well in advance of the activities that were being

15   discussed in that specific fix for the records we were looking

16   at yesterday, the IRS had already announced that that change

17   for 940A in the new box would apply only to businesses that

18   had -- or only to work being done in the US Virgin Islands,

19   and so that was in November 28th of 2018.

20              Subsequent to that, if we look at the Jira records,

21   we see that in January 15th, Ms. Gardner set the scope of the

22   Form 940, therefore, to include just Spherion, the client SPH.

23   Q    And who is Laurie Gardner, to your recollection?

24   A    My recollection is that she was the manager of the

25   business analysts group, and I don't remember her specific
```

1    title.

2            But she was the person who, as I understand it,

3    would be authorized to make those determinations of scope, and

4    to update the Jira record based on the facts that the business

5    analysts had determined in reviewing publications such as this

6    IRS announcement.

7    Q    Okay.  And then what happened next?

8    A    On January 24th, rather than the 25th -- and this is the

9    one that I feel is in error with respect to Mr. Astrachan's

10   timeline that he showed, but the communications we reviewed

11   showed that Don Sheffield had already indicated on the 24th of

12   January before the scope got changed back to US -- so while it

13   was still only Spherion that he was testing in the City of

14   Eugene.

15   Q    Okay.  And then the scope was later changed after that?

16   A    Right.  On the 25th he changes the scope to the US rather

17   than Spherion to facilitate his distribution of that fix.

18   Q    At any point in time in these proceedings, have you heard

19   or seen any evidence that the City of Eugene requested or

20   needed delivery of the HCM200049 update in January of 2019?

21   A    No, I have not.

22   Q    Let's assume for the sake of argument that the City of

23   Eugene was in scope to receive the HCM200049 update as of

24   January 24th, 2019, when Mr. Sheffield indicated that he

25   tested that update in the environment associated with the City

1    of Eugene, would that change your opinions in any way?

2    A    Not with respect to whether or not that action appears to

3    violate the injunction.

4    Q    And why is that?

5    A    Well, again, as I understand the language of the

6    injunction, it prevents testing and problem diagnosis,

7    troubleshooting, in one client's environment on behalf of

8    other clients.

9              And so -- at least as I understand the wording of

10   this injunction, that would be something that was prohibited

11   to then subsequently distribute that solution more broadly on

12   behalf -- so that it was for the benefit of other clients

13   because now it's not work done solely on behalf of the City of

14   Eugene.

15   Q    So is it your opinion that Rimini's development work in

16   client A, for example -- in the environment of client A, for

17   example, must be solely for the support of client A?

18   A    That's my understanding of the injunction, yes.

19   Q    And what is that understanding based upon?

20   A    Well, I think we discussed the other day paragraph 4, for

21   instance, of the injunction with respect to PeopleSoft, and

22   paragraph 8 of the injunction.

23   Q    You mean paragraph 6?

24   A    Sorry, yes, paragraph 6.

25              MR. SMITH:  Matt, can we display 4 and 6.

1   BY MR. SMITH:

2   Q   And so what is the language within this -- within these

3   two paragraphs that you're relying upon?

4   A   Well, in paragraph 4, you have the language that,

5               "Rimini shall not reproduce, prepare

6        derivative works from, or use specific licensees --

7        specific licensees' PeopleSoft software or

8        documentation, other than to support the specific

9        licensee's own internal operations."

10              So I find that language significant there.

11              With respect to 16, again, the prohibition

12       is,

13              "Reproducing, preparing derivative works

14       from, or using PeopleSoft software or documentation

15       on one licensee's computer system to support,

16       troubleshoot, or perform development or testing for

17       any other licensee."

18  Q   Okay.  And I think you said paragraph 16, but I think you

19  were referring to --

20  A   Six, yes, Sorry.

21  Q   Okay.  But you would agree with me, wouldn't you, that

22  neither of these paragraphs use the word solely.

23  A   The word solely doesn't appear in these.  It talks about

24  a specific licensee's environment for the benefit of other

25  licensees."

1    Q    Is there is other language in the injunction that you

2    rely upon to support your opinion that work for one client

3    must be solely for purposes of that client?

4    A    Yeah.  This was the PeopleSoft specific prohibition, but

5    in paragraphs above that, in the Court's injunction, the Court

6    used the word "solely" specifically.  That would be, I think,

7    in paragraph 2A.

8              MR. SMITH:  Okay.  Can we take a look at

9    paragraph 2A.

10   BY MR. SMITH:

11   Q    And take a look at this and tell us if this is the

12   language you're referring to.

13   A    That's correct, "Unless solely in connection with the

14   work for a specific customer."

15   Q    Okay.  Now I would like to turn to a discussion of the

16   issue of scope with regard to violation number 3, and that's

17   the Johnson Controls W2 form issue.  Do you recall that?

18   A    I do.

19   Q    With regard to violation number 3 and the values

20   associated with that print format box that was tested in the

21   City of Eugene, did you see or hear any evidence that the City

22   of Eugene was affected by this print format problem?

23   A    No.  I had seen no evidence that they had reported any

24   problem with that, or any evidence, even after the fact, that

25   they were necessarily affected by that.

1    MR. SMITH:  Matt, I'd like to pull up Defense

2  Exhibit 302.

3  BY MR. SMITH:

4   Q   And, Ms. Frederiksen-Cross, directing your attention to

5  the second page, I believe, of this exhibit, near the bottom

6  there's an indication that the issue experienced by -- it's

7  the second line down in this e-mail.

8    There's an indication that the issue experienced by

9  Johnson Controls, quote, "Could be a problem" --

10    "Could be a potential problem for all new

11    clients switching from tax960us to rsi960us who have

12    left the formatting field blank."

13    In your opinion, does the injunction allow

14  Rimini to use the PeopleSoft environment associated with the

15  City of Eugene, to test a fix for Johnson Controls, simply

16  because the problem, quote, "could be a potential problem for

17  all new clients"?

18   A   Again, because they're doing that testing in order to

19  test something for hypothetical other clients, it seems to me

20  that that would be outside what was permitted under the

21  injunction.

22   Q   Okay.  Then I'd like to direct your attention back to

23  Oracle Exhibit 27, OREX_27, and the second page where

24  Mr. Sheffield included a screenshot from the PeopleSoft user

25  interface.

1    Does it matter, for purposes of your opinion,

2    whether the City of Eugene already had this print format

3    of B999999.99 in its PeopleSoft systems at the time

4    Mr. Sheffield entered into the system, or that he applied that

5    on the date that he tested the fix in the City of Eugene

6    environment?

7    A    So just to be clear, you're asking whether it would

8    affect my opinion whether they already had it or whether they

9    were doing it on the fly as they were trying to figure out

10   this problem.  No.

11   Q    Yeah, that's correct.  That was my question.  And the

12   answer is?

13   A    No, it doesn't change my opinion either way.

14   Q    And why is that?

15   A    Well, if they already had it, then they're making

16   reference to this environment in order to understand and

17   troubleshoot the problem to see what's different between the

18   two environments.

19        If, on the other hand, they were trying to work

20   through the problem, again, they would be trying to work

21   through that problem in the context of an issue that a

22   different client had reported, and, in either case, the City

23   of Eugene's environment was being used in order to

24   troubleshoot and resolve a problem for another customer.

25   Q    Okay.  I'd like to return back to slide 4 of your

1    demonstratives and talk about your second rebuttal point.

2              You indicated that there was some testimony that you

3    found to be muddled regarding the distinction between delivery

4    and development for a particular client; is that right?

5    A    Yeah.  There's one thing I would like to add in my

6    previous answer, though, if I may.

7    Q    Sure.

8    A    One of the things that struck me as particularly

9    interesting in that correspondence about the change to box 17

10   was, you know, this is a very simple change -- a comparatively

11   simple change.  It may not have been simple to figure out, but

12   it was a simple change.

13             But, if you look at the correspondence in that

14   e-mail, this is an instance where it's very clear that you

15   can't say this was know-how of what the fix was, because they

16   spent several days trying to work out a fix for the client who

17   is having the problem.

18             Had this already been a known solution, even if it

19   was already in Eugene's environment, they would not have

20   needed to spend that time to be able to communicate to the

21   client.

22             So this is an example -- you know, there's been a

23   lot talk about know-how and what's know-how, and this is an

24   example where I think it illustrates that, very simply, that

25   this is a small change, but was something that was already

1    evidence that they were struggling to know how to fix this

2    problem, and actually using that environment to -- the

3    environment of the City of Eugene, to try to determine what an

4    appropriate fix for the other client would be.

5    Q   So are you referring to the fact that this support case

6    for Johnson Controls, I think was opened a day or two earlier,

7    and Mr. Sheffield tried to apply different fixes before

8    arriving at this B999999.99 fix?

9    A   Yeah, that's exactly --

10                    MR. McCRACKEN:  Objection.  Leading.

11                    THE WITNESS:  But, that's exactly the point.  If

12   you look in this e-mail, starting at the beginning of the

13   change --

14                    THE COURT:  Wait.  Let me stop you.  We have an

15   objection that the question was leading.

16                    I'll allow the question because it appears to be

17   inviting an explanation from her -- at least that appears that

18   she was giving an explanation, so I will allow it with that

19   understanding.

20                    THE WITNESS:  Yeah, if you go to earlier parts

21   of this e-mail chain where you see the first days starting

22   at -- yeah, the bottom of the document.  Okay, one page up.

23                    You see that the initial correspondence took

24   place on the 23rd, and the client was, you know, "We really

25   need this fixed.  There's a problem here that we're having."

1                    And then if you go back through time here, there
2    are some, you know, proposed solutions.
3                    If you go one more page forward in time -- so,
4    yeah, if you could blow that one up.  So they're asking, you
5    know, what are they using to print it, what program are they
6    using?  What are they on?
7                    And then move forward in time a little bit
8    farther.
9                    So here, they're starting to talk about what
10   they've done for some other client, HCR, and that maybe that's
11   going to be a fix, and this point in time it's still focused
12   on the box 14 fix.
13                   And then go forward another roll in the e-mail
14   chain.
15                   And so, again, they're still struggling to fix
16   the template.  They're trying to change the underlying
17   template as opposed to the program at this point, And so this
18   is on the 24th, so a day later.
19                   And now go forward a little bit.
20                   And here's where they say they made a change in
21   the JHN environment, maybe that's going to fix it for them.
22                   It also notes that -- you know, it gives some
23   additional information about interacting with the form fields
24   in this e-mail, but that's on the 24th again.
25

1    BY MR. SMITH:

2    Q    And the change -- is it your recollection, did the change

3    to the templates work?

4    A    The change to the templates did not -- well, it fixed one

5    problem, but it didn't fix the other problem.  It didn't fix

6    the problem with the new box that was related to the Virgin

7    Islands.

8            And so several days have elapsed here as they try to

9    struggle to fix this.  So obviously it wasn't a solution that

10   was already understood at that point.

11   Q    Okay.  So just to summarize this, why is it your opinion

12   that the work performed by Mr. Sheffield in the City of Eugene

13   environment on January 23rd -- or 25th of -- 24th or 25th of

14   2019, doesn't merely constitute the use of know-how?

15   A    Well, it appears that Mr. Sheffield had the know-how to

16   know, for instance, where parameters are defined.  But he did

17   not know with certainty that that was the specific fix here at

18   the outset of the problem or he would have communicated that.

19           And with respect to City of Eugene, whether they had

20   the variable already, and he was comparing Eugene's

21   configuration to the client reporting the problem, or whether

22   he was going there to test some things and see if this would

23   fix it, in either case, it's apparent he was using the City of

24   Eugene's environment in order to help troubleshoot and come up

25   with a fix for a different client --

1    Q    Okay.

2    A    -- which I understand to be prohibited under the

3    injunction.

4    Q    Okay.  Now, returning to your demonstrative slide 4, and

5    you indicated, I think earlier today, that there was some

6    muddled testimony regarding the distinction between delivery

7    and development.  What did you mean by that?

8    A    Well, I heard testimony that the Apply Update logs, for

9    instance, were evidence of testing, and I disagree very

10   strongly with that, those logs provide evidence of delivery of

11   the solution to an environment.

12           But I've looked at many, many, many of these logs,

13   and what they show is that essentially the package of the

14   software that is a particular update is delivered and

15   confirmation that that delivery was correct, so, in other

16   words, that the right objects were in the package and that

17   they are in the right place, but there is no testing shown in

18   those logs.

19           And I think there's a clear distinction between

20   sending something to a client and actually testing in that

21   client's environment.

22   Q    Okay.  And does violation number two with regard to

23   Matheson Trucking illustrate this point?

24   A    It does.

25   Q    If we could take a look at Oracle Exhibit 22, page 3 of

1    4, do you recall this exhibit, Ms. Frederiksen-Cross, whereby

2    Mr. Benge indicated to Mr. Pringle, quote,

3                    "Hi, Tim.  I have absolutely no indication

4         that HCM 20049 was developed or tested yet for MAT.

5         Has it been?"

6                    Now, despite this e-mail, do you recall hearing

7    from Mr. Benge that this update was, in fact, developed in

8    Matheson's environment?

9     A    I recall that he testified to that, yes.

10    Q    I'd like to display the hearing transcript from day 4,

11    page 804, lines 9 through 21.

12                    And is this the testimony that you were referencing,

13    Ms. Frederiksen-Cross, as being muddled?

14    A    Yes.  And here he's talking about the part of that

15    delivery record that shows the creation of the update folders,

16    that is to say creating a folder on the system that you're

17    going to be putting the update into, as evidence of testing.

18                    And, again, that to me is very clearly a part of the

19    set up for the delivery, and he goes on to say, you know, they

20    ran the Transfer Files utility and moved the files from

21    Rimini's system to Matheson's development folders.

22                    So they weren't on Matheson already, and they were

23    just being moved there, and this log that he's discussing --

24    I've reviewed that log several times.  There is nothing in

25    that log to indicate development or testing there, merely that

1    the package was delivered there.

2    Q    Okay.  So with respect to Mr. Benge's testimony here,

3    does the act of creating update folders to get the folder

4    structures all set up in the development environment for

5    Matheson, including collecting the before source code for the

6    program, have anything to do with development?

7    A    No, that's just a part of the delivery process.  They

8    create a set of folders where the code is going to be

9    delivered.

10           They create a before folder and take the client's

11   current version of the program and put it in the before folder

12   so that once they have delivered the solution, they are able

13   to verify that what should be in the after folder, if you

14   will, which is also created as a part of this process, is the

15   correct version of the file.  But, it's not testing the file,

16   it's just a verification of delivery of the content.

17   Q    Does the creation of update folders, including the

18   collecting the before source code for the program, have

19   anything to do with testing of this update?

20   A    Only to the extent that you would test the update after

21   delivery, that that would be a, you know, a predicate step for

22   the delivery is to bring that content down to where you're

23   going to be testing it.

24   Q    I think you mentioned this already, but did you review

25   the automation framework database records that were referenced

1  by Mr. Benge in this testimony?

2   A    Yes.  He mentioned specifically the portion of the

3  automation framework that creates the update folders, and then

4  a little bit farther beyond where you just highlighted, the

5  part that does the transfer files, that is to say that then

6  moves the folders from Rimini's system to those -- or moves

7  the update from Rimini's system to the folders that were just

8  created.

9   Q    Do these records referenced by Mr. Benge in his testimony

10  confirm any development or testing of the HCM200049 update in

11  the Matheson Trucking environment prior to January 28th of

12  2019?

13   A    I would want to look at the date specifically on that

14  e-mail, but it certainly didn't confirm any testing prior to

15  the date of that e-mail.

16   Q    Now, if Rimini had developed this update that we're

17  talking about, the HCM200049, in the environment of Matheson

18  Trucking, would there have been any need for Rimini to deliver

19  the update with the automation framework as referenced by

20  Mr. Benge?

21   A    Well, that was the point I made before.  If it was

22  already there, you wouldn't need to move it there to check it

23  out there.  If they developed it in that environment, you

24  would expect that it would be in that environment in the

25  developmental folders.

1    Q    Okay.  A couple of more questions.  Do you recall

2    Ms. Davenport's testimony that there is no quality assurance

3    testing at what Rimini calls informal updates?

4    A    I do recall that testimony, yes.

5    Q    Based upon your review of Rimini's postinjunction support

6    practices, is Rimini's provision of informal updates a common

7    occurrence in your opinion?

8    A    It appears to be.  Anytime there's a bug to be fixed or

9    the customer needs some customization, it might result in an

10   informal update if they need it more quickly than waiting for

11   the future formal update.

12   Q    Okay.  I'd like to move to violation number 5 which has

13   been the subject of a significant amount of testimony.

14             Do you recall Professor Astrachan's testimony

15   regarding the psptarry.cbl, and rspcmpay.cbl files?

16   A    Yes, I do.

17   Q    Was there anything surprising to you about the

18   methodology that Professor Astrachan used to compare the

19   Oracle file with the Rimini file?

20   A    There were a couple of things that surprised me about

21   that.  One is that it appears he applied a different

22   methodology or a different process here than he used in the

23   Rimini II matter.

24             I mean, the steps he articulates are different in

25   what he says -- what he identifies as constraints or things

1   that his filtration would filter out were a different set than

2   before.

3   Q    Okay.  Anything else?  You said a couple of things.

4   A    Yeah.  There was some vagueness in his -- is it possible

5   to put up the list that he used in this case?

6   Q    Sure.  So let's show slide DDX-512 which is already up.

7           Do you understand these to be the elements that

8   Professor Astrachan used for constraint filtering and analytic

9   dissection in his testimony in this case?

10  A    Yes.

11  Q    And how many elements are there?

12  A    Five.

13  Q    And now I'd like to show you paragraph 205 of his Rimini

14  II rebuttal report -- and Matt will pull that up for us.

15          And are these the elements Professor Astrachan

16  claimed -- strike that.

17          Are these the elements that Professor Astrachan

18  claimed to be needed for exclusion for purposes of substantial

19  similarity analysis in the Rimini II case?

20  A    Yes, I understand these to be the elements he had listed

21  there as required for analytic dissection.

22  Q    And how many elements are there?

23  A    There are eight in this particular list.

24  Q    In your opinion, did Professor Astrachan include elements

25  for exclusion during his testimony in this proceeding that are

1    not included in the prior list of elements he's referenced in

2    paragraph 205 of his Rimini II report?

3    A    He did.  If we could go back to the list that he referred

4    to in his testimony.

5              So there's a couple things that I don't see here in

6    the other list.  And I don't know if it's possible to put

7    these up side-by-side, or one atop the other.

8              But, for instance, here he lists code constrained by

9    the syntax of the language, and I didn't see reference

10   specifically to syntax of the language in the list he used in

11   Rimini II.

12   Q    Let's see if we can get paragraph 205 up side-by-side

13   with the demonstrative from this case.

14   A    Yeah, Matt, we only just need the list from paragraph 205

15   I think.

16   Q    Okay.  So please proceed, Ms. Frederiksen-Cross.  I think

17   you were talking about item one from Professor Astrachan's

18   demonstrative code constrained by the syntax.

19   A    Yeah.  He didn't appear to be citing to language syntax

20   in his analytic dissection he used in Rimini II.

21             And then looking at this list, I think he mentions

22   elements constrained by function, code constrained by software

23   function, I think that's essentially the same thing in

24   different words in all likelihood, similarly logic and

25   efficiency.

1    But then you get to code constrained by standard

2 programming terms, and I don't see any reference in the

3 other -- in the other list to standard programming terms, nor

4 do I think that this is something that would be particularly

5 reproducible unless you identify the language and what terms

6 you're talking about.

7    So there's -- this would be a difficult standard to

8 apply, I think.

9    And then the code constrained by standard

10 development conventions, again, I think here, while I don't

11 disagree that you would want to look at whether common coding

12 conventions are being used, I don't think that in and of

13 itself their use is necessarily dispositive of anything.

14    And you would want to look at them in the context of

15 the software because, if you're using a coding convention, for

16 instance, from one language, in a different language where

17 nobody does that, that would be something that I would want to

18 look at.

19    And similarly the -- you know, just saying standard

20 development conventions without identifying what those are

21 makes it very difficult to reproduce this work, and to perform

22 the analysis again.

23 Q   Okay.  Regardless of whether Professor Astrachan's

24 methodology involves five unprotectible elements, or eight

25 unprotectible elements, do you agree with his general analytic

1   dissection methodology?

2   A    Again, I don't, because it seems to be adapted to the

3   specific instance of the matter before the Court here today,

4   rather than being a more broadly applied technique, and he

5   didn't cite any reference that I'm aware of for the use of the

6   specific steps he chose in either of these cases.

7   Q    Okay.  Let's talk about some of his specific criticisms.

8          So, first, Professor Astrachan complained about the

9   fact that you did not conduct your analysis using Oracle and

10  Rimini files, and this, again, is the psptarry file, and the

11  rspcmpay.cbl file.

12         He complained that you didn't conduct your analysis

13  using a fixed-width format.  Do you recall that?

14  A    I recall him discussing that, yes.

15  Q    And what is a fixed-width format?

16  A    What I understand him to be referring is to have compared

17  the two side-by-side using a fixed-width font such that each

18  character would necessarily occupy the same amount of real

19  estate on a line so you're comparing 80 character lines to

20  80 character lines.

21         But with a proportional font, a W, for instance,

22  is -- takes up much more real estate than, say, the lower case

23  i, and so you can't see as clearly the alignment of things

24  within the code.

25         Whereas if you used a fixed-width font, those

1  columns will line up vertically.  If you put the code one over

2  the other, you're going to see the exact same alignment

3  throughout.

4  Q    Okay.  So after hearing Professor Astrachan's testimony,

5  did you repeat your analysis using a fixed-width format?

6  A    Yes.

7  Q    And did that analysis change your opinions in any way?

8  A    The only thing it changed is I would retract the comment

9  about the one orphan flower on the end of that one comment

10  because after I looked at then in fixed-width format, I see

11  that they do both occur in column 72.

12  Q    Okay.  Was there anything else that you noticed after

13  conducting your fixed-width format analysis?

14  A    Actually, I noticed a couple of other similarities that

15  are an unconstrained visual aspects of how the code is

16  presented, that is to say, other unconstrained issues with

17  respect to alignment.

18  Q    Okay.  Let's stick with the fixed-width format here for

19  one more minute.

20         Did you assess Professor Astrachan's testimony that

21  the Rimini flower boxes uniformly start with a back slash

22  asterisk rather than an asterisk?

23  A    I'm sorry.  Are you asking was I aware of that testimony

24  or did I --

25  Q    Did you consider it?

1    A    I considered it, but it's not accurate.

2    Q    Okay.  So let me refresh everyone's recollection by

3    showing the transcript at page 951, lines 7 through 18.

4           And in this transcript portion, Professor Astrachan

5    testified that they uniformly, the beginning of the flower

6    boxes started with a slash asterisk on the top line.

7           Do you agree with that testimony?

8    A    No, I don't.  I mean, he goes on at the bottom of the

9    page here to say the convention is followed throughout the

10   file, but that is inaccurate.

11          Some of the comment boxes in the Rimini file start

12   with the slash asterisk, some start on the first line of the

13   comment box just with an asterisk.

14   Q    And do you have a demonstrative highlighting some of

15   those examples?

16   A    I do.  I think there's actually a couple of them.

17   Q    Could you walk us through, briefly, slides 9 and 10 from

18   your demonstratives.

19   A    Yes.  Just to orient here, so when we are looking at the

20   bottom box on the left, you see that the first flower box

21   starts with a slash asterisk.  That's what we're talking

22   about.  The slash is on the first line of the top of the box,

23   and then if you look at the bottom of the flower box, it's all

24   asterisks.

25          But if you look down the page to the SQL

1    communication, that line starts with -- the top line starts

2    with a flower box, and this is on the Oracle code.

3              When you look across to the Rimini code, you see the

4    exact same two comment boxes with the exact same flower box

5    annotation style, the exact same comments, and, of course, the

6    exact same alignment of those comments within the flower box.

7    Q    Okay.  And so why is this significant to you that these

8    two files have consistent different starting characters for

9    flower boxes?

10   A    Well, it's one more example of a difference that, if it

11   occurred once in a program, might arguably be considered to

12   be, you know, coincidence, you know, somebody mistyped or

13   something, but, we see several of these throughout the

14   program.

15             And, again, it's not obviously the process -- or the

16   product of this particular developer's habitual practice

17   because they're inconsistent with it.

18             And it's another unexplained similarity between the

19   two code files between the Oracle psptarry file and the

20   rscmpay file.

21   Q    Did you discover other unexplained similarities after

22   conducting your fixed-width analysis?

23   A    There are several, yes.

24   Q    And could you describe those for us, please.

25   A    Well, for instance, if you -- just on the screen that we

1    have up right now, you'll notice that the word copy is aligned

2    roughly under the "U" in "function" on both sides.

3              That is to say copy occupies this -- it has been

4    aligned to the same alignment.

5              Now, I don't dispute that programmers like to kind

6    of line those things up, it makes the program a little

7    visually cleaner.  But there's no constraint on where they

8    line them up.

9              I heard Professor Astrachan say that Cobol is a

10   column-driven language, but that's really only true with

11   respect to the first six characters or a sequence.

12             The seventh character can be used to indicate

13   continuation or a comment, and then columns 8 through 11 are

14   reserved for certain types of things can start in those

15   columns.

16             But then once you get into the main segment of the

17   line, until you get to column 72, there are really no

18   requirements of any form for how you line things up within

19   that real estate.

20             Column 72 on are then required -- are then reserved

21   for other things within the language like some

22   machine-generated sequence numbers, for instance, which goes

23   back to the old days when COBOL was being done on punch cards,

24   because in COBOL a line can only be 80 characters wide unlike

25   some other languages that give you more latitude.

1    Q    Okay.  So do I have it correct that respect to COBOL

2    programming you can really only use the seventh through the

3    72nd portion of the page in terms of if they are all columns?

4    A    Right, right.

5    Q    And is it your understanding that all of the copy words

6    appear or start in the exact same column?

7    A    Oh, it's not true that they do everywhere throughout the

8    program, but in these specific instances they do, again, in

9    association with these other similarities.

10   Q    Were all PIC and column and comp and value statements --

11   or were there other statements that were all aligned in the

12   same columns?

13   A    There were.  The PIC statements were consistently aligned

14   in column 39.  And do we -- I think I have an example of that

15   in my demonstrative unless we ditched that slide.

16   Q    We have the next slide which is the analytic dissection

17   slide, the last one.

18   A    Okay.  We threw that one away then.

19            So, yes, in all of the PIC statements, which in

20   COBOL is how you describe what the data type going to be -- so

21   you say PIC, and then you give it an indicator to say if it's,

22   for instance, numeric or alphabetic or alphanumeric in the

23   length the field.

24            All of the PIC words were aligned in column 39, and

25   then all of the value words were aligned in column 51, and

1   then all of the comp -- one of the alignment issues that

2   Dr. Astrachan pointed out -- were aligned in column 63 if I'm

3   remembering the column numbers correctly.

4   Q    And assuming you remember the column numbers correctly,

5   why is that of significant to you?

6   A    Well, again, although I wouldn't dispute that a

7   programmer might align things visually to make the program

8   easier on the eye, there is no constraint in COBOL as to what

9   column you would choose for that.

10           And so, again, the fact that both of these programs

11  selected exactly the same column for their alignment is,

12  again, something I would take into consideration when

13  evaluating the similarity between these files, and, it's one

14  more piece of that evidence that makes it clear to me that

15  either one file -- that the rscmpay was either copied from

16  psptarry, or that there is some common ancestor with psptarry

17  with the Oracle file.

18  Q    Do you recall Professor Astrachan's testimony regarding

19  the spacing irregularities seen in both the Oracle file and

20  the Rimini file?

21  A    I believe so, yes.

22  Q    And do you agree with Professor Astrachan that the

23  spacing irregularities in both files is not indicative of

24  copying?

25  A    In this particular instance, I do not.

1    MR. SMITH:  And, Matt, can you pull up Professor

2  Astrachan's demonstrative on spacing, which I think is

3  DDX-538.  Yes.

4  BY MR. SMITH:

5  Q    Now, do you recall that Professor Astrachan testified

6  with respect to this demonstrative that there are two spaces

7  between the word comp in both the Oracle file and the Rimini

8  file because of COBOL conventions to line up columns?

9  A    Right.  I had pointed out that this was an unusual, in my

10  opinion, difference with respect just looking at the spaces

11  themselves.

12    Generally, I think, programmers would have, for

13  instance, set up tabs or something to the extent they were

14  going to put things in fields.

15    And then he came back and explained that, oh, well,

16  that's just so that comp could be lined up.

17    But then -- and this illustrates what I was talking

18  about before about the use of all of the PIC statements being

19  lined up, and all of the value statements being lined up, and

20  then the comp statements being lined up.

21    And, again, it's not so much that they're lined up,

22  but that they're lined up in exactly the same place that I

23  find telling here.

24  Q    So are you saying that the double space after zero, which

25  appears in both the Rimini file and the Oracle file, is a

1   function of the comp word aligning in both files at the same

2   spot?

3   A    Yes.  It is not a requirement of the COBOL language that

4   these things be lined up.  It is not a requirement that they

5   be lined up in a particular column.

6            But, again, with respect to these two programs, that

7   double space has been added to allow it to line up in the same

8   columns throughout the code.  So where necessary to do that

9   alignment to get it into the 63rd column, that's how it was

10  done.

11  Q    Okay.  And just for clarity, does the Oracle psptarry.cbl

12  file, and the Rimini rspcmpay.cbl file have the same general

13  alignment of 88 potential columns?

14  A    There's only 80 potential columns.

15  Q    Eighty, 80 potential columns.

16  A    With respect to the data areas that are defined -- that's

17  these things that start with 01, 02, and 03, for instance,

18  yes, they do.

19            And they also do with respect to that example I

20  talked about the other day, the 88 level that's used to

21  provide a value in association with the data element.

22  Q    That's why I was confused, 88 versus 80.

23  A    Oh, yes.  Eighty-eight is a particular reserve type of

24  COBOL value.

25  Q    Okay.  Let's go back to your demonstrative which

1    highlighted the substantial similarity between the Oracle file

2    and the Rimini file, which was your side-by-side comparison.

3              MR. SMITH:  It's the last demonstrative, I

4    believe, and we can actually put this down.  But let's just --

5    the 175 -- can we pull up 175 as a whole.  There we go.

6    BY MR. SMITH:

7    Q    Now, Ms. Frederiksen-Cross, you indicated during your

8    direct testimony that, as shown on the right-hand side of this

9    first page, the program description provided by Rimini was

10   important with the language that this augments TARRY.  Can you

11   remind us why you thought that was important.

12   A    Because the PeopleSoft TARRY, or TARRY, this is a

13   statement in the program written by the programmer who

14   developed this program, that is stating specifically that this

15   program was intended to augment functionality from the TARRY,

16   and it goes on to list one other function that it performs as

17   well.

18              But I thought it significant that the program itself

19   self-identifies as being a program that augments that

20   PeopleSoft TARRY program.

21   Q    Is it your opinion that the rspcmpay file was copied or

22   derived from, in some way, the psptarry file?

23   A    I think as an initial point, from the visual aspect, the

24   actual way the source code is arranged and laid out, it would

25   be my conclusion that this program started, in all likelihood,

1    as a copy of psptarry, or some file that itself had been

2    derived psptarry.

3              And then that with respect to the functional aspect

4    of the software, because software really exists in two forms,

5    it's its textural representation and then its functional

6    characteristics.

7              With respect to the functional characteristics, it's

8    an augmentation -- a modification or extension, if you will,

9    of the function that's provided by the Oracle PeopleSoft TARRY

10   program.

11   Q    Okay.  Do you recall Professor Astrachan's testimony that

12   it is important for programmers to follow convention?

13   A    I recall that testimony, yes.  I think he said he would

14   grade them down if they didn't.

15   Q    And do you agree with that testimony?

16   A    Not a hundred percent.

17            I think that, you know, there's kind of a fine line

18   there.  Adhering to convention to a certain extent is valuable

19   to those who come behind you and need to maintain your code.

20            On the other hand, it can serve to stifle creativity

21   with respect to, for instance, trying new approaches, or

22   finding better ways to do something.

23            So, you know, it's not something I would say -- I

24   don't place the value on it that Mr. Astrachan -- or

25   Dr. Astrachan obviously does.

1    Q    Okay.  Do you recall Professor Astrachan's testimony

2    regarding the API, which was defense exhibit 500?

3    A    I think you're referring to the documentation for the

4    Oracle API?

5    Q    Yes.

6    A    For this -- yeah, for the SQL interface that's used in

7    COBOL programs in Oracle to talk to the database.

8    Q    And is this Exhibit 500?  I believe it is.

9    A    Yeah.

10   Q    And Professor Astrachan indicated that this is a document

11   instructing COBOL programmers how to program for PeopleSoft;

12   is that correct?

13   A    Yeah.  It's a PeopleSoft-oriented document, so it's how a

14   programmer writing in COBOL in a PeopleSoft environment would

15   talk to this subprogram that's used in that environment to

16   talk to the database.

17   Q    And do you recall Professor Astrachan identifying what he

18   considered to be conventional and constrained API naming

19   conventions?

20   A    Yes.  I believe he referred initially to the names at the

21   bottom of this page.

22   Q    Okay.  And what is the -- what does the bottom of this

23   page show?

24   A    It's giving an example of the way in which one would call

25   an Oracle subroutine ptpsqlrt.

1           So it gives an example of the parameters that that

2    subroutine was expecting and their order.  So you see that

3    this -- when you call this program, you're calling it using

4    action -- in this particular instance with the full list,

5    "action, sqlrt, cursor, statement, bind-setup, bind-data,

6    select-setup and select data."

7           So it gives some examples of what that parameter

8    list would look like in terms of what the full set of

9    parameters could be.

10   Q   Okay.  Just so I have this straight, would you expect a

11   COBOL programmer operating in PeopleSoft to write into the

12   code, capital CALL ptpsqlrt using statement with the word

13   statement written out, s-t-a-t-e-m-e-n-t?

14   A   Well, this is an example, so a programmer just -- these

15   parameters have to be provided in COBOL according to their

16   position within this list, but they don't have to have these

17   specific names.

18          So I would not necessarily expect that a programmer

19   would use statement spelled out in full.  They might

20   abbreviate it, they might append a prefix to it, but it would

21   have to be -- it would have to occur in the list in this

22   order.

23          So this is an example of where some things are

24   constrained within interacting with this software, and other

25   things are not.

1    Q    Okay.  Does the Oracle file, the psptarry file, and

2    the Rimini file use these purportedly conventional and

3    constrained naming conventions consistently, in your opinion?

4    A    Consistent with each other or consistent with this

5    example or --

6    Q    Consistent with the examples that are provided in this

7    document DTX-500.

8    A    They both use some of the same words.  They both use some

9    different words.

10            And for example in the case of statement, they both

11   depart from this example, but they do so using identical words

12   to identify the statement type.

13   Q    Okay.  Can we direct your attention back to Exhibit 175,

14   which is your comparison, and is there an example of this, I

15   guess, shared inconsistency on page 20?

16   A    Yeah.  Here would be an example -- it's probably a little

17   easier to see if we were looking at the fully expanded

18   programs, one above the other.

19            But you see on line 589 on the left-hand side, we've

20   got that call ptpsqlrt using that would just looked at a

21   minute ago.

22            And, for instance, in the one that we were talking

23   about just a minute ago, statement, you see that in line 592,

24   both programs, instead of calling it statement spelled out

25   fully, they call it sql-stmt.

1    So here again they are doing something that --
2    they're conforming to the API, they have the list of
3    parameters in the same order which is required, but then they
4    depart from the example in what they're calling them, or what
5    they're calling those parameters.
6    Q    Okay.  Do you recall that Professor Astrachan spent a
7    significant amount of time going over one page of your code
8    comparison from this Exhibit 175?
9    A    I do.  I think it's where he was drawing the red lines is
10   what you're referring to?
11   Q    Yeah.  I'd like to -- yes, that's right.
12        And I'd like to go briefly over the other portions
13   of the code that you believe are important for purposes of
14   substantial similarity, and just ask you very quickly about
15   them.
16        So could you take a look at the bottom of page 5 to
17   the top of page 6, and do you recall Professor Astrachan
18   addressing this portion of your code comparison?
19   A    I don't recall if he specifically addressed the
20   flower boxes, but I think his focus was on this 01 data level
21   S-YT -- or my focus had been on the 01 data level S-YTD, and
22   the name of these below that, the FETCH-YTD-SW, FETCH-YTD-END,
23   FETCH-YTD-START.  I don't recall that he --
24                THE CLERK:  I'm Sorry, Ma'am.  You're going to
25   have to slow down.

1    THE WITNESS:  Okay.  It's FETCH-YTD-END and

2    FETCH-YTD-START, and I don't recall that he addressed those

3    lines in his testimony.

4    BY MR. SMITH:

5    Q   And are those lines important to you for purposes of your

6    substantial similarity opinion?

7    A   Again, this is something that the programmer had

8    coded in the Oracle code.  They had chosen those names.

9         I think he might have alluded to the fact that YTD

10   is a common abbreviation for year-to-date.  But, of course,

11   you don't have to use it in COBOL.  You're not limited on the

12   length of your variable name, so it could have been spelled

13   out, could have been abbreviated.

14        But here is a case where an Oracle programmer has

15   coded -- has chosen to code this particular programming switch

16   and chose it within the S-YTD data structure and has chosen to

17   given it -- give it specific names for the values E and S.

18        So if that switch contains the value E, you could

19   say does this switch contain E if you were testing that value,

20   or you could say the name -- you could use the name that was

21   assigned FETCH-YTD-END.

22        And, similarly, if you wanted to see if it was at

23   the start of that process, you could test FETCH-YTD-START.

24        There's nothing that constrains the order that those

25   88 elements -- those 88 level elements need to be in the

1   FETCH-YTD-END or START, they just are assignments that are

2   associated with that particular data value.

3           There's nothing that controls the use and choice of

4   these particular names.  This was something the programmer

5   chose to do this way, and we see the exact same code in the

6   Rimini file.

7   Q    Is there any significance, in your opinion, to the fact

8   that line 139 in the Oracle file uses SQL-CURSOR, while line

9   140 in the Oracle file uses SQL-STMT?

10  A    Well, if you recall looking back to the list of

11  parameters, you have to provide a cursor.  It doesn't have to

12  be called SQL-CURSOR.

13          I think in the API document we were looking at, it

14  wasn't even consistent there.  I think they give the example,

15  on the first page of cursor, and few pages later of an

16  SQL-CURSOR.

17          There's no example in that document of SQL-STMT for

18  the statement.  But, that's how it's being used in this

19  context of this particular call to the subroutine is it's

20  being provided as the statement variable.

21  Q    Okay.  I'd like to direct your attention to page 16 of 57

22  of this Exhibit 175.

23          Is it your opinion that the portions of the code at

24  the top of the page are substantially similar?

25  A    Again, those were -- again, it's a comment which is

```
 1   neither required for constrained other than that you have to
 2   indicate that a comment -- you indicate the presence of a
 3   comment in COBOL by an asterisk or slash in column 7, so that
 4   first position indicates it's a column.
 5           But how many flower box -- how asterisks you put on
 6   the flower box, that's not constrained.  What you put in the
 7   flower box, the actual description you're putting in there as
 8   your comment, in this case, additional library function
 9   parameter, is not constrained.
10           It could have been library function parameters, it
11   could have said more function parameters -- library function
12   parameters, or it could have been omitted entirely.
13           This is not functional code.  It's just a
14   programmer's eye catch is what we used to call them, so that
15   when you're flipping through a listing, you can find something
16   more quickly.
17   Q   Okay.  Directing your attention to the bottom of page 18
18   and the top of page 19, is it your opinion that these portions
19   of the code are substantially similar?
20   A   Can you -- you're saying the bottom of 18 and the top --
21   Q   It's actually top of 18, my bad.
22   A   Yeah.  We're off the reservation here.  Okay.  Yeah, here
23   again, this is an example of a different kind of eye catch.
24   This is in the part of the program that's actually doing the
25   procedural logic of the program.
```

1       And so there's a couple of similarities here I'd

2  like point out.  The first is just that the programmer, in the

3  case of Oracle, has chosen to put one of these flower boxes

4  that starts above and finishes below the name of a section.

5       But the two lines that start with AA, those are

6  actually functional code.  Those are not a part of the

7  comment.  They are a functional code that is being bracketed

8  on either side by this comment.

9       The names of those functions are at the discretion

10 of the programmer.  So AA000-MAIN is what the programmer chose

11 to name this -- for initial part of the program that sets

12 forth the MAIN logic.

13      The choice to have a paragraph within that section,

14 AA000, again, that -- the choice of that paragraph name is

15 completely at the discretion of the programmer.

16      Now, I'll point out that it's not uncommon for a

17 programmer to use either alphabetic or numeric or a

18 combination of alpha-numeric characters to help navigate the

19 program.

20      So you often put things at the front of the program

21 would be identified as 000 whatever, or AAA whatever, and the

22 ones at the end of the program, you know, would be on the

23 other end, 999 or ZZZ.

24      And this goes back to the old days when you were

25 looking at programs on listings instead of on Glass so that,

1    you know, if I'm in the middle of the program and I'm on G,

2    and I want to find something that's referred to as M, I know I

3    go downstream, and if I'm on G, and I want to find something

4    that's referred to as D, whatever, I know I go upstream in the

5    listing.

6              But, again, that's a completely discretionary choice

7    of whether I append it with, in this case, two alphabets and

8    three numeric characters, or if I had used entirely alphabetic

9    characters or entirely numeric characters, or a single A and a

10   single number, all of that is discretionary choice for the

11   programmer.

12   Q    Do you believe there's anything unusual about the fact

13   that this main section starts with this AA000 on page 18, but

14   then ends without reference to the AA000 in both the Oracle

15   file and the Rimini file on the next page?

16   A    Yeah.  What is unusual here, in my experience, is

17   normally --

18   Q    Just for match reference, we're referencing lines 547 in

19   the Oracle code and 233 in the Rimini code.

20   A    Yeah.  And, Matt, is this any way you can get the AAA on

21   the same screen with the MAIN-EXIT there?  It would be a

22   little easier to explain.

23              No, we want the EXIT statement.  We're going to talk

24   about the EXIT statement here.

25              MR. SMITH:  Right above that.  There you go.

1            THE WITNESS:  Yeah, where it says MAIN-EXIT.

2            So, again, the use of this MAIN-EXIT basically

3    indicates that it's a way of better illuminating that you have

4    reached the end of a section.

5            But typically programmers will give -- in my

6    experience, at least -- typically programmers will give that

7    exit the same name as the MAIN.  So you would have, in this

8    case, AA000-MAIN, and you would set forth MAIN'S exit as

9    AA000-MAIN-EXIT.

10           Or if you had called -- you know, if your

11   program was named -- or if your function -- if that section of

12   the program was called something like that D000-FILE-RECOVERY,

13   then you would have D000-FILE-RECOVERY-EXIT, so that it was

14   always completely clear and evident what you were exiting

15   from.  You know, that this was the bracket, if you will,

16   between the beginning and the end of an exit.

17           So I find it unusual that they have omitted the

18   alphabetic prefix here on line 547 on the Oracle side, and in

19   line 233 on the Rimini side, and instead they have both chosen

20   to just call the exit to that function MAIN-EXIT.

21   Q    Okay.  I'd like to turn to your demonstrative which is

22   your last slide, and it reflects page 29 of 57 of this Exhibit

23   175, and this is a page that Professor Astrachan spent a

24   significant amount of time discussing and applying his

25   methodology regarding analytic dissection to.  Do you recall

1    that?

2  A    I do recall that, yes.

3  Q    And do you have some response to the analytic dissection

4    that Professor Astrachan performed?

5  A    Yeah.  I think, you know, he went perhaps a bit

6    heavy-handed on his red-lining tool here because he didn't

7    really appear to consider whether all of what he was excluding

8    on a particular line was subject to constraint or whether only

9    part of it was.

10           So, for instance, he drew a red line through the

11   first line here, the 888 on the Oracle side, that says

12   initialize select data of S-YTD, saying of course you want to

13   initialize your data.

14           But he ignored the fact that they were both

15   initializing the same data, so that the initialize -- I have

16   no problem saying that's good programming practice, you want

17   to initialize your data before you use it in COBOL.

18           But it's the similarity of what's being initialized

19   and what's being used in this particular call operation.

20           And, again, you know, when he got to line 890, he

21   drew a red line there saying, well, ptpsqlrt is required, and

22   it's not remarkable for a programmer to call the ACTION-FETCH

23   or ACTION dash FETCH, as is the case here.

24           But, again, he's not acknowledging that that is not

25   a completely constrained choice.  That, really, as I had

1    testified the other day, as long as you present this list of

2    parameters in the same order, you have a great deal of

3    discretion about what you call them.

4    Q    What does the highlighting reflect on this page or in

5    this demonstrative?

6    A    Well, SQL-CURSOR -- if we go back for a moment to that

7    API document, or if you recall that API document, it was just

8    cursor spelled out.  It was a single word without any prefix

9    in the API document.

10            So it says you need a cursor.  You need a cursor.

11   It's a part of the API, but what you call it is at your

12   discretion.

13            And then the next line down at line 895, there is

14   nothing in that API that addresses the set FETCH-YTD-END,

15   setting that particular processing switch to true.

16            Because that's what's going on here.  You're saying

17   I'm going to put the value of true in that processing switch,

18   and so that might be something that you would need to do in

19   your logic but you would not need to call this switch this

20   name.

21            Again, similarly, I think we've already talked about

22   SQL-CURSOR.

23            The next area down is the ZZZ-SQL-ERROR, and while I

24   agree with Dr. Astrachan that it's, you know, good practice

25   when you've interacted with a subroutine to check and see if

1    you had any errors as a result, the use of the exact same name

2    for the SQL-ERROR function is not constrained.  That, again,

3    is a programmer choice.  What are you going to call the error

4    routine that you're going to execute if you find an error in

5    this particular part of the program.

6    Q    Do you consider all of the terms or language that you've

7    highlighted on this demonstrative to be creative expression?

8    A    They are -- they are creative, or at least partially

9    creative.  Like I said, you need a cursor to talk to this

10   thing.  What you call it is up in the air.

11          You don't have to reference the word cursor in it at

12   all, but it wouldn't strike me as unusual for a programmer to

13   have cursor somewhere in the name.

14          So on the one that's SQL-CURSOR, you know, that one

15   is partially, partially suggested by programmer convention,

16   but the others, I think, are completely independent of any --

17   any constraint or convention actually.

18          MR. SMITH:  Okay.  Your Honor, I probably have

19   15 minutes, I would guess, left.  I'm happy to proceed, or we

20   could break for lunch.

21          THE COURT:  All right.  Well, I assume that

22   there will be some cross-examination as well, so let's go

23   ahead and break for lunch, and we'll reconvene between 1:20

24   and 1:25.

25          (The noon recess was taken.)

1    RENO, NEVADA, TUESDAY, SEPTEMBER 28, 2021, 1:25 P.M.

2                        ---o0o---

3

4            THE COURT:  Have a seat, please.

5            The record will show we are reconvened following

6    our lunch break today, and we continue with the examination

7    and testimony from Mr. Lanchak --

8            MR. SMITH:  Ms. Frederiksen-Cross.

9            THE COURT:  I'm sorry.

10            MR. SMITH:  Before we do that, your Honor, can I

11    just raise one housekeeping with you?

12            THE COURT:  Yes, go ahead.

13            MR. SMITH:  So I think I have maybe 15 minutes

14    left with Ms. Frederiksen-Cross.  We have a significant number

15    of travel and other scheduling issues.

16            So with the Court's indulgence, and if possible,

17    I'm not sure it's even going to be possible or necessary, but

18    we would like to extend the day today past 5:00 so we can

19    complete closings and complete this hearing.

20            THE COURT:  That's acceptable to me.  I want to

21    do the closings in one sitting, and I would offer to do it

22    tomorrow morning or to do it this afternoon.

23            My preference would be to do it this afternoon

24    and run it as late as we need to run it.

25            MR. SMITH:  Okay.

```
 1              MR. VANDEVELDE:  Your Honor, we would have no
 2   objection assuming that it can be fit in.  We did not
 3   anticipate such lengthy cross-examinations and rebuttal case
 4   from Oracle, so I think we're fairly deep into the day, but if
 5   there's time, then I'm happy to do that as well.
 6              THE COURT:  Okay.  Well, it sounds like we're on
 7   essentially one page.  I'd like to see it finish today, and
 8   I'm sure -- I see a number of heads nodding so I can see what
 9   the consensus is.
10              And, Ms. Frederiksen-Cross, you may be one of
11   the nodders, I just didn't notice, and please excuse me.
12              Mr. Smith, go ahead, please.
13              MR. SMITH:  Thank you, your Honor.
14                   DIRECT EXAMINATION RESUMED
15   BY MR. SMITH:
16   Q   Ms. Frederiksen-Cross, did any of the testimony that you
17   heard from Mr. Benge or Professor Astrachan change your
18   opinion that the files associated with the bundle update
19   RS18F07, which included the SQR and DMS files associated with
20   that update, are derivative works?
21   A   No, nothing changed my opinion about that.
22   Q   Was the RS18F07 update delivered to Easter Seals before
23   or after the injunction?
24   A   It was delivered after.
25   Q   And are you -- how do you know that?
```

1   A    We see it from the e-mail -- I mean, with respect to the

2   specific instance that we were looking at yesterday, it was

3   delivered after as shown by the e-mail.

4                MR. SMITH:  Okay.  Matt, can we pull up Exhibit

5   90.

6   BY MR. SMITH:

7   Q    Is Exhibit 90 the e-mail you're referring to?

8   A    Yes, it is.

9   Q    Other than this e-mail, are you aware of other evidence

10  that the rsi1099i and rsi1099m files, distributed as part of

11  this RS18F07 update, were further developed after November of

12  2018?

13  A    Yes.

14  Q    And what is that evidence?

15  A    I've seen other copies of these files in the context of

16  the Rimini II case that have later modification dates.  This

17  is a file that appears to be updated at least once yearly.

18  Q    Okay.  And can you please remind us of your opinion as to

19  why the SQR and DMS files associated with this update, as well

20  as the RS18F07 update itself, are derivative works?

21  A    Sure.  As a first point, as we've discussed before, these

22  files have no independent purpose outside the PeopleSoft

23  environment.  They exist as extensions and modifications to

24  the PeopleSoft environment.

25           They rely for their operation on the framework and

1    infrastructure provided by the PeopleSoft environment, and

2    that would specifically be the PeopleTools, DMS Data Mover in

3    the case of the DMS scripts, and the infrastructure provided

4    by the PeopleSoft environment in the case of the SQR programs.

5    Q    Okay.  We've heard some testimony in this case about

6    #include statements.  Is one of the bases for your derivative

7    works opinions the #include statement?

8    A    Specifically the #include statements that include and

9    show that these programs rely on the Oracle infrastructure,

10   and then the use of things that come from those #includes in

11   the files.

12   Q    Professor Astrachan has testified that almost every

13   program uses a #include statement.  Do you agree with that?

14   A    In some languages that would be true.  Some languages use

15   a different form for that kind of reusable code.

16   Q    And is it your opinion that every time there is a

17   #include statement in a software program the result is a

18   derivative work?

19   A    No, not at all.

20   Q    And why is that?

21   A    Well, I'm drawing the distinction in my analysis between

22   those #includes that indicate a direct reliance on the

23   underlying Oracle PeopleSoft environment, for instance, as

24   opposed to a generic #include that just indicates that a

25   programmer is using some common reusable component that might

1    be a part of a language set or of services for the operating

2    system.

3    Q    Do the #include statements within the Oracle software

4    files that you cite to as evidence of the file being a

5    derivative work incorporate protected expression into that --

6    into the compile code?

7    A    Oh, they do when the code as a compiled, yes, absolutely.

8    Q    Now, Professor Astrachan stressed the point that the

9    RSI-1099 files, although containing the #include statements to

10   incorporate the PeopleSoft source code, they don't actually do

11   that until the source code is compiled or the software is run.

12   Do you recall that?

13   A    Yes.

14   Q    Does that have any impact on your opinion that the files

15   themselves are derivative works?

16   A    No, those files are created specifically for use in the

17   context of the Oracle software, and, in fact, if you look at

18   what's in those files, even before they include the code

19   that's copied in from the #includes, they make reference to

20   that code so you know that those #includes are being used.

21   Q    Okay.  Let's take a look at the exhibit we were just

22   looking at, Oracle 90, and I'd like to direct your attention

23   to page 4 of this exhibit.  What is page 4 of Oracle

24   Exhibit 90?

25   A    That is one of the Data Mover scripts, the DMS files,

1    that was included as a part of this update.

2    Q    And can you remind us why Data Mover scripts are -- what

3    they are and why they're important.

4    A    Sure.  Data Mover scripts are used in the context of the

5    database, so they allow you, for instance, to move or

6    modify -- move information into the database, to modify

7    information that's in the database, or to select and extract

8    information from the database for use by the program.

9    Q    Are the Data Mover tools part of PeopleTools?

10   A    That is correct, yes.

11   Q    Can DMS scripts operate or be run without use of

12   PeopleSoft utility tools?

13   A    No, they're designed specifically for interoperability

14   with the PeopleSoft environment, and they rely on that

15   environment.

16   Q    Do you recall Mr. Benge's testimony that the DMS scripts

17   associated with the RS18F07 update were written on Rimini's

18   systems without using Oracle's People's tools -- PeopleSoft

19   tools?

20   A    I'm aware of that testimony, yes.

21   Q    And do you have new reason to question that testimony?

22   A    I do.  There's really two principal reasons.  One is that

23   these files could, of course, not be tested or verified to be

24   working accurately without having used a PeopleTools

25   environment, specifically a Data Mover environment, to test

1   them.

2        But the other one is -- if you could blow up this

3   window -- or shrink this window just a bit so we can see a

4   little bit more of the context, maybe half the page, or even

5   the whole page is fine.

6        As you see here, this file refers to Oracle

7   PeopleSoft tables, for instance, the PS_WTHD_CNTL_VNDR is the

8   name of a PeopleSoft table that was provided by Oracle as a

9   part of PeopleSoft environment.

10       And you can see here that what the script is doing

11  is working with a lot of different variable names that have

12  these very programmerly abbreviations, if you will, you know,

13  we're a bit sparse with our vowels.

14       So what you see here is something that, for this to

15  work, each of these names would have had to have been typed

16  correctly, that is to say, they have to -- these names have to

17  match what's in the database.

18       And so to say that this was written without some

19  reference to the PeopleSoft tools or environment, I don't

20  think that's a hundred percent credible.

21       I mean, I don't -- I'm not saying it couldn't have

22  been typed in on a screen or on a text editor on someone's

23  computer, but I think that it's really unlikely that they

24  weren't either using a -- remotely using a PeopleSoft

25  environment to look at the database to get these names, or

1    possibly referencing, you know, some printout or some content

2    that would give them that information, maybe a copy of another

3    program that was available to them, but something to get these

4    names right.

5              There's a lot of names there, even in a short

6    script, and, it won't run if they're wrong.

7    Q    Okay.  I'd like to direct your attention to Exhibit 604.

8              Do you recall that Exhibit 604 is the technical

9    specification for the DMS scripts associated with the RS18F07

10   update?

11   A    Yes, I see that.

12   Q    And on the second page of this exhibit there's a

13   statement at the top reading, "Development was completed in

14   the OAKS environment."  Do you see that?

15   A    Yes.  Oakland County, yes.

16   Q    Okay.  So do you understand OAKS to refer to Oakland

17   County, Michigan?

18   A    Michigan or Maryland, I forget.  It's an "M" state.

19   Q    And you understand Oakland County to be another Rimini

20   customer in addition to Easter Seals.

21   A    That is correct, yes.

22   Q    Is this document consistent with Mr. Benge's testimony

23   that the DMS scripts were developed on Rimini systems without

24   use of PeopleSoft utility tools?

25   A    That does not appear to be true based on the wording of

1    the document here.

2    Q    Does this document indicate that development occurred

3    in -- development occurred and was completed in the City of

4    Oakland environment?

5    A    Yes, it says that the development was completed in the

6    O-A-K-S environment, which I understand to be the City of --

7    or the County of Oakland.

8    Q    Would Rimini have used Oracle's PeopleSoft utility tools

9    to test the RS18F07 update?

10   A    That would be the only way it could be tested is to use

11   the DMS tools for this component of the update.

12              MR. SMITH:  Okay.  I have no further questions

13   at this time.  Thank you.

14              THE COURT:  All right.  Cross-examination?

15              MR. VANDEVELDE:  May I proceed, your Honor?

16              THE COURT:  Yes.  Go ahead, please.

17                        CROSS-EXAMINATION

18   BY MR. VANDEVELDE:

19   Q    Ms. Frederiksen-Cross, does JDE World only operate on the

20   AS-1400 operating system from IBM?

21              MR. SMITH:  Objection, outside the scope.

22              THE WITNESS:  My recollection is --

23              THE COURT:  Wait.  Excuse me.  We have an

24   objection.

25              Just a moment.  I need to refresh on the

1    question.

2                    MR. VANDEVELDE:  And, your Honor, this goes to

3    her testimony about software being able to only run on other

4    software being independent.

5                    THE COURT:  All right.  I'm sorry, I wasn't

6    listening closely to the question.  Would you repeat it,

7    please.

8                    MR. VANDEVELDE:  Sure.

9    BY MR. VANDEVELDE:

10   Q    Does JDE World -- you're familiar with that software,

11   right?

12   A    Yes.

13   Q    Does it only operate on the IBM operating system AS-1400?

14                   MR. SMITH:  And the objection is it's outside

15   the scope.  We did not have any questioning regarding JDE in

16   the rebuttal presentation of Ms. Cross --

17   Ms. Frederiksen-Cross.

18                   MS. VANDEVELDE:  This does not go to JDE.  It

19   goes to her testimony about her definition of derivative

20   works.

21                   THE COURT:  I'll allow the question with that

22   understanding and expect it to be limited to that subject

23   matter.

24                   THE WITNESS:  Counsel, I think you mean the

25   AS-400, not 1400?

1              MR. VANDEVELDE:  Yes, sorry, correct.

2              THE WITNESS:  And that is the current platform

3     it runs on.

4              My recollection is that originally it also ran

5     on, like, the S-36, S-35 platforms, but I'm not sure if those

6     are still available from IBM.  I think they've been retired.

7     BY MR. VANDEVELDE:

8     Q   Okay.  So it currently runs on the AS-400 from IBM.

9     A   I know that it currently runs on AS-400 for IBM, and I'm

10    not aware, as I sit here, that it had been ported to other

11    platforms, but I think it had predecessor platforms.

12    Q   So it can't run independently from AS-400, correct?

13    A   Again, I haven't checked super recently, but, as I sit

14    here, I think that's the one platform that it's deployed for.

15    Q   So the answer is correct?

16    A   As best I know, as I sit here.  Again, I would want to

17    research that to answer dispositively, but, as far as I know,

18    that's true.

19    Q   So it can't operate independently of that operating

20    system, correct?

21    A   Now that the other operating -- or the other machines and

22    operating systems are not being sold, that's probably correct.

23    Q   Okay.  And it extends the functionality that didn't come

24    with that operating system, correct?

25    A   It doesn't extend the operating system functionality, it

1    provides an application functionality that runs in that

2    operating system.

3    Q    That's new functionality, correct?

4    A    That is new functionality that is not an extension of the

5    operating system but rather a program that runs using some of

6    the facilities of the operating system.

7    Q    Operating systems store data, correct, they have file

8    systems?

9    A    Most do.

10   Q    And JDE offers ways to store data, correct?

11   A    In a database, yes.

12   Q    And it does it in a way that extends the ability to store

13   data in different ways, doesn't it?

14   A    A database management system is, itself, a specialized

15   type of program that allows for data to be stored, organized,

16   retrieved, and managed in a particular format.

17   Q    Operating systems store, organize, and retrieve data in

18   particular format, don't they?

19   A    Not typically in database formats.

20   Q    In file system format, correct?

21   A    Some operating systems do.

22   Q    Okay.  Is JDE World a derivative work of AS-400?

23   A    Again, as I have expressed before, I do not believe it to

24   be so, no, sir.

25   Q    Were you -- on Issue Number 5 relating to rscmpay.cbl

1    file and the psptarry file, were you provided an understanding

2    by Oracle's counsel of the difference between copying and

3    protectability?

4    A    I think we have had that discussion, yes.

5    Q    Was it in your report?

6    A    I would want to check my report and see if I put that in

7    the legal guidance section --

8    Q    What's your understanding of the difference between

9    copying and protectability?

10   A    My understanding is that some things may be copied but

11   are not necessarily a violation of the rights-holder's

12   exclusive copyright for various reasons, fair use, having been

13   placed in the public domain, being *de minimus* with respect to

14   the role in the new work, but that there are factors that need

15   to be evaluated before you say that something is necessarily

16   protectible expression.

17   Q    Even assuming a line of asterisks or stars was copied,

18   are you contending that that line is creative and protectible?

19   A    Just a line of asterisks?

20   Q    Yes.

21   A    I think that is a common enough convention that, taken in

22   isolation, that line is not a protectible expression.

23   Q    Even assuming white space was copied, are you contending

24   that that white space and alignment is creative and

25   protectible?

```
1   A    Again, not in all contexts.  I mean, I could see

2   situations where it might be, but I wouldn't opine that as a

3   general rule it is.  I think that needs to be evaluated on a

4   case-by-case basis.

5   Q    Do you think it's creative protectible expression to

6   choose the name "cursor" for the computer science term cursor?

7   A    Again, I suppose it was in this specific context, but I

8   wouldn't assert that in all cases that were necessarily true.

9   Q    So there's some cases where choosing cursor for the

10  term -- the computer science term cursor is not creative or

11  protectible.

12  A    I would think that likely to be true, yes.

13  Q    Okay.  How about for using the abbreviation s-t-m-t,

14  statement, for the term statement, do you think that's

15  creative and protectible?

16  A    Again, it's contextually dependent, but in and of itself,

17  absent other lines and other code, probably is a borderline

18  case.  I would want to look at a specific example to say yes

19  or no here.

20  Q    How about choosing the abbreviation YTD for year-to-date,

21  do you think that's creative and protectible?

22  A    Again, it depends on the context and the code that's

23  around it.

24  Q    So you're saying that it is or it is not?

25  A    I wouldn't think those three characters in isolation are
```

1    necessarily protectible expression.

2    Q    Okay.  But in this case you contend that the use of YTD

3    in a line of rscmpay file is protectible expression?

4    A    No, I think that the line that contains it is, counsel.

5         And particularly, for instance, in the YTD that

6    we've been talking about, it's not a single line in isolation.

7    There's a series of four or five lines there that are

8    identical, that perform specific function, that have unique

9    characteristics, and that are not dictated by the specific

10   programming conventions or constraints of the code in which

11   they're being used, nor any other constraint that I could

12   identify.  And so --

13   Q    You said "partially creative" earlier in your testimony.

14   What do you mean by "partially creative"?

15   A    Well, again, you know, you just asked about, for

16   instance, the use of YTD to abbreviate year-to-date.  Taken in

17   and of itself, that part of the line I would not assume to be

18   creative, just as a single word in a haiku I would not assume

19   to be creative.  But, when you string enough of those words

20   together to get a fully formed haiku, you've probably crossed

21   that line.

22   Q    Do you think that the term FETCH-DATA for a procedure

23   that fetches data, is creative and expressive and protectible?

24   A    May be creative, not terribly creative, but may be

25   creative because there are other ways that it could be -- you

1    could say that same thing.

2    Q    Is your basis --

3    A    What were the other two parts of your question, though?

4    That was a three-part question.

5    Q    Yeah -- no, I think it was one.  Let me ask the

6    follow-up.

7              Is your basis for contending that, for example,

8    FETCH-DATA is protectible, your contention that a programmer

9    could use a different name?

10   A    Certainly.  I'm not saying that it's a masterpiece.  I'm

11   saying that, you know, it is something specifically coded by a

12   particular programmer in a particular situation and so has at

13   least some small creative spark.

14   Q    Let's move on to a different topic -- actually, hold on,

15   one follow-up question.

16             Is that your only basis to contend that that phrase,

17   FETCH-DATA, is creative and protectible is that it can be

18   written different ways?

19   A    That's not my only basis in this specific situation, and

20   that is because there is a copybook, that is an Oracle-written

21   copybook, that contains that expression and quite a few others

22   that are used in the context with this rscmpay -- or, I'm

23   sorry, within the pts SQL subroutine.

24             And so it's an Oracle-provided copybook that spells

25   out these user friendly names that can be used in the context

1    of interacting with that same program.

2            So if a programmer chooses to use that copybook, as

3    we see in the cases here, they're using that name that Oracle

4    created.  But that name is actually part of a set of other

5    names that define the various actions that that particular

6    subroutine is responsive to.

7    Q    Let me ask my question again.

8            Is the basis for your contention that the term

9    FETCH-DATA is protectible and creative only that the

10   programmer could choose a different name if he or she wanted?

11   A    No.  As I've just explained, counsel, that's one factor.

12   In this particular instance, I see that as one factor amongst

13   several.

14   Q    What else makes it creative and protectible?

15   A    Well, again, it's a user friendly way of labeling what

16   would otherwise be a single alphabetic character.

17           You could as easily pass the F character to that

18   subroutine in a value that had whatever name you chose to, and

19   it would allow you to perform the same function using that

20   subroutine, because in COBOL the names of those elements don't

21   matter, it's their position.

22           So here somebody has said, "I'm going to make

23   this really easy to recognize what this statement is doing.

24   I'm going to do so by assigning certain names to certain

25   functions," and FETCH -- the -- select FETCH, or FETCH action,

1    rather, ACTION-FETCH -- I'll get it right eventually -- was

2    one of the names that that programmer chose to help the

3    readability of that particular program.

4             And that was an Oracle PeopleSoft programmer who had

5    originally created that statement, and so it's not --

6    Q   I believe my question was a yes or no answer.  I'm just

7    asking a simple question.

8             Is the only basis for your contention that the

9    phrase FETCH-DATA is protectible and expressive the fact that,

10   in your opinion, it can be written many different ways?

11             MR. SMITH:  I'll object as asked and answered

12   twice.

13             MS. VANDEVELDE:  I'm asking for any other basis.

14   BY MR. VANDEVELDE:

15   Q   What's your basis for saying that's expressive and

16   creative and protectible?

17   A   I just gave you my basis, counsel.  Maybe I'm not

18   understanding your question, but I thought I just answered

19   that question.

20   Q   I don't believe so.

21             Is it that it can be written in different ways?

22   What else beyond the fact that it can be written in different

23   ways?

24   A   That there was a choice made to write it in a way that

25   improves the readability of the program if you're using it.

1    Q    So beyond the choice --

2    A    The choice to package it in that --

3                    (Simultaneous indecipherable
                      conversation.)

4                    THE COURT:  Wait a minute.  One, you're

5    interrupting the witness while she's answering the question.

6                    Two, let her finish her answer, and then if

7    there's a follow-up question, I'll consider it.

8    BY MR. VANDEVELDE:

9    Q    You mentioned choice.  What beyond the choice of how to

10   write that name makes it expressive and protectible?

11   A    Again, I'm going to try to be clear here.

12                I think the choice to -- rather than passing a bare

13   parameter, passing a parameter with a friendly name, the

14   choice of the specific name assigned to that parameter, and

15   then ultimately the way that that particular parameter was

16   packaged into a COBOL copybook, along with other parameters

17   related to the same program, is all a part of the creative

18   choice of that programmer.

19   Q    I'm just talking about the name FETCH-DATA, the choice of

20   the name FETCH-DATA.  Beyond the choice of that term, what

21   else, in your opinion if anything, makes it creative and

22   protectible?

23   A    Well, it's not just pulling a name out of the air, it's

24   pulling the name out of the air in specific context, counsel,

25   in order to fulfill a specific purpose, and that is to improve

1    the readability of the program.

2    Q    I'll move on.

3              Let's talk about local hosting.  You understand the

4    local hosting prohibition in the injunction to mean, as

5    enjoined here, the hosting of a client's systems on Rimini's

6    systems, correct?

7    A    Which paragraph of the injunction are you referring to,

8    counsel?

9    Q    It's paragraph 5.

10   A    Okay.  I don't see the word hosting appear in paragraph

11   5.  This is,

12              "...shall not reproduce, prepare derivative

13         works from, or use PeopleSoft software or

14         documentation on, with, or to any computer system

15         other than a specific licensee's own computer

16         system."

17              So this -- I don't see the word hosting in here.

18   I'm not sure what you're asking me to direct my attention to.

19   Q    Have you never heard of the term local hosting in this

20   case?

21   A    Oh, sure, I have.

22   Q    Okay.  I'm asking you about that term.

23              You understand local hosting to mean, as enjoined

24   here, the hosting of a client's systems on Rimini's systems,

25   correct?

1    A    That is not entirely my understanding here.  That would

2    be certainly encompassed within what is in this paragraph, but

3    this paragraph seems to be a bit broader than that.

4    Q    So yes or no, you understand local hosting to mean, as

5    enjoined here, the hosting of a client's systems on Rimini's

6    systems.

7    A    I would understand that to fall within what is

8    contemplated here, but I think that this is just slightly

9    broader than that.

10              MR. VANDEVELDE:  Okay.  If we could pull up her

11   deposition transcript, page 3 -- not deposition, her trial

12   testimony, page 365, lines 2 through 4.  And, actually, if you

13   could go up a few lines and get the question.

14   BY MR. VANDEVELDE:

15   Q    All right.  You were asked,

16              "Okay.  You've defined an environment --

17        actually, before I go there, I believe you were going

18        to say --"

19              MR. VANDEVELDE:  Hold on one second.  I need a

20   few more lines, John, line 1.

21   BY MR. VANDEVELDE:

22   Q    All right.  You were asked:

23              "Okay.  You've defined an environment --

24        actually, strike that.

25              "Before I go there, I believe you were going

```
1           to say you understood the term local hosting as --

2           tell us, what's your definition?

3                   "I understand local hosting to mean, as

4           enjoined here, the hosting of a client's system on

5           Rimini's systems, but that would be hosting it

6           locally to Rimini's systems."

7                   That was your testimony, correct?

8    A    That is correct.

9    Q    Now, you testified this morning about allegedly finding

10   4,481 documents, correct?

11   A    That is correct, yes.

12   Q    And that testimony was under oath, right?

13   A    That is correct.  This -- I think I got the number right.

14   I may have transposed a digit, but I believe that to be the

15   correct number.

16   Q    You think you only transposed a digit?

17   A    No, I don't think that I transposed a digit.  I'm saying

18   that if it was 4,481 or 18, I mean, I could possibly, in

19   preparing the slides, counsel, have transposed a digit.  But

20   that is the number of files that I recollect.

21   Q    Did you double check your work?

22   A    I actually had one of my colleagues provide that number

23   to me over the phone.

24   Q    So you didn't.

25   A    Not as we were preparing the slide, no, because that was
```

1    done after I came out here to --

2    Q    What was the basis for that number, 4,481?

3    A    It was the work I had done in my earlier report.

4    Q    And it was the spreadsheet you cited in the report,

5    correct?

6    A    I believe that's -- I believe the spreadsheet was

7    provided with the report, yes.

8              MR. VANDEVELDE:  Okay.  Can we pull up her

9    opening report, paragraph 198, please, and if we could focus

10   on that paragraph.

11   BY MR. VANDEVELDE:

12   Q    It says,

13             "At my direction, three separate searches for

14        documents with Oracle copyright statements in

15        Rimini's production were run.  The following keyword

16        search was used," and you set forth the keyword

17        search.  And you state, "The unfiltered search

18        identified 4,481 documents."

19             Correct?

20   A    Correct.

21   Q    And that was your sworn testimony today, correct?

22   A    Correct.

23   Q    And you cite a footnote -- well, you have a footnote

24   there, 203.  Do you see that?

25   A    Correct.

1   Q    And that's supposed to be the basis for that statement?

2   A    Better be, yeah.

3   Q    Did you check the spreadsheet that you cite in that

4   footnote last night?

5   A    I did not check it last night.  At the time we were

6   providing -- or preparing these slides a couple days ago I

7   called back to my colleague, Wilford, and asked him to provide

8   the number to me.

9   Q    And you relied on him?

10  A    I did.

11                  MR. VANDEVELDE:  Can you zoom in on the footnote

12  203, please, John.

13                  So 203 cites Exhibit 120, an Excel spreadsheet.

14                  And if we could pull up OREX Exhibit 198 which

15  is that exhibit attached to your report, and if you could

16  scroll down to the very bottom, John, the last row of data.

17  BY MR. VANDEVELDE:

18  Q    Ms. Frederiksen-Cross, how many rows are on this

19  spreadsheet?

20  A    Could you go back to the top and let me see if it is

21  filtered in any way.

22  Q    Do you see any filtering?

23  A    I do not here.

24  Q    How many rows are in this spreadsheet?

25  A    Go back to the bottom.

1                   There are 1,070 rows in this spreadsheet.

2      Q    So you're off by more than 3,300 rows, aren't you?

3      A    Could we go back to the snippet of my report again.

4      Q    Please answer my question.  You were off by more than

5      3,300 rows, correct?

6      A    If this is the proper citation in that footnote, yes.  If

7      this footnote citation was for the other number, I --

8      Q    We'll get to the other number in a second.

9      A    Okay.

10     Q    So you provided sworn testimony in a report that said

11     there was 4,481, and you supported it by a spreadsheet that

12     only has 1,070 rows, correct?

13     A    My recollection is that this spreadsheet was

14     de-duplicated, but I agree with you that this spreadsheet that

15     you're showing, if it's the full spreadsheet, has 1,070 rows.

16     Q    You didn't say it was de-duplicated in your report, did

17     you?

18     A    Pretty much everything we used in the report, with

19     exceptions where I noted otherwise, was de-duplicated.

20     Q    You didn't note that, did you?

21     A    I'd have to go back and look at what I said about it in

22     the report, counsel.

23     Q    And you presented an incorrect number to the Court,

24     didn't you?

25     A    I am confident in the work of my assistant and in his

1    provision of that number to me.

2    Q    Even though he's off by more than 3,300 rows?

3    A    Again, I am confident in that number, counsel.

4                   MR. VANDEVELDE:  Can we pull up her report

5    again, John.

6    BY MR. VANDEVELDE:

7    Q    The next two -- the next two sentences of your report

8    say,

9                   "Next the results were filtered to only

10             include text, .txt files, or files with file names

11             that start with 00P.  This search identified 1,139

12             documents," and you cite to footnote 204.

13                   Do you see that?

14   A    I see that.

15                  MR. VANDEVELDE:  Okay.  Can we look at footnote

16   204, please.

17   BY MR. VANDEVELDE:

18   Q    Footnote 204 cites Exhibit 118, and it cites another

19   Excel spreadsheet.

20   A    I see that.

21                  MR. VANDEVELDE:  And if we could pull up OREX

22   Exhibit 196, which is that Excel spreadsheet, Exhibit 118,

23   attached to your opening report.

24   BY MR. VANDEVELDE:

25   Q    Now, you told the Court this morning, and it's in your

1    report, that the results of the filtered search revealed 1,139

2    documents, correct?

3    A    I believe that is the correct number, yes.

4    Q    And that was sworn testimony, correct?

5    A    Again, that is correct.

6    Q    That was on your slide this morning?

7    A    It was on my slide as well, yes.

8              MR. VANDEVELDE:  And so, John, if we could look

9    down at the bottom of this spreadsheet.

10   BY MR. VANDEVELDE:

11   Q    Ms. Frederiksen-Cross, how many rows are on this

12   spreadsheet?

13   A    There are 710 rows.

14   Q    So you're off again, correct?

15   A    Again, you know, I believe that this spreadsheet was

16   probably de-duplicated.  I would want to double check that

17   with my colleague who assisted in its preparation.

18        But I have worked with Wilford for over ten years,

19   and he is someone who's -- the quality of his work I trust

20   completely.

21   Q    But the number you presented to the Court is not

22   supported by your spreadsheet, is it?

23   A    The spreadsheet -- the number I presented to the Court is

24   not shown by the rows -- the count of the rows in this

25   spreadsheet.

1    Q    It's off by more than 300.  That's off by more than,

2    what, almost 50 percent, correct?

3    A    What was the underlying number?  1100?

4    Q    Seven ten is what you claimed --

5    A    Right.

6    Q    -- or what is --

7    A    Right.

8    Q    -- actually in here.

9    A    I've got 710 here.

10   Q    And the previous spreadsheet we saw that allegedly

11   supported the 4,481, that does not support what you told the

12   Court today, does it?

13   A    Can we go back to the spreadsheet just for a moment to

14   see if there is a count of the occurrences in these columns?

15   Q    Sure.  We can look at it.  It's OREX Exhibit 198.

16   A    Can you go up to the top, please, so I can see the row

17   headers?  Okay.

18   Q    There's no count column is there?

19   A    I do not have a count column here.

20   Q    Beyond these two spreadsheets that are -- do not support

21   what you told the Court this morning, do you have any other

22   basis sitting here today to support those numbers?

23   A    Here in the courtroom with me today?

24   Q    Here in the courtroom today.

25   A    No, not beyond my recollection of the process that we

1   used and the counts that we derived originally, I do not.

2                    MR. VANDEVELDE:  If we could pull up your

3   surrebuttal report, paragraph 69, please.

4   BY MR. VANDEVELDE:

5   Q   And you filtered another time based on file types,

6   correct?

7   A   That is also correct.

8   Q   And you -- that resulted in 934 attachments.  Do you see

9   that?

10  A   I see that, yes.

11  Q   And you said that those are intended to be used with

12  Oracle database, correct?

13  A   With respect to these specific ones that had Oracle

14  copyrights, yes.

15  Q   And, by the way, 934 doesn't match either of the two

16  incorrect spreadsheets we saw or the two spreadsheets we saw

17  earlier, correct?

18  A   That's correct because some of the zip files were opened

19  up, and we had expanded things before we counted the

20  individual files they contained.

21  Q   And so your opinion is that 90 -- roughly, 98 percent of

22  these 934 attachments, so that's 919, are intended to be used

23  with Oracle database, correct?

24  A   Correct.

25  Q   And you've previously testified in this case that the

1    license that governs Oracle database does not contain a

2    facilities restriction, correct?

3     A    Well, many of these were PeopleSoft Oracle licenses

4    designed to be used in that PeopleSoft context.  But I agree

5    with you that I did not see a facilities restriction

6    specifically in the Oracle database.

7     Q    And you filtered based on file types that are associated

8    with Oracle database, correct?

9     A    Well, I would note that these file types are associated

10   with Oracle database but also with specific Oracle products,

11   for instance, PeopleSoft uses SQL and NPKB.

12    Q    Ninety-eight percent of 90 files that you say is left

13   over, that's 88.2, so that leave less than two files left

14   over, correct?

15    A    I'm sorry, do that -- tell me what your math is again?

16    Q    You stated at the beginning of this paragraph that there

17   are 90 files left that are unaccounted for that you claim were

18   uploaded by Rimini employees.

19    A    Okay.

20    Q    And you say that 98 percent, roughly 98 percent, are the

21   file types intended to be used with instances of Oracle

22   database.

23           So 98 percent -- you don't have to do the math -- of

24   90, is 88.2.  So that's less than two files are left over,

25   isn't that true?

```
1    A   No, I don't --
2                 MR. SMITH:  Objection, vague.
3                 THE WITNESS:  That would be -- I mean, just
4    doing the simple math transaction, 98 percent, 2 per 900, that
5    would be -- hang on just a second.
6                 MR. VANDEVELDE:  I'll move on.
7                 THE WITNESS:  So I think -- yeah, I think your
8    math is wrong, counsel.
9    BY MR. VANDEVELDE:
10   Q   Let's talk about -- you testified that the evidence and
11   testimony you heard from Mr. Craig MacKereth -- do you recall
12   that?
13   A   Which -- I was asked several questions about his
14   testimony.
15   Q   Yeah, you heard his testimony, correct?
16   A   Yes, I was here for his testimony.
17   Q   And you testified that the evidence you heard from
18   Mr. MacKereth about quarantining was new to you?
19   A   With respect to showing any -- any evidence of the
20   specific quarantine method, or anything specific about it
21   other than the generic statement that Mr. Astrachan had in his
22   report, that he had been told there was quarantining.
23   Q   You're aware that one of the methods Rimini uses to
24   detect files that should be quarantined is via e-mail sent to
25   security@riministreet.com, correct?
```

1    A    I'm aware of that, yes.

2                    MR. VANDEVELDE:  Okay.  If we could pull up

3    Oracle counsel's opening statement which is at transcript --

4    starting on line 14 -- sorry, 34, line 14, to 35, the first

5    line.  If you could blow up starting at 14.

6    BY MR. VANDEVELDE:

7    Q    Mr. Pocker stated,

8                    "After they receive Oracle code, even if it's

9         from their clients, Rimini did not instruct those

10        clients not to send Oracle code.  As I've mentioned,

11        there's no communications back to them saying, 'Oh,

12        yeah, don't do this again; don't do it ever.'

13                    "There's no evidence of notification being

14        sent to what is called security@riministreet.com, and

15        in their presentation and in some of the policies

16        that are already in evidence, you'll see that

17        employees who receive third-party software or

18        copyrighted materials from clients are supposed to

19        report that incident to Rimini at

20        security@riministreet.com.  There's no evidence that

21        that was done in connection with any of these

22        supposed accidental receipts of copyrighted

23        material."

24                    Do you see that?

25   A    I saw that until the screen switched, yes.

1    Q    Do you think that's a correct statement?

2                    MR. SMITH:  Your Honor, I'll object as outside

3    the scope.

4                    MR. VANDEVELDE:  Your Honor, she has testified

5    about how things were quarantined, and what Rimini did in

6    response to alleged local hosting issues.  This is directly --

7                    THE COURT:  Well, it's also irrelevant.

8                    The Court is not concerned about a misstatement

9    that occurred by either counsel in the course of an opening

10   statement.

11                   MR. VANDEVELDE:  Okay.  I'll move on.  I don't

12   have to ask questions about that particular statement.

13   BY MR. VANDEVELDE:

14   Q    Ms. Frederiksen-Cross, you reviewed e-mails relating to

15   that e-mail address security@riministreet.com, correct?

16                   MR. SMITH:  Also outside the scope.

17                   MR. VANDEVELDE:  Your Honor, this is

18   directly relevant to Oracle's contentions through

19   Ms. Frederiksen-Cross about what Rimini did in response to the

20   very files she testified about this morning.

21                   THE COURT:  The Court agrees.  The question will

22   be allowed.

23                   THE WITNESS:  My recollection, as I sit here, is

24   that what I reviewed was a spreadsheet or log of such e-mails,

25   and I believe I may have seen a couple of examples of such

```
 1    e-mails.

 2    BY MR. VANDEVELDE:

 3    Q    Did counsel provide with you that log?

 4    A    Yes.  I believe it was work product that they had put

 5    together with respect to just --

 6    Q    Did you review it?

 7    A    I did.

 8    Q    We talked last week about your process for making

 9    summaries of certain SalesForce cases, correct?

10    A    Creating the HTML display of what was given to us in the

11    SalesForce table I assume is what you're talking about?

12    Q    Remember we had the discussion about the GB column

13    labeled Important?  Do you remember that discussion?

14    A    Yeah, I do.

15    Q    And did you review the security@riministreet logs to

16    determine whether the materials attached to those SalesForce

17    cases were reported to the compliance department?

18    A    I'm trying to remember the format of that log

19    specifically, counsel.  As I sit here, I don't recall if that

20    was something I reviewed or not.

21    Q    So you don't --

22    A    I think I searched for the specific attachment numbers,

23    but I don't think I read the entire log or anything.

24    Q    So you didn't.

25    A    No.  My recollection is, as I sit here at least, that I
```

```
 1    personally at least just searched for those attachment

 2    numbers, the attachment identifiers.

 3    Q    Is it your testimony that none of the materials attached

 4    to any of those SalesForce summaries was reported to

 5    security@riministreet.com?

 6    A    With respect to the ones I discussed here in court, are

 7    you limiting it to that or --

 8    Q    I'm asking -- yeah, the ones you discussed in court.

 9    A    I saw no such evidence until yesterday in the courtroom

10    when there was that discussion of the role of -- I'm sure I'm

11    slaughtering her name, but I believe it was Maurya -- his or

12    her name, actually -- that if you knew that that person was

13    the IT person who enforced those actions, you might be able to

14    infer that.

15            But I do not recall anything specific beyond that

16    that has been provided to me that was -- we were never even

17    given an explanation about how the alleged quarantining of

18    these files occurred.  It was just a statement in

19    Mr. Astrachan's report that he had had a conversation and had

20    been told that they had been.

21    Q    You chose to present five SalesForce summaries to the

22    Court, didn't you?

23    A    I believe that number is correct, yes.

24    Q    But you prepared six, didn't you?

25    A    I think we actually prepared more than that when we were
```

1    converting tables to HTML, considerably more than that.

2    Q    But there's six on the exhibit list, correct?

3    A    I don't know what the exhibit list that was given to you

4    was, counsel.

5    Q    Okay.  You prepared more than five though, correct?

6    A    I know that in translating the SalesForce tables to HTML

7    there is a very, very, very lengthy exhibit that was prepared

8    that had all of the SalesForce that we were able to

9    reconstruct.

10            With respect to preparing exhibits for use here in

11   court, I know counsel and I talked about a number of them as,

12   you know, what would be a good exhibit.

13            I don't specifically recall if we talked about more

14   than five, or if we prepared exhibit drafts for more than

15   five.  I just -- I don't know.

16   Q    Okay.  Well, you prepared two relating to Guest Services,

17   do you remember?

18   A    Yes.

19            MR. SMITH:  Your Honor, these questions are

20   getting further and further beyond the scope.  This was all

21   addressed in her direct testimony.

22            MR. VANDEVELDE:  Your Honor, this is directly

23   relevant to how Rimini dealt with the very files that she is

24   accusing Rimini of locally hosting.

25            THE COURT:  Response from counsel?

1    MR. SMITH:  These individual SalesForce cases

2  were discussed at length during Ms. Frederiksen-Cross's direct

3  testimony.  There was an opportunity for counsel to

4  cross-examine her on those cases and the cases that she

5  reviewed at that time.

6         Now we're in the rebuttal case.  The only

7  content that I provided during the rebuttal case, or that

8  Ms. Frederiksen-Cross provided during the rebuttal case

9  regarding these SalesForce cases, was that four indicated that

10  there had been use by Rimini of the files to solve problems.

11    MR. VANDEVELDE:  I'm looking at their slide,

12  your Honor.  It has information about the SalesForce cases

13  that he presented this morning to this Court about the

14  local -- alleged local hosting issues.

15    THE COURT:  I'm going to sustain the objection.

16    I will candidly tell you that I do not recall

17  testimony along that line in the rebuttal case.

18  BY MR. VANDEVELDE:

19  Q   In your opinion, can a Rimini engineer install or create

20  a development environment for JDE without copying the open

21  code portion?

22    MR. SMITH:  Beyond the scope.  The rebuttal case

23  did not include any discussion of JDE violations.

24    THE COURT:  Sustained.

25    MR. VANDEVELDE:  Your Honor, I'd like to make an

1    offer of proof regarding a number -- actually, a few files,

2    and then I think I will be close to done.  It relates to JDE.

3              I take your Honor's sustaining of his objection

4    that I'm not allowed to talk about JDE at all?

5              THE COURT:  Well, I don't recall any JDE

6    testimony in the rebuttal case, and for that reason I am

7    granting the objection, I'm sustaining it.

8              MR. VANDEVELDE:  So can I just make an offer of

9    proof about a few particular documents?

10             THE COURT:  You can certainly make your offer of

11   proof.

12             MR. VANDEVELDE:  Okay.  I'll make an offer of

13   proof.

14             Your Honor, pursuant to Federal Rule of Evidence

15   103 -- and, your Honor, this is cross of Ms. Frederiksen-Cross

16   in Oracle's rebuttal case.  We would like to call her in our

17   surrebuttal case.  Can I do that, and go beyond the scope of

18   their rebuttal case?

19             THE COURT:  No, you can't.

20             MR. VANDEVELDE:  Okay.  Then I will make an

21   offer of proof on JDE.

22             Pursuant to Federal Rule of Evidence 103, Oracle

23   has come into this court arguing, without evidence or basis,

24   in conflict with the documentary record, that the open-closed

25   distinction is somehow made-up.

1    We would like to make a very brief offer of

proof on a few documents, including the Gartner article that

was excluded earlier today during the testimony of Stephen

Lanchak, as well as certain e-mail communications at Rimini

Street, that touch on this exact issue.

6    Were we permitted to introduce the Gartner

article exhibit, it would show explicitly that the term open

code and visible code goes back many years in the industry.

9    In fact, the article would say that -- says

that,

11    "Third-Party application maintenance and

support services refer to services that maintain,

customize, modify, and provide technical support for

the application within the MEANS provision by the

software publisher such as tools or open code."

16    He goes on to say that, "While some ERP

products are delivered with tools or APIs that allow

the customer to modify portions of the product, for

example, Oracle's PeopleSoft and PeopleCode, others

such as JDE and SAP's ERP, have visible code that can

be modified."

22    That article predates the injunction by many

years.

24    We would also proffer e-mails, which are Bates

numbered RSI2_013352306 and RSI2_013223831, and these e-mails

1   similarly show that Rimini was using the terms open and closed

2   code and made that distinction as far as back as at least

3   2013.

4              Those very terms are used in the e-mails

5   regarding JDE support, including closed code and open code

6   layers exactly as Rimini has presented at the hearings.

7              These e-mails are in the specific context of

8   providing support for JDE, and we believe that these are

9   admissible for a number of reasons.

10             As I said at the outset, they are highly

11  relevant.  Oracle has come into court and argued that Rimini

12  has effectively made up these terms, and these documents

13  disprove that suggestion.

14             Second, they are self-authenticating under

15  902-6, and as business records.

16             Third, they would not be introduced for the

17  truth of any matter asserted but merely to show that these

18  terms were used in the industry going back many years, and

19  used by the industry and by Rimini.

20             And, finally, the Court has discretion to let it

21  in to prevent manifest injustice under Rule 16 despite not

22  being in the prehearing order.

23             Again, it is only during the context of this

24  proceeding that Oracle has made this argument that these are

25  made up, and these are documents that Oracle has had in its

1    possession for many, many years, and in fact one of them, the

2    Gartner article, was produced by Oracle to Rimini.

3              And so we believe that they are highly relevant

4    and admissible, and so we will plan to follow up with a very

5    brief written submission on this proffer, but I at least

6    wanted to make it on the record, and I appreciate the

7    opportunity.

8              THE COURT:   Okay.  So noted.  The Court's ruling

9    stands.

10              But if Rimini wishes to provide further

11    supplement to the Court relevant to the issue, and feels that

12    it is clearly within the scope of the rebuttal examination

13    that's been conducted of Ms. Frederiksen-Cross, I will

14    consider it.

15    BY MR. VANDEVELDE:

16    Q   I think I just have one more topic,

17    Ms. Frederiksen-Cross, and it's relating to cross-use.

18              Are you -- are you aware that the Court has held

19    that Rimini is permitted to, quote, create the same update

20    file for multiple clients?

21    A   I believe I am aware of that opinion, yes.  I don't

22    remember the Court's exact wording in it.

23    Q   It is, quote, "create the same update file."

24    A   For multiple clients, yes.

25    Q   Okay.  And are you aware that the Court has held that

1    Rimini can memorize its work product?

2    A    Yes, I recall that.

3    Q    And the Court has held that Rimini can replicate the work

4    that it has done.

5    A    So long as it does so without violating the injunction,

6    that is my understanding, yes.

7    Q    Do you understand that the Court has ruled that Rimini

8    may, quote, use the same tests to ensure functionality of an

9    update?

10   A    I'm aware of that, yes.

11   Q    And that Rimini is allowed to perform, quote, less

12   testing if it so chooses?

13   A    I believe the Court even contemplated that if they chose

14   to distribute something without testing, that was permitted.

15                MR. VANDEVELDE:   Okay.  If we could put up --

16   let's focus on issue number 3 when talking about cross-use,

17   which is the Johnson Controls issues, and if we could put up

18   DDX-202, which was a demonstrative.

19   BY MR. VANDEVELDE:

20   Q    Now, using your understanding of what Oracle's counsel

21   gave you as to cross-use, how can Rimini address the W2 print

22   parameter problem for both COE, City of Eugene, and Johnson

23   Controls without violating the injunction?

24   A    Well, I haven't attempted to try to figure out what

25   Rimini's work process should be, but, as a general principle,

```
 1    if Rimini went into Johnson Controls' PeopleSoft environment,

 2    performed the analysis necessary to troubleshoot there, and

 3    did their work entirely using Johnson Controls' license, and

 4    developed a solution in that environment using only that

 5    environment and not making reference to any other customer's

 6    environment, as a general principle I wouldn't -- at least as

 7    I sit here -- and, you know, I'm doing this from the hip as

 8    I'm sitting in the witness stand, but --

 9    Q    Let me make it more concrete.

10          Don Sheffield tested the print parameter solution,

11    correct, at some point?

12    A    At some point he did, yes, because he states -- I believe

13    it was Don who stated in the e-mail that he said he had tested

14    it in COE, City of Eugene.

15    Q    So he's in City of Eugene's environment, he tests the

16    print parameter solution, which is just inputting B9999 in a

17    certain parameter, right?

18    A    I don't think you got the quite -- the right number of

19    9s, but generally, yes, putting a -- you're basically

20    supplying a definition for that parameter.

21    Q    So he knows the parameter, and he now wants to perform

22    the same fix for Johnson Controls.  How can he do that?

23          He knows the specific solution, exactly what to do.

24    How can he do that?

25    A    Well, again, had he done that in Johnson Controls'
```

1    environment when Johnson Controls raised the issues, had he

2    done that work there, I think there would have been no direct

3    issue because he would not have been relying on another

4    customer's environment.

5            And I don't know from the correspondence whether he

6    looked up what Eugene already had, or if he did the old

7    classic I'll try, I'll try this, I'll try this, ah-hah, here's

8    what works in City of Eugene.

9            He just said he tested it.  So he confirmed that

10   that particular definition that he had provided in the e-mail

11   was going to be adequate.

12           But had he done that work in Johnson Controls, I

13   think there would be no specific problem.

14   Q    He already --

15   A    And as I said earlier in my testimony, had he known that,

16   had that been in his head before -- or at the time the problem

17   arose, had he not had to rely on another client's environment,

18   then I would have not thought that putting that number in was

19   a problem because it would be something that he knew.

20           But in this case the e-mail chain clearly shows that

21   that was not something that he knew.  They fussed around with

22   these other solutions and tried various things to fix the

23   problem before they ever got there.

24   Q    So let's say Don Sheffield figured out the solution for

25   City of Eugene.  He knows what to do with the print parameter

1    field and to type in B999 -- I'm shortening it, but let's just

2    assume it's B999.

3              Can he then, knowing that specific knowledge, based

4    on the use of City of Eugene's environment, go and do the same

5    work for Johnson Controls?

6    A    In your hypothetical, counsel, we're assuming that he did

7    not go and figure that out in City of Eugene after Johnson

8    Controls raised the issue, and he couldn't get at the Johnson

9    environment.

10             In your hypothetical it was something he had solved

11   last month or last year or some other point in time, and it

12   was knowledge that was just in his possession that, for a

13   particular field, oh, if this doesn't print right, go do this.

14   Is that your hypothetical?

15   Q    He knows the solution, having developed it in City of

16   Eugene, and he wants to reuse that knowledge with Johnson

17   Controls.  Can he reuse that knowledge?

18   A    I would think if it was just knowledge that he had in his

19   head, it was just an experience he had had as a developer

20   developing a solution, and he knows this particular solution

21   will always work in this situation, it will work in this

22   general type of situation, and so he's in Johnson Controls and

23   he says, "Oh, I've seen this problem before, I know how to fix

24   this," that he probably could.

25   Q    Could he tell his coworker that the way to fix that

1    problem is to type B999 in City of Johnson's [sic] print

2    parameter field?

3     A    Again, so long as he had not done the specific

4    diagnostics and made reference to another client's licensed

5    environment to diagnose, to troubleshoot that problem, or to

6    develop the fix there, I think, yes.

7     Q    So he can communicate B999 to his colleague.

8     A    Again, if it's something that he just has as his general

9    know-how because he solved this kind of problem before, and

10   it's not work that was done in one customer's environment that

11   is then being distributed to another customer, but rather is

12   something that is just his general know-how as a person

13   experienced with certain types of programming techniques,

14   yeah, I'm assuming that he could.

15    Q    And if the fix for that problem was to write one line of

16   Rimini written code, could he write that Rimini written code,

17   that one line, in City of Johnson's -- or Johnson Controls'

18   environment?

19              MR. SMITH:  I'm going to object as beyond the

20   scope because now we're getting into hypotheticals that

21   doesn't touch upon the rebuttal exam.

22              MR. VANDEVELDE:  The rebut -- her examination

23   was about Rimini-created files, for example, RSI1099M and -I

24   and other ones, and so I'm asking about if Rimini writes its

25   line of code, can it reuse it with another client.

 1          THE COURT:  I think it's within the scope.  I'll

 2    allow the question.

 3          THE WITNESS:  Well, again, in your hypothetical

 4    here -- let me just flesh out a couple details that will help

 5    me answer it.

 6          So you're saying that -- I'll use the two

 7    parties here to make it easy -- they wrote a line of code in

 8    City of Eugene, not in response to a problem raised by Johnson

 9    Controls, but they just wrote a line of code because they were

10    changing the number -- the year from 2019 to 2020 on a form.

11          So they had to go in and make that one change,

12    and they remembered that that was how they had done it.  So

13    they're not transferring any work product, they're not copying

14    any code, they're just -- he's remembering it and he's going

15    to go do it in another environment because he remembers that's

16    how he did it.

17          Is that -- I mean, you're saying he wrote it,

18    and then he can use it over here, and I think much depends on

19    how it gets from here to there, honestly.

20    BY MR. VANDEVELDE:

21    Q    It depends on whether that one line of Rimini written is

22    retyped or not?  Or remembered?

23    A    Well, if it's transferred, for instance, from City

24    of Eugene to Rimini and then to Johnson Controls, it's

25    effectively being transferred from one client's environment to

1    another.

2           And I think there you have a clear instance that the

3    work done in one client's environment is being used not solely

4    for that client.

5           If, on the other hand, it's just some know-how the

6    guy has, it's just something that, again, you know, he knows

7    that you have to go into these two reports and change the year

8    from 2018 to 2019 or 2019 to 2020 because he's done it every

9    year since 2011, and he just knows that's how you do it, then

10   I don't see anything that prevents him from doing that.

11   Q   So let me understand that answer.

12          You're saying that it does make a difference whether

13   he remembers that one line of code, or whether he writes down

14   that one line of Rimini written code?

15   A   Again, you know, that's a little bit of an incomplete

16   hypothetical.

17          But generally speaking I think if you're talking

18   about a single line of code, the thing I would want to look at

19   is, you know, under what circumstances was the code written.

20          Was it being written over here because someone

21   somewhere else had a problem, you know, a different client had

22   a problem, well, that would fall afoul of the troubleshooting

23   prohibitions.

24          But assuming that it had just been written at one

25   point in time, and the guy just remembered that, yeah, you

1    know, we do this every year, we've been doing this for a

2    decade, we go in and we change all the 2019s to 2020s, and

3    then in 2021, we change all the 2020s to 2021, you know,

4    something like that would just be a part of a programmer's

5    know-how, I don't think that that would be excluded.

6              But as soon as you start saying he wrote it down,

7    then it's, like, okay, well, if he wrote it down, he wrote it

8    down because he didn't think he was going to remember it, he's

9    going to document something, and so it's a little bit more

10   sophisticated scenario and --

11   Q    And that's cross-use in your opinion?

12   A    That's where I would want to look specifically at the

13   very detailed specifics of what was being done.

14                   MR. VANDEVELDE:  Nothing further.

15                   THE COURT:  All right.  Redirect exam?

16                   MR. SMITH:  One question.

17                        REDIRECT EXAMINATION

18   BY MR. SMITH:

19   Q    Ms. Frederiksen-Cross, did Professor Astrachan, in his

20   report, use the same number of Oracle copyrighted files after

21   you filtered the number down, in his report as you used in

22   your report?

23   A    Yes, and it's my understanding that he confirmed that

24   number when he discussed it with Mr. -- I believe it was

25   Butler, to find out how those files had been copied.

```
1              MR. SMITH:  No further questions, your Honor.

2              THE COURT:  All right.  Mr. McCracken?

3              MR. McCRACKEN:  Your Honor, if we may, we would

4    like to call Professor Astrachan to the stand in surrebuttal

5    for about ten minutes to deal with just the rscmpay file.

6              THE COURT:  Okay.  Let's do that.

7              And, Ms. Frederiksen-Cross, you may step down.

8    Thank you.

9              THE WITNESS:  Thank you.

10                       OWEN ASTRACHAN,
     called as a surrebuttal witness on behalf of the Defendant,
11             previously sworn, testified as follows:

12             MR. McCRACKEN:  May I proceed, your Honor?

13             THE COURT:  Yes.  Go ahead, please.

14             MR. McCRACKEN:  Good afternoon, Professor

15   Astrachan.

16             THE WITNESS:  Good afternoon.

17                     DIRECT EXAMINATION

18   BY MR. McCRACKEN:

19   Q    I have called you back to the stand, Professor, to

20   discuss the comparisons of the file rspcmpay.cbl and the

21   Oracle file psptarry.cbl.

22             Were you here for Ms. Frederiksen-Cross's rebuttal

23   testimony about those two files?

24   A    Yes, I was.

25   Q    And Ms. Frederiksen-Cross focused on what she thought was
```

1  evidence of Rimini copying the Oracle file.

2          Do you agree with her that there is evidence that

3  shows that Rimini copied the Oracle file?

4  A   No, I do not.

5  Q   For purposes of a substantial similarity analysis, is

6  there a difference between the fact of copying and copying

7  protected expression?

8  A   Yes.  It's my understanding that as part of determining

9  whether there is substantial similarity, one has to determine

10 whether protected expression has been copied.

11 Q   And with regard to that difference between the

12 fact of copying something and the copying of protected

13 expression, did you have any major disagreements with

14 Ms. Frederiksen-Cross's rebuttal testimony today?

15 A   Yes, I did.

16 Q   And can you elaborate on that, Professor.

17 A   There were several examples that she outlined as copying

18 that I don't think qualifies the copying of protected

19 expression.

20 Q   Professor, in your opinion, is white space protectible

21 expression?

22 A   No, I don't think it is.

23 Q   In your opinion is adjusting the white space in a file so

24 that columns line up, for example, the pic statements line up

25 or the comp statements line up, is that protectible creative

1    expression?

2    A    No, it is not.

3                    MR. McCRACKEN:  Mr. Jay, could we please turn to

4    DTX-501, and look at page 5, and.  If you could, could you

5    blow up the top third or so of the page down to where it says

6    A00-MAIN.

7    BY MR. McCRACKEN:

8    Q    Professor Astrachan, do you recall Ms. Frederiksen-Cross

9    testifying about this section of DTX-501 which is the Rimini

10   file?

11   A    Yes, I do.

12   Q    And just to orient us, what do you recall she said was

13   significant about this section of the file?

14   A    As I recall, Ms. Frederiksen-Cross was discussing that

15   this says AA000-MAIN SECTION, as opposed to just MAIN SECTION,

16   and that that was notable.

17   Q    Is the section of this file that's called AA000-MAIN

18   SECTION, is that the main section of the file?

19   A    Yes, it is the main section of the file.

20   Q    In your opinion is it protectible to name the main

21   section of a file MAIN?

22   A    In my opinion it is not protectible to name this MAIN

23   SECTION, as it is, and I'd like to note in reviewing hundreds

24   of PeopleSoft COBOL files, that all of them begin with

25   AA000-MAIN SECTION when they discuss the main section.

1    Q    Is it protectible, in your opinion, to label the main

2    section with the letter abbreviation A000?

3    A    No, it is not.

4    Q    I think Ms. Frederiksen-Cross also testified that she

5    thought this particular portion was significant because

6    the flower box starting the MAIN section starts with an

7    asterisk, whereas the other flower boxes in the file start

8    with a slash.  Do you recall that?

9    A    Yes, I do.

10   Q    Is it protectible expression, in your opinion, to start a

11   flower box with an asterisk rather than a slash?

12   A    No, in my opinion, that's not protectible expression.

13   Q    Why not?

14   A    Because flower boxes and lines of asterisks in general I

15   would not considerable protectible expression.

16           And I also note that, as I mentioned, in the

17   hundreds of COBOL files I reviewed, those that begin -- and

18   these were PeopleSoft files -- that this is relatively

19   standard among all of them.

20   Q    When you say, "this is relatively standard," what do you

21   mean?

22   A    I mean the beginning of the flower box not starting with

23   a slash before the MAIN section.

24   Q    So I guess just so I understand, are you saying that the

25   MAIN section often starts with an asterisk whereas other

1    sections start with a slash?

2    A   Yes, that's relatively common.

3              MR. McCRACKEN:  Let's go to new exhibits.  Let's

4    go to Oracle Exhibit 175 and look at page 20.

5              And while that's coming up, I will just say for

6    the record that is Ms. Frederiksen-Cross's side-by-side

7    comparison of the two files.

8              And let's zoom in on line 592 of the Oracle

9    file, if you could, Mr. Jay.

10   BY MR. McCRACKEN:

11   Q   Professor, do you recall Ms. Frederiksen-Cross testifying

12   about this piece of code that says SQL-STMT?

13   A   Yes, I do.

14   Q   Okay.  And how do you pronounce that, Professor?

15   A   I pronounce it as sequel statement.

16   Q   And I believe Ms. Frederiksen-Cross testified that this

17   was significant to her because a programmer could have written

18   SQL dash the word statement all the way spelled out.  Is that

19   your recollection?

20   A   Yes, that is my recollection.

21   Q   What is your response to that opinion?

22   A   I think that, as we actually heard Ms. Frederiksen-Cross

23   say, programmers often have an aversion to vowels, and sequel

24   statement is a very common abbreviation for the full use of

25   the word statement.

1    In fact that phrase sequel statement, as written,

2  SQL-STMT, is a standard in Sequel Light which is the most

3  commonly used database in the world.

4  Q    In your opinion, is it expressive or creative to write

5  SQL-STMT instead of SQL-STATEMENT?

6  A    It is not creative nor is it protected expression in my

7  opinion.

8              MR. McCRACKEN:  Mr. Jay, let's go up one page to

9  page 19, please, and let's zoom in on the area that says

10  MAIN-EXIT, EXIT PROGRAM, so about two-thirds down the page.

11  BY MR. McCRACKEN:

12  Q    Professor, do you recall Ms. Frederiksen-Cross opining

13  about this particular piece of code?

14  A    Yes, I do.

15  Q    What was her opinion on rebuttal with regard to this

16  piece of code we're looking at, which is lines 547 and 548 of

17  the Oracle file?

18  A    That somehow this was an indication of copying.

19  Q    Do you recall she said that this could have been written

20  as A000-MAIN-EXIT?  Did I get that right?

21  A    There were -- I believe that's correct.  And MAIN-EXIT,

22  as I determined from reviewing hundreds of COBOL files, is,

23  again, relatively standard across all of them.  These are

24  PeopleSoft files that I'm describing here.

25  Q    All right.  In your opinion, Professor, is it protectible

1    and creative to use MAIN-EXIT instead of A000 MAIN-EXIT?

2    A    No, it is not creative, nor is it protectible expression,

3    in my opinion.

4              MR. McCRACKEN:   Let's go to page 6, Mr. Jay, and

5    let's blow up the top few lines, lines 135 to 140 of the

6    Oracle file.   Thank you.

7    BY MR. McCRACKEN:

8    Q    And, Professor, if you look at lines 136 and 137,

9    Ms. Frederiksen-Cross testified that there's a structure being

10   set up here for FETCH-YTD-END given the value of E, and

11   FETCH-YTD-START given the value of S.   Do you see that?

12   A    Yes.

13   Q    And do you recall her testimony about that?

14   A    Yes, I do.

15   Q    In your opinion, Professor, is there anything about

16   giving the N variable the value E?

17   A    No, nor is it creative or protected to give START the

18   value S.

19   Q    And if we go down a few lines to line 139, does that line

20   relate to the cursor?

21   A    Yes, and similarly to SQL-STMT being not creative nor

22   protectible, I think using SQL-CURSOR to represent cursor, is

23   neither creative nor protectible.

24   Q    I think you taught us during your direct testimony what a

25   cursor is in computer science.   Can you just remind us.

1    A    Yes, I believe I made an analogy to a cursor blinking on

2    the screen as giving the position on the screen at where you

3    are, and that a cursor in a file or a database is the position

4    in that file or database where you are as the program is

5    executing and reading values from the file or database.

6    Q    So would it be normal, in your opinion, to refer to the

7    cursor, which is a computer science term, as cursor?

8    A    Yes, that seems very normal to me.

9              MR. LIVERSIDGE:   Mr. Jay, could we pull up

10   Ms. Frederiksen-Cross's rebuttal slide 11.  Is the -- oh,

11   you've got it.  Perfect.

12             And just for the record, we're looking at

13   rebuttal slide 11, which was a portion of Oracle Exhibit 175

14   showing lines in the Oracle file 888 through 909 or so.

15   BY MR. McCRACKEN:

16   Q    And, Professor, we heard some testimony from

17   Ms. Frederiksen-Cross about this line 888, the one that says

18   INITIALIZE SELECT-DATA OF S-YTD.  Do you recall that?

19   A    Yes.

20   Q    And I believe Ms. Frederiksen-Cross testified that while

21   she agrees one would initialize before doing other steps, she

22   did not think the other words or elements on this line were

23   required.  Did I hear that right?

24   A    I believe you heard that correctly.

25   Q    Can you just speak to that, Professor, are the words on

```
 1   this line required?
 2    A    Yes, I believe I discussed that in my direct testimony
 3   that the S in S-YTD is required because this is SELECT-DATA,
 4   and that the INITIALIZE SELECT-DATA is required because that's
 5   what we are doing when we fetch data.
 6    Q    And select data is a term we looked at in the API
 7   document DTX-500.
 8    A    That's correct.
 9    Q    And, Professor, there's certain terms highlighted on the
10   slide.  What do you understand that to indicate?
11    A    My understanding is that the terms highlighted in yellow
12   might be terms that people would perhaps disagree should not
13   be constrained.
14           I indicated that they would be constrained and
15   should be filtered out doing analytic dissection, and I
16   believe Ms. Frederiksen-Cross contends that perhaps those
17   highlighted in yellow would not be constrained.
18    Q    I think the term she used on rebuttal was that these were
19   partially creative.  Is that what you heard?
20    A    I did hear that phrase.
21    Q    We talked about SQL-CURSOR.  Do you think that is even
22   partially creative?
23    A    I do not.
24    Q    What about this line 895 that says SET FETCH-YTD-END OF
25   S-YTD TO TRUE," can you just tell us what that code does and
```

1    whether you think it is protectible.

2    A    I do not think it's protectible.  I also described that

3    in my direct testimony as when you reach the end of the

4    statement that you've just done, and this is when the return

5    code is end, that you must set a value, and setting that value

6    to true indicating the end seems relatively obvious and

7    required.

8            And the fact that we are setting a value of the

9    S-YTD, that's -- all those -- each part of this line is

10   essentially constrained by the context in which it has

11   occurred.  It must be S-YTD because that's the section that

12   we're in.  It must be set to true because we're indicating the

13   end.

14           So I don't think there's any creativity in that

15   line.

16   Q    Right.  And you're saying it indicates the end because,

17   if we look at line 893, it says if the return code is end.

18   A    Yes, that's correct.

19   Q    Can you explain what that means.

20   A    As we discussed in my direct testimony, once you've

21   called ptpsqlrt, you wait for that call to end, and if the

22   return code is end, you take a particular series of actions

23   indicating that it's the end.  And if the return code is

24   error, you also have to take a specific sequence of actions.

25           And so essentially, in my opinion, this line is

1   required by the fact that it's the end of the call that you

2   made.

3   Q    All right.  Thank you.

4        And then at line 899 we see the highlighting again,

5   it's just SQL-CURSOR once again, so we've already talked about

6   that, right?

7   A    Yes, we have.

8   Q    And then at lines 903 and line 909, Ms. Frederiksen-Cross

9   highlighted something that says PERFORM ZZ000-SQL-ERROR.

10       Do you see that?

11  A    Yes, I do.

12  Q    In your opinion, Professor, is it protectible and

13  creative expression to call the error module SQL-ERROR?

14  A    No.  As I indicated again in my direct testimony, we know

15  at this point in the program that the return code is error

16  because of what's on line 900 in psptarry, that it's an error.

17  So we must perform the error routine, and we know that's named

18  ZZ000-SQL-ERROR, so that's required.

19  Q    All right.  Professor, if you assumed that everything on

20  this slide that is highlighted by Ms. Frederiksen-Cross, and

21  which she claims is partially creative, if you assume that's

22  protectible expression, what's your opinion with regard to

23  whether this Rimini file is substantially similar to the

24  Oracle file?

25  A    Making that assumption, which I don't agree with, but if

1    we make the assumption that it is protectible expression, we

2    have a total of one, two, three, four, five lines.  This

3    psptarry file is about 1900 lines of code.  I would consider

4    this *de minimus*.

5                    MR. McCRACKEN:  Thank you, Professor.  I have no

6    more questions.

7                    THE COURT:  Cross-examination -- actually, we

8    probably are due for an afternoon break.  Is it short?

9                    MR. ISAACSON:  Yes.

10                   THE COURT:  All right.

11                   Go ahead, please, Mr. Issacson.

12                   MR. ISAACSON:  Professor, good afternoon.

13                            CROSS-EXAMINATION

14   BY MR. ISAACSON:

15   Q    You began your examination by saying you don't agree with

16   Ms. Frederiksen-Cross that there's evidence of copying with

17   respect to the rspcmpay file, correct?

18   A    Yes, that's correct.

19   Q    And is it still the case that you -- that while you are

20   able to ask Rimini, you still have not asked Rimini whether it

21   copied that file.  Is that still true?

22   A    That's true.

23                   MR. ISAACSON:  All right.  I have no further

24   questions.

25                   THE COURT:  All right.  Any further questions?

```
 1                    MR. McCRACKEN:  No, your Honor.  We ask that he
 2      be excused.
 3                    THE COURT:  I'm sorry?
 4                    MR. McCRACKEN:  We'd ask that he be excused,
 5      your Honor.  No more questions.
 6                    THE COURT:  Yes.  Professor, you may be excused.
 7                    We will take our break at this time.  We will
 8      reconvene between 3:05 and 3:10, please.
 9                        (A recess was taken.)
10                    THE COURT:  Be seated, please.
11                    All right.  The record will show that we're
12      reconvened following the midafternoon break, and,
13      Mr. McCracken, I see you are ready to proceed so please go
14      ahead.
15                    MR. ISAACSON:  It's Mr. Isaacson, your Honor,
16      but --
17                    THE COURT:  Oh, I'm sorry.
18                    MR. ISAACSON:  -- he may be ready to proceed
19      also.
20                    THE COURT:  You know, I apologize.  I've mixed
21      names several times, but I have to also say that this is the
22      first trial I've had where I've had 12 different attorneys
23      participating in the course of seven days, and I apologize for
24      any of my mistakes in addressing any you.
25                    MR. ISAACSON:  You have no need to apologize,
```

1    your Honor, we've been with you for awhile.

2              Just as a housecleaning matter, we wanted to

3    admit Exhibits 1356 through 1362 which are transcripts of

4    deposition designations that Oracle played in court, so it's

5    just the written transcripts, and Rimini has no objection to

6    that.

7              MR. McCRACKEN:  We have no objection.

8              THE COURT:  All right, those are submitted.

9                   (Plaintiff's Exhibit 1356 through 1362
                    received in evidence.)

10             MR. ISAACSON:  Without throwing things off

11   track, we're very grateful that we're going to go a little

12   late today and that you're allowing us to do that.

13             Before we do leave, we would appreciate your

14   guidance as to how we go about having a discussion of a trial

15   date in Rimini II.

16             THE COURT:  All right.

17             MR. ISAACSON:  And, other than that, I'm

18   prepared to begin.

19             THE COURT:  Okay.  All right.

20             MR. ISAACSON:  We have an hour for closing.  My

21   goal is to -- if I accomplish it, I'll be doing it in about

22   50 minutes and trying to reserve ten minutes for rebuttal.

23             THE COURT:  All right.  And I assume you have

24   someone there to remind you of when you reach the 50-minute

25   mark.

1    MR. ISAACSON:  There's a lot of them back there.

2    We'll see if they do.

3    THE COURT:  No shortage of timekeepers here.

4    MR. ISAACSON:  Right.

5    THE COURT:  All right.  Go ahead, please,

6    Mr. Isaacson.

7    MR. ISAACSON:  And, your Honor, I'm sure counsel

8    on both sides want to thank you for the serious attention

9    you've given to what are serious issues in this case over the

10   last week.

11   From the perspective of Oracle, the time and

12   attention the Court has addressed to the issue Rimini's

13   contempt has been valuable because of what has been revealed

14   in the past week.

15   Much like the jury trial in this case that

16   revealed the business practices that Rimini had previously

17   denied using, like cross-use, the hearing in this case about

18   ten contempt violations has revealed that the violations are

19   about broad and, in some cases, dramatic and even brazen

20   violations of the injunction that are built on the business

21   practices of Rimini.

22   This hearing has addressed ten violations of the

23   Court's injunction, and the Court will rule on those, but

24   those violations are the result of a business model that

25   continues to be based on violations of Oracle's copyrights.

1    Rimini does not believe in fair competition, as

2    it says.  As its history shows, it believes in competition

3    based on copyright violations, and it continues to build its

4    business that way, and now we know that Rimini competes also

5    based on violations of a court order.

6    We have learned that Rimini's favorite word in

7    this case is "isolated," and its least favorite words are "we

8    are sorry."

9    Nothing was isolated here about the violations,

10   and that is why they can't stand up and apologize for it.

11   They are defending business practices that they want to

12   continue and that the Court therefore needs to address.

13   The violations were based on Rimini's ongoing

14   business model which is now about violating a court order.

15   First, we have learned that since the injunction

16   Rimini feels free to copy JDE code every day if it desires to

17   develop and test updates in order to attract customers.

18   This was the foundation of the JDE portion of

19   the jury trial that took place, and Rimini now says that trial

20   was pointless because it was only about closed -- somehow says

21   it was only about closed object code which Rimini doesn't even

22   use, and it wasn't about open source code which Rimini does

23   use.

24   Second, we have learned that development

25   testing, troubleshooting in support of clients in the easy

1    environments like the City of Eugene that are not solely -- I

2    repeat that words solely because that is the word used in the

3    license and the injunction -- that are not solely for that

4    client, that's accepted practice at Rimini.

5              Third, we have learned that informal delivery,

6    another term, of updates to clients means that testing can

7    take place in an easy environment and does not have to take

8    place before delivery to another client.

9              There are more business practices that I will

10   discuss, but these violations result from a company who, in

11   the words of Rimini's senior executive, Mr. MacKereth who was

12   here, was incredulous at the words of the Court's injunction

13   about JDE, and he continues to feel free to interpret the

14   injunction how Rimini pleases without seeking the guidance of

15   the Court.

16             The violations arise because Rimini made

17   virtually no changes in its business practices or business

18   model after the injunction.  It thought it was enough to have

19   removed the general and PeopleSoft environments from the

20   Rimini systems.  In opening statement it even wanted to be

21   complimented for doing that as if that was going to be

22   sufficient to comply with the injunction.

23             Oracle believes it has shown over the last week

24   that the evidence of contempt here is clear and convincing for

25   the ten violations at issue, but the contemptuous conduct of

1    Rimini is just as evident from the business practices which

2    continue to permit illegal conduct in violation of the order

3    of the Court.

4              Matt, can we look at slide 2.

5              Here is our burden of proof and what needs to be

6    proven.  The Court has already set this out.  Oracle has to

7    show by clear and convincing evidence that Rimini violated the

8    injunction, that's the ten instances, Rimini did not

9    substantially comply with the junction, and Rimini's

10   violations were not based on a good faith and reasonable

11   interpretation of the injunction.

12             And those flow directly from not only the

13   quantity of violations but the fact that these flow from

14   ongoing business practices that they want to continue.

15             And after that the burden shifts to Rimini to

16   show they took reasonable steps to comply with the injunction

17   but were unable to do so, but what we have seen is they won't

18   do it.

19             Now, the evidence was quite clear that Rimini

20   made very few changes in response to the junction.  From the

21   top of the company in response to the injunction Rimini told

22   everyone they did not have to change their current practices.

23             Seth Ravin, the CEO of Rimini Street, told

24   everyone at Rimini Street that.  He said, "We took immediate

25   responsibility for the injunction only because of what we had

1     only -- what we had done years earlier."

2              Rimini said, "The injunction has no impact on

3     our operations."

4              Rimini's general counsel told employees, "Pay

5     attention to your managers about how to comply with the

6     injunction," but then the managers did not do much.

7              Jim Benge, who was here, quarantined 17 files

8     because they came from the era of the practices in Rimini I.

9     He did that, he quarantined them for new customers but not for

10    updates for old customers.  He stopped two tools only out of

11    what he said was an abundance of caution.

12             Ray Grigsby, in charge of the JDE team who was

13    not here, told that JDE team, "We don't need to do anything."

14             Far from showing that Rimini took all reasonable

15    steps to comply with the injunction or acted in good faith,

16    Rimini now admits it did virtually nothing because it changed

17    its practices, it said, four years before.

18             Further, in a -- it's in the injunction, Rimini

19    represented to the Court that the injunction would severely

20    impact its business practices, yet after the injunction

21    issued, Rimini said it didn't have to do anything.

22             Jim Benge showed the contempt of this company

23    for the injunction.  He said Rimini is trying to do its best,

24    but he then went through that, "All we did were the things we

25    have already done."

1          Ray Grigsby, he's the one who adopted for all

2    the employees the open and closed language that was discussed

3    again today, open and closed code.   That's what Rimini depends

4    upon to violate the JDE portion of the injunction.

5          And he said in that note, in that message to the

6    employee -- to the JDE team that Rimini would seek further

7    guidance from the District Court as necessary at the

8    appropriate time, and Rimini never did, and I'm going to talk

9    more about that.

10          Rimini, in its opening statement and in witness

11   testimony, has taken credit for what they say is compliance

12   after the Court found their processes illegal.

13          The Court should not be impressed at any company

14   changes that a business makes to its practices after the Court

15   has ruled that it has committed copyright infringement.   The

16   Court may even remember telling Rimini that during the jury

17   trial when they made the same arguments.

18          Rimini wants credit for the parts of the

19   injunction it complied with, and it wants to use that as a

20   defense for the parts of the injunction it is violating.

21          The attitude of Rimini towards this company was

22   demonstrated in this hearing, the utter contempt for the order

23   of the Court.   It emanated from the top of the company,

24   including its CEO, Seth Ravin, its president, Mr. Grady, and

25   even the general counsel.

1    They told all of the employees of Rimini that

2  the injunction was undefined, vague, and ambiguous.  They

3  asked themselves often, that's the word they use, "Why is this

4  judge out to get us?"

5    They changed that.  They changed that to telling

6  customers that this Court was, quote, just sold a bill of

7  goods and was misled by Oracle.

8    Rimini, including its general counsel and

9  president, even said, "Now the circuit court will correct our

10 course," which, of course, the Ninth Circuit did not do.

11   This is the company that counsel said in opening

12 statement has always been respectful of this Court.  Their

13 conduct indicates otherwise, their internal words indicate

14 otherwise, and even what they say to customers shows

15 otherwise.

16   This should not be surprising.  This case is

17 come -- comes with a background and a history of its own that

18 the Court is familiar with.

19   We had a trial before, and the Court summarized,

20 in issuing the injunction, some of the things that happened

21 there, and one of it is that this case from the beginning has

22 been about Rimini denying its practices, and then, after

23 trials like this, being forced to explain what is actually

24 going on.

25   The Court wrote in its order on the permanent

1    injunction, in fact, it was on Rimini Street's assertions

2    through various affidavits and deposition testimony submitted

3    in summary judgment that the Court denied portions of Oracle's

4    motion for summary judgment on its copyright infringement

5    claims and let those issues go to trial.

6              However, at trial Defendant Ravin testified for

7    the first time that Rimini Street did in fact engage in

8    cross-use and other conduct which constitutes copyright

9    infringement, but did so innocently and without knowledge that

10   Rimini Street was acting properly.

11             And the Court also will recall that it gave

12   instructions about spoliation of evidence because of a

13   PeopleSoft library that was destroyed.

14             The Court has explained that the evidence from

15   the prior proceedings show that the evidence establishes that

16   Rimini Street's business model from 2006 up until at least the

17   Court's summary judgment orders in February 2014 was built

18   entirely on infringement of Oracle's copyrighted software.

19             Nothing has changed as the evidence from

20   Mr. MacKereth showed.  He said they could win JDE customers

21   through his remarkable rewriting of the injunction.  Again,

22   the business model depends on copyright infringement, and, in

23   this case, a violation of the injunction.

24             The nature of Rimini's defenses here also

25   demonstrates its bad faith and lack of substantial compliance.

1    Rimini has built new business models based on the contention

2    it can relitigate the jury trial that took place, and they can

3    do that after the injunction.

4              Rimini never argued open versus closed code at

5    that trial.  Now they feel free to litigate it.

6              They stipulated to providing Oracle's -- to

7    copying Oracle's original works, JDE and -- JDE at that

8    trial -- well, no, to PeopleSoft at that trial, and they

9    raised only a license defense with respect to JDE.

10             They stipulated to copying with respect to JDE.

11   Now they want to relitigate the issue of copying.  Rimini

12   says, and their witnesses said over and over again, that this

13   Court says that the injunction only applies to illegal conduct

14   and, therefore, they say, Rimini has the right to litigate

15   over and over what is illegal conduct.

16             Rimini is wrong.  The Court said the injunction

17   applies to conduct that has already been found illegal.

18   Rimini has no right to refight that battle, but that's what

19   they're doing when they argue open versus closed code, when

20   they say we're not copying because of analytic dissection, and

21   even their Spinnaker defenses.

22             Rimini conceded copying of original work at

23   trial.  The injunction was entered.  Now Rimini says the Court

24   has to analyze whether there was copying of an original work

25   every time there's a violation the plain language of the

 1    injunction.

 2              We know Rimini is violating the injunction

 3    because Rimini's compliance arguments depend on a revised

 4    injunction which they never sought.  They depend on a

 5    definition of open versus closed, and the injunction says only

 6    source code.

 7              They say analytic dissection is required.  The

 8    injunction says no copying.  But they say every time -- if we

 9    just go in and copy to our heart's content before -- and do it

10    on our systems, before you can find a violation of the

11    injunction, we've got to get all the experts here and do

12    analytic dissection day after day.

13              Rimini says it may develop and test updates for

14    client A who needs it, and then -- but also for clients B, C,

15    and D.

16              They are striking the word "solely" from the

17    injunction in paragraph 2a where it says,

18              "Rimini Street shall not reproduce, prepare

19         derivative works from, or distribute the different

20         types of software documentation unless solely in

21         connection with work for a specific customer."

22              And they are striking the words in paragraph 6,

23    "for the benefit of any other licensee."

24              It also became clear through the testimony of

25    Mr. Benge that Rimini relitigating the conduct that the Court

1    held on summary judgment in this case was illegal.

2                    Rimini says it may develop Rimini code and work

3    through PeopleSoft software in the environment of client A and

4    then deliver it to clients B, C, and D, including prototypes

5    for future clients.

6                    The Court addressed that in its summary judgment

7    order.  It's -- and this was in the ruling on the City of

8    Flint.

9                    "It's undisputed the development environments

10                associated with the City of Flint were not used

11                solely for the City of Flint's internal data

12                processing operations.  Instead, the development

13                environments were used to develop and test software

14                updates for the City of Flint and other Rimini

15                customers with similar software licenses."

16                    Now they say, "We can use easy environments,

17    City of Eugene environments, to develop and test software

18    updates for the City of Eugene and other Rimini customers with

19    similar software licenses," and that was outside of the scope

20    of the license as the Court found.

21                    The violations in this case are in no sense

22    isolated and in no sense in good faith because they are

23    connected to the ongoing promises -- practices of Rimini.

24                    Rimini copies and modifies JDE open code with

25    JDE tools to provide development and support.  It uses

1    informal delivery, it uses easy access to environments not

2    solely for the benefit of that client, and it copies Oracle

3    code into technical specifications to use as pointers and

4    markers.

5              Those are things that are violations where

6    there's specific examples, but all things they say, "We are

7    permitted to do and that we do."

8              It is not even possible to estimate how many

9    individual violations there would be that would be included in

10   just Rimini's copying of JDE code which Mr. MacKereth said is

11   an ongoing and critical part of Rimini's business.

12             The substantial -- lack of substantial

13   compliance and the bad faith here was also shown because the

14   Acceptable User Policy is not complete.

15             You may remember when I asked Mr. Benge if he

16   could reconcile the Acceptable User Policy and the injunction,

17   and he said, "Well, that would take me about 15 minutes."  It

18   would take him much longer than that, because, if you compare,

19   for example, just paragraph 6 of the injunction which is the

20   paragraph that talks about support, troubleshooting,

21   development, and testing for -- from one licensee to the

22   other, and then you look at their simple instruction which is

23   the appendix to the Acceptable User Policy, this is the one

24   they said that it would use the easy to read, and do not do

25   this, do not do that, there is nothing in there to tell the

employees what they are supposed to do about cross-use.

The bad faith here was also demonstrated by the fact that Rimini continues to use infringing files, and this was something we learned about during this hearing.

They issued a notice after the injunction saying, "We've quarantined 17 PeopleSoft files." Mr. Benge testified the files were quarantined because they were part of the early history of Rimini when Rimini had generic environments and PeopleSoft environments on its system.

He said that the quarantine only applied to new customers and not to providing updates to customers who already had the infringing files.

Well, that was false testimony because the document that we were discussing at the time discussing the quarantine file, which rsi960us -- 960us said expressly that that file was need by, quote, "All new clients switching from the Oracle update."

And even for old customers using these files for updates means that Rimini was continuing its cross-use as defined by paragraphs 4 and 6 of the injunction. It was continuing to work on those files.

The initial cross-use was not halted, it continued as Rimini continued to update the original files that violated Oracle's copyrights, a clear example of a lack of bad faith [sic].

1    Rimini's defense also heavily depended on

2  Professor Astrachan, so a few words about him.

3    As I made the point again a few minutes ago, he

4  did no independent investigation of whether Rimini violated

5  the instruction -- the injunction.  His only role, as a

6  computer scientist, lots of people go to his classes, he

7  writes textbooks, but all he would do here was critique

8  Ms. Frederiksen-Cross.

9    For an academic, he had no curiosity.  He said

10  his expertise was the pedagogy of computer science, and his

11  classes were popular, but there was no inquiry made in this

12  case to help the Court determine whether there were violations

13  of the injunction.

14    He was also -- it was more than that.  He was

15  also hired to just believe what Rimini told him and what he

16  saw in their documentation.

17    His willingness to cross lines for his clients

18  was shown early on because I asked him -- he initially said,

19  "My understanding that a violation of the junction would be a

20  legal determination, and that's not something I would do."

21    But then he said he had a -- based on

22  Ms. Frederiksen-Cross's work that for every one of the

23  violations that there's no violation.

24    And then he said, "No, it's just -- I was just

25  thinking about cross-use," and then ultimately he agreed,

1    "Well, but I wasn't -- but the Court found that there was a

2    violation with respect to Matheson," and he's not questioning

3    that.

4              A lot of time was spent on Barbara -- with

5    Barbara Frederiksen-Cross and just by Rimini witnesses about

6    reusing knowledge.

7              Rimini spent a lot of time on this, but none of

8    the violations here relate to the use of know-how.  They

9    relate to express violations of the language of the

10   injunction, and all of her testimony was tied to specific

11   violations of the injunction.

12             Now, I'm going to go out -- a little bit out of

13   numerical order here with the violations.  I would like to

14   start with number 7 which is the copying of JDE source code

15   because I think that shows a lot about what is going on at

16   Rimini Street.

17             As background, Rimini's copying of JDE source

18   code has already been found illegal by the jury.  Here you

19   will see the jury instructions, and you may recall these.

20             You set -- the Court set forth the elements of

21   direct infringement the second of which was,

22             "Rimini Street copied original elements from,

23        created derivative works from, or distributed the

24        original work."

25             And then, as it was explained, "The parties

1    have also agreed as stated in your juror notebook,

2    that Defendant Rimini Street copied the JD Edwards

3    software applications and related documentation as

4    well as the PeopleSoft documentation at issue in this

5    action.  This means that Oracle has also proven the

6    second element of these copyrighted works."

7            The Court instructed the jury that Rimini Street

8    copied, they copied original work, and that with respect --

9    and that Rimini did not defend the case on this, and did not

10   say we're not copying protected work, we're not -- we're

11   not -- we're only working with open code, none of those

12   things, and Rimini was found liable for copying that code in

13   that original work.

14           And then you'll see the jury instruction about

15   defense at trial.  The defense at trial on JDE was a license

16   defense, were these being used for archival purposes.

17           And the Court may even remember that turned out

18   to be just a way to avoid summary judgment because they

19   decided not to present any evidence that they were using it

20   for archival purposes because they weren't.

21           In any event, the jury rejected that defense,

22   and the Court entered the resulting injunction.  Rimini is

23   brazenly violating that injunction because it is arguing it

24   has the right to do what was found illegal at trial and then

25   enjoined by the Court.

1            Rimini never argued this source code was

2    objectionable or to prevent them from providing JDE support.

3    We've set out here a timeline of all the briefs to this Court,

4    and the Ninth Circuit; did not happen.

5            Rimini didn't even whisper it in those briefs,

6    nor did they say that the injunction should be limited to

7    closed code which isn't even source code, it's object code.

8            So as a result, you got the language of the

9    injunction.

10           "Rimini shall not copy JD Edwards software

11       source code to carry out development and testing of

12       software updates."

13           This is also what the Court held in its summary

14   judgment opinion about the JDE license for Giant Cement and

15   said, quote,

16           "The Court agrees that Article 2 of that

17       license does not permit Rimini to access the software

18       source code to carry out development and testing of

19       software updates."

20           The result of the jury verdict on this issue was

21   a straightforward injunction based on the jury instructions

22   and the summary judgment decision.

23           The plain language of this injunction, over and

24   over we have shown, in referring to source code, is showing

25   that the term source code includes JDE code including any code

1    they want to call open.

2              I have never seen an expert before say -- and

3    this is Mr. Lanchak, that an injunction makes no sense if it's

4    interpreted to mean what it says it means.

5              He said it cannot apply to open code, it has to

6    be limited to closed code, but he agreed that source code is

7    human-readable code, and that's the open code.  And he agreed

8    that closed code is not humanly readable and is object code.

9              Rimini's definition of source code is intended

10   to thwart the junction, to relitigate the jury trial.

11             Rimini has never provided support for what is

12   closed code, that's object code, they told you that.  Rimini

13   can't even access or copy closed code, they told you that.

14             At trial the only JDE code at issue was JDE code

15   that Rimini did access and copy.  We weren't litigating things

16   that Rimini wasn't doing, we were litigating things that

17   Rimini was doing.

18             Rimini's definition means that paragraph 8 of

19   the injunction is meaningless because it prohibits what Rimini

20   has never done and permits the -- and would permit the conduct

21   held illegal at trial.

22             Mr. MacKereth said many at Rimini were confused

23   about the injunction but he was not.  He refused to accept the

24   results of the trial or the plain language of the injunction

25   that resulted.

1           Mr. Lanchak argued that JDE licensing, and he

2    read the provisions for you, must be referring to closed code,

3    an argument not made at trial.  None of the language of the

4    licenses actually accepts his limitations because the licenses

5    say source code, not object code which would be the closed

6    code.

7           Now, Rimini knew, as I said before, it needed

8    court approval to limit the injunction to open code.  It wrote

9    that to the JDE team that it was adopt -- it was.

10          "...adopting this for the time being

11      consistent with our current understanding, and we

12      will continue to access open JDE code consistent with

13      license terms and seek further guidance from the

14      District Court as necessary at the appropriate time."

15          Rimini's decision to contemptuously violate this

16   injunction is made clear in that exhibit, Exhibit 2.  This is

17   in November after a stay was lifted.  This is different from

18   what Rimini did when the injunction was first issued, then

19   they made the decision to look at things over the shoulder.

20   Seth Ravin testified to that.

21          You never heard who made the decision not to

22   seek further guidance from this Court.  No one accepted that

23   responsibility, but we know that falls on the shoulders of CEO

24   Seth Ravin who continues to build this company on business

25   models that violate the law.

1    The decision to write this to your employees and

2    to not follow through for a company when you have just been

3    found to violate Oracle's copyrights, to have an injunction

4    entered in to you, the decision to not transparently come to

5    the Court and make the arguments that they want to make is

6    absolutely remarkable.  It shows the intent to disobey this

7    injunction.  It's one of the strongest pieces of evidence of a

8    lack of good faith and failure of substantial compliance.

9    The plain language of the injunction, as I said,

10   is evident in the definitions of the US Copyright Office,

11   Webster's Dictionary, Rimini's Acceptable User Policy,

12   Rimini's own expert, Professor Astrachan, and also the JDE

13   dictionary.

14   You heard all this stuff about, well,

15   industry -- there's industry use in this proffer about --

16   there's industry use of the terms of open and closed.  That's

17   lovely that there's this industry out there that use those

18   words.  Those are not the words of the injunction, and they

19   don't mean source code.  Source code means human-readable

20   code.

21   And you heard about Rimini's over-the-shoulder

22   processes, and you heard over and over again they don't like

23   them now, but when the injunction was first adopted Seth Ravin

24   said, "We implemented it."

25   Mr. MacKereth said, "Well, we thought about it,

1    we never did it."

2              The CEO said they implemented it, and then you

3    heard the evidence that they told customers it was going to

4    work out fine.

5              And there was even -- and then, Mr. Grady, the

6    president of Rimini, said, "It's okay, the stories that the

7    injunction mattered were sensationalistic, and most of our JDE

8    work doesn't even touch source code."

9              Remarkably, Mr. MacKereth said the president of

10   Rimini, higher up, did you not know what he was talking about

11   and then made his own sensationalistic statements that

12   Mr. Grady was criticizing.

13             The injunction has prohibited the copying of

14   source code since November 2018, and now Mr. MacKereth

15   predicts disaster if Rimini has to comply.

16             One of the arguments that was made was that

17   Oracle's definition of source code does not render paragraph

18   10 of the injunction superfluous.

19             If you look at them, only paragraph 8 prevents

20   copying source code.  Only paragraph 10 discusses cross-use,

21   discusses derivative works, or prohibits copying and use of

22   software documentation.

23             Then there was this whole litany of evidence, as

24   I just said, about industry practice in Spinnaker.  There's no

25   evidence in the record of what JD Edwards' customers were

```
1    issued in Oracle's review of Spinnaker's processes.  You heard
2    that, you don't know what was happening back there, and it
3    happened in 2011, and the injunction does not apply to
4    Spinnaker, it applies to Rimini.
5                   Mr. Lanchak argued that JDE customers have tools
6    that modify and copy codes, but Rimini is not a client,
7    they're not licensed, and the Court has already held in that
8    summary judgment ruling I said, looking at the Giant Cement
9    license, which is in this record as OREX_67, that the license
10   makes a distinction between what the client can do and what
11   the support -- the third-party provider can do, and that's not
12   access or copy code.
13                   Mr. Lanchak has said, "Well, everybody I know in
14   my history has been working with this open code."
15                   He wasn't knowledgeable of any of the licenses
16   and what was permitted, and, of course, clients can do those
17   things, nor, in all of his history and all this time did he
18   say he had ever worked with anyone who had been adjudicated as
19   a copyright violator.
20                   All right.  Now, let me talk about violation 1.
21                   It's -- the Court has already held that there's
22   a violation here, and we summarize the range of evidence here
23   in a chart on page -- that we've laid out here.
24                   There's Oracle file and documentations on
25   Rimini's systems, there's three of them for violations, three
```

1    more for lack of substantial compliance.

2              We know which clients sent it to them.  We know

3    that -- they say for each of them in these SalesForce things

4    you get the Oracle copyright -- oh, all of them had the Oracle

5    copyright warnings.

6              Some of them were internally distributed by

7    Rimini, not just in the SalesForce record.  Some of them were

8    used by Rimini.  None of them were e-mailed to Rimini

9    security.

10             There was a contention that during the discovery

11   period some gentleman who was not identified by what he did,

12   did some quarantine in August, I believe, 2019, all right, but

13   nothing contemporaneously.

14             There was no documentation of quarantine at the

15   time, and all of these were admitted either directly or

16   implicitly by Mr. Benge as violations of the Acceptable User

17   Policy, and there was only one instance of discipline.

18             In addition, Barbara Frederiksen-Cross

19   identified 934 PeopleSoft documents with copyright warnings,

20   and then Rimini's expert, Professor Astrachan, looked at that

21   and agreed.

22             There was some fuss today about what the

23   files -- the files from which they were screened on to get to

24   the 934, but the two experts agree on the 934, and then

25   something remarkable happened.

1    Professor Astrachan discussed the 934 with the

2    assistant general counsel of Rimini, James Butler, who

3    reported that Rimini had already flagged these documents, they

4    already knew about this, all right?  As potentially containing

5    third-party intellectual property material.

6    As was typical of Professor Astrachan, he asked

7    no questions about this, and never -- Rimini never explained

8    what it did with almost a thousand potential violations of the

9    Acceptable Use Policy and the injunction that they knew about

10   before our expert notified them about it.

11   Mr. Benge -- he's the only -- he and his

12   colleague Ms. MacEachern were the only ones we know who have

13   been disciplined, and that took years.

14   Rimini -- and then he testified about -- he was

15   trying to testify they were acting in good faith, but it only

16   showed what they're not doing.

17   We are, I think, still learning, and this is a

18   situation where we've had a few occasional cases where things

19   like this have happened, and we've got to make this more

20   clear, right?  Those boilerplate warnings aren't enough.

21   We're glad to have them.

22   But what you didn't see in the SalesForce

23   records was when an e-mail -- when a file was sent that the

24   reply was, "Please don't send this to us, you're not supposed

25   to send this to us, this is not our policy."  In fact, you saw

1    in some circumstances they were circulated and used.

2                    We live in a world of boilerplate, and we know

3    it doesn't work by itself.

4                    And then there was a discussion of quarantine.

5                    Jim Benge said, "If it was reported, it would be

6    quarantined."  But we don't know what violations were

7    reported.

8                    The files Professor Astrachan saw he said were

9    not quarantined.  He saw no documentation of any quarantine.

10                   Craig MacKereth got on the stand and pointed to

11   two SalesForce documents he said he thinks somebody went in

12   and created a quarantine.  This is in August of 2019 while

13   discovery was going on, right after they agreed to produce

14   SalesForce records, but that's only two documents.

15                   Let's go to violations 2 through 4.

16                   Two through 4 -- I begin with 4 because it works

17   that way chronologically, Spherion-Smead, then Matheson

18   Trucking, and Johnson Controls.

19                   And there's a chart on slide 41 which summarizes

20   the cross-use of the City of Eugene.  The files are listed

21   there, and -- for 4, which is Spherion-Smead, 2, Matheson, 3,

22   Johnson Controls.

23                   The client environment that was used for testing

24   wasn't needed by that client.  They dispute this, but we have

25   shown the evidence that says it was not needed by that client.

1    Was it solely for the City of Eugene?  No one
2    attempted to say it was solely for the City of Eugene.  They
3    said the opposite.  They said, "We were using it for others."
4    We said, of course, who is the client requesting
5    the update, there you see Spherion-Smead, Matheson, and
6    Johnson Controls.
7    And then was there testing in that client
8    environment.  We know for Spherion-Smead there wasn't because
9    they never got access.  For the others there was no
10   documentation.
11   The City -- moving to 43 here, the City of
12   Eugene's software license prohibits the use of software for
13   purposes other than solely the City of Eugene's internal
14   dating processing operations.
15   That's the language on which the jury verdict
16   and the jury instructions and the injunction was based.
17   Now, Mr. Astrachan in many cases was arguing
18   against these prior rulings, and one of the things he said was
19   if there -- is it -- I asked him the question is it cross-use
20   if there's no reproduction or derivative work of Oracle's
21   software.
22   And he said, no, it's not, "We want to see both
23   of these," which is directly contrary to the Court's order
24   in -- summary judgment order in Rimini II which talks about
25   even if the individual updates was not a derivative work.

1    However, we've also followed the Court's
2    guidance as to what was a derivative work following the
3    *Microstar* case.  This Court has applied an analysis that
4    Professor Astrachan has ignored and even disagreed with some
5    of its elements.
6    And we have followed those here, and this was
7    where you get the testimony about using these things in the
8    PeopleSoft environment and being able to use them in a
9    PeopleSoft environment.
10    The only dispute of fact here is the PeopleSoft
11    tools fact, and you heard more testimony about that today.
12    But all the other facts are present here that the Court relied
13    on its summary judgment decision, and there is nothing in the
14    facts of this case to distinguish it from *Microstar*.
15    So the testimony, and Ms. Frederiksen-Cross, set
16    forth, following what the Court said is the proper analysis,
17    why that analysis applies here.  This is an example of her
18    testimony applying the relevant facts.
19    So that brings us to the Spherion and Smead
20    violation which is Exhibit -- there you go.
21    Now, we know the City of Eugene did not need the
22    form in 940 Schedule A update because it doesn't operate in
23    the Virgin Islands.  Everyone agreed to that.
24    We learned that the IRS said that in
25    November 2018.  Rimini was not playing it straight when it

1    told the Court that US clients would generally need this

2    update and that that's what its engineers were thinking in

3    January 2019.

4              It has a Business Analysis team that they told

5    you about that's in charge of reviewing these announcements

6    and making decisions about who would be in scope for an

7    update.

8              So when did the test in the City of Eugene take

9    place?  January 24th.  This document shows that Don Sheffield,

10   who, like his CEO and president, did not appear as a witness,

11   tested the update in January 24th when only Spherion was in

12   scope.

13             Why did he do that?  Did he do it because the

14   City of Eugene did it -- needed it?  No, it was because

15   Mr. Sheffield couldn't get into the Spherion and Smead system,

16   he didn't have access, and so he accessed City of Eugene when

17   only Spherion was in scope on January 24th.

18             The immediate prior entry before that by the

19   head of the Business Analysis department on January 10th,

20   Laurie Gardner, said only include Spherion within scope.

21             By January 10th Business Analysis had figured

22   out what the IRS had notified in November, but what happened

23   was they told you something different.

24             Mr. Benge -- there's a later e-mail where he

25   says on January 25th I tested, referring to his test that he

1    said he did on January 24th.  So they tried to move the test

2    to January 25th, so did Professor Astrachan in that

3    timeline -- in that slide I spent with him.

4              And the Rimini -- and this is an example of how

5    the Rimini witnesses in this case were advocates.  They

6    overreached, they misstated documents.

7              Both Mr. Benge and Professor Astrachan told the

8    Court what happened based on these documents but -- instead of

9    investigating from their actual engineers what really

10   happened, and they also testified about tests that were not

11   documented.

12             So what happened?  Mr. Benge and Rimini Street

13   used informal delivery to violate the injunction.

14             What was remarkable and important about informal

15   delivery was it was revealed not as an isolated incident but a

16   business practice of Rimini on an ongoing basis.

17             He said, "I don't think it's a requirement

18   necessarily that we test something in a client's QA

19   environment prior to us delivering it."

20             But what they told you over and over again is,

21   "We're going to test it someday when it's a batch or," you

22   know, whatever.  "But when a client needs it, we'll give it to

23   them, we'll give it to them as an informal delivery, and we'll

24   test it in an easy environment like City of Eugene first."

25             So that -- what happened then with Matheson

1   Trucking is they used the same update, and then they used that

2   for a bug fix.

3                   Mr. Benge tried to say, "Well, there was

4   separate testing in the Matheson environment," but his

5   testimony was entirely conflicting, both with the documents

6   that said, "I'm not sure if it's been tested for Matheson."

7                   And ultimately he said, "I don't believe it's

8   been tested in the Dev environment."  That's what he

9   concluded.

10                  Then after that you get -- and it's all in the

11  same time period -- Johnson Controls.

12                  And up in the upper left-hand corner here you

13  heard some more about Johnson Controls today.  That's a

14  screenshot from the City of Eugene environment sent to solve a

15  problem for Johnson Controls.

16                  We learned that Rimini, in a phone conversation

17  between two engineers, did a break fix in the City of Eugene

18  environment for Johnson Controls.

19                  Rimini says it was using know-how here, but that

20  never held up.  What happened was Johnson Controls identified

21  a bug, Rimini Street went to the City of Eugene environment

22  which had not reported any bug issue, they did troubleshooting

23  of the bug, and then Rimini instructed Johnson Controls what

24  to do.

25                  Rimini Street -- City of Eugene did not need

1    that W2 bug fix update.  The document said, "We will be

2    handling this on a case-by-case basis.  It will depend on the

3    data they report," and City of Eugene never reported that

4    data.

5              In fact, Mr. Benge tried to say, "Well, we

6    thought they did, but then, after we took some time, we

7    figured it out."

8              And he said that would take days but certainly

9    more than an hour, and it turned out that notice came out less

10   than an hour later.  Once again, the Business Development

11   department already knew that -- knew about this.

12             So I'm going to move to violation 5.

13             Now, this is a file that was just talked about,

14   the rspcmpay file distributed at least 14 tines to seven

15   clients, and Professor Astrachan said it doesn't matter

16   because of analytic dissection.

17             And, as I said, what was shown in

18   cross-examination is analytic dissection is absolutely

19   irrelevant for copying, and it's also been explained that --

20   how he started with A criteria, moved to 5 for the hearing.

21             And he's actually, with all his teaching and

22   everything, never published in this area, but most

23   fundamentally, 63, there is a Catch-22 going on here that

24   he wants to use to nullify the jury verdict, nullify the

25   injunction and even copyright law, because what he said was,

1    "I expect programmers to follow conventions, and the lines

2    that are constrained by that convention I would filter out."

3              He expects only the conventional, and you don't

4    count the conventional, and after that nothing is

5    copyrightable and none of which is consistent with the

6    language of the injunction.

7              If you accept that, they are free to copy to

8    their heart's content, and contrary to that Professor

9    Astrachan admits programming is absolutely a creative process.

10             A few words about violation number 6, and -- if

11   we can go to 69, the derivative work discussion that's been

12   going on.

13             Professor Astrachan basically ridiculed the

14   criteria used by the Ninth Circuit in *Microsoft* -- in

15   *Microstar* saying that every game working on Microsoft

16   operating system would be a derivative work.  That's wrong, it

17   would only affect the application software.  It doesn't create

18   a derivative work of the operating system.

19             By contrast, as he admits, there is a derivative

20   work created by updates that alters the PeopleSoft

21   environment.  That's the next slide.

22             And for there he admits there's a derivative

23   work, but he says it's not compliant with the -- it is

24   compliant with the injunction which cannot be reconciled with

25   paragraph 2 of the injunction which says you have to obey the

1    license, and the Easter Seals license does not permit -- does

2    not permit that, does not permit the client to create

3    derivative works.

4              Which brings to us to slide 74.

5              What happened here violated the junction.  The

6    chart you saw a little earlier on cross which says -- on

7    rebuttal, that's not what happened.  What happened here is

8    that the update contained two SQR files and two Data Mover

9    scripts.

10             Rimini e-mailed the update to at least Easter

11   Seals, XCorp, Pikeville Medical Services, and others.  These

12   were derivative works, the SQR files.

13             So developing them in the Easter Seals

14   environment violated Easter Seals' license, and that's

15   paragraph 2 of the junction, storing and modifying them on

16   Rimini systems violated paragraph 5 of the injunction, and

17   reproducing them by e-mailing them to Rimini clients violated

18   paragraph 5.

19             And the Data Mover scripts were developed and

20   tested using PeopleSoft tools in the Oakland County

21   environment and sent to other clients like Easter Seals.

22             The Court asked some questions about what was

23   delivered and when, and we've answered that in the last

24   section of that.

25             So I will say just one other word about the --

1    the tech spec documents which was violation 9, and what I will

2    say there that what we learn there -- and this is where there

3    were markers and pointers using Oracle code, what we learn is

4    they copy Oracle code, they use it in order to be able to mark

5    things to say put things there, and what we learned was it's

6    not just this document.  This is a practice again at Rimini

7    Street.

8                   So -- and, lastly I'll say on paragraph number

9    10, that is also a -- an example of a business practice at

10   Rimini Street because they are arguing that we can use

11   derivative works created for one client and then also for

12   future clients.

13                  They are not going to do things solely for that

14   client, they're going to do it for future clients which is

15   what happened with Johnson Controls and with Rockefeller --

16   Rockefeller environment in that case.

17                  With that, I've got a few minutes left, somebody

18   will tell me what that is, and I thank you for your attention,

19   and I look forward to addressing you for those few more

20   minutes later.

21                  THE COURT:  All right, thank you.

22                  MR. VANDEVELDE:  Your Honor, may I proceed?

23                  THE COURT:  You may, Mr. Vandevelde, go ahead.

24                  MR. VANDEVELDE:  And thank you, your Honor.  I

25   just want to echo Mr. Isaacson's comments as well.  Rimini

1    appreciates the time and attention you've devoted to this

2    matter.  It is very important to us, and we very much

3    appreciate your time.

4                  This Court issued its OSC and set this hearing

5    because it had questions about these ten issues and it wanted

6    to hear evidence, the actual facts about these ten issues, so

7    that's what we did.  We brought five witnesses.

8                  Your Honor had questions about PeopleSoft, so we

9    brought the head of PeopleSoft, Mr. Jim Benge.

10                  Your Honor had questions about testing and

11   quality assurance, and so we brought the head of QA, Brenda

12   Davenport.

13                  And your Honor had questions about JDE, and so

14   we brought the head of Global Support Delivery, Craig

15   MacKereth, and we brought technical experts Professor Owen

16   Astrachan and Stephen Lanchak, the only expert in this case

17   who is an expert in JDE.

18                  And so while Oracle instead spent the first -- I

19   believe I counted 25 minutes of its opening -- or, sorry, its

20   closing statement relitigating the past and talking about Seth

21   Ravin, we want to focus on the evidence.

22                  We intended to address your Honor's questions,

23   and I submit that we have, about what was developed, where and

24   by who, that it was developed for each client in each client's

25   separate siloed systems, about Rimini's work product showing

1    that it is Rimini's creative expression, those are the files

2    we have been talking about the last week and a half, RSI

3    quarter tax, rsi940, RSI cmpay, Dev instruction, tech specs,

4    those are Rimini's work product.

5              And what you didn't hear were opinions from

6    Oracle's expert saying that they were substantially similar to

7    Oracle code with the one exception of the rscmpay file.

8              And also presented evidence about how Rimini's

9    JDE processes work and how Rimini is simply doing what every

10   JDE consultant, system integrator, third-party support

11   provider, has done for decades, which is to modify the very

12   open code that has to be modified, that Oracle provides tools

13   to modify.

14             And so we'll end where we began.  I'm going to

15   go through the ten issues in a somewhat methodical manner,

16   we're going to march right through them, and before I do that,

17   though, I just want to briefly touch on the burden because I

18   think it's important.

19             Oracle has a heavy burden in this case.  It has

20   acknowledged the elements that it needs to prove.  They're up

21   here on this slide, this is from Oracle's brief.

22             It has to prove that Rimini violated the Court's

23   injunction, that it was beyond substantial compliance, that

24   Rimini's violations were not based on a good faith and

25   reasonable interpretation of the injunction, and all of these

1    have to be proven by clear and convincing evidence, and that's

2    a heavy burden.

3              The Supreme Court has said that the fact finder

4    has to have an abiding conviction of the truth its factual

5    contentions are highly probable, that there's no substantial

6    doubt, the unhesitating assent of every reasonable mind, and

7    at the bottom one there, the absence of evidence, the absence

8    evidence does not support a conclusion that a plaintiff has

9    met their burden by clear and convincing evidence.

10             Now, why is that last point so important in this

11   case?  Because this is what this slide, 806, demonstrates

12   Oracle's strategy here.  These are examples of Oracle's

13   improper attempt to burden shift, to shift the burden onto

14   Rimini.

15             The slide on the -- the portion on the left says

16   Rimini has no evidence that they complied with the junction.

17   That's from Oracle's opening.  That's burden shifting.

18             Throughout the trial there's numerous instances

19   where Oracle was saying there's no evidence of discipline.

20   That was false, by the way.  There's no evidence that it was

21   quarantined.  That was false by the way.  But these are

22   examples of burden shifting.

23             They said, "I saw no evidence that Rimini was

24   complying with this policy."  Again, that was false, but it's

25   also burden shifting.

1    That there was no evidence that it was reported

2  or that it was tested or that it was developed.  All of those

3  are burden-shifting tactics to put the onus on Rimini to prove

4  it is not in contempt when the only burden here is on Oracle.

5    In fact, you heard Mr. Isaacson talk about who

6  Rimini could have called and didn't call, and who they should

7  have put on.  Again, those are forms of burden shifting, and

8  it is not proper in this proceeding where the only burden is

9  on Oracle.

10    Now, I want to get through the -- start the ten

11  issues.  Here they are again, and I'll talk about the first

12  set of them.  Those are the two PeopleSoft local hosting

13  issues.

14    Now, as your Honor has ruled, the local hosting

15  conduct at issue in Rimini I was the hosting of entire

16  environments, and Ms. Frederiksen-Cross, as you see in this

17  second box here, she interpreted that prohibition as enjoining

18  hosting of a client's systems.

19    That's Oracle's own expert interpreting

20  consistently with what your Honor had ruled, that it was about

21  environments, and that what is not at issue here because there

22  are no environments on Rimini's systems.

23    Your Honor many years ago ordered that Rimini

24  couldn't locally host environments, and so Rimini got all of

25  those environments off its systems and moved them back to its

1    clients, and, ever since, has been having a remote model where

2    each client's environment is on their own separate and siloed

3    systems, and it is undisputed that Rimini does not host those

4    any more.

5              So what was at issue in this hearing?

6              Well, the evidence, the actual evidence was

7    about four support cases involving eight files and three

8    e-mails involving 11 files, and that's in the context, as you

9    heard evidence of, and it wasn't disputed, 10 to 15,000

10   updates during the relevant time period.

11             Ms. Frederiksen-Cross admitted that each of

12   these files you see here was sent to Rimini by a client or

13   even an Oracle partner in one case.

14             And what they came to this hearing saying turned

15   out not to be true.  When we started this hearing Oracle's

16   message was there was no warnings to clients.  Oracle's

17   counsel said they haven't identified a single reminder.  That

18   wasn't true.

19             Ms. Frederiksen-Cross says, "I've never seen

20   such evidence."  We all now remember the GB column labeled

21   Important that showed warning after warning after warning.

22             They told your Honor that there was no

23   quarantining of files.  That was actually not true.

24   Mr. MacKereth talked about that.

25             They said that there was no reports to

1    compliance.  That was not true.  That there was no outreach to

2    clients that sent files.  Again, that was not true.

3              What the actual evidence showed in this case was

4    that there were warnings to clients.  There is automatic

5    scanning and quarantining.  There is routine training for

6    employees and education of its own clients, and that employees

7    have been disciplined, and there is outreach to clients who

8    have sent files.

9              And so Oracle pivoted, and so you heard that

10   this morning.  They pivoted to a whole new set of files that

11   was not part of your Honor's OSC.  They put before your Honor

12   a number, 4,481, which had no basis, was not supported by any

13   evidence in Ms. Frederiksen-Cross's report.

14             They put forth another number, 1,070, that was

15   also not supported by any evidence we've seen, and she,

16   herself, admitted that those spreadsheets did not support her

17   analysis.

18             And so where they landed was on this number 934.

19             But what's important here is that they offered

20   no opinions on the content of those files, and the testimony

21   is right below.

22             I asked Ms. Frederiksen-Cross,

23             "And of those 934 documents, you didn't offer

24        opinions on the contents of those files, correct?"

25             And she said only with respect to the few that

1    she had presented the day before, not to the balance of those

2    files.

3                  Nor did they offer an opinion on how they were

4    used.  And, in fact, she, herself, wrote that the files are

5    intended to be used with Oracle database.  I asked her that,

6    and she said that's correct.

7                  And, importantly, there's no facilities

8    restriction as to Oracle's database.  There's no local hosting

9    prohibition, there's no facilities restriction.

10                 The Ninth Circuit has said there can only be a

11   local hosting prohibition if there is a facilities restriction

12   in the license, and Oracle database is governed by the OLSA

13   and not any other license with a facilities restriction.

14                 I'll turn now to Issue 5.  There's obviously

15   been a lot of testimony about this.  This slide is from

16   Professor Astrachan.  He analyzed these files, he did analytic

17   dissection in the first instance before Ms. Frederiksen-Cross

18   had done any of that.  The first time she had done analytic

19   dissection was in this hearing this week.

20                 Professor Astrachan analyzed the files and

21   pointed out that although they load data from the same

22   database, they act differently, they have different purposes,

23   different functions.  They load different types of data.

24                 Rimini's loads less data but more granular data.

25   It breaks it into more detail.  It stores it in different

1  Rimini-created data structures.

2           And then we saw the analytic dissection based on

3  these code comparisons, but what's important to remember,

4  these side-by-side comparisons that Ms. Frederiksen-Cross

5  prepared, these are the very same side-by-side comparisons

6  generated by a tool she used in another case that were deemed

7  unreliable in a copyright case.

8           These exact same tools generating the exact same

9  type of side-by-side comparisons were deemed unreliable, and

10  her opinions were excluded.

11           Now, Ms. Frederiksen-Cross had never before

12  performed analytic dissection on this file before this week.

13  She did not consider any constraints that are set forth by the

14  Ninth Circuit or by *Nimmer on Copyright* like APIs, like

15  industry terms, like required terms under the programming

16  language itself.

17           She attempted to say that naming a procedure

18  error processing because the procedure actually processes

19  errors was somehow protectible and creative.

20           She said you could use the phrase go get 'em

21  instead of FETCH-DATA.  Her opinion seems to be that if you

22  can name a variable anything you want, that that makes it

23  unconstrained, in her words, and therefore inherently

24  protectible.  That's not the law.

25           She focused on stars or asterisks and spaces and

1    slashes.  Those were the basis for her opinions, and she's

2    conflating copying with protectability.  That's the key

3    question here, are these things protectible, and she didn't

4    filter them out.

5              Professor Astrachan, on the other hand, he

6    methodically went through this file, he analyzed each line, he

7    talked about those terms, and he filtered out, this is not

8    protectible expression.

9              It's not copied.  He didn't see indications of

10   copying either, but even if it were, that doesn't mean it was

11   protectible.  That's the key.

12             And it's not just that she hadn't done the

13   analysis before, which she didn't, or that she did it wrong,

14   which she did, it's that the analysis that she did do was

15   misleading, and she even walked some of it back today.

16             The side-by-side comparisons, as I mentioned,

17   those were found to generate false positives.  That's in the

18   *Drop Zone* case where the Court excluded her analysis.

19             She claimed that 30 percent of the lines matched

20   through what she called normalized line matching, but then

21   admitted that that was before any filtering had been applied

22   to take into account any constraints, and that only some of

23   them were interesting.

24             And she acknowledged that when do you normalized

25   line matching, which she essentially backed off of in terms it

1    being -- relying on it in this proceeding, she acknowledged

2    that it destroys all structure, sequence, and organization.

3              You can't take a normalized line match in those

4    two sets of lines and compare them and reach a reliable result

5    because they completely eliminate all structure, sequence, and

6    organization.

7              And then in this third bullet we see -- she made

8    a big deal, she spent a lot of time on the so-called orphan

9    asterisks and the oddness with the flower box, and then this

10   morning, recognizing the weakness of that position, she backed

11   off of it.  She retracted that opinion.

12             And we actually saw this, the reason she backed

13   off that opinion is because she based it using different types

14   of fonts in the files to create, to manufacture a fake

15   difference.

16             Where that star under the red arrow in this

17   slide somehow juts out way beyond where it should have been,

18   that was a manufactured difference, and it was the basis of

19   her testimony until this morning when she retracted that

20   opinion.

21             Now, I want to turn to the cross-use issues.

22   There's five of them, issues 2, 3, 4, 6 and 10, and there are

23   a couple of issues that underlie all of the cross-use issues

24   that I want to briefly hit here.

25             First, this is the law, this is the Ninth

1    Circuit law, the definition of derivative work.

2                    It has to -- it must substantially incorporate

3    protected material from the pre-existing work in some form,

4    literal or nonliteral, but it has to substantially incorporate

5    protected material.  That's the definition.

6                    And what's critical here is there has been a lot

7    of confusion that Rimini -- we have been trying to unpack

8    because when Ms. Frederiksen-Cross talks about files and code,

9    she's not making clear where that code is.

10                   So, yes, when Rimini uses its own expression,

11   these blue files, that she said she had no opinion on whether

12   they were substantially similar to any Oracle code, it's

13   undisputed that those are Rimini-written expression.

14                   When the Rimini expression is in the client

15   environment, and, yes, it modifies that client environment,

16   yes, that is a derivative work, but it's compliant.  Why?

17   Because the client has a license.

18                   There's no dispute that every single client with

19   respect to every environment and with respect to every file

20   has a license.  So when that Rimini expression is in the

21   client's environment, that's licensed, it's not a violation of

22   the injunction.

23                   But that doesn't somehow transform the Rimini

24   expression by itself into a derivative work unless it

25   substantially incorporates Oracle expression which it's

1    undisputed that it doesn't.

2                 Now, Oracle, they put forth a series of

3    definitions all of which are wrong.  Every single definition

4    on this slide is wrong.

5                 They said that a derivative work is something

6    tailored only to work with copyrighted software.  That's not

7    the law.

8                 They said it's something that modifies or

9    extends copyrighted software.  That is not the law.

10                That it cannot operate independently of other

11   copyrighted software.  That is not the law.

12                This morning I asked Ms. Frederiksen-Cross about

13   JDE World, and she acknowledged that JDE World can only run on

14   a particular version of IBM operating system called AS400.  If

15   that were the definition, independent -- cannot operate

16   independently of, it would make a derivative work of JDE World

17   of that operating system.

18                And so what happened -- and you've seen this the

19   last two days, Oracle has pivoted to this what I'll call the

20   #include theory of derivative work.

21                And, again, Oracle obfuscated where things were

22   happening to make it seem like all this copying and merging

23   and compiling and running of code was just everywhere.  That's

24   not the case.

25                All of that copying of Oracle code with respect

1    to #include, that is only in the client's environment.  It's

2    only when the code is compiled, it's only when the code is

3    run.

4                On Rimini's systems, when it says #include and

5    it has a file name, that's just a reference to an Oracle file

6    so that when later it is incorporated into the client

7    environment and it is run and compiled, then, yes, there is

8    copying that happens that is licensed.

9                But when that Rimini-written file sitting on

10   Rimini's server by itself has a #include, that does not make

11   it a derivative work, that is not substantial incorporation of

12   Oracle protected expression.

13               And you heard Professor Astrachan talk about

14   what the consequences would be to the industry if something as

15   small as the use of a #include to reference some other

16   software external to the file would make it a derivative work

17   of that file.  That's how all software works.

18               Now, the other kind of common theme I wanted to

19   hit before we dive into the cross-use issues is that we don't

20   come to cross-use with a blank slate.

21               Your Honor has already made a number of rulings

22   with key portions that bear directly on the issue here today.

23   Your Honor has held in its OSC and in it's summary judgment

24   order Rimini II that Rimini is permitted to create the same

25   update file.

1          It can memorize its work product, it can

2    replicate its work.  It can reuse work product like test

3    cases.  It can develop updates faster.  It can perform less

4    testing, use the same test or perform no test at all.

5          Why are we talking about testing reuse, the

6    knowledge of testing?  Oracle's counsel just spent a lot of

7    time talking about where's the evidence of testing, where's

8    the evidence of testing.

9          Your Honor has already ruled that Rimini can

10   choose to perform less testing or even no testing so why are

11   they talking about testing?

12         The critical question is not about testing, the

13   critical question is whether Rimini's work product

14   substantially incorporates Oracle expression.  That has always

15   been the issue, it is the issue, and so that's what the test

16   for all of these cross-use issues should be.

17         And for every single cross-use issue, for every

18   single file we're talking about, and we'll go through them in

19   a second, there is no opinion and no evidence that those

20   substantially incorporate Oracle code.

21         Okay, issue number 3.  Issue 3, as you'll

22   recall, this is a slide, just to kind of orient ourselves, it

23   dealt with a W2 form for Johnson Controls.  Some of the text

24   was being cut off in two of the boxes.

25         Now, City of Eugene was affected by the W2 bug.

1   It is the City of Eugene, which is in the State of Oregon

2   which is in the United States.  City of Eugene was affected by

3   the W2 bug.

4            Contemporaneous e-mails show Rimini believed the

5   update affected many clients.

6            City of Eugene contracted for updates to federal

7   forms.  Rimini was under a contractual obligation to provide

8   federal form updates.  Rimini had provided W2 updates year

9   after year after year including for City of Eugene.

10           And Ms. Frederiksen-Cross offered no opinion,

11  and it's cited there, no opinion that City of Eugene did not

12  need the bug fix.  Oracle's counsel talked about that as if it

13  was some failure of proof on Rimini's part, but, again, it is

14  not our burden.

15           We actually did affirmatively prove that City of

16  Eugene needed this update, but they can't point and say

17  there's a failure of evidence when their own expert offered no

18  opinion that City of Eugene did not need the bug fix.

19           Here's the testimony of Jim Benge.  He said,

20           "This is a federal US form, something all of

21      our clients receive updates for every year.  So you

22      know, we had just gone in and made changes in this

23      area and thought that we could have introduced a bug

24      for all our clients.  He," that's referring to Don

25      Sheffield, "was working on the development of this

1              for all of the clients that were impacted, City of

2         Eugene being one of them."

3                   Again, it's not our burden, but we met that

4    burden.  We have proven that City of Eugene needed this

5    update, was affected by this update, and their own expert said

6    that she had offered no opinion to the contrary.

7                   E-mails, too, indicate that Rimini believed the

8    bug affected multiple clients.  Here are some of the e-mails

9    that we put in evidence.

10                  And Professor -- I'm sorry, Barbara

11   Frederiksen-Cross testified that it doesn't matter where

12   Rimini starts the work first, right?  They're trying to

13   backtrack from that now, but I asked her,

14             "If City of Eugene and Johnson Controls are

15        both affected by the W2 issue, the misalignment that

16        we saw, do you have an opinion on which client Rimini

17        is required to start its work in?"

18                  Her answer was no.

19                  "They can start in either one, right?"

20                  And, "Presumably, yes."

21                  So whether it's two clients or 20 clients,

22   Rimini is entitled to start in any client's environment that

23   it believes is affected by the issue.

24                  And, remember, Rimini -- and I talked about this

25   in opening a little bit, Rimini is a consultant.  Their

1516

1    clients don't want to be thinking about tax updates.  It's not

2    their core competency.

3              Rimini is just expected year after year after

4    year, when W2 forms are put out, to implement the update for

5    its client within the US, for the clients it has a contract

6    with, for the clients that -- the clients expect Rimini to do

7    it for.

8              The clients don't call up Rimini every year and

9    say, "Hey, I need our W2 update."  Rimini proactively does it.

10             And so what's striking about issue 3, what's

11   really striking here, is that this is a pure reuse of

12   knowledge situation.  This is a pure reuse of knowledge.

13             Jim Benge testified,

14             "So we had a call with the client, and the

15        client actually changed the print parameter for box

16        17 as we've described, and actually tried it out

17        while we were on the phone with them, and confirmed

18        that it resolved their issue."

19             Your Honor, Oracle is contending that that is

20   cross-use, the phone call where Jim Benge had a call with a

21   client, the client typed in B99999 and said, "Hey, Jim, I

22   think it works."

23             They are contending that Rimini is in violation

24   of a federal injunction by having that phone call and talking

25   about B99999 in that print parameter.  That's where we are.

1          And, in fact, this is how far she took it.  She

2    said, "If Don Sheffield" -- I asked her the question,

3               "If Don Sheffield had figured out the

4          solution for City of Eugene to fix the print

5          parameter, and then his colleague is working in

6          Johnson Controls, and the colleague says to

7          Mr. Sheffield, 'Hey, have you ever dealt with a

8          situation like this,' and he says, 'Yes, actually I

9          have, for City of Eugene, I have changed this print

10         parameter.  Go to this field in Johnson Controls and

11         change it to this.  I think it should work,' would

12         that be cross-use?"

13              And Ms. Frederiksen-Cross said, "If he gave

14         him the very specific details of exactly what he

15         changed it to, yes, that is knowledge reuse."

16              And you know what's interesting is we went

17   through that same issue again this morning, your Honor, and I

18   asked her essentially the same version of this question, and

19   she flip-flopped.  She said it's not cross-use any more.

20              And you saw that actually on redirect, too,

21   where they asked her are any of your opinions based on reuse

22   of know-how, and she denied it, but that's not what she said

23   earlier.

24              And Oracle's cross-use theory would have truly

25   absurd implications.  As we saw, Don Sheffield could never

1    reimplement that solution again.  He could never tell a

2    colleague about his solution, about his know-how.  He could

3    maybe say check the print parameter, but he can't tell him to

4    use the specific value to put in that parameter?

5              And Professor Astrachan testified, "I don't

6    know how they would do that without using the knowledge they'd

7    gained."  They would have to reuse their knowledge and

8    know-how.  That's what these cross-use issues are about.

9              In this slide, I think this slide puts in stark

10   relief just how much Ms. Frederiksen-Cross contradicts herself

11   and the Court.  She said on cross-examination,

12             "I would characterize this as cross-use, the

13        act of reusing the knowledge of the solution."

14             Reusing knowledge of the solution.

15             And then again later she said that would be

16   cross-use -- I asked, "That would be cross-use, right?"

17             And she said,

18             "Yes, if he gave him the very specific

19        details of exactly what he changed to it, yes."

20             And then after all that cross-examination, that

21   was sworn testimony, she comes up on redirect, and there was

22   one question by Oracle's counsel where she was asked,

23             "Are any of your cross-use opinions based on

24        Rimini's reuse of knowledge?

25             "No, I don't believe so."

1              Those are directly in conflict.  Either that's

2   false statement on the left or it's a false statement on the

3   right.

4              And the Court's order is clear.  The Court's

5   order said it is not cross-use for a Rimini engineer to

6   memorize and replicate the work as Oracle claims.

7              Now, let's turn to issue 4, and this slide again

8   is just to orient us.  It's Schedule A of Form 940, and,

9   again, the red arrows indicate the Xs that were misaligned.

10             And to start with, the file at issue is ris940a,

11  and that file is Rimini's work product.  We proved that.  Jim

12  Benge testified about it, Professor Astrachan testified about

13  it.

14             And Ms. Frederiksen-Cross, like I said before,

15  she did not give an opinion on whether that file was

16  substantially similar to any Oracle code.  That's a failure of

17  proof.

18             Rimini doesn't have a burden again.  We proved

19  that it's our work product.  The burden is entirely on Oracle

20  on this issue, and they have no opinion on it.

21             And then the evidence showed that Rimini tested

22  the update in City of Eugene's environment, and it was for

23  City of Eugene who needed the update.

24             The update, again, is a federal form.  City of

25  Eugene is in Oregon which is in the United States.  City of

1    Eugene and other clients receive this update every year.

2                    On January 25th, 2019, I'll go into the timeline

3    in a little bit more detail in a second, when the testing

4    occurred City of Eugene was slated to receive the update, and

5    it's backed up by numerous documents that show this update was

6    slated to go to all US clients with software versions prior to

7    Oracle release 2018-B, and, again, Ms. Frederiksen-Cross

8    offered no opinion to the contrary.

9                    Now, the update was developed and tested for

10   Spherion/Smead.  You heard the testimony of Mr. Benge and the

11   testimony of Ms. Davenport as to development and testing.

12                   And now here's the timeline, and our timeline is

13   more detailed than the one Oracle's counsel just showed you.

14                   Oracle has tried to suggest that the key issue

15   here is about someone named Laurie Gardner, who is not a

16   Rimini developer, and why, after client Spherion logged a

17   ticket with Rimini, the scope in Jira was set to Spherion

18   which would be expected when a ticket comes in.

19                   Now, they speculate about what Laurie Gardner

20   saw or knew or intended or heard about the tax publication put

21   out by the IRS.  Again, that's burden shifting.  Speculation

22   about what Ms. Gardner knew or didn't know, that's not

23   evidence, that's burden shifting.

24                   And they speculate without any evidence

25   whatsoever, there's not been a shred of evidence about whether

1        she knew about that IRS instruction that referenced the Virgin

2        Islands, and why -- why?  Why does this matter?

3                        Look at the timeline here.  The timeline shows

4        Oracle's speculation is wrong.  In July 2018, documents and

5        testimony show that the update was contemplated for all US

6        clients.  January 2019, all US clients were set to receive it.

7                        On January 14th, yes, Spherion logged a ticket

8        regarding this update, and, yes, the next day the scope field

9        was set to Spherion to reflect that ticket, but that did not

10       change, it was not indicative of what other clients were

11       expected to receive that update.

12                       How do we know that?  Because still, on

13       January 25th, the tech doc reflects that the update will go to

14       all US clients.  Don Sheffield says he's developing the

15       updates for all US clients that will ultimately get this.

16                       The 28th, the business analyst e-mail reflects

17       the update will go to all US clients.

18                       So before and after this critical ticket from

19       Spherion that came in on January 14th, the documents and

20       testimony show that Rimini expected that City of Eugene, all

21       US clients were going to get this federal form which makes

22       sense because it's a federal form and these are all US

23       clients.

24                       Now, Ms. Frederiksen-Cross accuses reuse of

25       know-how.  She tried to disavow that in her redirect, but on

1    cross she was asked,

2              "So even if that Rimini expression -- if the

3        engineer just remembers it, he can't even retype it

4        for Spherion and Smead?  That's your opinion?"

5              And she said, "That would be prohibited."

6              And, in fact, this morning I asked her those

7    same questions, and, again, it's been a series of backsliding

8    and changing of positions.

9              I asked can you remember the line code, can you

10   remember this, can you remember that, and she tried to draw a

11   line between, yes, you can remember it but you can't write it

12   down, that's not a distinction, and it directly contradicts

13   your Honor's orders.  Your Honor has already ruled that it is

14   not cross-use for a Rimini engineer to memorize the work.

15             So when I asked her can you remember it and

16   retype it, and she said no, that was in contradiction of your

17   Honor's orders.  It is irreconcilable with your Honor's order.

18             That takes me to issue number 6 regarding the

19   1099 files.  These are the two files, if you recall, rsi1099i,

20   for the 1099 INT, and rsi1099m for the 1099-MISC.  Those are,

21   again, obviously both federal forms.

22             Now, both of those files are Rimini created work

23   product.  They're Rimini expression.  There's testimony from

24   Jim Benge, there's testimony from Professor Astrachan, and,

25   again, a failure of proof.  Ms. Frederiksen-Cross does not

1    contend that they corporate any protected expression.   That's

2    the end of the analysis.

3                   Rimini did not incorporate Oracle protected

4    expression.   They are Rimini work product.   And they were

5    developed and tested for Easter Seals in Easter Seals'

6    environments.   The documents show that they were.

7                   Ms. Frederiksen-Cross offered no opinion on

8    where or when the update was developed other than to

9    acknowledge that it was developed initially pre-injunction.

10                   She was asked about this.   I asked her a series

11    of questions.   She said she's not offering an opinion on

12    substantial similarity.   She's not offering an opinion on

13    development.   She's not offering an opinion on testing.

14                   Again, nothing is our burden here.   We have

15    affirmatively proved all these things.   Ms. Frederiksen-Cross

16    has not opined on any of them.   That's a failure of proof.

17                   Now, another key issue with respect to issue

18    number 6 has to do again with the issue of derivative works.

19                   And again on the left, I had this in an earlier

20    slide, this is the law.   It's clear as day.   You have to

21    substantially incorporate protected material from the

22    preexisting work, literal or nonliteral.   That is the test.

23                   And I asked her a clear and direct question.   I

24    asked,

25                   "But that file by itself could also be a

1    derivative work even if it contains no literal or

2    nonliteral Oracle expression whatsoever in your view?

3              "That's my understanding, counsel."

4              That is wrong as a matter of law.

5              I asked her when she used and applied that

6    definition in her analysis in this case, and also in Rimini II

7    by the way, and she said yes.  That infects every single

8    opinion that she has in this proceeding as well as Rimini II.

9              And so, again, facing a failure of proof, where

10   did Oracle turn this morning?  They turned to #include again.

11   They said #include.  But #include does not incorporate any

12   Oracle expression until the file is run in the client's

13   environment.

14             Again, the #include in the RSI file is just a

15   single line.  It says #include, and then it references a file

16   name.  That's it.

17             It's only when that file is sent to the client,

18   compiled and run, is Oracle code even involved in the process.

19   Professor Astrachan explained this, and eventually

20   Ms. Frederiksen-Cross admitted this.  It's a red herring.

21             Now, I turn to Issue 10.  This had to do with

22   the issue for Rockefeller and Home Shopping Network.

23             Now, that update involved 13 steps.  It was --

24   and one step was integrating the rsi quarter tax file which,

25   again, contains no Oracle copyrighted expression.

1    Ms. Frederiksen-Cross did not contend that it contained any

2    Oracle copyrighted expression.  Again, it's a failure of

3    proof.

4                    And you saw the Dev instruction.  We went

5    through it in painstaking detail.  It was extremely long.  I

6    believe it had 13 steps, it was dozens of pages long,

7    incredibly complex.  It had tons of Rimini-written code in it,

8    all Rimini creative expression.

9                    There is not a single opinion from Oracle in

10   this case that that Dev instruction contains any Oracle

11   expression or is substantially similar to any Oracle

12   expression.  It is Rimini's work product, and Rimini can use

13   it, yes.

14                   And you saw the testing records.  The testing

15   records show that Rimini tested it in Home Shopping Network's

16   environment for Home Shopping Network; in Rockefeller's

17   environment, for Rockefeller.

18                   And so then where did Oracle go faced with this

19   evidence?  They went to what I'm calling a retroactive

20   cross-use theory.

21                   I asked Ms. Frederiksen-Cross,

22                   "So if Rimini has just one client, and

23        they're -- we hope to get more clients, we're not

24        sure, and if they do end up getting clients, then

25        somehow it makes the prior use of that first client's

1    environment cross-use?"

2              And her answer was, "That's my understanding

3    just under the way the language of the injunction is

4    framed."

5              Oracle's theory is so expansive that cross-use

6    somehow runs backwards in time to RAM copies in the first

7    client's environment that no longer exist, so that if Rimini

8    gets a new client next year and reuses its know-how and work

9    product developed in the first client's environment using that

10   first client's software, and therefore there were RAM copies

11   in that first client's environment, those RAM copies are long

12   gone.  They've been gone for a year.

13             But somehow Oracle's cross-use theory is so

14   expansive that it retroactively makes the use of those copies

15   in the first environment somehow illegal, and, again, because

16   the injunction, it's undisputed, only covers illegal conduct,

17   it makes it illegal for anyone.

18             Now, let's turn to issue 2.  Again, this slide

19   is to just orient us again.  It's the same Schedule A of Form

20   940, it's got the boxes and the Xs that are misaligned.

21             This update was developed for Matheson.  The

22   documents show that.  It was tested for Matheson.  Yes, this

23   is an Apply Update log that shows that the update was sent to

24   Matheson.

25             But there was the testimony of Jim Benge about

1   it being tested for Matheson, and Mr. Benge testified,

2             "At the time of this informal delivery to

3      Matheson Trucking, did you believe you were violating

4      the injunction?

5             "No, not at all.

6             "Why not?

7             "The work that was done here was for

8      Matheson in Matheson's environment."

9             So, again, while we are not rearguing the

10  violation, Rimini did not believe it was in violation of the

11  injunction at the time that this happened and should not be

12  held in contempt because the work for Matheson was in

13  Matheson's environment.  The work for City of Eugene was in

14  City of Eugene's environment.

15             And when you look at whether it's developments

16  or testing or Rimini expression where the work product at

17  issue, that rsi quarter tax or rsi940 or rsi 1099s, the Rimini

18  expression, we have proven all of those.  Again, it is not our

19  burden, we don't have a burden here.

20             But Oracle has failed.  Her opinions --

21  Ms. Frederiksen-Cross hasn't even offered opinions on whether

22  these files substantially incorporate protected Oracle

23  expression, and that's the critical issue here, and Rimini

24  should not be held in contempt for any of these.

25             And I want to turn to issue numbers 7 and 9.

1   These are the two issues regarding JDE source code.

2              Here's the injunction language.  "Rimini shall

3   not copy JD Edwards software source code."

4              And here's a demonstrative I showed in opening

5   and you also saw during the testimony of Mr. Lanchak.

6              And the red and the green depict the two

7   portions of JDE software.

8              And what's critical with this slide is that,

9   yes, Oracle doesn't like the labels for some reason, but they

10  are not disputing the fact.  It's not the term that matters,

11  it's the fact.

12             I asked Ms. Frederiksen-Cross about whether the

13  green portion was accessible human-readable, and she said yes.

14             I asked her about whether some of the components

15  of the software of JDE is not easily accessible and not

16  human-readable, right, that's the red portion.

17             And I have to say Oracle's counsel said that

18  these terms were made up, that they've never been used.  The

19  documents I referred to in the proffer earlier show that that

20  is not the case.

21             Now, critically, Oracle showed you the jury

22  instruction for Rimini I, and I want talk about that, because

23  the Ninth Circuit has already held that creating JDE software

24  environments which necessarily, necessarily, includes open and

25  closed code, is permissible under the JDE license.

1    That's the Ninth Circuit saying that the

2  Rimini -- the JDE license does not prohibit Rimini from

3  creating JDE software environments.

4    JDE software environments, it is undisputed,

5  contain both the open accessible portions and the closed

6  inaccessible portions.

7    And your Honor also heard testimony just this

8  morning about the Giant Cement JDE license, and there was a

9  reference to source code, and what it referred to was the

10  closed code, consistent with Rimini's interpretation.  It

11  referred to source code in the context of not decompiling, not

12  reverse engineering, not disassembling.

13    And so this slide is critical because the Ninth

14  Circuit, it affirmed your Honor's instruction, and it said

15  that when your Honor construed the JDE license, it would not

16  preclude Rimini from creating a development environment for a

17  licensee, for JDE.

18    And, again, it is undisputed that JDE contains

19  both open and closed code so you cannot create a JDE software

20  environment without copying both of those components.

21    There's also been a lot testimony and evidence

22  about Spinnaker, and this is Ms. Ransom.  She was the Senior

23  Global Vice-President of Customer Support for Oracle, and she

24  was asked a series of questions about Spinnaker's processes.

25    And she was asked,

1    "And Oracle viewed them as respectful and

2    noninfringing of Oracle's intellectual property?"

3         And she said yes.

4    "And also that the support processes

5    described in paragraph 14 do not violate Oracle

6    license agreements with its clients."

7         And she said correct.

8         And what is intriguing is that Oracle's counsel

9    didn't even provide Ms. Ransom's testimony to

10   Ms. Frederiksen-Cross.  I asked her about that.

11        She wasn't really aware of what the details

12   were.  Oracle shielded their own corporate representative's

13   interpretation of the license at issue from their expert who

14   is here to talk about what is and is not permitted under the

15   license in the injunction.

16        And, again, this is not -- I'll go to this next

17   slide first.  So she was also asked the question,

18   "And is it fair to say that Oracle concluded

19   that it was proper for Spinnaker to develop fixes,

20   updates, and custom code solutions -- " that's the

21   open code -- "for its customers that may take the

22   form of source code changes?"

23        Her answer was yes.

24        Again, that is the open code that we are talking

25   about.

1    And I said this in opening, we're now here in

2  this proceeding and Oracle is saying the exact opposite.  They

3  don't say that out in the real world.  They don't say that --

4  now they're saying that the injunction, which only covers

5  illegal conduct, prohibits the copying of Oracle code.

6    But out in the world, to its licensees, to its

7  partners, to its support providers, to all the consultants

8  that are literally modifying -- you heard them from

9  Mr. Lanchak, modifying and copying JDE code, this open code,

10  they don't tell them that that's prohibited.

11    And Oracle's assistant general counsel, Deborah

12  Miller, was part of that audit, it was an onsite audit at

13  Spinnaker's processes, and it was concluded that Spinnaker's

14  practices and procedures are respectful of and do not infringe

15  Oracle's intellectual property rights and do not violate the

16  license agreements.

17    Now, everyone, all the experts and I think all

18  the lawyers, agree that Oracle's theory would prevent support

19  providers from copying, checking out, displaying, checking in,

20  promoting, using tools, or doing anything with JDE code.

21    And the reason is, is because, in the digital

22  world, you cannot interact with a file, you can't even look at

23  a file without copying code.  It's impossible.  You can't look

24  at a file without copying code, let alone modify it, let alone

25  create an update.

1            I asked Ms. Frederiksen-Cross,

2            "All of those involve copying of what you

3       contend is JDE source code in the client's

4       environment, correct?"

5            The answer was yes.

6            Mr. MacKereth agreed.  Mr. Lanchak agreed.  You

7  cannot do anything without copying the JDE code.

8            And, again, I've said this before, but your

9  Honor has been crystal clear.  The injunction only enjoins

10 conduct that has been adjudicated unlawful.  If it's unlawful

11 for Rimini, it's unlawful, period.  It's unlawful for

12 everyone.

13           And so if the injunction is interpreted to mean,

14 as Oracle wants, that any and all code, even the open code of

15 JDE that is shipped with the product that is designed to be

16 modified, that Oracle provides tools to modify it, and that

17 has to be modified to keep the software up to date, if that is

18 enjoined, if that is illegal, it would make the JDE support

19 industry suddenly illegal.

20           And Mr. Lanchak, who again is the only person

21 who you've heard from, with decades of experience actually

22 implementing Oracle software implementations and maintaining

23 Oracle software and many years of JDE support specifically,

24 that was his testimony.

25           Now, Oracle has tried to suggest that this is

1    made up, that it's some new-fangled -- I think the word was in

2    opening, new-fangled explanation, some new distinction without

3    a -- that Rimini has never used before, but the timeline

4    disproves that.

5                   Now, they put up a timeline, but, you know, they

6    keep leaving critical things out.

7                   So the injunction was originally issued in

8    October 2016, was stayed roughly two months later in December

9    2016, and then they did have the portion on 1/8/2018, the

10   portion in black where it says the original injunction was

11   vacated.

12                  But, you know what they left out?  They left out

13   that the Ninth Circuit held Rimini can create JD environments.

14   You cannot create a JD environment without copying both the

15   open and closed portions of the code.

16                  And they also left out the testimony of

17   Ms. Ransom four days later.  She is the 30(b)(6) corporate

18   designee of Oracle.  She said that source code changes and

19   custom code are permissible.

20                  So this is not some made-up story.  This is not

21   some new-fangled distinction.  These are facts.  The fact of

22   the distinction between open and closed, whether you like the

23   terms or not, or whether Oracle likes the terms or not, that

24   doesn't matter.  The facts matter.

25                  The Ninth Circuit has held that Rimini can

1    create JD environments, and that necessarily requires copying

2    open code.

3              Now, I also talked in opening about the

4    superfluous argument.  Again, this is Oracle's attempted

5    rewrite of paragraph 8.

6              If Rimini Street can't copy any and all JDE

7    code, even accessible code, it renders the rest of paragraph

8    10 you see here at the bottom superfluous.

9              It would be a ban on providing updates so it

10   wouldn't matter -- that portion of paragraph 10 where it says

11   you can't create updates for the benefit of some other

12   licensee, that would be totally superfluous if paragraph 8 is

13   read as Oracle says.

14             Now, on issue 9, issue 9 concerns the single

15   technical specification at issue, and this issue is moot if

16   the Court finds that Rimini is allowed to access and copy open

17   code to create these markers in the red box.

18             But those markers aren't code at all.

19   Mr. MacKereth testified about that.  Professor Astrachan

20   testified about that.  I believe even Ms. Frederiksen-Cross

21   testified that these can't be run, these aren't code, they're

22   markers, and no one disputed the purpose of them.

23             That code already exists, or the snippet of

24   code, I should say, already exists in the client's

25   environment.  It's used as a frame of reference, a pointer was

1   used, an indicator the term was used, a marker the term was

2   used.  That is the purpose.

3             And it is undisputed, again, there is no opinion

4   from Ms. Frederiksen-Cross, or evidence to the contrary, that

5   the code in this blue box and the many, many, many, other

6   boxes that have the word "add" in them in this technical

7   specification, that is Rimini-written code.  That is Rimini

8   expression, and the fact that there is a snippet, a marker to

9   indicate where to insert that code in a client's environment

10  does not violate the injunction.

11            And Professor Astrachan, he talked about this,

12  he talked about their purpose, he talked about how it can't be

13  executed and it's not even code.

14            And, again, there was no opinion from Oracle

15  that these were somehow substantially similar to any Oracle

16  expression, and Professor Astrachan talked about and explained

17  how it was *de minimus* in any event.

18            And here's the testimony from

19  Ms. Frederiksen-Cross on this issue.  She agreed that the

20  snippets are used merely as markers and cannot be executed.

21  She agreed that Rimini wrote the code to be added, and she

22  failed to conduct a substantial similarity analysis.

23            Again, it is not our burden.  We have presented

24  affirmative evidence that that is our code, but it is not

25  disputed, and Oracle has a failure of proof issue on all of

1    these that require an analysis of substantial similarity.

2                    Now, I want to briefly talk about issue 8.  I

3    don't believe Oracle's counsel even raised it during their

4    closing.  Issue 8 relates to the Australian Bureau of

5    Statistics, ABS I'll call them.  That's a client in Australia.

6    ABS uploaded a single database file to Rimini.

7                    Oracle's expert admitted she did not disclose

8    any opinion regarding database.  She was asked,

9            "You have never disclosed any opinion in any

10       of your reports about this file as it relates

11       specifically to paragraph 15 of the injunction,"

12       that's regarding database.

13                   Her answer, "That's correct."

14               And she admitted that she did not take into

15   account the Court's OSC.  She was asked,

16           "You didn't take into account the Court's

17       order on this paragraph in forming your opinions?"

18               And she said, "I do not recall that in

19       forming my opinions."

20               And what's she's referring to there is, your

21   Honor, I had asked her a question about whether she had

22   remembered that your Honor had written in an order that in

23   context that paragraph 15 did not mean that all copying of

24   Oracle database was now prohibited, that the injunction had to

25   be interpreted in the context of this now decade plus

1    litigation, and your Honor had written explicitly that given

2    that lengthy history, clearly the injunction would not

3    prohibit all copying of Oracle database.

4              And she did not take that into account in

5    forming her opinions in her case, therefore her opinions are

6    unreliable.  She actually didn't have opinions until this

7    hearing, but, in any event, they're unreliable.

8              They're also wrong because the paragraph 15 of

9    the database -- of the injunction relating to database says,

10             "Rimini Street shall not reproduce, prepare

11        derivative works from, or distribute Oracle database

12        software."

13             And so I asked her, "I don't know what your

14        theory is.  What is your theory?"  I said, "What's

15        your theory as to why this violates paragraph 15 of

16        the injunction?"

17             And her answer was, "Because it's a copy of

18        the file that is present on Rimini's systems."

19             In other words, she's saying that there's some

20   local hosting prohibition, an implied one, a silent one that

21   doesn't exist in the text, despite the fact -- again, I've

22   shown this slide before -- that there is no facilities

23   restriction in the OLSA.

24             And the Ninth Circuit -- I've shown this

25   before -- says that only the PeopleSoft license limits the

1     licensee to using the licensed software at its facilities

2     which is the basis for the local hosting requirement.  The JD

3     Edwards and Seibel licenses don't, and that's why the Ninth

4     Circuit struck those provisions.

5             Oracle is trying to imply a local hosting

6     prohibition as to database, and it doesn't exist.

7             Now, I have a very short section on how Oracle's

8     interpretation grossly distorts the junction.  It's a

9     text-heavy slide, I admit, I won't go through every piece of

10    it.

11            But to recap, Oracle is saying that client-sent

12    files weren't contempt when the Rimini I conduct was about

13    environments.

14            They're saying that with respect to local --

15    with respect cross-use, and the words "for the benefit of,"

16    that support providers cannot reuse know-how and work product.

17            They try and sidestep it sometimes.  On redirect

18    she claimed otherwise, but there was clear testimony from

19    Ms. Frederiksen-Cross that she was accusing as cross-use the

20    reuse of knowledge.

21            With respect to JDE, again, Oracle is claiming

22    that support providers can't view, look at, check out,

23    display, check in, or promote any JDE code, and as to database

24    they imply a local hosting prohibition that doesn't exist.

25    It's nonexistent.

1          Now, I wanted to zoom in a little bit on
2    cross-use, though, again, and I think this point is critical.
3          Rimini should not be held in contempt when
4    Oracle's own expert can't keep Oracle's theories straight and
5    doesn't even know what's allowable.  She's changed her views.
6    Ms. Frederiksen-Cross has flip-flopped back and forth about
7    know-how.
8          It was acknowledged that there is such a thing
9    as allowable cross-use.  That was the testimony.  There is
10   such a thing as allowable cross-use, but we don't know what it
11   is.
12         Ms. Frederiksen-Cross said that Rimini can't
13   reuse knowledge but then said the opposite.  I went through
14   that.  On cross she said you can't, on redirect she said you
15   can.
16         There was a repeated flip-flop on intent,
17   whether somehow there's some intent element to cross-use.
18         All these issues are up in the air.
19         Ms. Frederiksen-Cross couldn't keep Oracle
20   counsel's theories straight about what is and is not
21   permitted, and so Rimini can't be held in contempt when their
22   own expert doesn't know, when it can't be articulated.
23         And that last bullet on the left I think is an
24   important one because there was a glimmer of lucidity there,
25   and there was testimony by Ms. Frederiksen-Cross where she

1    eventually said correctly that the line, the critical line

2    here for cross-use is does the work product substantially

3    incorporate protectible Oracle expression.

4             That is the key to unlocking all of these

5    cross-use issues.  That's the key issue when it comes to

6    cross-use, and there's been a failure of proof onto each and

7    every one of these cross-use issues.

8             I want to briefly touch on the substantial

9    compliance efforts.

10            Now, Oracle has claimed from the opening,

11   through testimony, and now in closing, that the only two

12   things that Rimini did was to stop using two automated tools,

13   and there was references to Co-Analyzer and DevReview.

14            They want to rehash the entire history of this

15   litigation when it serves them, but then they want to ignore

16   the history of this litigation when it doesn't.  And so what

17   didn't they talk about?  They don't talk about Process 2.0.

18            Your Honor's summary judgment order in February

19   2014 provided guidance, and what did Rimini do?  It followed

20   that guidance.  It spent months and millions of dollars moving

21   all of its client systems off of its environment.

22            For some reason they don't count that, it

23   doesn't count.  If it didn't happen within the days after the

24   injunction it somehow doesn't matter.

25            But Process 2.0 we specifically designed to

1    address the issues your Honor had identified in February 2014.

2    So seven years ago Rimini took steps to comply and order its

3    conduct in response to your Honor's instruction in that

4    summary judgment order.

5           And Oracle also didn't acknowledge that Rimini

6    does instruct clients to not send Oracle IP to them.  We saw

7    that.  Again, that was the column that was missed apparently

8    inadvertently, even though the column was labeled Important,

9    even though the column -- even though there was testimony by

10    Ms. Frederiksen-Cross that she reviewed each of the column

11    headers.

12           There was testimony from Mr. MacKereth about

13    scanning and quarantining and discipline, and Oracle wants to

14    just eliminate that, zero it all out.

15           And they pretend -- I'll just show it one more

16    time.  These are the only two things they think happened, but

17    they're not saying the whole story.  They're refusing to

18    acknowledge these things on this slide, Process 2.0, scanning,

19    quarantining.

20           And then I want to just briefly address -- I

21    know Oracle's counsel didn't address it in his last few

22    minutes, but I can't let it go unaddressed a little bit.

23           Their request for Rimini here is essentially a

24    monitorship.  That's unprecedented and it's contrary to law.

25           They withdrew their request for a bar order,

1    your Honor will remember.  It said -- your Honor wrote Oracle,

2    in its response to the motion, withdrew its request for a

3    complete ban on Rimini support services.  But what they're

4    doing is they're essentially seeking one again through a

5    backdoor by saying all copying is illegal with respect to

6    database and JDE.

7              There was this testimony on database where it

8    was asked of Ms. Frederiksen-Cross, it says,

9              "It says Rimini shall not reproduce Oracle

10       database software.  What's your understanding of

11       that?

12             "That they shall not copy.

13             "Ever?

14             "Oracle database software, that would be my

15       reading of it, yes."

16             That would be a ban, that would be a bar on

17   providing Oracle database support.

18             And as to JDE, she was asked,

19             "All of those things involve copying of what

20       you contend is JDE source code in the client's

21       environment, correct?

22             "ANSWER:  Yes."

23             Again, that would effectively be a bar on

24   providing JDE updates, any meaningful -- in the broadest sense

25   of the word, any meaningful support.

1    You heard the testimony of Mr. Lanchak, the only

2  JDE expert in this case, it would prevent meaningful JDE

3  support.  It's effectively a bar order.  So while they say

4  they withdrew it, they come back to it a different way.

5    And Oracle is effectively seeking perpetual

6  discovery.  They don't want this to end.  Rimini is under the

7  yoke of them.  They want perpetual discovery, and not just of

8  any, you know, litigant adversary, it's of its biggest

9  competitor.

10    They want essentially a monitorship.  If you saw

11  the things in the opening slides that were presented to your

12  Honor from Oracle's counsel, it had a whole litany of things,

13  essentially a monitorship.

14    That requires statutory authorization.  The

15  Copyright Act does not authorize it.  There's no inherent

16  power absent this heightened showing, and there's serious

17  constitutional concerns with it.

18    And with that, your Honor, I'll conclude.

19    Rimini respects Oracle's IP, and it respects

20  your Honor's orders.  It fundamentally changed its processes

21  more than seven years ago.

22    It has interpreted the injunction consistent

23  with the Court's ruling that permits lawful support, yes,

24  including the reuse of its own know-how and work product, and

25  that Rimini is in substantial compliance, and we respectfully

1    ask that at the end of this your Honor discharge the OSC.

2                    And thank you very much again for your time.

3                    THE COURT:  Thank you.

4                    (Discussion held off the record.)

5                    THE COURT:  Mr. Isaacson, with that, we'll go

6    ahead and turn to Oracle's reply closing argument.

7                    MR. ISAACSON:  Thank you for this last ten

8    minutes.  We have the opportunity to propose trial briefs so I

9    don't have to touch on everything that was just said over the

10   last hour, but I will say that this is not about burden

11   shifting, of course it's not.

12                    I laid out for you in detail significant proof,

13   clear and convincing proof of not just the violations but of

14   the overall attitude, contemptuous bad faith, and the fact

15   that these are all tied to business practices which indicates

16   that what is happening here are not just the ten violations

17   but practices that are going to continue and be the foundation

18   of part of aspects of the business model that are dependent

19   upon copyright violation and violation of this court order.

20                    The last thing that was just said, we are in

21   substantial compliance because we have Process 2.0.

22                    Seth Ravin explained in his testimony that the

23   Process 2.0 which was adopted before the injunction, as I

24   said, consists of no more PeopleSoft environments, no more

25   general environments on the Rimini system, and we have -- and

1    they were operating remotely.  That's it.

2                    He said we give warnings.  They are boilerplate

3    warnings.  They don't respond when they get these materials;

4    please stop.

5                    He said we have scanning.  Their witness,

6    Mr. MacKereth, said they adopted that about a year ago.

7                    He said they have quarantining, which their own

8    expert said, "I couldn't see it," and then Mr. MacKereth said

9    there's quarantining, and he pointed to only two SalesForce

10   files.

11                   They said, "We have discipline."  And Mr. Benge

12   said he only knows of two cases, maybe there's a third, and,

13   in all the cases he said there were violations of their

14   policy, he could not identify any of that discipline.

15                   I began with JDE because it exemplifies what's

16   going on here.  They rewrite the injunction, they ignore the

17   plain words, and they do that in order to commit copyright

18   violations that are now happening after a jury verdict and

19   after an injunction.

20                   Remarkably he stood up here and said the Ninth

21   Circuit says we can create JD environments, and, of course,

22   what did the Ninth Circuit do?  It maintained your injunction

23   except for the words "access," which has been blacked out, but

24   otherwise the provision of the injunction with respect to JDE

25   remains the same, and the plain language of that says no

1    copying of source code.

2              And he stood up here and said, yes, source code

3    is human-readable code.  Open code is human-readable, closed

4    code is not, and that, of course, is object code.

5              The plain language of the injunction, which they

6    never came to this Court to seek to modify or clarify or make

7    any of these arguments, instead they contemptuously violated

8    the plain language of that injunction, says they are not

9    entitled to do what they are doing.

10             There is no explanation that you heard of what

11   happened at the trial.  How could that trial have been about

12   closed code that Rimini never used?

13             There was no explanation of what is the purpose

14   of an injunction after a jury verdict if it's about enjoining

15   something that Rimini did not do and can't do.

16             The Giant Cement license agreement, which was

17   also touched upon, he said -- he seemed to imply it doesn't

18   talk about source code, it talks about compiling, and there

19   are sections on that.

20             But the relevant provision in your summary

21   judgment order, which is under Article 2, Sub 3,

22             "For any access to the software other than by

23        an employee of a customer, customer shall not provide

24        access to source code."

25             That's what you relied on in your summary

1    judgment order, source code in the license, source code in the

2    summary judgment order, source code in the junction, and

3    that's what they're violating.

4              They're doing the same thing with respect to

5    violation 9 trying to rewrite things which are those tech

6    specifications for JDE where you have markers, where they are

7    using Oracle code for the makers, but they say that's okay

8    because it's not executable source code.  That's not what the

9    injunction says.  It's another example their rewriting things.

10             On Issue 1, all that Oracle copyrighted

11   information on the Rimini systems, he said that it's all

12   Oracle database which is not what happened.

13             What it said was that they were systems that use

14   Oracle database which includes the other products such as

15   PeopleSoft which, as the Court may remember, everything

16   interacts with Oracle database.

17             There were 934 instances of this type of content

18   on Rimini systems confirmed by Professor Astrachan who said he

19   read the individual SalesForce files on that, and he said it

20   was confirmed by Rimini's assistant general counsel who told

21   them they already knew about that exact number before Barbara

22   Frederiksen-Cross told them about it.

23             Issue 5, which is -- basically comes down to

24   analytic dissection, I'm not going to repeat the debate that

25   went on today.  You heard whole debate about the specifics of

1    analytic dissection.

2              But counsel never confronted the Catch-22 of

3    what they want you to accept from Professor Astrachan, that

4    all code -- software code should be considered to be

5    conventional, and all conventional code should be weeded out

6    by analytic dissection, and nothing should be protected, and

7    therefore we can violate the injunction to our heart's

8    content.

9              The injunction does not permit that because

10   they've waived any type of argument at the trial that this was

11   not original protectible content.

12             The jury was instructed, the violation was

13   found, the injunction was entered.  They don't get to say we

14   get to copy to our heart's content and come in with analytic

15   dissection.

16             In addition, his analytic dissection method had

17   no basis in any literature, as he agreed, he made no speeches

18   about it.

19             He's a remarkably qualified computer scientist,

20   but he's just got this side gig about analytic dissection that

21   has nothing to do with his work.  How could it?  His method of

22   analytic dissection would make all software not copyrightable

23   because he expects it all to be conventional.

24             With respect to violations 2 through 4, which

25   this is Form 940, Exhibit A, which went to Spherion/Smead and

1    then Matheson, and then there was a bug fix for Johnson

2    Controls, the Spherion -- all of this took place over a single

3    weekend in January 2019, and it also however said, as

4    Mr. Benge said, it represents a business practice because they

5    feel free to do this.

6                    And what -- just like Mr. Benge, just like

7    Professor Astrachan, they said this was permissible for all

8    clients on January 25th, but the record says clear and

9    convincingly that the test took place on January 24th, and on

10   January 24th the only -- the only client in scope was

11   Spherion.  That's what it says.

12                   And it is also undisputed, and, you know,

13   counsel said we were speculating, it's not speculation that

14   the documents -- and Mr. Benge said the reason they went to

15   City of Eugene was because they did not have access to

16   Spherion and Smead.  It's not because they're trying to help

17   City of Eugene, they don't have access to help the clients who

18   are complaining so they rush over to the easy environment.

19                   They say, well -- they said some things about

20   the AS400 and operating systems which have nothing to do with

21   the PeopleSoft environments or the PeopleSoft updates.

22                   But on this issue of derivative works, we have

23   applied the standard of substantially incorporating protected

24   material.

25                   First, a derivative work is not necessary.  A

1    modification violates the injunction.  The Court has held that

2    in its summary judgment order in Rimini II.

3              Second, the files in these violations and in

4    violation 6 are derivative works using the analysis of the

5    Court of derivative works in its summary judgment ruling when

6    it applied the *Microstar* decision.

7              Third, the PeopleSoft environments are also

8    derivative works in the customer environments.  Professor

9    Astrachan says that.

10             He says, however, he thinks that's legal, but

11   they are not because they're a breach of paragraph 2 of the

12   junction because they violate the underlying Easter Seals

13   injunction which says Easter Seals can't create derivative

14   works.

15             It can -- issue 3, Johnson Controls, he says,

16   well, Johnson Controls needs this, there's lots of evidence.

17   The document says it will depend on what they report -- I'm

18   sorry, he said the City of Eugene needed it, that it was

19   applied given Johnson Controls.

20             The document says it will depend on what they

21   report.  City of Eugene did not report a bug, Johnson Controls

22   did.  That's why they used the City of Eugene to help -- to

23   help Johnson Controls.

24             They say that Ms. Frederiksen-Cross is talking

25   about now the cross-use of knowledge, which is not correct,

1   because it was Johnson Controls that identified a problem,

2   that Rimini Street went into the City of Eugene environment to

3   identify a solution to that problem, and then they typed that

4   solution into Johnson Controls.  That's cross-use.

5              And, finally, with respect to Issue 10, the

6   whole -- that long thing about the Dev instructions which was,

7   you know, almost an hour of talking about all these steps in

8   Dev instructions, and he mentions it again, is irrelevant

9   because it was sent to Home Shopping Network -- the update was

10  sent to Home Shopping Network and Rockefeller after

11  development.  Rimini provided an update that it developed

12  earlier to the future customers.

13             He says, well, cross-use can't run backwards,

14  it's a straightforward application of the injunction because

15  the injunction uses the term solely.  It is not solely for the

16  benefit of client A if it is being done for future clients.

17             The injunction talks about it has to be for the

18  benefit of that client A.  It is not for the benefit of client

19  A if it is for future clients.

20             What I have said about what Rimini has done and

21  not done shows bad faith, contempt, a lack of substantial

22  compliance, and ten violations of the injunctions.

23             But it's not just about those ten things, and

24  counsel was silent about whether somehow these were some ten

25  discrete things or ongoing business practices.  That's why you

1    didn't hear even a whiff of an apology for a single one of

2    these things.

3              They are not taking steps to enforce this

4    injunction, they are taking steps to internally say we're

5    going to change this injunction ourselves.

6              They changed the injunction prohibition on

7    copying JDE source code to nullify it because Mr. MacKereth

8    said he thought reading the injunction to cover the conduct

9    that was held illegal at trial would be incredulous, and

10   Rimini didn't come to this Court to ask permission to do that.

11             The company that built itself from copyright

12   violations, I'm not just talking about history, I'm talking

13   about today, now says that JDE business -- its JDE business

14   requires it to violate the plain language of a court order

15   which is not what it said when the junction was first entered.

16             We know that Rimini has 930 files on its system

17   with Oracle copyright notices.  That's evidence of lack of

18   substantial compliance.  We know their assistant general

19   counsel knew about that.

20             And we know the violations here are not

21   isolated.  The hearing has revealed it's based on business

22   practices, and business practices that they continue to

23   defend, informal testing -- informal delivery to deliver

24   updates by testing from easy environments, delivering testing

25   updates in an easy environment that's not solely for a client,

1    using technical documents with Rimini code as markers.

2            The ten violations in this hearing have

3    uncovered fundamental ways that Rimini is doing business that

4    violates this injunction.

5            This is not going to stop without serious

6    attention from this Court.  It's not just about the ten things

7    because the ten things -- each of the ten things, or most of

8    the ten things, represent serious business practices.

9            Rimini right now feels free to say that the

10   provisions of the junction are incredulous and then do what it

11   wants.

12           It will announce after the orders of the Court

13   again that it need do nothing else to comply with the court

14   order as it did before if something isn't done.

15           It won't compete fairly.  It will do so by

16   conduct in violation of a court order if something isn't done.

17   These are very serious matters, because we are discussing a

18   jury verdict, an injunction affirmed on appeal, and Rimini

19   rewriting that to help itself in the marketplace.

20           Nothing has fundamentally changed with Rimini.

21   It reveals its business practices only when there's a trial or

22   a hearing.  It builds its business on copyright violations and

23   now violations of court orders.

24           We ask the Court to find Rimini in contempt and

25   to take serious action to address those violations.

1    And, once again, I thank the Court for its time

2  this week, and I also thank everybody here who has been

3  working very hard.

4    THE COURT:  All right.  Well, I'll extend an

5  appreciation to both counsel.  You have done a fine job

6  summarizing your clients' cases, and I appreciate the

7  professionalism that I've seen throughout the trial, and

8  Mr. Vandevelde and Mr. Isaacson, you have reflected that in

9  your closing statements.

10    A couple of things.  First of all, I had earlier

11  approved a three-week period from the end of this hearing to

12  submit proposed findings and conclusions of law.

13    Madam Clerk, why don't you give me that

14  three-week date so that we have a specific deadline in mind.

15    THE CLERK:  That would be Tuesday, October 19th.

16    THE COURT:  All right --

17    THE CLERK:  I'm sorry -- yes.

18    THE COURT:  Yes, I think that's correct.

19    That will be the date for that, and, Madam

20  Clerk, I apologize for not asking you to think about that

21  earlier.

22    Let's see.  I assume that the slides which have

23  been referred to by counsel in argument are going to and have

24  been made a part of the record here somehow.  I'd like to have

25  them as part of the record if they haven't been so submitted.

1      Madam Clerk --

2           MR. ISAACSON:  We handed up our copies.

3           MR. VANDEVELDE:  We did, too, and we're happy

4  to -- we're planning to lodge a copy as well, your Honor.

5           THE COURT:  All right.  And that takes us to the

6  other question that was raised earlier about trial date for

7  Rimini II.  Do you want to tell me what you're concerned about

8  there?

9           MR. VANDEVELDE:  I'm happy -- do you want to

10  start, Bill?

11           MR. ISAACSON:  I don't have much to say --

12           THE COURT:  I don't mind telling you there's

13  been an obvious hold by the Court, so to speak.

14           I'm sure everyone is aware what the problems are

15  with the COVID-19 pandemic and trying to have jury trials, and

16  I can tell you that it's been a jungle in trying to preserve

17  jury trials for our criminal cases.

18           You can imagine how they're backed up and the

19  complications that that has caused because under the federal

20  system there are -- most defendants are being held in custody

21  pending their criminal charges in cases, and I -- it's just

22  part of the way things are.

23           On the issue of civil cases, we start with the

24  obvious proposition that this case is definitely unique in the

25  sense that it, like the earlier trial, I foresee a trial which

1    easily could go a month, and with the jury under current

2    pandemic conditions, which have only gotten worse in the last

3    month, I'm really hesitant to schedule and be looking at that

4    date.

5                     I can tell you I have other complex civil cases

6    that we have actually set trial dates on, and jury trials, and

7    as I sit here -- when I started this case, I mentioned the

8    double murder trial that we had last month, and we were able

9    to get the jury for that, but it was only a week and a half

10   trial at the same time, but -- and that was not an easy

11   proposition and actually COVID has gotten worse since that

12   trial.

13                    So I'm -- I'm just giving you that as

14   background.  I haven't signed off on the pretrial order in

15   this case.  We pretty much have what the parties have

16   submitted, and I probably will accept it on that basis without

17   adopting any particular party's position.

18                    But all of that stated, let me hear from

19   counsel.

20                    MR. VANDEVELDE:  Your Honor, I have made a

21   proposal, which there's obviously large casts on both sides.

22   We have most of our team here although we are missing one of

23   our key members.  I can't speak on his behalf.

24                    I would suggest that maybe we take this offline.

25   We can talk about those and maybe come up with some dates in a

1   range.  I think there's at least some range that we're largely

2   targeting next year, and hopefully we can come to an

3   agreement.

4              It would be very hard for me to represent right

5   now that would work given --

6              THE COURT:  Yeah, I'm not trying to pin anyone

7   down.  I just want you to appreciate the problem from the

8   Court's perspective.

9              MR. VANDEVELDE:  I totally understand.

10              MR. ISAACSON:  You know, we obviously understand

11  those problems and how they come first, your Honor.

12              And to be totally transparent, the last

13  conversation, which was some time ago, I don't even remember

14  when, quite frankly, hopefully the vaccination rate was lower

15  then, but I don't know, we were talking about April, not

16  anybody agreeing to that, but talking about that, and whether

17  we should set that and then see how things go.

18              But I don't know if that's how -- that's sort of

19  the way the Court wants to proceed, if we're able to agree on

20  some date range or date.

21              MR. VANDEVELDE:  Yeah.  Again, I believe the

22  conversation was with Mr. Thomas who I can't speak on behalf,

23  and he's our lead trial counsel.

24              I know there are trials, in fact, I have one in

25  May and March, and I know there are other conflicts.  I think

-1558-

1    we can thread the needle somewhere towards early summer,

2    midsummer, that's what we were targeting, but I think there's

3    common ground for us to discuss, and I think it's easier done

4    via phone calls than in open court.

5              I just note that there's lots of --

6              THE COURT:  No, I'm certainly not looking for

7    dates and ranges right now.  I recognize that there's so many

8    factors affected, and that's hard to do.

9              Just an observation, I would tell you, just with

10   the Court's own history in dealing with jury trials during the

11   pandemic circumstances, I'm really only looking at criminal

12   cases.  It seemed that we had less problems earlier in the

13   summer, but waiting until summer as I look back at those

14   cases, but that may just be circumstance, I don't know.

15             So give it some thought, let the Court know.

16   We'll take it from there.  I will certainly entertain your

17   findings and conclusions.

18             I appreciate the professionalism I've seen

19   throughout this trial, on behalf of the witnesses as well, and

20   we'll decide this matter as quickly as we can expeditiously do

21   so.

22             MR. ISAACSON:  Thank you, your Honor.

23             MR. VANDEVELDE:  Thank you, your Honor.

24             THE COURT:  All right.  Thank you very much.

25   That will complete this matter as far as evidence and argument

1   is are concerned, and I want to thank you once again, and

2   you'll be excused at this time, and court will be adjourned.

3                    (The proceedings were adjourned.)

4                              -o0o-

5

6           I certify that the foregoing is a correct
            transcript from the record of proceedings
7           in the above-entitled matter.

8           /s/Margaret E. Griener        9/29/2021
            Margaret E. Griener, CCR #3, FCRR
9           Official Reporter

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1      I N D E X

2

3      DEFENDANT'S WITNESSES:                                    PAGE:

4        LANCHAK, Stephen
           Direct Examination Resumed by Mr. Liversidge      1291
5          Cross-examination by Mr. Hill                      1331
           Redirect Examination by Mr. Liversidge             1346
6

7      PLAINTIFFS' REBUTTAL WITNESSES:

8        FREDERIKSEN-CROSS, Barbara
           Direct Examination by Mr. Smith                    1350
9          Cross-examination by Mr. Vandevelde                1411
           Redirect Examination by Mr. Smith                  1451
10

11     DEFENDANTS' SURREBUTTAL WITNESSES:

12       ASTRACHAN, Owen
           Direct Examination by Mr. McCracken                1452
13         Cross-Examination by Mr. Isaacson                  1463

14

15     PLAINTIFFS' EXHIBITS:

16       68 -                                                 1349
       1357 through 1362 -                                    1465
17

18     DEFENDANTS' EXHIBITS:

19       46 -                                                 1349
        733 -                                                 1349
20      740 -                                                 1350

21

22     PLAINTIFFS' CLOSING ARGUMENT BY MR. ISAACSON           1466

23     DEFENDANTS' CLOSING ARGUMENT BY MR. VANDEVELDE         1499

24     PLAINTIFFS' REBUTTAL CLOSING ARGUMENT BY MR. ISAACSON  1544

25

1

**'**

**'90s** [1] - 1310:21
**'em** [1] - 1507:20
**'Hey** [1] - 1517:7
**'Oh** [1] - 1434:11
**'paper** [1] - 1319:10
**'Yes** [1] - 1517:8

**/**

**/s/Margaret** [1] - 1559:8

**0**

**000** [1] - 1397:21
**00P** [1] - 1428:11
**01** [3] - 1387:17, 1393:20, 1393:21
**02** [1] - 1387:17
**03** [1] - 1387:17

**1**

**1** [10] - 1325:14, 1325:15, 1340:4, 1340:5, 1340:11, 1340:13, 1341:7, 1423:20, 1487:20, 1547:10
**1,070** [4] - 1427:1, 1427:12, 1427:15, 1505:14
**1,139** [3] - 1352:8, 1428:11, 1429:1
**1-ii** [1] - 1311:11
**1/8/2018** [1] - 1533:9
**10** [20] - 1301:14, 1321:25, 1322:23, 1330:4, 1330:13, 1330:15, 1331:5, 1331:6, 1331:11, 1357:17, 1381:17, 1486:18, 1486:20, 1499:9, 1504:9, 1509:22, 1524:21, 1534:8, 1534:10, 1551:5
**103** [2] - 1440:15, 1440:22
**1099** [3] - 1292:10, 1522:19, 1522:20
**1099-MISC** [1] - 1522:20
**1099s** [1] - 1527:17
**10:40** [1] - 1348:10
**10th** [2] - 1493:19, 1493:21
**11** [4] - 1383:13,

1459:10, 1459:13, 1504:8
**1100** [1] - 1430:3
**1139** [1] - 1352:6
**1166** [1] - 1345:4
**118** [2] - 1428:18, 1428:22
**12** [2] - 1321:13, 1464:22
**120** [1] - 1426:13
**1291** [1] - 1560:4
**13** [2] - 1524:23, 1525:6
**1331** [1] - 1560:5
**1346** [1] - 1560:5
**1349** [3] - 1560:16, 1560:19, 1560:19
**135** [1] - 1458:5
**1350** [2] - 1560:8, 1560:20
**1356** [2] - 1465:3, 1465:9
**1357** [1] - 1560:16
**136** [1] - 1458:8
**1362** [3] - 1465:3, 1465:9, 1560:16
**137** [1] - 1458:8
**139** [2] - 1395:8, 1458:19
**14** [10] - 1318:12, 1318:20, 1318:25, 1336:18, 1369:12, 1434:4, 1434:5, 1496:14, 1530:5
**140** [2] - 1395:9, 1458:5
**1400** [1] - 1412:25
**1411** [1] - 1560:9
**1451** [1] - 1560:9
**1452** [1] - 1560:12
**1459** [1] - 1330:10
**1463** [1] - 1560:13
**1465** [1] - 1560:16
**1466** [1] - 1560:22
**1499** [1] - 1560:23
**14th** [2] - 1521:7, 1521:19
**15** [9] - 1306:16, 1321:13, 1402:19, 1403:13, 1477:17, 1536:11, 1536:23, 1537:8, 1537:15
**15,000** [1] - 1504:9
**1544** [1] - 1560:24
**156** [1] - 1322:22
**15th** [1] - 1360:21
**16** [5] - 1335:11, 1363:11, 1363:18, 1395:21, 1442:21
**163** [1] - 1321:13

**164** [1] - 1321:24
**17** [4] - 1367:9, 1470:7, 1478:6, 1516:16
**175** [8] - 1388:5, 1392:13, 1393:8, 1395:22, 1399:23, 1456:4, 1459:13
**18** [10] - 1298:3, 1314:12, 1328:19, 1344:2, 1381:3, 1396:17, 1396:20, 1396:21, 1398:13, 1424:18
**181** [1] - 1335:11
**19** [3] - 1353:18, 1396:18, 1457:9
**1900** [1] - 1463:3
**196** [1] - 1428:22
**198** [3] - 1425:9, 1426:14, 1430:15
**19th** [1] - 1554:15
**1:20** [1] - 1402:23
**1:25** [2] - 1402:24, 1403:1

**2**

**2** [20] - 1314:4, 1351:10, 1357:17, 1358:14, 1358:24, 1359:2, 1423:12, 1433:4, 1469:4, 1482:16, 1484:16, 1490:15, 1490:21, 1497:25, 1498:15, 1509:22, 1526:18, 1546:21, 1548:24, 1550:11
**2.0** [5] - 1540:17, 1540:25, 1541:18, 1544:21, 1544:23
**20** [3] - 1392:15, 1456:4, 1515:21
**20049** [1] - 1372:4
**2006** [1] - 1473:16
**2011** [6] - 1321:18, 1337:9, 1337:12, 1337:15, 1450:9, 1487:3
**2013** [1] - 1442:3
**2014** [3] - 1473:17, 1540:19, 1541:1
**2016** [3] - 1357:2, 1533:8, 1533:9
**2018** [7] - 1357:4, 1360:19, 1405:12, 1450:8, 1486:14, 1492:25, 1521:4
**2018-B** [1] - 1520:7

**2019** [15] - 1356:20, 1357:13, 1361:20, 1361:24, 1370:14, 1374:12, 1449:10, 1450:8, 1488:12, 1490:12, 1493:3, 1520:2, 1521:6, 1549:3
**2019s** [1] - 1451:2
**2020** [3] - 1335:11, 1449:10, 1450:8
**2020s** [2] - 1451:2, 1451:3
**2021** [6] - 1290:6, 1291:1, 1342:7, 1403:1, 1451:3
**203** [2] - 1425:24, 1426:12, 1426:13
**204** [3] - 1428:12, 1428:16, 1428:18
**205** [4] - 1376:13, 1377:2, 1377:12, 1377:14
**21** [2] - 1372:11
**22** [1] - 1371:25
**233** [2] - 1398:19, 1399:19
**23rd** [3] - 1357:12, 1368:24, 1370:13
**24** [1] - 1353:15
**24th** [12] - 1361:8, 1361:11, 1361:24, 1369:18, 1369:24, 1370:13, 1493:9, 1493:11, 1493:17, 1494:1, 1549:9, 1549:10
**25** [2] - 1306:17, 1500:19
**25th** [9] - 1361:8, 1361:16, 1370:13, 1493:25, 1494:2, 1520:2, 1521:13, 1549:8
**27** [1] - 1365:23
**28** [4] - 1290:6, 1291:1, 1357:13, 1403:1
**28th** [4] - 1291:7, 1360:19, 1374:11, 1521:16
**29** [1] - 1399:22
**2:10-cv-0106-LRH-VCF** [1] - 1290:5
**2a** [1] - 1475:17
**2A** [2] - 1364:7, 1364:9

**3**

**3** [19] - 1290:23,

1311:12, 1312:14, 1322:22, 1354:15, 1357:17, 1364:16, 1364:19, 1371:25, 1423:11, 1444:16, 1490:21, 1509:22, 1513:21, 1516:10, 1546:21, 1550:15, 1559:8
**3,300** [3] - 1427:2, 1427:5, 1428:2
**30** [1] - 1508:19
**30(b)(6)** [1] - 1533:17
**300** [2] - 1301:13, 1430:1
**301** [1] - 1306:16
**302** [1] - 1365:2
**34** [1] - 1434:4
**35** [1] - 1434:4
**365** [1] - 1423:12
**37** [1] - 1296:4
**38** [1] - 1299:16
**39** [2] - 1384:14, 1384:24
**3:05** [1] - 1464:8
**3:10** [1] - 1464:8

**4**

**4** [24] - 1321:24, 1330:10, 1357:17, 1358:1, 1358:24, 1359:2, 1362:20, 1362:25, 1363:4, 1366:25, 1371:4, 1372:1, 1372:10, 1407:23, 1423:12, 1478:20, 1490:15, 1490:16, 1490:21, 1509:22, 1519:7, 1548:24
**4,481** [8] - 1351:22, 1424:10, 1424:18, 1425:2, 1425:18, 1427:11, 1430:11, 1505:12
**400** [1] - 1290:24
**41** [1] - 1490:19
**43** [1] - 1491:11
**45** [1] - 1301:15
**46** [2] - 1349:10, 1560:19

**5**

**5** [14] - 1328:19, 1359:25, 1375:12, 1393:16, 1414:25, 1422:9, 1422:11, 1454:4, 1496:12,

2

1496:20, 1498:16,
1498:18, 1506:14,
1547:23
**50** [2] - 1430:2,
1465:22
**50-minute** [1] -
1465:24
**500** [2] - 1390:2,
1390:8
**51** [1] - 1384:25
**51st** [1] - 1292:15
**543** [1] - 1328:19
**547** [3] - 1398:18,
1399:18, 1457:16
**548** [1] - 1457:16
**57** [2] - 1395:21,
1399:22
**589** [1] - 1392:19
**592** [2] - 1392:23,
1456:8
**5:00** [1] - 1403:18
**5th** [1] - 1356:19

## 6

**6** [16] - 1340:8, 1341:9,
1360:9, 1362:23,
1362:24, 1362:25,
1393:17, 1458:4,
1475:22, 1477:19,
1478:20, 1497:10,
1509:22, 1522:18,
1523:18, 1550:4
**60** [1] - 1298:7
**604** [2] - 1410:7,
1410:8
**63** [2] - 1385:2,
1496:23
**63rd** [1] - 1387:9
**68** [4] - 1348:22,
1348:24, 1349:2,
1560:16
**69** [2] - 1431:3,
1497:11
**6th** [1] - 1356:19

## 7

**7** [8] - 1290:8, 1312:3,
1328:21, 1353:16,
1381:3, 1396:3,
1480:14, 1527:25
**7-iii** [1] - 1311:12
**71** [1] - 1309:23
**710** [2] - 1429:13,
1430:9
**716** [1] - 1349:18
**72** [3] - 1380:11,
1383:17, 1383:20
**72nd** [1] - 1384:3

**733** [2] - 1349:17,
1560:19
**74** [1] - 1498:4
**740** [2] - 1350:3,
1560:20

## 8

**8** [13] - 1330:5,
1330:13, 1330:19,
1330:22, 1345:4,
1362:22, 1383:13,
1483:18, 1486:19,
1534:5, 1534:12,
1536:2, 1536:4
**80** [6] - 1379:19,
1379:20, 1383:24,
1387:14, 1387:15,
1387:22
**804** [1] - 1372:11
**806** [1] - 1502:11
**844** [2] - 1352:25,
1353:10
**88** [5] - 1387:13,
1387:20, 1387:22,
1394:25
**88.2** [2] - 1432:13,
1432:24
**888** [3] - 1400:11,
1459:14, 1459:17
**890** [1] - 1400:20
**893** [1] - 1461:17
**895** [2] - 1401:13,
1460:24
**89501** [1] - 1290:24
**899** [1] - 1462:4

## 9

**9** [7] - 1372:11,
1381:17, 1499:1,
1527:25, 1534:14,
1547:5
**9/29/2021** [1] - 1559:8
**90** [9] - 1353:14,
1405:5, 1405:7,
1407:22, 1407:24,
1431:21, 1432:12,
1432:17, 1432:24
**900** [2] - 1433:4,
1462:16
**902-6** [1] - 1442:15
**903** [1] - 1462:8
**909** [2] - 1459:14,
1462:8
**919** [1] - 1431:22
**929** [1] - 1353:15
**930** [2] - 1353:15,
1552:16
**934** [12] - 1353:1,

1353:11, 1431:8,
1431:15, 1431:22,
1488:19, 1488:24,
1489:1, 1505:18,
1505:23, 1547:17
**940** [5] - 1360:22,
1492:22, 1519:8,
1526:20, 1548:25
**940A** [2] - 1359:3,
1360:17
**951** [1] - 1381:3
**960us** [1] - 1478:15
**98** [5] - 1431:21,
1432:20, 1432:23,
1433:4
**999** [1] - 1397:23
**9:00** [1] - 1291:1
**9s** [1] - 1445:19

## A

**A.M** [1] - 1291:1
**A00-MAIN** [1] - 1454:6
**A000** [2] - 1455:2,
1458:1
**A000-MAIN-EXIT** [1] -
1457:20
**AA** [1] - 1397:5
**AA000** [3] - 1397:14,
1398:13, 1398:14
**AA000-MAIN** [5] -
1397:10, 1399:8,
1454:15, 1454:17,
1454:25
**AA000-MAIN-EXIT** [1]
- 1399:9
**AAA** [2] - 1397:21,
1398:20
**abbreviate** [2] -
1391:20, 1417:16
**abbreviated** [1] -
1394:13
**abbreviation** [5] -
1394:10, 1416:13,
1416:20, 1455:2,
1456:24
**abbreviations** [1] -
1409:12
**abiding** [1] - 1502:4
**ability** [7] - 1295:9,
1296:18, 1323:23,
1324:1, 1324:22,
1329:25, 1414:12
**able** [14] - 1300:6,
1305:6, 1313:15,
1355:9, 1367:20,
1373:12, 1412:3,
1437:13, 1448:8,
1463:20, 1492:8,
1499:4, 1556:8,

1557:19
**above-entitled** [1] -
1559:7
**ABS** [2] - 1536:5,
1536:6
**absence** [2] - 1502:7
**absent** [2] - 1416:17,
1543:16
**absolutely** [11] -
1296:16, 1307:9,
1311:7, 1314:11,
1324:24, 1331:11,
1372:3, 1407:7,
1485:6, 1496:18,
1497:9
**absurd** [1] - 1517:25
**abundance** [1] -
1470:11
**academic** [1] - 1479:9
**Accenture** [2] -
1297:9, 1338:1
**accept** [4] - 1483:23,
1497:7, 1548:3,
1556:16
**acceptable** [1] -
1403:20
**Acceptable** [6] -
1477:14, 1477:16,
1477:23, 1485:11,
1488:16, 1489:9
**accepted** [3] - 1305:6,
1468:4, 1484:22
**accepts** [1] - 1484:4
**access** [41] - 1295:2,
1306:7, 1311:6,
1311:16, 1311:23,
1312:1, 1312:15,
1312:17, 1312:18,
1312:24, 1313:3,
1313:5, 1313:9,
1313:13, 1313:16,
1313:18, 1313:19,
1313:22, 1313:23,
1329:23, 1329:25,
1342:17, 1345:11,
1345:18, 1477:1,
1482:17, 1483:13,
1483:15, 1484:12,
1487:12, 1491:9,
1493:16, 1534:16,
1545:23, 1546:22,
1546:24, 1549:15,
1549:17
**accessed** [1] -
1493:16
**accessible** [6] -
1293:12, 1306:10,
1528:13, 1528:15,
1529:5, 1534:7
**accessing** [6] -

1344:24, 1345:7,
1346:4, 1346:9,
1346:11, 1347:9
**accidental** [1] -
1434:22
**accommodate** [4] -
1292:24, 1293:12,
1317:2, 1317:14
**accomplish** [1] -
1465:21
**according** [3] -
1300:2, 1318:22,
1391:15
**account** [4] - 1508:22,
1536:15, 1536:16,
1537:4
**accounts** [6] -
1292:21, 1292:22,
1313:8, 1313:9,
1313:10
**accurate** [4] -
1321:16, 1353:10,
1360:5, 1381:1
**accurately** [1] -
1408:24
**accuses** [1] - 1521:24
**accusing** [2] -
1438:24, 1538:19
**acknowledge** [3] -
1523:9, 1541:5,
1541:18
**acknowledged** [5] -
1501:20, 1508:24,
1509:1, 1511:13,
1539:8
**acknowledging** [1] -
1400:24
**acquire** [1] - 1328:7
**Act** [2] - 1292:13,
1543:15
**act** [4] - 1316:12,
1373:3, 1506:22,
1518:13
**acted** [1] - 1470:15
**acting** [2] - 1473:10,
1489:15
**action** [6] - 1362:2,
1391:4, 1391:5,
1419:25, 1481:5,
1553:25
**ACTION** [3] - 1400:22,
1400:23, 1420:1
**ACTION-FETCH** [2] -
1400:22, 1420:1
**actions** [4] - 1419:5,
1437:13, 1461:22,
1461:24
**activities** [1] - 1360:14
**actual** [7] - 1346:22,
1388:24, 1396:7,

3

1494:9, 1500:6, 1504:6, 1505:3

**adapted** [1] - 1379:2

**add** [9] - 1292:20, 1292:21, 1293:5, 1315:15, 1315:21, 1317:4, 1317:5, 1367:5, 1535:6

**added** [5] - 1293:2, 1293:8, 1387:7, 1535:21

**addition** [3] - 1410:20, 1488:18, 1548:16

**additional** [7] - 1292:22, 1293:11, 1302:1, 1316:19, 1353:14, 1369:23, 1396:8

**address** [8] - 1435:15, 1444:21, 1467:12, 1500:22, 1541:1, 1541:20, 1541:21, 1553:25

**addressed** [6] - 1393:19, 1394:2, 1438:21, 1466:12, 1466:22, 1476:6

**addresses** [1] - 1401:14

**addressing** [3] - 1393:18, 1464:24, 1499:19

**adequate** [1] - 1446:11

**adhering** [1] - 1389:18

**adjourned** [2] - 1559:2, 1559:3

**adjudicated** [2] - 1487:18, 1532:10

**adjusting** [1] - 1453:23

**admissible** [2] - 1442:9, 1443:4

**admit** [4] - 1340:18, 1341:4, 1465:3, 1538:9

**admits** [4] - 1470:16, 1497:9, 1497:19, 1497:22

**admitted** [13] - 1320:3, 1348:25, 1349:8, 1349:14, 1349:16, 1350:2, 1488:15, 1504:11, 1505:16, 1508:21, 1524:20, 1536:7, 1536:14

**adopt** [1] - 1484:9

**adopted** [4] - 1471:1, 1485:23, 1544:23, 1545:6

**adopting** [2] - 1484:10, 1556:17

**advance** [1] - 1360:14

**adversary** [1] - 1543:8

**adviser** [1] - 1298:6

**advocates** [1] - 1494:5

**affect** [2] - 1366:8, 1497:17

**affected** [10] - 1364:22, 1364:25, 1513:25, 1514:2, 1514:5, 1515:5, 1515:8, 1515:15, 1515:23, 1558:8

**affidavits** [1] - 1473:2

**affiliates** [1] - 1346:11

**affirmatively** [2] - 1514:15, 1523:15

**affirmed** [2] - 1529:14, 1553:18

**Affordable** [1] - 1292:13

**afoul** [1] - 1450:22

**afternoon** [6] - 1403:22, 1403:23, 1452:14, 1452:16, 1463:8, 1463:12

**ago** [11] - 1338:20, 1354:19, 1392:21, 1392:23, 1426:6, 1479:3, 1503:23, 1541:2, 1543:21, 1545:6, 1557:13

**agree** [21] - 1307:1, 1308:23, 1308:24, 1330:7, 1354:4, 1359:16, 1363:21, 1378:25, 1381:7, 1385:22, 1389:15, 1401:24, 1406:13, 1427:14, 1432:4, 1453:2, 1462:25, 1463:15, 1488:24, 1531:18, 1557:19

**agreed** [15] - 1348:23, 1356:14, 1356:17, 1479:25, 1481:1, 1483:6, 1483:7, 1488:21, 1490:13, 1492:23, 1532:6, 1535:19, 1535:21, 1548:17

**agreeing** [1] - 1557:16

**agreement** [12] - 1308:12, 1338:10, 1341:15, 1341:22, 1341:24, 1342:12, 1343:9, 1343:13, 1343:14, 1343:16, 1546:16, 1557:3

**agreements** [18] - 1320:21, 1323:4, 1338:13, 1338:18, 1338:22, 1338:25, 1339:11, 1339:12, 1339:16, 1339:19, 1339:23, 1339:25, 1343:25, 1344:4, 1344:10, 1344:15, 1530:6, 1531:16

**agrees** [3] - 1435:21, 1459:21, 1482:16

**ahead** [12] - 1348:16, 1349:21, 1402:23, 1403:12, 1404:12, 1411:16, 1452:13, 1463:11, 1464:14, 1466:5, 1499:23, 1544:6

**aid** [1] - 1295:19

**air** [4] - 1402:10, 1421:23, 1421:24, 1539:18

**al** [2] - 1290:4, 1290:7

**align** [1] - 1385:7

**aligned** [7] - 1383:1, 1383:4, 1384:11, 1384:13, 1384:24, 1384:25, 1385:2

**aligning** [1] - 1387:1

**alignment** [10] - 1379:23, 1380:2, 1380:17, 1382:6, 1383:4, 1385:1, 1385:11, 1387:9, 1387:13, 1415:24

**alleged** [3] - 1435:6, 1437:17, 1439:14

**allegedly** [2] - 1424:9, 1430:10

**Allen** [1] - 1290:19

**allocate** [1] - 1317:12

**allow** [13] - 1299:1, 1305:21, 1324:5, 1341:3, 1365:13, 1368:16, 1368:18, 1387:7, 1408:5, 1412:21, 1419:19, 1441:17, 1449:2

**allowable** [4] - 1322:18, 1539:5, 1539:9, 1539:10

**allowed** [6] - 1311:24, 1328:24, 1435:22, 1440:4, 1444:11, 1534:16

**allowing** [1] - 1465:12

**allows** [3] - 1295:17, 1295:18, 1414:15

**alluded** [1] - 1394:9

**alluding** [1] - 1330:15

**almost** [4] - 1406:12, 1430:2, 1489:8, 1551:7

**alone** [2] - 1531:24

**alpha** [1] - 1397:18

**alpha-numeric** [1] - 1397:18

**alphabetic** [5] - 1384:22, 1397:17, 1398:8, 1399:18, 1419:16

**alphabets** [1] - 1398:7

**alphanumeric** [1] - 1384:22

**alters** [1] - 1497:20

**ambiguous** [1] - 1472:2

**Ames** [1] - 1316:23

**amount** [4] - 1375:13, 1379:18, 1393:7, 1399:24

**analogy** [1] - 1459:1

**Analysis** [3] - 1493:4, 1493:19, 1493:21

**analysis** [33] - 1317:22, 1334:8, 1334:14, 1334:19, 1334:22, 1335:22, 1336:3, 1336:11, 1336:14, 1351:14, 1376:19, 1378:22, 1379:9, 1379:12, 1380:5, 1380:7, 1380:13, 1382:22, 1406:21, 1445:2, 1453:5, 1492:3, 1492:16, 1492:17, 1505:17, 1508:13, 1508:14, 1508:18, 1523:2, 1524:6, 1535:22, 1536:1, 1550:4

**analyst** [2] - 1303:2, 1521:16

**analysts** [3] - 1302:21, 1360:25, 1361:5

**analytic** [24] - 1376:8, 1376:21, 1377:20, 1378:25, 1384:16, 1399:25, 1400:3, 1460:15, 1474:20, 1475:7, 1475:12, 1496:16, 1496:18, 1506:16, 1506:18, 1507:2, 1507:12, 1547:24, 1548:1, 1548:6, 1548:14, 1548:16, 1548:20, 1548:22

**analyze** [1] - 1474:24

**analyzed** [4] - 1355:20, 1506:16, 1506:20, 1508:6

**Analyzer** [1] - 1540:13

**ancestor** [1] - 1385:16

**Andersen** [1] - 1316:16

**annotation** [1] - 1382:5

**announce** [1] - 1553:12

**announced** [1] - 1360:16

**announcement** [1] - 1361:6

**announcements** [1] - 1493:5

**ANSWER** [13] - 1302:5, 1302:13, 1302:15, 1306:22, 1308:14, 1308:18, 1322:8, 1323:2, 1323:6, 1329:3, 1329:10, 1335:16, 1542:22

**answer** [22] - 1299:1, 1301:18, 1301:23, 1305:21, 1333:12, 1353:20, 1366:12, 1367:6, 1413:15, 1413:17, 1420:6, 1421:6, 1427:4, 1449:5, 1450:11, 1515:18, 1526:2, 1530:23, 1532:5, 1536:13, 1537:17

**answered** [3] - 1420:11, 1420:18, 1498:23

**answering** [1] - 1421:5

**anticipate** [2] - 1347:22, 1404:3

**anticipated** [1] - 1348:5

**anytime** [1] - 1375:8

**API** [11] - 1390:2, 1390:4, 1390:18, 1393:2, 1395:13, 1401:7, 1401:9, 1401:11, 1401:14, 1460:6

**APIs** [2] - 1441:17, 1507:14

**apologize** [5] - 1464:20, 1464:23, 1464:25, 1467:10, 1554:20

**apology** [1] - 1552:1

4

apparent [1] - 1370:23
appeal [1] - 1553:18
appear [7] - 1363:23,
1377:19, 1384:6,
1400:7, 1410:25,
1422:10, 1493:10
APPEARANCES [1] -
1290:13
append [2] - 1391:20,
1398:7
appendix [1] -
1477:23
Application [1] -
1341:11
application [17] -
1297:7, 1302:23,
1303:5, 1307:5,
1315:14, 1315:24,
1325:10, 1325:22,
1326:1, 1331:4,
1341:14, 1414:1,
1441:11, 1441:14,
1497:17, 1551:14
applications [5] -
1292:16, 1325:2,
1339:20, 1339:21,
1481:3
applied [11] - 1304:22,
1366:4, 1375:21,
1379:4, 1478:10,
1492:3, 1508:21,
1524:5, 1549:23,
1550:6, 1550:19
applies [6] - 1345:14,
1345:23, 1474:13,
1474:17, 1487:4,
1492:17
Apply [2] - 1371:8,
1526:23
apply [6] - 1345:22,
1360:17, 1368:7,
1378:8, 1483:5,
1487:3
applying [3] - 1336:1,
1399:24, 1492:18
appreciate [7] -
1349:1, 1443:6,
1465:13, 1500:3,
1554:6, 1557:7,
1558:18
appreciates [1] -
1500:1
appreciation [1] -
1554:5
approach [2] - 1328:7,
1331:16
approaches [1] -
1389:21
approaching [1] -
1306:4

appropriate [3] -
1368:4, 1471:8,
1484:14
approval [1] - 1484:8
approved [1] -
1554:11
April [1] - 1557:15
architectural [2] -
1306:8, 1310:18
archival [2] - 1481:16,
1481:20
area [5] - 1315:3,
1401:23, 1457:9,
1496:22, 1514:23
areas [1] - 1387:16
arguably [1] - 1382:11
argue [1] - 1474:19
argued [5] - 1442:11,
1474:4, 1482:1,
1484:1, 1487:5
arguing [4] - 1440:23,
1481:23, 1491:17,
1499:10
ARGUMENT [3] -
1560:22, 1560:23,
1560:24
argument [8] -
1361:22, 1442:24,
1484:3, 1534:4,
1544:6, 1548:10,
1554:23, 1558:25
arguments [5] -
1471:17, 1475:3,
1485:5, 1486:16,
1546:7
arise [1] - 1468:16
arose [1] - 1446:17
arounds [1] - 1319:4
arranged [1] - 1388:24
arrangements [2] -
1343:18, 1343:25
arriving [1] - 1368:8
arrow [1] - 1509:16
arrows [1] - 1519:9
artfully [1] - 1307:3
Arthur [1] - 1316:16
article [5] - 1441:2,
1441:7, 1441:9,
1441:22, 1443:2
Article [2] - 1482:16,
1546:21
articulated [1] -
1539:22
articulates [1] -
1375:24
AS-1400 [2] - 1411:20,
1412:13
AS-400 [5] - 1412:25,
1413:8, 1413:9,
1413:12, 1414:22

AS400 [2] - 1511:14,
1549:20
aspect [2] - 1388:23,
1389:3
aspects [2] - 1380:15,
1544:18
assent [1] - 1502:6
assert [1] - 1416:8
asserted [1] - 1442:17
assertions [1] -
1473:1
assess [2] - 1354:21,
1380:20
assessed [1] -
1316:24
assigned [2] -
1394:21, 1421:14
assigning [1] -
1419:24
assignments [1] -
1395:1
assistant [5] -
1427:25, 1489:2,
1531:11, 1547:20,
1552:18
assisted [1] - 1429:17
assists [2] - 1293:18,
1294:15
Associate [1] - 1320:5
associated [19] -
1293:6, 1293:9,
1327:22, 1331:1,
1331:3, 1356:5,
1359:18, 1361:25,
1364:20, 1365:14,
1395:2, 1404:18,
1404:19, 1405:19,
1408:17, 1410:9,
1432:7, 1432:9,
1476:10
association [2] -
1384:9, 1387:21
assume [10] -
1341:23, 1361:22,
1402:21, 1417:17,
1417:18, 1436:11,
1447:2, 1462:21,
1465:23, 1554:22
assumed [1] - 1462:19
assuming [11] -
1330:17, 1346:2,
1353:10, 1356:11,
1385:4, 1404:2,
1415:17, 1415:23,
1447:6, 1448:14,
1450:24
assumption [2] -
1462:25, 1463:1
assurance [2] -
1375:2, 1500:11

asterisk [10] -
1380:22, 1381:6,
1381:12, 1381:13,
1381:21, 1396:3,
1455:7, 1455:11,
1455:25
asterisks [7] -
1381:24, 1396:5,
1415:17, 1415:19,
1455:14, 1507:25,
1509:9
Astrachan [60] -
1332:4, 1352:25,
1353:7, 1375:18,
1376:8, 1376:15,
1376:17, 1376:24,
1379:8, 1381:4,
1383:9, 1385:2,
1385:22, 1386:5,
1389:24, 1389:25,
1390:10, 1390:17,
1393:6, 1393:17,
1399:23, 1400:4,
1401:24, 1404:17,
1406:12, 1407:8,
1433:21, 1451:19,
1452:4, 1452:15,
1454:8, 1479:2,
1485:12, 1488:20,
1489:1, 1489:6,
1490:8, 1491:17,
1492:4, 1494:2,
1494:7, 1496:15,
1497:9, 1497:13,
1500:16, 1506:16,
1506:20, 1508:5,
1512:13, 1518:5,
1519:12, 1522:24,
1524:19, 1534:19,
1535:11, 1535:16,
1547:18, 1548:3,
1549:7, 1550:9
ASTRACHAN [2] -
1452:10, 1560:12
Astrachan's [16] -
1350:19, 1353:17,
1356:1, 1359:22,
1360:3, 1361:9,
1375:14, 1377:17,
1378:23, 1380:4,
1380:20, 1385:18,
1386:2, 1389:11,
1390:1, 1437:19
atop [1] - 1377:7
attached [4] -
1426:15, 1428:23,
1436:16, 1437:3
attachment [4] -
1355:3, 1436:22,
1437:1, 1437:2

attachments [2] -
1431:8, 1431:22
attempt [2] - 1310:6,
1502:13
attempted [4] -
1444:24, 1491:2,
1507:17, 1534:4
attention [15] -
1303:16, 1365:4,
1365:22, 1392:13,
1395:21, 1396:17,
1407:22, 1410:7,
1422:18, 1466:8,
1466:12, 1470:5,
1499:18, 1500:1,
1553:6
attitude [2] - 1471:21,
1544:14
attorneys [1] -
1464:22
Attorneys [2] -
1290:17, 1290:21
attract [1] - 1467:17
audit [4] - 1320:12,
1321:18, 1531:12
augment [1] - 1388:15
augmentation [1] -
1389:8
augments [2] -
1388:10, 1388:19
August [4] - 1356:19,
1357:12, 1488:12,
1490:12
Australia [1] - 1536:5
Australian [1] - 1536:4
authenticating [1] -
1442:14
authorization [1] -
1543:14
authorize [1] -
1543:15
authorized [1] -
1361:3
automated [1] -
1540:12
automatic [1] - 1505:4
automation [3] -
1373:25, 1374:3,
1374:19
available [5] -
1306:13, 1306:20,
1352:16, 1410:3,
1413:6
aversion [1] - 1456:23
avoid [1] - 1481:18
aware [11] - 1308:11,
1308:16, 1328:10,
1379:5, 1380:23,
1405:9, 1408:20,
1413:10, 1433:23,

5

1434:1, 1443:18, 1443:21, 1443:25, 1444:10, 1530:11, 1555:14
**awhile** [1] - 1465:1

# B

**B999** [4] - 1447:1, 1447:2, 1448:1, 1448:7
**B9999** [1] - 1445:16
**B99999** [2] - 1516:21, 1516:25
**B999999.99** [2] - 1366:3, 1368:8
**backdoor** [1] - 1542:5
**backed** [5] - 1508:25, 1509:10, 1509:12, 1520:5, 1555:18
**background** [3] - 1472:17, 1480:17, 1556:14
**backsliding** [1] - 1522:7
**backtrack** [1] - 1515:13
**backwards** [2] - 1526:6, 1551:13
**bad** [8] - 1325:18, 1396:21, 1473:25, 1477:13, 1478:2, 1478:25, 1544:14, 1551:21
**balance** [1] - 1506:1
**ban** [3] - 1534:9, 1542:3, 1542:16
**bandwidth** [1] - 1316:14
**banning** [4] - 1323:21, 1330:19, 1330:22, 1331:4
**bar** [4] - 1541:25, 1542:16, 1542:23, 1543:3
**BARBARA** [1] - 1350:15
**Barbara** [6] - 1480:4, 1480:5, 1488:18, 1515:10, 1547:21, 1560:8
**bare** [1] - 1421:12
**base** [1] - 1294:13
**Based** [1] - 1320:16
**based** [37] - 1294:8, 1294:14, 1298:14, 1299:1, 1300:17, 1304:16, 1305:17, 1326:3, 1334:4, 1334:8, 1334:10,

1351:20, 1353:12, 1356:10, 1361:4, 1362:19, 1375:5, 1410:25, 1431:5, 1432:7, 1447:3, 1466:25, 1467:3, 1467:5, 1467:13, 1469:10, 1474:1, 1479:21, 1482:21, 1491:16, 1494:8, 1501:24, 1507:2, 1509:13, 1517:21, 1518:23, 1552:21
**bases** [1] - 1406:6
**basis** [22] - 1416:4, 1418:2, 1418:7, 1418:16, 1418:19, 1419:8, 1420:8, 1420:13, 1420:15, 1420:17, 1425:2, 1426:1, 1430:22, 1440:23, 1494:16, 1496:2, 1505:12, 1508:1, 1509:18, 1538:2, 1548:17, 1556:16
**bat** [3] - 1348:15, 1350:9, 1350:10
**batch** [1] - 1494:21
**Bates** [2] - 1303:22, 1441:24
**battle** [1] - 1474:18
**bear** [1] - 1512:22
**BearingPoint** [1] - 1338:1
**became** [2] - 1311:1, 1475:24
**become** [1] - 1292:14
**BEFORE** [1] - 1290:2
**began** [3] - 1463:15, 1501:14, 1545:15
**begin** [4] - 1454:24, 1455:17, 1465:18, 1490:16
**beginning** [7] - 1352:3, 1368:12, 1381:5, 1399:16, 1432:16, 1455:22, 1472:21
**behalf** [11] - 1291:17, 1347:23, 1348:5, 1350:15, 1362:7, 1362:12, 1362:13, 1452:10, 1556:23, 1557:22, 1558:19
**behind** [1] - 1389:19
**believes** [3] - 1467:2, 1468:23, 1515:23
**below** [4] - 1343:6, 1393:22, 1397:4,

1505:21
**benefit** [10] - 1304:17, 1362:12, 1363:24, 1475:23, 1477:2, 1534:11, 1538:15, 1551:16, 1551:18
**Benge** [32] - 1372:2, 1372:7, 1374:1, 1374:9, 1374:20, 1404:17, 1470:7, 1470:22, 1475:25, 1477:15, 1478:6, 1488:16, 1489:11, 1490:5, 1493:24, 1494:7, 1494:12, 1495:3, 1496:5, 1500:9, 1514:19, 1516:13, 1516:20, 1519:12, 1520:10, 1522:24, 1526:25, 1527:1, 1545:11, 1549:4, 1549:6, 1549:14
**Benge's** [4] - 1359:11, 1373:2, 1408:16, 1410:22
**Benjamin** [1] - 1290:14
**best** [2] - 1413:16, 1470:23
**better** [3] - 1389:22, 1399:3, 1426:2
**between** [25] - 1301:16, 1302:3, 1304:6, 1337:18, 1366:17, 1367:3, 1371:6, 1371:19, 1382:18, 1382:19, 1385:13, 1386:7, 1388:1, 1399:16, 1402:23, 1406:21, 1415:2, 1415:8, 1453:6, 1453:11, 1464:8, 1487:10, 1495:17, 1522:11, 1533:22
**beyond** [14] - 1374:4, 1420:22, 1421:1, 1421:9, 1421:20, 1430:20, 1430:25, 1437:15, 1438:20, 1439:22, 1440:17, 1448:19, 1501:23, 1509:17
**big** [3] - 1315:7, 1339:5, 1509:8
**biggest** [1] - 1543:8
**bill** [1] - 1472:6
**Bill** [1] - 1555:10
**bills** [1] - 1325:16

**bind** [2] - 1391:5
**bind-data** [1] - 1391:5
**bind-setup** [1] - 1391:5
**binder** [2] - 1340:5, 1340:11
**binders** [1] - 1331:17
**Bingham** [1] - 1320:11
**bio** [5] - 1316:24, 1317:2, 1317:8, 1317:11, 1317:15
**bio-diesel** [5] - 1316:24, 1317:2, 1317:8, 1317:11, 1317:15
**bit** [21] - 1294:23, 1295:1, 1315:4, 1335:4, 1336:8, 1344:1, 1369:7, 1369:19, 1374:4, 1400:5, 1409:3, 1409:4, 1409:13, 1423:3, 1450:15, 1451:9, 1480:12, 1515:25, 1520:3, 1539:1, 1541:22
**black** [1] - 1533:10
**blacked** [1] - 1545:23
**blank** [2] - 1365:12, 1512:20
**blinking** [1] - 1459:1
**blow** [5] - 1369:4, 1409:2, 1443:5, 1454:5, 1458:5
**blue** [2] - 1510:11, 1535:5
**boilerplate** [3] - 1489:20, 1490:2, 1545:2
**bolt** [2] - 1306:9, 1317:16
**borderline** [1] - 1416:17
**bottom** [15] - 1365:5, 1368:22, 1381:8, 1381:20, 1381:23, 1390:21, 1390:22, 1393:16, 1396:17, 1396:20, 1426:16, 1426:25, 1429:9, 1502:7, 1534:8
**box** [25] - 1317:15, 1360:17, 1364:20, 1367:9, 1369:12, 1370:6, 1381:13, 1381:20, 1381:22, 1381:23, 1382:2, 1382:4, 1382:6, 1396:5, 1396:6, 1396:7, 1455:6,

1455:11, 1455:22, 1503:17, 1509:9, 1516:15, 1534:17, 1535:5
**boxes** [12] - 1380:21, 1381:6, 1381:11, 1382:4, 1382:9, 1393:20, 1397:3, 1455:7, 1455:14, 1513:24, 1526:20, 1535:6
**bracket** [1] - 1399:15
**bracketed** [1] - 1397:7
**brazen** [1] - 1466:19
**brazenly** [1] - 1481:23
**breach** [1] - 1550:11
**break** [18] - 1324:22, 1324:25, 1325:1, 1325:19, 1326:2, 1326:17, 1329:19, 1333:22, 1335:8, 1335:14, 1348:14, 1402:20, 1402:23, 1403:6, 1463:8, 1464:7, 1464:12, 1495:17
**breaks** [1] - 1506:25
**Brenda** [1] - 1500:11
**brief** [3] - 1441:1, 1443:5, 1501:21
**briefly** [10] - 1346:15, 1354:16, 1358:5, 1381:17, 1393:12, 1501:17, 1509:24, 1536:2, 1540:8, 1541:20
**briefs** [3] - 1482:3, 1482:5, 1544:8
**bring** [11] - 1295:4, 1301:10, 1303:21, 1308:7, 1309:3, 1320:10, 1321:12, 1328:18, 1330:9, 1345:3, 1373:22
**brings** [2] - 1492:19, 1498:4
**broad** [1] - 1466:19
**broader** [2] - 1423:3, 1423:9
**broadest** [1] - 1542:24
**broadly** [2] - 1362:11, 1379:4
**brought** [5] - 1500:7, 1500:9, 1500:11, 1500:14, 1500:15
**Buffy** [2] - 1318:5, 1349:24
**bug** [14] - 1375:8, 1495:2, 1495:21, 1495:22, 1495:23,

6

1496:1, 1513:25,
1514:3, 1514:12,
1514:18, 1514:23,
1515:8, 1549:1,
1550:21
**build** [3] - 1317:15,
1467:3, 1484:24
**building** [1] - 1329:17
**builds** [1] - 1553:22
**built** [4] - 1466:20,
1473:17, 1474:1,
1552:11
**bullet** [2] - 1509:7,
1539:23
**bundle** [1] - 1404:18
**burden** [27] - 1469:5,
1469:15, 1501:17,
1501:19, 1502:2,
1502:9, 1502:13,
1502:17, 1502:22,
1502:25, 1503:3,
1503:4, 1503:7,
1503:8, 1514:14,
1515:3, 1515:4,
1519:18, 1519:19,
1520:21, 1520:23,
1523:14, 1527:19,
1535:23, 1544:10
**burden-shifting** [1] -
1503:3
**Bureau** [1] - 1536:4
**business** [52] -
1292:8, 1292:19,
1292:22, 1293:5,
1293:11, 1295:5,
1295:20, 1295:21,
1315:16, 1316:24,
1326:25, 1328:5,
1328:6, 1338:13,
1339:21, 1339:25,
1360:25, 1361:4,
1442:15, 1466:16,
1466:20, 1466:24,
1467:4, 1467:11,
1467:14, 1468:9,
1468:17, 1469:1,
1469:14, 1470:20,
1471:14, 1473:16,
1473:22, 1474:1,
1477:11, 1484:24,
1494:16, 1499:9,
1521:16, 1544:15,
1544:18, 1549:4,
1551:25, 1552:13,
1552:21, 1552:22,
1553:3, 1553:8,
1553:21, 1553:22
**Business** [4] - 1493:4,
1493:19, 1493:21,
1496:10

**businesses** [2] -
1359:3, 1360:17
**Butler** [4] - 1353:8,
1356:2, 1451:25,
1489:2
**buy** [1] - 1328:8
**BY** [78] - 1291:20,
1292:3, 1293:24,
1296:6, 1299:3,
1299:18, 1301:12,
1305:10, 1305:22,
1306:18, 1308:9,
1309:24, 1311:13,
1318:13, 1318:21,
1320:6, 1321:14,
1324:8, 1328:20,
1330:11, 1331:22,
1334:18, 1335:12,
1336:19, 1341:6,
1342:4, 1343:22,
1345:5, 1345:21,
1346:17, 1350:18,
1351:13, 1355:18,
1358:2, 1360:1,
1360:10, 1363:1,
1364:10, 1365:3,
1370:1, 1386:4,
1388:6, 1394:4,
1404:15, 1405:6,
1411:18, 1412:9,
1413:7, 1420:14,
1421:8, 1423:14,
1423:21, 1425:11,
1426:17, 1426:8,
1428:17, 1428:24,
1429:10, 1431:4,
1433:9, 1434:6,
1435:13, 1436:2,
1439:18, 1443:15,
1444:19, 1449:20,
1451:18, 1452:18,
1454:7, 1456:10,
1457:11, 1458:7,
1459:15, 1463:14,
1560:22, 1560:23,
1560:24

**C**

**calendar** [1] - 1355:15
**CALL** [1] - 1391:12
**campaign** [1] -
1315:12
**campaigns** [2] -
1315:9, 1315:10
**candidly** [1] - 1439:16
**cannot** [13] - 1327:8,
1331:2, 1337:18,
1483:5, 1497:24,
1511:10, 1511:15,

1529:19, 1531:22,
1532:7, 1533:14,
1535:20, 1538:16
**capacity** [2] - 1297:24,
1300:6
**Capgemini** [1] -
1297:9
**capital** [1] - 1391:12
**cards** [1] - 1383:23
**Care** [1] - 1292:13
**career** [2] - 1302:8,
1313:23
**carriers** [1] - 1317:13
**carries** [1] - 1303:9
**carry** [3] - 1345:12,
1482:11, 1482:18
**case** [92] - 1293:25,
1302:14, 1304:4,
1307:7, 1307:24,
1309:9, 1310:11,
1310:16, 1317:25,
1318:8, 1321:1,
1322:11, 1334:11,
1348:1, 1348:19,
1350:5, 1356:7,
1356:18, 1356:22,
1357:1, 1357:17,
1366:22, 1368:5,
1370:23, 1376:5,
1376:9, 1376:19,
1377:13, 1379:22,
1392:10, 1394:14,
1396:8, 1397:3,
1398:7, 1399:8,
1400:23, 1404:3,
1405:16, 1406:3,
1406:4, 1406:5,
1416:4, 1416:18,
1417:2, 1422:20,
1431:25, 1439:6,
1439:7, 1439:8,
1439:17, 1439:22,
1440:6, 1440:16,
1440:17, 1440:18,
1446:20, 1463:19,
1466:9, 1466:15,
1466:17, 1467:7,
1472:16, 1472:21,
1473:23, 1476:1,
1476:21, 1479:12,
1481:9, 1492:3,
1492:14, 1494:5,
1496:2, 1499:16,
1500:16, 1501:19,
1502:11, 1504:13,
1505:3, 1507:6,
1507:7, 1508:18,
1511:24, 1524:6,
1525:10, 1528:20,
1537:5, 1543:2,

1555:24, 1556:7,
1556:15
**case-by-case** [2] -
1416:4, 1496:2
**cases** [25] - 1379:6,
1416:8, 1416:9,
1419:3, 1436:9,
1436:17, 1439:1,
1439:4, 1439:9,
1439:12, 1466:19,
1489:18, 1491:17,
1504:7, 1513:3,
1545:12, 1545:13,
1554:6, 1555:17,
1555:21, 1555:23,
1556:5, 1558:12,
1558:14
**Casey** [1] - 1290:21
**casts** [1] - 1556:21
**catastrophic** [1] -
1325:4
**catch** [2] - 1396:14,
1396:23
**Catch-22** [2] -
1496:23, 1548:2
**caused** [1] - 1555:19
**caution** [1] - 1470:11
**CCR** [2] - 1290:23,
1559:8
**Cement** [5] - 1309:6,
1482:14, 1487:8,
1529:8, 1546:16
**Center** [1] - 1355:13
**CEO** [6] - 1318:24,
1469:23, 1471:24,
1484:23, 1486:2,
1493:10
**certain** [17] - 1304:16,
1313:3, 1313:4,
1326:18, 1344:14,
1352:7, 1354:13,
1383:14, 1389:18,
1419:24, 1436:9,
1441:4, 1445:17,
1448:13, 1460:9
**certainly** [7] -
1374:14, 1418:10,
1423:2, 1440:10,
1496:8, 1558:6,
1558:16
**certainty** [1] - 1370:17
**certify** [1] - 1559:6
**cetera** [1] - 1295:6
**chain** [3] - 1368:21,
1369:14, 1446:20
**change** [29] - 1293:4,
1293:13, 1327:16,
1354:20, 1356:12,
1360:16, 1362:1,
1366:13, 1367:9,

1367:10, 1367:11,
1367:12, 1367:25,
1368:13, 1369:16,
1369:20, 1370:2,
1370:4, 1380:7,
1404:17, 1449:11,
1450:7, 1451:2,
1451:3, 1469:22,
1517:11, 1521:10,
1552:5
**changed** [16] -
1361:12, 1361:15,
1380:8, 1404:21,
1470:16, 1472:5,
1473:19, 1516:15,
1517:9, 1517:15,
1518:19, 1539:5,
1543:20, 1552:6,
1553:20
**changes** [29] - 1292:9,
1292:10, 1292:11,
1292:15, 1293:1,
1295:4, 1314:20,
1315:23, 1319:8,
1319:9, 1319:18,
1319:19, 1322:5,
1322:6, 1322:17,
1337:5, 1337:8,
1361:16, 1468:17,
1469:20, 1471:14,
1514:22, 1530:22,
1533:18
**changing** [2] -
1449:10, 1522:8
**character** [6] -
1379:18, 1379:19,
1379:20, 1383:12,
1419:16, 1419:17
**characteristics** [3] -
1389:6, 1389:7,
1417:9
**characterization** [1] -
1354:10
**characterize** [1] -
1518:12
**characters** [8] -
1382:8, 1383:11,
1383:24, 1397:18,
1398:8, 1398:9,
1416:25
**charge** [2] - 1470:12,
1493:5
**charges** [1] - 1555:21
**chart** [4] - 1292:21,
1487:23, 1490:19,
1498:6
**check** [11] - 1326:10,
1374:22, 1401:25,
1415:6, 1424:21,
1426:3, 1426:5,

7

1429:16, 1518:3, 1538:22, 1538:23
**checked** [1] - 1413:13
**checking** [2] - 1531:19
**Children's** [1] - 1354:25
**choice** [17] - 1395:3, 1397:13, 1397:14, 1398:6, 1398:10, 1400:25, 1402:3, 1420:24, 1421:1, 1421:2, 1421:9, 1421:12, 1421:14, 1421:18, 1421:19, 1421:20
**choose** [4] - 1385:9, 1416:6, 1419:10, 1513:10
**chooses** [2] - 1419:2, 1444:12
**choosing** [2] - 1416:9, 1416:20
**chose** [8] - 1379:6, 1394:16, 1395:5, 1397:10, 1419:18, 1420:2, 1437:21, 1444:13
**chosen** [5] - 1394:8, 1394:15, 1394:16, 1397:3, 1399:19
**chronologically** [1] - 1490:17
**CIO** [1] - 1325:13
**CIOs** [1] - 1298:7
**circuit** [1] - 1472:9
**Circuit** [15] - 1472:10, 1482:4, 1497:14, 1506:10, 1507:14, 1510:1, 1528:23, 1529:1, 1529:14, 1533:13, 1533:25, 1537:24, 1538:4, 1545:21, 1545:22
**circulated** [1] - 1490:1
**circumstance** [1] - 1558:14
**circumstances** [3] - 1450:19, 1490:1, 1558:11
**citation** [2] - 1427:6, 1427:7
**cite** [5] - 1379:5, 1407:4, 1425:23, 1426:3, 1428:12
**cited** [2] - 1425:4, 1514:11
**cites** [3] - 1426:13, 1428:18
**citing** [1] - 1377:19

**City** [83] - 1359:12, 1359:14, 1359:16, 1359:18, 1361:13, 1361:19, 1361:22, 1361:25, 1362:13, 1364:21, 1365:15, 1366:2, 1366:5, 1366:22, 1368:3, 1370:12, 1370:19, 1370:23, 1411:3, 1411:6, 1444:22, 1445:14, 1445:15, 1446:8, 1446:25, 1447:4, 1447:7, 1447:15, 1448:1, 1448:17, 1449:8, 1449:23, 1468:1, 1476:7, 1476:10, 1476:11, 1476:14, 1476:17, 1476:18, 1490:20, 1491:1, 1491:2, 1491:11, 1491:13, 1492:21, 1493:8, 1493:14, 1493:16, 1494:24, 1495:14, 1495:17, 1495:21, 1495:25, 1496:3, 1513:25, 1514:1, 1514:2, 1514:6, 1514:9, 1514:11, 1514:15, 1514:18, 1515:1, 1515:4, 1515:14, 1517:4, 1517:9, 1519:22, 1519:23, 1519:24, 1519:25, 1520:4, 1521:20, 1527:13, 1527:14, 1549:15, 1549:17, 1550:18, 1550:21, 1550:22, 1551:2
**civil** [2] - 1555:23, 1556:5
**claim** [1] - 1432:17
**claimed** [6] - 1376:16, 1376:18, 1430:4, 1508:19, 1538:18, 1540:10
**claiming** [1] - 1538:21
**claims** [3] - 1462:21, 1473:5, 1519:6
**clarify** [2] - 1311:15, 1546:6
**clarity** [1] - 1387:11
**classes** [2] - 1479:6, 1479:11
**classic** [1] - 1446:7
**clean** [1] - 1347:25
**cleaner** [1] - 1383:7
**clear** [26] - 1358:11,

1358:21, 1366:7, 1367:14, 1371:19, 1385:14, 1399:14, 1421:11, 1450:2, 1468:24, 1469:7, 1469:19, 1475:24, 1478:24, 1484:16, 1489:20, 1502:1, 1502:9, 1510:9, 1519:4, 1523:20, 1523:23, 1532:9, 1538:18, 1544:13, 1549:8
**clearly** [7] - 1305:16, 1319:22, 1372:18, 1379:23, 1443:12, 1446:20, 1537:2
**CLERK** [3] - 1393:24, 1554:15, 1554:17
**Clerk** [3] - 1554:13, 1554:20, 1555:1
**clerk** [1] - 1313:9
**click** [1] - 1295:18
**client** [69] - 1299:25, 1313:2, 1326:21, 1327:17, 1327:22, 1329:17, 1355:8, 1358:8, 1358:17, 1360:22, 1362:16, 1362:17, 1364:2, 1364:3, 1366:22, 1367:4, 1367:16, 1367:21, 1368:4, 1368:24, 1369:10, 1370:21, 1370:25, 1371:20, 1448:25, 1450:4, 1450:21, 1468:4, 1468:8, 1475:14, 1476:3, 1477:2, 1487:6, 1487:10, 1490:23, 1490:24, 1490:25, 1491:4, 1491:7, 1494:22, 1498:2, 1499:11, 1499:14, 1500:24, 1504:12, 1510:14, 1510:15, 1510:17, 1510:18, 1512:6, 1515:16, 1516:5, 1516:14, 1516:15, 1516:21, 1520:16, 1524:17, 1525:22, 1526:8, 1536:5, 1538:11, 1540:21, 1549:10, 1551:16, 1551:18, 1552:25
**client's** [33] - 1329:17, 1353:22, 1358:10, 1358:12, 1358:17,

1362:7, 1371:21, 1373:10, 1422:5, 1422:24, 1423:5, 1424:4, 1446:17, 1448:4, 1449:25, 1450:3, 1494:18, 1500:24, 1503:18, 1504:2, 1510:21, 1512:1, 1515:22, 1524:12, 1525:25, 1526:7, 1526:9, 1526:10, 1526:11, 1532:3, 1534:24, 1535:9, 1542:20
**client-sent** [1] - 1538:11
**clients** [81] - 1294:18, 1298:19, 1315:6, 1315:17, 1315:19, 1320:21, 1322:7, 1323:5, 1324:3, 1324:12, 1324:13, 1328:16, 1335:15, 1337:18, 1353:2, 1353:11, 1353:13, 1353:19, 1359:8, 1359:12, 1362:8, 1362:12, 1365:11, 1365:17, 1365:19, 1434:9, 1434:10, 1434:18, 1443:20, 1443:24, 1467:25, 1468:6, 1475:14, 1476:4, 1476:5, 1478:16, 1479:17, 1487:16, 1488:2, 1493:1, 1496:15, 1498:17, 1498:21, 1499:12, 1499:14, 1504:1, 1504:16, 1505:2, 1505:4, 1505:6, 1505:7, 1514:5, 1514:21, 1514:24, 1515:1, 1515:8, 1515:21, 1516:1, 1516:5, 1516:6, 1516:8, 1520:1, 1520:6, 1521:6, 1521:10, 1521:14, 1521:15, 1521:17, 1521:21, 1521:23, 1525:23, 1525:24, 1530:6, 1541:6, 1549:8, 1549:17, 1551:16, 1551:19
**clients'** [1] - 1554:6
**close** [2] - 1348:1, 1440:2
**closed** [57] - 1301:7,

1301:17, 1302:4, 1302:12, 1302:25, 1304:7, 1305:13, 1306:2, 1306:13, 1306:20, 1307:3, 1307:5, 1307:8, 1307:20, 1307:21, 1307:23, 1309:11, 1309:16, 1310:17, 1310:25, 1311:5, 1311:15, 1319:23, 1332:8, 1332:23, 1346:19, 1346:22, 1346:25, 1347:3, 1347:10, 1440:24, 1442:1, 1442:5, 1467:20, 1467:21, 1471:2, 1471:3, 1474:4, 1474:19, 1475:5, 1482:7, 1483:6, 1483:8, 1483:12, 1483:13, 1484:2, 1484:5, 1485:16, 1528:25, 1529:5, 1529:10, 1529:19, 1533:15, 1533:22, 1546:3, 1546:12
**closely** [1] - 1412:6
**closing** [6] - 1465:20, 1500:20, 1536:4, 1540:11, 1544:6, 1554:9
**CLOSING** [3] - 1560:22, 1560:23, 1560:24
**closings** [2] - 1403:19, 1403:21
**cmpay** [1] - 1501:3
**co** [2] - 1338:14, 1340:2
**Co** [1] - 1540:13
**Co-Analyzer** [1] - 1540:13
**co-sale** [2] - 1338:14, 1340:2
**Cobol** [1] - 1383:9
**COBOL** [21] - 1383:23, 1383:24, 1384:1, 1384:20, 1385:8, 1386:8, 1387:3, 1387:24, 1390:7, 1390:11, 1390:14, 1391:11, 1391:15, 1394:11, 1396:3, 1400:17, 1419:20, 1421:16, 1454:24, 1455:17, 1457:22
**code** [341] - 1291:22, 1291:23, 1292:17,

8

1292:24, 1293:5,
1294:20, 1295:3,
1295:9, 1295:10,
1295:14, 1295:18,
1295:19, 1295:22,
1295:24, 1296:12,
1296:15, 1296:19,
1298:17, 1298:23,
1299:5, 1299:13,
1299:24, 1300:8,
1300:11, 1300:14,
1300:20, 1300:23,
1301:2, 1301:7,
1301:16, 1301:17,
1302:4, 1302:6,
1302:7, 1302:12,
1302:25, 1304:7,
1305:13, 1306:2,
1306:8, 1306:10,
1306:13, 1306:20,
1307:3, 1307:5,
1307:6, 1307:8,
1307:12, 1307:13,
1307:15, 1307:17,
1307:18, 1307:19,
1307:20, 1307:21,
1307:23, 1308:5,
1308:15, 1309:11,
1309:17, 1309:20,
1310:6, 1310:17,
1310:18, 1311:2,
1311:5, 1311:15,
1311:16, 1312:12,
1312:17, 1313:16,
1314:9, 1314:20,
1314:22, 1315:23,
1317:17, 1319:6,
1319:7, 1319:8,
1319:16, 1319:18,
1319:21, 1319:23,
1322:4, 1322:5,
1322:15, 1322:17,
1323:19, 1324:16,
1324:20, 1324:23,
1325:3, 1326:4,
1326:9, 1328:25,
1329:7, 1329:23,
1330:1, 1330:21,
1331:1, 1331:2,
1331:9, 1332:2,
1332:5, 1332:6,
1332:8, 1332:10,
1332:11, 1332:12,
1332:14, 1332:15,
1332:23, 1332:24,
1333:4, 1333:8,
1333:19, 1333:23,
1334:4, 1336:13,
1336:22, 1337:8,
1342:17, 1344:21,
1344:25, 1345:7,

1345:12, 1346:5,
1346:7, 1346:9,
1346:12, 1346:19,
1347:1, 1347:10,
1347:14, 1352:23,
1373:5, 1373:8,
1373:18, 1377:8,
1377:18, 1377:22,
1378:1, 1378:9,
1379:24, 1380:1,
1380:15, 1382:2,
1382:3, 1382:19,
1387:8, 1388:24,
1389:19, 1391:12,
1393:7, 1393:13,
1393:18, 1394:8,
1394:15, 1395:5,
1395:23, 1396:13,
1396:19, 1397:6,
1397:7, 1398:19,
1406:15, 1407:6,
1407:7, 1407:10,
1407:11, 1407:18,
1407:20, 1416:17,
1416:22, 1417:10,
1434:8, 1434:10,
1439:21, 1441:8,
1441:15, 1441:20,
1442:2, 1442:5,
1448:16, 1448:25,
1449:7, 1449:9,
1449:14, 1450:13,
1450:14, 1450:18,
1450:19, 1456:12,
1457:13, 1457:16,
1460:25, 1461:5,
1461:17, 1461:22,
1461:23, 1462:15,
1463:3, 1467:16,
1467:21, 1467:22,
1471:3, 1474:4,
1474:19, 1475:6,
1476:2, 1476:24,
1477:3, 1477:10,
1480:14, 1480:18,
1481:11, 1481:12,
1482:1, 1482:7,
1482:11, 1482:18,
1482:24, 1482:25,
1483:5, 1483:6,
1483:7, 1483:8,
1483:9, 1483:12,
1483:13, 1483:14,
1484:2, 1484:5,
1484:6, 1484:8,
1484:12, 1485:19,
1485:20, 1486:8,
1486:14, 1486:17,
1486:20, 1487:12,
1487:14, 1499:3,
1499:4, 1501:7,

1501:12, 1507:3,
1510:8, 1510:9,
1510:12, 1511:23,
1511:25, 1512:2,
1513:20, 1519:16,
1522:9, 1524:18,
1525:7, 1528:1,
1528:3, 1528:25,
1529:9, 1529:10,
1529:11, 1529:19,
1530:20, 1530:21,
1530:22, 1530:24,
1531:5, 1531:9,
1531:20, 1531:23,
1531:24, 1532:3,
1532:7, 1532:14,
1533:15, 1533:18,
1533:19, 1534:2,
1534:7, 1534:17,
1534:18, 1534:21,
1534:23, 1534:24,
1535:5, 1535:7,
1535:9, 1535:13,
1535:21, 1535:24,
1538:23, 1542:20,
1546:1, 1546:2,
1546:3, 1546:4,
1546:12, 1546:18,
1546:24, 1547:1,
1547:2, 1547:7,
1547:8, 1548:4,
1548:5, 1552:7,
1553:1

**coded** [6] - 1292:23,
1293:11, 1336:5,
1394:8, 1394:15,
1418:11
**codes** [1] - 1487:6
**coding** [3] - 1314:18,
1378:11, 1378:15
**COE** [2] - 1444:22,
1445:14
**coin** [1] - 1307:17
**coincidence** [1] -
1382:12
**colleague** [7] -
1426:7, 1429:17,
1448:7, 1489:12,
1517:5, 1517:6,
1518:2
**colleagues** [1] -
1424:22
**collecting** [2] -
1373:5, 1373:18
**column** [26] - 1380:11,
1383:10, 1383:17,
1383:20, 1384:6,
1384:10, 1384:14,
1384:24, 1384:25,
1385:2, 1385:3,

1385:4, 1385:9,
1385:11, 1387:5,
1387:9, 1396:3,
1396:4, 1430:18,
1430:19, 1436:12,
1504:20, 1541:7,
1541:8, 1541:9,
1541:10
**column-driven** [1] -
1383:10
**columns** [12] - 1380:1,
1383:13, 1383:15,
1384:3, 1384:12,
1386:8, 1387:8,
1387:13, 1387:14,
1387:15, 1430:14,
1453:24
**combination** [1] -
1397:18
**coming** [10] - 1305:3,
1309:1, 1310:10,
1310:22, 1311:20,
1312:21, 1318:7,
1320:7, 1320:23,
1456:5
**comment** [13] -
1335:22, 1380:8,
1380:9, 1381:11,
1381:13, 1382:4,
1383:13, 1395:25,
1396:2, 1396:3,
1396:8, 1397:7,
1397:8
**comments** [3] -
1382:5, 1382:6,
1499:25
**commit** [1] - 1545:17
**committed** [1] -
1471:15
**common** [12] -
1296:20, 1311:1,
1375:6, 1378:11,
1385:16, 1394:10,
1406:25, 1415:21,
1456:2, 1456:24,
1512:18, 1558:3
**commonly** [1] -
1457:3
**communicate** [2] -
1367:20, 1448:7
**communicated** [1] -
1370:18
**communication** [1] -
1382:1
**communications** [4] -
1302:24, 1361:10,
1434:11, 1441:4
**commuter** [1] -
1327:23
**comp** [7] - 1384:10,

1385:1, 1386:7,
1386:16, 1386:20,
1387:1, 1453:25
**companies** [8] -
1297:2, 1297:4,
1297:9, 1310:24,
1316:20, 1337:25,
1338:22, 1339:1
**company** [14] -
1297:14, 1315:12,
1328:10, 1338:4,
1468:10, 1469:21,
1470:22, 1471:13,
1471:21, 1471:23,
1472:11, 1484:24,
1485:2, 1552:11
**company's** [1] -
1292:19
**comparative** [1] -
1303:3
**comparatively** [1] -
1367:10
**compare** [3] -
1375:18, 1477:18,
1509:4
**compared** [1] -
1379:16
**comparing** [2] -
1370:20, 1379:19
**comparison** [5] -
1388:2, 1392:14,
1393:8, 1393:18,
1456:7
**comparisons** [6] -
1452:20, 1507:3,
1507:4, 1507:5,
1507:9, 1508:16
**compete** [1] - 1553:15
**competency** [1] -
1516:2
**competes** [1] - 1467:4
**competition** [2] -
1467:1, 1467:2
**competitor** [2] -
1336:9, 1543:9
**competitors** [1] -
1297:5
**compile** [2] - 1307:17,
1407:6
**compiled** [9] - 1307:5,
1307:20, 1307:21,
1332:14, 1407:7,
1407:11, 1512:2,
1512:7, 1524:18
**compiling** [2] -
1511:23, 1546:18
**complained** [2] -
1379:8, 1379:12
**complaining** [1] -
1549:18

**complete** [5] - 1403:19, 1477:14, 1542:3, 1558:25

**completed** [3] - 1410:13, 1411:3, 1411:5

**completely** [8] - 1326:13, 1397:15, 1398:6, 1399:14, 1400:25, 1402:16, 1429:20, 1509:5

**complex** [3] - 1295:21, 1525:7, 1556:5

**compliance** [14] - 1436:17, 1471:11, 1473:25, 1475:3, 1477:13, 1485:8, 1488:1, 1501:23, 1505:1, 1540:9, 1543:25, 1544:21, 1551:22, 1552:18

**compliant** [3] - 1497:23, 1497:24, 1510:16

**complications** [1] - 1555:19

**complied** [2] - 1471:19, 1502:16

**complimented** [1] - 1468:21

**comply** [8] - 1468:22, 1469:9, 1469:16, 1470:5, 1470:15, 1486:15, 1541:2, 1553:13

**complying** [1] - 1502:24

**component** [2] - 1406:25, 1411:11

**components** [2] - 1528:14, 1529:20

**computer** [14] - 1327:18, 1331:23, 1331:25, 1363:15, 1409:23, 1416:6, 1416:10, 1422:14, 1422:15, 1458:25, 1459:7, 1479:6, 1479:10, 1548:19

**conceded** [1] - 1474:22

**conceivable** [1] - 1298:21

**concept** [1] - 1328:23

**concepts** [4] - 1309:14, 1309:17, 1346:25, 1347:5

**concern** [1] - 1359:2

**concerned** [3] -

1435:8, 1555:7, 1559:1

**concerning** [1] - 1319:24

**concerns** [2] - 1534:14, 1543:17

**conclude** [7] - 1299:8, 1299:10, 1301:1, 1322:24, 1323:3, 1347:21, 1543:18

**concluded** [4] - 1322:2, 1495:9, 1530:18, 1531:13

**conclusion** [3] - 1345:16, 1388:25, 1502:8

**conclusions** [8] - 1309:2, 1311:21, 1312:21, 1318:8, 1320:8, 1356:10, 1554:12, 1558:17

**concrete** [1] - 1445:9

**conditions** [1] - 1556:2

**conduct** [22] - 1345:9, 1345:25, 1379:9, 1379:12, 1468:25, 1469:2, 1472:13, 1473:8, 1474:13, 1474:15, 1474:17, 1475:25, 1483:20, 1503:15, 1526:16, 1531:5, 1532:10, 1535:22, 1538:12, 1541:3, 1552:8, 1553:16

**conducted** [3] - 1320:12, 1337:3, 1443:13

**conducting** [3] - 1292:8, 1380:13, 1382:22

**confident** [2] - 1427:25, 1428:3

**configuration** [4] - 1319:9, 1319:18, 1322:6, 1370:21

**confirm** [2] - 1374:10, 1374:14

**confirmation** [2] - 1357:2, 1371:15

**confirmed** [5] - 1446:9, 1451:23, 1516:17, 1547:18, 1547:20

**conflate** [1] - 1358:16

**conflating** [1] - 1508:2

**conflict** [2] - 1440:24, 1519:1

**conflicting** [1] -

1495:5

**conflicts** [1] - 1557:25

**conforming** [1] - 1393:2

**confronted** [1] - 1548:2

**confused** [2] - 1387:22, 1483:22

**confusion** [1] - 1510:7

**Congress** [2] - 1316:9, 1316:12

**connect** [1] - 1328:15

**connected** [1] - 1476:23

**connection** [6] - 1296:10, 1298:11, 1311:20, 1364:13, 1434:21, 1475:21

**consensus** [1] - 1404:9

**consequences** [1] - 1512:14

**consider** [8] - 1353:18, 1380:25, 1400:7, 1402:6, 1421:7, 1443:14, 1463:3, 1507:13

**considerable** [1] - 1455:15

**considerably** [1] - 1438:1

**consideration** [1] - 1385:12

**considered** [6] - 1304:15, 1327:2, 1381:1, 1382:11, 1390:18, 1548:4

**consistent** [11] - 1382:8, 1392:4, 1392:6, 1395:14, 1410:22, 1484:11, 1484:12, 1497:5, 1529:10, 1543:22

**consistently** [3] - 1384:13, 1392:3, 1503:20

**consists** [1] - 1544:24

**constitute** [1] - 1370:14

**constitutes** [1] - 1473:8

**constitutional** [1] - 1543:17

**constrained** [19] - 1377:8, 1377:18, 1377:22, 1378:1, 1378:9, 1390:18, 1391:24, 1392:3, 1396:1, 1396:6, 1396:9, 1400:25,

1402:2, 1460:13, 1460:14, 1460:17, 1461:10, 1497:2

**constrains** [1] - 1394:24

**constraint** [6] - 1376:8, 1383:7, 1385:8, 1400:8, 1402:17, 1417:11

**constraints** [4] - 1375:25, 1417:10, 1507:13, 1508:22

**construed** [1] - 1529:15

**consultant** [2] - 1501:10, 1515:25

**consultants** [1] - 1531:7

**contain** [7] - 1308:3, 1309:19, 1321:16, 1325:2, 1394:19, 1432:1, 1529:5

**contained** [6] - 1310:25, 1332:24, 1351:17, 1431:20, 1498:8, 1525:1

**containing** [2] - 1407:9, 1489:4

**contains** [7] - 1394:18, 1417:4, 1418:21, 1524:1, 1524:25, 1525:10, 1529:18

**contemplate** [1] - 1331:6

**contemplated** [3] - 1423:8, 1444:13, 1521:5

**contemporaneous** [1] - 1514:4

**contemporaneously** [1] - 1488:13

**contempt** [13] - 1466:13, 1466:18, 1468:24, 1470:22, 1471:22, 1503:4, 1527:12, 1527:24, 1538:12, 1539:3, 1539:21, 1551:21, 1553:24

**contemptuous** [2] - 1468:25, 1544:14

**contemptuously** [2] - 1484:15, 1546:7

**contend** [7] - 1293:15, 1417:2, 1418:16, 1523:1, 1525:1, 1532:3, 1542:20

**contending** [6] - 1299:22, 1415:18,

1415:23, 1418:7, 1516:19, 1516:23

**contends** [1] - 1460:16

**content** [11] - 1373:16, 1373:22, 1410:1, 1439:7, 1475:9, 1497:8, 1505:20, 1547:17, 1548:8, 1548:11, 1548:14

**contention** [7] - 1296:10, 1296:14, 1418:8, 1419:8, 1420:8, 1474:1, 1488:10

**contentions** [2] - 1435:18, 1502:5

**contents** [1] - 1505:24

**context** [21] - 1309:17, 1366:21, 1378:14, 1395:19, 1405:15, 1407:17, 1408:4, 1409:4, 1416:7, 1416:22, 1418:22, 1418:25, 1421:24, 1432:4, 1442:7, 1442:23, 1461:10, 1504:8, 1529:11, 1536:23, 1536:25

**contexts** [1] - 1416:1

**contextually** [1] - 1416:16

**continuation** [1] - 1383:13

**continue** [7] - 1403:6, 1467:12, 1469:2, 1469:14, 1484:12, 1544:17, 1552:22

**continued** [2] - 1478:23

**continues** [5] - 1466:25, 1467:3, 1468:13, 1478:3, 1484:24

**continuing** [2] - 1478:19, 1478:21

**contract** [4] - 1326:22, 1328:2, 1328:3, 1516:5

**contracted** [1] - 1514:6

**contractor** [1] - 1313:1

**contractors** [6] - 1297:22, 1311:25, 1325:7, 1325:8, 1325:11, 1342:25

**contracts** [2] - 1326:16, 1328:8

**contractual** [2] -

10

1344:10, 1514:7
**contradiction** [1] -
1522:16
**contradicts** [2] -
1518:10, 1522:12
**contrary** [6] - 1491:23,
1497:8, 1515:6,
1520:8, 1535:4,
1541:24
**contrast** [1] - 1497:19
**Controls** [37] -
1364:17, 1365:9,
1365:15, 1368:6,
1444:17, 1444:23,
1445:22, 1446:1,
1446:12, 1447:5,
1447:8, 1447:17,
1447:22, 1449:9,
1449:24, 1490:18,
1490:22, 1491:6,
1495:11, 1495:13,
1495:15, 1495:18,
1495:20, 1495:23,
1499:15, 1513:23,
1515:14, 1517:6,
1517:10, 1549:2,
1550:15, 1550:16,
1550:19, 1550:21,
1550:23, 1551:1,
1551:4
**controls** [1] - 1395:3
**Controls'** [4] - 1445:1,
1445:3, 1445:25,
1448:17
**convention** [8] -
1378:15, 1381:9,
1389:12, 1389:18,
1402:15, 1402:17,
1415:21, 1497:2
**conventional** [7] -
1390:18, 1392:2,
1497:3, 1497:4,
1548:5, 1548:23
**conventions** [9] -
1352:5, 1378:10,
1378:12, 1378:20,
1386:8, 1390:19,
1392:3, 1417:10,
1497:1
**conversation** [7] -
1334:16, 1356:2,
1421:3, 1437:19,
1495:16, 1557:13,
1557:22
**conversations** [1] -
1306:3
**conversely** [1] -
1313:7
**converted** [1] -
1332:15

**converting** [1] -
1438:1
**conviction** [1] -
1502:4
**convincing** [5] -
1468:24, 1469:7,
1502:1, 1502:9,
1544:13
**convincingly** [1] -
1549:9
**copied** [1] - 1352:17,
1385:15, 1388:21,
1407:19, 1415:10,
1415:17, 1415:23,
1451:25, 1453:3,
1453:10, 1463:21,
1480:22, 1481:2,
1481:8, 1508:9
**copies** [9] - 1336:21,
1405:15, 1476:24,
1477:2, 1526:6,
1526:10, 1526:11,
1526:14, 1555:2
**copy** [43] - 1294:20,
1298:16, 1298:23,
1300:1, 1305:13,
1311:16, 1312:7,
1312:12, 1313:15,
1324:23, 1329:7,
1329:23, 1331:2,
1331:9, 1336:13,
1342:17, 1345:11,
1349:12, 1349:13,
1349:23, 1351:11,
1383:1, 1383:3,
1384:5, 1389:1,
1410:2, 1467:16,
1475:9, 1482:10,
1483:13, 1483:15,
1487:6, 1487:12,
1497:7, 1499:4,
1528:3, 1534:6,
1534:16, 1537:17,
1542:12, 1548:14,
1555:4
**copybook** [5] -
1418:20, 1418:21,
1418:24, 1419:2,
1421:16
**copying** [66] - 1295:3,
1299:5, 1311:3,
1314:8, 1324:16,
1330:20, 1333:4,
1333:8, 1333:19,
1333:22, 1344:21,
1346:4, 1346:12,
1347:10, 1347:14,
1385:24, 1415:2,
1415:9, 1439:20,
1449:13, 1453:1,

1453:6, 1453:12,
1453:17, 1453:18,
1457:18, 1463:16,
1474:7, 1474:10,
1474:11, 1474:20,
1474:22, 1474:24,
1475:8, 1477:10,
1480:14, 1480:17,
1481:10, 1481:12,
1486:13, 1486:20,
1486:21, 1496:19,
1508:2, 1508:10,
1511:22, 1511:25,
1512:8, 1529:20,
1531:5, 1531:9,
1531:19, 1531:23,
1531:24, 1532:2,
1532:7, 1533:14,
1534:1, 1536:23,
1537:3, 1542:5,
1542:19, 1546:1,
1552:7
**Copyright** [3] -
1485:10, 1507:14,
1543:15
**copyright** [21] -
1351:18, 1351:21,
1352:16, 1415:12,
1425:14, 1467:3,
1471:15, 1473:4,
1473:8, 1473:22,
1487:19, 1488:4,
1488:5, 1488:19,
1496:25, 1507:7,
1544:19, 1545:17,
1552:11, 1552:17,
1553:22
**copyrightable** [2] -
1497:5, 1548:22
**copyrighted** [14] -
1350:20, 1351:7,
1351:15, 1434:18,
1434:22, 1451:20,
1473:18, 1481:6,
1511:6, 1511:9,
1511:11, 1524:25,
1525:2, 1547:10
**copyrights** [4] -
1431:14, 1466:25,
1478:24, 1485:3
**core** [3] - 1306:8,
1310:18, 1516:2
**Corey** [1] - 1290:16
**corner** [1] - 1495:12
**corporate** [5] - 1321:9,
1322:1, 1523:1,
1530:12, 1533:17
**corporation** [1] -
1314:13
**correct** [139] - 1298:1,

1298:2, 1298:5,
1298:12, 1302:15,
1305:15, 1306:22,
1314:21, 1323:16,
1323:17, 1331:23,
1331:24, 1332:13,
1332:18, 1332:21,
1332:25, 1333:1,
1333:4, 1333:5,
1333:8, 1333:19,
1333:23, 1334:3,
1334:9, 1334:21,
1334:22, 1335:1,
1335:8, 1335:9,
1335:19, 1335:24,
1336:6, 1336:7,
1336:9, 1336:10,
1336:13, 1337:2,
1337:4, 1337:12,
1337:16, 1338:2,
1338:3, 1338:5,
1338:11, 1338:18,
1338:23, 1339:2,
1339:3, 1339:6,
1339:13, 1339:17,
1339:23, 1342:6,
1342:14, 1342:18,
1343:4, 1343:9,
1343:25, 1344:11,
1344:21, 1344:25,
1345:7, 1345:14,
1345:23, 1347:12,
1364:13, 1366:11,
1371:15, 1373:15,
1384:1, 1390:12,
1408:10, 1410:21,
1413:1, 1413:12,
1413:15, 1413:20,
1413:22, 1413:24,
1414:3, 1414:7,
1414:10, 1414:20,
1422:6, 1422:25,
1424:7, 1424:8,
1424:10, 1424:11,
1424:13, 1424:15,
1425:5, 1425:19,
1425:20, 1425:21,
1425:22, 1425:25,
1427:5, 1427:12,
1429:2, 1429:3,
1429:4, 1429:5,
1429:14, 1430:2,
1431:6, 1431:7,
1431:12, 1431:17,
1431:18, 1431:23,
1431:24, 1432:2,
1432:8, 1432:14,
1433:15, 1433:25,
1435:1, 1435:15,
1436:9, 1437:23,
1438:2, 1438:5,

1445:11, 1457:21,
1460:8, 1461:18,
1463:17, 1463:18,
1472:9, 1505:24,
1506:6, 1530:7,
1532:4, 1536:13,
1542:21, 1550:25,
1554:18, 1559:6
**correctly** [5] - 1385:3,
1385:4, 1409:16,
1459:24, 1540:1
**correspondence** [4] -
1367:9, 1367:13,
1368:23, 1446:5
**cost** [2] - 1317:11,
1327:22
**Counsel** [1] - 1320:5
**counsel** [49] -
1320:11, 1346:18,
1412:24, 1415:2,
1417:4, 1419:11,
1420:17, 1421:24,
1422:8, 1424:19,
1427:22, 1428:3,
1433:8, 1435:9,
1436:3, 1436:19,
1438:4, 1438:11,
1438:25, 1439:3,
1444:20, 1447:6,
1466:7, 1470:4,
1471:25, 1472:8,
1472:11, 1489:2,
1504:17, 1513:6,
1514:12, 1518:22,
1520:13, 1524:3,
1528:17, 1530:8,
1531:11, 1536:3,
1541:21, 1543:12,
1547:20, 1548:2,
1549:13, 1551:24,
1552:19, 1554:5,
1554:23, 1556:19,
1557:23
**counsel's** [2] - 1434:3,
1539:20
**count** [7] - 1429:24,
1430:14, 1430:18,
1430:19, 1497:4,
1540:22, 1540:23
**counted** [2] - 1431:19,
1500:19
**countless** [1] -
1298:20
**country** [1] - 1326:10
**counts** [1] - 1431:1
**County** [5] - 1410:15,
1410:17, 1410:19,
1411:7, 1498:20
**couple** [13] - 1356:15,
1375:1, 1375:20,

11

1376:3, 1377:5, 1380:14, 1381:16, 1397:1, 1426:6, 1435:25, 1449:4, 1509:23, 1554:10
**course** [18] - 1291:10, 1292:8, 1297:21, 1298:10, 1339:21, 1382:5, 1394:10, 1400:12, 1408:23, 1435:9, 1464:23, 1472:10, 1487:16, 1491:4, 1544:11, 1545:21, 1546:4
**COURT** [85] - 1290:1, 1291:4, 1293:22, 1299:1, 1304:19, 1305:8, 1305:21, 1324:5, 1331:15, 1331:18, 1340:20, 1341:3, 1341:19, 1343:19, 1345:17, 1346:14, 1347:18, 1347:20, 1348:2, 1348:8, 1348:12, 1348:20, 1348:25, 1349:8, 1349:16, 1349:18, 1349:21, 1350:2, 1350:6, 1350:9, 1350:12, 1351:12, 1368:14, 1402:21, 1403:4, 1403:9, 1403:12, 1403:20, 1404:6, 1411:14, 1411:16, 1411:23, 1412:5, 1412:21, 1421:4, 1435:7, 1435:21, 1438:25, 1439:15, 1439:24, 1440:5, 1440:10, 1440:19, 1443:8, 1449:1, 1451:15, 1452:2, 1452:6, 1452:13, 1463:7, 1463:10, 1463:25, 1464:3, 1464:6, 1464:10, 1464:17, 1464:20, 1465:8, 1465:16, 1465:19, 1465:23, 1466:3, 1466:5, 1499:21, 1499:23, 1544:3, 1544:5, 1554:4, 1554:16, 1554:18, 1555:5, 1555:12, 1557:6, 1558:6, 1558:24
**Court** [88] - 1304:12, 1304:17, 1348:22, 1351:11, 1364:5, 1379:3, 1427:23,

1428:25, 1429:21, 1429:23, 1430:12, 1430:21, 1435:8, 1435:21, 1437:22, 1439:13, 1442:20, 1443:11, 1443:18, 1443:25, 1444:3, 1444:7, 1444:13, 1466:12, 1466:23, 1467:12, 1468:15, 1469:3, 1469:6, 1470:19, 1471:7, 1471:12, 1471:13, 1471:14, 1471:16, 1471:23, 1472:6, 1472:12, 1472:18, 1472:19, 1472:25, 1473:3, 1473:11, 1473:14, 1474:13, 1474:16, 1474:23, 1475:25, 1476:6, 1476:20, 1479:12, 1480:1, 1480:20, 1481:7, 1481:17, 1481:22, 1481:25, 1482:3, 1482:13, 1482:16, 1484:14, 1484:22, 1485:5, 1487:7, 1487:21, 1492:3, 1492:12, 1492:16, 1493:1, 1494:8, 1498:22, 1500:4, 1502:3, 1508:18, 1518:11, 1534:16, 1546:6, 1547:15, 1550:1, 1550:5, 1552:10, 1553:6, 1553:12, 1553:24, 1554:1, 1555:13, 1557:19, 1558:15
**court** [19] - 1349:24, 1349:25, 1437:6, 1437:8, 1438:11, 1440:23, 1442:11, 1465:4, 1467:5, 1467:14, 1472:9, 1484:8, 1544:19, 1552:14, 1553:13, 1553:16, 1553:23, 1558:4, 1559:2
**Court's** [18] - 1354:14, 1364:5, 1403:16, 1443:8, 1443:22, 1466:23, 1468:12, 1473:17, 1491:23, 1492:1, 1501:22, 1519:4, 1536:15, 1536:16, 1543:23, 1557:8, 1558:10
**courtroom** [3] -

1430:23, 1430:24, 1437:9
**cover** [1] - 1552:8
**covers** [2] - 1526:16, 1531:4
**COVID** [1] - 1556:11
**COVID-19** [1] - 1555:15
**coworker** [1] - 1447:25
**Craig** [3] - 1433:11, 1490:10, 1500:14
**crashes** [1] - 1325:12
**create** [24] - 1295:9, 1295:14, 1295:18, 1323:23, 1324:1, 1333:18, 1373:8, 1373:10, 1439:19, 1443:19, 1443:23, 1497:17, 1498:2, 1509:14, 1512:24, 1529:19, 1531:25, 1533:13, 1533:14, 1534:1, 1534:11, 1534:17, 1545:21, 1550:13
**created** [14] - 1336:4, 1360:7, 1373:14, 1374:8, 1407:16, 1419:4, 1420:5, 1448:23, 1480:23, 1490:12, 1497:20, 1499:11, 1507:1, 1522:22
**creates** [2] - 1300:1, 1374:3
**creating** [9] - 1295:19, 1336:2, 1336:24, 1372:16, 1373:3, 1436:10, 1528:23, 1529:3, 1529:16
**creation** [3] - 1358:20, 1372:15, 1373:17
**creative** [40] - 1402:7, 1402:8, 1402:9, 1415:18, 1415:24, 1416:5, 1416:10, 1416:15, 1416:21, 1417:13, 1417:14, 1417:18, 1417:19, 1417:23, 1417:24, 1417:25, 1418:13, 1418:17, 1419:9, 1419:14, 1420:16, 1421:17, 1421:21, 1453:25, 1457:4, 1457:6, 1458:1, 1458:2, 1458:17, 1458:21, 1458:23, 1460:19, 1460:22,

1462:13, 1462:21, 1497:9, 1501:1, 1507:19, 1525:8
**creativity** [2] - 1389:20, 1461:14
**credible** [1] - 1409:20
**credit** [4] - 1359:3, 1359:7, 1471:11, 1471:18
**criminal** [3] - 1555:17, 1555:21, 1558:11
**crisis** [1] - 1329:21
**criteria** [2] - 1496:20, 1497:14
**critical** [11] - 1477:11, 1510:6, 1513:12, 1513:13, 1521:18, 1527:23, 1528:8, 1529:13, 1533:6, 1539:2, 1540:1
**critically** [1] - 1528:21
**criticisms** [1] - 1379:7
**criticizing** [1] - 1486:12
**critique** [1] - 1479:7
**cross** [65] - 1330:17, 1331:15, 1341:1, 1357:19, 1358:23, 1402:22, 1404:3, 1411:14, 1439:4, 1440:15, 1443:17, 1444:16, 1444:21, 1451:11, 1463:7, 1466:17, 1473:8, 1478:1, 1478:19, 1478:22, 1479:17, 1479:25, 1486:20, 1490:20, 1491:19, 1496:18, 1498:6, 1509:21, 1509:23, 1512:19, 1512:20, 1513:16, 1513:17, 1516:20, 1517:12, 1517:19, 1517:24, 1518:8, 1518:11, 1518:12, 1518:16, 1518:20, 1518:23, 1519:5, 1522:1, 1522:14, 1525:20, 1526:1, 1526:5, 1526:13, 1538:15, 1538:19, 1539:2, 1539:9, 1539:10, 1539:14, 1539:17, 1540:2, 1540:5, 1540:6, 1540:7, 1550:25, 1551:4, 1551:13
**Cross** [101] - 1296:2, 1299:12, 1299:22,

1301:5, 1304:9, 1304:21, 1306:12, 1307:1, 1308:21, 1323:14, 1323:20, 1328:14, 1330:3, 1330:14, 1334:5, 1348:7, 1350:11, 1350:13, 1360:12, 1365:4, 1372:1, 1372:13, 1377:16, 1388:7, 1403:8, 1403:14, 1404:10, 1404:16, 1411:19, 1412:16, 1412:17, 1426:18, 1429:11, 1435:14, 1435:19, 1439:8, 1440:15, 1443:13, 1443:17, 1451:19, 1452:7, 1452:25, 1454:8, 1454:14, 1455:4, 1456:11, 1456:16, 1456:22, 1457:12, 1458:9, 1459:17, 1459:20, 1460:16, 1462:8, 1462:20, 1463:16, 1479:8, 1480:5, 1488:18, 1492:15, 1503:16, 1504:11, 1504:19, 1505:22, 1506:17, 1507:4, 1507:11, 1510:8, 1511:12, 1514:10, 1515:11, 1517:13, 1518:10, 1519:14, 1520:7, 1521:24, 1522:25, 1523:7, 1523:15, 1524:20, 1525:1, 1525:21, 1527:21, 1528:12, 1530:10, 1532:1, 1534:20, 1535:4, 1535:19, 1538:19, 1539:6, 1539:12, 1539:19, 1539:25, 1541:10, 1542:8, 1547:22, 1550:24, 1560:5, 1560:9, 1560:13
**CROSS** [5] - 1331:21, 1350:15, 1411:17, 1463:13, 1560:8
**Cross's** [17] - 1296:5, 1296:9, 1296:13, 1299:17, 1300:2, 1308:2, 1326:4, 1329:15, 1330:23, 1349:4, 1439:2, 1452:22, 1453:14, 1456:6, 1459:10, 1479:22, 1505:13

12

**Cross-examination** [3] - 1560:5, 1560:9, 1560:13
**cross-examination** [8] - 1331:15, 1341:1, 1402:22, 1411:14, 1463:7, 1496:18, 1518:11, 1518:20
**CROSS-EXAMINATION** [3] - 1331:21, 1411:17, 1463:13
**cross-examinations** [1] - 1404:3
**cross-examine** [1] - 1439:4
**cross-use** [50] - 1330:17, 1357:19, 1358:23, 1443:17, 1444:16, 1444:21, 1451:11, 1466:17, 1473:8, 1478:1, 1478:19, 1478:22, 1479:25, 1486:20, 1490:20, 1491:19, 1509:21, 1509:23, 1512:19, 1512:20, 1513:16, 1513:17, 1516:20, 1517:12, 1517:19, 1517:24, 1518:8, 1518:12, 1518:16, 1518:23, 1519:5, 1522:14, 1525:20, 1526:1, 1526:5, 1526:13, 1538:15, 1538:19, 1539:2, 1539:9, 1539:10, 1539:17, 1540:2, 1540:5, 1540:6, 1540:7, 1550:25, 1551:4, 1551:13
**crossed** [1] - 1417:20
**crude** [2] - 1316:8, 1316:18
**crystal** [1] - 1532:9
**CTOs** [1] - 1298:7
**curiosity** [1] - 1479:9
**current** [7] - 1320:18, 1341:24, 1373:11, 1413:2, 1469:22, 1484:11, 1556:1
**cursor** [20] - 1391:5, 1395:11, 1395:15, 1401:8, 1401:10, 1402:9, 1402:11, 1402:13, 1416:6, 1416:9, 1416:10, 1458:20, 1458:22, 1458:25, 1459:1,

1459:3, 1459:7
**CURSOR** [9] - 1395:8, 1395:12, 1395:16, 1401:6, 1401:22, 1402:14, 1458:22, 1460:21, 1462:5
**custody** [1] - 1555:20
**custom** [8] - 1315:23, 1319:5, 1319:7, 1319:16, 1322:4, 1322:15, 1530:20, 1533:19
**customer** [20] - 1294:13, 1311:25, 1312:16, 1326:14, 1328:1, 1337:1, 1337:14, 1354:22, 1364:14, 1366:24, 1375:9, 1410:20, 1441:18, 1448:11, 1475:21, 1546:23, 1550:8
**Customer** [3] - 1310:4, 1312:6, 1529:23
**customer's** [4] - 1334:2, 1445:5, 1446:4, 1448:10
**customers** [33] - 1293:18, 1294:11, 1294:15, 1297:20, 1316:17, 1319:3, 1319:6, 1322:4, 1325:7, 1327:10, 1327:13, 1333:7, 1334:1, 1336:13, 1337:9, 1337:12, 1337:16, 1467:17, 1470:9, 1470:10, 1472:6, 1472:14, 1473:20, 1476:15, 1476:18, 1478:11, 1478:18, 1486:3, 1486:25, 1487:5, 1530:21, 1551:12
**customization** [1] - 1375:9
**customizations** [7] - 1306:10, 1315:6, 1315:10, 1316:3, 1316:5, 1316:7, 1317:2
**customize** [1] - 1441:13
**cut** [3] - 1341:19, 1342:1, 1513:24
**cycle** [1] - 1291:25

# D

**D.C** [1] - 1292:14
**D000-FILE-RECOVERY** [1] - 1399:12
**D000-FILE-RECOVERY-EXIT** [1] - 1399:13
**dash** [2] - 1400:23, 1456:18
**DATA** [11] - 1417:22, 1418:8, 1418:17, 1419:9, 1420:9, 1421:19, 1421:20, 1459:18, 1460:3, 1460:4, 1507:21
**Data** [9] - 1315:13, 1406:2, 1407:25, 1408:2, 1408:4, 1408:9, 1408:25, 1498:8, 1498:19
**data** [33] - 1319:9, 1319:19, 1322:6, 1384:20, 1387:16, 1387:21, 1391:5, 1391:6, 1393:20, 1393:21, 1394:16, 1395:2, 1400:12, 1400:13, 1400:15, 1400:17, 1414:7, 1414:10, 1414:13, 1414:15, 1414:17, 1417:23, 1426:16, 1460:5, 1460:6, 1476:11, 1496:3, 1496:4, 1506:21, 1506:23, 1506:24, 1507:1
**database** [47] - 1325:21, 1355:16, 1373:25, 1390:7, 1390:16, 1408:5, 1408:6, 1408:7, 1408:8, 1409:17, 1409:25, 1414:11, 1414:14, 1414:19, 1431:12, 1431:23, 1432:1, 1432:6, 1432:8, 1432:10, 1432:22, 1457:3, 1459:3, 1459:4, 1459:5, 1506:5, 1506:8, 1506:12, 1506:22, 1536:6, 1536:8, 1536:12, 1536:24, 1537:3, 1537:9, 1537:11, 1538:6, 1538:23, 1542:6, 1542:7,

1542:10, 1542:14, 1542:17, 1547:12, 1547:14, 1547:16
**date** [18] - 1356:12, 1357:4, 1357:13, 1366:5, 1374:13, 1374:15, 1394:10, 1416:20, 1417:16, 1465:15, 1532:17, 1554:14, 1554:19, 1555:6, 1556:4, 1557:20
**dated** [1] - 1342:7
**dates** [5] - 1357:11, 1405:16, 1556:6, 1556:25, 1558:7
**dating** [1] - 1491:14
**Davenport** [2] - 1500:12, 1520:11
**Davenport's** [1] - 1375:2
**days** [12] - 1354:19, 1367:16, 1368:21, 1370:8, 1383:23, 1397:24, 1426:6, 1464:23, 1496:8, 1511:19, 1533:17, 1540:23
**DDX-202** [1] - 1444:18
**DDX-512** [1] - 1376:6
**DDX-538** [1] - 1386:3
**DDX-559** [1] - 1360:2
**DDX-708** [1] - 1292:2
**DDX-709** [1] - 1314:4
**DDX-711** [1] - 1323:12
**DDX-724** [1] - 1320:2
**de** [7] - 1415:13, 1427:14, 1427:16, 1427:19, 1429:16, 1463:4, 1535:17
**de-duplicated** [4] - 1427:14, 1427:16, 1427:19, 1429:16
**deadline** [1] - 1554:14
**deal** [3] - 1401:2, 1452:5, 1509:8
**dealing** [2] - 1342:21, 1558:10
**dealt** [3] - 1438:23, 1513:23, 1517:7
**debate** [2] - 1547:24, 1547:25
**Deborah** [2] - 1320:4, 1531:11
**decade** [2] - 1451:2, 1536:25
**decades** [3] - 1298:1, 1501:11, 1532:21
**December** [1] - 1533:8
**decide** [1] - 1558:20

**decided** [1] - 1481:19
**decision** [8] - 1482:22, 1484:15, 1484:19, 1484:21, 1485:1, 1485:4, 1492:13, 1550:6
**decisions** [1] - 1493:6
**deck** [3] - 1292:2, 1296:5, 1299:17
**declaration** [7] - 1318:5, 1318:15, 1319:1, 1321:21, 1321:22, 1349:12
**decompile** [3] - 1307:18, 1307:23, 1310:5
**decompiled** [2] - 1311:6, 1311:16
**decompiling** [6] - 1308:4, 1308:13, 1309:20, 1311:2, 1347:9, 1529:11
**deemed** [2] - 1507:6, 1507:9
**deep** [1] - 1404:4
**defend** [2] - 1481:9, 1552:23
**Defendant** [4] - 1291:17, 1452:10, 1473:6, 1481:2
**Defendant's** [3] - 1349:10, 1349:17, 1350:3
**DEFENDANT'S** [1] - 1560:3
**Defendants** [1] - 1290:8
**defendants** [1] - 1555:20
**DEFENDANTS** [1] - 1290:19
**DEFENDANTS'** [3] - 1560:1, 1560:18, 1560:23
**defending** [1] - 1467:11
**defense** [8] - 1390:2, 1471:20, 1474:9, 1479:1, 1481:15, 1481:16, 1481:21
**Defense** [1] - 1365:1
**defenses** [2] - 1473:24, 1474:21
**defer** [1] - 1332:4
**define** [1] - 1419:5
**defined** [5] - 1370:16, 1387:16, 1423:16, 1423:23, 1478:20
**definitely** [1] - 1555:24

**definition** [19] - 1323:19, 1326:4, 1332:1, 1332:5, 1332:6, 1334:4, 1412:19, 1424:2, 1445:20, 1446:10, 1475:5, 1483:9, 1483:18, 1486:17, 1510:1, 1510:5, 1511:3, 1511:15, 1524:6
**definitions** [2] - 1485:10, 1511:3
**deliver** [3] - 1374:18, 1476:4, 1552:23
**delivered** [9] - 1371:14, 1373:1, 1373:9, 1373:12, 1404:22, 1404:24, 1405:3, 1441:17, 1498:23
**delivering** [2] - 1494:19, 1552:24
**delivery** [20] - 1358:16, 1361:20, 1367:3, 1371:6, 1371:10, 1371:15, 1372:15, 1372:19, 1373:7, 1373:16, 1373:21, 1373:22, 1468:5, 1468:8, 1477:1, 1494:13, 1494:15, 1494:23, 1527:2, 1552:23
**Delivery** [1] - 1500:14
**Deloitte** [1] - 1297:10
**demonstrated** [2] - 1471:22, 1478:2
**demonstrates** [2] - 1473:25, 1502:11
**demonstrative** [19] - 1351:6, 1354:12, 1357:23, 1359:22, 1360:3, 1371:4, 1377:13, 1377:18, 1381:14, 1384:15, 1386:2, 1386:6, 1387:25, 1388:3, 1399:21, 1401:5, 1402:7, 1444:18, 1528:4
**demonstratives** [4] - 1305:4, 1351:10, 1367:1, 1381:18
**denied** [3] - 1466:17, 1473:3, 1517:22
**denying** [1] - 1472:22
**depart** [2] - 1392:11, 1393:4
**department** [3] -

1436:17, 1493:19, 1496:11
**depended** [1] - 1479:1
**dependent** [2] - 1416:16, 1544:18
**depict** [1] - 1528:6
**deployed** [1] - 1413:14
**deposition** [10] - 1294:1, 1318:5, 1321:20, 1335:11, 1349:5, 1349:24, 1423:11, 1465:4, 1473:2
**depositions** [1] - 1340:12
**derivative** [42] - 1363:6, 1363:13, 1404:20, 1405:20, 1406:6, 1406:18, 1407:5, 1407:15, 1412:19, 1414:22, 1422:12, 1475:19, 1480:23, 1486:21, 1491:20, 1491:25, 1492:2, 1497:11, 1497:16, 1497:18, 1497:19, 1497:22, 1498:3, 1498:12, 1499:11, 1510:1, 1510:16, 1510:24, 1511:5, 1511:16, 1511:20, 1512:11, 1512:16, 1523:18, 1524:1, 1537:11, 1549:22, 1549:25, 1550:4, 1550:5, 1550:8, 1550:13
**derived** [3] - 1388:22, 1389:2, 1431:1
**describe** [3] - 1352:20, 1382:24, 1384:20
**described** [9] - 1293:19, 1294:16, 1294:21, 1316:25, 1322:7, 1341:15, 1461:2, 1516:16, 1530:5
**describing** [2] - 1329:18, 1457:24
**description** [5] - 1314:19, 1321:17, 1354:8, 1388:9, 1396:7
**design** [3] - 1306:4, 1324:15
**designates** [1] - 1314:24
**designations** [1] -

1465:4
**designed** [6] - 1316:7, 1336:5, 1408:13, 1432:4, 1532:15, 1540:25
**designee** [1] - 1533:18
**desires** [1] - 1467:16
**despite** [3] - 1372:6, 1442:21, 1537:21
**destroyed** [1] - 1473:13
**destroys** [1] - 1509:2
**detail** [5] - 1358:6, 1506:25, 1520:3, 1525:5, 1544:12
**detailed** [8] - 1334:14, 1334:19, 1334:22, 1335:22, 1339:24, 1351:24, 1451:13, 1520:13
**details** [5] - 1334:8, 1449:4, 1517:14, 1518:19, 1530:11
**detect** [1] - 1433:24
**determination** [1] - 1479:20
**determinations** [1] - 1361:3
**determine** [6] - 1334:20, 1336:12, 1368:3, 1436:16, 1453:9, 1479:12
**determined** [4] - 1320:17, 1353:6, 1361:5, 1457:22
**determining** [1] - 1453:8
**Dev** [6] - 1495:8, 1501:3, 1525:4, 1525:10, 1551:6, 1551:8
**develop** [12] - 1316:17, 1322:3, 1324:15, 1324:19, 1448:6, 1467:17, 1475:13, 1476:2, 1476:13, 1476:17, 1513:3, 1530:19
**developed** [25] - 1316:8, 1316:18, 1319:7, 1319:17, 1359:13, 1372:4, 1372:7, 1374:16, 1374:23, 1388:14, 1405:11, 1410:23, 1445:4, 1447:15, 1498:19, 1500:23, 1500:24, 1503:2, 1520:9, 1523:5,

1523:8, 1523:9, 1526:9, 1526:21, 1551:11
**developer** [3] - 1310:18, 1447:19, 1520:16
**developer's** [1] - 1382:16
**developing** [3] - 1447:20, 1498:13, 1521:14
**Development** [2] - 1410:13, 1496:10
**development** [34] - 1313:4, 1331:6, 1331:10, 1338:14, 1340:1, 1345:12, 1358:17, 1362:15, 1363:16, 1367:4, 1371:7, 1372:21, 1372:25, 1373:4, 1373:6, 1374:10, 1378:10, 1378:20, 1411:2, 1411:3, 1411:5, 1439:20, 1467:24, 1476:9, 1476:12, 1476:25, 1477:21, 1482:11, 1482:18, 1514:25, 1520:11, 1523:13, 1529:16, 1551:11
**development-oriented** [1] - 1340:1
**developmental** [1] - 1374:25
**developments** [1] - 1527:15
**develops** [1] - 1319:2
**devoted** [1] - 1500:1
**DevReview** [1] - 1540:13
**diagnose** [1] - 1448:5
**diagnosing** [1] - 1355:14
**diagnosis** [2] - 1354:7, 1362:6
**diagnostics** [1] - 1448:4
**dictated** [1] - 1417:9
**Dictionary** [1] - 1485:11
**dictionary** [1] - 1485:13
**diesel** [5] - 1316:24, 1317:2, 1317:8, 1317:11, 1317:15
**difference** [9] - 1382:10, 1386:10, 1415:2, 1415:8, 1450:12, 1453:6,

1453:11, 1509:15, 1509:18
**different** [37] - 1293:3, 1307:13, 1317:10, 1366:17, 1366:22, 1368:7, 1370:25, 1375:21, 1375:22, 1375:24, 1376:1, 1377:24, 1378:16, 1382:8, 1392:9, 1396:23, 1406:15, 1409:11, 1414:13, 1418:9, 1418:14, 1418:18, 1419:10, 1420:10, 1420:21, 1420:22, 1450:21, 1464:22, 1475:19, 1484:17, 1493:23, 1506:22, 1506:23, 1506:25, 1509:13, 1543:4
**differently** [1] - 1506:22
**difficult** [2] - 1378:7, 1378:21
**digit** [4] - 1424:14, 1424:16, 1424:17, 1424:19
**digital** [1] - 1531:21
**DIRECT** [1] - 1291:19, 1350:17, 1404:14, 1452:17
**Direct** [3] - 1560:4, 1560:8, 1560:12
**direct** [20] - 1297:5, 1360:3, 1365:22, 1388:8, 1392:13, 1395:21, 1406:22, 1407:22, 1410:7, 1422:18, 1438:21, 1439:2, 1446:2, 1458:24, 1460:2, 1461:3, 1461:20, 1462:14, 1480:21, 1523:23
**directing** [2] - 1365:4, 1396:17
**direction** [1] - 1425:13
**directly** [12] - 1295:22, 1327:10, 1337:1, 1435:6, 1435:18, 1438:22, 1469:12, 1488:15, 1491:23, 1512:22, 1519:1, 1522:12
**disagree** [6] - 1323:14, 1330:14, 1354:10, 1371:9, 1378:11, 1460:12
**disagreed** [1] - 1492:4

**disagreements** [1] - 1453:13
**disassemble** [2] - 1307:23, 1310:5
**disassembling** [3] - 1308:4, 1309:20, 1529:12
**disaster** [1] - 1486:15
**disavow** [1] - 1521:25
**discharge** [1] - 1544:1
**discipline** [5] - 1488:17, 1502:19, 1541:13, 1545:11, 1545:14
**disciplined** [2] - 1489:13, 1505:7
**disclose** [1] - 1536:7
**disclosed** [1] - 1536:9
**discover** [2] - 1310:6, 1382:21
**discovery** [4] - 1488:10, 1490:13, 1543:6, 1543:7
**discrete** [1] - 1551:25
**discretion** [5] - 1397:9, 1397:15, 1401:3, 1401:12, 1442:20
**discretionary** [2] - 1398:6, 1398:10
**discuss** [5] - 1306:6, 1452:20, 1454:25, 1468:10, 1558:3
**discussed** [15] - 1292:13, 1347:7, 1355:24, 1358:19, 1360:15, 1362:20, 1405:21, 1437:6, 1437:8, 1439:2, 1461:20, 1471:2, 1489:1
**discusses** [2] - 1486:20, 1486:21
**discussing** [7] - 1372:23, 1379:14, 1399:24, 1454:14, 1478:14, 1553:17
**discussion** [9] - 1364:15, 1415:4, 1436:12, 1436:13, 1437:10, 1439:23, 1465:14, 1490:4, 1497:11
**Discussion** [1] - 1544:4
**disobey** [1] - 1485:6
**display** [8] - 1300:11, 1300:20, 1301:1, 1354:15, 1362:25,

**1372:10, 1436:10, 1538:23
**displayed** [1] - 1299:24
**displaying** [5] - 1299:13, 1300:7, 1300:14, 1300:23, 1531:19
**dispositive** [1] - 1378:13
**dispositively** [1] - 1413:17
**disprove** [1] - 1442:13
**disproves** [1] - 1533:4
**dispute** [5] - 1383:5, 1385:6, 1490:24, 1492:10, 1510:18
**disputed** [3] - 1504:9, 1534:22, 1535:25
**disputing** [1] - 1528:10
**dissection** [24] - 1376:9, 1376:21, 1377:20, 1379:1, 1384:16, 1399:25, 1400:3, 1460:15, 1474:20, 1475:7, 1475:12, 1496:16, 1496:18, 1506:17, 1506:19, 1507:2, 1507:12, 1547:24, 1548:1, 1548:6, 1548:15, 1548:16, 1548:20, 1548:22
**distinction** [18] - 1301:16, 1301:21, 1302:3, 1302:5, 1302:7, 1304:6, 1304:13, 1367:3, 1371:6, 1371:19, 1406:21, 1440:25, 1442:2, 1487:10, 1522:12, 1533:2, 1533:21, 1533:22
**distinguish** [1] - 1492:14
**distorts** [1] - 1538:8
**distribute** [4] - 1362:11, 1444:14, 1475:19, 1537:11
**distributed** [5] - 1405:10, 1448:11, 1480:23, 1488:6, 1496:14
**distributing** [1] - 1308:15
**distribution** [1] - 1361:17
**distributor** [3] - 1293:2, 1293:5

**DISTRICT** [3] - 1290:1, 1290:1, 1290:2
**District** [2] - 1471:7, 1484:14
**ditched** [1] - 1384:15
**dive** [1] - 1512:19
**DMS** [10] - 1404:19, 1405:19, 1406:2, 1406:3, 1407:25, 1408:11, 1408:16, 1410:9, 1410:23, 1411:11
**doc** [1] - 1521:13
**docket** [1] - 1330:10
**Document** [2] - 1349:2, 1349:17
**document** [33] - 1300:22, 1303:23, 1304:2, 1304:14, 1305:1, 1319:11, 1340:7, 1340:16, 1340:24, 1342:1, 1342:6, 1352:18, 1355:8, 1368:22, 1390:10, 1390:13, 1392:7, 1395:13, 1395:17, 1401:7, 1401:9, 1410:22, 1411:1, 1411:2, 1451:9, 1460:7, 1478:14, 1493:9, 1496:1, 1499:6, 1550:17, 1550:20
**documentary** [1] - 1440:24
**documentation** [21] - 1294:3, 1312:7, 1314:16, 1335:5, 1336:16, 1344:15, 1350:24, 1351:3, 1354:23, 1363:8, 1363:14, 1390:3, 1422:14, 1475:20, 1479:16, 1481:3, 1481:4, 1486:22, 1488:14, 1490:9, 1491:10
**documentations** [1] - 1487:24
**documented** [1] - 1494:11
**documents** [45] - 1299:4, 1301:21, 1304:12, 1340:23, 1350:20, 1351:17, 1351:19, 1351:22, 1352:6, 1352:8, 1352:11, 1353:1, 1353:11, 1353:12, 1353:14, 1354:13,

**1356:7, 1356:13, 1356:15, 1424:10, 1425:14, 1425:18, 1428:12, 1429:2, 1440:9, 1441:2, 1442:12, 1442:25, 1488:19, 1489:3, 1490:11, 1490:14, 1494:6, 1494:8, 1495:5, 1499:1, 1505:23, 1520:5, 1521:4, 1521:19, 1523:6, 1526:22, 1528:19, 1549:14, 1553:1
**dollars** [1] - 1540:20
**domain** [1] - 1415:13
**Don** [11] - 1359:17, 1361:11, 1445:10, 1445:13, 1446:24, 1493:9, 1514:24, 1517:2, 1517:3, 1517:25, 1521:14
**done** [43] - 1305:4, 1334:13, 1334:19, 1334:22, 1335:22, 1336:11, 1336:14, 1358:9, 1360:18, 1362:13, 1369:10, 1383:23, 1387:10, 1425:1, 1425:3, 1434:21, 1440:2, 1444:4, 1445:25, 1446:2, 1446:12, 1448:3, 1448:10, 1449:12, 1450:3, 1450:8, 1451:13, 1461:4, 1470:1, 1470:25, 1483:20, 1501:11, 1506:18, 1508:12, 1527:7, 1551:16, 1551:20, 1551:21, 1553:14, 1553:16, 1554:5, 1558:3
**dot** [1] - 1351:24
**double** [5] - 1386:24, 1387:7, 1424:21, 1429:16, 1556:8
**doubt** [1] - 1502:6
**down** [25] - 1316:12, 1320:15, 1355:17, 1365:7, 1373:22, 1381:25, 1388:4, 1389:14, 1393:25, 1401:13, 1401:23, 1426:16, 1429:9, 1450:13, 1451:6, 1451:7, 1451:8, 1451:21, 1452:7,

**1454:5, 1457:10, 1458:19, 1522:12, 1547:23, 1557:7
**downstream** [1] - 1398:3
**dozens** [1] - 1525:6
**Dr** [3] - 1385:2, 1389:25, 1401:24
**drafts** [1] - 1438:14
**dramatic** [1] - 1466:19
**draw** [2] - 1302:3, 1522:10
**drawing** [2] - 1393:9, 1406:21
**drew** [2] - 1400:10, 1400:21
**drilling** [2] - 1316:10, 1316:20
**driven** [1] - 1383:10
**Drop** [1] - 1508:18
**DSI** [3] - 1315:13, 1315:22
**DTX-46** [2] - 1349:4, 1349:6
**DTX-500** [2] - 1392:7, 1460:7
**DTX-501** [2] - 1454:4, 1454:9
**DTX-716** [1] - 1349:14
**DTX-733** [4] - 1318:11, 1336:17, 1349:12, 1349:14
**DTX-740** [1] - 1349:23
**due** [1] - 1463:8
**duplicated** [4] - 1427:14, 1427:16, 1427:19, 1429:16
**during** [22] - 1294:6, 1298:14, 1300:17, 1305:11, 1321:18, 1327:2, 1328:9, 1376:25, 1388:7, 1439:2, 1439:7, 1439:8, 1441:3, 1442:23, 1458:24, 1471:16, 1478:4, 1488:10, 1504:10, 1528:5, 1536:3, 1558:10

**E**

**e-mail** [22] - 1365:7, 1367:14, 1368:12, 1368:21, 1369:13, 1369:24, 1372:6, 1374:14, 1374:15, 1405:1, 1405:3, 1405:7, 1405:9, 1433:24, 1435:15,

1441:4, 1445:13, 1446:10, 1446:20, 1489:23, 1493:24, 1521:16
**e-mailed** [2] - 1488:8, 1498:10
**e-mailing** [1] - 1498:17
**e-mails** [11] - 1435:14, 1435:24, 1436:1, 1441:24, 1441:25, 1442:4, 1442:7, 1504:8, 1514:4, 1515:7, 1515:8
**early** [3] - 1478:8, 1479:18, 1558:1
**easier** [4] - 1385:8, 1392:17, 1398:22, 1558:3
**easily** [3] - 1419:17, 1528:15, 1556:1
**Easter** [11] - 1404:22, 1410:20, 1498:1, 1498:10, 1498:13, 1498:14, 1498:21, 1523:5, 1550:12, 1550:13
**easy** [12] - 1419:23, 1449:7, 1467:25, 1468:7, 1476:16, 1477:1, 1477:24, 1494:24, 1549:18, 1552:24, 1552:25, 1556:10
**ECF** [1] - 1345:4
**echo** [1] - 1499:25
**ecosystem** [4] - 1297:7, 1338:23, 1339:1, 1343:6
**edition** [1] - 1341:24
**editor** [1] - 1409:22
**education** [1] - 1505:6
**Edwards** [39] - 1291:22, 1295:2, 1296:12, 1297:16, 1306:21, 1314:9, 1314:17, 1315:9, 1315:15, 1315:17, 1315:22, 1316:11, 1316:13, 1317:1, 1317:14, 1319:3, 1319:22, 1321:5, 1321:6, 1323:16, 1323:21, 1330:21, 1331:2, 1331:3, 1332:20, 1332:24, 1333:3, 1333:23, 1335:15, 1335:24, 1337:13, 1338:22, 1345:12, 1346:3,

1347:8, 1481:2, 1482:10, 1528:3, 1538:3
**Edwards'** [1] - 1486:25
**effect** [2] - 1332:7, 1359:6
**effective** [1] - 1334:7
**effectively** [9] - 1333:2, 1333:18, 1333:21, 1334:1, 1442:12, 1449:25, 1542:23, 1543:3, 1543:5
**efficiency** [1] - 1377:25
**efforts** [1] - 1540:9
**eight** [6] - 1357:5, 1376:23, 1378:24, 1387:23, 1432:12, 1504:7
**eighty** [2] - 1387:15, 1387:23
**eighty-eight** [1] - 1387:23
**either** [18] - 1304:1, 1316:14, 1350:24, 1366:13, 1366:22, 1370:23, 1379:6, 1385:15, 1397:8, 1397:17, 1409:24, 1431:15, 1435:9, 1488:15, 1508:10, 1515:19, 1519:1
**elaborate** [1] - 1453:16
**elapsed** [1] - 1370:8
**element** [3] - 1387:21, 1481:6, 1539:17
**elements** [20] - 1339:8, 1376:7, 1376:11, 1376:15, 1376:17, 1376:20, 1376:22, 1376:24, 1377:1, 1377:22, 1378:24, 1378:25, 1394:25, 1419:20, 1459:22, 1480:20, 1480:22, 1492:5, 1501:20
**eliminate** [2] - 1509:5, 1541:14
**elsewhere** [1] - 1328:3
**emanated** [1] - 1471:23
**employee** [6] - 1312:16, 1329:15, 1329:22, 1353:9, 1471:6, 1546:23
**employees** [11] -

1327:13, 1359:4, 1432:18, 1434:17, 1470:4, 1471:2, 1472:1, 1478:1, 1485:1, 1505:6
**enables** [1] - 1295:14
**enacted** [1] - 1316:9
**encompassed** [1] - 1423:2
**encourage** [1] - 1296:17
**end** [25] - 1292:10, 1340:5, 1340:12, 1348:1, 1380:9, 1397:22, 1397:23, 1399:4, 1399:16, 1461:3, 1461:5, 1461:6, 1461:13, 1461:16, 1461:17, 1461:21, 1461:22, 1461:23, 1462:1, 1501:14, 1523:2, 1525:24, 1543:6, 1544:1, 1554:11
**END** [7] - 1393:22, 1394:1, 1394:21, 1395:1, 1401:14, 1458:10, 1460:24
**ends** [2] - 1325:12, 1398:14
**Energy** [1] - 1316:23
**enforce** [1] - 1552:3
**enforced** [1] - 1437:13
**engage** [2] - 1327:13, 1473:7
**engaged** [1] - 1311:25
**engagement** [2] - 1313:1, 1313:2
**engagements** [2] - 1298:11, 1339:9
**engineer** [13] - 1307:23, 1310:5, 1325:20, 1326:6, 1327:19, 1328:23, 1329:1, 1329:19, 1329:20, 1439:19, 1519:5, 1522:3, 1522:14
**engineer's** [1] - 1299:24
**engineering** [3] - 1308:5, 1308:13, 1529:12
**engineers** [3] - 1493:2, 1494:9, 1495:17
**enjoined** [6] - 1422:5, 1422:23, 1423:5, 1424:4, 1481:25, 1532:18

**enjoining** [2] - 1503:17, 1546:14
**enjoins** [1] - 1532:9
**ensure** [1] - 1444:8
**entered** [7] - 1302:24, 1366:4, 1474:23, 1481:22, 1485:4, 1548:13, 1552:15
**Enterprise** [3] - 1298:15, 1300:18, 1305:12
**entertain** [1] - 1558:16
**entire** [4] - 1302:8, 1436:23, 1503:15, 1540:14
**entirely** [8] - 1396:12, 1398:8, 1398:9, 1423:1, 1445:3, 1473:18, 1495:5, 1519:19
**entities** [2] - 1339:11, 1339:15
**entitled** [4] - 1340:7, 1515:22, 1546:9, 1559:7
**entrants** [1] - 1310:22
**entry** [1] - 1493:18
**environment** [118] - 1295:5, 1313:5, 1313:6, 1315:16, 1353:21, 1353:22, 1353:23, 1358:10, 1358:12, 1358:18, 1359:18, 1361:25, 1362:7, 1362:16, 1363:24, 1365:14, 1366:6, 1366:16, 1366:23, 1367:19, 1368:2, 1368:3, 1369:21, 1370:13, 1370:24, 1371:11, 1371:21, 1372:8, 1373:4, 1374:11, 1374:17, 1374:23, 1374:24, 1390:14, 1390:15, 1405:23, 1405:24, 1406:1, 1406:4, 1406:23, 1408:14, 1408:15, 1408:25, 1409:9, 1409:19, 1409:25, 1410:14, 1411:4, 1411:6, 1423:16, 1423:23, 1439:20, 1445:1, 1445:4, 1445:5, 1445:6, 1445:15, 1446:1, 1446:4, 1446:17, 1447:4, 1447:9, 1448:5, 1448:10,

1448:18, 1449:15, 1449:25, 1450:3, 1468:7, 1476:3, 1490:23, 1491:8, 1492:8, 1492:9, 1494:19, 1494:24, 1495:4, 1495:8, 1495:14, 1495:18, 1495:21, 1497:21, 1498:14, 1498:21, 1504:2, 1504:2, 1510:15, 1510:19, 1510:21, 1512:1, 1512:7, 1515:22, 1519:22, 1524:13, 1525:16, 1525:17, 1526:1, 1526:7, 1526:9, 1526:11, 1526:15, 1527:8, 1527:13, 1527:14, 1529:16, 1529:20, 1532:4, 1533:14, 1534:25, 1535:9, 1540:21, 1542:21, 1549:18, 1551:2, 1552:25
**environments** [34] - 1295:11, 1351:1, 1353:23, 1354:1, 1354:2, 1366:18, 1468:1, 1468:19, 1476:9, 1476:13, 1476:16, 1476:17, 1477:1, 1478:9, 1503:16, 1503:21, 1503:22, 1503:24, 1503:25, 1523:6, 1528:24, 1529:3, 1529:4, 1533:13, 1534:1, 1538:13, 1544:24, 1544:25, 1545:21, 1549:21, 1550:7, 1550:8, 1552:24
**EOP** [1] - 1310:22
**era** [1] - 1470:8
**Eric** [1] - 1290:19
**ERP** [7] - 1297:15, 1338:4, 1343:4, 1343:8, 1343:15, 1441:16, 1441:20
**error** [9] - 1361:9, 1402:3, 1402:4, 1461:24, 1462:13, 1462:15, 1462:16, 1462:17, 1507:18
**ERROR** [3] - 1401:23, 1402:2, 1462:13
**errors** [2] - 1402:1, 1507:19

16

**especially** [2] - 1300:6, 1315:8

**essentially** [21] - 1295:7, 1295:17, 1296:11, 1304:6, 1304:7, 1321:4, 1322:19, 1323:20, 1330:19, 1331:4, 1371:13, 1377:23, 1404:7, 1461:10, 1461:25, 1508:25, 1517:18, 1541:23, 1542:4, 1543:10, 1543:13

**established** [1] - 1324:6

**establishes** [1] - 1473:15

**establishing** [1] - 1340:19

**estate** [3] - 1379:19, 1379:22, 1383:19

**estimate** [1] - 1477:8

**et** [3] - 1290:4, 1290:7, 1295:6

**Eugene** [67] - 1359:12, 1359:14, 1359:16, 1359:19, 1361:14, 1361:19, 1361:23, 1362:1, 1362:14, 1364:21, 1364:22, 1365:15, 1366:2, 1366:5, 1368:3, 1370:12, 1370:19, 1444:22, 1445:14, 1446:6, 1446:8, 1446:25, 1447:7, 1447:16, 1449:8, 1449:24, 1468:1, 1476:17, 1476:18, 1490:20, 1491:1, 1491:2, 1492:21, 1493:8, 1493:14, 1493:16, 1494:24, 1495:14, 1495:17, 1495:21, 1495:25, 1496:3, 1513:25, 1514:1, 1514:2, 1514:6, 1514:9, 1514:11, 1514:16, 1514:18, 1515:2, 1515:4, 1515:14, 1517:4, 1517:9, 1519:23, 1519:25, 1520:1, 1520:4, 1521:20, 1527:13, 1549:15, 1549:17, 1550:18, 1550:21, 1550:22, 1551:2

**Eugene's** [10] -

1366:23, 1367:19, 1370:20, 1370:24, 1445:15, 1447:4, 1491:12, 1491:13, 1519:22, 1527:14

**evaluated** [2] - 1415:15, 1416:3

**evaluating** [1] - 1385:13

**event** [7] - 1291:10, 1295:13, 1340:21, 1349:25, 1481:21, 1535:17, 1537:7

**events** [1] - 1293:15

**eventually** [4] - 1328:1, 1420:1, 1524:19, 1540:1

**Evergreen** [1] - 1355:6

**everywhere** [2] - 1384:7, 1511:23

**evidence** [87] - 1291:9, 1305:2, 1305:6, 1318:11, 1348:23, 1349:2, 1349:10, 1349:17, 1349:18, 1350:3, 1351:25, 1353:3, 1356:4, 1357:16, 1361:19, 1364:21, 1364:23, 1364:24, 1368:1, 1371:9, 1371:10, 1372:17, 1385:14, 1405:9, 1405:14, 1407:4, 1433:10, 1433:17, 1433:19, 1434:13, 1434:16, 1434:20, 1437:9, 1440:23, 1453:1, 1453:2, 1463:16, 1465:9, 1468:24, 1469:7, 1469:19, 1473:12, 1473:14, 1473:15, 1473:19, 1481:19, 1485:7, 1486:3, 1486:23, 1486:25, 1487:22, 1490:25, 1500:6, 1500:21, 1501:8, 1502:1, 1502:7, 1502:8, 1502:9, 1502:16, 1502:19, 1502:20, 1502:23, 1503:1, 1504:6, 1504:9, 1504:20, 1505:3, 1505:13, 1505:15, 1513:7, 1513:8, 1513:19, 1514:17, 1515:9, 1519:21, 1520:23, 1520:24,

1520:25, 1525:19, 1529:21, 1535:4, 1535:24, 1550:16, 1552:17, 1558:25

**Evidence** [2] - 1440:14, 1440:22

**evident** [3] - 1399:14, 1469:1, 1485:10

**evidentiary** [1] - 1348:18

**EVIDENTIARY** [1] - 1290:11

**exact** [16] - 1314:7, 1342:24, 1380:2, 1382:4, 1382:5, 1382:6, 1384:6, 1395:5, 1402:1, 1441:5, 1442:6, 1507:8, 1531:2, 1547:21

**exactly** [11] - 1322:21, 1334:25, 1335:18, 1368:9, 1368:11, 1385:11, 1386:22, 1442:6, 1445:23, 1517:14, 1518:19

**exam** [2] - 1448:21, 1451:15

**Examination** [6] - 1560:4, 1560:5, 1560:8, 1560:9, 1560:12, 1560:13

**examination** [16] - 1291:10, 1331:15, 1341:1, 1346:14, 1402:22, 1403:6, 1411:14, 1443:12, 1448:22, 1463:7, 1463:15, 1496:18, 1518:11, 1518:20, 1560:5, 1560:9

**EXAMINATION** [9] - 1291:19, 1331:21, 1346:16, 1350:17, 1404:14, 1411:17, 1451:17, 1452:17, 1463:13

**examinations** [1] - 1404:3

**examine** [1] - 1439:4

**examined** [1] - 1308:18

**example** [42] - 1292:15, 1293:1, 1297:15, 1302:9, 1308:25, 1315:11, 1316:6, 1316:22, 1325:5, 1329:18, 1362:16, 1362:17, 1367:22, 1367:24,

1382:10, 1384:14, 1387:19, 1390:24, 1391:1, 1391:14, 1391:23, 1392:5, 1392:10, 1392:11, 1392:14, 1392:16, 1393:4, 1395:14, 1395:17, 1396:23, 1416:18, 1418:7, 1441:19, 1448:23, 1453:24, 1477:19, 1478:24, 1492:17, 1494:4, 1499:9, 1547:9

**examples** [8] - 1381:15, 1391:7, 1392:6, 1435:25, 1453:17, 1477:6, 1502:12, 1502:22

**Excel** [3] - 1426:13, 1428:19, 1428:22

**except** [2] - 1312:7, 1545:23

**exception** [1] - 1501:7

**exceptions** [1] - 1427:19

**excerpt** [1] - 1349:4

**exclude** [1] - 1352:13

**excluded** [8] - 1352:6, 1352:9, 1352:11, 1352:19, 1441:3, 1451:5, 1507:10, 1508:18

**excluding** [1] - 1400:7

**exclusion** [2] - 1376:18, 1376:25

**exclusive** [1] - 1415:12

**exclusively** [2] - 1298:3, 1314:12

**Excuse** [1] - 1411:23

**excuse** [1] - 1404:11

**excused** [4] - 1464:2, 1464:4, 1464:6, 1559:2

**executable** [1] - 1547:8

**execute** [1] - 1402:4

**executed** [3] - 1353:25, 1535:13, 1535:20

**executing** [2] - 1337:5, 1459:5

**executive** [2] - 1322:14, 1468:11

**executives** [1] - 1298:7

**exemplar** [1] - 1354:17

**exemplifies** [1] -

1545:15

**exhibit** [21] - 1303:25, 1340:16, 1340:18, 1340:23, 1340:24, 1341:2, 1365:5, 1372:1, 1390:2, 1407:21, 1407:23, 1410:12, 1426:15, 1438:2, 1438:3, 1438:7, 1438:12, 1438:14, 1441:7, 1484:16

**Exhibit** [31] - 1348:22, 1348:24, 1349:2, 1349:10, 1349:17, 1350:3, 1365:2, 1365:23, 1371:25, 1390:8, 1392:13, 1393:8, 1395:22, 1399:22, 1405:4, 1405:7, 1407:24, 1410:7, 1410:8, 1413:6, 1426:14, 1428:18, 1428:22, 1430:15, 1456:4, 1459:13, 1465:9, 1484:16, 1492:20, 1548:25

**Exhibits** [1] - 1465:3

**exhibits** [2] - 1438:10, 1456:3

**EXHIBITS** [2] - 1560:15, 1560:18

**exist** [7] - 1304:10, 1307:14, 1405:23, 1526:7, 1537:21, 1538:6, 1538:24

**existing** [3] - 1295:10, 1317:5, 1510:3

**exists** [3] - 1389:4, 1534:23, 1534:24

**EXIT** [11] - 1398:21, 1398:23, 1398:24, 1399:1, 1399:2, 1399:20, 1457:10, 1457:21, 1458:1

**exit** [4] - 1399:7, 1399:8, 1399:16, 1399:20

**exiting** [1] - 1399:14

**expanded** [2] - 1392:17, 1431:19

**expanding** [1] - 1292:20

**expansive** [2] - 1526:5, 1526:14

**expect** [7] - 1291:9, 1374:24, 1391:10, 1391:18, 1412:22, 1497:1, 1516:6

17

**expected** [4] - 1516:3, 1520:18, 1521:11, 1521:20
**expecting** [2] - 1325:16, 1391:2
**expects** [2] - 1497:3, 1548:23
**expeditiously** [1] - 1558:20
**experience** [14] - 1297:2, 1298:14, 1299:2, 1300:17, 1301:15, 1302:11, 1313:12, 1313:21, 1334:11, 1335:6, 1398:16, 1399:6, 1447:19, 1532:21
**experienced** [3] - 1365:6, 1365:8, 1448:13
**expert** [20] - 1332:17, 1335:23, 1335:25, 1336:2, 1483:2, 1485:12, 1488:20, 1489:10, 1500:16, 1500:17, 1501:6, 1503:19, 1514:17, 1515:5, 1530:13, 1536:7, 1539:4, 1539:22, 1543:2, 1545:8
**expertise** [1] - 1479:10
**experts** [4] - 1475:11, 1488:24, 1500:15, 1531:17
**expiration** [1] - 1328:3
**explain** [6] - 1354:16, 1358:5, 1360:11, 1398:22, 1461:19, 1472:23
**explained** [9] - 1386:15, 1419:11, 1473:14, 1480:25, 1489:7, 1496:19, 1524:19, 1535:16, 1544:22
**explanation** [7] - 1327:1, 1368:17, 1368:18, 1437:17, 1533:2, 1546:10, 1546:13
**explicitly** [2] - 1441:7, 1537:1
**exploration** [2] - 1316:10, 1316:20
**exploratory** [1] - 1325:25
**exploring** [1] - 1325:21

**exposed** [1] - 1306:10
**express** [2] - 1298:22, 1480:9
**expressed** [1] - 1414:23
**expression** [49] - 1402:7, 1407:5, 1415:16, 1415:22, 1416:5, 1417:1, 1417:3, 1418:21, 1453:7, 1453:10, 1453:13, 1453:19, 1453:21, 1454:1, 1455:10, 1455:12, 1455:15, 1457:6, 1458:2, 1462:13, 1462:22, 1463:1, 1501:1, 1508:8, 1510:10, 1510:13, 1510:14, 1510:20, 1510:24, 1510:25, 1512:12, 1513:14, 1522:2, 1522:23, 1523:1, 1523:4, 1524:2, 1524:12, 1524:25, 1525:2, 1525:8, 1525:11, 1525:12, 1527:16, 1527:18, 1527:23, 1535:8, 1535:16, 1540:3
**expressive** [5] - 1417:23, 1420:9, 1420:15, 1421:10, 1457:4
**expressly** [1] - 1478:15
**extend** [3] - 1403:18, 1413:25, 1554:4
**extends** [3] - 1413:23, 1414:12, 1511:9
**extension** [2] - 1389:8, 1414:4
**extensions** [2] - 1352:23, 1405:23
**extensively** [1] - 1303:19
**extent** [4] - 1312:8, 1373:20, 1386:13, 1389:18
**external** [1] - 1512:16
**extract** [1] - 1408:7
**extremely** [1] - 1525:5
**eye** [3] - 1385:8, 1396:14, 1396:23

## F

**face** [2] - 1296:20, 1314:25

**faced** [1] - 1525:18
**facilitate** [3] - 1295:2, 1296:18, 1361:17
**facilitating** [1] - 1338:15
**facilities** [9] - 1414:6, 1432:2, 1432:5, 1506:7, 1506:9, 1506:11, 1506:13, 1537:22, 1538:1
**facing** [1] - 1524:9
**fact** [44] - 1307:7, 1333:6, 1341:24, 1354:5, 1356:12, 1364:24, 1368:5, 1372:7, 1379:9, 1385:10, 1394:9, 1395:7, 1398:12, 1400:14, 1407:17, 1420:9, 1420:22, 1441:9, 1443:1, 1453:6, 1453:12, 1457:1, 1461:8, 1462:1, 1469:13, 1473:1, 1473:7, 1478:3, 1489:25, 1492:10, 1492:11, 1496:5, 1502:3, 1503:5, 1506:4, 1517:1, 1522:6, 1528:10, 1528:11, 1533:21, 1535:8, 1537:21, 1544:14, 1557:24
**factor** [2] - 1419:11, 1419:12
**factors** [2] - 1415:14, 1558:8
**facts** [7] - 1361:4, 1492:12, 1492:14, 1492:18, 1500:6, 1533:21, 1533:24
**factual** [1] - 1502:4
**failed** [2] - 1527:20, 1535:22
**failure** [10] - 1485:8, 1514:13, 1514:17, 1519:16, 1522:25, 1523:16, 1524:9, 1525:2, 1535:25, 1540:6
**fair** [5] - 1315:4, 1322:2, 1415:12, 1467:1, 1530:18
**fairly** [4] - 1305:16, 1317:7, 1404:4, 1553:15
**faith** [12] - 1469:10, 1470:15, 1473:25, 1476:22, 1477:13,

1478:2, 1478:25, 1485:8, 1489:15, 1501:24, 1544:14, 1551:21
**fake** [1] - 1509:14
**fall** [2] - 1423:7, 1450:22
**falls** [1] - 1484:23
**false** [7] - 1478:13, 1502:20, 1502:21, 1502:24, 1508:17, 1519:2
**familiar** [13] - 1302:3, 1317:20, 1337:22, 1338:12, 1341:21, 1341:25, 1342:6, 1342:8, 1342:9, 1342:13, 1344:13, 1412:10, 1472:18
**fangled** [3] - 1533:1, 1533:2, 1533:21
**far** [5] - 1413:17, 1442:2, 1470:14, 1517:1, 1558:25
**fashion** [1] - 1355:21
**faster** [1] - 1513:3
**favorite** [2] - 1467:6, 1467:7
**FCRR** [2] - 1290:23, 1559:8
**feasible** [1] - 1329:24
**February** [3] - 1473:17, 1540:18, 1541:1
**federal** [10] - 1359:8, 1514:6, 1514:8, 1514:20, 1516:24, 1519:24, 1521:21, 1521:22, 1522:21, 1555:19
**Federal** [2] - 1440:14, 1440:22
**fees** [4] - 1338:14, 1338:15, 1340:2
**felt** [3] - 1316:14, 1317:1, 1358:15
**fetch** [1] - 1460:5
**FETCH** [26] - 1393:22, 1393:23, 1394:1, 1394:2, 1394:21, 1394:23, 1395:1, 1400:22, 1400:23, 1401:14, 1417:22, 1418:8, 1418:17, 1419:9, 1419:25, 1420:1, 1420:9, 1421:19, 1421:20, 1458:10, 1458:11, 1460:24, 1507:21
**FETCH-DATA** [8] -

1417:22, 1418:8, 1418:17, 1419:9, 1420:9, 1421:19, 1421:20, 1507:21
**FETCH-YTD-END** [7] - 1393:22, 1394:1, 1394:21, 1395:1, 1401:14, 1458:10, 1460:24
**FETCH-YTD-START** [4] - 1393:23, 1394:2, 1394:23, 1458:11
**FETCH-YTD-SW** [1] - 1393:22
**fetches** [1] - 1417:23
**few** [23] - 1338:19, 1347:25, 1348:18, 1350:24, 1354:19, 1395:15, 1418:21, 1423:13, 1423:20, 1440:1, 1440:9, 1441:2, 1458:5, 1458:19, 1469:20, 1479:2, 1479:3, 1489:18, 1497:10, 1499:17, 1499:19, 1505:25, 1541:21
**field** [8] - 1317:4, 1365:12, 1384:23, 1447:1, 1447:13, 1448:2, 1517:10, 1521:8
**fields** [3] - 1317:4, 1369:23, 1386:14
**figure** [5] - 1353:10, 1366:9, 1367:11, 1444:24, 1447:7
**figured** [4] - 1446:24, 1493:21, 1496:7, 1517:3
**file** [114] - 1352:19, 1352:22, 1354:19, 1355:1, 1355:4, 1355:6, 1355:10, 1355:11, 1358:19, 1373:15, 1375:19, 1379:10, 1379:11, 1381:10, 1381:11, 1382:19, 1382:20, 1385:15, 1385:17, 1385:19, 1385:20, 1386:7, 1386:8, 1386:25, 1387:12, 1388:1, 1388:2, 1388:21, 1388:22, 1389:1, 1392:1, 1392:2, 1395:6, 1395:8, 1395:9, 1398:15, 1405:17, 1407:4, 1409:6,

1414:7, 1414:20,
1415:1, 1417:3,
1428:10, 1431:5,
1432:7, 1432:9,
1432:21, 1443:20,
1443:23, 1452:5,
1452:20, 1452:21,
1453:1, 1453:3,
1453:23, 1454:10,
1454:13, 1454:17,
1454:18, 1454:19,
1454:21, 1455:7,
1456:9, 1457:17,
1458:6, 1459:3,
1459:4, 1459:5,
1459:14, 1462:23,
1462:24, 1463:3,
1463:17, 1463:21,
1478:15, 1478:16,
1487:24, 1489:23,
1496:13, 1496:14,
1501:7, 1507:12,
1508:6, 1510:19,
1512:5, 1512:9,
1512:16, 1512:17,
1512:25, 1513:18,
1519:10, 1519:11,
1519:15, 1523:25,
1524:12, 1524:14,
1524:15, 1524:17,
1524:24, 1531:22,
1531:23, 1531:24,
1536:6, 1536:10,
1537:18

**files** [112] - 1304:3,
1350:20, 1350:24,
1351:3, 1351:6,
1351:7, 1351:15,
1351:25, 1352:3,
1352:6, 1352:7,
1352:9, 1352:14,
1353:18, 1353:24,
1354:7, 1354:13,
1354:17, 1354:18,
1355:9, 1355:13,
1355:24, 1357:13,
1372:20, 1374:5,
1375:15, 1379:10,
1382:8, 1382:19,
1385:13, 1385:23,
1387:1, 1404:18,
1404:19, 1405:10,
1405:15, 1405:19,
1405:22, 1406:11,
1407:4, 1407:9,
1407:14, 1407:16,
1407:18, 1407:25,
1408:23, 1424:20,
1428:10, 1431:18,
1431:20, 1432:12,
1432:13, 1432:17,

1432:24, 1433:24,
1435:20, 1437:18,
1438:23, 1439:10,
1440:1, 1448:23,
1451:20, 1451:25,
1452:23, 1454:24,
1455:17, 1455:18,
1456:7, 1457:22,
1457:24, 1470:7,
1478:3, 1478:6,
1478:7, 1478:12,
1478:18, 1478:21,
1478:23, 1488:23,
1490:8, 1490:20,
1498:8, 1498:12,
1501:1, 1504:7,
1504:8, 1504:12,
1504:23, 1505:2,
1505:8, 1505:10,
1505:20, 1505:24,
1506:2, 1506:4,
1506:16, 1506:20,
1509:14, 1510:8,
1510:11, 1522:19,
1522:22, 1527:22,
1538:12, 1545:10,
1547:19, 1550:3,
1552:16

**Files** [1] - 1372:20

**filing** [1] - 1352:4

**filter** [3] - 1376:1,
1497:2, 1508:4

**filtered** [11] - 1351:24,
1352:3, 1352:22,
1426:21, 1428:9,
1429:1, 1431:5,
1432:7, 1451:21,
1460:15, 1508:7

**filtering** [7] - 1352:6,
1352:12, 1352:20,
1353:1, 1376:8,
1426:22, 1508:21

**filtration** [1] - 1376:1

**final** [2] - 1323:13,
1357:6

**finally** [4] - 1349:22,
1355:12, 1442:20,
1551:5

**finder** [1] - 1502:3

**findings** [2] - 1554:12,
1558:17

**fine** [4] - 1389:17,
1409:5, 1486:4,
1554:5

**finish** [2] - 1404:7,
1421:6

**finished** [2] - 1291:9,
1291:21

**finishes** [1] - 1397:4

**firm** [1] - 1325:6

**firms** [2] - 1297:11,
1316:11

**first** [48] - 1311:23,
1318:16, 1326:8,
1340:6, 1340:14,
1348:21, 1355:23,
1356:4, 1358:7,
1358:22, 1359:13,
1359:18, 1368:21,
1379:8, 1381:12,
1381:20, 1381:22,
1383:11, 1388:9,
1395:15, 1396:4,
1397:2, 1400:11,
1405:21, 1434:4,
1464:22, 1467:15,
1473:7, 1484:18,
1485:23, 1494:24,
1500:18, 1503:11,
1506:17, 1506:18,
1509:25, 1515:12,
1525:25, 1526:6,
1526:9, 1526:10,
1526:11, 1526:15,
1530:17, 1549:25,
1552:15, 1554:10,
1557:11

**fit** [2] - 1317:1, 1404:2

**five** [14] - 1343:7,
1343:17, 1343:23,
1353:16, 1376:12,
1378:24, 1417:7,
1437:21, 1438:5,
1438:14, 1438:15,
1463:2, 1500:7,
1509:22

**fix** [42] - 1324:22,
1324:25, 1325:1,
1325:19, 1326:17,
1329:19, 1333:22,
1335:8, 1335:14,
1354:8, 1360:15,
1361:17, 1365:15,
1366:5, 1367:15,
1367:16, 1368:1,
1368:4, 1368:8,
1369:11, 1369:12,
1369:15, 1369:21,
1370:5, 1370:9,
1370:17, 1370:23,
1370:25, 1445:22,
1446:22, 1447:23,
1447:25, 1448:6,
1448:15, 1495:2,
1495:17, 1496:1,
1514:12, 1514:18,
1517:4, 1549:1

**fix'** [1] - 1319:10

**fixed** [15] - 1325:15,
1325:18, 1354:9,

1368:25, 1370:4,
1375:8, 1379:13,
1379:15, 1379:17,
1379:25, 1380:5,
1380:10, 1380:13,
1380:18, 1382:22

**fixed-width** [9] -
1379:13, 1379:15,
1379:17, 1379:25,
1380:5, 1380:10,
1380:13, 1380:18,
1382:22

**fixes** [9] - 1319:2,
1319:3, 1319:6,
1319:16, 1322:3,
1322:15, 1326:7,
1530:19

**fixing** [1] - 1354:9

**flagged** [2] - 1355:20,
1489:3

**flesh** [1] - 1449:4

**flies** [1] - 1296:20

**flight** [1] - 1326:8

**Flint** [3] - 1476:8,
1476:10, 1476:14

**Flint's** [1] - 1476:11

**flip** [3] - 1517:19,
1539:6, 1539:16

**flip-flop** [1] - 1539:16

**flip-flopped** [2] -
1517:19, 1539:6

**flipping** [1] - 1396:15

**flop** [1] - 1539:16

**flopped** [2] - 1517:19,
1539:6

**flow** [2] - 1469:12,
1469:13

**flower** [20] - 1380:9,
1380:21, 1381:5,
1381:20, 1381:23,
1382:2, 1382:4,
1382:6, 1382:9,
1393:20, 1396:5,
1396:6, 1396:7,
1397:3, 1455:6,
1455:7, 1455:11,
1455:14, 1455:22,
1509:9

**fly** [5] - 1304:11,
1326:8, 1326:9,
1329:21, 1366:9

**focus** [5] - 1393:20,
1393:21, 1425:9,
1444:16, 1500:21

**focused** [5] - 1338:13,
1358:18, 1369:11,
1452:25, 1507:25

**focusing** [1] - 1291:24

**folder** [5] - 1372:16,
1373:3, 1373:10,

1373:11, 1373:13

**folders** [10] - 1358:20,
1372:15, 1372:21,
1373:3, 1373:8,
1373:17, 1374:3,
1374:6, 1374:7,
1374:25

**follow** [7] - 1389:12,
1418:6, 1418:15,
1421:7, 1443:4,
1485:2, 1497:1

**follow-up** [3] - 1418:6,
1418:15, 1421:7

**followed** [4] - 1381:9,
1492:1, 1492:6,
1540:19

**following** [6] - 1356:7,
1403:5, 1425:15,
1464:12, 1492:2,
1492:16

**follows** [3] - 1291:18,
1350:16, 1452:11

**font** [3] - 1379:17,
1379:21, 1379:25

**fonts** [1] - 1509:14

**footnote** [9] - 1425:23,
1426:4, 1426:11,
1427:6, 1427:7,
1428:12, 1428:15,
1428:18

**FOR** [2] - 1290:14,
1290:19

**forced** [1] - 1472:23

**foreclose** [1] -
1323:15

**foregoing** [1] - 1559:6

**foresee** [1] - 1555:25

**forget** [2] - 1316:13,
1410:18

**form** [25] - 1307:20,
1307:21, 1319:8,
1319:10, 1319:18,
1322:5, 1322:17,
1329:8, 1332:11,
1359:3, 1359:8,
1364:17, 1369:23,
1383:18, 1406:15,
1449:10, 1492:22,
1510:3, 1513:23,
1514:8, 1514:20,
1519:24, 1521:21,
1521:22, 1530:22

**Form** [4] - 1360:22,
1519:8, 1526:19,
1548:25

**formal** [1] - 1375:11

**format** [13] - 1364:20,
1364:22, 1366:2,
1379:13, 1379:15,
1380:5, 1380:10,

1380:13, 1380:18,
1414:16, 1414:18,
1414:20, 1436:18
**formats** [1] - 1414:19
**formatting** [1] -
1365:12
**formed** [2] - 1335:7,
1417:20
**forming** [3] - 1536:17,
1536:19, 1537:5
**forms** [6] - 1354:5,
1389:4, 1503:7,
1514:7, 1516:4,
1522:21
**forth** [11] - 1323:20,
1334:4, 1397:12,
1399:8, 1425:16,
1480:20, 1492:16,
1505:14, 1507:13,
1511:2, 1539:6
**forward** [7] - 1291:12,
1327:6, 1369:3,
1369:7, 1369:13,
1369:19, 1499:19
**foundation** [8] -
1293:21, 1293:23,
1305:20, 1324:4,
1324:6, 1340:19,
1467:18, 1544:17
**four** [6] - 1417:7,
1439:9, 1463:2,
1470:17, 1504:7,
1533:17
**frame** [1] - 1534:25
**framed** [1] - 1526:4
**framework** [4] -
1373:25, 1374:3,
1374:19, 1405:25
**frankly** [2] - 1302:20,
1557:14
**Frederiksen** [114] -
1296:2, 1296:5,
1296:9, 1296:13,
1299:12, 1299:17,
1299:22, 1300:2,
1301:5, 1304:9,
1304:21, 1306:12,
1307:1, 1308:2,
1308:21, 1323:14,
1323:20, 1326:4,
1328:14, 1329:15,
1330:3, 1330:14,
1330:23, 1334:5,
1348:7, 1349:4,
1350:11, 1350:13,
1360:12, 1365:4,
1372:1, 1372:13,
1377:16, 1388:7,
1403:8, 1403:14,
1404:10, 1404:16,

1411:19, 1412:17,
1426:18, 1429:11,
1435:14, 1435:19,
1439:2, 1439:8,
1440:15, 1443:13,
1443:17, 1451:19,
1452:7, 1452:22,
1452:25, 1453:14,
1454:8, 1454:14,
1455:4, 1456:6,
1456:11, 1456:16,
1456:22, 1457:12,
1458:9, 1459:10,
1459:17, 1459:20,
1460:16, 1462:8,
1462:20, 1463:16,
1479:8, 1479:22,
1480:5, 1488:18,
1492:15, 1503:16,
1504:11, 1504:19,
1505:13, 1505:22,
1506:17, 1507:4,
1507:11, 1510:8,
1511:12, 1514:10,
1515:11, 1517:13,
1518:10, 1519:14,
1520:7, 1521:24,
1522:25, 1523:7,
1523:15, 1524:20,
1525:1, 1525:21,
1527:21, 1528:12,
1530:10, 1532:1,
1534:20, 1535:4,
1535:19, 1538:19,
1539:6, 1539:12,
1539:19, 1539:25,
1541:10, 1542:8,
1547:22, 1550:24
**FREDERIKSEN** [2] -
1350:15, 1560:8
**Frederiksen-Cross**
[97] - 1296:2,
1299:12, 1299:22,
1301:5, 1304:9,
1304:21, 1306:12,
1307:1, 1308:21,
1323:14, 1323:20,
1328:14, 1330:3,
1330:14, 1334:5,
1348:7, 1350:11,
1350:13, 1360:12,
1365:4, 1372:1,
1372:13, 1377:16,
1388:7, 1403:8,
1403:14, 1404:10,
1404:16, 1411:19,
1412:17, 1426:18,
1429:11, 1435:14,
1435:19, 1439:8,
1440:15, 1443:13,
1443:17, 1451:19,

1452:7, 1452:25,
1454:8, 1454:14,
1455:4, 1456:11,
1456:16, 1456:22,
1457:12, 1458:9,
1459:17, 1459:20,
1460:16, 1462:8,
1462:20, 1463:16,
1479:8, 1480:5,
1488:18, 1492:15,
1503:16, 1504:11,
1504:19, 1505:22,
1506:17, 1507:4,
1507:11, 1510:8,
1511:12, 1514:10,
1515:11, 1517:13,
1518:10, 1519:14,
1520:7, 1521:24,
1522:25, 1523:7,
1523:15, 1524:20,
1525:1, 1525:21,
1527:21, 1528:12,
1530:10, 1532:1,
1534:20, 1535:4,
1535:19, 1538:19,
1539:6, 1539:12,
1539:19, 1539:25,
1541:10, 1542:8,
1547:22, 1550:24
**FREDERIKSEN-
CROSS** [2] -
1350:15, 1560:8
**Frederiksen-Cross's**
[17] - 1296:5, 1296:9,
1296:13, 1299:17,
1300:2, 1308:2,
1326:4, 1329:15,
1330:23, 1349:4,
1439:2, 1452:22,
1453:14, 1456:6,
1459:10, 1479:22,
1505:13
**free** [6] - 1467:16,
1468:13, 1474:5,
1497:7, 1549:5,
1553:9
**Friday** [3] - 1325:9,
1325:17, 1349:25
**friendly** [3] - 1418:25,
1419:15, 1421:13
**front** [1] - 1397:20
**frustrating** [3] -
1327:17, 1327:21,
1327:25
**fulfill** [1] - 1421:25
**full** [5] - 1391:4,
1391:8, 1391:19,
1427:15, 1456:24
**fully** [3] - 1392:17,
1392:25, 1417:20

**function** [17] - 1313:8,
1313:10, 1377:22,
1377:23, 1383:2,
1387:1, 1388:16,
1389:9, 1396:8,
1396:10, 1396:11,
1399:11, 1399:20,
1402:2, 1417:8,
1419:19
**functional** [6] -
1389:3, 1389:5,
1389:7, 1396:13,
1397:6, 1397:7
**functionality** [11] -
1293:3, 1312:10,
1317:6, 1317:16,
1388:15, 1413:23,
1413:25, 1414:1,
1414:3, 1414:4,
1444:8
**functions** [10] -
1292:23, 1293:6,
1293:11, 1295:20,
1295:21, 1312:18,
1312:25, 1397:9,
1419:25, 1506:23
**fundamental** [1] -
1553:3
**fundamentally** [3] -
1496:23, 1543:20,
1553:20
**furthermore** [1] -
1328:5
**fuss** [1] - 1488:22
**fussed** [1] - 1446:21
**future** [7] - 1375:11,
1476:5, 1499:12,
1499:14, 1551:12,
1551:16, 1551:19

## G

**gained** [1] - 1518:7
**game** [1] - 1497:15
**Gardner** [6] - 1360:21,
1360:23, 1493:20,
1520:15, 1520:19,
1520:22
**Gartner** [14] - 1302:22,
1303:1, 1303:2,
1303:4, 1303:8,
1303:10, 1303:14,
1303:18, 1303:21,
1441:2, 1441:6,
1443:2
**Gartner's** [1] - 1303:8
**gas** [1] - 1316:10
**GB** [2] - 1436:12,
1504:20
**gears** [1] - 1317:19

**general** [24] - 1294:10,
1294:12, 1357:20,
1357:23, 1358:3,
1358:22, 1378:25,
1387:12, 1416:3,
1444:25, 1445:6,
1447:22, 1448:8,
1448:12, 1455:14,
1468:19, 1470:4,
1471:25, 1472:8,
1489:2, 1531:11,
1544:25, 1547:20,
1552:18
**General** [2] - 1320:5,
1354:24
**General's** [1] -
1354:24
**generally** [4] -
1386:12, 1445:19,
1450:17, 1493:1
**generate** [1] - 1508:17
**generated** [2] -
1383:22, 1507:6
**generating** [1] -
1507:8
**generic** [3] - 1406:24,
1433:21, 1478:8
**gentleman** [1] -
1488:11
**Giant** [5] - 1309:5,
1482:14, 1487:8,
1529:8, 1546:16
**gig** [1] - 1548:20
**given** [10] - 1394:17,
1436:10, 1437:17,
1438:3, 1458:10,
1458:11, 1466:9,
1537:1, 1550:19,
1557:5
**glad** [1] - 1489:21
**Glass** [1] - 1397:25
**Glazer** [2] - 1355:2,
1355:3
**glimmer** [1] - 1539:24
**Global** [2] - 1500:14,
1529:23
**globally** [1] - 1292:20
**goal** [1] - 1465:21
**goods** [1] - 1472:7
**governed** [3] -
1338:14, 1340:1,
1506:12
**governing** [1] - 1343:1
**governs** [1] - 1432:1
**grade** [1] - 1389:14
**Grady** [3] - 1471:24,
1486:5, 1486:12
**grant** [1] - 1313:3
**granted** [1] - 1312:24
**granting** [1] - 1440:7

**granular** [1] - 1506:24
**grateful** [1] - 1465:11
**great** [2] - 1295:20,
1401:2
**greater** [2] - 1293:22,
1358:6
**green** [2] - 1528:6,
1528:13
**Griener** [3] - 1290:23,
1559:8, 1559:8
**Grigsby** [2] - 1470:12,
1471:1
**grossly** [1] - 1538:8
**ground** [1] - 1558:3
**group** [2] - 1359:12,
1360:25
**Group** [1] - 1316:23
**grouped** [1] - 1357:18
**guess** [3] - 1392:15,
1402:19, 1455:24
**Guest** [1] - 1438:16
**guidance** [9] - 1415:7,
1465:14, 1468:14,
1471:7, 1484:13,
1484:22, 1492:2,
1540:19, 1540:20
**guy** [2] - 1450:6,
1450:25
**guys** [1] - 1306:8

---

# H

**habitual** [1] - 1382:16
**hah** [1] - 1446:7
**haiku** [2] - 1417:18,
1417:20
**half** [3] - 1409:4,
1501:2, 1556:9
**halfway** [1] - 1326:10
**halted** [1] - 1478:22
**hand** [7] - 1366:19,
1388:8, 1389:20,
1392:19, 1450:5,
1495:12, 1508:5
**handed** [2] - 1400:6,
1555:2
**handful** [1] - 1297:19
**handle** [1] - 1316:18
**handling** [1] - 1496:2
**hands** [1] - 1325:25
**hang** [1] - 1433:5
**happy** [4] - 1402:19,
1404:5, 1555:3,
1555:9
**hard** [4] - 1302:20,
1554:3, 1557:4,
1558:8
**hardware** [1] -
1341:12
**HCL** [2] - 1297:10,

1338:1
**HCM** [1] - 1372:4
**HCM200049** [6] -
1359:7, 1359:17,
1361:20, 1361:23,
1374:10, 1374:17
**HCR** [1] - 1369:10
**head** [6] - 1446:16,
1447:19, 1493:19,
1500:9, 1500:11,
1500:14
**headers** [2] - 1430:17,
1541:11
**heads** [1] - 1404:8
**Health** [1] - 1355:12
**hear** [8] - 1308:2,
1364:21, 1459:23,
1460:20, 1500:6,
1501:5, 1552:1,
1556:18
**heard** [40] - 1301:16,
1302:11, 1304:10,
1327:1, 1337:23,
1349:13, 1355:23,
1361:18, 1371:8,
1383:9, 1404:17,
1406:5, 1422:19,
1433:11, 1433:15,
1433:17, 1456:22,
1459:16, 1459:24,
1460:19, 1484:21,
1485:14, 1485:21,
1485:22, 1486:3,
1487:1, 1492:11,
1495:13, 1503:5,
1504:9, 1505:9,
1512:13, 1520:10,
1520:20, 1529:7,
1531:8, 1532:21,
1543:1, 1546:10,
1547:25
**HEARING** [1] -
1290:11
**hearing** [22] - 1296:1,
1301:4, 1302:16,
1372:6, 1372:10,
1380:4, 1403:19,
1466:17, 1466:22,
1471:22, 1478:4,
1496:20, 1500:4,
1504:5, 1504:14,
1504:15, 1506:19,
1537:7, 1552:21,
1553:2, 1553:22,
1554:11
**hearings** [1] - 1442:6
**hearsay** [1] - 1298:25
**heart's** [4] - 1475:9,
1497:8, 1548:7,
1548:14

**heavily** [1] - 1479:1
**heavy** [4] - 1400:6,
1501:19, 1502:2,
1538:9
**heavy-handed** [1] -
1400:6
**heightened** [1] -
1543:16
**held** [21] - 1443:18,
1443:25, 1444:3,
1476:1, 1482:13,
1483:21, 1487:7,
1487:21, 1495:20,
1512:23, 1527:12,
1527:24, 1528:23,
1533:13, 1533:25,
1539:3, 1539:21,
1544:4, 1550:1,
1552:9, 1555:20
**hell** [1] - 1325:18
**help** [11] - 1354:21,
1370:24, 1397:18,
1420:2, 1449:4,
1479:12, 1549:16,
1549:17, 1550:22,
1550:23, 1553:19
**helping** [1] - 1340:2
**herring** [1] - 1524:20
**herself** [3] - 1505:16,
1506:4, 1518:10
**hesitant** [1] - 1556:3
**Hi** [1] - 1372:3
**HICKS** [1] - 1290:2
**high** [2] - 1293:14,
1303:7
**higher** [1] - 1486:10
**highlighted** [8] -
1374:4, 1388:1,
1402:7, 1460:9,
1460:11, 1460:17,
1462:9, 1462:20
**highlighting** [4] -
1354:12, 1381:14,
1401:4, 1462:4
**highly** [3] - 1442:10,
1443:3, 1502:5
**Hill** [2] - 1290:17,
1500:5
**hill** [3] - 1331:20,
1340:9, 1348:4
**HILL** [30] - 1293:21,
1298:25, 1303:23,
1324:4, 1331:16,
1331:19, 1331:22,
1334:17, 1334:18,
1335:10, 1335:12,
1336:17, 1336:19,
1340:4, 1340:11,
1340:17, 1341:1,
1341:5, 1341:6,

1342:3, 1342:4,
1343:21, 1343:22,
1345:3, 1345:5,
1345:20, 1345:21,
1346:13, 1347:19,
1348:6
**HILL1** [1] - 1305:20
**hip** [1] - 1445:7
**hire** [2] - 1297:22,
1324:14
**hired** [3] - 1300:7,
1344:8, 1479:15
**history** [12] - 1301:5,
1356:6, 1467:2,
1472:17, 1478:8,
1487:14, 1487:17,
1537:2, 1540:14,
1540:16, 1552:12,
1558:10
**hit** [2] - 1509:24,
1512:19
**Hmm** [1] - 1326:6
**hold** [4] - 1326:7,
1418:14, 1423:19,
1555:13
**holder's** [1] - 1415:11
**holding** [1] - 1316:2
**Home** [5] - 1524:22,
1525:15, 1525:16,
1551:9, 1551:10
**honestly** [1] - 1449:19
**Honor** [78] - 1291:13,
1293:21, 1303:23,
1304:2, 1304:25,
1331:16, 1340:16,
1340:17, 1340:22,
1341:2, 1342:3,
1345:20, 1346:13,
1346:15, 1347:17,
1347:19, 1347:24,
1348:17, 1349:3,
1349:20, 1350:5,
1350:10, 1402:18,
1403:10, 1404:1,
1404:13, 1411:15,
1412:2, 1435:2,
1435:4, 1435:17,
1438:19, 1438:22,
1439:12, 1439:25,
1440:14, 1440:15,
1452:1, 1452:3,
1452:12, 1464:1,
1464:5, 1464:15,
1465:1, 1466:7,
1499:22, 1499:24,
1500:8, 1500:10,
1500:13, 1503:14,
1503:20, 1503:23,
1504:22, 1505:11,
1512:21, 1512:23,

1513:9, 1516:19,
1517:17, 1522:13,
1529:7, 1529:15,
1532:9, 1536:21,
1536:22, 1537:1,
1541:1, 1542:1,
1543:12, 1543:18,
1544:1, 1555:4,
1556:20, 1557:11,
1558:22, 1558:23
**Honor's** [11] - 1351:9,
1440:3, 1500:22,
1505:11, 1522:13,
1522:17, 1529:14,
1540:18, 1541:3,
1543:20
**HONORABLE** [1] -
1290:2
**hope** [1] - 1525:23
**hopefully** [2] - 1557:2,
1557:14
**Hospital** [1] - 1354:25
**host** [2] - 1503:24,
1504:3
**hosting** [27] - 1422:3,
1422:4, 1422:5,
1422:10, 1422:17,
1422:19, 1422:23,
1422:24, 1423:4,
1423:5, 1424:1,
1424:3, 1424:4,
1424:5, 1435:6,
1438:24, 1439:14,
1503:12, 1503:14,
1503:15, 1503:18,
1506:8, 1506:11,
1537:20, 1538:2,
1538:5, 1538:24
**hotel** [1] - 1326:10
**Houmand** [1] -
1290:16
**hour** [5] - 1465:20,
1496:9, 1496:10,
1544:10, 1551:7
**housecleaning** [1] -
1465:2
**housekeeping** [3] -
1347:25, 1348:18,
1403:11
**HTML** [4] - 1352:13,
1436:10, 1438:1,
1438:6
**human** [10] - 1332:6,
1332:10, 1332:12,
1332:15, 1483:7,
1485:19, 1528:13,
1528:16, 1546:3
**human-readable** [10] -
1332:6, 1332:10,
1332:12, 1332:15,

21

1483:7, 1485:19,
1528:13, 1528:16,
1546:3
**humanly** [1] - 1483:8
**hundred** [2] - 1389:16,
1409:20
**hundreds** [3] -
1454:23, 1455:17,
1457:22
**hypothetical** [6] -
1365:19, 1447:6,
1447:10, 1447:14,
1449:3, 1450:16
**hypotheticals** [1] -
1448:20

## I

**i.e** [1] - 1313:4
**IBM** [7] - 1297:9,
1411:20, 1412:13,
1413:6, 1413:8,
1413:9, 1511:14
**identical** [2] -
1392:11, 1417:8
**identification** [1] -
1340:21
**identified** [10] -
1347:11, 1397:21,
1425:18, 1428:11,
1488:11, 1488:19,
1495:20, 1504:17,
1541:1, 1551:1
**identifiers** [1] - 1437:2
**identifies** [2] -
1375:25, 1388:19
**identify** [9] - 1337:9,
1337:15, 1337:17,
1355:9, 1378:5,
1392:12, 1417:12,
1545:14, 1551:3
**identifying** [2] -
1378:20, 1390:17
**IDs** [1] - 1333:14
**ignore** [2] - 1540:15,
1545:16
**ignored** [2] - 1400:14,
1492:4
**ignores** [1] - 1354:5
**II** [14] - 1375:23,
1376:14, 1376:19,
1377:2, 1377:11,
1377:20, 1405:16,
1465:15, 1491:24,
1512:24, 1524:6,
1524:8, 1550:2,
1555:7
**Ilissa** [1] - 1290:20
**illegal** [20] - 1296:14,
1296:19, 1314:24,

1469:2, 1471:12,
1474:13, 1474:15,
1474:17, 1476:1,
1480:18, 1481:24,
1483:21, 1526:15,
1526:16, 1526:17,
1531:5, 1532:18,
1532:19, 1542:5,
1552:9
**illuminating** [1] -
1399:3
**illustrate** [2] -
1358:25, 1371:23
**illustrates** [2] -
1367:24, 1386:17
**image** [1] - 1294:24
**imagine** [1] - 1555:18
**immediate** [2] -
1469:24, 1493:18
**immediately** [2] -
1325:13, 1325:19
**impact** [3] - 1407:14,
1470:2, 1470:20
**impacted** [1] - 1515:1
**implement** [2] -
1295:23, 1516:4
**implementation** [3] -
1313:2, 1327:14,
1339:7
**implementations** [1] -
1532:22
**implemented** [4] -
1337:1, 1485:24,
1486:2
**implementing** [1] -
1532:22
**implications** [1] -
1517:25
**implicitly** [1] - 1488:16
**implied** [1] - 1537:20
**imply** [3] - 1538:5,
1538:24, 1546:17
**important** [10] -
1307:11, 1309:15,
1309:18, 1324:2,
1324:11, 1347:6,
1388:10, 1388:11,
1389:12, 1393:13,
1394:5, 1408:3,
1494:14, 1500:2,
1501:18, 1502:10,
1505:19, 1507:3,
1539:24
**Important** [3] -
1436:13, 1504:21,
1541:8
**importantly** [1] -
1506:7
**impossible** [4] -
1333:3, 1333:18,

1333:21, 1531:23
**impressed** [1] -
1471:13
**improper** [1] - 1502:13
**improve** [1] - 1421:25
**improves** [1] -
1420:25
**in-memory** [1] -
1300:1
**inability** [1] - 1334:7
**inaccessible** [1] -
1529:6
**inaccurate** [2] -
1360:6, 1381:10
**inadvertently** [1] -
1541:8
**INC** [2] - 1290:4,
1290:7
**incident** [3] - 1326:17,
1434:19, 1494:15
**incidents** [1] -
1326:24
**include** [28] - 1319:3,
1351:24, 1352:18,
1360:22, 1376:24,
1406:6, 1406:7,
1406:8, 1406:13,
1406:17, 1406:24,
1407:3, 1407:9,
1407:18, 1428:10,
1439:23, 1493:20,
1511:20, 1512:1,
1512:4, 1512:10,
1512:15, 1524:10,
1524:11, 1524:14,
1524:15
**included** [6] - 1339:7,
1365:24, 1377:1,
1404:19, 1408:1,
1477:9
**includes** [9] - 1331:1,
1338:1, 1406:10,
1406:22, 1407:19,
1407:20, 1482:25,
1528:24, 1547:14
**including** [14] -
1297:7, 1298:7,
1318:1, 1319:4,
1373:5, 1373:17,
1441:2, 1442:5,
1471:24, 1472:8,
1476:4, 1482:25,
1514:9, 1543:24
**inclusion** [1] -
1355:11
**incomplete** [2] -
1360:6, 1450:15
**inconsistency** [1] -
1392:15
**inconsistent** [1] -

1382:17
**incorporate** [10] -
1407:5, 1407:10,
1510:2, 1510:4,
1513:20, 1523:3,
1523:21, 1524:11,
1527:22, 1540:3
**incorporated** [1] -
1512:6
**incorporates** [2] -
1510:25, 1513:14
**incorporating** [1] -
1549:23
**incorporation** [1] -
1512:11
**incorrect** [3] - 1345:1,
1427:23, 1431:16
**incredibly** [1] - 1525:7
**incredulous** [3] -
1468:12, 1552:9,
1553:10
**indecipherable** [2] -
1334:16, 1421:3
**independent** [9] -
1297:22, 1311:25,
1315:14, 1342:25,
1402:16, 1405:22,
1412:4, 1479:4,
1511:15
**independently** [4] -
1413:12, 1413:19,
1511:10, 1511:16
**indicate** [13] - 1314:5,
1331:5, 1372:25,
1383:12, 1396:2,
1406:22, 1411:2,
1460:10, 1472:13,
1515:7, 1519:9,
1535:9
**indicated** [13] -
1318:14, 1346:22,
1357:8, 1361:11,
1361:24, 1367:2,
1371:5, 1372:2,
1388:7, 1390:10,
1439:9, 1460:14,
1462:14
**indicates** [7] - 1355:8,
1396:4, 1399:3,
1406:24, 1461:16,
1472:13, 1544:15
**indicating** [3] -
1461:6, 1461:12,
1461:23
**indication** [5] -
1344:4, 1365:6,
1365:8, 1372:3,
1457:18
**indications** [1] -
1508:9

**indicative** [2] -
1385:23, 1521:10
**indicator** [2] -
1384:21, 1535:1
**indicia** [1] - 1351:17
**individual** [7] -
1327:22, 1327:23,
1431:20, 1439:1,
1477:9, 1491:25,
1547:19
**individually** [1] -
1298:19
**individuals** [1] -
1297:22
**indulgence** [1] -
1403:16
**industry** [39] - 1298:1,
1298:15, 1299:4,
1299:7, 1300:17,
1300:18, 1300:22,
1300:25, 1301:6,
1303:2, 1303:3,
1303:8, 1303:13,
1303:17, 1303:21,
1304:11, 1305:12,
1305:17, 1305:18,
1305:24, 1313:25,
1317:3, 1328:10,
1334:11, 1335:4,
1335:6, 1337:25,
1339:16, 1441:8,
1442:18, 1442:19,
1485:15, 1485:16,
1485:17, 1486:24,
1507:15, 1512:14,
1532:19
**inexplicably** [1] -
1325:12
**infects** [1] - 1524:7
**infer** [2] - 1337:4,
1437:14
**informal** [11] - 1375:3,
1375:6, 1375:10,
1468:5, 1477:1,
1494:13, 1494:14,
1494:23, 1527:2,
1552:23
**information** [15] -
1303:3, 1304:20,
1320:7, 1320:16,
1320:22, 1322:9,
1323:7, 1356:2,
1369:23, 1408:6,
1408:7, 1408:8,
1410:2, 1439:12,
1547:11
**Infosys** [1] - 1297:10
**infractions** [1] -
1326:20
**infrastructure** [4] -

22

1325:22, 1406:1,
1406:3, 1406:9
**infringe** [4] - 1320:19,
1321:7, 1322:25,
1531:14
**infringement** [6] -
1471:15, 1473:4,
1473:9, 1473:18,
1473:22, 1480:21
**infringing** [2] -
1478:3, 1478:12
**inherent** [1] - 1543:15
**inherently** [1] -
1507:23
**initial** [6] - 1304:15,
1352:12, 1368:23,
1388:23, 1397:11,
1478:22
**INITIALIZE** [2] -
1459:18, 1460:4
**initialize** [5] - 1400:12,
1400:13, 1400:15,
1400:17, 1459:21
**initialized** [1] -
1400:18
**initializing** [1] -
1400:15
**injunction** [156] -
1299:14, 1299:23,
1300:3, 1301:22,
1330:4, 1330:12,
1344:20, 1344:24,
1345:4, 1345:19,
1345:25, 1356:24,
1357:2, 1358:9,
1358:11, 1362:3,
1362:6, 1362:10,
1362:18, 1362:21,
1362:22, 1364:1,
1364:5, 1365:13,
1365:21, 1371:3,
1404:23, 1422:4,
1422:7, 1441:22,
1444:5, 1444:23,
1466:20, 1466:23,
1467:15, 1468:3,
1468:12, 1468:14,
1468:18, 1468:22,
1469:8, 1469:11,
1469:16, 1469:21,
1469:25, 1470:2,
1470:6, 1470:15,
1470:18, 1470:19,
1470:20, 1470:23,
1471:4, 1471:19,
1471:20, 1472:2,
1472:20, 1473:1,
1473:21, 1473:23,
1474:3, 1474:13,
1474:16, 1474:23,

1475:1, 1475:2,
1475:4, 1475:5,
1475:8, 1475:11,
1475:17, 1477:16,
1477:19, 1478:5,
1478:20, 1479:5,
1479:13, 1480:10,
1480:11, 1481:22,
1481:23, 1482:6,
1482:9, 1482:21,
1482:23, 1483:3,
1483:19, 1483:23,
1483:24, 1484:8,
1484:16, 1484:18,
1485:3, 1485:7,
1485:9, 1485:18,
1485:23, 1486:7,
1486:13, 1486:18,
1487:3, 1489:9,
1491:16, 1494:13,
1496:25, 1497:6,
1497:24, 1497:25,
1498:16, 1501:23,
1501:25, 1510:22,
1516:24, 1523:9,
1526:3, 1526:16,
1527:4, 1527:11,
1528:2, 1530:15,
1531:4, 1532:9,
1532:13, 1533:7,
1533:10, 1535:10,
1536:11, 1536:24,
1537:2, 1537:9,
1537:16, 1540:24,
1543:22, 1544:23,
1545:16, 1545:19,
1545:22, 1545:24,
1546:5, 1546:8,
1546:14, 1547:9,
1548:7, 1548:9,
1548:13, 1550:1,
1550:13, 1551:14,
1551:15, 1551:17,
1552:4, 1552:5,
1552:6, 1552:8,
1553:4, 1553:18
**injunction's** [1] -
1345:8
**injunctions** [1] -
1551:22
**injustice** [1] - 1442:21
**innocently** [1] -
1473:9
**innovation** [1] -
1293:7
**innumerable** [2] -
1297:19, 1298:19
**inputting** [1] - 1445:16
**inquire** [1] - 1347:22
**inquiry** [1] - 1479:11

**insert** [1] - 1535:9
**install** [1] - 1439:19
**instance** [38] -
1292:12, 1292:19,
1315:11, 1317:4,
1351:25, 1352:14,
1352:15, 1354:6,
1362:21, 1367:14,
1370:16, 1371:9,
1377:8, 1378:16,
1379:3, 1379:21,
1382:25, 1383:22,
1384:22, 1385:25,
1386:13, 1387:17,
1389:21, 1391:4,
1392:22, 1400:10,
1405:2, 1406:23,
1408:5, 1409:7,
1417:5, 1417:16,
1419:12, 1432:11,
1449:23, 1450:2,
1488:17, 1506:17
**instances** [5] -
1384:8, 1432:21,
1469:8, 1502:18,
1547:17
**instead** [10] - 1392:24,
1397:25, 1399:19,
1457:5, 1458:1,
1476:12, 1494:8,
1500:18, 1507:21,
1546:7
**instruct** [3] - 1306:1,
1434:9, 1541:6
**instructed** [3] -
1481:7, 1495:23,
1548:12
**instructing** [1] -
1390:11
**instruction** [10] -
1477:22, 1479:5,
1481:14, 1501:3,
1521:1, 1525:4,
1525:10, 1528:22,
1529:14, 1541:3
**instructional** [1] -
1319:10
**instructions** [6] -
1473:12, 1480:19,
1482:21, 1491:16,
1551:6, 1551:8
**INT** [1] - 1522:20
**integrate** [1] - 1315:15
**integrating** [1] -
1524:24
**integration** [13] -
1337:19, 1337:20,
1339:5, 1339:6,
1339:7, 1341:13,
1342:5, 1342:9,

1342:12, 1342:14,
1342:15, 1342:16,
1343:13
**integrator** [3] -
1297:16, 1338:15,
1501:10
**integrators** [2] -
1297:8, 1303:6
**intellectual** [7] -
1310:25, 1320:19,
1321:8, 1322:25,
1489:5, 1530:2,
1531:15
**intended** [9] -
1352:13, 1388:15,
1431:11, 1431:22,
1432:21, 1483:9,
1500:22, 1506:5,
1520:20
**intends** [1] - 1348:6
**intent** [4] - 1311:2,
1485:6, 1539:16,
1539:17
**interact** [1] - 1531:22
**interacted** [1] -
1401:25
**interacting** [3] -
1369:23, 1391:24,
1419:1
**interacts** [1] - 1547:16
**interesting** [3] -
1367:9, 1508:23,
1517:16
**interface** [2] -
1365:25, 1390:6
**interject** [1] - 1340:15
**internal** [6] - 1301:21,
1302:24, 1363:9,
1472:13, 1476:11,
1491:13
**internally** [2] - 1488:6,
1552:4
**International** [1] -
1315:13
**interoperability** [1] -
1408:13
**interpret** [1] - 1468:13
**interpretation** [15] -
1323:15, 1330:5,
1330:24, 1330:25,
1331:1, 1344:20,
1344:23, 1346:2,
1346:3, 1346:7,
1469:11, 1501:25,
1529:10, 1530:13,
1538:8
**interpreted** [5] -
1483:4, 1503:17,
1532:13, 1536:25,
1543:22

**interpreting** [2] -
1332:18, 1503:19
**interrogatory** [1] -
1294:2
**interrupting** [1] -
1421:5
**interview** [1] - 1353:8
**intriguing** [1] - 1530:8
**introduce** [1] - 1441:6
**introduced** [2] -
1442:16, 1514:23
**investigating** [1] -
1494:9
**investigation** [1] -
1479:4
**invite** [2] - 1315:18,
1315:19
**inviting** [1] - 1368:17
**involve** [2] - 1532:2,
1542:19
**involved** [5] - 1336:1,
1359:3, 1359:7,
1524:18, 1524:23
**involvement** [1] -
1344:14
**involves** [1] - 1378:24
**involving** [2] - 1504:7,
1504:8
**Iowa** [1] - 1316:24
**IP** [2] - 1541:6,
1543:19
**irreconcilable** [1] -
1522:17
**irregularities** [2] -
1385:19, 1385:23
**irrelevant** [3] - 1435:7,
1496:19, 1551:8
**IRS** [6] - 1360:16,
1361:6, 1492:24,
1493:22, 1520:21,
1521:1
**ISAACSON** [20] -
1463:9, 1463:12,
1463:14, 1463:23,
1464:15, 1464:18,
1464:25, 1465:10,
1465:17, 1465:20,
1466:1, 1466:4,
1466:7, 1544:7,
1555:2, 1555:11,
1557:10, 1558:22,
1560:22, 1560:24
**Isaacson** [7] -
1290:15, 1464:15,
1466:6, 1503:5,
1544:5, 1554:8,
1560:13
**Isaacson's** [1] -
1499:25
**Islands** [5] - 1359:4,

1360:18, 1370:7, 1492:23, 1521:2

**isolated** [12] - 1350:21, 1350:24, 1351:4, 1353:19, 1353:20, 1353:24, 1354:2, 1467:7, 1467:9, 1476:22, 1494:15, 1552:21

**isolation** [3] - 1415:22, 1416:25, 1417:6

**Issacson** [1] - 1463:11

**issue** [65] - 1325:14, 1325:15, 1326:12, 1328:22, 1330:17, 1349:3, 1349:11, 1359:7, 1364:16, 1364:17, 1365:6, 1365:8, 1366:21, 1441:5, 1443:11, 1444:16, 1446:3, 1447:8, 1466:12, 1468:25, 1474:11, 1481:4, 1482:20, 1483:14, 1495:22, 1503:15, 1503:21, 1504:5, 1512:22, 1513:15, 1513:17, 1513:21, 1515:15, 1515:23, 1516:10, 1516:18, 1517:17, 1519:7, 1519:10, 1519:20, 1520:14, 1522:18, 1523:17, 1523:18, 1524:22, 1526:18, 1527:17, 1527:23, 1527:25, 1530:13, 1534:14, 1534:15, 1535:19, 1535:25, 1536:2, 1536:4, 1540:5, 1549:22, 1550:15, 1555:23

**Issue** [6] - 1414:25, 1506:14, 1524:21, 1547:10, 1547:23, 1551:5

**issued** [8] - 1301:22, 1356:24, 1470:21, 1478:5, 1484:18, 1487:1, 1500:4, 1533:7

**issues** [26] - 1380:16, 1385:1, 1403:15, 1435:6, 1439:14, 1444:17, 1446:1, 1466:9, 1473:5, 1500:5, 1500:6, 1501:15, 1503:11,

1503:13, 1509:21, 1509:22, 1509:23, 1512:19, 1513:16, 1518:8, 1528:1, 1539:18, 1540:5, 1540:7, 1541:1

**issuing** [1] - 1472:20

**IT** [2] - 1298:7, 1437:13

**item** [1] - 1377:17

**items** [2] - 1333:16

**itself** [16] - 1307:14, 1327:9, 1378:13, 1388:18, 1389:1, 1405:20, 1414:14, 1416:16, 1417:17, 1490:3, 1507:16, 1510:24, 1512:10, 1523:25, 1552:11, 1553:19

## J

**James** [1] - 1489:2

**January** [25] - 1360:21, 1361:8, 1361:12, 1361:20, 1361:24, 1370:13, 1374:11, 1493:3, 1493:9, 1493:11, 1493:17, 1493:19, 1493:21, 1493:25, 1494:1, 1494:2, 1520:2, 1521:6, 1521:7, 1521:13, 1521:19, 1549:3, 1549:8, 1549:9, 1549:10

**Jay** [5] - 1454:3, 1456:9, 1457:8, 1458:4, 1459:9

**JD** [44] - 1291:22, 1295:2, 1296:12, 1297:16, 1306:21, 1314:8, 1314:17, 1315:9, 1315:15, 1315:17, 1315:22, 1316:11, 1316:13, 1316:25, 1317:14, 1319:2, 1319:22, 1321:5, 1321:6, 1323:16, 1323:21, 1330:20, 1331:1, 1331:3, 1332:20, 1332:24, 1333:3, 1333:23, 1335:15, 1335:24, 1337:13, 1338:22, 1345:11, 1346:3, 1347:8, 1481:2, 1482:10,

1486:25, 1528:3, 1533:13, 1533:14, 1534:1, 1538:2, 1545:21

**JDE** [136] - 1294:21, 1295:24, 1296:2, 1296:21, 1298:17, 1298:23, 1299:13, 1300:11, 1300:14, 1300:20, 1301:2, 1305:14, 1306:2, 1306:13, 1307:25, 1308:3, 1308:5, 1308:16, 1309:5, 1309:20, 1313:13, 1313:25, 1317:23, 1323:22, 1324:12, 1327:6, 1328:11, 1331:7, 1331:10, 1332:9, 1333:4, 1333:7, 1333:8, 1333:19, 1334:1, 1335:1, 1336:13, 1336:21, 1339:1, 1339:5, 1342:17, 1344:20, 1344:21, 1344:24, 1345:7, 1346:4, 1346:5, 1346:9, 1351:19, 1411:19, 1412:10, 1412:15, 1412:18, 1414:10, 1414:22, 1439:20, 1439:23, 1440:2, 1440:4, 1440:5, 1440:21, 1441:20, 1442:5, 1442:8, 1467:16, 1467:18, 1468:13, 1470:12, 1470:13, 1471:4, 1471:6, 1473:20, 1474:7, 1474:9, 1474:10, 1476:24, 1476:25, 1477:10, 1480:14, 1480:17, 1481:15, 1482:2, 1482:14, 1482:25, 1483:14, 1484:1, 1484:9, 1484:12, 1485:12, 1486:7, 1487:5, 1500:13, 1500:17, 1501:9, 1501:10, 1511:13, 1511:16, 1528:1, 1528:7, 1528:15, 1528:23, 1528:25, 1529:2, 1529:3, 1529:4, 1529:8, 1529:15, 1529:17, 1529:18, 1529:19, 1531:9, 1531:20, 1532:3,

1532:7, 1532:15, 1532:18, 1532:23, 1534:6, 1538:21, 1538:23, 1542:6, 1542:18, 1542:20, 1542:24, 1543:2, 1545:15, 1545:24, 1547:6, 1552:7, 1552:13

**Jessica** [1] - 1290:15

**JHN** [1] - 1369:21

**Jim** [11] - 1470:7, 1470:22, 1490:5, 1500:9, 1514:19, 1516:13, 1516:20, 1516:21, 1519:11, 1522:24, 1526:25

**Jira** [3] - 1360:20, 1361:4, 1520:17

**job** [6] - 1300:7, 1313:11, 1315:8, 1327:18, 1327:24, 1554:5

**John** [13] - 1301:9, 1306:15, 1308:8, 1309:23, 1318:10, 1321:12, 1328:19, 1330:10, 1423:20, 1426:12, 1426:16, 1428:5, 1429:8

**Johnson** [42] - 1364:17, 1365:9, 1365:15, 1368:6, 1444:17, 1444:22, 1445:1, 1445:3, 1445:22, 1445:25, 1446:1, 1446:12, 1447:5, 1447:7, 1447:8, 1447:16, 1447:22, 1448:17, 1449:8, 1449:24, 1490:18, 1490:22, 1491:6, 1495:11, 1495:13, 1495:15, 1495:18, 1495:20, 1495:23, 1499:15, 1513:23, 1515:14, 1517:6, 1517:10, 1549:1, 1550:15, 1550:16, 1550:19, 1550:21, 1550:23, 1551:1, 1551:4

**Johnson's** [2] - 1448:1, 1448:17

**JUDGE** [1] - 1290:2

**judge** [1] - 1472:4

**judgment** [19] - 1473:3, 1473:4, 1473:17, 1476:1,

1476:6, 1481:18, 1482:14, 1482:22, 1487:8, 1491:24, 1492:13, 1512:23, 1540:18, 1541:4, 1546:21, 1547:1, 1547:2, 1550:2, 1550:5

**July** [1] - 1521:4

**junction** [12] - 1469:9, 1469:20, 1479:19, 1483:10, 1498:5, 1498:15, 1502:16, 1538:8, 1547:2, 1550:12, 1552:15, 1553:10

**June** [1] - 1335:11

**jungle** [1] - 1555:16

**juror** [1] - 1481:1

**jury** [26] - 1466:15, 1467:19, 1471:16, 1474:2, 1480:18, 1480:19, 1481:7, 1481:14, 1481:21, 1483:10, 1491:15, 1491:16, 1496:24, 1528:21, 1545:18, 1546:14, 1548:12, 1553:18, 1555:15, 1555:17, 1556:1, 1556:6, 1556:9, 1558:10

**juts** [1] - 1509:17

## K

**keep** [4] - 1532:17, 1533:6, 1539:4, 1539:19

**key** [15] - 1314:3, 1314:4, 1314:10, 1315:3, 1323:11, 1323:13, 1324:13, 1508:2, 1508:11, 1512:22, 1520:14, 1523:17, 1540:4, 1540:5, 1556:23

**keyboard** [1] - 1325:25

**keyword** [2] - 1425:15, 1425:16

**kind** [13] - 1294:18, 1315:22, 1344:4, 1344:15, 1356:3, 1357:18, 1383:5, 1389:17, 1396:23, 1406:15, 1448:9, 1512:18, 1513:22

**kinds** [1] - 1303:15

24

**know-how** [19] -
1367:15, 1367:23,
1370:14, 1370:15,
1448:9, 1448:12,
1450:5, 1451:5,
1480:8, 1495:19,
1517:22, 1518:2,
1518:8, 1521:25,
1526:8, 1538:16,
1539:7, 1543:24
**knowing** [1] - 1447:3
**knowledge** [19] -
1447:3, 1447:12,
1447:16, 1447:17,
1447:18, 1473:9,
1480:6, 1513:6,
1516:12, 1517:15,
1518:6, 1518:7,
1518:13, 1518:14,
1518:24, 1538:20,
1539:13, 1550:25
**knowledgeable** [1] -
1487:15
**known** [2] - 1367:18,
1446:15
**knows** [9] - 1292:14,
1445:21, 1445:23,
1446:25, 1447:15,
1447:20, 1450:6,
1450:9, 1545:12
**KPMG** [1] - 1338:1

**L**

**label** [1] - 1455:1
**labeled** [3] - 1436:13,
1504:20, 1541:8
**labeling** [1] - 1419:15
**labels** [3] - 1309:16,
1347:3, 1528:9
**lack** [7] - 1473:25,
1477:12, 1478:24,
1485:8, 1488:1,
1551:21, 1552:17
**laid** [3] - 1388:24,
1487:23, 1544:12
**Lanchak** [48] -
1291:11, 1291:15,
1292:4, 1293:17,
1293:25, 1296:1,
1296:7, 1297:25,
1299:19, 1301:4,
1302:16, 1305:11,
1305:23, 1309:4,
1309:25, 1311:14,
1314:10, 1317:19,
1318:14, 1320:7,
1321:19, 1323:13,
1330:13, 1331:13,
1331:19, 1331:23,

1332:17, 1335:13,
1335:23, 1337:19,
1341:7, 1342:5,
1344:19, 1345:6,
1346:18, 1347:21,
1403:7, 1441:4,
1483:3, 1484:1,
1487:5, 1487:13,
1500:16, 1528:5,
1531:9, 1532:6,
1532:20, 1543:1
**LANCHAK** [2] -
1291:17, 1560:4
**Lanchak's** [2] -
1303:24, 1335:11
**landed** [1] - 1505:18
**language** [36] -
1295:13, 1362:5,
1363:2, 1363:4,
1363:10, 1364:1,
1364:12, 1377:9,
1377:10, 1377:19,
1378:5, 1378:16,
1383:10, 1383:21,
1387:3, 1388:10,
1402:6, 1407:1,
1471:2, 1474:25,
1480:9, 1482:8,
1482:23, 1483:24,
1484:3, 1485:9,
1491:15, 1497:6,
1507:16, 1526:3,
1528:2, 1545:25,
1546:5, 1546:8,
1552:14
**languages** [3] -
1383:25, 1406:14
**laptop** [2] - 1299:25,
1300:8
**large** [2] - 1339:8,
1556:21
**largely** [1] - 1557:1
**larger** [2] - 1292:11,
1342:20
**LARRY** [1] - 1290:2
**last** [23] - 1384:17,
1388:3, 1399:22,
1426:4, 1426:5,
1426:16, 1436:8,
1447:11, 1466:10,
1468:23, 1498:23,
1501:2, 1502:10,
1511:19, 1539:23,
1541:21, 1544:7,
1544:10, 1544:20,
1556:2, 1556:8,
1557:12
**lastly** [2] - 1293:7,
1499:8
**late** [3] - 1310:21,

1403:24, 1465:12
**latitude** [1] - 1383:25
**Laurie** [4] - 1360:23,
1493:20, 1520:15,
1520:19
**law** [13] - 1292:9,
1484:25, 1496:25,
1507:24, 1509:25,
1510:1, 1511:7,
1511:9, 1511:11,
1523:20, 1524:4,
1541:24, 1554:12
**Law** [2] - 1290:17,
1290:21
**lawful** [1] - 1543:23
**lawyers** [1] - 1531:18
**layer** [16] - 1292:16,
1292:23, 1293:12,
1295:3, 1311:1,
1311:5, 1311:15,
1314:22, 1317:17,
1319:22, 1319:23,
1325:21, 1325:22,
1346:12, 1347:10
**layers** [2] - 1346:25,
1442:6
**lead** [1] - 1557:23
**leading** [2] - 1368:10,
1368:15
**learn** [2] - 1499:2,
1499:3
**learned** [8] - 1467:6,
1467:15, 1467:24,
1468:5, 1478:4,
1492:24, 1495:16,
1499:5
**learning** [1] - 1489:17
**least** [19] - 1317:11,
1329:4, 1340:20,
1362:9, 1368:17,
1399:6, 1402:8,
1405:17, 1418:13,
1436:25, 1437:1,
1442:2, 1443:5,
1445:6, 1467:7,
1473:16, 1496:14,
1498:10, 1557:1
**leave** [3] - 1353:12,
1432:13, 1465:13
**leaves** [1] - 1353:14
**leaving** [1] - 1533:6
**left** [19] - 1292:7,
1365:12, 1381:20,
1392:19, 1402:19,
1403:14, 1432:12,
1432:13, 1432:17,
1432:24, 1495:12,
1499:17, 1502:15,
1519:2, 1523:19,
1533:12, 1533:16,

1539:23
**left-hand** [2] -
1392:19, 1495:12
**Legacy** [4] - 1307:25,
1308:3, 1308:16,
1309:5
**legal** [14] - 1320:11,
1323:23, 1324:2,
1324:11, 1324:15,
1327:9, 1333:17,
1335:23, 1335:25,
1336:5, 1345:15,
1415:7, 1479:20,
1550:10
**length** [3] - 1384:23,
1394:12, 1439:2
**lengthy** [3] - 1404:3,
1438:7, 1537:2
**less** [8] - 1432:13,
1432:24, 1444:11,
1496:9, 1506:24,
1513:3, 1513:10,
1558:12
**letter** [3] - 1320:4,
1320:15, 1455:2
**level** [8] - 1293:14,
1326:17, 1333:6,
1333:9, 1387:20,
1393:20, 1393:21,
1394:25
**levels** [1] - 1326:15
**liable** [1] - 1481:12
**library** [4] - 1396:8,
1396:10, 1396:11,
1473:13
**license** [65] - 1307:4,
1307:22, 1308:11,
1309:5, 1309:12,
1309:13, 1309:14,
1309:19, 1309:25,
1311:8, 1320:21,
1323:4, 1332:25,
1337:11, 1337:15,
1337:17, 1337:19,
1337:20, 1338:16,
1339:13, 1339:17,
1339:19, 1341:12,
1342:5, 1342:7,
1342:10, 1342:12,
1342:14, 1342:15,
1342:16, 1342:17,
1343:18, 1346:3,
1346:8, 1432:1,
1445:3, 1468:3,
1474:9, 1476:20,
1481:15, 1482:14,
1482:17, 1484:13,
1487:9, 1491:12,
1498:1, 1498:14,
1506:12, 1506:13,

1510:17, 1510:20,
1528:25, 1529:2,
1529:8, 1529:15,
1530:6, 1530:13,
1530:15, 1531:16,
1537:25, 1546:16,
1547:1
**licensed** [5] - 1448:4,
1487:7, 1510:21,
1512:8, 1538:1
**licensee** [15] - 1307:6,
1307:7, 1314:23,
1342:17, 1345:7,
1345:22, 1346:4,
1346:8, 1358:10,
1363:17, 1475:23,
1477:21, 1529:17,
1534:12, 1538:1
**licensee's** [5] -
1314:23, 1363:9,
1363:15, 1363:24,
1422:15
**licensees** [10] -
1306:13, 1306:21,
1332:9, 1332:12,
1344:20, 1344:24,
1346:10, 1363:6,
1363:25, 1531:6
**licensees'** [1] - 1363:7
**licenses** [29] -
1305:16, 1307:25,
1308:3, 1308:16,
1308:25, 1309:8,
1310:20, 1319:23,
1332:18, 1332:20,
1337:13, 1340:3,
1341:14, 1343:25,
1346:10, 1346:20,
1347:1, 1347:6,
1347:8, 1347:9,
1347:14, 1347:16,
1432:3, 1476:15,
1476:19, 1484:4,
1487:15, 1538:3
**licensing** [1] - 1484:1
**life** [1] - 1291:25
**lifecycle** [1] - 1291:24
**lifted** [1] - 1484:17
**Light** [1] - 1457:2
**likelihood** [2] -
1377:24, 1388:25
**likely** [2] - 1293:9,
1416:12
**limit** [1] - 1484:8
**limitations** [1] -
1484:4
**limited** [6] - 1319:5,
1341:3, 1394:11,
1412:22, 1482:6,
1483:6

25

**limiting** [1] - 1437:7
**limits** [1] - 1537:25
**line** [83] - 1301:14,
1328:21, 1335:11,
1353:15, 1353:16,
1365:7, 1379:19,
1380:1, 1381:6,
1381:12, 1381:22,
1382:1, 1383:6,
1383:8, 1383:17,
1383:18, 1383:24,
1386:8, 1387:7,
1389:17, 1392:19,
1392:23, 1395:8,
1399:18, 1399:19,
1400:8, 1400:10,
1400:11, 1400:20,
1400:21, 1401:13,
1415:17, 1415:18,
1415:19, 1415:22,
1417:3, 1417:4,
1417:6, 1417:17,
1417:21, 1423:20,
1434:4, 1434:5,
1439:17, 1448:15,
1448:17, 1448:25,
1449:7, 1449:9,
1449:21, 1450:13,
1450:14, 1450:18,
1453:24, 1453:25,
1456:8, 1458:19,
1459:17, 1459:22,
1460:1, 1460:24,
1461:9, 1461:15,
1461:17, 1461:25,
1462:4, 1462:8,
1462:16, 1508:6,
1508:20, 1508:25,
1509:3, 1522:9,
1522:11, 1524:15,
1540:1
**lined** [8] - 1386:16,
1386:19, 1386:20,
1386:21, 1386:22,
1387:4, 1387:5
**lines** [32] - 1294:21,
1306:16, 1325:3,
1328:19, 1372:11,
1379:19, 1379:20,
1381:3, 1393:9,
1394:3, 1394:5,
1397:5, 1398:18,
1416:17, 1417:7,
1423:12, 1423:13,
1423:20, 1455:14,
1457:16, 1458:5,
1458:8, 1458:19,
1459:14, 1462:8,
1463:2, 1463:3,
1479:17, 1497:1,

1508:19, 1509:4
**lining** [1] - 1400:6
**list** [25] - 1297:10,
1303:25, 1304:15,
1340:24, 1340:25,
1341:2, 1376:5,
1376:23, 1377:1,
1377:3, 1377:6,
1377:10, 1377:14,
1377:21, 1378:3,
1388:16, 1391:4,
1391:8, 1391:16,
1391:21, 1393:2,
1395:10, 1401:1,
1438:2, 1438:3
**listed** [2] - 1376:20,
1490:20
**listening** [1] - 1412:6
**listing** [4] - 1355:7,
1355:10, 1396:15,
1398:5
**listings** [1] - 1397:25
**lists** [1] - 1377:8
**litany** [2] - 1486:23,
1543:12
**literal** [3] - 1510:4,
1523:22, 1524:1
**literally** [2] - 1329:16,
1531:8
**literature** [1] - 1548:17
**litigant** [1] - 1543:8
**litigate** [2] - 1474:5,
1474:14
**litigating** [2] -
1483:15, 1483:16
**litigation** [5] -
1302:13, 1304:8,
1537:1, 1540:15,
1540:16
**live** [1] - 1490:2
**Liversidge** [5] -
1290:20, 1291:11,
1343:3, 1560:4,
1560:5
**LIVERSIDGE** [49] -
1291:13, 1291:20,
1292:1, 1292:3,
1293:24, 1296:4,
1296:6, 1299:3,
1299:16, 1299:18,
1301:9, 1301:12,
1303:20, 1304:2,
1304:25, 1305:9,
1305:10, 1305:22,
1306:15, 1306:18,
1308:7, 1308:9,
1309:22, 1309:24,
1311:11, 1311:13,
1318:10, 1318:13,
1318:16, 1318:19,

1318:21, 1320:2,
1320:6, 1321:12,
1321:14, 1324:8,
1328:18, 1328:20,
1330:9, 1330:11,
1331:13, 1340:15,
1340:22, 1345:15,
1346:15, 1346:17,
1347:17, 1347:24,
1459:9
**LLCs** [3] - 1297:19,
1342:24, 1343:6
**load** [2] - 1506:21,
1506:23
**loaded** [1] - 1354:25
**loads** [1] - 1506:24
**local** [19] - 1422:3,
1422:4, 1422:19,
1422:23, 1423:4,
1424:1, 1424:3,
1435:6, 1439:14,
1503:12, 1503:14,
1506:8, 1506:11,
1537:20, 1538:2,
1538:5, 1538:14,
1538:24
**locally** [3] - 1424:6,
1438:24, 1503:24
**lodge** [1] - 1555:4
**log** [9] - 1354:20,
1372:23, 1372:24,
1372:25, 1435:24,
1436:3, 1436:18,
1436:23, 1526:23
**logged** [2] - 1520:16,
1521:7
**logic** [4] - 1377:24,
1396:25, 1397:12,
1401:19
**logs** [6] - 1358:18,
1371:8, 1371:10,
1371:12, 1371:18,
1436:15
**look** [50] - 1311:19,
1312:14, 1318:25,
1326:9, 1326:11,
1328:1, 1328:24,
1329:22, 1341:9,
1341:17, 1360:20,
1364:8, 1364:11,
1367:13, 1368:12,
1371:25, 1374:13,
1378:11, 1378:14,
1378:18, 1381:23,
1381:25, 1382:3,
1391:8, 1393:16,
1407:17, 1407:21,
1409:25, 1416:18,
1427:21, 1428:15,
1429:8, 1430:15,

1450:18, 1451:12,
1454:4, 1456:4,
1458:8, 1461:17,
1469:4, 1477:22,
1484:19, 1486:19,
1499:19, 1521:3,
1527:15, 1531:22,
1531:23, 1538:22,
1558:13
**looked** [9] - 1304:15,
1332:20, 1347:8,
1371:12, 1380:10,
1392:20, 1446:6,
1460:6, 1488:20
**looking** [21] - 1325:21,
1329:16, 1340:10,
1354:6, 1360:15,
1377:21, 1381:19,
1386:10, 1392:17,
1395:10, 1395:13,
1397:25, 1405:2,
1407:22, 1439:11,
1457:16, 1459:12,
1487:8, 1556:3,
1558:6, 1558:11
**looks** [1] - 1351:20
**loosely** [1] - 1357:18
**lovely** [1] - 1485:17
**lower** [2] - 1379:22,
1557:14
**lucidity** [1] - 1539:24
**ludicrous** [2] - 1300:5,
1329:23
**lunch** [4] - 1315:21,
1402:20, 1402:23,
1403:6

## M

**Ma'am** [1] - 1393:24
**MacEachern** [1] -
1489:12
**machine** [3] - 1329:6,
1329:8, 1383:22
**machine-generated**
[1] - 1383:22
**machines** [1] -
1413:21
**MacKereth** [18] -
1433:11, 1433:18,
1468:11, 1473:20,
1477:10, 1483:22,
1485:25, 1486:9,
1486:14, 1490:10,
1500:15, 1504:24,
1532:6, 1534:19,
1541:12, 1545:6,
1545:8, 1552:7
**MacKereth's** [2] -
1355:19, 1356:7

**madam** [2] - 1554:13,
1555:1
**Madam** [1] - 1554:19
**made-up** [2] -
1440:25, 1533:20
**mail** [22] - 1365:7,
1367:14, 1368:12,
1368:21, 1369:13,
1369:24, 1372:6,
1374:14, 1374:15,
1405:1, 1405:3,
1405:7, 1405:9,
1433:24, 1435:15,
1441:4, 1445:13,
1446:10, 1446:20,
1489:23, 1493:24,
1521:16
**mailed** [2] - 1488:8,
1498:10
**mailing** [1] - 1498:17
**mails** [11] - 1435:14,
1435:24, 1436:1,
1441:24, 1441:25,
1442:4, 1442:7,
1504:8, 1514:4,
1515:7, 1515:8
**MAIN** [16] - 1397:12,
1398:21, 1399:1,
1399:2, 1399:7,
1399:20, 1454:15,
1454:21, 1454:22,
1455:6, 1455:23,
1455:25, 1457:10,
1457:21, 1458:1
**MAIN'S** [1] - 1399:8
**MAIN-EXIT** [8] -
1398:21, 1399:1,
1399:2, 1399:20,
1457:10, 1457:21,
1458:1
**maintain** [5] - 1321:5,
1321:6, 1333:3,
1389:19, 1441:12
**maintained** [1] -
1545:22
**maintaining** [1] -
1532:22
**maintenance** [14] -
1291:25, 1292:6,
1293:15, 1294:4,
1294:17, 1297:8,
1297:23, 1302:23,
1303:6, 1326:25,
1328:8, 1328:11,
1339:8, 1441:11
**major** [2] - 1292:15,

1453:13
**makers** [1] - 1547:7
**manageable** [1] - 1351:23
**managed** [1] - 1414:16
**Management** [2] - 1295:8, 1296:12
**management** [1] - 1414:14
**manager** [1] - 1360:24
**managers** [2] - 1470:5, 1470:6
**manifest** [1] - 1442:21
**manner** [2] - 1322:7, 1501:15
**manufacture** [2] - 1293:10, 1509:14
**manufactured** [1] - 1509:18
**March** [1] - 1557:25
**march** [1] - 1501:16
**Margaret** [2] - 1290:23, 1559:8
**mark** [3] - 1340:20, 1465:25, 1499:4
**marker** [2] - 1535:1, 1535:8
**markers** [8] - 1477:4, 1499:3, 1534:17, 1534:18, 1534:22, 1535:20, 1547:6, 1553:1
**market** [3] - 1310:22, 1316:21
**marketing** [2] - 1315:5, 1315:7
**marketplace** [1] - 1553:19
**MarketSphere** [1] - 1315:8
**Maryland** [1] - 1410:18
**masterpiece** [1] - 1418:10
**MAT** [1] - 1372:4
**match** [4] - 1398:18, 1409:17, 1431:15, 1509:3
**matched** [1] - 1508:19
**matching** [2] - 1508:20, 1508:25
**material** [6] - 1434:23, 1489:5, 1510:3, 1510:5, 1523:21, 1549:24
**materials** [11] - 1294:1, 1294:8, 1304:15, 1304:17, 1317:25, 1318:7,

1334:10, 1434:18, 1436:16, 1437:3, 1545:3
**math** [4] - 1432:15, 1432:23, 1433:4, 1433:8
**Matheson** [21] - 1358:25, 1371:23, 1372:22, 1373:5, 1374:11, 1374:17, 1480:2, 1490:17, 1490:21, 1491:5, 1494:25, 1495:4, 1495:6, 1526:21, 1526:22, 1526:24, 1527:1, 1527:3, 1527:8, 1527:12, 1549:1
**Matheson's** [4] - 1372:8, 1372:21, 1527:8, 1527:13
**Mathew** [3] - 1318:4, 1336:15, 1349:12
**Matt** [13] - 1335:10, 1336:17, 1340:4, 1340:8, 1345:3, 1362:25, 1365:1, 1376:14, 1377:14, 1386:1, 1398:20, 1405:4, 1469:4
**matter** [19] - 1366:1, 1375:23, 1379:3, 1412:23, 1419:21, 1442:17, 1465:2, 1496:15, 1500:2, 1515:11, 1521:2, 1524:4, 1533:24, 1534:10, 1540:24, 1558:20, 1558:25, 1559:7
**mattered** [1] - 1486:7
**matters** [4] - 1347:25, 1348:18, 1528:10, 1553:17
**Maurya** [2] - 1357:9, 1437:11
**McCracken** [31] - 1290:21, 1348:15, 1348:21, 1349:3, 1349:11, 1349:19, 1349:22, 1350:4, 1350:7, 1350:8, 1368:10, 1452:2, 1452:3, 1452:12, 1452:14, 1452:18, 1454:3, 1454:7, 1456:3, 1456:10, 1457:8, 1457:11, 1458:4, 1458:7, 1459:15, 1463:5,

1464:1, 1464:4, 1464:13, 1465:7, 1560:12
**MCCRACKEN** [1] - 1348:17
**McCutchen** [1] - 1320:12
**mean** [27] - 1292:14, 1293:7, 1312:25, 1333:11, 1362:23, 1371:7, 1375:24, 1381:8, 1405:1, 1409:21, 1412:24, 1416:1, 1417:14, 1422:4, 1422:23, 1423:4, 1424:3, 1424:18, 1433:3, 1449:17, 1455:21, 1455:22, 1483:4, 1485:19, 1508:10, 1532:13, 1536:23
**meaningful** [7] - 1327:6, 1333:4, 1333:9, 1333:15, 1542:24, 1542:25, 1543:2
**meaningless** [1] - 1483:19
**MEANS** [1] - 1441:14
**means** [14] - 1292:20, 1319:20, 1325:15, 1326:5, 1326:17, 1337:11, 1338:10, 1461:19, 1468:6, 1478:19, 1481:5, 1483:4, 1483:18, 1485:19
**meant** [2] - 1340:14, 1345:25
**measurable** [1] - 1315:16
**Medical** [1] - 1498:11
**medium** [1] - 1297:14
**medium-sized** [1] - 1297:14
**meet** [2] - 1303:10, 1303:15
**meetings** [6] - 1298:10, 1298:18, 1298:19, 1298:20, 1303:14, 1314:15
**members** [1] - 1556:23
**memorize** [4] - 1444:1, 1513:1, 1519:6, 1522:14
**memory** [1] - 1300:1
**mention** [1] - 1328:23
**mentioned** [18] - 1291:23, 1297:18,

1302:21, 1303:1, 1332:23, 1336:25, 1339:4, 1342:5, 1343:4, 1343:8, 1343:24, 1373:24, 1374:2, 1421:9, 1434:10, 1455:16, 1508:16, 1556:7
**mentions** [2] - 1377:21, 1551:8
**mere** [1] - 1347:3
**merely** [4] - 1370:14, 1372:25, 1442:17, 1535:20
**merging** [1] - 1511:22
**message** [2] - 1471:5, 1504:16
**met** [3] - 1352:10, 1502:9, 1515:3
**method** [7] - 1327:3, 1327:7, 1327:11, 1328:12, 1433:20, 1548:16, 1548:21
**methodical** [1] - 1501:15
**methodically** [1] - 1508:6
**methodology** [5] - 1375:18, 1375:22, 1378:24, 1379:1, 1399:25
**methods** [1] - 1433:23
**Michigan** [2] - 1410:17, 1410:18
**Microsoft** [2] - 1497:14, 1497:15
**Microstar** [4] - 1492:3, 1492:14, 1497:15, 1550:6
**midafternoon** [1] - 1464:12
**middle** [2] - 1329:21, 1398:1
**midsummer** [1] - 1558:2
**might** [13] - 1292:14, 1292:22, 1375:9, 1382:11, 1385:7, 1391:19, 1391:20, 1394:9, 1401:18, 1406:25, 1416:2, 1437:13, 1460:12
**Miller** [2] - 1320:4, 1531:12
**millions** [2] - 1325:3, 1540:20
**mind** [4] - 1315:5, 1502:6, 1554:14, 1555:12
**minimus** [3] -

1415:13, 1463:4, 1535:17
**minute** [4] - 1380:19, 1392:21, 1392:23, 1421:4
**minutes** [12] - 1402:19, 1403:13, 1452:5, 1465:22, 1477:17, 1479:3, 1499:17, 1499:20, 1500:19, 1541:22, 1544:8
**misaligned** [2] - 1519:9, 1526:20
**misalignment** [1] - 1515:15
**misleading** [1] - 1508:15
**misled** [1] - 1472:7
**missed** [1] - 1541:7
**missing** [1] - 1556:22
**misstated** [1] - 1494:6
**misstatement** [1] - 1435:8
**mistakes** [1] - 1464:24
**mistyped** [1] - 1382:12
**mixed** [1] - 1464:20
**modal** [1] - 1317:7
**model** [8] - 1329:25, 1466:24, 1467:14, 1468:18, 1473:16, 1473:22, 1504:1, 1544:18
**models** [2] - 1474:1, 1484:25
**modification** [5] - 1295:3, 1343:7, 1389:8, 1405:16, 1550:1
**modifications** [1] - 1405:23
**modified** [7] - 1291:23, 1357:9, 1357:13, 1441:21, 1501:12, 1532:16, 1532:17
**modifies** [3] - 1476:24, 1510:15, 1511:8
**modify** [21] - 1294:20, 1295:10, 1296:15, 1296:18, 1298:16, 1298:23, 1305:13, 1312:11, 1313:15, 1324:23, 1331:9, 1408:6, 1441:13, 1441:18, 1487:6, 1501:11, 1501:13, 1531:24, 1532:16,

1546:6
**modifying** [9] - 1299:5, 1314:8, 1324:16, 1324:20, 1329:23, 1346:11, 1498:15, 1531:8, 1531:9
**module** [2] - 1316:18, 1462:13
**modules** [1] - 1302:7
**mom** [2] - 1297:11, 1343:3
**mom-and-pop** [1] - 1297:11
**moment** [5] - 1356:11, 1358:6, 1401:6, 1411:25, 1430:13
**MONDAY** [1] - 1291:1
**Monday** [1] - 1349:25
**monitorship** [3] - 1541:24, 1543:10, 1543:13
**month** [4] - 1447:11, 1556:1, 1556:3, 1556:8
**months** [5] - 1356:15, 1356:24, 1357:5, 1533:8, 1540:20
**moot** [1] - 1534:15
**morning** [26] - 1291:4, 1291:7, 1291:10, 1291:14, 1291:15, 1291:16, 1331:19, 1331:20, 1348:9, 1348:14, 1348:17, 1403:22, 1424:9, 1428:25, 1429:6, 1430:21, 1435:20, 1439:13, 1505:10, 1509:10, 1509:19, 1511:12, 1517:17, 1522:6, 1524:10, 1529:8
**most** [8] - 1309:18, 1414:9, 1457:2, 1486:7, 1496:22, 1553:7, 1555:20, 1556:22
**motion** [3] - 1304:21, 1473:4, 1542:2
**move** [12] - 1357:6, 1369:7, 1374:22, 1375:12, 1408:5, 1408:6, 1418:14, 1422:2, 1433:6, 1435:11, 1494:1, 1496:12
**moved** [5] - 1355:3, 1372:20, 1372:23, 1496:20, 1503:25

**Mover** [8] - 1406:2, 1407:25, 1408:2, 1408:4, 1408:9, 1408:25, 1498:8, 1498:19
**moves** [2] - 1374:6
**moving** [2] - 1491:11, 1540:20
**MR** [234] - 1291:13, 1291:20, 1292:1, 1292:3, 1293:21, 1293:24, 1296:4, 1296:6, 1298:25, 1299:3, 1299:16, 1299:18, 1301:9, 1301:12, 1303:20, 1303:23, 1304:2, 1304:25, 1305:9, 1305:10, 1305:20, 1305:22, 1306:15, 1306:18, 1308:7, 1308:9, 1309:22, 1309:24, 1311:11, 1311:13, 1318:10, 1318:13, 1318:16, 1318:19, 1318:21, 1320:2, 1320:6, 1321:12, 1321:14, 1324:4, 1324:8, 1328:18, 1328:20, 1330:9, 1330:11, 1331:13, 1331:16, 1331:19, 1331:22, 1334:17, 1334:18, 1335:10, 1335:12, 1336:17, 1336:19, 1340:4, 1340:11, 1340:15, 1340:17, 1340:22, 1341:1, 1341:5, 1341:6, 1342:3, 1342:4, 1343:21, 1343:22, 1345:3, 1345:5, 1345:15, 1345:20, 1345:21, 1346:13, 1346:15, 1346:17, 1347:17, 1347:19, 1347:24, 1348:6, 1348:17, 1348:21, 1349:3, 1349:11, 1349:19, 1349:22, 1350:4, 1350:8, 1350:10, 1350:13, 1350:18, 1351:9, 1351:13, 1355:17, 1355:18, 1358:1, 1358:2, 1359:25, 1360:1, 1360:9, 1360:10, 1362:25, 1363:1, 1364:8, 1364:10, 1365:1,

1365:3, 1368:10, 1370:1, 1386:1, 1386:4, 1388:3, 1388:6, 1394:4, 1398:25, 1402:18, 1403:8, 1403:10, 1403:13, 1403:25, 1404:1, 1404:13, 1404:15, 1405:4, 1405:6, 1411:12, 1411:15, 1411:18, 1411:21, 1412:2, 1412:8, 1412:9, 1412:14, 1413:1, 1413:7, 1420:11, 1420:14, 1421:8, 1423:10, 1423:14, 1423:19, 1423:21, 1425:8, 1425:11, 1426:11, 1426:17, 1428:4, 1428:6, 1428:15, 1428:17, 1428:21, 1428:24, 1429:8, 1429:10, 1431:2, 1431:4, 1433:2, 1433:6, 1433:9, 1434:2, 1434:6, 1435:2, 1435:4, 1435:11, 1435:13, 1435:16, 1435:17, 1436:2, 1438:19, 1438:22, 1439:1, 1439:11, 1439:18, 1439:22, 1439:25, 1440:8, 1440:12, 1440:20, 1443:15, 1444:15, 1444:19, 1448:19, 1448:22, 1449:20, 1451:14, 1451:16, 1451:18, 1452:1, 1452:3, 1452:12, 1452:14, 1452:18, 1454:3, 1454:7, 1456:3, 1456:10, 1457:8, 1457:11, 1458:4, 1458:7, 1459:9, 1459:15, 1463:5, 1463:9, 1463:12, 1463:14, 1463:23, 1464:1, 1464:4, 1464:15, 1464:18, 1464:25, 1465:7, 1465:10, 1465:17, 1465:20, 1466:1, 1466:4, 1466:7, 1499:22, 1499:24, 1544:7, 1555:2, 1555:3, 1555:9, 1555:11, 1556:20, 1557:9,

1557:10, 1557:21, 1558:22, 1558:23, 1560:22, 1560:23, 1560:24
**MS** [2] - 1412:18, 1420:13
**muddled** [3] - 1367:3, 1371:6, 1372:13
**muddy** [1] - 1358:15
**multi** [1] - 1317:7
**multi-modal** [1] - 1317:7
**multiple** [3] - 1443:20, 1443:24, 1515:8
**mundane** [1] - 1327:16
**murder** [1] - 1556:8
**must** [9] - 1329:16, 1362:17, 1364:3, 1461:5, 1461:11, 1461:12, 1462:17, 1484:2, 1510:2

# N

**name** [33] - 1352:4, 1393:22, 1394:12, 1394:20, 1397:4, 1397:11, 1397:14, 1399:7, 1401:20, 1402:1, 1402:13, 1409:8, 1416:6, 1418:9, 1419:3, 1419:4, 1419:10, 1419:18, 1421:10, 1421:13, 1421:14, 1421:19, 1421:20, 1421:23, 1421:24, 1437:11, 1437:12, 1454:20, 1454:22, 1507:22, 1512:5, 1524:16
**named** [4] - 1317:20, 1399:11, 1462:17, 1520:15
**names** [19] - 1390:20, 1391:17, 1394:8, 1394:17, 1395:4, 1397:9, 1409:11, 1409:15, 1409:16, 1409:25, 1410:4, 1410:5, 1418:25, 1419:5, 1419:20, 1419:24, 1420:2, 1428:10, 1464:21
**naming** [3] - 1390:18, 1392:3, 1507:17
**native** [2] - 1295:22, 1314:20
**nature** [1] - 1473:24

**navigate** [1] - 1397:18
**near** [1] - 1365:5
**necessarily** [12] - 1364:25, 1378:13, 1379:18, 1391:18, 1415:11, 1415:15, 1416:8, 1417:1, 1494:18, 1528:24, 1534:1
**necessary** [9] - 1293:4, 1293:23, 1336:3, 1387:8, 1403:17, 1445:2, 1471:7, 1484:14, 1549:25
**necessary...to** [1] - 1312:8
**need** [41] - 1292:16, 1292:20, 1292:23, 1293:11, 1295:4, 1312:11, 1312:25, 1313:11, 1315:23, 1325:7, 1325:8, 1325:15, 1327:23, 1331:9, 1336:4, 1368:25, 1374:18, 1374:22, 1375:10, 1377:14, 1389:19, 1394:25, 1401:10, 1401:18, 1401:19, 1402:9, 1403:24, 1411:25, 1415:14, 1423:19, 1464:25, 1470:13, 1478:16, 1492:21, 1493:1, 1495:25, 1514:12, 1514:18, 1516:9, 1553:13
**needed** [13] - 1310:24, 1317:1, 1361:20, 1367:20, 1376:18, 1484:7, 1490:24, 1490:25, 1493:14, 1514:16, 1515:4, 1519:23, 1550:18
**needing** [1] - 1329:20
**needle** [1] - 1558:1
**needs** [11] - 1307:6, 1311:5, 1311:15, 1375:9, 1416:3, 1467:12, 1469:5, 1475:14, 1494:22, 1501:20, 1550:16
**negotiated** [1] - 1326:15
**negotiations** [1] - 1344:11
**Network** [8] - 1338:2, 1338:5, 1338:9, 1340:7, 1524:22,

28

1525:16, 1551:9, 1551:10
**Network's** [1] - 1525:15
**NEVADA** [3] - 1290:1, 1291:1, 1403:1
**Nevada** [2] - 1290:7, 1290:24
**never** [33] - 1298:20, 1301:5, 1304:10, 1314:6, 1336:5, 1337:23, 1422:19, 1437:16, 1471:8, 1474:4, 1475:4, 1482:1, 1483:2, 1483:11, 1483:20, 1484:21, 1486:1, 1489:7, 1491:9, 1495:20, 1496:3, 1496:22, 1504:19, 1507:11, 1517:25, 1518:1, 1528:18, 1533:3, 1536:9, 1546:6, 1546:12, 1548:2
**new** [39] - 1292:21, 1292:22, 1292:24, 1293:2, 1293:3, 1293:5, 1293:8, 1293:9, 1293:10, 1295:9, 1310:22, 1315:24, 1317:5, 1328:5, 1328:6, 1333:13, 1360:17, 1365:10, 1365:17, 1370:6, 1389:21, 1408:21, 1414:3, 1414:4, 1415:14, 1433:18, 1456:3, 1470:9, 1474:1, 1478:10, 1478:16, 1505:10, 1526:8, 1533:1, 1533:2, 1533:21
**new-fangled** [3] - 1533:1, 1533:2, 1533:21
**Next** [1] - 1428:9
**next** [18] - 1292:1, 1315:2, 1321:24, 1322:22, 1328:24, 1347:22, 1361:7, 1384:16, 1398:15, 1401:13, 1401:23, 1428:7, 1497:21, 1521:8, 1526:8, 1530:16, 1557:2
**niche** [1] - 1316:15
**night** [2] - 1426:4, 1426:5

**Nimmer** [1] - 1507:14
**ninety** [1] - 1432:12
**ninety-eight** [1] - 1432:12
**Ninth** [15] - 1472:10, 1482:4, 1497:14, 1506:10, 1507:14, 1509:25, 1528:23, 1529:1, 1529:13, 1533:13, 1533:25, 1537:24, 1538:3, 1545:20, 1545:22
**nobody** [1] - 1378:17
**nodders** [1] - 1404:11
**None** [1] - 1488:8
**none** [6] - 1298:18, 1437:3, 1480:7, 1481:11, 1484:3, 1497:5
**nonexistent** [1] - 1538:25
**noninfringing** [1] - 1530:2
**nonliteral** [3] - 1510:4, 1523:22, 1524:2
**noon** [1] - 1402:25
**normal** [3] - 1327:24, 1459:6, 1459:8
**normalized** [3] - 1508:20, 1508:24, 1509:3
**normally** [2] - 1292:8, 1398:17
**notable** [1] - 1454:16
**note** [6] - 1427:20, 1432:9, 1454:23, 1455:16, 1471:5, 1558:5
**notebook** [1] - 1481:1
**noted** [2] - 1427:19, 1443:8
**notes** [1] - 1369:22
**nothing** [21] - 1347:17, 1347:19, 1372:24, 1394:24, 1395:3, 1401:14, 1404:21, 1451:14, 1467:9, 1470:16, 1473:19, 1477:25, 1488:13, 1492:13, 1497:4, 1523:14, 1548:6, 1548:21, 1549:20, 1553:13, 1553:20
**notice** [4] - 1383:1, 1404:11, 1478:5, 1496:9
**noticed** [2] - 1380:12, 1380:14
**notices** [1] - 1552:17

**notification** [1] - 1434:13
**notified** [2] - 1489:10, 1493:22
**November** [8] - 1357:3, 1357:4, 1360:19, 1405:11, 1484:17, 1486:14, 1492:25, 1493:22
**NPKB** [1] - 1432:11
**nullify** [1] - 1496:24, 1552:7
**Number** [1] - 1414:25
**number** [57] - 1314:4, 1330:10, 1340:16, 1340:18, 1341:13, 1350:25, 1351:4, 1351:6, 1351:23, 1353:5, 1353:6, 1358:14, 1358:24, 1364:16, 1364:19, 1371:22, 1375:12, 1398:10, 1403:14, 1404:8, 1424:13, 1424:15, 1424:20, 1424:22, 1425:2, 1426:8, 1427:7, 1427:8, 1427:23, 1428:1, 1428:3, 1429:3, 1429:21, 1429:23, 1430:3, 1437:23, 1438:11, 1440:1, 1442:9, 1444:16, 1445:18, 1446:18, 1449:10, 1451:20, 1451:21, 1451:24, 1480:14, 1497:10, 1499:8, 1505:12, 1505:14, 1505:18, 1512:21, 1513:21, 1522:18, 1523:18, 1547:21
**numbered** [1] - 1441:25
**numbers** [8] - 1303:22, 1383:22, 1385:3, 1385:4, 1430:22, 1436:22, 1437:2, 1527:25
**numeric** [5] - 1384:22, 1397:17, 1397:18, 1398:8, 1398:9
**numerical** [1] - 1480:13
**numerous** [2] - 1502:18, 1520:5

---

# O

**Oakland** [6] - 1410:15,

1410:16, 1410:19, 1411:4, 1411:7, 1498:20
**OAKS** [3] - 1410:14, 1410:16, 1411:6
**oath** [2] - 1318:2, 1424:12
**obey** [1] - 1497:25
**obfuscated** [1] - 1511:21
**Object** [2] - 1295:8, 1296:11
**object** [16] - 1302:7, 1307:12, 1307:13, 1307:17, 1307:18, 1308:15, 1332:11, 1420:11, 1435:2, 1448:19, 1467:21, 1482:7, 1483:8, 1483:12, 1484:5, 1546:4
**objected** [1] - 1340:22
**objection** [23] - 1293:21, 1298:25, 1303:23, 1304:19, 1304:24, 1305:20, 1324:4, 1345:15, 1349:6, 1349:15, 1350:1, 1368:10, 1368:15, 1404:2, 1411:21, 1411:24, 1412:14, 1433:2, 1439:15, 1440:3, 1440:7, 1465:5, 1465:7
**objectionable** [1] - 1482:2
**objects** [4] - 1295:9, 1295:10, 1295:11, 1371:16
**obligation** [1] - 1514:7
**observation** [1] - 1558:9
**obvious** [3] - 1461:6, 1555:13, 1555:24
**obviously** [9] - 1312:9, 1317:14, 1370:9, 1382:15, 1389:25, 1506:14, 1522:21, 1556:21, 1557:10
**occasion** [1] - 1292:12
**occasional** [1] - 1489:18
**occasions** [1] - 1315:25
**occupies** [1] - 1383:3
**occupy** [1] - 1379:18
**occur** [2] - 1380:11,

1391:21
**occurred** [7] - 1382:11, 1411:2, 1411:3, 1435:9, 1437:18, 1461:11, 1520:4
**occurrence** [1] - 1375:7
**occurrences** [1] - 1430:14
**October** [3] - 1356:23, 1533:8, 1554:15
**oddness** [1] - 1509:9
**OF** [4] - 1290:1, 1290:11, 1459:18, 1460:24
**offer** [13] - 1348:24, 1349:6, 1349:14, 1349:23, 1403:21, 1440:1, 1440:8, 1440:10, 1440:12, 1440:21, 1441:1, 1505:23, 1506:3
**offered** [10] - 1304:5, 1304:11, 1356:25, 1505:19, 1514:10, 1514:17, 1515:6, 1520:8, 1523:7, 1527:21
**offering** [7] - 1324:3, 1324:10, 1324:12, 1340:18, 1523:11, 1523:12, 1523:13
**offerings** [1] - 1334:9
**offers** [1] - 1414:10
**offhand** [1] - 1337:10
**Office** [1] - 1485:10
**Official** [2] - 1290:23, 1559:9
**offline** [1] - 1556:24
**often** [7] - 1306:3, 1315:10, 1326:20, 1397:20, 1455:25, 1456:23, 1472:3
**oil** [4] - 1316:8, 1316:10, 1316:19, 1316:20
**Oklahoma** [1] - 1355:12
**old** [5] - 1383:23, 1397:24, 1446:6, 1470:10, 1478:18
**OLSA** [3] - 1308:3, 1506:12, 1537:23
**OLSAs** [1] - 1307:25
**omitted** [3] - 1360:13, 1396:12, 1399:17
**once** [9] - 1373:12, 1382:11, 1383:16, 1405:17, 1461:20,

1462:5, 1496:10,
1554:1, 1559:1
**one** [122] - 1300:5,
1302:9, 1303:14,
1307:10, 1308:25,
1309:8, 1309:25,
1310:10, 1311:23,
1315:11, 1316:6,
1316:22, 1324:13,
1327:2, 1328:8,
1328:22, 1337:18,
1340:6, 1347:8,
1355:9, 1357:6,
1361:9, 1362:7,
1363:15, 1364:2,
1367:5, 1367:8,
1368:22, 1369:3,
1369:4, 1370:4,
1375:21, 1377:7,
1377:17, 1378:16,
1380:1, 1380:9,
1380:19, 1382:10,
1384:17, 1384:18,
1385:1, 1385:13,
1385:15, 1388:16,
1390:24, 1392:18,
1392:22, 1393:7,
1397:3, 1402:14,
1403:11, 1403:21,
1404:7, 1404:10,
1406:6, 1407:25,
1408:22, 1409:2,
1413:14, 1418:5,
1418:15, 1419:11,
1419:12, 1420:2,
1421:4, 1423:19,
1424:22, 1433:23,
1443:1, 1443:16,
1448:10, 1448:15,
1448:17, 1449:11,
1449:21, 1449:25,
1450:3, 1450:13,
1450:14, 1450:24,
1451:16, 1453:9,
1457:8, 1459:17,
1459:21, 1463:2,
1471:1, 1472:21,
1477:21, 1477:23,
1479:22, 1484:22,
1485:7, 1486:16,
1488:17, 1491:1,
1491:18, 1498:25,
1499:11, 1501:7,
1502:7, 1504:13,
1515:2, 1515:19,
1518:22, 1520:13,
1524:24, 1525:22,
1534:22, 1537:20,
1539:24, 1540:7,
1541:15, 1542:4,
1552:1, 1556:22,

1557:24
**one-on-one** [1] -
1303:14
**ones** [8] - 1308:18,
1312:9, 1397:22,
1431:13, 1437:6,
1437:8, 1448:24,
1489:12
**ongoing** [7] - 1328:11,
1467:13, 1469:14,
1476:23, 1477:11,
1494:16, 1551:25
**onsite** [1] - 1531:12
**onus** [1] - 1503:3
**OOP** [2] - 1352:3,
1352:10
**open** [91] - 1291:22,
1291:23, 1292:16,
1292:23, 1293:5,
1293:12, 1294:20,
1295:3, 1295:24,
1296:15, 1298:17,
1298:23, 1299:5,
1299:13, 1300:11,
1300:14, 1300:20,
1300:23, 1301:2,
1301:6, 1301:16,
1302:3, 1302:11,
1302:25, 1304:6,
1309:11, 1309:15,
1312:12, 1313:15,
1314:22, 1317:17,
1319:21, 1324:16,
1324:20, 1324:23,
1331:9, 1332:24,
1333:4, 1333:8,
1333:19, 1333:23,
1336:13, 1336:22,
1337:8, 1342:17,
1344:21, 1344:24,
1345:7, 1346:5,
1346:9, 1346:12,
1346:19, 1346:22,
1346:25, 1347:2,
1347:14, 1439:20,
1440:24, 1441:7,
1441:15, 1442:1,
1442:5, 1467:22,
1471:2, 1471:3,
1474:4, 1474:19,
1475:5, 1476:24,
1481:11, 1483:1,
1483:5, 1483:7,
1484:8, 1484:12,
1485:16, 1487:14,
1501:12, 1528:24,
1529:5, 1529:19,
1530:21, 1530:24,
1531:9, 1532:14,
1533:15, 1533:22,

1534:2, 1534:16,
1546:3, 1558:4
**open-closed** [1] -
1440:24
**opened** [4] - 1347:3,
1354:20, 1368:6,
1431:18
**opening** [16] - 1425:9,
1428:23, 1434:3,
1435:9, 1468:20,
1471:10, 1472:11,
1500:19, 1502:17,
1515:25, 1528:4,
1531:1, 1533:2,
1534:3, 1540:10,
1543:11
**operate** [7] - 1408:11,
1411:19, 1412:13,
1413:19, 1492:22,
1511:10, 1511:15
**operating** [23] -
1292:24, 1339:21,
1391:11, 1407:1,
1411:20, 1412:13,
1413:19, 1413:21,
1413:22, 1413:24,
1413:25, 1414:2,
1414:5, 1414:6,
1414:7, 1414:17,
1414:21, 1497:16,
1497:18, 1511:14,
1511:17, 1545:1,
1549:20
**operation** [2] -
1400:19, 1405:25
**operational** [1] -
1319:4
**operations** [6] -
1294:4, 1343:17,
1363:9, 1470:3,
1476:12, 1491:14
**opine** [1] - 1416:2
**opined** [2] - 1352:25,
1523:16
**opining** [1] - 1457:12
**opinion** [93] - 1299:7,
1300:2, 1300:25,
1305:3, 1323:15,
1323:22, 1324:10,
1327:5, 1329:24,
1331:11, 1332:1,
1333:2, 1333:6,
1333:25, 1334:25,
1335:17, 1336:21,
1344:3, 1358:23,
1360:5, 1360:6,
1362:15, 1364:2,
1365:13, 1366:1,
1366:8, 1366:13,
1370:11, 1375:7,

1376:24, 1386:10,
1388:21, 1392:3,
1394:6, 1395:7,
1395:23, 1396:18,
1404:18, 1404:21,
1405:18, 1406:16,
1407:14, 1420:10,
1421:21, 1431:21,
1439:19, 1443:21,
1451:11, 1453:20,
1453:23, 1454:20,
1454:22, 1455:1,
1455:10, 1455:12,
1456:21, 1457:4,
1457:7, 1457:15,
1457:25, 1458:3,
1458:15, 1459:6,
1461:25, 1462:12,
1462:22, 1482:14,
1506:3, 1507:21,
1509:11, 1509:13,
1509:20, 1510:11,
1513:19, 1514:10,
1514:11, 1514:18,
1515:6, 1515:16,
1519:15, 1519:20,
1520:8, 1522:4,
1523:7, 1523:11,
1523:12, 1523:13,
1524:8, 1525:9,
1535:3, 1535:14,
1536:8, 1536:9
**opinions** [35] -
1303:9, 1309:1,
1310:13, 1310:15,
1311:9, 1311:21,
1312:4, 1312:21,
1318:8, 1320:8,
1320:23, 1320:25,
1321:2, 1322:11,
1323:9, 1332:21,
1334:6, 1335:7,
1362:1, 1380:7,
1406:7, 1501:5,
1505:20, 1505:24,
1507:10, 1508:1,
1517:21, 1518:23,
1527:20, 1527:21,
1536:17, 1536:19,
1537:5, 1537:6
**OPM** [1] - 1341:15
**opportunity** [5] -
1327:22, 1358:21,
1439:3, 1443:7,
1544:8
**opposed** [3] -
1369:17, 1406:24,
1454:15
**opposite** [4] - 1314:7,
1491:3, 1531:2,

1539:13
**ORACLE** [1] - 1290:4
**Oracle** [240] - 1295:2,
1296:14, 1298:3,
1298:11, 1298:15,
1298:17, 1298:19,
1299:9, 1300:18,
1303:22, 1304:5,
1305:11, 1308:11,
1313:18, 1314:6,
1314:7, 1314:13,
1315:8, 1315:18,
1316:1, 1319:24,
1320:5, 1320:11,
1321:4, 1321:18,
1321:20, 1322:2,
1322:14, 1322:19,
1322:24, 1323:3,
1332:18, 1337:19,
1337:20, 1338:2,
1338:4, 1338:9,
1338:10, 1338:12,
1338:16, 1338:17,
1338:21, 1338:25,
1339:10, 1339:12,
1339:13, 1339:16,
1339:17, 1340:2,
1340:7, 1341:21,
1341:24, 1343:9,
1343:18, 1343:25,
1344:2, 1344:4,
1344:11, 1344:15,
1348:5, 1348:6,
1348:22, 1348:24,
1349:7, 1350:20,
1351:3, 1351:7,
1351:18, 1352:16,
1354:8, 1354:9,
1355:10, 1365:23,
1371:25, 1375:19,
1379:9, 1382:2,
1382:19, 1385:17,
1385:19, 1386:7,
1386:25, 1387:11,
1388:1, 1389:9,
1390:4, 1390:7,
1390:25, 1392:1,
1394:8, 1394:14,
1395:8, 1395:9,
1397:3, 1398:14,
1398:19, 1399:18,
1400:11, 1404:4,
1406:9, 1406:23,
1407:3, 1407:17,
1407:22, 1407:23,
1409:6, 1409:8,
1418:20, 1418:24,
1419:3, 1420:4,
1425:14, 1431:12,
1431:13, 1431:23,
1432:1, 1432:3,

1432:6, 1432:8, 1432:10, 1432:21, 1434:3, 1434:8, 1434:10, 1440:22, 1442:11, 1442:24, 1442:25, 1443:2, 1451:20, 1452:21, 1453:1, 1453:3, 1456:4, 1456:8, 1457:17, 1458:6, 1459:13, 1459:14, 1462:24, 1465:4, 1466:11, 1468:23, 1469:6, 1472:7, 1477:2, 1478:17, 1481:5, 1487:24, 1488:4, 1499:3, 1499:4, 1500:18, 1501:7, 1501:12, 1501:19, 1502:19, 1503:4, 1503:9, 1504:13, 1505:9, 1506:5, 1506:12, 1510:12, 1510:25, 1511:2, 1511:19, 1511:21, 1511:25, 1512:5, 1512:12, 1513:14, 1513:20, 1516:19, 1519:6, 1519:16, 1519:19, 1520:7, 1520:14, 1523:3, 1524:2, 1524:10, 1524:12, 1524:18, 1524:25, 1525:2, 1525:9, 1525:10, 1525:11, 1525:18, 1527:20, 1527:22, 1528:9, 1528:21, 1529:23, 1530:1, 1530:5, 1530:12, 1530:18, 1531:2, 1531:5, 1532:14, 1532:16, 1532:22, 1532:23, 1532:25, 1533:18, 1533:23, 1534:13, 1535:14, 1535:15, 1535:25, 1536:24, 1537:3, 1537:11, 1538:5, 1538:11, 1538:21, 1539:19, 1540:3, 1540:10, 1541:5, 1541:6, 1541:13, 1542:1, 1542:9, 1542:14, 1542:17, 1543:5, 1547:7, 1547:10, 1547:12, 1547:14, 1547:16, 1552:17

**Oracle's** [65] - 1304:3, 1318:2, 1320:19,

1320:20, 1321:8, 1321:9, 1322:1, 1322:25, 1323:4, 1344:19, 1344:23, 1346:2, 1346:7, 1350:5, 1352:4, 1408:18, 1411:8, 1415:2, 1435:18, 1440:16, 1441:19, 1444:20, 1466:25, 1473:3, 1473:18, 1474:6, 1474:7, 1478:24, 1485:3, 1486:17, 1487:1, 1491:20, 1501:6, 1501:21, 1502:12, 1502:17, 1503:19, 1504:15, 1504:16, 1506:8, 1513:6, 1514:12, 1517:24, 1518:22, 1520:13, 1521:4, 1526:5, 1526:13, 1528:17, 1530:2, 1530:8, 1531:11, 1531:15, 1531:18, 1534:4, 1536:3, 1536:7, 1538:7, 1539:4, 1541:21, 1543:12, 1543:19, 1544:6

**Oracle-provided** [3] - 1298:17, 1299:9, 1418:24

**Oracle-written** [1] - 1418:20

**ORCORST-00639707** [1] - 1303:22

**order** [51] - 1311:6, 1311:16, 1329:17, 1331:10, 1341:13, 1354:7, 1354:8, 1354:21, 1365:18, 1366:16, 1366:23, 1370:24, 1391:2, 1391:22, 1393:3, 1394:24, 1401:2, 1421:25, 1442:22, 1467:5, 1467:14, 1467:17, 1469:2, 1471:22, 1472:25, 1476:7, 1480:13, 1491:23, 1491:24, 1499:4, 1512:24, 1519:4, 1519:5, 1522:17, 1536:17, 1536:22, 1540:18, 1541:2, 1541:4, 1541:25, 1543:3, 1544:19, 1545:17, 1546:21, 1547:1, 1547:2, 1550:2,

1552:14, 1553:14, 1553:16, 1556:14

**ordered** [1] - 1503:23

**orders** [6] - 1473:17, 1522:13, 1522:17, 1543:20, 1553:12, 1553:23

**Oregon** [2] - 1514:1, 1519:25

**OREX** [3] - 1426:14, 1428:21, 1430:15

**OREX_27** [1] - 1365:23

**OREX_67** [2] - 1309:2, 1487:9

**organization** [2] - 1509:2, 1509:6

**organize** [1] - 1414:17

**organized** [1] - 1414:15

**orient** [5] - 1381:19, 1454:12, 1513:22, 1519:8, 1526:19

**oriented** [2] - 1340:1, 1390:13

**original** [11] - 1357:2, 1474:7, 1474:22, 1474:24, 1478:23, 1480:22, 1480:24, 1481:8, 1481:13, 1533:10, 1548:11

**originally** [5] - 1310:21, 1413:4, 1420:5, 1431:1, 1533:7

**orphan** [2] - 1380:9, 1509:8

**OSC** [5] - 1500:4, 1505:11, 1512:23, 1536:15, 1544:1

**otherwise** [8] - 1310:6, 1419:16, 1427:19, 1472:13, 1472:14, 1472:15, 1538:18, 1545:24

**ourselves** [2] - 1513:22, 1552:5

**outlined** [1] - 1453:17

**outlining** [1] - 1357:23

**outreach** [2] - 1505:1, 1505:7

**outset** [2] - 1370:18, 1442:10

**outside** [10] - 1302:13, 1302:14, 1320:11, 1365:20, 1405:22, 1411:21, 1412:14, 1435:2, 1435:16, 1476:19

**outsourcing** [1] -

1313:8

**over-the-shoulder** [7] - 1327:3, 1327:7, 1327:11, 1328:12, 1328:16, 1334:3, 1485:21

**overall** [1] - 1544:14

**overreached** [1] - 1494:6

**OWEN** [1] - 1452:10

**Owen** [2] - 1500:15, 1560:12

**own** [20] - 1300:8, 1311:3, 1360:7, 1363:9, 1422:15, 1472:17, 1485:12, 1486:11, 1503:19, 1504:2, 1505:6, 1510:10, 1514:17, 1515:5, 1530:12, 1539:4, 1539:22, 1543:24, 1545:7, 1558:10

## P

**P.M** [1] - 1403:1

**package** [4] - 1371:13, 1371:16, 1373:1, 1421:2

**packaged** [1] - 1421:16

**page** [55] - 1301:13, 1306:16, 1318:17, 1321:13, 1330:10, 1335:11, 1340:8, 1341:9, 1352:15, 1352:17, 1353:15, 1365:5, 1365:23, 1368:22, 1369:3, 1371:25, 1372:11, 1381:3, 1381:9, 1381:25, 1384:3, 1388:9, 1390:21, 1390:23, 1392:15, 1393:7, 1393:16, 1393:17, 1395:15, 1395:21, 1395:24, 1396:17, 1396:18, 1398:13, 1398:15, 1399:22, 1399:23, 1401:4, 1404:7, 1407:23, 1409:4, 1409:5, 1410:12, 1423:11, 1423:12, 1454:4, 1454:5, 1456:4, 1457:8, 1457:9, 1457:10, 1458:4, 1487:23

**PAGE** [1] - 1560:3

**pages** [2] - 1395:15, 1525:6

**paid** [2] - 1325:16, 1325:17

**painstaking** [1] - 1525:5

**pandemic** [3] - 1555:15, 1556:2, 1558:11

**paragraph** [66] - 1312:3, 1312:14, 1318:12, 1318:20, 1318:25, 1321:16, 1322:7, 1330:4, 1330:5, 1330:13, 1330:15, 1330:19, 1330:22, 1331:5, 1331:6, 1336:18, 1345:4, 1362:20, 1362:22, 1362:23, 1362:24, 1363:4, 1363:18, 1364:7, 1364:9, 1376:13, 1377:2, 1377:12, 1377:14, 1397:13, 1397:14, 1422:7, 1422:9, 1422:10, 1423:2, 1423:3, 1425:9, 1425:10, 1431:3, 1432:16, 1475:17, 1475:22, 1477:19, 1477:20, 1483:18, 1486:17, 1486:19, 1486:20, 1497:25, 1498:15, 1498:16, 1498:18, 1499:8, 1530:5, 1534:5, 1534:7, 1534:10, 1534:12, 1536:11, 1536:17, 1536:23, 1537:8, 1537:15, 1550:11

**paragraphs** [6] - 1321:21, 1330:12, 1363:3, 1363:22, 1364:5, 1478:20

**parameter** [20] - 1391:7, 1396:9, 1421:13, 1421:14, 1421:15, 1444:22, 1445:10, 1445:16, 1445:17, 1445:20, 1445:21, 1446:25, 1448:2, 1516:15, 1516:25, 1517:5, 1517:10, 1518:3, 1518:4

**parameters** [12] - 1370:16, 1391:1, 1391:9, 1391:15,

1393:3, 1393:5,
1395:11, 1396:10,
1396:11, 1396:12,
1401:2, 1421:16
**part** [47] - 1293:25,
1307:24, 1309:8,
1310:7, 1315:7,
1324:2, 1324:11,
1334:24, 1338:1,
1338:4, 1338:9,
1339:12, 1339:16,
1353:21, 1359:12,
1372:14, 1372:18,
1373:7, 1373:14,
1374:5, 1396:24,
1397:6, 1397:11,
1400:9, 1401:11,
1402:5, 1405:10,
1407:1, 1408:1,
1408:9, 1409:9,
1417:17, 1418:4,
1419:4, 1421:17,
1451:4, 1453:8,
1461:9, 1477:11,
1478:7, 1505:11,
1514:13, 1531:12,
1544:18, 1554:24,
1554:25, 1555:22
**partially** [8] - 1402:8,
1402:15, 1417:13,
1417:14, 1460:19,
1460:22, 1462:21
**participating** [1] -
1464:23
**particular** [42] -
1295:8, 1309:4,
1310:3, 1313:2,
1322:14, 1342:8,
1358:8, 1358:12,
1367:4, 1371:14,
1376:23, 1382:16,
1385:25, 1387:5,
1387:23, 1391:4,
1394:15, 1395:2,
1395:4, 1395:19,
1400:8, 1400:19,
1401:15, 1402:5,
1414:16, 1414:18,
1418:12, 1419:5,
1419:12, 1420:3,
1421:15, 1435:12,
1440:9, 1446:10,
1447:13, 1447:20,
1455:5, 1457:13,
1461:22, 1511:14,
1556:17
**particularly** [4] -
1302:22, 1367:8,
1378:4, 1417:5
**parties** [8] - 1294:1,

1303:15, 1313:15,
1327:14, 1348:23,
1449:7, 1480:25,
1556:15
**Partner** [4] - 1338:2,
1338:4, 1338:9,
1340:7
**partner** [17] - 1338:10,
1338:12, 1338:18,
1338:21, 1338:25,
1339:11, 1339:12,
1339:16, 1339:22,
1339:25, 1341:24,
1342:11, 1343:9,
1343:14, 1343:15,
1343:16, 1504:13
**partners** [1] - 1531:7
**partnership** [1] -
1341:22
**parts** [5] - 1294:5,
1368:20, 1418:3,
1471:18, 1471:20
**Party** [1] - 1441:11
**party** [27] - 1294:17,
1294:19, 1297:22,
1300:6, 1300:10,
1312:23, 1313:12,
1313:18, 1315:14,
1317:20, 1323:15,
1323:21, 1325:6,
1325:11, 1326:16,
1326:24, 1329:20,
1330:15, 1330:18,
1330:19, 1330:22,
1331:4, 1342:25,
1434:17, 1487:11,
1489:5, 1501:10
**party's** [1] - 1556:17
**pass** [2] - 1352:5,
1419:17
**passing** [2] - 1421:12,
1421:13
**past** [5] - 1292:12,
1344:18, 1403:18,
1466:14, 1500:20
**Pay** [1] - 1470:4
**pay** [6] - 1303:16,
1325:7, 1325:8,
1325:17, 1325:18
**payable** [3] - 1313:8,
1313:9, 1313:10
**payment** [2] -
1338:14, 1340:1
**payments** [1] -
1325:11
**pdf** [2] - 1352:6,
1352:9
**pedagogy** [1] -
1479:10
**penalties** [1] -

1326:19
**pending** [1] - 1555:21
**people** [6] - 1297:19,
1325:16, 1343:7,
1343:23, 1460:12,
1479:6
**People's** [1] - 1408:18
**PeopleCode** [1] -
1441:19
**PeopleSoft** [67] -
1350:25, 1351:18,
1353:24, 1353:25,
1354:23, 1362:21,
1363:7, 1363:14,
1364:4, 1365:14,
1365:24, 1366:3,
1388:12, 1388:20,
1389:9, 1390:11,
1390:13, 1390:14,
1391:11, 1405:22,
1405:24, 1406:1,
1406:4, 1406:23,
1407:10, 1408:12,
1408:14, 1408:18,
1409:7, 1409:8,
1409:9, 1409:19,
1409:24, 1410:24,
1411:8, 1420:4,
1422:13, 1432:3,
1432:4, 1432:11,
1441:19, 1445:1,
1454:24, 1455:18,
1457:24, 1468:19,
1473:13, 1474:8,
1476:3, 1478:6,
1478:9, 1481:4,
1488:19, 1492:8,
1492:9, 1492:10,
1497:20, 1498:20,
1500:8, 1500:9,
1503:12, 1537:25,
1544:24, 1547:15,
1549:21, 1550:7
**PeopleSoft-oriented**
[1] - 1390:13
**PeopleTools** [4] -
1351:19, 1406:2,
1408:9, 1408:24
**per** [1] - 1433:4
**percent** [10] - 1389:16,
1409:20, 1430:2,
1431:21, 1432:12,
1432:20, 1432:23,
1433:4, 1508:19
**percents** [1] - 1317:12
**perception** [3] -
1305:18, 1305:23,
1305:25
**perfect** [1] - 1459:11
**PERFORM** [1] -

1462:9
**perform** [14] - 1300:7,
1312:1, 1312:25,
1313:11, 1363:16,
1378:21, 1417:8,
1419:19, 1444:11,
1445:21, 1462:17,
1513:3, 1513:4,
1513:10
**performed** [5] -
1359:19, 1370:12,
1400:4, 1445:2,
1507:12
**performs** [1] - 1388:16
**perhaps** [4] - 1333:14,
1400:5, 1460:12,
1460:16
**period** [7] - 1326:18,
1488:11, 1495:11,
1504:10, 1532:11,
1554:11
**permanent** [1] -
1472:25
**permissible** [4] -
1322:18, 1528:25,
1533:19, 1549:7
**permission** [3] -
1351:9, 1354:14,
1552:10
**permissions** [1] -
1313:3
**permit** [7] - 1469:2,
1482:17, 1483:20,
1498:1, 1498:2,
1548:9
**permits** [2] - 1483:20,
1543:23
**permitted** [9] -
1365:20, 1441:6,
1443:19, 1444:14,
1477:7, 1487:16,
1512:24, 1530:14,
1539:21
**perpetual** [2] - 1543:5,
1543:7
**person** [6] - 1343:17,
1361:2, 1437:12,
1437:13, 1448:12,
1532:20
**personally** [1] -
1437:1
**perspective** [5] -
1292:6, 1299:7,
1300:25, 1466:11,
1557:8
**phase** [3] - 1291:25,
1306:4, 1306:5
**Phillips** [1] - 1290:15
**phone** [9] - 1325:13,
1326:6, 1333:12,

1424:23, 1495:16,
1516:17, 1516:20,
1516:24, 1558:4
**phrase** [5] - 1418:16,
1420:9, 1457:1,
1460:20, 1507:20
**physical** [1] - 1329:16
**physically** [2] -
1329:21, 1329:22
**pic** [1] - 1453:24
**PIC** [6] - 1384:10,
1384:13, 1384:19,
1384:21, 1384:24,
1386:18
**picked** [1] - 1355:15
**piece** [5] - 1385:14,
1456:12, 1457:13,
1457:16, 1538:9
**pieces** [1] - 1485:7
**Pikeville** [1] - 1498:11
**pin** [1] - 1557:6
**pitch** [1] - 1315:20
**pivoted** [3] - 1505:9,
1505:10, 1511:19
**place** [14] - 1338:10,
1342:20, 1342:21,
1368:24, 1371:17,
1386:22, 1389:24,
1467:19, 1468:7,
1468:8, 1474:2,
1493:9, 1549:2,
1549:9
**placed** [1] - 1415:13
**plain** [9] - 1474:25,
1482:23, 1483:24,
1485:9, 1545:17,
1545:25, 1546:5,
1546:8, 1552:14
**PLAINTIFF** [1] -
1290:14
**plaintiff** [1] - 1502:8
**Plaintiff** [1] - 1350:15
**Plaintiff's** [2] - 1349:2,
1465:9
**plaintiffs** [1] - 1290:5
**PLAINTIFFS'** [4] -
1560:7, 1560:15,
1560:22, 1560:24
**plan** [1] - 1443:4
**plane** [1] - 1329:20
**planning** [1] - 1555:4
**platform** [2] - 1413:2,
1413:14
**platforms** [3] - 1413:5,
1413:11
**platter** [1] - 1314:23
**played** [3] - 1349:24,
1349:25, 1465:4
**playing** [1] - 1492:25
**pleases** [1] - 1468:14

32

**plus** [1] - 1536:25
**Pocker** [2] - 1290:14, 1434:7
**point** [36] - 1295:18, 1307:11, 1318:11, 1320:3, 1327:2, 1327:15, 1340:18, 1347:2, 1347:6, 1348:3, 1356:14, 1358:7, 1358:25, 1359:21, 1361:18, 1367:1, 1368:11, 1369:11, 1369:17, 1370:10, 1371:23, 1374:21, 1388:23, 1397:2, 1397:16, 1405:21, 1407:8, 1445:11, 1445:12, 1447:11, 1450:25, 1462:15, 1479:3, 1502:10, 1514:16, 1539:2
**pointed** [5] - 1385:2, 1386:9, 1490:10, 1506:21, 1545:9
**pointer** [1] - 1534:25
**pointers** [2] - 1477:3, 1499:3
**pointless** [1] - 1467:20
**points** [4] - 1315:3, 1357:20, 1357:24, 1358:3
**Policies** [1] - 1340:7
**policies** [2] - 1321:17, 1434:15
**Policy** [6] - 1477:14, 1477:16, 1477:23, 1485:11, 1488:17, 1489:9
**policy** [3] - 1489:25, 1502:24, 1545:14
**pop** [2] - 1297:11, 1343:3
**popular** [1] - 1479:11
**ported** [1] - 1413:10
**portion** [19] - 1312:12, 1325:10, 1329:5, 1336:20, 1374:2, 1381:4, 1384:3, 1393:18, 1439:21, 1455:5, 1459:13, 1467:18, 1471:4, 1502:15, 1528:13, 1528:16, 1533:9, 1533:10, 1534:10
**portions** [11] - 1313:4, 1393:12, 1395:23, 1396:18, 1441:18, 1473:3, 1512:22,

1528:7, 1529:5, 1529:6, 1533:15
**position** [8] - 1314:6, 1391:16, 1396:4, 1419:21, 1459:2, 1459:3, 1509:10, 1556:17
**positions** [1] - 1522:8
**positives** [1] - 1508:17
**possession** [2] - 1443:1, 1447:12
**possible** [7] - 1305:2, 1334:20, 1376:4, 1377:6, 1403:16, 1403:17, 1477:8
**possibly** [2] - 1410:1, 1424:18
**postinjunction** [1] - 1375:5
**potential** [6] - 1365:10, 1365:16, 1387:13, 1387:14, 1387:15, 1489:8
**potentially** [1] - 1489:4
**power** [1] - 1543:16
**practice** [10] - 1355:24, 1382:16, 1400:16, 1401:24, 1468:4, 1486:24, 1494:16, 1499:6, 1499:9, 1549:4
**practices** [25] - 1303:11, 1320:18, 1375:6, 1466:16, 1466:21, 1467:11, 1468:9, 1468:17, 1469:1, 1469:14, 1469:22, 1470:8, 1470:17, 1470:20, 1471:14, 1472:22, 1476:23, 1531:14, 1544:15, 1544:17, 1551:25, 1552:22, 1553:8, 1553:21
**pre** [2] - 1510:3, 1523:9
**pre-existing** [1] - 1510:3
**pre-injunction** [1] - 1523:9
**preadmitted** [1] - 1309:3
**preclude** [1] - 1529:16
**predates** [1] - 1441:22
**predecessor** [1] - 1413:11
**predicate** [1] - 1373:21
**predicts** [1] - 1486:15

**preeminent** [1] - 1303:3
**preexisting** [1] - 1523:22
**preference** [1] - 1403:23
**preferred** [1] - 1317:12
**prefix** [3] - 1391:20, 1399:18, 1401:8
**prehearing** [1] - 1442:22
**premises** [1] - 1320:12
**preparation** [1] - 1429:17
**prepare** [4] - 1363:5, 1422:12, 1475:18, 1537:10
**prepared** [8] - 1437:24, 1437:25, 1438:5, 1438:7, 1438:14, 1438:16, 1465:18, 1507:5
**preparing** [6] - 1332:21, 1363:13, 1424:19, 1424:25, 1426:6, 1438:10
**presence** [1] - 1396:2
**present** [8] - 1304:12, 1305:2, 1305:7, 1401:1, 1437:21, 1481:19, 1492:12, 1537:18
**presentation** [2] - 1412:16, 1434:15
**presented** [14] - 1321:18, 1321:20, 1356:4, 1357:16, 1380:16, 1427:23, 1429:21, 1429:23, 1439:13, 1442:6, 1501:8, 1506:1, 1535:23, 1543:11
**presenting** [1] - 1314:22
**preserve** [1] - 1555:16
**President** [2] - 1320:4, 1529:23
**president** [5] - 1471:24, 1472:9, 1486:6, 1486:9, 1493:10
**presumably** [1] - 1355:4
**Presumably** [1] - 1515:20
**pretend** [1] - 1541:15
**pretrial** [1] - 1556:14
**Pretty** [1] - 1427:18

**pretty** [5] - 1308:14, 1308:24, 1337:14, 1344:14, 1556:15
**prevent** [4] - 1442:21, 1482:2, 1531:18, 1543:2
**prevents** [4] - 1344:20, 1362:6, 1450:10, 1486:19
**previous** [2] - 1367:6, 1430:10
**previously** [6] - 1291:18, 1341:20, 1350:16, 1431:25, 1452:11, 1466:16
**primarily** [1] - 1338:13
**principal** [1] - 1408:22
**principle** [2] - 1444:25, 1445:6
**Pringle** [1] - 1372:2
**print** [15] - 1364:20, 1364:22, 1366:2, 1369:5, 1444:21, 1445:10, 1445:16, 1446:25, 1447:13, 1448:1, 1516:15, 1516:25, 1517:4, 1517:9, 1518:3
**printing** [1] - 1352:15
**printout** [1] - 1410:1
**privy** [1] - 1344:10
**Priyadarshi** [1] - 1357:9
**proactively** [1] - 1516:9
**probable** [1] - 1502:5
**problem** [43] - 1354:7, 1354:22, 1355:9, 1355:14, 1359:20, 1362:6, 1364:22, 1364:24, 1365:9, 1365:10, 1365:16, 1366:10, 1366:17, 1366:20, 1366:21, 1366:24, 1367:17, 1368:2, 1368:25, 1370:5, 1370:6, 1370:18, 1370:21, 1400:16, 1444:22, 1446:13, 1446:16, 1446:19, 1446:23, 1447:23, 1448:1, 1448:5, 1448:9, 1448:15, 1449:8, 1450:21, 1450:22, 1495:15, 1551:1, 1551:3, 1557:7
**problems** [4] - 1439:10, 1555:14, 1557:11, 1558:12

**procedural** [1] - 1396:25
**procedure** [3] - 1417:22, 1507:17, 1507:18
**procedures** [5] - 1320:18, 1334:20, 1334:23, 1335:3, 1531:14
**proceed** [8] - 1377:16, 1402:19, 1411:15, 1452:12, 1464:13, 1464:18, 1499:22, 1557:19
**proceeding** [8] - 1294:6, 1327:2, 1376:25, 1442:24, 1503:8, 1509:1, 1524:8, 1531:2
**proceedings** [4] - 1361:18, 1473:15, 1559:3, 1559:6
**process** [13] - 1352:12, 1352:20, 1353:1, 1373:7, 1373:14, 1375:22, 1382:15, 1394:23, 1430:25, 1436:8, 1444:25, 1497:9, 1524:18
**Process** [5] - 1540:17, 1540:25, 1541:18, 1544:21, 1544:23
**processes** [24] - 1317:23, 1318:1, 1318:3, 1319:25, 1320:13, 1322:25, 1323:4, 1325:10, 1334:14, 1334:20, 1334:23, 1335:1, 1335:3, 1336:12, 1336:14, 1471:12, 1485:22, 1487:1, 1501:9, 1507:18, 1529:24, 1530:4, 1531:13, 1543:20
**processing** [6] - 1293:3, 1401:15, 1401:17, 1476:12, 1491:14, 1507:18
**produce** [2] - 1356:15, 1490:13
**produced** [7] - 1294:1, 1304:3, 1342:1, 1356:16, 1356:22, 1356:25, 1443:2
**producer** [1] - 1316:24
**producing** [1] - 1341:23
**product** [27] -

33

1291:25, 1293:8,
1293:10, 1300:12,
1300:15, 1319:3,
1382:16, 1436:4,
1441:18, 1444:1,
1449:13, 1500:25,
1501:4, 1513:1,
1513:2, 1513:13,
1519:11, 1519:19,
1522:23, 1523:4,
1525:12, 1526:9,
1527:16, 1532:15,
1538:16, 1540:2,
1543:24
**production** [5] -
1304:3, 1313:5,
1313:10, 1356:6,
1425:15
**products** [7] - 1293:8,
1296:22, 1298:4,
1314:13, 1432:10,
1441:17, 1547:14
**professionalism** [2] -
1554:7, 1558:18
**Professor** [85] -
1332:4, 1350:19,
1352:25, 1353:7,
1353:16, 1359:22,
1360:3, 1375:14,
1375:18, 1376:8,
1376:15, 1376:17,
1376:24, 1377:17,
1378:23, 1379:8,
1380:4, 1380:20,
1381:4, 1383:9,
1385:18, 1385:22,
1386:1, 1386:5,
1389:11, 1390:1,
1390:10, 1390:17,
1393:6, 1393:17,
1399:23, 1400:4,
1404:17, 1406:12,
1407:8, 1451:19,
1452:4, 1452:14,
1452:19, 1453:16,
1453:20, 1454:8,
1456:11, 1456:14,
1457:12, 1457:25,
1458:8, 1458:15,
1459:16, 1459:25,
1460:9, 1462:12,
1462:19, 1463:5,
1463:12, 1464:6,
1479:2, 1485:12,
1488:20, 1489:1,
1489:6, 1490:8,
1492:4, 1494:2,
1494:7, 1496:15,
1497:8, 1497:13,
1500:15, 1506:16,
1506:20, 1508:5,

1512:13, 1515:10,
1518:5, 1519:12,
1522:24, 1524:19,
1534:19, 1535:11,
1535:16, 1547:18,
1548:3, 1549:7,
1550:8
**proffer** [4] - 1441:24,
1443:5, 1485:15,
1528:19
**profits** [2] - 1316:8,
1316:19
**PROGRAM** [1] -
1457:10
**program** [46] -
1341:15, 1355:7,
1369:5, 1369:17,
1373:6, 1373:11,
1373:18, 1382:11,
1382:14, 1383:6,
1384:8, 1385:7,
1388:9, 1388:13,
1388:14, 1388:15,
1388:18, 1388:19,
1388:20, 1388:25,
1389:10, 1390:11,
1391:3, 1396:24,
1396:25, 1397:11,
1397:19, 1397:20,
1397:22, 1398:1,
1399:11, 1399:12,
1402:5, 1406:13,
1406:17, 1408:8,
1410:3, 1414:5,
1414:15, 1419:1,
1420:3, 1420:25,
1421:17, 1422:1,
1459:4, 1462:15
**programmer** [28] -
1385:7, 1388:13,
1390:14, 1391:11,
1391:14, 1391:18,
1394:7, 1394:14,
1395:4, 1397:2,
1397:10, 1397:15,
1397:17, 1398:11,
1400:22, 1402:3,
1402:12, 1402:15,
1406:25, 1418:8,
1418:12, 1419:2,
1419:10, 1420:2,
1420:4, 1421:18,
1456:17
**programmer's** [2] -
1396:14, 1451:4
**programmerless** [1] -
1295:15
**programmerly** [1] -
1409:12
**programmers** [8] -

1383:5, 1386:12,
1389:12, 1390:11,
1399:5, 1399:6,
1456:23, 1497:1
**programming** [11] -
1295:15, 1378:2,
1378:3, 1384:2,
1394:15, 1400:16,
1417:10, 1448:13,
1497:9, 1507:15
**Programs** [1] -
1341:11
**programs** [8] -
1385:10, 1387:6,
1390:7, 1392:18,
1392:24, 1397:25,
1406:4, 1406:9
**prohibit** [6] - 1345:1,
1345:6, 1345:8,
1345:25, 1529:2,
1537:3
**prohibited** [9] -
1319:23, 1328:15,
1329:11, 1362:10,
1371:2, 1486:13,
1522:5, 1531:10,
1536:24
**prohibiting** [2] -
1308:4, 1330:20
**prohibition** [14] -
1309:19, 1347:9,
1347:13, 1347:15,
1363:11, 1364:4,
1422:4, 1503:17,
1506:9, 1506:11,
1537:20, 1538:6,
1538:24, 1552:6
**prohibitions** [1] -
1450:23
**prohibits** [8] -
1344:24, 1346:4,
1346:8, 1358:9,
1483:19, 1486:21,
1491:12, 1531:5
**project** [1] - 1297:24
**projects** [4] - 1339:5,
1339:6, 1344:9
**promises** [1] -
1476:23
**promote** [2] - 1295:10,
1538:23
**promoted** [2] -
1314:14, 1315:10
**promoting** [1] -
1531:20
**promotion** [2] -
1315:5, 1315:7
**promotional** [3] -
1315:9, 1315:10,
1315:12

**pronounce** [2] -
1456:14, 1456:15
**proof** [17] - 1440:1,
1440:9, 1440:11,
1440:13, 1440:21,
1441:2, 1469:5,
1514:13, 1519:17,
1522:25, 1523:16,
1524:9, 1525:3,
1535:25, 1540:6,
1544:12, 1544:13
**proper** [5] - 1322:3,
1427:6, 1492:16,
1503:8, 1530:19
**properly** [2] - 1295:10,
1473:10
**property** [7] - 1310:25,
1320:20, 1321:8,
1323:1, 1489:5,
1530:2, 1531:15
**proportional** [1] -
1379:21
**proposal** [1] - 1556:21
**propose** [1] - 1544:8
**proposed** [3] -
1304:21, 1369:2,
1554:12
**proposition** [2] -
1555:24, 1556:11
**proprietary** [1] -
1341:14
**protect** [2] - 1310:19,
1310:24
**protectability** [3] -
1415:3, 1415:9,
1508:2
**protected** [17] -
1407:5, 1453:7,
1453:10, 1453:12,
1453:18, 1457:6,
1458:17, 1481:10,
1510:3, 1510:5,
1512:12, 1523:1,
1523:3, 1523:21,
1527:22, 1548:6,
1549:23
**protectible** [43] -
1415:16, 1415:18,
1415:22, 1415:25,
1416:5, 1416:11,
1416:15, 1416:21,
1417:1, 1417:3,
1417:23, 1418:8,
1418:17, 1419:9,
1419:14, 1420:9,
1420:16, 1421:10,
1421:22, 1453:20,
1453:25, 1454:20,
1454:22, 1455:1,
1455:10, 1455:12,

1455:15, 1457:25,
1458:2, 1458:22,
1458:23, 1461:1,
1461:2, 1462:12,
1462:22, 1463:1,
1507:19, 1507:24,
1508:3, 1508:8,
1508:11, 1540:3,
1548:11
**prototypes** [1] -
1476:4
**prove** [4] - 1501:20,
1501:22, 1503:3,
1514:15
**proved** [3] - 1519:11,
1519:18, 1523:15
**proven** [5] - 1469:6,
1481:5, 1502:1,
1515:4, 1527:18
**provide** [25] - 1296:17,
1312:16, 1313:13,
1327:9, 1329:17,
1331:10, 1333:7,
1333:22, 1334:1,
1334:7, 1335:14,
1335:17, 1356:17,
1371:10, 1387:21,
1395:11, 1424:22,
1426:7, 1436:3,
1441:13, 1443:10,
1476:25, 1514:7,
1530:9, 1546:23
**provided** [39] -
1295:1, 1295:23,
1298:17, 1299:9,
1307:20, 1307:21,
1312:17, 1313:24,
1314:18, 1320:17,
1327:5, 1328:10,
1332:11, 1335:8,
1351:10, 1355:2,
1355:7, 1356:2,
1357:15, 1388:9,
1389:9, 1391:15,
1392:6, 1395:20,
1406:1, 1406:3,
1409:8, 1415:1,
1418:24, 1425:7,
1427:10, 1437:16,
1439:7, 1439:8,
1446:10, 1483:11,
1514:8, 1540:19,
1551:11
**provider** [10] -
1294:17, 1294:20,
1297:16, 1300:11,
1317:20, 1325:14,
1333:22, 1333:25,
1487:11, 1501:11
**providers** [10] -

34

1297:8, 1303:6,
1312:23, 1313:12,
1342:20, 1342:23,
1531:7, 1531:19,
1538:16, 1538:22
**provides** [9] -
1294:11, 1294:13,
1296:15, 1314:7,
1315:2, 1324:12,
1414:1, 1501:12,
1532:16
**providing** [11] -
1291:22, 1334:2,
1337:2, 1426:6,
1442:8, 1474:6,
1478:11, 1482:2,
1534:9, 1542:17,
1542:24
**provision** [12] -
1308:3, 1308:19,
1310:3, 1310:15,
1310:17, 1312:20,
1312:22, 1375:6,
1428:1, 1441:14,
1545:24, 1546:20
**provisions** [11] -
1309:25, 1310:10,
1311:1, 1311:8,
1311:11, 1311:19,
1311:20, 1343:1,
1484:2, 1538:4,
1553:10
**proximity** [1] -
1351:21
**PS_WTHD_CNTL_
VNDR** [1] - 1409:7
**psptarry** [11] -
1379:10, 1382:19,
1385:16, 1388:22,
1389:1, 1389:2,
1392:1, 1415:1,
1462:16, 1463:3
**psptarry.cbl** [3] -
1375:15, 1387:11,
1452:21
**psptaxdt.dms** [1] -
1354:19
**psptcalc.lis** [1] -
1355:7
**ptpsqlrt** [5] - 1390:25,
1391:12, 1392:20,
1400:21, 1461:21
**pts** [1] - 1418:23
**public** [1] - 1415:13
**publication** [2] -
1303:21, 1520:20
**publications** [2] -
1303:16, 1361:5
**publicly** [1] - 1352:16
**published** [1] -

1496:22
**publisher** [1] -
1441:15
**pull** [21] - 1296:4,
1299:16, 1306:15,
1309:22, 1311:11,
1318:10, 1335:10,
1336:17, 1365:1,
1376:14, 1386:1,
1388:5, 1405:4,
1423:10, 1425:8,
1426:14, 1428:4,
1428:21, 1431:2,
1434:2, 1459:9
**pulling** [2] - 1421:23,
1421:24
**punch** [1] - 1383:23
**pure** [2] - 1516:11,
1516:12
**purportedly** [1] -
1392:2
**purpose** [10] -
1294:24, 1314:8,
1341:3, 1345:8,
1405:22, 1421:25,
1534:22, 1535:2,
1535:12, 1546:13
**purposes** [12] -
1304:8, 1355:14,
1364:3, 1366:1,
1376:18, 1393:13,
1394:5, 1453:5,
1481:16, 1481:20,
1491:13, 1506:22
**pursuant** [2] -
1440:14, 1440:22
**put** [31] - 1305:1,
1323:19, 1327:18,
1334:4, 1340:4,
1373:11, 1376:5,
1377:6, 1380:1,
1386:14, 1388:4,
1396:5, 1396:6,
1397:3, 1397:20,
1401:17, 1415:6,
1436:4, 1444:15,
1444:17, 1499:5,
1503:3, 1503:7,
1505:11, 1505:14,
1511:2, 1515:9,
1516:4, 1518:4,
1520:20, 1533:5
**puts** [1] - 1518:9
**putting** [4] - 1372:17,
1396:7, 1445:19,
1446:18
**PWC** [1] - 1297:10

## Q

**QA** [2] - 1494:18,
1500:11
**qualified** [1] - 1548:19
**qualifies** [1] - 1453:18
**quality** [3] - 1375:2,
1429:19, 1500:11
**quantity** [1] - 1469:13
**quarantine** [9] -
1356:3, 1433:20,
1478:10, 1478:15,
1488:12, 1488:14,
1490:4, 1490:9,
1490:12
**quarantined** [12] -
1355:21, 1356:13,
1356:14, 1433:24,
1435:5, 1470:7,
1470:9, 1478:6,
1478:7, 1490:6,
1490:9, 1502:21
**quarantining** [10] -
1356:5, 1433:18,
1433:22, 1437:17,
1504:23, 1505:5,
1541:13, 1541:19,
1545:7, 1545:9
**quarter** [3] - 1501:3,
1524:24, 1527:17
**QUESTION** [5] -
1301:20, 1302:2,
1302:10, 1302:14,
1329:9
**questioning** [2] -
1412:15, 1480:2
**questions** [23] -
1331:14, 1333:12,
1346:13, 1375:1,
1411:12, 1433:13,
1435:12, 1438:19,
1452:1, 1463:6,
1463:24, 1463:25,
1464:5, 1489:7,
1498:22, 1500:5,
1500:8, 1500:10,
1500:13, 1500:22,
1522:7, 1523:11,
1529:24
**quick** [1] - 1293:14
**quickly** [6] - 1301:11,
1321:13, 1375:10,
1393:14, 1396:16,
1558:20
**quite** [7] - 1297:10,
1335:4, 1344:1,
1418:21, 1445:18,
1469:19, 1557:14
**quote** [10] - 1365:9,
1365:16, 1372:2,

1443:19, 1443:23,
1444:8, 1444:11,
1472:6, 1478:16,
1482:15

## R

**rail** [1] - 1317:9
**raise** [1] - 1403:11
**raised** [6] - 1446:1,
1447:8, 1449:8,
1474:9, 1536:3,
1555:6
**RAM** [4] - 1300:1,
1526:6, 1526:10,
1526:11
**ran** [2] - 1372:20,
1413:4
**range** [4] - 1487:22,
1557:1, 1557:20
**ranged** [1] - 1357:12
**ranges** [1] - 1558:7
**rank** [2] - 1303:5,
1303:6
**ranking** [1] - 1303:7
**Ransom** [4] - 1318:5,
1349:24, 1529:22,
1533:17
**ransom's** [1] - 1530:9
**rate** [1] - 1557:14
**rather** [11] - 1307:3,
1358:15, 1361:8,
1361:16, 1379:4,
1380:22, 1414:5,
1420:1, 1421:12,
1448:11, 1455:11
**Ravin** [8] - 1469:23,
1471:24, 1473:6,
1484:20, 1484:24,
1485:23, 1500:21,
1544:22
**Ray** [2] - 1470:12,
1471:1
**reach** [5] - 1315:18,
1356:10, 1461:3,
1465:24, 1509:4
**reached** [1] - 1399:4
**reaction** [3] - 1296:13,
1300:4, 1302:19
**read** [8] - 1345:10,
1345:22, 1349:5,
1436:23, 1477:24,
1484:2, 1534:13,
1547:19
**readability** [1] -
1420:3, 1420:25,
1422:1
**readable** [11] - 1332:6,
1332:10, 1332:12,
1332:15, 1483:7,

1483:8, 1485:19,
1528:13, 1528:16,
1546:3
**reading** [6] - 1319:12,
1337:5, 1410:13,
1459:5, 1542:15,
1552:8
**ready** [2] - 1464:13,
1464:18
**real** [4] - 1379:18,
1379:22, 1383:19,
1531:3
**realized** [1] - 1310:24
**really** [19] - 1307:4,
1307:13, 1330:16,
1358:11, 1368:24,
1383:10, 1383:17,
1384:2, 1389:4,
1400:7, 1400:25,
1408:22, 1409:23,
1419:23, 1494:9,
1516:11, 1530:11,
1556:3, 1558:11
**rearguing** [1] - 1527:9
**reason** [13] - 1298:16,
1300:19, 1314:4,
1314:10, 1316:14,
1323:13, 1408:21,
1440:6, 1509:12,
1528:9, 1531:21,
1540:22, 1549:14
**reasonable** [7] -
1299:8, 1301:1,
1469:10, 1469:16,
1470:14, 1501:25,
1502:6
**reasons** [5] - 1314:3,
1323:11, 1408:22,
1415:12, 1442:9
**rebut** [1] - 1448:22
**REBUTTAL** [2] -
1560:7, 1560:24
**rebuttal** [30] - 1348:4,
1350:5, 1350:15,
1357:20, 1357:24,
1358:3, 1358:22,
1360:7, 1367:1,
1376:14, 1404:3,
1412:16, 1439:6,
1439:7, 1439:8,
1439:17, 1439:22,
1440:6, 1440:16,
1440:18, 1443:12,
1448:21, 1452:22,
1453:14, 1457:15,
1459:10, 1459:13,
1460:18, 1465:22,
1498:7
**recalled** [1] - 1291:17
**recap** [1] - 1538:11

**receipts** [1] - 1434:22
**receive** [14] - 1307:8, 1332:9, 1332:12, 1359:9, 1359:13, 1359:17, 1361:23, 1434:8, 1434:17, 1514:21, 1520:1, 1520:4, 1521:6, 1521:11
**received** [5] - 1349:2, 1349:10, 1349:17, 1350:3, 1465:9
**recent** [1] - 1316:23
**recently** [1] - 1413:13
**recess** [4] - 1348:9, 1348:11, 1402:25, 1464:9
**recognize** [3] - 1360:2, 1419:23, 1558:7
**recognizing** [1] - 1509:10
**recollect** [1] - 1424:20
**recollection** [13] - 1356:19, 1360:23, 1360:24, 1370:2, 1381:2, 1411:22, 1413:4, 1427:13, 1430:25, 1435:23, 1436:25, 1456:19, 1456:20
**reconcile** [1] - 1477:16
**reconciled** [1] - 1497:24
**reconstruct** [1] - 1438:9
**reconvene** [3] - 1348:10, 1402:23, 1464:8
**reconvened** [4] - 1291:7, 1348:13, 1403:5, 1464:12
**record** [21] - 1291:6, 1302:25, 1348:13, 1349:5, 1355:13, 1361:4, 1372:15, 1403:5, 1440:24, 1443:6, 1456:6, 1459:12, 1464:11, 1486:25, 1487:9, 1488:7, 1544:4, 1549:8, 1554:24, 1554:25, 1559:6
**records** [15] - 1355:20, 1356:21, 1356:25, 1357:7, 1357:8, 1357:12, 1360:15, 1360:20, 1373:25, 1374:9,

1442:15, 1489:23, 1490:14, 1525:14, 1525:15
**red** [10] - 1393:9, 1400:6, 1400:10, 1400:21, 1509:16, 1519:9, 1524:20, 1528:6, 1528:16, 1534:17
**red-lining** [1] - 1400:6
**redirect** [6] - 1346:14, 1517:20, 1518:21, 1521:25, 1538:17, 1539:14
**Redirect** [3] - 1451:15, 1560:5, 1560:9
**REDIRECT** [2] - 1346:16, 1451:17
**reduce** [1] - 1351:23
**reduction** [1] - 1359:7
**reductions** [1] - 1359:3
**refer** [3] - 1410:16, 1441:12, 1459:6
**reference** [17] - 1301:6, 1303:24, 1366:16, 1377:9, 1378:2, 1379:5, 1398:14, 1398:18, 1402:11, 1407:19, 1409:19, 1445:5, 1448:4, 1512:5, 1512:15, 1529:9, 1534:25
**referenced** [6] - 1352:21, 1373:25, 1374:9, 1374:19, 1377:1, 1521:1
**references** [2] - 1524:15, 1540:13
**referencing** [4] - 1336:20, 1372:12, 1398:18, 1410:1
**referred** [9] - 1340:21, 1377:3, 1390:20, 1398:2, 1398:4, 1528:19, 1529:9, 1529:11, 1554:23
**referring** [19] - 1297:4, 1310:1, 1310:17, 1318:15, 1319:21, 1330:23, 1363:19, 1364:12, 1368:5, 1379:16, 1390:3, 1393:10, 1405:7, 1422:7, 1482:24, 1484:2, 1493:25, 1514:24, 1536:20
**refers** [2] - 1311:23, 1409:6

**refight** [1] - 1474:18
**reflect** [4] - 1356:12, 1357:13, 1401:4, 1521:9
**reflected** [6] - 1292:5, 1346:19, 1347:1, 1347:6, 1357:11, 1554:8
**reflects** [3] - 1399:22, 1521:13, 1521:16
**refresh** [3] - 1351:16, 1381:2, 1411:25
**refused** [1] - 1483:23
**refusing** [1] - 1541:17
**regard** [9] - 1294:4, 1349:11, 1355:24, 1364:16, 1364:19, 1371:22, 1453:11, 1457:15, 1462:22
**regarding** [25] - 1294:3, 1296:2, 1315:7, 1318:2, 1321:10, 1357:17, 1357:21, 1358:23, 1358:24, 1359:23, 1367:3, 1371:6, 1375:15, 1385:18, 1390:2, 1399:25, 1412:15, 1439:9, 1440:1, 1442:5, 1521:8, 1522:18, 1528:1, 1536:8, 1536:12
**regardless** [1] - 1378:23
**region** [1] - 1292:24
**regulatory** [12] - 1295:5, 1295:24, 1319:5, 1323:23, 1324:2, 1324:11, 1324:16, 1327:10, 1333:17, 1335:24, 1336:1, 1336:6
**rehash** [1] - 1540:14
**reimplement** [1] - 1518:1
**rejected** [1] - 1481:21
**relate** [3] - 1458:20, 1480:8, 1480:9
**related** [6] - 1292:18, 1314:17, 1352:23, 1370:6, 1421:17, 1481:3
**relates** [4] - 1317:23, 1440:2, 1536:4, 1536:10
**relating** [5] - 1414:25, 1435:14, 1438:16, 1443:17, 1537:9
**relation** [1] - 1302:22

**relatively** [5] - 1455:18, 1455:20, 1456:2, 1457:23, 1461:6
**release** [1] - 1520:7
**relevant** [8] - 1435:18, 1438:23, 1442:11, 1443:3, 1443:11, 1492:18, 1504:10, 1546:20
**reliable** [1] - 1509:4
**reliance** [1] - 1406:22
**relied** [7] - 1305:3, 1305:5, 1336:15, 1353:5, 1426:9, 1492:12, 1546:25
**relief** [1] - 1518:10
**relies** [1] - 1303:4
**relitigate** [3] - 1474:2, 1474:11, 1483:10
**relitigating** [2] - 1475:25, 1500:20
**rely** [8] - 1303:18, 1305:16, 1309:17, 1364:2, 1405:25, 1406:9, 1408:14, 1446:17
**relying** [3] - 1363:3, 1446:3, 1509:1
**remains** [1] - 1545:25
**remarkable** [5] - 1400:22, 1473:21, 1485:6, 1488:25, 1494:14
**remarkably** [3] - 1486:9, 1545:20, 1548:19
**remember** [28] - 1299:15, 1302:12, 1306:14, 1309:15, 1310:20, 1340:3, 1360:25, 1385:4, 1436:12, 1436:13, 1436:18, 1438:17, 1443:22, 1451:8, 1471:16, 1477:15, 1481:17, 1504:20, 1507:3, 1515:24, 1522:9, 1522:10, 1522:11, 1522:15, 1542:1, 1547:15, 1557:13
**remembered** [4] - 1449:12, 1449:22, 1450:25, 1536:22
**remembering** [2] - 1385:3, 1449:14
**remembers** [3] - 1449:15, 1450:13, 1522:3

**remind** [5] - 1388:11, 1405:18, 1408:2, 1458:25, 1465:24
**reminder** [1] - 1504:17
**remote** [3] - 1329:6, 1329:25, 1504:1
**remotely** [10] - 1326:9, 1328:15, 1329:2, 1329:4, 1329:8, 1329:25, 1334:1, 1337:2, 1409:24, 1545:1
**removed** [1] - 1468:19
**renamed** [1] - 1352:1
**render** [1] - 1486:17
**rendered** [1] - 1330:5
**renders** [2] - 1331:11, 1534:7
**Renewable** [1] - 1316:23
**RENO** [2] - 1291:1, 1403:1
**Reno** [2] - 1290:7, 1290:24
**repeat** [11] - 1324:7, 1328:6, 1338:24, 1339:14, 1343:20, 1344:22, 1346:6, 1380:5, 1412:6, 1468:2, 1547:24
**repeated** [1] - 1539:16
**replicate** [3] - 1444:3, 1513:2, 1519:6
**reply** [2] - 1489:24, 1544:6
**report** [33] - 1303:12, 1315:11, 1356:1, 1376:14, 1377:2, 1415:5, 1415:6, 1425:3, 1425:4, 1425:7, 1425:9, 1426:15, 1427:3, 1427:10, 1427:16, 1427:18, 1427:22, 1428:4, 1428:7, 1428:23, 1429:1, 1431:3, 1433:22, 1434:19, 1437:19, 1451:20, 1451:21, 1451:22, 1496:3, 1505:13, 1550:17, 1550:21
**reported** [10] - 1364:23, 1366:22, 1436:17, 1437:4, 1489:3, 1490:5, 1490:7, 1495:22, 1496:3, 1503:1
**Reported** [1] - 1290:23

**Reporter** [2] - 1290:23, 1559:9
**REPORTER** [1] - 1343:19
**reporting** [1] - 1370:21
**reports** [4] - 1303:24, 1450:7, 1504:25, 1536:10
**represent** [3] - 1458:22, 1553:8, 1557:4
**representation** [1] - 1389:5
**representative** [2] - 1321:10, 1322:1
**representative's** [1] - 1530:12
**represented** [2] - 1356:5, 1470:19
**represents** [1] - 1549:4
**reproduce** [6] - 1363:5, 1378:21, 1422:12, 1475:18, 1537:10, 1542:9
**reproducible** [1] - 1378:5
**reproducing** [2] - 1363:13, 1498:17
**reproduction** [1] - 1491:20
**request** [3] - 1541:23, 1541:25, 1542:2
**requested** [1] - 1361:19
**requesting** [1] - 1491:4
**require** [3] - 1292:22, 1312:1, 1536:1
**required** [18] - 1312:19, 1317:8, 1327:13, 1376:21, 1383:20, 1393:3, 1396:1, 1400:21, 1459:23, 1460:1, 1460:3, 1460:4, 1461:7, 1462:1, 1462:18, 1475:7, 1507:15, 1515:17
**requirement** [4] - 1387:3, 1387:4, 1494:17, 1538:2
**requirements** [7] - 1293:3, 1293:4, 1316:25, 1317:7, 1317:8, 1317:10, 1383:18
**requires** [3] - 1534:1, 1543:14, 1552:14

**resale** [2] - 1338:15, 1340:1
**research** [3] - 1336:3, 1351:22, 1413:17
**reservation** [1] - 1396:22
**reserve** [2] - 1387:23, 1465:22
**reserved** [3] - 1348:22, 1383:14, 1383:20
**resolve** [2] - 1354:22, 1366:24
**resolved** [3] - 1326:18, 1350:4, 1516:18
**respect** [49] - 1302:6, 1352:8, 1355:6, 1357:7, 1358:7, 1359:20, 1360:11, 1361:9, 1362:2, 1362:21, 1363:11, 1370:19, 1373:2, 1380:17, 1383:11, 1384:1, 1386:6, 1386:10, 1387:6, 1387:16, 1387:19, 1389:3, 1389:7, 1389:21, 1405:1, 1415:13, 1431:13, 1433:19, 1436:5, 1437:6, 1438:10, 1463:17, 1474:9, 1474:10, 1480:2, 1481:8, 1505:25, 1510:19, 1511:25, 1523:17, 1538:14, 1538:15, 1538:21, 1542:5, 1545:24, 1547:4, 1548:24, 1551:5
**respectful** [5] - 1320:18, 1321:7, 1472:12, 1530:1, 1531:14
**respectfully** [1] - 1543:25
**respects** [3] - 1303:8, 1543:19
**respond** [4] - 1304:12, 1316:15, 1321:21, 1545:3
**responded** [1] - 1316:13
**response** [11] - 1319:24, 1400:3, 1435:6, 1435:19, 1438:25, 1449:8, 1456:21, 1469:20, 1469:21, 1541:3,

1542:2
**responses** [1] - 1294:2
**responsibility** [2] - 1469:25, 1484:23
**responsive** [3] - 1295:4, 1326:23, 1419:6
**rest** [2] - 1297:7, 1534:7
**restricted** [1] - 1312:18
**restriction** [8] - 1308:12, 1432:2, 1432:5, 1506:8, 1506:9, 1506:11, 1506:13, 1537:23
**rests** [2] - 1348:19, 1350:5
**result** [10] - 1323:20, 1328:1, 1375:9, 1402:1, 1406:17, 1466:24, 1468:10, 1482:8, 1482:20, 1509:4
**resulted** [3] - 1353:1, 1431:8, 1483:25
**resulting** [1] - 1481:22
**results** [4] - 1352:14, 1428:9, 1429:1, 1483:24
**Resumed** [1] - 1560:4
**RESUMED** [2] - 1291:19, 1404:14
**retired** [1] - 1413:6
**retract** [1] - 1380:8
**retracted** [2] - 1509:11, 1509:19
**retrieve** [1] - 1414:17
**retrieved** [1] - 1414:16
**retroactive** [1] - 1525:19
**retroactively** [1] - 1526:14
**return** [6] - 1366:25, 1461:4, 1461:17, 1461:22, 1461:23, 1462:15
**returning** [1] - 1371:4
**retype** [2] - 1522:3, 1522:16
**retyped** [1] - 1449:22
**reusable** [2] - 1406:15, 1406:25
**reuse** [17] - 1358:9, 1447:16, 1447:17, 1448:25, 1513:2, 1513:5, 1516:11, 1516:12, 1517:15, 1517:21, 1518:7,

1518:24, 1521:24, 1538:16, 1538:20, 1539:13, 1543:24
**reuses** [1] - 1526:8
**reusing** [3] - 1480:6, 1518:13, 1518:14
**revealed** [7] - 1351:22, 1429:1, 1466:13, 1466:16, 1466:18, 1494:15, 1552:21
**reveals** [1] - 1553:21
**reverse** [5] - 1307:23, 1308:4, 1308:13, 1310:5, 1529:12
**review** [18] - 1294:1, 1294:8, 1307:24, 1314:16, 1318:7, 1320:7, 1320:16, 1321:9, 1322:9, 1334:10, 1351:24, 1356:6, 1356:10, 1373:24, 1375:5, 1436:6, 1436:15, 1487:1
**reviewed** [25] - 1294:3, 1309:1, 1309:8, 1310:10, 1311:20, 1312:20, 1312:22, 1317:25, 1318:6, 1318:14, 1320:22, 1323:7, 1335:2, 1335:3, 1355:14, 1356:18, 1356:22, 1361:10, 1372:24, 1435:14, 1435:24, 1436:20, 1439:5, 1455:17, 1541:10
**reviewing** [7] - 1309:4, 1329:7, 1355:10, 1361:5, 1454:23, 1457:22, 1493:5
**revised** [1] - 1475:3
**Revolution** [1] - 1297:6
**rewrite** [3] - 1534:5, 1545:16, 1547:5
**rewriting** [3] - 1473:21, 1547:9, 1553:19
**Richard** [1] - 1290:14
**ridiculed** [1] - 1497:13
**right-hand** [1] - 1388:8
**rights** [5] - 1320:20, 1321:8, 1323:1, 1415:11, 1531:15
**rights-holder's** [1] - 1415:11

**Rimini** [358] - 1293:18, 1294:3, 1294:10, 1294:13, 1294:15, 1294:18, 1296:24, 1297:5, 1301:20, 1302:25, 1304:22, 1323:22, 1324:2, 1324:10, 1324:12, 1324:14, 1324:15, 1324:19, 1324:22, 1327:2, 1327:5, 1327:9, 1327:13, 1327:19, 1328:2, 1328:15, 1328:23, 1329:1, 1329:15, 1329:19, 1331:7, 1331:9, 1333:7, 1333:18, 1334:25, 1335:4, 1335:5, 1335:8, 1335:14, 1336:9, 1345:11, 1345:14, 1345:23, 1347:23, 1348:19, 1350:5, 1351:4, 1351:7, 1353:9, 1353:19, 1353:23, 1353:25, 1354:17, 1354:21, 1355:8, 1355:9, 1355:11, 1355:24, 1356:14, 1356:17, 1356:22, 1356:25, 1363:5, 1365:14, 1374:16, 1374:18, 1375:3, 1375:19, 1375:23, 1376:13, 1376:19, 1377:2, 1377:11, 1377:20, 1379:10, 1380:21, 1381:11, 1382:3, 1385:20, 1386:7, 1386:25, 1387:12, 1388:2, 1388:9, 1392:2, 1395:6, 1398:15, 1398:19, 1399:19, 1405:16, 1410:19, 1410:23, 1411:8, 1432:18, 1433:23, 1434:9, 1434:19, 1435:5, 1435:19, 1438:23, 1438:24, 1439:10, 1439:19, 1441:4, 1442:1, 1442:6, 1442:11, 1442:19, 1443:2, 1443:10, 1443:19, 1444:1, 1444:3, 1444:7, 1444:11, 1444:21, 1445:1, 1448:16, 1448:23, 1448:24, 1449:21,

1449:24, 1450:14,
1453:1, 1453:3,
1454:9, 1462:23,
1463:20, 1465:5,
1465:15, 1466:16,
1466:21, 1467:1,
1467:4, 1467:16,
1467:19, 1467:21,
1467:22, 1468:4,
1468:14, 1468:16,
1468:20, 1469:1,
1469:7, 1469:8,
1469:15, 1469:19,
1469:21, 1469:23,
1469:24, 1470:2,
1470:8, 1470:14,
1470:16, 1470:18,
1470:21, 1470:23,
1471:3, 1471:6,
1471:8, 1471:10,
1471:16, 1471:18,
1471:21, 1472:1,
1472:8, 1472:22,
1473:1, 1473:7,
1473:10, 1473:16,
1474:1, 1474:4,
1474:11, 1474:14,
1474:16, 1474:18,
1474:22, 1474:23,
1475:2, 1475:13,
1475:18, 1475:25,
1476:2, 1476:14,
1476:18, 1476:23,
1476:24, 1478:3,
1478:8, 1478:19,
1478:23, 1479:4,
1479:15, 1480:5,
1480:7, 1480:16,
1480:22, 1481:2,
1481:7, 1481:9,
1481:12, 1481:22,
1482:1, 1482:5,
1482:10, 1482:17,
1483:11, 1483:12,
1483:15, 1483:16,
1483:17, 1483:19,
1483:22, 1484:7,
1484:18, 1486:6,
1486:10, 1486:15,
1487:4, 1487:6,
1488:7, 1488:8,
1489:2, 1489:3,
1489:7, 1489:14,
1491:24, 1492:25,
1494:4, 1494:5,
1494:12, 1494:16,
1495:16, 1495:19,
1495:21, 1495:23,
1495:25, 1498:10,
1498:16, 1498:17,
1499:6, 1499:10,

1499:25, 1501:9,
1501:22, 1502:14,
1502:16, 1502:23,
1503:3, 1503:6,
1503:15, 1503:23,
1503:24, 1504:3,
1504:12, 1507:1,
1510:7, 1510:10,
1510:13, 1510:14,
1510:20, 1510:23,
1512:9, 1512:24,
1513:9, 1514:4,
1514:7, 1514:8,
1515:7, 1515:12,
1515:16, 1515:22,
1515:24, 1515:25,
1516:3, 1516:6,
1516:8, 1516:9,
1516:23, 1519:5,
1519:18, 1519:21,
1520:16, 1520:17,
1521:20, 1522:2,
1522:14, 1522:22,
1522:23, 1523:3,
1523:4, 1524:6,
1524:8, 1525:7,
1525:8, 1525:12,
1525:15, 1525:22,
1526:7, 1527:10,
1527:16, 1527:17,
1527:23, 1528:2,
1528:22, 1529:2,
1529:16, 1532:11,
1533:3, 1533:13,
1533:25, 1534:6,
1534:16, 1535:7,
1535:21, 1536:6,
1537:10, 1538:12,
1539:3, 1539:12,
1539:21, 1540:12,
1540:19, 1541:2,
1541:5, 1541:23,
1542:3, 1542:9,
1543:6, 1543:19,
1543:25, 1544:25,
1546:12, 1546:15,
1547:11, 1547:18,
1550:2, 1551:2,
1551:11, 1551:20,
1552:10, 1552:16,
1553:1, 1553:3,
1553:9, 1553:18,
1553:20, 1553:24,
1555:7
**RIMINI** [1] - 1290:7
**Rimini's** [65] - 1296:2,
1303:25, 1324:13,
1327:24, 1334:8,
1334:14, 1334:19,
1334:23, 1335:16,
1336:12, 1350:21,

1354:12, 1354:20,
1355:4, 1362:15,
1372:21, 1374:6,
1374:7, 1375:5,
1375:6, 1408:17,
1422:5, 1422:24,
1423:5, 1424:5,
1424:6, 1425:15,
1444:25, 1466:12,
1467:6, 1467:13,
1468:11, 1469:9,
1470:4, 1473:24,
1475:3, 1477:10,
1477:11, 1479:1,
1480:17, 1483:9,
1483:18, 1484:15,
1485:11, 1485:12,
1485:21, 1487:25,
1488:20, 1500:25,
1501:1, 1501:4,
1501:8, 1501:24,
1503:22, 1506:24,
1512:4, 1512:10,
1513:13, 1514:13,
1518:24, 1519:11,
1525:12, 1529:10,
1537:18, 1547:20
**Rimini-created** [2] -
1448:23, 1507:1
**Rimini-written** [4] -
1510:13, 1512:9,
1525:7, 1535:7
**ris940a** [1] - 1519:10
**Rockefeller** [5] -
1499:15, 1499:16,
1524:22, 1525:17,
1551:10
**Rockefeller's** [1] -
1525:16
**role** [3] - 1415:14,
1437:10, 1479:5
**roll** [1] - 1369:13
**room** [1] - 1316:1
**roughly** [4] - 1383:2,
1431:21, 1432:20,
1533:8
**route** [1] - 1317:12
**routine** [3] - 1402:4,
1462:17, 1505:5
**row** [2] - 1426:16,
1430:16
**rows** [12] - 1426:18,
1426:24, 1427:1,
1427:2, 1427:5,
1427:12, 1427:15,
1428:2, 1429:11,
1429:13, 1429:24
**RPG** [1] - 1316:8
**RS18F07** [7] -
1404:19, 1404:22,

1405:11, 1405:20,
1408:17, 1410:9,
1411:9
**rscmpay** [6] -
1382:20, 1385:15,
1417:3, 1418:22,
1452:5, 1501:7
**rscmpay.cbl** [1] -
1414:25
**rsi** [3] - 1524:24,
1527:17
**RSI** [3] - 1501:2,
1501:3, 1524:14
**RSI-1099** [1] - 1407:9
**rsi1099i** [2] - 1405:10,
1522:19
**RSI1099M** [1] -
1448:23
**rsi1099m** [2] -
1405:10, 1522:20
**RSI2_013223831** [1] -
1441:25
**RSI2_013352306** [1] -
1441:25
**rsi940** [2] - 1501:3,
1527:17
**rsi960us** [2] - 1365:11,
1478:15
**rspcmpay** [3] -
1388:21, 1463:17,
1496:14
**rspcmpay.cbl** [4] -
1375:15, 1379:11,
1387:12, 1452:20
**rule** [3] - 1295:13,
1416:3, 1466:23
**Rule** [3] - 1440:14,
1440:22, 1442:21
**ruled** [6] - 1444:7,
1471:15, 1503:14,
1503:20, 1513:9,
1522:13
**ruling** [6] - 1348:22,
1443:8, 1476:7,
1487:8, 1543:23,
1550:5
**rulings** [2] - 1491:18,
1512:21
**run** [16] - 1354:1,
1403:24, 1407:11,
1408:11, 1410:6,
1412:3, 1413:12,
1425:15, 1511:13,
1512:3, 1512:7,
1524:12, 1524:18,
1534:21, 1551:13
**running** [3] - 1325:9,
1354:6, 1511:23
**runs** [7] - 1307:5,
1413:3, 1413:8,

1413:9, 1414:1,
1414:5, 1526:6
**rush** [1] - 1549:18

## S

**S-35** [1] - 1413:5
**S-36** [1] - 1413:5
**S-YT** [1] - 1393:21
**S-YTD** [8] - 1393:21,
1394:16, 1400:12,
1459:18, 1460:3,
1460:25, 1461:9,
1461:11
**sake** [1] - 1361:22
**sale** [3] - 1338:14,
1338:16, 1340:2
**SalesForce** [29] -
1352:2, 1353:2,
1353:11, 1354:24,
1355:8, 1355:20,
1356:7, 1356:18,
1356:21, 1356:25,
1357:7, 1357:12,
1436:9, 1436:11,
1436:16, 1437:4,
1437:21, 1438:6,
1438:8, 1439:1,
1439:9, 1439:12,
1488:3, 1488:7,
1489:22, 1490:11,
1490:14, 1545:9,
1547:19
**Samplin** [1] - 1290:20
**Samuel** [1] - 1290:20
**SAP's** [1] - 1441:20
**sat** [1] - 1294:5
**saw** [24] - 1344:3,
1357:8, 1430:10,
1431:16, 1434:25,
1437:9, 1479:16,
1489:25, 1490:8,
1490:9, 1498:6,
1502:23, 1507:2,
1509:12, 1515:16,
1517:20, 1517:25,
1520:20, 1525:4,
1525:14, 1528:5,
1541:6, 1543:10
**scanning** [4] - 1505:5,
1541:13, 1541:18,
1545:5
**scenario** [1] - 1451:10
**Schedule** [3] -
1492:22, 1519:8,
1526:19
**schedule** [1] - 1556:3
**scheduling** [1] -
1403:15
**science** [5] - 1416:6,

38

1416:10, 1458:25, 1459:7, 1479:10
**Sciences** [1] - 1355:13
**scientist** [4] - 1331:23, 1331:25, 1479:6, 1548:19
**scope** [29] - 1358:9, 1359:8, 1359:13, 1359:16, 1360:21, 1361:3, 1361:12, 1361:15, 1361:16, 1361:23, 1364:16, 1411:21, 1412:15, 1435:3, 1435:16, 1438:20, 1439:22, 1440:17, 1443:12, 1448:20, 1449:1, 1476:19, 1493:6, 1493:12, 1493:17, 1493:20, 1520:17, 1521:8, 1549:10
**screen** [16] - 1312:18, 1312:24, 1313:9, 1313:13, 1313:16, 1313:19, 1313:21, 1313:23, 1320:4, 1334:2, 1382:25, 1398:21, 1409:22, 1434:25, 1459:2
**screened** [1] - 1488:23
**screens** [3] - 1317:5, 1317:6
**screenshot** [2] - 1365:24, 1495:14
**script** [2] - 1409:10, 1410:6
**scripts** [10] - 1406:3, 1407:25, 1408:2, 1408:4, 1408:11, 1408:16, 1410:9, 1410:23, 1498:9, 1498:19
**scroll** [1] - 1426:16
**Seals** [9] - 1404:22, 1410:20, 1498:1, 1498:11, 1498:13, 1498:21, 1523:5, 1550:12, 1550:13
**Seals'** [2] - 1498:14, 1523:5
**search** [7] - 1351:20, 1353:12, 1425:16, 1425:17, 1428:11, 1429:1
**searched** [3] - 1351:17, 1436:22, 1437:1
**searches** [1] - 1425:13
**seat** [3] - 1291:5,

1348:12, 1403:4
**seated** [1] - 1464:10
**second** [19] - 1314:10, 1341:17, 1349:3, 1365:5, 1365:7, 1365:23, 1367:1, 1410:12, 1423:19, 1427:8, 1433:5, 1442:14, 1467:24, 1480:21, 1481:6, 1503:17, 1513:19, 1520:3, 1550:3
**SECTION** [5] - 1454:15, 1454:18, 1454:23, 1454:25
**section** [23] - 1340:8, 1341:9, 1341:10, 1397:4, 1397:13, 1398:13, 1399:4, 1399:11, 1415:7, 1454:9, 1454:13, 1454:17, 1454:18, 1454:19, 1454:21, 1454:25, 1455:2, 1455:6, 1455:23, 1455:25, 1461:11, 1498:24, 1538:7
**Section** [1] - 1309:23
**sections** [2] - 1456:1, 1546:19
**security** [1] - 1488:9
**security@riministreet** [1] - 1436:15
**security@riministreet.com** [5] - 1433:25, 1434:14, 1434:20, 1435:15, 1437:5
**see** [82] - 1300:14, 1310:8, 1311:3, 1319:24, 1327:15, 1327:25, 1341:10, 1341:11, 1341:16, 1345:24, 1348:15, 1360:21, 1364:21, 1366:17, 1368:21, 1368:23, 1370:22, 1377:5, 1377:9, 1377:12, 1378:2, 1379:23, 1380:2, 1380:10, 1381:20, 1382:3, 1382:13, 1391:2, 1392:17, 1392:19, 1392:23, 1394:22, 1395:5, 1401:25, 1404:7, 1404:8, 1405:1, 1409:3, 1409:6, 1409:10, 1409:14,

1410:11, 1410:14, 1415:6, 1416:1, 1419:3, 1419:12, 1422:10, 1422:17, 1425:24, 1426:20, 1426:22, 1428:13, 1428:14, 1428:20, 1430:14, 1430:16, 1431:8, 1431:10, 1432:5, 1434:16, 1434:24, 1450:10, 1458:11, 1462:4, 1462:10, 1464:13, 1466:2, 1480:19, 1481:14, 1489:22, 1491:5, 1491:22, 1503:16, 1504:12, 1508:9, 1509:7, 1534:8, 1545:8, 1554:22, 1557:17
**seeing** [1] - 1296:7, 1299:19, 1304:18
**seek** [4] - 1471:6, 1484:13, 1484:22, 1546:6
**seeking** [3] - 1468:14, 1542:4, 1543:5
**seem** [1] - 1511:22
**segment** [1] - 1383:16
**Seibel** [1] - 1538:3
**SELECT** [3] - 1459:18, 1460:3, 1460:4
**select** [6] - 1391:6, 1400:12, 1408:7, 1419:25, 1460:6
**SELECT-DATA** [3] - 1459:18, 1460:3, 1460:4
**select-setup** [1] - 1391:6
**selected** [2] - 1316:25, 1385:11
**self** [2] - 1388:19, 1442:14
**self-authenticating** [1] - 1442:14
**self-identifies** [1] - 1388:19
**sell** [1] - 1340:2
**send** [4] - 1434:10, 1489:24, 1489:25, 1541:6
**sending** [1] - 1371:20
**Senior** [1] - 1529:22
**SENIOR** [1] - 1293:25
**senior** [2] - 1298:7, 1468:11
**sensationalistic** [2] - 1486:7, 1486:11
**sense** [11] - 1296:16,

1296:20, 1300:9, 1315:1, 1330:2, 1476:21, 1476:22, 1483:3, 1521:22, 1542:24, 1555:25
**sent** [17] - 1353:18, 1354:23, 1355:2, 1433:24, 1434:14, 1488:2, 1489:23, 1495:14, 1498:21, 1504:12, 1505:2, 1505:8, 1524:17, 1526:23, 1538:11, 1551:9, 1551:10
**sentences** [1] - 1428:7
**separate** [4] - 1425:13, 1495:4, 1500:25, 1504:2
**separated** [1] - 1350:25
**September** [2] - 1290:6, 1291:7
**SEPTEMBER** [2] - 1291:1, 1403:1
**sequel** [3] - 1456:15, 1456:23, 1457:1
**Sequel** [1] - 1457:2
**sequence** [5] - 1383:11, 1383:22, 1461:24, 1509:2, 1509:5
**series** [7] - 1340:6, 1417:7, 1461:22, 1511:2, 1522:7, 1523:10, 1529:24
**serious** [6] - 1333:16, 1466:8, 1466:9, 1543:16, 1553:5, 1553:8, 1553:17, 1553:25
**serve** [2] - 1315:21, 1389:20
**server** [1] - 1512:10
**serves** [1] - 1540:15
**service** [6] - 1297:20, 1308:12, 1312:23, 1326:15, 1326:16, 1328:8
**Services** [2] - 1438:16, 1498:11
**services** [6] - 1328:4, 1335:17, 1407:1, 1441:12, 1542:3
**set** [30] - 1333:13, 1360:21, 1372:19, 1373:4, 1373:8, 1376:1, 1386:13, 1391:8, 1399:8, 1401:14, 1407:1, 1419:4, 1425:16,

1458:10, 1461:5, 1461:12, 1469:6, 1480:20, 1482:3, 1492:15, 1500:4, 1503:12, 1505:10, 1507:13, 1520:17, 1521:6, 1521:9, 1556:6, 1557:17
**SET** [1] - 1460:24
**Seth** [7] - 1469:23, 1471:24, 1484:20, 1484:24, 1485:23, 1500:20, 1544:22
**sets** [2] - 1397:11, 1509:4
**setting** [3] - 1401:15, 1461:5, 1461:8
**setup** [2] - 1391:5, 1391:6
**Sev** [1] - 1325:14
**seven** [9] - 1343:7, 1343:17, 1343:23, 1357:5, 1430:4, 1464:23, 1496:14, 1541:2, 1543:21
**seven-person** [1] - 1343:17
**seventh** [3] - 1291:8, 1383:12, 1384:2
**several** [9] - 1367:16, 1370:8, 1372:24, 1382:13, 1382:23, 1419:13, 1433:13, 1453:17, 1464:21
**severely** [1] - 1470:19
**severity** [1] - 1325:15
**shall** [15] - 1307:22, 1310:4, 1312:6, 1312:16, 1312:17, 1345:11, 1363:5, 1422:12, 1475:18, 1482:10, 1528:2, 1537:10, 1542:9, 1542:12, 1546:23
**share** [2] - 1354:25, 1355:4
**shared** [1] - 1392:15
**Sharon** [1] - 1290:16
**Sheffield** [18] - 1359:17, 1361:11, 1361:24, 1365:24, 1366:4, 1368:7, 1370:12, 1370:15, 1445:10, 1446:24, 1493:9, 1493:15, 1514:25, 1517:2, 1517:3, 1517:7, 1517:25, 1521:14
**shielded** [1] - 1530:12
**shift** [2] - 1502:13

shifting [9] - 1317:19,
1502:17, 1502:22,
1502:25, 1503:3,
1503:7, 1520:21,
1520:23, 1544:11
shifts [1] - 1469:15
shipment [1] - 1317:8
shipped [1] - 1532:15
shipping [4] - 1317:7,
1317:8, 1317:11,
1317:15
Shopping [5] -
1524:22, 1525:15,
1525:16, 1551:9,
1551:10
shops [3] - 1297:11,
1343:3, 1343:23
short [4] - 1326:18,
1410:5, 1463:8,
1538:7
shortage [1] - 1466:3
shortening [1] -
1447:1
shortly [1] - 1348:10
shoulder [12] -
1326:11, 1327:3,
1327:7, 1327:11,
1327:19, 1328:12,
1328:16, 1329:16,
1329:22, 1334:3,
1484:19, 1485:21
shoulders [1] -
1484:23
show [29] - 1291:6,
1348:13, 1351:10,
1353:15, 1358:1,
1359:25, 1360:9,
1371:13, 1376:6,
1376:13, 1390:23,
1403:5, 1406:9,
1441:7, 1442:1,
1442:17, 1464:11,
1469:7, 1469:16,
1473:15, 1514:4,
1520:5, 1521:5,
1521:20, 1523:6,
1525:15, 1526:22,
1528:19, 1541:19
showed [11] -
1361:10, 1361:11,
1470:22, 1473:20,
1489:16, 1504:21,
1505:3, 1519:21,
1520:13, 1528:4,
1528:21
showing [10] -
1340:23, 1351:6,
1381:3, 1427:15,
1433:19, 1459:14,
1470:14, 1482:24,

1500:25, 1543:16
shown [12] - 1371:17,
1388:8, 1405:3,
1429:24, 1468:23,
1477:13, 1479:18,
1482:24, 1490:25,
1496:17, 1537:22,
1537:24
shows [12] - 1355:13,
1372:15, 1446:20,
1453:3, 1467:2,
1472:14, 1480:15,
1485:6, 1493:9,
1521:3, 1526:23,
1551:21
shred [1] - 1520:25
shrink [1] - 1409:3
sic [2] - 1341:19,
1448:1
sic] [1] - 1478:25
side [25] - 1377:7,
1377:12, 1379:17,
1388:2, 1388:8,
1392:19, 1397:8,
1399:18, 1399:19,
1400:11, 1456:6,
1507:4, 1507:5,
1507:9, 1508:16,
1548:20
side-by-side [9] -
1377:7, 1377:12,
1379:17, 1388:2,
1456:6, 1507:4,
1507:5, 1507:9,
1508:16
sides [4] - 1307:16,
1383:2, 1466:8,
1556:21
sidestep [1] - 1538:17
signed [1] - 1556:14
significance [1] -
1395:7
significant [14] -
1333:16, 1360:13,
1363:10, 1375:13,
1382:7, 1385:5,
1388:18, 1393:7,
1399:24, 1403:14,
1454:13, 1455:5,
1456:17, 1544:12
silent [2] - 1537:20,
1551:24
siloed [2] - 1500:25,
1504:2
silver [1] - 1314:23
similar [10] - 1395:24,
1396:19, 1462:23,
1467:15, 1476:19,
1501:6, 1510:12,
1519:16, 1525:11,

1535:15
similarities [4] -
1380:14, 1382:21,
1384:9, 1397:1
similarity [12] -
1376:19, 1382:18,
1385:13, 1388:1,
1393:14, 1394:6,
1400:18, 1453:5,
1453:9, 1523:12,
1535:22, 1536:1
similarly [8] - 1352:3,
1352:17, 1377:24,
1378:19, 1394:22,
1401:21, 1442:1,
1458:21
simple [8] - 1295:20,
1367:10, 1367:11,
1367:12, 1420:7,
1433:4, 1477:22
simply [3] - 1365:15,
1367:24, 1501:9
Simultaneous [2] -
1334:16, 1421:3
single [19] - 1398:9,
1398:10, 1401:8,
1417:6, 1417:18,
1419:16, 1503:18,
1504:17, 1510:18,
1511:3, 1513:17,
1513:18, 1524:7,
1524:15, 1525:9,
1534:14, 1536:6,
1549:2, 1552:1
sit [8] - 1413:10,
1413:13, 1413:16,
1435:23, 1436:19,
1436:25, 1445:7,
1556:7
site [3] - 1326:8,
1326:9, 1329:21
sitting [5] - 1327:23,
1403:21, 1430:22,
1445:8, 1512:9
situation [7] -
1418:12, 1418:19,
1447:21, 1447:22,
1489:18, 1516:12,
1517:8
situations [1] - 1416:2
six [4] - 1363:20,
1383:11, 1437:24,
1438:2
sized [1] - 1297:14
slash [10] - 1380:21,
1381:6, 1381:12,
1381:21, 1381:22,
1396:3, 1455:8,
1455:11, 1455:23,
1456:1

slashes [1] - 1508:1
slate [1] - 1512:20
slated [2] - 1520:4,
1520:6
slaughtering [1] -
1437:11
slide [61] - 1292:2,
1292:5, 1293:19,
1294:16, 1294:21,
1294:24, 1296:4,
1296:5, 1296:7,
1296:10, 1299:16,
1299:17, 1299:19,
1299:22, 1315:2,
1351:10, 1351:14,
1354:15, 1354:16,
1358:1, 1359:25,
1360:9, 1366:25,
1371:4, 1376:6,
1384:15, 1384:16,
1384:17, 1399:22,
1424:25, 1429:6,
1429:7, 1439:11,
1459:10, 1459:13,
1460:10, 1462:20,
1469:4, 1490:19,
1494:3, 1497:21,
1498:4, 1501:21,
1502:11, 1502:15,
1506:15, 1509:17,
1511:4, 1513:22,
1518:9, 1519:7,
1523:20, 1526:18,
1528:8, 1529:13,
1530:17, 1537:22,
1538:9, 1541:18
slides [5] - 1381:17,
1424:19, 1426:6,
1543:11, 1554:22
slightly [2] - 1317:19,
1423:8
slipperier [1] - 1329:3
slogan [1] - 1295:16
slope [1] - 1329:3
slow [1] - 1393:25
slower [1] - 1343:20
small [5] - 1316:15,
1343:17, 1367:25,
1418:13, 1512:15
smaller [4] - 1297:11,
1297:15, 1342:23,
1343:23
Smead [9] - 1358:25,
1490:17, 1490:21,
1491:5, 1491:8,
1492:19, 1493:15,
1522:4, 1549:16
SMITH [49] - 1350:10,
1350:13, 1350:18,
1351:9, 1351:13,

1355:17, 1355:18,
1358:1, 1358:2,
1359:25, 1360:1,
1360:9, 1360:10,
1362:25, 1363:1,
1364:8, 1364:10,
1365:1, 1365:3,
1370:1, 1386:1,
1386:4, 1388:3,
1388:6, 1394:4,
1398:25, 1402:18,
1403:8, 1403:10,
1403:13, 1403:25,
1404:13, 1404:15,
1405:4, 1405:6,
1411:12, 1411:21,
1412:14, 1420:11,
1433:2, 1435:2,
1435:16, 1438:19,
1439:1, 1439:22,
1448:19, 1451:16,
1451:18, 1452:1
Smith [8] - 1290:14,
1290:16, 1341:19,
1348:3, 1350:9,
1404:12, 1560:8,
1560:9
snippet [3] - 1427:3,
1534:23, 1535:8
snippets [1] - 1535:20
so-called [1] - 1509:8
software [93] -
1291:22, 1295:1,
1295:24, 1296:16,
1298:15, 1300:1,
1300:18, 1305:12,
1306:2, 1308:15,
1310:7, 1310:18,
1311:4, 1311:23,
1312:1, 1312:7,
1312:10, 1312:12,
1312:13, 1312:15,
1313:25, 1317:16,
1323:16, 1323:21,
1325:2, 1330:21,
1331:3, 1332:9,
1333:3, 1343:2,
1345:12, 1345:13,
1354:6, 1358:16,
1363:7, 1363:14,
1371:14, 1377:22,
1378:15, 1389:4,
1391:24, 1406:17,
1407:3, 1407:11,
1407:17, 1412:3,
1412:4, 1412:10,
1422:13, 1434:17,
1441:15, 1473:18,
1475:20, 1476:3,
1476:13, 1476:15,

1476:17, 1476:19, 1481:3, 1482:10, 1482:12, 1482:17, 1482:19, 1486:22, 1491:12, 1491:21, 1497:17, 1511:6, 1511:9, 1511:11, 1512:16, 1512:17, 1520:6, 1526:10, 1528:3, 1528:7, 1528:15, 1528:23, 1529:3, 1529:4, 1529:19, 1532:17, 1532:22, 1532:23, 1537:12, 1538:1, 1542:10, 1542:14, 1546:22, 1548:4, 1548:22

**software's** [1] - 1291:24

**sold** [3] - 1316:19, 1413:22, 1472:6

**solely** [23] - 1358:11, 1362:13, 1362:17, 1363:22, 1363:23, 1364:3, 1364:6, 1364:13, 1450:3, 1468:1, 1468:2, 1468:3, 1475:16, 1475:20, 1476:11, 1477:2, 1491:1, 1491:2, 1491:13, 1499:13, 1551:15, 1552:25

**solution** [21] - 1319:6, 1362:11, 1367:18, 1370:9, 1371:11, 1373:12, 1445:4, 1445:10, 1445:16, 1445:23, 1446:24, 1447:15, 1447:20, 1517:4, 1518:1, 1518:2, 1518:13, 1518:14, 1551:3, 1551:4

**solutions** [7] - 1319:7, 1319:17, 1322:14, 1322:15, 1369:2, 1446:22, 1530:20

**solve** [2] - 1439:10, 1495:14

**solved** [2] - 1447:10, 1448:9

**someday** [1] - 1494:21

**someone** [8] - 1327:17, 1328:24, 1352:15, 1355:4, 1429:19, 1450:20, 1465:24, 1520:15

**sometimes** [1] -

1538:17

**somewhat** [1] - 1501:15

**somewhere** [3] - 1402:13, 1450:21, 1558:1

**soon** [1] - 1451:6

**sophisticated** [1] - 1451:10

**sorry** [24] - 1310:13, 1340:9, 1340:15, 1342:12, 1343:12, 1343:19, 1344:22, 1348:4, 1354:25, 1362:24, 1380:23, 1403:9, 1412:5, 1413:1, 1418:23, 1432:15, 1434:4, 1464:3, 1464:17, 1467:8, 1500:19, 1515:10, 1550:18, 1554:17

**Sorry** [3] - 1343:21, 1363:20, 1393:24

**sort** [1] - 1557:18

**sought** [1] - 1475:4

**sounds** [2] - 1325:1, 1404:6

**source** [70] - 1302:4, 1302:6, 1303:3, 1306:13, 1306:20, 1307:5, 1307:12, 1307:14, 1307:15, 1307:17, 1307:19, 1310:6, 1311:16, 1312:17, 1319:8, 1319:18, 1322:5, 1323:19, 1326:4, 1330:21, 1332:1, 1332:5, 1332:6, 1332:14, 1334:4, 1345:12, 1346:7, 1352:23, 1373:5, 1373:18, 1388:24, 1407:10, 1407:11, 1467:22, 1475:6, 1480:14, 1480:17, 1482:1, 1482:7, 1482:11, 1482:18, 1482:24, 1482:25, 1483:6, 1483:9, 1484:5, 1485:19, 1486:8, 1486:14, 1486:17, 1486:20, 1528:1, 1528:3, 1529:9, 1529:11, 1530:22, 1532:3, 1533:18, 1542:20, 1546:1, 1546:2, 1546:18, 1546:24,

1547:1, 1547:2, 1547:8, 1552:7

**sources** [2] - 1302:2, 1304:23

**South** [1] - 1290:24

**space** [6] - 1386:24, 1387:7, 1415:23, 1415:24, 1453:20, 1453:23

**spaces** [3] - 1386:6, 1386:10, 1507:25

**spacing** [3] - 1385:19, 1385:23, 1386:2

**spark** [1] - 1418:13

**sparse** [1] - 1409:13

**speaking** [1] - 1450:17

**speaks** [1] - 1307:22

**SpearMC** [5] - 1297:14, 1338:7, 1343:4, 1343:8, 1343:15

**spec** [1] - 1499:1

**specialized** [1] - 1414:14

**specific** [53] - 1302:22, 1314:8, 1335:3, 1335:16, 1338:19, 1339:3, 1339:18, 1342:7, 1359:20, 1360:15, 1360:25, 1363:6, 1363:7, 1363:8, 1363:24, 1364:4, 1364:14, 1370:17, 1379:3, 1379:6, 1379:7, 1384:8, 1391:17, 1394:17, 1405:2, 1416:7, 1416:18, 1417:8, 1417:9, 1418:19, 1421:14, 1421:24, 1421:25, 1422:15, 1431:13, 1432:10, 1433:20, 1436:22, 1437:15, 1442:7, 1445:23, 1446:13, 1447:3, 1448:3, 1461:24, 1475:21, 1477:6, 1480:10, 1517:14, 1518:4, 1518:18, 1554:14

**specifically** [29] - 1307:22, 1309:13, 1337:3, 1337:15, 1337:17, 1344:1, 1344:12, 1344:17, 1352:22, 1358:18, 1364:6, 1374:2, 1374:13, 1377:10,

1388:14, 1393:19, 1406:2, 1406:8, 1407:16, 1408:13, 1408:25, 1418:11, 1432:6, 1436:19, 1438:13, 1451:12, 1532:23, 1536:11, 1540:25

**specification** [3] - 1410:9, 1534:15, 1535:7

**specifications** [2] - 1477:3, 1547:6

**specifics** [2] - 1451:13, 1547:25

**specs** [1] - 1501:3

**speculate** [2] - 1520:19, 1520:24

**speculating** [1] - 1549:13

**speculation** [3] - 1520:21, 1521:4, 1549:13

**speeches** [1] - 1548:17

**speed** [1] - 1325:24

**spelled** [6] - 1305:15, 1391:19, 1392:24, 1394:12, 1401:8, 1456:18

**spells** [1] - 1418:24

**spend** [1] - 1367:20

**spent** [11] - 1314:12, 1367:16, 1393:6, 1399:23, 1480:4, 1480:7, 1494:3, 1500:18, 1509:8, 1513:6, 1540:20

**SPH** [1] - 1360:22

**Spherion** [22] - 1358:24, 1360:22, 1361:13, 1361:17, 1490:17, 1490:21, 1491:5, 1491:8, 1492:19, 1493:11, 1493:15, 1493:17, 1493:20, 1520:16, 1520:17, 1521:7, 1521:9, 1521:19, 1522:4, 1549:2, 1549:11, 1549:16

**Spherion-Smead** [4] - 1490:17, 1490:21, 1491:5, 1491:8

**Spherion/Smead** [2] - 1520:10, 1548:25

**Spinnaker** [28] - 1297:6, 1317:20, 1318:24, 1319:2, 1319:7, 1319:17,

1320:12, 1321:5, 1321:10, 1321:17, 1322:3, 1336:8, 1336:11, 1336:21, 1336:25, 1337:2, 1337:4, 1337:7, 1337:9, 1337:12, 1337:16, 1337:18, 1474:21, 1486:24, 1487:4, 1529:22, 1530:19

**Spinnaker's** [12] - 1317:22, 1318:1, 1319:21, 1319:25, 1320:17, 1322:24, 1323:3, 1487:1, 1529:24, 1531:13

**spoken** [2] - 1294:25, 1295:13

**spoliation** [1] - 1473:12

**spot** [1] - 1387:2

**spreadsheet** [22] - 1425:4, 1425:6, 1426:3, 1426:13, 1426:19, 1426:24, 1427:1, 1427:11, 1427:13, 1427:14, 1427:15, 1428:19, 1428:22, 1429:9, 1429:12, 1429:15, 1429:22, 1429:23, 1429:25, 1430:10, 1430:13, 1435:24

**spreadsheets** [4] - 1430:20, 1431:16, 1505:16

**sql** [1] - 1392:25

**SQL** [24] - 1381:25, 1390:6, 1395:8, 1395:9, 1395:12, 1395:16, 1395:17, 1401:6, 1401:22, 1401:23, 1402:2, 1402:14, 1418:23, 1432:11, 1456:12, 1456:18, 1457:2, 1457:5, 1458:21, 1458:22, 1460:21, 1462:5, 1462:13

**SQL-CURSOR** [9] - 1395:8, 1395:12, 1395:16, 1401:6, 1401:22, 1402:14, 1458:22, 1460:21, 1462:5

**SQL-ERROR** [2] - 1402:2, 1462:13

**SQL-STATEMENT** [1] - 1457:5

**sql-stmt** [1] - 1392:25
**SQL-STMT** [6] - 1395:9, 1395:17, 1456:12, 1457:2, 1457:5, 1458:21
**sqlrt** [1] - 1391:5
**SQR** [5] - 1404:19, 1405:19, 1406:4, 1498:8, 1498:12
**staffing** [1] - 1325:6
**stage** [1] - 1291:23
**stand** [7] - 1304:9, 1350:11, 1445:8, 1452:4, 1452:19, 1467:10, 1490:10
**standard** [13] - 1308:14, 1308:24, 1337:14, 1378:1, 1378:3, 1378:7, 1378:9, 1378:19, 1455:19, 1455:20, 1457:2, 1457:23, 1549:23
**standards** [2] - 1314:18, 1314:21
**standing** [1] - 1328:24
**stands** [1] - 1443:9
**star** [1] - 1509:16
**stark** [1] - 1518:9
**stars** [2] - 1415:17, 1507:25
**start** [24] - 1291:24, 1325:21, 1326:11, 1380:21, 1381:11, 1381:12, 1383:14, 1384:6, 1387:17, 1394:23, 1397:5, 1428:11, 1451:6, 1455:7, 1455:10, 1456:1, 1480:14, 1503:10, 1515:17, 1515:19, 1515:22, 1519:10, 1555:10, 1555:23
**START** [6] - 1393:23, 1394:2, 1394:23, 1395:1, 1458:11, 1458:17
**started** [5] - 1381:6, 1388:25, 1496:20, 1504:15, 1556:7
**starting** [9] - 1301:14, 1368:12, 1368:21, 1369:9, 1382:8, 1434:4, 1434:5, 1455:6, 1455:22
**starts** [10] - 1303:21, 1328:21, 1381:21, 1382:1, 1397:4, 1398:13, 1455:6,

1455:25, 1515:12
**State** [1] - 1514:1
**state** [4] - 1292:15, 1345:17, 1410:18, 1425:17
**statement** [42] - 1319:12, 1336:15, 1388:13, 1391:5, 1391:12, 1391:13, 1391:19, 1392:10, 1392:12, 1392:23, 1392:24, 1395:18, 1395:20, 1398:23, 1398:24, 1406:7, 1406:13, 1406:17, 1410:13, 1416:14, 1419:23, 1420:5, 1426:1, 1433:21, 1434:3, 1435:1, 1435:10, 1435:12, 1437:18, 1456:15, 1456:18, 1456:24, 1456:25, 1457:1, 1461:4, 1468:20, 1471:10, 1472:12, 1500:20, 1519:2
**STATEMENT** [2] - 1391:13, 1457:5
**statements** [17] - 1318:2, 1384:10, 1384:11, 1384:13, 1384:19, 1386:18, 1386:19, 1386:20, 1406:6, 1406:8, 1407:3, 1407:9, 1425:14, 1453:24, 1453:25, 1486:11, 1554:9
**STATES** [1] - 1290:1
**states** [2] - 1359:8, 1445:12
**States** [2] - 1514:2, 1519:25
**stating** [1] - 1388:14
**Statistics** [1] - 1536:5
**statutory** [1] - 1543:14
**Stava** [3] - 1318:22, 1319:13, 1319:15, 1320:5, 1336:15, 1336:21, 1349:12
**Stava's** [4] - 1318:4, 1318:14, 1318:25, 1321:20
**stay** [2] - 1326:24, 1484:17
**stayed** [1] - 1533:8
**step** [4] - 1326:3, 1373:21, 1452:7, 1524:24
**STEPHEN** [1] -

1291:17
**Stephen** [3] - 1441:3, 1500:16, 1560:4
**steps** [11] - 1375:24, 1379:6, 1459:21, 1469:16, 1470:15, 1524:23, 1525:6, 1541:2, 1551:7, 1552:3, 1552:4
**stick** [1] - 1380:18
**stifle** [1] - 1389:20
**still** [11] - 1317:1, 1318:24, 1361:13, 1369:11, 1369:15, 1413:6, 1463:19, 1463:20, 1463:21, 1489:17, 1521:12
**stipulated** [2] - 1474:6, 1474:10
**stmt** [1] - 1392:25
**STMT** [7] - 1395:9, 1395:17, 1416:13, 1456:12, 1457:2, 1457:5, 1458:21
**stood** [2] - 1545:20, 1546:2
**stop** [4] - 1368:14, 1540:12, 1545:4, 1553:5
**stopped** [1] - 1470:10
**stops** [1] - 1325:12
**store** [4] - 1414:7, 1414:10, 1414:12, 1414:17
**stored** [1] - 1414:15
**stores** [1] - 1506:25
**stories** [1] - 1486:6
**storing** [1] - 1498:15
**story** [2] - 1533:20, 1541:17
**straight** [4] - 1391:10, 1492:25, 1539:4, 1539:20
**straightforward** [2] - 1482:21, 1551:14
**strategically** [1] - 1303:11
**strategy** [2] - 1292:19, 1502:12
**STREET** [1] - 1290:7
**Street** [24] - 1290:24, 1324:3, 1324:12, 1345:11, 1345:14, 1345:23, 1441:5, 1469:23, 1469:24, 1473:7, 1473:10, 1475:18, 1480:16, 1480:22, 1481:2, 1481:7, 1494:12, 1495:21, 1495:25,

1499:7, 1499:10, 1534:6, 1537:10, 1551:2
**Street's** [3] - 1324:10, 1473:1, 1473:16
**stressed** [1] - 1407:8
**stricken** [1] - 1345:18
**strike** [3] - 1376:16, 1402:12, 1423:24
**striking** [4] - 1475:16, 1475:22, 1516:10, 1516:11
**string** [1] - 1417:19
**strongest** [1] - 1485:7
**strongly** [1] - 1371:10
**struck** [3] - 1304:20, 1367:8, 1538:4
**structure** [4] - 1394:16, 1458:9, 1509:2, 1509:5
**structures** [2] - 1373:4, 1507:1
**struggle** [1] - 1370:9
**struggling** [2] - 1368:1, 1369:15
**stuff** [1] - 1485:14
**style** [1] - 1382:5
**Sub** [1] - 1546:21
**subject** [4] - 1350:5, 1375:13, 1400:8, 1412:22
**submission** [1] - 1443:5
**submit** [2] - 1500:23, 1554:12
**submitted** [4] - 1465:8, 1473:2, 1554:25, 1556:16
**subprogram** [1] - 1390:15
**subroutine** [8] - 1390:25, 1391:2, 1395:19, 1401:25, 1418:23, 1419:6, 1419:18, 1419:20
**subscribes** [1] - 1303:4
**subsequent** [1] - 1360:20
**subsequently** [1] - 1362:11
**substantial** [22] - 1376:18, 1388:1, 1393:14, 1394:6, 1453:5, 1453:9, 1473:25, 1477:12, 1485:8, 1488:1, 1501:23, 1502:5, 1512:11, 1523:12, 1535:22, 1536:1,

1540:8, 1543:25, 1544:21, 1551:21, 1552:18
**substantially** [18] - 1395:24, 1396:19, 1462:23, 1469:9, 1501:6, 1510:2, 1510:4, 1510:12, 1510:25, 1513:14, 1513:20, 1519:16, 1523:21, 1525:11, 1527:22, 1535:15, 1540:2, 1549:23
**successful** [1] - 1337:7
**sudden** [1] - 1325:12
**suddenly** [1] - 1532:19
**sufficient** [2] - 1324:6, 1468:22
**suggest** [3] - 1520:14, 1532:25, 1556:24
**suggested** [1] - 1402:15
**suggesting** [2] - 1299:4, 1300:22
**suggestion** [1] - 1442:13
**Suite** [1] - 1338:4
**Suites** [4] - 1297:15, 1343:4, 1343:8, 1343:15
**summaries** [3] - 1436:9, 1437:4, 1437:21
**summarize** [2] - 1370:11, 1487:22
**summarized** [1] - 1472:19
**summarizes** [1] - 1490:19
**summarizing** [1] - 1554:6
**summary** [22] - 1293:14, 1314:3, 1323:11, 1473:3, 1473:4, 1473:17, 1476:1, 1476:6, 1481:18, 1482:13, 1482:22, 1487:8, 1491:24, 1492:13, 1512:23, 1540:18, 1541:4, 1546:20, 1546:25, 1547:2, 1550:2, 1550:5
**summer** [3] - 1558:1, 1558:13
**super** [1] - 1413:13
**superfluous** [6] - 1330:5, 1331:12,

1486:18, 1534:4, 1534:8, 1534:12
**supplement** [1] - 1443:11
**supplemental** [1] - 1304:20
**supplied** [1] - 1307:4
**supplying** [1] - 1445:20
**support** [118] - 1291:25, 1292:6, 1293:15, 1294:4, 1294:10, 1294:13, 1294:17, 1294:19, 1295:7, 1295:9, 1297:8, 1297:16, 1297:23, 1300:6, 1300:10, 1302:23, 1303:5, 1311:9, 1312:8, 1312:13, 1313:1, 1313:12, 1313:13, 1313:24, 1317:20, 1317:23, 1318:1, 1319:7, 1319:25, 1320:13, 1321:5, 1321:6, 1323:16, 1323:21, 1323:22, 1324:3, 1324:22, 1324:25, 1325:6, 1325:14, 1325:20, 1326:5, 1326:16, 1326:24, 1327:6, 1327:7, 1328:7, 1328:11, 1328:16, 1329:17, 1329:19, 1329:20, 1330:15, 1330:18, 1330:20, 1330:23, 1331:3, 1331:4, 1333:3, 1333:7, 1333:9, 1333:15, 1333:22, 1333:25, 1334:1, 1334:3, 1334:7, 1334:8, 1335:1, 1335:8, 1335:14, 1336:9, 1336:11, 1336:13, 1337:2, 1338:22, 1339:1, 1339:8, 1346:10, 1352:15, 1358:10, 1358:11, 1362:17, 1363:8, 1363:15, 1364:2, 1368:5, 1375:5, 1430:11, 1430:20, 1430:22, 1441:12, 1441:13, 1442:5, 1442:8, 1467:25, 1476:25, 1477:20, 1482:2, 1483:11,

1487:11, 1501:10, 1502:8, 1504:7, 1505:16, 1530:4, 1531:7, 1531:18, 1532:18, 1532:23, 1538:16, 1538:22, 1542:3, 1542:17, 1542:25, 1543:3, 1543:23
**Support** [8] - 1297:6, 1319:2, 1319:17, 1321:10, 1321:17, 1355:6, 1500:14, 1529:23
**supported** [5] - 1427:11, 1429:22, 1430:11, 1505:12, 1505:15
**supporting** [3] - 1294:21, 1312:11, 1346:11
**supports** [6] - 1310:15, 1312:4, 1320:25, 1321:2, 1322:11, 1323:9
**suppose** [1] - 1416:7
**supposed** [6] - 1306:9, 1426:1, 1434:18, 1434:22, 1478:1, 1489:24
**Supreme** [1] - 1502:3
**surgery** [1] - 1326:1
**surprised** [1] - 1375:20
**surprising** [2] - 1375:17, 1472:16
**surrebuttal** [4] - 1431:3, 1440:17, 1452:4, 1452:10
**SURREBUTTAL** [1] - 1560:11
**sustain** [1] - 1439:15
**sustained** [5] - 1293:22, 1304:19, 1304:24, 1345:17, 1439:24
**sustaining** [2] - 1440:3, 1440:7
**SW** [1] - 1393:22
**switch** [6] - 1394:15, 1394:18, 1394:19, 1401:15, 1401:17, 1401:19
**switched** [1] - 1434:25
**switching** [2] - 1365:11, 1478:16
**sworn** [10] - 1291:18, 1318:2, 1319:12, 1336:15, 1350:16, 1425:21, 1427:10,

1429:4, 1452:11, 1518:21
**syntax** [4] - 1377:9, 1377:10, 1377:18, 1377:19
**system** [34] - 1315:22, 1325:20, 1354:20, 1355:4, 1363:15, 1366:4, 1372:16, 1372:21, 1374:6, 1374:7, 1407:2, 1411:20, 1412:13, 1413:20, 1413:24, 1413:25, 1414:2, 1414:5, 1414:6, 1414:14, 1414:20, 1422:14, 1422:16, 1424:4, 1478:9, 1493:15, 1497:16, 1497:18, 1501:10, 1511:14, 1511:17, 1544:25, 1552:16, 1555:20
**systems** [40] - 1297:8, 1303:6, 1339:6, 1342:22, 1350:21, 1351:4, 1351:7, 1354:17, 1366:3, 1408:18, 1410:23, 1413:22, 1414:7, 1414:8, 1414:17, 1414:21, 1422:5, 1422:6, 1422:24, 1423:5, 1423:6, 1424:5, 1424:6, 1468:20, 1475:10, 1487:25, 1498:16, 1500:25, 1503:18, 1503:22, 1503:25, 1504:3, 1512:4, 1537:18, 1540:21, 1547:11, 1547:13, 1547:18, 1549:20
**Systems** [1] - 1315:13
**sytem** [1] - 1313:4

**T**

**tab** [7] - 1340:4, 1340:5, 1340:9, 1340:11, 1340:13, 1340:14, 1341:7
**table** [2] - 1409:8, 1436:11
**tables** [4] - 1356:18, 1409:7, 1438:1, 1438:6
**tabs** [2] - 1340:6, 1386:13
**tactics** [1] - 1503:3

**tailored** [1] - 1511:6
**talks** [6] - 1363:23, 1477:20, 1491:24, 1510:8, 1546:18, 1551:17
**targeting** [2] - 1557:2, 1558:2
**TARRY** [6] - 1388:10, 1388:12, 1388:15, 1388:20, 1389:9
**task** [1] - 1334:24
**tasks** [1] - 1312:2
**Tata** [1] - 1297:10
**taught** [1] - 1458:24
**tax** [21] - 1292:8, 1295:24, 1316:9, 1316:19, 1319:5, 1323:23, 1324:1, 1324:10, 1324:15, 1327:9, 1333:17, 1335:23, 1335:25, 1336:5, 1355:13, 1359:8, 1501:3, 1516:1, 1520:20, 1524:24, 1527:17
**tax960us** [1] - 1365:11
**teaching** [1] - 1496:21
**team** [7] - 1306:11, 1470:12, 1470:13, 1471:6, 1484:9, 1493:4, 1556:22
**teams** [6] - 1300:14, 1306:1, 1306:6, 1313:24, 1344:8, 1344:14
**tech** [4] - 1499:1, 1501:3, 1521:13, 1547:5
**technical** [7] - 1410:8, 1441:13, 1477:3, 1500:15, 1534:15, 1535:6, 1553:1
**technique** [1] - 1379:4
**techniques** [1] - 1448:13
**template** [2] - 1369:16, 1369:17
**templates** [2] - 1370:3, 1370:4
**ten** [22] - 1429:18, 1430:4, 1452:5, 1465:22, 1466:18, 1466:22, 1468:25, 1469:8, 1500:5, 1500:6, 1501:15, 1503:10, 1544:7, 1544:16, 1551:22, 1551:23, 1551:24, 1553:2, 1553:6, 1553:7, 1553:8

**term** [24] - 1302:11, 1306:11, 1332:1, 1337:22, 1416:6, 1416:10, 1416:14, 1417:22, 1419:8, 1421:20, 1422:19, 1422:22, 1424:1, 1441:7, 1459:7, 1460:6, 1460:18, 1468:6, 1482:25, 1528:10, 1535:1, 1551:15
**terms** [51] - 1292:9, 1301:7, 1302:20, 1302:22, 1302:25, 1304:10, 1306:7, 1309:11, 1309:13, 1332:23, 1335:1, 1337:11, 1338:17, 1338:19, 1338:21, 1338:25, 1339:3, 1339:10, 1339:18, 1339:22, 1339:24, 1341:21, 1341:25, 1342:13, 1342:19, 1346:19, 1346:22, 1378:2, 1378:3, 1378:5, 1384:3, 1391:8, 1402:6, 1442:1, 1442:4, 1442:12, 1442:18, 1460:9, 1460:11, 1460:12, 1484:13, 1485:16, 1507:15, 1508:7, 1508:25, 1528:18, 1533:23
**terribly** [1] - 1417:24
**test** [25] - 1324:15, 1324:19, 1365:15, 1365:19, 1370:22, 1373:20, 1394:23, 1408:25, 1411:9, 1467:17, 1475:13, 1476:13, 1476:17, 1493:8, 1493:25, 1494:1, 1494:18, 1494:21, 1494:24, 1513:2, 1513:4, 1513:15, 1523:22, 1549:9
**tested** [21] - 1361:25, 1364:20, 1366:5, 1372:4, 1408:23, 1411:10, 1445:10, 1445:13, 1446:9, 1493:11, 1493:25, 1495:6, 1495:8, 1498:20, 1503:2, 1519:21, 1520:9, 1523:5, 1525:15,

1526:22, 1527:1
**testified** [38] -
1291:18, 1297:25,
1298:6, 1302:10,
1334:13, 1341:20,
1350:16, 1350:23,
1372:9, 1381:5,
1386:5, 1401:1,
1406:12, 1424:9,
1431:25, 1433:10,
1433:17, 1435:4,
1435:20, 1452:11,
1455:4, 1456:16,
1458:9, 1459:20,
1473:6, 1478:7,
1484:20, 1489:14,
1494:10, 1515:11,
1516:13, 1518:5,
1519:12, 1527:1,
1534:19, 1534:20,
1534:21
**testify** [1] - 1489:15
**testifying** [3] -
1299:12, 1454:9,
1456:11
**testimony** [149] -
1294:2, 1294:5,
1294:9, 1296:1,
1297:13, 1301:4,
1301:10, 1301:24,
1302:1, 1302:17,
1302:19, 1304:6,
1304:16, 1306:12,
1306:16, 1306:24,
1308:2, 1308:20,
1318:2, 1321:9,
1321:24, 1322:19,
1322:22, 1327:1,
1328:14, 1329:12,
1330:3, 1335:19,
1335:20, 1347:21,
1349:5, 1349:13,
1350:20, 1350:22,
1351:16, 1353:4,
1353:17, 1354:4,
1354:18, 1355:19,
1355:22, 1355:25,
1356:8, 1357:15,
1358:15, 1359:6,
1359:10, 1359:11,
1359:15, 1360:3,
1367:2, 1371:6,
1371:8, 1372:12,
1373:2, 1374:1,
1374:9, 1375:2,
1375:4, 1375:13,
1375:14, 1376:9,
1376:25, 1377:4,
1380:4, 1380:20,
1380:23, 1381:7,
1385:18, 1388:8,

1389:11, 1389:13,
1389:15, 1390:1,
1394:3, 1403:7,
1404:16, 1406:5,
1408:16, 1408:20,
1408:21, 1410:22,
1412:3, 1412:19,
1417:13, 1423:12,
1424:7, 1424:12,
1425:21, 1427:10,
1429:4, 1433:11,
1433:14, 1433:15,
1433:16, 1437:3,
1438:21, 1439:3,
1439:17, 1440:6,
1441:3, 1446:15,
1452:23, 1453:14,
1458:13, 1458:24,
1459:16, 1460:2,
1461:3, 1461:20,
1462:14, 1471:11,
1473:2, 1475:24,
1478:13, 1480:10,
1492:7, 1492:11,
1492:15, 1492:18,
1495:5, 1505:20,
1506:15, 1509:19,
1514:19, 1518:21,
1520:10, 1520:11,
1521:5, 1521:20,
1522:23, 1522:24,
1526:25, 1528:5,
1529:7, 1529:21,
1530:9, 1532:24,
1533:16, 1535:18,
1538:18, 1539:9,
1539:25, 1540:11,
1541:9, 1541:12,
1542:7, 1543:1,
1544:22
**testing** [49] - 1331:6,
1331:10, 1345:13,
1359:19, 1361:13,
1362:6, 1363:16,
1365:18, 1371:9,
1371:17, 1371:20,
1372:17, 1372:25,
1373:15, 1373:19,
1373:23, 1374:10,
1374:14, 1375:3,
1394:19, 1444:12,
1444:14, 1467:25,
1468:6, 1477:21,
1482:11, 1482:18,
1490:23, 1491:7,
1495:4, 1500:10,
1513:4, 1513:5,
1513:6, 1513:7,
1513:8, 1513:10,
1513:11, 1513:12,
1520:3, 1520:11,

1523:13, 1525:14,
1527:16, 1552:23,
1552:24
**tests** [3] - 1444:8,
1445:15, 1494:10
**Texas** [4] - 1316:20,
1354:24, 1354:25
**text** [6] - 1351:20,
1409:22, 1428:10,
1513:23, 1537:21,
1538:9
**text-based** [1] -
1351:20
**text-heavy** [1] -
1538:9
**textbooks** [1] - 1479:7
**textural** [1] - 1389:5
**THE** [109] - 1290:2,
1290:14, 1290:19,
1291:4, 1291:16,
1293:22, 1299:1,
1304:19, 1305:8,
1305:21, 1318:18,
1324:5, 1324:7,
1331:15, 1331:18,
1331:20, 1340:9,
1340:13, 1340:20,
1341:3, 1341:19,
1345:17, 1346:14,
1347:18, 1347:20,
1348:2, 1348:8,
1348:12, 1348:20,
1348:25, 1349:8,
1349:16, 1349:18,
1349:21, 1350:2,
1350:6, 1350:9,
1350:12, 1350:14,
1351:12, 1368:11,
1368:14, 1368:20,
1393:24, 1394:1,
1399:1, 1402:21,
1403:4, 1403:9,
1403:12, 1403:20,
1404:6, 1411:14,
1411:16, 1411:22,
1411:23, 1412:5,
1412:21, 1412:24,
1413:2, 1421:4,
1433:3, 1433:7,
1435:7, 1435:21,
1435:23, 1438:25,
1439:15, 1439:24,
1440:5, 1440:10,
1440:19, 1443:8,
1449:1, 1449:3,
1451:15, 1452:2,
1452:6, 1452:9,
1452:13, 1452:16,
1463:7, 1463:10,
1463:25, 1464:3,

1464:6, 1464:10,
1464:17, 1464:20,
1465:8, 1465:16,
1465:19, 1465:23,
1466:3, 1466:5,
1499:21, 1499:23,
1543:3, 1544:5,
1554:4, 1554:15,
1554:16, 1554:17,
1554:18, 1555:5,
1555:12, 1557:6,
1558:6, 1558:24
**theme** [1] - 1512:18
**themselves** [5] -
1297:23, 1337:8,
1386:11, 1407:15,
1472:3
**theories** [2] - 1539:4,
1539:20
**theory** [9] - 1511:20,
1517:24, 1525:20,
1526:5, 1526:13,
1531:18, 1537:14,
1537:15
**thereafter** [1] -
1348:10
**therefore** [7] -
1360:22, 1467:12,
1474:14, 1507:23,
1526:10, 1537:5,
1548:7
**they've** [5] - 1369:10,
1413:6, 1526:12,
1528:18, 1548:10
**thinking** [3] - 1479:25,
1493:2, 1516:1
**thinks** [2] - 1490:11,
1550:10
**third** [37] - 1294:17,
1294:19, 1297:22,
1300:6, 1300:10,
1303:15, 1312:23,
1313:12, 1313:15,
1313:18, 1315:14,
1317:20, 1323:15,
1323:21, 1325:6,
1325:11, 1326:16,
1326:24, 1327:14,
1329:20, 1330:15,
1330:18, 1330:19,
1330:22, 1331:4,
1342:25, 1344:11,
1434:17, 1442:16,
1454:5, 1468:5,
1487:11, 1489:5,
1501:10, 1509:7,
1545:12, 1550:7
**Third** [1] - 1441:11
**third-parties** [3] -
1303:15, 1313:15,

1327:14
**Third-Party** [1] -
1441:11
**third-party** [27] -
1294:17, 1294:19,
1297:22, 1300:6,
1300:10, 1312:23,
1313:12, 1313:18,
1315:14, 1317:20,
1323:15, 1323:21,
1325:6, 1325:11,
1326:16, 1326:24,
1329:20, 1330:15,
1330:18, 1330:19,
1330:22, 1331:4,
1342:25, 1434:17,
1487:11, 1489:5,
1501:10
**thirds** [1] - 1457:10
**Thomas** [1] - 1557:22
**thou** [1] - 1307:22
**thousand** [1] - 1489:8
**thousands** [1] -
1325:6
**thread** [1] - 1558:1
**three** [12] - 1298:1,
1343:7, 1398:8,
1416:25, 1418:4,
1425:13, 1463:2,
1487:25, 1504:7,
1554:11, 1554:14
**three-part** [1] - 1418:4
**three-week** [2] -
1554:11, 1554:14
**threw** [1] - 1384:18
**throughout** [8] -
1380:3, 1381:9,
1382:13, 1384:7,
1387:8, 1502:18,
1554:7, 1558:19
**throwing** [1] - 1465:10
**thwart** [1] - 1483:10
**ticket** [5] - 1520:17,
1520:18, 1521:7,
1521:9, 1521:18
**tied** [2] - 1480:10,
1544:15
**tier** [1] - 1343:5
**Tim** [1] - 1372:3
**timekeepers** [1] -
1466:3
**timeline** [14] -
1359:23, 1360:5,
1360:7, 1360:11,
1361:10, 1482:3,
1494:3, 1520:2,
1520:12, 1521:3,
1533:3, 1533:5
**tines** [1] - 1496:14
**title** [1] - 1361:1

44

**TO** [1] - 1460:25
**today** [24] - 1291:9, 1325:16, 1337:7, 1371:5, 1379:3, 1403:6, 1403:18, 1404:7, 1425:21, 1430:12, 1430:22, 1430:23, 1430:24, 1441:3, 1453:14, 1465:12, 1471:3, 1488:22, 1492:11, 1495:13, 1508:15, 1512:22, 1547:25, 1552:13
**together** [4] - 1315:12, 1357:18, 1417:20, 1436:5
**Tom** [2] - 1355:2, 1355:3
**tomorrow** [1] - 1403:22
**tons** [1] - 1525:7
**took** [12] - 1368:23, 1467:19, 1469:16, 1469:24, 1470:14, 1474:2, 1489:13, 1496:6, 1517:1, 1541:2, 1549:2, 1549:9
**tool** [6] - 1294:24, 1295:12, 1295:14, 1295:17, 1400:6, 1507:6
**tools** [50] - 1294:25, 1295:7, 1295:8, 1295:23, 1296:2, 1296:14, 1296:17, 1296:18, 1296:19, 1296:21, 1296:25, 1297:2, 1297:12, 1297:15, 1297:17, 1297:20, 1297:24, 1298:17, 1298:23, 1299:9, 1299:11, 1313:18, 1314:7, 1314:14, 1314:17, 1314:19, 1314:25, 1315:4, 1324:19, 1408:9, 1408:12, 1408:18, 1408:19, 1409:19, 1410:24, 1411:8, 1411:11, 1441:15, 1441:17, 1470:10, 1476:25, 1487:5, 1492:11, 1498:20, 1501:12, 1507:8, 1531:20, 1532:16, 1540:12
**top** [15] - 1381:6, 1381:22, 1382:1,

1393:17, 1395:24, 1396:18, 1396:20, 1396:21, 1410:13, 1426:20, 1430:16, 1454:5, 1458:5, 1469:21, 1471:23
**topic** [2] - 1418:14, 1443:16
**total** [1] - 1463:2
**totally** [3] - 1534:12, 1557:9, 1557:12
**touch** [7] - 1328:22, 1441:5, 1448:21, 1486:8, 1501:17, 1540:8, 1544:9
**touched** [1] - 1546:17
**towards** [3] - 1340:12, 1471:21, 1558:1
**track** [2] - 1341:12, 1465:11
**training** [1] - 1505:5
**transaction** [1] - 1433:4
**TRANSCRIPT** [1] - 1290:11
**transcript** [11] - 1301:10, 1301:13, 1306:16, 1349:23, 1353:16, 1372:10, 1381:3, 1381:4, 1423:11, 1434:3, 1559:6
**transcripts** [2] - 1465:3, 1465:5
**Transfer** [1] - 1372:20
**transfer** [2] - 1358:19, 1374:5
**transferred** [2] - 1449:23, 1449:25
**transferring** [1] - 1449:13
**transform** [1] - 1510:23
**translating** [1] - 1438:6
**transmitted** [1] - 1352:1
**transparent** [1] - 1557:12
**transparently** [1] - 1485:4
**transposed** [4] - 1424:14, 1424:16, 1424:17, 1424:19
**travel** [1] - 1403:15
**treatment** [1] - 1304:22
**trial** [43] - 1291:8, 1340:23, 1340:24, 1423:11, 1464:22,

1465:14, 1466:15, 1467:19, 1471:17, 1472:19, 1473:5, 1473:6, 1474:2, 1474:5, 1474:8, 1474:23, 1481:15, 1481:24, 1483:10, 1483:14, 1483:21, 1483:24, 1484:3, 1502:18, 1544:8, 1546:11, 1548:10, 1552:9, 1553:21, 1554:7, 1555:6, 1555:25, 1556:6, 1556:8, 1556:10, 1556:12, 1557:23, 1558:19
**trials** [6] - 1472:23, 1555:15, 1555:17, 1556:6, 1557:24, 1558:10
**tried** [10] - 1368:7, 1446:22, 1494:1, 1495:3, 1496:5, 1516:16, 1520:14, 1521:25, 1522:10, 1532:25
**troubleshoot** [6] - 1363:16, 1366:17, 1366:24, 1370:24, 1445:2, 1448:5
**troubleshooting** [5] - 1362:7, 1450:22, 1467:25, 1477:20, 1495:22
**truck** [1] - 1317:9
**Trucking** [7] - 1358:25, 1371:23, 1374:11, 1374:18, 1490:18, 1495:1, 1527:3
**TRUE** [1] - 1460:25
**true** [20] - 1304:14, 1383:10, 1384:7, 1401:15, 1401:17, 1406:14, 1410:25, 1413:18, 1416:8, 1416:12, 1432:25, 1461:6, 1461:12, 1463:21, 1463:22, 1504:15, 1504:18, 1504:23, 1505:1, 1505:2
**truly** [1] - 1517:24
**trust** [1] - 1429:19
**trusted** [1] - 1298:6
**truth** [2] - 1442:17, 1502:4
**try** [9] - 1325:22, 1368:3, 1370:8,

1421:11, 1444:24, 1446:7, 1538:17
**trying** [22] - 1303:7, 1310:19, 1326:1, 1326:12, 1366:9, 1366:19, 1366:20, 1367:16, 1369:16, 1389:21, 1436:18, 1465:22, 1470:23, 1489:15, 1510:7, 1515:12, 1538:5, 1547:5, 1549:16, 1555:15, 1555:16, 1557:6
**TUESDAY** [1] - 1403:1
**Tuesday** [2] - 1291:7, 1554:15
**turn** [11] - 1364:15, 1399:21, 1454:3, 1506:14, 1509:21, 1519:7, 1524:10, 1524:21, 1526:18, 1527:25, 1544:6
**turned** [4] - 1481:17, 1496:9, 1504:14, 1524:10
**twice** [1] - 1420:12
**two** [54] - 1307:13, 1307:16, 1330:12, 1363:3, 1366:18, 1368:6, 1371:22, 1379:17, 1382:4, 1382:8, 1382:19, 1386:6, 1387:6, 1389:4, 1397:5, 1398:7, 1408:22, 1418:3, 1421:6, 1428:7, 1430:20, 1431:15, 1431:16, 1432:13, 1432:24, 1438:16, 1449:6, 1450:7, 1452:23, 1456:7, 1457:10, 1463:2, 1470:10, 1488:24, 1490:11, 1490:14, 1495:17, 1498:8, 1503:12, 1509:4, 1511:19, 1513:24, 1515:21, 1522:19, 1528:1, 1528:6, 1533:8, 1540:11, 1540:12, 1541:16, 1545:9, 1545:12
**Two** [1] - 1490:16
**two-thirds** [1] - 1457:10
**txt** [3] - 1351:25, 1352:1, 1428:10
**type** [13] - 1327:16,

1328:6, 1330:17, 1384:20, 1387:23, 1392:12, 1414:15, 1447:1, 1447:22, 1448:1, 1507:9, 1547:17, 1548:10
**typed** [4] - 1409:15, 1409:22, 1516:21, 1551:3
**types** [22] - 1293:14, 1293:18, 1294:10, 1294:12, 1294:15, 1297:4, 1317:10, 1326:16, 1326:23, 1333:16, 1352:7, 1352:11, 1352:19, 1383:14, 1431:5, 1432:7, 1432:9, 1432:21, 1448:13, 1475:20, 1506:23, 1509:13
**typical** [1] - 1489:6
**typically** [3] - 1399:5, 1399:6, 1414:19

## U

**ultimately** [5] - 1347:10, 1421:15, 1479:25, 1495:7, 1521:15
**unable** [1] - 1469:17
**unacceptable** [1] - 1326:14
**unaccounted** [1] - 1432:17
**unaddressed** [1] - 1541:22
**uncommon** [1] - 1397:16
**unconstrained** [3] - 1380:15, 1380:16, 1507:23
**uncovered** [1] - 1553:3
**undefined** [1] - 1472:2
**under** [21] - 1318:2, 1340:8, 1341:9, 1346:7, 1365:20, 1371:2, 1383:2, 1424:12, 1442:14, 1442:21, 1450:19, 1507:15, 1509:16, 1514:7, 1526:3, 1528:25, 1530:14, 1543:6, 1546:21, 1555:19, 1556:1
**underlie** [1] - 1509:23
**underlying** [4] - 1369:16, 1406:23,

1430:3, 1550:12
**understood** [4] -
1341:5, 1342:3,
1370:10, 1424:1
**undertaken** [1] -
1317:22
**undisputed** [9] -
1476:9, 1504:3,
1510:13, 1511:1,
1526:16, 1529:4,
1529:18, 1535:3,
1549:12
**unexplained** [2] -
1382:18, 1382:21
**unfiltered** [1] -
1425:17
**unhesitating** [1] -
1502:6
**uniformly** [2] -
1380:21, 1381:5
**unintelligible** [1] -
1343:12
**unique** [3] - 1317:7,
1417:8, 1555:24
**UNITED** [1] - 1290:1
**United** [2] - 1514:2,
1519:25
**University** [1] -
1355:12
**unlawful** [25] -
1296:11, 1298:16,
1298:22, 1299:5,
1299:8, 1299:10,
1299:23, 1300:3,
1300:19, 1300:23,
1301:1, 1305:13,
1314:24, 1326:5,
1330:20, 1345:2,
1345:9, 1345:25,
1346:1, 1532:10,
1532:11
**Unless** [1] - 1364:13
**unless** [5] - 1352:10,
1378:5, 1384:15,
1475:20, 1510:24
**unlike** [1] - 1383:24
**unlikely** [1] - 1409:23
**unlimited** [2] -
1341:13
**unlocking** [1] - 1540:4
**unpack** [1] - 1510:7
**unprecedented** [1] -
1541:24
**unprotectible** [2] -
1378:24, 1378:25
**unreliable** [4] -
1507:7, 1507:9,
1537:6, 1537:7
**unusual** [5] - 1386:9,
1398:12, 1398:16,

1399:17, 1402:12
**up** [122] - 1296:4,
1299:16, 1301:10,
1303:21, 1304:7,
1305:3, 1306:15,
1308:7, 1309:1,
1309:3, 1309:22,
1310:11, 1311:11,
1311:20, 1312:21,
1315:9, 1315:17,
1318:7, 1318:10,
1320:7, 1320:10,
1320:23, 1321:12,
1328:18, 1328:22,
1330:9, 1333:13,
1335:10, 1336:17,
1337:6, 1340:4,
1343:6, 1345:3,
1347:25, 1348:15,
1355:15, 1358:21,
1365:1, 1368:22,
1369:4, 1370:24,
1372:19, 1373:4,
1376:5, 1376:6,
1376:14, 1377:7,
1377:12, 1379:22,
1380:1, 1383:1,
1383:6, 1383:8,
1383:18, 1386:1,
1386:8, 1386:13,
1386:16, 1386:19,
1386:20, 1386:21,
1386:22, 1387:4,
1387:5, 1387:7,
1388:5, 1402:10,
1405:4, 1409:2,
1418:6, 1418:15,
1421:7, 1423:10,
1423:13, 1425:8,
1426:14, 1428:4,
1428:21, 1430:16,
1431:2, 1431:19,
1434:2, 1434:5,
1440:25, 1442:12,
1442:25, 1443:4,
1444:15, 1444:17,
1446:6, 1453:24,
1453:25, 1454:5,
1456:5, 1457:8,
1458:5, 1458:10,
1459:9, 1467:10,
1473:16, 1486:10,
1495:12, 1495:20,
1501:20, 1516:8,
1518:21, 1520:5,
1525:24, 1528:18,
1532:17, 1533:1,
1533:5, 1533:20,
1539:18, 1545:20,
1546:2, 1555:2,
1555:18, 1556:25

**Update** [2] - 1371:8,
1526:23
**update** [78] - 1336:6,
1358:17, 1359:7,
1359:9, 1359:13,
1359:17, 1359:19,
1361:4, 1361:20,
1361:23, 1361:25,
1371:14, 1372:7,
1372:15, 1372:17,
1373:3, 1373:17,
1373:19, 1373:20,
1374:3, 1374:7,
1374:10, 1374:16,
1374:19, 1375:10,
1375:11, 1404:18,
1404:20, 1404:22,
1405:11, 1405:19,
1405:20, 1408:1,
1408:17, 1410:10,
1411:9, 1411:11,
1443:19, 1443:23,
1444:9, 1478:17,
1478:23, 1491:5,
1492:22, 1493:2,
1493:7, 1493:11,
1495:1, 1496:1,
1498:8, 1498:10,
1512:25, 1514:5,
1514:16, 1515:5,
1516:4, 1516:9,
1519:22, 1519:23,
1519:24, 1520:1,
1520:4, 1520:5,
1520:9, 1521:5,
1521:8, 1521:11,
1521:13, 1521:17,
1523:8, 1524:23,
1526:21, 1526:23,
1531:25, 1551:9,
1551:11
**updated** [1] - 1405:17
**updates** [54] -
1291:22, 1293:18,
1294:15, 1295:24,
1319:4, 1319:5,
1319:6, 1319:16,
1322:4, 1322:15,
1323:24, 1324:2,
1324:11, 1324:16,
1327:10, 1331:7,
1331:10, 1333:17,
1335:24, 1336:1,
1336:2, 1336:4,
1336:24, 1345:13,
1375:3, 1375:6,
1467:17, 1468:6,
1470:10, 1475:13,
1476:14, 1476:18,
1478:11, 1478:19,
1482:12, 1482:19,

1491:25, 1497:20,
1504:10, 1513:3,
1514:6, 1514:8,
1514:21, 1516:1,
1521:15, 1530:20,
1534:9, 1534:11,
1542:24, 1549:21,
1552:24, 1552:25
**upload** [1] - 1358:20
**uploaded** [6] - 1353:2,
1353:11, 1353:13,
1354:19, 1432:18,
1536:6
**upper** [1] - 1495:12
**upstream** [1] - 1398:4
**US** [16] - 1359:4,
1360:18, 1361:12,
1361:16, 1485:10,
1493:1, 1514:20,
1516:5, 1520:6,
1521:5, 1521:6,
1521:14, 1521:15,
1521:17, 1521:21,
1521:22
**USA** [1] - 1290:4
**useable** [1] - 1354:11
**useful** [1] - 1355:5
**user** [7] - 1295:14,
1295:18, 1295:19,
1333:13, 1365:24,
1418:25, 1419:15
**User** [5] - 1477:14,
1477:16, 1477:23,
1485:11, 1488:16
**users** [3] - 1312:8,
1312:9, 1312:13
**users'** [1] - 1333:12
**uses** [13] - 1295:19,
1296:24, 1297:15,
1297:16, 1395:8,
1395:9, 1406:13,
1432:11, 1433:23,
1476:25, 1477:1,
1510:10, 1551:15
**utility** [4] - 1372:20,
1408:12, 1410:24,
1411:8
**utilize** [2] - 1297:24,
1315:23
**utilizing** [1] - 1312:10
**utter** [1] - 1471:22

# V

**vacated** [1] - 1533:11
**vaccination** [1] -
1557:14
**vague** [2] - 1433:2,
1472:2
**vagueness** [1] -

1376:4
**valuable** [2] - 1389:18,
1466:13
**value** [22] - 1315:16,
1315:22, 1384:10,
1384:25, 1386:19,
1387:21, 1387:24,
1389:24, 1394:18,
1394:19, 1395:2,
1401:17, 1419:18,
1458:10, 1458:11,
1458:16, 1458:18,
1461:5, 1461:8,
1518:4
**values** [3] - 1364:19,
1394:17, 1459:5
**VANDEVELDE** [61] -
1404:1, 1411:15,
1411:18, 1412:2,
1412:8, 1412:9,
1412:18, 1413:1,
1413:7, 1420:13,
1420:14, 1421:8,
1423:10, 1423:14,
1423:19, 1423:21,
1425:8, 1425:11,
1426:11, 1426:17,
1428:4, 1428:6,
1428:15, 1428:17,
1428:21, 1428:24,
1429:8, 1429:10,
1431:2, 1431:4,
1433:6, 1433:9,
1434:2, 1434:6,
1435:4, 1435:11,
1435:13, 1435:17,
1436:2, 1438:22,
1439:11, 1439:18,
1439:25, 1440:8,
1440:12, 1440:20,
1443:15, 1444:15,
1444:19, 1448:22,
1449:20, 1451:14,
1499:22, 1499:24,
1555:3, 1555:9,
1556:20, 1557:9,
1557:21, 1558:23,
1560:23
**Vandevelde** [4] -
1290:19, 1499:23,
1554:8, 1560:9
**variable** [6] - 1370:20,
1394:12, 1395:20,
1409:11, 1458:16,
1507:22
**various** [9] - 1294:5,
1295:11, 1303:5,
1317:12, 1317:13,
1415:12, 1419:5,
1446:22, 1473:2

**vendor** [2] - 1295:2, 1296:16
**vendors** [1] - 1293:9
**verbal** [1] - 1356:2
**verdict** [6] - 1482:20, 1491:15, 1496:24, 1545:18, 1546:14, 1553:18
**verification** [1] - 1373:16
**verified** [1] - 1408:23
**verify** [1] - 1373:13
**version** [8] - 1313:10, 1342:8, 1342:9, 1354:21, 1373:11, 1373:15, 1511:14, 1517:18
**versions** [1] - 1520:6
**versus** [4] - 1387:22, 1474:4, 1474:19, 1475:5
**vertically** [1] - 1380:1
**via** [3] - 1317:9, 1433:24, 1558:4
**Vice** [2] - 1320:4, 1529:23
**Vice-President** [2] - 1320:4, 1529:23
**video** [1] - 1329:5
**view** [11] - 1304:22, 1305:18, 1305:24, 1322:19, 1324:17, 1329:15, 1330:1, 1344:19, 1344:23, 1524:2, 1538:22
**viewed** [1] - 1354:20, 1530:1
**viewing** [2] - 1329:25, 1334:2
**views** [2] - 1303:13, 1539:5
**violate** [14] - 1320:20, 1323:4, 1362:3, 1471:4, 1484:15, 1484:25, 1485:3, 1494:13, 1530:5, 1531:15, 1535:10, 1548:7, 1550:12, 1552:14
**violated** [9] - 1469:7, 1478:24, 1479:4, 1498:5, 1498:14, 1498:16, 1498:17, 1501:22, 1546:7
**violates** [3] - 1537:15, 1550:1, 1553:4
**violating** [8] - 1444:5, 1444:23, 1467:14, 1471:20, 1475:2, 1481:23, 1527:3,

1547:3
**violation** [33] - 1299:13, 1299:23, 1300:3, 1314:25, 1360:12, 1364:16, 1364:19, 1371:22, 1375:12, 1415:11, 1469:2, 1473:23, 1474:25, 1475:10, 1479:19, 1479:23, 1480:2, 1487:20, 1487:22, 1492:20, 1496:12, 1497:10, 1499:1, 1510:21, 1516:23, 1527:10, 1544:19, 1547:5, 1548:12, 1550:4, 1553:16
**violations** [49] - 1357:17, 1357:19, 1357:21, 1358:24, 1359:2, 1439:23, 1466:18, 1466:20, 1466:22, 1466:24, 1466:25, 1467:3, 1467:5, 1467:9, 1467:13, 1468:10, 1468:16, 1468:25, 1469:10, 1469:13, 1476:21, 1477:5, 1477:9, 1479:12, 1479:23, 1480:8, 1480:9, 1480:11, 1480:13, 1487:25, 1488:16, 1489:8, 1490:6, 1490:15, 1501:24, 1544:13, 1544:16, 1545:13, 1545:18, 1548:24, 1550:3, 1551:22, 1552:12, 1552:20, 1553:2, 1553:22, 1553:23, 1553:25
**violator** [1] - 1487:19
**Virgin** [5] - 1359:4, 1360:18, 1370:6, 1492:23, 1521:1
**Virginia** [1] - 1290:24
**virtually** [2] - 1468:17, 1470:16
**visible** [2] - 1441:8, 1441:20
**visual** [2] - 1380:15, 1388:23
**visually** [2] - 1383:7, 1385:7
**Volume** [1] - 1290:8
**vowels** [2] - 1409:13, 1456:23
**vs** [1] - 1290:6

# W

**W2** [1] - 1292:10, 1364:17, 1444:21, 1496:1, 1513:23, 1513:25, 1514:3, 1514:8, 1515:15, 1516:4, 1516:9
**wait** [5] - 1328:2, 1368:14, 1411:23, 1421:4, 1461:21
**waiting** [2] - 1375:10, 1558:13
**waived** [1] - 1548:10
**walk** [5] - 1292:4, 1301:11, 1326:22, 1351:14, 1381:17
**walked** [1] - 1508:15
**wants** [9] - 1445:21, 1447:16, 1471:18, 1471:19, 1496:24, 1532:14, 1541:13, 1553:11, 1557:19
**warning** [3] - 1504:21
**warnings** [7] - 1488:5, 1488:19, 1489:20, 1504:16, 1505:4, 1545:2, 1545:3
**Washington** [2] - 1292:14
**ways** [10] - 1316:9, 1389:22, 1414:10, 1414:13, 1417:25, 1418:18, 1420:10, 1420:21, 1420:23, 1553:3
**weakness** [1] - 1509:10
**Web** [1] - 1314:16
**webinars** [3] - 1315:18, 1315:19, 1316:2
**Webster's** [1] - 1485:11
**Wednesday** [1] - 1349:6
**weeded** [1] - 1548:5
**week** [11] - 1436:8, 1466:10, 1466:14, 1468:23, 1501:2, 1506:19, 1507:12, 1554:2, 1554:11, 1554:14, 1556:9
**weekend** [1] - 1549:3
**weight** [1] - 1303:9
**welcome** [2] - 1291:12, 1350:13
**west** [1] - 1310:22
**West** [1] - 1290:19
**whatsoever** [3] -

1298:18, 1520:25, 1524:2
**whereas** [3] - 1379:25, 1455:7, 1455:25
**whereby** [1] - 1372:1
**whiff** [1] - 1552:1
**whisper** [1] - 1482:5
**white** [4] - 1415:23, 1415:24, 1453:20, 1453:23
**whole** [10] - 1297:7, 1316:18, 1388:5, 1409:5, 1486:23, 1505:10, 1541:17, 1543:12, 1547:25, 1551:6
**wide** [1] - 1383:24
**width** [9] - 1379:13, 1379:15, 1379:17, 1379:25, 1380:5, 1380:10, 1380:13, 1380:18, 1382:22
**wild** [1] - 1310:21
**Wilford** [2] - 1426:7, 1429:18
**William** [1] - 1290:15
**willingness** [1] - 1479:17
**win** [1] - 1473:20
**windfall** [2] - 1316:8, 1316:19
**window** [2] - 1409:3
**wishes** [1] - 1443:10
**withdrew** [3] - 1541:25, 1542:2, 1543:4
**WITNESS** [20] - 1291:16, 1318:18, 1324:7, 1331:20, 1340:9, 1340:13, 1350:14, 1368:11, 1368:20, 1394:1, 1399:1, 1411:22, 1412:24, 1413:2, 1433:3, 1433:7, 1435:23, 1449:3, 1452:9, 1452:16
**witness** [11] - 1291:17, 1305:3, 1331:17, 1340:23, 1350:15, 1421:5, 1445:8, 1452:10, 1471:10, 1493:10, 1545:5
**WITNESSES** [3] - 1560:3, 1560:7, 1560:11
**witnesses** [5] - 1474:12, 1480:5, 1494:5, 1500:7,

1558:19
**wizards** [1] - 1295:19
**word** [22] - 1363:22, 1363:23, 1364:6, 1383:1, 1386:7, 1387:1, 1391:12, 1401:8, 1402:11, 1417:18, 1422:10, 1422:17, 1456:18, 1456:25, 1467:6, 1468:2, 1472:3, 1475:16, 1498:25, 1533:1, 1535:6, 1542:25
**Word** [2] - 1352:18, 1352:19
**worded** [1] - 1307:3
**wording** [3] - 1362:9, 1410:25, 1443:22
**words** [29] - 1345:18, 1345:24, 1351:21, 1371:16, 1377:24, 1384:5, 1384:24, 1384:25, 1392:8, 1392:9, 1392:11, 1417:19, 1459:22, 1459:25, 1467:7, 1468:2, 1468:11, 1468:12, 1472:13, 1475:22, 1479:2, 1485:18, 1497:10, 1507:23, 1537:19, 1538:15, 1545:17, 1545:23
**work-arounds** [1] - 1319:4
**Workbench** [2] - 1295:8, 1296:12
**works** [28] - 1333:13, 1363:6, 1363:13, 1404:20, 1405:20, 1406:7, 1407:15, 1412:20, 1422:13, 1446:8, 1474:7, 1475:19, 1480:23, 1481:6, 1486:21, 1490:16, 1498:3, 1498:12, 1499:11, 1512:17, 1516:22, 1523:18, 1537:11, 1549:22, 1550:4, 1550:5, 1550:8, 1550:14
**workstation** [1] - 1300:8
**World** [7] - 1316:11, 1411:19, 1412:10, 1414:22, 1511:13, 1511:16
**world** [5] - 1457:3,

1490:2, 1531:3,
1531:6, 1531:22
**worse** [2] - 1556:2,
1556:11
**write** [8] - 1391:11,
1420:24, 1421:10,
1448:15, 1448:16,
1457:4, 1485:1,
1522:11
**writes** [3] - 1448:24,
1450:13, 1479:7
**writing** [1] - 1390:14
**written** [30] - 1302:6,
1310:21, 1345:6,
1388:13, 1391:13,
1408:17, 1409:18,
1418:18, 1418:20,
1420:10, 1420:21,
1420:22, 1443:5,
1448:16, 1449:21,
1450:14, 1450:19,
1450:20, 1450:24,
1456:17, 1457:1,
1457:19, 1465:5,
1510:13, 1512:9,
1525:7, 1535:7,
1536:22, 1537:1
**wrote** [11] - 1449:7,
1449:9, 1449:17,
1451:6, 1451:7,
1472:25, 1484:8,
1506:4, 1535:21,
1542:1

# X

**XCorp** [1] - 1498:11
**Xs** [2] - 1519:9,
1526:20

# Y

**year** [23] - 1292:10,
1355:15, 1394:10,
1416:20, 1417:16,
1447:11, 1449:10,
1450:7, 1450:9,
1451:1, 1514:8,
1514:9, 1514:21,
1516:3, 1516:4,
1516:8, 1520:1,
1526:8, 1526:12,
1545:6, 1557:2
**year-end** [1] - 1292:10
**year-to-date** [3] -
1394:10, 1416:20,
1417:16
**yearly** [1] - 1405:17
**years** [19] - 1298:3,
1301:15, 1304:4,

1314:12, 1334:12,
1338:20, 1344:2,
1429:18, 1441:8,
1441:23, 1442:18,
1443:1, 1470:1,
1470:17, 1489:13,
1503:23, 1532:23,
1541:2, 1543:21
**yellow** [2] - 1460:11,
1460:17
**yesterday** [20] -
1291:21, 1295:1,
1297:14, 1297:18,
1297:21, 1302:21,
1316:25, 1322:16,
1334:13, 1339:4,
1348:21, 1355:19,
1355:23, 1356:3,
1356:8, 1357:8,
1358:15, 1360:16,
1405:2, 1437:9
**yielded** [1] - 1352:5
**yoke** [1] - 1543:7
**yourself** [2] - 1294:20,
1313:21
**YT** [1] - 1393:21
**YTD** [25] - 1393:21,
1393:22, 1393:23,
1394:1, 1394:2,
1394:9, 1394:16,
1394:21, 1394:23,
1395:1, 1400:12,
1401:14, 1416:20,
1417:2, 1417:5,
1417:16, 1458:10,
1458:11, 1459:18,
1460:3, 1460:24,
1460:25, 1461:9,
1461:11

# Z

**Zachary** [1] - 1290:17
**zero** [2] - 1386:24,
1541:14
**zip** [1] - 1431:18
**Zone** [1] - 1508:18
**zoom** [4] - 1426:11,
1456:8, 1457:9,
1539:1
**ZZ000-SQL-ERROR**
[2] - 1462:9, 1462:18
**ZZZ** [2] - 1397:23,
1401:23
**ZZZ-SQL-ERROR** [1] -
1401:23