GIBSON, DUNN & CRUTCHER LLP
MARK A. PERRY (*pro hac vice*)
1050 Connecticut Avenue, N.W.
Washington, DC  20036-5306
Telephone: 202.955.8500
mperry@gibsondunn.com

GIBSON, DUNN & CRUTCHER LLP
JEFFREY T. THOMAS (*pro hac vice*)
BLAINE H. EVANSON (*pro hac vice*)
JOSEPH A. GORMAN (*pro hac vice*)
CASEY J. MCCRACKEN (*pro hac vice*)
3161 Michelson Drive
Irvine, CA  92612-4412
Telephone: 949.451.3800
jtthomas@gibsondunn.com
bevanson@gibsondunn.com
jgorman@gibsondunn.com
cmccracken@gibsondunn.com

GIBSON, DUNN & CRUTCHER LLP
SAMUEL LIVERSIDGE (*pro hac vice*)
ERIC D. VANDEVELDE (*pro hac vice*)
ILISSA SAMPLIN (*pro hac vice*)
333 South Grand Avenue
Los Angeles, CA  90071-3197
Telephone: 213.229.7000
sliversidge@gibsondunn.com
evandevelde@gibsondunn.com
isamplin@gibsondunn.com

*Attorneys for Defendant*
*Rimini Street, Inc.*

RIMINI STREET, INC.
JOHN P. REILLY (*pro hac vice*)
3993 Howard Hughes Parkway, Suite 500
Las Vegas, NV  89169
Telephone: 336.908.6961
jreilly@riministreet.com

HOWARD & HOWARD ATTORNEYS PLLC
W. WEST ALLEN (Nevada Bar No. 5566)
3800 Howard Hughes Parkway, Suite 1000
Las Vegas, NV  89169
Telephone: 702.667.4843
wwa@h2law.com

## UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| ORACLE USA, INC., et al., | Case No. 2:10-cv-00106-LRH-VCF |
| Plaintiffs, | **RIMINI STREET, INC.'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW** |
| v. | |
| RIMINI STREET, INC., et al., | |
| Defendants. | |

1.      After issuing an Order to Show Cause (ECF 1459) ("OSC"), the Court held a seven-day evidentiary hearing to determine whether Rimini Street, Inc. acted in contempt of the Injunction (ECF 1166) with respect to ten specific issues, which the parties grouped into four categories: (I) Issues 1 and 5, concerning PeopleSoft files allegedly present on Rimini's systems; (II) Issues 3, 4, 2, 6, and 10, concerning allegations of cross-use and derivative works; (III) Issues 7 and 9, concerning disputes about "J.D. Edwards software source code"; and (IV) Issue 8, concerning Oracle Database.  ECF 1527, Def.'s Demonstrative Ex. ("DDX")-102.  The underlying facts have been described in detail elsewhere.  *See*, *e.g.*, ECF 1484.

2.      As the moving party, Oracle bore the burden of proving by clear and convincing evidence that:  (i) Rimini violated the Injunction; (ii) Rimini's violations were "beyond substantial compliance"; and (iii) Rimini's conduct was "not based on a good faith and reasonable interpretation" of the Injunction.  *United States v. Bright*, 596 F.3d 683, 694 (9th Cir. 2010).  This is a "heavy burden."  *Mattel, Inc. v. Realtoy Int'l, Ltd.*, 43 F. App'x 51, 52 (9th Cir. 2002).  Clear and convincing evidence must place "in the ultimate factfinder an abiding conviction that the truth of [the party's] factual contentions are 'highly probable.'"  *Colorado v. New Mexico*, 467 U.S. 310, 316 (1984).  "[W]here there is ground [t]o doubt the wrongfulness of the conduct of the defendant, he should not be adjudged in contempt," even if the moving party has "c[ome] within a scintilla" of meeting the clear and convincing standard.  *Quinter v. Volkswagen of Am.*, 676 F.2d 969, 974 (3d Cir. 1982).  Moreover, "[a] party should not be held in contempt unless a court first gives fair warning that certain acts are forbidden; any ambiguity in the law should be resolved in favor of the party charged with contempt."  *U.S. on Behalf of I.R.S. v. Norton*, 717 F.2d 767, 774 (3d Cir. 1983).  Finally, "it is [Oracle's] burden to prove" contempt, "not [Rimini's] burden to prove lack thereof," and the "absence of evidence … does not support a conclusion that the [party] has met its burden."  *United States v. Valle*, 940 F.3d 473, 483 (9th Cir. 2019).

3.      For the reasons set forth below, the Court finds that Rimini did not act contumaciously and sanctions are not warranted.  The Order to Show Cause is therefore discharged.  The Court summarizes its rulings as follows:

Gibson, Dunn & Crutcher LLP

RIMINI STREET, INC.'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW
CASE NO. 2:10-CV-00106-LRH-VCF

| Issue | Ruling |
|---|---|
| **Issue 1** – Isolated PeopleSoft Files on Rimini's Systems | Oracle has not proven a lack of substantial compliance. Rimini is in full compliance as to local hosting of environments, and, despite some isolated files sent by its clients, Rimini has instituted a significant compliance program. *See infra* ¶¶ 6–15. |
| **Issue 5** – RSPCMPAY.cbl | RSPCMPAY.cbl does not incorporate any protected Oracle expression; it is therefore not "Oracle software." *See infra* ¶¶ 16–25. |
| **Issue 3** – Johnson Controls W-2 Update | Rimini did not engage in cross-use when it tested a print parameter box fix in the City of Eugene's ("COE") environment for COE, and then used and tested that same fix in Johnson Controls's environment. Engineers may re-use their know-how, and the work in each environment was for that respective client. *See infra* ¶¶ 30–38. |
| **Issue 4** – Rsi940.sqr delivered to Spherion and Smead | Rimini did not engage in cross-use when it developed the update in COE's environment, for COE, and then later implemented and tested that update for clients Spherion and Smead in their environments. The work done in each environment was for that client in that client's environment. *See infra* ¶¶ 39–50. |
| **Issue 2** – Update for Matheson Trucking | This is the same update in Issue 4, and Rimini has not acted contumaciously. *See infra* ¶¶ 51–56. |
| **Issue 6** – 1099 Update for Easter Seals | The update does not incorporate any protected Oracle expression, and is therefore not a derivative work. *See infra* ¶¶ 57–65. |
| **Issue 10** – Update for Rockefeller and Home Shopping Network | Rimini did not engage in cross-use when it developed the rsiqtrtx.sqr update for clients that needed it, and then later developed and tested it for clients Rockefeller and Home Shopping Network in their environments. *See infra* ¶¶ 66–73. |
| **Issue 7** – J.D. Edwards Source Code | Rimini did not violate the Injunction, which only prohibits *unlawful* conduct, when—consistent with the license agreements, this Court's jury instructions, the Ninth Circuit opinion, decades of industry practice, and Oracle's 30(b)(6) witness—it copied open code in supporting J.D. Edwards clients, including by using Oracle-provided tools. *See infra* ¶¶ 74–89. |
| **Issue 9** – J.D. Edwards Technical Specification | Rimini's J.D. Edwards technical specification did not violate the Injunction, as it merely contained "markers" of inexecutable characters that are not protected expression. *See infra* ¶¶ 90–94. |
| **Issue 8** – Oracle Database | Rimini did not violate the Injunction when a client sent it an Oracle Database file. Paragraph 15 of the Injunction and the licenses do not contain any facilities restriction regarding Oracle Database. *See infra* ¶¶ 95–99. |

## I.   ISOLATED PEOPLESOFT FILES ON RIMINI'S SYSTEMS (ISSUES 1 & 5)

4.     Issue 1 concerns 11 specific PeopleSoft files found on Rimini's systems, all of which were first put on Rimini's systems by clients—not Rimini. And Oracle concedes Rimini is in full compliance with "the key" issue litigated in *Rimini I* that resulted in the Injunction provision—the hosting of client *environments* (each containing *thousands of files*) on Rimini's

Gibson, Dunn & Crutcher LLP

systems. *Rimini II*, ECF 1253 at 3.  The handful of files that are part of Issue 1 are insufficient to show that Rimini is not in substantial compliance with the Injunction.

5.      Issue 5 involves a single *Rimini* file, RSPCMPAY.cbl.  Oracle contends that some lines of code in the file "match" lines in an Oracle file, and that the Injunction prohibits *all* "copying" without regard to whether any *protected* expression has been copied.  That is wrong.  Under the Copyright Act and Ninth Circuit law, Oracle must prove that Rimini copied protected Oracle expression, which requires filtering out unprotected expression, and *then* evaluating substantial similarity.  *Rentmeester v. Nike, Inc.*, 883 F.3d 1111, 1116–17 (9th Cir. 2018).  Under that analysis, RSPCMPAY.cbl does not include protected Oracle expression.

**A.      Issue 1:  Isolated PeopleSoft Files on Rimini's Systems**

6.      This Court previously found that a PeopleSoft file called "psptaxdt.dms" (OREX_1337) and some PeopleSoft documentation were on Rimini's systems in violation of Paragraph 5 of the Injunction (OSC at 22–23)—a total of 11 PeopleSoft files, all sent to Rimini by its clients.  The Court permitted Oracle to introduce "examples of similar contemptuous files and documents on Rimini's systems," but only to determine whether Oracle could prove Rimini was not "substantially complying" with the Injunction, *i.e.*, "whether this conduct is an isolated incident or shows a pattern of impertinence."  ECF 1503 at 5.  Oracle failed to meet its burden.

**(i)      Findings of Fact on Issue 1**

7.      "[T]he key" issue litigated in *Rimini I* was "that Rimini violated the 'facilities restriction' within PeopleSoft's standard licensing agreement when it hosted its clients' development *environments* on its own computer systems, a process called 'local hosting.'" *Rimini II*, ECF 1253 at 3 (emphasis added); OSC at 5.  Oracle's expert witness Barbara Frederiksen-Cross agreed that the "local hosting" prohibited by the Injunction means "hosting of a *client's systems* on Rimini's systems."  Tr. 367:6–20 (emphasis added).  A PeopleSoft system—or environment—is comprised of "thousands of PeopleSoft files," as well as "all of the PeopleTools" and a "database system," and can be executed and run.  Tr. 369:3–19.

8.      It is undisputed that there are no PeopleSoft (or other Oracle software) *environments* on Rimini's systems.  Tr. 367:6–368:17, 607:9–609:11, 619:20–22, 1165:16–

1166:16, 1181:12–1182:15.  Rimini made significant changes to address the "key issue" from *Rimini I*, and its conduct complies fully with the Injunction's "local hosting" prohibition.

9.     Oracle's arguments at the hearing focused exclusively on individual PeopleSoft files.  In addition to the 11 files sent by three clients to Rimini that the Court previously found were a violation, Ms. Frederiksen-Cross testified regarding eight additional PeopleSoft files on Rimini's systems that were sent by three different clients.   Tr. 129:25–130:5, 130:15–25, 146:22–152:11, 152:22–154:12, 163:12–166:2, 169:18–172:6, 172:24–174:16, 184:17–200:18; OREX_098–100; OREX_103–105; OREX_199; OREX_201–202; OREX_214; OREX_229; OREX_231–236; OREX_1337; DDX-508.  This evidence does not clearly and convincingly prove that Rimini is not in substantial compliance with the Injunction.

10.    Rimini has between 1,400 and 1,500 employees and provides between 10,000 and 15,000 individual PeopleSoft updates across hundreds of clients each year.  Tr. 596:6–10, 601:3–6.  It is undisputed that "all the files" identified by Ms. Frederiksen-Cross were "uploaded by the client" to Rimini's system either through Rimini's Salesforce portal or via email, resulting in an initial copy on Rimini's systems through no affirmative Rimini action and in violation of Rimini's Acceptable Use Policy (OREX_017) ("AUP").  Tr. 372:11–16, 374:1– 6, 374:12–21, 375:9–376:5.  That some technical violations occurred is understandable given the volume of Rimini's updates, and Rimini has acknowledged these shortcomings and shown a commitment to improvement.  Tr. 741:25–742:11.

11.    Although Rimini carries no burden to prove substantial compliance, Rimini nonetheless put forward considerable evidence of steps it took to adhere to the Injunction, including:  (i) migrating *all* client environments off its systems in response to the 2014 summary judgment ruling (Tr. 367:6–368:17, 607:9–609:11, 619:20–22, 1165:16–1166:16, 1181:12– 1182:15); (ii) maintaining an AUP that prohibits any Oracle files—not just PeopleSoft files— from being present on its systems (Tr. 609:12–24, 1259:17–24); (iii) providing ongoing training on the AUP for all employees (Tr. 610:3–18, 1157:6–1160:10, 1162:20–1163:17, 1168:16–20, 1195:5–13); (iv) disciplining employees that violate the AUP (Tr. 715:14–717:12, 753:5–754:3, 1195:5–13, 1259:17–24); (v) implementing technological measures to keep Oracle files from

reaching Rimini's systems, including the one-way TransferFiles tool (Tr. 622:22–623:18); (vi) implementing scanning tools to detect Oracle files on Rimini's systems (Tr. 1190:18–1192:3); (vii) and quarantining potential Oracle files that reach Rimini's systems (Tr. 1183:13–1184:3, 1185:10–1186:21, 1187:23–1188:9, 1190:6–17, 1194:4–10).

12.     Rimini also presented evidence that it educates and reminds clients not to send such files to Rimini.  At multiple stages during Rimini's "onboarding" process for new clients, clients are informed that they should not send Oracle files to Rimini.  Tr. 710:4–711:1, 1163:18–1168:23.  Clients also receive written reminders not to send such files *every time* they open or access a support case in Rimini's Street Central portal, through which Rimini's clients interact with Rimini's support personnel.  Tr. 391:20–392:6, 393:20–24, 830:5–14, 1168:24–1169:13, 1170:12–1174:5; DTX-008 at 2; DTX-041(a); DTX-040 at 14.  Those reminders read: "**Important Information**[–] Please do not upload any third party software (for example, code contained in either documentation, trace files or screen shots), or any other third party intellectual property or confidential data to this client portal or send such information to Rimini Street via email . . . . All access to your supported products will be via the Remote Access establishing during your onboarding process." *E.g.*, DTX-008 at 2.  Rimini also spent hundreds of thousands of dollars to implement a tool called Kona that scans and removes suspicious files within 15 minutes after they are attached to Salesforce cases.  Tr. 1191:12–1194:13.

13.     The evidence adduced at the hearing contradicts Oracle's contention that Rimini took essentially no steps to prevent clients from sending Rimini PeopleSoft files and took no remedial actions when they did.  While Ms. Frederiksen-Cross initially testified that she "saw no evidence" of such preventative measures by Rimini (Tr. 161:8–11, 109:12–21, 145:16–19, 171:7–10, 172:11–20, 183:9–184:7), she admitted during cross examination that she "missed" data in her analysis showing that clients received the above written reminder every time they interacted with Rimini via the Street Central portal.  Tr. 391:20–392:6; *see also* Tr. 393:20–24.  Ms. Frederiksen-Cross also admitted that the data she reviewed did, in fact, contain evidence that files sent to Rimini by clients were quarantined.  Tr. 1355:19–1356:16.

14.     Oracle also contends that Rimini's conduct evidenced a "pattern of

impertinence" because Rimini requested that clients send these files to Rimini, and Rimini also "used" the files once they were on Rimini's systems.  Much of Oracle's evidence either directly undermined these claims, or was based solely on Ms. Frederiksen-Cross's speculative interpretation of communications.  *See* OREX_004 and Tr. 713:17–714:10 (indicating that Rimini asked client G6 Hospitality to place requested files "on the shared file" on G6's system); OREX_098 and 726:8–727:10 (indicating that Rimini asked client Evergreen's representative to place requested file on client's system); Tr. 191:2–192:8 (Ms. Frederiksen-Cross speculating that files were "under discussion and uploaded" to Salesforce during a meeting between Rimini and client University of Oklahoma Health Sciences Center).  But even accepting Oracle's unsupported characterizations, they would not be sufficient to show a systematic lack of respect for the Injunction, especially in light of the evidence Rimini put forward regarding its compliance efforts.  The question is one of *substantial*, not *perfect*, compliance.[1]  *See*, *e.g.*, *S. Ry. Co. v. Bhd. of Locomotive Firemen & Enginemen*, 337 F.2d 127, 135 (D.C. Cir. 1964) (substantial compliance with 47 violations in 42,000 instances).

  **(ii)**  **Conclusions of Law on Issue 1**

  15.  Oracle has presented, at most, "a few technical violations."  *Vertex Distrib., Inc. v. Falcon Foam Plastics, Inc.*, 689 F.2d 885, 892 (9th Cir. 1982).  There is no dispute that Rimini has stopped the key practice at issue in *Rimini I* prohibited by the Injunction—local hosting of PeopleSoft environments.  While Oracle argues that the presence of isolated *files* on Rimini's servers is evidence of systemic noncompliance, this argument ignores that Rimini is no longer engaging in the key conduct the Court adjudicated in *Rimini I* and enjoined in the

---

[1] Ms. Frederiksen-Cross also testified that she performed a search for files that contained certain terms—such as "Oracle" within 15 words of "copyright"—on Rimini's systems.  She initially identified 4,481 responsive documents, filtered that down to 1,139 documents, and then filtered further to arrive at a final set of 934 files.  Tr. 1351:14–1353:5.  This analysis has no bearing on Rimini's compliance with the PeopleSoft prohibitions in Paragraph 5 of the Injunction.  On cross examination, Ms. Frederiksen-Cross admitted that she could not provide in court any support for the 4,481 or 1,139 numbers.  Tr. 1424:9–1431:1.  Further, she did not analyze the contents of the files (Tr. 407:2–16), and thus she had no basis to opine on whether they were PeopleSoft or even Oracle files, whether they relate to the Oracle copyrights at issue here, or whether they are protectable.  Tr. 407:8–409:25.  At most, she opined—based on their file extensions—that the 934 files were "likely" Oracle Database files.  Tr. 407:22–409:12.  Even if such an opinion were reliable despite her lack of analysis, as discussed *infra* Section IV, there is no Oracle Database local hosting prohibition in the relevant licenses or the Injunction.

Injunction paragraph at issue—which in and of itself is substantial compliance. Oracle also ignores that every such file was sent to Rimini *by a client* contrary to Rimini's own policies. Moreover, Oracle's attempt to carry *its* burden by pointing to a supposed failure on Rimini's part to bring forward evidence of compliance (*see, e.g.*, DDX-806; Tr. 41:24–42:1, 127:12–19, 161:8–11) is not only inadequate under the law, *see Valle*, 940 F.3d at 483, it is incorrect. Rimini has adopted policies *prohibiting* any PeopleSoft files from being present on its systems, and, as Craig Mackereth testified extensively and credibly, Rimini takes substantial steps to enforce these policies and educate clients. *See* Tr. 1156:22–1158:23, 1159:18–1164:8, 1164:19–1174:14, 1175:15–1176:8. Oracle has not proven that contempt is warranted.

**B.      Issue 5:  Whether RSPCMPAY.cbl Incorporates Oracle Protected Expression**

16.      The Court requested evidence about whether a file—RSPCMPAY.cbl (OREX_237/DTX-501)—contains Oracle protected expression, whether the file's presence on Rimini's systems is a violation of Paragraph 5 of the Injunction, and whether Rimini should be found in contempt and sanctioned. OSC at 22. Oracle failed to carry its burden for this file.

**(i)      Findings of Fact on Issue 5**

17.      Ms. Frederiksen-Cross identified so-called "matching" lines between Rimini's RSPCMPAY.cbl file and Oracle's PSPTARRY.cbl file (OREX_225/DTX-502), using a tool known as Araxis Merge. Tr. 134:7–23. She testified that "important factor[s]" led her to find similarities between the files, such as purportedly idiosyncratic uses of spaces, "flower boxes" and "orphan asterisks," backslash conventions, and naming choices in certain lines of code such as switches and variables. *E.g.*, Tr. 208:13–212:13, 223:19–224:8, 228:22–229:9.

18.      The Court finds Ms. Frederiksen-Cross's analysis unreliable for determining whether the two files are substantially similar, and instead credits the analysis of Rimini's expert, Professor Owen Astrachan. To begin with, some supposed idiosyncrasies (such as "orphan asterisks") on which Ms. Frederiksen-Cross relied were a product of her printing the file with the wrong font. *E.g.*, Tr. 936:5–938:25. She "retract[ed]" her opinion when confronted with the error. Tr. 1380:7–11. This basic error alone casts doubt on her analyses.

19.      Ms. Frederiksen-Cross admitted that her matching analysis was done "before

any filtering to apply any constraints." Tr. 514:12–23. Professor Astrachan convincingly demonstrated that other similarities relied on by Ms. Frederiksen-Cross, such as using the word "FETCH" to perform a fetch command; calling a cursor "CURSOR"; using the abbreviation "YTD" for year-to-date; using commands such as "END-IF"; using header sections and divisions such as "AA000-Main"; using slashes versus asterisks to begin what is known as a "flower box"; and other similarities were required or heavily constrained by Oracle's APIs, COBOL syntax, and programming conventions. Tr. 946:5–961:2, 967:10–968:21, 978:11–983:20, 1454:8–1455:3, 1462:12–1463:4; DTX-500. Accordingly, they are not protectable, expressive elements, and copying them would not violate the Injunction, *even if* copying were proven. *E.g.*, Tr. 961:3–978:10, 983:21–984:7, 990:12–992:20. Moreover, Oracle presented no direct evidence of copying, and the conventional nature of these items suggests independent creation, not copying.

20.     The Rimini file serves a different purpose than the Oracle file, including by adding multiple functionalities not in Oracle's file. Tr. 939:1–941:16; DDX-510. Ms. Frederiksen-Cross conceded differences in functionality between the files. Tr. 206:5–12.

21.     Ms. Frederiksen-Cross also failed to quantify how many "matching" lines she contended were protectable. Professor Astrachan testified that none were, but that in any event, the lines Ms. Frederiksen-Cross claimed to be possibly or "partially creative" constituted "less than a percent" of Oracle's file, which is one of tens of thousands of files in PeopleSoft. Tr. 977:18–25, 1402:8–9, 1417:13–21. Nor did Ms. Frederiksen-Cross opine that the matching portions were "qualitatively important." Tr. 978:8–10.

22.     Based on this testimony, the Court cannot find by clear and convincing evidence that any portion of Rimini's file was copied from Oracle's file, as the similarities are likely due to the fact that portions of both programs load data from the same database, as constrained by programming syntax, the API, and conventions. Even if a portion of Oracle's file was copied, the Court cannot find that the code was protectable, for the same reasons.

### (ii)     Conclusion of Law on Issue 5

23.     Under the proper analytic dissection analysis as performed by Professor

Astrachan, the Court holds that RSPCMPAY.cbl does not contain "protected Oracle expression that Rimini is prohibited from having on its systems." OSC at 22. The alleged similarities are not protectable expression, so any "copying" is not unlawful and does not violate the Injunction. *See Apple Comput., Inc. v. Microsoft Corp.*, 35 F.3d 1435, 1443 (9th Cir. 1994) ("[O]nly those elements of a work that are protectable and used without the [copyright holder's] permission can be compared when it comes to the ultimate question of illicit copying."); OSC at 21, 23.

24.     The Court alternatively excludes Ms. Frederiksen-Cross's opinion as deficient under Federal Rule 702 because: (i) her side-by-side comparison of RSPCMPAY.cbl and PSPTARRY.cbl is insufficient and unreliable, as other courts have recognized (*see DropzoneMS, LLC v. Cockayne*, 2019 WL 7630788, at *6–8 (D. Or. Sept. 12, 2019)); (ii) she admitted that elements of her analysis she first deemed "important" were based on error (Tr. 1380:7–11); and (iii) her opinions are based on legal error. Indeed, during its closing argument, Oracle wrongly argued that "analytic dissection" is not required to prove a violation of the Injunction. Tr. 1475:7–12; *see Apple*, 35 F.3d at 1443 (analytic dissection is required because only similarities in *protected* expression are legally relevant). Further, Ms. Frederiksen-Cross's assertion that she performed analytic dissection is not credible or supported, and, in any event, Professor Astrachan's contrary and credible opinions on this highly technical question preclude a finding of contempt. *See Am. Tech. Ceramics Corp. v. Presidio Components, Inc.*, 414 F. Supp. 3d 304, 311 (E.D.N.Y. 2019) (Where there are "ample, credible, and competing [expert] opinions on the [relevant] question," the moving party has not established its case "by clear and convincing[] evidence[.]").[2]

25.     Separately, even if any "matching" code in the files was protected (which Oracle has failed to establish), the Injunction does not prohibit *de minimis* copying. The fact that "there is some copying" is not the relevant inquiry because "[s]ome copying is permitted." *Newton v. Diamond*, 388 F.3d 1189, 1193 (9th Cir. 2004); *Ringgold v. Black Ent. Television, Inc.*, 126

---

[2] Even if analytic dissection were not required, as Oracle contends, the Court would not hold Rimini in contempt. There was no "fair warning" to Rimini that *unprotected* expression on its systems would violate an Injunction that only covers unlawful conduct adjudicated as infringing Oracle's copyrights. *Norton*, 717 F.2d at 774.

Gibson, Dunn &
Crutcher LLP

1   F.3d 70, 75 (2d Cir. 1997).  Here any copying was "meager and fragmentary" (*Newton*, 388

2   F.3d at 1193), particularly in light of the comparison between the few lines at issue in the Rimini

3   file and the entire copyrighted work (PeopleSoft) or the particular Oracle file (PSPTARRY.cbl).

4   **II.   ALLEGED CROSS-USE AND DERIVATIVE WORKS (ISSUES 3, 4, 2, 6, & 10)**

5       26.     Every accusation of cross-use in this contempt proceeding involves Rimini's

6   use of its *own* work product.  Unlike the cross-use claimed in *Rimini I*, there is no allegation

7   that Rimini copied any Oracle code from one client to another.  This Court has issued numerous

8   rulings on cross-use, which, generally speaking, is "using one client's *Oracle software*

9   environment to develop and test updates and modifications for the benefit of another

10  licensee." OSC at 10–11; *see also id.* at 16, 19 (emphasis added).  Cross-use requires

11  reproduction of *Oracle's* protected expression; the use and reproduction of Rimini's work

12  product is not cross-use.  *See Rimini II*, ECF 1253 at 86–87.  Further, "cross-use must entail the

13  use of one customer's software to *directly* support another customer." *Id.* (emphasis added);

14  OSC at 19 (indirect "benefits" not sufficient for cross-use).  The Court has held that Rimini is

15  permitted to "create the same update file" for more than one client (*Rimini II*, ECF 1253 at 87);

16  "memorize" work product and "replicate the work" for more than one client (*id.*); re-use work

17  product such as "test cases" (OSC at 19); "develop updates faster" and perform "less testing"

18  (*id.* at 16); and "use the same tests to ensure functionality of an update" for more than one client

19  (*id.* at 19).  Where Rimini distributes an update to clients and performs development or testing

20  in that client's environment, no cross-use occurs.  *See id.* at 17–18.  Further, while Rimini's

21  testing of an update in a client's environment is evidence supporting *lack of* cross-use, "Rimini

22  is not *required* to test updates and if Rimini chooses to send a client an untested update,

23  developed in that client's environment, the Court cannot find that conduct violates the

24  injunction." *Id.* at 26; *see also id.* at 19.  Rimini may choose to "not test the update because it

25  had previously been tested and worked for other clients." *Id.* at 26.  Cross-use does not prohibit

26  Rimini from re-using its know-how gained from developing and testing an update for one client

27  for another client. *Rimini II*, ECF 1253 at 87.

28       27.     Oracle's contempt theory would dramatically expand cross-use beyond the

Court's rulings and the requirements of the Injunction. Ms. Frederiksen-Cross testified that there are "allowable form[s] of cross-use" and impermissible forms of cross-use, but could not articulate a clear dividing line between the two. Tr. 441:10–442:23, 461:24–462:5. She also contradicted herself as to the requirements for cross-use, denying there is an "intent" element to cross-use, while also testifying that cross-use depends on Rimini's intent. Tr. 491:7–21. Ms. Frederiksen-Cross further testified that her opinions were based on her understanding that Rimini engineers can only re-use "general knowledge" and general "know-how," but not "specific knowledge" or "specific know-how"—concepts not in this Court's rulings or the Injunction. *See* Tr. 454:20–457:7, 460:24–462:5, 467:23–468:13. Oracle's position would lead to absurd results, as was evident when Ms. Frederiksen-Cross could not explain how a Rimini engineer could *ever* lawfully implement a fix for one client after knowing it worked for another client. Tr. 460:24–463:15, 1002:15–25. While Rimini's engineers might not have "to get a lobotomy to continue to work," Tr. 461:6–8, it is unclear how they could do their jobs under Oracle's expansive and elastic approach to cross-use. That is why this Court previously rejected the approach. *Rimini II*, ECF 1253 at 87.

28.     Oracle's theory of "derivative works" is also contrary to the law and common sense. Oracle contends that entirely Rimini-written work product—*i.e.*, Rimini-written files standing alone on Rimini's systems—are derivative works. When asked whether something can be a derivative work "regardless of whether it substantially incorporates protected expression of the original work," Ms. Frederiksen-Cross answered "yes," and confirmed that was "the definition [she] applied in this case." Tr. 501:8–16. That is contrary to Ninth Circuit law: a Rimini work is derivative *only if* it "substantially incorporate[s] protected material from" Oracle's work. *Micro Star v. Formgen Inc.*, 154 F.3d 1107, 1110 (9th Cir. 1998).

29.     Applying the proper standards, as explained below, the Court finds that Oracle has failed to meet its burden on the Issues related to cross-use and derivative works.

## A.     Issue 3:  Johnson Controls ("JHN") Update

30.     This Court asked the parties to address whether a Rimini "W-2 update was tested in [COE's environment] for Rimini Client JHN and . . . was not tested in JHN's environment[,]"

1   and if so, whether that testing "constitutes unlawful cross-use in violation of the permanent
2   injunction." OSC at 19–20.  Oracle has failed to meet its burden.

3   **(i)    Findings of Fact on Issue 3**

4   31.    In late January 2019, Rimini client JHN reported an issue printing federal W-2
5   forms, in which the text in Boxes 14 and 17 was cut off.  Tr. 634:14–24, 996:2–9; DTX-306.
6   Rimini believed this bug "potentially affected many clients" using the form because it recently
7   updated W-2 printing functionality for many clients and appeared to have introduced the bug.
8   Tr. 635:14–636:8, 639:22–640:17, 641:20–644:17, 996:25–999:4; DTX-302 at 2.

9   32.    Rimini's bug fix involved two steps.  First, Rimini edited a non-Oracle Adobe
10  PDF template of the W-2 form (DTX-306) to reduce the font size, and delivered it to JHN.  Tr.
11  638:4–14.  This involved no changes to any Oracle software.  Tr. 638:13–14.  Ms. Frederiksen-
12  Cross did not opine that this was unlawful cross-use.  *See* Tr. 279:10–12, 440:3–441:16.

13  33.    Second, fixing Box 17 required changing a print parameter in the client's
14  PeopleSoft environment by typing the value "B999999.99" into the "Print Format" box.  Tr.
15  638:18–639:2; DTX-302.  Rimini tested the solution in COE's environment because COE was
16  potentially impacted by the bug, being a U.S. client that received U.S. federal form updates
17  under its contract with Rimini.  Tr. 639:22–640:17; DTX-043 at 20.  Oracle did not contest that
18  COE was affected by the issue.  Tr. 433:24–434:1, 434:20–22, 437:21–24.  When asked "[i]f
19  [COE] and [JHN] were both affected by the W-2 issue, do you have an opinion on which client
20  Rimini is required to start its work in," Ms. Frederiksen-Cross answered "[n]o," and agreed that
21  "[t]hey can start in either one."  Tr. 434:23–435:4, 466:10–13.  Consistent with this testimony,
22  and the testimony of James Benge, Rimini's then-Vice-President of PeopleSoft Development,
23  and Professor Astrachan, the Court finds that Rimini's testing of this solution in COE's
24  environment used COE's software to support COE, and is therefore not cross-use.  Tr. 639:22–
25  640:17, 644:18–645:4, 996:10–1002:2; DTX-302.

26  34.    Rimini implemented the bug fix for JHN by initiating a phone call with JHN,
27  during which JHN was instructed to enter "B999999.99," and it was tested and confirmed to
28  work.  Tr. 640:22–641:19.  This use of Rimini's knowledge was not cross-use, nor is the use of

Gibson, Dunn &
Crutcher LLP

JHN's environment to implement and test the update for JHN. Tr. 1001:3–17, 1002:15–25. Rimini delivered the fix to other clients "the following tax year" because, as it turned out, "although this was a bug that needed to be addressed for [Rimini's] clients, the symptoms" appeared only when there was a certain data configuration in the client's environment, as JHN had experienced. Tr. 641:20–642:4.

35.     Ms. Frederiksen-Cross opined that Rimini's conduct amounted to cross-use because its engineer used "specific knowledge" gained about the print parameter box working in COE's environment and provided that same fix to JHN. Tr. 454:16–455:2, 456:1–457:7, 467:23–468:13. But as the Court has previously held, Rimini is free to re-use its own knowledge, including to "memorize and replicate" its work. *Rimini II*, ECF No. 1253 at 87. As Professor Astrachan testified, this was a clear instance of Rimini's re-use of its own knowledge. Tr. 1000:14–1001:2, 1002:15–25.

36.     This issue also illustrates the flaws in Oracle's attempt to expand the concept of cross-use. Ms. Frederiksen-Cross could not explain how, under her "specific knowledge" theory of cross-use, a Rimini engineer could ever implement this "B999999.99" fix for any clients. Tr. 456:1–13. Indeed, she testified that it would be impermissible under her theory for a Rimini engineer to tell his colleague that typing "B999999.99" into the box would fix the bug. Tr. 456:1–13, 1002:15–25. The Injunction does not prohibit such sharing of knowledge.

37.     Oracle has not proved cross-use by clear and convincing evidence.

**(ii)     Conclusions of Law on Issue 3**

38.     Applying the proper understanding of what constitutes unlawful cross-use (*supra* ¶¶ 26–27), Issue 3 is a clear case of the legitimate use of know-how that does not violate the Injunction. Nor, in any event, could the Court fairly hold Rimini in contempt for instances that Ms. Frederiksen-Cross herself repeatedly described as "corner case[s]" and "on the bump" cases. *E.g.*, Tr. 424:19, 444:3–15, 445:18–25; *see Norton*, 717 F.2d at 774.

**B.     Issue 4:  Rsi940.sqr Update to Spherion and Smead**

39.     Issue 4 concerns whether Rimini committed cross-use for its rsi940a.sqr update for clients Spherion and Smead. OSC at 19–20. Oracle has failed to meet its burden.

Gibson, Dunn & Crutcher LLP

1

(i)      **Findings of Fact on Issue 4**

2

40.      Issue 4 concerns an update (HCM200049) to clients' software to accommodate

3  printing onto IRS tax Form 940, Schedule A (DTX-421), which changed slightly in tax year

4  2018.  Tr. 645:21–25, 646:8–23.  Years prior to the Injunction, Rimini engineers authored a file

5  called "rsi940a.sqr," which contains no Oracle code or protected expression.  Tr. 646:4–7,

6  649:15–20, 1003:25–1004:10; DTX-419.   Ms. Frederiksen-Cross offered no opinion that

7  rsi940a.sqr is derivative of any Oracle work.  Tr. 474:12–16, 477:7–12, 477:22–478:1.  Rimini

8  updates this file (and related files) approximately annually as the form changes.  Tr. 646:8–18.

9

41.      As reflected in Rimini's development database and other records, Rimini

10  contemplated as early as July 2018 that an update to address tax year 2018's form would be

11  delivered to all U.S. clients that had not previously received a particular Oracle package, called

12  "2018-B."  DTX-414 at 1; DTX-401 at 2, 7; Tr. 652:20–653:11, 654:22–655:7.

13

42.      In January 2019, Rimini's client Spherion noted that it had not yet received

14  Rimini's update.  Tr. 656:9–23.  At that point, a Rimini business analyst adjusted the scope of

15  the update from "U.S." to "SPH" for Spherion.  DTX-401 at 4.  Contrary to Oracle's

16  speculation, the change in "scope" did not mean that Rimini believed that *only* Spherion needed

17  the update.  Rimini documents showed that engineers believed, up until January 28, 2019, that

18  the update needed to go to all U.S. clients (minus those with Oracle package 2018-B).  Tr.

19  652:7–653:11, 654:9–656:5, 668:14–670:25, 1005:13–1008:4; DTX-401 at 3–4, 7; DTX-407

20  at 5 (update contemplated for all U.S. clients minus 2018-B as of morning of January 28), 1;

21  DTX-014 at 1; DTX-412 at 2–3, 5.  Mr. Benge also confirmed that changes to "scope" are

22  merely a "point in time" and do not indicate that other clients are not scheduled for or do not

23  need the update.  Tr. 643:8–24, 656:3–657:7, 657:19–658:4, 672:1–5.

24

43.      Rimini engineers began development of this update in COE's environment, on

25  or about January 24 or 25, 2019.  Tr. 658:9–10; DTX-412 at 2–3.  COE was a client slated to

26  receive this update because COE had "not received Oracle's 2018B update," was a U.S. client

27  that contracted to receive federal tax form updates (DTX-043 at 20), and in fact had received

28  "prior rsi940 updates" "every year" in the past.  Tr. 658:9–15.  Rimini's work in COE's

environment was to support COE, which needed the update.  Tr. 659:1–8, 1010:23–1011:21.

44.   Rimini then used its CreateUpdateFolders and TransferFiles tools to send the Rimini-written file, rsi940a.sqr, and other .gif update files not containing any Oracle copyrighted expression from Rimini's systems to the development environments of all U.S. clients that had not received Oracle package 2018-B, and to perform development in those clients' environments by assembling the necessary folders to house Rimini's files.  Tr. 659:14–664:17, 1009:24–1010:22; DTX-412 at 2.  These steps are not cross-use as they do not involve the reproduction of any Oracle software.  All files involved are entirely Rimini work product.

45.   Mr. Benge and Brenda Davenport, Rimini's Global Vice-President of Quality Assurance, testified that informal delivery occurred for Spherion and Smead, and that their updates were tested in their respective environments.  Tr. 663:7–667:16, 878:9–884:12, 886:8–22; DTX-400; DTX-402; DTX-403; DTX-405; DTX-406; ECF No. 1527-4.  Rimini made formal delivery to Smead later (which included further testing), but did not do so for Spherion, because Spherion ceased Rimini support before formal delivery.  Tr. 667:17–21.[3]

46.   On January 28, 2019, *after* development of this update, Rimini's business analysts determined that Form 940, that year, would only be needed for those clients doing business in the Virgin Islands, and thus decided that the update would not be delivered to the originally contemplated clients after all.  Tr. 668:6–20, 670:13–25; DTX-407 at 1, 5; DTX-412 at 1–3.  The Court finds that this later decision does not change the fact that, at the time Rimini used COE's environment to develop this update for COE, Rimini intended for COE to receive the update.  Tr. 1011:7–1012:11, 672:1–14; DTX-407 at 4–5; DTX-412 at 2–3.

47.   After the Court excluded any opinion that rsia940.sqr was a derivative work because no such opinion was properly disclosed, Tr. 257:10–260:19, Ms. Frederiksen-Cross opined that Rimini's work in COE's environment violated the Injunction because that work

---

[3] Formal delivery is the normal process in which an update is tested in both the development environment and QA environment, packaged with explanatory documentation, and delivered to the client via pickup from the QA environment.  Tr. 633:4–7, 656:17–23.  Informal delivery is an "early release of something that [Rimini is] still working on" (Tr. 633:8–20), before testing in the QA environment, and may occur when a client initiates a request because of an exigency.  Rimini carries through with a formal delivery for that client, however, including the full battery of testing.  Tr. 633:21–634:1.

created a random access memory ("RAM") copy of COE's software, and this RAM copy was allegedly created to benefit Spherion and Smead.  *E.g.*, Tr. 269:13–270:2, 483:13–24.  The Court disagrees.  Ms. Frederiksen-Cross offered no opinion that COE was not impacted by the update, and the evidence indicates that any RAM copies created in COE's environment were to support COE, which was slated to receive the update.

48.     Oracle insinuated Rimini may have known in late 2018 that only clients doing business in the Virgin Islands (not COE) would require this update.  Tr. 1492:24–1493:3.  This is speculative, and not consistent with Rimini's contemporaneous documentation, which indicated that until January 28, 2019, the update was slated for all U.S. clients that had not received Oracle package 2018-B.  *Supra* ¶ 42.  Oracle introduced an exhibit (OREX_1351) purporting to be an IRS document stating that in 2018, Schedule A to Form 940 would only provide a credit reduction for the Virgin Islands.  Tr. 790:13–23, 794:18–795:4.  This document was produced for the first time during the hearing—by Oracle, not by Rimini—and there is no evidence that Rimini was aware of it, or otherwise believed prior to January 28, 2019 that COE would not receive this update.

49.     The Court finds that Rimini had a reasonable, good faith belief that COE needed this update.  When Rimini developed the fix in COE's environment, it was for COE.  When it further developed and tested the fix in the environments of Spherion and Smead, that use of their environments was for Spherion and Smead, respectively.

**(ii)     Conclusions of Law on Issue 4**

50.     Ms. Frederiksen-Cross's opinion that cross-use occurred because Rimini made a "rote recreation" of its rsi940a.sqr file (Tr. 483:13–24) contradicts this Court's order that it is not "cross-use for a Rimini engineer to 'memorize and replicate the work' as Oracle claims."  *Rimini II*, ECF No. 1253 at 87:8–9.  The Court also rejects Oracle's arguments that supposed gaps in evidence as to whether Rimini tested these updates before informal delivery render the updates cross-use, because Rimini tested the updates, the Court already held that "Rimini is not required to test updates" (OSC at 28), and the absence of evidence does not prove contempt.

## C.      Issue 2:  Update for Matheson Trucking

51.      This Court previously found that Rimini's update HCM200049 for Matheson Trucking ("MAT"), "without any indication it was developed or tested in that client's environments," violated the Injunction.  OSC at 26–27.  The Court finds that Oracle has failed to meet its burden to show that this conduct was contumacious.

### (i)      Findings of Fact on Issue 2

52.      The update for MAT involved the same annual update to align printing for the new IRS form (*see* DTX_0421 at 5) and the same rsi940a.sqr file as in Issue 4.  The Court therefore incorporates the relevant factual findings from Issue 4.  *Supra* ¶¶ 40–49.

53.      MAT was slated to receive this update because it had not yet received update 2018-B from Oracle.  Tr. 729:18–24.  MAT opened a support ticket on January 25, 2019, while Rimini was already developing the update for MAT.  DTX-204; Tr. 728:25–731:2.

54.      Relying on one email, Ms. Frederiksen-Cross testified that delivery of the update to MAT *appeared* to occur without development or testing in MAT's environment (Tr. 275:3–277:8, 564:3–8), but conceded that she had no definitive opinion on the issue (Tr. 565:10–14, 564:18).  Her assumptions were contradicted by the testimony of Mr. Benge, who was a participant in the email correspondence.  Tr. 734:1–6, 736:14–737:2; OREX_022 at 3.

55.      The Court finds that Rimini performed development work for MAT in its environment, including creating update folder utilities and transferring Rimini-created files to the development environment.  The Court also finds that Rimini tested the update for MAT in MAT's environments.  Tr. 731:3–11, 733:23–734:13, 736:14–737:2; OREX_022 at 3.  The update was delivered informally through pickup in MAT's own development environment.  Tr. 737:13–14, 875:21–878:8; OREX_084; DTX-201; DTX-205.  After informal delivery, further testing was completed in MAT's environment.  Tr. 739:12–17, 884:13–885:9; DTX-200; DTX-205; ECF No. 1527-4 at 6.  This Court also credits Mr. Benge's testimony that Rimini believed in good faith that it was not violating the Injunction with respect to this update given that the update involved only Rimini-written work product and because development and testing occurred for MAT, in MAT's environment.  Tr. 739:18–23, 735:12–737:21.

1

### (ii) Conclusions of Law on Issue 2

2      56.     Oracle has failed to meet its burden to show that any violation of the Injunction

3  as to MAT was contumacious, not in substantial compliance, and not based on a good faith and

4  reasonable interpretation of the Injunction.

5  **D.     Issue 6:  1099 Update for Easter Seals**

6      57.     Oracle accused an IRS Form 1099 update that Rimini "emailed to Easter Seals

7  in 2018" of being a derivative work.  OSC at 24.  Oracle has failed to meet its burden.

8      ### (i) Findings of Fact on Issue 6

9      58.     Oracle's allegations focused on two Rimini-created files:  "rsi1099m.sqr" and

10  "rsi1099i.sqr," which print IRS Forms 1099-MISC and 1099-INT, respectively.  Tr. 673:21–

11  675:19, 1015:8–13; DDX-307; DDX-562–67.   As Mr. Benge testified, modification logs

12  demonstrated that the files were updated in February and March 2018, "about nine months

13  before the Injunction."  Tr. 676:25–678:21; DTX-619; DTX-620.  The technical specification

14  documents  (DTX-603;  DTX-602)  showed  the  same,  and  further  demonstrated  that

15  "development was completed in the Easter Seals environment."  Tr. 682:1–4, 686:9–12; DTX-

16  603 at 2.[4]  Documents also demonstrated "unit testing … performed in the EAS environment."

17  Tr. 686:17–19.  Ms. Davenport testified, consistent with records from Rimini's Spira system,

18  that her QA team tested the update for Easter Seals in Easter Seals's environment.  Tr. 849:25–

19  850:1, 862:17–865:18; DTX-605; DTX-606.  The Court finds that the files were developed and

20  tested in Easter Seals's environment for Easter Seals.

21      59.     "All of" the files in this update "were written by Rimini," and contained no

22  Oracle expression or code.  Tr. 675:12–19.  Ms. Frederiksen-Cross did not contend otherwise,

23  conceding that she performed no substantial similarity analysis on the files.  Tr. 506:18–507:2,

24  508:2–10.  Nor were any files "created using any Oracle tools"; "[t]hey were created from

25  scratch using a standard text editor."  Tr. 675:20–25.  Nevertheless, Oracle contended through

26  Ms. Frederiksen-Cross that the rsi1099i.sqr and rsi1099m.sqr files are "derivative works" of

27  PeopleSoft because they were designed to operate solely with PeopleSoft and contained a

28  ───────────────

[4]  One technical specification had a typographical error indicating a last updated date of March 2017, instead of March 2018, which Mr. Benge corrected in his testimony.  Tr. 685:24–686:8.

Gibson, Dunn &
Crutcher LLP

command known as "#include" that references an Oracle PeopleSoft file when executed in a client's environment. *E.g.*, Tr. 1406:5–1407:2.

60.     Professor Astrachan testified, however, that #include only operates "on the client's PeopleSoft environment." Tr. 1019:19–24. A common command in software (Tr. 1021:3–4, 1023:2–13), #include does not contain, incorporate, or reproduce any Oracle expression (protected or otherwise) unless and until it is run *on the client's environment*. Tr. 1021:17–1022:11, 511:9–13, 512:1–25. The Rimini update sent to Easter Seals, including rsi1099i.sqr and rsi1099m.sqr, accordingly contains no Oracle copyrighted expression. Ms. Frederiksen-Cross never rebutted Professor Astrachan's testimony that the #include command was not itself protected expression (Tr. 1407:3–13), and Oracle did not otherwise identify any protected expression contained in Rimini's update. To the extent applying Rimini's update in Easter Seals's environment, or running it there, causes *Easter Seals's environment* to become a derivative work, that does not violate the Injunction because that environment is (a) not on Rimini's systems and (b) not reproduced or used for multiple clients. *See* Inj. ¶¶ 4–6.

**(ii)     Conclusions of Law on Issue 6**

61.     The Easter Seals update, standing alone, is not a derivative work because it does not substantially incorporate protected material from Oracle's work. *See Micro Star*, 154 F.3d at 1110. Oracle's argument that the update is derivative simply because it is designed to operate with PeopleSoft has no legal support.

62.     Oracle's contention that the Easter Seals license prohibits Rimini from creating derivative works misreads the license's plain terms. Section 1.1(c) explicitly grants the licensee the right to "create and use derivative works," and Sections 1.1(b) and 14 explicitly authorize the licensee to "provide with a right to access the Software" a "[d]esignate," including a third-party support provider, "to facilitate Licensee's use of the Software." DTX-608. Absent express language to the contrary, a designate stands in the shoes of the licensee in regards to the rights granted under the license. *See, e.g., Automation By Design, Inc. v. Raybestos Prods. Co.*, 463 F.3d 749, 758 (7th Cir. 2006); *Storage Tech. Corp. v. Custom Hardware Eng'g & Consulting, Inc.*, 421 F.3d 1307, 1316–17 (Fed. Cir. 2005). Further, to the extent Oracle argues

that designates may not modify the software, in the client's systems, to create derivative works, that reading would necessarily preclude third parties from providing competing support services, an obvious example of copyright misuse.  *See*, *e.g.*, *Apple, Inc. v. Psystar Corp.*, 658 F.3d 1150, 1159 (9th Cir. 2011); Oracle Answering Brief at 30, 879 F.3d 948 (2018) (Nos. 16-16832, 16-16905) Dkt. 50 (Oracle agreeing that reading its licenses to "preclude third parties from … providing competing support services" would constitute "copyright misuse.").

63.    Oracle also focuses on Section 2.1(k)'s restriction that a licensee shall not "use the Software to create new applications, modules, products, or services," but ignores the prefatory clause: "*Except as expressly provided herein*."  DTX-608, § 2.1(k) (emphasis added). Section 1.1 expressly provides for the creation of derivative works.

64.    Oracle also erroneously emphasizes Section 4.1's language that the licensee "has no right to commercialize or transfer" derivative works.  DTX-608, § 4.1.  As explained, the derivative work in this case consists of the modified PeopleSoft environment on Easter Seals's systems, but that modified environment was never commercialized or transferred.

65.    To the extent Oracle suggests that the license's "commercialized" language either prohibits third parties from providing software updates they write themselves that contain no Oracle protected expression or prohibits anyone but Oracle from writing such updates, the Court rejects such a construction as inconsistent with its prior orders.  Such an expansive interpretation would also raise serious questions regarding copyright misuse.  *Oracle*, 879 F.3d at 957–58; *Alcatel USA Inc. v. DGI Techs., Inc.*, 166 F.3d 772, 792 (5th Cir. 1999).

E.    **Issue 10:  Update for Rockefeller Group and Home Shopping Network**

66.    The Court asked the parties to address whether the "update HCM2000105, delivered to clients Rockefeller Group International [RKF] and [HSP] … was sent directly to these clients or developed and tested in their own environments."  OSC at 27.  The Court finds that Oracle has failed to meet its burden on this issue.

(i)    **Findings of Fact on Issue 10**

67.    Update HCM2000105 created new functionality to handle "[q]uarterly tax reporting for certain tax jurisdictions, for example, Oregon transit tax."  Tr. 688:6–8.  One

RIMINI STREET, INC.'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW
CASE NO. 2:10-CV-00106-LRH-VCF

Gibson, Dunn &
Crutcher LLP

aspect of the update (focused on by Oracle) was a newly created Rimini file, rsiqtrtx.sqr.  The file was written on Rimini's systems, by Rimini engineers, and consists solely of Rimini work product.  Tr. 689:25–690:16, 691:15–23, 692:8–14.  There is no dispute that the file contains no protected Oracle expression.  Tr. 486:15–18, 691:15–23, 1026:6–16, 1028:20–25.

68.     Rimini's "Dev Instructions" (OREX_053), describe the 13 steps involved in developing this update for each client.  Mr. Benge testified that these steps were performed for both RKF and HSP, in their environments.  Tr. 692:21–708:21, 829:4–17.  After development, the QA team tested the update in RKF and HSP's environments, as testified by Ms. Davenport with supporting documentary evidence.  Tr. 708:16–21, 868:11–872:3; DTX-1004; DTX-1009; DTX-1013.

69.     This testimony was credible and unrebutted.  The Court therefore finds that development and testing occurred for this update in the separate environments of RKF and HSP.

70.     It is undisputed that this update was originally developed for a first client in September 2018 (Tr. 694:12–18, 695:13–16), and that it was later developed for RKF and HSP, which were not clients in September 2018.  Ms. Frederiksen-Cross opined that this constituted cross-use, because the creation of the file for the first client necessarily resulted in a RAM copy of the client's software (before the Injunction took effect), and that the RAM copy eventually and "retroactively" "benefit[ed]" RKF and HSP *a year later* when the update was developed for them, thereby rendering the initial RAM copy unlawful cross-use.  Tr. 491:22–494:19.

71.     The Court disagrees, and finds that the development done for the first client was for that client, and the subsequent development and testing done for RKF and HSP in their respective environments was to support RKF and HSP.  Rimini's sending of its own work product, rsiqtrtx.sqr, to RKF's and HSP's development environments for further development does not reproduce any Oracle software and is not cross-use.  Tr. 1026:6–1027:7.

**(ii)    Conclusions of Law on Issue 10**

72.     Rsiqtrtx.sqr is not a derivative work because it does not substantially incorporate any protected material from Oracle's works.  *See Micro Star*, 154 F.3d at 1110.  Nor was Rimini's development of HCM200105 for RKF and HSP cross-use, because no Oracle

expression was copied between clients, and the updates were developed and tested separately in each client's environment. The Court rejects Oracle's overbroad cross-use definition that would render an ephemeral RAM copy in one client's environment, made while working for that client, a copy "for the benefit of" other, future clients. *See supra* ¶¶ 47, 70.[5]

73.     For the reasons given as to Issues 3 and 4, the Court rejects Ms. Frederiksen-Cross's definition of cross-use. *Supra* ¶¶ 35–38, 50. Moreover, despite not having done any substantial similarity analysis of the contents of rsiqtrtx.sqr, Ms. Frederiksen-Cross opined that such one-code-for-all files are "derivative works" because they "depend on the PeopleSoft or [J.D. Edwards] environment for their operations, and serve as extensions or modifications to those environments." Tr. 291:3–11. Again, her basis for this was the presence of #include commands in the file. DTX_1008 at 2. The Court further rejects Ms. Frederiksen-Cross's opinions on derivative works for the reasons stated as to Issue 6. *Supra* ¶¶ 61–65.

### III.     "J.D. EDWARDS SOFTWARE SOURCE CODE" (ISSUES 7 & 9)

**A.     Issue 7: Whether Rimini Can Copy Open J.D. Edwards Code**

74.     The parties dispute the meaning of "J.D. Edwards software source code" in Paragraph 8 of the Injunction. OSC at 25. Oracle contends it encompasses all J.D. Edwards code and that Rimini violates the Injunction any time it makes any copy (including RAM copies) of any code, including by simply displaying (let alone modifying) such code. That position contradicts Oracle's 30(b)(6) testimony, the license agreements, widespread industry practice, and prior rulings of this Court and the Ninth Circuit, which indicate that third-party providers may copy open code. Oracle's position also would effectively prohibit all meaningful third-party support of J.D. Edwards software, contrary to this Court's ruling that "a complete ban on Rimini support services … was neither the intention nor the purpose of the permanent injunction and such a reading would be outside its scope." *Id.* at 26. The Court agrees with Rimini that the prohibition on copying "J.D. Edwards software source code" refers to "closed

---

[5]  Even if this conduct were prohibited, Rimini could not have been on notice that the Injunction retroactively makes ephemeral and no-longer-existing RAM copies unlawful years in the future when new clients legitimately need the same update. *See Norton*, 717 F.2d at 774; *PHH Corp. v. CFPB*, 839 F.3d 1, 46 (D.C. Cir. 2016) (due process limits on retroactivity).

Gibson, Dunn &
Crutcher LLP

code"—the code shipped to licensees in compiled form, which the license (on which the Injunction was patterned) prohibits licensees and third parties from decompiling or copying.

### (i)   Findings of Fact on Issue 7

75.   The parties do not dispute that J.D. Edwards contains two types of code—(1) easily accessible human readable code, and (2) not readily accessible compiled code— regardless of the labels attached to them. Tr. 520:11–19, 521:22–522:12. For ease of reference, the Court will use the terms "open code" and "closed code." Oracle argues that Paragraph 8 prohibits Rimini from copying both closed and open code; Rimini argues it prohibits copying only closed code. The Court finds that the facts support Rimini's position for several reasons.

76.   First, as explained by Rimini's expert Stephen Lanchak, included in Oracle's definition of "J.D. Edwards software source code" is the open code that licensees and their support providers must copy to implement, maintain, and support the product. Tr. 1280:2– 1282:9. J.D. Edwards is designed for the open code to be modified. *Id.*; *see also* Tr. 1128:24– 1129:20, 1282:10–1283:12. When the software is first licensed, the open code must be configured (and thus copied) to meet a licensee's business requirements; the product cannot be used straight out of the box. Tr. 1284:17–1285:6. As business needs change, the open code must be further configured. Tr. 1132:8–1133:1. 1280:1–1281:12, 1292:4–1293:16.

77.   Second, J.D. Edwards and Oracle have for decades actively encouraged the industry to copy open code, and the ability to copy that code to create updates and configuration changes has been crucial to J.D. Edwards's success. Tr. 1133:2–19, 1276:11–1277:2, 1294:23– 1295:25, 1297:25–1298:24, 1314:3–1316:2. Indeed, J.D. Edwards and Oracle provide licensees with tools that are *designed* to modify and change the open code (Object Management Workbench). Tr. 1129:10–20 (product "comes bundled" with these tools), 1294:23–1295:25. Ms. Frederiksen-Cross, assuming that "J.D. Edwards software source code" encompasses open code, opined that using these Oracle-provided tools necessarily violates the Injunction. Tr. 320:17–324:11, 1296:1–12. This is illogical, as Oracle provides these tools to licensees and encourages their use. Tr. 1296:9–20, 1298:14–24.

78.   Third, unrebutted evidence demonstrated that an entire industry of third-party

support providers, systems integrators, and application support maintenance firms has lawfully copied and modified J.D. Edwards open code for decades. Tr. 1139:21–1140:12, 1148:3–1149:6, 1280:9–1282:9. Both parties' experts testified that they personally modified open code as third-party consultants. Tr. 523:25–527:25, 1294:19–22, 1272:3–10. Over the decades, Oracle has never once stated that it is unlawful for third parties to modify licensees' open code. Tr. 1276:11–1277:2, 1297:25–1298:24, 1299:4–6. To the contrary, Oracle actively promoted this use. Tr. 1297:25–1298:24, 1314:3–1316:5. Oracle's present position that it is unlawful to modify open code that an industry has been modifying for decades has no factual support and is not persuasive. *See* OSC at 23 (Injunction reaches only "unlawful" conduct).

79. Fourth, Oracle has explicitly approved third-party support providers modifying the open code. Third-party support firm Spinnaker provides "custom code solutions" for customers, including "source code changes," all of which modify open code. DTX-733 ¶ 14; DTX-740 at 162:16–164:23; Tr. 1318:10–1319:23. Oracle audited Spinnaker's processes and approved them, stating they were "respectful of and do not infringe upon Oracle's intellectual property rights and [] do not violate Oracle's license agreements with its clients." DTX-724; Tr. 1319:24–1321:8. Oracle's 30(b)(6) witness testified in 2018 that Spinnaker's "source code changes"—its copying of J.D. Edwards open code—were consistent with Oracle's licenses. DTX-740 at 162:16–164:23; Tr. 1321:9–1322:21.

80. Fifth, Oracle's position would foreclose third-party support of J.D. Edwards. Tr. 1148:3–21, 1149:10–19, 1323:13–25, 1324:10–24. Ms. Frederiksen-Cross opined that under her assumed definition of "source code," Rimini could not even use *Oracle-provided tools* to display, transfer, or modify code. Tr. 537:11–544:20. And she testified that the *only* lawful way for Rimini to provide "support" J.D. Edwards is to physically stand behind a client and direct that client on how to modify and copy the code. Tr. 540:17–541:1, 544:24–545:10. Unrebutted testimony demonstrated that this physical over-the-shoulder support would be impossible and would not meet clients' urgent needs. Tr. 1136:20–1137:20, 1141:4–1142:4, 1150:14–1151:6, 1324:25–1330:2. The Injunction was not intended to prohibit J.D. Edwards support. The Court's jury instruction in *Rimini I* stated that "the J.D. Edwards software license

Gibson, Dunn & Crutcher LLP

agreements authorized a third party like Rimini Street—who was engaged by a licensee to provide support or other services—to copy the J.D. Edwards software application and related documentation onto its computer systems to the extent necessary for the customer's archival needs *and to support the customer's use*." ECF 880 at 27–28 (emphasis added). This instruction makes clear that copying of some code is permissible—as has long been the case in the industry, and as Oracle itself recognizes in providing tools for this purpose.[6]

81.    At the hearing, Oracle relied on definitions of "source code" in the abstract and outside the context of the licenses or the Injunction. *See* Tr. 317:25–319:9. Oracle also pointed to Rimini emails and documents in which the terms "code" and "source code" were used to refer to open code. *See, e.g.*, OREX_017 at 26; OREX_062 at 4; OREX_065. The Court does not find this evidence persuasive as to the meaning of "J.D. Edwards software source code" in Oracle's licenses and the Injunction, including because there is no evidence that these Rimini employees were speaking in terms of the licenses or had ever seen the licenses. And Rimini employees credibly testified that "source code" is a "flexible term" in the industry and requires context. Tr. 1152:14–22. The question before the Court is the meaning of "J.D. Edwards software source code" in the Injunction.

82.    Oracle accused Rimini of "ma[king] up" "in November 2018" the distinction between open and closed code to "derail the injunction." Tr. 42:24–43:4. The evidence disproves this charge. Mr. Lanchak credibly testified to an industry understanding of both the concepts of open and closed code and the terms themselves, noting that they appeared in "industry publications and other documents" predating the Injunction. Tr. 1286:4–1287:10; ORCLRST00639707[7] (industry article from 2013 discussing "open code" and "visible code" in J.D. Edwards context). Rimini witnesses testified to using these terms long before the

---

[6] Ms. Frederiksen-Cross's previously undisclosed opinion that only "roughly two percent" of Rimini's J.D. Edwards support work involved modification to J.D. Edwards code (Tr. 547:6–17) is flawed, resting on a single email about Rimini's support cases (but not tax and regulatory updates) for a single client for only part of a year. Tr. 1151:13–1155:13. It fails to take into account copies that are made even when code is not modified. Tr. 553:2–554:6, 555:6–556:20, 1155:14–1156:21. The Court rejects this undisclosed and unsupported opinion.

[7] Rimini submitted this article with a Rule 103 proffer. Tr. 1439:25–1443:7. The Court considers the evidence because it is highly relevant and admissible; there is no prejudice to Oracle as the article was produced by Oracle from its own files.

Injunction. Tr. 1199:7–17. The labels are not what matters; the parties agree that the two forms of code exist in J.D. Edwards regardless of how they are labeled. The Court finds that Rimini has a good faith and reasonable factual basis for its reading of the Injunction. Tr. 1139:9–20, 1140:19–1141:3, 1202:18–1203:3, 1210:12–1211:18, 1232:11–18.

**(ii)     Conclusions of Law on Issue 7**

83.     Oracle's argument that the Injunction prohibits copying open code is legally incorrect. The Giant Cement License, which served as the basis for the jury instructions in *Rimini I* (and hence, the Injunction), prohibits *decompiling* "source code," a provision which can *only* refer to "closed code," given that closed code is compiled and open code is not. OREX_067 at 1 (¶ 7(i)); Tr. 1306:12–1307:23, 1309:19–1311:17. Interpreting the Injunction to prohibit decompiling and copying of closed code is consistent with the purpose behind the license agreements, as testified to by *both* parties' experts. Tr. 1308:2–24.

84.     In addition, the Giant Cement license explicitly permits third parties to copy open code in supporting licensees. Tr. 1312:3–13. Section 2 of the License Grant gives the licensee "the right to modify the Licensed Products," which necessarily requires copying open code. OREX_067 at 1. Section 1 of the License Restriction further expressly permits "independent contractors" and "vendors" of the licensee to work on the licensee's behalf. *Id.* And Section 7(iii) of the License Restriction expressly permits licensees to permit third parties to "*copy* the Documentation *or Software* … to the extent necessary for [the licensee's] archival needs *and to support*" the licensee. *Id.* (emphases added); *see* Tr. 1307:24–1314:2. Of course, a third party cannot "copy" "Software" "to support" the licensee without copying the open code.

85.     For its position, Oracle relies on a single provision—Section 3 of the License Restriction—which provides: "For any access to the Software other than by an employee of [the licensee], [the licensee] shall not provide access to source code and all provided access shall be restricted to screen access for the functions required." OREX_067 at 1. Oracle contends that this provision precludes the copying of open code, but failed to put forth any evidence concerning the meaning of the phrase "screen access." Mr. Lanchak testified extensively to the meaning of that phrase in the industry, *i.e.*, that "that is how third-party

service providers work"; they are "granted access, screen access to the functions that [they] need to perform," that is "certain permissions, certain access to certain portions of that system, i.e., the development environment," but not "the production environment."  Tr. 1312:14–1313:6.  If a licensee is outsourcing its "accounts payable function," then "screen access" comes in the form of access to "just the accounts payable function[] that [the third party] need[s] to perform [the] job."  Tr. 1313:7–11.  Mr. Lanchak testified unequivocally that "screen access" includes the ability "to modify and copy the open code."  Tr. 1313:12–1314:1.  Moreover, this provision prohibits access (not copying), and "access" is no longer prohibited by the Injunction.

86.     Oracle's position conflicts with the Ninth Circuit's holding that the *Rimini I* judgment does "not preclude Rimini from creating development environments for a licensee for various purposes after that licensee has become" a client.  879 F.3d at 957–58 (construing this Court's jury instructions and the language on which Rimini relies from Section 7(iii) of the license).  It is undisputed that creating a development environment requires copying open code. Tr. 1331:9–12.  Oracle's position therefore would override the Ninth Circuit's clear holding.

87.     In line with the Ninth Circuit's holding, this Court subsequently rejected Oracle's reading of the "[I]njunction to prohibit all distribution of Rimini [J.D. Edwards] updates to its clients" because that "*would be a complete ban on Rimini support services*," and "*[t]hat was neither the intention nor the purpose of the permanent injunction and such a reading would be outside its scope*."  OSC at 26 (emphasis added).  The Court finds that Oracle's reading of the Injunction to prohibit copying of J.D. Edwards open code likewise would be a complete ban on Rimini support services for J.D. Edwards clients.  Indeed, Oracle's current argument that the copying of open code is prohibited would encompass the distribution of J.D. Edwards updates, which the Court *already* held was an overbroad interpretation.

88.     Adopting Oracle's reading also would render superfluous the final clause of Paragraph 10 of the Injunction.  Paragraph 10 states that "Rimini shall not use a specific licensee's J.D. Edwards environment to develop and test software updates or modifications *for the benefit of any other licensee*."  (Emphasis added.)  Developing and testing updates necessarily requires copying open code.  If Oracle were correct that *all* developing and testing

of updates are prohibited, then Paragraph 10's prohibition on *cross-using* updates would be completely superfluous. Tr. 1330:3–1331:12.  In rejecting Oracle's prior attempts to secure a ban on Rimini's distribution of J.D. Edwards updates, the Court similarly held that Oracle's reading would "render other provision of the [I]njunction superfluous."  OSC at 26.  The same is true here.  At minimum, Rimini's position was reasonable.

89.     The Court alternatively holds that Oracle is estopped from asserting that the Injunction, which only prohibits *unlawful* conduct, prohibits Rimini from copying or altering open code, given its prior testimony (through its 30(b)(6) witness) that third-party support providers may lawfully make "source code changes" and "custom code" changes to the open code.  DTX-740 at 162:16–164:23; *see Union Pac. R.R. Co. v. Winecup Ranch, LLC*, 2020 WL 7125918, at *14 (D. Nev. Dec. 4, 2020) (Hicks, J.) (party cannot contradict 30(b)(6) witness).

## B.     Issue 9:  J.D. Edwards Technical Specification

90.     The Court asked the parties to address whether a Rimini J.D. Edwards technical specification "did in fact copy Oracle source code in violation of the permanent injunction." OSC at 25.  For the reasons stated as to Issue 7 (*supra* ¶¶ 74–89) and the additional reasons listed below, the Court finds that Oracle has failed to meet its burden on this issue.

### (i)     Findings of Fact on Issue 9

91.     It is undisputed that the characters in bold underline listed as examples from Rimini's technical specifications appear in Oracle's copyrighted files:  "** Add code lines before the "**If $CT3 <> $T3 OR**" conditional block**"; "Add code before the "**Write F06767 RECRUC**" code line"; "**VArpt_mnOrigRoth457b**…………**TH01="0""**; "**Math N………c To String**".  OREX_080 at 36; OREX_219; DTX-901 at 12 (emphases added).  The ellipses are not from Oracle's code, but were placed in the specification by Rimini engineers to *avoid* reproducing Oracle code.  Tr. 988:11–16.  It is undisputed that the non-elided characters are merely "markers" a developer uses once logged into the client's environment to indicate *where* to place the *Rimini-written code*.  Tr. 330:12–16, 334:24–335:23, 559:18–560:2, 987:12–988:10.  The markers are not executable (Tr. 560:3–7, 988:17–23) and represent only a handful of characters from two Oracle files that span roughly 13,000 lines of code (Tr. 561:7–14).

92.     The technical specification contains large amounts (nearly 50 pages) of Rimini-written code, and except for the markers, contains no other alleged Oracle expression. OREX_080; Tr. 984:20–985:1, 986:10–19, 986:23–987:5.

93.     Ms. Frederiksen-Cross did not perform a substantial similarity analysis on these characters.  Nor did she perform analytic dissection to determine whether the characters are protected expression.  Tr. 561:15–563:19.  The Court credits the opinion and testimony of Professor Astrachan, who, having analyzed the files, opined that the characters do not qualify as "code," are not protected expression, are not substantially similar to Oracle's copyrighted expression, and represent only a miniscule fraction of the Oracle files.  Tr. 990:16–993:20.

**(ii)     Conclusions of Law on Issue 9**

94.     Oracle has failed to establish that Rimini copied any *protected* Oracle expression—which is what Oracle *must* show to prove unlawful copying, and thus, a violation of the Injunction.  *See*, *e.g.*, *Apple*, 35 F.3d at 1443.  Even if Oracle had shown that the allegedly copied characters upon which Ms. Frederiksen-Cross relied were *protected* Oracle expression, any copying would be *de minimis*, and so not unlawful or a violation of the Injunction.  *See Newton*, 388 F.3d at 1193.  Finally, it was reasonable for Rimini to believe that the Injunction did not prohibit this lawful conduct.  *See Norton*, 717 F.2d at 774–75.

## IV.     ORACLE DATABASE (ISSUE 8)

95.     Oracle seeks to hold Rimini in contempt for the presence of a single Oracle Database file on Rimini's systems, sent to Rimini by a client.  Prior to the hearing, Oracle and its expert contended that the file was a *J.D. Edwards* file—and never claimed (as they did at the hearing) that the presence of the file on Rimini's systems violated Paragraph 15 of the Injunction.  *See* Tr. 349:5–24, 570:4–571:19.  Oracle's undisclosed theory of contempt fails on the facts and the law, and the Court finds that Rimini has not acted contumaciously.

**A.     Issue 8:  Oracle Database File Prvtsidx.plb**

**(i)     Findings of Fact on Issue 8**

96.     It is undisputed that prvtsidx.plb was on Rimini's systems, and that it was sent to Rimini by a client (Tr. 353:13–15, 566:6–9), as with the files involved in Issue 1.

Gibson, Dunn &
Crutcher LLP

97.     Ms. Frederiksen-Cross opined for the first time at the hearing that she understood Paragraph 15 prohibits Rimini from "ever" copying "Oracle Database software." Tr. 574:7–19.  But when asked whether she was "aware that the Court held, quote: 'Given the extensive record in this case and the Court's previous orders, it is clear that this provision,' paragraph 15, 'does not prohibit *all* copying of Oracle database,'" she conceded she was not and "did not recall that [instruction by the Court] in forming [her] opinions."  Tr. at 574:20– 575:4.

98.     Her theory "as to why this violates paragraph 15 of the injunction" is that "it's a copy of the file that is present on Rimini's system."  Tr. 571:2–6, 570:1–3, 572:2–12.  Yet the operative Oracle License and Services Agreement does not restrict where the licensee may store software.  DTX-725.  Oracle presented no evidence of any such restriction.  Tr. 366:16–367:3, 409:15–21.  Nor did it present evidence that, like the adjudicated conduct that led to Paragraph 15, Rimini downloaded Oracle Database under a developer license.  Tr. 575:18–22.

**(ii)     Conclusion of Law on Issue 8**

99.     Paragraph 15 does not prohibit *all* copying of Oracle Database; the Injunction only covers conduct already adjudicated unlawful.  OSC at 28, 33.  Oracle failed to present any evidence that this file was improperly downloaded pursuant to a developer license, and the evidence is to the contrary.  *Id.* at 27–28; Tr. 61:5–10.  The Court also rejects Oracle's attempts to read a "facilities" restriction into Paragraph 15 where none exists.  *Oracle USA, Inc. v. Rimini St., Inc.*, 783 F. App'x 707, 710 (9th Cir. 2019).  Nor could Rimini be held in contempt given this Court's and the Ninth Circuit's prior rulings and the lack of prohibition in the Injunction regarding having Oracle Database files on Rimini's systems.  *See Norton*, 717 F.2d at 774.

# V.     CONCLUSION

For the foregoing reasons, the Order to Show Cause is discharged.  The Court finds no additional violations of the Injunction, and the two violations the Court previously found do not warrant a finding of contempt.  Rimini is in substantial compliance with the Injunction and its challenged actions were based on good faith and reasonable interpretations of the Injunction.

Gibson, Dunn &
Crutcher LLP

1   Dated:  October 19, 2021

2                                           GIBSON, DUNN & CRUTCHER LLP

3

4                                           By:   /s/ Eric D. Vandevelde
                                                        Eric D. Vandevelde

5                                           *Attorneys for Defendant*
                                            *Rimini Street, Inc.*
6

7

8   IT IS SO ORDERED:

9   DATED:

10

11  _____
    LARRY R. HICKS
12  UNITED STATES DISTRICT JUDGE

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

RIMINI STREET, INC.'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW
CASE NO. 2:10-CV-00106-LRH-VCF

# APPENDIX A

## Cross-Reference Chart of Admitted Exhibits

**Appendix A to Rimini Street, Inc.'s Proposed Findings of Fact and Conclusions of Law**
*Rimini I* OSC Hearing – Cross-Reference Chart of Admitted Exhibits

The below chart can be used to cross-reference those exhibits that were admitted with both a DTX

number and an OREX number at the evidentiary hearing regarding the Order to Show Cause (ECF 1459).

| Rimini Exhibit | Description from Rimini Exhibit List | Beginning Bates | Oracle Exhibit |
|---|---|---|---|
| DTX-018 | Nov. 6, 2018 email from S. Ravin with subject "MUST READ: The 'On Again', 'Off Again' Injunction is Now ON AGAIN - Atty Client Priv Comm," *Rimini I* Dep. Ex. 1831 | RSI006850039 | OREX_019 |
| DTX-019 | Nov. 13, 2018 email from J. Benge with subject "PeopleSoft Injunction Compliance Notice," *Rimini I* Dep. Ex. 1832 | RSI006850037 | OREX_014 |
| DTX-020 | Nov. 10, 2018 email from R. Grigsby with subject "JD Edwards Injunction Compliance Notice," *Rimini I* Dep. Ex. 1833 | RSI006850025 | OREX_002 |
| DTX-025 | Document entitled "RSI Acceptable Use Policy.docx," *Rimini I* Dep. Ex. 1835 | RSI007115475 | OREX_017 |
| DTX-100 | Nov. 27, 2018 email chain with subject "FW: PSFT-G6 -- Status meeting- Updates," *Rimini I* Dep. Ex. 1852 | RSI007050433 | OREX_004 |
| DTX-210 | Jan 28, 2019 email with subject "[PeopleSoft - Matheson Trucking, Inc.] New Case Comment Notification: Case Number 00162054" | RSI007200750 | OREX_084 |
| DTX-236 | Jan. 28, 2019 email chain with subject "RE: SF case 162054, Matheson Trucking" | RSI007142189 | OREX_022 |
| DTX-302 | Jan. 24, 2019 email chain with subject "RE: [PeopleSoft - Johnson Controls, Inc.]P2 - Production Impacted Case # 00161783 : W2 Printing for Box 14 - xmlp is off" | RSI007075263 | OREX_023 |
| DTX-303 | Jan. 24, 2019 email chain with subject "RE: [PeopleSoft - Johnson Controls, Inc.]P2 - Production Impacted Case # 00161783 : W2 Prinfing for Box 14 - xmlp is off" | RSI007421994 | OREX_027 |
| DTX-405 | Jan. 25, 2019 email with subject "[PeopleSoft - Smead Manufacturing Company] New Case Comment Notification: Case Number 00161188" | RSI007035817 | OREX_081 |
| DTX-406 | Jan. 25, 2019 email with subject "[PeopleSoft - Randstad Professionals US, LP (SFN | RSI007036586 | OREX_082 |

**Appendix A to Rimini Street, Inc.'s Proposed Findings of Fact and Conclusions of Law**
*Rimini I* OSC Hearing – Cross-Reference Chart of Admitted Exhibits

| Rimini Exhibit | Description from Rimini Exhibit List | Beginning Bates | Oracle Exhibit |
|---|---|---|---|
| | Group/Spherion)] New Case Comment Notification: Case Number 00160772" | | |
| DTX-407 | Jan. 29, 2019 email chain with subject "RE: Doc Artifact HCM200049" | RSI007074143 | OREX_030 |
| DTX-501 | File with file name "RSPCMPAY.cbl" | RSI006952749 | OREX_237 |
| DTX-502 | File with file name "PSPTARRY.cbl" | ORCLRST00195795 | OREX_225 |
| DTX-608 | Software License and Services Agreement between PeopleSoft USA, Inc. and Easter Seals New Hampshire, Inc., *Rimini I* Dep. Ex. 1811 | ORCLRS0665229 | OREX_042 / OREX_310 |
| DTX-619 | File with file name "rsi1099i.sqr" | ESNHI3-SUB00000218 | OREX_040 |
| DTX-620 | File with file name "rsi1099m.sqr" | ESNHI3-SUB00000235 | OREX_041 |
| DTX-900 | File R89078652 | ORCLRS1360924 | OREX_220 |
| DTX-901 | Document entitled "JDE Tech Doc - US EFW2c 2018.docx" | RSI007981483 | OREX_072 |
| DTX-1002 | Screenshots of electronic record "PUSP-12669 – HCM200105 – US – Oregon Statewide Transit Payroll Tax Quarterly Reporting Eff 2018-10-31" (Jira) | | OREX_050 |
| DTX-1004 | Document entitled "HCM200105_ENV SS_New Clients" | RSI007899877 | OREX_049 |